EXECUTION VERSION

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release (the "Agreement") is made between and among Westborough SPE LLC ("SPE"), through Jonathan Goldsmith, Chapter 7 Trustee ("Trustee"); the Town of Westborough ("Town"); Ferris Development Group, LLC ("Ferris"); Lax Media LLC and Lax Media MA LLC (together, "Lax"); Nathanson & Goldberg, P.C. ("N&G"); and Durgaprasad Nagalla and Venkatesh Mohanraj, Trustees of The MobileStreet Trust, u/d/t dated December 11, 2014, recorded with the Worcester Registry of Deeds in Book 53141, Page 193 ("MobileStreet") (each a "Party" and all together the "Parties") as of the date on which the last Party signs the Agreement.

WHEREAS, in 1997, SPE acquired real property located at 231 Turnpike Road, Westborough, Massachusetts (the "Property");

WHEREAS, the Property is subject to a Declaration of Reciprocal Covenants, Easements and Restrictions concerning abutting real property owned by MobileStreet, recorded with the Worcester County Registry of Deeds at Book 18745, Page 313 (the "Reciprocal Covenants"), which Reciprocal Covenants run with the Property;

WHEREAS, on December 28, 2018, the Town recorded an instrument of taking on the Property and all improvements thereon pursuant to G.L. c. 60, §§ 53-54, as a result of unpaid FY2018 taxes in the amount of $106,944.99;

WHEREAS, on July 8, 2019, the Town filed a tax title foreclosure action with respect to the Property in the Massachusetts Land Court, Town of Westborough v. Westborough SPE, LLC, et al. (Mass. Land Ct. No. 19 TL 000768) (the "Tax Foreclosure Action");

WHEREAS, on January 5, 2022, the Land Court entered judgment in favor of the Town and against SPE in the Tax Foreclosure Action;

WHEREAS, on May 26, 2022, the Town issued a request for proposals for the purchase and redevelopment of the Property (the "RFP");

WHEREAS, the Town received proposals from Ferris, Lax, and Pulte Homes of New England, LLC in response to the RFP;

WHEREAS, the Town, by and through its Select Board, selected Lax's proposal to purchase the Property;

WHEREAS, in November 2022, Ferris filed suit against the Town and Lax in Massachusetts Superior Court for breach of implied contract, declaratory judgment, and injunctive relief as a result of the Town's selection of Lax's proposal, Ferris Development Group, LLC v. Town of Westborough, et al., Mass. Superior Court Case No. 2285CV0128 (the "30B Action");

EXECUTION VERSION

WHEREAS, on January 4, 2023, SPE filed* a Motion to Vacate the Tax Title Foreclosure Judgment in the Tax Foreclosure Action (the "Motion to Vacate"), which Motion to Vacate the Town opposed;

WHEREAS, N&G subsequently appeared in the Tax Foreclosure Action to represent SPE and prosecute the Motion to Vacate;

WHEREAS, on August 31, 2023, N&G commenced a civil action on behalf of SPE against the Town and the members of its Select Board arising out of the judgment entered in the Tax Foreclosure Action and the Town's subsequent efforts to sell the Property, Westborough SPE, LLC v. Town of Westborough, et al., U.S. Dist. Ct. (D. Mass.) Case No. 4:23-cv-12017 (the "Federal Action");

WHEREAS, on August 31, 2023, before the Land Court adjudicated the Motion to Vacate, N&G and MobileStreet filed an involuntary Chapter 7 petition (the "Involuntary Petition") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") against SPE, commencing the Chapter 7 Bankruptcy Proceeding, In re Westborough SPE, LLC, U.S. Bankr. Ct. (D. Mass.) Case No. 23-40709 (the "Bankruptcy Proceeding");

WHEREAS, on September 5, 2023, SPE filed* (through the same individual who filed the Motion to Vacate in the Tax Foreclosure Action) an answer consenting to the Involuntary Petition;

WHEREAS, on October 3, 2023, the Town filed a Motion for Relief from Automatic Stay (the "Motion for Relief") in the Bankruptcy Proceeding, in which the Town, inter alia, contended that the Property was no longer an asset of SPE;

WHEREAS, on October 11, 2023, the Bankruptcy Court entered an Order of Relief in the Bankruptcy Proceeding, after no parties having filed an objection to the entry of an Order for Relief;

WHEREAS, on October 12, 2023, the Bankruptcy Court appointed the Trustee to administer the assets and liabilities of SPE (the "Bankruptcy Estate");

WHEREAS, Ferris, N&G, and MobileStreet all filed proofs of claim against the Bankruptcy Estate;

WHEREAS, during a November 30, 2023 hearing on the Motion for Relief (which was continued), the Trustee raised the possibility of commencing an adversary proceeding to assert a claim against the Town pursuant to 11 U.S.C. § 548 to avoid the judgment entered in the Tax Foreclosure Action;

WHEREAS, on January 16, 2024, the Town filed a Motion to Dismiss the Bankruptcy Proceeding pursuant to 11 U.S.C. § 707(a) (the "Motion to Dismiss");

* The Town has disputed whether SPE has been properly revived and had the ability to file court papers.

EXECUTION VERSION

WHEREAS, the Trustee and other parties in interest have filed objections to the Motion to Dismiss;

WHEREAS, on January 17, 2024, the Trustee removed the Tax Foreclosure Action to an adversary proceeding in the Bankruptcy Court, Town of Westborough v. Westborough SPE, LLC, U.S. Bankr. Ct. (D. Mass.) Case No. 24-ap-04006;

WHEREAS, on February 7, 2024, the Town filed a Motion to Remand and/or Abstain from Hearing the Tax Foreclosure Action (the "Motion to Remand" and, with the Motion for Relief and Motion to Dismiss, the "Town's Motions");

WHEREAS, the Town's Motions remain pending before the Bankruptcy Court;

WHEREAS, the Parties intend to narrow or resolve the disputes between them concerning the Property, including to resolve all disputes between SPE and the Town;

NOW, THEREFORE, in consideration of the promises and covenants set forth below, and for other good and valuable consideration as set forth in this Agreement, the Parties agree as follows:

1. Motion to Approve: Upon execution of this Agreement, the Trustee shall file a motion to approve the settlement pursuant to Fed. R. Bankr. P. 9019 (the "Motion to Approve") in a form that is agreeable to all other Parties, each of whom shall assent to the Motion to Approve. The Motion to Approve shall expressly seek a final order from the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1) as this Agreement seeks to dispose of all claims and disputes between SPE and the Town concerning the Property.

2. Sale of the Property:

a. Within three (3) days following the expiration of the 14-day appeal period of the Bankruptcy Court's entry of a final order allowing the Motion to Approve, the Trustee shall file in the Bankruptcy Court a withdrawal of the Motion to Vacate in the Tax Foreclosure Action adversary proceeding; provided, however, that if the Tax Foreclosure Action has been remanded to the Land Court prior to that time, the Trustee shall file the withdrawal in the Land Court;

b. The Town and Lax shall have a period of one hundred twenty (120) days from the expiration of the 14-day appeal period of the Bankruptcy Court's entry of a final order allowing the Motion to Approve to complete the sale of the Property pursuant to the Town's selection of Lax's proposal in response to the RFP at the price of $2,500,001. In no event shall the Trustee or any other Party challenge, interfere with, or seek to unwind such sale. If any other Party challenges, interferes with, or seeks to unwind such sale, they shall be precluded from purchasing the Property from the Trustee in the event that Lax does not complete the sale.

c. In the event that a stay of the Bankruptcy Court's entry of a final order allowing the Motion to Approve pending appeal is entered, the time periods set forth in sections 2.a and 2.b above shall be paused while the stay is in place.

EXECUTION VERSION

d. In the event that Lax does not complete the purchase of the Property within the 120-day period (subject to section 2.c above), the Town agrees that the Trustee shall take the Property as part of the Bankruptcy Estate and may proceed to sell the Property to Ferris for the sale price of $2,875,000. In the event that Ferris fails to purchase the Property at the aforementioned sale price within 30 days from the expiration of the exclusive Lax sale period (set forth in section 2.b above), then the Trustee may proceed to sell the Property via a sale pursuant to 11 U.S.C. § 363. To the extent necessary to facilitate the Trustee's taking of the Property for this purpose, after the expiration of the 120-day Lax sale period (subject to section 2.c above), the Town will stipulate to conditionally vacate the tax title foreclosure judgment entered in the Tax Foreclosure Action solely for the purposes of permitting the Trustee to sell the Property, which stipulation shall be contingent upon the Bankruptcy Court's approval of any motion to sell, which motion shall be assented to by all Parties. If, for any reason, such sale does not take place, the judgment in the Tax Foreclosure Action shall not be vacated.

e. Whether the sale is to Lax, Ferris, or another party, the Property will be sold subject to (i) a permanent trail easement on the Property in the form attached hereto as **<u>Exhibit A</u>**; and (ii) the Reciprocal Covenants, such that necessary maintenance items arising under the Reciprocal Covenants which were not undertaken by MobileStreet prior to the closing but must be completed after the closing of any sale of the Property pursuant to this Agreement are not discharged under this Agreement and shall be the responsibility of the new owner of the Property. Notwithstanding, however, neither Lax nor Ferris shall be liable for any and all amounts due and owing under the Reciprocal Covenants prior to the closing upon Lax's or Ferris's purchase and sale of the Property.

f. If the Trustee sells the Property as set forth in section 2.d, the Town agrees to execute any and all documents reasonably requested by the Trustee or the buyer that may be necessary to convey title clear of the Town's tax lien or related such claims.

3. <u>Distribution of Sales Proceeds</u>: The Town shall receive the initial distribution from the sale of the Property pursuant to section 2 above in the amount of $1,165,000, which amount SPE, through the Trustee, stipulates is the amount due and owing to the Town (including legal fees) as a result of the tax lien and tax taking process, based on the Trustee's due diligence of materials the Town has provided to the Trustee. In the event that the Property is sold by the Trustee pursuant to section 2.d above but such sale is for less than this amount, the Trustee shall pay the Town the balance of this amount from the Bankruptcy Estate. Upon payment of this amount, the Town shall have no further claim against SPE or the Bankruptcy Estate. The Trustee's Motion to Approve (and, if necessary, any motion to sell the Property) shall include a provision reflecting this term so that the Bankruptcy Court's allowance of such motion(s) authorizes the distribution to the Town. The remaining proceeds of the sale will be tendered to the Trustee to be distributed to SPE's remaining creditors and other appropriate parties only after Bankruptcy Court approval and pursuant to the priorities codified in the Bankruptcy Code.

4. <u>Claims of Other Settling Creditors</u>:

a. If the Property is sold to anyone other than Ferris, Ferris shall be entitled to recover and be paid its expenses for preparing its bid to the Town in response to the RFP from the Bankruptcy Estate in the amount of $100,000, but shall have no claim to such expenses against the

EXECUTION VERSION

Town and shall have no claim for other damages regarding the Property against the Town and SPE or the Bankruptcy Estate. Notwithstanding this provision, in the event that the Trustee is ready to close on a sale of the Property to Ferris pursuant to section 2.d but Ferris is unable or unwilling to purchase the Property within the time frame noted in section 2.d above, then Ferris agrees to waive its $100,000 claim and any other claims it may hold against the Town and SPE or the Bankruptcy Estate, except for the proof of claim amount noted below. Ferris's $100,000 claim is in addition to, and not in lieu of, its $10,000 proof of claim filed in the Bankruptcy Proceeding which shall be deemed allowed upon approval of this Agreement. If the Property is sold to Ferris, Ferris waives any claim it has against the Town, SPE, or the Bankruptcy Estate, with the exception of its $10,000 proof of claim filed in the Bankruptcy Proceeding, which the Trustee shall pay from the Bankruptcy Estate. Ferris and its principals agree not to make any disparaging statements regarding the Town, or any elected or appointed official or any employee thereof, concerning the solicitation and evaluation of proposals submitted in response to the RFP, sale of the Property pursuant to this Agreement, or any proceedings relative thereto. The Town and its elected or appointed officials or employees agree not to make any disparaging statements regarding Ferris, its officer, directors, or employees concerning the solicitation and evaluation of proposals submitted in response to the RFP, sale of the Property pursuant to this Agreement, or any proceedings relative thereto.

b. MobileStreet agrees that any expenses or obligations MobileStreet has incurred under the Reciprocal Covenants prior to the closing of any sale of the Property pursuant to this Agreement may only be recovered from the Bankruptcy Estate through a verified and approved proof of claim and shall not be made as a claim against the Town, Lax, Ferris or any other purchaser of the Property. Prior to any closing on the sale of the Property, MobileStreet and the Trustee will be required to either file a joint pleading with the Bankruptcy Court agreeing to the amount of MobileStreet's claim against the Bankruptcy Estate or will have requested and obtained an Order from the Bankruptcy Court establishing the amount of such claim (hereinafter "MobileStreet Allowed Claim"). After the distribution to the Town set forth in section 3 above, the Trustee shall place in escrow funds in the amount of MobileStreet Allowed Claim for distribution to MobileStreet. Within 30 days of the closing on the sale of the Property, the Trustee will file a motion with the Bankruptcy Court seeking approval to distribute the funds to satisfy the MobileStreet Allowed Claim.

c. N&G's proof of claim against the Bankruptcy Estate shall be processed in the ordinary course.

5. Dismissal of Litigation: Within three (3) days of the Bankruptcy Court's allowance of the Motion to Approve,

a. SPE, through Trustee, will execute and file the voluntary notice of dismissal with prejudice attached hereto as **Exhibit B** in Federal Action; and

b. Ferris, the Town, and Lax will execute and file the voluntary stipulation of dismissal with prejudice attached hereto as **Exhibit C** in the 30B Action.

6. Mutual Release: The Parties, their members, managers, officers, directors, shareholders, partners, principals, agents, servants, employees, representatives, attorneys,

EXECUTION VERSION

affiliates, subsidiaries, predecessors, successors, insurers, sureties, heirs and assigns, executors and administrators, past and present (the "Releasors"), hereby each release and forever discharge each other, their respective officers, directors, shareholders, partners, principals, agents, servants, employees, representatives, attorneys, successors, assigns and affiliates, subsidiaries, predecessors, successors, insurers, sureties, heirs and assigns, executors and administrators, past and present and each of them (the "Releasees"), of and from any and all claims, actions, causes of action, debts, demands, costs, charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, and expenses (including attorneys' fees and costs actually incurred), whatsoever, of every name and nature, both in law and equity or otherwise, known or unknown, arising out of or related to the Property, at any time through the Effective Date of this Agreement, which the Releasors, or any one or more of them, had or now have, from the beginning of the world to the Effective Date, specifically including, without limitation, all claims that could have been raised in the Tax Foreclosure Action, the 30B Action, the Federal Action, or the Bankruptcy Proceeding, except as set forth herein with respect to any proof of claim filed by Ferris, N&G, or MobileStreet in the Bankruptcy Proceeding.

7. Zoning and Permitting: Nothing in this Agreement shall be construed as a waiver of any zoning, permitting, or other requirements concerning the Property under the Town's Bylaws or other applicable law. Any purchaser of the Property pursuant to the processes contemplated by section 2 above shall be required to satisfy any zoning, permitting, or other legal requirements necessitated by a particular use of the Property.

8. No Admission: This Agreement shall not constitute or be construed or deemed to be evidence of any admission or concession of liability by any of the Parties.

9. Entire Agreement: This Agreement contains the entire agreement among the Parties with regard to the matters set forth herein. There are no other understandings or agreements, verbal or otherwise, in relation thereto, among the Parties except as expressly set forth herein. This Agreement may not be changed, modified, supplemented, or terminated except by a written agreement executed by the Parties.

10. Representation by Counsel: By entering into this Agreement, the Parties represent that they have completely read all terms hereof, that they have been represented by counsel of their choice, and that such terms are fully understood and voluntarily accepted by them.

11. Governing Law: This Agreement shall be construed and interpreted in accordance with the laws of the Commonwealth of Massachusetts.

12. Jurisdiction: The Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, this Agreement, including but not limited to any claims that this Agreement has been breached by one of the Parties.

13. Miscellaneous: The Parties agree to cooperate fully and to execute any and all necessary supplementary documents and to take all additional actions that may be necessary or appropriate to give full force and effect to the intent of this Agreement, which are not inconsistent with its terms. This Agreement has been negotiated by the Parties and shall be construed as drafted by all Parties.

EXECUTION VERSION

14. Execution: This Agreement may be executed by facsimile or .pdf in one or more counterparts, each of which shall be deemed an original.

[*Signatures on following page*]

EXECUTION VERSION

IN WITNESS WHEREOF, the parties below have hereunto set their hands and seals, the dates below written.

WESTBOROUGH SPE LLC

By: Jonathan Goldsmith, Chapter 7 Trustee

Dated: 7/3, 2024

FERRIS DEVELOPMENT GROUP, LLC

By: David M. Ferris, its Manager

Dated: June 7, 2024

TOWN OF WESTBOROUGH

By Its Select Board:

Patrick Welch, Chair

Sean Keogh

Allen Edinberg

Ian Johnson

Shelby Marshall

Dated: 5/20, 2024

LAX MEDIA MA LLC

By: Jegan Gomangalam, Manager

Dated: July 8th, 2024

LAX MEDIA LLC

By: Jegan Gomangalam, Manager

Dated: July 8th, 2024

THE MOBILESTREET TRUST

By Its Trustees:

Durgaprasad Nagalla

Venkatesh Mohanraj

Dated: 05/30/2024, 2024

NATHANSON & GOLDBERG, P.C.

By: Jose Centeio, Partner

Dated: 5/22, 2024

905577/WBOR/0049

EXECUTION VERSION

# EXHIBIT A

## PERMANENT TRAIL EASEMENT

EASEMENT AGREEMENT

________________________, having an address of ______________________ ("Grantor"), hereby grants to **Westborough Community Land Trust, Inc.**, a Massachusetts not-for-profit corporation organized under M.G.L. c. 180, and having a mailing address of P.O. Box 838, Westborough, MA 01581 ("Grantee" or "WCLT"), with Quitclaim Covenants, for nominal consideration of One Dollar, a non-exclusive perpetual right and easement ("Trail Easement") to use, and to allow the public to enter and use, trails for public passage in, on, under and over a certain portion or portions of the property owned by the Grantor and located 231 Turnpike Road, Westborough, shown as Lot 1 on a plan recorded with the Worcester South District Registry of Deeds in Book 714, Page 77, containing 29 acres, more or less, according to said plan, and described in a deed recorded with said Deeds in Book ________, Page ______ (the "Property"):

1. Grantee and its agents and contractors shall have the right to clear, maintain, inspect, improve, repair, mark and use trails in, under, over, and across those portions of the Property shown as "Easement A", "Easement B", and "Easement C" (collectively, the "Trail Easement Area") on a plan entitled "________________________", prepared by _____________, dated ______________, 2024, recorded with said Registry herewith (the "Easement Plan"), a reduced copy of which Easement Plan is attached hereto as Exhibit A and incorporated herein, which trails may be up to twenty (20) feet wide.

2. Grantee shall have the nonexclusive right to permit the public to pass and repass over said Trail Easement Area for passive recreational purposes, including, without limitation, bicycling, walking, jogging, dog walking, cross-country skiing, snowshoeing, scenic enjoyment, and other outdoor passive recreational activities, subject to the following prohibitions:

(i) Access by motorized vehicles, including, without limitation, snowmobiles, dirt bikes, motorcycles and all-terrain vehicles, shall be prohibited; with the following exceptions:

(a) vehicles required by Grantee and/or heavy equipment to construct, improve relocate, maintain, repair, replace and patrol the Trail Easement Area;

(b) motorized wheelchairs and like vehicles or motorized devices for use by the disabled, including but not limited to those "Other Power-Driven Mobility Devices" (OPDMD) as defined by the US Access Board and complying with WCLT's guidance for these trails; and

(c) emergency vehicles on emergency calls or business;

(ii) Littering, picking or injuring plants or trees, injuring or harassing livestock or wildlife, building of fires, hunting and trapping shall be prohibited.

3. It is expressly acknowledged by, and is the express intention of, all parties hereto that the aforesaid recreational and other use(s) of the Trail Easement Area by the public shall be subject to and benefit from the protections guaranteed by G.L. c. 21, § 17C, commonly known as the Recreational Use Statute.

4. Grantee shall have the right, but not the obligation, from time to time, to cover or pave the trail surfaces by concrete, asphalt, wood chips, gravel, stone dust, or the like, at Grantee's sole cost and expense. Grantee shall obtain and bear any costs associated with obtaining permits required carry out future trail or trail-related improvements. Grantee, after notice to the Grantor, may also construct, maintain, repair and replace minor structures within the Trail Easement Area, such as benches, signage, boardwalks, screening, and other similar improvements, for the safety and/or convenience of persons using the trails.

5. Grantee shall have no right to assign this Trail Easement without prior written consent of a majority of the Grantors, provided, however, that no such consent shall be required for Grantee to assign this Trail Easement to the Town of Westborough.

6. The Grantee shall ensure that all contractors and/or subcontractors undertaking action on its behalf to construct or repair the trail and/or other improvements the Trail Easement Area have liability coverage to protect all Grantors and naming the Grantors as additional insureds, with the following coverages: (a) general liability insurance with a limit of liability of at least One Million Dollars ($1,000,000.00) per person and Two Million Dollars ($2,000,000.00) annual aggregate for property damage and at least One Million Dollars ($1,000,000.00) per occurrence for personal injury or property damage, (b) Automobile Liability Insurance for owned, hired and non-owned automobiles with limits of liability not less than One Million Dollars ($1000,000.00) combined single limit for each accident for bodily injury and property damage; and (c) Worker's compensation insurance as required by applicable law.

7. Grantee shall post the trails with notices stating the rules and regulations governing its use by the public, and stating further that the property over which it passes is private and that, in permitting its use by the public, the liability of the landowner is limited by Massachusetts General Laws Chapter 21, Section 17C, as amended.

8. During such times as Grantee invites public use of the trails, Grantee shall use reasonable efforts to maintain the trails in neat, clean and safe condition, free and clear of debris and litter. Grantee shall have the right and obligation to clear, prune, and remove vegetation, including trees and shrubs, remove fallen limbs or branches and mow vegetated areas in the Trail Easement Area, provided such cleared areas remain in a condition compatible with the natural surroundings, take measures to discourage littering and other acts that would encroach upon the natural features of the trail corridors or diminish its attractiveness, take steps to educate users in trail etiquette, and include guidelines for users in maps and other trail publications, all at Grantee's sole cost and expense.

9. At no time shall the public use of the trails unreasonably interfere with the rights of Grantor or the Grantor's respective successors or assigns to use the Property. In the event that such interference occurs, Grantor and Grantee shall meet to consider Grantor's concerns and use

reasonable good faith efforts to address such concerns, the extent of such efforts to be subject to appropriation and authorization, but only if and as applicable.

10. The Grantors and Grantee retain the right over time to jointly agree to relocate the Trail Easement as necessary or convenient to preserve the accessibility of the trail or its contiguity with other trails on Grantee's Land, or for any other reason, provided such relocation is duly effected by an instrument executed by the Grantors and Grantee, the instrument is duly recorded at the Registry of Deeds, and the trails and all other improvements made by Grantee to the Trail Easement Area is reconstructed at the sole cost of the party requesting the relocation.

11. In the event Grantee damages the Property outside of the Trail Easement Area and/or any improvements thereon, Grantee shall promptly restore the Property and/or the improvements to a condition substantially similar to the condition that existed immediately prior to the commencement of such damage, to the extent practicable.

12. The provisions of this easement, which is executed under seal, shall be binding upon and may be enforced against both the Grantors and Grantee and their respective successors and assigns.

13. Grantor shall have no responsibility to provide any maintenance, but Grantor shall repair any damage caused by the negligence or intentional misconduct of the Grantor and/or Grantor's agents, employees, contractors and/or invitees to the Trail Easement Area and/or the improvements thereon. Grantor agrees that neither Grantor nor Grantor's agents, employees, representatives and parties acting by or through the Grantor will unreasonably interfere with the access rights granted to Grantee hereunder.

14. Any consent to be granted by the Grantor hereunder shall not be unreasonably conditioned, delayed or withheld, and if Grantors do not respond to requests for consent made in writing by Grantee within thirty (30) days from the submission of such request or any additional information required by the Grantee, the requested work shall be deemed approved, subject to all other provisions hereof.

15. The Trail Easement hereby granted shall be in gross and is not for the benefit of or appurtenant to any particular land. The Grantee's interest in the Trail Easement shall be assignable to any governmental or any non-profit, non-governmental organization whose purposes include conservation of natural areas. The burden of this Trail Easement shall run with the land and shall be binding upon all future owners of any interest herein.

[signature page follows]

Witness my hand and seal this ___ day of __________, 2024.

**GRANTOR:**

______________________________

By: ________________________

Name:

Title:

not individually and without personal liability

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss.

On this ____ day of ___________, 2024, before me, the undersigned notary public, personally appeared ___________________, proved to me through satisfactory evidence of identification of satisfactory evidence of identification, which was ☐ photographic identification with signature issued by a federal or state governmental agency, ☐ oath or affirmation of a credible witness, ☐ personal knowledge of the undersigned, to be the persons whose name is signed on the preceding or attached document, and acknowledged to me that he/she/they signed it voluntarily for its stated purpose as ___________________________.

________________________________

Notary Public

My commission expires:

EXECUTION VERSION

# EXHIBIT B

## NOTICE OF VOLUNTARY DISMISSAL

**Westborough SPE LLC v. Town of Westborough, et al., U.S. District Court (D. Mass.) Case No. 4:23-cv-12017**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, SS. CASE NO. 4:23-cv-12017-MRG

| WESTBOROUGH SPE, LLC,<br><br>Plaintiff,<br><br>v.<br><br>TOWN OF WESTBOROUGH, et al.<br><br>Defendants. | NOTICE OF VOLUNTARY DISMISSAL |
|---|---|

NOW COMES Plaintiff Westborough SPE, LLC and hereby provides notice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i) that this action and all claims asserted therein are VOLUNTARILY DISMISSED with prejudice. All parties are to bear their own costs and waive any rights of appeal.

Respectfully submitted,

PLAINTIFF WESTBOROUGH SPE, LLC

By its Chapter 7 Trustee (Case No. 23-40709)

____________________________
Jonathan R. Goldsmith, Esq. (BBO# 548285)
GOLDSMITH, KATZ & ARGENIO, P.C.
1350 Main Street, Suite 1505
Springfield, MA 01103
Tel. (413) 747-0700

Certificate of Service

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non registered participants on ______________, 2024.

____________________________
Jonathan R. Goldsmith, Esq.

EXECUTION VERSION

# EXHIBIT C

## STIPULATION OF VOLUNTARY DISMISSAL

**Ferris Development Group, LLC v. Town of Westborough, et al.,**
**Mass. Superior Court Case No. 2285CV01281**

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

SUPERIOR COURT DEPARTMENT
CASE NO. 2285CV01281

FERRIS DEVELOPMENT GROUP, LLC,

Plaintiff,

v.

TOWN OF WESTBOROUGH, LAX MEDIA, LLC and LAX MEDIA MA, LLC.

Defendants.

STIPULATION OF VOLUNTARY DISMISSAL

NOW COME Plaintiff Ferris Development Group, LLC and Defendants Town of Westborough, Lax Media, LLC, and Lax Media MA, LLC and pursuant to Mass. R. Civ. P. 41(a)(1), hereby STIPULATE that this action and all claims asserted therein are VOLUNTARILY DISMISSED with prejudice. All parties are to bear their own costs and waive any rights of appeal.

Respectfully submitted,

PLAINTIFF

FERRIS DEVELOPMENT GROUP, LLC

By its attorney,

______________________________

Thomas A. Mullen (BBO# 360315)
Thomas A. Mullen, P.C.
40 Salem Street, Suite 12
Lynnfield, MA 01940
(781) 245-2284
tmullen@thomasamullenpc.com

DEFENDANT

TOWN OF WESTBOROUGH

By its attorneys,

______________________________

Thomas W. McEnaney (BBO# 629130)
Roger L. Smerage (BBO# 675388)
KP Law, P.C.
Town Counsel
101 Arch Street
12th Floor
Boston, MA 02110-1109
(617) 556-0007
tmcenaney@k-plaw.com
rsmerage@k-plaw.com

DEFENDANTS

LAX MEDIA, LLC and LAX MEDIA MA, LLC

By their attorney,

______________________________

Christopher M. Mulhearn (BBO# 628626)
Law Office of Christopher M. Mulhearn, Inc.
1300 Division Road, Suite 304
West Warwick, RI 02893
Tel.: (401) 533-9330
cmulhearn@mulhearnlawri.com

Dated: ____________, 2024

CERTIFICATE OF SERVICE

I, Roger L. Smerage, hereby certify that on the below date, I caused a copy of the foregoing Stipulation of Voluntary Dismissal to be served by electronic mail to the following counsel of record:

Thomas A. Mullen, Esq.
40 Salem Street
Building 2, Suite 12
Lynnfield, MA 01940
tmullen@thomasamullenpc.com
*Counsel for Plaintiff Ferris Development Group, LLC*

Christopher M. Mulhearn, Esq.
1300 Division Road, Suite 304
West Warwick, RI 02893
cmulhearn@mulhearnlawri.com
*Counsel for Defendants Lax Media, LLC and Lax Media MA, LLC*

Dated: _________________, 2024

______________________________
Roger L. Smerage

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re:<br><br>WESTBOROUGH SPE LLC<br><br>Debtor | ) | Chapter 7, No. 23-40709-CJP |

**MOTION OF CHAPTER 7 TRUSTEE FOR APPROVAL OF SETTLEMENT AGREEMENT**

Now comes JONATHAN R. GOLDSMITH, the duly appointed, qualified and acting Trustee in the above-captioned case ("Trustee"), and respectfully requests that this Court enter an Order approving the Settlement Agreement and Mutual Release ("Settlement") made between and among the Trustee acting on behalf of the Debtor's bankruptcy estate, the Town of Westborough ("Town"), Ferris Development Group, LLC ("Ferris"), Lax Media LLC and Lax Media MA LLC (together "Lax"), Nathanson & Goldberg, P.C. ("N&G"), and Durgaprasad Nagalla and Venkatesh Mohamraj, Trustees of the MobileStreet Trust ("MobileStreet") (collectively the "Parties"), pursuant to Federal Rule of Bankruptcy Procedure 9019 and MLBR 9019-1. In support of this Motion, the Trustee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. In summary, the Settlement is global in nature and completely and finally resolves all of the contested issues between and among the Parties surrounding the real estate located at 231 Turnpike Road, Westborough, Massachusetts ("Property"). The Property was titled in the name of the Debtor from 1997 to January 5, 2022, when judgment entered in a tax title foreclosure action initiated by the Town. The Settlement is contained in a document agreed to by all of the Parties, subject to the approval of this Court, which is attached to this Motion as Exhibit "A" and is intended to resolve various disputes arising out of and related to the entry of that judgment.

## GENERAL BACKGROUND

2. On August 31, 2023, an Involuntary Petition was filed against the Debtor under the provisions of Chapter 7 of the Bankruptcy Code; subsequently, an Order for Relief was entered on October 11, 2023.

3. On October 12, 2023, the Trustee accepted the appointment as Chapter 7 Trustee for the above-entitled estate.

4. The primary assets of the Bankruptcy Estate are: (i) funds from a checking account in the name of the Debtor that had been remitted to the California State Controllers Office by MUFG Union Bank in the amount of $1,293,646.83. These funds have now been remitted to the Trustee and are being held for the benefit of the Bankruptcy Estate; and (ii) any interest the Debtor may still have in the Property and/or claims of the Debtor against the Town related to its tax title foreclosure of the Property and subsequent efforts to sell the Property.

5. The path by which this bankruptcy case came to be commenced is somewhat convoluted, with a good portion of the background information having been noted in other pleadings filed in this case. In an effort to summarize the pertinent facts which support this Settlement, the Trustee notes the following:

(a) The Debtor, a Delaware limited liability company, had registered to do business in Massachusetts and acquired the Property in 1997.

(b) The Debtor's manager at the time it acquired the Property was Babcock & Brown Administrative Services, Inc. ("Babcock & Brown"). Babcock & Brown's president at the time was F. Jan Blaustein.

(c) The Trustee has been provided with an LLC Operating Agreement that indicates that Mignotte Investments Limited ("Mignotte"), a British Virgin Island entity, was the Debtor's sole member. The Trustee has not yet been

able to confirm the authenticity of this document including whether Mignotte is still the sole or even a Member of the Debtor and neither Mignotte nor any other party has come forward yet in this bankruptcy case to claim and validate a membership interest in the Debtor (this is important because there is a significant likelihood that this bankruptcy estate will have a surplus of funds available to the Debtor's equity owner(s) after payment of all expenses of administration and full payment on all allowed claims, even with such post-petition interest to which allowed claims may be entitled by contract or law).

(d) The last tenant at the Property was a Regal Cinema ("Regal"). It is believed that Regal's obligation under the corresponding lease of the Property required it to pay, inter alia, the property taxes as well as the obligation under a Reciprocal Covenant, Easement and Restriction as recorded in the Worcester County Registry of Deeds at Book 18745, Page 313 (hereinafter "Reciprocal Easement"). Upon information and belief, the lease expired in late 2017, at which time Regal vacated the Property and thereafter the property taxes were no longer being paid and the obligations under the Reciprocal Easement were no longer being met by the Debtor or anyone else on its behalf.

(e) From what the Trustee has ascertained, the Debtor, its manager and member had essentially (but not legally) abandoned the Property sometime shortly after the Regal lease expired.

(f) As a result of the delinquency in the payment of real estate taxes, the Town on December 28, 2018 recorded an instrument of Taking and commenced a Tax Foreclosure Action in the Massachusetts Land Court on July 8, 2019 ("Tax Foreclosure Action") to foreclose the Debtor's Right of Redemption.

(g) On January 5, 2022, the Land Court entered Judgment in favor of the Town and against the Debtor. Subsequent thereto, on May 26, 2022, the Town issued a request for proposals for the purchase and redevelopment of the Property.

(h) Upon information and belief, the following three bids were received: (i) Lax offered $2,500,001.00 and proposed opening a new movie theater; (ii) Ferris offered $2,875,000.00 and proposed re-developing the Property as a work-

share facility for tradespeople; and (iii) Pulte Homes of New England, LLC ("Pulte Homes") offered $7,942,000 and proposed converting the Property into a residential development featuring 108 condominium units. The Town, by a vote of its Select Board, elected to proceed with a sale of the Property to Lax upon completion of the Tax Foreclosure Action.

(i) Upon information and belief, one Denise Edwards ("Edwards") and one Lolonyon Akouete ("Akouete") are in the lost, abandoned, or escheated asset recovery business. Upon information and belief, within the last couple of years they came across notice of a bank account in the name of Westborough SPE LLC that had been turned over by MUFG Union Bank to the California State Controller's Office as abandoned or escheated property pursuant to California law. Prior to this time, the Trustee believes that neither Edwards nor Akouete had any knowledge of or connection with the Debtor or its member(s) or manager. The account being deemed as "unclaimed property" (hereinafter "Bank Account") had a balance of $1,293,646.83.

(j) It is also an important point that by letter dated February 8, 2023, the California State Controller denied the request of Akouete and Edwards to have the funds in the Bank Account turned over to them on behalf of the Debtor on the basis that the documents they presented were legally insufficient.

(k) Upon information and belief, Edwards and Akouete undertook an investigation to ascertain who owned/controlled the Debtor with a desire for them to garner a fee for the recovery of the funds in the Bank Account for the benefit of the Debtor. During the course of their efforts, Edwards and/or Akouete have submitted documents to the California State Controller's Office, the Massachusetts Land Court as well as this Court claiming that they are now the manger(s) of the Debtor having purportedly been granted/assigned this position by Babcock & Brown. That grant of authority to Edwards and/or Akouete was purportedly given to them by F. Jan Blaustein ("Blaustein") who at one time was believed to be the President of Babcock & Brown Administrative Service, Inc. However, Blaustein's mental capacity and her legal authority to grant such authority had been challenged.

(l) On January 4, 2023, Akouete, purporting to act on the Debtor's behalf as its Manager, filed a motion with the Land Court seeking to vacate the foreclosure judgment in the Tax Foreclosure Action ("Motion to Vacate"). The Town opposed the Motion to Vacate on several grounds, including whether Akouete and Edwards had actual authority to act on behalf of the Debtor.

(m) Upon information and belief, the Land Court was prepared to hold an evidentiary hearing on whether Akouete and/or Edwards had actual authority to act on behalf of the Debtor. Just prior to a pre-hearing conference in the Land Court scheduled for August 31, 2023, the involuntary bankruptcy petition was filed in this matter, which stayed the hearing.

(n) The Trustee subsequently removed the Tax Foreclosure Action to this Court, creating the Tax Foreclosure Adversary Proceeding [AP #24-04006]. The Town has moved to remand the Tax Foreclosure Action to the Land Court or, in the alternative, for this Court to abstain from hearing the Tax Foreclosure Action, on the basis that the Property is allegedly not an asset of the Debtor's bankruptcy estate. (The Town had previously moved for relief from the automatic stay on these grounds.)

(o) The Town has also moved to dismiss this bankruptcy proceeding in its entirety pursuant to 11 U.S.C. § 707(a) based, in part, on the actions of Akouete and/or Edwards with respect to the Debtor.

**<u>TERMS OF THE SETTLMENT</u>**

6. In light of the complex and often disputed factual and legal issues surrounding the Property, and the likelihood of years of litigation (and its attendant expense and uncertainty of result) that would be required for a complete and final judicial resolution of all contested matters regarding the Property and the Town's motion to dismiss, the Parties engaged in settlement negotiations which have resulted in the Settlement, which is comprehensive and global in nature and will pave the way for the Trustee to administer this bankruptcy case in a manner that reduces further delays and costs to the Bankruptcy Estate and is expected to

result in the fastest possible payment on allowed claims in this case. A summary of the terms of the Settlement (as set forth in Exhibit A, with any conflict between the summary below and Exhibit A to be resolved in favor of Exhibit A subject to the Parties' submission of any amendment to the Settlement to resolve such conflict) are as follows:

I. <u>Settlement of issues involving the Town:</u>

(a) Under the terms of the Settlement, the Town and Lax shall have a period of one hundred and twenty days (120) following the passage of 14 days after this Court's entry of an order allowing this Motion (hereinafter "Lax Exclusivity Period") to complete the sale of the Property to Lax for $2,500,0001.00 (hereinafter the "Lax Sale").

(b) The Town shall receive the proceeds of the Lax Sale the sum of $1,165,000.00 in full satisfaction of any claims the Town may hold against the Debtor or the Bankruptcy Estate. The balance of the Lax Sale proceeds ($1,335,000) will be turned over to the Trustee subject to distribution upon further order of this Court.

(c) Within (3) days following the expiration of 14 days after this Court's entry of an order allowing this Motion the following shall occur:

(i) The Trustee shall file in the Bankruptcy Court a withdrawal of the Debtor's Motion to Vacate Judgment in the Tax Foreclosure Action (provided, however, that if the Tax Foreclosure Action has been remanded to the Land Court prior to that time, the Trustee shall file a withdrawal of the Debtor's objection in the Land Court).

(ii) The Town will withdraw its Motion for Relief from Stay (Docket #20) and its Motion to Dismiss the Bankruptcy proceeding pursuant to 11 U.S.C. §707(a) (Docket #69), as well as its Motion to Remand and/or Abstain from Hearing Tax Foreclosure Action (AP #24-04006 Docket #2).

(iii) The Trustee on behalf of the Debtor shall execute and file a Voluntary Notice of Dismissal (with prejudice) in the Civil Action pending in the United States District Court for the District of Massachusetts, Worcester Division entitled: <u>*Westborough SPE, LLC v. Town of Westborough, et al.*</u>, Case No. 4:23-CV-12017-MR6.

(d) The Tax Foreclosure Action will be stayed except in the event that the sale to Lax does not occur as noted herein. In such an event, the Town will stipulate to conditionally vacate the Tax Foreclosure Action judgment solely for the purpose of permitting the Trustee to sell the Property, which stipulation shall be contingent upon the Bankruptcy Court's approval on any motion to sell, which motion shall be assented to by all Parties, provided that the Town's stipulation will conditionally vacate the Tax Foreclosure Action judgment enabling the Trustee to sell the Property to Ferris as provided in the Settlement (and summarized below) without further order of this Court. If, for any reason, such sale does not take place, the judgment in the Tax Foreclosure Action shall not be vacated. The Town will execute any documents necessary to convey clear title in the event of a Trustee sale.

II. <u>Settlement of issues with Ferris</u>.

(a) In the event that Lax does not complete the purchase of the Property within the Lax Exclusivity Period, the Trustee shall take the Property into the Bankruptcy Estate. The Trustee will then proceed to sell the Property to Ferris for the sale price of $2,875,000.00 with the protections provided under 11 U.S.C. §363(m), without further order of this Court upon allowance of this Motion.

(b) In the event that the Trustee sells the Property to Ferris under the terms noted above, then the Town shall receive from the sale proceeds a distribution of $1,165,000.00, which sum shall be in full satisfaction of any claims the Town may hold against the Debtor or the Bankruptcy Estate.

(c) In the event that Ferris fails to purchase the Property at the aforementioned sale price within 30 days from the expiration of the Lax Exclusivity Period, then the Trustee may proceed to sell the Property via a sale pursuant to 11 U.S.C. §363 subject to further Court procedures. In such event, the sale motion shall provide that the Town shall receive the first $1,165,000 of sale proceeds which sum shall be in full satisfaction of any claim the Town may hold against the Debtor or the Bankruptcy Estate.

(d) If the Property is sold to anyone other than Ferris, Ferris shall be entitled to be paid from the Bankruptcy Estate its expenses for preparing its bid to the Town in response

to the RFP in the agreed amount of $100,000.00, but shall have no claim for other damages regarding the Property against the Town, the Debtor or the Bankruptcy Estate other than its filed $10,000.00 proof of claim which shall be deemed an allowed claim in this bankruptcy case. Notwithstanding this provision, in the event that the Trustee is ready, willing and able to close on the sale of the Property to Ferris as set forth in the Settlement, but Ferris fails to timely close on the purchase of the Property, then Ferris shall waive its aforementioned $100,000.00 claim and any other claims it may hold against the Town, the Debtor or the Bankruptcy Estate, except for its filed $10,000.00 proof of claim which the Trustee shall pay from the Bankruptcy Estate at the time of other allowed unsecured claims.

(e) If the Property is sold to Ferris under the terms herein, then Ferris will waive its $100,000.00 claim asserted that it is entitled to recover from the Town for its expenses in preparing its bid to the Town in response to the RFP, and any other claim it may hold against the Town, the Debtor or the Bankruptcy Estate except for its filed $10,000.00 proof of claim which shall be deemed an allowed unsecured claim in this bankruptcy case.

(f) Within three (3) days following the expiration of 14 days after this Court's entry of an order allowing this Motion, Ferris, the Town, and Lax will execute and file a voluntary stipulation of dismissal with prejudice in the action pending in the Massachusetts Superior Court, Worcester County styled *Ferris Development Group, LLC v. Town of Westborough, Lax Media LLC and Lax Media MA, LLC.,* Mass. Superior Court, Case No. 2285CV0128.[1]

III. Property to be sold subject to:

Whether the sale of the Property is to Lax, Ferris or another party, the Property will be sold subject to: (i) a permanent trail easement on the Property in the form attached as Exhibit "A" to the Settlement (Exhibit A here); and (ii) Declaration of Reciprocal Covenants, Easements and Restriction concerning abutting real property owned by MobileStreet, recorded with the Worcester County Registry of Deeds at Book 18745,

[1] This lawsuit was commenced in an effort by Ferris to recover the funds it spent in preparing for and submitting its bid under the RFP.

Page 313, which said Reciprocal Covenants run with the Property. For purposes of clarity, the necessary maintenance items arising under the said Reciprocal Covenants which were not undertaken by MobileStreet prior to closing but must be completed after the closing of any sale of the Property pursuant to the Settlement, are not discharged under the Settlement and shall be the responsibility of the new owner of the Property. Notwithstanding, however, neither Lax nor Ferris shall be liable for any amounts due and owing under the said Reciprocal Covenants prior to the closing on Lax's or Ferris's purchase of the Property.

IV. Resolution of Issues with MobileStreet

(a) MobileStreet agrees that any expenses or obligations MobileStreet has incurred under the Reciprocal Covenants prior to the closing of any sale of the Property pursuant to the Settlement may only be recovered from the Bankruptcy Estate through a verified and approved proof of claim and shall not be made as a claim against the Town, Lax, Ferris or any other purchaser of the Property. Prior to any closing on the sale of the Property, MobileStreet and the Trustee will be required to either file a joint pleading with the Bankruptcy Court agreeing to the amount of MobileStreet's claim against the Bankruptcy Estate or will have requested and obtained an Order from the Bankruptcy Court establishing the amount of such claim (hereinafter "MobileStreet Allowed Claim")[2]. After the distribution to the Town as noted above, the Trustee shall place in escrow funds in the amount of the MobileStreet Allowed Claim for distribution to MobileStreet. Within 30 days of the closing on the sale of the Property, the Trustee will file a motion with the Bankruptcy Court seeking approval to distribute the funds to satisfy the MobileStreet Allowed Claim.

V. N & G

(a) N & G's proof of claim against the Bankruptcy Estate shall proceed in the ordinary course.

[2] The Trustee and MobileStreet have agreed to the amount of MobileStreet's claim in the sum of $374,934.60 as set forth in MobileStreet's Amended Proof of Claim filed with the Court on July 2, 2024.

VI. Mutual Release

(a) As part of the Settlement, the Parties will execute a Mutual Release except with respect to any proof of claim filed by Ferris, N & G or MobileStreet in the Bankruptcy case.

**REASONABLENESS OF THE SETTLEMENT**

7. In evaluating a settlement for the estate, a bankruptcy court should "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Jeffrey v. Desmond,* 70 F.3d 183, 185, *quoting In re GHR Cos.,* 50 B.R. 931 (Bankr. D. Mass. 1985). A Trustee's judgment concerning the justifications for a settlement is ordinarily provided some deference. *Hill v. Burdick (In re Moorhead Corp.),* 208 B.R. 87 (1st Cir. 1997); *In re FiberCore, Inc.,* 391 B.R. 647 (Bankr. D. Mass. 2008) (citations omitted).

8. The Trustee's duty in determining whether to settle claim is to reach an informed judgment, after diligent investigation, upon whether it would be prudent to eliminate inherent risks, delays and expense of prolonged litigation in an uncertain case. *In re C.R. Stone Concrete Contractors, Inc.,* 346 B.R. 32 (Bankr. D. Mass. 2006). As such, "[a] chapter 7 trustee is entrusted to marshal an estate's assets and liabilities, and proceed in settling its accounts on whatever grounds he, in his informed discretion, believes will net the maximum return for the creditors (on whose behalf he toils). When augmentation of an asset involves protracted investigation or potentially costly litigation, with no guarantee as to the outcome, the trustee must tread cautiously—and an inquiring court must accord him wide latitude should he conclude that the game is not worth the candle." *In re Mailman Steam Carpet Cleaning Corp.,* 212 F.3d 632 (1st Cir. 2000).

9. The Trustee believes that the Settlement is fair and reasonable in light of the history, complexities and circumstances surrounding the Property and the multiple lawsuits between competing claimants regarding the Property. In evaluating whether to enter into the Settlement, the Trustee has taken into consideration the following:

(a) Although the Trustee has not sought to solicit offers for the Property other than from Lax and Ferris, it is his belief that by the Town having proceeded with its RFP procedure pursuant to chapter 30B of the Massachusetts General Laws that the Ferris bid represents the current fair market value of the Property.[3]

(b) Irrespective if the Property is sold by the Town to Lax or by the Trustee to Ferris, the proceeds from the sale of the Property that are to be remitted to the Bankruptcy Estate coupled with the funds already held by the Bankruptcy Estate will total at least $2,500,000.00[4] which is expected to be sufficient to pay all allowed claims in this bankruptcy case in full.

(c) The difference in price between the Lax and Ferris bids is approximately $375,000. Although this difference is not insignificant, the Trustee avers that the costs and delays that would undoubtedly accrue if this Settlement had not been reached and the Trustee had to litigate the various issues raised by the Town, justify permitting the Town a period of exclusivity to try to complete the sale of the Property to Lax albeit at a price that is believed to be slightly lower than the fair market value, but which was the result of the Town's RFP procedure.

(d) The Trustee has also taken into consideration a potential fraudulent transfer action that he could pursue against the Town related to the Tax Foreclosure Action. However, the costs and delay of proceeding with this type of action, even if successful, weigh in favor of the Settlement.

(e) In his evaluation of this Settlement, the Trustee also recognized the costs that would be incurred by the Bankruptcy Estate if the Land Court Judgment was vacated, and the Property was redeemed by the Bankruptcy Estate. These costs would include: (i) insuring and securing the Property; (ii) the payment of the past real estate taxes (both those that accrued prior to the judgment and those that would have accrued after the date of the judgment had the Town not taken title to the Property) and interest thereon; and (iii) the payment of current property taxes until the Property is sold, as

---

[3] Although the Town did receive a much higher bid from Pulte Homes, it is believed that this bid had certain contingencies—including the need to secure residential water and sewer access that is not presently available at the Property—that at best would delay a sale for an extended period of time and it is highly questionable whether the contingencies could or would ever be satisfied.

[4] Although any tax obligation resulting from the sale of the Property is not known at this time, the Trustee still believes that there will be sufficient funds to pay all allowed claims, in full.

well as amounts due to MobileStreet under the Reciprocal Covenants. In other words, under no circumstances would the Bankruptcy Estate be entitled to recover the Property without paying the Town.

(f) The Settlement provides additional benefits to the Bankruptcy Estate in the form of avoiding the expenditure of costs associated with litigating the Town's various motions, as well as avoiding the risk that the Court might dismiss this bankruptcy proceeding entirely pursuant to the Town's motion to dismiss.

(g) The Trustee believes that, with the exception of the claims alleged by Akouete and Edwards, all creditors of the Bankruptcy Estate are either Parties to the Settlement or are not opposed to its terms.

(h) As noted in pleadings filed in this case, the claims and the purported position of Akouete and Edwards to act on behalf of the Debtor is disputed. Moreover, any legitimate party claiming to be the member(s) of the Debtor has neither come forward to appear in the bankruptcy proceedings nor appeared in the Tax Foreclosure Action. This leads the Trustee to believe that the member(s) of the Debtor have decided to abandon their interest in the Debtor. Nonetheless, to the extent that proceeds remain after payment of all allowed claims in the bankruptcy case, the Trustee will proceed with an interpleader action enabling parties to come forward to assert their valid right to the remaining proceeds as members of the Debtor.

10. In light of the foregoing, the Trustee avers this Settlement is in the best interest of the Bankruptcy Estate. Given the disputed status of the Property and the volume (and cost) of the litigation that will be required to augment that asset for the benefit of the Bankruptcy Estate, while still having to pay the Town to redeem the Property even if the Trustee succeeded in reviving the Debtor's right of redemption (whether through pursuit of the Motion to Vacate in the removed Tax Foreclosure Action or through an action for fraudulent transfer), the Trustee has concluded "that the game is not worth the candle," considering the finality and return for the Bankruptcy Estate (in terms of excess sales proceeds) that the Settlement yields. *In re Mailman Steam Carpet Cleaning Corp.*, 212 F.3d 632 (1st Cir. 2000).

WHEREFORE, the Trustee respectfully request that this Court enter an Order:

(i) granting the Motion approving the Settlement;

(ii) authorizing the Trustee to execute all documents necessary to effectuate the Settlement; and

(iii) grant such other and further relief as the Court deems just and proper.

JONATHAN R. GOLDSMITH, TRUSTEE IN BANKRUPTCY FOR WESTBOROUGH SPE LLC

Dated: 7/8/24

By: */s/ Jonathan R. Goldsmith, Esq.*

JONATHAN R. GOLDSMITH, ESQ.
(BBO No. 548285)
GOLDSMITH, KATZ & ARGENIO, P.C.
1350 Main Street, Suite 1505
Springfield, MA 01103
Tel: (413) 747-0700
Email: jgoldsmith@gkalawfirm.com

# *Exhibit "A"*

EXECUTION VERSION

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release (the "Agreement") is made between and among Westborough SPE LLC ("SPE"), through Jonathan Goldsmith, Chapter 7 Trustee ("Trustee"); the Town of Westborough ("Town"); Ferris Development Group, LLC ("Ferris"); Lax Media LLC and Lax Media MA LLC (together, "Lax"); Nathanson & Goldberg, P.C. ("N&G"); and Durgaprasad Nagalla and Venkatesh Mohanraj, Trustees of The MobileStreet Trust, u/d/t dated December 11, 2014, recorded with the Worcester Registry of Deeds in Book 53141, Page 193 ("MobileStreet") (each a "Party" and all together the "Parties") as of the date on which the last Party signs the Agreement.

WHEREAS, in 1997, SPE acquired real property located at 231 Turnpike Road, Westborough, Massachusetts (the "Property");

WHEREAS, the Property is subject to a Declaration of Reciprocal Covenants, Easements and Restrictions concerning abutting real property owned by MobileStreet, recorded with the Worcester County Registry of Deeds at Book 18745, Page 313 (the "Reciprocal Covenants"), which Reciprocal Covenants run with the Property;

WHEREAS, on December 28, 2018, the Town recorded an instrument of taking on the Property and all improvements thereon pursuant to G.L. c. 60, §§ 53-54, as a result of unpaid FY2018 taxes in the amount of $106,944.99;

WHEREAS, on July 8, 2019, the Town filed a tax title foreclosure action with respect to the Property in the Massachusetts Land Court, Town of Westborough v. Westborough SPE, LLC, et al. (Mass. Land Ct. No. 19 TL 000768) (the "Tax Foreclosure Action");

WHEREAS, on January 5, 2022, the Land Court entered judgment in favor of the Town and against SPE in the Tax Foreclosure Action;

WHEREAS, on May 26, 2022, the Town issued a request for proposals for the purchase and redevelopment of the Property (the "RFP");

WHEREAS, the Town received proposals from Ferris, Lax, and Pulte Homes of New England, LLC in response to the RFP;

WHEREAS, the Town, by and through its Select Board, selected Lax's proposal to purchase the Property;

WHEREAS, in November 2022, Ferris filed suit against the Town and Lax in Massachusetts Superior Court for breach of implied contract, declaratory judgment, and injunctive relief as a result of the Town's selection of Lax's proposal, Ferris Development Group, LLC v. Town of Westborough, et al., Mass. Superior Court Case No. 2285CV0128 (the "30B Action");

EXECUTION VERSION

WHEREAS, on January 4, 2023, SPE filed* a Motion to Vacate the Tax Title Foreclosure Judgment in the Tax Foreclosure Action (the "Motion to Vacate"), which Motion to Vacate the Town opposed;

WHEREAS, N&G subsequently appeared in the Tax Foreclosure Action to represent SPE and prosecute the Motion to Vacate;

WHEREAS, on August 31, 2023, N&G commenced a civil action on behalf of SPE against the Town and the members of its Select Board arising out of the judgment entered in the Tax Foreclosure Action and the Town's subsequent efforts to sell the Property, Westborough SPE, LLC v. Town of Westborough, et al., U.S. Dist. Ct. (D. Mass.) Case No. 4:23-cv-12017 (the "Federal Action");

WHEREAS, on August 31, 2023, before the Land Court adjudicated the Motion to Vacate, N&G and MobileStreet filed an involuntary Chapter 7 petition (the "Involuntary Petition") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") against SPE, commencing the Chapter 7 Bankruptcy Proceeding, In re Westborough SPE, LLC, U.S. Bankr. Ct. (D. Mass.) Case No. 23-40709 (the "Bankruptcy Proceeding");

WHEREAS, on September 5, 2023, SPE filed* (through the same individual who filed the Motion to Vacate in the Tax Foreclosure Action) an answer consenting to the Involuntary Petition;

WHEREAS, on October 3, 2023, the Town filed a Motion for Relief from Automatic Stay (the "Motion for Relief") in the Bankruptcy Proceeding, in which the Town, inter alia, contended that the Property was no longer an asset of SPE;

WHEREAS, on October 11, 2023, the Bankruptcy Court entered an Order of Relief in the Bankruptcy Proceeding, after no parties having filed an objection to the entry of an Order for Relief;

WHEREAS, on October 12, 2023, the Bankruptcy Court appointed the Trustee to administer the assets and liabilities of SPE (the "Bankruptcy Estate");

WHEREAS, Ferris, N&G, and MobileStreet all filed proofs of claim against the Bankruptcy Estate;

WHEREAS, during a November 30, 2023 hearing on the Motion for Relief (which was continued), the Trustee raised the possibility of commencing an adversary proceeding to assert a claim against the Town pursuant to 11 U.S.C. § 548 to avoid the judgment entered in the Tax Foreclosure Action;

WHEREAS, on January 16, 2024, the Town filed a Motion to Dismiss the Bankruptcy Proceeding pursuant to 11 U.S.C. § 707(a) (the "Motion to Dismiss");

* The Town has disputed whether SPE has been properly revived and had the ability to file court papers.

EXECUTION VERSION

WHEREAS, the Trustee and other parties in interest have filed objections to the Motion to Dismiss;

WHEREAS, on January 17, 2024, the Trustee removed the Tax Foreclosure Action to an adversary proceeding in the Bankruptcy Court, Town of Westborough v. Westborough SPE, LLC, U.S. Bankr. Ct. (D. Mass.) Case No. 24-ap-04006;

WHEREAS, on February 7, 2024, the Town filed a Motion to Remand and/or Abstain from Hearing the Tax Foreclosure Action (the "Motion to Remand" and, with the Motion for Relief and Motion to Dismiss, the "Town's Motions");

WHEREAS, the Town's Motions remain pending before the Bankruptcy Court;

WHEREAS, the Parties intend to narrow or resolve the disputes between them concerning the Property, including to resolve all disputes between SPE and the Town;

NOW, THEREFORE, in consideration of the promises and covenants set forth below, and for other good and valuable consideration as set forth in this Agreement, the Parties agree as follows:

1. Motion to Approve: Upon execution of this Agreement, the Trustee shall file a motion to approve the settlement pursuant to Fed. R. Bankr. P. 9019 (the "Motion to Approve") in a form that is agreeable to all other Parties, each of whom shall assent to the Motion to Approve. The Motion to Approve shall expressly seek a final order from the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1) as this Agreement seeks to dispose of all claims and disputes between SPE and the Town concerning the Property.

2. Sale of the Property:

a. Within three (3) days following the expiration of the 14-day appeal period of the Bankruptcy Court's entry of a final order allowing the Motion to Approve, the Trustee shall file in the Bankruptcy Court a withdrawal of the Motion to Vacate in the Tax Foreclosure Action adversary proceeding; provided, however, that if the Tax Foreclosure Action has been remanded to the Land Court prior to that time, the Trustee shall file the withdrawal in the Land Court;

b. The Town and Lax shall have a period of one hundred twenty (120) days from the expiration of the 14-day appeal period of the Bankruptcy Court's entry of a final order allowing the Motion to Approve to complete the sale of the Property pursuant to the Town's selection of Lax's proposal in response to the RFP at the price of $2,500,001. In no event shall the Trustee or any other Party challenge, interfere with, or seek to unwind such sale. If any other Party challenges, interferes with, or seeks to unwind such sale, they shall be precluded from purchasing the Property from the Trustee in the event that Lax does not complete the sale.

c. In the event that a stay of the Bankruptcy Court's entry of a final order allowing the Motion to Approve pending appeal is entered, the time periods set forth in sections 2.a and 2.b above shall be paused while the stay is in place.

EXECUTION VERSION

d. In the event that Lax does not complete the purchase of the Property within the 120-day period (subject to section 2.c above), the Town agrees that the Trustee shall take the Property as part of the Bankruptcy Estate and may proceed to sell the Property to Ferris for the sale price of $2,875,000. In the event that Ferris fails to purchase the Property at the aforementioned sale price within 30 days from the expiration of the exclusive Lax sale period (set forth in section 2.b above), then the Trustee may proceed to sell the Property via a sale pursuant to 11 U.S.C. § 363. To the extent necessary to facilitate the Trustee's taking of the Property for this purpose, after the expiration of the 120-day Lax sale period (subject to section 2.c above), the Town will stipulate to conditionally vacate the tax title foreclosure judgment entered in the Tax Foreclosure Action solely for the purposes of permitting the Trustee to sell the Property, which stipulation shall be contingent upon the Bankruptcy Court's approval of any motion to sell, which motion shall be assented to by all Parties. If, for any reason, such sale does not take place, the judgment in the Tax Foreclosure Action shall not be vacated.

e. Whether the sale is to Lax, Ferris, or another party, the Property will be sold subject to (i) a permanent trail easement on the Property in the form attached hereto as **Exhibit A**; and (ii) the Reciprocal Covenants, such that necessary maintenance items arising under the Reciprocal Covenants which were not undertaken by MobileStreet prior to the closing but must be completed after the closing of any sale of the Property pursuant to this Agreement are not discharged under this Agreement and shall be the responsibility of the new owner of the Property. Notwithstanding, however, neither Lax nor Ferris shall be liable for any and all amounts due and owing under the Reciprocal Covenants prior to the closing upon Lax's or Ferris's purchase and sale of the Property.

f. If the Trustee sells the Property as set forth in section 2.d, the Town agrees to execute any and all documents reasonably requested by the Trustee or the buyer that may be necessary to convey title clear of the Town's tax lien or related such claims.

3. Distribution of Sales Proceeds: The Town shall receive the initial distribution from the sale of the Property pursuant to section 2 above in the amount of $1,165,000, which amount SPE, through the Trustee, stipulates is the amount due and owing to the Town (including legal fees) as a result of the tax lien and tax taking process, based on the Trustee's due diligence of materials the Town has provided to the Trustee. In the event that the Property is sold by the Trustee pursuant to section 2.d above but such sale is for less than this amount, the Trustee shall pay the Town the balance of this amount from the Bankruptcy Estate. Upon payment of this amount, the Town shall have no further claim against SPE or the Bankruptcy Estate. The Trustee's Motion to Approve (and, if necessary, any motion to sell the Property) shall include a provision reflecting this term so that the Bankruptcy Court's allowance of such motion(s) authorizes the distribution to the Town. The remaining proceeds of the sale will be tendered to the Trustee to be distributed to SPE's remaining creditors and other appropriate parties only after Bankruptcy Court approval and pursuant to the priorities codified in the Bankruptcy Code.

4. Claims of Other Settling Creditors:

a. If the Property is sold to anyone other than Ferris, Ferris shall be entitled to recover and be paid its expenses for preparing its bid to the Town in response to the RFP from the Bankruptcy Estate in the amount of $100,000, but shall have no claim to such expenses against the

EXECUTION VERSION

Town and shall have no claim for other damages regarding the Property against the Town and SPE or the Bankruptcy Estate. Notwithstanding this provision, in the event that the Trustee is ready to close on a sale of the Property to Ferris pursuant to section 2.d but Ferris is unable or unwilling to purchase the Property within the time frame noted in section 2.d above, then Ferris agrees to waive its $100,000 claim and any other claims it may hold against the Town and SPE or the Bankruptcy Estate, except for the proof of claim amount noted below. Ferris's $100,000 claim is in addition to, and not in lieu of, its $10,000 proof of claim filed in the Bankruptcy Proceeding which shall be deemed allowed upon approval of this Agreement. If the Property is sold to Ferris, Ferris waives any claim it has against the Town, SPE, or the Bankruptcy Estate, with the exception of its $10,000 proof of claim filed in the Bankruptcy Proceeding, which the Trustee shall pay from the Bankruptcy Estate. Ferris and its principals agree not to make any disparaging statements regarding the Town, or any elected or appointed official or any employee thereof, concerning the solicitation and evaluation of proposals submitted in response to the RFP, sale of the Property pursuant to this Agreement, or any proceedings relative thereto. The Town and its elected or appointed officials or employees agree not to make any disparaging statements regarding Ferris, its officer, directors, or employees concerning the solicitation and evaluation of proposals submitted in response to the RFP, sale of the Property pursuant to this Agreement, or any proceedings relative thereto.

b. MobileStreet agrees that any expenses or obligations MobileStreet has incurred under the Reciprocal Covenants prior to the closing of any sale of the Property pursuant to this Agreement may only be recovered from the Bankruptcy Estate through a verified and approved proof of claim and shall not be made as a claim against the Town, Lax, Ferris or any other purchaser of the Property. Prior to any closing on the sale of the Property, MobileStreet and the Trustee will be required to either file a joint pleading with the Bankruptcy Court agreeing to the amount of MobileStreet's claim against the Bankruptcy Estate or will have requested and obtained an Order from the Bankruptcy Court establishing the amount of such claim (hereinafter "MobileStreet Allowed Claim"). After the distribution to the Town set forth in section 3 above, the Trustee shall place in escrow funds in the amount of MobileStreet Allowed Claim for distribution to MobileStreet. Within 30 days of the closing on the sale of the Property, the Trustee will file a motion with the Bankruptcy Court seeking approval to distribute the funds to satisfy the MobileStreet Allowed Claim.

c. N&G's proof of claim against the Bankruptcy Estate shall be processed in the ordinary course.

5. Dismissal of Litigation: Within three (3) days of the Bankruptcy Court's allowance of the Motion to Approve,

a. SPE, through Trustee, will execute and file the voluntary notice of dismissal with prejudice attached hereto as **Exhibit B** in Federal Action; and

b. Ferris, the Town, and Lax will execute and file the voluntary stipulation of dismissal with prejudice attached hereto as **Exhibit C** in the 30B Action.

6. Mutual Release: The Parties, their members, managers, officers, directors, shareholders, partners, principals, agents, servants, employees, representatives, attorneys,

EXECUTION VERSION

affiliates, subsidiaries, predecessors, successors, insurers, sureties, heirs and assigns, executors and administrators, past and present (the "Releasors"), hereby each release and forever discharge each other, their respective officers, directors, shareholders, partners, principals, agents, servants, employees, representatives, attorneys, successors, assigns and affiliates, subsidiaries, predecessors, successors, insurers, sureties, heirs and assigns, executors and administrators, past and present and each of them (the "Releasees"), of and from any and all claims, actions, causes of action, debts, demands, costs, charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, and expenses (including attorneys' fees and costs actually incurred), whatsoever, of every name and nature, both in law and equity or otherwise, known or unknown, arising out of or related to the Property, at any time through the Effective Date of this Agreement, which the Releasors, or any one or more of them, had or now have, from the beginning of the world to the Effective Date, specifically including, without limitation, all claims that could have been raised in the Tax Foreclosure Action, the 30B Action, the Federal Action, or the Bankruptcy Proceeding, except as set forth herein with respect to any proof of claim filed by Ferris, N&G, or MobileStreet in the Bankruptcy Proceeding.

7. Zoning and Permitting: Nothing in this Agreement shall be construed as a waiver of any zoning, permitting, or other requirements concerning the Property under the Town's Bylaws or other applicable law. Any purchaser of the Property pursuant to the processes contemplated by section 2 above shall be required to satisfy any zoning, permitting, or other legal requirements necessitated by a particular use of the Property.

8. No Admission: This Agreement shall not constitute or be construed or deemed to be evidence of any admission or concession of liability by any of the Parties.

9. Entire Agreement: This Agreement contains the entire agreement among the Parties with regard to the matters set forth herein. There are no other understandings or agreements, verbal or otherwise, in relation thereto, among the Parties except as expressly set forth herein. This Agreement may not be changed, modified, supplemented, or terminated except by a written agreement executed by the Parties.

10. Representation by Counsel: By entering into this Agreement, the Parties represent that they have completely read all terms hereof, that they have been represented by counsel of their choice, and that such terms are fully understood and voluntarily accepted by them.

11. Governing Law: This Agreement shall be construed and interpreted in accordance with the laws of the Commonwealth of Massachusetts.

12. Jurisdiction: The Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, this Agreement, including but not limited to any claims that this Agreement has been breached by one of the Parties.

13. Miscellaneous: The Parties agree to cooperate fully and to execute any and all necessary supplementary documents and to take all additional actions that may be necessary or appropriate to give full force and effect to the intent of this Agreement, which are not inconsistent with its terms. This Agreement has been negotiated by the Parties and shall be construed as drafted by all Parties.

EXECUTION VERSION

14. Execution: This Agreement may be executed by facsimile or .pdf in one or more counterparts, each of which shall be deemed an original.

[*Signatures on following page*]

EXECUTION VERSION

IN WITNESS WHEREOF, the parties below have hereunto set their hands and seals, the dates below written.

WESTBOROUGH SPE LLC

By: Jonathan Goldsmith, Chapter 7 Trustee

Dated: 7/3, 2024

FERRIS DEVELOPMENT GROUP, LLC

By: David M. Ferris, its Manager

Dated: June 7, 2024

TOWN OF WESTBOROUGH

By Its Select Board:

Patrick Welch, Chair

Sean Keogh

Allen Edinberg

Ian Johnson

Shelby Marshall

Dated: 5/20, 2024

LAX MEDIA MA LLC

By: Jegan Gomangalam, Manager

Dated: July 8th, 2024

LAX MEDIA LLC

By: Jegan Gomangalam, Manager

Dated: July 8th, 2024

THE MOBILESTREET TRUST

By Its Trustees:

Durgaprasad Nagalla

Venkatesh Mohanraj

Dated: 05/30/2024, 2024

NATHANSON & GOLDBERG, P.C.

By: Jose Centeio, Partner

Dated: 5/22, 2024

905577/WBOR/0049

EXECUTION VERSION

# EXHIBIT A

## PERMANENT TRAIL EASEMENT

EASEMENT AGREEMENT

________________________, having an address of ______________________ ("Grantor"), hereby grants to **Westborough Community Land Trust, Inc.**, a Massachusetts not-for-profit corporation organized under M.G.L. c. 180, and having a mailing address of P.O. Box 838, Westborough, MA 01581 ("Grantee" or "WCLT"), with Quitclaim Covenants, for nominal consideration of One Dollar, a non-exclusive perpetual right and easement ("Trail Easement") to use, and to allow the public to enter and use, trails for public passage in, on, under and over a certain portion or portions of the property owned by the Grantor and located 231 Turnpike Road, Westborough, shown as Lot 1 on a plan recorded with the Worcester South District Registry of Deeds in Book 714, Page 77, containing 29 acres, more or less, according to said plan, and described in a deed recorded with said Deeds in Book ________, Page ______ (the "Property"):

1. Grantee and its agents and contractors shall have the right to clear, maintain, inspect, improve, repair, mark and use trails in, under, over, and across those portions of the Property shown as "Easement A", "Easement B", and "Easement C" (collectively, the "Trail Easement Area") on a plan entitled "________________________", prepared by _____________, dated ______________, 2024, recorded with said Registry herewith (the "Easement Plan"), a reduced copy of which Easement Plan is attached hereto as Exhibit A and incorporated herein, which trails may be up to twenty (20) feet wide.

2. Grantee shall have the nonexclusive right to permit the public to pass and repass over said Trail Easement Area for passive recreational purposes, including, without limitation, bicycling, walking, jogging, dog walking, cross-country skiing, snowshoeing, scenic enjoyment, and other outdoor passive recreational activities, subject to the following prohibitions:

(i) Access by motorized vehicles, including, without limitation, snowmobiles, dirt bikes, motorcycles and all-terrain vehicles, shall be prohibited; with the following exceptions:

(a) vehicles required by Grantee and/or heavy equipment to construct, improve relocate, maintain, repair, replace and patrol the Trail Easement Area;

(b) motorized wheelchairs and like vehicles or motorized devices for use by the disabled, including but not limited to those "Other Power-Driven Mobility Devices" (OPDMD) as defined by the US Access Board and complying with WCLT's guidance for these trails; and

(c) emergency vehicles on emergency calls or business;

(ii) Littering, picking or injuring plants or trees, injuring or harassing livestock or wildlife, building of fires, hunting and trapping shall be prohibited.

3. It is expressly acknowledged by, and is the express intention of, all parties hereto that the aforesaid recreational and other use(s) of the Trail Easement Area by the public shall be subject to and benefit from the protections guaranteed by G.L. c. 21, § 17C, commonly known as the Recreational Use Statute.

4. Grantee shall have the right, but not the obligation, from time to time, to cover or pave the trail surfaces by concrete, asphalt, wood chips, gravel, stone dust, or the like, at Grantee's sole cost and expense. Grantee shall obtain and bear any costs associated with obtaining permits required carry out future trail or trail-related improvements. Grantee, after notice to the Grantor, may also construct, maintain, repair and replace minor structures within the Trail Easement Area, such as benches, signage, boardwalks, screening, and other similar improvements, for the safety and/or convenience of persons using the trails.

5. Grantee shall have no right to assign this Trail Easement without prior written consent of a majority of the Grantors, provided, however, that no such consent shall be required for Grantee to assign this Trail Easement to the Town of Westborough.

6. The Grantee shall ensure that all contractors and/or subcontractors undertaking action on its behalf to construct or repair the trail and/or other improvements the Trail Easement Area have liability coverage to protect all Grantors and naming the Grantors as additional insureds, with the following coverages: (a) general liability insurance with a limit of liability of at least One Million Dollars ($1,000,000.00) per person and Two Million Dollars ($2,000,000.00) annual aggregate for property damage and at least One Million Dollars ($1,000,000.00) per occurrence for personal injury or property damage, (b) Automobile Liability Insurance for owned, hired and non-owned automobiles with limits of liability not less than One Million Dollars ($1000,000.00) combined single limit for each accident for bodily injury and property damage; and (c) Worker's compensation insurance as required by applicable law.

7. Grantee shall post the trails with notices stating the rules and regulations governing its use by the public, and stating further that the property over which it passes is private and that, in permitting its use by the public, the liability of the landowner is limited by Massachusetts General Laws Chapter 21, Section 17C, as amended.

8. During such times as Grantee invites public use of the trails, Grantee shall use reasonable efforts to maintain the trails in neat, clean and safe condition, free and clear of debris and litter. Grantee shall have the right and obligation to clear, prune, and remove vegetation, including trees and shrubs, remove fallen limbs or branches and mow vegetated areas in the Trail Easement Area, provided such cleared areas remain in a condition compatible with the natural surroundings, take measures to discourage littering and other acts that would encroach upon the natural features of the trail corridors or diminish its attractiveness, take steps to educate users in trail etiquette, and include guidelines for users in maps and other trail publications, all at Grantee's sole cost and expense.

9. At no time shall the public use of the trails unreasonably interfere with the rights of Grantor or the Grantor's respective successors or assigns to use the Property. In the event that such interference occurs, Grantor and Grantee shall meet to consider Grantor's concerns and use

reasonable good faith efforts to address such concerns, the extent of such efforts to be subject to appropriation and authorization, but only if and as applicable.

10. The Grantors and Grantee retain the right over time to jointly agree to relocate the Trail Easement as necessary or convenient to preserve the accessibility of the trail or its contiguity with other trails on Grantee's Land, or for any other reason, provided such relocation is duly effected by an instrument executed by the Grantors and Grantee, the instrument is duly recorded at the Registry of Deeds, and the trails and all other improvements made by Grantee to the Trail Easement Area is reconstructed at the sole cost of the party requesting the relocation.

11. In the event Grantee damages the Property outside of the Trail Easement Area and/or any improvements thereon, Grantee shall promptly restore the Property and/or the improvements to a condition substantially similar to the condition that existed immediately prior to the commencement of such damage, to the extent practicable.

12. The provisions of this easement, which is executed under seal, shall be binding upon and may be enforced against both the Grantors and Grantee and their respective successors and assigns.

13. Grantor shall have no responsibility to provide any maintenance, but Grantor shall repair any damage caused by the negligence or intentional misconduct of the Grantor and/or Grantor's agents, employees, contractors and/or invitees to the Trail Easement Area and/or the improvements thereon. Grantor agrees that neither Grantor nor Grantor's agents, employees, representatives and parties acting by or through the Grantor will unreasonably interfere with the access rights granted to Grantee hereunder.

14. Any consent to be granted by the Grantor hereunder shall not be unreasonably conditioned, delayed or withheld, and if Grantors do not respond to requests for consent made in writing by Grantee within thirty (30) days from the submission of such request or any additional information required by the Grantee, the requested work shall be deemed approved, subject to all other provisions hereof.

15. The Trail Easement hereby granted shall be in gross and is not for the benefit of or appurtenant to any particular land. The Grantee's interest in the Trail Easement shall be assignable to any governmental or any non-profit, non-governmental organization whose purposes include conservation of natural areas. The burden of this Trail Easement shall run with the land and shall be binding upon all future owners of any interest herein.

[signature page follows]

Witness my hand and seal this ___ day of __________, 2024.

**GRANTOR:**

______________________________

By: ________________________

Name:

Title:

not individually and without personal liability

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss.

On this ____ day of ___________, 2024, before me, the undersigned notary public, personally appeared ____________________, proved to me through satisfactory evidence of identification of satisfactory evidence of identification, which was ☐ photographic identification with signature issued by a federal or state governmental agency, ☐ oath or affirmation of a credible witness, ☐ personal knowledge of the undersigned, to be the persons whose name is signed on the preceding or attached document, and acknowledged to me that he/she/they signed it voluntarily for its stated purpose as ___________________________.

________________________________

Notary Public

My commission expires:

EXECUTION VERSION

# EXHIBIT B

## NOTICE OF VOLUNTARY DISMISSAL

**<u>Westborough SPE LLC</u> v. <u>Town of Westborough, et al</u>.,**
**U.S. District Court (D. Mass.) Case No. 4:23-cv-12017**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, SS. CASE NO. 4:23-cv-12017-MRG

WESTBOROUGH SPE, LLC,

Plaintiff,

v.

TOWN OF WESTBOROUGH, et al.

Defendants.

NOTICE OF VOLUNTARY DISMISSAL

NOW COMES Plaintiff Westborough SPE, LLC and hereby provides notice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i) that this action and all claims asserted therein are VOLUNTARILY DISMISSED with prejudice. All parties are to bear their own costs and waive any rights of appeal.

Respectfully submitted,

PLAINTIFF WESTBOROUGH SPE, LLC

By its Chapter 7 Trustee (Case No. 23-40709)

____________________________

Jonathan R. Goldsmith, Esq. (BBO# 548285)
GOLDSMITH, KATZ & ARGENIO, P.C.
1350 Main Street, Suite 1505
Springfield, MA 01103
Tel. (413) 747-0700

Certificate of Service

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non registered participants on ______________, 2024.

____________________________

Jonathan R. Goldsmith, Esq.

EXECUTION VERSION

**EXHIBIT C**

**STIPULATION OF VOLUNTARY DISMISSAL**

**Ferris Development Group, LLC v. Town of Westborough, et al., Mass. Superior Court Case No. 2285CV01281**

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

SUPERIOR COURT DEPARTMENT
CASE NO. 2285CV01281

| | |
|---|---|
| FERRIS DEVELOPMENT GROUP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>TOWN OF WESTBOROUGH, LAX MEDIA, LLC and LAX MEDIA MA, LLC.<br><br>Defendants. | STIPULATION OF VOLUNTARY DISMISSAL |

NOW COME Plaintiff Ferris Development Group, LLC and Defendants Town of Westborough, Lax Media, LLC, and Lax Media MA, LLC and pursuant to Mass. R. Civ. P. 41(a)(1), hereby STIPULATE that this action and all claims asserted therein are VOLUNTARILY DISMISSED with prejudice. All parties are to bear their own costs and waive any rights of appeal.

Respectfully submitted,

PLAINTIFF

FERRIS DEVELOPMENT GROUP, LLC

By its attorney,

_______________________________

Thomas A. Mullen (BBO# 360315)
Thomas A. Mullen, P.C.
40 Salem Street, Suite 12
Lynnfield, MA 01940
(781) 245-2284
tmullen@thomasamullenpc.com

DEFENDANT

TOWN OF WESTBOROUGH

By its attorneys,

_______________________________

Thomas W. McEnaney (BBO# 629130)
Roger L. Smerage (BBO# 675388)
KP Law, P.C.
Town Counsel
101 Arch Street
12th Floor
Boston, MA 02110-1109
(617) 556-0007
tmcenaney@k-plaw.com
rsmerage@k-plaw.com

DEFENDANTS

LAX MEDIA, LLC and LAX MEDIA MA, LLC

By their attorney,

_______________________________

Christopher M. Mulhearn (BBO# 628626)
Law Office of Christopher M. Mulhearn, Inc.
1300 Division Road, Suite 304
West Warwick, RI 02893
Tel.: (401) 533-9330
cmulhearn@mulhearnlawri.com

Dated: _____________, 2024

CERTIFICATE OF SERVICE

I, Roger L. Smerage, hereby certify that on the below date, I caused a copy of the foregoing Stipulation of Voluntary Dismissal to be served by electronic mail to the following counsel of record:

Thomas A. Mullen, Esq.
40 Salem Street
Building 2, Suite 12
Lynnfield, MA 01940
tmullen@thomasamullenpc.com
*Counsel for Plaintiff Ferris Development Group, LLC*

Christopher M. Mulhearn, Esq.
1300 Division Road, Suite 304
West Warwick, RI 02893
cmulhearn@mulhearnlawri.com
*Counsel for Defendants Lax Media, LLC and Lax Media MA, LLC*

Dated: ________________, 2024

______________________________
Roger L. Smerage

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) | |
| | ) | |
| Debtor. | ) | |

OPPOSITION OF CREDITOR LOLONYON AKOUETE TO MOTION OF CHAPTER 7 TRUSTEE FOR APPROVAL OF SETTLEMENT AGREEMENT

Now comes Lolonyon Akouete, a creditor of Westborough SPE LLC ("Debtor"), and respectfully submits this Opposition to the Motion of Chapter 7 Trustee for Approval of Settlement Agreement ("Motion") and states as follows:

## PRELIMINARY STATEMENT

The proposed settlement does not serve the best interests of the creditors or the bankruptcy estate. It undervalues the Debtor's primary asset, fails to maximize the return for creditors, and improperly grants an exclusive sale period to a lower bidder. This Court should reject the Motion and require a competitive bidding process to ensure the highest possible return for the estate.

## GROUNDS FOR OPPOSITION

### 1. Failure to Maximize Asset Value

The Trustee proposes to sell the property to Lax Media LLC for $2,500,001, despite having received higher bids from Ferris Development Group ($2,875,000) and Pulte Homes of New England, LLC ($7,942,000). By not pursuing the highest offer, the Trustee is not fulfilling his fiduciary duty to maximize the value of the estate for the benefit of creditors. Other offers previously received include $4 million from Grossman Development of Southboro, $3.1 million from Cinema World of Florida, and another $2.5 million bid from Black Socks Corp.

Even though Michael Travaline from Pulte Homes was willing to discuss his offer with the Trustee and clarify any contingency they had, the Trustee refused to consider any other offers, sticking to the Town's opinions against Pulte Homes' offer. The Trustee's action does not indicate a diligent investigation. **See Exhibit 1**.

### 2. Unjustified Exclusivity Period

The settlement proposal granting Lax Media LLC a 120-day exclusivity period to complete the purchase of the property is deeply problematic. This exclusivity period stifles competition by precluding other potential buyers from making competitive offers during this time. As a result, the property may not be sold at its highest possible value, ultimately diminishing the amount realized from the sale. Without the pressure of competing bids, Lax Media has less incentive to offer a price that reflects the true market value, which is detrimental to the estate and its creditors.

Furthermore, the financial terms outlined in the settlement raise significant concerns. The Town of Westborough's initial sale price of $2,500,000.01 to Lax Media is notably lower than Ferris Development's subsequent offer of $2,875,000. This means that Ferris Development is willing to pay $375,000 more for the property. Additionally, Ferris Development has committed to completing the purchase within 30 days, compared to the 120 days given to Lax Media. The stark difference between these two offers suggests that the initial offer from Lax Media is not in the best interest of the estate. The additional time granted to Lax Media further delays the potential realization of proceeds from the sale, which could be used to settle claims and debts more quickly.

Adding to the inconsistency, the Town of Westborough had previously accepted a bid of $5,005,005 from Lax Media in November 2018. This earlier bid was significantly higher than the current proposed sale price of $2,500,000.01, raising questions about the justification for the reduced offer and the fairness of the current settlement terms.

The proposal also includes a clause for compensating Ferris Development with $100,000 to cover its fees and expenses if Lax Media successfully purchases the property. This compensation, sourced from the estate’s sale proceeds, unnecessarily burdens the estate, diverting funds that could be used to settle more debts and claims. The fact that Ferris Development waives this fee if they ultimately purchase the property further indicates that this expense is not essential but an additional financial strain on the estate.

The structure of this proposal could lead to several adverse outcomes, including a delayed sale process and increased costs. The exclusivity period and subsequent contingencies are likely to prolong the sale process, which is not beneficial for the estate or its creditors. Moreover, the additional financial arrangements, such as the $100,000 compensation, add unnecessary costs, reducing the overall proceeds available for settling claims and debts.

This settlement falls below the lowest point of reasonableness. It is not fair nor equitable and it is not in the best interests of the estate.

### 3. Lack of Comprehensive Market Testing

The Trustee has not conducted a comprehensive market testing process. The reliance on the Town's RFP process, which resulted in selecting a lower bid, demonstrates a lack of diligence in seeking out the highest and best offers for the property.

Market testing is essential to ensure that the property is sold at its highest and best value, reflecting current market conditions. The property was appraised at $4,790,000 on August 3, 2018, but market dynamics have likely shifted since then. Without comprehensive market testing, there's a significant risk of underselling the property, leading to a potential loss of equity for the creditors and the estate. A new appraisal or at least a Broker Price Opinion (BPO) is crucial to provide an updated and accurate valuation, considering recent economic trends, and changes in the local real estate market.

#### Historical Examples Highlighting the Need for Market Testing:

In a letter addressed to Steven Ellis, the Town Administrator of Montague, George Xenakis, Director of Investigations, addressed concerns regarding the town's handling of a property sale. The property in question, identified as Lot F, was subject to an investigation by the Office of the Inspector General due to alleged violations of Chapter 30B of the Massachusetts General Laws during its attempted sale in 2018. The Office highlighted two primary issues:

- **Property Valuation:** Montague had undervalued Lot F at $5,100 based on outdated information from a mapping system, whereas a 2018 appraisal by Patriot Properties, Inc. valued it at $20,200. This use of outdated data violated the requirements of Chapter 30B, which mandates property valuations to follow procedures accepted by the appraising profession.
- **Restrictive Requirement:** The town's Request for Proposals (RFP) for Lot F only allowed owners of abutting properties to bid, effectively limiting eligible bidders to one. This restriction conflicted with the principles of a fair and competitive bidding process required by law. After receiving only one bid of $1,000 from the sole eligible abutter, the town rejected the bid and canceled the RFP. The letter advises that any future attempts to sell the property should adhere strictly to the legal requirements outlined in Chapter 30B. **See Exhibit 2**.

In 2002, the Office of the Inspector General (OIG) reviewed the City of Revere's processes involving the disposition and reacquisition of a property known as the "Surf Site." This review was prompted by a request from Mayor Thomas Ambrosino, who sought to avoid past missteps in future real property dispositions. Key findings included:

- **Initial Sale and Valuation:** Despite the property being appraised at $530,000, the City agreed to sell it to Condits Hall Associates LP (CHA) for $200,000. The limited interest from other developers and anticipated costs CHA would incur in infrastructure improvements were cited as justifications, but the OIG found the RFP process restrictive and lacking broader competitive interest.
- **Subsequent Transactions and Development Failures:** CHA sold the site in 1998 for $2.842 million without starting construction, highlighting a lack of competition and a flawed RFP process.

The OIG recommended improving RFP criteria, extending advertising to attract more developers, and including terms to secure the city's interests. **See Exhibit 3**.

In December 2007, the OIG received a complaint about the Town of Carver's disposal of a property at 13 Birch Terrace, alleging non-compliance with M.G.L. c. 30B. The town's failure to follow proper procedures resulted in significant financial loss. Recommendations included training for town officials on public procurement laws and ethics, thorough review of procurement procedures, and filing a disclosure of beneficial interests for the property. **See Exhibit 4 and 5.**

These examples demonstrate the critical need for comprehensive market testing to avoid undervaluation, ensure compliance with legal requirements, and secure the best possible outcome for property sales. Neglecting market testing could result in accepting a lower bid, as demonstrated by the reliance on the Town's RFP process, which has already selected a lower offer, underscoring the need for a diligent and transparent market evaluation.

### 4. Premature Settlement of Claims Against the Town

The Trustee is proposing to settle claims against the Town of Westborough without fully investigating or litigating potential fraudulent transfer claims related to the tax foreclosure action. Settling prematurely may deprive the estate of additional funds that could be recovered through litigation.

The Town of Westborough questioned the legitimacy of the debtor's current management and their authority to act on behalf of the company. They highlighted the absence of evidence proving

Lolonyon Akouete's legal interest or managerial rights in the debtor and emphasized that the revival of the debtor as a legal entity might be invalid. However, the debtor's operating agreement, along with the Durable Power of Attorney and Written Consent of Manager executed by Frances Jan Blaustein Scholes, grants Akouete the authority to act as manager of the debtor. Section 1(g) of the operating agreement explicitly states that "the signature of the Manager on any agreement, contract, instrument or other document shall be sufficient to bind the Company and any other Manager in respect thereof, shall be deemed the action of the Company and of any other Manager, and shall conclusively evidence the authority of such executing Manager and the Company with respect thereto, and no third party need look to any other evidence, or require joinder or consent of any other party to bind the Company or to evidence such Manager's authority." This provision clearly contradicts the Town's claims and confirms Akouete's managerial authority. Furthermore, according to a memo from Edmund A. Williams, Land Court Chief Title Examiner, a foreign LLC which owns registered land in Massachusetts is not required to register if it presents a Certificate of Good Standing from its state of formation. This supports the legitimacy of the debtor's authority and managerial actions.

The Town argued that allowing the debtor to vacate the foreclosure judgment and redeem the property could disrupt the ongoing RFP process. They highlighted potential legal challenges from the bidders involved in the RFP, which could complicate and prolong the resolution of the property's status. However, the Town's RFP process is not legally binding until a purchase and sale agreement (P&S) is signed. According to the terms of the RFP proposal, the Town is not obligated to sell the property to either Lax Media LLC or Ferris Development Group, LLC, and any selection made during the RFP process does not create any binding rights until the P&S is executed. Page 12 of the Proposal (RFP) explicitly states, "In the event that the Town defaults under the P&S, Buyer shall be entitled to terminate the P&S and receive a refund of the deposit. The foregoing shall be Buyer's sole and exclusive remedy at law and equity for any breach of the P&S by the Town." Furthermore, Page 13 clarifies, "The Town will not be liable for any costs incurred by any respondents in the preparation and presentation of responses to this RFP or in the participation in views, interviews, negotiations, or any other aspect of this RFP process," and "This RFP does not represent any obligation or agreement whatsoever on the part of the Town to sell the property described in this RFP." Additionally, Page 14 asserts, "Selection of a proposer's proposal will not create any rights on the proposer's part, including, without limitation, rights of enforcement, equity, or reimbursement, until the P&S and all related documents are approved by the Select Board and fully executed." **See Exhibit 6**.

Moreover, the Town, Ferris Development Group, LLC, and Lax Media, LLC's second joint motion to extend tracking order deadlines states that an involuntary bankruptcy petition was filed against Westborough SPE, LLC, which was the prior record owner of the property. The Town is selling the property through a Chapter 30B bidding process that gives rise to Ferris's claims for breach of implied contract and injunctive/declaratory relief. Recent developments in the bankruptcy proceeding have raised the possibility that the Chapter 7 trustee may seek to avoid the Town's tax title foreclosure judgment, which transferred title to the property to the Town, pursuant to 11 U.S.C. § 548(a). In the event of such avoidance, the Town would potentially be incapable of completing the sale of the property under Chapter 30B, rendering the claims asserted in this matter moot. This indicates that upon adjudication of the motion to vacate, the claims by Ferris Development Group, LLC, and Lax Media, LLC would become irrelevant, as the property would no longer be subject to the disputed sale. **See Exhibit 7**.

The Town pointed out the significant financial liabilities associated with the property, including approximately $300,000 in tax title and $400,000 owed in a reciprocal easement agreement for the parking lot cleanup. They emphasized the debtor's history of delinquency and questioned whether

the revived entity could reliably meet these financial obligations. However, the trustee’s failure to address these financial concerns before proposing a settlement added to the Town’s opposition. The debtor had indicated the availability of $1.2 million in funds held by the California Unclaimed Property Division, which could cover the outstanding liabilities, suggesting that the trustee's concerns might be mitigated with proper verification of these funds. The trustee is now in possession of $1,293,646.83 in cash. **See Exhibit 8**.

The Town underscored the importance of adhering to legal and procedural standards in the foreclosure process. They argued that vacating the foreclosure judgment without sufficient proof of the debtor’s legitimate claim and capability to manage the property would undermine the integrity of the process. However, the trustee’s decision to propose a settlement without thoroughly investigating these critical issues reflects a lack of due diligence. The trustee should have conducted a detailed investigation to verify the legitimacy of the debtor’s management and their authority to act on behalf of the company.

The Town failed to comply with the notice requirements for a foreign LLC registered in Massachusetts. According to Massachusetts General Laws, Chapter 156C, Section 48, and Chapter 156D, Section 15.10, a Delaware LLC registered in Massachusetts must have a designated registered agent to receive service of process. If the registered agent cannot be located, the notice can be served through the Secretary of the Commonwealth. The Town did not demonstrate reasonable diligence in attempting to serve the registered agent or in following the alternative service process through the Secretary of the Commonwealth. This non-compliance with notice requirements further complicates the due process aspects of the case.

There is also a due process violation because the Town never properly served Jan with notice of the foreclosure proceedings. Similar to Jones v. Flowers, two U.S. certified mail packages intended for Jan were returned “undeliverable,” indicating unsuccessful service. The Town then hired a process server to attempt to serve Jan at 34 Stern Lane in Atherton, California. The process server left the notice at the front gate, indicating service based on a male voice over the intercom. Since Jan is not a man, this should have informed the Town that proper service was not made. Public records, including Jan’s divorce and the deed transfer of the 34 Stern Lane property, would have revealed that Jan no longer lived there and had no ownership interest.

In Jones v. Flowers, the U.S. Supreme Court determined that returned certified mail notices were insufficient notice and that further reasonable steps were required. The Town’s steps to locate Jan by using outdated addresses without confirming her current residence failed to meet the due diligence standard. Proper service requires more than leaving notice at an old address; it necessitates a logical and diligent effort to find the current address. Thus, Jan was never properly served, constituting a due process violation pursuant to Jones v. Flowers. **See Exhibit 9**.

Additionally, the Supreme Court decision in Tyler v. Hennepin County establishes that even if the Town wins the motion to vacate, they will be required to pay any surplus from the sale of the property to the debtor. Therefore, pursuing the motion to vacate presents no risk to the debtor. If the debtor wins the motion to vacate, they can sell the property to the highest bidder or to Ferris Development Group for a higher price without waiting for the 120-day period, closing within 30 days. If the debtor loses the motion to vacate, the Town can sell the property to whomever they want but can only retain the amount owed in taxes, which will likely be less than what they are proposing, with the rest paid to the debtor. This is in line with General Law - Part I, Title IX, Chapter 60, Section 28 (Chapter 60: Section 28. Accounting for surplus: The collector shall, upon demand, provide a written account of every sale on distress or seizure and charges, and pay to the owner any surplus above the taxes, interest, and charges of keeping and sale.) **See Exhibit 10.**

In conclusion, the trustee's decision to propose a settlement without thoroughly investigating these critical issues reflects a lack of due diligence. The trustee should have conducted a detailed investigation to verify the legitimacy of the debtor's management and their authority to act on behalf of the company. Additionally, the trustee should have ensured that the Town complied with the proper notice requirements for serving a foreign LLC registered in Massachusetts. By failing to conduct a comprehensive analysis in these areas, the trustee overlooked significant factors that could impact the estate's recovery and the rights of all parties involved. The motion to vacate the foreclosure judgment is straightforward and concrete, requiring the court to consider all aspects of the case and ensure that legal and procedural standards are upheld before issuing a decree. **See Exhibit 11 and 12.** The trustee's premature settlement proposal undermines this process, potentially depriving the estate of additional funds that could be recovered through litigation and proper adherence to legal standards.

**5. Inadequate Consideration of Creditor Interests**

The proposed settlement in the bankruptcy case of Westborough SPE LLC raises significant concerns regarding the inadequate consideration of creditor interests. The settlement appears to prioritize a quick resolution over maximizing recovery for creditors, undermining the fundamental principles of bankruptcy proceedings that aim to ensure equitable treatment of all creditors. The trustee, Jonathan Goldsmith, sent a written settlement proposal to the Town's counsel on December 5, 2023. However, it was not until July 8, 2024, that the settlement proposal was filed with the court. This seven-month delay in crafting and submitting the proposal contradicts the notion that the settlement aims for a swift resolution. Litigating the motion to vacate would have likely been quicker, demonstrating that the proposed settlement does not serve the interest of expediting the process.

The core of the proposed settlement fails to ensure the highest possible sale price for the property, which is crucial for maximizing funds available to satisfy creditor claims. Creditors would be better served by a process that seeks to achieve the highest recovery from the property sale. A thorough and competitive sales process, rather than a potentially undervalued settlement, is essential to fulfill fiduciary duties owed to creditors. Despite the passage of the claim bar date on January 9, 2024, the trustee has not examined any proofs of claim to either allow or object to them. This neglect impairs the proper evaluation of creditor claims and undermines the bankruptcy process. Creditors, whose claims amount to significant sums, deserve due consideration and verification of their claims to ensure accurate and fair distribution of the bankruptcy estate.

The town of Westborough is seeking $1,165,000.00 as part of the settlement proposal. However, a closer examination of the actual funds owed reveals discrepancies. The primary issue is the Town of Westborough's seizure of the debtor's commercial real property at 231 Turnpike Rd, Westborough, MA, with a fair market value of approximately $5,235,000.00 ($9,264,800.00 assessed value) as payment for a tax debt of $119,628.17 in 2018. This was done without adhering to tax foreclosure laws, in a process fraught with constitutional due process violations. The balance of the tax title account, including principal, interest, fees, and costs calculated to January 19, 2023, was $642,678.20. This balance included the following amounts:

- Taxes, interest, electric lien paid, water lien: $525,970.40
- Boston Board Up (to secure the property): $14,438.55
- Insurance: $38,419.96 (renewal date February 15, 2023)
- Eversource: $2,757.92
- Appraisal: $6,000.00
- KP Law - Legal Fees as of 01/13/2023: $32,797.97

- Law Office of Iris A. Leahy - Legal Fees as of 01/26/2023: $21,778.40
- Filing Fee: $515.00

The total of these amounts is $642,678.20. When compared to the $1,165,000.00 the town is seeking, it becomes evident that there is a significant discrepancy. Therefore, the actual funds owed to the town are significantly lower than what they are asking for. **See Exhibit 13.**

The bankruptcy estate currently holds $1,293,646.83 in cash and stands to receive a potential $2,875,000.00 from the sale of its real estate. The potential recovery should be distributed equitably among all creditors, reflecting their legitimate claims. Any settlement proposal must focus on maximizing this recovery to ensure that creditors receive the highest possible repayment.

The proposed settlement in its current form does not adequately consider the interests of creditors. The delay in filing the proposal, failure to maximize the property sale price, neglect of proof of claims examination, and disproportionate favoring of the town of Westborough highlight significant flaws in the process. The detailed calculation of the town's actual claim further underscores the need for a reassessment. A re-evaluation of the settlement proposal, with a focus on achieving the highest recovery for creditors and ensuring equitable treatment, is imperative. The trustee must fulfill fiduciary duties by prioritizing creditor interests and ensuring a transparent, competitive, and fair process.

### 6. Contested Authority of Debtor's Representatives

The authority of Edwards and Akouete to represent the Debtor has been contested. Before any settlement is approved, there should be a thorough examination of their legitimacy and the validity of their actions on behalf of the Debtor.

The imaginary challenge of authority by the Town is unwarranted. The Town of Westborough lacks standing and the Land Court does not have subject matter jurisdiction over a challenge to a Delaware Limited Liability Company's manager's authority.

Subject matter jurisdiction in tax lien foreclosure proceedings in the Land Court is highly circumscribed. These proceedings are only quasi-judicial, being presided over by the Recorder, that court's clerk magistrate, who need not be and is not today an attorney. Parties cannot contest the amount of an assessment; only whether it is void. The sole purpose of these proceedings, when they are adversarial, is for the Recorder to set the amount owed and the date upon which that amount is to be paid. As stated in Tyler v. Hennepin County, Minnesota, 143 S. Ct. 644 (2023), "the proceedings are only quasi-judicial-being presided over by the Recorder, that court's clerk magistrate, who need not be and is not today an attorney. Parties cannot contest the amount of an assessment; only whether it is void. The sole purpose of these proceedings, when they are adversarial, is for the Recorder to set the amount owed and the date upon which that amount is to be paid."

Westborough SPE, LLC, by and through Lolonyon Akouete, its manager, as evidenced through the Certificate of Good Standing filed with this Court, brought motion practice pursuant to M.G.L. c. 60, § 69A, within the first year as required by the statute. A proof of funds was similarly filed with the Court. Westborough SPE, LLC requested an exact redemption amount. **See Exhibit 14.**

The Town of Westborough, without legal standing, and in an effort to rectify an improper and premature bid process, has fixated on an imaginary legal challenge to Lolonyon Akouete's authority as Manager of Westborough SPE, LLC to redeem the property on behalf of the entity.

The Certificate of Good Standing is prima facie evidence of Mr. Akouete's authority to act on behalf of the entity. Moreover, the Land Court lacks subject matter jurisdiction to adjudicate a challenge to the managerial authority of a Delaware LLC, as this issue falls squarely within the jurisdiction of the Delaware Court of Chancery.

To address this issue, an adversary proceeding (Case No. 24-4017) has been filed in the bankruptcy court. This proceeding challenges the authority of Edwards and Akouete, aiming to establish the legitimacy of their actions on behalf of the debtor. This legal action is necessary to resolve any disputes regarding their managerial authority before any settlement proposal can be approved.

The proper procedure to address the managerial authority issue for a Delaware entity involves the Delaware Court of Chancery. The process includes filing a complaint in the Court of Chancery detailing the contested authority, the legal basis for the challenge, and the relief sought. During the discovery phase, relevant evidence such as articles of incorporation, bylaws, minutes of board meetings, and resolutions are collected and presented. A trial is then conducted where arguments and evidence are presented, leading to a judicial determination of the legitimacy of the managerial authority.

Delaware General Corporation Law (DGCL) Section 225 provides the Court of Chancery with the authority to review contested elections or appointments of directors and officers. The statute states, “Upon application of any stockholder or director, or any officer whose title to office is contested, … the Court of Chancery may hear and determine the validity of any election, appointment, removal, or resignation of any director or officer of any corporation, and the right of any person to hold or continue to hold such office.” Additionally, the Land Court's chief title examiner addresses title issues and questions of authority. According to a memo from Edmund A. Williams, Chief Title Examiner, dated November 20, 2008, regarding foreign LLCs, LLPs, and LPs: **See Exhibit 15.**

"Except as listed herein, a foreign LLC which owns registered land must file with the Massachusetts Secretary of State.

- It is not required that a foreign LLC, LLP, or LP which is not the owner, but is a member, partner, manager etc. in a tiered signature chain, be registered in Massachusetts. It should present a Certificate of Good Standing or the equivalent from their state of formation. If the certificate does not identify manager, member or other authorized signatory, the deed and any authorization documentation should be referred to the Chief Title Examiner or his designee for review. See G. L. c. 156C, § 48 and G. L. c. 156D, Part 15, § 15.01.
- A foreign LLC which has taken title by virtue of a foreclosure deed does not have to file in Massachusetts in order to convey. It should register a Certificate of Good Standing from the state of formation. If the certificate does not identify manager, member or other authorized signatory, the deed and any authorization documentation should be referred to the Chief Title Examiner or his designee for review.
- Mortgagees need not be registered in order to foreclose or amend a mortgage. To amend a mortgage, they should register a Certificate of Good Standing from the state of formation. If the certificate does not identify manager, member or other authorized signatory, the amendment and any authorization documentation should be referred to the Chief Title Examiner or his designee for review.
- For a foreign LLC only, a certificate signed by a clerk or secretary may be accepted as evidence of authority of the person signing on its behalf."

By challenging the authority of Mr. Akouete, the Town of Westborough is attempting to overstep its bounds and divert the focus from the real issues at hand in the tax lien foreclosure proceedings.

The proper jurisdiction for any disputes regarding the internal governance of Westborough SPE, LLC lies with the Delaware Court of Chancery, which has the exclusive authority to resolve such matters under Delaware General Corporation Law.

Therefore, the Town of Westborough's challenge to Mr. Akouete's authority is not only baseless but also outside the scope of the Land Court's jurisdiction. The focus should remain on determining the exact redemption amount and resolving the tax lien foreclosure in accordance with the procedures and statutes governing these proceedings.

## 7. Dismissal of Pending State Court Actions

The proposed settlement's broad dismissal of pending state court actions is neither fair nor just, for several critical reasons.

Firstly, the settlement's dismissal clause would unjustly strip affected parties of their legal recourse. This is particularly egregious as these parties have legitimate claims and grievances that deserve to be heard in a court of law. The dismissal of these actions without due process undermines the fundamental principles of justice and fairness.

Secondly, the recent Supreme Court decision involving the Sackler family and opioid victims highlighted that bankruptcy courts do not possess the authority to release non-debtor third parties from legal claims. This precedent is directly applicable here. The state court actions involve parties not part of this bankruptcy case, and dismissing their claims within the bankruptcy context violates the legal boundaries established by the Supreme Court.

Additionally, the affected parties in the state court actions are entitled to due process, which includes the right to have their cases heard and adjudicated independently. Dismissing these actions as part of a bankruptcy settlement deprives these parties of their constitutional right to due process, setting a dangerous precedent for future cases. In the case of WESTBOROUGH SPE LLC v. TOWN OF WESTBOROUGH, the actions involve significant claims against various parties, including Shelby Marshall, Ian Johnson, Allen Edinberg, Sean Keogh, Patrick Welch, and Peter Blaustein, who are both individually and officially named.

Furthermore, the equitable principle that "justice delayed is justice denied" applies here. Many of the pending state court actions have been ongoing, with parties investing significant time, resources, and effort. Abruptly dismissing these actions would not only be unfair but also would undermine public confidence in the judicial system's ability to provide equitable resolutions. For instance, in Ferris Development Group, LLC. v. Town of Westborough, Lax Media, LLC, and Lax Media MA, LLC, Worcester Superior Court C.A. No. 2285CV01281, significant investments have been made, and dismissing this action would disregard the efforts and rights of the involved parties.

Moreover, the state court actions involve complex issues and claims that are distinct from the bankruptcy proceedings. Forcing a blanket dismissal without considering the merits and specifics of each case risks leaving many legitimate claims unresolved, which could result in further legal disputes and complications down the line. The case WESTBOROUGH SPE LLC, Civil Action Number: 123-cv-12017, underscores the intricacies involved, as it pertains to a Delaware limited liability company against a municipal corporation and its officials.

Importantly, the state court actions include claims against individuals and entities who are not debtors in this bankruptcy case. These parties should not be unjustly absolved of liability without their day in court. According to the Supreme Court ruling in Hafer v. Melo, 502 U.S. 21 (1991),

state officials sued in their individual capacities are "persons" within the meaning of 42 U.S.C. § 1983. The Eleventh Amendment does not bar such suits, nor are state officers absolutely immune from personal liability under § 1983 solely by virtue of the "official" nature of their acts. This ruling emphasizes that state officials can be held personally liable for actions taken under the color of state law, underscoring the necessity of maintaining these state court actions to address individual accountability.

In conclusion, dismissing the pending state court actions as part of the settlement would be an unfair and unjust resolution that disregards the rights of the affected parties, contravenes established legal precedents, and undermines the principles of due process and equitable justice. It is imperative that these actions be allowed to proceed independently to ensure that all parties have the opportunity to seek fair and just outcomes in their respective cases.

**8. Disproportionate Impact on Specific Creditors**

The proposed settlement in the bankruptcy case of Westborough SPE LLC presents a glaring disparity in how it treats various creditors, resulting in a significant disproportionate impact on specific creditors. This inequity is particularly evident in the undervaluation of claims such as those from MobileStreet Trust, and the substantial benefits conferred to select parties, notably the Town of Westborough. This settlement, if approved, would unfairly advantage some creditors while severely disadvantaging others, undermining the fundamental principles of equity and justice in bankruptcy proceedings.

The settlement proposal undervalues the claims of certain creditors, notably the MobileStreet Trust. The MobileStreet Trust's claim of $356,681.00 was initially filed, and subsequently amended to $700,131.00. However, the trustee plans to object to this claim, suggesting it should be closer to $300,000. This drastic reduction in valuation not only undermines the trust's legitimate expectations but also highlights the inequitable nature of the settlement. The proposed terms appear to benefit select parties at the expense of creditors with substantial, legitimate claims.

The settlement proposal allocates benefits in a manner that disproportionately favors certain creditors, particularly the Town of Westborough. Despite not filing a proof of claim, the Town stands to receive $1,165,000.00 under the settlement agreement, significantly more than the balance of the tax title account, which is $642,678.20. This excessive allocation to the Town, without a corresponding claim, starkly contrasts with the undervaluation of claims like those of the MobileStreet Trust and others.

A detailed examination of the claims filed by various creditors further illustrates the disproportionate impact:

- Darin Clagg: $10,000.00
- Ferris Development Group, LLC: $10,000.00 (Amended to $100,000 based on settlement terms)
- Matthew A. Morris Sherin and Lodgen LLP: $20,000.00
- Lolonyon Akouete: $625,297.00 (Amended to $1,250,594.05)
- Denise Edwards: $333,491.00
- The MobileStreet Trust: $356,681.00 (Amended to $700,131.00, with the trustee objecting to a reduction to approximately $300,000)
- Nathanson & Goldberg, P.C.: $101,692.83

The amendments in claims such as those of the Lolonyon Akouete reflect attempts to address inequities in the settlement terms. However, the significant disparity remains.

Ferris Development Group, LLC, and Darin Clagg both filed claims for $10,000 related to legal fees. Despite the similarity in the nature and amount of their claims, the settlement agreement proposes a substantial increase for Ferris Development Group's claim, amending it to $100,000, while Darin Clagg's claim remains unchanged at $10,000. Even if Darin Clagg wants to buy the property, he would not be allowed to do so because it's only exclusive to Ferris Development Group. This discrepancy underscores the unequal evaluation of claims and highlights a fundamental inequity in the proposed settlement.

Under Bankruptcy Code § 502(a), 11 U.S.C. § 502(a), any proof of claim "is deemed allowed, unless a party in interest . . . objects." This provision ensures that claims are presumed valid unless challenged. The trustee's strategic refusal to challenge any claim at this time suggests unclean hands and bad faith. This selective approach undermines the integrity of the bankruptcy process and the equitable principles that govern it.

Additionally, the trustee's failure to thoroughly review all claims raises significant concerns about the sufficiency of the bankruptcy estate's funds. Without a comprehensive evaluation of claims, it is uncertain whether the estate has enough resources to satisfy the proposed settlements. This oversight could lead to prolonged litigation over disputed claims, which would be time-consuming and costly. It would be wiser to resolve potential disputes through a global settlement that accounts for all claims and avoids subsequent litigation.

The proposed settlement highlights a fundamental inequity in the treatment of creditors. The undervaluation of claims, such as those from MobileStreet Trust, and the disproportionate allocation of benefits to select parties, notably the Town of Westborough, underscore the need for a more equitable resolution. It is imperative that the settlement terms be revised to ensure a fair and just distribution of the estate's assets, reflecting the legitimate claims and interests of all creditors involved. Failure to address these disparities will result in a settlement that is not only inequitable but also undermines the principles of fairness that are central to the bankruptcy process.

**9. Violation of Competitive Bidding and Ethical Standards**

The town and the Chapter 7 trustee have already spent seven months working on a settlement proposal that raises significant concerns regarding potential violations of the competitive bidding process mandated by M.G.L. c. 30B, §16, as well as possible breaches of ethical standards as outlined in Section 23(b)(2)(ii) of G.L. c. 268A. This situation warrants close scrutiny due to several key points.

Massachusetts General Laws Chapter 30B, Section 16, establishes a stringent competitive bidding process to ensure fairness and transparency in public procurement. The apparent preferential treatment given to Lax Media LLC undermines this process, as it circumvents the open competition intended to secure the best possible financial outcome for the creditors. By not adhering to these regulations, the involved parties compromise the integrity of the bidding process, potentially resulting in financial losses for creditors who might otherwise benefit from higher offers. This not only harms creditors but also erodes public trust in the fairness of public procurement and the ethical conduct of public officials.

Section 23(b)(2)(ii) of G.L. c. 268A explicitly prohibits public employees from using their official positions to secure unwarranted privileges or exemptions not properly available to similarly

situated individuals. This provision is crucial in maintaining the integrity of public offices, ensuring that public employees act without prejudice and do not misuse their positions for personal gain or to benefit others improperly. The actions taken in favor of Lax Media LLC suggest a misuse of official positions, providing the company with advantages not accessible to other potential bidders. The Trustee and the Town are, in effect, committing fraud by using the lawful means of the settlement to achieve an unlawful purpose. By manipulating the settlement process to favor Lax Media LLC, they are subverting the legal requirements designed to ensure a fair and competitive bidding environment. This deceptive practice not only violates statutory and ethical standards but also constitutes an abuse of their positions to further an illegitimate goal.

The case of Jeanne Carnevale, the City Treasurer of Peabody, serves as a pertinent precedent illustrating the consequences of ethical violations. Carnevale was found to have used her official position to influence property transactions for personal and familial gain, breaching Sections 19 and 23(b)(2)(ii) of G.L. c. 268A. This resulted in a $50,000 civil penalty and underscores the importance of upholding ethical standards in public office. The parallels between Carnevale's actions and the current situation involving Lax Media LLC highlight the critical need for strict adherence to ethical guidelines to prevent similar abuses of power. **See Exhibit 16.**

The current scenario necessitates rigorous oversight to ensure compliance with both competitive bidding laws and ethical standards. The involvement of oversight agencies, similar to the role played by the State Ethics Commission in the Carnevale case, is essential to uphold accountability and transparency. Ensuring that all parties adhere to the established legal and ethical frameworks will help protect the interests of creditors and maintain public trust in the integrity of the public procurement process. The actions surrounding the extension request and preferential treatment of Lax Media LLC raise serious concerns about violations of competitive bidding requirements and ethical standards, which must be addressed promptly to safeguard the interests of creditors and uphold the principles of fairness, transparency, and ethical conduct in public procurement.

### 10. Evidence of Collusion and Fraudulent Transfers

The evidence strongly indicates potential collusion intended to facilitate the sale of the property below its market value, which raises significant concerns under both federal and state fraudulent transfer laws. Under 11 U.S.C. § 548 of the U.S. Bankruptcy Code and the Massachusetts Uniform Fraudulent Transfer Act (M.G.L.A. 109A), any transfer made without receiving reasonably equivalent value and with the intent to hinder, delay, or defraud creditors can be voided. The proposed sale to Lax Media LLC is indicative of such irregularities.

First, there are significant pricing and terms discrepancies. The Trustee himself admits on page 12 of his motion that he has received an offer for the property that is $375,000 higher than the Lax Media offer. This discrepancy suggests that the property is being sold significantly below its market value, which is a clear red flag. The terms of the transaction disproportionately favor Lax Media LLC, which is indicative of non-arm's-length negotiations. **See Exhibit 17.**

Furthermore, the relationship between the parties involved raises suspicion. Evidence suggests a pre-existing relationship between the involved parties, raising the suspicion of preferential treatment and arrangements made to benefit one party over others, particularly creditors. This suspicion is further compounded by the secrecy and lack of transparency surrounding the transaction. The transaction lacks the transparency typical of standard property sales, and there have been efforts to hide the transaction details or terms from other interested parties, suggesting an attempt to avoid scrutiny and fair competition. **See Exhibit 18.**

The timing of the transaction also raises questions. The timing coincides with a period advantageous to the buyer and disadvantageous to the creditors, suggesting strategic manipulation. The trustee in a bankruptcy case has a fiduciary duty to act with care, diligence, and loyalty to maximize returns for creditors. Selling assets below market value without justification is a breach of this duty. **See Exhibit 19.** The actions of the trustee in this case suggest a failure to uphold these responsibilities, potentially amounting to a breach of fiduciary duty. Directors also have fiduciary duties to act in the best interests of the company and its shareholders. If a company's assets are sold for much less than their worth without adequately seeking the best possible deal, it constitutes a failure in their duty, harming shareholders and creditors alike.

In an email dated Tuesday, September 26, 2023, counsel of petitioning creditor Stephen Gordon stated that the trustee will fight off the Town, indicating that the trustee will be fulfilling his fiduciary duty by defending the interest of the debtor. **See Exhibit 20.** David Ferris made his position clear when he stated in a text message on November 20, 2024, "I just spoke to my atty and told him to tell the bankruptcy atty I will honor the offer I made to the town $2.875 if the trustee doesn't take it I'll litigate w him for the next 10 years. We want to open our factory there. If you need $10-20k to get an atty to object lmk and I'll consider it if they don't take that generous offer to close quickly." **See Exhibit 21.** For all three parties to change their position abruptly can only be a product of collusion and conspiracy to defraud.

The Town has already shown a pattern of this behavior when they reached out to the California State Controller to try to prevent them from releasing the $1.2 million that belongs to the debtor so that the debtor would not have funds to redeem the property. **See Exhibit 22.** Similarly, in a bid to circumvent the glaring due process violations, the Town enlisted Dyann Blaine and Peter Blaustein to sign a Waiver of Notice and Assent to the Entry of Judgment so that they can seize the debtor's property. **See Exhibit 23 and 24.**

Furthermore, the Trustee has broad discretion to manage the bankruptcy estate, and courts typically defer to the Trustee's business judgment unless there is clear evidence of abuse of discretion or bad faith. However, in this case, the Trustee's discretion and business judgment appear compromised. The significant pricing discrepancy, the suspicious relationships between the parties, the lack of transparency, and the timing of the transaction all point towards an abuse of discretion. The Trustee's actions, which favor a lower offer despite higher bids being available, suggest bad faith and a potential breach of fiduciary duty, undermining the trust placed in the Trustee's judgment. **See Exhibit 25 and 26.**

The cumulative evidence of pricing discrepancies, secretive conduct, suspicious timing, and subsequent actions strongly supports the assertion that the proposed transaction is a product of fraud, collusion, and undue pressure, rather than legitimate, arm's-length bargaining. Consequently, this sale should be scrutinized and potentially voided under 11 U.S.C. § 548 and M.G.L.A. 109A to protect the creditors' interests.

## CONCLUSION

For the foregoing reasons, Creditor Lolonyon Akouete respectfully requests that this Court deny the Motion of Chapter 7 Trustee for Approval of Settlement Agreement. The settlement proposal fails to maximize the value of the Debtor's estate, grants unjustified exclusivity periods, lacks comprehensive market testing, prematurely settles significant claims, inadequately considers creditor interests, contests the legitimate authority of Debtor's representatives, unjustly dismisses pending state court actions, disproportionately impacts specific creditors, violates competitive bidding and ethical standards, and shows evidence of collusion and fraudulent transfers.

DATED: July 11, 2024, Respectfully submitted:

By creditor,

Lolonyon Akouete
800 Red Milles Rd
Wallkill NY 12589
info@smartinvestorsllc.com
(443) 447-3276

Exhibit 1

Gmail **Lolonyon Akouete <info@smartinvestorsllc.com>**

---

## New Buyer for 231 Turnpike Rd
2 messages

---

**Lolonyon Akouete** <info@smartinvestorsllc.com> Thu, Mar 21, 2024 at 2:11 PM
To: Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>, "Roger L. Smerage" <rsmerage@k-plaw.com>, "Carey, Paul W." <pcarey@mirickoconnell.com>, Stephen Gordon <sgordon@gordonfirm.com>, "Scott A. Schlager" <sas@natgolaw.com>, Denise Edwards <deniseedwards818@yahoo.com>

Hello everyone,

I spoke with Mike from Pulte Homes and they are still interested in buying the property. They had offered $7,942,000.00 previously and want to have a meeting tomorrow to discuss the offer. I would like to know if anyone wants to join this discussion.

Thank you.

Lolonyon Akouete

Manager of Westborough SPE, LLC

1241 Deer Park Ave., Suite 1, #1051

North Babylon, NY 11703

info@smartinvestorsllc.com

(443) 447-3276

---

**BID RESULTS 22-0080 SALE OF PROPERTY-1-1.pdf**
27K

---

**Stephen Gordon** <sgordon@gordonfirm.com> Thu, Mar 21, 2024 at 2:34 PM
To: Lolonyon Akouete <info@smartinvestorsllc.com>
Cc: Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>, "Roger L. Smerage" <rsmerage@k-plaw.com>, "Carey, Paul W." <pcarey@mirickoconnell.com>, "Scott A. Schlager" <sas@natgolaw.com>, Denise Edwards <deniseedwards818@yahoo.com>

Lolo-
The Petitioning Creditors are comfortable with the Trustee representing the interests of the bankruptcy estate and see no need for us to participate.
Best,
Steve

Stephen F. Gordon
The Gordon Law Firm LLP
River Place
57 River Street
Wellesley, MA 02481
Direct: 617-456-1270
Main: 617-261-0100
Sgordon@gordonfirm.com
www.GordonFirm.com

On Mar 21, 2024, at 2:12 PM, Lolonyon Akouete <info@smartinvestorsllc.com> wrote:

Case 1:26-cv-10037-WGY Document 1-3 Filed 01/11/26 Page 68 of 582

Exhibit 2

The Commonwealth of Massachusetts

Office of the Inspector General

GREGORY W. SULLIVAN
INSPECTOR GENERAL

JOHN W. McCORMACK
STATE OFFICE BUILDING
ONE ASHBURTON PLACE
ROOM 1311
BOSTON, MA 02108
TEL: (617) 727-9140
FAX: (617) 723-2334

November 3, 2009

Paul Cohen, Town Manager
Town of Chelmsford
50 Billerica Road
Chelmsford, Massachusetts 02739

RE: 19 Maple Road, Chelmsford, Massachusetts

Dear Mr. Cohen:

Reference is made to this Office's August 25, 2009 request seeking all documents relating to the 2006 sale of a parcel of town-owned property located at 19 Maple Road, Chelmsford ("Property") to Robert and Jo Morse, specifically the transaction records for the sale of the Property and copies of the municipal valuation(s) of the Property and all related real estate tax bills from March 6, 2006 to the present.

You provided the requested documents in a timely manner.

As you know, this was a disposition of an interest in real property subject to M.G.L. c.30B, §16. This Office reviewed the transaction record provided by the town and notes certain deficiencies. These are as follows: there is no evidence of a declaration of availability (M.G.L. c.30B, §16(a)); no evidence of two consecutive weeks of newspaper advertising (M.G.L. c.30B, §16(d)); and no publication in the *Central Register* of name of the person selected as party to a real property transaction, and the amount of the transaction (M.G.L. c.30B, §16(f)). In addition, since it appears that the town disposed of the Property for less than its appraised value, a notice of that fact and its reasons should have been published in the *Central Register* (M.G.L. c.30B, §16(a)) .

This transaction was consummated more than three years ago. However, for future transactions of this type the law requires that you follow statutory requirements.

Paul Cohen, Town Manager
Town of Chelmsford
November 3, 2009
Page 2

A summary of these requirements is available in our *Municipal, County, District and Local Authority Procurement of Supplies, Services and Real Property* (5th ed.)(9/06), which you may access on our website at http://www.mass.gov/ig/publ/30bmanl.pdf. This Office also teaches a segment on real property transactions in its Public Contracting Overview course offered through the Massachusetts Certified Public Purchasing Official program. For more information, see http://www.mass.gov/ig/mcppo/igmpo.htm.

Please contact me with any questions.

Sincerely,

Gregory W. Sullivan

Gregory W. Sullivan
Inspector General

Exhibit 3

# The Commonwealth of Massachusetts
## Office of the Inspector General

GLENN A. CUNHA
INSPECTOR GENERAL

JOHN W. McCORMACK
STATE OFFICE BUILDING
ONE ASHBURTON PLACE
ROOM 1311
BOSTON, MA 02108
TEL: (617) 727-9140
FAX: (617) 723-2334

November 14, 2019

Steven Ellis
Town Administrator
Montague Town Hall
One Avenue A
Turners Falls, MA 01376

**Re: Disposition of Town-Owned Land**

Dear Mr. Ellis:

This letter concerns an allegation that the town of Montague (the "Town") violated Chapter 30B of the Massachusetts General Laws ("Chapter 30B") in its attempted sale of Town land: parcel 29-180 ("Lot F"). The Office of the Inspector General (the "Office") reviewed the disposition process for Lot F and identified problems with (1) how the Town valued Lot F; and (2) the requirement in its request for proposals ("RFP") that restricted eligible buyers to all but one.

In 2018, the Town tried to sell Lot F through a Request for Proposals ("RFP") process. Based on its review, the Office determined that the Town failed to comply with Chapter 30B in the following ways:

1. Property valuation: Chapter 30B requires that the Town determine the value of a property through procedures customarily accepted by the appraising profession. See M.G.L. ch. 30B, § 16(b). The Town listed the value of Lot F at $5,100 in its RFP based on the maps on the Town Assessor's online graphic information system provided by Main Street GIS, LLC in 2016. Using dated information provided from a graphic information mapping system is not a customarily accepted appraisal procedure. Indeed, in 2018 Patriot Properties, Inc. appraised Lot F's value at $20,200 – nearly four times higher than the value listed in the Town's RFP.

2. Restrictive requirement: The RFP included a requirement that respondents to the RFP must own an abutting property to Lot F. There is only one abutter, meaning there was only one possible eligible respondent to the RFP. The Town stated that it added this requirement due to (1) stipulations in the Town's preexisting subdivision

> plan involving Lot F; and (2) frontage regulations under local zoning bylaws that limited the parcel's use without an easement. However, this restriction established a non-competitive process with only one eligible buyer to purchase the property. This requirement violates the spirit of a fair, open and competitive process required for public procurements, including the disposition of real property. A public jurisdiction cannot determine or mandate that one buyer is uniquely qualified to purchase Lot F. Additionally, the requirement in the Town's RFP presupposes that no other potential buyer might find value in Lot F.

In 2018, the Town received one bid for Lot F, from the only abutter, for the price of $1,000. During the Office's review, the Town rejected the $1,000 bid and subsequently cancelled the RFP. If the Town plans to conduct another disposition, it should ensure it follows all of the requirements in Chapter 30B.

Should you have any questions about land dispositions or other aspects of Chapter 30B, please review the Office's Chapter 30B Manual, or contact our Chapter 30B Hotline at (617) 722-8838 or via email at 30BHotline@state.ma.us. Additionally, the Office offers a real property class as part of its Massachusetts Certified Public Procurement Official ("MCPPO") Program; the class teaches public employees about the purchase, sale, lease and rental of real property under Section 16 of Chapter 30B.

Thank you for your attention on this matter. If you have any questions, please feel free to contact me at (617) 722-8853.

Sincerely,

George Xenakis

George Xenakis
Director of Investigations

cc: Richard Kuklewicz, Select Board Chairman
Michael Nelson, Select Board Vice Chairman
Christopher Boutwell, Select Board Clerk

Exhibit 4

# Office of the Inspector General

## Commonwealth of Massachusetts

**Gregory W. Sullivan**
Inspector General

# Review of a Real Property Disposition by the City of Revere

October 2002

Publication No. 18308-12-50-10/02-IGO, approved by Philmore Anderson III, State Purchasing Agent.
Printed on recycled paper.

The Commonwealth of Massachusetts

Office of the Inspector General

GREGORY W. SULLIVAN
INSPECTOR GENERAL

JOHN W. McCORMACK
STATE OFFICE BUILDING
ONE ASHBURTON PLACE
ROOM 1311
BOSTON, MA 02108
TEL. (617) 727-9140
FAX (617) 723-2334

October 15, 2002

Mayor Thomas G. Ambrosino
City of Revere
28 Broadway
Revere, MA 02151

Re: Disposition of "Surf Site"

Dear Mayor Ambrosino:

I am responding to your letter requesting that this Office review the City of Revere's 1997 disposition and 2001 reacquisition of a parcel known locally as the "Surf Site" (Site). It is this Office's understanding that the City is seeking guidance to assist in avoiding missteps in future dispositions of real property. The City is to be commended for its willingness to learn from the "Surf Site" disposition, which ultimately failed to achieve the City's objectives. With the assistance of the City Solicitor's Office, this Office obtained and reviewed the request for proposals (RFP) and the provided documents relating to the original disposition of the Site. The attached report summarizes the issues and recommendations identified by this Office based on a limited review of these documents.

I hope that these comments and recommendations are helpful to the City. Our Office currently offers a course, "Local Government Real Property Transaction under M.G.L. c. 30B" in our Massachusetts Certified Public Purchasing Official (MCPPO) Program. Enclosed is information on that class and other MCPPO courses. If this Office can be of any further assistance, please do not hesitate to contact us.

Sincerely,

Gregory W. Sullivan

Gregory W. Sullivan
Inspector General

cc: Robert A. Marra Jr., City Solicitor
Encl. (1) MCPPO Course Catalog 2002
(2) MCPPO Registration Form

## Background

At the City's request this Office reviewed the 1997 disposition of a parcel of Revere land located across from the ocean known locally as the "Surf Site" (Site). The following review provides guidance to the City on proper disposition procedures.

## Introduction

According to the documents reviewed by this Office, sometime prior to March 21, 1997, Condits Hall Associates LP (CHA), a development firm, contacted the City about acquiring the Site to be used as parking and commercial space ancillary to developing a hotel on a nearby parcel. On March 21, 1997, the Mayor wrote the following to the City Council:

> This Office has been presented with a development plan for the construction of a hotel on the southern end of Revere Beach along Revere Beach Boulevard. The development plan proposed includes the city owned parcel know as the 'Surf site' located on Ocean Avenue. I am requesting that a meeting with the Economic Development Subcommittee, City Planner and City Solicitor be convened to allow for careful analysis of the proposal.
>
> Given the proposed development plans implication to the "Surf site", it will be necessary to formulate a Request For Proposal for public advertisement for the disposition or lease of the city owned parcel involved. Therefore, it is necessary for the City Planner, City Solicitor and City Clerk work together with the Economic Development Subcommittee to structure a Request For Proposal that best represents the City's objective for broadening the City's tax base and encouraging sound planning.

According to an entry in the City Council's April 1997 Journal, the Purchasing Agent and the City Planner were instructed to dispose of the Site pursuant to M.G.L. c. 30B. Section 16 of M.G.L. c. 30B governs the disposition of real property by municipalities. As required by M.G.L. c. 30B, the City obtained an appraisal, which valued the Site at $530,000, prepared, and advertised a request for proposals (RFP). The RFP defined the project as "the City of Revere's desire to promulgate a hotel development which will foster the attraction of Tourism and Economic Development of the Revere Beach area and which is consistent with the emulating of the historic theme of Revere Beach." It

also stated that proposals would be evaluated on the basis of seven equally weighted criteria. As of June 9, 1997, the proposal submission deadline, the one proposal the City had received was from CHA which offered the City $200,000 for the Site.

On the same day that proposals were due, the City Council voted to sign a purchase and sale agreement for $200,000 with CHA and to publish in the Central Register the justification for disposing of the Site at less than fair market value as required by M.G.L. c. 30B. The City's published justification stated:

> The Revere City Council has determined that it is in the City's best interest to sell this property for less than the appraised value for a number of reasons.
>
> First, this property was publicly advertised and publicly offered for sale with very little interest shown by developers. The only bid that the City received was from the Purchaser. Due to the lack of development interest in this property, the City Council feels that the sale of this property, below the appraised value, is warranted.
>
> Secondly, the City Council is aware that the Developer will be required to make a significant financial investment to improve the public utility infrastructure of this area to accommodate future development of this property. Sewer mitigation improvements alone from the property under the adjacent M.B.T.A. Blue Line Track to Porter Street will cost in excess of three hundred thousand dollars ($300,000) to upgrade a portion of the sewer line to secure State Department of Environmental Protection (DEP) approval to develop the property for the Purchasers intended use.
>
> Lastly, the City Council views this proposed development as the catalyst for future development along Revere Beach and surrounding areas. The City Council feels that the development resulting from the sale of this property will increase the property value of this area, stimulate future development and ultimately broaden the tax base of the City.

On September 2, 1997, the City transferred the deed to CHA. The deed, together with a Land Disposition Agreement (LDA) setting forth the development obligations of the City and CHA, was recorded at the Registry of Deeds. The RFP and the LDA gave CHA two years to commence development of the project and stated that if construction did not commence by September 2, 1999, CHA would be deemed to be in default of the

development agreement,[1] and the City could require CHA to reconvey the Site to the City.[2] The LDA did not state a completion deadline for the project.

On January 23, 1998, the City executed another agreement with CHA, a Land Development Agreement (Development Agreement) that required CHA to perform significant sewer system improvements to accommodate hotel construction at the Revere Boulevard location. The Development Agreement provided that CHA was to complete the improvements within one year (by January 23, 1999). This agreement with CHA was subsequently amended. The amendment, dated December 3, 1998, required CHA to enlarge a sewer line connected to the Revere Beach Boulevard location. It also required that CHA perform a television inspection and clean certain sewer lines on Ocean Avenue, and enlarge certain sewer lines at the Site. The amendment eliminated the original one-year completion deadline for the sewer improvements, instead allowing CHA to complete the work in a timely and workmanlike manner.[3]

On December 15, 1998, without having commenced construction,[4] CHA sold all of its rights to develop the undeveloped Site to Red Roof Inn (RRI) for $2.842 million.[5] The Site was transferred with a parking easement previously granted by CHA to third parties in March of 1998. The City received no part of CHA's profits on the sale.

In late December of 1999, RRI, which had been acquired by new owners since buying the development rights from CHA, transferred all rights in the Site to a third developer, Boston Logan Associates (BLA), for $1.00. The Site was transferred with additional

---

[1] "Development agreement," was apparently intended to refer to the Land Disposition Agreement.

[2] According to the RFP, the City would then have the right to retain the entire purchase price and reclaim clear title to the Site.

[3] A second amendment dated May 3, 1999, instructed a new owner, RRI, to provide an $80,000 payment to the City in lieu of a portion of the above sewer improvement work if the City received a State grant for certain sewer replacement work.

[4] Some site work such as clearing and grading may have been performed.

[5] The consideration also included an agreement from CHA not to operate or lease a lodging facility with one-quarter mile of the Site for 40 years.

parking easements granted by RRI to third parties in December 1998. In conjunction with this transfer, the City executed an amended LDA with RRI and BLA. While the amended LDA extended by one year the period by which BLA had to achieve 15 percent completion of the first hotel located on Revere Beach Boulevard, it also expanded the project scope by adding a second hotel to be constructed at the Site. It eliminated the two-year deadline and again did not include a schedule for the completion of the entire project.

In September 2000, the Mayor wrote to BLA's attorney stating that it was evident BLA would not be able to reach a level of construction reasonably close to 15 percent completion by December 22, 2000, the required date under the amended LDA. On November 6, 2000, the City informed BLA of its intention to reclaim the property. BLA transferred the Site back to the City on January 31, 2001 for $1.00.

**Chronology of Events**

| | |
|---|---|
| May 1997 | City advertised RFP for disposition of Site. |
| June 9, 1997 | City received one proposal from CHA. |
| September 2, 1997 | City transferred Site to CHA for $200,000 and executed Land Disposition Agreement with CHA for development. |
| January 23, 1998 | City and CHA executed Land Development Agreement with CHA for public utilities improvement. |
| March 18, 1998 | CHA and Surf Club Associates granted parking easement to Trustees of the Festa Boulevard 3,4, and 5, Nominee Trust. |
| December 3, 1998 | City and CHA amended Land Development Agreement. |
| December 15, 1998 | CHA transferred Site to Red Roof Inns for $2.842 million. |
| | Red Roof Inn granted and recorded parking easements to Surf Club Associates. |
| May 3, 1999 | City and RRI amended Land Development Agreement. |
| December 28, 1999 | Red Roof Inns transferred Site to Boston Logan Associates LLC for $1.00. |
| | City, RRI, and BLA amended Land Disposition Agreement. |
| January 31, 2001 | Boston Logan Associates LLC transferred site back to City for $1.00. |

## Issues

**1. The evaluation criteria set forth in the RFP were deficient.**

The RFP issued by the City in May 1997 stated that the development proposals would be evaluated on the basis of the following seven, equally weighted criteria:

1. Purchase price of the subject parcel, together with the estimated economic stimulus to Revere Beach area.
2. Submission of a hotel and commercial development plan which best promotes the beachfront area and addresses urban design issues relating to massing, density, landscaping and open space in a manner which is sensitive to minimizing impact to the beachfront.
3. Submission of a hotel and commercial development plan which provides for a minimum 125 room full service hotel and restaurant facility with a minimum of 10,000 sq. ft. associated retail space within ¼ mile of the subject parcel.
4. The design criteria shall be based upon the appropriateness of the design, configuration, and orientation of the proposed development to the Revere Beach area and its conduciveness to attracting tourism and related commercial activity to the beach area.
5. The experience and track record of the proposed developer in new construction and proven ability to develop and attract retail and commercial tenants to retail space as well as the ability to secure financial resources adequate to implement the proposal.
6. The ability of the developer to secure all necessary permits in a timely fashion and commence construction within 24 months of taking title to the property.
7. The value of $530,000 has been established for this parcel based on an appraisal conducted by John D. Heaphy Appraisal Associates.

As described below, many of these evaluation criteria were inadequate to ensure a fair selection process.

The second, fourth, fifth and sixth criteria were excessively vague. These criteria failed to detail what the City required in the proposal. Specifically, the second and fourth criteria failed to indicate what plan and design features were required. The fifth and sixth criteria failed to detail what documentation needed to be submitted as evidence of satisfying these criteria.

In addition to being vague, the criteria, sometimes stated as goals, did not instruct what objective standards the City would use to evaluate whether proposals met the stated criteria or goals or whether proposers were qualified. In the end, the City lacked not only the assurance that the developer could develop a hotel and commercial area which would promote tourism and activity in the Revere Beach area and minimize the impact to the Beach but also objective standards to use in an evaluation process that would result in the selection of a developer with the financial stability and resources necessary to undertake and complete the proposed development.

The seventh criterion was a declarative statement that failed to provide prospective proposers with any indication of how the City intended to use the appraised value. The statement could have been interpreted to mean that the City would not accept a proposal priced below $530,000.

**2. The City failed to generate competition for the Site.**

M.G.L. c. 30B, §16(g) states that if a governmental body decides to dispose of property at less than fair market value, it must explain the reasons for its decision in its published justification in the Central Register. As previously discussed, one reason stated by the City for disposing of the Site at less than fair market value was that developers showed little interest. However, while the City advertised in accordance with M.G.L. c. 30B, §16(d),[6] there is no evidence in the documents reviewed by this Office that suggest the City attempted any proactive outreach, such as advertising in industry publications, professional trade association bulletins and/or in statewide or national newspapers. More aggressive solicitation by the City for prospective developers may have improved this situation.

[6] M.G.L. c. 30B, §16(d) requires an advertisement for proposals in a newspaper with a circulation sufficient to inform the people in the affected locality. The advertisement must be published at least once a week for two consecutive weeks preceding the day selected for opening the proposals. The last publication must occur at least eight days before the proposal opening. In addition, an advertisement must be published in the Central Register at least 30 days before the proposal opening when the acquisition or disposition is for more than 2,500 square feet.

**3. The City's vague RFP submission requirements were inadequate to enable a meaningful review of developer qualifications and plans.**

To facilitate a jurisdiction's evaluation of proposals, an RFP typically sets forth proposal submission requirements detailing what information proposers must submit. The City's RFP did not require proposers to submit certain documentation that would permit the City to conduct a reliable evaluation of proposers' qualifications.

Submission requirements relating to qualifications should minimally require detailed information about previous and ongoing projects as well as the names of contact people on such projects who can provide references. However, the City's RFP failed to define and require detailed information regarding dates, location, contact people and specific project financing information. Instead, it contained only the following vague submission requirements regarding qualifications:

> C. Qualifications Statement
>
> Specific information on the previous experience and other qualification credentials for each of the principal members of the development firm shall be presented. Also included shall be specific references and information describing similar projects either completed or in progress which have been undertaken by the developer.

The RFP submission requirement relating to proposers' financial qualifications was similarly vague:

> D. Financial Qualifications
>
> In order to establish the developer's proven financial responsibility and overall financial ability to undertake the proposed project, a general bank reference must be provided. The bank reference must include a statement concerning the developer's ability to finance the project.

The information solicited by the RFP was insufficient for the City to: 1) check proposers' references on specific development projects - an indicator of how proposers would perform in the future and 2) accurately determine the proposers' financial capacity to complete the proposed development project. Because of the vague submission requirements, the City did not have the information to do a meaningful review of CHA's proposal based on the evaluation criteria set forth.

**4. CHA's proposal did not satisfy the City's submission requirements and therefore the City should have either rejected CHA's proposal as not responsive or subsequently obtained the information for evaluation.**

CHA failed to comply with the City's submission requirements described above. Based on the records reviewed by this Office, CHA did not completely respond to subections C and D of Section IV. Specifically, CHA failed to include previous experience and qualification credentials for each principal member of the development firm as well as a bank reference including a statement concerning the developer's ability to finance the project. Instead, in response to the qualification and financial submission requirements, CHA submitted the following information:

- A corporate brochure for The Claremont Companies including a list of completed projects describing the kind of property, the location, number of units and square footage for each project.
- A chart describing Claremont's "track record." The chart states the amount of total square footage that Claremont had rehabilitated, constructed, purchased, and managed. However, the chart did not identify specific projects that CHA had completed.
- A statement that Claremont should be able to obtain permitting within 24 months because "Claremont has tremendous experience with new development projects" and "the project itself does not seek to stretch the development envelope."
- Statements to the effect that Claremont had estimated it could obtain permits and approval for the Hotel on Revere Beach Boulevard within six to eight months with construction commencing thereafter, expected such construction to take approximately five months, and expected to start hotel construction within one year from the awarding of the RFP and completion within six months after that.
- A statement that Claremont, at the time of its proposal submission, controlled a real estate portfolio with a market capitalization in excess of $500,000,000, had a broad reach in debt markets and had had preliminary discussions with lenders regarding the Revere development project, and was highly confident that a debt and equity capital structure could be put in place without delay.
- A statement that The Claremont Company had "both extensive relationships with lenders and financial institutions which manage our cash and other financial instruments" along with a reference list providing the names and telephone numbers for eight financial institutions.

Given that CHA failed to meet the City's RFP bid submission requirements the City could have rejected CHA as not responsive. Alternatively, the City could have treated the failure to include such information as a minor informality and could have required CHA to provide this information for evaluation. Based on the records reviewed by this Ofiice such information was never obtained.

**5. City records provided for review to this Office contained no documentation indicating that the City conducted an evaluation of the sole proposal received.**

The RFP stated that the city would evaluate proposals. However, this Office found no records indicating that CHA's proposal was evaluated either on the basis of the seven criteria set forth in the RFP or any other basis. The City Council voted to award the contract to CHA on the same day that proposals were due.

**6. The RFP and related agreements did not address either subsequent transfers of or encumbrances on the Site or development rights and thus, failed to ensure the City's interests would be protected.**

The RFP stated that if the chosen developer failed to commence the project within 24 months then the City would have the right to retain the entire purchase price and reclaim clear title to the Site. While both the original and amended LDA and Development Agreements established the obligations of successors and assigns, neither established the City's right to prevent or review and approve/deny transfers of or encumbrances on the Site or the development rights by the developer.[7]

Consequently, as previously discussed, ownership of the Site changed from CHA to RRI to BLA. During the periods of ownership by both CHA and RRI the respective developers of the Site entered into two agreements, dated March 18, 1998[8] and December 15, 1998, which in part, granted parking easements to third parties for parking rights at the Site. Both Agreements stated that the easements ran with the land. The City reacquired the Site on January 31, 2001. It appears that at least one

[7] The RFP stated that if the project was not completed within two years, the City had the right to reclaim clear title of the Site.

[8] This easement was subsequently amended on 1/12/99 to correct a clerical error.

easement may have diminished the value of the Site. Thus, the City's reversionary and financial interests in the Site were not protected.

## Conclusion and Recommendations

The City's land disposition process did not generate competition. While the original Development Agreement did establish actual completion deadlines, the original and amended LDA and amended Development Agreement failed to establish completion deadlines for the project. Furthermore, none of these original or amended agreements addressed the subsequent transfer of or encumbrances on the Site.

To assist the City in avoiding similar problems in the future, the Office offers the following general recommendations for future real property dispositions under M.G.L. c. 30B, §16.

- **RFP evaluation criteria should be specific and provide objective standards to allow for meaningful comparisons.** To its credit, the City, in a recent 2002 RFP to dispose of the Site, inserted objective standards to rate proposals received. By including comparative criteria relating to highest and best use, purchase price, economic impact, relevant experience, financial strength, quality of concept and development timeline, the City outlined, with specificity, what the City required of a proposer in order to achieve ratings of "highly advantageous," "advantageous," or "not advantageous."[9]

- **RFP submission requirements should solicit all information and documentation necessary for the evaluation of the proposals based on the RFP evaluation criteria.**

- **The City should include a non-collusion form in all RFPs and contracts for the acquisition and disposition of real property interests.** While M.G.L. c. 30B, §16 does not explicitly require a non-collusion form for the disposition of real property, it is this Office's recommendation that a non-collusion form be

---

[9] For example, the City's criterion relating to purchase price stated that a proposer would receive a rating of highly advantageous if it offered a price greater than the appraised value. To receive a rating of advantageous the proposer would be required to offer the appraised value. Finally, the criteria stated that if the proposer submitted a price proposal below the appraised value, the proposer would receive a rating of not advantageous.

required for transactions done pursuant to M.G.L. c. 30B, §16.[10]

- **For each RFP and any related agreements, the City should consider whether to protect its interests by including restrictions on the subsequent use of the property.** M.G.L. c. 30B, §16(a) allows jurisdictions to restrict the subsequent use of property. If the City chooses to include subsequent use restrictions, the City should take several additional steps to ensure the effectiveness of the restrictions. First, such restrictions should be incorporated into the deed and/or any agreements relating to the real property. Second, such deed and any agreements relating to the real property should be recorded at the Registry of Deeds to ensure that notice of the restriction(s) is provided to all potential interest holders.

Possible restrictions relating to the sale, transfer of interests in, or development rights to a parcel could include:

1. Any necessary prohibitions, restrictions, or limitations on or prior approvals for subsequent sales, encumbrances such as but not limited to easements or partial-interest transfers;

2. requirements for profit-sharing;

3. retention of a right of first refusal;

4. requirement that certain actions be contingent upon prior written approval by the City; and/or

5. the City, being owner on record at the Registry of Deeds, holding the deed in escrow, as leverage, until the developer has completed the project in accordance with the RFP and any related agreements. [11]

These kinds of actions will protect the City's interest in real property.

- **The City's advertising period should be sufficient to generate competition.** Based on its RFP requirements, the City should assess the advertising period necessary for developers to prepare substantive proposals. While M.G.L. c. 30B, §16(d) sets forth the minimally required advertising period, the City is encouraged to extend such period when doing so is likely to generate additional competition.

- **The City should plan strategies for outreach to developers.** Contacting

---

[10] M.G.L. c. 30B, § 10 requires non-collusion forms be included in contracts for supplies or services.

[11] If the City elects this option, for liability purposes it should obtain indemnification from the owner or developer.

potential proposers and advertising in statewide or national newspapers and professional trade journals are all means that can and should be used in addition to advertising in a local newspaper and the *Central Register*. In addition to generating competition, a broadened advertising strategy will dispel any appearances of favoritism.

- **The City should document its evaluation process.** Receipt of only one proposal does not automatically suggest that the proposer is qualified. Even when only one proposal is received, the City has an obligation to conduct a systematic review on the basis of each evaluation criterion contained in the RFP and to document that review. These records should be maintained in the project file and serve as documentation assuring public accountability.

In addition, this Office has two general recommendations for all governmental bodies valuing property as required M.G.L. c. 30B, §16(b).

- **Governmental bodies should incorporate the Uniform Standards for Professional Appraisal Practice in its procurements for appraisal services.** The City's written scope of services for procuring appraisal services should require appraisers to follow Standard 1 of the Uniform Standards for Professional Appraisal Practice (USPAP). USPAP Standard 1 contains specific requirements for conducting appraisals.

- **Governmental bodies should include experience requirements for appraisers in its procurement for appraisal services.** As a minimum requirement, the City should require licensed appraisers to demonstrate that they have performed at least three appraisals of properties with characteristics similar to the subject parcel within the past five years. The City should require that individuals proposing to perform appraisal services provide all references relevant to their performance appraising similar property within the last five years. The City should then choose to contact a set number of those references and use the information obtained to evaluate the response.

An official website of the Commonwealth of Massachusetts Here's how you know

Exhibit 5

Menu

Mass.gov

Search Mass.gov SEARCH

(/) > State Employee Resources (/topics/state-employee-resources) > ... > Financial Interests Conflicting with Official Duties (G.L. c. 268A, §§ 6, 1

SETTLEMENT

# Disposition Agreement in the Matter of Jeanne Carnevale

| | |
|---|---|
| DATE: | 04/16/2020 |
| ORGANIZATION: | State Ethics Commission |
| DOCKET NUMBER: | 20-0001 |

TABLE OF CONTENTS


- Disposition Agreement (#disposition-agreement)
- Findings of Fact (#findings-of-fact)
- 22 Catherine Drive (#22-catherine-drive)
- 32 Columbia Boulevard (#32-columbia-boulevard)
- 22 Lynnfield Street (#22-lynnfield-street)
- Resolution (#resolution)


## Disposition Agreement

The State Ethics Commission ("Commission") and Jeanne Carnevale enter into this Disposition Agreement pursuant to Section 3 of the Commission's Enforcement Procedures. This Agreement constitutes a consented-to final order enforceable in the Superior Court, pursuant to G.L. c. 268B, § 4(j).

On March 19, 2018, the Commission initiated a preliminary inquiry, pursuant to

G.L. c. 268B, § 4(a), into possible violations of the conflict of interest law, G.L. c. 268A. On October 17, 2019, the Commission concluded its inquiry and found reasonable cause to believe that Jeanne Carnevale violated G.L. c. 268A, §§ 19 and 23(b)(2)(ii).

The Commission and Jeanne Carnevale now agree to the following findings of fact and conclusions of law:

## Findings of Fact

1. Jeanne Carnevale ("Carnevale"), a resident of Peabody, Massachusetts, was at all relevant times the City of Peabody ("City") Treasurer.

2. As City Treasurer, Carnevale was responsible for initiating tax title foreclosure proceedings on properties with delinquent real estate taxes.

3. During the relevant time, Carnevale and real estate agent Janet Howcroft ("Howcroft") were friends.

4. As of October 25, 2016, Carnevale's daughter was trustee of Victory Realty Trust, a trust created to purchase and sell real property.

5. As of October 25, 2016, Carnevale's husband, Richard Carnevale, was a beneficiary of Victory Realty Trust.

6. As of October 25, 2016, Howcroft's husband, Richard Howcroft, was a beneficiary of Victory Realty Trust.

7. Melo's Construction, LLC was at all relevant times a building contracting company in Peabody. Melo's Construction performed private vinyl siding work on Carnevale's private residence in or about 2013.

## 22 Catherine Drive

### Facts

8. As of 2015, the property located at 22 Catherine Drive, Peabody, Massachusetts had an outstanding tax liability of approximately $27,624. The property was owned by the Catherine Drive Estate.[1]

9. The City's Office of Inspectional Services deemed 22 Catherine Drive unsafe on May 20, 2015.

10. Carnevale as City Treasurer hired private attorney Paul Rabchenuk ("Rabchenuk") to probate the Catherine Drive Estate so that 22 Catherine Drive could be sold.[2]

11. In May 2015, the principal of Melo's Construction and the administrator of the Catherine Drive Estate, who was also an heir, signed a purchase and sale agreement for Melo's Construction to purchase 22 Catherine Drive for $195,000.

12. The purchase and sale agreement identified Howcroft as the real estate broker. Her broker's fee under the purchase and sale agreement was $9,750.

13. According to the purchase and sale agreement, the closing on the sale of 22 Catherine Drive was scheduled for July 31, 2015.

14. The closing did not occur on July 31, 2015.

15. On or about August 4, 2015, Carnevale as City Treasurer sent a letter on City Treasurer letterhead to the administrator and heir of the Catherine Drive Estate noting that the City had expended resources to assist him with probating his parents' estate and because the City had been unable to contact him, it would be moving forward with court actions including foreclosure proceedings on 22 Catherine Drive due to delinquent taxes.

16. On August 13, 2015, the administrator and heir of the Catherine Drive Estate went to Carnevale's City Treasurer's office to discuss 22 Catherine Drive with Carnevale. In an email to real estate agent Howcroft and attorney Rabchenuk sent using her City email account, Carnevale recounted her discussion with the administrator and heir as follows:

*I informed him that we are still moving forward with the closing. . . . He said that it is the "best news." I told him that he needed to call Paul [Rabchenuk] Monday and let him know that he is going to cooperate with him and participate in the closing. I also told him that foreclosure is the next step if he does not cooperate and that I expect him to contact me on Monday. I explained the seriousness of the situation and that he should be listening to me, Paul and Janet [Howcroft] and no one else. I am hopeful I got through to him.*

17. The Essex County Probate and Family Court issued attorney Rabchenuk a license to sell 22 Catherine Drive on September 1, 2015.

18. The administrator and heir of the Catherine Drive Estate sold 22 Catherine Drive to Melo's Construction on October 2, 2015 for $195,000. At the time, the assessed value of the property was $282,800.

19. Melo's Construction secured a construction permit from the City to construct a garage addition with a kitchen and bath valued at $90,000. Melo's Construction resold 22 Catherine Drive for $625,000 on June 1, 2016.

### Conclusions of Law

20. Section 23(b)(2)(ii) of G.L. c. 268A prohibits a municipal employee from knowingly, or with reason to know, using or attempting to use his official position to secure for himself or others unwarranted privileges or exemptions which are of substantial value and which are not properly available to similarly situated individuals.

21. As City Treasurer, Carnevale was a municipal employee as that term is defined in G.L. c. 268A, § 1(g).

22. The opportunity to purchase 22 Catherine Drive from the administrator and heir of the Catherine Drive Estate was a privilege.

23. This privilege was of substantial value. As a result of the purchase, Howcroft was able to receive a broker's fee of $9,750 and Melo's Construction was able to realize a substantial profit on the June 1, 2016 sale of 22 Catherine Drive.

24. This privilege was unwarranted because it was secured through Carnevale's knowing use of her City Treasurer position and her foreclosure power to steer, direct and compel the administrator and heir to sell 22 Catherine Drive to Melo's Construction using her friend Howcroft as his real estate broker.

25. This privilege was not properly available to similarly situated individuals because no private buyer of real estate is entitled to benefit from the use of the official governmental power of a city treasurer to foreclose on property for nonpayment of taxes to steer, direct, coerce or otherwise compel the owner of the real estate to sell to them.

26. Therefore, by using her official City Treasurer position to steer, direct and compel the administrator and heir of the Catherine Drive Estate to sell property to Melo's Construction and to otherwise facilitate that sale, Carnevale knowingly used her City Treasurer position to secure for Howcroft and Melo's Construction an unwarranted privilege of substantial value not properly available to other similarly situated individuals. In so doing, Carnevale violated § 23(b)(2)(ii).

## 32 Columbia Boulevard

### Facts

27. As of 2016, the property located at 32 Columbia Boulevard, Peabody, Massachusetts had an outstanding tax liability of approximately $24,613. The property was owned by the Columbia Boulevard Estate.[3]

28. At the time, the daughter of the deceased owner of 32 Columbia Boulevard (the "Decedent's Daughter") was living at 32 Columbia Boulevard and unable to pay the real estate taxes.

29. In or about May 2016, Carnevale as City Treasurer hired attorney Rabchenuk to probate the

Columbia Boulevard Estate so that 32 Columbia Boulevard could be sold. Attorney Rabchenuk charged $733.36 for filing fees and advertising, which the City paid on July 6, 2016.

30. In order for her to move from 32 Columbia Boulevard upon its sale, the Decedent's Daughter required replacement housing. On or about July 12, 2016, Carnevale as City Treasurer sent a letter on City Treasurer letterhead to the Peabody Housing Authority requesting assistance in placing the Decedent's Daughter in "suitable housing."

31. On August 23, 2016, Carnevale as City Treasurer contacted the Peabody Housing Authority using her City email account to ask about the Decedent's Daughter's place on the public housing list. Carnevale advised that a "cash sale" for 32 Columbia Boulevard was ready to proceed. The "cash sale" was the sale of 32 Columbia Boulevard to Victory Realty Trust.

32. On September 16, 2016, Carnevale, using her City email, notified attorney Rabchenuk and real estate agent Howcroft that the Decedent's Daughter would soon have housing and that they needed to complete the "two trusts." The "two trusts" were the Decedent's Daughter's Trust[4] and Victory Realty Trust.

33. The Decedent's Daughter's Trust was recorded with the Southern Essex District Registry of Deeds on September 20, 2016 along with a quitclaim deed to the trustee of the Decedent's Daughter's Trust.

34. On September 22, 2016, Carnevale as City Treasurer used her City email to request an invoice from attorney Rabchenuk for his legal work related to establishing the Decedent's Daughter's Trust. Attorney Rabchenuk submitted an invoice for $5,710 for the Decedent's Daughter's Trust, which the City paid on September 29, 2016.

35. On September 29, 2016, Carnevale as City Treasurer again contacted the Peabody Housing Authority using her City email to ask when the Decedent's Daughter's apartment would be ready stating, "She is currently living with no heat/hot water in the house."

36. Richard Carnevale signed a check dated October 6, 2016, to attorney Rabchenuk from The Carnevale Group checking account in the amount of $587.50 for drafting the Victory Realty Trust. Richard Carnevale operates The Carnevale Group. Carnevale is a signatory on The Carnevale Group checking account and uses the company's email account.

37. On October 25, 2016, Victory Realty Trust was recorded at the Southern Essex District Registry of Deeds. Carnevale's daughter was trustee of Victory Realty Trust. Carnevale's husband, Richard Carnevale, and Howcroft's husband, Richard Howcroft, were beneficiaries.

38. On November 15, 2016, Carnevale as City Treasurer again contacted the Peabody Housing Authority using her City email inquiring as to the date when the Decedent's Daughter's public housing unit would be available. The Decedent's Daughter moved into public housing on November 21, 2016.

39. On November 22, 2016, the decedent's granddaughter, as trustee of the Decedent's Daughter's Trust, signed a purchase and sale agreement to sell 32 Columbia Boulevard to Carnevale's daughter, as

trustee for Victory Realty Trust, for $125,000. On the same date, Carnevale's daughter, as trustee for Victory Realty Trust, signed a purchase and sale agreement to sell 32 Columbia Boulevard to Melo's Construction for $210,000.

40. At the time, the assessed value of 32 Columbia Boulevard was $228,800.

41. On November 26, 2016, Victory Realty Trust issued a check for $5000 payable to the decedent's granddaughter as trustee for Decedent's Daughter's Trust as an advance payment on the purchase of 32 Columbia Boulevard.

42. On December 6, 2016, two deposits of $59,000 were made to the Victory Realty Trust checking account from lines of credit secured by Victory Realty Trust beneficiaries Richard Carnevale and Richard Howcroft.

43. On December 7, 2016, the trustee of the Decedent's Daughter's Trust sold 32 Columbia Boulevard to the trustee of Victory Realty Trust, Carnevale's daughter, for $125,000. Under the terms of the sale, real estate agent Howcroft was to receive a broker's commission of $4,000.

44. On December 12, 2016, the trustee of the Decedent's Daughter's Trust filed a confirmatory deed for the sale of 32 Columbia Boulevard to the trustee of Victory Realty Trust.

45. Also on December 12, 2016, the trustee of Victory Realty Trust, Carnevale's daughter, sold 32 Columbia Boulevard to Melo's Construction for $210,000.

46. On December 12, 2016, a deposit of $204,016.84 was made to the Victory Realty Trust checking account.

47. On December 15, 2016, Victory Realty Trust issued the following checks: Janet Howcroft, $59,000.00; Richard Carnevale, $59,000.00; The Carnevale Group, $43,430.92; and Janet Howcroft $43,430.92.

48. On December 15, 2016, an electronic funds transfer of $21,594 was made from The Carnevale Group to Carnevale and her husband's joint savings account.

49. On December 15, 2016, an electronic funds transfer of $1,050 was made from Carnevale and her husband's joint savings account to their joint checking account.

50. On December 15, 2016, Carnevale wrote a check for $1,050 to her daughter for "trustee fees."

51. The City was not reimbursed from the sale of 32 Columbia Boulevard for any of the fees it paid to attorney Rabchenuk in connection with probating the Columbia Boulevard Estate and establishing Decedent's Daughter's Trust.

## § 19

52. Except as otherwise permitted,[5] § 19 of G.L. c. 268A prohibits a municipal employee from participating[6] as such an employee in a particular matter[7] in which, to his knowledge, he or an

immediate family member[8] has a financial interest.[9]

53. The particular matters in which Carnevale participated were the decisions to hire attorney Rabchenuk to probate the Columbia Boulevard Estate and create a trust to sell 32 Columbia Boulevard, and to expedite Decedent's Daughter's move into public housing. Carnevale participated as City Treasurer in these particular matters by: (1) hiring attorney Rabchenuk to probate the Columbia Boulevard Estate and create the trust, and repeatedly following up regarding this legal work with emails to attorney Rabchenuk copied to real estate agent Howcroft; and (2) sending the July 2016 letter on her City Treasurer letterhead to the Director of the Peabody Housing Authority and repeatedly following up using her City email to the housing authority in an effort to expedite Decedent's Daughter's move out of 32 Columbia Boulevard and into public housing.

54. Carnevale's daughter is a member of Carnevale's immediate family and trustee of Victory Realty Trust. Carnevale's husband is a member of Carnevale's immediate family and a beneficiary of Victory Realty Trust.

55. Carnevale and her immediate family had a financial interest in the decisions to hire attorney Rabchenuk to probate the Colombia Boulevard Estate and create the Decedent's Daughter's Trust and to contact the Peabody Housing Authority in order to expedite the Decedent's Daughter's move into public housing, because these decisions, and the actions that were taken as a result, facilitated the sale of 32 Columbia Boulevard to Victory Realty Trust of which her daughter was trustee and her husband was a beneficiary.

56. When, as City Treasurer, Carnevale asked attorney Rabchenuk to draft the Decedent's Daughters Trust documents and notified the Peabody Housing Authority that the sale of 32 Columbia Boulevard was imminent in an effort to expedite the Decedent's Daughter's move to public housing, she knew that her immediate family members had a financial interest in these matters as they were necessary for the completion of the sale of 32 Columbia Boulevard to Victory Realty Trust.

57. Therefore, by as City Treasurer hiring attorney Rabchenuk to probate the Columbia Boulevard Estate and create the Decedent's Daughter's Trust, and by as City Treasurer repeatedly communicating with the Peabody Housing Authority to expedite the Decedent's Daughter's move to public housing, Carnevale violated § 19.

## § 23(b)(2)(ii)

## Use of Public Funds to Probate a Private Estate

58. The use of public resources to pay attorney Rabchenuk to probate the Columbia Boulevard Estate and create the Decedent's Daughter's Trust was a privilege.

59. This privilege was unwarranted because Carnevale's use of public resources for these private purposes was not authorized by law except only where the City was fully reimbursed from the proceeds of sale of the estate's property.

60. The unwarranted privilege was of substantial value because attorney Rabchenuk's legal fees totaled $6,443.36 and the creation of the trust made possible Victory Realty Trust's profitable acquisition of 32 Columbia Boulevard.

61. Carnevale secured this unwarranted privilege for herself and Victory Realty Trust and its beneficiaries. Attorney Rabchenuk's services on the Columbia Boulevard Estate and Decedent's Daughter's Trust enabled Victory Realty Trust to purchase 32 Columbia Boulevard.

62. The privilege of using City funds to pay to probate a private estate and create a private trust without full reimbursement of the City for the expenditure was not properly available to Carnevale, the Victory Realty Trust beneficiaries or any other similarly situated individuals seeking to purchase real estate in Peabody.

63. Therefore, by, as City Treasurer, using public resources for a private purpose without fully reimbursing the City for that use, Carnevale knowingly used her official position to secure an unwarranted privilege of substantial value for herself and Victory Realty Trust and its beneficiaries.

## § 23(b)(2)(ii)

## Use of City Email and Letterhead to Expedite Public Housing Move

64. The Decedent's Daughter's expedited move into Peabody Housing Authority housing so that Victory Realty Trust could purchase 32 Columbia Boulevard was a privilege which Carnevale sought by repeatedly contacting the housing authority using her official title, office letterhead and City email.

65. This privilege was unwarranted because there was no legal basis or justification for Carnevale to use public resources, including her position as City Treasurer, to facilitate and expedite the Decedent's Daughter's move into public housing so that Victory Realty Trust could purchase 32 Columbia Boulevard.

66. This privilege was of substantial value because the Decedent's Daughter vacating the property enabled Carnevale's daughter, as trustee of Victory Realty Trust, to purchase the property for $125,000, when the assessed value was $228,800, and immediately sell the property for $210,000, realizing a profit of $85,000 for the beneficiaries of the Victory Realty Trust.

67. This unwarranted privilege was not properly available to Carnevale or any other similarly situated individual as no public employee may use his or her official position to help facilitate a private purchase of real estate with which the employee, the employee's family or the employee's friends are associated.

68. Therefore, by, as City Treasurer, using public resources to expedite the Daughter's move to public housing, Carnevale knowingly used her official position to secure for herself, her immediate family, and her friends an unwarranted privilege of substantial value that was not property available to similarly situated individuals. Thus, Carnevale violated § 23(b)(2)(ii).

# 22 Lynnfield Street

## Facts

69. As of 2015, the property located at 22 Lynnfield Street, Peabody, Massachusetts had an outstanding tax liability of approximately $12,379. The property was held in Trust ("Lynnfield Trust"[10]).

70. In September 2015, Carnevale as City Treasurer filed a complaint in Land Court to foreclose on the tax lien.

71. Between September 2015 and 2017, a trustee of the Lynnfield Trust was removed and replaced, and a private attorney was granted a mortgage on the property.

72. In or about 2017, Carnevale as City Treasurer asked a Peabody Building Commissioner whether the building on 22 Lynnfield Street was a two-family or a single-family dwelling because she was assisting the owners in selling the property.

73. The Building Commissioner advised Carnevale that he considered the building to be a two-family dwelling.

74. Victory Realty Trust required a mortgage to purchase the 22 Lynnfield Street property. An April 2, 2017 email to Century Bank, from Carnevale's husband's email account, advised that Victory Realty Trust planned to close on the purchase of 22 Lynnfield Street in mid-April.

75. In an April 12, 2017 email, Carnevale as City Treasurer advised the City's Tax Title Attorney's paralegal that the sale of 22 Lynnfield Street was scheduled for closing on April 20, 2017, and asked whether a redemption[11] could be filed immediately following the closing.

76. In accordance with Carnevale's request as City Treasurer, the City's Tax Title Attorney's paralegal prepared an Instrument of Redemption dated April 18, 2017.

77. On April 26, 2017, the trustee of Victory Realty Trust secured a mortgage for 22 Lynnfield Street through Century Bank in the amount of $244,000.

78. On April 26, 2017, the trustee of the Lynnfield Trust sold 22 Lynnfield Street to the trustee of Victory Realty Trust for $239,500.

79. Carnevale as City Treasurer signed the Instrument of Redemption and it was recorded with the Southern Essex Registry of Deeds on May 11, 2017.

## Conclusions of Law

## § 19

80. The decisions to ask a City Building Commissioner to determine whether 22 Lynnfield Street was a

two-family or a single-family dwelling, to direct the City's tax title attorney to prepare an Instrument of Redemption in anticipation of the sale of 22 Lynnfield Street to Victory Realty Trust, and to sign the Instrument of Redemption, were particular matters. Carnevale participated as City Treasurer in each of these particular matters by making these decisions and taking these actions.

81. Carnevale's immediate family had a financial interest in these particular matters because her decisions and actions as City Treasurer facilitated Victory Realty Trust's purchase of 22 Lynnfield Street and cleared the tax lien. When she acted as City Treasurer on these particular matters, Carnevale knew of her immediate family's financial interest in these particular matters resulting from their involvement in the Victory Realty Trust.

82. Therefore, by as City Treasurer taking actions she knew would facilitate the sale of 22 Lynnfield Street to the Victory Realty Trust, Carnevale participated officially in particular matters in which her immediate family had to her knowledge a financial interest. In so doing, Carnevale violated §19.

## Resolution

83. The Commission has determined that the public interest would be served by the disposition of this matter without further enforcement proceedings, on the basis of the following terms and conditions agreed to by Jeanne Carnevale:

(1) that Jeanne Carnevale pay to the Commonwealth of Massachusetts, with such payment to be delivered to the Commission, the sum of $50,000 as a civil penalty for violating G.L. c. 268A, §§ 19 and 23(b)(2)(ii); and,

(2) that Jeanne Carnevale waive all rights to contest, in this or any other administrative or judicial proceeding to which the Commission is or may be a party, the findings of fact, conclusions of law and terms and conditions contained in this Agreement.

By signing below, Jeanne Carnevale acknowledges that she has personally read this Disposition Agreement, that it is a public document, and that she agrees to all of the terms and conditions therein.

---

[1] A pseudonym.

[2] The City paid Attorney Rabchenuk's fees. The City was reimbursed upon the sale of 22 Catherine Drive.

[3] A pseudonym.

[4] A pseudonym.

[5] None of the exemptions applies.

[6] “Participate” means to participate in agency action or in a particular matter personally and substantially as a state, county or municipal employee, through approval, disapproval, decision, recommendation, the rendering of advice, investigation or otherwise. G.L. c. 268A, § 1(j).

[7] “Particular matter” means any judicial or other proceeding, application, submission, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, decision, determination, finding, but excluding enactment of general legislation by the general court and petitions of cities, towns, counties and districts for special laws related to their governmental organizations, powers, duties, finances and property. G.L. c. 268A, § 1(k).

[8] “Immediate family” means the employee and his spouse, and their parents, children, brothers and sisters. G.L. c. 268A, § 1(e).

[9] “Financial interest” means any economic interest of a particular individual that is not shared with a substantial segment of the population of the municipality. *See Graham v. McGrail*, 370 Mass. 133 (1976). This definition has embraced private interests, no matter how small, which are direct, immediate or reasonably foreseeable. *See EC-COI-84-98.* The interest can be affected in either a positive or negative way. *EC-COI-84-96.*

[10] A pseudonym.

[11] An Instrument of Redemption is a document signed by the City Treasurer indicating that the tax title taking, including costs, has been satisfied.

(/)

All Topics (/topics/massachusetts-topics)    Site Policies (/massgov-site-policies)    Public Records Requests (/topics/public-records-requests)

© 2024 Commonwealth of Massachusetts.
Mass.gov® is a registered service mark of the Commonwealth of Massachusetts. **Mass.gov Privacy Policy** (/privacypolicy)

Exhibit 6

# TOWN OF WESTBOROUGH, MASSACHUSETTS

# REQUEST FOR PROPOSALS (RFP)

**Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)**

## 1. REQUEST FOR PROPOSALS

The Town of Westborough, acting by and through its Select Board, is offering for sale, through the Request for Proposal ("RFP") process in accordance with Massachusetts General Laws Chapter 30B, Section 16, the parcel of land with a building and other improvements thereon located at 231 Turnpike Road, containing 29 acres, more or less, currently known as the former Regal Cinema property, identified on Assessor's Map 32 as Parcel 48, and shown as Lot 1 on a plan recorded with the Worcester South District Registry of Deeds in Book 714, Page 77, a copy of which plan is attached as Attachment A (the "Property").

For the purposes of this RFP, the term "Town" shall mean the Town of Westborough, and the term "Select Board" shall mean the Town of Westborough Select Board, and shall be interchangeable and synonymous with "Select Board" or "Board." The awarding authority is the Select Board. The aforementioned terms shall include the Select Board's designee.

Sealed proposals must be received by the Chief Procurement Officer/Grants Administrator at the Westborough Town Hall, 34 W. Main Street, Westborough, MA 01581 on or before Monday, July 25, 2022 at 11:00 a.m., at which time and place the proposals will be publicly opened in the Memorial Hall at Town Hall. Proposals become public information when opened. The Submission Requirements are set forth in Section 8, the Evaluation Criteria in Section 9, the Selection Process in Section 10, and the Instructions to Buyers in Section 12. Proposals received after this time will be deemed non-responsive and will not be accepted.

All proposals must be accompanied by a certified or bank check or bid bond, in the amount of $10,000 as bid security, which will be returned to any unsuccessful proposer.

All inquiries or questions regarding this RFP must be in writing and received by the Town no later than Thursday, June 30, 2022 at 4:00 p.m. Questions should be directed to Shab Khan, Westborough Town Hall, 34 W. Main Street, Westborough, MA 01581 or email skhan@town.westborough.ma.us

The successful proposer must enter into a purchase and sale agreement materially on the same terms as set forth the Purchase and Sale Agreement attached hereto as Attachment C and incorporated herein (the "P&S") within 30 days from the date the sale of the Property is awarded to the proposer. The terms and conditions applicable to the sale of the Property are also set forth in Section 11. A deposit of 10% of the purchase price shall be paid upon the execution and the remaining amount shall be paid in full at the closing. The closing shall occur no later than ninety (90) days from the date the parties enter into the P&S or such other date as is acceptable to both parties.

No proposer may withdraw his or her proposal for a period of one hundred fifty (150) days after the date set for the opening thereof.

The Town reserves the right to reject any and all proposals, to negotiate any and all non-mandatory contract terms with the successful proposer, or to cancel this procurement at any time if it is in the Town's best interest to do so.

While the Town believes that the information provided in this RFP, including all exhibits and addendums, if any, is accurate, **the Town makes no representation or warranty, express or implied, as to the accuracy and completeness of the information in this RFP**. The proposer assumes all risk in connection with the use of the information, and releases the Town from any liability in connection with the use of the information provided by the Town. Further, the Town makes no representation or warranty with respect to the Property, including without limitation, the value, quality or character of the Property or it fitness or suitability for any particular use and/or the physical and environmental condition of the Property. The Property will be sold in its "AS-IS" condition.

Each proposer shall undertake its own review and analysis (due diligence) concerning the physical and environmental condition of the Property, applicable zoning and other land use laws, required permits and approvals, and other development, ownership, and legal considerations pertaining to the Property, and the use of the Property, and shall be responsible for applying for and obtaining any and all permits and approvals necessary or convenient for the proposer's use of the Property. All costs and expenses of purchasing and developing the Property, including without limitation, all costs of permitting and improvements, shall be the sole responsibility of the successful proposer.

## 2. DESCRIPTION OF THE PROPERTY

The property consist of a parcel of land with the building thereon located at 231 Turnpike Road, Westborough, currently known as the former Regal Cinema property, identified on Assessor's Map 32, parcel 48, and shown as Lot 1 on a plan recorded with the Worcester South District Registry of Deeds in Book 714, Page 77, a copy of which plan is attached as Attachment A (the "Property").

The Town acquired the Property by Foreclosure in Tax Lien Case dated January 5, 2022 and recorded with the Registry in Book 66983, Page 53. Proposers are advised that the Property is subject to the former owner's rights of redemption, which rights shall terminate if they are not exercised within one (1) year from the date of the judgment that, is on January 4, 2023.

The Property, as surveyed in 2017, consists of approximately 29.336 acres of land, improved by an approximately 49,000 square foot building consisting of 12 individual theaters built in 1997 with brick veneer and a tar and gravel roof, with six (6) bathrooms, an elevator and snack stand, and is connected to Town water and sewer. The building on the Property has suffered extensive damage from vandalism since 2017, when Regal Cinema closed, including destruction of bathroom fixtures, walls, drop ceilings and glass. The building has also suffered water damage in several areas due to burst pipes in the sprinkler system, which needs to be repaired.

Proposers are advised that they may not be able to use the building without extensive renovations. The Town believes the gas and electricity was turned off in 2021. Before utilities can be turned back on, all systems, including water, gas, electrical and HVAC, will need to be examined and repaired as needed. The fire escapes will also need to be inspected and certified prior to any occupancy. Photographs showing the current condition of the building and the Property are attached hereto as Attachment H.

It should be noted that it is not just the actual structure that is in disrepair, but also the exterior supporting components of the Property, such the pavement, landscaping, stormwater management, signs, and lighting.

The Property is subject to use limitations, rights and obligations, including cost-sharing arrangements, set forth more particularly in the Declaration of Reciprocal Covenants, Easements and Restrictions (the "Declaration") recorded with the Worcester South District Registry of Deeds in Book 18745, Page 313 and attached hereto as to as Attachment D. Proposers are advised to review the Declaration to ascertain the cost-sharing arrangements and sum due under said Declaration.

Proposers are advised that the Town may reserve trail easements in, on, under, and across a portion or portions of the Property for use by the Town and members of the public, the approximate location of which is shown on the sketch plan attached hereto as Attachment G. The Town anticipates that exact locations of the easements, and the terms of the easement, shall be determined in consultation with the successful proposer and shown on plans prepared by the proposer and acceptable to the Town. The Town expects to convey the trail easements before the Property is conveyed to the successful proposer.

The Property, including any and all buildings and other improvements thereon, shall be conveyed in their **"AS-IS" condition**, without any representations or warranties of any kind whatsoever. The Town shall have no obligation to make any repairs or improvements to the Property or to deliver it in broom-clean condition.

## 3. ZONING

The Property are currently zoned BA Highway Business (see Attachment B for Highway Business Zoning Regulations). All proposals must indicate the proposed use for the Property. The successful proposer will be responsible for acquiring all necessary permits and zoning relief/changes.

## 4. TOWN MEETING APPROVAL

The Westborough Town Meeting authorized the Select Board to sell the Property pursuant to the vote taken under Article 20 of the March 19, 2022 Annual Town Meeting.

## 5. PRICE

The purchase price is a significant criteria to the Town, and proposers are advised to offer the highest price. However, the Town reserves the right to make an award to a proposal that offers a price other than the highest price. The Town will consider the overall value of the offer based on the selection criteria set forth herein.

## 6. READINESS TO PROCEED

The Town is interested in selling the Property to a proposer who is ready to put the Property to productive use soon after the closing. Proposers are required to identify their proposed use of the Property and provide a schedule of permitting, financing, and rehabilitation of the Property, as well as a detailed description of how the proposer intends to finance the project. The Town will give preference to proposers who have the financial and operational wherewithal or are otherwise ready to proceed with the development of the Property. Proposers are to include with their proposals a development schedule from the time they enter into the P&S with the Town to the closing, addressing permits and approvals required for development and anticipated financial closings.

## 7. PROPOSAL PROCESS AND SCHEDLE OF EVENTS

A. Availability of RFP Packages. This project is being Electronically Bid (E-Bid). You can register to become a bidder (for free) online at www.BidNetDirect.com. For assistance, contact BidNetDirect.com at 800-835-4603.

RFP Documents will be available online beginning at **8 AM on May 26, 2022** at https://www.bidnetdirect.com/massachusetts/townwestborough. All plan holders must have an active online account on www.bidnetdirect.com to acquire documents, receive project notifications, download plan holders list and receive addenda. It is the responsibility of prospective proposers to check www.BidNetDirect.com for new information via any addenda to this solicitation. **Any addenda issued will be emailed to all plan holders registered with BidNetDirect.**

B. Site Visit; Pre-Submittal meeting. There will be a site visit on location on **June 16, 2022, at 1:00 p.m.** Proposers are to meet at the site at 231 Turnpike Road, following which a meeting will be held at the Westborough Town Hall, 34 W. Main Street, Westborough, MA 01581, where Town representatives will respond to questions about the Property, the selection process, and related issues. Proposers are advised to do their own due diligence, and neither the Town nor any of its agents or representatives is responsible for representations made regarding the site view or pre-submittal meeting.

C. Deadline for Submission of Questions. **The deadline for written questions is Thursday, June 30, 2022 at 4:00 p.m.**

All inquiries and questions pertaining to this RFP must be in writing and should be emailed to Shab Khan, Chief Procurement Officer, at skhan@town.westborough.ma.us. Answers to all questions will be posted via addenda online at https://www.bidnetdirect.com/massachusetts/townwestborough. All plan holders must be

registered with BidNet to receive addenda. Questions asked at the Site visit on June 16, 2022 will also be emailed to all Plan holders via an addendum through BidNetDirect.com.

In the sole discretion of the Town, written responses to questions raised during the view of the Property or at the pre-submittal meeting may be similarly distributed. The Select Board is not obligated, in any way, to waive RFP requirements or create exceptions for proposers who choose not to attend the pre-submittal meeting or the site view.

D. Submission Deadline. Sealed Proposals shall be submitted **by 11:00 AM on Monday, July 25, 2022 to the following address.**

**All applicants must provide one (1) signed original and five copies with all Bid Forms with their proposal.** Hard copy submittals are to be sealed and identified on the outer envelope as:

**Sale of Property at 231 Turnpike Rd, Westborough (Former Regal Cinema)**
**RFP 22-0080**
**Westborough Town Hall**
**Attn: Shab Khan, CPO**
**34 West Main St.**
**Westborough MA 01581**

No submittals will be accepted after the time and date noted above.

The Town reserves the right to accept any submittal in whole or in any part and to reject any or all submittals if it is deemed in the best interest of the Town.

E. Withdrawal; Effectiveness. Proposals may be withdrawn upon written request to the Office of the Town Manager prior to the submission deadline. After the date scheduled for the opening of the proposals, proposals shall not be modified, amended or withdrawn for a period of one hundred and fifty (150) days.

F. Summary of RFP Schedule

| Activity | Date |
|---|---|
| Posted in Central Register and advertised | Wednesday, June 1, 2022 |
| Site Visit and Pre-Submittal Meeting | Thursday, June 16, 2022, at 1:00 p.m. |
| Deadline for Questions/Inquiries | Thursday, June 30, 2022 at 4:00 p.m. |
| Response to RFP Due at Town Hall | Monday, July 25, 2022 at 11:00 a.m. |

## 8. SUBMISSION REQUIREMENTS

Parties interested in responding to this RFP are invited to submit a proposal in accordance with the following terms and conditions. With submission of a response to this RFP, the proposer acknowledges that he or she has read and understands the requirements and conditions herein.

Sealed Proposals shall be submitted by **Monday, July 25, 2022 at 11:00 a.m. to the following address.**

**All applicants must provide one (1) signed original and five copies with all Bid Forms in the Attachment D of this RFP with their proposal.** Hard copy submittals are to be sealed and identified on the outer envelope as:

**Sale of Property at 231 Turnpike Rd, Westborough (Former Regal Cinema)**
**RFP 22-0080**
**Westborough Town Hall**
**Attn: Shab Khan, CPO**
**34 West Main St.**
**Westborough MA 01581**

No submittals will be accepted after the time and date noted above.

The Town reserves the right to accept any submittal in whole or in any part and to reject any or all submittals if it is deemed in the best interest of the Town.

A. Cover Letter; References. A letter signed by the principal(s) of the proposer who is authorized to submit its RFP response, including a statement of interest, the identity of the proposer, and name of the purchaser of the Property (if other than proposer), and the name, address and contact information of all interested parties. At least three (3) references shall be included.

B. Price Proposal. Proposers must insert the price offered for the Property by filling in the blank spaces in the Price Proposal Form attached hereto in both words and figures (form attached as Attachment E).

C. Proposal Security. Proposal security in the form of a certified check, cashier's check or bid bond payable to the "Town of Westborough" in the amount of $10,000.00 must accompany the proposal package. The proposal security of parties not selected will be returned within a reasonable time after the date of an award. Proposal packages that fail to include this security, or those of responding parties who fail to provide the aforementioned security by the submission deadline, will be rejected as non-responsive. In the event that the successful proposer and the Town fail to enter into a purchase and sale agreement ("P&S") within 30 days of the date of the award or such later date as the Town may agree to, the Town shall retain the proposal security. Otherwise, the proposal security shall be credited to the purchase price, as set forth in the P&S.

D. Forms 1 through 4. Proposers are required to fill out and sign Forms 1 through 4 (the "Required Forms") attached hereto as Attachment F:

- *Form 1, Certificate of Tax Compliance*: required under G.L. c. 62C. §49A, in which the proposer certifies that he or she has complied with all laws of the Commonwealth of Massachusetts relating to taxes.

- *Form 2, Certificate of Non-Collusion*: required under G.L. c. 30B, §10, in which the proposer states that this proposal is made in good faith without fraud or collusion or connection with any other person submitting a proposal signed and dated by the proposer.

- *Form 3, Certificate of Authority*: in which the proposer, if an entity, identifies the names and addresses of the managers, directors, officers, and/or other parties authorized to act on behalf of the entity.

- *Form 4, Real Property Disclosure Statement*: required under G.L. c. 7C, §38, in which the proposer identifies the parties who will have a legal or beneficial interest in the Property and whether any such party is a state or local employee.

E. Financing Information and, if applicable, Loan Commitment. Each proposer must provide evidence of the proposer's ability to meet the financial obligations of the acquisition and development of the Property. Financial statements and background information must be attached to the proposal. If a proposer intends to purchase the Property with a purchase money mortgage, the proposer must specify how much is to be borrowed and submit, in its proposal package, a pre-approval or commitment letter from an institutional lender acknowledging that the proposer has sufficient financial resources to obtain a loan commitment, subject to prevailing terms and conditions. If the proposer provides a pre-approval letter, the proposer must deliver a firm letter of commitment to the Town within thirty (30) days from the date the P&S is fully executed.

F. Development Plan and Schedule; Closing Date. Each proposer must submit narrative on the proposer's proposed use of the Property, the impact of the proposer's use of the Property on Town infrastructure, including water, sewer, drainage, parking, public safety, and roads, and the economic benefit to the Town in tax revenue and in local job creation. Proposers must include a development schedule for permitting and financing their projects, and demonstrate their readiness to commence their projects shortly following the closing.

G. Other. The proposer should include in this section any other information which the proposer believes the Town should know in order to fully evaluate the proposal.

H. Instructions to Proposers. The instructions to proposers are set forth in Section 12 of this RFP.

Failure to meet the submittal requirements will be sufficient cause to reject a proposal. Proposers are solely responsible for reviewing all the provisions of this RFP and any attachments prior to submitting the proposal. Proposals that are incomplete, not properly endorsed, or are otherwise in conflict with the requirements of this RFP, will be rejected.

## 9. EVALUATION CRITERIA

A. Minimum Evaluation Criteria. All responsive proposals must meet the following minimum threshold criteria:

- Complete conformance with all submission requirements set forth in Section 8, including submission of all required forms, including the Price Proposal Form, and

- Statement of proposed use of the Property.

B. Comparative Evaluation Criteria. Proposals meeting the minimum threshold criteria will also be judged on the following comparative evaluation criteria:

- A Highly Advantageous rating will be given to a proposal that in the judgment of the evaluators exceeds the requirements of the RFP.

- An Advantageous rating will be given to a proposal that in the judgment of the evaluators meets the requirements of the RFP.

- A Least Favorable rating will be given to a proposal that in the judgment of the evaluators falls short of meeting the requirements of the RFP.

**(1) Purchase Price.**

- A Highly Advantageous rating will be given to a proposal that offers a price above the fair market value of the Property.

- An Advantageous rating will be given to a proposal that offers the fair market value of the Property.

- A Least Favorable rating will be given to a proposal that offers less than the fair market value of the Property.

Notwithstanding the foregoing, the Town shall not be required to convey the Property to the proposer offering the highest price.

**(2) Other Financial Benefits.**

- A Highly Advantageous rating will be given to a proposal that, in the judgment of the evaluators, presents a plan that has the most favorable financial impact on the community, including taxes, fees, and job growth.

- An Advantageous rating will be given to a proposal that, in the judgment of the evaluators, presents a plan that has an average financial impact on the community.

- A Least Favorable rating will be given to a proposal that, in the judgment of the evaluators, presents a plan that has a below average financial impact on the community.

**(3) Financial Resources.**

- A Highly Advantageous rating will be given to a proposal that is not contingent on financial approval for the purchase and/or development of the Property and the proposer has demonstrable funds to purchase the Property;

- An Advantageous rating will be given to a proposal that is contingent on financial approval, but the proposer has provided a firm commitment from institutional mortgagees to purchase the Property for the offered price.

- A Least Favorable rating will be given to a proposal that, in the judgment of the evaluators, is contingent on financing and the proposer has not provided a firm commitment from institutional mortgagees to purchase the Property for the offered price.

**(4) <u>Ability to Proceed.</u>**

- A Highly Advantageous rating will be given to a proposal that contains the fewest contingencies to closing, and the parties are able to complete the transaction promptly after the parties enter into a P&S. The sale cannot be contingent on the sale or purchase of other property.

- An Advantageous rating will be given to a proposal that contains contingencies to closing, but which can be reasonably satisfied, and the parties are able to complete the transaction, within a reasonable period of time after the date the parties enter into the P&S. The sale cannot be contingent on the sale or purchase of other property.

- A Least Favorable rating will be given to a proposal which is contingent on the satisfaction of contingencies that cannot be reasonably be satisfied within a reasonable period of time after the date the parties enter into the P&S and/or is contingent on the sale or purchase of other property.

**(5) <u>Sustainability.</u>**

- An Advantageous rating will be given to a proposal that the development design includes elements of green, sustainable, climate resilient design and promotes conservation of energy resources consistent with Westborough's Climate Action Plan. Site layout and design addresses environmental issues e.g. wetlands, stormwater management.

- A Least Favorable rating will be given to a proposal that fails to articulate a thoughtful design concept that incorporates green, sustainable, and climate resilient design and does not promote energy conservation.

After evaluating a proposal on the foregoing factors, the evaluators will provide an overall ranking for the proposal as compared to other proposals. For example, a proposal which achieves "Highly Advantageous" and/or "Advantageous" rankings in several categories will not necessarily be disqualified simply because it received a "Least Favorable" ranking in one or more other categories if, in the judgment of the evaluators, the proposal on the whole is "Advantageous" or "Highly Advantageous" to the Select Board. Any notice of award, however, could be contingent upon the potential proposer and the Select Board mitigating any "Least Favorable" criterion ranking prior to the execution of the P&S.

**10. <u>SELECTION PROCESS</u>**

A. All proposals submitted by the proposal filing deadline set forth under Section 7 above will be opened in public and recorded. All information contained in the proposals is public.

B. Each proposer must include sufficient supporting material to allow a meaningful and comprehensive evaluation of its proposal. The Town reserves the right to disqualify any proposal or response due to insufficient supporting or explanatory information, or to request additional supporting information. The Select Board may request additional information of one or more respondents relative to a proposal or qualifications. Requests shall be in writing with the expectation of a written response within a specified time. Proposers may also be invited to appear before the Select Board. Failure to comply with this request will result in a rejection of the proposal at issue. The right to an interview does not automatically extend to all whose proposals are accepted for review, but is granted in the sole discretion of the Select Board.

C. Following the interviews and the receipt of any additional information requested of the proposers by the Town, if any, proposals will be evaluated and rated by the Town according to the comparative evaluation criteria set forth in this RFP. The Select Board will select the most advantageous proposal, taking into consideration all of the evaluation criteria set forth in this RFP. The Select Board is the awarding authority and will notify all proposers in writing of its decision.

D. The proposer selected by the Select Board will be given exclusive rights to negotiate with the Town the terms of the P&S of the Property. If, at any time, such negotiations are not proceeding to the satisfaction of the Town, it its sole discretion, then the Town may choose to terminate said negotiations. The Select Board may select the next most advantageous proposer with whom to initiate negotiations.

E. The selected proposer and the Town shall enter into the P&S within thirty (30) days from the date the proposer is notified of the award unless the Town extends the same, in its discretion.

F. The selected proposer shall, if it intends to obtain financing to purchase the Property, provide the Town with a firm commitment letter from an institutional mortgagee on standard terms and conditions within thirty (30) days of the parties entering into the P&S.

**11. <u>AWARD, TERMS AND CONDITIONS OF SALE</u>**

The Property shall be awarded to the proposer selected in accordance with Section 10 above. The Select Board shall send a letter to the successful proposer, informing the proposer of such award.

The Select Board and the selected proposer (referred to as "Buyer") shall, within 30 days of date of the award, enter into a purchase and sale agreement **<u>materially on the same terms as those set forth in</u>** the Purchase and Sale Agreement attached thereto as <u>Attachment C</u> and incorporated herein (the "P&S"). In the event the successful proposer fails to enter into the P&S with the Town within said 30-day period, the Town may rescind the award and retain any proposal security as liquidated damages.

The P&S shall contain, in addition to the usual provisions, the following terms:

A. At time of execution of the P&S, Buyer shall pay a deposit, which, with the $10,000 proposal security paid with the submission of the proposal, will equal ten percent (10%) of the purchase price. The deposit submitted by Buyer shall be held in escrow by the Treasurer of the Town of Westborough in a non-interest bearing account, and shall be duly accounted for at the time for performance of the P&S. In the event that Buyer fails to fulfill its obligation to purchase the Property, the Town shall retain the deposit as liquidated damages. In the event of any disagreement between the parties, the escrow agent may retain all deposits made under the P&S pending instructions mutually given by the Town and Buyer.

B. If the acquisition of the Property is financed by a lending institution, Buyer must deliver a firm letter of commitment to the Town <u>within thirty (30) days from the date the P&S is fully executed</u>.

C. No broker's commission shall be paid by the Town, and Buyer shall indemnify and hold harmless the Town from any claims for such commission.

D. A payment in lieu of taxes shall be paid in accordance with G.L. c. 44, §63A as of the day of performance of the P&S and the net amount thereof shall be added to the purchase price payable by Buyer at the time of delivery of the deed.

E. Buyer shall pay the monetary consideration for the Parcel by certified, treasurer's, or bank check or by wire transfer.

F. Buyer acknowledges that Buyer has not been influenced to enter into this transaction and that Buyer has not relied upon any warranties or representations not set forth in the P&S. Buyer represents and warrants that it will accept the Property "AS IS", provided however Buyer shall have the right to terminate this P&S if Buyer finds Hazardous Materials on the Property in amounts required to be reported to the Department of Environmental Protection. Buyer acknowledges that the Town has no responsibility for hazardous waste, oil, hazardous material or hazardous substances, as those terms are defined by any applicable law, rule or regulation, including, without limitation, the Massachusetts Oil and Hazardous Materials Release Prevention and Response Act, M.G. L. c. 21E, the Massachusetts Hazardous Waste Management

Act, M.G.L. c. 21C, the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. §§ 9601 et seq. and the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §§ 6901 et seq. (herein collectively referred to as "Hazardous Materials") on, in, under or emitting from or onto the Property or for any other condition or defect on the Property. The provisions of this paragraph shall survive the delivery of the deed.

G. The Property is subject to rights and obligations, including cost-sharing arrangements, set forth more particularly in the Declaration of Reciprocal Covenants, Easements and Restrictions (the "Declaration") attached hereto as to as Attachment D.

H. In the event that the Town defaults under the P&S, Buyer shall be entitled to terminate the P&S and receive a refund of the deposit. The foregoing shall be Buyer's sole and exclusive remedy at law and equity for any breach of the P&S by the Town.

I. The purchase of the Property shall not be contingent on the sale of any other property.

J. The closing shall occur within thirty (30) days from the date on which the Buyer obtains permits necessary to construct and operate its project on the Property and has financing in place to undertake the project shortly following the closing, provided that the closing occurs no later than January 30, 2023.

K. Buyer acknowledges that Buyer has not been influenced to enter into this transaction nor has Buyer relied upon any warranties or representations not set forth or incorporated in this P&S, except for the following additional warranties and representations, if any, made by the Town: NONE.

L. In the event that the proposer's obligations under the P&S are contingent on financing, permitting, inspection and/or other contingencies, the Town shall have the right to set forth deadlines by which some or all of the contingencies must be met, depending on when the closing is to occur and other factors.

## 12. INSTRUCTIONS TO PROPOSERS

A. Each proposer shall submit one (1) original proposal and five (5) copies of the proposal on or before **Monday, July 25, 2022 at 11:00 a.m** to:

**Sale of Property at 231 Turnpike Rd, Westborough (Former Regal Cinema)**
**RFP 22-0080**
**Westborough Town Hall**
**Attn: Shab Khan, CPO**
**34 West Main St.**
**Westborough MA 01581**

B. The proposals will be opened and recorded at this time. No proposals submitted after this time will be accepted. Proposals must be submitted in writing in a sealed envelope

clearly marked "Purchase of Former Regal Cinema Property." Responses to the RFP must include all required documents, completed, and signed per the instructions and attached forms included in this RFP package. Electronically mailed (e-mailed) proposals will not be accepted and will be deemed non-responsive and will not be evaluated.

C. If any changes are made to this RFP, an addendum will be issued. Each addendum will be emailed to all plan holders via BidNet. Failure of any proposer to receive any such addendum or interpretation shall not relieve such proposer from the obligation to comply with the terms of such addenda. All addenda so issued shall become part of this RFP.

D. At the time of the opening of bids, each proposer will be presumed to have inspected the Property and to have read and be thoroughly familiar with the RFP (including all addenda). The failure or omission of any proposer to examine any form, instrument, or document shall in no way relieve any proposer from any obligation to comply with the RFP.

E. Proposers are cautioned that it is the responsibility of each individual proposer to assure that his/her proposal is in the possession of the responsible official or his designated alternate prior to the stated time and at the place of proposal by the due date. The Town is not responsible for proposals delayed by mail and/or delivery service of any nature. Late responses will not be accepted nor will additional time be granted to individual respondents unless the Select Board extend the required submittal date for all proposers.

F. Proposals may be corrected, modified, or withdrawn prior to the deadline for submission of proposals by submitting the required number of copies of such correction, modification, withdrawal or a new submission, clearly marked on the outside envelope with the appropriate heading, by the deadline listed above.

G. Proposals cannot be withdrawn, modified or amended for a period of 150 days from the deadline for submission of proposals.

H. All proposals submitted to the Town must include all forms included within the contents of this RFP and they must all be filled out and properly executed. Failure to submit all forms properly filled out and executed will be grounds for rejection of the proposal.

I. All signatures must be handwritten and in ink by the person(s) seeking to purchase the Property. All other words and figures submitted on the proposal shall be neatly written in ink or typed. Proposals that are conditional, obscure, or which contain additions not called for in the specifications, erasures, alteration, or irregularities may be rejected.

J. All proposals become the property of the Town. All proposals are deemed to be public records within the meaning of MA General Law Chapter 4, Section 7(26).

K. The Town will not be liable for any costs incurred by any respondents in the preparation and presentation of responses to this RFP or in the participation in views, interviews, negotiations or any other aspect of this RFP process.

13. **RESERVATIONS BY THE TOWN**

A. This RFP does not represent any obligation or agreement whatsoever on the part of the Town to sell the Property described in this RFP.

B. The Town reserves the right, in its sole discretion, to reject at any time any or all proposals, to withdraw the RFP, to select finalists to submit and negotiate a more fully-developed response, to negotiate with one or more applicants, and/or negotiate and dispose of the Property on terms that are not materially different from those set forth herein. The Town also reserves the right, at any time and to waive strict compliance with terms and conditions of this RFP or to entertain reasonable modifications or additions to selected proposals provided the same are not materially different from the terms set forth herein.

C. The Town makes no representations or warranties, express or implied, as to the accuracy and/or completeness of the information provided in this RFP. This RFP (including all attachments and supplements) is made subject to errors, omissions, prior sale, withdrawal without prior notice, and changes to, additions to, and different interpretations of laws and regulations.

D. Selection of a proposer's proposal will not create any rights on the proposer's part, including, without limitation, rights of enforcement, equity or reimbursement, until the P&S and all related documents are approved by the Select Board and fully executed.

E. All determinations as to the completeness or compliance of any proposals, or as to the eligibility or qualification of any proposer, will be within the sole discretion of the Select Board.

**Attachments**:

| | |
|---|---|
| Attachment A: | Plan of the Property |
| Attachment B: | Highway Business (HA) Zoning Bylaw |
| Attachment C: | Purchase and Sale Agreement |
| Attachment D: | Declaration of Reciprocal Covenants, Easements and Restrictions |
| Attachment E: | Price Proposal |
| Attachment F: | Required Forms |
| Attachment G: | Easements |
| Attachment H: | Interior Photographs |

800924/WBOR/0027

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

**Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)**

**ATTACHMENT A**

PLAN OF PREMISES


LOCUS MAP
ROUTE 135 MILK STREET
OTIS STREET
MILK (PUBLIC - VARIABLE WIDTH - 1947 COUNTY LAYOUT) STREET
OAK STREET
MILK (PUBLIC - VARIABLE WIDTH - LAYOUT NO. 5946) STREET
LOT 1
1,277,351 ± S.F.
or 29.324 ± AC.
LOT 2
564,773 ± S.F.
or 12.965 ± AC.
LOT 3
243,854 ± S.F.
or 5.644 ± AC.
PARCEL 4
102,128 ± S.F.
or 2.345 ± AC.
BOSTON - WORCESTER TURNPIKE
OWNER:
TRUSTEE OF NORTHSIDE
REALTY TRUST
18210/372
PLAN OF LAND
IN
WESTBOROUGH, MA
(WORCESTER COUNTY)
BEALS AND THOMAS, INC.

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

## Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)

## ATTACHMENT B

HIGHWAY BUSINESS (BA) ZONING BYLAWS

# ZONING BYLAWS

# ADOPTED MARCH 5, 1990, ARTICLE 19

# AMENDED THROUGH JUNE 20, 2020

ARTICLE 1 ADMINISTRATION AND PROCEDURE....10
(Adopted March 5, 1990)....10
1100. PURPOSE....10
1200. ADMINISTRATION....10
1210. Building Commissioner....10
1220. Permits Required....11
1230. Permit Application....11
1240. Site Plan Review....11
1241. Design Requirements....11
1242. Drawing Requirements....12
1243. Submission of Plans....12
1244. Procedures of the Board of Selectmen....13
1245. Design Review For the Downtown Westborough....14
1250. Penalty....16
1260. Enforcement....17
1300. BOARD OF APPEALS....17
1310. Appeals....17
1320. Variances....17
1350. Filing of Decisions....19
1360. Repetitive Petitions....19
1400. AMENDMENTS....19
1500. SEPARABILITY....19
1600. APPLICABILITY....19
1700. EFFECTIVE DATE....19
ARTICLE 2 DISTRICT REGULATIONS....20
(Adopted March 5, 1990)....20
2100. ESTABLISHMENT OF DISTRICTS....20

2110. ..... 20
2120. Official Zoning Map. ..... 20
2130. Dimension Lines. ..... 21
2140. Split Lot. ..... 21
2150. ..... 21
2151. ..... 21
2152. ..... 21
2153. ..... 21
2200. USE REGULATIONS ..... 22
2210. Classification of Use. ..... 22
2420. Abandonment. ..... 25
2430. Restoration. ..... 26
2440. Changes. ..... 26
2500. DIMENSIONAL REGULATIONS. ..... 26
2510. Exemptions. ..... 26
2520. Changing Nonconforming Lot Dimensions. ..... 27
2530. Average of Building setbacks. ..... 27
2540. Multiple Uses. ..... 27
2600. DIMENSIONAL SCHEDULE. ..... 27
2610. ..... 27
2620. ..... 29
2621. ..... 30
ARTICLE 3 GENERAL REGULATIONS. ..... 32
(Adopted March 5, 1990) ..... 32
3100. PARKING AND LOADING REQUIREMENTS ..... 32
3110. General. ..... 32
3120. Schedule of Parking Area Requirements. ..... 32
3130. Parking Area Design. ..... 32
3131. ..... 33
3132. ..... 33
3133. ..... 33
3134. ..... 33
3135. Parking Garage. ..... 33
3140. Loading Requirements. ..... 33
3200. ENVIRONMENTAL CONTROLS ..... 33
3210. Disturbances. ..... 33

3220. Roadside and Parking Area Trees....33
3300. SIGN REGULATIONS....34
3310. General Sign Regulations....35
3311....35
3312....35
3313....35
3314....35
3315....35
3316. Projecting Signs....35
3317. Wall Signs....35
3318. Ground Signs....35
3319. Roof Signs....36
3320. Temporary Accessory Signs....36
3330. Permanent Accessory signs....37
3331....37
3332....37
3333....38
3334....38
3335....38
3336....38
3337. Historical Districts and/or National Register Properties....38
3340. Off-Premises Signs....39
3350. Non-Conforming Signs....39
ARTICLE 4 SPECIAL REGULATIONS....41
(Adopted March 5, 1990)....41
4100. EARTH MOVING AND CLEARING OF PROPERTY REGULATIONS....41
4110. General....41
4111....41
4112....41
4113....41
4114....41
4120. Special Permit or Approval....41
4121....41
4122....41
4123....42
4126. Inspection and Compliance....42

4131....................................................................................................................42
4132....................................................................................................................42
4133....................................................................................................................42
4134....................................................................................................................42
4135....................................................................................................................42
4136....................................................................................................................42
4137....................................................................................................................42
4138....................................................................................................................42
4141....................................................................................................................43
4142....................................................................................................................43
4143....................................................................................................................43
4144....................................................................................................................43
4145....................................................................................................................43
4150. Restoration.......................................................................................................43
4151....................................................................................................................43
4152....................................................................................................................43
4153....................................................................................................................43
4154....................................................................................................................43
4160. Additional Conditions........................................................................................44
4170. Renewal or Revocation of Permit. ......................................................................44
4200. MULTI-FAMILY DWELLINGS.................................................................................44
4210. Units Below Grade. ...........................................................................................44
4220. Bedrooms..........................................................................................................44
4230. Business in High-Rise Apartments. ...................................................................44
4231....................................................................................................................44
4300. OPEN SPACE COMMUNITIES ..............................................................................44
4350....................................................................................................................45
4400. ACCESSORY USES AND STRUCTURES ..................................................................46
4410. Home Occupations.............................................................................................46
4411....................................................................................................................46
4412....................................................................................................................46
4413....................................................................................................................47
4414....................................................................................................................47
4415....................................................................................................................47
4416....................................................................................................................47
4417....................................................................................................................47

4418....47
4421....47
4422....47
4431....47
4432....47
4433....47
4434....48
4440. Unregistered Vehicles. ....48
4451. Structures-Non-Residential Areas. ....48
4452. Structures Residential Areas. ....48
4460. ACCESSORY DWELLING UNITS ....48
4500. FLOOD PLAIN DISTRICT....51
4600. PLANNED PARCEL DEVELOPMENT. ....51
4700. AQUIFER AND WATERSHED PROECTION DISTRICT. ....51
4710. Purpose of District. ....51
4720. Scope and Authority. ....51
4730. Establishment and Delineation of Aquifer and watershed Protection District. ....51
4731. District. ....51
4732. Overlay Map....52
4733. Split lot Provisions. ....52
4734. Recoverable water yield criteria. ....52
4741. Permitted uses. ....53
4750....55
4753. Approval criteria. ....56
4760. Violations. ....57
4800. SPECIAL PERMITS FOR ADULT USES. ....57
4810. Definitions ....57
4823....59
4824. Existing Adult Entertainment Enterprises....59
4900. DOWNTOWN PLANNING OVERLAY DISTRICT (DPOD)....60
4910. Purpose....60
4920. Scope and Authority. ....60
4931. Overlay Map....60
4940. Permitted Uses....60
4950. Rules and Regulations. ....60
5000. TRANSIT-ORIENTED VILLAGE BY SPECIAL PERMIT IN INDUSTRIAL C ZONE. ...63

5010. Purpose....63
5020. Applicability....63
5030. Mixed Uses....63
5040. Review Requirements....63
5050. General Standards....63
5060. Dimensional Requirements....64
5070. Application....65
5080. Action on Application....65
5090. Density Bonus for the Preservation of Open Space....65
5100. GATEWAY 2 DISTRICT....68
5110. Purpose....68
5120. Scope and Authority....68
5130. Establishment and Delineation of Gateway 2 District....68
5140. Permitted Uses....68
5150. Rules and Regulations....68
5151. Public Hearing and Approval....68
5152. Design Review Requirements....69
5200. MULTI-FAMILY HOUSING IN THE HIGHWAY BUSINESS DISTRICT....69
5210. Purpose....69
5220. Scope and Authority....69
5230. Establishment of District....69
5240. Permitted Uses....70
5250. Rules and Regulations....70
5251. Public Hearing and Approval....70
5252. Findings....70
5252.1....70
5252.2....70
5252.3....70
5252.4....70
5252.5....70
5252.6....70
5252.7....70
5252.8....71
5252.9....71
5261....71
5261.2 Development Statement....71

5261.3. 71
5262. Affordable Housing. 71
5263. Parking. 72
5300. SENIOR OVERLAY DISTRICT. 72
5310. Purpose. 72
5320. Scope and Authority. 72
5330. Applicability. 73
5340. Establishment of District. 73
5350. Permitted Uses. 73
5360. Dimensional Requirements. 73
5370. Rules and Regulations. 73
5371. Public Hearing and Approval. 73
5372. Findings. 73
5381.4. 74
5382.1. 74
5382.2. 74
5382.3. 75
5382.4. 75
5382.5. 75
5400. INDUSTRIAL D (ID) OVERLAY DISTRICT 76
5410. Purpose. **Error! Bookmark not defined.**
5420. Scope and Authority. 76
5430. Establishment of District. **Error! Bookmark not defined.**
5440. Permitted Uses. **Error! Bookmark not defined.**
5450. Rules and Regulations. 76
5451. Public Hearing and Approval. **Error! Bookmark not defined.**
5452. Findings. **Error! Bookmark not defined.**
5452.1. 76
5452.2. **Error! Bookmark not defined.**
5452.3. **Error! Bookmark not defined.**
5452.4. **Error! Bookmark not defined.**
5452.5. **Error! Bookmark not defined.**
5461. **Error! Bookmark not defined.**
5461.2 Development Statement. **Error! Bookmark not defined.**
5461.3. **Error! Bookmark not defined.**
5461.4. **Error! Bookmark not defined.**

5462. Parking.................................................................. **Error! Bookmark not defined.**

5500. MIXED USE DISTRICT (MUD). ....................................................................77

5510. Purpose.................................................................................................77

5520. Scope and Authority. ...............................................................................77

5530. Establishment and Delineation of Mixed Use District. ...................................78

5531. Mixed Use Zoning Map. ...........................................................................78

5540. Permitted Uses.......................................................................................78

5550. Rules and Regulations. ............................................................................78

5551. Public Hearing and Approval. ....................................................................78

5552. Density Requirements. .............................................................................78

5553. Multiple Buildings. ...................................................................................78

5554. Signage.................................................................................................78

5560. Site Plan Approval of a Mixed Use District. ...................................................78

5600. LARGE-SCALE GROUND-MOUNTED SOLAR PHOTOVOLTAIC INSTALLATIONS. 79

5630......................................................................................................80

5651. As-of-Right Siting. ..................................................................................82

5652. Large-Scale Ground-Mounted Solar Photovoltaic Installation. .........................83

5700. Marijuana establishments, MEDICAL MARIJUANA TREATMENT AND DISPENSING FACILITIES AND MARIJUANA CULTIVATION. ......................................................83

5721......................................................................................................83

5722......................................................................................................83

5723......................................................................................................83

5751......................................................................................................84

5752. Separation.............................................................................................84

5753. No Entitlement or vested rights to permitting. ..............................................85

5754......................................................................................................85

5755. Signage.................................................................................................85

5756. Visibility. ...............................................................................................85

5757. Manufacturing. .......................................................................................85

5758. Cultivation Activities. ...............................................................................85

5761. Notification. ...........................................................................................85

ARTICLE 5 DEFINITIONS ...........................................................................88

(Adopted March 5, 1990) ............................................................................88

Westborough Zoning By-law Appendix ..........................................................96

# ARTICLE 1 ADMINISTRATION AND PROCEDURE (ADOPTED MARCH 5, 1990)

## 1100. PURPOSE

The purpose of this bylaw is to promote the health, safety, convenience, amenity and general welfare of the inhabitants of the Town of Westborough, through encouraging the most appropriate use of land, as authorized by Chapter 40A of the General Laws; and in particular, lessen congestion in the streets to conserve health, secure safety from fire, flood panic and other dangers; to provide adequate light and air; to prevent overcrowding of land; to avoid undue concentration of population to encourage housing for people of diverse income levels; to facilitate the adequate provision of transportation, water, water supply, drainage, sewerage, schools, parks, open space and other public requirements; to conserve the value of land and buildings, including the conservation of natural resources and the prevention of blight and pollution of the environment; and to preserve and increase amenities by the promulgation of regulations to fulfill said objectives. Said regulations may include but are not limited to restricting, prohibiting, permitting or regulating: (Amended 3/2/1992, Article 20)

1. Uses of land, including wetlands and lands deemed subject to seasonal or periodic flooding;
2. Size, height, bulk, location and use of structures, including buildings and signs except that billboards, signs and other advertising devices are also subject to the provisions of Sections 29 through 33, inclusive, of Chapter 93 (General Laws), and to Chapter 93D;
3. Uses of bodies of water, including water courses;
4. Noxious uses;
5. Areas and dimensions of land and bodies of water to be occupied or unoccupied by uses and structures, courts, yards and open spaces;
6. Density of population and intensity of use;
7. Accessory facilities and uses, such as vehicle parking and loading, landscaping and open space; and
8. The development of the natural, scenic and aesthetic qualities of the community.

## 1200. ADMINISTRATION

1210. BUILDING COMMISSIONER. This bylaw shall be administered by the Selectmen through a Building Commissioner. His duties shall consist of obtaining all routine information, issuing zoning and occupancy permits, and, in general, administering this bylaw under the control and direction of the Board of Selectmen. The Building Commissioner shall be notified by the Board of Selectmen as to the granting or refusal of any application over which he may have jurisdiction. (Amended 5/14/2011, Article 19)

1220. PERMITS REQUIRED. No structure shall be erected or externally altered without a Building Permit having been issued by the Building Commissioner. No land or buildings shall be occupied or changed from one use category of Section 2300 to another without an occupancy permit having been issued by the Building Commissioner. No such permits shall be issued for construction or use in violation of any provision of this Bylaw. (Amended 5/14/2011, Article 19)

1230. PERMIT APPLICATION. Applications for permits for construction shall be accompanied by two prints of a plan of the lot, drawn to scale, showing the actual dimensions of the lot, exact location and size of any existing or proposed buildings, and streets and ways adjacent to the lot. Where such are involved, any parking areas for six or more cars and their means of egress, and any required screening or landscaping, shall also be shown.

1240. SITE PLAN REVIEW. Findings - Procedures. The Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board shall review site plans for development prior to approval of application for Building Permits for all uses specified in Section 2300, Use Regulations Schedule, and which involve six (6) or more parking spaces; to make findings and determinations in regard to such cases in conformity with Section 1241 of this Bylaw. In such cases, the permitted use shall be allowed only if the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board make a finding and determination that the placement of existing and proposed buildings, existing and proposed topography, structure, parking spaces, loading areas, driveway openings, driveway, service areas, other open uses, park or recreation area and screening, all facilities for water, sewage, refuse and other waste disposal and for surface water drainage, storm drainage and all landscape features (such as walks, fences, walls, planting areas and greenbelts) will constitute a suitable development and will not result in substantial detriment to the neighborhood. (Amended 5/14/2011, Article 20; Amended 3/16/2019, Article 33)

No building located in any district, except residential districts, within 2500 feet of the Rotary, or no building, if involving six (6) or more parking spaces, shall be erected or externally enlarged, and no area for roadways, parking, loading or open space shall be established or changed on land developed under the provisions of this Section except in conformity with a·site plan bearing the endorsement of approval of the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board. No certificate of zoning compliance shall be issued for any such building or buildings, unless the same conforms in all respects to such site plan and unless all facilities included in the site plan have been in accordance therein. (Amended 3/17/1997, Article 27; Amended 3/16/2019, Article 33)

No building in any district, except in residential districts, within 2500 feet of the Rotary shall be erected except as provided in Section 1245 of this bylaw. No building in any district except residential districts, within 2500 feet of the Rotary shall be externally altered except in conformance with Design Review approval prior to issuance of any required permits.

Single and two family residential uses shall be exempt from this Bylaw. Buildings where external changes are not proposed are exempt from the provisions of this Bylaw. (Amended 3/15/1997, Article 26)

1241. DESIGN REQUIREMENTS. The Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board shall only approve a site plan upon a determination that, at a minimum, the following have been satisfied. In addition to these items, the Selectmen shall establish, after a public hearing, rules and regulations concerning the

procedure for and content of an application for Site Plan Review. These rules and regulations shall be effective on the date the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board files them with the Town Clerk. (Amended 5/14/2011, Article 20; Amended 3/15/2014, Article 22; Amended 3/16/2019, Article 33)

a. Internal circulation and egress are such that traffic safety is protected, and access via minor streets servicing single-family homes is minimized and the convenience and safety of vehicular and pedestrian movement in relation to adjacent streets and intersections are protected;

b. Visibility of parking areas from public ways is minimized;

c. Adequate access to each structure for fire and service equipment is provided, based on the functional standards of the Planning Board's Subdivision Regulations;

d. Utilities and drainage in the vicinity either are or will be made adequate, based on the functional standards of the Planning Board's Subdivision Regulations;

e. Lighting of parking areas avoids glare on adjoining properties;

f. Major topographic changes or removal of existing trees are minimized;

g. In or abutting Residential Districts, effective use is made of topography landscaping and building placement to maintain, to the degree feasible, the character of the neighborhood;

h. Parking requirements of Section 3100 have been satisfied;

i. Provisions of the Wetland Protection Act (Massachusetts General Laws Chapter 131) will be satisfied if applicable;

j. All other requirements of the Zoning Bylaws have been satisfied;

k. Estimated waste water effluent in gallons per day and type of effluent is provided with the Site Plan application.

1242. DRAWING REQUIREMENTS. Plans subject to site plan review shall show the boundaries of the lot, existing and proposed topography, existing buildings and proposed buildings, structure, parking, park or recreation area, screening, water, sanitary sewage, storm drainage, loading areas, driveway openings, driveways, service area and landscape features (such as walls, fences, walks, planting area and greenbelts).

1243. SUBMISSION OF PLANS. A person applying for site plan review shall file with the Building Commissioner eight (8) plans of the lot. He shall forward one (1) each to the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board, the Planning Board, the Westborough Treatment Plant Board, the DPW Manager, the Fire Department, the Conservation Commission and the Board of Health for this review. Such application and site plan shall include the elements on which the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board is to make a finding and determination, as provided in Section 1240 and shall also include information as to the nature and extent of the proposed use of buildings, and such further information in respect to such elements and use required in Sections 2200, 2300, 2500 and 2600, if applicable. In

subsequent application concerning the same subject matter, the Board may waive the filing of plans and documents to the extent they duplicate those previously filed. (Amended 5/14/2011, Article 19; Amended 3/16/2019, Article 33)

## 1244. PROCEDURES OF THE SPECIAL PERMIT GRANTING AUTHOTIRY (SPGA), OR WHERE THERE IS NO SPECIAL PERMIT REQUIRED, THE PLANNING BOARD.

The Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board shall not make a finding and determination upon an application until it has received the final reports of the different Boards listed in Section 1243 or until thirty (30) days shall have elapsed since the transmittal of said copies of the application and site plans to the Boards, etc., without such report being submitted. The applicant for a Site Plan Review shall make a presentation to the Board of Selectmen, prior to the public hearing with the Special Permit Granting Authority (SPGA), or where there is no Special Permit required, the Planning Board. Following the presentation to the Board of Selectmen, the Selectmen shall submit their report to the Special Permit Granting Authority (SPGA), or where there is no Special Permit required, to the Planning Board. The report shall be included in the final determination of Site Plan Review. (Amended 3/16/2019, Article 33)

The Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board shall hold a public hearing within sixty-five (65) days of the Building Commissioner accepting a completed application which meets all of the criteria required by the Zoning Bylaws, including the payment of any fees established by the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board, and shall take action within thirty (30) days of the hearing, it nonetheless being the intention of this Bylaw that the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board shall act as expeditiously as is practical on such application. Such final action shall consist of either: (Amended 5/14/2011, Article 21)

a. A finding and determination that the proposed construction, reconstruction, substantial exterior alteration, or addition will constitute a suitable development and will not result in substantial detriment to the neighborhood, or

b. A written denial of the application for such finding and determination, stating the reasons for such denial, which reasons shall include a statement of the respect in which any elements in and particular features of the proposal are deemed by the Board to be unsuitable or detrimental to the neighborhood.

c. A finding and determination may be made subject to such reasonable conditions, modifications and restrictions set forth therein as the Board may deem necessary to ensure that the proposed construction, reconstruction, substantial exterior alteration or addition will constitute a suitable development and will not result in substantial detriment to the neighborhood.

d. In the event that no action is taken by the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board on or before the thirty (30) day period, it shall be deemed that the site plan is approved.

In the event that the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board approves a site plan under these provisions, any

construction, reconstruction, substantial exterior alteration or addition shall be carried on only in conformity with any conditions, modifications and restrictions subject to which the Board shall have made its findings and determination, and only in conformity with the application and site plan on the basis of which the finding and determination are made.

1245. DESIGN REVIEW FOR THE DOWNTOWN WESTBOROUGH: (Added 3/15/1997, Article 26; Amended 5/14/2011, Article 19):

A. Purpose

It is the intent of this section to provide detailed review of exterior structural design and/or exterior alterations having substantial impact on any district, except residential districts, within 2500 feet of the Rotary, to prevent blight; to enhance the natural and aesthetic qualities of the Town; to preserve the value of land and buildings; and to protect and preserve the historic and cultural aspects and heritage of the Town.

Within (the) Downtown Westborough, Design Review approval shall be by the Design Review Board and its procedural requirements and design criteria of Section 1245 D.

B. Design Review Board

The Design Review Board shall be appointed annually by the Planning Board and shall consist of five (5) residents of the Town with the following credentials, if possible:

1. Chairman of the Planning Board or his/her designee;

2. One person qualified by training and experience in architecture or landscape design;

3. One person owning business property in the area governed by this bylaw;

4. One person qualified by training and experience in the graphic arts or design professions;

5. One member of the Historic Commission.

The Planning Board may also appoint up to two (2) voting alternate members who shall be citizens at large. At least one (1) of these alternates shall be a business owner in the area governed by this bylaw.

C. Applicability and Authority

The Design Review Board shall review applications for Design Review, as appropriate, submitted pursuant to Section 1200. It shall evaluate such requests based on Design Criteria in Section D below. Its written findings shall be submitted to the applicant along with any recommendations and conditions required for approval with 30 days from the request for design revisions. Such findings shall contain explanation and rationale as appropriate. Conditions of approval shall be to the appropriate permitting advisory authority.

1. Organization and Proceedings – The Design Review Board shall elect from among its members a Chairman, Vice-Chairman and clerk. The Design Review Board shall adopt such rules and guidelines as are considered necessary to the conduct of its responsibilities which shall be a matter of public record.

The Board shall keep records of its proceedings and the final decision of the Board. Records shall also be kept of all plans, photographs and any other documents pertaining to each case, as well as all examinations, findings determinations, and any other official action, including all reasons for all decisions and conditions prescribed; and all such items shall be a matter of public record. Decisions of the Design Review Board shall be by a simple majority and no final action shall be taken without the concurrence of at least a majority of the members.

2. Duties and Procedures of Design Review Board – Whether or not requested by the applicant, the Design Review Board shall review applications for building permits, site plan review, special permits or variances for all proposals for any district except residential districts within 2500 feet of the Rotary if involving new construction or exterior alteration. A copy of all usual submittals required for such proposals shall be provided through the Building Commissioner. The Design Review Board review shall preferably be done in consultation with the applicant or their designer. The Design Review Board shall make (an advisory) a report in writing to the applicant as follows:

(a) Building Permits: To the Building Commissioner regarding any exterior design changes.

(b) For Site Plan Review: To the Site Plan Review authority regarding the effect of the design on abutters and the neighborhood.

(c) For Special Permits: To the Special Permit Granting authority regarding effect of the amenity on the neighborhood.

(d) For Variances: To the Board of Appeals regarding possible detriment to the public good or derogation from the intent or purpose of the bylaw.

Lack of a report from the Design Review Board shall not be sufficient reason to delay action on a proposal which otherwise could be acted upon by the Building Commissioner, Site Plan Review Authority, Special Permit Granting Authority, or Board of Appeals.

D. Design Criteria

The Design Review Board shall review requests for external alterations and new construction. Designs shall comply with all the requirements of the appropriate permitting authority. In addition, where appropriate designs, as required by the permitting authority, shall comply with the following criteria:

1. Plans. Submittals shall include structural footprint and architectural elevations of all proposed buildings. Plans shall provide details responding to all elements outlined in item 3, below, and all other elements of the proposal as shall be requested by the Design Review Board.

2. Preservation and enhancement of landscaping. The landscape shall be preserved in its natural state, insofar as practicable, by minimizing tree and soil removal, and any grade changes shall be in keeping with the general appearance or neighboring development area.

   Scenic views, if any, visible from public ways should be preserved to the degree reasonably consistent with the given type and scale of use.

3. Relation of buildings to environment. The proposed development shall be related harmoniously to the terrain and to the design, scale, and architecture of existing buildings in the surrounding area that have visual relationship to the proposed buildings, in so far as practical. Proposed buildings shall be related to their surroundings with respect to:

   (a) Street façade and exterior walls visible from public ways.

   (b) Variations and breaks in wall and/or roof planes.

   (c) Materials, textures and color

   (d) Roof slopes and materials

   The appearance of primary wall and roof materials should match, to a degree reasonably consistent, that of materials commonly found on existing buildings within the Westborough downtown.

   (e) Scale

   Domestic scale should be produced through massing devices such as breaks in wall and roof planes and through design of architectural features.

   (f) The building should not be made, in effect, a sign, through painting with bold patterns, checks, logos or other graphic devices, use of lighting or use of unconventional building form.

   (g) External lighting

   (h) External windows

4. Open Space. All open space, landscaped and usable, shall be designed to add to the visual amenities of the area by maximizing, in so far as practical, its visibility for persons passing the site or overlooking it from nearby properties.

5. Heritage. Proposals to remove or disrupt historic or traditional structures, or architectural elements shall be minimized.

6. Cost. The Design Review Board shall be obligated to be sensitive to potential financial burden to the applicant.

E. Design Guidelines

The Design Review Board shall make available to the public as part of the building permit package, a booklet of guidelines based on the specific Design Criteria cited above to carry out the purposes of this section.

The Design Review Board shall adopt such recommendations and guidelines as are considered necessary to the conduct of its responsibilities which shall be a matter of public record.

1250. PENALTY. Whoever violates any provision of this Bylaw, or any of the conditions under which a building or occupancy permit is issued, or any decision rendered by a Permit

Granting Authority or Special Permit Granting Authority under the provisions of this Bylaw, shall be liable to a fine of not more than one hundred dollars ($100.00) for each violation. Each day that such violation continues shall constitute a separate offense.

1260. ENFORCEMENT. If the Board of Selectmen shall be informed, or have reason to believe that any provision of this Bylaw or of any permit or decree thereunder has been, is being, or is 1ikely to be violated, they shall make or cause an investigation to be made of the facts, including an inspection of the property where the violation may exist, and, if they find any violation, they shall give immediate notice in writing to the owner or his duly authorized agent and to the occupant of the premises and shall order that any violation of the provisions of this Bylaw shall immediately cease. If, after such notice and order, such violation continues, or if any owner, agent or occupant fails to obey any lawful order of the Board of Selectmen with respect to any violation or any use contrary to the provisions of this Bylaw, the Board of Selectmen shall forthwith revoke any permit issued for the occupation of the premises, may make complaint to the Superior Court or any court of competent jurisdiction for an injunction or order restraining the further use of the premises, and shall take such other action as is necessary to enforce the provisions of this Bylaw. In the event the Building Commissioner is requested in writing to enforce the Zoning Bylaw and he declines to do so, he shall notify in writing the party requesting such enforcement of any action or refusal to act and the reasons therefor within fourteen (14) days of receipt of the request. (Amended 5/14/2011, Article 19)

## 1300. BOARD OF APPEALS

A Zoning Board of Appeals is hereby established under the provision of Section 12 of Chapter 40A as amended (General Laws) consisting of three (3) members and two (2) associate members who shall be appointed and act in all matters under this Bylaw in the manner prescribed by Chapter 40A of the General Laws powers:[1]

1310. APPEALS. To hear and decide appeals taken by any person aggrieved by reason of his inability to obtain a permit from any administrative official under the provisions of Chapter 40A, General Laws, or taken by any officer or Board of the Town, or taken by any person aggrieved by any order or decision of the Building Inspector or other administrative official in violation of any provision of Chapter 40A, General Laws, or by this Bylaw; and, in any case, in accordance with Section 8 of Massachusetts General Laws Chapter 40A.

1320. VARIANCES. To authorize upon appeal, or upon petition with respect to particular land or structures a variance from the terms of the applicable zoning ordinance or Bylaw where such permit granting authority specifically finds that owing to circumstances relating to said conditions, - shape or topography of such land or structures and especially affecting such land or structures, but not affecting generally the zoning district in which it is located, a literal enforcement of the provisions of the ordinance of Bylaw would involve substantial hardship, financial or .otherwise, to the petitioner or appellant and that desirable relief may be granted without substantial detriment to the public good and without nullifying or substantially derogating from the intent or purpose of such ordinance or Bylaw. Except where local ordinances or Bylaws shall expressly permit variances for use, no variance may authorize a use or activity not otherwise permitted in the district in which the land or structure is located; provided however, that such variances properly granted prior to January first, nineteen hundred and seventy-six but

[1] Except that a Highway Business District BA and BA(f), SLO, ID & MUD (ATM 2010) Special Permits and Appeals shall be heard and decided by the Planning Board unless stated elsewhere in these zoning bylaws.

limited in time, may be extended on the same terms and conditions that were in effect for such variance upon said effective date. The Board of Appeals is hereby authorized to grant use variances conditioned upon the satisfaction of the criteria for the granting of variances in this section.

The permit granting authority may impose conditions, safeguards and limitations, both of time and use, including the continued existence of any particular structures but excluding any condition, safeguards or limitations based upon the continued ownership of the land or structures to which the variance pertains by the applicant, petitioner or any owner.

If the rights authorized by a variance are not exercised within one year of the date of grant of such variance, they shall lapse, and may be re-established only after notice and a new hearing pursuant to this section.

## 1330. SPECIAL PERMITS.

A. To hear and decide applications for Special Permits for exceptions as provided in this Bylaw, subject to any general or specific rules therein contained, and subject to appropriate conditions or safeguards "and limitations on time or use," imposed by the Board. Special Permits may be granted unless, because of conditions peculiar to the particular case but not generally true for similar permitted uses on other sites in the same district, it appears that nuisance, hazard or congestion will be created, or for other reasons there will be substantial harm to the neighborhood or derogation from the intent of the bylaw. In the event any Special Permit required under this Bylaw or amendment thereto requires specific findings of the Board as described in Section 9 of General Laws Chapter 40A, such a finding is mandatory to the granting of such exception. (Amended 3/29/1994, Article 41)

B. A Special Permit granted under these Bylaws pursuant to Section 9 of General Laws Chapter 40A as amended, shall lapse within six (6) months, subject however to the provisions of said Section 9 of General Laws Chapter 40A, if a substantial use thereof has not sooner commenced except for good cause or, in the case of permit for construction, if construction has not begun by such date except for good cause.

C. The Board of Appeals shall hold a public hearing on any appeal, application or petition within sixty-five (65) days after the filing of an application with the Board of Appeals.

## 1340. PRESCRIBED TIME FOR ACTION AND PROCEDURE.

If the special permit granting authority shall fail to take final action within ninety (90) days of the required public hearing, or the permit granting authority (variances) shall fail to act within seventy-five (75) days after the date of the filing of an appeal, application or petition, then the petition shall be deemed approved subject to the following requirements:

The petitioner, after the expiration of the aforesaid period shall file with the Town Clerk a copy of his petition and an affidavit stating the date of the public hearing and the failure of the authority to render a decision within the required time.

Upon receipt of the petition and affidavit, the Town Clerk shall give notice of the filing to those persons entitled to a notice of the decision under Chapter 40A, Section 15, General Laws. The filing of a petition and affidavit in the office of the Town Clerk shall be deemed the equivalent of

the filing of a decision for purposes of judicial appeals provided for under Chapter 40A, Section 17, General Laws.

If no appeal is taken within the required statutory period, then the Town Clerk shall furnish the petitioner with a certified copy of the petition and affidavit together with a certificate that no appeal has been filed; all of which shall be recorded in the manner prescribed under Chapter 40A, Section 15, General Laws, in lieu of the documents required to be recorded under that Section.

1350. FILING OF DECISIONS. Variances and Special Permits must be recorded in the Registry of Deeds with the conditions imposed thereon prior to any construction or use thereunder.

1360. REPETITIVE PETITIONS. Repetitive appeals, applications or petitions to the Board of Appeals or other applicable Special Permit Granting Authority shall be limited and subject to the provisions of Section 16 of Chapter 40A as amended, General Laws.

## 1400. AMENDMENTS

This Bylaw may from time to time be changed by amendment, addition or repeal by the Town Meeting in the manner provided in Section 5 of Massachusetts General Laws Chapter 40A, as amended, and Massachusetts General Laws Chapter 40, Section 32, as amended.

## 1500. SEPARABILITY

The invalidity of any section or provisions of this Bylaw shall not invalidate any other section or provisions of this Bylaw. Where there exists any conflict between the provisions of this Zoning Bylaw and Chapter 40A as amended, General Laws, the provisions of Chapter 40A shall control.

## 1600. APPLICABILITY

Where the application of this Bylaw imposes greater restrictions than those imposed by any other regulations, permits, restrictions, easements, covenants or agreements, the provisions of this Bylaw shall control.

## 1700. EFFECTIVE DATE

The effective date of the adoption of this zoning Bylaw or any amendments to it, shall be the date on which such adoption or amendments were voted upon by Town Meeting. Upon its effective date, this Bylaw shall supersede the Zoning Bylaw and all amendments to it previously in effect.

NOTE: All Bylaws and amendments to it still must be submitted to the Attorney General for approval and said approval must be made public pursuant to General Laws Ch. 40, § 32.

# ARTICLE 2 DISTRICT REGULATIONS (ADOPTED MARCH 5, 1990)

2100. ESTABLISHMENT OF DISTRICTS (Amended 3/12/1996, Article 66, Amended 3/13/2004, Article 38; 10/18/04, Article 10; 5/15/2010, Article 31 and 32; Amended 3/16/2019, Article 35)

2110. For the purposes of this Bylaw, the Town of Westborough is hereby divided into the following zoning districts:

Residential
Single Residential R
Garden Apartment AA

Business
Highway Business BA
Downtown Business BB (1)
Gateway 2 G2 (6)
Mixed Use District MUD (8)
Adult Entertainment AE (3)

Industrial, Governmental
Exclusive Industrial IA
General Industrial IB
Mixed Use Industrial IC (5)
Industrial D Overlay ID (9)
Conservation C (2) State, MDC and Municipal M Town-owned
Property M-1

Overlay Districts
Downtown Planning Overlay
DPOD (4) Senior Living Overlay

SLO (7)

(1) All areas zoned Business lying within 2,500 feet of the intersection of the center lines of Milk, Main and South Streets.
(2) To be established by vote of Town Meeting only on land owned by the Commonwealth of Massachusetts, the Town of Westborough, one of their agencies, or land on which the Conservation Commission hold a Conservation Restriction under Section 31-33, Chapter 184, General Laws.
(3) Adult uses in accordance with Section 4800 Special Permits for Adult Uses:
(4) In accordance with Section 4900, Special Permits for Downtown Planning Overlay Districts shall be issued by the Planning Board.

(5) In accordance with Section 5000, Transit Oriented Village by Special Permit in Industrial C District shall be issued by the Planning Board.
(6) In accordance with Section 5100 Special Permits in the Gateway 2 District.
(7) In accordance with Section 5300, Special Permits for the Senior Housing Overlay district shall be issued by the Planning Board.
(8) In accordance with Section 5500 Special Permits for Mixed Use District.
(9) In accordance with Section 5400 Industrial D Overlay District.

In accordance with Section 5400 Industrial D Overlay District. 2120. OFFICIAL ZONING MAP. The boundaries of these districts are defined and bounded on the latest adopted revision of the "Zoning Map of the Town of Westborough, Massachusetts" being hereby declared to be a part of this Bylaw.

2130. DIMENSION LINES. Except when labelled to the contrary, boundary or dimension lines shown approximately following or terminating at street, railroad, or utility easement center or layout lines, boundary of lot lines, or the channel of a stream, shall be construed to be actually at those lines; when shown approximately parallel, perpendicular, or radial to such lines shall be construed to be actually parallel, perpendicular, or radial thereto. When not locatable in any other way, boundaries shall be determined by scale from the Zoning Map.

2140. SPLIT LOT. Where a district boundary line divides any lot existing at the time such line is adopted, the regulations for any district in which the lot has frontage on a street may be extended not more than thirty feet into the other district.

2150. In the Town of Westborough the subdivision of land in a residential district shall be completed as follows: (Amended 3/5/1990, Article 59)

2151. Where major residential development is proposed, the developer shall prepare two sets of concept plans for the parcel of land to be subdivided. One plan shall describe a conventional subdivision while the second shall describe an open space community according to section 4300 of this Bylaw. (Amended 3/5/1990, Article 59)

2152. In accordance with Chapter 40A, the Planning Board will hold a public hearing to review these conceptual plans. The Board will render a decision within sixty (60) days from the date of the closing of the public hearing as to which development plan the developer shall design. The action of the Board may create a special permit for an open space community in the residential district, if the Board determines that the plan is more beneficial to the Town than the conventional plan. The Open Space Community plan must be, in the judgement of the Planning Board, superior to a conventional plan in, preserving open space for conservation, agricultural, or recreation, utilizing natural features of the land, and allowing more efficient provision of public service. The special permit shall be recorded at the Worcester Registry of Deeds. (Amended 3/5/1990, Article 59)

2153. The developer may then submit a preliminary plan and then a final definitive plan to the Board for their consideration. For conventional subdivisions the Subdivision Rules and Regulations, and the dimensional use regulations as set forth in Section 2600 shall apply. For open space subdivisions, the subdivision Rules and Regulations, and the requirements of section 4300 shall apply. (Amended 3/5/1990, Article 59)

2154. General: It is the intent of this bylaw to increase the range of housing options for people of different income levels and at different life stages while providing for a variety of housing needs. All residential subdivisions creating lots or dwelling units shall meet the requirements of this Section regarding affordable housing.

Except as otherwise provided herein, when applying for a residential subdivision consisting of five (5) or more lots or units, the proposed project shall include 10% of the total units as affordable units under the Massachusetts Department Housing and Community Development G.L.c.40B Regulations and Guidelines.

For the purpose of determining the appropriate number of affordable units actually constructed, fractional units shall be rounded up to the nearest whole number.

Segmentation: In determining whether a subdivision contains at least five (5) lots and is therefore subject to this affordable requirement the Planning Board shall consider the entirety of the project, including any likely future expansion, and not separate phases or segments thereof. During or prior to Preliminary Subdivision review, in conformance with the Rules and Regulations Governing the Subdivision of Land in Westborough, the proponent shall submit a sketch plan showing all adjacent parcels of land, in their entirety, labeled with their current ownership and the owner as of the adoption of this regulation (March, 2019), and showing a conceptual layout which utilizes available adjacent land to maximize the number of lots. If the Board determines that the proposed subdivision is part of a larger potential development that could contain five (5) or more lots, then the proposed subdivision will be subject to above affordable housing requirements. (Section Added 3/16/2019, Article 31)

## 2200. USE REGULATIONS

No lot or land shall be used, no building or structure shall be erected or used except as set forth in Section 2300, Use Regulation Schedule, or as exempted by this Bylaw or statute. Symbols employed shall mean the following:

Y – A permitted use

N – An excluded or prohibited use

S – A use authorized by issuance of a Special Permit from the Board of Appeals as provided for in Section 1330 herein

SP – Special Permit to be issued by the Planning Board

2210. CLASSIFICATION OF USE. Where an activity might be classified under more than one of the following uses, the more specific classification shall determine permissibility; if equally specific the more restrictive shall govern.

## 2300. USE REGULATION SCHEDULE

AE Added 3/12/1996, Article 66; DPOD added 3/13/2004, Article 38; IC Added 10/18/2004, Article 10; G2 Added 5/14/2005, Article 41; ID Added 5/15/2010, Article 30; MUD Added 5/15/2010, Article 32; Amended 10/21/2013, Article 26

2300. Use Regulation Schedule

AE Added 3/12/1996, Article 66; DPOD added 3/13/2004, Article 38; IC Added 10/18/2004, Article 10; G2 Added 5/14/2005, Article 41; ID Added 5/15/2010, Article 30; MUD Added 5/15/2010, Article 32; Amended 10/21/2013, Article 26 Amended 6/20/2020, Article 26

| RESIDENTIAL USES [1] | C | R | AA AB | BA | G2 | BB | IA | IB | IC | ID | M | M-1 | AE | All Others | DPOD | MUD | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | |
| Single Family dwelling: | N | Y | Y | SP | Y | Y | N | N | Y | N | N | N | SP | Y | SP | N[7] | |
| Two-family dwelling: | N | S | Y | SP | SP | Y | N | N | Y | N | N | N | SP | S | SP | N[7] | |
| Conversion of existing structure to more than two-family dwelling: | N | N | S | SP | SP | S | N | N | SP | N | N | N | SP | N | SP | N[7] | |
| Boardinghouse: | N | S | S | SP | SP | S | N | S | SP | S | N | N | SP | S | SP | N | |
| Multi-family dwelling (See Section 4200): | N | N | Y | SP [5] | SP | N | N | N | N | N | N | N | N | N | SP | N[7] | Amended 5/13/2006, Article 30 |
| Open Space Communities (See Section 4300): | N | SP | N | N | N | N | N | N | N | N | N | N | N | N | SP | N[7] | Amended 3/5/1990, Article 52A |
| Mobile Home: | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | |
| Campground, mobile home park: | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | |
| Mixed Use Residential/Commercial with Industrial Components (see Section 5000) | N | N | N | N | N | N | N | N | SP | N | N | N | N | N | N | N | Added 10/18/2004, Article 10) |
| Senior Living Overlay (see Section 5300) [6] | N | SP | SP | N | SP | SP | SP | SP | N | N | N | N | N | SP | SP | SP | Added 5/15/2010, Article 31 |

| OPEN USES | C | R | AA AB | BA | G2 | BB | IA | IB | IC | ID | M | M-1 | AE | All Others | DPOD | MUD | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Farm: With pigs, animals raised for pelts: [2] | N | N | S | SP | SP | S | N | S | S | S | N | N | SP | N | N | N | |
| Nursery, greenhouses (commercial): | S | N | Y | Y | SP | Y | N | Y | Y | Y | N | N | SP | N | SP | N | |
| Recreational Camps | S | N | N | SP | SP | Y | N | S | S | S | Y | Y | SP | N | N | N | Amended 3/15/2014, Article 21 |
| Cemetery: | N | Y | Y | Y | Y | Y | N | Y | Y | Y | N | N | Y | Y | N | N | |
| Drive-in Theaters, Amusement Park or similar commercial outdoor recreation: [3] | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | |
| Outdoor recreation other than the above operated by a governmental agency: | S | Y | Y | Y | Y | Y | N | Y | Y | Y | N | N | Y | Y | Y | Y | |
| Other: [4] | | | | | | | | | | | | | | | | | |
| Sale of Christmas Trees: | S | Y | Y | Y | Y | Y | N | Y | Y | Y | N | N | Y | Y | Y | Y | |

(1) Animal keeping may be subject to permit from the Board of Health.
(2) But no animals kept closer than 500 feet to any lot line.
(3) Temporary carnival sponsored by a non-profit organization permitted upon approval by the Board of Selectmen. (Added 3/2/1992, Arricle 23)
(4) As determined by the zoning enforcement officer.
(5) Multi-Family dwellings are allowed in the Highway Business (BA) District upon grant of a Special Permit by the Planning Board in accordance with Section 5200 (Added 5/13/2006, Article 30)
(6) In accordance with the requirements and restrictions of Section 5300
(7) These uses are prohibited except when proposed as part of a Senior Living Overlay Project in conformance with Section 5300
(8) Only one dwelling unit shall be allwed per residential lot unless otherwise specifically allowed in this bylaw

| INSTITUTIONAL USES | C | R | AA AB | BA | G2 | BB | IA | IB | IC | ID | M | M-1 | AE | All Others | DPOD | MUD | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | |
| Religious, sectarian, denominational or public educational uses, religious purposes: | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | |
| Other educational uses: [3] | S | N | N | Y | Y | S | N | S | S | S | Y | Y | Y | N | SP | SP | |
| Municipal use voted at Town Meeting (not more specifically cited in Section 2300): | S | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | |
| Hospital, sanitarium, convalescent, nursing or rest home, congregate housing: | N | S | Y | SP | SP | Y | N | S | Y | S | Y | Y | SP | S | SP | SP | |
| Patriotic, fraternal or social clubs if not conducted for profit; other philanthropic institution or club: | N | N | S | Y | SP | S | N | S | S | S | Y | Y | SP | N | SP | SP | |

| COMMERCIAL USES | C | R | AA AB | BA | G2 | BB | IA | IB | IC | ID | M | M-1 | AE | All Others | DPOD | MUD | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | |
| Motor vehicle service station (See Section 3300): | N | N | N | S (1) | N | S (1) | N | S (1) | S | S (1) | N | N | S (1) | N | N | N | |
| Animal kennel or hospital as licensed under Chapter 140, Sec. 137a, General Laws: | N | N | S | SP | SP | Y | N | Y | N | Y | N | N | SP | N | N | N | |
| Indoor Recreation: | N | N | N | Y | SP | Y | N | Y | SP | Y | N | N | SP | N | SP | SP | |
| Banks, office space: | N | N | N | Y | SP(4) | Y | Y | Y | SP | Y | N | N | SP | N | SP | SP | |
| Restaurants, Brew Pubs: | N | N | N | Y(2) | N | Y(2) | N | Y(2) | SP | Y(2) | N | N | SP | N | SP | SP | |
| Hotel, motel, motor court: | N | N | N | SP | SP | Y | N | Y | SP | Y | N | N | SP | N | SP | SP | |
| Other retail sales & services: | N | N | N | Y | SP (5) | Y | N | Y | SP | Y | N | N | SP | N | SP | N (6) | |
| Display and sale of natural products, a significant portion of which are raised by the proprietor in Westborough: | N | S | S | Y | Y | Y | Y | Y | SP | Y | N | N | Y | S | SP | SP | Amended 3/5/1990, Article 52F |
| Micro/Nano Brewery or Distillery | N | N | N | SP | N | Y | N | Y | SP | Y | N | N | SP | N | SP | SP | |
| Multiple Uses Allowed: All uses shall comply with the underlying zoning | N | N | N | Y | SP | Y | Y | Y | SP | Y | N | N | SP | N | SP | SP | Added 3/16/2019, Article 30, Amended 6/20/2020, Article 26) |

(1) Special Permits to be issued by Selectmen rather than the Board of Appeals.

(2) Except "SP" where a restaurant involves any drive-up or walk-up window service.

(3) Shall not apply to land or structures for religious or educational purposes on land owned or leased by Commonwealth or any of its agencies, subdivisions or bodies, politic or by a

(4) Small professional offices in residential style structure limited to a maximum of 4,000 square feet of gross floor area

(5) Limited to a maximum of 5,000 square feet of gross floor area

(6) Except as an accessory use to a permitted use, and then only by Special Permit

| | C | R | AA AB | BA | G2 | BB | IA | IB | IC | ID | M | M-1 | AE | All Others | DPOD | MUD | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INDUSTRIAL, UTILITY USES | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Airport, heliport: | N | N | N | N | N | N | S | S | S | S | N | N | Y | N | N | N | |
| Public/Private utility with outside equipment or storage (2) | | | | | | | | | | | | | | | | | |
| With outside equipment or storage: | N | N | N | Y | N | N | Y | Y | Y | Y | N | N | Y | N | N | N | |
| With none of above: | S | S | S | Y | Y | Y | Y | Y | Y | Y | N | N | Y | S | SP | SP | |
| Earth removal (See Sec. 4100): (1) | S | S | S | S | S | S | S | S | SP | S | N | N | S | S | SP | SP | |
| Research laboratory: | N | N | S | Y | N | Y | Y | Y | Y | Y | N | N | Y | N | SP | SP | |
| Trucking terminal, bulk storage contractor's yard: | N | N | N | N | N | N | Y | Y | SP | Y | N | N | N | N | N | N | |
| Manufacturing, Processing and Warehouse: | N | N | N | SP | N | N | Y | Y | Y | Y | N | N | SP | N | N | N | |
| Adult Entertainment Uses | N | N | N | N | N | N | N | N | N | N | N | N | SP | N | N | N | Added 3/12/1996, Article 66 |
| Brewery/Distillery | N | N | N | N | N | N | Y | Y | Y | Y | N | N | N | N | N | N | |
| Multiple Uses Allowed: All uses shall comply with the underlying zoning | N | N | N | Y | Y | Y | Y | Y | Y | Y | N | N | Y | N | SP | SP | |
| | | | | | | | | | | | | | | | | | |
| OTHER PRINCIPAL USES | C | R | AA AB | BA | G2 | BB | IA | IB | IC | ID | M | M-1 | AE | All Others | DPOD | MUD | |
| | | | | | | | | | | | | | | | | | |
| Other use having externally observable attributes similar to one of above: | as regulated above | | | | | | | | | | | | | | | | |
| All other uses: | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | |

| ACCESSORY USES | C | R | AA AB | BA | G2 | BB | IA | IB | IC | ID | M | M-1 | AE | All Others | DPOD | MUD | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | |
| Home occupations (See Sec. 4410): | N | Y | Y | Y | S | Y | S | Y | Y | Y | N | N | Y | Y | SP | N | |
| Customary uses & structures (See. 4400): | Shall incur the same use regulations as the principal use listed in this Section | | | | | | | | | | | | | | | | |
| Agriculture, Horticulture or Floriculture. | Insofar as it can be established that the primary purpose of the use of the land falls within the | | | | | | | | | | | | | | | | |
| Large-Scale Ground-Mounted Solar Photovoltaic Installations | N | N | N | N | N | N | Y | Y | Y | Y | Y | Y | N | N | N | N | (Added 10/15/2012, Article 16) |
| Marijuana Establishment, Medical Marijuana Treatment and Dispensing Facilities & Marijuana Cultivation | N | N | N | N | N | N | N | N | N | N | N | N | SP(3) | N | N | N | (Added 3/16/2013, Article 16) |

(1) Special Permits to be issued by Planning Board rather than the Board of Appeals.

(2) Except for Large Scale Ground-Mounted Solar Photovoltaic Installation as defined and in accordance with Section 5600

(3) Allowed by Special Permit issued by the Planning Board.

2400. NONCONFORMING USES

This Zoning Bylaw or any amendment thereto shall not apply to the use of any structure or land uses lawfully in existence or lawfully begun, or to a Building or Special Permit issued before the first publication or notice of the public hearing on such Bylaw required by Section 5 of General Laws Chapter 40A as amended, but shall apply to any change or substantial extension of such use, to a Building or Special Permit issued after the first notice of said public hearing, to any reconstruction, extension or structural change of such structure and to any alteration of a structure begun after the first notice of said public hearing to provide for its use for a substantially different purpose or for the same purpose in a substantially different manner or to a substantially greater extent except where alteration, reconstruction, extension or structural change to a single or two-family residential structure does not increase the nonconforming nature of said structure.

2410. PRE-EXISTING NONCONFORMING USES OR STRUCTURES (EXTENSIONS) This section shall not apply to billboards, signs and other advertising devices subject to the provisions of Section 29 through 33, inclusive, of Chapter 93 of Chapter 93D, General Laws.

The Board of Appeals, by Special Permit, may authorize lawfully pre-existing, non-conforming uses or structures to be changed or altered; provided that such extension, alteration or enlargement meets all the following requirements: (Amended 3/17/2018, Article 27)

2410.1 All the special permit guidelines of section 1330;

2410.2 That it will not be substantially more detrimental or objectionable to the neighborhood than the existing non-conforming structure or use to the neighborhood.

2411. Building construction and Special Permits. Construction or operations under a Building or Special Permit obtained in conformity with this Zoning Bylaw or lawful amendments thereto, shall conform to any subsequent amendments of the Zoning Bylaw unless the use or construction is commenced within a period of not more than six (6) months after the issuance of such Permit, and in cases involving construction, unless such construction is continued through to completion as continuously and expeditiously as is reasonable.

2412. Non-conforming Single and Two Family Residential Structures. Non-conforming single and two family residential structures may be reconstructed, extended, altered, or structurally changed upon a determination by the Zoning Enforcement Officer that such proposed reconstruction, extension, alteration, or change does not increase the non-conforming nature of said structure. The aggregate sum of the gross floor area of all additions to a structure since the date when the structure became non-conforming under the provisions of this subsection shall not be greater than 50% of the gross floor area of the dwelling unit or one thousand (1000) square feet, whichever is smaller, unless a Special Permit is issued by the Zoning Board of Appeals under Section 2410 allowing a larger gross floor area. The following circumstances shall not be deemed to increase the non-conforming nature of said structure:

2412.1 Alteration to a structure which complies with all current setback, yard, building coverage, and building height requirements but is located on a lot with insufficient area, where the alteration will also comply with all of said current requirements.

2412.2 Alteration to a structure which complies with all current setback, yard, building coverage, and building height requirements but is located on a lot with insufficient frontage, where the alteration will also comply with all of said requirements.

2412.3 Alteration to a structure which encroaches upon one or more required yard or setback areas, where the alteration will comply with all current setback, yard, building coverage and building height requirements; the provisions of this subsection shall apply regardless of whether the lot complies with current area and frontage requirements.

2412.4 Alteration to the side, front or rear of a structure which encroaches upon a required yard or setback area, where the alteration will not encroach upon such area to a distance greater than the existing structure; the provisions of this subsection shall apply regardless of whether the lot complies with the current area and frontage requirements.

2413. Notwithstanding Section 2412, in the event that the Zoning Enforcement Officer determines that the non-conforming nature of such structure would be increased by the proposed reconstruction, extension, alteration, or change, the Board of Appeals may, by special permit, allow such reconstruction, extension, alteration, or change where the proposed modification will not be substantially more detrimental than the existing non-conforming structure to the neighborhood.

2414. Pre-Existing non-conforming use: Any increase in the area or extent of the non-conforming use of a structure or land made by Special Permit from the Special Permit Granting Authority, is limited to a fifty percent (50%) increase in the non-conforming floor area or land area at the time the use became non-conforming.

2420. ABANDONMENT. A nonconforming use which has been abandoned or discontinued for a period of two (2) years, or a nonconforming sign which has been abandoned or discontinued for a period of (6) months, shall not be re-established and any future use shall conform with the Bylaw, except in the case of land used for agriculture, horticulture or floriculture where such non-use shall have existed for a period of five (5) consecutive years.

2430. RESTORATION. Any nonconforming building or structure in existence at the time of adoption of the Bylaw or any amendment thereto may be reconstructed on the old foundation area if destroyed by fire or other accidental or natural cause provided such reconstruction takes place within a period of two years (1) from the date of catastrophe, or else such reconstruction must comply with this Bylaw.

2440. CHANGES. Premises may be changed from one nonconforming use to another only on Special Permit from the Special Permit Granting Authority. Such Permit shall be granted only for uses whose externally observable attributes are no more damaging to or inharmonious with the environs than those-of the use being replaced. See Section 2410 (a) for additional criteria for the granting of Special Permit hereunder.

(1) Six months in the case of nonconforming signs.

## 2500. DIMENSIONAL REGULATIONS

All principal buildings hereafter erected in any district shall be located on a lot such that all of the requirements set forth in Section 2600 are conformed to except where specifically exempted by this Bylaw or General Laws.

2510. EXEMPTIONS. Certain lots in subdivisions or in separate ownership are exempted from some of these requirements through Section 6 of General Laws, Chapter 40A as

amended. In addition, lots in non-residential districts and/or to be built upon for non-residential use shall enjoy the same exemption as if being built upon for residential use in a residential district.

2520. CHANGING NONCONFORMING LOT DIMENSIONS. No existing lot conforming with the Dimensional Schedule shall be changed in size or shape, except through a public taking, or changed in use, so as to result in violation of the requirements set forth below. No existing lot already nonconforming shall be changed except through a public taking so as to increase the existing degree of nonconformity. For lots which are currently owned by the Town, or are in an M-1 zone, the Town shall be allowed to seek relief from the Zoning Board of Appeals for lot size, setbacks and parking requirements, and/or from any other applicable provisions of this Bylaw. Provided that the ZBA finds that the requested relief is consistent with the intent and purpose of this Bylaw. (Amended 10/15/2018, Article 37)

2530. AVERAGE OF BUILDING SETBACKS. No building need provide a front yard depth greater than the average of the yards provided by existing buildings on abutting lots fronting on the same street.

2540. MULTIPLE USES. Not more than one principal use shall be allowed on a lot, except as allowed elsewhere in these Bylaws. (Amended 3/15/2014, Article 23)

2600. DIMENSIONAL SCHEDULE. (Amended 3/29/1994, Article 75, Amended 3/12/1996, Article 64; Amended 5/15/2010, Article 31)

2610. All building in Residential and Conservation Districts (R, AA, AB, C) and Residential buildings in Other Districts, and Senior Housing in the Senior Living Overlay, shall comply with

the following dimensional regulations.

Amended 3/12/1336, Article 64; Amended 10/21/2013, Ameded 3/29/1994, Article 75; Senior Living Overlay added 5/15/2010, Article 30; Amended 3/17/2018, Article 28; Replaced 3/16/2019, Article 36

| | USE CATEGORY<br>Garden Apartment (AA) | Senior Living Overlay | All Other |
|---|---|---|---|
| Min. lot area: | 2 acres [(a)] | 5 acres | 50,000 sf [(h) (l)] |
| Min. lot frontage [(d)]: | 140 ft | [(n)] | 200 ft [(h)] |
| Min. front yard [(d)]: | 100 ft | 25 feet [(n)] | 50 ft [(f) (i)] |
| Min. side yard: | 50 ft | 25 feet [(n) (o)] | 15 ft [(g) (l)] |
| Min. rear yard: | 50 ft | 25 feet [(n) (o)] | 30 [(g) (l)] |
| Min. bldg. separation on same lot: | 50 ft | ~ | ~ |
| Max. bldg. height: | 35 ft | 45 feet | 35 ft [(l)] |
| Max. bldg. stories: | 3 | 3 | 2 1/2 [(l)] |
| Max. lot coverage (%): | 30 | ~ | 30 |
| Min. open space per d.u.: | 1,500 sf | ~ | ~ |
| Min. habitable floor area per d.u.: | 600 sf | 600 feet | 720 sf [(j) (l)] |
| Min. lot width: | ~ | ~ | as required [(k) (l)] |
| Min. open space (%): | ~ | [(n)] | 40 [(q)] |
| Max. lots permitted on a common driveway [(m)]: | ~ | (5 for independent living, no requirement otherwise, or PB determines via special | 5 |
| Number of affordable unit (%): | 20% [(p) (r)] | 10% - 20% [(p)] | |

(a) But not less than 2,500 square feet (sf) per dwelling unit (d.u.) plus 500 square feet per bedroom.

(b) *(Footnote deleted Annual Town Meeting 2019)*

(c) *(Footnote deleted Annual Town Meeting 2019)*

(d) Corner and through lots shall observe frontage and front yard requirements for each portion of a lot that adjoins a public way. Footnote (d) shall not apply in the Senior Living Overlay.

(e) *(Footnote deleted Annual Town Meeting 2019)*

(f) Increase to 75 feet abutting Turnpike Road.

(g) Reduce to 5 feet for one-story accessory structure not occupying more than 25% of either required or actual yard.

(h) For two-family dwelling 250 feet; 55,000 square feet area per lot.

(i) *(Footnote deleted 10/21/2013, Article 23)*

(j) Shall not apply to single family dwellings.

(k) Minimum Width of Lot – The required minimum lot frontage extending from the front lot line to the rear building line of the main building. *(Amended 3/12/1996, Article 64)*

(l) For congregate housing, the minimum lot area is six (6) acres; the minimum side and rear yards and lot width may be reduced or eliminated by Special Permit to allow the construction of congregate housing and a nursing home on contiguous parcels with minimal separation between buildings, the maximum building height is thirty-eight (38) feet; the maximum building stories is four (4); and the minimum habitable floor area per

dwelling unit shall not apply. Separate buildings for congregate housing and a nursing home may be erected on the same lot.

(m) In all districts in the Town of Westborough, Common Driveways serving more than two (2) detached single family dwellings shall be required to receive a Special Permit from the Planning Board. In no case will a common driveway serve more than five (5) detached single family dwellings. In granting a Special Permit for a common driveway, the Planning Board shall require that the common driveway meet the standards defined in the Rules and Regulations Governing the Subdivision of Land in the Town of Westborough.

(n) For these yard requirements, in all residential districts, SLO shall be required to conform to Section 2610 of this Bylaw. SLO uses in all non-residential districts shall be required to conform to Section 2620. Except, where abutting a residential district it shall conform to Section 2610.

(o) Except 50 feet if adjacent to residentially zoned land. In the G2 District, a fifty (50) foot buffer strip shall be maintained where abutting a residential district, forty (40) feet of this to remain undisturbed, except for the planting of additional natural vegetative screening.

(p) A range of 10% to 20% of the units, as determined by the Special Permit Granting Authority, that are to be designated affordable must comply with the requirements of the Massachusetts Department of Housing and Community Development or a successor agency. Such units shall have deed restrictions regarding affordability which will continue in perpetuity and will allow the units to "count" as State recognized affordable units. All such affordable units shall be priced at levels affordable to individuals or families earning no more than 80% of Area Median Income (AMI) as published by the State/US Department of Housing and Urban Development (HUD).

(q) Man-made retention and detention areas shall not be considered open space.

(r) Applicants for affordable housing projects shall be expected to meet the 20% minimum number of affordable units provided herein. The Special Permit Granting Authority may, however, in its discretion decrease the minimum 20% affordable housing requirement to no less than 10%provided that other affordable housing contributions are made to the Town which the Special Permit Granting Authority deems sufficient to meet affordable housing needs. Such alternative contributions may include, contributions to the Town's Senior/Disabled Tax Relief Fund, creation of affordable housing units elsewhere in Town, or other alternatives deemed suitable to the Special Permit Granting Authority.

2620. NON-RESIDENTIAL BUILDINGS IN NON-RESIDENTIAL DISTRICTS
(BB, IA, IB, IC, ID and G2) (See 2610 for residential buildings) (Amended 10/18/04, Article 10; 5/14/05, Article 41; Amended 5/15/2010, Article 30)

| | BA | BB | G2 | IA, IB | ID (j) | DPOD(g) | MUD (g) |
|---|---|---|---|---|---|---|---|
| Minimum lot area (sf): | 15,000 | 10,000 | 15,000 | 15,000 | 15,000 | 10,000 | 10,000 |
| Minimum lot frontage (ft) (a): | 125 | 100 | 125 | 125 | 125 | 100 | 100 |
| Minimum front yard (ft) (a,b,c, e): | 25 | 25 | 25 | 25 | 25 | 10 | 10 |
| Minimum side yard (ft) (d): | 25 | 0 | 25 | 25 | 25 | 0 | 0 |
| Minimum rear yard (ft) (d): | 25 | 0 | 25 | 25 | 25 | 0 | 0 |
| Maximum building height (ft): | 60 | 35 | 45 | 60 | 95 | 60 | 60 |
| Maximum building stories: | 4 | 2 1/2 | 2 1/2 | 4 | 6 | 4 | 4 |
| Maximum lot coverage (%): | 40 | 100 | 40 | 40 | 60 | ~(h) | ~(h) |
| Minimum distance between edge of curb cut & nearest side lot line or corner (ft): | 20 | ~ | 20 | ~ | ~ | ~(h) | ~(h) |
| Minimum open space (%): | 60 | ~ | 60 | 60 | 40 | ~(h) | ~(h) |
| Max. square foot floor area | ~ | ~ | (i) | ~ | ~ | ~ | ~(h) |

(Amended 3/5/1990, Article 61; Amended 3/2/1992, Article 19; Amended 3/17/2001, Article 44; DPOD Added 3/15/2004, Article 38; Amended 5/14/2005, Article 38; ID Added 5/15/2010, Article 30; MUD added 5/15/2010, Article 32; Replaced 3/16/2019, Article 37)

(a) Corner and through lots shall observe frontage and front yard requirements for each portion of a lot that adjoins a public way.
(b) Increase to 75 feet abutting Turnpike Road.
(c) But not less than 50 feet measured from the street centerline.
(d) (1) Decrease to zero (0) feet where abutting a railroad right-of-way.

(2) A one hundred (100) foot buffer strip shall be maintained where abutting a Residential District; seventy-five (75) feet of this to remain undisturbed, except for the planting of additional natural vegetative screening.
(3) In the G2 District, a fifty (50) foot buffer strip shall be maintained where abutting a Residential District, forty (40) feet of this to remain undisturbed, except for the planting of additional natural vegetative screening.

(e) No building need provide a yard greater than that existing on any abutting parcel on the same street.
(f) *(Footnote deleted Annual Town Meeting 2019).*
(g) With Special Permit issued by the Special Permit Granting Authority.
(h) Determined by the sole discretion of the Special Permit Granting Authority during Special Permit process.
(i) Newly constructed professional offices shall be in a residential style structure and be limited to a maximum of 4,000 sq. ft. gross floor area; Newly constructed retail sales and services shall be limited to a maximum of 5,000 sq. ft. gross floor area.
(j) The Industrial D District (ID) is an overlay district. The maximum dimensional schedule shall be allowed in accordance with Section 5400 of this Zoning Bylaw. Otherwise, the underlying requirements of the Industrial B District (IB) are applicable.

2621. Non-Residential buildings in Non-Residential Districts (AE) (see 2610 for residential buildings. (Added 3/12/1996, Article 66)
In the case of Adult Entertainment uses, all the dimensional requirements of Section 4822 shall be met in addition to the applicable requirements of Section 2620, BA and BA (f) Districts;

## 2630. BUILDING IN M-1 DISTRICT (M-1)

Dimensional regulations for municipal or institutional buildings or structures on land zoned M-1 shall be established for each building or structure by two-thirds vote of Town Meeting. Notwithstanding the foregoing, no vote to establish such dimensional requirements shall be taken until a public hearing has been held by the Planning Board and a report with

recommendations by the Planning Board has been submitted to the Town Meeting pursuant to the provisions of Massachusetts General Laws, Chapter 40A, Section 5, as amended, and further that the Site Plan Review process as defined by Town Bylaws shall apply to any such buildings or structures approved by the Town Meeting (Amended 3/16/2002, Article 42 and Article 43)

## 2640. BUILDINGS IN MUNICIPAL DISTRICT (M)

Dimensional regulations for municipal institutional buildings or structures on land in M zoned Districts shall be established for each building or structure through the issuance Special Permit as provided in Section 1330.

2650. Should any building or structure need be erected in Zoning District M-1, Section 2630 shall not apply provided that the total estimated cost of construction be less than two thousand dollars ($2,000.00).

# ARTICLE 3 GENERAL REGULATIONS
# (ADOPTED MARCH 5, 1990)

## 3100. PARKING AND LOADING REQUIREMENTS

3110. GENERAL. Except in the Downtown Business (BB) District, which is exempt from these requirements, adequate off-street parking must be provided to service all parking demand created by new construction, whether through new structures or additions to old ones, and by change of use of existing structures. Such parking shall be either on the same premises as the activity it services, or within three hundred (300) feet on a separate parcel, which may be jointly used with other premises for this purpose.

3120. SCHEDULE OF PARKING AREA REQUIREMENTS. In applying for a Building or Occupancy Permit, the applicant must demonstrate that the following minimums. will be met unless these are reduced on Special Permit from the Special Permit Granting Authority upon their determination that special circumstances render a lesser provision adequate for all parking needs. Requirements are additive for multiple uses on the same lot. Where uses cannot be calculated separately, the use requiring the higher number of spaces shall be used throughout.

- Dwellings: two spaces per dwelling unit
- Motel, motor court, lodging house: one space per guest unit plus one space per eight (8) guest units or fraction thereof
- Offices: three and one-half (3.5) spaces per one thousand (1,000) square feet: (1) (Amended 3/17/2001, Article 45)
- Retail Sales: one space per two hundred (200) square feet (1)
- Wholesale Sales (where the public is not allowed): one space per three hundred (300) square feet (1)
- Research and Development: three and one-half (3.5) spaces per one thousand (1,000) square feet, (1) (Amended 3/17/2001, Article 45)
- Restaurant, place of assembly: one space per four (4) seats
- Lounges: one space per two seats
- Restaurant (take-out): three spaces per each employee
- Bowling Alley: four spaces per lane
- Nursing Home: one (1) space per four (4) beds
- Hospital: one (1) space per bed
- Industrial: one (1) space per each one and one-half (1-1/2) employees per shift
- Congregate housing: one (1) space per two (2) dwelling units
- Others: individually determined by the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board upon Site Plan Review

(1) Square feet shall mean that total floor area enclosed within the outside walls of the building or, if not enclosed, it shall be the area of the smallest quadrangle which can encompass the area in use.

3130. PARKING AREA DESIGN. No off-street parking area shall be maintained within ten (10) feet of a street line. For parking areas of six (6) cars or more, the following shall apply:

3131. Parking area use shall not require backing on a public way.

3132. There shall be not more than one (1) entrance and one (1) exit from such lots per two hundred (200) feet of street frontage or fraction thereof. If necessary to meet this requirement, uses shall arrange for shared egress.

3133. Such parking lots shall be screened from any abutting residential use by densely planted evergreen shrubs or by a stockade-type fence, and shall be paved. Said shrubs shall be a minimum of four (4) feet in height; variety of shrub, the distance from any lot line, and spacing shall be subject to approval by the Tree Warden. Said fence shall be a minimum of six (6) feet in height and said paving shall be with generally accepted paving material as approved by the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board at the time of Site Plan Review. (Amended 3/16/2019, Article 33)

3134. In a Residential district, no such parking lot shall extend into a required yard, except that such an extension may be permitted by Special Permit for congregate housing.

3135. PARKING GARAGE. A parking garage shall conform to Sections 3131 and 3132. Where a Parking Garage is attached to or part of a structure, it shall be constructed to give the same outward appearance as the structure to which it is attached. For the purpose of this Bylaw, a Parking Garage shall not be considered an accessory use or structure.

3140. LOADING REQUIREMENTS. Adequate off-street loading facilities and space must be provided to service all needs created by new construction, whether through new structures or additions to old ones, and by change of use of existing structures. Facilities shall be so sized and arranged that no trucks need back onto or off of a public way, or be parked on a public way while loading, unloading, or waiting to do so.

## 3200. ENVIRONMENTAL CONTROLS

3210. DISTURBANCES. No use shall be allowed if it will cause sound, noise, vibration, odor, or flashing (except for warning devices, temporary construction or maintenance work, parades; recreational activities, or other special circumstances) perceptible without instruments more than four hundred (400) feet from the boundaries of the originating premises if in an Industrial District, or more than two hundred (200) feet from the boundaries of the originating premises if in a Business District.

(3220. Pollution Control and 3230. Liquid Waste deleted 10/21/2013, Article 24)

3220. ROADSIDE AND PARKING AREA TREES. (Amended 3/5/1990, Article 69, Amended 10/21/2013, Article 24)

In all zoning districts, the maintenance, establishment and protection of roadside and parking area trees is to be encouraged. Roadside trees are to at least meet the requirements of the Subdivision Rules and Regulations. In all zoning districts, minimum requirements for roadside and parking area trees shall conform to Article 46 of the Town Charter and Bylaws.

A. Removal of healthy trees over five (5) inches in diameter (at breast height) is to be minimized along roadways and in areas proposed for parking areas.

B. Planting new or replacement trees approximately every thirty-five (35) feet along roads is required. Such trees should be deciduous hardwoods in order that a stately atmosphere may ultimately be created; and, the placement of said trees is to be as approved by the permit granting authority and based upon recommendations from the tree warden.

C. Planting new trees in parking areas of a size greater than six (6) parking spaces is required at a ratio of l tree per 12 parking spaces; and placement of said trees is to be as approved by the permit granting authority and based upon recommendations from the tree warden.

D. Roadside and parking area tree plantings should meet the following criteria:

1. Cast moderate to dense shade in summer;
2. Be long-lived, i.e., over 60 years;
3. Be tolerant of pollution and direct or reflected heat;
4. Require little maintenance, by being mechanically strong and insect-and disease-resistant;
5. Be able to survive with no irrigation by two (2) years after establishment.

## 3300. SIGN REGULATIONS

Signs erected after the adoption of this Bylaw shall be governed by Section 3300. Signs lawfully existing at the time of the adoption of this Bylaw shall be governed by Section 2400.

The following, however, shall not be considered signs within the context of this Bylaw;

a. Flags and insignia of any government except when displayed in connection with commercial promotion;

b. Legal notices or informational signs erected or required by government bodies;

c. Temporary signs, erected for a maximum of thirty (30) days, for a charitable, non-profit or religious cause, provided that the sign area does not exceed six (6) square feet in a Residential District or twelve (12) square feet in any other zoning district.

d. Standard fuel pumps bearing thereon in usual size and form the name, type and price of fuel;

e. Integral decorative or architectural features of building, except letters, trademarks, moving parts, or parts internally illuminated or employing decorative lighting;

f. Signs guiding and directing traffic and parking and not exceeding six (6) square feet in area, bearing no advertising matter,

g. Lettering on approved U.S. Mail Boxes provided: said lettered area shall not exceed two (2) square feet.

h. Signs posting "No Hunting" or "No Fishing" provided: said sign area shall not exceed two (2) square feet.

(Amended 10/19/2015, Article 5)

## 3310. GENERAL SIGN REGULATIONS

3311. Signs, any part of which moves or flashes, or of the traveling light or animated type, and all beacons and flashing devices whether a part of, attached to, or apart from a sign, are prohibited. Within the Downtown Business District (BB), Downtown Planning Overlay District (DPOD), Gateway 2 District (G2), Historic District and the Senior Living Overlay District (SLO) only externally illuminated signs or opaque signs that are not illuminated, shall be allowed. Automated Variable Message signage shall be prohibited in the aforementioned Districts. (Amended 10/19/2015, Article 5; Amended 3/16/2019, Article 32)

3312. No illumination shall be permitted which casts glare onto any Residential District, or onto any portion of a way so as to create a traffic hazard. Externally light d signs may be illuminated only by a white, steady, stationary light of reasonable intensity shielded and directed solely at the sign. When lighted from within, a sign may be illuminated only with light of reasonable intensity. Reasonable intensity of said light shall be determined by the Board of Selectmen based on the use and character of the immediate vicinity.

3313. No sign shall be placed within or projecting over a public way or on public property except with a permit from the Board of Selectmen.

3314. All new signs not elsewhere provided for in these Bylaws or qualifying as a nonconforming use under our Zoning Bylaws, having a sign area greater than twelve (12) square feet may only be erected, constructed or altered after a Permit has been issued by the Building Inspector.

3315. No sign shall be affixed to or painted on any living or natural object such as a tree or rock, and no sign shall be placed on land or affixed to any structure without permission from the owners thereof.

3316. PROJECTING SIGNS. Any sign any part of which projects more than ten (10) inches from a supporting wall of any building shall not be permitted.

3317. WALL SIGNS. Signs affixed to an exterior wall of any building shall be permitted only if conforming with the following:

a. All parts of said sign shall be within ten (10) inches from its supporting wall.

b. Sign area shall not exceed fifteen (15) percent of the wall area with which it is viewed.

c. Said sign shall not extend beyond the wall dimensions, horizontally or vertically.

d. not more than one (1) such sign shall be allowed on any building except as allowed or as further restricted elsewhere in this Bylaw. (Amended 10/19/2015, Article 5)

3318. GROUND SIGNS. Signs erected on the ground and which are wholly supported from the ground shall be permitted only if conforming with the following:

a. No part of any such sign shall be within five (5) feet from any building.

b. All such signs shall have a clear space where required to promote public safety. This shall be demonstrated at the proposed sign location prior to sign approval and sign installation. (Amended 10/19/2015, Article 5)

c. No such sign shall have a horizontal dimension greater than fifteen (15) feet.

d. Sign area shall not exceed fifty (50} square feet except if the lot fronts on Turnpike Road, the sign area shall not exceed one hundred (100) square feet.

e. No such sign shall have a vertical height greater than twenty (20} feet except if the lot fronts on Turnpike Road, the vertical height shall not be greater than thirty (30} feet.

f. No part of any such sign shall be less than ten (10} feet from any lot line except if the lot fronts on Turnpike Road, no part of any such sign shall be less than thirty- five (35} feet from any lot line. Signs within the Downtown Business (BB} District shall be exempt from this provision.

g. Every sign within twenty-five (25} feet of the curb line of two (2} intersecting streets shall have a clear space, except for necessary structural supports, of not less than eight (8} feet between the ground and the lowest part of the sign.

3319. ROOF SIGNS. Signs affixed to a building or roof shall not extend more than twelve (12) feet above the height of the building. Any sign erected and maintained wholly upon or over the roof of any building with the entire support on the roof structure shall have a clear space, except for necessary structural supports, of not less than four (4) feet between the roof level and the lowest part of the sign. Said sign shall be more than four (4) feet measured from the inside dimension of the wall toward which the sign faces.

3320. TEMPORARY ACCESSORY SIGNS. Any temporary sign is permitted to be erected for up to thirty (30) days if in accordance with limitations set for permanent signs or the following: (Amended 10/19/2015, Article 5)

a. An unlighted sign of up to twenty (20) square feet indicating parties involved in construction on the premises.

b. An unlighted sign of up to twelve (12) square feet pertaining to lease, sale or rental of the premises on which the sign is located; except in a Residential District where the sign area shall not exceed six (6) square feet.

c. A sign of up to ten (10) square feet pertaining to a subdivision while under development only with permission of the Planning Board.

d. Signs inside display windows covering not more than thirty (30) percent of window area, illuminated by building illumination only. Temporary Signs inside a display window advertising a specific event or activity or notice to the public shall not be permitted for longer than 30 days, unless approved by the Building Commissioner, and shall be removed immediately upon the conclusion of the event or activity. Such sign shall not exceed 20% of the window area and shall not be separately list. (Amended 10/19/2015, Article 5)

e. Signs which are mounted to any motor vehicle or trailer which is parked for the sole purpose of advertising or directing traffic to a business establishment on or off premise are prohibited except by Special Permit issued by the Board of Selectmen, and then only within Business (BA) (BB) and Industrial (IA) (IB) Districts. (Amended 10/19/2015, Article 5)

f. Signs naming political issues or political candidates shall not exceed six (6) square feet in area. Said signs shall be allowed only from sixty (60) days prior to an election until five (5) days following the election. (Amended 10/19/2015, Article 5)

3330. PERMANENT ACCESSORY SIGNS. Signs whose content relates exclusively to the premises on which they are located, or to products, accommodations, services or activities on those premises, shall only be allowed if conforming to Sections 3331 through 3335.

3331. Signs, unlighted unless otherwise provided herein, which may be permitted in any Single Residence (R), Garden Apartment (AA), and High Rise Apartment (AB) Districts:

a. One (1) identification sign for each dwelling unit provided said sign area shall not exceed two (2) square feet and it shall not be used other than for identifying the occupant and/or address thereof. Land used for ten (10) or fewer dwelling units may have one (1) sign not to exceed two (2) square feet in area indicating the owners or occupants. Sign area may be increased by one (1) square foot for each ten (10) additional dwelling units; sign area not to exceed twenty (20) square feet except if the land fronts on Turnpike Road, sign area may increase to forty (40) square feet.

b. One (1) identification sign for each community facility provided; said sign area shall not exceed twelve (12) square feet, if lighted, it shall be illuminated with white light by indirect method only and it shall be set back from the front lot line by not less than one-half (1/2) the depth of the front yard.

c. Signs of the Temporary Accessory type not elsewhere restricted.

d. One (1) home occupation sign not to exceed two (2) square feet in area.

e. A business in a High Rise Apartment shall have no sign pertaining to such place of business outside of any building and no illuminated sign pertaining to such place of business visible from a public way.

3332. Signs which may be permitted in any Business (BA) (BB) or Industrial (IA) (IB) District:

a. Any sign permitted by Section 3331 subject to the same provisions.

b. Each commercial or industrial enterprise may only have one (1) Ground Sign and one (1) Roof or two (2) Wall Signs. (Amended 5/14/2011, Article 18)

c. One (1) additional Wall Sign used as a directory to the occupants or tenants of a building may be affixed to an exterior wall at one (1) entrance of said building. Said directory shall not exceed an area determined on the basis of one (1) square foot for each occupant or tenant; total sign area shall not exceed six (6) square feet.

d. Each lot in a Business or Industrial District with a building put to commercial or industrial use may have not more than one (1) Ground Sign. Sign area shall not exceed that

allowed for said lot. Each tenant may share equally in the allowed sign area. Where an industrial area is removed from a public way by a private access road, one (1) additional Ground Sign not to exceed twenty (20) square feet may be placed within view of said public way, but not within twenty (20) feet of said way.

e. Information related to specific business operations on the premise, such as proprietors name; contact information, including phone number, hours of operation, web page address, and the like, as defined in the Town of Westborough's Signage Guidelines, shall be allowed on the primary customer entry door. Such information shall not occupy more than 25% if the door surface area. (Amended 10/19/2015, Article 5)

3333. Signs which may be permitted in any Conservation (C), State, MDC, Municipal (M) Districts:

a. One (1) identification sign for each frontage on a public way shall be permitted.

b. Sign area shall not exceed twelve (12) square feet.

3334. A farm, institutional or non-commercial recreational use may have one (1) sign not to exceed twelve (12} square feet. Said sign must be located on the land so used. Should said land front on more than one public way, a sign shall be allowed for each such lot frontage.

3335. Signs, whose content relates jointly to "Brand Names" as well as information relating to the premises on which the sign is located, shall have the sign area divided equally between the "Brand Name" and the information relating to the premises.

3336. When any sign becomes insecure, in danger of falling, or otherwise unsafe, the owner thereof shall, upon written order of the Building Inspector, remove or repair the sign forthwith.

3337. HISTORICAL DISTRICTS AND/OR NATIONAL REGISTER PROPERTIES (Amended 10/19/2015, Article 5)

a. Signs erected, altered or relocated within the confines of any National Register of Historic Places District or the Westborough Downtown Business District or any Zoning District within 2500 feet of the Downtown Rotary shall be in keeping with the historic character of that District. This places additional conditions upon design, materials, lettering and color of signs in these Districts. In Residential Districts within 2500 feet of the Downtown Rotary signage shall be in conformance with Section 4413 of this Bylaw. (Amended 3/5/90, Article 72; 3/29/1994, Article 39)

b. The Historical Commission approval is required for any new or revised existing signs which will be located in any Historic District, the Westborough Downtown Business District, or any Zoning District within 2500 feet of the Downtown Rotary. The Historical Commission shall prepare, and the Planning Board shall approve, guidelines relating to appropriate sign design for Historic Districts. Where there are overlapping review of building elements required by both the Historic Commission and the Design Review Board, the Design Review Board shall be the approving authority for signage on these buildings.

c. The Historical Commission Guidelines shall be applied by both the Historical Commission and the Design Review Board, where appropriate, in reviewing and

approving signs. Copies of these guidelines shall be made available from both the Historical Commission and Building Commissioner. (Amended 3/12/1996, Article 74)

d. Following signage review Historical Commission or Design Review Board, where appropriate, shall provide a decision to the Building Commissioner.

e. Neon halo, gas-filled tube type illuminated signs and internally illuminated signs are not in keeping with the historic character of the Districts and shall not be allowed.

f. Lighting of signs within these Districts shall be limited to shielded light sources. For sign boards or other wall mounted signs, historically appropriate gooseneck light sources may be used. The design, material, and location of such light sources shall be reviewed and approved by the Historical Commission or Design Review Board, where appropriate. Indirect or downward-directed lighting may be used to illuminate projecting signs.

g. Enforcement of these requirements shall be the responsibility of the Building Commissioner.

3340. OFF-PREMISES SIGNS. Billboards or signs, whose content does not relate exclusively to the premises on which they are located, or to products, accommodations, services or activities on those premises, shall not be permitted. (Amended 10/19/2015, Article 5)

Off-Premises Signage may be allowed by the Building Commissioner if the Off-Premises Signage serves to reduce traffic congestion, improve public safety or serves a similar public benefit"; (Added 10/19/2015, Article 5)

"The Building Commissioner may also allow Off-Premises Signage to announce temporary events. The location and duration of the display of such Off-Premises Signage shall be determined by the Building Commissioner"; (Added 10/19/2015, Article 5)

3350. NON-CONFORMING SIGNS. Any sign that was legally erected prior to the adoption of Section 3300 of this Bylaw or has been legally erected since the adoption of this Section may continue to be maintained but shall not be enlarged or altered in any way unless it is brought into conformity with the requirements of this Bylaw. A non-conforming sign is subject further to the following regulations:

a. A non-conforming sign shall not be moved or relocated unless it is brought into compliance with the provisions of this Bylaw.

b. A non-conforming sign which is removed or abandoned for longer than 30 days or destroyed by more than 35% shall not be replaced unless it complies with this Bylaw.

c. Any modification to a non-conforming sign, other than repainting, refurbishing and/or repairing it to its original condition shall void such non-conformity and any new sign shall comply with this Bylaw;

(Added 10/19/2015, Article 5)

3360. OUTSIDE DISPLAY.

a. Display of merchandise or other materials exterior to a building in the Downtown Business District (BB), Downtown Planning Overlay District (DPOD), and the Gateway 2 District (G2) shall be reviewed and approved by the Design Review Board.

b. Umbrellas serving outdoor seating or related activities in the Downtown Business District (BB), Downtown Planning Overlay District (DPOD), and the Gateway 2 District (G2) shall be considered an architectural feature and shall be reviewed and approved by the Design Review Board";

(Added 10/19/2015, Article 5)

# ARTICLE 4 SPECIAL REGULATIONS (ADOPTED MARCH 5, 1990)

## 4100. EARTH MOVING AND CLEARING OF PROPERTY REGULATIONS

(Replaced 3/16/2002, Article 17)

4110. GENERAL. Earth moving and/or clearing shall be done only in accordance with Sections 4120 through 4170, except that the following shall be exempted from these provisions:

4111. The removal or addition of less than five hundred (500) cubic yards of such material, or clearing and grading activity which disturbs less than 20,000 square feet of land, within any twelve (12) month period. (Amended 3/2/1992, Article 21; Amended 3/29/1994, Article 43)

4112. Earth moving and/or clearing incidental to construction on a lot where such earth moving is explicitly allowed under a currently valid Building Permit, Special Permit, or Subdivision Approval. (Amended 3/29/1994, Article 43; Amended 10/21/2013, Article 22)

4113. Removal on a parcel for which removal was authorized under a legal permit issued prior to adoption of Section 4100 may continue until the expiration date of said permit, of for eighteen (18) months, whichever is the greater, provided that all bylaws, permits and conditions applicable prior to the adoption of this Section shall be complied with. Subsequent to that date, full compliance with all the requirements of Section 4100 must be met.

4114. Clearing on property that has received an approved Forest Cutting Plan development by a certified forester and approved by the Massachusetts Department of Environmental Management.

4120. SPECIAL PERMIT OR APPROVAL. Earth moving and/or clearing shall be allowed only under a Special Permit issued by the Planning Board, following a written application, a copy of which shall be forwarded to the Conservation Commission and Town Engineer. The following shall be conditions for such issuance:(Amended 10/21/2013, Article 22)

4121. The application shall be accompanied by a plan showing all natural and man-made features, including wetlands, water courses, 100- year flood plain, property lines, names and addresses of all abutters if available from the Assessors, including those across any street or way, topography at two (2) foot contour interval of the site and all land within one hundred (100) feet of the area of the earth moving and/or clearing activity together with any grades below or above which finish surface will now lie, and the proposed cover vegetation and trees. The application shall include a description of earth moving, clearing or construction activities, in sequence, which specifies the expected date of soil stabilization, vegetation and completion. If involving more than one (1) acre of clearing, the plan shall be prepared by a registered landscape architect. If involving more than five hundred (500) cubic yards of materials to be moved, the plan shall be prepared by a Registered Engineer. (Amended 3/29/1994, Article 43)

4122. A performance bond in the amount determined by the Planning Board shall be posted in the name of the Town assuring satisfactory performance in the fulfillment of the requirements of this Bylaw and such other conditions as the Planning Board may impose as conditions to the issuance of its permit.

4123. Before granting a permit, the Planning Board shall give due consideration to the location of the proposed earth moving and/or clearing, to the general character of the neighborhood surrounding such location, to the protection of water supply, to the general safety of the public on the public ways in the vicinity, and to the recommendations of the Conservation Commission and Town Engineer. Prior to said consideration the applicant shall notify the abutters as to the time and place of consideration and shall provide the Planning Board with proof of such notification.

(Deleted 4125 10/21/2013, Article 22)

4126. INSPECTION AND COMPLIANCE. In order to ensure compliance with a Special Permit or approval granted under this regulation, the Planning Board will require the applicant to perform periodic inspections and submit written reports. The interval and content of such inspection and reporting shall be determined during review of the application. Upon satisfactory completion of earth moving, and/or clearing activity, the applicant shall request a certificate of compliance. The Planning Board, as the case may require, shall perform an inspection prior to granting such certificate and releasing the performance bond or other security. (Added 3/29/1994, Article 43)

4130. EARTH MOVING

4131. Finish grade shall not lie below a level that would reasonably be considered a desirable grade for the later development of the area, or below the grades specified on the plan accompanying the permit application. The Planning Board may specify a base grade below which excavation shall in no event take place. The Planning Board from time to time may require the site be surveyed by a registered land surveyor for compliance with these Bylaws. Cost of survey is to be paid by the permit holder.

4132. Provision shall be made for safe drainage of water, and for prevention of wind or water erosion carrying material onto adjoining properties.

4133. The Planning Board may require an undisturbed fifty (50) foot buffer strip be maintained at all boundaries. (Amended 3/29/1994, Article 43; Amended 10/21/2013, Article 22)

4134. The visibility, sound and airborne particulates from processing equipment shall be screened from adjacent premises through the design and location of such equipment, and through use of natural vegetation planting, overburden piles and surge piles as screening.

4135. Dust from all earth-moving activities shall be controlled.

4136. Earth materials shall not be deposited onto public roads.

4137. Finish grade shall not lie below a level that is ten (10) feet above the natural, seasonal high groundwater table for the site. (Amended 3/29/1994, Article 43)

4138. Vegetative stabilization measures shall be employed during earth, moving and construction activity as required by the approving authority. All perimeter dikes and slopes, basin or trap embankments shall be stabilized with sod, seed, anchored straw mulch within seven (7) days of disturbance. All other disturbed areas shall be stabilized with sod; seed and anchored straw mulch within fourteen (14) days after disturbing activities are ceased.

Topsoil shall be stripped from disturbed areas and stockpiled in an approved area and stabilized with a temporary vegetative cover if left more than fifteen (15) calendar days.

Perimeter sediment controls shall be installed around stockpiled topsoil.

During cold weather months, when seeding and sodding may be impractical, anchored mulch shall be applied as approved.

4140. CLEARING PROCESS

4141. Provision shall be made for safe drainage of water, and for prevention of wind or water erosion carrying material onto adjoining properties.

4142. The Planning Board may require an undisturbed fifty (50) foot buffer strip be maintained at all boundaries. (Amended 10/21/2013, Article 22)

4143. The visibility, sound and airborne particulates from processing equipment shall be screened from adjacent premises through the design and location of such equipment, and through use of natural vegetation planting.

4144. Dust shall be controlled.

4145. Vegetative stabilization measures shall be employed during clearing or grubbing activity as required by the Planning Board. All exposed soils shall be stabilized with sod, seed, anchored straw mulch within seven (7) days of disturbance. All other disturbed areas shall be stabilized with sod; seed and anchored straw mulch within fourteen (14) days after disturbing activities are ceased. During cold weather months, when seeding and sodding may be impractical, anchored mulch shall be applied as approved.

4150. RESTORATION. Forthwith following the expiration or withdrawal of a permit or upon voluntary cessation of operations, or upon completion of activities to the extent covered by the performance bond (Section 4122), that entire area shall be restored as follows:

4151. For earth moving activities, all land shall be so graded that no slope exceed one (1) foot vertical rise in three (3) feet horizontal distance and shall be so graded as to safely provide for drainage without erosion. The Planning Board may require the restored site be surveyed by a registered land surveyor for compliance with these Bylaws. Cost of survey is to be paid by the permit holder.

4152. For earth-moving activities, all boulders larger than one-half (1/2) cubic yard shall be removed or buried, and all tree stumps removed in compliance with the Westborough Board of Health Regulations. For clearing activities, all stumps shall be removed in compliance with the Westborough Board of Health Regulations.

4153. The entire area excepting exposed ledge rock shall be covered with not less than four inches of topsoil, which shall be planted with perennial cover vegetation adequate to prevent soil erosion.

4154. Any performance bond shall not be released until sufficient time has lapsed to·ascertain that the vegetation planted has successfully been established and that drainage is satisfactory.

4160. ADDITIONAL CONDITIONS. The Planning Board may set conditions in addition to the above, including but not limited to: duration of the permit, hours of the day during which earth moving and/or clearing may take place, hours during which vehicles may travel to and from the premises, routes to be used by hauling vehicles and trees to be planted. (Amended 3/29/1994, Article 43)

4170. RENEWAL OR REVOCATION OF PERMIT. No Permit or Approval shall be issued under the provisions of Section 4100 to extend for a term of more than one (1) year, but a Permit or Approval may be renewed upon application and after a Public Hearing. Prior to renewal, inspection of the premises shall be made by the Planning Board to determine that the provisions of this Bylaw are being complied with. The Planning Board, after a hearing and proof of violation of the Bylaw, shall withdraw the permit, after which the operation shall be discontinued and the area restored in accordance with Section 4150. Violations of this bylaw, or of any condition of a Special Permit or approval granted under this section, shall be punished by a fine of not more than three hundred ($300) dollars per day.

## 4200. MULTI-FAMILY DWELLINGS

Multi-family dwellings shall be permitted only subject to the following:

4210. UNITS BELOW GRADE. No floor in a dwelling unit except unoccupied basements shall be below grade of the adjoining ground at any place on its perimeter.

4220. BEDROOMS. Not more than 5% of all dwelling units in the entire apartment complex shall have more than two (2) bedrooms.

4230. BUSINESS IN HIGH-RISE APARTMENTS. Up to 5% of the gross floor area of structures proposed for high-rise apartments may be devoted to retail stores, offices and service outlets exclusively servicing on-site residents, provided that:

4231. There shall be no entrance to such place of business except from inside a building.

## 4300. OPEN SPACE COMMUNITIES (Amended 3/5/1990, Article 59)

### 4310. PURPOSE.

Provide for the public interest by the preservation of open space and natural landscape features in perpetuity, and ensure that residential development, to the maximum possible extent, respects the natural features of the land.

Promote housing patterns which are designed to be sensitive to and accommodate a site's physical characteristics. Such features include wetlands and water bodies, topography, vegetation, wildlife habitats, scenic views & vistas, the integrity of ancient ways, historic sites, and the remaining rural character of the community which is exemplified by its farmlands, open field and orchards.

### 4315. APPLICABILITY.

Open Space Communities shall be allowed within the Residential Zoning District subject to the requirements of this Bylaw for that District and in accordance with the additional requirements specified herein and in the Subdivision Rules and Regulations.

4320. GENERAL REQUIREMENTS.

1. Any parcel of land located within the residential zone containing ten (10) or more acres shall be considered for open community development.

2A. For major residential development, that is, the potential creation of more than six (6) residential house lots on a property or set of contiguous properties in common ownership, an open space community development is allowed only by Special Permit issued by the Planning Board.

2B. For minor residential development or a parcel of at least five (5) acres but less than ten (10) acres in size, at the owners option, an application can be made for an Open Space Community Special Permit in preferences to filing a conventional development plan.

4330. MINIMUM REQUIREMENTS.

1. Size: The total area of the tract or parcel proposed for the Open Space Community shall be at least ten (10) acres, and have a minimum of fifty (50) feet of frontage on an existing Town way.

2. Density: The total number of lots shall not exceed the number of lots which could reasonably be expected to be developed under a conventional plan in full conformance with zoning, subdivision regulations, and health codes. (Amended 3/29/1994, Article 40)

3. Intensity Regulations: The Planning Board may grant a reduction of all intensity regulations of the underlying zone regulations for all portions of an open space development if the Board finds that the reduction will result in better design, improved protection of natural and scenic resources, and will otherwise comply with these regulations, provided that in no instance shall any lot deviate from the following table of requirements:

<u>Table of Requirements</u>

| | |
|---|---|
| Maximum Lot Size | 15,000 square feet |
| Minimum Lot Size | 8,000 square feet |
| Minimum Frontage | 50 feet |
| Minimum lot width, at building line | 80 feet |
| Minimum Front Yard Setback | 30 feet |
| Minimum Side Yard | 15 feet |
| Minimum Rear Yard | 15 feet |

4. The minimum front yard setback requirement contained in this Bylaw may be waived by the Board in order to achieve the purpose of this Bylaw.

4350. Common Open Space ownership and Management: Common open space in any development under this provision shall be conveyed to:

1. An Open Space Land Trust, or any other nonprofit corporation, approved by the Planning Board, the principal purpose of which is the land conservation and the preservation of open space; and/or

2. A corporation, trust or association owned or to be owned by the owners of the lots in the development, here-after referred to as the "Homeowners Association", provided that the land shall be conveyed to the "Homeowners Association" subject to covenants, enforceable by the Town, to keep the dedicated common space, open or in a natural state as approved by the Planning Board; and/or

3. The Town, and may be accepted by it for conservation and/or recreational use; and/or

4. Owners of the lots within the open space community subject to a conservation restriction acceptable to the Board.

### 4360. APPLICATION AND REVIEW PROCESS.

The application process for an Open Space Community Development is comprised of two steps. In the first step, the applicant submits a concept plan, as outlined in the Subdivision Rules and Regulations, which describes the overall development plan. The Planning Board shall grant or deny a Special Permit based upon the information contained in the concept plan. If the Special Permit is granted, the applicant then submits a preliminary plan based upon the concept plan. The Planning Board reviews the plan and then the applicant submits a definitive subdivision plan which incorporates comments made during the preliminary plan review. Two separate public hearings, one for the Special Permit and one for the definitive plan must be held.

### 4365. DURATION OF APPROVAL, DEDICATION OF OPEN SPACE AND RECORDING.

Notwithstanding anything to the contrary within/without this Bylaw, any Special Permit granted by the Planning Board for an Open Space Community, shall have a life span equal to that of conventional subdivisions.

All common open space shall be dedicated and recorded, with covenants, at or prior to the time the permit holder receives a Building Permit.

### 4370. SUBSEQUENT TO APPROVAL.

Subsequent to approval of such Open Space Community, no land therein shall be sold and no lot line shall be changed in such a way as to increase the number of lots or the extent of non-conformity with the provisions of section 2600 of this Bylaw.

## 4400. ACCESSORY USES AND STRUCTURES

4410. HOME OCCUPATIONS. Home occupations are permitted only if conforming to the following conditions:

4411. Floor area used for the home occupation shall not exceed 25% of the floor area of the dwelling or 30% of the combined floor area of the dwelling plus any accessory structures used in the home occupation.

4412. Not more than one person not a member of the household shall be employed on the premises in the home occupation.

4413. There shall be no exterior display, no exterior storage of materials and no other exterior indication of the home occupation or other variation from the residential character of the principal building other than a sign as provided in Section 3331 (d).

4414. No offensive noise, vibration, smoke, dust, odors, heat or glare shall be produced.

4415. Traffic generated shall not exceed volumes normally expected in a residential neighborhood.

4416. Parking generated shall be accommodated off-street, but not more than two (2) spaces shall be in a required front yard.

4417. Should any home occupation create any variation from the normal activity within the neighborhood, the hours of operation shall be limited to 8:00 A.M. to 9:00 P.M. with Sundays to be days of no operation.

4418. One-day yard or garage sales are permitted only upon written permit from the Selectmen. Should any premises be used more frequently than two (2) days in one year for the purpose of a yard or garage sale, the sale shall be considered a home occupation and be governed by the regulation set forth in these Bylaws under Section 4410 through 4417.

## 4420. MOBILE HOMES AND CAMPERS

4421. A mobile home or camper may be temporarily occupied:

a. by non-paying guests of the owner of the premises for a period not to exceed two (2) weeks in any calendar year, or

b. as a temporary office incidental to construction or development of the premises on which it is located, upon issuance of a permit by the Selectmen, for a period of one (1) year, renewable once.

4422. Campers may be regularly stored within a structure and a single camper may be regularly stored in the open accessory to a permitted use in any district, provided that it is not within a required front yard or within ten (10) feet of a side or rear lot line, except when loading or unloading.

## 4430. SWIMMING POOL FENCING.

4431. Every outdoor swimming pool considered to be a Structure (see definition) or other body of water which constitutes a hazard whether or not filled with water shall be completely surrounded at all times by a fence or wall not less than four (4) feet in height above grade, which may be the pool wall itself.

4432. Every such fence or wall shall be so constructed as to not have openings, holes or gaps larger than four (4) inches in any dimension except for doors, gates and picket fences; in the latter case, however, the gaps between pickets shall not exceed four (4) inches.

4433. All gates or doors opening through such enclosure shall be of not less than four (4) feet in height and shall be equipped with a self-closing and self-latching device located at least four (4) feet above the underlying ground and inaccessible from the outside to small children. Every

Case 1:26-cv-10037-WGY Document 13-2 Filed 02/11/26 Page 161 of 582

such gate or door shall be kept latched at all times when the swimming pool is not in use, and any ladders removed.

4434. A natural barrier, hedge, pool cover or other protective device approved by the Building Inspector may be used in lieu of a fence or wall so long as the degree of protection afforded by the substitute device or structure is not less than the protection afforded by the enclosure, gate and latch described herein.

4440. UNREGISTERED VEHICLES. No person shall permit more than one unregistered motor vehicle or trailer or major parts thereof, except for farm vehicles, to remain ungaraged on his premises at any time unless under a Class 1 or Class 2 license for sale of motor vehicles (Section 57-69, Chapter 140, General Laws), or unless given written authorization by the Selectmen following an investigation and report thereon by the Board of Health. Authorization shall be granted only if no hazard to health or safety is involved, and no unsightly condition visible from adjacent property or public ways is created.

4450. STRUCTURES.

4451. STRUCTURES-NON-RESIDENTIAL AREAS. In non-residential areas, no structures (including but not limited to power generation or communication devices) shall be permitted with a height in excess of seventy-five (75) feet, nor shall any such structure be permitted as part of another structure or building with an aggregate height in excess of seventy-five (75) feet. Structure height is as measured from the ground adjacent to the structure to the highest point of the structure, including any moving parts or whip antennae.

4452. STRUCTURES RESIDENTIAL AREAS. In residential areas, no structures (including but not limited to power generation or communication devices) shall be permitted with a height in excess of thirty-five (35) feet, nor shall any such structure be part of a residential structure with an aggregate height in excess of fifty (50) feet. Holders of valid FCC licenses for 2-way communications of a non-commercial nature shall be permitted structures or aggregate height of a residence plus antenna not to exceed sixty (60) feet. Structure height is as defined in Section 4451. In the event of conflict with applicable rules of the FCC, the FCC rules shall apply.

## 4460. ACCESSORY DWELLING UNITS

Introduction:

Accessory dwelling units (also known as ‘accessory apartments’, ‘in-law apartments’, ‘family apartments’ or ‘secondary units’) provide units that can be integrated into existing single family neighborhoods to provide alternatives that have little or no negative impact on the character of the neighborhood. For two-family or multi-family uses refer to section 2300.

### 4461. PURPOSE AND INTENT: THE INTENT OF PERMITTING ACCESSORY DWELLING UNITS IS TO:

1. Provide older or disabled homeowners with a means of obtaining individual caregiver services, thereby enabling them to stay more independently in homes and neighborhoods they might otherwise be forced to leave;

2. Develop housing units in single-family neighborhoods that are appropriate for households at a variety of stages in their life cycle.

3. Protect stability, property values, and preserve the residential character of a neighborhood.

## 4462. DEFINITIONS:

1. Accessory Dwelling Unit: An Accessory Dwelling Unit (ADU) is a self-contained housing unit incorporated within a single-family dwelling (not within accessory structures, except with a Special Permit) that is clearly a subordinate part of the single-family dwelling and complies with each of the criteria stated below.

2. Building, Attached: A building having any portion of one or more walls with more than five feet in common with another building and which contains a common passage between the buildings.

3. Building, Detached: A building having less than five feet of common walls.

4. Dwelling, Single-Family: A building designed or used exclusively as a residence and including only one dwelling unit.

5. Primary Residence: A building in which is conducted the principal use of the lot on which it is located. For residentially zoned lots, such a building would be a dwelling.

## 4463. PROCEDURAL REQUIREMENTS:

Review procedure: (Refer to section 1200 of this Bylaw)

## 4464. USE AND DIMENSIONAL REGULATIONS:

1. The Building Commissioner may issue a Building Permit authorizing the installation and use of an attached accessory dwelling unit within an existing or new owner-occupied, single-family dwelling only when the following conditions are met:

    (a) The unit will be a complete, separate housekeeping unit containing both kitchen and bath.

    (b) Only one accessory dwelling unit may be created within a single-family dwelling or residential lot.

    (c) The owner(s) of the residence in which the accessory dwelling unit is created must continue to occupy at least one of the dwelling units as their primary residence, except for bona fide temporary absences.

    (d) Any new separate outside entrance serving an accessory dwelling unit shall not be allowed, unless a Special Permit is issued by the Zoning Board of Appeals.

    (e) The gross floor area of an accessory dwelling unit (including any additions) shall not be greater than 50% of the primary dwelling unit or one thousand (1000) square feet, whichever is smaller unless a special permit is issued by the Zoning Board of Appeals allowing a larger gross floor area.

(f) Once an accessory dwelling unit has been added to a single-family residence or lot, the accessory dwelling unit shall never be enlarged beyond the one thousand (1000) square feet allowed by this bylaw/ordinance.

(g) An accessory dwelling unit structure may be detached from the primary dwelling only by special permit issued by the Zoning Board of Appeals.

(h) An accessory dwelling unit may not be occupied by more than two (2) people nor have more than two (2) bedrooms, unless a special permit is issued by the Zoning Board of Appeals.

(i) The construction of any accessory dwelling unit must be in conformity with the State Building Code, Title V of the State Sanitary Code and other local bylaws/ordinances and regulations.

(j) Off-street parking spaces shall be available for use by the occupant(s).

(k) An accessory dwelling unit and its primary dwelling unit shall share utility metering.

(l) An accessory dwelling unit shall be designed to preserve the appearance of the single family dwelling.

(m) An accessory dwelling unit shall not be held or transferred into a separate ownership from the primary residence either through deed or 'condo' association documents.

(n) All stairways associated with an accessory dwelling unit leading to an above ground floor shall be enclosed and not visible to the outside.

2. Approval for an ADU requires that the owner must occupy one of the dwelling units. The zoning approval and the notarized letters required in 4464.3 and 4464.4 below must be recorded in the County Registrar of Deeds or Land Court, as appropriate, in the chain of title to the property, with documentation of the recording provided to the Building Commissioner, prior to the occupancy of the accessory dwelling unit.

3. Prior to issuance of a permit, the owner(s) must send a notarized letter stating that the owner will occupy one of the dwelling units on the premises as the owner's primary residence, except for bona fide temporary absences.

4. When a structure, which has received a permit for an accessory dwelling unit, is sold, the new owner(s), if they wish to continue to exercise the Permit, must submit a notarized letter to the Building Commissioner stating that they will occupy one of the dwelling units on the premises as their primary residence, except for bona fide temporary absences.

5. Prior to issuance of a permit, a floor plan must be submitted showing the proposed interior and exterior changes to the building.

## 4465. ADMINISTRATION AND ENFORCEMENT

1. It shall be the duty of the Building Commissioner to administer and enforce the provisions of this Bylaw.

2. The property owner of the dwelling containing the accessory unit shall allow the Building Commissioner to inspect the unit for compliance with this bylaw.

4500. FLOOD PLAIN DISTRICT. Amended 3/5/1990, Article 74, Amended 6/20/90, Article 12, Deleted 10/21/2013, Article 25)

4600. PLANNED PARCEL DEVELOPMENT. (Amended 9/19/1995, Article 10; Deleted in its entirety 10/17/05, Article 12)

4700. AQUIFER AND WATERSHED PROECTION DISTRICT. (Amended 3/29/1994, Article 42)

4710. PURPOSE OF DISTRICT. The purpose of this Aquifer and Watershed Protection District is:

1. To promote the health, safety and general welfare of the community by promoting an adequate quality and quantity of drinking water for residents, institutions, and businesses of the Town of Westborough;

2. To preserve and maintain the existing and potential groundwater supplies, aquifers and groundwater recharge areas of the Town and to protect them from adverse development or land use practices;

3. To preserve and protect present and potential sources of drinking water supply for the public health and safety;

4. To conserve the natural resources of the Town;

5. To prevent blight and the temporary or permanent pollution of the environment.

6. To ensure that only water supply related activities are permitted in the Zone 1 400 foot protective radius of the Town wells (Added 3/12/1996, Article 58)

4720. SCOPE AND AUTHORITY. The Aquifer and Watershed Protection District shall be considered as overlaying other Zoning Districts. This overlay district shall apply to all new construction, reconstruction, or expansion of existing activities or uses permitted in the portion of the District so overlaid shall be permitted, subject to all the provisions of this District, unless expressly prohibited under this overlay District.

4730. ESTABLISHMENT AND DELINEATION OF AQUIFER AND WATERSHED PROTECTION DISTRICT. For the purposes of this District, there are hereby established within the Town certain Aquifer and Watershed Protection areas, consisting of aquifer and/or aquifer recharge areas, which are delineated on the overlay map referenced in Section 4732.

4731. DISTRICT. The Aquifer and Watershed Protection District includes the aquifer itself, including the land above the most significant recharge areas for these aquifers and consists of:

- Zone I, which includes land within the protective four hundred (400) foot radius around an existing or potential public water supply well or wellfield; and,
- Zone II, which includes that area of an aquifer which contributes water to an existing or potential well under the most severe pumping and recharge conditions that can be realistically anticipated (180 days of pumping at safe yield, with no recharge from

Case 1:26-cv-10037-WGY Document 13-2 Filed 02/11/26 Page 165 of 582

precipitation). It is bounded by the groundwater divides which result from pumping the well and by the contact of the aquifer with less permeable materials such as till or bedrock. In some cases, streams or lakes may act as recharge boundaries. In all cases, Zone II shall extend up gradient to its point of intersection with prevailing hydrogeologic boundaries (a groundwater flow divide, a contact with till or bedrock, or a recharge boundary); and,

- Zone III, (Contributing Watershed), which includes that land area beyond the area of Zone II from which surface water and groundwater drain into Zone II. The surface drainage area as determined by topography is commonly coincident with the groundwater drainage area and is used to delineate Zone III. In some locations, where surface and groundwater drainage are not coincident, Zone III shall consist of both the surface drainage and the groundwater drainage areas.

4732. OVERLAY MAP. The Boundaries of this District are delineated on a map at a scale of one inch equals eight hundred feet entitled Aquifer and Watershed Protection Districts, Town of Westborough, Massachusetts dated January, 2001. These boundaries reflect the best hydrogeologic information available as of the date of the map. In the event of a discrepancy between the map and the criteria of Zones I, II and III, above, the criteria shall control. (Amended 3/12/1996, Article 58)

Where the bounds as delineated are in doubt or in dispute, the burden of proof shall be upon the owner(s) of the land in question to show where they should properly be located. At the request of the owner(s), the Town may engage a professional hydrogeologist or engineer to determine more accurately the location and extent of an aquifer or recharge area or to review information submitted by the owner(s), for all or part of the cost of the investigation.

4733. SPLIT LOT PROVISIONS. (Amended 3/17/2001, Article 30)

- Zone I Boundary Line. Where the Zone I boundary line divides any lot of record, the portion of the lot within Zone I shall remain undeveloped with the exception of the land uses directly related to the operation and maintenance of a public water supply and the uses and regulations pertinent to Zone II shall be applied to the development of the remainder of such lot.
- Zone II Boundary Line. Where the Zone II District boundary line divides any lot of record, the uses and regulations pertinent to Zone III shall be applied to the development of such lot provided that all structures and waste disposal systems are located in that portion of the lot lying in Zone III.
- Zone III Boundary Line. Where the Zone III boundary line divides a lot of record in any underlying District, the requirements of the Westborough Zoning Bylaws applicable to the less restrictive District may be applied to the development of such lot, provided that all structures and waste disposal systems are located in that portion of the lot lying in the less restrictive District.

4734. RECOVERABLE WATER YIELD CRITERIA. Aquifers and aquifer recharge areas are defined by standard geologic and hydrogeologic investigations which may include drilling observation wells, performing pumping tests, water sampling and geologic mapping. An aquifer recharge area, to be considered significant for drinking water purposes must generally be comprised of sand and gravel with at least twenty (20) feet of saturated thickness for transmissivity of at least ten thousand five hundred (10,500) gallons per day per foot and/or capable of continuous yield of at least one hundred (100) gallons per minute to a single well.

## 4740. USE REGULATIONS.

Within the Aquifer and Watershed Protection District, the requirements of the underlying Districts continue to apply as indicated in subsections 4741 and 4742, Use Regulations Schedule, or as exempted by this Bylaw or Statute.

Symbols employed shall mean the following:

Y - A permitted use

N - An excluded or prohibited use

S - A use authorized by the issuance of a Special Permit as provided for in Section 1330 and Section 4750 herein.

4741. PERMITTED USES. The following uses are permitted within the Aquifer and Watershed Protection district, (provided that all necessary permits, orders, or approvals required by law are also obtained):

- Conservation of soil, water, plants and wildlife;
- Outdoor recreation, native study, boating, fishing, hunting;
- Foot, bicycle and/or horse paths, and bridges;
- Normal operation and maintenance of existing water bodies and dams, splash boards, and other water control, supply and conservation devices;
- Maintenance and repair of existing structures;
- Residential development, subject to Section 4742 (use regulation schedule) and Section 5740 (Special Permits);
- Farming, gardening, nursery, conservation, forestry, harvesting, grazing, subject to 4742 and 4750.
- Construction, maintenance, repair and enlargement of drinking water supply related facilities.

## SECTION 4742. USE REGULATION SCHEDULE (AMENDED 3/29/1994, ARTICLE 42; AMENDED 3/12/1996, ARTICLE 58; AMENDED 3/17/2001, ARTICLE 30)

District Protection Area

| Principal uses | Zone I | II | III |
|---|---|---|---|
| Disposal or treatment of toxic or hazardous materials or hazardous wastes as a principal activity: | N | N | N |
| Manufacture, use, transport, storage of toxic or hazardous materials or hazardous wastes as a principal activity: | N | N | N |
| Truck terminal: | N | N | S |
| Sanitary landfill, junk yard, open dump, salvage yard, other solid waste disposal: | N | N | N |
| Landfilling of sludge or septage as defined in 310 CMR 32.05 | N | N | S |
| Storage of sludge and septage, unless such storage is in compliance with 310 CMR 32.30 and 310 CMR 32.31; | N | N | S |
| Earth removal to within six (6) feet of high groundwater level, except for excavation for buildings, roads, and utility works: | N | N | S |
| Motor vehicle service, station, car wash: | N | N | S |
| Automobile Service and repair shops, automotive body and paint shops: | N | N | S |
| Disposal of snow from outside District area: | N | N | S |
| Storage of commercial fertilizers and soil conditioners, as defined in MGL c. 128, s. 64, unless such storage is within a structure designated to prevent the generation and escape of contaminated runoff or leacheate; | N | N | S |
| Industrial uses which discharge process wastewater on site; any commercial and service uses discharging wastewater on site containing contaminants other than domestic septic waste: | N | N | S |
| Storage of liquid petroleum products, except the following; | | | |
| a. normal household use, outdoor maintenance and heating of a structure: | | | |
| b. waste oil retention facilities required by statute, rule, or regulation; | | | |
| c. emergency generators required by statute, rule or regulation; | | | |
| d. treatment works approved under 314 CMR 5.00 for treatment of ground or surface waters: | | | |
| Provided that storage, listed in items a through d above, is in free-standing containers within buildings or above ground with secondary containment adequate to contain a spill the size of the container's total storage capacity. | N | N | S |
| Storage of deicing chemicals unless such storage, including loading areas, is within a structure designed to prevent the generation and escape of containminated runoff or leacheate; | N | N | S |
| Storage of animal manure unless covered or contained; | N | N | S |
| | | | |
| Accessory Uses or Activities. | | | |
| Disposal or treatment of toxic or hazardous materials as a secondary activity: | N | N | N |
| Manufacture, use, transport, storage of toxic or hazardous materials as a secondary activity: | N | N | S |
| Sanitary landfill, junkyard, open dump, salvage yard, other solid waste disposal: | N | N | N |
| Lanfilling of sludge or septage as defined in 310 CMR 32.05 | N | N | S |
| Storage of sludge and septage, unless such storage is in compliance with 310 CMR 32.30 and 310 CMR 32.31; | N | N | S |
| Storage of liquid petroleum products except the following: | | | |
| a. normal household use, outdoor maintenance, and heating of a structure; | | | |
| b. waste oil retention facilities required by statute, rule, or regulation; | | | |
| c. emergency generators required by statute, rule, or regulation; | | | |
| d. treatment works approved under 314 CMR 5.00 for treatment of ground or surface waters; | | | |
| Provided that storage, listed in items a through d above, is in free-standing containers within buildings or above ground with secondary containment adequate to contain a spill the size of the container's total storage capacity. | N | N | S |
| Underground storage of fuel oil, gasoline or chemicals: | N | N | S |
| Disposal of snow from outside District area: | N | N | S |
| Storage of deicing chemicals unless such storage, including loading areas, is within a structure designed to prevent the generation and escape of contaminated runoff or leacheate; | N | N | S |
| Storage of animal manure unless covered or contained; | N | N | S |
| Storage of commercial fertilizers and soil conditioners, as defined in MGL c. 128 s.64, unless such storage is within a structure designated to prevent the generation and escape of containminated runoff or leachate. | N | N | S |
| Land uses that result in impervious surfaces of more than15% or 2,500 square feet, whichever is greater, of any lot unless a means for providing ground water recharge of runoff is provided. Land uses on residential lots where impervious surfaces drain to pervious areas on the same lot do not require special permits in Zone II. | N | SP | Y |

4750. Special Permits shall be granted if the Special Permit Granting Authority determines that the intent of this Bylaw, as well as the specific criteria of Sections 4751 through 4753 are met. The Special Permit Granting Authority shall be the Zoning Board of Appeals, except that, where a Special Permit is required by Section 2300 (Use Regulation Schedule), the Special Permit Granting Authority authorized by that Section shall also be the Special Permit Granting Authority for the Special Permit required herein. In making such determination, the Special Permit Granting Authority shall give consideration to the simplicity, reliability and feasibility of the control measures proposed and the degree of threat to surface and groundwater quality which would result if the control measures were to fail. The Special Permit granting authority shall not grant a Special Permit under this section unless the application includes, in the Special Permit granting authority's opinion, sufficiently detailed, definite, and credible information to support positive findings in relation to the criteria given in this section.

4751. SPECIAL PERMIT APPLICATION.

1. Each application for a Special Permit shall be filed with the Special Permit Granting Authority and shall be accompanied by nine (9) copies of the plan and documents;

2. Said application and plan shall be prepared in accordance with the data requirements of the proposed development (e.g., Site Plan Review, Erosion and Sedimentation Control Plan, etc.);

3. The following documents shall also be submitted in applying for a Special Permit:

   a. A complete list of all chemicals, pesticides, herbicides, fertilizers, fuels, and other potentially toxic or hazardous materials to be used or stored on the premises in quantities greater than those associated with normal household use.

   b. A description of potentially toxic or hazardous wastes to be generated, indicating storage and disposal method.

   c. For those activities using, storing, or generating such hazardous materials, an Aquifer Protection Management Plan shall be prepared and filed with the Board of Health, Building Department and Fire Chief.

   The Plan shall include:

   - Provisions to protect against the discharge of hazardous materials or wastes to the environment due to spillage, accidental damage, corrosion, leakage, or vandalism, including spill containment and clean-up procedures;
   - Provisions for indoor, secured storage of hazardous materials and waste with impervious floor surfaces;
   - Evidence of compliance with the Regulations of the Massachusetts Hazardous Waste Management Act 310 CMR 30.00, including obtaining an EPA identification number from the Massachusetts Department of Environmental Protection.

   d. Evidence of approval by the Massachusetts Department of Environmental Protection (DEP) for any industrial waste treatment and disposal system or any wastewater treatment system over fifteen thousand (15,000) gallons per day capacity as regulated by 314 CMR 5.00 Massachusetts Groundwater Discharge Permit Program.

e. For underground storage of toxic or hazardous materials, evidence of qualified professional supervision of system design and installation.

f. Analysis by a hydrogeologist or engineer experienced in groundwater evaluation and/or hydrogeology to demonstrate that the proposed activity will not be detrimental to the purpose of the District as set forth in Section 4710.

g. Proposed and/or existing down-gradient location(s) for groundwater monitoring well(s) should the special permit granting authority deem the proposed activity a potential groundwater threat, together with a monitoring schedule.

## 4752. PROCEDURES.

The Special Permit Granting Authority shall refer copies of the application to the Board of Health, Planning Board, Board of Selectmen, Building Department, Conservation Commission, Town Engineer, Department of Public Works and Fire Department which shall review, either jointly or separately, the application and shall submit their recommendations to the Special Permit Granting Authority. Failure to make recommendations within thirty-five (35) days of the referral of the application shall be deemed lack of opposition.

The Special Permit Granting Authority shall hold a hearing, in conformity with the provisions of Massachusetts General Laws Chapter 40A, Section 9 within sixty-five (65) days after the filing of the application with the Special Permit Granting Authority and after the review of the aforementioned Town Boards/Departments.

Notice of Public Hearing shall be given by publication and posting and by first-class mailings to "parties of interest" as defined in Massachusetts General Laws Chapter 40A, Section 11. The decision of the Special Permit Granting Authority and any extension, modifications or renewal thereof, shall be filed with the Special Permit Granting Authority and Town Clerk within ninety (90) days following the closing of the Public Hearing. Failure of the Special Permit Granting Authority to act within ninety (90) days shall be deemed as a granting of the Permit. However, no work shall commence until a certification is recorded as required by said Section 11.

4753. APPROVAL CRITERIA. After notice and Public Hearing, and after due consideration of the reports and recommendations of the Planning Board, the Board of Health, the Conservation Commission, Board of Selectmen, Building Department, the Town Engineer, Department of Public Works and Fire Department, the Special Permit Granting Authority may grant such a Special Permit, only upon finding that the proposed use:

1. Will not cause groundwater quality to fall below the standards established in 314 CMR 6.00 Massachusetts Groundwater Quality Standards or for parameters where no standard exists, below standards established by the Board of Health and, where existing groundwater quality is already below those standards, upon determination that the proposed activity will result in no further degradation;

2. Is in harmony with the purpose and intent of this Bylaw and will promote the purposes of the Aquifer and Watershed Protection District;

3. Will not, during construction or thereafter, have an adverse environmental impact on any aquifer or recharge area in the Town and is designed to avoid substantial disturbance of the soils, topography, drainage, vegetation and other water related natural characteristic of the site to be developed; and,

4. Will not adversely affect the quality or quantity of an existing or potential water supply.

4760. VIOLATIONS. Written notice of any violation shall be provided by the Building Commissioner to the owner of the premises, specifying the nature of the violation and specifying a time for compliance, including cleanup of any spilled materials. The time allowed shall be reasonable in relation to the public health hazard involved and the difficulty of compliance, but in no event shall more than thirty (30) days be allowed for either compliance or finalizing of the plan for longer-term compliance. The cost of containment, clean-up or other action of compliance shall be borne by the owner and operator of the premises. (Amended 5/14/2011, Article 19)

NOTE: The Town voted (at the March, 1986 Annual Town Meeting) to adopt a plan entitled "Aquifer and Watershed Protection Districts, Town of Westborough, Massachusetts", dated January 10, 1986, which plan is on file in the Office of the Town Clerk.

4800. SPECIAL PERMITS FOR ADULT USES. (Section 4800 Deleted 6/20/1990, Article 11, Added 3/12/1996, Article 66)

A. Purpose and Intent:

This bylaw is enacted pursuant to MGL, Chapter 40A, Section 9A to serve the compelling Town interests of preventing the clustering and concentration of adult entertainment enterprises as defined herein because of the deleterious effect on adjacent areas and in response to studies demonstrating their effect on generating crime and blight.

B. General:

Special permits shall be required to authorize the establishment of adult bookstores, adult video stores, adult paraphernalia, adult live entertainment establishments or adult motion picture theaters or establishments which display live nudity for its patrons as hereinafter defined. Such permit shall require specific improvements, amenities and locations of proposed use for which such permit may be granted. (Amended 11/18/1996, Article 13)

4810. DEFINITIONS – As used in this section, the following words shall have the following meanings:

Adult Book Store – An establishment having as a substantial or significant portion of its stock in trade, books, magazines, and other matter which are distinguished or characterized by their emphasis sexual depicting, describing, or relating to sexual conduct or excitement as defined in MGL, Chapter 272, Section 31. For purposes herein, “substantial or significant portion of stock” shall mean more than twenty-five percent (25%) of the subject establishment’s inventory or more than twenty-five percent (25%) of the subject premise’s gross floor area.

Adult Motion Picture Theater – An enclosed building used for presenting material distinguished by an emphasis on matter depicting, describing or relating to sexual conduct or sexual excitement as defined in MGL, Chapter 272, Section 31.

Adult Paraphernalia Store – An establishment having as a substantial or significant portion of its stock devices, objects, tools, or toys which are distinguished or characterized by their association with sexual activity, including sexual conduct or sexual excitement as defined in MGL, Chapter 272, Section 31. For purposes herein, “Substantial or significant portion of stock”

shall mean more than twenty-five percent (25%) of the subject establishment's inventory or more than twenty-five percent (25%) of the subject premise's gross floor area.

Adult Video Store – An establishment having as a substantial or significant portion of its stock in trade, videos, movies, or other film material which are distinguished or characterized by their emphasis depicting, describing, or relating to sexual conduct or sexual excitement as defined in MGL, Chapter 272, Section 31. For purposes herein, "Substantial or significant portion of stock" shall mean more than twenty-five percent (25%) of the subject establishment's inventory or more than twenty-five percent (25%) of the subject premise's gross floor area.

Adult Live Entertainment Establishment – Any establishment which displays live entertainment which is distinguished or characterized by its emphasis depicting, describing or related to sexual conduct or sexual excitement as defined in MGL, Chapter 272, Section 31 and which excludes minors by virtue of age.

Establishment Which Displays Nudity For Its Patrons – Any establishment which provides Live entertainment for its patrons which includes nudity, as that term is defined in M.G.L. Ch. 272, Sec. 31. (Added 11/18/1996, Article 13)

### 4820. RULES AND APPLICATION REQUIREMENTS.

### 4821.

The special permit granting authority, the Westborough Planning Board, shall adopt and from time to time amend rules relative to the issuance of the permits, and shall file a copy of said rules in the office of the Town Clerk.

### 4822.

No special permit shall be granted by the Planning Board for an Adult Bookstore, Adult Video Store, Adult Paraphernalia Store, Adult Motion Picture Theater or Adult Live Entertainment Establishment unless the following conditions are satisfied:

A. When submitting a proposal for a special permit under Section 4800 of these bylaws, the applicant shall obtain a copy of the application and procedures from the Westborough Planning Board, the permit granting authority. The applicant shall file one copy of the application with the Town Clerk and deliver a second, date stamped copy of the application from to the office of the Planning Board. All applications shall be accompanied by fifteen copies of the permit applied for. Special Permits issued by a special permit granting authority shall require a two thirds vote of boards with more than five members, a vote of at least four members of a five member board and a unanimous vote of a three member board.

B. Dimensional Requirements:

The proposed use shall observe the following minimum distance separations from all property lines of the proposed adult uses:

1. A minimum of one thousand (1000) feet from any residential district designated by Westborough zoning bylaws;

2. A minimum of one thousand (1000) feet from any public school, public library, daycare facility, or religious facility;

3. A minimum of five hundred (500) feet from any public playground, park, or recreational area where large numbers of minors regularly travel or congregate;

4. A minimum of one thousand (1000) feet from any other adult bookstore, adult video store, adult paraphernalia store, adult entertainment establishment, or adult motion picture theater or from any establishment licensed under the provision of MGL, Chapter 138, Section 12.

C. No pictures, publications, videotapes, movies, covers, or other implements, items, or advertising that fall within the definition of adult bookstore, adult video store, adult paraphernalia store, adult motion picture theater or adult live entertainment establishment merchandise or which are erotic, prurient, or related to violence, sadism, or sexual exploitation shall be displayed in the windows of, or on the building of any adult bookstore, adult video store, adult paraphernalia store, adult live entertainment establishment or adult motion picture theater, or be visible to the public from the pedestrian sidewalks or walkways or from other areas, public or semi-public, outside such establishments.

D. No special permit shall be issued to any person convicted of violating the provisions of MGL, Chapter 119, Section 63 or MGL, Chapter 272, Section 28.

E. Adult use special permits shall only be issued following public hearings held within sixty-five (65) days after filing of an application with the special permit granting authority, a copy of which shall forthwith be given to the city or town clerk by the applicant. The special permit granting authority shall act within ninety (90) days following a public hearing for which notice has been given by publication or posting as provided in MGL, Chapter 40A, Section 11, and by mailing to all parties in interest. Failure by a special permit granting authority to take final action upon an application for a special permit within said ninety (90) days following the date of public hearing shall be deemed to be a grant of the permit applied for. Special Permits issued by a special permit granting authority shall require a two-thirds vote of boards with more than five members, a vote of at least four members of a five member board and a unanimous vote of a three member board.

4823. A special permit granted under this bylaw shall lapse after six months, and including such time required to pursue or await the determination of an appeal referred to in MGL, Chapter 40A, Section 17, from the grant thereof, if a substantial use thereof has not sooner commenced except for a good cause or, in the case of permit for construction, if construction has not begun by such date except for good cause.

4824. EXISTING ADULT ENTERTAINMENT ENTERPRISES. (Amended 11/18/1996, Article 13)

Any existing adult bookstore, adult motion picture theater, adult paraphernalia store, adult video store or establishment which displays live nudity for its patrons or adult video store shall apply for such permit with ninety (90) days following the adoption of this zoning bylaw.

4830. SEVERABILITY.

If any section of this bylaw is ruled invalid by a court of competent jurisdiction, such ruling will not affect the validity of the remainder of the bylaw.

## 4900. DOWNTOWN PLANNING OVERLAY DISTRICT (DPOD) (Added 3/13/2004, Article 38)

4910. PURPOSE. The intent of this Downtown Planning Overlay District, which hereafter may be referred to as DPOD, is to permit greater flexibility and more creative and imaginative design for the development of retail, office, restaurant, residential and open space than is generally possible under conventional zoning provisions. It is further intended to promote and facilitate redevelopment of certain portions of downtown Westborough while providing a harmonious variety of uses, a higher level of amenities, a stimulus to the economic development of the community and providing vitality to the downtown area.

4920. SCOPE AND AUTHORITY. When land within the DPOD area has been approved by action of Town meeting as having a DPOD classification, it may then be developed or redeveloped by the owner either in accord with the underlying zoning district, or in accord with this DPOD Bylaw, at the election of the owner. If an owner, or applicant acting upon permission from the owner, elects to proceed under this bylaw, this Overlay District shall apply to all new construction, reconstruction or expansion of existing buildings and new or expanded uses. When an owner elects to have a Special Permit application considered under the DPOD, the underlying zone remains in place and may always be used as the basis of the new application, even if a Special Permit has been granted under a DPOD. (Amended 10/18/04, Article 8)

## 4930. ESTABLISHMENT AND DELINEATION OF DOWNTOWN PLANNING OVERLAY DISTRICT.

For the purposes of this Bylaw, there is hereby established a Downtown Planning Overlay District (DPOD). This DPOD shall be only within twenty-five hundred (2,500) feet of the inter-section of the centerline of Milk, Main and South Streets. Land in the DPOD area may be considered for classification as a DPOD at Town Meeting only if, at the time of the filing of the Warrant, the underlying zone classification of the land is Non-Residential. (Amended 10/18/04, Article 8)

4931. OVERLAY MAP. No property may be the subject of a Special Permit Application hereunder unless it has been designated, by 2/3 vote at Town Meeting, as having a DPOD zoning classification (In addition to its underlying Zoning). The classification of properties as a DPOD shall be indicated on the official Zoning map of the Town of Westborough. (Amended 10/18/04, Article 8)

4940. PERMITTED USES. Only land with the DPOD classification may be subject of a Special Permit Application under this Bylaw. Each parcel developed within the DPOD shall be designated by the owner either according to the existing underlying Zoning District or Mixed Use by Special Permit. In any Mixed Use development, no building or other structure shall be erected, altered or used and no land shall be used or occupied for any purpose except under a Special Permit issued by the Planning Board in accordance with the provisions and requirements of this Section and the rules and regulations of the Planning Board. (Amended 10/18/04, Article 8)

4950. RULES AND REGULATIONS. The Planning Board shall establish, after a Public Hearing, Rules and Regulations concerning the procedures for and content of an application for

new building or change of use in a Downtown Planning Overlay District. The Planning Board shall require a filing fee as part of the application, the amount of which shall be prescribed in the Downtown Planning Overlay District Rules and Regulations. The Downtown Planning Overlay District Rules and Regulations shall be effective on the date the Planning Board files them with the Town Clerk.

### 4951. PUBLIC HEARING AND APPROVAL.

A public hearing shall be required on any Downtown Planning Overlay District Building or Change of Use before any final action can be taken by the Planning Board on the application. The timing of and form of notice of the hearing shall be as prescribed in Massachusetts General Laws, Ch. 40A, §11 for Special Permits. After the Public Hearing, the Planning Board shall consider the development for a Special Permit. In its consideration the Planning Board shall determine whether the application meets the purpose of Section 1100, and of the Downtown Planning Overlay District regulations. The Planning Board shall specifically determine whether the development will contribute to the orderly and harmonious development of the Downtown Planning Overlay District Area and is consistent with the character of the neighborhood. The Board may recommend that the developer modify, alter, adjust or amend the development and may recommend such reasonable additional conditions as the Planning Board deems necessary.

### 4952. DENSITY REQUIREMENTS.

Within the Downtown Planning Overlay District, building lots shall be established by the applicants subject to approval of the Planning Board.

### 4953. MULTIPLE BUILDINGS.

Notwithstanding §2540 of this Bylaw, multiple buildings may be allowed on a lot in a Mixed Use project by Special Permit issued by the Planning Board.

### 4954. SIGNAGE.

Notwithstanding Section 3300 of this Bylaw, multiple signs may be allowed on a lot or building in a Mixed Use project by Special Permit issued by the Planning Board. The number, size and locations of signs shall be based on the nature, size, architecture and location of each building or portion thereof.

### 4955. AFFORDABLE HOUSING

Mixed-use projects proposed in the Downtown Planning Overlay District shall be required to provide an affordable housing component for all projects containing a residential component. A minimum of 20% of the residential units shall be designated affordable and shall comply with the requirements of the Massachusetts Department of Housing and Community Development or a successor agency. Such units shall have deed restrictions regarding affordability which will continue in perpetuity and will allow the units to “count” as State recognized affordable units. All such affordable units shall be priced at levels affordable to individuals or families earning no more than 80% of Area Median Income (AMI) as published by the State/US Department of Housing and Urban Development (HUD).

Mixed-use projects containing residential components shall be expected to meet the 20% minimum number of affordable units provided herein. The Special Permit Granting Authority may, however, in its discretion decrease the minimum 20% affordable housing requirement to no less than 10% provided that other affordable housing contributions are made to the Town which the Special Permit Granting Authority deems sufficient to meet affordable housing needs. Such alternative contributions may include, contributions to the Town's Senior/Disabled Tax Relief Fund, creation of affordable housing units elsewhere in Town, or other alternatives deemed suitable to the Special Permit Granting Authority. (Added 3/17/2018, Article 30)

## 4960. SITE PLAN APPROVAL OF A DOWNTOWN PLANNING OVERLAY DISTRICT.

A Downtown Planning Overlay District Development, as herein permitted, shall be made only pursuant to a Site Plan Submission. Within a DPOD, the Board of Selectmen shall approve the Site Plan. All requirements as outlined in the Westborough Zoning Bylaws, Sections 1240 through 1245, shall apply.

The Site Plan Submission documentation shall be appropriate to the proposed project to show and convey the level of detail required for review by the Board of Selectmen and shall show at a minimum:

1. Topography and grades both existing and proposed for the site and its relation to surrounding areas

2. Proposed plan and cross sections of all street systems and pedestrian walkways and their relationship to the overall project.

3. Proposed preliminary layout and routing of storm and sanitary sewer systems, water supply, fire protection and power and communications services.

4. Proposed lot(s), their layout and areas.

5. Proposed areas of the site reserved for parks, parkways, playgrounds and other private or public open spaces and their location, use, areas and access.

6. Proposed location of all buildings, their proposed use, size and height and related parking facilities.

7. Tabulation of the total number of acres in the proposed project and, if applicable, the percentage thereof designated for each proposed building and use and related off-street parking, streets, parks and other uses;

8. Tabulation of all buildings and uses and the over-all and per lot coverage and density (Floor Area Ratio).

9. Preliminary plans and elevations of the major buildings, their use, location and floor areas.

10. Environmental issues and mitigation measures if any.

11. Any other items that may be required by the Board of Selectmen.

## 5000. TRANSIT-ORIENTED VILLAGE BY SPECIAL PERMIT IN INDUSTRIAL C ZONE. (Added 10/18/04, Article 10)

5010. PURPOSE. The purpose of this Transit-Oriented Village (T-OV) by Special Permit By-law is to:

a. encourage the development of new “village oriented” transit development on appropriate properties, now zoned for industrial use, proximate to commercial areas, services and/or public transportation,

b. foster the development of smaller living units, which by virtue of their size will be more affordable than larger single-family homes.

c. provide additional housing units which meet the official State definition of affordability.

d. contribute to the Town’s efforts to preserve Open Space.

e. create realistic incentives that will bring about the re-development of properties that are currently underutilized or on which there are outdated or unattractive non-residential structures.

5020. APPLICABILITY. In any zoning district in which Transit-Oriented Village (“T-OV”) is allowed, such use shall be by way of Special Permit issued by the Planning Board and subject to the requirements of this Section 5000. TOV shall be allowed by Special Permit from the Planning Board in the following zones:

Industrial C (Mixed Use Industrial)

5030. MIXED USES. Development under this By-law may include a mixture of uses, combining those already allowed in the zone and those multi-family housing uses allowed by Special Permit pursuant to this By-law. The Planning Board shall have broad discretion in determining which uses are compatible and the degree to which various non-residential uses may be mixed with the multi-family housing proposed for a particular site. However, no building shall have industrial uses in the same building as residential uses.

5040. REVIEW REQUIREMENTS. All applications for a Special Permit under this T-OV regulation shall be subject to design review by the Design Review Board in accordance with Section 1200 of these By-laws, and Site Plan Review, as prescribed in Section 1200 of these By-laws. These hearings may be combined at the option of the reviewing boards.

5050. GENERAL STANDARDS. All applications must meet all applicable dimensional, density, design, drainage, safety, parking, signage, lighting, and other land use standards and regulations set forth in these By-laws for the underlined zone, except for those standards that are specifically modified by the Planning Board in its review of the Special Permit application. In taking action on a T-OV Special Permit application, the Planning Board may wave and or modify such standards, including dimensional standards, upon a finding that to do so will further the purposes listed above without having a detrimental effect on the health, safety and general welfare of the Town’s residents and the public. The Planning Board shall enjoy broad discretion to deny applications, to the extent that the proposed development is found to contain negative attributes which the Planning Board concludes outweigh the positive contribution to the

purposes outlined above. The Planning Board may also approve a Special Permit application under this By-law with reasonable conditions, in keeping with its Special Permit powers.

5060. DIMENSIONAL REQUIREMENTS. Except to the extent specifically modified below, all dimensional requirements of the zone shall apply to any T-OV development. However, the Planning Board may, in accordance with the above paragraph on General Standards 5050, modify the dimensional requirements of the zone or the following special dimensional requirements upon a finding that such modification furthers the purposes of this By-law without detrimental effect.

A. Special Dimensional Requirements of T-OV:

| | | |
|---|---|---|
| 1. | Min. lot area (sf) | 10,000 |
| 2. | Min. lot frontage (ft) | 90 |
| 3. | Min. front yard (ft) | 25 [4] |
| 4. | Min. side yard (ft) | 15 [1][4] |
| 5. | Min. rear yard (ft) | 25 [4] |
| 6. | Max. bldg height (ft)/stories | 60/4* [2] |
| 7. | Max. lot coverage (%) | 60 |
| 8. | Max. floor area ratio (FAR) (both res. and non-res.) | 1.2 |
| 9. | Max. building size (sf) | 20,000 |
| 10. | Min. separation of buildings on same lot | 20 |
| 11. | Min. open space (%) | 40 |
| 12. | Base living units per acre | 4 [6] |
| 13. | Maximum units per acre | 14 |
| 14. | Min. habitable floor area per d.u. (sf) | 600 (studio)<br>750 (1-bdrm)<br>900 (2-3 bdrm) |
| 15. | Max. number of units with more than 2 bedrooms (%) | 20 |
| 16. | Min. number of affordable units (%) | 20 [3] |
| 17. | In mixed use structures, maximum non-residential floor area ratio | 0.3 |

* Except only 2.5 stories and 35 feet within 100 feet of a recognized watercourse (pond, reservoir, river, etc.), or within 2,500 feet of the rotary in the center of Town or where property under consideration is adjacent to a residential district.

B. Notes to Dimensional Requirements

1. It is specifically noted that side yard setbacks may be reduced to zero in cases where the Planning Board determines that joined buildings add to the "village center" atmosphere that is envisioned by this By-law.

2. Where the Planning Board finds merit, it may allow taller structures where lot coverage on the development parcel is correspondingly reduced. For example, assuming all others features and characteristics of a Special Permit application comply with this regulation, a four story structure would be allowed with a maximum coverage of 60%. The proponent might suggest an 8-story building with a coverage of 30% (50% increase in allowed height and 50% decrease in coverage).

3. The minimum of 20% of the units that are to be designated affordable must comply with the requirements of the Massachusetts Department of Housing and Community Development or a successor agency. Such units shall have deed restrictions regarding

affordability which will continue in perpetuity and will allow the units to “count” as State recognized affordable units. All such affordable units shall be priced at levels affordable to individuals or families earning no more than 80% of Area Median Income (AMI) as published by the State/US Department of Housing and Urban Development (HUD).

4. A 75-foot buffer strip shall be maintained where abutting a Residential District; thirty feet of this to remain undisturbed, except for the planting of additional natural vegetative screening.

5. No floor of a dwelling unit, except for unoccupied basements, shall be below grade of the adjoining ground at any place on its perimeter.

6. See Section 9 F below, Density Bonus for Preservation for Open Space by the use of Transfer of Development Rights.

5070. APPLICATION. An application for a Special Permit for T-OV shall be submitted to the Planning Board on forms furnished by the Planning Board, accompanied by the filing fee and the information, data and plans required in the Administration and Procedure Section of these By-Laws for other Special Permit applications, or as otherwise determined by the Planning Board. The Planning Board shall promulgate its own application requirements for the T-OV Special Permits.

5080. ACTION ON APPLICATION. The Planning Board, the Design Review Board, and other governmental agencies which are, by these By-laws, given review jurisdiction over applications under this T-OV By-law, shall process and take action on such applications as prescribed for each review board by zoning, other local by-laws or regulations, state statute or regulation. The Design Review Board shall promulgate its own review standards for T-OV which shall be stated in the Design Review Board Guidelines.

5090. DENSITY BONUS FOR THE PRESERVATION OF OPEN SPACE. Recognizing that one of the purposes of this By-law is the preservation of open space, the transfer of development rights (“TDR”) to parcels that are the subject of a Special Permit application under this By-law is allowed as follows:

A. The parcel or parcels to be preserved as Open Space through a TDR shall be referred to as the “Sending Parcel(s)”, while the parcel(s) on which the Transit-Oriented Village is proposed under this By-law shall be referred to as the “Receiving Parcel(s)”.

B. Sending and Receiving Parcels do not have to be contiguous or under common ownership, so long as each Sending Parcel is made part of an application for a Special Permit under this By-law.

C. The Sending Parcel(s) shall provide a legal description (deed) and the Town’s GIS description of the property. Such description shall show property boundaries, area in acres or square feet, wetlands and wetlands setback lines, rivers protection setbacks, flood plain areas, topographical lines and other features and conditions normally included in an existing conditions survey. The applicant need not show that the land is capable of sustaining septic systems, or provide any geological or soils data. Once the sending parcel is accepted by the Planning Board, the applicant shall provide a field survey of the parcel by a licensed surveyor.

D. In order to qualify as a Sending Parcel, the Planning Board in consultation the Open Space Preservation Committee must make a finding that the land to be preserved as Open Space: (1) has unique and/or valuable natural or physical attributes, or (2) that there exists a valid planning reason to preserve the land as Open Space, or (3) that the land is substantially developable, and that the Town would benefit more from the land's permanent preservation as Open Space than from its development.

E. The applicant must present a plan to treat the sending parcel as preserved Open Space in one of the manners prescribed in Article 4350 of these By-laws, entitled: "Common Open Space Ownership and Management". Upon approval of a T-OV Special Permit, the ownership and management plan for the Open Space must be implemented, and the deed to the property sufficiently restricted, to accomplish the complete and permanent severance of development rights therefrom.

F. For every acre of preserved land in a Sending Parcel that is in the Single Residence Zone, the Special Permit applicant shall be entitled to a bonus of 10 additional units in the multi-family project. For every acre of preserved land in a Sending Parcel that is in a zone other than the Single Residence Zone, the Special Permit applicant shall be entitled to a bonus of 5 additional units in the multi-family project. However, such density bonuses are usable only to the extent that the proposed project, with the added units, in the discretion of the Planning Board, continues to meet all other requirements of these By-laws including satisfying the goals stated in the Purpose Section herein.

G. For example, if a parcel in the Industrial C Zone that is the subject of an application under this Transit-Oriented Village By-law meets all requirements for a total of 40 units (4 base units per acre on a 10-acre parcel) and the applicant is preserving 10 acres of acceptable land in the Single Residence Zone, the total possible units in the multi-family housing project would be 140 units (40 base units, 100 bonus units). This assumes that the 140-unit project still meets all requirements of this By-law, including those which are discretionary on the part of the Planning Board.

H. In the event that a transfer of a partial acre of land from a Sending Parcel, or any other calculation, results in a number of bonus units, or total units per acre, which is a fraction, the total shall be rounded down to the previous whole number.

I. In approving a T-OV, the Planning Board shall have the power and authority to condition the Special Permit on the fulfillment of reasonable improvements to or near the Sending Parcel, as well as its traditional authority to impose conditions on and near the site to be developed. For example, the Planning Board might condition a T-OV Special Permit on the installation of a certain number of parking spaces on the Sending Parcel to facilitate the Town's use and enjoyment of the preserved land.

## 5091. SPECIFIC SITE AND CONSTRUCTION STANDARDS.

Unless modified in accordance with the above paragraph on General Standards, the following specific site and construction standards shall be observed in the development of a T-OV project as stated in the T-OV Architectural Guidelines applied by the Design Review Board.

A. Architectural Standards:

Design characteristics shall be stated in the Special Permit application and shall include, but shall not be limited to: architectural design, building materials, massing, scale, color, roofline,

street furniture, site and building landscaping, lighting and signage as stated in the Architectural Guidelines available from and administered by the Design Review Board.

B. Roadways/Pedestrian Access

Where intended for dedication and acceptance by the Town, the principal roadway(s) serving the site shall be designed to conform to the standards of the Subdivision Regulations and any other relevant standards of the Town unless otherwise required by the Planning Board Private ways shall be adequate for intended vehicular, including public safety vehicle access, and pedestrian traffic and shall be maintained by an association of unit owners or by the applicant. It is intended that a sidewalk network will be provided throughout the T-OV area that interconnects all dwelling units with other dwelling units, non-residential uses, common open spaces, parking areas, transportation centers and major activity areas adjacent to the zone in which T-OV is permitted. The Planning Board may require construction of on-site or off-site sidewalks, footpaths or bicycle paths. Access to off-site areas is required, particularly to permit safe and convenient pedestrian and/or bicycle access to nearby amenities.

## 5092. AREA CONCEPT PLAN REQUIREMENT

A. Each Special Permit application filed under this By-law, shall be accompanied by an updated Area Concept Plan ("ACP") covering all properties which are partially or completely within 300 feet of any property line of the site on which the applicant proposes to place a T-OV project. The ACP does not need to include any land outside the underlying zone in which T-OV is allowed by Special Permit.

B. The Area Concept Plan (ACP) is not binding on any party, and does not need to meet the technical requirements of a Special Permit application. The ACP shall show a plan in scale of all existing buildings, as well as all parking lots, streets, sidewalks, bike paths, and other existing conditions in the area covered by the ACP.

C. The applicant shall show on the Area Concept Plan (ACP) any changes to surrounding properties that it suggests might be made in the future so as to best integrate the applicant's proposed T-OV into the area around the site. For example, if the applicant's site is within walking distance of, but not adjacent to, an amenity, such as a park, parking lot, watercourse, transportation hub, or local shops, and if the goals of this By-law would be furthered by connecting pathways, streets or other alterations to nearby properties, these should be shown on the ACP. The applicant need not have the permission of the owner of such nearby property to complete the ACP. However, if the Planning Board, in the course of its review and action on a Special Permit application hereunder, determines that such alteration on a nearby property would greatly enhance the application and further the goals of this By-law, the Planning Board may require that the applicant make a good faith effort to procure such permission. A failure to obtain permission from such neighboring property owner shall not, however, be the sole basis of denying the application.

D. If the applicant suggests changes to neighboring properties, it shall also provide renderings or elevations showing the modifications and the "tie-ins" to the applicant's site.

E. The applicant shall take into consideration any Area Concept Plans (ACP) that has been done by a previous applicant which covers all or part of the area to be covered by the new ACP.

F. The purpose of the Area Concept Plan (ACP) requirement of this By-law is to encourage the greatest possible integration of the proposed new T-OV project into the surrounding area, recognizing the "village" character that is the objective of this By-law.

## 5100. GATEWAY 2 DISTRICT (Added 5/14/05, Article 41)

5110. PURPOSE. The portion of East Main Street from Lyman Street to Water Street, herein referred to as Gateway 2, contains a mix of land uses including single family residences, small professional offices, and other commercial uses. The intent of this Gateway 2 District, is to permit more creative and imaginative design for development in the District. It will also serve to retain East Main Street's aesthetically pleasing elements and relatively unobtrusive buildings and parking areas. It is intended to allow for redevelopment and a limited amount of new development without significantly altering the areas character or introducing large amounts of new traffic.

5120. SCOPE AND AUTHORITY. The Gateway 2 Regulations shall apply to all new construction, reconstruction or expansion of existing buildings and new or expanded uses.

5130. ESTABLISHMENT AND DELINEATION OF GATEWAY 2 DISTRICT. For the purposes of this District, there is hereby established a Gateway 2 District area. Gateway 2 shall consist of those areas delineated on a map and approved at Town Meeting.

5140. PERMITTED USES. Each parcel developed within the Gateway 2 shall be approved by Special Permit. No building or other structure shall be erected, altered or used and no land shall be used or occupied for any purpose except under a Special Permit issued by the Planning Board in accordance with the provisions and requirements of this Section and the rules and regulations of the Planning Board governing Special Permits.

5150. RULES AND REGULATIONS. The Planning Board Rules and Regulations governing Special Permits shall apply. The Planning Board shall require a filing fee as part of the Special Permit application, the amount of which shall be prescribed in the Gateway 2 Special Permit application.

5151. PUBLIC HEARING AND APPROVAL. A public hearing shall be required on any Gateway 2 District Building or Change of Use before any final action can be taken by the Planning Board on the application. The timing of and form of notice of the hearing shall be as prescribed in Massachusetts General Laws, c. 40A, §11 for Special Permits. After the Public Hearing, the Planning Board shall consider the development for a Special Permit. In its consideration the Planning Board shall determine whether the application meets the purpose of Sections 5100 and 1100, and of the Gateway 2 District regulations. The Planning Board shall specifically determine whether the development will contribute to the orderly and harmonious development of the Gateway 2 District and is consistent with the character of the neighborhood. The Board may recommend that the developer modify, alter, adjust or amend the development and may recommend such reasonable additional conditions as the Planning Board deems necessary.

5152. DESIGN REVIEW REQUIREMENTS. Design Review Board review and recommendations shall be required as prescribed in Section 1245 of these bylaws.

## 5153. AFFORDABLE HOUSING

Proposals in the Gateway 2 District that contain a multi-family residential component shall be required to provide an affordable housing percentage. A minimum of 20% of the residential units shall be designated affordable and shall comply with the requirements of the Massachusetts Department of Housing and Community Development or a successor agency. Such units shall have deed restrictions regarding affordability which will continue in perpetuity and will allow the units to "count" as State recognized affordable units. All such affordable units shall be priced at levels affordable to individuals or families earning no more than 80% of Area Median Income (AMI) as published by the State/US Department of Housing and Urban Development (HUD).

Projects containing multi-family residential components shall be expected to meet the 20% minimum number of affordable units provided herein. The Special Permit Granting Authority may, however, in its discretion decrease the minimum 20% affordable housing requirement to no less than 10% provided that other affordable housing contributions are made to the Town which the Special Permit Granting Authority deems sufficient to meet affordable housing needs. Such alternative contributions may include, contributions to the Town's Senior/Disabled Tax Relief Fund, creation of affordable housing units elsewhere in Town, or other alternatives deemed suitable to the Special Permit Granting Authority. (Added 3/18/2018, Article 31)

## 5200. MULTI-FAMILY HOUSING IN THE HIGHWAY BUSINESS DISTRICT.

(Added 5/13/2006, Article 30; Amended 10/15/2018, Article 36)

5210. PURPOSE. The Highway business district encompasses the majority of land fronting on Route 9 lying west of Connector Road. The area is highlighted by a series of strip centers, restaurants and other non-residential uses, but residential development is not contained in the mix. The Westborough Master Plan dated May 2003 identifies a perceived, but unrealized provision for multi-family housing. Smaller housing units available at prices available to a wider range of family types and incomes is lacking in Westborough. The purpose of the Multi-family Special Permit in the BA district is to allow residential units to be incorporated to the mix of uses in the highway business district, where residents could benefit from proximity to shopping and services, while maintaining an appropriate mix and scale of development.

5220. SCOPE AND AUTHORITY. The Multi-family housing Special Permit is an optional additional use and does not replace, but rather supplements, the uses allowed in the BA district. The Planning Board shall be the Special Permit Granting Authority for any project submitted in accordance with this Section and shall have the authority to approve a project upon grant of a Special Permit in accordance with Section 1300, Site Plan Review in accordance with Section 1240 and further upon a finding that the intent of Sections 1100 and 5200 have been met. The Planning Board may vary the dimensional and parking requirements of this section, or as noted in Section 2620 dimensional requirements, if, in its opinion, such change will result in a more desirable design of the development than could otherwise be developed without variation of the dimensional or parking requirement. This authority continues subsequent to occupancy.

5230. ESTABLISHMENT OF DISTRICT. The Multi-family housing Special Permit applies to all property within the Highway Business (BA) zoning district as an optional, alternate form of

development where certain criteria specified within this Section 5200 can be satisfied. Multi-family housing may only be permitted on a parcel(s) of land that can and will be accessed by roadways other than Route 9.

5240. PERMITTED USES. Uses shall be permitted as indicated in Section 2300 Use Schedule under the column BA, including multi-family dwellings in accordance with this Section 5200.

5250. RULES AND REGULATIONS. The Planning Board may from time to time establish Rules and Regulations governing Special Permits under this section. The Planning Board shall require a filing fee as a part of the Special Permit application, the amount of which shall be established by the Planning Board.

5251. PUBLIC HEARING AND APPROVAL. The Planning Board shall hold a public hearing on any multi-family proposal alleging compliance with Section 5250 in accordance with the public hearing and notice requirements of Massachusetts General Laws c. 40A §9 and §11. In considering the grant of a Special Permit for the application, the Planning Board shall make a finding that the provisions of this Section 5200 are satisfied.

5252. FINDINGS. The Planning Board shall specifically consider the following in determining whether the development will contribute to the orderly and harmonious development of the BA district and whether it creates a mix of uses supported by and consistent with the character of the neighborhood. Access shall only be allowed from roadways other than Route 9 [unless the Planning Board, in its sole discretion, finds that such access already exists and maintaining such access is in the best interests of the Town]

5252.1 Benefit to the residents and /or public such as dedication of valued open space, active or passive recreational facilities, tot lots if accompanied by other usable undeveloped areas for active or passive recreation.

5252.2 Sidewalks and pedestrian trail connections are made within the site, as well as on existing ways where none exist, in an effort to enhance pedestrian access to buildings and between sites.

5252.3 Curb cuts shall be limited to the extent feasible while maintaining appropriate emergency vehicle access. The Board may require provisions for off-site pedestrian and vehicular access to adjacent land in order to facilitate pedestrian access and to minimize curb cuts.

5252.4 Project design maximizes the opportunities for walking and bicycling, and integrates residential users with non-residential uses.

5252.5 Where feasible, structures and roadways shall be located so as not to disrupt the existing streetscape.

5252.6 Project incorporates best practices in energy efficient design, environmental protection, stormwater management, LEED (Leadership in Energy and Environmental Design) criteria and low impact development (LID) techniques wherever practicable.

5252.7 Existing mature vegetation is retained wherever possible, including winding of sidewalks and creative siting of structures.

5252.8 Landscape materials used as buffers are native, non-invasive, hardy for New England weather conditions and disease resistant.

5252.9 A mix of trees, shrubs, and perennial or annual flower beds are integrated as appropriate to the proposed use of the site.

## 5260. SPECIAL PERMIT REQUIREMENTS.

5261. Application For any use requiring a Special Permit, the applicant shall submit the number of copies of the application and plans in such form as the Planning Board may require by its Rules and Regulations. In addition, the following shall be provided

### 5261.1 APPLICATION FORM AND FEE.

5261.2 DEVELOPMENT STATEMENT. A development statement shall consist of a petition, a list of the parties in interest with respect to the land, a list of the development team and a written statement describing the major aspects of the proposed development.

5261.3 Development Plans shall bear the seal of a Massachusetts Registered Architect, Registered Civil Engineer or similar professional as appropriate. One set of reduced size plans shall be submitted measuring 11 x 17 inches. The following plans shall be submitted, unless waived by the Planning Board.

(a) Site plans and specifications showing all site improvements and circulation.

(b) Site perspective, sections, and elevations at a scale of 1/8 inch = 1 foot.

(c) Detailed plans illustrating connection to public or private utilities and surface drainage; and

(d) Detailed landscaping plans.

### 5261.4 ADDITIONAL INFORMATION AS THE BOARD MAY DETERMINE NECESSARY TO EVALUATE THE PROPOSAL.

5262. AFFORDABLE HOUSING. It is the intent of this bylaw to increase the range of housing options for people of different income levels and at different life stages. Multi-family housing projects within the BA zone shall provide a housing type distinct from conventional single-family homes and shall include housing only on upper floors, above non-residential uses. All multi-family residential proposals made in the BA zone shall allocate a minimum of 20% of the total number of dwelling units as housing that is affordable to households earning 80% or less of median income for the Worcester Metropolitan Statistical Area as determined by the most recent calculation of the U.S. Department of Housing and Urban Development. In the event that an approved rental apartment proposal is converted to ownership units at any time then the percentage of affordable units, as described above, shall increase to 20% of the total dwelling units. The affordable units must be subject to restrictions sufficient to maintain perpetual affordability exclusively to persons with qualifying incomes and to qualify the units as affordable under the Local Initiative Project Unit Application criteria of the Massachusetts Department of Housing and Community Development (DHCD), or successor agency. The applicant shall be responsible for preparing the marketing plan and obtaining DHCD approval of the affordable units such that they are included in the Town's inventory of affordable housing.

The minimum of 20% of the units that are to be designated affordable must comply with the requirements of the Massachusetts Department of Housing and Community Development or a successor agency. Such units shall have deed restrictions regarding affordability which will continue in perpetuity and will allow the units to “count” as State recognized affordable units. All such affordable units shall be priced at levels affordable to individuals or families earning no more than 80% of Area Median Income (AMI) as published by the State/US Department of Housing and Urban Development (HUD).

All multi-family residential proposals under this section shall be expected to meet the 20% minimum number of affordable units provided herein. The Special Permit Granting Authority may, however, in its discretion decrease the minimum 20% affordable housing requirement to no less than 10% provided that other affordable housing contributions are made to the Town which the Special Permit Granting Authority deems sufficient to meet affordable housing needs. Such alternative contributions may include, contributions to the Town’s Senior/Disabled Tax Relief Fund, creation of affordable housing units elsewhere in Town, or other alternatives deemed suitable to the Special Permit Granting Authority. (Amended 3/17/2018, Article 29)

5263. PARKING. Parking shall be provided in accordance with Section 3100 except that one and one-half (1.5) spaces shall be provided for each residential unit, and bicycle parking shall be provided in close proximity to multi-unit structures unless individual garages are provided. Bicycle racks shall be provided at all structured common areas such as parks, playgrounds and/or club houses. The Planning Board shall have the authority to waive parking requirements to allow a lower or higher number of spaces as it deems appropriate to support the type of residential use(s) and/or the incorporation of publicly accessible cultural or recreational amenities and/or the opportunity for shared parking with non-residential occupants of the site. Parking structures and surface parking lots shall be appropriately landscaped to promote pedestrian flow within and between the various uses on the site and public ways.

5300. SENIOR OVERLAY DISTRICT. (Added 5/15/2010, Article 31)

5310. PURPOSE. The purpose of the Senior Living Overlay (SLO) is to provide the opportunity to diversify the Town of Westborough’s housing stock by specifically addressing the needs of its aging population and, to provide an additional level of affordability for these housing units which meet the official Massachusetts definition of affordability.

5320. SCOPE AND AUTHORITY. The Senior Living Overlay provides for optional additional uses and does not replace, but rather supplements, the uses allowed in the designated overlay areas by grant of a Special Permit. The Planning Board shall be the Special Permit Granting Authority (SPGA) for any project submitted in accordance with this Section and shall have the authority to approve a project upon grant of a Special Permit in accordance with Section 1330, Site Plan Review in accordance with Section 1240 and further upon a finding that the intent of Sections 1100 (Purpose) and 5300 have been met.

The Planning Board may modify the density, parking and open space requirements of this Section or Section 2610 or 2620, where applicable, if, in its opinion, such change will result in a more desirable design of the development than could otherwise be developed without variation of the dimensional or parking requirement. This authority continues subsequent to occupancy. This bylaw does not specifically set density standards; however, it is expected that each site, housing type and project design will influence the appropriate number of residential units for any

particular site. The density of units allowed shall be appropriate to the zone, neighborhood and development capacity of the site.

5330. APPLICABILITY. The Senior Living Overlay applies to all property within the Senior Living Overlay district as an optional, alternate form of development where certain criteria specified within this Section 5300 can be satisfied.

5340. ESTABLISHMENT OF DISTRICT. The Senior Living Overlay district shall include all land within the Mixed Use District (MUD) and all property located within five thousand (5,000) feet of the intersection of the centerlines of Milk, West Main, Brigham and South Streets, except that the district shall extend to six thousand five hundred (6,500) feet along East Main Street, provided that the land has frontage located within the SLO on one of said streets, SLO proposals shall comply with the dimensional standards of section 5360. The provisions of Section 2140 (split lots) shall not apply. The SLO shall not apply to any parcel of land located within a Highway Business (BA) district. (Amended Article 12 of 2016 ATM)

5350. PERMITTED USES. Independent Senior Housing, Senior Living Facility, and Continuing Care Retirement Communities shall be permitted in accordance with this Section 5300. In addition, accessory uses typically associated with these uses may be permitted by the Board, upon a finding that the accessory use is appropriate to the proposed development and not more detrimental to the neighborhood than the senior living use without such accessory uses.

5351. A range of 10% to 20% of the units created in the SLO District, as determined by the Special Permit Granting Authority, are to be designated Affordable and shall comply with the requirements of the Massachusetts Department of Housing and Community Development or a successor agency. Such units shall have deed restrictions regarding affordability which will continue in perpetuity and will allow the units to “count” as State recognized affordable units.

All dwelling units in an SLO Project shall be subject to a restriction requiring that all residents of these units shall be at least the age of 62 (referred to as “Qualified Occupants”). (Added 10/21/2019, Article 17)

5360. DIMENSIONAL REQUIREMENTS. All minimum standards in the Senior Housing Overlay district (SLO) shall be consistent with those requirements of the applicable underlying district found in Section 2610 or 2620.

5370. RULES AND REGULATIONS. The Planning Board may from time to time establish Rules and Regulations governing Special Permits under this section. The Planning Board shall require a filing fee as a part of the Special Permit application, the amount of which shall be established by the Planning Board.

5371. PUBLIC HEARING AND APPROVAL. The Planning Board shall hold a public hearing on any proposal alleging compliance with Section 5300 in accordance with the public hearing and notice requirements of Massachusetts General Laws c. 40A §9 and §11. In considering the grant of a Special Permit for the application, the Planning Board shall make a finding that the provisions of this Section 5300 are satisfied.

5372. FINDINGS. The Planning Board shall specifically consider whether the development will contribute to the orderly and harmonious development of the neighborhood and the Town

Case 23-40709 Document 13-2 Filed 02/11/24 Page 187 of 582

that is consistent with the character of the neighborhood and satisfies community demand for the proposed uses, while responding to the performance standards of Section 5390.

- The Planning Board shall make findings related to the Town's current goals for the proposed type of senior housing. These findings might include, but are not limited to the following:
- Compatibility with the surrounding neighborhood;
- Consistency with any current planning documents or studies;
- Ability for public infrastructure such as water, roads, drainage or sewer system or any other municipal system to support the proposed development without causing impacts that would adversely affect health, safety or the general welfare;
- Appropriate design and layout of streets and driveways;
- Appropriate project mitigation or enhancement of services typically associated with senior housing. This mitigation may be provided on site, or at the SPGA's discretion be in the form of a contribution elsewhere in Town. Strong preference is given to mitigation providing public access and/or that is integrated with other Town services;
- Appropriateness of building architecture, orientation and site design;
- Incorporation of energy efficient and environmentally friendly design criteria;
- Incorporation of pedestrian amenities, appropriate accessory uses, and integration of community benefits (for larger projects);
- Preservation of open space, existing vegetation, natural, historical or archeologically significant features or resources.

## 5380. SPECIAL PERMIT REQUIREMENTS.

## 5381. PERMIT APPLICATION.

For any use requiring a Special Permit, the applicant shall submit the number of copies of the application and plans in such form as the Planning Board may require by its Rules and Regulations. In addition, the following shall be provided:

### 5381.1 APPLICATION FORM AND FEE.

### 5381.2 DEVELOPMENT STATEMENT.

### 5381.3 DEVELOPMENT PLANS.

5381.4 Additional information as the Board may determine necessary to evaluate the proposal.

## 5382. DECISIONS.

5382.1. The findings, including the basis of such findings, of the SPGA shall be stated in the written decision of approval, conditional approval, or denial of the application for Special Permit, and shall require a super-majority vote for approval.

5382.2. The SPGA may also require, in addition to any applicable conditions specified in this Bylaw, such conditions as it finds reasonably appropriate to safeguard the neighborhood, or otherwise serve the purposes of this Bylaw, including, but not limited to the following: front, side, or rear yards greater than the minimum required by this Bylaw; screening buffers or planting strips, fences, or walls, modification of the architectural design and exterior appearance of the structures; lighting, regulation of the number and location of driveways, or other traffic features; off-street parking or loading or any other special features beyond the minimum required by this bylaw.

5382.3. The SPGA shall specifically require project mitigation and/or enhancement of services, including possible integration with other Town services, as appropriate for the type and scale of development proposed.

5382.4. Such conditions shall be provided in writing, and the applicant may be required to post a performance guaranty for compliance with said conditions in an amount satisfactory to the SPGA.

5382.5. The Special Permit is granted for a period of two years and shall lapse if substantial use or construction has not commenced by such date, except for good cause shown as determined by the SPGA. Once construction has begun, it shall be actively and continuously pursued to completion within a reasonable time.

## 5383. PARKING REQUIREMENTS

Parking shall be provided in accordance with Section 3100 except as modified or amended by the following:

- Independent senior housing: one and one-half (1.5) spaces per dwelling unit.
- Assisted living: one-half (0.5) space per bedroom unit plus the number of employees expected on the premises at the peak hour of operation.
- Continuing Care Residence Community: 0.75 spaces per bedroom unit.
- Accessory Uses: As the board deems necessary taking into consideration Section 3100 and the potential for shared parking with other proposed uses on site.

Parking structures and surface parking lots shall be appropriately designed and landscaped to promote pedestrian flow within and between the various uses on the site and public ways.

## 5390. PERFORMANCE STANDARDS

Projects in the Downtown Business district (BB) shall require a positive recommendation of the Design Review Board in accordance with Section 1245. Projects in the SLO, but outside of the Downtown Business district shall comply with sub-sections 1245. D. 2-5, except that these requirements shall not apply to SLO projects in the Mixed Use District (MUD). For SLO proposals in the MUD District, the SPGA shall require the Design Review Board to provide a recommendation to the SPGA on the SLO proposal during the plan review process as provided in subsections 1245 D.1 and 3. a-c and f-h of this bylaw. (Amended Article 12 of ATM 2016)

Subdivision Rules & Regulations shall be used as a guideline; however, the Board may waive any of these standards based on a persuasive argument by the applicant that such compliance does not serve the best interests of the project or the public good.

In addition to other minimum requirements stated elsewhere in this bylaw, the following improvements, performance standards and/or conditions are required (insofar as they are applicable to the proposal) to support a grant of a Special Permit in the SLO.

- Natural resources are preserved or improved and cutting of mature and specimen trees is avoided wherever feasible.
- Landscaping and vegetated buffer strips are appropriate for the neighborhood.
- Soil removal is minimized and cuts and fills are balanced to the maximum extent reasonable.

- Pedestrian walks, patios and other amenities support intra- and inter-site access and gathering places for residents.
- Roads and driveways maximize the convenience and safety of vehicular and pedestrian movement within the site and in relation to adjacent ways.
- Architectural details are varied to avoid monotonous or repetitive styles.
- Architectural style shall be in harmony with the prevailing character and scale of buildings in the neighborhood and the Town through the use of appropriate building materials, screening, breaks in roof and wall lines and other architectural techniques.
- Shade trees are provided along internal roadways and pedestrian walks.
- Site lighting is designed to avoid unnecessary glare to abutting properties or the sky. Reflectors and shields provide total cut-off of light at the property boundaries.
- US Green Building Council Leadership in Energy and Environmental Design (LEED) criteria shall be incorporated into project buildings and site design.
- Stormwater Management incorporates Low Impact Design (LID) wherever feasible and appropriate for the context.
- Utilities shall be located underground.

## 5400. INDUSTRIAL D (ID) OVERLAY DISTRICT (Added 5/15/2010, Article 30; Amended 3/15/2019, Article 34)

5410. PURPOSE. The Industrial D (ID) Overlay District encompasses the majority of land fronting on Route 9 lying east of Connector Road including, Flanders Road (east of Connector Road), Old Flanders Road, Fruit Street, Gilmore Road, Washington Street, Friberg Parkway, West Park Drive, Computer Drive, and Technology Drive. This area is highlighted by a series of industrial and office parks and individual general industrial uses encompassed by the General Industrial (IB) District. The purpose of the ID Overlay District is to allow increased land use intensity through increased dimensional standards more permissive than those provided by the underlying IB District.

5420. SCOPE AND AUTHORITY. The Industrial D (ID) Overlay District shall allow for optional increase in use through expanded dimensional standards subject to Site Plan Review, and does not replace, but rather supplements, the uses allowed in the IB district. Projects in the Industrial D (ID) Overlay District shall undergo Site Plan Review in accordance with Section 1240 and shall be consistent with the intent of Sections 1100 and 5400. Proposed changes in the use of the site shall require a new Site Plan Review.

5430. ESTABLISHMENT OF DISTRICT. The Industrial D (ID) Overlay District includes all property within the Industrial D Overlay (ID) zoning district as an optional, alternate form of development where certain criteria specified within this Section 5400 can be satisfied.

5440. PERMITTED USES. Uses shall be permitted as indicated in Section 2300 Use Schedule under the column ID, in accordance with this Section 5400.

5450. RULES AND REGULATIONS. The Site Plan Review Authority may from time to time establish Rules and Regulations governing this section. The Site Plan Review Authority shall require a filing fee as a part of the Site Plan Review application, the amount of which shall be established by the Site Plan Review Authority.

5451. PUBLIC HEARING AND APPROVAL. The Site Plan Review Authority shall hold a public hearing on any proposal alleging compliance with Section 5450 in accordance with

Section 1244. In considering the grant of a Site Plan Review approval ~~the a~~pplication, the Site Plan Review Authority shall make a finding that the provisions of this Section 5400 are satisfied.

5452. FINDINGS. The Site Plan Review Authority, pursuant to Section 1200, shall specifically consider the following in determining whether the development will contribute to the orderly and harmonious development of the ID Overlay and underlying IB district.

5452.1 Project design maximizes the opportunities for walking and bicycling

5452.2 Project incorporates best practices in energy efficient design, environmental protection, stormwater management, LEED (Leadership in Energy and Environmental Design) criteria and low impact development (LID) techniques wherever practicable.

5452.3 Existing mature vegetation is retained wherever possible, including winding of sidewalks and creative siting of structures.

5452.4 Landscape materials used as buffers are native, non-invasive, hardy for New England weather conditions and disease resistant.

5452.5 A mix of trees, shrubs, and perennial or annual flower beds are integrated as appropriate to the proposed use of the site.

5460. SITE PLAN REVIEW REQUIREMENTS.

5461. Application for any use in this District shall be governed by the Town Site Plan Review process in conformance with Section 1240 of these Bylaws.

5462. PARKING. Parking shall be provided in accordance with Section 3100 and bicycle parking shall be provided in close proximity to structures where determined by the Site Plan Review Authority. The Site Plan Review Authority shall have the authority to waive parking requirements to allow a lower or higher number of spaces as it deems appropriate to support the permitted use(s) and/or the opportunity for shared parking. Parking structures and surface parking lots shall be appropriately designed and landscaped to promote pedestrian flow within and between the various uses on the site and ways.

5500. MIXED USE DISTRICT (MUD). (Added 5/15/2010, Article 32)

5510. PURPOSE. The intent of this Mixed Use District, which hereafter may be referred to as MUD, is to permit greater flexibility and more creative and imaginative design for the development of retail, office, restaurant, residential and open space than is generally possible under conventional zoning provisions. It is further intended to promote and facilitate redevelopment of certain portions of the former Westborough State Hospital and other State owned properties while providing a harmonious variety of uses, a higher level of amenities, a stimulus to the economic development of the community and vitality to the district.

5520. SCOPE AND AUTHORITY. This Mixed Use District shall apply to all new construction, reconstruction or expansion of existing buildings and new or expanded uses. Any activities or uses permitted in the District shall be permitted, subject to the provisions of this District, unless expressly prohibited. New uses shall only be permitted through the granting a Special Permit from the Planning Board.

5530. ESTABLISHMENT AND DELINEATION OF MIXED USE DISTRICT. For the purposes of this District, there is hereby established a Mixed Use District area as shown on the Westborough Zoning Map.

5531. MIXED USE ZONING MAP. The boundaries of properties within the Mixed Use District shall be delineated on a Zoning Map approved at Town Meeting.

5540. PERMITTED USES. In any Mixed Use development, no building or other structure shall be erected, altered or used and no land shall be used or occupied for any purpose except under a Special Permit issued by the Planning Board in accordance with the provisions and requirements of this Section and the rules and regulations of the Planning Board.

5550. RULES AND REGULATIONS. The Planning Board shall establish, after a Public Hearing, Rules and Regulations concerning the procedure for and content of an application for new building use or change of use in the Mixed Use District. The Planning Board shall require a filing fee as part of the application, the amount of which shall be prescribed in the Mixed Use District Rules and Regulations. The MUD Rules and Regulations shall be effective on the date the Planning Board files them with the Town Clerk.

5551. PUBLIC HEARING AND APPROVAL. A public hearing shall be required on any Mixed Use District Building or Change of Use before any final action can be taken by the Planning Board on the application. The timing of and form of notice of the hearing shall be as prescribed in Massachusetts General Laws, c. 40A, §11 for Special Permits. After the Public Hearing, the Planning Board shall consider the development for a Special Permit. In its consideration the Planning Board shall determine whether the application meets the purpose of Section 1100, and of the Mixed Use District regulations. The Planning Board shall specifically determine whether the development will contribute to the orderly and harmonious development of the Mixed Use District Area and is consistent with the character of the neighborhood. The Board may recommend that the applicant modify, alter, adjust or amend the proposed development and may recommend such reasonable additional conditions as the Planning Board deems necessary.

5552. DENSITY REQUIREMENTS. Within the Mixed Use District, building lots shall be established by the applicants subject to approval of the Planning Board.

5553. MULTIPLE BUILDINGS. Notwithstanding §2540 of this Bylaw, multiple buildings may be allowed on a lot in a Mixed Use Project by Special Permit issued by the Planning Board.

5554. SIGNAGE. Notwithstanding Section 3300 of this Bylaw, multiple signs may be allowed on a lot or building in a Mixed Use Project by Special Permit issued by the Planning Board. The number, size and locations of signs shall be based on the nature, size, architecture and location of each building or portion thereof.

5560. SITE PLAN APPROVAL OF A MIXED USE DISTRICT. A Mixed Use District Development, as herein permitted, shall be made only pursuant to a Site Plan Submission. Within a MUD, the Board of Selectmen shall approve the Site Plan. All requirements as outlined in the Westborough Zoning Bylaws, Sections 1240 through 1245, shall apply. The Site Plan Submission documentation shall be appropriate to the proposed project to show and convey the level of detail required for review by the Board of Selectmen and shall show at a minimum:

1. Topography and grades both existing and proposed for the site and its relation to surrounding areas.

2. Proposed plan and cross sections of all street systems and pedestrian walkways and their relationship to the overall project.

3. Proposed preliminary layout and routing of storm and sanitary sewer systems, water supply, fire protection and power and communications services.

4. Proposed lot(s), their layout and areas.

5. Proposed areas of the site reserved for parks, parkways, playgrounds and other private or public open spaces and their location, use, areas and access.

6. Proposed location of all buildings, their proposed use, size and height and related parking facilities.

7. Tabulation of the total number of acres in the proposed project and, if applicable, the percentage thereof designated for each proposed building and use and related off-street parking, streets, parks and other uses.

8. Tabulation of all buildings and uses and the over-all and per lot, coverage and density (Floor Area Ratio).

9. Preliminary plans and elevations of the major buildings, their use, location and floor areas.

10. Environmental issues and mitigation measures if any.

11. Any other items that may be required by the Board of Selectmen.

## 5600. LARGE-SCALE GROUND-MOUNTED SOLAR PHOTOVOLTAIC INSTALLATIONS. (Added 10/15/2012, Article 19)

### 5610. PURPOSE.

The purpose of this bylaw is to allow the creation of new Large-Scale Ground-Mounted Solar Photovoltaic Installations by providing standards for the placement, design, construction, operation, monitoring, modification and removal of such installations that address public safety, minimize impacts on scenic, natural and historic resources and to provide adequate assurance for the eventual decommissioning of such installations.

### 5620. APPLICABILITY.

This section applies to Large-Scale Ground-Mounted Solar Photovoltaic installations proposed to be constructed after the effective date of this section. This section also pertains to physical modifications that materially alter the type, configuration, or size of these installations or related equipment.

Large-Scale Ground-Mounted Solar Photovoltaic Installations shall only be allowed in the Districts as noted below. These Districts are those listed in Article 2 District Regulations, Section 2100, Establishment of Districts and Section 2200, Use Regulations.

| | C | R | AA AB | BA | G2 | BB | IA | IB | IC | ID | M | M-1 | AE | All Others | DPOD | MUD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Large-Scale Ground-Mounted Solar Photovoltaic Installations with outside equipment or storage: | N | N | N | N | N | N | Y | Y | Y | Y | Y | Y | Y | N | N | N |

5630. General Requirements For All Large Scale Ground-Mounted Solar Photovoltaic Installations:

The following requirements are common to all Large-Scale Ground-Mounted Solar Photovoltaic Installations to be sited in designated locations.

5631. COMPLIANCE WITH LAWS, ORDINANCES AND REGULATIONS.

The construction and operation of all Large Scale Ground-Mounted Solar Photovoltaic Installations shall be consistent with all applicable local, state and federal requirements, including but not limited to all applicable safety, construction, electrical, and communications requirements. All buildings and fixtures forming part of a Large-Scale Ground-Mounted Solar Photovoltaic Installation shall be constructed in accordance with the State Building Code.

5632. BUILDING PERMIT AND BUILDING INSPECTION.

No Large Scale Ground-Mounted Solar Photovoltaic Installation shall be constructed, installed or modified as provided in this section without first obtaining a building permit.

5633. FEES.

The application for a building permit for a Large-Scale Ground-Mounted Solar Photovoltaic Installation must be accompanied by the fee required for a building permit.

5634. SITE PLAN REVIEW.

Large-Scale Ground-Mounted Solar Photovoltaic Installations shall undergo Site Plan Review by the Site Plan Review Authority, as specified under Section 1240 of these Zoning Bylaws prior to construction, installation or modification as provided in this section.

5635. GENERAL.

All plans and maps shall be prepared, stamped and signed by a Professional Engineer licensed to practice in Massachusetts.

5636. SETBACKS.

For Large-Scale Ground-Mounted Solar Photovoltaic Installations, front side and rear setbacks shall be as follows:

a. Front Yard: The front yard shall have a depth of at least 25 feet provided, however, that where the lot abuts a Residential district or residential use within the district allowing Large-Scale Ground-Mounted Solar Photovoltaic Installations, the front yard shall not be less than 100 feet;

b. Side Yard: Each side yard shall have a depth of at least 25 feet provided, however, that where the lot abuts a Residential district or residential use within the district allowing

Large-Scale Ground-Mounted Solar Photovoltaic Installations, the side yard shall not be less than 100 feet;

c. Rear Yard: The rear yard shall have a depth of at least 25 feet provided, however, that where the lot abuts a Residential district or residential use within the district allowing Large-Scale Ground-Mounted Solar Photovoltaic Installations, the rear yard shall not be less than 100 feet.

## 5637. ADDITIONAL CONSIDERATIONS.

a. Where Large-Scale Ground-Mounted Solar Photovoltaic Installations abut residential uses, there must be increased consideration for mitigating visual impact to the residential use. For example, such items as increased setbacks, visual screening or sound buffering and the like may be required by the Site Plan Review Authority;

b. Where the Installation panels could pose sun glare to abutting properties or roadways, additional screening or other public safety measures may be considered;

c. The Site Plan Review Authority reserves the right to hire independent third party consultants to review Large-Scale Ground-Mounted Solar Photovoltaic Installation proposals in consideration of the proposals impact to surrounding properties or public safety implications. Fees associated with the hiring of these consultants shall be born solely by the project proponent;

d. Operation and Maintenance Plan: The project proponent shall submit a plan for the operation and maintenance of the Large-Scale Ground-Mounted Solar Photovoltaic Installation, which shall include measures for maintaining safe access to the Installation, storm water controls, as well as general procedures for operational maintenance of the Installation;

e. Utility Notification: No Large-Scale Ground-Mounted Solar Photovoltaic Installation shall be constructed until evidence has been given to the Site Plan Review Authority that the utility company that operates the electrical grid where the Installation is to be located has been informed of the Installation owner or operator's intent to install an interconnected customer-owned generator. Off-grid Installations or systems shall be exempt from this requirement;

f. Appurtenant Structures: All appurtenant structures to Large-Scale Ground-Mounted Solar Photovoltaic Installations shall be subject to reasonable regulations concerning the bulk and height of structures, building coverage requirements, lot area, setbacks, sound or noise level generated by equipment, open space and parking. All such appurtenant structures, including but not limited to, equipment shelters, storage facilities, transformers, and substations, shall be architecturally compatible with each other. Whenever reasonable, structures shall be screened from view by vegetation and/or joined or clustered to avoid adverse visual impacts.

## 5638. DESIGN STANDARDS.

a. Lighting: Lighting of Large-Scale Ground-Mounted Solar Photovoltaic Installations shall be consistent with local, state and federal law. Lighting of other parts of the Installation, such as appurtenant structures, shall be limited to that required for safety and operational purposes, and shall be of reasonable height and reasonably shielded from

abutting properties. Where feasible, light of the Large-Scale Ground-Mounted Solar Photovoltaic Installation and appurtenant structures shall be directed downward and shall incorporate full cut-off fixtures to reduce light pollution.

b. Signage: Signs on Large-Scale Ground-Mounted Solar Photovoltaic Installations shall comply with Section 3300, Sign Regulations of the Westborough Zoning Bylaws. A sign that identifies the owner and provides a 24-hour emergency contact phone number shall be required. Large-Scale Ground-Mounted Solar Photovoltaic Installations shall not be used for displaying any advertising except for reasonable identification of the manufacturer or operator of the Installation.

c. Utility Connections: Reasonable efforts, as determined by the Site Plan Review Authority, shall be made to place all utility connections for Large-Scale Ground-Mounted Solar Photovoltaic Installations underground on-site, depending on appropriate soil conditions, shape, and topography of the site and any requirements of the utility provider. Electrical transformers for utility interconnections may be above ground if required by the utility provider.

## 5639. MODIFICATIONS.

All material modifications to a Large-Scale Ground-Mounted Solar Photovoltaic Installation made after issuance of the required building permit shall require approval by the Site Plan Review Authority.

## 5640. ABANDONMENT OR DECOMMISSIONING.

## 5641. REMOVAL REQUIREMENTS:

Any Large-Scale Ground-Mounted Solar Photovoltaic Installation which has reached the end of its useful life or has been abandoned shall be removed. The owner or operator shall physically remove the Installation no more than 150 days after the date of discontinued operations. The owner or operator shall notify the Site Plan Review Authority by certified mail of the proposed date of discontinued operations and plans for removal. The owner shall be responsible for all associated decommissioning activities and associated costs. Decommissioning shall consist of:

a. Physical removal of all Large-Scale Ground-Mounted Solar Photovoltaic Installations, structures, equipment, security barriers and transmission lines from the site;

b. Disposal of all solid and hazardous waste in accordance with local, state, and federal waste disposal regulations;

c. Stabilization or re-vegetation of the site as necessary to minimize erosion. The Site Plan Review Authority may allow the owner or operator to leave landscaping or designated below-grade foundations in order to minimize erosion and disruption to vegetation.

## 5650. DEFINITIONS.

5651. AS-OF-RIGHT SITING. As-of Right Siting shall mean that development may proceed without the need for a special permit, variance, amendment, waiver, or other discretionary approval. As-of-right development shall be subject to Site Plan Review to determine conformance with local zoning bylaws. Projects cannot be prohibited, but can be reasonably regulated by the Building Commissioner or local inspector, or the Site Plan Review Authority, as provided in Sections 1200 through 1244 of these Zoning Bylaws.

5652. LARGE-SCALE GROUND-MOUNTED SOLAR PHOTOVOLTAIC INSTALLATION. A solar photovoltaic system that is structurally mounted on the ground and is not roof-mounted, and has a minimum nameplate capacity of 250 kW DC as measured by the sum of the nameplate ratings at Standard Test Conditions of the solar modules installed at the site or a solar installation that utilizes at least one-thousand (1,000) square feet, including all supporting equipment, appurtenant structures and ground area between solar panels.

5700. MARIJUANA ESTABLISHMENTS, MEDICAL MARIJUANA TREATMENT AND DISPENSING FACILITIES AND MARIJUANA CULTIVATION. (Added 3/16/2013, Article 16) (Amended Article 3, 2016 Fall Town Meeting) The zoning of Marijuana Establishments, Medical Marijuana Treatment and Dispensing Facilities and, Marijuana Cultivation uses, including, but not limited to the sale, use, and consumption of marijuana, marijuana accessories, or marijuana products in the Town of Westborough shall be governed in accordance with this section, Section 5700.

5710. PURPOSE.

It is the purpose of this section titled “Marijuana Establishments, Medical Marijuana Treatment and Dispensing Facilities and Marijuana Cultivation” to establish specific zoning standards and regulations for marijuana establishments, medical marijuana centers (treatment and dispensing facilities), marijuana products, marijuana accessories, manufacturers, and marijuana growing and cultivation;

To provide for the limited establishment of Marijuana Establishments, and Medical Marijuana Treatment and Dispensing Facilities in appropriate places and under strict conditions;

To minimize the adverse impacts of Marijuana Establishments, Medical Marijuana Treatment and Dispensing Facilities and Marijuana Cultivation on adjacent properties, residential neighborhoods, schools and other places where children congregate, local historic districts, and other land uses potentially incompatible with said uses;

To regulate the siting, design, placement, safety, monitoring, modification, and removal of Marijuana Establishments Medical Marijuana Treatment and Dispensing Facilities; and Marijuana Cultivation.

5720. APPLICABILITY.

The cultivation, production, processing, assembly, packaging, retail or wholesale sale, trade, distribution or dispensing of marijuana for either general or medical use is prohibited unless permitted as a Medical Marijuana Treatment and Dispensing Facility under this Section.

5721. No Marijuana Establishments, Medical Marijuana Treatment and Dispensing Facility or any Marijuana Cultivation use shall be established except in compliance with the provisions of this Section.

5722. Nothing in this Bylaw shall be construed to supersede federal laws governing the sale and distribution of narcotic drugs.

5723. If any provision of this Section or the application of any such provision to any person or circumstance shall be held invalid, the remainder of this Section, to the extent it can be given effect, or the application of those provisions to persons or circumstances other than those to

which it is held invalid, shall not be affected thereby, and to this end the provisions of this Section are severable.

## 5730. GENERAL.

Marijuana Establishments, Medical Marijuana Treatment and Dispensing Facilities and Marijuana Cultivation shall be authorized by Special Permit only in District(s) provided, as set forth in Section 2300, Use Regulation Schedule of the Zoning Bylaws. Any such Special Permit issued by the Special Permit Granting Authority shall comply with all relevant local, state, and federal laws.

## 5740. DISALLOWANCE.

No Marijuana Establishments, Medical Marijuana Treatment and Dispensing Facilities or Marijuana Cultivation Special Permit shall be issued to any person convicted of violating the provisions of Mass General Law, Chapter 119, Section 63, or General Law, Chapter 94C, or similar laws in other jurisdictions. Any applicant for special permit under this Bylaw must allow for a criminal background check which includes jurisdiction beyond Massachusetts.

## 5750. ELIGIBLE LOCATIONS.

Any Marijuana Establishment, Medical Marijuana Treatment and Dispensing Facility or Marijuana Cultivation activities permitted under this Section shall be located only in a zoning district that is designated for its use within this Zoning Bylaw.

No Marijuana Establishment, Medical Marijuana Treatment and Dispensing Facilities use or Marijuana Cultivation activities shall be located within five hundred (500) linear feet of a property line where the following Districts or activity or uses occur:

1. Any Residential District as defined in these Zoning Bylaws;
2. Any school or child care establishment; or place where minors frequent (e.g. a library, ball field, sports or family recreation facility, religious facility or the like);
3. Any other Medical Marijuana Treatment or Dispensing Facility or Marijuana Cultivation site; or any other general retail establishment where marijuana is sold, consumed, used or where marijuana is grown, cultivated, produced, processed or refined.
4. Any drug or alcohol rehabilitation facility;
5. Any correctional facility, half-way house or similar facility; or
6. Any establishment licensed under the provisions of General Law, Chapter 138, Section 12.

5751. No marijuana or marijuana based product shall be sold or grown or cultivated, interior or exterior, of a residential dwelling unit or residential district. Growing and related cultivation activities shall occur only in districts as permitted in this Bylaw.

5752. SEPARATION. Distances shall be calculated by direct measurement from the nearest property line of the land used for school or child care purposes or places where minors frequent or any other use listed above in Section 5750 to the nearest portion of the building in which the medical marijuana dispensary or marijuana establishment is located.

5753. NO ENTITLEMENT OR VESTED RIGHTS TO PERMITTING. No person shall be deemed to have any entitlement or vested rights to permitting under this Bylaw by virtue of having received any prior permit from the Town including, by way of example only, any zoning permit or any wholesale food manufacturer's license. In order to lawfully engage in the business of selling, cultivating marijuana, or manufacturing marijuana for medical or general use, or marijuana products in the Town on and after the date of passage of this Bylaw, any person must qualify for and obtain a special permit in accordance with the requirements of this Bylaw.

5754. All sales and distribution of medical marijuana by a licensed Medical Marijuana Treatment and Dispensing Facility shall occur only upon the permitted premises. In addition, the delivery of general retail, non-medical, marijuana to any consumer at any location shall be strictly prohibited unless specifically permitted through the special permit process governed by this Section.

5755. SIGNAGE. Any permitted Marijuana Establishment, Medical Marijuana Treatment and Dispensing Facilities site shall comply with the requirements of the Town Sign Bylaws at all times. In addition, upon penalty of special permit revocation, no permitted Marijuana Establishment, Medical Marijuana Treatment and Dispensing Facility or Marijuana Cultivation Facility shall use any advertising material that is misleading, deceptive, or false, or that is designed to appeal to minors. Off-site signage or advertising in any form, including billboards shall not be allowed.

5756. VISIBILITY. There shall be no visibility of marijuana accessories, activities, products or treatment occurring within or on the premises of a Marijuana Establishment, Medical Marijuana Treatment or Dispensing Facility or Marijuana Cultivation Facility from the exterior of such facility or premises.

5757. MANUFACTURING. A local special permit for marijuana or any marijuana product manufacturing may be issued only in locations where Marijuana Establishments, Medical Marijuana Treatment and Dispensing Facilities and Marijuana Cultivation activities are permitted.

5758. CULTIVATION ACTIVITIES. Cultivation, as defined in this Bylaw, by any Marijuana Establishment or Medical Marijuana Treatment and Dispensing Facility in any location other than where specifically permitted shall be disallowed.

5760. TERM OF SPECIAL PERMIT.

Any local special permit issued pursuant to this Section shall be valid for a period of two years from the date of issuance. Any renewal of the special permit shall be governed by the standards and procedures set forth in this Section and any regulations adopted pursuant thereto by the Planning Board/Zoning Enforcement Officer and/or Licensing Board.

5761. NOTIFICATION. Any new applications sought under this Section must be publically advertised for a period of no less than fourteen (14) days, not including the date of the required special permit public hearing. Abutters and abutters-to-abutters within five hundred (500) feet shall be notified in writing of said application, and include any and all dates and locations of public hearings on said application.

5770. CONFLICT OF LAWS.

In the event of any conflict between the provisions of this Bylaw and any other applicable state or local law, the stricter provision, as deemed by the Zoning Enforcement Officer, shall control.

## DEFINITIONS.

Medical Marijuana Treatment and Dispensing Facilities: a not-for-profit entity, as defined by Massachusetts Law as a “Medical Marijuana Treatment Center”, registered under this law, that acquires, cultivates, possesses, processes (including development of related products such as food, tinctures, aerosols, oils, or ointments or marijuana accessories), transfers, transports, sells, material to qualifying patients or their personal caregivers. It shall also include any establishment having as any portion of its stock in trade marijuana or non-FDA approved marijuana based products or its active ingredient, THC (tetrahydrocannabinol); or paraphernalia for the consumption or delivery of marijuana or products containing marijuana as allowed for medical uses under Massachusetts Law, including but not limited to retail distribution, wholesale distribution or growth and/or cultivation of marijuana; production or sale of marijuana (cannabis) seeds; or the refinement or manufacturing or sale of marijuana infused products.

Marijuana: In addition to the Commonwealth’s definition under Chapter 94C of Mass General Laws, our definition shall include: Marijuana, Marihuana, Cannabis, Hashish, Cannabis seeds, THC (tetrahydrocannabinol) and its derivatives and extracts as well as any substances containing THC whether in plant, including its flowers, oil, resin, solid, liquid or aerosol form.

Marijuana Cultivation: the process of propagation, including germination, using soil, hydroponics, or other mediums to generate growth and maturity. The intended process of bringing a plant or other grown product to maturity for harvesting, sale, refining or use as an ingredient in further manufacturing or processing. This definition encompasses marijuana cultivation related to Medical Marijuana Treatment and Dispensing Facilities

Consumer: a person who is at least 21 years of age.

Manufacture: to compound, blend, extract, infuse or otherwise make or prepare a marijuana product.

Marijuana accessories: equipment, products, devices or materials of any kind that are intended or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, ingesting, inhaling or otherwise introducing marijuana into the human body.

Marijuana cultivator: an entity licensed to cultivate, process and package marijuana, to deliver marijuana to marijuana establishments and to transfer marijuana to other marijuana establishments, but not to consumers.

Marijuana establishment: a marijuana cultivator, marijuana testing facility, marijuana product manufacturer, marijuana retailer or any other type of licensed marijuana-related business.

Marijuana product manufacturer: an entity licensed to obtain, manufacture, process and package marijuana and marijuana products, to deliver marijuana and marijuana products to marijuana establishments and to transfer marijuana and marijuana products to other marijuana establishments, but not to consumers.

Marijuana products: products that have been manufactured and contain marijuana or an extract from marijuana, including concentrated forms of marijuana and products composed of marijuana and other ingredients that are intended for use or consumption, including edible products, beverages, topical products, ointments, oils and tinctures.

Marijuana testing facility: an entity licensed to test marijuana and marijuana products, including certification for potency and the presence of contaminants.

Marijuana retailer: an entity licensed to purchase and deliver marijuana and marijuana products from marijuana establishments and to deliver, sell or otherwise transfer marijuana and marijuana products to marijuana establishments and to consumers.

Process or processing: to harvest, dry, cure, trim and separate parts of the marijuana plant by manual or mechanical means.

## SECTION 5800. MARIJUANA NOT MEDICALLY PRESCRIBED

Consistent with MGL Ch. 94G, Section 3(a)(2), all types of marijuana establishments as defined in MGL Ch. 94G, Section 1(j), to include all marijuana cultivators, marijuana testing facilities, marijuana product manufacturers, marijuana retailers or any other types of licensed marijuana-related businesses, shall be prohibited within the Town of Westborough.

# ARTICLE 5 DEFINITIONS (ADOPTED MARCH 5, 1990)

In this Bylaw, the following terms shall have the following meanings, unless a contrary meaning is required by the context or is specifically prescribed:

Accessory Building: (Amended 3/15/2014, Article 23; Deleted 10/20/2014, Article 34 )

Accessory Use: A use that constitutes only an incidental or insubstantial part of the total activity that takes place on a lot and is commonly associated with and integrally related to the principal use. Even though a use may be a principal use in another situation, it may be conducted as an accessory use in conjunction with another principal use. (Added 3/15/2014, Article 23)

Agricultural shall mean the science, art and business of cultivating the soil, producing crops, and raising of livestock, useful to man. Agricultural shall not include any uses or activities associated with Marijuana Establishments or Medical Marijuana Treatment and Dispensing Facilities or Marijuana Cultivation activities, such as the growing, sale, manufacturing, processing, refinement and consumption of marijuana, marijuana accessories, or marijuana products. Medical Marijuana Treatment and Dispensing Facilities and Marijuana Cultivation are defined elsewhere in Article 5 Definitions. (Amended 3/16/2013, Article 16) (Amended Article 3, 2016 FTM)

Airport shall mean any area on a lot used for the landing and take-off of aircraft or similar fixed-wing craft on a regular or intermittent basis.

Animal Kennel or Hospital shall mean harboring and/or care of more than three (3) dogs three (3) months old or over, or of other domestic animals, irrespective of the purpose for which they are maintained.

Apartment, Garden shall mean premises not over three (3) stories high, accommodating three (3) or more dwelling units, irrespective of ownership or tenure. Includes town houses.

Apartment, High Rise shall mean premises over three (3) stories high, accommodating three (3) or more dwelling units, irrespective of ownership or tenure.

Aquifer shall mean a geologic formation composed of sand and gravel that contains significant amounts of potentially recoverable potable water. (Amended 3/29/1994, Article 42)

Bedroom shall mean a habitable room in a residence for the purpose of sleeping and that contains a space for the use of a closet. (Amended 10/21/2013, Article 27)

Boardinghouse shall mean a building used for lodging seven (7) or more persons, with or without meals, for compensation with owner resident on premises.

Brewery, Distillery: A facility, licensed under the relevant state and federal statutes, for the large scale production of more r than 15,000 barrels per year (a barrel being equivalent to thirty one (31) gallons) and packaging of malt, wine, hard cider beverages and/or distilled spirits for distribution retail or wholesale, which may include a tap room where beverages produced on the premises may be sold and consumed. (Added 10/16/2017, Article 12)

Brew Pub: Restaurants, licensed under the relevant state and federal statutes, to produce and sell beer and/or ale and/or distilled spirits at the location and whose primary business is the sale and preparation of food to be consumed on the premises. Beverages including malt, hard ciders, wine or distilled spirits produced on the premises may be sold to other establishments but those sales shall not exceed 25 percent of the establishment's production capacity. (Added 10/16/2017, Article 12)

Buffer Strip shall mean lot area not used for any commercial, business or industrial purposes nor covered by any structure or pavement. The buffer strip shall be kept stabilized with natural vegetative cover adequate to prevent soil erosion.

Building, Accessory shall mean building that is subordinate and customarily incidental to the principal building and is located on the same lot as the principal building. (Added 10/20/2014, Article 34)

Building Height shall mean the vertical distance from the mean finished grade of the ground adjoining the building to the highest point of the roof or parapet for flat or shed roofs, to the deck line for mansard roofs and to the mean height between eaves and ridge for gable, hip, and gambrel roofs. Not included are spires, cupolas, TV antennae or other parts of structures which do not enclose potentially habitable floor space.

Building, Principal shall mean that a building's primary purpose is for the furtherance of the functioning of the principal use and is located on the same lot as the principal use. (Added 10/20/2014, Article 34)

Camping, Supervised Amended 10/21/2013, Article 27; Deleted 3/15/2014, Article 21

Clearing: The removal and/or cutting of trees, shrubs, bushes, or brush. Clearing shall also include grubbing. Grubbing shall mean the removal of stumps and/or roots from the soil. (Added 3/16/2002, Article 17)

Common Driveway: (Added 3/29/1994, Article 75) The primary means of access and egress, which is not considered a local Town road or way of public access, serving more than two (2) but not more than five (5) detached single family dwellings.

Congregate Housing shall mean a structure providing living accommodations and communal facilities for elderly persons (over age sixty), including those requiring limited medical attention, which is located on the same parcel or on a parcel of land contiguous to a parcel on which a nursing home is located and to which it is attached. Such a structure may contain retail stores, offices and service outlets provided that such places of business exclusively service on-site residents, and there is no entrance (other than emergency) to any such place of business except from inside a building.

Continuing Care Retirement Community (CCRC) shall mean a senior housing development that is planned, designed and operated to provide a full range of accommodations for older persons, including independent living, congregate care and assisted living facilities, and which shall also include a nursing home or skilled-housing/care facility. Residents of a CCRC have the ability to move from one level of housing/care to another as their needs change. (Added 5/15/2010, Article 31)

Convalescent, Nursing or Rest Home shall mean any institution licensed as a nursing, convalescent or rest home or charitable home for the aged by the Department of Public Health pursuant to Section 71, Chapter III General Laws.

Corner Lot shall mean a continuous parcel of land with legal definable boundaries, and having frontage on at least two streets or recorded ways open to public use.

Density shall mean the number of dwelling units, households or housing structures per unit of land (minimum lot area as defined herein). (Added 5/15/2010, Article 31)

Discharge shall mean the accidental or intentional spilling, leaking, pumping, pouring, emitting, emptying or dumping of toxic or hazardous material upon or into any land or waters in the Town of Westborough. Discharge includes, without limitations, leakage of such materials from failed or discarded containers or storage systems, and disposal of such materials into any on-site sewage disposal system, drywell, catch basin or unapproved landfill. The term, discharge, as used and applied in this Bylaw does not include the following:

1. Proper disposal of any material in a sanitary or industrial landfill that has received and maintained all necessary legal approvals for that purpose;

2. Application of road salts in conformance with Section 4700 and the Snow and Ice Control Program of the Massachusetts Department of Public Works; and,

3. Disposal of "sanitary sewage" to subsurface sewage disposal systems as defined and permitted by Title 5 of the Massachusetts Environmental Code, unless restricted by Section 4700. (Amended 3/29/1994, Article 42)

Dwelling shall mean building or part of a building used exclusively as the living quarters for one (1) or more families.

Dwelling, Single Family shall mean premises accommodating a single dwelling unit.

Dwelling Unit shall mean building or portion of a building providing living quarters for a single family and up to six (6) boarders.

Earth Moving: The moving within, removal from and/or addition to any lot or parcel of topsoil, borrow, rock, sod, loam, peat, humus, clay, sand, or gravel. (Added 3/16/2002, Article 17)

Family shall mean any number of individuals living and cooking together on the premises as a single non-profit housekeeping unit.

Floor Area, Habitable shall mean the total interior floor area of a dwelling, excluding areas where ceiling height is less than five (5) feet, areas with more than half of floor to ceiling height below average grade of the adjoining ground, and excluding community laundries or foyers, utility rooms, communicating corridors, porches or terraces.

Floor Area Ratio (FAR): The ratio of the sum of the gross floor area of all buildings on a lot to the total site area of the lot. (Amended 3/17/18, Article 26)

Floricultural shall mean the cultivation of flowering plants for sale or otherwise.

Gross Floor Area: The sum, in square feet, of the horizontal areas of a building (or several buildings on the same lot) measured from the exterior face of the exterior walls, or from the

center line of a party wall separating two buildings, including garages, basements, covered porches, and half stories. Floors where the headroom is greater than five feet, measured from the top of the floor joists of the top story to the bottom of the roof rafters, is included in the measurement of gross floor area. Gross floor area does not include “crawl spaces” as defined by current building code; “attics”; and “open decks”. Where the text of this bylaw refers to the floor area, the term means gross floor area unless the term habitable floor area is used. (Amended 3/17/18, Article 26)

Groundwater shall mean all the water found beneath the surface of the ground. (Amended 3/29/1994, Article 42)

Heliport shall mean a landing and take-off place for a helicopter on a regular or intermittent basis.

Home Occupation shall mean a business or profession engaged in within a dwelling or its accessory building by a resident thereof as a use accessory thereto.

Horticultural shall mean the science or art of cultivating plants, gardens.

Impervious Surface shall mean a material or structure on, above, or below the ground that does not allow precipitation or surface water to penetrate directly into the soil. (Added 3/29/1994, Article 42)

Independent Senior Housing shall mean a building or series of buildings containing independent dwelling units intended to provide housing for persons not requiring health or other services, and designed and occupied by individuals or families in which all members are 62 years of age or older (referred to as a “Qualified Occupant”). (Added 5/15/2010, Article 31; Amended Article 12, 2016 ATM; Amended 10/21/2019, Article 17)

Lot shall mean a continuous parcel of land with legally definable boundaries.

Lot Area shall mean the horizontal area of the Lot exclusive of any area in a street or recorded way open to public use. (Amended 10/21/2013, Article 27)

Lot Area – Minimum Buildable shall mean at least 90% of the Lot Area as required for the zoning district as shown in Section 2600, Dimensional Schedule and shall be land exclusive of wetland resource areas as currently defined in the Massachusetts Wetland Protection Act, MGL c. 131 Section 40 and regulations promulgated under 310 CMR 10.00. (Added 10/21/2013, Article 27)

Lot coverage shall mean percentage of the Lot Area as required for the district as shown in Section 2600, Dimensional Schedule, covered by Structures. (Amended 10/21/2013, Article 27)

Lot Frontage shall mean that portion of a lot fronting upon and having access to a street. Lot frontage shall be measured continuously along one (1) street line between side lot lines. In the case of a corner lot, lot frontage shall be measured between one (1) side lot line and the midpoint of the arc made by the corner radius.

Major Residential Development Added 3/5/1990, Article 59; deleted 10/21/2013, Article 27

Marijuana: In addition to the Commonwealth’s definition under Chapter 94C of Mass General Laws, our definition shall include: Marijuana, Marihuana, Cannabis, Hashish, Cannabis seeds,

THC (tetrahydrocannabinol) and its derivatives and extracts as well as any substances containing THC whether in plant, including its flowers, oil, resin, solid, liquid or aerosol form. (Added 3/16/2013, Article 16)

Marijuana Cultivation: The process of propagation, including germination, using soil, hydroponics, or other mediums to generate growth and maturity. The intended process of bringing a plant or other grown product to maturity for harvesting, sale, refining or use as an ingredient in further manufacturing or processing. This definition encompasses marijuana cultivation related to Medical Marijuana Treatment and Dispensing Facilities. (Added 3/16/2013, Article 16)

Medical Marijuana Treatment and Dispensing Facilities shall mean a not-for-profit entity, as defined by Massachusetts Law as a "Medical Marijuana Treatment Center", registered under this law, that acquires, cultivates, possesses, processes (including development of related products such as food, tinctures, aerosols, oils, or ointments), transfers, transports, sells, material to qualifying patients or their personal caregivers. It shall also include any establishment having as any portion of its stock in trade marijuana or non-FDA approved marijuana based products or its active ingredient, THC (tetrahydrocannabinol); or paraphernalia for the consumption or delivery of marijuana or products containing marijuana as allowed for medical uses under Massachusetts Law, including but not limited to retail distribution, wholesale distribution or growth and/or cultivation of marijuana; production or sale of marijuana (cannabis) seeds; or the refinement or manufacturing or sale of marijuana infused products. (Added 3/16/2013, Article 16)

Micro-brewery/Micro-distillery: A facility, licensed under the relevant state and federal statutes, for the production and packaging of malt, wine, hard cider beverages and/or distilled spirits for distribution retail or wholesale, on or off the premise, with a capacity of not more than fifteen thousand (15,000) barrels per year, (a barrel being equivalent to thirty one (31) gallons) and which may include a tap room where beverages produced on the premises may be sold and consumed. May include other uses such as a restaurant, including outdoor dining if otherwise permitted in the zoning district. (Added 10/16/2017, Article 12)

Mining shall mean the removal or relocation of geological materials such as topsoil, sand, gravel, metallic ores or bedrock. (Added 3/29/1994, Article 42)

Minor Residential Development added 3/5/1990, Article 59; deleted 10/21/2013, Article 27

Mobile Home shall mean a moveable or portable dwelling built on a chassis, designed for connection to utilities when in use, and designed without necessity of a permanent foundation for year-round living.

Motor Vehicle Service Station shall mean premises devoted primarily to retail sale of fuels and lubricants and/or washing of motor vehicles, with any repair services or other sales or services of secondary importance.

Nano-brewery/Nano-distillery: Also considered a craft brewery, a facility, licensed under the relevant state and federal statutes, for the small scale production of malt, wine, hard cider beverages and/or distilled spirits primarily for on premises consumption and sale with limited distribution to retail or wholesale, with a capacity of not more than six thousand (6,000) barrels per year, (a barrel being equivalent to thirty one (31) gallons) and which may include accessory preparation and sale of food for on premises consumption. (Added 10/16/2017, Article 12)

Nursery or Greenhouse shall mean premises used for the propagation of trees, shrubs, vines, flowers, or other plants for transplanting, stock for grafting, or for cut flower, pine needles, bark, or other organic materials.

Open Space shall mean that portion of the Lot Area as required for the district as shown in Section 2600, Dimensional Schedule which is not covered by any Structure and not used for drives, parking or storage. All Open Space shall be kept stabilized with natural vegetative cover. Biking, walking, recreational and multi-use trails, which are created through an easement accepted by the Town or other entity approved by the Board of Selectmen, for public purposes, any portion of which contains impervious surface, associated land or structures within the easement, shall be considered open space and not be considered lot coverage. (Amended 10/21/2013, Article 27) (Amended 10/16/17, Article 11)

Parking Garage shall mean a structure constructed for the intended purpose of parking and/or the storing of vehicles.

Parking Space shall mean space adequate to park an automobile, not less than nine (9) by twenty (20) feet, plus means of access. Where spaces are not marked, each space shall be assumed to require three hundred fifty (350) square feet.

Principal Use: The primary use to which the premises are devoted, and the main purpose for which the premises exist as defined in Section 2300: Use Regulation Schedule. (Added 3/15/2014, Article 23)

Recharge Areas shall mean areas composed of permeable porous materials that allow infiltration and collection of precipitation or surface water and thereby transmit this water to aquifers. (Amended 3/29/1994, Article 42)

Recreational Camps shall mean facilities as licensed by the Massachusetts Department of Health under 105 CMR 430.000. (Added 3/15/2014, Article 21)

Senior Living Facility shall mean an assisted living residence as defined by the Massachusetts Executive Office of Elder Affairs pursuant to M.G.L. c. 19D and which provides assistance with activities of daily living, such as assistance with bathing, dressing, eating, toileting and medication reminders and which provides room and board for three or more adult residents. Senior living facilities shall also include senior congregate housing that includes room and board, but without necessity for assistance with activities of daily living. (Added 5/15/2010, Article 31)

Septic Wastes shall mean wastewaters arising from ordinary domestic water use as from toilets, sinks and bathing facilities, etc., and containing such concentrations and types of pollutants as to be considered normal wastes.

Sign shall mean any device located on or off the premises, designed to inform or attract public attention promoting a use or uses; (Amended 10/19/2015, Article 5)

Sign, Area of shall mean the surface area within a single continuous perimeter enclosing all the display area of the sign, but not including structural members not bearing advertising matter unless internally or decoratively lighted. One side only of flat, back-to- hack signs shall be counted. For a sign consisting of individual letters, designs, and/or symbols attached to or

painted on a surface, building, wall or window, the area shall be considered to be that of the smallest quadrangle which encompasses all of the letters, designs and symbols.

Sign, Automated Variable Message shall mean a variable message sign that changes its message by programmable electronic or mechanical processes, automatically or by remote control. (Added 3/16/2019, Article 32)

Sign, Externally Illuminated shall mean any sign which is composed of an opaque material and is illuminated only by a static white light source that is located in front of and shines on the face of the sign to be viewed. (Added 3/16/2019, Article 32)

Signs, Non-Conforming shall mean any sign which does not comply with Section 3300 of the Zoning Bylaws. (Added 10/19/2015, Article 5)

Solid Wastes shall mean useless, unwanted or discarded solid material with insufficient liquid content to be free- flowing. This includes, but is not limited to, rubbish, garbage, scrap materials, junk, refuse, inert fill material and landscape refuse.

Story shall mean that portion of a building between the top of any floor and the top of the floor or roof next above, counting as a half story such portion if more than half its exterior wall area is below grade or if directly under a sloping roof in which more than half the exterior wall perimeter has less than three (3) feet floor-rafters interior dimension, and excluding cellar or attic spaces used solely for utilities and storage.

Street shall mean a way providing legally sufficient frontage for subdivision of land under the requirements of Chapter 41, Section 81L General Laws.

Structure shall mean anything constructed or erected, the use of which requires fixed location on the ground, or attachment to something located on the ground, including swimming pools having capacity of 4,000 gallons or more and mobile homes, but not including walls, pavement or fences. The construction of walls and fences shall comply with the Massachusetts State Building Code. (Amended 10/21/2013, Article 27)

Town House shall be synonymous with "Garden Apartment".

Toxic or Hazardous Materials shall mean any substance or mixture of physical, chemical, or infectious characteristics posing a significant, actual or potential hazard to water supplies or other hazards to human health or potential hazard to water supplies or other hazards to human health if such substance or mixture were discharged to land or water; and, shall include without limitation synthetic organic chemicals, petroleum products, heavy metals, radioactive or infectious waste, acids and alkalis, and all substances defined as Toxic or Hazardous under MGL, Chapter 21C and 21 E and 310 CMR 30.00, and also include such products as solvents and thinners in quantities greater than normal household use. (Amended 3/29/1994, Article 42)

Trails shall mean biking, walking, recreational and multi-use paths created through an easement accepted by the Town or other entity approved by the Board of Selectmen, for public purpose. (Amended 10/16/17, Article 11)

Yard shall mean a required open space, unoccupied and unobstructed by any structure or portion of a structure, except the following:

a. fences, walls, poles, posts and other customary yard accessories, ornaments and furniture;

b. in front yards only, eaves, steps, noncovered porches and signs.

Yard, Front shall mean a yard extending between lot side lines across the front of a lot adjacent to each street the lot adjoins, measured from the street line, assumed to be twenty-five (25) feet from the center of the travelled roadway where no such right-of-way line has been established or can be readily determined.

Yard or Garage Sale shall be considered any offering for sale to the general public any and all items new or used, said sale taking place on premises by the resident thereof.

Yard, Rear shall mean an open space on the same lot as the main building unoccupied except as herein permitted, extending the full width of the lot and situated between the rear line of the lot and the rear line of the main building projected to the side lines of the lot.

Yard, Side shall mean the portion of the yard situated between the building and the side line of the lot and extending from the front yard to the rear yard.

**2020 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *6/20/2020* | *Replace Section 2300 Use Schedule* | *26* |

**2019 Fall Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *10/21/2019* | *Amend Section 5300 and Definitions* | *17* |
| *10/21/2019* | *Amend Dimensional Regulations M-1* | *18* |

**2019 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/16/19* | *Section 2300 Outside display of retail merchandise* | *30* |
| *3/16/19* | *Added Section 2154* | *31* |
| *3/16/19* | *Amended Section 3300 and Definitions* | *32* |
| *3/16/19* | *Amended Site Plan Review Authority* | *33* |
| *3/16/19* | *Amend Section 5400* | *34* |
| *3/16/19* | *Replace Section 2100* | *35* |
| *3/16/19* | *Replace Section 2610* | *36* |

**2018 Fall Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *10/15/2018* | *Amend Section 2520* | *37* |
| *10/15/2018* | *Amend Dimensional Regulations M-1* | *38* |
| *10/15/2018* | *Amend Dimensional Regulations M-1* | *40* |

**2018 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/17/2018* | *Amend Article 5: Definitions* | *26* |
| *3/17/2018* | *Sec 2410: Preexisting, Non-Conforming Use or Structures* | *27* |
| *3/17/2018* | *Sec 2600: Garden and High Rise Apartments* | *28* |
| *3/17/2018* | *Sec 5200: Multi-Family Housing* | *29* |
| *3/17/2018* | *Sec 4955: Downtown Planning Overlay District* | *30* |
| *3/17/2018* | *Sec 5100: Gateway 2 District* | *31* |

**2017 Special Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *11/27/2017* | *Amend Senior Living Overlay Affordable Housing* | *2* |

**2017 Fall Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *10/16/2017* | *Amend Dimensional Regulations M-1* | *1* |
| *10/16/2017* | *Amend Dimensional Regulations M-1* | *2* |
| *10/16/2017* | *Amend Dimensional Regulations M-1* | *3* |
| *10/16/2017* | *Amend Section 2300* | *10* |
| *10/16/2017* | *Amend Article 5 Definitions* | *11* |
| *10/16/2017* | *Amend 2300, Article 5: Microbreweries* | *12* |
| *10/16/2017* | *Amend 2610, Senior Living Overlay District* | *13* |

**2017 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/18/17* | *Added Sec. 5800: Marijuana Not Medically Prescribed* | *33* |
| *3/18/17* | *Sec. 4400, 4460: Accessory Dwelling Units* | *34* |
| *3/18/17* | *Sec. 2300: Highway Business District Amendment* | *35* |

**2016 Fall Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *10/17/16* | *Amend Zoning Map: Parcels 42, 49, 49A, 41, 41A (Map 33)* | *2* |
| *10/17/16* | *Sec. 5700: Marijuana Treatment, Dispensing & Cultivation* | *3* |

**2016 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/12/16* | *Amend the Use Schedule – MUD* | *11* |
| *3/12/16* | *Amend the SLO Bylaw, Definitions & District Regs.* | *12* |
| *3/12/16* | *Amend the Zoning Map – Spurr House – 7 Parkman* | *39* |

**2015 Fall Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *10/19/15* | *Amend Zoning Map: Parcels 53, 55, 56 (Map 21) Parcels 1, 4,176, 177, 180, 181, 182 (Map 28)* | *4* |
| *10/19/15* | *Sec. 3300: Sign Regulations* | *5* |

**2014 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/15/14* | *Sec. 2300 and Article 5: Definitions* | *21* |
| *3/15/14* | *Sec. 1200, 1241: Administration – Design Requirements* | *22* |
| *3/15/14* | *Sec. 2500, 2540: Dimensional Regulations – Multiple Buildings and Article 5: Definitions* | *23* |

**2013 Special Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *10/21/13* | *Sec. 4100, 4112, 4120, 4125, 4133, 4142: Earth Moving* | *22* |
| *10/21/13* | *Sec. 2600: Dimensional Schedule* | *23* |
| *10/21/13* | *Sec. 3200m 3220, 3230, 3240: Environmental Controls* | *24* |
| *10/21/13* | *Sec. 4500: Flood Plain District* | *25* |
| *10/21/13* | *Sec. 2300: Use Regulation Schedule – Residential Uses* | *26* |
| *10/21/13* | *Article 5: Definitions* | *27* |
| *10/21/13* | *Zoning Map amendment Country Club* | *30* |
| *10/21/13* | *Zoning Map amendment Town Hall* | *31* |

**2013 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/16/13* | *Added Sec. 5700 Medical Marijuana Treatment & Dispensing Facilities & Marijuana Cultivation* | *16* |

**2012 Special Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|

| | | |
|---|---|---|
| *10/15/12* | *Added Sec. 5600: Large-Scale Ground-Mounted Solar Photovoltaic Installations* | *19* |

**2012 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/17/12* | *Zoning Map Change – 36 West Main St. – to BB* | *27* |
| *3/17/12* | *Zoning Map Change – 44-46 East Main St. – to BB* | *28* |
| *3/17/12* | *Zoning Map Change – Downtown Planning Overlay Dist.* | *29* |

**2011 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *5/14/11* | *Sec. 3300, Subsection 3332 Sign Regulations* | *18* |
| *5/14/11* | *Delete Bldg. Inspector & replace Bldg. Commissioner* | *19* |
| *5/14/11* | *Sec. 1240, 1241 Site Plan Review* | *20* |
| *5/14/11* | *Sec. 1200, 1244 Site Plan Review Public Hearing* | *21* |

**2010 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *5/15/10* | *Amend Zoning Map Parcels 44, 53, &53A (Map 33)* | *18* |
| *5/15/10* | *Sec. 5400 Industrial D (ID) Overlay District* | *30* |
| *5/15/10* | *Sec. 5300 Senior Housing Overlay District* | *31* |
| *5/15/10* | *Sec. 5500 Mixed Use District (MUD)* | *32* |

**2009 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *5/16/09* | *Amend Zoning Map – R to BA* | *27* |

**2008 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *5/17/08* | *Amend Zoning Map – Highway Business District* | *29* |

**2007 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *No Zoning Bylaws Passed in 2007* | | |

**2006 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *5/13/2006* | *Sec. 2300: Multi-Family Dwelling* | *30* |
| *5/13/2006* | *Sec. 5200: Multi-Family Housing in (BA)* | *30* |

**2005 Special Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *10/17/05* | *Sec. 4600: Delete Planned Parcel Development (PPD)* | *12* |

**2005 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *5/14/05* | *Sec. 2620: Non-Residential (District Chart)* | *41* |
| *5/14/05* | *Sec. 2110: Zoning-District Sub.Sec. Business (G2)* | *41* |
| *5/14/05* | *Sec. 2110: Footnote (6)* | *41* |
| *5/14/05* | *Sec.5100: (G2) Gateway District* | *41* |
| *5/14/05* | *Amend Zoning Map (BA) → (G2)* | *41* |

| | | |
|---|---|---|
| *5/14/05* | *Sec. 2300: Delete "Other" from Use Reg. Schedule* | *41* |
| *5/14/05* | *Amend Zoning Map (Parcel 77, Map 21)* | *42* |
| *5/14/05* | *Replace Zoning Map with GIS Map* | *44* |

**2004 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/15/04* | *Sec. 2100: Sub.Sec. 2110 DPOD (4)* | *38* |
| *3/15//04* | *Sec. 2300: Add DPOD to District Column* | *38* |
| *3/15/04* | *Sec. 2620: Add DPOD to District column* | *38* |
| *3/15/04* | *Sec. 4900: Downtown Planning Overlay District* | *38* |
| *3/15/04* | *Zoning Map: Amend in Accordance with Sec. 4900* | *39* |
| *3/15/04* | *Licenses for Alcohol Sales in DPOD* | *40* |

**2004 Special Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *10/18/04* | *Sec. 4900: DPOD* | *8* |
| *10/18/04* | *Amend Zoning Map: Parcels 23-A, 24-A, 27, 28, 40, 46 and 50 (Map 33); Parcels 48, 49, 51 (Map 33); Parcels 43, 43-A, 47 (Map 33); Parcels 41, 42 (Map 33)* | *9* |
| *10/18/04* | *Sec. 2100: Sub. Sec, 2110 'Mixed-Use Industrial'* | *10* |
| *10/18/04* | *Sec. 2110: Footnote (5)* | *10* |
| *10/18/04* | *Sec. 2300: Add MUI (IC) to Dist. Column* | *10* |
| *10/18/04* | *Sec. 2620: Add MUI (IC) to Sec. 5000* | *10* |
| *10/18/04* | *Amend Zoning Map: Parcels 96, 96B and 96C (Map 19); Parcels 49, 50, 11, 51, 10, 10, 9, 4, 5, 6, 24 and 3 (Map 18)* | *10* |

**2003 Annual Town Meeting**

*No Zoning By-laws Passed in 2003*

**2002 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/18/02* | *Zoning Map: Parcel 113 (Map 34)* | *36* |
| *3/18/02* | *Sec. 2630: Building in M-1 District* | *42* |
| *3/18/02* | *Sec. 2630: Wording of Building in M-1 District* | *43* |
| *3/18/02* | *Sec. 4100: Earth Moving Replacement and Definitions* | *17* |

**2001 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/17/01* | *Sec. 4700- 4733: Split Lot Provisions* | *30* |
| *3/17/01* | *Sec. 4700-4742: Use Regulation Schedule* | *30* |
| *3/17/01* | *Sec.4700-4742: Word Change* | *30* |
| *3/17/01* | *Sec.4700-4732: Updated Overlay Map* | *30* |
| *3/17/01* | *Sec. 2600-2610: Footnote (i): Rejected by AG* | *36* |
| *3/17/01* | *Amend Zoning Map: Route 9* | *40* |
| *3/17/01* | *Amend Zoning Map: Gilmore and Flanders Road* | *41* |
| *3/17/01* | *Zoning Map Label Changes* | *42* |
| *3/17/01* | *Sec. 2620: Non-Res. Buildings in Non-Res. Districts* | *44* |
| *3/17/01* | *Sec. 3120: Schedule of Parking Area Requirements* | *45* |
| *3/17/01* | *Zoning Map: Parcels 60, 60A (Map 27) Parcel 20A (Map 28)* | *46* |

**2000 Annual Town Meeting**
*No Zoning By-laws passed in 2000*

**1999 Annual Town Meeting**

| *Date* | *Bylaw* | *Article* |
|---|---|---|
| *3/13/99* | *Zoning Map: Parcels 59, 59A, 60 (Map 28)* | *47* |

**1998 Annual Town Meeting**
*No Zoning By-laws passed in 1998*

**1997 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/15/97* | *Sec. 1241: Add Section 1245* | *26* |
| *3/15/97* | *Sec. 1240: Site Plan Review* | *27* |
| *3/15/97* | *Zoning Map: Parcels 22, 23, 24 (Map 28)* | *49* |
| *3/15/97* | *Zoning Map: Parcels 62, 254 (Map 27)* | *50* |
| *3/15/97* | *Zoning Map: Parcel 26 (Map 4)* | *51* |

**1996 Annual Town Meeting /Special Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/23/96* | *Sec. 4700: Aquifer & Watershed Protection District* | *58* |
| *3/23/96* | *Sec. 2600 :Dimensional Schedule, District Regulations* | *64* |
| *3/23/96* | *Sec. 4800: Special Permits for Adult Uses* | *66* |
| *3/23/96* | *Sec. 3337: Sub. Sec. C- Historical Commission* | *74* |

**1996 Special Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *11/18/96* | *Special Adult Uses Revision* | *13* |

**1995 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/7/95* | *Zoning Map: Parcels 25, 27 (Map 28)* | *51* |
| *3/7/95* | *Zoning Map: Parcel 21 (Map 28)* | *25* |
| *3/7/95* | *Zoning Map: Parcels 22, 23, 258 (Map 8) → PPD* | *48* |

**1995 Special Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *9/19/95* | *Special Regulations 4600 (Planned Parcel Development)* | *10* |

**1994 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/29/94* | *3337A: Historical Dist. &/or National Reg. of Properties* | *39* |
| *3/29/94* | *Sec. 4330: Minimum Requirements (Wording)* | *40* |
| *3/29/94* | *Sec.1330: Special Permits* | *41* |
| *3/29/94* | *Sec. 4700: Aquifer & WPD to comply with DEP* | *42* |
| *3/29/94* | *Sec. 4100: 4111-4137 Earth Moving Changes* | *43* |
| *3/29/94* | *Sec. 2610: District Reg. and Article 5: Common Driveway* | *75* |

**1993 Annual Town Meeting**
*No Zoning By-laws passed in 1993*

**1992 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/2/92* | *Sec. 2620: Footnote (d) Revision* | *19* |
| *3/2/92* | *Sec. 1100: Purpose Revision* | *20* |
| *3/2/92* | *Sec. 4100: Earth Removal Revisions* | *21* |
| *3/2/92* | *Sec. 2300: Use Regulation Schedule* | *23* |

**1991 Annual Town Meeting**

*No Zoning By-laws passed in 1991*

**1990 Annual Town Meeting**

| *Date* | *By-laws* | *Article* |
|---|---|---|
| *3/5/90* | *Entire Westborough Zoning Bylaws* | *19* |
| *3/5/90* | *Addition of Sec. 4800: Critical Resource Protection Dist.* | *26* |
| *3/5/90* | *Sec. 2300: Open Space Communities* | *52A* |
| *3/5/90* | *Sec. 2300: Use Regulation Schedule: Commercial Uses* | *52F* |
| *3/5/90* | *Sec. 2150-2153 and 4300* | *59* |
| *3/5/90* | *Sec. 2600 Sub. Sec. 2620* | *61* |
| *3/5/90* | *Sec. 3200 Sub. Sec. 3240* | *69* |
| *3/5/90* | *Sec. 3337 Sub. Sec. A* | *72* |
| *3/5/90* | *Sec. 4500: Changes – Flood Plain District* | *74* |

**1990 Special Town Meeting**

| *Date* | *By-laws* | *Article* |
|---|---|---|
| *6/20/90* | *Deletion of Sec. 4800 – Adult Uses* | *11* |
| *6/20/90* | *Sec. 4500: Changes at ATM 1990: Nullified* | *12* |

**1989 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/21/89* | *3337 Historical Dist &/or National Register Properties* | *43* |

**1988 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/14/88* | *Article 5 Definition: Parking Garage* | *70* |
| *3/14/88* | *Sec. 3135: Parking Garage* | *71* |
| *3/14/88* | *Sec. 4651: Planned Parcel Development* | *72* |
| *3/14/88* | *Sec. 4653: Planned Parcel Development* | *73* |
| *3/14/88* | *Sec. 2300: Banks and Office Space* | *76* |
| *3/14/88* | *Sec. 4320: Replacement - Total Number of Lots* | *77* |
| *3/14/88* | *Sec. 4300: Lot Dimensional Requirements* | *78* |

**1987 Annual Town Meeting**

*No Zoning By-laws were passed in 1987*

**1986 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/15/86* | *Article 5 Definitions: Airport and Heliport* | *67* |
| *3/15/86* | *Article 5 Definitions: Aquifer, Discharge, Groundwater, Recharge Areas, Septic Wastes, Solid Wastes, Toxic or Hazardous Materials.* | *75* |

| | | |
|---|---|---|
| 3/15/86 | 4700 Aquifer and Watershed Protection Dist. | 76 |
| 3/15/86 | Article 5 Definitions: Open Space | 86 |
| 3/15/86 | Sec. 2610: Dimensional Schedule | 87 |
| 3/15/86 | Sec. 2300: Customary Accessory Uses and Structures | 88 |
| 3/15/86 | Sec. 2400: Nonconforming Uses – add “uses” | 89 |

**1985 Annual Town Meeting**

| Date | By-law | Article |
|---|---|---|
| 3/16/85 | Sec. 2610: Min. Lot Frontage (d) | 19 |
| 3/16/85 | Sec. 4136: Earth Removal – finish grade | 73 |
| 3/16/85 | Sec. 2620: Dimensional Schedule Footnote (a) | 85 |

**1984 Annual Town Meeting**

| Date | By-law | Article |
|---|---|---|
| 3/5/84 | Sec. 1240, 1241, 1242, 1243, 1244: Replacement | 14 |
| 3/5/84 | Sec. 3120: Schedule of Parking Area Requirements | 17 |
| 3/5/84 | Sec. 1700: Effective Date Replacement | 26 |
| 3/5/84 | Sec. 2400: Nonconforming Uses – word change | 34 |
| 3/5/84 | Sec. 2300: Institutional Uses | 51 |
| 3/5/84 | Sec. 2600: Footnote L. | 52 |
| 3/5/84 | Sec. 3120: Congregate Housing | 53 |
| 3/5/84 | Sec. 3130: Sub. Sec. 3134 Replacement | 54 |
| 3/5/84 | Article 5 Definition: Congregate Housing | 55 |
| 3/5/84 | Sec. 1210: Building Inspector | 60 |
| 3/5/84 | Sec. 2410: Nonconforming Uses – word change | 66 |

**1983 Annual Town Meeting**

| Date | By-law | Article |
|---|---|---|
| 3/7/83 | Sec. 3337: Sign unlawfully installed - deletion | 47 |
| 3/7/83 | Sec. 2620: Min. Open Space Requirements | 50 |
| 3/7/83 | Sec. 4450: Structures | 58 |

**1982 Annual Town Meeting**

| Date | By-law | Article |
|---|---|---|
| 3/1/82 | Sec. 4600: Planned Parcel Development | 35 |
| 3/1/82 | Sec. 2620: Min. Side Yard | 37 |
| 3/1/82 | Sec. 2540: Replacement | 46 |
| 3/1/82 | Sec. 1242: Subsection J | 52 |
| 3/1/82 | Sec. 1240: Site Plan Review | 53 |

**1981 Annual Town Meeting**

| Date | By-law | Article |
|---|---|---|
| 3/2/81 | Sec. 2300: Open Space Communities | 28 |
| 3/2/81 | Sec. 2650: Dimensional Regulations | 31 |
| 3/2/81 | Sec. 2610: Min. Open Space | 35 |
| 3/2/81 | Sec. 1250: Penalty | 49 |
| 3/2/81 | Sec. 2300: Industrial, Utility Uses | 57 |
| 3/2/81 | Sec. 2300: Motor Vehicle Ser. Stat. and Earth Removal | 64 |
| 3/2/81 | 2410(d), 3120, 2440, 2620(f) | 70 |
| 3/2/81 | Article 5 Definitions: Structure | 71 |
| 3/2/81 | Sec. 1300: Footnote | 74 |
| 3/2/81 | Sec. 2620: Min. Open Space | 75 |

| | | |
|---|---|---|
| 3/2/81 | Article 5 Definitions: Open Space | 76 |
| 3/2/81 | Sec. 4540: Footnote | 79 |

**1980 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/3/80* | *Article 5 Definitions: Lot Frontage* | *20* |
| *3/3/80* | *Article 5 Definitions: Buffer Strip* | *21* |
| *3/3/80* | *Sec. 2620: Footnote (d)* | *22* |
| *3/3/80* | *Sec. 4112: Replacement* | *23* |
| *3/3/80* | *Sec. 2200: Special Permit* | *24* |
| *3/3/80* | *Sec. 2300: Code Symbol ‘S’ → ‘SP’* | *25* |
| *3/3/80* | *Sec. 2300: Use Regulation Schedule* | *26* |

**1979 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/21/79* | *Sec. 2640: Buildings in Municipal Districts* | *11* |

**1978 Special Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *12/21/78* | *Deletion of Sec. 1330, Addition of 4600* | *1* |
| *12/21/78* | *Sec. 2110: Residential Districts* | *2(a)* |
| *12/21/78* | *Sec. 2200: Use Regulations: ‘S’ Substitution* | *2(b)* |
| *12/21/78* | *Sec. 2300: Use Regulations Schedule: BA, BB* | *2(c)* |
| *12/21/78* | *Sec. 2300: Use Regulations Schedule: R60, R25, R15* | *2(d)* |
| *12/21/78* | *Sec. 2300: Use Regulations Schedule: TC* | *2(e)* |
| *12/21/78* | *Sec. 2300: Use Regulations Schedule: M* | *2(f)* |
| *12/21/78* | *Sec. 2600-2610: Dimensional Schedule* | *2(g)* |
| *12/21/78* | *Sec. 2600-2620: Dimensional Schedule: BA, BA(f)* | *2(h)* |
| *12/21/78* | *Sec. 2600-2620: Dimensional Schedule* | *2(i)* |
| *12/21/78* | *Addition of Sec. 4700 Planned Unit Development* | *3* |
| *12/12/78* | *Zoning Map: IB & BB →BA* | *4* |
| *12/12/78* | *Zoning Map: R25& IB→ R60* | *5* |
| *12/12/78* | *Zoning Map: R25→ R15* | *6* |
| *12/12/78* | *Zoning Map: R25→ TC* | *7* |
| *12/12/78* | *Zoning Map: Municipal District ‘M’* | *8* |
| *12/12/78* | *Proposed Zoning Map of the town of Westborough* | *9* |

**1977 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| *3/7/77* | *Sec. 2300 Use Regulation Schedule: Res. Uses Footnote* | *22* |
| *3/7/77* | *Sec. 3120: Boarding House* | *23* |
| *3/7/77* | *Sec. 3133 Substitution* | *25* |
| *3/7/77* | *Sec. 1320: Variances* | *37(1)* |
| *3/7/77* | *Sec.1360: Repetitive Petitions* | *37(2)* |
| *3/7/77* | *Sec. 2510: Exemptions* | *37(3)* |
| *3/7/77* | *Sec. 1100: Purpose Replacement* | *37 A* |
| *3/7/77* | *Sec. 1250: Penalty* | *37 B* |
| *3/7/77* | *Sec. 1260: Enforcement* | *37 C* |
| *3/7/77* | *Sec. 1300: Board of Appeals & Subsections Substitution* | *37 D* |
| *3/7/77* | *Sec. 1400: Amendments* | *37 E* |
| *3/7/77* | *Sec. 1500: Separability Substitution* | *37 F* |
| *3/7/77* | *Sec. 2300: Use Regulation Schedule* | *37 G* |

| | | |
|---|---|---|
| 3/7/77 | Sec. 2300: Agriculture, Horticulture, Floriculture | 37 H |
| 3/7/77 | Sec. 2400: Non-Conforming Uses | 37 I |
| 3/7/77 | Sec. 2510: Exemption | 37 J |
| 3/7/77 | Article 5: Def.- Agricultural, Horticultural, Floriculture | 37 1 |
| 3/7/77 | Sec. 2200: District Regulations | 38 |
| 3/7/77 | Sec. 1240: Site Plan Review | 40 |
| 3/7/77 | Sec. 3311 through 3337 | 67 |
| 3/7/77 | Sec. 3340: Non-Accessory Signs Substitution | 70 |
| 3/7/77 | Article 5 Definitions: Sign, Sign (Area of) | 72 |
| 3/7/77 | Sec. 3110: General | 73 |
| 3/7/77 | Sec. 2600: Dimensional Schedule | 74 |
| 3/7/77 | Sec. 3230: Liquid Waste | 75 |

**1977 Special Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| 3/22/77 | Sec. 4232: Special Regulations | 7 |

**1976 Annual Town Meeting**

| *Date* | *By-law* | *Article* |
|---|---|---|
| 3/76 | Sec. 4417: Home Occupation | 25 |
| 3/76 | Sec. 4418: Home Occupation | 26 |
| 3/76 | Article 5 Definitions: Yard or Garage Sale | 28 |
| 3/76 | Zoning Map and Bylaw Addition: Sec. 4500 | 34 |

**1975 Annual Town Meeting**

*No Zoning By-laws were passed in 1975*

**1974 Annual Town Meeting**

| *Date* | *Bylaw* | *Article* |
|---|---|---|
| 3/74 | Sec. 2300: District Reg. Single or 2 Family Dwelling | 82 |
| 3/74 | Sec. 4330: Lot Dimensional Requirements | 83 |
| 3/74 | Sec. 2110 and Sec. 2300: District Regulations | 85 |

**1973 Annual Town Meeting**

| *Date* | *Bylaw* | *Article* |
|---|---|---|
| 3/5/73 | Sec. 2610: Dimensional Schedule | 56 |
| 3/5/73 | Sec. 2620: Non-Res. Building in Non-Res. District | 59 |
| 3/5/73 | Article 5 Definitions: Corner Lot | 61 |
| 3/5/73 | Article 5 Definitions: Lot Frontage | 62 |
| 3/5/73 | Sec. 3220: Pollution Control | 94 |

**1972 Annual Town Meeting**

| *Date* | *Bylaw* | *Article* |
|---|---|---|
| 3/18/72 | Westborough Building Code | 37 |
| 3/18/72 | Entire Zoning Bylaw Deletion | 77 |
| 3/18/72 | Sec. 2300: Multi Family Dwelling | 78 |
| 3/18/72 | Sec. IV Apartment Buildings | 81 |
| 3/18/72 | Zoning Map: Conservation Land: Kelleher/Aubrey | 82 |
| 3/18/72 | Zoning Map: Rozefsky Bros. | 83 |
| 3/18/72 | Zoning Map and Bylaw: Campbell | 84 |
| 3/18/72 | Zoning Map: Tufts/Hickox | 85 |
| 3/18/72 | Zoning Map: S.E. Side of East Main St. | 86 |

| | | |
|---|---|---|
| *3/18/72* | *Zoning Map and Bylaw: E. Main and Water St.* | *88* |
| *3/18/72* | *Zoning Map: S.E. Side of East Main Street* | *89* |

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

**Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)**

**ATTACHMENT C**

PURCHASE AND SALE AGREEMENT

1. **INTRODUCTION**.

(a) EFFECTIVE DATE: ____________________________, 2022.

(b) PROPERTY: A parcel of land with the building and other improvements thereon located at 231 Turnpike Road, Westborough, known as the former Regal Cinema property, shown as Lot 1 on a plan recorded with the Worcester South District Registry of Deeds in Book 714, Page 77, and containing 29 acres, more or less, according to said plan.

(c) SELLER: Town of Westborough

Address: Westborough Town Hall, 34 W. Main Street, Westborough, MA 01581

Seller's Attorney: Shirin Everett, Esq., K.P. Law, P.C., 101 Arch Street, Boston, MA 02110

Phone: (617) 556-0007 Fax: (617) 654-1735

Email: severett@k-plaw.com

(d) BUYER:

Address:

Buyer's Attorney:

Phone: Fax:

Email:

2. **COVENANT**. Seller agrees to sell and Buyer agrees to buy the Property upon the terms hereinafter set forth.

3. **PURCHASE PRICE**.

(a) Purchase Price. The purchase price for the Property shall be _______________________ and 00100 Dollars ($___________________.00) (the "Purchase Price"), of which ___________________ and no/100 Dollars shall be paid within two (2) Business Days of the Effective Date (the "Deposit"). The balance of the Purchase Price, as adjusted by all prorations as provided for herein, shall be paid to Seller by Purchaser at Closing, by wire transfer of immediately available federal funds.

(b) Deposit. (a) Within two (2) Business Days after the Effective Date, Buyer will deposit the Deposit with the Town Treasurer as escrow agent in a non-interest bearing account. The Deposit shall be applied to the Purchase Price at Closing or shall be disbursed as otherwise provided herein. The escrow agent's obligation to return the Deposit to the party entitled thereto under the terms of this Agreement, as and when provided herein, shall survive the termination of this Agreement. In the event that this Agreement is terminated solely because of Seller's default, the Deposit shall be returned to Buyer within fourteen (14) of said termination, regardless of whether the return of said Deposit is stated elsewhere in this Agreement. The foregoing obligation shall survive the termination of this Agreement.

4. **TITLE**.

(a) Title Report. Buyer shall obtain a title commitment (the "Title Commitment") issued by a nationally recognized title insurance company, together with a copy of all instruments creating title exceptions described in the Title Commitment (the "Exception Documents"), all at its sole cost and expense;

(b) Title Objection Notice. Buyer shall have until 5:00 p.m. on _________________, 2022 (the "Inspection Termination Date" and the period from the Effective Date to the Inspection Termination Date, the "Inspection Period") to send Seller a letter (the "Title Objection Letter") setting forth all of Buyer's objections to the Title Report and Exception Documents, with copies thereof (collectively, the "Title Objections"), and (b) Seller shall have until 5:00 p.m._______________, 2022 (the "Seller Response Period"), which date is fifteen (15) days after Seller receives the Title Objection Letter, to notify Buyer in writing ("Seller's Title Response Notice") of Seller's election, in its sole and absolute discretion, to either: (i) cure, on or prior to Closing, any of the Title Objections, or (ii) not cure any or all of the Title Objections (and Seller's failure to respond by the expiration of the Seller Response Period shall be deemed an election by Seller not to cure any of the Title Objections). If Seller elects to cure any Title Objections, Seller shall use good faith efforts to cure such Title Objections at or prior to Closing, provided, however, that good faith efforts shall not require Seller to expend more than $2,000.00 to effectuate said cure, including attorneys' fees, but excluding monetary liens voluntarily granted by Seller.

(c) Title Termination Date. If Seller is unwilling to cure (or is deemed to have elected not to cure) any of the Title Objections, Buyer will have the option to either: (a) waive any Title Objections that Seller is unwilling to cure or is deemed to have elected not to cure; or (b) terminate this Agreement by written notice to Seller sent by 5:00 p.m. on __________________, 2022 (the "Termination Day"), which date is fifteen (15) days after the

Seller Response Period expires. Upon a timely termination by Buyer, this Agreement shall automatically terminate, the parties shall be released from all further obligations under the Agreement (except for those provisions that, by their terms, survive a termination of this Agreement).

(d) Waiver. Buyer's failure to take either one of the actions described in (b) and (c) above shall be deemed to be Buyer's election to acquire the Property notwithstanding the Title Objections under this subsection (d), if any, and Buyer shall have waived its right to terminate this Agreement under this Section. Buyer shall have been deemed to have approved any title matter that exists as of the date of the Title Commitment and that Seller is not obligated to remove or as to which either Buyer did not object to as provided above or to which Buyer did object, but with respect to which Buyer did not terminate this Agreement. Nothing herein shall affect Buyer's right to object to title matters occurring after the Inspection Period.

(e) Permitted Exceptions. Notwithstanding anything herein to the contrary, Buyer acknowledges and agrees that the Property shall be conveyed subject to the following matters: (i) the rights and obligations, including cost-sharing arrangements, set forth in the Declaration of Reciprocal Covenants, Easements and Restrictions, recorded with the Worcester South Registry of Deeds in Book 18745, Page 313, (ii) any lien to secure payment of special assessments, not delinquent, (iii) any and all applicable laws, ordinances, rules and governmental regulations (including, without limitation, those relating to building, zoning and land use) affecting the development, use, occupancy and/or enjoyment of the Property, (iv) matters set forth in the Title Report and not included in the Title Objections, (v) Title Objections subsequently waived or deemed waived by Buyer in accordance with this Section 4, (iv) such other Title Objections as Buyer's title company shall commit to insure over or omit as exception, without any additional cost to Buyer, (vii) any lien, encumbrance, title exception or defect that are approved or deemed approved by Buyer after the date hereof, and (viii) a trail easement or easements that may be reserved by Seller on portion or portions of the Property at locations reasonably acceptable to Buyer for benefit of the public, to be shown on a plan prepared by Buyer and acceptable to Seller. The foregoing matters are referred to herein, collectively, as the "Permitted Exceptions." Notwithstanding anything stated to the contrary herein, Seller covenants and agrees to remove from the Property any lien or encumbrance which is a mortgage, deed of trust and/or other debt instruments to the extent voluntarily executed by Seller or expressly assumed by Seller in writing.

(f) Title and Practice Standards. Any matter or practice arising under or relating to this Agreement which is the subject of a title standard or a practice standard of the Massachusetts Real Estate Bar Association at the time for delivery of the deed shall be covered by said title standard or practice standard to the extent applicable.

5. PLANS. If said deed refers to a plan necessary to be recorded therewith, Buyer shall prepare and deliver such plan in form adequate for recording or registration to Seller for Seller's approval, not to be unreasonably withheld, at least thirty (30) days prior to the closing date. Buyer shall prepare a survey plan of the easements to be reserved by Seller, if any.

6. PROPERTY INSPECTIONS.

(a) Inspections. During the Inspection Period, Buyer shall have a limited license to enter upon the Property for the purpose of conducting such other inspections, surveys, tests and investigations as Buyer deems reasonably necessary to ascertain the suitability of the Property for the Permitted Uses (including use thereof residential purposes and ability to construct the Project improvements), including, without limitation, ALTA boundary/topographical and/or "as-built" surveys, utility inspections, zoning verifications, examination of flood plain status, to determine the acceptability of soil compaction, examination of water and drainage delineations, and other non-invasive inspections (the "Inspections"), all at Buyer's sole risk and expense. Buyer shall not conduct any subsurface or invasive inspections unless: Buyer's Phase 1 Site Assessment report recommends a Phase 2 Site Assessment and Buyer has notified Seller of the same in writing at least thirty (30) days prior thereto and obtained Seller's prior written approval, including, without limitation, Seller's prior written approval of the location of such invasive inspections, which may not be unreasonably withheld. Buyer shall use commercially diligent efforts to complete the Inspections as soon as practicable and to minimize any interference with the use of the Property by Seller and others entitled thereto. All of such other entries upon the Property shall be at reasonable times during normal business hours and after at least forty-eight (48) hours prior written notice to Seller or Seller's agent (which notice may be sent by e-mail to __________ at _____________), and Seller or Seller's agent shall have the right to accompany Buyer during any activities performed by or on behalf of Buyer on the Property. Buyer will promptly provide Seller with a copy of any reports in Seller's possession or control ("Reports") which assesses the presence of any Hazardous Materials (as such term is defined herein) on the Property or any violation of any applicable law. Buyer agrees to keep confidential and not disclose the contents or result of any Reports, except to the extent required by applicable law.

(b) Repair, Restoration. Except as provided below, if Buyer and/or its agents, employees, representatives, contractors, consultants and/or invitees (with Buyer, the "Buyer Parties") disturb or damage the Property or any other improvements or property of Seller or of others during the Inspection Period or at any other time that Buyer and/or the other Buyer Parties enter the Property, Buyer shall promptly restore or repair the Property and/or the improvements thereon to the same condition as existed prior to such disturbance or damage, it being acknowledged that the failure to repair/restore the Property and/or the other property promptly shall be a material default under this Agreement. The foregoing obligation shall survive the termination of this Agreement.

(c) Property Objection Notice. If Buyer determines that the condition of the Property is not acceptable under this Section, Buyer shall have the right to terminate this Agreement by notifying Seller of such termination no later than the Inspection Termination Date, setting forth therein the reasons for said termination (the "Property Objection Letter"). Upon such timely termination, neither party shall have any further rights or obligations under this Agreement except for such obligations expressly intended to survive termination. If Buyer fails to so notify Seller of Buyer's termination of this Agreement by the Inspection Termination Date, then Buyer shall have waived its right to terminate this Agreement pursuant to this Section 6, and be deemed to have approved the condition of the Property as of said Inspection Termination Date. Nothing herein shall affect Buyer's right to object to Hazardous Materials released on the Property after the Inspection Termination Date.

7. INSURANCE.

(a) Insurance. Buyer shall procure and maintain, effective as of the date of this Agreement through and until the Closing: (a) Workers' Compensation Insurance in statutory limits, and Employer's Liability Insurance in a minimum amount of One Million ($1,000,000.00) Dollars, and (b) the following insurance coverages with insurance companies reasonably acceptable to Seller: (i) Commercial General Liability Insurance including Personal Injury, Death, Contractual, Products/Completed Operations, Independent Contractors, and Property Damage and Commercial Automobile Liability Insurance covering all automobiles, trucks, and other vehicles utilized at the Property, all in a minimum amount of One Million ($1,000,000.00) Dollars combined single limit coverage arising out of any one occurrence, and Two Million ($2,000,000.00) Dollars in the aggregate; and (iii) umbrella insurance in the amount of Five Million Dollars ($5,000,000).

(b) General Requirements. Each of the foregoing policies (except workers' compensation insurance) must include "Town of Westborough, Massachusetts" as an additional insured. Upon or prior to execution of this Agreement, Buyer shall deliver to Seller one or more certificates of insurance evidencing that Buyer has in fact procured the insured required hereunder. Buyer will not be permitted to access the Property until Seller receives such certificates of insurance. Such policies shall contain a provision whereby the insurer shall give Seller not less than thirty (30) days' written notice prior to the cancellation or material modification of such policies. If such insurance is available only on a claims-made basis, then the dates of coverage, including the retroactive date and the time period within which any claim can be filed, shall be stated in the certificate(s) of insurance, and Buyer shall be obligated to ensure that no gaps in coverage occur. Such insurance shall not relieve or release Buyer from, or limit its respective liability as to, any and all obligations arising under this Section. Buyer shall immediately notify Seller, initially by telephone, and thereafter in writing, of any and all accidents arising out of Buyer's activities on the Property.

9. INDEMNIFICATION; RELEASE. Buyer shall release, discharge, indemnify, defend and hold harmless Seller and/or its agents, employees, representatives, board of commission members, and others acting by and through Seller (collectively, with Seller, the "Seller Parties") from and against any and all damages, claims, losses, liabilities, costs and expenses (including reasonable attorneys' fees), which may be brought against, imposed upon and/or incurred by any of the Seller Parties arising out of or related to the Inspections of the Property and/or the entry upon and/or activities undertaken by Buyer and/or any of the other Buyer Parties, except to the extent that the same is directly caused by the gross negligence of any of the Seller Parties. The obligations of Buyer pursuant to this Section shall survive the Closing and/or the termination of this Agreement.

10. HAZARDOUS MATERIALS. Buyer acknowledges that Buyer has not been influenced to enter into this transaction and that she has not relied upon any warranties or representations not set forth in this Agreement. Buyer represents and warrants that it or its agents have conducted a full inspection of the Property, and based upon Buyer's investigation, Buyer is aware of the condition of the Property and will accept the Property "AS IS", subject to Buyer's right to terminate this Agreement under Section 5. Buyer acknowledges that Seller has

no responsibility for hazardous waste, oil, hazardous material or hazardous substances, as those terms are defined by any applicable federal, state and/or local law, rule or regulation, including, without limitation, the Massachusetts Oil and Hazardous Materials Release Prevention and Response Act, M.G. L. c. 21E, the Massachusetts Hazardous Waste Management Act, M.G.L. c. 21C, the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. §§ 9601 et seq. and the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §§ 6901 et seq. (herein collectively referred to as "Hazardous Materials") on, in, under or emitting from the Property or for any other condition or defect on the Property, and shall defend, indemnify the hold harmless Seller form any and all losses, damages, costs, claims, fines, expenses and liabilities relating to said Hazardous Materials. The provisions of this Section shall survive delivery of the deed.

11. BUYER'S ACKNOWLEDGEMENT. Buyer acknowledges and agrees that Seller has not made, does not make and specifically disclaims any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning or with respect to (a) the nature, quality or condition of the Property, including, without limitation, the water, soil and geology, (b) the income to be derived from the Property, (c) the suitability of the Property for any and all activities and uses which Buyer may conduct thereon, (d) the compliance of or by the Property or its operation with any laws, rules, ordinances or regulations of any applicable governmental authority or body, including, without limitation, the Americans with Disabilities Act and any rules and regulations promulgated thereunder or in connection therewith, (e) the habitability, merchantability or fitness for a particular purpose of the Property, or (f) any other matter with respect to the Property, and specifically that Seller has not made, does not make and specifically disclaims any representations regarding the presence, existence or absence of Hazardous Materials, toxic substance or other environmental matters. Buyer further acknowledges and agrees that, having been given the opportunity to inspect the Property, Buyer is relying solely on its own investigation of the Property and not on any information provided or to be provided by Seller. Buyer further acknowledges and agrees that any information provided or to be provided with respect to the Property was obtained from a variety of sources and that Seller has not made any independent investigation or verification of such information. **Buyer further acknowledges and agrees that, and as a material inducement to the execution and delivery of this Agreement by Seller, the sale of the Property as provided for herein is made on an "AS IS, WHERE IS" CONDITION AND BASIS "WITH ALL FAULTS."** Buyer acknowledges, represents and warrants that Buyer is not in a significantly disparate bargaining position with respect to Seller in connection with the transaction contemplated by this Agreement; that Buyer freely and fairly agreed to this acknowledgment as part of the negotiations for the transaction contemplated by this Agreement.

12. POSSESSION AND DELIVERY OF PREMISES. Full possession of said Property free of all tenants and occupants is to be delivered at the time of the delivery of the deed.

13. EXTENSION TO PERFECT TITLE OR MAKE PREMISES CONFORM. If Seller shall be unable to give title or to make conveyance, or to deliver possession of the Property, all as herein stipulated, or if at the time of the delivery of the deed the Property do not conform with the provisions hereof, then any payments made under this Agreement shall be

forthwith refunded and all other obligations of the parties hereto shall cease and this Agreement shall be void without recourse to the parties hereto, unless Seller elects, in its sole discretion, to use reasonable efforts to remove any defects in title, or to deliver possession as provided herein, or to make the said Property conform to the provisions hereof, as the case may be, in which event Seller shall give written notice thereof to Buyer at or before the time for performance hereunder. In no event, however, shall reasonable efforts require Seller to expend more than $2,500.00, including attorneys' fees. Seller's obligations hereunder are subject to the availability and/or appropriation of funds to fulfill Seller's obligations.

14. FAILURE TO PERFECT TITLE OR MAKE PREMISES CONFORM. If at the expiration of the extended time Seller shall have failed so to remove any defects in title, deliver possession, or make the Property conform, as the case may be, all as herein agreed, then any payments made under this Agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this Agreement shall be void without recourse to the parties hereto.

15. BUYER'S ELECTION TO ACCEPT TITLE. Buyer shall have the election, at either the original or any extended time for performance, to accept such title as Seller can deliver to the said Property in their then condition and to pay therefore the purchase price, without deduction, in which case Seller shall convey such title.

16. USE OF MONETY TO CLEAR TITLE. To enable Seller to make conveyance as herein provided, Seller may, at the time of delivery of this deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests, provided that all instruments so procured are recorded in accordance with customary Massachusetts conveyancing practices.

17. ACCEPTANCE OF DEED. The acceptance of a deed by Buyer shall be deemed to be a full performance and discharge of every Agreement and obligation herein contained or expressed, except such as are, by the terms hereof, to be performed after the delivery of said deed.

18. ADJUSTMENTS. Buyer shall make payment in lieu of taxes in accordance with G.L.c.44, §63A as of the day of performance of this Agreement and the net amount thereof shall be added to the purchase price payable by Buyer at the time of delivery of the deed. Charges for water, sewer, and fuel shall be adjusted as of the day of closing.

19. BUYER'S DEFAULT; DAMAGES. If Buyer shall fail to fulfill Buyer's Agreements herein, the Deposit made hereunder by Buyer shall be retained by Seller as Seller's sole and exclusive remedy at law and equity for Buyer's breach of this Agreement. The parties acknowledge and agree that Seller has no adequate remedy in the event of Buyer's default under this Agreement because it is impossible to exactly calculate the damages which would accrue to Seller in such event. Therefore, acknowledging this fact, the parties agree that: (i) the Deposit hereunder is the best estimate of such damages which would accrue to Seller in the event of Buyer's default, (ii) said Deposit represents damages and not a penalty against Buyer, and (iii) the parties have been afforded the opportunity to consult an attorney with regard to the provisions of this Section.

20. LIABILITY OF SHAREHOLDER, TRUSTEE, FIDUCIARY. If Seller or Buyer executes this Agreement in a representative or fiduciary capacity, only the principal or the estate represented shall be bound, and neither Seller or Buyer so executing, nor any shareholder or beneficiary of any trust, shall be personally liable for any obligation, express or implied, hereunder.

21. PERMITS AND FINANCING.

(a) Permits. Buyer shall obtain any and all necessary permits, approvals, and licenses from federal, state and local authorities that are necessary or convenient to enable Buyer to undertake, construct and operate the Project for the Permitted Use (collectively, the "Permits"), with appeal periods having expired without any appeal being filed, or if filed, the final adjudication of such appeal pursuant to a final court order without further appeal. All such Permits shall be obtained at the sole risk and expense of the Buyer, and no work shall be done upon the Property in connection therewith unless and until Buyer has provided Seller with written notice and copies of all applicable Permits. Seller agrees to cooperate in any reasonable manner in connection with the making of applications for any such Permits, all at Buyer's cost, but Buyer acknowledges that Seller has no control over and cannot guarantee that Permits required from municipal boards or officers within their statutory or regulatory authority will be granted or fees waived.

(b) Financing. Buyer shall obtain financing, in an amount sufficient in the reasonable judgment of Buyer and Seller for Buyer to pay the purchase price for the Property and design, construct, operate and maintain the Project as required under the LDA (the "Financing"), and Buyer shall provide Seller with firm project financing commitments, including, but not limited to public funding commitments, construction loan commitments, and/or permanent loan commitment from institutional lenders and/or public or quasi-public entities, on terms and amounts reasonably satisfactory to Buyer and Seller (the "Financing Commitments"), and Buyer shall, prior to or simultaneously with the execution and delivery of the Deeds, close on the Financing, including closing on all financing transactions and admission of the tax credit equity investor(s) to Buyer, whereby Buyer shall have the contractual right to receive funds from institutional lenders, tax credit equity investors and/or public or quasi-public entities (the "Financial Closing").

(c) Due Diligence. Buyer shall use commercially diligent and good faith efforts to obtain the Permits and Financing Commitments no later than ____________________, 2022 (as Seller may extend in writing, in its sole and absolute discretion, the "Initial Permit Period"). If, at the expiration of the Initial Permit Period, the Financing Commitments have not been obtained despite Buyer's good faith and diligent efforts, Buyer may, with Seller's consent, which shall not be unreasonably withheld, extend the Initial Permit Period by no more than _________ (____) days (the "Extended Permit Period" and, with the Initial Permit Period, the "Permit Period"), provided that Buyer gives written notice to Seller requesting the extension at least thirty (30) days prior to the expiration of the Initial Permit Period. In the event that the Financing Commitments cannot be satisfied within the Permit Period, Buyer or Seller shall have the right to terminate this Agreement, whereupon this Agreement shall be null and void, without recourse to the parties, except those provisions that are expressly stated herein to survive said termination.

Buyer shall not be liable to Seller for failing to obtain the Permits and/or the Financing unless Buyer failed to use good faith and diligent efforts to satisfy said contingencies.

(d) Buyer shall provide Seller with written status once every ____ weeks/months from the Effective Date until the Closing, and shall meet with Buyer at such times as Seller may reasonably request, to update Seller of the specific steps taken by Buyer to obtain the Permits and Financing and shall provide such other information as Seller may reasonably request.

22. CONDITIONS TO CLOSING. The parties acknowledge and agree that Buyer's and Seller's obligations hereunder are contingent on the satisfaction of following conditions (the "Contingencies") on or before the Closing Date or such earlier or later date set forth in this Agreement:

(a) Permits. Buyer shall have obtained the necessary Permits to construct and operate the Property for its permitted uses (the "Project") by the expiration of the Diligence Period;

(b) Financing. Buyer shall obtained the Financing Commitments by the expiration of the Diligence Period, and shall conduct the Financial Closing prior to or simultaneously with the execution and delivery of the Deed to the Property, whereby Buyer shall receive access to funds to undertake and complete the Project;

(c) Compliance. Compliance by Buyer and Seller with any other requirements of Massachusetts General or Special laws relative to the disposition of real property by Seller, including G.L. c. 30B, and Buyer and Seller agree to diligently pursue full compliance with said laws; and

(d) Termination. In the event that the Closing does not occur within the time set forth in Section ____ because of Buyer's failure to satisfy the Contingencies, despite its good faith and diligent efforts, Buyer or Seller shall have the right to terminate this Agreement, whereupon neither party shall have any further rights or obligations under this Agreement except for such obligations expressly intended to survive termination. In the event that the Closing does not occur within the time set forth in Section____ because of Seller's failure to satisfy the condition set forth in Section 22(a) on the date of the Closing, despite its good faith and diligent efforts, Buyer shall have the right to terminate this Agreement, whereupon the Deposit shall be returned to Buyer and neither party shall have any further rights or obligations under this Agreement except for such obligations expressly intended to survive termination.

23. DELIVERABLES AT CLOSING.

(a) Items to be Delivered by Seller. Seller shall execute, acknowledge and deliver, as applicable, to Buyer's attorney on or prior to the date of Closing, the following: (a) an original, recordable release deed (the "Deed") conveying all of Seller's right, title and interest in and to the Property, subject only to Permitted Exceptions and the other restrictions set forth herein, (b) a settlement statement showing all of the payments, adjustments and prorations provided for in in this Agreement and otherwise agreed upon by Seller and Buyer ("Closing Statement"), and (c) such customary and usual certificates and affidavits as Buyer's title insurance company may reasonably require in order to issue the Title Policy without exception for mechanic's and

materialmen's liens, broker's liens, rights of parties in possession, without cost or expense to Seller.

(b) Items to be Delivered by Buyer. Buyer shall execute and deliver, as applicable, to the Seller's attorney the following: (a) the Purchase Price, adjusted as provided in this Agreement, which funds shall remain in escrow until the Deed has been recorded; (b) a signed counterpart of the Closing Statement; (c) evidence, reasonably satisfactory to Seller's attorney, of authority of any person or persons executing instruments for or on behalf of Buyer, (d) a signed Disclosure of Beneficial Interest form, as required under G.L. c.7C, §38, and (e) such other documents, instruments and items as may be reasonably required by the Seller's title insurance company and/or Seller to consummate the transaction contemplated by this Agreement.

24. CLOSING AND CLOSING COSTS.

(a) Closing. The consummation of the purchase and sale of the Property which is the subject of this Agreement (the "Closing") shall be at 11:00 a.m. EST on ________________________, 2022 (or such later date agreed to by Seller, in its sole and absolute discretion, the "Closing Date"), and shall take place at Westborough Town Hall or a closing by mail, at Seller's option. All documents and funds are to be delivered in escrow subject to prompt rundown of title and recording, and such recording shall take place by 3:45 p.m. on the Closing Date, which recording shall not be unreasonably delayed beyond customary conveyancing practices. All funds shall be held in escrow by Seller's Attorney who shall release the funds to Seller only upon the recording of the Deed. It is agreed that time is of the essence of this Agreement.

(b) Closing Costs. At the Closing, (a) Seller will pay and be responsible for (i) the recording charges for any instrument which releases or discharges any monetary encumbrances or liens for which the Seller is responsible as required under this Agreement, (ii) any transfer or Deed stamp taxes, (iii) Seller's counsel's fees and expenses, and (b) Buyer will pay and be responsible for (i) all recording charges other than as are the express responsibility of Seller pursuant to the terms of this Section, (ii) all costs and fees for title examination, title insurance (if obtained) and other title company charges (if applicable), the ALTA survey of the Property (if performed) and all of Buyer's due diligence studies and investigations, and (iii) Buyer's counsel's fees and expenses. Seller and Buyer will each pay all other expenses, charges or costs for which sellers and purchasers, respectively, are customarily responsible in commercial real estate transactions in Massachusetts.

25. EMINENT DOMAIN. Notwithstanding anything herein to the contrary, in the event that all or a substantial part of the Property is taken by eminent domain by an entity other than Seller, Seller or Buyer may each, at its option, terminate this Agreement. "Substantial Part" is defined herein as that portion of the Property that would materially and adversely prevent Buyer from undertaking the Project and/or using the Property for the Permitted Use.

26. EXTENSIONS. Buyer and Seller hereby authorize their respective attorneys (as the case may be) to execute on their behalf any extensions to the time for performance and any change of location and/or time for delivery of the Deed. Buyer and Seller shall be able to rely

upon the signature of said attorneys as binding unless they have actual knowledge before the execution or other consent to such extensions, that either party has disclaimed the authority granted herein to bind them. For purposes of this Agreement, facsimile signatures shall be construed as original.

27. MISCELLANEOUS.

(a) Assignment. Buyer shall not assign this Agreement or any of its rights hereunder without prior written consent of Seller, which may be withheld in Seller's sole and absolute discretion.

(b) Brokers' Commissions. Seller and Buyer each hereby represent and warrant to each other that it has not dealt with or engaged any broker or finder in respect to the transaction contemplated hereby. Seller and Buyer each hereby indemnify, protect and defend and hold the other harmless from and against all losses, claims, damages, awards, costs and expenses resulting from the claims of any broker, finder, or other such party claiming by, through or under the acts or agreements of the indemnifying party. The provisions of this paragraph shall survive the Closing.

(c) Waiver; Consent. Either party may specifically and expressly waive in writing any portion of this Agreement or any breach thereof, but no such waiver shall constitute a further or continuing waiver of any preceding or succeeding breach of the same or any other provision. The consent by one party to any act by the other party for which consent was required shall not be deemed to imply consent or waiver of the necessity of obtaining such consent for the same or any similar acts in the future. No waiver or consent shall be implied from silence or any failure of a party to act, except as otherwise specified in this Agreement.

(d) Notices. Any notice required or permitted to be given under this Agreement shall be in writing and signed by the party or the party's attorney or agent and shall be deemed properly given upon the earlier of: (1) two (2) business days after deposit with the United States Postal Service, if sent by registered or certified mail, return receipt requested, postage prepaid; (ii) one (1) business day after deposit with an express courier service such as Federal Express; (iii) actual receipt, or (iv) electronic transmission, addressed to the parties as set forth in Section 1, with a copy to the party's attorney. A party may change its address for receipt of notices by service of a notice of such change in accordance herewith.

(e) Entire Agreement. This Agreement and its exhibits constitute the entire agreement between the parties hereto pertaining to the subject matter hereof, and the final, complete and exclusive expression of the terms and conditions thereof. All prior agreements, representations, negotiations and understandings of the parties hereto, oral or written express or implied, are hereby superseded and merged herein.

(f) Captions. The captions used herein are for convenience only and are not a part of this Agreement and do not in any way limit or amplify the terms and provisions hereof.

(g) Governing Law. This Agreement shall be governed by and construed under the laws of the Commonwealth of Massachusetts, and any and all disputes, issues and claims of any

kind or nature relating to this Agreement and/or the Property shall be brought in the courts of the Commonwealth of Massachusetts.

(h) Invalidity of Provision. If any provision of this Agreement as applied to either party or to any circumstances shall be adjudged by a court of competent jurisdiction to be void or unenforceable for any reason, the same shall in no way affect (to the maximum extent permissible by law) any other provision of this Agreement, the application of any such provision under circumstances different from those adjudicated by the court, or the validity or enforceability of the Agreement as a whole.

(i) Amendments. No addition to or modification of any provision contained in this Agreement shall be effective unless fully set forth in writing executed by both Buyer and Seller.

(j) Date of Performance. All references to "days" in this Agreement shall be construed to mean calendar days unless otherwise expressly provided. If the date on which any performance required hereunder is other than a Business Day, then such performance shall be required as of the next following Business Day. The term "Business Day" shall mean a day that is other than a Saturday, Sunday or holiday in which the banks in Massachusetts are authorized to close. Unless otherwise expressly provided herein, the last day of any period of time described herein shall be deemed to end at 5:00 p.m., Eastern Standard Time.

(k) Time of Essence. Time is of the essence of every provision of this Agreement of which time is an element.

(l) Effective Date of this Agreement. The Effective Date of this Agreement shall be the last date on which fully-executed Agreements or counterpart signature pages have been delivered.

(m) Counterparts; PDF Execution; Drafts not an Offer to Enter into a Legally Binding Agreement. This Agreement may be executed in multiple counterparts (which counterparts may be executed by facsimile) which shall together constitute a single document. However, this Agreement shall not be effective unless and until all counterpart signatures have been obtained. Delivery of an executed counterpart of this Agreement via electronic mail shall be equally as effective as delivery of an original executed counterpart. Any party delivering an executed counterpart of this Agreement by electronic mail also shall deliver an original executed counterpart of this Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability and binding effect of this Agreement. Signature and acknowledgement pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document.

(n) No Third Party Beneficiaries. This Agreement is for the sole and exclusive benefit of the parties hereto and their respective permitted successors and assigns, and no third party is intended to, or shall have, any rights hereunder.

[signatures on the following page]

Signed by the parties under seal as of this _______ day of ___________________, 2022.

SELLER:

TOWN OF WESTBOROUGH,
By its Select Board

_____________________________________

_____________________________________

_____________________________________

_____________________________________

_____________________________________

BUYER:

By:_____________________________________
Name:
Title:

813628/WBOR/0027

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

### Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)

### ATTACHMENT D

RECIPROCAL PROPERTY MANAGEMENT AGREEMENT

Case 1:26-cv-10037-WGY Document 13-2 Filed 02/11/26 Page 233 of 582

# ATTACHMENT D
# RECIPROCAL PROPERTY MANAGEMENT AGREEMENT

MSS/NRTHSIDE/COREA.5

# DECLARATION OF RECIPROCAL COVENANTS, EASEMENTS AND RESTRICTIONS

THIS DECLARATION OF RECIPROCAL COVENANTS, EASEMENTS AND RESTRICTIONS is made this day of ________, 1997, by LESLIE S. CAREY, as Trustee of Northside Realty Trust under a Declaration of Trust dated January 4, 1994 recorded with the Worcester District Registry of Deeds in Book 15975, Page 213, having a mailing address at 55 New York Avenue, Framingham, Massachusetts 01701 (hereinafter referred to as "Grantor").

## PRELIMINARY RECITALS

A. Grantor is the owner of certain premises (the "Shopping Center Site") located on Boston-Worcester Turnpike and Milk Street in Westborough, Worcester County, Massachusetts, shown as Lot 1, Lot 2 and Lot 3 on a plan of land entitled "Compiled Plan of Land in Westborough, MA" dated July 14, 1995, with the latest revision date of February 15, 1996 prepared by Beals and Thomas, Inc., recorded with the Worcester District Registry of Deeds in Plan Book 706, Plan 56 (the "Plan"), and as shown on the Site Plan (defined below) attached hereto and made a part hereof as Exhibit A, and as more particularly bounded and described in Exhibit A-1.

B. Grantor desires to provide for the joint development, operation and use of Lot 1, Lot 2 and Lot 3 as one integrated shopping center.

C. In order to provide for the integrated development, operation and use of Lot 1, Lot 2 and Lot 3, Grantor desires to provide for the benefit and burden, respectively, of Lot 1, Lot 2 and Lot 3, certain rights, easements, servitudes, charges, restrictions, and privileges, all as hereinafter provided.

NOW THEREFORE, the Grantor, for itself, its successors and assigns, declares that Lot 1, Lot 2 and Lot 3, are and shall be sold, conveyed, occupied and owned, subject to and with the benefit of the covenants, conditions, restrictions, easements, charges and liens hereafter set forth.

## ARTICLE I

## DEFINITIONS

### SECTION 1.1. TERMS DEFINED.

Whenever used in this Agreement the terms defined in this Article shall have the meanings ascribed to them in this Article:

(a) "Abutting Highways" shall mean Boston-Worcester Turnpike (Route 9) and Milk Street, and any other road, street, avenue, highway or other public way abutting the Shopping Center Site, or replacing in whole or in part said Boston-Worcester Turnpike or Milk Street.

(b) "Agreement" shall mean this Declaration of Reciprocal Covenants, Easements and Restrictions.

(c) "Common Areas" shall mean all portions of the Shopping Center Site shown on Exhibit A other than where buildings are located or are permitted to be located, and shall include parking areas, entrances and exits, roadways, walkways, sidewalks, traffic lanes, traffic signs, lighting fixture poles, landscaped areas, and other similar areas and facilities.

(d) "Condemnation" or "Condemn" shall mean (i) taking or appropriation of any portion of the Shopping Center Site pursuant to an exercise of the power of eminent domain, and (ii) (but only with the consent of the owners of the Shopping Center Site) any conveyance in lieu of condemnation, or under threat thereof, to a grantee having the power of condemnation with respect to the property in question.

(e) "Driveways" shall mean the areas shown and designated as such on Exhibit A.

(f) "Easement Plan" shall mean the plan dated ________ prepared by ____________, a copy of which is attached hereto as Exhibit C, showing the location of the Shopping Center easements.

(g) "Entrances and Exits" shall mean the portions of the on-site roadways of the Shopping Center Site immediately adjoining and connecting with Abutting Highways.

(h) "Lot 1" shall mean that portion of the Shopping Center Site designated as Lot 1 on the Plan.

(i) "Lot 1 Building" shall mean the building now or hereafter constructed on Lot 1 as shown on Exhibit A hereto and designated thereon as "Cinema Building".

(j) "Lot 1 Owner" or "Owner of Lot 1" shall mean the Owner or Owners (legally and beneficially) of record, at the relevant time, of all or any portions of Lot 1.

(k) "Lot 2" shall mean that portion of the Shopping Center Site designated as Lot 2 on the Plan.

(l) "Lot 2 Building" shall mean the building now or hereafter on Lot 2 as shown on Exhibit A hereto and designated thereon as "Restaurant/Retail".

(m) "Lot 2 Owner" or "Owner of Lot 2" shall mean the Owner or Owners (legally and beneficially) or record, at the relevant time, of all or any portions of Lot 2.

(n) "Lot 3" shall mean that portion of the Shopping Center Site designated as Lot 3 on the Plan.

(o) "Lot 3 Building" shall mean the building constructed on Lot 3 as shown on Exhibit A hereto and designated thereon as "Lot 3 Building".

(p) "Lot 3 Owner" or "Owner of Lot 3" shall mean the Owner or Owners (legally and beneficially) or record, at the relevant time, of all or any portions of Lot 3.

(q) "Common Sidewalk" shall mean the sidewalks (i) connecting the Reserve Parking Area to Milk Street and the parking area to the rear of the Lot 1 Building, (ii) connecting the parking area to the rear of Lot 1 to land now or formerly of Andrew J. Lane Company, and (iii) connecting the parking area on Lot 2 to the parking area on Lot 3, as more particularly shown on Exhibit A.

(r) "Occupant" shall mean any person legally entitled to the use and occupancy of any improvement on the Shopping Center Site, whether a Party or a tenant, subtenant, licensee or concessionaire in the Shopping Center Site.

(s) "Operator" shall mean the Owner of Lot 2 from time to time and any successor thereto designated in accordance with the provision of Section 3.1(H) below.

(t) "Owner" shall mean the owner (legally or beneficially) of record of the fee simple interest in a Parcel or portion of a Parcel.

(u) "Parcel", "Parcel(s)" or "Parcels" means Lot 1, Lot 2 and/or Lot 3, as the context may appropriately require.

(v) "Party" and "Parties" means the Owner of Lot 1, the Owner of Lot 2, and the Owner of Lot 3 from time to time, and their successors and assigns, except that:

(A) successors and assigns of less than a fee simple interest (such as tenants) are not Parties (unless covered by (B) below), and the predecessor or assignor that retains the fee simple title remains a Party;

(B) a Party that retains possession of a Parcel under a mortgage remains a Party, and the mortgagee is not a Party unless it takes possession after a default under the mortgage, provided however, that a mortgagee which takes possession under a so-called conditional assignment of lease shall not be a Party; and

(C) successors and assigns of less than all of a Parcel or of an undivided interest in a Parcel (such as joint tenants or tenants in common) are not Parties, and the predecessor or assignor remains a Party.

A Party ceases to have rights under this Agreement and shall no longer be a Party after it transfers its interest to an assign that qualifies as a Party. A former Party who has assigned or transferred its interest to a successor Party, is released from its obligations under this Agreement only after it (i) transfers its Parcel to a Person who qualifies as a Party; and (ii) pays all amounts and performs all obligations owed to the other Parties at the time of the transfer; (iii) notifies the other Parties of the transfer; and (iv) delivers to the other Parcel Owners an instrument in recordable form pursuant to which the transferee covenants to assume and carry out all of the covenants and obligations of the transferor under this Agreement. Until the transferring Party is so released from its obligations, both the transferring Party and the transferee Party are jointly and severally liable under this Agreement.

(w) "Permits" shall mean a Special Permit dated December 6, 1995 issued by the Town of Westborough Planning Board and recorded with said Deeds in Book ___, Page ___ ; a Conditional Approval for Definitive Plan dated June 26, 1996 issued by the Town of Westborough Planning Board and recorded with said Deeds in Book ___, Page ___; and a variance issued by the Town of Westborough Board of Zoning Appeals dated October 6, 1996, notice of which is recorded with said Deeds in Book 18341, Page 191.

(x) "Permittees" shall mean the officers, director, partners, employees, agents, contractors, subcontractors, customers, patrons, clients, visitors, licensees and invitees of an Occupant.

(y) "Person(s)" shall mean an individual, partnership, firm, association, corporation, trust and any other form of legal entity, and the singular includes the plural.

(z) "Plan" shall mean that certain subdivision plan entitled "Compiled Plan of Land in Westborough, MA" dated July 14, 1995 prepared by Beals and Thomas, Inc., a copy of which plan is attached hereto and made a part hereof as Exhibit B.

(aa) "Protected Area" shall mean that portion of Lot 1 designated as "Protected Area" on Exhibit A.

(bb) "Site Plan" shall mean that certain plan entitled "Stage Coach Plaza Westborough, Massachusetts" dated February 20, 1997, prepared for New England Management & Realty Corp. by Beals and Thomas, Inc., a copy of which is attached hereto as Exhibit A.

(cc) "Shopping Center Site" shall mean Lot 1, Lot 2 and Lot 3.

(dd) "Termination Date" shall have the meaning given to said term in this Agreement.

(ee) "Utility Facilities" shall mean utility facilities (excluding laterals) now or hereafter installed in the Shopping Center Site, providing for water, gas, electricity, sanitary sewer, storm sewer, drainage, telephone or other utility service to the buildings and Common Areas from time to time located on the Shopping Center Site.

**SECTION 1.2. ADDITIONS, REPLACEMENTS OR ALTERATIONS.**

Any reference in any definition to any improvement whatsoever shall be deemed also to be a reference to any reconstruction, alteration or replacement thereof, unless the express language or context of such reference shall otherwise indicate.

## ARTICLE II

## GRANT OF EASEMENTS

**SECTION 2.1. DEFINITIONS AND DOCUMENTATION.**

This Article II sets forth the easements and the terms and conditions thereof which shall be binding upon each of the Parcels and the Owners, Occupants and Permittees thereof, and shall run with the land.

As used in this Article II, the word "in", in respect of an easement granted "in" a particular Parcel, shall be deemed to mean, as the context may require "in", "to" "on", "over", "through", "upon' "across", and/or "under". As to the easements herein granted:

(A) A particular easement in a Parcel shall bind and burden such Parcel which shall, for the purpose of this Article, be deemed to be the servient tenement;

(B) The grant of a particular easement in favor of a Parcel shall benefit such Parcel which shall, for the purposes of this Article, be deemed to be the dominant tenement;

(C) All easements granted in this Article II shall exist by virtue of this Agreement, without the necessity of confirmation by any other documents. However, the Owner of a Parcel shall, as to any easement, at the request of the Owner of any other Parcel, upon the submission of an appropriate document in form and substance reasonably acceptable to the Owner(s), execute and acknowledge such a document memorializing the existence, or the extinguishment (in whole or in part), or the release in respect of all or any portion of any Parcel, as the case may be, of any easement, in accordance with the terms and provisions of this Agreement.

(D) All easements hereby granted are, unless limited herein, irrevocable and shall have the duration herein specified.

SECTION 2.2. EASEMENTS.

(A) EASEMENTS FOR USE OF PARKING AREAS.

(1) The Owners, Occupants and Permittees of each Parcel are hereby granted easements to use the parking facilities and walkways in the Common Areas on the Shopping Center Site for the parking and passage of motor vehicles (so long as, with respect to trucks, there is no unreasonable interference with customer and employee parking), and passage by pedestrians.

(2) The Owners, Occupants and Permittees of each Parcel are hereby granted easements to use those portions of the Lots adjacent to the parking facilities in the Common Areas on the Shopping Center Site designated by the Operator for the storage of snow and ice collected from the removal of snow from the common areas, provided that there is no unreasonable interference with customer and employee parking), the use of the buildings on the Lots and passage by pedestrians.

(3) Except as otherwise provided in this Section, the easements provided in this Subsection (A) shall be for the joint, non-exclusive use of the Parcel Owners, the Occupants and others included as Permittees of any thereof.

(4) The easements provided in this Subsection (A) are perpetual.

(5) The aforesaid easements in the Common Areas on each Parcel for vehicle parking by the Occupants and Permittees of the Parcel(s) to which the easements is (are) appurtenant, are subject to the following limitations:

(a) Occupants' employees may not use such parking easements on the other Parcel(s), unless any portion of the other Parcel has been designated an employee parking area by the Owner thereof;

(b) Such parking easements may be used by a Permittee only as long as the Permittee is patronizing or otherwise has business with any of the Occupants of the Shopping Center Site; and

(c) Lot 2 and Lot 3 may use the respective parking easements to satisfy parking requirements imposed by the Town of Westborough Zoning By-Law to the extent of the aggregate building area now shown on Exhibit A. Without limiting the foregoing, the Owners, Occupants and Permittees of Lot 2 are expressly granted the right and easement to use 15 of the parking spaces located on Lot 3 to satisfy the requirements of the Town of Westborough Zoning By-Law. At the request of the Lot 2 Owner, the Lot 3 Owner shall designate 15 specific parking spaces on Lot 3 for the exclusive use of the Owner, Occupants and Permittees of Lot 2.

(B) EASEMENTS FOR ACCESS.

(1) The Owners, Occupants and Permittees of each Parcel are hereby granted non-exclusive easements in the Driveways and sidewalks of the Common Areas on each Owner's Parcel for access to or from such Parcel by the Owner and the Occupants and Permittees of the Parcel to which such easement is appurtenant; and nonexclusive easements to use the roadways on the Common Areas and the Entrances and Exits on the Shopping Center Site to provide passage by motor vehicles (passenger and truck) and by pedestrians between each Parcel and between the Parcels and the Abutting Highways.

(2) The easements provided in this Subsection (B) shall be for the joint, non-exclusive use of the Parcel Owners, the Occupants and others included as Permittees of any thereof, except that loading docks located adjacent to any premises shall be for the exclusive use of the Occupant thereof and shall not be subject to the access easement granted hereunder.

(3) The easements provided in this Subsection (B) are perpetual.

(C) EASEMENT FOR UTILITY FACILITIES.

(1) The Owner of each Parcel is hereby granted the following easements in the other Parcels for Utility Facilities:

(a) easements for all pipe(s) comprising the Utility Facilities for the purpose of using, operating, maintaining, repairing, relocating, replacing or enlarging any of such Utility Facilities, subject to the provisions of Subparagraph (3) below. The term "pipe(s)", as used in this Subsection (C) shall mean "pipe(s)", and/or "line(s)", and/or "conduit(s)", and/or "wire(s)", and/or

"cable(s)", and/or "other means of providing utility facilities", as the context may require.

(b) easements for the purposes of installing therein in the future, other pipe(s) not part of the Utility Facilities, to provide gas, water, fire loops and hydrants therefor, electric power, other forms of energy, signal, telephone, sanitary sewer and storm sewer services, or any of them, to or from any present or future facilities and for the purpose of using, operating, maintaining, repairing, relocating, replacing or enlarging any or all of such pipe(s), to the extent required by the facilities from time to time on the Parcels, subject to the provisions of Subparagraph (3) below; and

(c) easements for the purpose of installing pipe(s) to connect any and all of the pipe(s) comprising the Utility Facilities with any other facilities to the extent that the connection thereof is necessary to service such facility, and after any such connection, for the purpose of using, operating, maintaining, repairing, relocating, replacing or enlarging any or all of such pipe(s), subject to the provisions of Subparagraph (3) below.

(2) For the purpose of exercising the rights granted in Subparagraph (1) above, each Parcel Owner, and its respective employees, agents and contractors, shall have the right to enter upon and use the other Parcel to such extent and as long as reasonably necessary to accomplish such purposes, subject to the provisions of Subparagraph (3) below.

(3) The rights of any Parcel Owner to do any work under Subparagraph (1) above, to the extent that entry on another Parcel or work on pipe(s) which may be located across another Parcel are concerned shall be subject to the following conditions and requirements:

(a) the location of the easement shall be subject to the reasonable approval of the Parcel Owner on whose Parcel the Utility Facilities are to be located;

(b) not less than thirty (30) days prior written notice shall be given to the other Parcel Owner(s) that the Parcel Owner anticipates doing such work, together with notification of the proposed area of such work, and the anticipated date of start and completion of such work; but if the work involved is emergency repair work, only such advance notice, written or oral, as is reasonably practical, needs to be given;

(c) after such work, the pipe(s) in question shall be underground and not beneath or reasonably close to any buildings on the other Parcel, but this Subparagraph (c) shall not require the moving of any pipe(s) installed prior to the date of execution hereof, nor permit any such work, if, as the result thereof, any Person(s) utilizing the Utility Facilities to provide utilities to or from improvements owned by it would be required to relocate any connection between the Utility Facilities and such improvement in order for such Person to continue to be able to utilize the Utility Facilities therefor, or if its ability so to utilize the same is otherwise materially adversely affected unless all such Person(s) shall consent to such work or the Parcel Owner proposing such work shall agree (and place the money therefor in escrow, if reasonably required by such Person[s]) to pay all costs (direct or indirect) which will be incurred by such Person(s) as a consequence of the performance of the work by such Parcel Owner;

(d) after the completion of such work, the Parcel Owner shall, at its own cost and expense, restore the portion of the other Parcel so used to as good condition as the same was in immediately prior to the commencement of such work; and

(e) the Parcel Owner shall exercise best efforts to minimize interference with use and enjoyment the other of Parcel by the Owner(s) of such Parcel.

(4) The easements granted pursuant to this Subsection C shall be located in the areas shown on the Easement Plan but, notwithstanding the foregoing, each Parcel Owner shall have the right to relocate any pipe(s) located on its parcel pursuant to an easement granted by this Subsection (c) within the applicable "Easement Relocation Area" shown on the Easement Plan if reasonably deemed by it to be necessary for the use and enjoyment of its parcel and if it complies with the conditions in Subparagraph (3) above.

(5) The easements provided in this Subsection (C) are perpetual.

(D) **EASEMENT FOR SELF-HELP.**

The Owner of each Parcel, its employees, agents and contractors, are hereby granted easements to enter upon the other Parcels for the purpose of performing any obligation which the other Parcel Owner is required to perform on the other Parcel, pursuant to the terms of this Agreement, but which such other Parcel Owner fails or refuses to perform and which the non-defaulting Parcel Owner has the right then so to perform under Section 7.2 hereof, provided that the defaulting Parcel Owner is first served with notice and allowed the period of time set forth in Section 7.2 hereof to cure such default.

The Owner of each Parcel, its employees, agents and contractors, are hereby granted easements to enter upon the other Parcels for the purpose of performing any obligation which the Operator is required to perform pursuant to the terms of this Agreement, but which such Operator fails or refuses to perform and which the other Parcel Owners have the right then so to perform under Section 3.1(I) hereof.

In exercising the easements granted pursuant to this Subsection (D), the Parcel Owners shall use reasonable efforts to minimize any interference with or interruption of business conducted on the other Parcels.

The easements provided in this Subsection (D) are perpetual.

**SECTION 2.3. SIGNS.**

(A) Except as the parties may hereafter agree and as proved in Paragraph (B) below, no free standing signs shall be erected in the Shopping Center Site other than a pylon sign and a box sign at the locations shown therefor on Exhibit A hereto.

(B) If at any time in the future, necessary approvals and permits are obtained for the construction of a pylon sign at the entrance to Lot 1 on Milk Street listing any tenants (as opposed to a sign merely identifying the Shopping Center Site), then the Owner of Lot 2 and the Owner of Lot 3 shall each have, as appurtenant to their Lot, for the use of the Occupants of Lot 2 and the Occupants of Lot 3, an easement to install illuminated panel signs on such pylon sign at positions thereon located beneath any panel sign(s) installed by any Occupant(s) of Lot 1. Such signs shall be limited to identifying the Occupants of Lot 2 and Lot 3, and shall conform to all applicable rules, regulations and by-laws of the Town of Westborough. The panel signs erected on the pylon sign shall be maintained by the Occupants utilizing such signs at the sole cost and expense of such Occupants.

(C) The Owner of Lot 1 and the Owner of Lot 3 shall each have, as appurtenant to their Lot, for the use of the Occupants of Lot 2 and the Occupants of Lot 3, an easement to install illuminated panel signs on the pylon sign at the entrance to Lot 3 on Boston-Worcester Turnpike (Route 9) at positions thereon located beneath the reader board installed by any Occupant(s) of Lot 1. Such signs shall be limited to identifying the Occupants of Lot 2 and

Lot 3, and shall conform to all applicable rules, regulations and by-laws of the Town of Westborough. For so long as Lot 1 is used for a cinema, the Owner of Lot 1 shall have as appurtenant to Lot 1 for the use of the Occupants of Lot 1 an easement to use the reader board on such pylon sign for the designation of films showing in the Lot 1 Building and the owner of Lot 1 shall maintain such reader board at its sole cost and expense.

(D) No exterior signs shall be erected or placed on any premises in the Shopping Center Site except non-flashing and non-moving signs which, in size and number, shall have a reasonable relationship to the premises to which they relate, and which comply with all local zoning and other applicable governmental requirements. Neither the Parcel Owner nor any tenant or Occupant of the Shopping Center Site shall paint signs on or affix paper signs to any part of the exterior of the buildings in the Shopping Center, or in any windows. All exterior signs shall be placed upon the marquee or against the parapet of each store. Notwithstanding any of the foregoing provisions of this Section, any national or regional "chain store" tenant may have a reasonable number of signs designating its parcel pick-up stations(s) (if any) and non-moving, non-flashing signs on the exterior of its store of the same number, size, design and degree of illumination as are customarily utilized by it for a majority of its other stores of substantially the same size. All Parcel Owners shall engage only the sign company or companies designated from time to time by the Operator for the erection and placement of signs in the Shopping Center or shall obtain the prior written approval of the Operator to use any other sign company or companies.

**SECTION 2.4. AMENDMENT OF EASEMENTS.**

Any of the easements, rights or licenses granted hereby may only be released, extinguished, amended, waived or modified by instrument in recordable form, executed by all of the Owners with the written consent of the holders of all mortgages encumbering the Parcels and recorded.

**SECTION 2.5. CONTROL.**

Each Party may, utilizing reasonable means, exclude unauthorized persons or prevent unauthorized acts in the Common Areas. Each Party may restrict access to its Parcel on any one day that the Occupant(s) of the other Parcel are not open for business as necessary to prevent the acquisition of prescriptive rights by anyone, but shall notify the other Party of its planned closing and shall coordinate the closing with the other Party to minimize interference with the operation of the Shopping Center Site.

Case 23-14067-DJL Doc 1062 Filed 02/11/24 Entered 02/11/24 12:25:37 Page 245 of 290

## ARTICLE III

## MAINTENANCE, MANAGEMENT AND OPERATION OF SHOPPING CENTER COMMON AREA AND COMMON UTILITY FACILITIES

### SECTION 3.1. COMMON AREA OPERATION AND MAINTENANCE.

(A) Commencing on the date that the first Occupant within the Shopping Center Site opens for business (the "Operation Commencement Date"), the Lot 2 Owner (for purposes of this Section 3.1 called the "Operator"), shall, until it shall be removed for cause, elect otherwise, in both cases in accordance with the provisions of Section I below, operate and maintain or cause to be operated and maintained the Common Area of the Shopping Center Site in accordance with, and subject to, the terms and conditions of this Section 3.1. Such operation and maintenance of the Common Area shall include, but not be limited to:

(1) Maintaining the surfaces of the driveways, entrances and exits, parking areas and common sidewalks in a level, smooth and evenly covered condition with the type of surfacing material originally installed or such substitute as shall in all respects be equal in quality, use, and durability;

(2) Maintaining the bridge for the driveway connecting Lot 2 to Lot 3;

(3) Maintaining the sewage pump station located on Lot 3 (unless and until the same shall be maintained by public authority);

(4) Removing all papers, debris, and refuse and sweeping the Common Area to the extent reasonably necessary to keep the Common Area in a neat, clean, and orderly condition;

(5) Placing, keeping in repair, and replacing any necessary directional signs, markers, and lines, and operating, keeping in repair, and replacing when necessary such artificial lighting facilities as shall be reasonably required (such lighting to be operated during those hours of darkness when any Occupant is conducting its business within the Shopping Center and until one (1) hour after closing of business; provided, however, that if illumination is required by any Occupant after ten (10) o'clock p.m., such Occupant shall pay for the cost of such illumination on a pro rata basis with any other Occupants also requesting such additional illumination, such pro rata basis to be in accordance with the square footage of the premises of such Occupants);

(6) Maintaining all Utility Facilities used to provide services to more than one Lot (unless maintained by any public authority);

(7) Paying any utility costs for which the Common Area may be separately metered if such is the case;

(6) Maintaining all landscaped areas, making such replacements of shrubs, and other landscaping as is necessary, and keeping said areas at all times adequately weeded, mowed and watered, except for such of the same as shall be the responsibility of the Lot Owners pursuant to Section 3.3 hereof;

(8) Maintaining the box and monument or pylon signs (other than the panels to be maintained by the Lot Owners) located within the Common Area as shown on Exhibit A in good order and condition;

(9) Snow and ice removal from and the sanding of driveways, parking areas, exits and entrances and Common Sidewalks;

(10) All costs incurred with respect to, and the perpetual maintenance of, the traffic signal at the intersection of Oak Street and the entrance to the Shopping Center, including, without limitation, any costs or obligations incurred by the Operator pursuant to any traffic signal maintenance agreement between the Operator and the Town of Westborough;

(11) Providing such off-site services as shall be required by the Permits or as otherwise shall be required by applicable public authority for the use of the Shopping Center Site as a whole, as opposed to such of the same as may be required by the particular use made of the Lots by the Owners, Occupants and Permittees thereof; and

(12) The employment of such personnel as is reasonably necessary to accomplish the foregoing and securing such insurance as is required in connection with such employment.

(B) As a part of said operation, the Operator shall obtain and maintain general public liability insurance insuring the Operator and all Parcel Owners, Occupants and the holders of all mortgages encumbering the Parcels, as their respective interest may appear, provided that the Operator is notified in writing of such Occupants and mortgagees, against claims for personal injury, death, or property damage occurring in, upon, or about the Common Area. The limits of liability of all such insurance shall not be less than Ten Million Dollars ($10,000,000.00) combined single limit for personal injury, death, and damage to property. Such liability insurance policy shall be primary to any other liability policy carried by any Parcel Owner and shall include blanket contractual liability coverage for the liability assumed under Section 11.3 hereof. All such insurance shall be maintained in force commencing upon the Operation Commencement Date. The Parcel Owners may agree on higher limits of insurance consistent with standards for first class shopping centers. All of the insurance required to be maintained pursuant to this Subsection (B) shall be

effected under valid and enforceable policies of insurance issued by insurers of recognized responsibility licensed to do business in the Commonwealth of Massachusetts and shall contain an agreement by such insurer to give at least ten (10) days prior written notice to the other Parcel Owners (and any other parties named as insureds therein) in the event of cancellation or material change in the coverage or amount of insurance so provided. A certificate evidencing renewal or replacement of the policies required by this Subsection (B) shall be delivered to each Parcel Owner (and any other party named as an insured under the then existing policy) within ten (10) days after the Operation Commencement Date and thereafter a certificate evidencing the renewal or replacement of the policies required by this Subsection (B) shall be delivered to each Parcel Owner (and any other party named as an insured under the then existing policy) at least thirty (30) days prior to the expiration thereof.

(C) The Operator shall, from time to time, but not more often than once each calendar month, send to each Parcel Owner a written statement of the total costs and expenses of operation and maintenance including, but not limited to, those items set forth in Subsections (A) and (B) hereof and any expenses allocated in accordance with Subsection (E) below (said statement to be accompanied by such bills, invoices, and other documentation as shall be necessary for proper analysis of such expenses). The Operator shall also be entitled to a management fee of ten percent (10%) of the total of such costs for the preceding period. Within thirty (30) days after receipt of such statement, each Parcel Owner shall pay, or cause to be paid, to the Operator its pro rata share of the total amount of said costs and expenses as set forth in Subsection (D) below. In the alternative, the Operator may elect to estimate the total costs and expenses of such maintenance and operation and the corresponding management fee on an annual basis and to render to each Parcel Owner a written statement of pro rata share of the same. Until such estimate shall be revised or such method of estimation shall be terminated by the Operator, each Parcel Owner shall pay to the Operator 1/12 of its pro rata on the first day of each month thereafter. At the end of the year chosen by the Operator for billing on an estimated basis, or at such earlier time as the Operator shall elect to cease billing on an estimated basis, Operator shall calculate the actual amount of such costs and expenses incurred during such period and refund any excess to the Parcel Owners or bill the Parcel Owners for their pro rata share of any deficiency and the Parcel Owners shall pay the Operator the same within thirty days after such bill. Notwithstanding the foregoing, for so long as the Owner of Lot 2 is the Operator, the Operator shall be entitled to a minimum management fee of $41,872.00 per annum. Immediately following any calendar year in which the management fee billed to the Parcel Owners in accordance with the foregoing shall be more than $41,872.00, the Parcel Owners shall thereupon pay to the Operator their pro rata share of the difference between the amount billed and $41,872.00.

(D) In the event that the Operator reasonably shall determine that any item of work for which Operator is responsible will cost more than $25,000.00 in the aggregate, Operator may assess the Lot Owners for their proportionate share thereof prior to the commencement of such work by written notice of assessment to the Lot Owners. Each Lot Owners share of such assessment shall be due and payable to the Operator within 15 days after the receipt of such notice of assessment.

(E) The Common Area maintenance expense, including any assessment therefor, shall be prorated among the Parcel Owners as follows:

| | |
|---|---|
| Lot 1 | 57.6% |
| Lot 2 | 35.8% |
| Lot 3 | 6.6% |
| Total | 100% |

The foregoing percentages shall be each Parcel Owner's "proportionate share" of Common Area maintenance expense.

Notwithstanding the foregoing, certain of the costs and expenses of the operation and the maintenance of the Shopping Center shall be allocated to the various Parcel Owners as follows:

1. All of the costs of providing police details or traffic control measures required by the Permits or otherwise required on account of the operation of a theatre on Lot 1 will be allocated to the Lot 1 Owner.

2. The costs of maintaining those portions of the pylon sign identifying the theatre on Lot 1 and the films being exhibited in the Lot 1 building (as opposed to the structure of the same) will be allocated to the Lot 1 Owner. The costs of those portions of the pylon sign identifying the occupants of Lots 2 and 3 shall be allocated to the Owner of Lots 2 and 3. The Operator shall include any such changes in the written statements provided for in Subsection (c) above.

F. If any Parcel Owner shall fail to pay in a timely manner its pro rata share of the Common Area maintenance expenses, the same shall be deemed delinquent, and the amount thereof shall bear interest thereafter at the rate provided in Section 7.1 until paid. Any and all delinquent amounts with said interest shall be a lien and charge upon all of the property of such Parcel Owner in accordance with Section 7.3 hereof.

G. Nothing contained in this Section 3.1 shall affect the right of any Parcel Owner to assess its Occupant(s) for Common Area maintenance expenses and for such management fees as the owner deems appropriate, subject, however, to any limitations contained in its rental agreement(s) with any such Occupant(s).

H. The Operator shall indemnify, defend (if requested), and hold the other Parcel Owners harmless from all claims and losses, and all costs and expenses relating thereto (including reasonable attorney's fees) arising out of or from (a) any occurrence in the Common Area, unless the claim or loss results from the negligence of another Parcel Owner or the Occupants of such other Parcel Owner's Parcel, or (b) any failure by Operator to perform imposed on the Operator under this Agreement, or the breach of such obligation.

I. Notwithstanding any preceding provisions of this Section 3.1 which may be to the contrary, should the Owner of Lot 2 elect to resign as Operator by written notice to either one of the other Parcel Owners, the Parcel Owners shall, within thirty (30) days thereafter, proceed to reach an agreement among themselves as to who shall assume the duties, obligations rights, and remedies of the Operator set forth herein. In the event that such agreement has not been reached within said thirty (30) day period, then the Parcel Owners shall employ an independent party or entity as the new Operator to assume the rights and obligations provided for hereunder. Any agreement of the Parcel Owners hereunder shall require the agreement of the owners of not less than sixty percent (60%) of the proportionate share of the Common Area maintenance expense of the Shopping Center, based upon the ground floor area of the buildings on each Parcel Owner's Parcel.

In addition to the foregoing, the Parcel Owners shall have the right to remove the Operator "for cause" pursuant to the following provisions:

1. The Parcel Owner's owning not less than sixty percent (60%) of the proportionate share of the Common Area maintenance expense of the Shopping Center may remove the Operator upon thirty (30) days prior written notice; and

2. For so long as Lot 2 and Lot 3 are in common ownership, if the Lot 1 Owner, in its reasonable judgment, feels that Operator's maintenance and operation of the Common Areas does not meet the general shopping center standards prevailing in the market area in which the Shopping Center is located, the Lot 1 Owner shall notify Operator specifying the Lot 1 Owner's reasons. Operator shall have a period of sixty (60) days after receipt of the Lot 1 Owner's notice within which to attempt to cure the problems set forth in the Lot 1 Owner's notice. Prior to the end of the sixty (60) day period, Operator and the Lot 1 Owner agree to discuss the corrective actions taken by Operator. In the event, the Lot 1 Owner, in the Lot 1 Owner's reasonable judgment, still feels that Operator's maintenance and operation of the Common Areas does not meet general shopping center standards, the Lot 1 Owner shall have the right, upon not less than thirty (30) days prior written notice to Operator, to assume the maintenance obligations of Operator pursuant to this Agreement and the Lot 1 Owner must honor, pay and perform all outstanding maintenance contracts (of not more than one year in duration) that Operator had entered into in good faith, unless such maintenance contracts may be terminated without cost to the Operator.

J. In addition to the foregoing, except to the extent that any such failure is caused by any of the causes set forth in Section 7.5 hereof, if the Operator shall fail to perform its maintenance obligations hereunder or fail to provide the required insurance, then any other Parcel Owner may, upon ten (10) days' prior notice to the Operator, do so, and the curing Parcel Owner may then bill the Operator for the expense incurred. If immediate remedial action is necessary to protect the interest of a Parcel Owner in the Shopping Center Site or its Parcel, or to prevent the interruption or further interruption of the conduct of business on such Parcel Owner's Parcel or in the Shopping Center Site (including, without limitation, interruption which may result if snow is not removed promptly from the paved parking areas

or if burned out or malfunctioning parking lot lighting is not promptly repaired), or to prevent injury to persons or damage to property, than a Parcel Owner may cure a default by the Operator without the requirement of the ten (10) day notice hereunder, but after oral or written notice to the Operator.

If the Operator shall not pay said bill within fifteen (15) days, the curing Parcel Owner shall have a lien on the property of the Operator for the amount of said bill, which amount shall bear interest at the rate set forth in Section 7.1 hereof until paid; provided, however, that such curing Parcel Owner shall also have the right to bill the other Parcel Owners for their pro rata shares of the costs incurred, and provided, further, that any such lien shall be subject to the provisions of Section 7.3 below. The foregoing shall not be construed as preventing the Operator from assessing the other Parcel Owners for their pro rata share of the amounts reimbursed by the Operator to the curing Parcel Owner (except as to any amounts previously paid by the other Parcel Owners directly to the curing Parcel Owner pursuant to the foregoing); provided, however, that the Operator shall not be entitled to a management fee as to such amounts and shall not be entitled to reimbursement for any interest or collection costs paid by the Operator to the curing Parcel Owner.

K. In the event that an Operator ceases to have an obligation to perform the duties described herein, said Operator shall cease to have any liability or responsibility for any acts, events, or circumstances occurring subsequent to and not as a result of its performance or non-performance of its duties while Operator.

L. During any period of time when no person is obligated to maintain the entire Common Area, each Parcel Owner shall have the obligation to maintain its own Parcel in accordance with Subsection (A) above.

SECTION 3.2. LIABILITY INSURANCE.

Each Parcel Owner shall cause to be maintained general liability insurance against claims of bodily or personal injury and death and property damage occasioned by accident or other event occurring in or upon, or resulting from a condition existing upon, or arising from its Parcel, with limits of at least $10,000,000 (combined single limit). Such liability insurance policy shall be primary to any other liability policy carried by any Parcel Owner and shall include blanket contractual liability coverage for the liability assumed under this Agreement. All such insurance shall be maintained in force commencing upon the date of the execution of this Agreement. The Parcel Owners may agree on higher limits of insurance consistent with standards for first class shopping centers. All of the insurance required to be maintained pursuant to this Subsection (D) shall be effected under valid and enforceable policies of insurance issued by insurers of recognized responsibility licensed to do business in the Commonwealth of Massachusetts and shall contain an agreement by such insurer to give at least ten (10) days prior written notice to the other Parcel Owner (and any other parties named as insureds therein) in the event of cancellation or material change in the coverage or amount of insurance so provided. A certificate evidencing renewal or

replacement of the policies required by this Subsection (D) shall be delivered to each Parcel Owner (and any other party named as an insured under the then existing policy) within ten (10) days after the date of recording of this Agreement and thereafter a certificate evidencing the renewal or replacement of the policies required by this Subsection (D) shall be delivered to each Parcel Owner (and any other party named as an insured under the then existing policy) at least thirty (30) days prior to the expiration thereof.

**SECTION 3.3. MAINTENANCE OF SHOPPING CENTER SITE.**

Each Parcel Owner, at its sole cost and expense, shall maintain the exterior of the improvements (whether or not occupied) on its Parcel and unimproved areas in a clean and neat condition, including:

(A) Sidewalks - maintaining the sidewalks other than the common sidewalks;

(B) Building Landscaping - maintaining the landscaped areas; including mowing, weeding, watering, raking and fertilizing, and promptly replacing unrecoverable diseased or dead plantings;

(C) Canopy, Gutters - maintaining the canopy and the gutters and downspouts on the buildings; and

(D) Rear Building and Canopy Lighting - maintaining the rear building and canopy lighting in good working condition and replacing burned-out bulbs promptly.

**SECTION 3.4. OPERATION OF SHOPPING CENTER SITE.**

Each Parcel Owner shall perform or cause to be performed the following obligations on its Parcel:

(A) Trash - pick up trash and debris daily in and empty trash receptacles and dumpsters serving the Parcel and keep them reasonably free of vermin;

(B) Rear Building and Canopy Lighting - light the rear building from dusk until at least 12:00 midnight each day of the week, and light the canopy lighting from dusk until at least 10:30 p.m. each day of the week; and

(C) Sidewalk - sweep the sidewalks, other than the common sidewalks, weekly and promptly remove snow and ice from the sidewalk.

**SECTION 3.5. ADDITIONAL COVENANTS RESPECTING THE COMMON AREAS.**

The Parcel Owner of Lot 2, acting as the Operator, covenants and agrees to construct, or cause to be constructed, the Common Areas shown on Exhibit A, including, without limitation, the Common Sidewalk, the Driveways, the Entrances and Exits, and the Utility Facilities, which construction shall be substantially complete on or before June 1, 1997, subject to delay for causes set forth in Section 7.5 of this Agreement.

Each Parcel Owner covenants and agrees with respect to its Parcel, as follows:

(A) It will not change, modify or alter the size or location of the Common Areas on its Parcel as shown on Exhibit A hereto, or change the configuration of, alter the location of or reduce the size of, or eliminate any of the parking spaces, driveways, accessways or Entrances and Exits located on its Parcel as shown on Exhibit A.

(B) It will not use or permit the use of the Common Area(s) on its parcel for any purpose other than the parking and passage of vehicles and movement of pedestrian traffic, landscaping, directional and traffic control signals, and it will not construct or locate, or allow construction or location of, any fence, barricade, structure, building, or other obstruction which would interfere with the intended use thereof, or the free flow of traffic to, across or from the parking areas on its Parcel, except to the extent reasonably required for, or appropriate in connection with:

(1) the proper exercise of the easements granted pursuant to Article II hereof, or any rights specifically granted to the Parcel Owners under this Agreement, and

(2) the performance by each Parcel Owner of its maintenance obligations set forth in this Agreement.

(3) the construction and maintenance of such perimeter fences and barricades as shall be required by public authority.

(C) The Common Areas of the Parcels shall not be used for sales of advertising purposes or for the operation of amusement devices.

(D) Each Parcel Owner shall use reasonable efforts to cause its Occupants to cause their employees to park their vehicles in any designated areas on their Parcels, provided that no portion of the Protected Area shall be designated for employee parking.

(E) There shall be no charge made for the use of the Common Areas in addition to the costs to be assessed to the Parcel Owners in accordance with the provisions of this Article IV.

<u>SECTION 3.6.</u> <u>NO ENLARGEMENT.</u>

There shall be no enlargement to any Parcel such that the Shopping Center Site is enlarged.

**SECTION 3.7. ADDITIONAL COVENANTS RESPECTING BUILDINGS.**

No Parcel Owner shall place or erect any structures or improvements on its Parcel except (i) the present and proposed buildings (in the locations therefor) shown on Exhibit A, containing at most, the amounts of ground floor area designated on Exhibit A; (ii) and additions to stores if and to the extent shown on Exhibit A and (iii) subject to the provisions of this Agreement, the Common Areas and Utility Facilities; provided, however, notwithstanding the foregoing, the operator and owner of Lot 2 and Lot 3 expressly reserve, and shall have, the right to enlarge the present and proposed buildings and to construct additional buildings on Lot 2 and Lot 3 respectively, as long as: (a) such buildings do not materially interfere with the driveways, entrances or exits of the Shopping Center; and (b) the total ground floor area of buildings on Lot 2 or Lot 3, as the case may be, does not exceed the maximum amount of ground floor area permitted to be constructed on such Parcels pursuant to the Special Permit (referenced in the definition of Permits above).

No building or structure constructed in the Shopping Center Site shall contain a basement or floor space above the ground floor level except for mezzanines in the Lot 1 Building, provided that any such mezzanine located in Lot 1 Building shall be used solely for non-selling purposes. No covered or uncovered outdoor area shall be placed in the Shopping Center Site unless shown on Exhibit A or located within an area where building is permitted.

Each Parcel Owner agrees that all construction performed by it or on its behalf shall be done in a diligent, good, and workmanlike manner with the use of first class materials, and in accordance with all applicable building and zoning laws and all other laws, ordinances, orders, codes, rules, regulations and requirements of all federal, state, municipal, public and governmental agencies and governments.

**SECTION 3.8. RELEASE OF LIABILITY AND MUTUAL WAIVER OF SUBROGATION.**

(A) Each Parcel Owner (the "Releasing Party") hereby releases each of the other Parcel Owners (the "Released Party") from any liability which the Released Party would, but for this Section, have had to the Releasing Party during the term of this Agreement resulting from the occurrence of any casualty against which the Releasing Party carries insurance, or is required to carry insurance, which casualty may have resulted in whole or in part from any act or neglect of the Released Party, its servants, agents or employees, other than the willful act of the Released Party, its servants, agents or employees; and to the extent permitted by law, each Releasing Party will also release from all such liability any Person holding under the respective Released Party from any such liability

to it, as if such Person were expressly a party to this Agreement with the Releasing Party.

(B) All releases which are the subject of this Section 3.7 shall be effective (i) only for so long as and to the extent that policies (if any) insuring the interest of the Releasing Party hereunder, contain a clause providing in effect that such release will not vitiate or adversely affect such policy or the right of the insured to recover thereunder, and (ii) only for so long as and to the extent that such release is reciprocal as to the Releasing Party. Each Party shall obtain a clause as described in (i) above in each of its policies, if it is available, and if no additional premium is charged therefor. If a Releasing Party maintains insurance and is unable to obtain such a clause, or if a material additional premium is charged therefor, the Releasing Party shall promptly notify the Released Party whereupon the Releasing Party shall have no obligation to obtain such a clause unless, in case a material additional premium is charged therefor, the Released Party agrees to pay the amount of the additional premium within ten (10) business days after notice to the Released Party of the applicability of this sentence and of the additional amount and thereafter promptly pays such amount.

**SECTION 3.9. CLEARING OF AREA.**

If any Parcel Owner shall not be obligated to, and shall elect not to, repair, reconstruct, or replace all or any portion of any improvement on its Parcel damaged by fire or other casualty, such Parcel Owner shall, nevertheless, cause the portion of such improvement not so replaced, reconstructed, repaired or restored to be demolished in its entirety and replaced with paved parking facilities or landscaped area comparable to the paved parking facilities or landscaped area, as the case may be, then existing within the parking areas.

**SECTION 3.10. MECHANICS' LIENS.**

If a mechanic's lien is filed against any Parcel in connection with any work or construction done on another Parcel, the Party permitting or causing the lien to be filed shall take prompt action to protect the Parcel upon which such lien has been filed and the Parcel Owner which owns such Parcel, such action to include removal of such lien if requested by the Parcel Owner of the Parcel upon which such lien has been filed, or if required by any Mortgagee, purchaser or lessee of such Parcel or a portion thereof.

**SECTION 3.11. EFFECT OF CONSTRUCTION ON SHOPPING CENTER SITE OPERATION.**

Each Parcel Owner shall take reasonable necessary safety measures to protect the other Parcel Owner and its Occupants and Permittees from injury or damage by work or

construction performed on its Parcel. Each Parcel Owner shall do its work and construction so that it does not unreasonably interfere with the Occupants and Permittees on the remainder of the Shopping Center Site and shall erect protective fences and other safeguards so that businesses on the other Parcel Owner's Parcels can continue operating during work and construction on its Parcel. Each Parcel Owner shall confine its construction activities to an area within a 10' radius of the building lines for the building(s) on its Parcel as shown on Exhibit A, and all materials and equipment used in such construction shall be stored solely within the boundaries of the Parcel on which such construction is being performed, provided that the Lot 1 Owner shall not store any materials or equipment south of the third row of parking on the southerly side of the Lot 1 Building. Each constructing Parcel Owner shall restore all areas it disturbs on any other Parcel Owner's Parcel to their condition prior to construction.

## ARTICLE IV

## EXCULPATION

No Parcel Owner, and no partner, shareholder, fiduciary or disclosed or undisclosed principal of any Parcel Owner and no officers, directors and stockholders of a Parcel Owner or on the part of the officers, directors and stockholders of any corporate successor in interest of a Parcel Owner or on the part of the members of any firm, partnership, or joint venture if any successor in interest be a firm, partnership, or joint venture (all, in this Article IV, being included in the meaning of the expression "Parcel Owner"), shall be under any personal liability with respect to any of the provisions of this Agreement, and if any Parcel Owner is in breach or default with respect to such Parcel Owner's obligations, or otherwise under this Agreement, the other Parcel Owner shall look solely to the interest of the defaulting Parcel Owner in its Parcel for the satisfaction of any monetary obligations of such defaulting party. It is expressly understood and agreed that each Parcel Owner's liability hereunder for monetary obligations shall in no event exceed such Parcel Owner's equity interest in its Parcel.

No provision of this Article shall be deemed to excuse any default or other breach on a Parcel Owner's part nor shall any right or remedy of any other Parcel Owner be thereby otherwise limited or derogated, including, without limitation, the right to injunctive or other equitable relief.

No provision of this Article shall operate to limit or derogate from each Parcel Owner's rights or remedies as to funds accruing from any eminent domain proceeding or the proceeds of any insurance (for which each Parcel Owner(s) shall remain personally liable) nor shall they render one Parcel Owner liable for the obligations or other liabilities of any other Parcel Owner to others.

Notwithstanding the foregoing, no provision of this Article shall be construed to affect the obligation of the Lot Owners to reimburse the Operator for the costs incurred by

Operator in the performance of its obligations hereunder or to pay the Operator for the associated management fee as provided herein, which obligation shall remain the unlimited personal liability of each Parcel Owner.

## ARTICLE V

## REAL ESTATE TAXES, WATER AND SEWER RENTS AND OTHER CHARGES

### SECTION 5.1. COVENANT TO PAY.

Each Parcel Owner respectively covenants to pay, before any penalty may be added thereto for the non-payment thereof, with respect to its respective Parcel, all real estate taxes and assessments thereon, all water and sewer rents thereon, all utility charges for its Parcel, all assessments hereafter made by governmental authorities for improvements on its Parcel, and all other liens, assessments, impositions, or other charges for the non-payment of which a lien could be imposed upon its Parcel (all of the foregoing being herein called a "Tax").

### SECTION 5.2. RIGHT TO CONTEST OR APPEAL.

Each Parcel Owner, respectively, shall have the right to contest the validity of the amount of any Tax levied against its Parcel by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such tax, pay same under protest, or take such other steps as it may deem appropriate; provided, however, such Parcel Owner shall take no action or defer payment beyond such period as shall cause or allow the institution of any foreclosure proceedings or similar action against its Parcel.

## ARTICLE VI

## CONDEMNATION/FIRE AND CASUALTY

**SECTION 6.1. RESTORATION.**

If any portion of a Parcel is taken by Condemnation, this Agreement shall not be affected thereby, except that the portion of such Parcel so taken shall be relieved and released from the terms of this Agreement, and the Parcel Owner whose Parcel was subject to such Condemnation shall apply the proceeds of the Condemnation Award attributable thereto (subject to the prior rights, if any, of the Mortgagee of such Parcel) and such additional funds as may be necessary, to the restoration of the remaining parking areas on its Parcel as near as possible to the condition which existed prior to the Condemnation.

**SECTION 6.2. WAIVER OF AWARD.**

The provisions of this Article VI are intended to establish the rights as between the Parcel Owners in the event of a Condemnation and such provisions shall not limit, affect or prejudice the claims which may be asserted by the Parcel Owners against the Condemnor. The Condemnation Award in respect of Condemnation, whether before or after the Termination Date, shall, as between the Parcel Owners, belong to the Parcel Owner(s) of the Parcel(s) affected by such Condemnation; provided, however, that each Parcel Owner who enjoys any easement, right or interest created by this Agreement in a Parcel shall be entitled to make its own separate claim against the Condemnor for the value attributable to any such easement, right or interest to the extent that such easement no longer benefits the Parcels not so Condemned, provided that such claim shall not affect the claim of the Parcel Owner of the Parcel affected by such condemnation.

**SECTION 6.3. FIRE INSURANCE.**

Each Parcel Owner agrees to maintain fire and extended coverage insurance in "all risk" form on the buildings located on its Parcel in the full amount of their replacement cost, subject to the maintenance of commercially reasonable and customary "deductibles" and co-insurance provisions.

**SECTION 6.4. DAMAGE.**

(A) If any building in the Shopping Center Site is damaged by fire or other casualty, the Parcel Owner on whose Parcel the building is located shall either promptly (i) repair or rebuild the building to at least its prior condition, or (ii) raze the building, fill in any excavation, pave or plant grass in the area affected by the damage, and perform such other work needed to put the area in a sightly condition.

(B) If any parking area, driveway or other Common Area is damaged by fire or casualty, the Parcel Owner on whose Parcel such area is located shall either promptly (i) repair or rebuild the area to at least its prior condition, or (ii) perform such work needed to put the area in a sightly condition.

(C) Notwithstanding the foregoing, the following provisions will apply to damage to the Lot 1 Building resulting from fire or other casualty:

1. PARTIAL DAMAGE. In case the Lot 1 Building shall be partially damaged, but not substantially damaged (as that term is hereinafter defined) by fire, by any hazard included within so-called extended coverage and all risk endorsements, or by casualty, the Lot 1 Owner shall forthwith proceed to repair such damage and restore the Lot 1 Building to substantially its condition at the time of such damage (subject, however, to zoning and building laws then in existence).

2. SUBSTANTIAL DAMAGE. In case the Lot 1 Building shall be substantially (as that term is hereinafter defined) damage or destroyed by fire or other casualty, the risk of which is covered by the Lot 1 Owner's Fire Insurance, the Lot 1 Owner shall, proceeding with all reasonable dispatch after such damage and the determination of the net amount of insurance proceeds available to the Lot 1 Owner, expend so much as may be necessary to, repair or rebuild the Lot 1 Building to substantially its condition at the time of such damage or destruction (subject, however, to building and zoning laws then in existence), but the Lot 1 Owner shall not be responsible for any delay which may result from any cause beyond its reasonable control. so long as the Lot 1 Owner has maintained the insurance coverage required hereunder, should the net amount of insurance proceeds to insufficient to cover the cost of restoration, the Lot 1 Owner shall not be responsible for any such insufficiency and shall not required to complete such restoration.

3. SUBSTANTIAL DAMAGE AFTER DECEMBER 31, 2007. However, in case the Lot 1 Building shall be substantially damaged or destroyed by fire any hazard included within so-called extended coverage and all risk endorsements, or by casualty, on or after December 31, 2007, the Lot Owner shall have no obligation under this subparagraph to restore the Lot 1 Building.

4. DEFINITION OF SUBSTANTIAL DAMAGE. The terms "substantially damaged" and "substantial damage" as used in this paragraph shall have reference to damage of such character that the Lot 1 Building cannot reasonably be expected to be repaired or restored within one hundred twenty (120) days from the time that such repair or restoration work would be commenced.

# ARTICLE VII

## DEFAULT, SELF-HELP AND OTHER REMEDIES

### SECTION 7.1. COSTS.

Costs to perform an obligation shall be paid by the Parcel Owner obligated to perform. If a Parcel Owner owes money to another Parcel Owner under this Agreement, the owed Parcel Owner shall submit a bill in reasonable detail to the owing Parcel Owner for its share. The owing Parcel Owner shall pay the amount owed within thirty (30) days after receiving the bill, and the amounts not paid within the thirty (30) days shall bear interest of two percent (2%) a year over the "Prime Rate") (herein defined as the prime interest rate charged by large U.S. money center commercial banks as published Monday through Friday under "Money Rates" in The Wall Street Journal), but in no event above the maximum rate permitted by law. Interest shall be calculated daily on the outstanding principal balance, and the interest rate shall change when the Prime Rate changes. If The Wall Street Journal discontinues publishing the Prime Rate, the Parcel Owners shall agree on a substitute source for the Prime Rate.

### SECTION 7.2. RIGHTS OF SELF-HELP.

If any Parcel Owner (hereinafter the "Defaulting Parcel Owner") fails to perform any of the provisions, covenants or conditions of this Agreement on its part to be performed (including, without limitation, the making of any payment to any other Party which the Defaulting Party has agreed herein to make or the payment of any real estate taxes or assessments) at the time and in the manner herein provided for the performance thereof, then any other Parcel Owner (hereinafter the "Non-Defaulting Parcel Owner") may give to the Defaulting Parcel Owner a notice (the "Default Notice") specifying the alleged default. The provisions of this Section 7.2 shall not apply to the failure of the Operator to perform its obligations under Section 3.1 hereof, which failure shall be governed by the provisions of Section 3.1(I).

In no event may a Parcel Owner terminate this Agreement if another Parcel Owner defaults. Any Parcel Owner may enjoin a Parcel Owner who defaults or who threatens to default, may enjoin an Occupant who violates or threatens to violate any term of this Agreement, and may seek any other available legal and equitable remedies for the default. A Parcel Owner may assess the costs of any suit or proceeding (including reasonable attorneys' fees) to prevent or remedy a default against the defaulting Parcel Owner or the violating Occupant. Any agreement which violates this Agreement shall be void as against this Agreement and may be set aside as it violates this Agreement on the petition of a Parcel Owner. Upon receipt of the Default Notice, the Defaulting Parcel Owner shall remedy the default, within the time period after the giving of the Default Notice as listed below:

| OBLIGATION | TIME PERIOD |
| --- | --- |
| granting utility easements | 60 days (then the requesting Parcel Owner has power of attorney to execute for the granting Parcel Owner) |
| initial construction of Common Areas | 60 days |
| restoring construction damage | 5 days |
| protecting during construction | 5 days |
| building maintenance | 60 days |
| remove trash from buildings | 3 days |
| rear building and canopy lights | 10 days |
| sidewalk sweeping | 7 days |
| removing ice and snow from sidewalks | 4 hours |
| paying real estate taxes and special assessments | any time after delinquency |
| paying other liens and charges against the Shopping Center Site | within five days before the foreclosure date |
| carrying insurance | 15 days |
| other obligations | 30 days |

A Defaulting Parcel Owner shall be in default ("Default") under this Agreement if, and only if, it shall fail to effect such remedial action within the time so limited. If the Defaulting Parcel Owner shall commence such remedial action within the applicable time but shall fail to complete the same within such time for reasons beyond its control, it shall not be deemed to be in default under this Agreement as long as it shall continue to use due diligence to complete such remedial action.

If a Defaulting Parcel Owner is in Default under this Agreement, the Non-Defaulting Parcel Owner may proceed to make payment or take such action as shall be necessary to remedy the Default for the account of the Defaulting Parcel Owner. Thereafter, on demand, the Defaulting Parcel Owner shall reimburse the Non-Defaulting Parcel Owner for the expenses (including counsel fees) incurred by the Non-Defaulting Parcel Owner in paying such sum or taking such action, together with all penalty sums reasonably required to be paid by it, if any, arising from such Default, with interest at the rate provided in Section 7.1. In the case of emergency and if the Defaulting Parcel Owner does not act in an expeditious manner, the Non-Defaulting Parcel Owner may exercise its rights hereunder without the necessity of written notice, as otherwise hereby required (but with telephonic notice, to the extent practicable).

At the time the Non-Defaulting Parcel Owner gives notice to the Defaulting Party as aforesaid, it shall also give notice of such default to all Mortgagee(s) holding a Mortgage(s) encumbering the Parcel owned by the Defaulting Parcel Owner of which the Non-Defaulting Parcel Owner has notice and such Mortgagee(s) shall have the right but not the obligation to cure such default, within the same period of time granted to the Defaulting Parcel Owner to so cure.

**SECTION 7.3. LIEN.**

Any amount due under Section 7.2 from a Defaulting Parcel Owner to a Non-Defaulting Parcel Owner shall, upon recording of a notice of lien, thereafter be deemed to constitute a lien (the "Default Lien") against the Parcel of the Defaulting Parcel Owner.

The Defaulting Parcel Owner shall, at the request of the Non-Defaulting Parcel Owner, execute and acknowledge such instruments as the Non-Defaulting Parcel Owner deems necessary to confirm and record the existence of such Default Lien. Upon failure or refusal of the Defaulting Parcel Owner to execute and acknowledge any such instrument, the Non-Defaulting Parcel Owner shall have full power of attorney with respect thereto. Upon the satisfaction of such obligations for which a notice of lien was recorded, the Non--Defaulting Parcel Owner shall record an appropriate release of such notice of lien upon payment by the Defaulting Parcel Owner of the reasonable costs, including reasonable attorney's fees and filing fees, of preparing and recording such release.

**SECTION 7.4. REMEDIES CUMULATIVE.**

Subject to any provision in this Agreement which states that a remedy is exclusive, any remedies herein specifically provided for are cumulative and shall be deemed additional to any and all other remedies to which a Parcel Owner may be entitled in law or in equity, and shall include the right of setoff and the right to restrain by injunction any violation or threatened violation by the other Parcel Owner(s) of any of the terms, covenants or conditions of this Agreement, and by decree, to compel performance of any such terms, covenants or conditions, it being agreed that the remedy at law for the breach of any such term, covenant or condition (except those, if any, requiring the payment of a liquidated sum) is not adequate.

**SECTION 7.5. FORCE MAJEURE.**

Parcel Owners are excused from performing an obligation under this Agreement while delayed or prevented from performing that obligation by a cause not within its reasonable control (excluding financial inability to pay amounts due under this Agreement, but including breach of this Agreement by another Parcel Owner resulting in such delay or prevention), acts of God, fire, earthquake, flood, explosion, action of the elements,, war, invasion, insurrection, riot, mob violence, sabotage, inability to procure or general shortage of labor, equipment, facilities, materials, or supplies in the open market (if promptly ordered), failure of transportation, strikes, lockouts, action of labor unions, condemnation, requisition, and governmental prohibition or delay. To be excused under this Section 7.5, a delayed Parcel Owner shall notify the other Parcel Owners of such delay within five (5) days after the start of the delay.

## ARTICLE VIII

## NOTICES

**SECTION 8.1. PLACE AND MANNER OF NOTICE.**

Every notice, demand, request, or other communication which any Parcel Owner is required or desires to give or make or communicate upon or to the other Parcel Owner, shall be in writing and shall be mailed by registered or certified mail, postage prepaid, return receipt requested to such address or addresses as the respective Parcel Owner shall at any time, or from time to time, designate by written notice to the other Parcel Owner(s) with a copy by registered or certified mail, postage prepaid, return receipt requested to the address or addresses of the mortgagee(s) of such Parcel Owner of which the other Parcel Owner(s) are aware.

SECTION 8.2. WHEN EFFECTIVE.

Any notice hereunder shall be deemed to have been received on the delivery date endorsed by the Postal Service on the return receipt, except that any notice which is (according to the terms of this Article) correctly addressed but which is returned by the Postal Service as undeliverable shall be deemed to have been received on the earliest date on which the Postal Service attempted delivery as indicated by Postal Service endorsement on the return receipt form.

ARTICLE IX

USE RESTRICTIONS

SECTION 9.1. INTRODUCTION.

No Parcel or part of a Parcel may be used in violation of any restriction set forth in this Article IX, except as expressly provided as an exception to the restriction in this Article IX.

SECTION 9.2. GENERAL.

In order to insure that the parking areas of the Shopping Center Site shall not be overburdened and to preserve the character of the Shopping Center Site as an active center of retail trade offering a variety of goods and services capable of attracting the widest possible spectrum of shoppers, neither Parcel Owner may, while the other Parcel shall be utilized substantially for retail purposes, use or suffer or permit the use of its Parcel for:

(A) for the conduct of a business operation which regularly or with significant frequency sells merchandise of the types of qualifies now commonly known as "odd lot" , "close out", "clearance", "discontinued" , "cancellation", "second" , "factory reject", "sample", "floor model", "demonstrator", "obsolescent", "over-stock", "distressed", "bankruptcy", "fire sale" or "damaged"; or

(B) for any purpose other than the conduct of a "retail business", so-called, which term shall mean the include mail-order catalog store operations of the Sears Roebuck and Montgomery Ward type, banks, finance company businesses, service and self-service dry cleaning and laundry businesses, shoe repair shops, barber shops, beauty shops, dance studios, health salons, and real estate brokerage, stock brokerage and insurance brokerage businesses, travel agencies, and private postal service businesses such as that operated by "mailboxes, Etc.", as well as ordinary retail businesses selling merchandise, provided that the Lot 1 Building may be used for the operation of a movie theater; or

(C) for a stand alone alcoholic beverage ("Bar") business of any kind; provided that any portion of Lots 2 and Lot 3 may be used for a Bar as part of a full service sit down restaurant;

(D) for (a) a "carhop" or "carry-out" restaurant business without reasonably adequate inside seating facilities and which advertises that customers may consume food items while occupying vehicles parked on the parking areas of a Parcel; or (b) a banquet hall business which serves its guests on a special, catered basis as distinguished from a restaurant business open to the public at large on a random basis; or

(E) for any "amusement operation," so-called, which term shall mean and include any activity consisting wholly or in substantial part of the furnishing of entertainment or amusement facilities, whether or not as a business or as a part or aspect of a business (including, without limitation, off-track betting parlors, "penny arcades," amusement games or devices (electronic or otherwise), strip-shows; and "discos", so-called), and live entertainment of any kind, provided that the foregoing shall not be construed to prohibit the operation of a movie theater in the Lot 1 Building or the use of amusement games or devices as a part thereof; or for a massage parlor, so-called or the business of the sale of so-called "adult" material such as, without limitation, magazines, books and photographs; or

(F) for any business using a substantial amount of outdoor space in its regular operations, such as lumber yards, boat sales yards and the like; or

(G) for any office or storage operations except: (a) office and storage operations which are a part of the conduct of a retail business in the shopping Center; and (b) professional offices.

(H) the operation of a hotel, motel or tourist court; or

(I) any automobile or truck sales, storage, service, fueling, washing or repair operation; or

(J) for any propose or business which is noxious or unreasonably offensive because of the regular emission of noise, smoke, dust or odors.

Case 23-14267-MBK Doc 113-2 Filed 04/24/23 Entered 04/24/23 14:25:17 Desc Main Document Page 265 of 290

**SECTION 9.3. LOT 1.**

Except as specifically provided in Exhibit D attached hereto and made a part hereof, Lot 1 may be used for (a) as a theater and public auditorium for use for telecasts, meetings, presentations of motion pictures, and other public presentations and entertainment as are generally shown in theaters; and in the location shown on the Site Plan as "Dream Machine" as an entertainment center such as, but not limited to, those currently being operated under the trade name "Dream Machine," and (b) for other entertainment uses incidental to the primary use of the Lot 1 Building, including, without limitation, the incidental operation of video games and entertainment and vending machines; and (c) for the incidental retail preparation and sale of food, beverages and refreshments for consumption on the Lot 1 Building; provided, however, that no alcoholic beverages shall be sold unless Tenant at its own expense obtains all governmental licenses and permits required, and (d) for the incidental sale of promotional and related items such as records, audio and video tapes, compact discs, books, magazines, toys and novelties; provided, however, that not more than 200 square feet shall be devoted to such sales without Landlord's consent, which consent may be withheld in Landlord's sole and absolute discretion if such additional sales space would violate the exclusive use clauses of the leases of other tenants in the Shopping Center, and Lot 1 shall be occupied, owned and conveyed subject to the restrictions set forth in Exhibit D attached hereto.

**SECTION 9.4. LOT 2.**

Except as specifically provided in Exhibit D attached hereto and made a part hereof, Lot 2 may be used for the operation of a restaurant(s) or for any other lawful retail purposes, and Lot 2 shall be occupied, owned and conveyed subject to the restrictions set forth in Exhibit D attached hereto.

**SECTION 9.5. LOT 3.**

Except as specifically provided in Exhibit D attached hereto and made a part hereof, Lot 3 may be used for the operation of a restaurant(s) or for any other lawful retail purposes, and Lot 3 shall be occupied, owned and conveyed subject to the restrictions set forth in Exhibit D attached hereto.

## ARTICLE X

## TERMINATION

### SECTION 10.1. TERMINATION DATE.

Except for the Parking Area Easements under Section 2.2(A), the Access Easements under Section 2.2(B), the Utility Easements under Section 2.2(C), and the Self Help Easements under Section 2.2(D), which are perpetual, and except for the restrictions set forth in Article IX of this Agreement which are governed by Section 10.2 hereof, this Agreement terminates on the Termination Date, which is the date, sixty (60) years from the date this Agreement is recorded or any earlier date as agreed by all Parcel Owners, and shall continue thereafter for successive periods of ten (10) years, unless any Parcel Owner and the Mortgagee holding a mortgage(s) encumbering the Parcel of such Parcel Owner shall give notice to the other Parcel Owner, at least six (6) months prior to the expiration of the initial sixty (60) year period hereunder or any such ten (10) year extension period hereof, as the case may be, that this Agreement shall terminate as of the end of such initial period or extension period, as the case may be.

### SECTION 10.2. NOTICE OF EXTENSION OF RESTRICTIONS.

A notice of extension of the provisions of Article IX of this Agreement shall be recorded in the Worcester District Registry of Deeds prior to the expiration of thirty (30) years from the date of recording of this Agreement, and prior to the expiration of twenty (20) years from the date of recording of the first notice of extension hereunder, and thereafter prior to the expiration of the term of this Agreement. All such notice(s) of extension shall be in the form and contain the information required by M.G.L. c. 184, §27 (as the same may be from time to time amended) and shall be executed by all of the Parcel Owners.

## ARTICLE XI

## MISCELLANEOUS

### SECTION 11.1. NO WAIVER.

No waiver of any default by a Parcel Owner shall be implied from any omission by such Parcel Owner to take any action in respect to such default in the performance of any term, provision or covenant of this Agreement, nor shall such failure be deemed a waiver of any subsequent default in the performance of the same term, provision or covenants, or any other term, provision or covenant of this Agreement.

**SECTION 11.2. NO RELATIONSHIP OF PRINCIPAL AND AGENT.**

Neither anything contained in this Agreement nor any act of the Parcel Owner(s) shall be deemed or construed by any Parcel Owner or by any third person to create the relationship of principal and agent, of partnership, of joint venture, or of any association between the Parcel Owners, nor shall anything contained in this Agreement or any act of the parties be construed to render either of the Parcel Owners liable for the debts or obligations of the other Parcel Owners, except as specifically provided herein.

**SECTION 11.3. INDEMNIFICATION AND MINIMUM INTERFERENCE.**

Each Parcel Owner shall indemnify, defend (if requested), and hold the other harmless from all claims and losses, and all costs and expenses relating thereto (including reasonable attorney's fees) connected with the use of its Parcel and the operations of the Occupants of its Parcel, unless the claim or loss results from the negligence of the other Parcel Owner or the Occupants of its Parcel. In addition, each Parcel Owner shall indemnify and hold the other harmless on account of any damage or injury caused by such Parcel Owner or by the Occupants of its Parcel as a result of exercising any of its rights or in performing any of its obligations hereunder, except to the extent that such other Parcel Owner or the Occupants of its Parcel shall have caused or contributed to any such damage or injury. Each Parcel Owner shall promptly notify the other Parcel Owner of any claim against the notifying Parcel Owner for which the notifying Parcel Owner intends to seek indemnification as provided herein. Each Parcel Owner further agrees that in exercising its rights hereunder it will do so in a manner so as to minimize the effect or interference with the rights of the other Parcel Owner in and to its Parcel. Each Parcel Owner before exercising any rights hereunder in any other Parcel shall first attempt to use its Parcel to accomplish the intended purpose provided such Parcel Owner can do so in a reasonable and financially practical manner.

**SECTION 11.4. CAPTIONS.**

The captions of the Articles and Sections of this Agreement are for convenience only and shall not be considered or referenced to in resolving questions of interpretation and construction.

**SECTION 11.5. GOVERNING LAW.**

This Agreement shall be construed, interpreted and applied in accordance with the laws of the Commonwealth of Massachusetts.

**SECTION 11.6. AMENDMENT.**

This Agreement may not be altered, modified, amended, renewed, extended or terminated unless by an instrument in writing duly executed by the parties then bound by this Agreement and the holders of all mortgages encumbering the Parcels.

**SECTION 11.7. COUNTERPARTS.**

Several copies of this Agreement shall be signed, and each shall be deemed an original.

**SECTION 11.8. NO GIFT OR DEDICATION.**

Nothing herein contained shall be deemed to be a gift or dedication of any portion of the Shopping Center Site to the general public or for any public purposes whatsoever, it being the intention of the Parties that this Agreement shall be strictly limited to and for the purposes herein expressed.

**SECTION 11.9. COVENANTS RUN WITH THE LAND.**

It is intended that the covenants and agreements set forth in this Agreement shall be construed as both covenants and conditions, and that they shall run with the land and be affirmatively enforceable against the Parcel Owners (but subject to the provisions of the exculpation clause set forth in Article IV above), the Parcels and any grantee, personal representative, heir, successor and assign thereof, and shall continue to be easements, servitudes, charges and encumbrances appertaining to and upon, and covenants benefiting, binding and running with the land, buildings and improvements now or later existing within the Shopping Center Site.

**SECTION 11.10. APPROVALS.**

No Parcel Owner may unreasonably withhold or delay its approval under this Agreement unless this Agreement expressly provides that its approval is discretionary. Unless a different time limit is expressly provided in this Agreement, a Parcel Owner's approval shall be given or withheld within thirty (30) days after it receives the item to be approved, or the item is deemed approved by that Parcel Owner. If a time period shorter than thirty (30) days is provided, the shorter period shall be stated in the request for approval. Failure to state the shorter time period means that a Parcel Owner has thirty (30) days to give or withhold its approval.

**SECTION 11.11. TITLE.**

This Agreement is superior to all liens and encumbrances on the Shopping Center Site except those title exceptions listed in Exhibit F, but the Parcel Owner's rights under Section

7.3 (regarding lien rights) are subordinate to any and all mortgages on any Parcel. The Parcel Owners represent and warrant to each other that the title exceptions listed in Exhibit F do not interfere with or prevent the exercise of the rights and easements granted hereunder, and each Parcel Owner agrees, for the benefit of the other, not to enter into any modification of existing leases or new leases which will permit uses that violate the use restrictions referenced in Article IX hereof.

**SECTION 11.12. ESTOPPEL CERTIFICATE.**

At the request of any other Parcel Owner, each Parcel Owner shall certify to the requesting Parcel Owner's prospective mortgagee or prospective assignee or transferee, whether, to the certifying Parcel Owner's knowledge: (i) there is any default under the Agreement (and, if any, describing the default); (ii) the Agreement has been assigned, modified or amended (and if so, describing it); and (iii) the Agreement as of that date is in full force. Such certification waives any claim of the certifying Parcel Owner based on facts contrary to those asserted in the certificate against any bona fide encumbrancer or purchaser for value to whom the certification was made, and who acted in reasonable reliance on the certificate and without knowledge of the contrary facts.

**SECTION 11.13. RIGHTS AND OBLIGATIONS OF SUCCESSOR AND ASSIGNS.**

The rights in this Agreement are appurtenant to each Parcel and benefit each Person who qualifies as a Parcel Owner under this Agreement. The obligations in this Agreement are equitable servitudes on and covenants running with each Parcel and bind personally each Person who qualifies as a Party under this Agreement (and Article IX regarding use binds the Occupants of the Parcels), except as otherwise provided herein.

**SECTION 11.14. PARTIAL INVALIDITY.**

If this Agreement is invalid or unenforceable in part or under certain circumstances, the rest of this Agreement and its application under other circumstances is valid and enforceable to the fullest extent permitted by law.

IN WITNESS WHEREOF, this instrument has been executed as a sealed instrument as of the day and year first above written.

**TRUSTEES OF NORTHSIDE REALTY TRUST**

______________________________

Leslie C. Carey, as Trustee of Northside Realty Trust and not individually

[acknowledgements]

mss\nrthside\restrict.2

**EXHIBIT D**

**RESTRICTIONS**

The following restrictions shall be applicable to Lot 1, Lot 2, and Lot 3:

1. Recognizing that certain uses create extraordinary demands for the parking capacity at the Shopping Center, no portion of the Protected Area shall be operated as or for: (i) a table service restaurant, (ii) any food service facility in excess of 3,500 square fee, or (iii) any facility utilizing an on-premises alcoholic beverage license. In addition, Landlord shall not permit the operation of a bowling alley, pool hall, skating rink, video store, children's entertainment complex or facility or game room, adult entertainment facility (including, but not limited to an adult bookstore, video store, nude or semi-nude entertainment facility), health club, gym, aerobics or fitness studio in the Shopping Center, or permit the construction of any additional building in any portion of the Protected Area or any expansion of the Shopping Center within the Protected Area. The respective Owners agree that all tenants of the Shopping Center shall be bound by the terms of this Section.

2. No sales of merchandise of any kind and no carnivals or Shopping Center promotions shall be permitted in the parking areas of the Shopping Center.

The following restrictions shall be applicable to Lot 2 and Lot 3:

3. No portion of Lot 2 or Lot 3 shall be used as a movie theater or for the staging of shows for profit.

4. The Lot 2 Owner and Lot 3 Owner will not sell or permit to be sold popcorn in or from any premises (a) within any so-called food court (or the like) located in the Shopping Center, (b) fronting on the corridors and pathways leading between the Late Lighting Area and the Lot 1 Building, or (c) within two hundred (200) feet of any wall of the Lot 1 Building, or in or from any part of the sidewalks, parking areas, any mall areas, or other common areas of the Shopping Center, which prohibition shall not apply to the incidental sale thereof by the operator of any store or restaurant in the Shopping Center within such store or restaurant if and to the extent permitted by such store's or restaurant's occupancy agreement executed heretofore; and

ATTEST: WORC. Anthony J. Vigliotti, Register

# ATTACHMENT E
# DEED

BOOK 19369 PAGE 75

129560

25 W/ mo

QUITCLAIM DEED

97 NOV 21 PM 2:19

LESLIE S. CAREY, as she is Trustee of NORTHSIDE REALTY TRUST under Declaration of Trust dated January 14, 1994 duly recorded with the Worcester District Registry of Deeds on January 14, 1994 in Book 15975, Page 213 having an address c/o New England Management and Realty Corporation, 55 New York Avenue, Framingham, Massachusetts 01701

for consideration paid and in consideration of Nine Million and One Hundred Fifty One Thousand Four Hundred and Forty Nine Dollars and 00/100 ($9,151,449.00)

grants to WESTBOROUGH SPE LLC, a Delaware Limited Liability Company with a principal place of business at c/o Babcock & Brown Administrative Services, Inc., Two Harrison Street, San Francisco, CA 94105

with Quitclaim Covenants, the following described property:

that certain parcel of land, together with any buildings and improvements thereon, located at 231 Turnpike Road, in the Town of Westborough, Worcester County, Massachusetts, which are shown as Lot #1 on a plan entitled "Plan of Land in Westborough, Worcester County,...", dated April 11, 1997, prepared by Beals and Thomas, Inc. recorded with the Worcester District Registry of Deeds, Plan Book 714, Plan 77 and being more particularly bounded and described according to said plan on Exhibit A attached hereto and made a part hereof.

Route 135 at Route 9, Westborough, MA

Said Lot 1 contains 1,277,351 square feet more or less, or 29.324 acres, more or less, according to said plan.

Said Premises are conveyed subject to and together with the benefit of easements, restrictions and other matters of record, insofar as in force and applicable.

Without limitation, said premises are conveyed together with the following:

(i) rights and easements set forth in that certain Declaration of Reciprocal Covenants, Easements and Restriction dated April 9, 1997 and recorded with said Deeds in Book 18745, Page 313 as being for the benefit of said Lot 1 and subject to the rights, easements and restrictions set forth therein as the same affect Lot 1, which are reserved for the benefit of Lots 2 and 3 as shown on said Plan, and (ii) Utility Easement "A", Utility Easement "B" and Utility Easement "D" all as shown on Plan Book 710, Plan 91.

GOULD & ETTENBERG, P.C.
370 Main Street
Worcester, MA 01608
Tel: (508) 752-6733

GUARANTY ABSTRACT Co
Vol 151 Pg 98

BOOK 19369 PAGE 76

Said Premises are conveyed subject to real estate taxes due the Town of Westborough for the 1998 tax fiscal year, which the Grantee hereof assumes and agrees to pay by the acceptance and recording of this deed.

The undersigned hereby certify that (i) Northside Realty Trust is in full force and effect and has not been amended, rescinded or terminated, (ii) that the undersigned is a trustee of the trust and (iii) that the undersigned has been directed by all of the beneficiaries of said trust to execute, seal, acknowledge and deliver this deed.

Grantor intends to convey and does hereby convey a portion of the premises conveyed to Grantor by Deed of Stanley Miller, Trustee dated April 13, 1994 recorded with the Worcester District Registry of Deeds Book 16210, Page 372.

EXECUTED as a sealed instrument the 31st day of October, 1997.

Leslie S. Carey, TEE

Leslie S. Carey, Trustee of
Northside Realty Trust,
and not individually

THE COMMONWEALTH OF MASSACHUSETTS

~~Middlesex~~ Suffolk, ss. October 31, 1997

Then personally appeared before me the above named Leslie S. Carey as she is Trustee of Northside Realty Trust and acknowledged the foregoing instrument to be his free act and deed, before me,

[signature]

~~[illegible]~~ Notary Public
My Commission Expires: 5/19/2000
KENNETH J. MISKIEWICZ

DEEDS REG 20
WORCESTER

11/21/97

TAX · 41730.84
CASH 41730.84

5032A140 14:02
EXCISE TAX ··

EXHIBIT A

METES AND BOUNDS DESCRIPTION

Lot 1
Westborough, Massachusetts
W-45.30

A certain parcel of land in the Commonwealth of Massachusetts, County of Worcester, Town of Westborough situated on the northerly side of Boston Worcester Turnpike, Route 9, and shown as Lot 1 on a plan entitled "Plan of Land in Westborough, Worcester County, ...", dated April 11, 1997, prepared by Beals and Thomas, Inc. More particularly bounded and described as follows:

Beginning at a point in the east bank of the Assabet River at Boston Worcester Turnpike, thence running;

N 30 58 22 W 1123.34 feet to a point, said course being by land now or formerly of Brown Realty Trust, thence turning and running;

N 86 07 42 E 1022.91 feet to a point, thence turning and running;

N 03 52 18 W 501.72 feet to a point, thence turning and running;

N 86 07 42 E 627.83 feet to a point, thence turning and running;

N 58 30 39 E 523.55 feet to a point, said four courses being by land now or formerly of P.V. Davis Construction Company, Inc., thence turning and running;

S 18 32 25 E 9.51 feet to a Worcester County Highway bound, thence turning and running;

S 17 00 25 E 69.96 feet to a point, thence turning and running;

S 15 35 25 E 79.20 feet to a Worcester County Highway bound, thence turning and running;

S 11 50 25 E 63.36 feet to a point, thence turning and running;

S 09 15 25 E 67.32 feet to a Worcester County Highway bound point, thence turning and running;

S 06 35 25 E 66.00 feet to a point, thence turning and running;

S 06 25 25 E 74.57 feet to a Worcester County Highway bound, thence turning and running;

S 05 48 30 E 73.06 feet to a Worcester County Highway bound, thence turning and running;

S 04 09 29 E 190.38 feet to a point, thence turning and running;

BEALS AND THOMAS, INC.

BOOK 19369 PAGE 78

Metes and Bounds Description
Lot 1
Westborough, Massachusetts
W-45.30
Page 2 of 2

Southerly by a curve to the right having a radius of 1000.00 feet and a length of 215.67 feet to a point, said last 10 courses being by the westerly line of Milk Street, thence turning and running;

S 52 34 33 W 376.10 feet to a point, thence turning and running;

S 86 07 42 W 209 07 feet to a point, thence turning and running;

N 49 56 56 W 33.00 feet to a point, thence turning and running;

Northwesterly by a curve to the left having a radius of 335.00 feet and a length of 76.89 feet to a point, thence turning and running;

S 86 07 42 W 213.61 feet to a point, thence turning and running;

N 03 47 36 W 319.22 feet to a point, thence turning and running;

S 86 07 42 W 337.66 feet to a point, thence turning and running;

S 03 52 18 E 112.44 feet to a point, thence turning and running;

S 86 07 42 W 437.86 feet to a point, said last nine courses being by Lot 2, thence turning and running;

S 03 52 18 E 925.00 feet to a point, said course being in part by Lot 2 and in part by land now or formerly of Lillian E. Brown Life Estate, thence turning and running;

S 86 07 42 W 148.31 feet to the point of beginning, said course being by the northerly line of Boston Worcester Turnpike.

Containing 1,277,351 square feet more or less, or 29.324 acres, more or less.

Subject to any and all existing rights and easements of record.

RJB/vmb/004530MB007

The plan referenced herein is recorded herewith as Plan Book 714 Plan 77 .

BEALS AND THOMAS, INC.

ATTEST: WORC. Anthony J. Vigliotti, Register

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

**Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)**

**ATTACHMENT E**

PRICE PROPOSAL FORM

<u>PRICE</u>
*Please write your proposal offer:*

____________________________________________
Print/Type your proposal amount above in written form

____________________________________________
Print/Type your proposal amount above in number form

***Note:*** *Both the written form and the number form should indicate the same total amount. If there is a conflict between the written form and the number form amounts, the written form will control.*

____________________________________________
Name of proposer

____________________________________________
Name of person signing proposal

____________________________________________
Signature of person signing proposal

Date

____________________________________________
Title

____________________________________________
Address

813928/WBOR/0027

**(Note: This form must be included in the proposal submission)**

Case 23-40709 Doc 1 ... Document 43-2 Filed 02/12/26 Page 277 of 582 ... Page 273 of 392

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

**Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)**

**ATTACHMENT F**

**REQUIRED FORMS**

***FORM 1***

**Certificate of Tax Compliance**

Pursuant to Chapter 62C, §49A(b) of the Massachusetts General Laws, I,

__________________________________________authorized signatory for
(Name)

__________________________________________, do hereby certify under the pains and
(Name of Proposer)

penalties of perjury that said proposer has complied with all laws of the Commonwealth of Massachusetts relating to taxes.

Signature: ______________________________

Printed name: ______________________________

Title: ______________________________

Name of Business: ______________________________

Date: ______________________________

813928/WBOR/0027

**(Note: This form must be included in the proposal submission)**

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

**Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)**

***FORM 2***

**<u>Certificate of Non-Collusion</u>**

The undersigned certifies under the pains and penalties of perjury that this bid or proposal has been made and submitted in good faith and without collusion or fraud with any other person. As used in this certification, the word "person" shall mean any natural person, business, partnership, corporation, union, committee, club or other organization, entity or group of individuals.

Signature: ______________________________

Printed name: ______________________________

Title: ______________________________

Name of Business: ______________________________

Date: ______________________________

813928/WBOR/0027

**(Note: This form must be included in the proposal submission)**

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

**Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)**

***FORM 3***

**CERTIFICATE OF AUTHORITY**

Give full names and residences of all persons and parties interested in the foregoing proposal:

(Notice: Give first and last name in full; in case of a corporation, give names of President and Treasurer; in case of a limited liability company, give names of the individual members, and, if applicable, the names of all managers; in case of a partnership or a limited partnership, all partners, general and limited and; in case of a trust, all the trustees)

| NAME | ADDRESS | ZIP CODE |
|---|---|---|
| ____________________ | ________________________________ | __________ |
| ____________________ | ________________________________ | __________ |
| ____________________ | ________________________________ | __________ |

Kindly furnish the following information regarding the Respondent:

**1) IF A PROPRIETORSHIP**

Name of Owner: ____________________________________________

Address: ____________________________________________

Name of Business: ____________________________________________

Home: ____________________________________________

**2) IF A PARTNERSHIP**

Business Name: ____________________________________________

Business Address: ____________________________________________

Names and Addresses of Partners

| PARTNER NAME | ADDRESS | ZIP CODE |
|---|---|---|
| ____________________ | ________________________________ | __________ |

| | | |
|---|---|---|
| ____________ | ____________ | ____________ |
| ____________ | ____________ | ____________ |

**3) IF A CORPORATION OR A LIMITED LIABILITY COMPANY**

Full Legal Name: ____________________________

State of Incorporation: ____________________________

Principal Place of Business ____________________________

Qualified in Massachusetts: Yes ________ No ________

Place of Business in Massachusetts: ____________________________

**4) IF A TRUST**

Full Legal Name: ____________________________

Recording Information: ____________________________

Full names and address of all trustees:

| NAME | ADDRESS | ZIP CODE |
|---|---|---|
| ____________ | ____________ | ____________ |
| ____________ | ____________ | ____________ |
| ____________ | ____________ | ____________ |
| ____________ | ____________ | ____________ |

Signature: ____________________________

Printed name: ____________________________

Title: ____________________________

Name of Business: ____________________________

Date: ____________________________

813928/WBOR/0027

**(Note: This form must be included in the proposal submission)**

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

**Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)**

***FORM 4***

**DISCLOSURE STATEMENT FOR**
**TRANSACTION WITH A PUBLIC AGENCY CONCERNING REAL PROPERTY**
**M.G.L. c. 7C, s. 38 (formerly M.G.L. c. 7, s. 40J)**

The undersigned party to a real property transaction with a public agency hereby discloses and certifies, under pains and penalties of perjury, the following information as required by law:

(1) Real Property:

A parcel of land located at 231 Turnpike Road, Westborough, Massachusetts, with the building and other improvements thereon, containing 29.336 acres of land, more or less, and shown as Lot 1 on a plan recorded with the Worcester South District Registry of Deeds in Book 714, Page 77.

(2) Type of Transaction, Agreement, or Document: Sale of Property by Town

(3) Public Agency Participating in Transaction: Town of Westborough

(4) Disclosing Party's Name and Type of Entity (if not an individual):

(5) Role of Disclosing Party (Check appropriate role):

_____Lessor/Landlord _____Lessee/Tenant

_____Seller/Grantor ___X__Buyer/Grantee

_____Other (Please describe):_______________________________________

**DISCLOSURE STATEMENT FOR**
**TRANSACTION WITH A PUBLIC AGENCY CONCERNING REAL PROPERTY**
**M.G.L. c. 7C, s. 38 (formerly M.G.L. c. 7, s. 40J)**

(6) The names and addresses of all persons and individuals who have or will have a direct or indirect beneficial interest in the real property excluding only 1) a stockholder of a corporation the stock of which is listed for sale to the general public with the securities and exchange commission, if such stockholder holds less than ten per cent of the outstanding stock entitled to vote at the annual meeting of such corporation or 2) an owner of a time share that has an interest in a leasehold condominium meeting all of the conditions specified in M.G.L. c. 7C, s. 38, are hereby disclosed as follows (attach additional pages if necessary):

| NAME | RESIDENCE |
|---|---|
| ____________________________ | ________________________________ |
| ____________________________ | ________________________________ |
| ____________________________ | ________________________________ |

(7) None of the above- named persons is an employee of the Division of Capital Asset Management and Maintenance or an official elected to public office in the Commonwealth of Massachusetts, except as listed below (insert "none" if none):

(8) The individual signing this statement on behalf of the above-named party acknowledges that he/she has read the following provisions of Chapter 7C, Section 38 (formerly Chapter 7, Section 40J) of the General Laws of Massachusetts:

> *No agreement to rent or to sell real property to or to rent or purchase real property from a public agency, and no renewal or extension of such agreement, shall be valid and no payment shall be made to the lessor or seller of such property unless a statement, signed, under the penalties of perjury, has been filed by the lessor, lessee, seller or purchaser, and in the case of a corporation by a duly authorized officer thereof giving the true names and addresses of all persons who have or will have a direct or indirect beneficial interest in said property with the commissioner of capital asset management and maintenance. The provisions of this section shall not apply to any stockholder of a corporation the stock of which is listed for sale to the general public with the securities and exchange commission, if such stockholder holds less than ten per cent of the outstanding stock entitled to vote at the annual meeting of such corporation. In the case of an agreement to rent property from a public agency where the lessee's interest is held by the organization of unit owners of a leasehold condominium created under chapter one hundred and eighty-three A, and time-shares are created in the leasehold condominium under chapter one hundred and eighty-three B, the provisions of this section shall not apply to an owner of a time-share in the leasehold condominium who (i) acquires the time-share on or after a bona fide arm's length transfer of such time-share*

*made after the rental agreement with the public agency is executed and (ii) who holds less than three percent of the votes entitled to vote at the annual meeting of such organization of unit owners. A disclosure statement shall also be made in writing, under penalty of perjury, during the term of a rental agreement in case of any change of interest in such property, as provided for above, within thirty days of such change.*

*Any official elected to public office in the commonwealth, or any employee of the division of capital asset management and maintenance disclosing beneficial interest in real property pursuant to this section, shall identify his position as part of the disclosure statement. The commissioner shall notify the state ethics commission of such names, and shall make copies of any and all disclosure statements received available to the state ethics commission upon request.*

*The commissioner shall keep a copy of each disclosure statement received available for public inspection during regular business hours.*

(9) This Disclosure Statement is hereby signed under penalties of perjury.

______________________________________________________________________

Print Name of Disclosing Party (from Section 4, above)

______________________________________________________________________

Authorized Signature of Disclosing Party                    Date (mm / dd / yyyy)

______________________________________________________________________

Print Name & Title of Authorized Signer

813928/WBOR/0027

**(Note: This form must be included in the proposal submission)**

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

**Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)**

**ATTACHMENT G**

EASEMENT PLAN


Stage Coach Plaza Theather Trails
Trails
Trails on Theather Property
0
200
400
600
Feet

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

## Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)

## ATTACHMENT H

INTERIOR PHOTOGRAPHS




MEN
EXIT


















SENSUS
COMPOUND

Exhibit 7

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

SUPERIOR COURT DEPARTMENT
CASE NO. 2285CV01281

FERRIS DEVELOPMENT GROUP, LLC,

Plaintiff,

v.

TOWN OF WESTBOROUGH, LAX MEDIA, LLC and LAX MEDIA MA, LLC.

Defendants.

SECOND JOINT MOTION TO EXTEND TRACKING ORDER DEADLINES

NOW COME Plaintiff Ferris Development Group, LLC ("Ferris") and Defendants Town of Westborough ("Town"), Lax Media, LLC ("Lax Media"), and Lax Media MA, LLC ("Lax Media MA," and together with the Town and Lax Media, "Defendants," and all collectively with Ferris, the "Parties") and pursuant to Superior Court Rule 9F jointly request this Honorable Court to further extend the tracking order deadlines in this matter by four months.

In support of this motion, the Parties state as follows:

1. Ferris commenced this action on November 14, 2022.

2. On August 15, 2023, the Court allowed the Parties' Joint Motion to Extend Tracking Order Deadlines and set the following deadlines:

| Event | Deadline |
|---|---|
| Completion of Discovery | 1/11/2024 |
| Rule 56 Motions Served by | 2/12/2024 |
| Rule 56 Motions Filed by | 3/12/2024 |
| Final Pre-Trial Conference by | 7/8/2024 |

3. Since that time, the Parties have continued working toward the completion of written discovery and preparation of depositions. Written discovery is largely complete with just a few issues of supplemental document production remaining. Nevertheless, the Parties require additional time to complete such discovery and prepare for depositions with the aid of production of all requested documents.

4. Additionally, since the date on which the Court previously extended the tracking order, an involuntary bankruptcy petition was filed against Westborough SPE, LLC. See In re Westborough SPE, LLC, Bankr. D. Mass. Case No. 23-40709-CJP. That entity was the prior record owner of the property that the Town sold through a Chapter 30B bidding process that gives rise to Ferris's claims in this matter for breach of implied contract and injunctive/declaratory relief. Although the automatic bankruptcy stay provisions of 11 U.S.C. § 362 do not apply to this civil action, recent developments in the bankruptcy proceeding have raised the possibility that the Chapter 7 trustee may seek to avoid the Town's tax title foreclosure judgment, which transferred title to the property to the Town, pursuant to 11 U.S.C. § 548(a). In the event of such avoidance, the Town would potentially be incapable of completing the sale of the property under Chapter 30B, rendering the claims asserted in this matter moot.

5. Finally, personal and professional scheduling issues have arisen with the dates in December and early January previously selected for depositions. Moreover, additional time is required as a result of the upcoming winter holidays (Hanukkah–December 8-15, 2023; Christmas Eve and Day–December 24-25, 2023; and New Year's Eve and Day–December 31, 2023 and January 1, 2024).

6. As such, the Parties seek to further extend all remaining tracking order deadlines by four months, as set forth below:

| Event | Deadline |
|---|---|
| Completion of Discovery | 5/13/2024 |
| Rule 56 Motions Served by | 6/12/2024 |
| Rule 56 Motions Filed by | 7/12/2024 |
| Final Pre-Trial Conference by | 11/8/2024 |

7. This is the second request for extension of the tracking order deadlines in this case.

8. This motion is not made for the purposes of delay.

9. No party will be prejudiced by the allowance of this motion.

WHEREFORE, the Parties by agreement respectfully request that the Court allow this motion to further extend the tracking order deadlines as set forth above.

Respectfully submitted,

PLAINTIFF

FERRIS DEVELOPMENT GROUP, LLC

By its attorney,

*/s/ Thomas A. Mullen (with permission)*
Thomas A. Mullen (BBO# 360315)
Thomas A. Mullen, P.C.
40 Salem Street, Suite 12
Lynnfield, MA 01940
(781) 245-2284
tmullen@thomasamullenpc.com

DEFENDANT

TOWN OF WESTBOROUGH

By its attorneys,

*/s/ Roger L. Smerage*
Thomas W. McEnaney (BBO# 629130)
Roger L. Smerage (BBO# 675388)
KP Law, P.C.
Town Counsel
101 Arch Street
12th Floor
Boston, MA 02110-1109
(617) 556-0007
tmcenaney@k-plaw.com
rsmerage@k-plaw.com

DEFENDANTS

LAX MEDIA, LLC and LAX MEDIA MA, LLC

By their attorney,

*/s/ Christopher M. Mulhearn (with permission)*
Christopher M. Mulhearn (BBO# 628626)
Law Office of Christopher M. Mulhearn, Inc.
1300 Division Road, Suite 304
West Warwick, RI 02893
Tel.: (401) 533-9330
cmulhearn@mulhearnlawri.com

Dated: December 12, 2023

894275/WBOR/0042

CERTIFICATE OF SERVICE

I, Roger L. Smerage, hereby certify that on the below date, I caused a copy of the foregoing Second Joint Motion to Extend Tracking Order Deadlines to be served by electronic mail to the following counsel of record:

Thomas A. Mullen, Esq.
40 Salem Street
Building 2, Suite 12
Lynnfield, MA 01940
tmullen@thomasamullenpc.com
*Counsel for Plaintiff Ferris Development Group, LLC*

Christopher M. Mulhearn, Esq.
1300 Division Road, Suite 304
West Warwick, RI 02893
cmulhearn@mulhearnlawri.com
*Counsel for Defendants Lax Media, LLC and Lax Media MA, LLC*

Dated: December 12, 2023

Roger L. Smerage

Exhibit 8

Gmail

Lolonyon Akouete <info@smartinvestorsllc.com>

## In re Westborough SPE LLC - FOR SETTLEMENT PURPOSES ONLY

**Scott A. Schlager** <sas@natgolaw.com> Thu, Feb 8, 2024 at 5:44 PM
To: "jgoldsmith@gkalawfirm.com" <jgoldsmith@gkalawfirm.com>
Cc: "sgordon@gordonfirm.com" <sgordon@gordonfirm.com>, Lolonyon Akouete <info@smartinvestorsllc.com>, "deniseedwards818@yahoo.com" <deniseedwards818@yahoo.com>, "Lenard B. Zide" <zide@buttersbrazilian.com>

**FOR SETTLEMENT PURPOSES ONLY**

Jonathan,

Thank you for taking the time to speak with me this afternoon. Per your suggestion, and after speaking with Lolo, Denise, and Attorney Zide, I am putting the following Settlement Proposal in writing per our discussion.

1. The Trustee is in receipt of the unclaimed funds from California which approximate $1,293,000.
2. The Trustee would use his best efforts to try and get all creditors paid within approximately 90 days +|- (see caveats below *)
3. The Trustee shall use those CA funds to pay off the creditor claims as follows:
   a. Denise Edwards - $150,000.00 at time of creditor distributions
   b. Lolonyon Akouete:
      i. $250,000.00 at time of creditor distributions
      ii. Remaining proceeds after payment of all creditors estimated to be approximately $150-200k +|- paid to Lolo.
      iii. Lolo would have a right to hire a new lawyer and pursue a claim in an "interpleader" action for the excess sale proceeds from the Real Property sale at 231 Turnpike Road, Westborough, MA turned over by the Town of Westborough at the Closing by the Escrow Agent.
   c. Nathanson & Goldberg, P.C. would be paid its to be filed revised Proof of Claim amount approximately $115k at time of creditor distributions.
   d. Mobile Street Trust to be paid its original proof of claim amount of roughly $367,131.
      i. Mobile Trust to have Town agree to a lien in the amount of $166,500 being placed on 231 Turnpike Road for additional amounts owed under the Reciprocal Easement Agreement to be paid at time of closing of the sale of the real property. If Town would not agree, then Mobile Trust to have a priority lien on sale proceeds in the "interpleader" action.
   e. Darren Clagg to be paid his claim amount
   f. All Other creditors to be paid their claim amount
3. Lolo to not object to Trustees payment of creditors.
4. Lolo to not object to Trustee allowing Town to sell property to their buyer of choice.
5. Land Court case will be dismissed by stipulation of the Trustee and the Town.
6. Federal Case will be dismissed by stipulation of the Trustee and the Town.
7. David Ferris to get paid his claim of $10k plus up to $90k for due diligence costs, etc. (to be paid either by the Town out of the real property sale proceeds or by the Bankruptcy Estate or split). Bankruptcy Trustee to speak with Counsel for Ferris shortly.
8. *All subject to approval by the US Trustee and Judge Panos/Bankruptcy Court; the parties signing necessary

settlement documents/stipulations to be drafted by Trustee

Does this reflect what you propose?

Thank you so much for your assistance.

-Scott

Scott A. Schlager

Partner

Nathanson & Goldberg, P.C.

183 State Street, 5th Floor

Boston, Massachusetts 02109

(O): (617) 210-4800

(C): (617) 909-4511

(F): (617) 210-4824

sas@natgolaw.com

***********************************************

This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

***********************************************

Exhibit 9

CERTIFIED MAIL

LAND COURT
3 PEMBERTON SQUARE, 5TH FLOOR
BOSTON MA 02108-1700

LAND COURT
FILED
21 SEP 24 PM 1:24

BOSTON MA 021
11 JUN 2021 PM 6 L

U.S. POSTAGE PITNEY BOWES
ZIP 02108 $ 006.96⁰
02 4W
0000365600 JUN 11 2021

7190 1706 1970 0098 0878

F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E.
Signatory & Agent for Westborough SPE LLC and Pres.
of Babcock & Brown Adminstrative Services, Inc.
34 Stern Lane
Atherton, CA 94027

D

N4DG
2761
R
VG71

NIXIE 950 DE 1 0009/21/21
RETURN TO SENDER
NO SUCH NUMBER
UNABLE TO FORWARD
NSN
BC: 02108170099 *1821-03136-11-36
94027-5432
02108>1700

PATENT NO. 5,901,903

FORM CML-5.2 Certified Mail Done Fast, Inc.

TEAR FROM BOTTOM UP

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by *(Printed Name)*

C. Date of Delivery

1. Article Addressed to:

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

19 TL 000768
F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E.
Signatory & Agent for Westborough SPE LLC and Pres.
of Babcock & Brown Adminstrative Services, Inc.
34 Stern Lane
Atherton, CA 94027

9290 9901 7061 9701 9339 04

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

2. Article Number *(Transfer from service label)*

7190 1706 1970 0098 0878

PS Form 3811, (facsimile) July, 2015

Domestic Return Receipt

FOLD BACK TO REMOVE CARD

LAW OFFICE OF
IRIS A. LEAHY

COPY

4 OPEN SQUARE WAY, SUITE 217, HOLYOKE, MA 01040
Phone: (413)322-8318 Fax: (413) 322-8661

Iris A. Leahy
attyleahy@outlook.com

Dawn E. Bloom, Of Counsel
attybloom@outlook.com

Audrey Jones, Legal Assistant
audreyj@gmail.com

September 20, 2021

Deborah J. Patterson, Recorder
Land Court, 5th Floor
Suffolk County Courthouse
Three Pemberton Square
Boston, MA 02108

**Re: Return of Service by Sheriff**
**Town of Westborough v. Westborough SPE, LLC, et al.**
**19 TL 000768**

Dear Recorder Patterson:

Please find enclosed, a Sheriff's Return of Service in the above-referenced case upon F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Administrative Services, Inc.

If you have any questions per this matter, please do not hesitate to contact this office.

Sincerely,

Iris A. Leahy, Esq.

Enclosure

[SEAL]

| CITATION BY DEPUTY SHERIFF | DOCKET NUMBER<br>19 TL 000768 | Commonwealth of Massachusetts<br>Land Court<br>Department of The Trial Court |
|---|---|---|

## RETURN OF SERVICE

**(for use by person making service on behalf of Plaintiff)**

I certify that on September 7, 2021 at 11:02am, I served a copy of the within Citation, together with a copy of the Complaint in this case, upon the named Defendant in the following manner (see Mass. R. Civ. P. 4 (d)(1)-(5)):

by leaving at the last and usual place of abode of F. Jan Bluestein a/k/a Jan Blaustein, 34 Stern Lane, Atherton, California, 94027 with a "Limited Assistance Representation (LAR) Document.

Document placed at front gate with knowledge of male who answered electronic intercom

| DATED: | SIGNATURE: |
|---|---|
| September 8, 2021 | x [signature] Jeffrey Diny<br>San Mateo County Registered process Server # 180 - |

**DATED:** 08/17/2021 **RECORDER:** Deborah J. Patterson

[SEAL]

| CITATION BY DEPUTY SHERIFF | DOCKET NUMBER<br>19 TL 000768 | Commonwealth of Massachusetts<br>Land Court<br>Department of The Trial Court |
|---|---|---|

CASE NAME:

Town of Westborough, Plaintiff(s)

v.

Westborough SPE, LLC , et al., Defendant(s)

**TO THE DEFENDANT:**

F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Adminstrative Services, Inc.
34 Stern Lane
Atherton, CA 94027

COURT ADDRESS & PHONE NUMBER

Land Court
Three Pemberton Square
Room 507
Boston, MA 02108

(617)788-7470

The Plaintiff has filed a lawsuit against you in the Land Court. A copy of the Plaintiff's Complaint filed against you is attached to this Citation. **To protect your interests, you must respond to this lawsuit in writing by the DEADLINE TO ANSWER: 10/11/2021.**

If you wish to object or defend against this Complaint, you or your attorney must file a written appearance and an answer. The answer must state clearly and specifically your objection or defense to each part of the Complaint. You must sign the answer "under oath", which means that you swear or affirm the answer is true. This appearance and answer must be filed in the Land Court Recorder's Office at the Court Address shown above, or in the office of the Assistant Recorder at the Registry of Deeds where the land is located on or before the deadline. You must also serve your answer upon the Plaintiff at the service address below on or before the deadline. If you do not respond, you may lose the chance to tell your side, and the Court may decide the case against you by default and award the Plaintiff everything asked for in the Complaint.

**To the Plaintiff:**

The Court **ORDERS** the Plaintiff to serve a copy of this Citation along with a copy of the Complaint upon the above-named Defendant by deputy sheriff at least fourteen (14) days prior to the deadline to answer. Plaintiff shall give this Citation and copy of the Complaint to the appropriate deputy sheriff where the Defendant is to be served, and is responsible for paying the sheriff's fee, except in Registration/Confirmation cases. The deputy sheriff's return of service must be completed on this Citation and then the Citation shall be submitted to the Land Court.

**SO ORDERED.** **Attest:**

**By the Court:**

| WITNESS | DATE ISSUED: | RECORDER: Deborah J. Patterson |
|---|---|---|
| Hon. Gordon H. Piper, Chief Justice | 08/17/2021 | Deborah J. Patterson |

PLAINTIFF'S SERVICE ADDRESS

Iris Ann Leahy, Esq.
Law Office of Iris A. Leahy
4 Open Square Way
Suite 217
Holyoke MA 01040
(413)322-8318

## AFFIDAVIT OF SERVICE

**State of Maryland** **County of** **Commonwealth Of Massachusetts Court**

Case Number: 19 TL 000768

Plaintiff:
**Town Of Westborough**

vs.

Defendant:
**F. Jan Bluestein**

For:
Iris Ann Leahy, Esq.
Law Office Of Iris A. Leahy
4 Open Square Way
Suite 217
Holyoke, MA 01040

Received by Are You Being Served?, Inc. on the 26th day of August, 2021 at 12:00 pm to be served on **F. Jan Bluestein a/k/a Jan Blaustein, 34 Stern Lane, Atherton, CA 94027**.

I, Jeffrey Pink, being duly sworn, depose and say that on the **7th day of September, 2021** at **11:02 am**, I:

**SUBSTITUTE** served by delivering a true copy of the **Citation By Deputy Sheriff; Limited Assistance Representation (LAR) Document.** with the date and hour of service endorsed thereon by me, to: **"John Doe"** as **Tenant** at the address of: **34 Stern Lane, Atherton, CA 94027**, the within named person's usual place of **Abode**, who resides therein, who is fifteen (15) years of age or older and informed said person of the contents therein, in compliance with state statutes.

I Certify, Under The Laws Of The State Of California, That The Above Information Is True And Correct Under Penalty Of Perjury.

9-7-2021

**Jeffrey Pink**
180

**Are You Being Served?, Inc.**
**1325 Howard Avenue**
**PMB 507**
**Burlingame, CA 94010**
**(650) 348-7378**

Our Job Serial Number: AYB-2021001686
Ref: TOWN OF WESTBOROUGH
Service Fee: $90.00

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2d

Exhibit 10

THE TRIAL COURT OF MASSACHUSETTS
LAND COURT

Three Pemberton Square
Boston, MA 02108

**Gordon H. Piper**
Chief Justice

**Jill K. Ziter**
Deputy Court Administrator

# Land Court Statement on *Tyler v. Hennepin County, Minnesota*

On May 25, 2023, the U.S. Supreme Court decided the case of *Tyler v. Hennepin County, Minnesota*, No. 22-166. In this case, the Minnesota county government seized a homeowner's property for unpaid taxes and then sold it. The government kept the full price from the sale—even though the sale brought in more money than the tax debt owed. The amount that exceeds the tax debt owed is sometimes called the "home equity." The Supreme Court decided that when the taxing authority keeps these "excess" or "surplus" funds from the foreclosure sale, the authority has made a "taking," in violation of the Fifth Amendment of the U.S. Constitution, which says that government cannot take private property without paying just compensation. The constitutional violation arose not when the county seized the property, but when it kept the full sale value of the property, above the tax debt, without paying compensation to the former owner.

Current Massachusetts tax laws do not address if or what money is owed to a property owner after the foreclosure is final. But the *Tyler* case makes clear that, under the U. S. Constitution, property owners will be owed compensation from a tax foreclosure—if the property taken by the government is worth more than the tax debt owed.

> **Property owners who are undergoing tax foreclosure should be aware of their right to claim compensation for their "home equity"—the excess value of the property above the amount of the tax debt.**
>
> **Cities, towns, and other plaintiffs bringing tax foreclosure cases will now need to ensure they comply with these constitutional protections and provide just compensation to property owners.**

The Massachusetts legislature, municipal government officials, and the courts each are assessing the impact of the *Tyler* opinion on Massachusetts law and practice. There are a variety of ways the legislature might revise the tax foreclosure statutes in Chapter 60 to respond to *Tyler*. Several bills are pending. In tax foreclosure cases pending before the Land Court, the court will address any motions or other pleadings that may be filed based on the *Tyler* decision. Other state laws, procedures, or mechanisms now in place may let property owners claim compensation for taken property, *see e.g.*, Chapter 79.

> **If you are facing a tax foreclosure, you should talk to an attorney to learn more about your options, including how to keep your property (redeem) or claim compensation for your home equity. Redemption is an important option that allows property owners to avoid foreclosure and keep their property by paying all taxes, interest, and costs due in full or through a repayment plan.**
>
> **If you cannot afford an attorney, you may be eligible for FREE legal advice or representation from a lawyer referred through the Land Court's Tax Lien Foreclosure Legal Assistance Program. For more information, contact Sean Thekkeparayil at the Lawyers Clearinghouse: (617) 544-3434 ext. 110 or**
> sthekkeparayil@lawyersclearinghouse.org

(1) If the court allows a motion for decree, it will then consider all the other aspects of the case and, if it finds they are in order, it will issue a decree of foreclosure. Subsequently, the court will send an attested copy of the decree to the treasurer or attorney, who must record or register it at the registry of deeds.

(2) Upon issuance of a decree, title vests in the municipality, and the treasurer should notify, in writing, all interested municipal departments, including the collector of taxes, board of assessors, town accountant or city auditor, board of selectmen, mayor, and/or city council. (See State Tax Form 486.)

n Redemption of Tax Titles Which Have Been Foreclosed

(1) Should any party with an interest in the property request the right to redeem a tax title which has been foreclosed, the treasurer must refuse. He cannot accept payment or issue an Instrument of Redemption. The treasurer should direct such party to the body now having control over the disposition of municipal property. If that department or body indicates to the treasurer, in writing, that it has no objection to a redemption, the treasurer or attorney may petition the Land Court, to have the foreclosure decree vacated.

(2) It is usually not advisable to have a decree vacated until after payment in full has been received and the check, if any, has cleared. Once payment has been received, the foreclosure decree vacated and the case withdrawn, the treasurer should prepare and record (register) an Instrument of Redemption.

o If the Request for Redemption Is Denied

(1) Should the appropriate department or body deny a party's request for redemption, the party may, within one year of the date of the decree, file with the Land Court his own petition to vacate. The Court will hold a hearing on the petition and, if the delinquent taxpayer can pay all monies due and the municipality has not conveyed the property to a third person, will generally grant the petition.

(2) Upon the entry of a decree of foreclosure or the denial of a petition to vacate a decree of foreclosure, an interested party may appeal to the Massachusetts Appeals Court. A treasurer should obtain counsel to handle cases allowed by that court.

p Recovery of Costs and Fees

b. A treasurer may file a motion with the Land Court to allow the payment of attorney's fees to the tax title account. The fees awarded shall not exceed the actual costs incurred. [60:65]

Gmail **Lolonyon Akouete <info@smartinvestorsllc.com>**

## 19 TL 000768 Town of Westborough v. Westborough SPE, LLC , et al.

**Iris Leahy** <AttyLeahy@outlook.com> Sat, Jan 14, 2023 at 10:05 AM
To: Lolonyon Akouete <info@smartinvestorsllc.com>

Hello Mr. Akouete,

Thank you for your agreement to my request for an extension. The docket reflects the hearing is scheduled for February 9, 2023 at 2:00pm. You should have received the motion I emailed yesterday.

Please provide me a copy of the Bill of Sale you received from Jan Blaustein Scholes. Also, please provide proof of funds. According to recent figures received from the town, I estimate the tax title account balance to be approximately $640,000.00 with interest to January 19, 2023. There is an additional amount due on the reciprocal easement which I believe is $300,000.00.

Thank you,

Iris A. Leahy, Esq.

Law Office of Iris A. Leahy

4 Open Square Way, Suite 217

Holyoke, MA 01040

Phone: (413)322-8318

Fax: (413)322-8661

attyleahy@outlook.com

---

**From:** Lolonyon Akouete <info@smartinvestorsllc.com>
**Sent:** Friday, January 13, 2023 12:37 PM
**To:** Iris Leahy <AttyLeahy@outlook.com>
**Subject:** Re: 19 TL 000768 Town of Westborough v. Westborough SPE, LLC , et al.

Hello Iris,

I am not opposed to rescheduling the hearing for February 9, 2023, at 2:00 pm.
Feel free to contact the Court and make the request. We will have enough money to redeem the property, including any additional legal fees.

Exhibit 14

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS. LAND COURT DEPARTMENT
19 TL 000768

TOWN OF WESTBOROUGH,
Plaintiff,

v.

WESTBOROUGH SPE, LLC,
Defendants.

**DEFENDANT WESTBOROUGH SPE, LLC's EMERGENCY MOTION FOR A WRIT OF MANDAMUS ORDERING THE TOWN OF WESTBOROUGH BY AND THROUGH ITS TREASURER TO PRODUCE WITH CERTIFICATION SIGNED UNDER THE PENALTIES OF PERJURY THE AMOUNT FOR REDEMPTION OF REAL PROPERTY LOCATED AT 231 TURNPIKE ROAD, WESTBOROUGH, MASSACHUSETTS AND REQUEST FOR EXTENSION OF TIME**

**NOW, COMES,** Westborough SPE, LLC ("Defendant") and hereby moves on an emergency basis, time being absolutely of the essence hereof, for a writ of mandamus compelling the Town of Westborough to forthwith produce the final payoff statement for redemption of the real property that is in question in this matter before the Court prior to the 2:00 PM Eastern Time hearing scheduled for today, March 23, 2023 and because of the Town's failure to provide such amount prior to the hearing, a request for an extension of no less than seven (7) days from today, i.e. on or before March 30, 2023 at 3:00 PM Eastern Time, for the Defendant to obtain a certified check for redemption of the real property in question.

The Land Court possesses the authority to issue a writ of mandamus pursuant to M.G.L. c. 249, Section 5, "A civil action to obtain relief formerly available by writ of mandamus may be brought in the supreme judicial or superior court, or, if the matter involves any right, title or interest in land, or arises under or involves the subdivision control law, the zoning act, or

municipal zoning, or subdivision ordinances, by-laws or regulations, in the land court." A writ of mandamus is an order from a court to an inferior government official (in this instance, the Town of Westborough and its Treasurer) ordering the government official to properly fulfill their official duties or correct an abuse of discretion. *See, e.g.*, *Cheney v. United States Dist. Court For D.C.*, 542 U.S. 367 (2004); *Cloherty v. Waterstone Wakefield LLC*, No. 20MISC000053JSDR, 2020 WL 2761273, at *8 (Mass. Land Ct. May 27, 2020).

**PRAYERS FOR RELIEF**

**WHEREFORE**, Defendant respectfully requests that this Honorable Court on an Emergency Basis:

A. Issue an emergency Writ of Mandamus to the Town of Westborough and its Treasurer compelling them to issue a final payoff statement for the redemption of the Real Property located at 231 Turnpike Road, Westborough, MA, and containing a certification signed under the penalties of perjury by the Treasurer as to the accuracy and completeness of said redemption payoff amount on or before the hearing scheduled at 2:00 PM Eastern Time today, March 23, 2023 or such other time as determined in the Court's discretion;

B. Order that Defendant Westborough SPE, LLC be granted until 3:00 PM on March 30, 2023 to provide a certified/bank check made payable to the Town of Westborough for the redemption of the real property in an amount to be determined by the Writ of Mandamus in Section A hereof;

C. Grant Defendant such other and further relief as this Court deems just and proper for the preservation of justice.

**DEFENDANT WESTBOROUGH SPE, LLC,**

**By its attorneys,**

/s/ Scott A. Schlager

Scott A. Schlager, BBO# 695421
Alvin S. Nathanson, BBO# 367480
Nathanson & Goldberg, P.C.
183 State Street, 5th Floor, Boston, MA 02109
Tel. (617) 909-4511 | Fax. (617) 210-4824 | sas@natgolaw.com | asn@natgolaw.com

**CERTIFICATE OF SERVICE**

I, Scott A. Schlager, Esq., hereby certify that a copy of the above-captioned Emergency Motion was filed electronically through the Massachusetts E-File system and a copy was transmitted electronically to counsel of record in the above-captioned matter.

**/s/ Scott A. Schlager, BBO# 695421**

# TOWN OF WESTBOROUGH
# MASSACHUSETTS

OFFICE OF THE TREASURER/COLLECTOR
34 WEST MAIN STREET
WESTBOROUGH, MA 01581-1998
LINDA A. SMITH

TELEPHONE
(508)871-5142
FAX
(508)366-3099

231 TURNPIKE ROAD, WESTBOROUGH, MA
PARCEL: 32-48-0 BOOK/PAGE: 66983-53

16% interest to 5/16/23

| | | | TOTALS | | | VALUE |
|---|---|---|---|---|---|---|
| 2018 | Tax Title Lien | $ 119,628.17 | | | pd Q1/1/2 Q2 | $ 9,264,800.00 |
| | interest | $ 93,956.04 | | | | |
| | Water Lien | | | | | water/sewer included in tax lien |
| | Sewer Lien | | | | | |
| | Interest | | $ 213,584.21 | | | |
| | Per Diem | | | 52.44 | | |
| 2019 | Tax Title Lien | $ 103,133.80 | | | | $ 5,239,100.00 |
| | interest | $ 64,197.28 | | | | |
| | Water Lien | | | | | water/sewer included in tax lien |
| | Sewer Lien | | | | | |
| | interest | | | | | |
| | No Income | $ 250.00 | $ 167,581.08 | | | |
| | Per Diem | | | 45.21 | | |
| 2020 | Tax Title Lien | $ 102,963.48 | | | | $ 5,239,100.00 |
| | interest | $ 48,068.54 | | | | |
| | Water Lien | | | | | water/sewer included in tax lien |
| | Sewer Lien | | | | | |
| | interest | | | | | |
| | No Income | $ 250.00 | $ 151,282.02 | | | |
| | Per Diem | | | 45.14 | | |
| 2021 | Tax Title Lien | $ 55,915.95 | | | | $ 2,622,100.00 |
| | interest | $ 17,108.72 | | | | |
| | Water Lien | | | | | water/sewer included in tax lien |
| | Sewer Lien | | | | | |
| | interest | | | | | |
| | No Income | $ 250.00 | $ 73,274.67 | | | |
| | Per Diem | | | 24.51 | | |
| 2022 | RE | $ 36,885.70 | | | | $ 1,994,900.00 |
| | interest | $ 11,075.82 | | | | |
| | Water Lien | $ 198.36 | | | | |
| | Sewer Lien | $ 208.44 | | | | |
| | interest | $ 268.00 | | | | |
| | No Income | $ 250.00 | $ 48,886.32 | | | |
| | Per Diem | | | 16.17 | | |
| 2023 | RE | $ 35,183.54 | | | | $ 2,082,000.00 |
| | interest | $ 4,935.33 | | | | |
| | Water Lien | $ 198.36 | | | | |
| | Sewer Lien | $ 208.44 | | | | |
| | interest | $ 236.26 | | | | |
| | Per Diem | | | 15.42 | | |

| | | | |
|---|---|---|---|
| No income | $ | 250.00 | $ 41,011.94 |
| | | $ 695,620.24 | $ 695,620.24 |

| | |
|---|---|
| NSTAR Lien | $ 9,900.53 |
| Boston Board Up | $ 14,438.55 |
| Ins. costs to date | $ 109,882.92 |
| EverSource costs | $ 2,757.92 |
| Appraisal | $ 6,000.00 |
| Legal fees: KP Law thru 2/28/23 - tax title | $ 24,110.75 |
| RFP | $ 20,591.22 |
| Legal fees: Iris Leahy thru 4/28/23 tax title | $ 34,027.47 |
| Filing fee | $ 515.00 |
| withdrawal ?? | $ 365.00 |
| recording fee?? | $ 105.00 |
| | $ 222,694.36 |

**GRAND TOTAL** $ 918,314.60

** there could be additional charges in the days to come that could get added on, legal etc....

Linda A. Smith 5/3/2023
LINDA A SMITH DATE
TREASURER'/COLLECTOR

COMMONWEALTH OF MASSACHUSETTS
Worcester, ss
On this 3rd day of May, 2023 before me, the undersigned notary public, Linda Smith, Treasurer Collector personally appeared, provide to me through satisfactory evidence of identification, which were Personally known to me, to be the person who signed the preceding or attached document in my presence and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of her knowledge and belief.

Deborah E. Ledoux (official signature and seal of notary public)

My Commission Expires: April 7, 2028

DEBORAH E. LEDOUX
My Commission Expires April 7, 2028
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS

Exhibit 15

# Memo

**To:** All Registry Districts

**From:** Edmund A. Williams, Chief Title Examiner

**Date:** November 20, 2008

**Subject:** Foreign LLC, LLP, LP

---

Except as listed herein, a foreign LLC which owns registered land must file with the Massachusetts Secretary of State.

1. It is not required that a foreign LLC, LLP, or LP which is not the owner, but is a member, partner, manager etc. in a tiered signature chain, be registered in Massachusetts. It should present a Certificate of Good Standing or the equivalent from their state of formation. If the certificate does not identify manager, member or other authorized signatory, the deed and any authorization documentation should be referred to the Chief Title Examiner or his designee for review. See G. L. c. 156C, § 48 and G. L. c. 156D, Part 15, § 15.01.

2. A foreign LLC which has taken title by virtue of a foreclosure deed does not have to file in Massachusetts in order to convey. It should register a Certificate of Good Standing from the state of formation. If the certificate does not identify manager, member or other authorized signatory, the deed and any authorization documentation should be referred to the Chief Title Examiner or his designee for review.

3. Mortgagees need not be registered in order to foreclose or amend a mortgage. To amend a mortgage, they should register a Certificate of Good Standing from the state of formation. If the certificate does not identify manager, member or other authorized signatory, the amendment and any authorization documentation should be referred to the Chief Title Examiner or his designee for review.

   For a foreign LLC only, a certificate signed by a clerk or secretary may be accepted as evidence of authority of the person signing on its behalf.

Exhibit 16

The Commonwealth of Massachusetts

Office of the Inspector General

GREGORY W. SULLIVAN
INSPECTOR GENERAL

JOHN W. McCORMACK
STATE OFFICE BUILDING
ONE ASHBURTON PLACE
ROOM 1311
BOSTON, MA 02108
TEL: (617) 727-9140
FAX: (617) 723-2334

June 30, 2008

Jack Angley
Chairman
Board of Selectmen
Town of Carver
108 Main Street
Carver, Massachusetts 02330

During December 2007, the Office of the Inspector General received a complaint from a concerned citizen pertaining to the disposal of a certain piece of property by the Town of Carver (Town), Massachusetts in 2002. Specifically, the citizen alleged that the Town disposed of property located at 13 Birch Terrace, Carver, Massachusetts, without following M. G. L. c. 30B (Chapter 30B), the statute which governs municipal land transfers. Chapter 30B applies to the sale of real property by governmental bodies, including cities and towns. Chapter 30B establishes specific procedures that governmental bodies are mandated to follow regarding the acquisition and disposition of real property. Chapter 30B permits a Town to dispose of real property for a public purpose and for less than its value. However, the procedures outlined in Chapter 30B must still be followed. In the complaint, the citizen alleged that the Town totally ignored the clear requirements of Chapter 30B in the sale of the property in question. Based upon the citizen's report, the Office of the Inspector General initiated an investigation to determine the validity of the allegations.

## General Background Regarding the Sale of 13 Birch Terrace by the Town of Carver

The property, identified as 13 Birch Terrace, Carver, Massachusetts came into ownership and lawful possession of the Town in 2000. The previous owner owed the Town $11,279.60 in back taxes on the property. The Town initiated foreclosure proceedings on the property and was declared the lawful owner by the Massachusetts, Land Court on May 12, 2000.

After the Town became the legal owner, Habitat for Humanity of Greater Plymouth (Habitat for Humanity) approached the Town Selectmen in an attempt to obtain the property.

During the Town Selectmen's meeting on March 27, 2001, Selectmen Robert Merritt indicated that Habitat for Humanity was interested in obtaining this property. Selectmen James Grimes made a motion to take title to the property and turn it over to Habitat for Humanity. This motion was seconded by Selectmen Bernadette Hemingway.

The Board of Selectmen transferred title to the property to Habitat for Humanity on March 19, 2002 for $1.00. Selectmen Merritt along with the other members of the Board of Selectmen authorized this transfer to Habitat for Humanity. On June 11, 2002, Habitat for Humanity sold the property to private buyers for $36,000.00. On September 10, 2004, this property was resold for $99,000.00. On December 9, 2004, the Zoning Board of Appeals held a public hearing at Town Hall at which time the current owner presented testimony requesting a variance for the construction of a house on the property. The property was an undersized lot and the Town Board of Health had issued a deed restriction that a home at this location must be limited to 2 bedrooms due to Title V requirements. On January 13, 2005, the Zoning Board of Appeals voted unanimously to grant the variance with certain conditions. On March 15, 2005, the Town Building Department issued a building permit for construction of a single family 2 bedroom home on the property. On June 18, 2006, the property was sold again for $288,000.00.

## Interview of Robert Merritt, Former Selectmen, Town of Carver, Carver, MA

Robert Merritt, former Selectmen, Town of Carver and former member of the Board of Directors for Habitat for Humanity was interviewed by investigators from the Office of the Inspector General. Merritt advised that he was a member of the Board of Selectmen when the Board donated the property located at 13 Birch Terrace to Habitat for Humanity. Merritt recalled that this property had been taken by the Town because of taxes that were owed on it.

Merritt stated that he created Habitat for Humanity of Greater Plymouth in 1997, and was a member of their Board of Directors. He advised that at the time the property was donated to Habitat for Humanity, he was an active member of Habitat for Humanity's Board of Directors and a Selectman for the Town of Carver. Merritt advised that he recommended to the site committee for Habitat for Humanity that they pursue an attempt to obtain the property from the Town. Merritt said he spoke with other Selectmen and obtained their support in donating the property to Habitat for Humanity. Merritt also stated that he was aware that Town Meeting would have to authorize the transfer of the deed to the property from the Town to Habitat for Humanity. He did not know if the Town Meeting authorized this deed transfer to Habitat for Humanity. He did not know if the Town advertised this property in the newspapers prior to transfer of the deed to Habitat for Humanity.

Merritt stated that when Habitat for Humanity received the deed to this property, he believed it was assessed at approximately $30,000.00.

Merritt stated that it was his assumption that the property was subsequently sold by Habitat for Humanity because it was a poor piece of property to develop. Merritt had no knowledge regarding who may have purchased the property from Habitat for Humanity or how much was paid to Habitat for Humanity for the land.

## Interview of Richard LaFond, Town Administrator, Town of Carver

Richard LaFond, Town Administrator, Town of Carver, was interviewed by investigators from the Office of the Inspector General and advised that he has been Town Administrator since October 1, 1996. LaFond advised that the Town took possession of property located at 13 Birch Terrace, Carver, MA, during 2000. The Town took possession of this land because of an outstanding tax obligation in the amount of $11,279.60. The property was small and had a dilapidated home located on it. LaFond stated that Habitat for Humanity approached the Town Board of Selectmen and asked if they would consider donating the property to Habitat for Humanity. LaFond stated that Habitat for Humanity intended to build an affordable home for a deserving family on the property. On March 27, 2001, the Board of Selectmen unanimously voted to donate the property to Habitat for Humanity for $1.00. The deed for the property was transferred from the Town to Habitat for Humanity on March 19, 2002.

LaFond stated that it was his understanding that Habitat for Humanity would either apply to the Zoning Board of Appeals for a variance because the lot was undersized and build an affordable home, or would sell the property and use the proceeds for another affordable housing initiative. LaFond stated that the Town used this land donation to receive a credit towards the Town's affordable housing certification from the Massachusetts Department of Housing and Community Development (DHCD).

LaFond stated that he has researched this matter and determined that it was not presented to Town Meeting for approval before the deed to the property was transferred from the Town to Habitat for Humanity. In fact, the Town Meeting never authorized the transfer of the property to Habitat for Humanity. LaFond advised that he was probably not aware that the property donation should have first gone before the Carver Town Meeting for approval. LaFond stated that the Town did not advertise this parcel of land for sale as required by Chapter 30B. Further, LaFond stated that the Town did not follow the proposal process for putting the land up for sale and soliciting proposals which is likewise required by Chapter 30B. He stated that he was not as familiar with the rules and regulations of Chapter 30B as he should have been.

## Interview of William Slater, Office Manager/ Affiliate Manager, Habitat for Humanity, Carver, MA

William Slater, Office Manager/Affiliate Manager, Habitat for Humanity, Carver, Ma, was interviewed by investigators from the Office of the Inspector General. Slater advised that after Habitat for Humanity received the parcel of land at 13 Birch Terrace from the Town, they

determined there were too many problems with the construction of a new home on this lot. According to Habitat for Humanity's Site Selection Committee's report, to the Habitat for Humanity Board of Directors, dated July 19, 2001, the main problem was the house size (625 square feet). They also indicated to the Board of Directors that if Habitat for Humanity went forward with the construction of a home, they would have to do battle with the Town Building Commissioner and Zoning Board. The Site Selection Committee recommended to the Board of Directors that consideration should be given to reselling the property.

According to records from Habitat for Humanity, on March 23, 2003, Bob Beane, Cochairman, Site Selection Committee, Habitat for Humanity informed the Board of Directors that the Birch Terrace lot had been sold "as is" to a developer for $36,000.00. The proceeds from the sale of this lot were used to payoff the balance of an outstanding $80,000 loan Habitat for Humanity had with Rockland Trust Bank, dated October 6, 2000.

## Factual Analysis and Applicable Massachusetts Law

Prior to disposing of real property, a governmental body, including cities and towns, must declare the property available for disposition and specify any reuse restrictions that should apply to said property.[1] Because M.G.L. c.40, §4 requires town meeting approval prior to entering into a contract, this Office interprets Chapter 30B, §16 to require, in a town with a town meeting form of government, an affirmative town meeting vote to declare the property available for disposition and to determine whether any reuse restrictions should apply to said property.[2]

Whether or not a proposal process is required to dispose of real property depends on the value of the property, and therefore, prior to the disposition of the property, the governmental body must determine the value through procedures customarily approved by the appraising profession as valid.[3] If the value of the property exceeds $25,000, the governmental body must solicit proposals,[4] and the Town must advertise the opportunity.[5] Where a governmental body disposes of property for less than its value, the governmental body must publish the notice in the *Central Register*, published by the Secretary of State. The notice shall state the difference between the value of the property and the price received, stating the reason for the disposition and listing all persons having a beneficial interest in the property.[6] Finally, no contract to lease or sell property is valid until the buyer or lessee has filed a disclosure of beneficial interests to the Division of

[1] M.G.L. c. 30B, §16(a).

[2] M.G.L. c.40, §4 requires a vote of town meeting, of the town council where there is no town meeting, the city council in a city and approval of the mayor, or the city council in a plan D or Plan E city with approval of the city manager. It is this Office's opinion that the required vote for purposes of M.G.L. c.30B, §16 is the vote that is required under M.G.L. c.40, §4.

[3] M.G.L. c.30B, §16(b).

[4] M.G.L. c.30B, §16(c).

[5] M.G.L. c.30B, §16(d).

[6] M.G.L. c.30B, §16(g).

Capital Asset Management.[7]

The disposition of the property by the Town to Habitat for Humanity was in direct violation of Chapter 30B. There was never a Town Meeting vote to authorize Town disposal of the property for $1.00. While the Selectman voted to dispose of the property, the Town's people, at Town Meeting, did not approve the sale of the property. Further, the Town failed to declare any reuse restrictions when disposing of the property. While not required, reuse restrictions could have mandated that Habitat for Humanity, or any subsequent owner, build an affordable unit on the property and that the property revert back to the Town if the requirement for building an affordable unit was not met. Without such a reuse restriction, Habitat for Humanity was able to realize a profit on the sale of the parcel and satisfy obligations to pay outstanding debt. Further, there is no evidence that the Town sought to actively discern the value of the property as required under Chapter 30B, §16(b); however, the assessed value of the property was $42,000. Because the assessed value of the property at the time of sale exceeded $25,000, the Town was required to conduct an advertised proposal process. The Town failed to do so. Lastly, the Town did not provide notice in the Central Register that it had disposed of a valuable parcel for $1.00.

Mirroring Chapter 30B, M.G.L. c. 60 § 77B also sets specific guidelines regarding the sale of land taken by a tax foreclosure. These guidelines include the option of appointing a custodian to manage the property acquired by the Town. Further, the statute permits the custodian to sell the acquired property at a public auction after giving notice of intent to sell to the previous owner. The Town did not appoint a custodian to manage and control the property. Instead, it appears that the Town allowed the property to come under the de facto control of Selectman Merritt. Merritt brought the potential availability of the property to the attention of Habitat for Humanity, and then approached the Board of Selectmen and lobbied them concerning its sale. While the appointment of a custodian was not mandatory, such an appointment would have demonstrated that the Town was acting in good faith pursuant to Chapter 60.

From this Office's prospective, it is unclear whether the Town followed Chapter 60 by giving notice to the prior owner of record regarding the sale. This office has asked the Town to clarify this matter but to date has not received the requested response. The Town clearly failed to hold an auction in order to sell the property. This violation of Chapter 60 is more troubling than the failure to appoint a custodian because it spreads the shadow of impropriety to the sale price, not just the manner of how the property was sold.

The decision of the Board of Selectmen and the Town Administrator to ignore and circumvent the existing laws of the Commonwealth regarding the transfer of this property clearly contravenes the will of the Legislature and the interests of the Town's citizens whom they are sworn to serve.

## Conclusions and Recommendations

The property located at 13 Birch Terrace, Carver, Massachusetts was originally obtained by the

[7] M.G.L. c.7, §40J.

Town in 2000 through a foreclosure process initiated because of a failure by the owner to pay the Town over $11,000 dollars in overdue taxes. Surely, the foreclosure process cost the Town certain legal fees and other incidental costs. Moreover, the overdue taxes were never recovered or made up for in the subsequent sale of the property. It appears that any sale of this property by the Town, at a minimum, should have included recouping the amount of back taxes owed and the cost of fees associated with its acquisition by the Town.

At the time the property was transferred from the Town to Habitat for Humanity, its assessed value was $42,000 dollars. This property, though undersized and in need of a zoning variance, was later sold by private parties in 2004 for $99,000 dollars. Subsequently, after a zoning change, a house was built on the lot and it was resold again for $288,000. All of this serves to demonstrate that the property was a valuable asset to the Town. Before parting with a valuable real property asset, the citizens of the Town legally had the right to decide whether selling this asset for $1.00 was in their best interest. The failure of the Town Administrator and the Board of Selectmen to follow the law in this regard amounts to a serious breach of the public trust.

Likewise, the failure of the Town Administrator and the Board of Selectmen to follow the clear requirements of Chapter 30B as established by the legislative body of the Commonwealth further exacerbates this breach of public trust. The sale of a valuable Town asset without following the legally required bidding process cannot be excused because the responsible parties thought they were acting in a charitable manner. The conduct of these individuals is even more objectionable because Chapter 30B, §16(g) permits a municipality to dispose of real property at less than full market value to accomplish a public purpose. It is clear that the conduct of Town officials in this matter was contrary to the best interests of the citizens of the Town and contrary to the express will of the Legislature.

Finally, this Office takes note of the fact that when the property in question was transferred to Habitat for Humanity by the Town, Robert Merritt was simultaneously serving as a member of the Town's Board of Selectmen and a member of Habitat for Humanity's Board of Directors. It is not within the purview of this Office to investigate alleged violations of the ethics laws of the Commonwealth. The Legislature has given that responsibility to the State Ethics Commission.

In order to obviate this kind of situation from occurring again, this Office makes the following recommendations:

1. That, at a minimum, the Town Administrator and members of the Board of Selectman should consider attending the various trainings for public officials that are available throughout the commonwealth. The Ethics Commission provides training to public officials on the conflict of interest laws, and this office, through its *Massachusetts Certified Public Purchasing Official program,* has a variety of seminars on public procurement.

2. That the Town Administrator and members of the Board of Selectman download and review the Inspector General's procurement manual, entitled *Municipal, County, District, and Local Authority Procurement of Supplies, Services and Real Property*, which sets out the legal requirements of M.G.L. c.30B, including those for the acquisition and

disposition of real property. The manual can be downloaded at http://www.mass.gov/ig/publ/30bmanl.pdf or purchased from the State Book Store.

3. That the Town ensure that a disclosure of beneficial interests in 13 Birch Terrace be immediately filed with the Division of Capital Asset Management. The form can be found in Appendix B of the Inspector General's procurement manual, entitled *Municipal, County, District, and Local Authority Procurement of Supplies, Services and Real Property*, a link to which has been provided above.

Sincerely,

Gregory W. Sullivan

Gregory W. Sullivan
Inspector General

Cc Francis J. Casey, Selectman
James Grimes, Selectman
Richard Ward, Selectman
Michael J. O'Donnell, Jr., Selectman
Richard J. LaFond, Town Administrator

Exhibit 17

# TOWN OF WESTBOROUGH MASSACHUSETTS

**TOWN MANAGER**
**Kristi Williams**

**TOWN HALL - 34 WEST MAIN STREET**
**WESTBOROUGH, MA 01581-1998**
**TEL: (508) 366-3030 FAX: (508) 366-3099**

January 10, 2024

BY ELECTRONIC MAIL ONLY

Mr. Lolonyon Akouete
Manager of Westborough SPE, LLC
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703

Re: Public Records Request - Town of Westborough

Dear Mr. Akouete:

The Town of Westborough ("Town") is in receipt of your public records request sent by e-mail on December 26, 2023 and received on December 26, 2023. Please find the Town's response to the request in accordance with the provisions of the Public Records Law within ten business days following receipt of the request by the Town.[1]

Request:

In your public records request, you state as follows:

I am seeking documents related to a settlement proposal made by Chapter 7 Trustee, Mr. Jonathan Goldsmith, in connection with the ongoing legal disputes concerning the property located at 231 Turnpike Rd, Westborough, MA 01581. Specifically, my request includes:

1. **The Written Settlement Proposal**: The full text of the written settlement proposal sent by Mr. Jonathan Goldsmith to the Town's counsel on December 5, 2023. This proposal was then provided to the Town Manager and the Town's Select Board.
2. **Corresponding Communications and Responses**: Any and all responses, communications, minutes, or decisions made by the Town, the Town's counsel, the Town

[1] Pursuant to 950 CMR 32.03(3), the following regulatory provision applies to time requirements under the Public Records Law: "Computation of Time. Unless otherwise provided, the computation of time referred to in 950 CMR 32.00 shall begin with the first business day following the date of receipt of any request, regardless of form."

Manager, and the Town's Select Board regarding this settlement proposal related to 231 Turnpike Rd, Westborough.

As an initial matter, and without waiving any of the Town's rights under the Public Records Law, as you know, the requested records all pertain to litigation pending in state and federal courts in which Westborough SPE, LLC is a party. Further, please be advised that the Town's duty to respond to records requests extends only to records that are in existence and in its custody, and the Town is under no obligation to create records in response to your request. See, e.g., G. L. c. 4, § 7(26) (defining "public records" as materials which have already been "made or received" by a public entity); 32 Op. Att'y Gen. 157, 165 (May 18, 1977) (records custodian is not obliged to create a record in response to a request for information); Secretary of the Commonwealth, "A Guide to the Massachusetts Public Records Law," at 41 (December 2022) (same). As permitted by law, certain information may be withheld or redacted under exemptions to the Public Records Law, other applicable provisions of law, and/or common law privileges, such as the attorney-client privilege. See, e.g., G.L. c. 4, § 7(26); Suffolk Construction Co. v. Div. of Capital Asset Mgmt., 449 Mass. 444, 449-450 (2007); 950 CMR 32.06(3).

After initial diligent review of your request and its records, the Town has certain records responsive to your request for the time period specified. The Town is providing the below hyperlinks to the meeting agendas for the Select Board meetings that took place on December 6, 2023 and December 18, 2023:

See https://ma-westborough.civicplus.com/AgendaCenter/ViewFile/Agenda/_12062023-901; https://ma-westborough.civicplus.com/AgendaCenter/ViewFile/Agenda/_12182023-923.

After an individualized review of the remaining Town records responsive to your public records request, such records will be withheld since they are protected by the attorney-client privilege, the deliberative process privilege pursuant to Exemption (d) of the Public Records Law, and the Open Meeting Law, as the materials are confidential executive session materials pursuant to G.L. c. 30A, § 21, as that statute operates through Exemption (a). A detailed description of such exemptions is detailed herein.

**Attorney-Client Privilege**

Certain records responsive to your request include privileged attorney-client communications between the Town and its attorneys on pending legal matters. In the case of Suffolk Construction v. DCAM, 449 Mass. 444, 449–50 (2007), the Supreme Judicial Court recognized and acknowledged the application of the attorney-client privilege to governmental entities. Where the Town has not waived the attorney-client privilege with respect to such records, they will not be released. Therefore, certain records responsive to your request have been withheld pursuant to the attorney-client privilege, as permitted by law. See Suffolk Construction Co. v. Div. of Capital Asset Mgmt., 449 Mass. 444, 449–50 (2007). Please see the log herein detailing the records withheld pursuant to the attorney-client privilege.

**Exemption (a)**

Exemption (a), G.L. c. 4, §7(26)(a) covers those records which are "specifically or by necessary implication exempted from disclosure by statute," which may be withheld from disclosure. This section has been interpreted to mean that requested materials may be withheld or information redacted where the language of the statute of exemption relied upon expressly states or necessarily implies that the public's right to inspect records under the Public Records Law is restricted. Certain provisions of the Open Meeting Law apply under Exemption (a), by derivation, namely: G.L. c. 30A, §21(a), which permits executive session meetings for several specifically-enumerated reasons; and G.L. c. 30A, §22(f), which allows the public body to withhold executive session meeting materials in their entirety, where public disclosure would defeat the purpose of the executive session. Records you have requested, including records responsive to Item 1 of your request, are confidential executive session materials pertaining to ongoing litigation, and, as such, will be withheld at this time.

**Exemption (d)**

This exemption is intended to avoid release of materials which could taint the deliberative process if prematurely disclosed. The exemption applies to recommendations on legal and policy matters found within an ongoing deliberative process. Babets v. Secretary of the Executive Office of Human Services, 403 Mass. 230, 237 n.8 (1988). In considering Exemption (d), the Supreme Judicial Court in General Electric Company v. Department of Environmental Protection, 429 Mass. 798, 807 (1999) stated, "[t]he purpose of Exemption (d) is to foster independent discussions between those responsible for a governmental decision in order to secure the quality of the decision." The courts and the Supervisor have additionally construed Exemption (d) as applying to records concerning ongoing litigation involving a public body. See, e.g., Lafferty v. Martha' s Vineyard Commission, Superior Court, C.A. No. 03-3397, 2004 WL 792712, Memorandum of Decision and Order on Plaintiff' s Motion for Summary Judgment (Brassard, J., April 9, 2004) (citations omitted). " The preparation of and involvement in litigation by [a public body] inherently entails the development of ' policy positions' by that [public body].... Further, the [public body] prosecutes a strategy for the litigation, and its 'policy positions' are frequently subject to change and refinement throughout the litigation." Id., 2004 WL 792712 at *3. Therefore, records requested which involve the Town's review of pending litigation matters related to 231 Turnpike Road will be withheld in their entirety at this time as such records relate directly to such ongoing court actions.

| Date | Record | Subject | Basis for Withholding |
|---|---|---|---|
| December 5, 8, 15, 17, 18, 2023 | E-mail messages between Town attorneys (Roger Smerage, Esq., Jeffrey Blake, Esq., Thomas McEnaney, Esq., Brian Riley, Esq. Shirin Everett, Esq., Courtney Mayo, Esq., and Iris Leahy, Esq.) and Town Manager Kristi Williams about litigation matters; E-mail from | 231 Turnpike Rd, Westborough Litigation | Attorney-Client Privilege/Exemption (d)/Exemption (a)-Executive Session Materials |

| | | | |
|---|---|---|---|
| | Select Board member Patrick Welch to Town Manager re: executive session/legal matters | | |
| December 23, 2023 | E-mail messages between Town Counsel and Town Manager about litigation matters | 231 Turnpike Rd, Westborough Litigation | Attorney-Client Privilege |
| December 5, 2023 | E-mail message between Town Manager and Select Board | 231 Turnpike Rd, Westborough Litigation | Exemption (d)/Attorney-Client Privilege/Exemption (a)- Executive Session Materials |
| December 12, 2023 | E-mail message between Town Manager and Select Board | 231 Turnpike Rd, Westborough Litigation | Exemption (d) /Exemption (a)- Executive Session Materials |

You may appeal this response to the Supervisor of Public Records pursuant to 950 CMR 32.08(1)(d). By law, the Supervisor is required to respond within ten (10) business days of receipt of your appeal. You may also seek judicial review of an unfavorable response by commencing a civil action in the superior court, under G.L. c. 66, § 10A(c).

Thank you.

Sincerely,

Kimberly Foster
Assistant Town Manager

Exhibit 18

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | Chapter 7, No. 23-40709 |
| WESTBOROUGH SPE LLC | ) | |
| Debtor | ) | |

**TRUSTEE'S OBJECTION TO MOTION OF LOLONYON AKOUETE SEEKING TO REQUIRE THE TRUSTEE TO FURNISH INFORMATION UNDER 11 U.S.C. §704(a)(7)**

NOW comes JONATHAN R. GOLDSMITH, Chapter 7Trustee of Westborough SPE, LLC ("Trustee") and hereby objects to the request of Lolonyon Akouete ("Akouete") seeking to require the Trustee to furnish the written settlement proposal the Trustee sent to the Town of Westborough's counsel on December 5, 2023. In support thereof, the Trustee submits that:

The referenced settlement proposal sent to counsel for the Town of Westborough was related to negotiations commenced in an attempt by the Trustee to resolve the dispute surrounding the pending Massachusetts Land Court foreclosure action initiated by the Town of Westborough as it relates to the Debtor's property at 231 Turnpike Road, Westborough, Massachusetts. The Trustee submits that this communication was part of a confidential settlement negotiation and is not within the ambit of 11 U.S.C. §704(a)(7). If a settlement is reached, then the terms will be laid out in a pleading filed with this Court and served upon Akouete and other parties of interest. To the extent that the Court concludes that §704(a)(7) applies to this communication, then the Trustee requests that an Order be issued excluding this communication from submission to Akouete. The basis for this request is that Akouete has a propensity to communicate directly with the Select Board of the Town as well as other parties in a manner that has undermined the Trustee's efforts to administer this case. Providing this communication would likely further erode the Trustee's efforts to resolve this claim.

WHEREFORE, the Trustee respectfully requests that:

1. Deny Lolonyon Akouete's Motion to Require the Trustee to Furnish Information Under 11 U.S.C. §704(a)(7); and
2. for other and further relief as is just and proper.

JONATHAN R. GOLDSMITH, TRUSTEE IN BANKRUPTCY FOR WESTBOROUGH SPE LLC

Dated: 1/25/24

By: */s/ Jonathan R. Goldsmith, Esq.*
JONATHAN R. GOLDSMITH, ESQ.
(BBO No. 548285)
GOLDSMITH, KATZ & ARGENIO, P.C.
1350 Main Street, 15th Floor
Springfield, MA 01103
Tel: (413) 747-0700

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re:<br><br>WESTBOROUGH SPE LLC<br><br>Debtor | ) | Chapter 7, No. 23-40709 |

**CERTIFICATE OF SERVICE**

I, JONATHAN R. GOLDSMITH, ESQ., of GOLDSMITH, KATZ & ARGENIO, P.C., 1350 Main Street, 15th Floor, Springfield, MA 01103, do hereby certify that I served a copy of the within Objection upon those parties listed below by electronic mail or by mailing, first class mail, postage prepaid, on this 25th day of January, 2024:

Stephen F. Gordon, Esq.
The Gordon Law Firm, LLP
River Place
57 River Street
Wellesley, MA 02481

Richard King, Esq.
Office of the U.S. Trustee
446 Main Street, 14th Floor
Worcester, MA 01608

Westborough SPE, LLC
c/o Lolonyon Akouete
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703

Scott A. Schlager, Esq.
Nathanson & Goldberg, P.C.
183 State Street, 5th Floor
Boston, MA 02109

Roger L. Smerage, Esq.
KP Law, P.C.
101 Arch Street, 12th Floor
Boston, MA 02110-1109

/s/ Jonathan R. Goldsmith, Esq.
JONATHAN R. GOLDSMITH, ESQ.

Exhibit 19

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | Chapter 7, No. 23-40709 |
| WESTBOROUGH SPE LLC | ) | |
| Debtor | ) | |

**TRUSTEE'S SUPPLEMENTAL OBJECTION TO TOWN OF WESTBOROUGH'S MOTION FOR RELIEF FROM AUTOMATIC STAY AND OPPOSTION TO THE APPOINTMENT OF A BANKRUPTCY TRUSTEE**

NOW comes JONATHAN R. GOLDSMITH, the duly appointed and acting Trustee ("Trustee"), and hereby submits this Supplemental Objection to the Town of Westborough's Motion for Relief from the Automatic Stay and Opposition to Appointment of a Bankruptcy Trustee[1] (the "Motion").

As a preliminary matter, the Trustee submits that he has now received an offer ("Offer") from Ferris Development Group, LLC ("Ferris") to purchase the subject property at 231 Turnpike Road, Westborough, Massachusetts ("Property") for the sum of Two Millon Eight Hundred and Seventy-Five Thousand Dollars ($2,875,000.00), which the Trustee has accepted, subject to Bankruptcy Court approval on a Motion to Sell and the contingencies noted therein. A copy of the Offer is attached hereto as Exhibit "A".

A sale of the Property to Ferris will, upon information and belief, be sufficient to pay all outstanding taxes and costs owed to the Town of Westborough ("Town") and also provide funds to distribute a dividend (possibly payment in full) to all scheduled creditors of the bankruptcy case. The Trustee also submits that a sale pursuant to 11 U.S.C. §363 will expedite payment to the Town and the creditors of the Bankruptcy Estate.

[1] The Trustee does not respond to the portion of the Motion for Relief from Stay in Opposition to the Appointment of a Bankruptcy Trustee, as the Trustee deems this issue moot.

On May 26, 2022, the Town issued a new request for proposals for the purchase and redevelopment of the Property. See Williams Decl. at ¶ 15. The Town received three proposals, including one from Lax Media. See id. at ¶ 16. Lax Media offered a purchase price of $2,500,001, which was higher than the estimated fair market value of the Property ($2,082,000). See id. at ¶ 17.[4] The Town's Select Board evaluated the proposals based on five categories and selected Lax Media's proposal, which received the score of "highly advantageous" in three categories and "advantageous" in the remaining two. See id. at ¶ 18.[5]

***Response:*** ***The Trustee has insufficient knowledge to admit or deny the allegations contained in the foregoing paragraph. Further answering, the Trustee submits that he has received an offer for the Property that is $375,000.00 higher than the Lax Media offer.***

On December 22, 2022, the Debtor (under the purported control of two new managers) applied for registration to do business in Massachusetts. See Exhibit H (Application for Registration). On January 4, 2023—which was one day short of the first year anniversary of the

---

[4] The Debtor's Schedule A/B (Doc. No. 8) lists a purported current value of $7,942,000 for the Property, based upon the highest bid that the Town received. As a Massachusetts Superior Court judge noted in a related proceeding to which the Debtor is not a party, that bid sought "to raze the existing structure and build 108 condominium units," which was not feasible because "[t]here was a moratorium on additional water and sewer connections in Westborough due to capacity constraints that [the bidder] would have to overcome." See Memorandum of Decision and Order on Plaintiff's Motion for Preliminary Injunction, at pp. 2-3, Ferris Development Group, LLC v. Town of Westborough, et al., No. 2285CV02181 (Mass. Superior Ct. Jan. 13, 2023); see also, infra, note 5. The Town rejected the highest bid because the water moratorium precluded the proposed development.

[5] In November 2022, one of the other bidders filed suit against the Town and Lax Media in Massachusetts Superior Court for breach of implied contract, declaratory judgment, and injunctive relief as a result of the Town's awarding the bid to Lax Media. See Ferris Development Group, LLC v. Town of Westborough, et al., Mass. Superior Court Case No. 2285CV01281. The Superior Court denied the plaintiff's motion for preliminary injunction, finding that plaintiff failed to show a likelihood of success on the merits. Memorandum of Decision and Order on Plaintiff's Motion for Preliminary Injunction, at pp. 9-11, Ferris Development Group, LLC v. Town of Westborough, et al., No. 2285CV02181 (Mass. Superior Ct. Jan. 13, 2023). As the Debtor is not a party to the Superior Court action, that action is not subject to the automatic stay.

ownership and the fact that the Town provided the Debtor sufficient notice in line with the applicable statutes and the Land Court's directions).

***<u>Response:</u>*** ***The Trustee denies the allegations contained in the foregoing paragraph. Further answering, the Trustee submits that the consummation of the sale with Ferris Development Group, LLC will most likely provide for the timely payment of outstanding taxes and the return of the Property to the tax rolls.***

The conduct of the Debtor and the Debtor's litigation counsel, one of the petitioners here, has caused the Town to lose municipal revenue and to incur unnecessary expense. The Town has not received real estate tax or water/sewer fees on the Property since 2017. With interest, this amounts to $695,620.24 due and owing to the Town as of May 3, 2023. <u>See</u> Doc. No. 8 at Ex. 2. This lack of payment establishes that the Town is not adequately protected, justifying relief from the stay. <u>See McCullough</u> v. <u>Horne</u> (<u>In re McCullough</u>), 495 B.R. 692, 695-696 (Bankr. W.D.N.C. 2013) (history of lack of prepetition payments to creditor combined with insufficient postpetition payments left creditor inadequately protected). Additionally, since the tax taking in 2018 and, in particular, since the Land Court entered judgment foreclosing the Debtor's right of redemption in January 2022, the Town has incurred significant costs to maintain the Property. <u>See</u> Doc. No. 8 at Ex. 2. For example, the Town has expended over $109,000 to insure the Property. <u>See</u> <u>id</u>. The Town has also paid almost $15,000 to board the Property and over $10,000 in utility costs, despite the fact that the building on the Property is vacant. <u>See id</u>. Additionally, the Town is responsible, to the extent provided by G.L. c. 60, § 77, to The MobileStreet Trust for payment of a portion of common area maintenance and snow removal under the Reciprocal Agreement. The Town

Exhibit 20

Gmail **Lolonyon Akouete <info@smartinvestorsllc.com>**

## Trustee's Escheat Claim

**Stephen Gordon** <sgordon@gordonfirm.com> Tue, Sep 26, 2023 at 7:31 AM
To: Lolonyon Akouete <info@smartinvestorsllc.com>
Cc: "Scott A. Schlager" <sas@natgolaw.com>

Lolo-
As counsel for the petitioning creditors I do in fact object to your emergency motion for relief from stay. First, there is no emergency. By one week from today, the Order for Relief should have entered. With that will come the immediate appointment of a Chapter 7 Trustee. He or she will have complete and exclusive authority (subject, as always, to Bankruptcy Court supervision) to both obtain the escheat money from California and to fight off the Town and sell the Westborough real estate for more money than the outstanding taxes. The Trustee may seek information on both assets from you and Scott to assist in their recovery. But commencement of litigation in California by you will not be permitted by the Trustee. What the Trustee will do with the Federal case brought just prior to the bankruptcy petition filing will have to await the Trustee's review of that case. I don't think that your current efforts are either necessary or productive. I suggest that you await the appointment of the Trustee.
Best,
Stephen

Stephen F. Gordon
The Gordon Law Firm LLP
River Place
57 River Street
Wellesley, MA 02481
Direct: 617-456-1270
Main: 617-261-0100
Fax: 617-261-0789
Sgordon@gordonfirm.com
www.GordonFirm.com

On Sep 26, 2023, at 6:54 AM, Lolonyon Akouete <info@smartinvestorsllc.com> wrote:

[Quoted text hidden]


TFW
10:55 PM
93%
BC
DF
2 People >
Mon, Nov 20 at 3:36 PM
Dave Ferris
I just spoke to my atty and told him to tell the bankruptcy atty I will honor the offer I made to the town $2.875 if the trustee doesn't take it I'll litigate w him for the next 10 years. We want to open our factory there.
If you need $10-20k to get an atty to object lmk and I'll consider it if they don't take that generous offer to close quickly
DF
Monday 4:37 PM
Brian Charville
Hi Lolo - the trustee accepted Dave's offer to buy the property for $2.875M. Now he will seek court approval. Dave will use the $120,000 that he had deposited to buy directly from SPE to make the purchase deposit with the trustee. Just wanted to let
iMessage

Exhibit 22

**AttyLeahy@outlook.com**

| | |
|---|---|
| **From:** | Nakhwal, Harpreet <HNakhwal@sco.ca.gov> |
| **Sent:** | Thursday, February 23, 2023 12:33 PM |
| **To:** | attyleahy@outlook.com |
| **Subject:** | Unclaimed Property-Westborough SPE LLC |
| **Attachments:** | MX-5071_20230223_092811.pdf |

Ms. Leahy,

Your inquiry regarding a claim for Unclaimed Property submitted for property reported with the owner as Westborough SPE LLC was forwarded to me. I attempted to contact you via telephone yesterday and left you a voicemail.

We are considering your inquiry a request under California's Public Records Act. Attached, please find a copy of my letter addressing the claim received for the unclaimed property in question.

I would also like to clarify that while people may register with the State Controller's Office as an investigator for purposes of unclaimed property claims, they are not registered investigators <u>of</u> the California State Controller's Office, Unclaimed Property Division.

If you would like to discuss further, please feel free to call me at the number listed below.

**Harpreet K. Nakhwal** | Staff Counsel
Office of State Controller Malia M. Cohen
Legal Office
300 Capitol Mall, Suite 1850
Sacramento, CA 95814
Tel: (916) 322-6430| Fax: (916) 322-1220

CONFIDENTIALITY NOTICE: This communication and its contents is from an attorney and may contain confidential and legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act (18 U.S.C. §§2510-22, 2701-11, 3121-26). If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

Exhibit 23

AFFIDAVIT OF PETER L. BLAUSTEIN

I, Peter L. Blaustein, attest and state the following of my own personal knowledge:

1. F. Jan Blaustein a/k/a Jan Blaustein Scholes is my mother and prefers to be addressed as Jan (hereinafter referred to as "Jan").
2. Jan is legally considered an incapacitated person.
3. Since September 11, 2014, I have been authorized as the "attorney-in-fact" or "agent" for Jan via a Power of Attorney. Therefore, I was granted all powers as her agent and/or her attorney-in-fact.
4. On June 3, 2019, I was appointed as Jan's conservator and court-appointed guardian upon signing the Waiver of Notice and Consent to Conservatorship.
5. Jan and I were approached by Denise Edwards and Loloynon Akouete who offered to investigate and attempt to reunite Jan with unclaimed property in California. The unclaimed property was a checking account owned by Westborough SPE LLC.
6. I consented to the assistance and gave permission for Jan to sign a Claim for Abandoned Property.
7. I did not give permission or consent for Jan to sign the Bill of Sale dated November 21, 2022, produced by Loloynon Akouete and/or Denise Edwards. I did not approve of Jan executing said document.
8. Lolonyon Akouete and Denise Edwards were aware Jan lacked capacity and that I was her legal guardian, and they did not involve me in the Bill of Sale contract process or seek my consent for Jan to sign it.

9. I do not believe the Bill of Sale contract terms are reasonable.

10. I do not believe Jan is or ever was the legal or rightful owner of Westborough SPE, LLC and/or the locus.

11. I have been in contact with Dyann Blaine (a previous employee of Babcock & Brown). Dyann Blaine does not think Jan has any legal interest in Westborough SPE, LLC and/or the locus.

12. I have instructed Jan to disengage from and cease contact with Lolonyon Akouete and Denise Edwards.

Signed under the pains and penalties of perjury this 3rd day of May, 2023.

Peter L. Blaustein

STATE OF CALIFORNIA

County of San Mateo

Date: 5/3/2023

On this day, before me, the undersigned notary public, personally appeared Peter L. Blaustein, proved to me on the basis of satisfactory evidence such as Drivers License (CA) to be the person whose name is signed on the preceding or attached document and, who subscribed and swore to or affirmed before me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

Notary Public Signature: [signature]
Notary Public Name: Dina N. Kolesnikov
My Commission Expires: 12.12.2025

(Seal)

DINA N. KOLESNIKOV
COMM. #2386495
Notary Public - California
San Mateo County
My Comm. Expires Dec. 12, 2025

AFFIDAVIT OF DYANN BLAINE

I, Dyann Blaine, attest and state the following of my own personal knowledge:

1. I was employed by Babcock & Brown LP, the indirect parent company of Babcock & Brown Administrative Services, Inc., as a corporate and tax attorney from 1993 through 2009.

2. I managed Babcock & Brown LP's corporate tax department and I worked with the General Counsel's group to manage corporate legal matters for the Babcock & Brown affiliated group.

3. In 1997 Babcock & Brown LP, through its Australian subsidiary, arranged a financing transaction relating to the Hoyts Cinemas movie theater complex located at 231 Turnpike Road, Westborough, Massachusetts, through which a group of private investors provided financing to Hoyts Cinemas with the intention of creating a sale-leaseback structure.

4. I do not have a legal interest in the property located at 231 Turnpike Road, Westborough, Massachusetts.

5. On October 30, 1997, Westborough SPE, LLC entered into a service agreement with Babcock & Brown Administrative Services, Inc. to provide administrative and management services to Westborough SPE, LLC.

6. On or about October 23, 1997, Jan Blaustein and I, along with a number of other individuals, were appointed by Babcock & Brown Administrative Services, Inc. to serve as officers of Babcock & Brown Administrative Services, Inc..

7. Subsequently, Jan Blaustein and I were appointed by Babcock & Brown Administrative Services, Inc. to serve as authorized signatories for real estate matters of Westborough SPE, LLC.

8. On November 19, 2007, Westborough SPE, LLC filed a Certificate of Withdrawal in Massachusetts.

9. In 2008 Babcock & Brown Administrative Services, Inc. filed a Certificate of Withdrawal in Massachusetts.

10. On June 8, 2009 Babcock & Brown Administrative Services, Inc. notified Westborough SPE, LLC that it was terminating the service arrangement effective August 31, 2009.

11. On June 25, 2009, I ceased to be an employee of Babcock & Brown LP, and resigned from my position as an officer of Babcock & Brown Administrative Services, Inc.

12. I was contacted by the Town of Westborough through their due diligence efforts to locate information about the owner(s) of Westborough SPE, LLC, prior to the tax title foreclosure judgment entering.

13. In response to the contact referenced above I provided detailed information regarding the history and ownership of Westborough SPE, LLC to the Town of Westborough.

14. I received a Citation from the Land Court as notice of the foreclosure case. I elected not to answer as I did not have a right to redeem.

15. I will appear in the audience at the upcoming hearing.

Signed under the pains and penalties of perjury this ~~27th~~ 28th day of April.

2023.

Dyanm Blaine
Dyann Blaine

STATE OF California

County of Contra Costa

Date: 04/28/2023

On this day, before me, the undersigned notary public, personally appeared Dyann Blaine, proved to me on the basis of satisfactory evidence such as CA identification to be the person whose name is signed on the preceding or attached document and, who subscribed and swore to or affirmed before me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

Notary Public Signature: [signature]

Notary Public Name: Navita Sohal

My Commission Expires: 02/28/2025

(Seal)

NAVITA SOHAL
Notary Public - California
Alameda County
Commission # 2149299
My Comm. Expires Feb 28, 2025

11:21
◂ Phone

189

SCOTT ›

The trustee will do whatever he decides to do. The trustees' actions are fully the trustees and only he is responsible for his actions. The Trustee told me he is frustrated by Lolo's actions—fact. The Trustee also told me that Walter Horst contacted him and challenged Lolo and your authority to make the Delaware filings —fact. I never threaten or intend to threaten anyone. Every action taken has a consequence. One of the intended consequences of Lolo's current actions could possibly de a delay of the bankruptcy proceedings and a delay in all creditors getting paid

Yes, but if there was no state money and only the property everyone would still have to wait. Walt did nothing to get us here. This thing was dormant until Lolo and I can along.

Delivered

The state money is not the issue. The Trustee said he'd pay the CA rate of 10% on the CA unclaimed funds. The issue is there's a fundamental difference between an asset recovery specialist ie a "Finder" vs. LLC Manager. That explanation aside, the real estate is unimportant to the bankruptcy because all creditors can be paid from the bankruptcy estate trustee getting the funds from CA. Walt

iMessage

Exhibit 26

Gmail

Lolonyon Akouete <info@smartinvestorsllc.com>

# In re Westborough SPE LLC - FOR SETTLEMENT PURPOSES ONLY

**Lolonyon Akouete** <info@smartinvestorsllc.com> Fri, Feb 9, 2024 at 4:25 PM
To: "Scott A. Schlager" <sas@natgolaw.com>
Cc: "jgoldsmith@gkalawfirm.com" <jgoldsmith@gkalawfirm.com>, "sgordon@gordonfirm.com" <sgordon@gordonfirm.com>, "deniseedwards818@yahoo.com" <deniseedwards818@yahoo.com>, "Lenard B. Zide" <zide@buttersbrazilian.com>

Scott,

Thank you for informing me that the trustee will retaliate by fighting my proof of claim.
I just want to remind you that Compensation for standard or probate unclaimed property claims, as well as general claims and administrative appeals proceedings, is dictated by State law. However, if a claim escalates to litigation, statutory fees outlined in state law no longer apply.

So, MGI C 200A Section 13 will not apply in this case.

If the trustee wanted to fight my claim, he would be dragging this case further.

Please note the last three attachments, which are cases where the court orders a 20% payment to the unclaimed property investigator. And if you look at the proportion of the amounts, the owner and the investigator get is almost 50%.

Lolonyon Akouete

Manager of Westborough SPE, LLC

1241 Deer Park Ave., Suite 1, #1051

North Babylon, NY 11703

info@smartinvestorsllc.com

(443) 447-3276

[Quoted text hidden]

**6 attachments**

**Contingency Fee Unclaimed Property.pdf**
259K

**Statutory Compensation Unclaimed Property.pdf**
106K

**Statutory Fees Unclaimed Property.pdf**
109K

**03885770.pdf**
108K

**FN{052BD2E7-2E08-4CF5-8ADB-5E2831CB7052}{F6FED901-556C-4B8C-ADAA-9621149CEF9D}-0.PDF**
3538K

**FN{D13F37F4-3E47-4C0F-845B-3B66C439F983}{F6FED901-556C-4B8C-ADAA-9621149CEF9D}-0.PDF**
232K

CERTIFICATE OF SERVICE

I, Lolonyon Akouete, hereby certify that the above document is served by email and mailing a copy of the same, first-class mail, to the following:

Stephen F. Gordon, Attorney of the Petitioners
(Email: sgordon@gordonfirm.com)
The Gordon Law Firm LLP
River Place 57 River Street Wellesley, MA 02481

Scott A. Schlager on behalf of,
Nathanson & Goldberg, P.C., a creditor.
(Email: sas@natgolaw.com)
183 State Street, 5th Floor Boston, MA 02109

Assistant U.S. Trustee
Richard King
Office of US. Trustee
446 Main Street 14th Floor
Worcester, MA 01608
USTPRegion01.WO.ECF@USDOJ.GOV

Jonathan R. Goldsmith
Chapter 7 Trustee
trusteedocs1@gkalawfirm.com
Goldsmith, Katz & Argenio P.C.
1350 Main Street, 15th Floor.
Springfield, MA 01103

Dyann Blaine
20 Queensbrook Place
Orinda, CA 94563
dyann.blaine@gmail.com

Jan Blaustein Scholes
7501 E Thompson Peak Pkwy
Scottsdale, AZ 85255
jan.scholes2@gmail.com

Mark S. Lichtenstein
AKERMAN LLP
1251 Avenue of the Americas, 37th Flr.
New York, New York 10020
mark.lichtenstein@akerman.com

Paul W. Carey, Attorney of Creditor
FERRIS DEVELOPMENT GROUP, LLC
(Email: pcarey@mirickoconnell.com)
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street, Worcester, MA 01608

Brian W. Riley, Attorney of Creditor
Jeffrey T. Blake, Attorney of Creditor
Roger L. Smerage, Attorney of Creditor
TOWN OF WESTBOROUGH
(Email: briley@k-plaw.com)
(Email: jblake@k-plaw.com)
(Email: rsmerage@k-plaw.com)
KP Law, P.C. 101 Arch Street,
12th Floor Boston, MA 02110

Gary M Ronan
David M Abromowitz
Goulston&storrs
GRonan@goulstonstorrs.com
DAbromowitz@goulstonstorrs.com
400 Atlantic Avenue
Boston, MA 02110

Peter Blaustein
950 Vista Road
Hillsborough, CA 94010
pblaustein@gmail.com

Walter Horst
Babcock & Brown
1264 Rimer Drive
Moraga, CA 94556
walter.horst@babcockbrown.com

Samual A. Miller, Esq.
AKERMAN LLP
420 South Orange Avenue
Suite 1200
Orlando, FL 32801
samual.miller@akerman.com
sharlene.harrison-carera@akerman.com

Lolonyon Y Akouete

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 23-40709-CJP

Chapter 7

| | |
|---|---|
| In re:<br><br>WESTBOROUGH SPE LLC | TOWN OF WESTBOROUGH'S REPLY IN SUPPORT OF MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT |

The Town of Westborough ("Town"), listed in the Debtor's Matrix List of Creditors (Doc. No. 7) in the above-captioned action, hereby files this reply in support of the Chapter 7 Trustee's Motion for Approval of Settlement Agreement (Doc. No. 190) ("Settlement Motion"). As set forth in the Settlement Motion, and as detailed below, the Settlement Agreement and Mutual Release (Doc. No. 189) ("Settlement") benefits all parties by resolving a highly-disputed issue—namely whether the real property located at 231 Turnpike Road, Westborough, Massachusetts (the "Property") is an asset of Westborough SPE LLC (the "LLC") that is subject to this bankruptcy proceeding—and a variety of related issues. Indeed, the Settlement avoids the need for litigation and court adjudication of at least four motions and two separate civil actions, and instead allows the Property to be put to productive use within months (if not weeks) rather than be mired in litigation for several more years. The Settlement also facilitates prompt resolution of the pending bankruptcy.

Only one person—purported creditor Loloyon Akouete—has filed any objection to the Settlement or opposition to the Settlement Motion. See Doc. No. 191. Mr. Akouete's Opposition, however, is the latest in a long string of attempts to complicate and undermine resolution of the issues related to this case. Rather than entertain Mr. Akouete's meritless objections, the Court should find that the Settlement, negotiated between and signed by the majority of creditors and the

United States Trustee as a result of months of good-faith negotiations, offers a fair and reasonable global settlement of issues that would otherwise cost hundreds of thousands of dollars to litigate and drag this bankruptcy proceeding out for months, if not years. Because Mr. Akouete is the only dissenting voice from the Settlement, and because he has not established any prejudice resulting from the Settlement, the Town respectfully submits that this Court should grant the Settlement Motion and approve the Settlement.

## ARGUMENT

It is well established that "compromises are favored in bankruptcy." LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 212 F.3d 632, 635 (1st Cir. 2000). With this in mind, the Court examines three factors when reviewing a proposal for and objections to a negotiated settlement in a Chapter 7 proceeding: "(i) the probability of the success in the litigation being compromised; … [(ii)] the complexity of the litigation involved and the expense, inconvenience, and delay in pursuing [the litigation]; and [(iii)] the paramount interest of the creditors and a proper deference to their reasonable views." Desmond v. Edrissi (In re Al-Idrisi), 634 B.R. 174, 181-182 (Bankr. D. Mass. 2021), quoting Jeffrey v. Desmond, 70 F.3d 183, 185 (1st Cir. 1995). Given the complexity of bankruptcy cases involving interrelated federal and state claims,[1] adversary proceedings, and fact-intensive disputes—such the instant case—the Court should give "deference to the business judgment of the Trustee at the time of the decision to pursue [an agreement] and sale" of a bankruptcy estate's property in order to resolve otherwise costly litigation and "to

[1] The fact that the Settlement provides for resolution of related state and federal court litigation that is not part of this bankruptcy proceeding—namely Ferris Development Group's Superior Court action challenging aspects of the Town's RFP process and the Debtor's U.S. District Court action challenging the Town's taking and sale of the Property under Tyler v. Hennepin County, 598 U.S. 631 (2023)—does not run afoul of Harrington v. Purdue Pharma L.P., 603 U.S. ---, 144 S.Ct. 2071 (2024). Harrington involved the bankruptcy court's authority to approve releases given to the debtor's principals as part of a chapter 11 reorganization plan, which is of no moment to this chapter 7 proceeding. See 144 S.Ct. at 2081. Notably, the U.S. Trustee objected to the private settlement negotiated in Harrington, see id. at 2080, whereas the Settlement here was negotiated by the Trustee.

generate a meaningful dividend to creditors where possible." In re Al-Idrisi, 634 B.R. at 182-183; see Crawford v. Riley (In re Wolverine, Proctor & Schwartz, LLC), 436 B.R. 253, 266 (D. Mass. 2010) (court does not to substitute judgment for that of trustee). As stated by the First Circuit:

> A chapter 7 trustee is entrusted to marshal an estate's assets and liabilities, and proceed in settling its accounts on whatever grounds he, in his informed discretion, believes will net the maximum return for the creditors (on whose behalf he toils). When augmentation of an asset involves protracted investigation or potentially costly litigation, with no guarantee as to the outcome, the trustee must tread cautiously—and an inquiring court must accord him wide latitude should he conclude that the game is not worth the candle.

In re Mailman Steam Carpet Cleaning Corp., 212 F.3d at 635.

In short, under circumstances like those present in this case, "[s]ettlements should be approved if they fall above 'the lowest point in the range of reasonableness,'" bearing in mind the Trustee's and creditors' preferences to avoid costly and complex litigation. In re Al-Idrisi, 634 B.R. at 182, quoting Hicks, Muse & Co., Inc. v. Brandt, Jr. (In re Healthco Int'l, Inc.), 136 F.3d 46, 51 (1st Cir. 1998). The Settlement in this case more than meets this standard. In the context of a bankruptcy proceeding where not only is the status of the Property in dispute, as set forth in the Town's Motion for Relief from the Automatic Stay (Doc. No. 20), but the very basis for the commencement of the bankruptcy proceeding has been challenged, as set forth in the Town's § 707(a) Motion to Dismiss (Doc. No. 69), the Settlement provides a global resolution to numerous pending motions and claims in federal and state courts, and all creditors connected to those motions and claims are in support of resolution. Weighed against the dubious claims of one lone purported creditor, the Settlement should be approved.

## I. THE SETTLEMENT IS AN EFFICIENT AND FAIR GLOBAL RESOLUTION TO ISSUES OTHERWISE REQUIRING SUBSTANTIAL LITIGATION

It is difficult to overstate the efficiency with which the Settlement will dispose of the pending claims and motions, litigation of which likely to be extremely costly and could negatively

affect the bankruptcy estate. As noted in the Town's pending motions, the LLC lost all legal interests in the Property when the Massachusetts Land Court entered judgment in the Town's tax title foreclosure action. Although both Mr. Akouete (on behalf of the LLC, despite serious questions concerning his authority) and the Trustee have initiated attempts to claw back the LLC's right of redemption, if those efforts prove unsuccessful, the Debtor's estate will see no benefit. And to succeed on any of those efforts, the Trustee (who now controls the Debtor's claims) will be forced to expend significant time and money. By settling, however, the Trustee obtains certainty—in terms of cost, time, and outcome—for the benefit of the Debtor's estate and the resulting benefit for its creditors. In light of the efficiency this global remedy poses, Mr. Akouete's quibbles with the Settlement are not well taken. Indeed Mr. Akouete's objections are rooted in factual suppositions and legal conclusions for which there is little (if any) support.

This is particularly true because Mr. Akouete completely ignores the disputed status of the Property. For all of the reasons set forth in the Town's pending motions, the Property is not a part of the bankruptcy estate. Any assertion that the Settlement undervalues the Property disregards this critical fact and the resulting position of the Town, which is that it has the right to complete its sale to Lax Media, LLC ("Lax"). The same is true of any challenge to the process the Town used to arrive at its selection of Lax's proposal to buy the Property. In any case, any disputes over these issues—whether concerning compliance with chapter 30B or sufficiency of service on the LLC in the Land Court—are within the purview of the Trustee.[2] Thus, it is up to the Trustee and interested creditors (such as Lax, Ferris Development Group, and the MobileStreet Trust) to settle

[2] Notably, the Land Court oversaw the service process and deemed it sufficient to enter judgment against the LLC. Likewise, the fact that the Land Court had scheduled a pre-hearing conference on the motion to vacate that judgment, contemplating an evidentiary hearing into the questions of Mr. Akouete's authority to try to redeem the Property on behalf of the LLC, undermines Mr. Akouete's contention that the motion to vacate was "straightforward and concrete." Opp'n at 6. Regardless, as the motion was filed on behalf of the LLC, it is now up to the Trustee to decide how to proceed with that motion on behalf of the Debtor.

such disputes, where the likely benefit to any given party significantly outweighs the risks and costs associated with full litigation.

The fact that many of these issues are in dispute does not demand denial of the Settlement Motion. Indeed, it is not a reviewing court's role to decide the disputed questions of fact and law but only to decide whether the proposed settlement's resolution thereof falls below the "lowest point in the range of reasonableness." Ars Brook, LLC v. Jalbert (In re Servisense.com, Inc.), 382 F.3d 68, 71-72 (1st Cir. 2004) (emphasis added and internal quotations omitted). Given the complexity of the ongoing litigation, including its multi-pronged and multi-party nature, the Settlement is far above the lowest point in the range of reasonableness. Similar to other cases where settlements were approved and deemed highly reasonable, among the various outstanding legal issues being resolved or narrowed through the Settlement is one "involving the disputed ownership of [an entity], which in turn may or may not own property of disputed value and condition." In re Anolik, 107 B.R. at 430. Such litigation is "sufficiently convoluted to insure a lengthy period of time before any resolution." Id.

Even assuming that there was any truth to the assertion that the Property is worth more than the Settlement provides, Mr. Akouete would need to demonstrate both that this is true and that this could be proved in an efficient and economical fashion. See Yelverton v. Webster (In Re Yelverton), 527 B.R. 557, 560-561 (D.D.C. 2014) (approving settlement valuing business at $110,000, though creditor asserted it was appraised at $900,000); In re Kavlakian, 403 B.R. 159, 161 (D. Mass 2009) (approving settlement including valuation of property at $98,000, although it was purchased for $450,000, where higher valuation was based on facts not proven by objector). Mr. Akouete has not done so and, given the condition of the Property (having been vacant since 2017), it is doubtful that he could. Rather than fully litigate these disputes, which could result in

serious harm to the bankruptcy estate (by proving that the Property is not part of the estate and by accrual of further attorney's fees), the Trustee has negotiated an eminently reasonable global Settlement. "If a trustee chooses to accept a less munificent sum for a good reason (say, to avoid potentially costly litigation), his judgment is entitled to some deference." City Sanitation, LLC v. Allied Waste Services of Massachusetts, LLC (In re Am. Cartage, Inc.), 656 F.3d 82, 92 (1st Cir. 2011).

> Furthermore, a chapter 7 trustee, like other fiduciaries engaged in complex litigation, realistically cannot be required to demonstrate to the satisfaction of every individual creditor and the debtor, or to any compelling degree of certitude, that the settlement benefit to the chapter 7 estate and the value of the settled claim comprise a matched set. Rather, a chapter 7 trustee is required to reach an informed judgment, after diligent investigation, as to whether it would be prudent to eliminate the inherent risks, delays and expense of prolonged litigation in an uncertain cause.

Kowal v. Malkemus (In re Thompson), 965 F.2d 1136, 1145 (1st Cir. 1992). Mr. Akouete "ha[s] made no creditable demonstration to the contrary." Id.

The wisdom in avoiding these factual and legal issues in exchange for global resolution and settlement is readily apparent particularly in consideration of the fact that the Settlement provides for satisfaction of all creditors' claims, once vetted by the Trustee and approved by the Court (as discussed further below). Mr. Akouete's dubious schemes to radically maximize the value of the Property are far too improbable to represent a reasoned—much less mandated—alternative to the Settlement. "Trustees must take care not to throw good money after bad, and" the "inclination to embrace the settlement is a choice which [is] deserving of some deference." In re Mailman Steam Carpet Cleaning Corp., 212 F.3d at 635.

## II. THE SETTLEMENT DOES NOT UNFAIRLY BENEFIT THE TOWN

Notwithstanding the broad acceptance of the Settlement, Mr. Akouete's assertions regarding the Settlement's purported improper effects on creditor interests largely revolve around his unsupported contentions that the Town is receiving a windfall from the Settlement and that

creditors are not treated fairly as a result. Additionally, Mr. Akouete raises baseless speculations about the propriety of the Town's relationship with Lax, obliquely suggesting that Lax's accepted proposal was the product of various ethics violations and abridgment of laws. None of these assertions has any merit, much less warrant denial of the Settlement Motion.

The claim that the Town is receiving more from the Settlement than it is owed ignores and misconstrues the facts of the matter. For instance, Mr. Akouete uses a figure taken from January 2023, which calculated the Town's claim, costs, and related expenses to be $642,678.20. This figure, however, is neither current nor complete. At present, the outstanding taxes as of January 5, 2022, plus interest and fees under G.L. c. 60, amount to $732,461.14. See Exhibit 1 (Declaration of Kristi Williams) at ¶ 5. On top of that, the Town has incurred maintenance, utility, insurance, and related costs of $246,109.67 and legal expenses of $244,063.51 related to the status of the Property. See id. at ¶¶ 6-7. Thus, the Town is presently owed $1,222,634.32. Additionally, the figure Mr. Akouete relies upon ignores the fact that if the Trustee were to prevail in vacating the tax title foreclosure judgment and restoring the LLC's right of redemption, the LLC would be obligated to pay the taxes that would have accrued since January 5, 2022 (but did not since the Town took title to the Property). These taxes amount to an additional $33,724.95. See Ex. 1 at ¶ 8. Given this, the Town's receipt of $1,165,000 is an eminently reasonable and accurate representation, if not underestimate, of the amount to which the Town is entitled.

Nor are Mr. Akouete's other arguments concerning the Town's role availing. Even assuming that Mr. Akouete had any basis for taking issue with the Town's RFP process,[3] that process was fair and proper. The request for proposals related to the Property resulted in three proposals. See Exhibit 2 (Affidavit of Select Board Chair Ian Johnson) ¶ 6. Although Lax's bid

---

[3] If the LLC had any issues with the Town's RFP process, it would be the Trustee, not Mr. Akouete, who would control the Debtor's handling of such issues.

was lower than the others, the others were deemed less practicable (Ferris) or completely impracticable (Pulte Homes), whereas Lax's bid and plans to utilize the Property as a cinema complex, which the Property had been previously and which the Town's zoning already permitted, were deemed "highly advantageous." See Ex. 2 at ¶¶ 7, 15-21. Furthermore, Lax's bid, at $2,500,001, was higher than the fair market value of the Property, assessed at $2,082,000 at the time. See Declaration of Kristi Williams (Doc. No. 22) ¶ 17; see also Ex. 1 at ¶ 3. The only other viable offer the Town received was Ferris's bid of $2,875,000, but the slightly higher price was not so significant as to outweigh the advantages Lax's bid offered, such as utilizing the Property for the same purpose it previously had been devoted. Additionally, the additional $375,000 Ferris proposed paying would not render the Settlement unreasonable by any stretch, in light of the cost of litigation and inefficiency that would accompany vindicating this marginal increase. Cf. In re Holly Marine Towing, Inc., 669 F.3d 796, 802 (7th Cir. 2012) (approving settlement that valued property at 50% of assessed value).[4]

Putting aside for the moment that Mr. Akouete likely does not have standing to raise any legal claims concerning the disposition of the Property, the likelihood that Mr. Akouete could successfully demonstrate that other options were viable, including those that did not submit proposals or those with insurmountable obstacles,[5] or that there were violations of Massachusetts

[4] In January 2023, the Massachusetts Superior Court denied Ferris's motion for preliminary injunction in the lawsuit Ferris brought to challenge the Town's sale to Lax through the RFP process, rejecting the argument that "no rational application of the [RFP] criteria could have resulted in Lax receiving the highest possible ratings on the purchase price, financial resources, ability to proceed, and sustainability criteria" and concluding that Ferris was "unable to demonstrate that it is likely to succeed on the merits of its claim that the Town breached an implied contract or violated G.L. c. 30B." See Memorandum of Decision and Order, at 9-11, Ferris Development Group, LLC v. Town of Westborough, Mass. Super. Ct. Case No. 2285CV02181 (Jan. 18, 2023).

[5] As discussed above, the bid received from Pulte Homes for $7,942,000 was not viable at the outset "because of a water and sewer connection moratorium in the Town imposed due to limited capacity in the Town's existing systems," which would completely bar Pulte Homes' proposed use, a 108-unit condominium. See Ex. 1 at ¶¶ 6-7. Other purported offers referenced in Mr. Akouete's Opposition, from Grossman Development, Cinema World of Florida, and Black Socks Corp., were not submitted to the Town in response to its RFP.

competitive bidding standards or conflicts of interest laws borders on zero. Indeed, Mr. Akouete has not alleged, much less established, that any Town official stands to gain personally from the Settlement. This is unsurprising, as the benefit of the Settlement to the Town runs to the municipality as a whole, by returning the Property to the tax rolls, satisfying the amounts due to the Town, and avoiding further legal expense.

Mr. Akouete's remaining, baseless speculations regarding alleged improprieties in the Town's dealings with Lax and others are completely unsupported. Moreover, the fact that the Settlement provides exclusivity periods (first for Lax, then for Ferris) to close on the Property is not uncommon or improper. Rather, they give effect to the Town's efforts to sell the Property before Mr. Akouete began to interfere. If neither Lax nor Ferris closes on the Property pursuant to the terms of the Settlement, then the Trustee will sell the Property through § 363. This is an eminently reasonable compromise. Even if a party with standing raised the claims Mr. Akouete purports to be prepared to pursue, the "likelihood of success in the pending state litigation is doubtful." In re Anolik, 107 B.R. 426, 430 (D. Mass. 1989). This is especially true where the actual parties to the current litigation concerning the bidding process—Ferris and Lax—are signatories to and in favor of the Settlement. As such, the Settlement does not unfairly favor the Town.

## III. THE SETTLEMENT ADEQUATELY PROTECTS ALL CREDITORS

Mr. Akouete asserts that the Settlement does not adequately protect the interests of creditors. This ignores that nearly all creditors—including the two petitioning creditors—are signatories to the Settlement and the fact that this Court's analysis of the Settlement must include "proper deference to their reasonable views." In re Al-Idrisi, 634 B.R. at 182, quoting Jeffrey, 70 F.3d at 185. Indeed, it is highly relevant in analyzing global settlements concerning large—and disputed—sums to defer to the reasonable views of not only the trustee but of the creditors who

would incur the costs and risks if a settlement were disapproved. See, e.g., Tri-State Fin., LLC v. Lovald, 525 F.3d 649, 654 (8th Cir. 2008) (approving settlement of $2,526,324.75 claim for $675,886.80 over lone creditor's objection, where 52 other entities did not object and claim presented complex litigation possibilities).

Mr. Akouete's contentions regarding the claims of other creditors are likewise unsupported. For example, MobileStreet is a signatory to the Settlement and its claim will be allowed at, in fact, a higher amount than it was initially filed and for the full amount of the most recent amended proof of claim, $374,934.60. See Settlement Motion at p.9 n.2. The assertion that Ferris's claim is being treated disparately from others (such as the unrelated claim of Darin Clagg) ignores the fact that Ferris has been litigating issues concerning the status of the Property since the conclusion of the Town's RFP process. To the extent that Mr. Akouete contends without factual support that "the Trustee's discretion and business judgment appear compromised," Opp'n at 9, these "conclusory assertions fall far short of the creditable demonstration of fiduciary nonfeasance required to establish lack of adequate representation." In re Thompson, 965 F.2d at 1144. There is ample basis, therefore, to "strongly disagree with [Mr. Akouete's] characterization of the challenged settlement as a dereliction of fiduciary duty on the part of the chapter 7 trustee." Id.

Mr. Akouete's baseless accusations aside, the Settlement more than adequately allows for the satisfaction of all claims on the estate. As outlined in the Settlement Motion, upon sale of the Property (whether to Lax, Ferris, or a third party), the Town will receive $1,165,000. The remaining sales proceeds will be transferred to the Trustee and immediately become a part of the bankruptcy estate, ensuring that the Settlement complies with Tyler v. Hennepin County, 598 U.S. 631 (2023). That amount—which would be an additional $1,335,000 assuming that Lax successfully exercises its purchase rights—will be added to the primary asset of the bankruptcy

estate, the $1,293,646.83 contained in the California checking account. The resulting amount, $2,627,146.83, is apparently more than enough to satisfy all valid existing claims of creditors. Indeed, as represented in Mr. Akouete's objection, the remaining claims—even including his claim (which is likely to be contested by the Trustee)—would total only $1,110,481.60, leaving a surplus of $1,516,665.23.[6] Therefore, Mr. Akouete cannot demonstrate that any creditor, himself included (assuming he is actually a creditor), would suffer any detriment by the proposed disposition of the Property through the Settlement. Cf. In re Al-Idrisi, 634 B.R. at 184.

Resolution of claims that could potentially deprive the bankruptcy estate of more than half of its assets not including the cost of litigation, is within the best interests of the creditors and the estate itself. Cf. In re Servisense.com, Inc., 382 F.3d at 72 (approving settlement where "the cost of litigation would 'in all likelihood' exceed the settlement amount"). Indeed, given the questions surrounding the Property and its relationship to the bankruptcy estate, the Settlement actually puts the estate in a much better situation than it reasonably could otherwise expect to be. In other words, "[w]hen comparing what the Debtors faced at the time of entering into the Stipulation with what the Debtors may have gained in protracted litigation, … the Debtors' decision to enter into the Stipulation f[alls] far above the lowest point of reasonableness." In re Managed Storage Int'l, Inc., 601 B.R. 261, 271 (Bankr. D. Del. 2019).

**CONCLUSION**

For the foregoing reasons, the Town respectfully submits that this Court should grant the Settlement Motion.

[6] The claims are, according to the claims register: Darin Clagg, $10,000; Sherin and Lodgen LLP, $20,000; Lolonyon Akouete, $625,297.02; Denise Edwards, $333,491.75; Nathanson & Goldberg, P.C., $121,692.83.

Respectfully submitted,

TOWN OF WESTBOROUGH,

By its attorneys,

Brian W. Riley (BBO# 555385)
Jeffrey T. Blake (BBO# 655773)
Roger L. Smerage (BBO# 675388)
KP Law, P.C.
Town Counsel
101 Arch Street, 12th Floor
Boston, MA 02110-1109
(617) 556-0007
briley@k-plaw.com
jblake@k-plaw.com
rsmerage@k-plaw.com

Date: July 24, 2024

931614/WBOR/0049

CERTIFICATE OF SERVICE

I, Roger L. Smerage, hereby certify that on the below date, I caused a copy of the foregoing Reply to be served through the Court's CM/ECF system to the following counsel of record or by U.S. mail to the following unregistered parties:

Stephen F. Gordon
The Gordon Law Firm LLP
River Place
57 River Street
Wellesley, MA 02481
sgordon@gordonfirm.com
*Attorney for Petitioning Creditors*

Jonathan R. Goldsmith
Goldsmith, Katz & Argenio P.C.
1350 Main Street, 15th Floor
Springfield, MA 01103
trusteedocs1@gkalawfirm.com
*Attorney for Chapter 7 Trustee*

Richard King
Office of US. Trustee
446 Main Street
14th Floor
Worcester, MA 01608
*Attorney for the U.S. Trustee*

Westborough SPE, LLC
c/o Lolonyon Akouete
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703
*Debtor* (by U.S. mail)

Lenard Benson Zide
Butters Brazilian LLP
420 Boylston Street, 4th Floor
Boston, MA 02116
zide@buttersbrazilian.com
*Attorney for Creditor The MobileStreet Trust* (by email)

Paul W. Carey
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
pcarey@mirickoconnell.com
*Attorney for Creditor Ferris Development Group, LLC*

Darin Clagg
24 Kobbs Korner Rd.
Pine Bush, NY 12566
*Creditor* (by U.S. Mail)

Jonathan La Liberte
Sherin and Lodgen LLP
101 Federal Street, 30th Floor
Boston, MA 02110
jclaliberte@sherin.com
*Attorney for Creditor Sherin and Lodgen LLP* (by email)

Lolonyon Akouete
800 Red Milles Rd.
Wallkill, NY 12589
info@smartinvestorsllc.com
*Creditor* (by email)

Denise Edwards
137 North 25th Street
Wyandanch, NY 11798
deniseedwards818@yahoo.com
*Creditor* (by email)

Dated: July 24, 2024

[signature]
Roger L. Smerage

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 23-40709-CJP

Chapter 7

In re:

WESTBOROUGH SPE LLC

LIST OF EXHIBITS

Pursuant to Rule 5 of Appendix 8 of the Local Bankruptcy Rules for the U.S. Bankruptcy Court for the District of Massachusetts, the Town of Westborough ("Town"), listed in the Debtor's Matrix List of Creditors (Doc. No. 7) in the above-captioned action, hereby lists the exhibits that are filed separately in conjunction with the Town's Reply in Support of Motion to Approve Settlement:

| Exhibit | Description | No. of Pages (with cover sheet) |
|---|---|---|
| 1 | Declaration of Kristi Williams | 4 |
| 2 | Affidavit of Select Board Chair Ian Johnson | 52 |

932343/WBOR/0049

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**(CENTRAL DIVISION)**

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

**STATEMENT OF FERRIS DEVELOPMENT GROUP, LLC IN SUPPORT OF MOTION OF CHAPTER 7 TRUSTEE FOR APPROVAL OF SETTLEMENT AGREEMENT**

NOW COMES Ferris Development Group, LLC ("Ferris Development") and hereby submits this Statement in support of the Motion of Chapter 7 Trustee for Approval of Settlement Agreement [Dkt. 190] to Approve Settlement (the "Settlement Motion"). Ferris Development respectfully states as follows:

1. Ferris Development is a Massachusetts limited liability company with a principal place of business in Southborough, Massachusetts.

2. Ferris Development is in the business of developing and managing real estate projects.

3. Ferris Development hereby incorporates by reference the Affidavit of David M. Ferris, principal of Ferris Development, submitted herewith as if fully restated herein (the "Affidavit").

4. As set forth in the Affidavit, Ferris Development at all times acted in good faith with respect to the matters described in the Settlement Motion. In the event that Ferris Development purchases the Premises pursuant to the terms set forth in the Settlement Motion, Ferris Development is entitled to the protections afforded to good faith purchasers under Section 363(m) of the Bankruptcy Code.

WHEREFORE, Ferris Development respectfully requests that this Court enter an Order:

a. Approving the Settlement Motion;

b. Finding Ferris Development to be a good faith purchaser entitled to the protections under Section 363(m) of the Bankruptcy Code; and

c. Granting Ferris Development such further relief as is just.

Respectfully submitted,

FERRIS DEVELOPMENT GROUP, LLC

By its counsel,

/s/ Paul W. Carey

Paul W. Carey, BBO #566865
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax: (508) 791-8502
Email: pcarey@mirickoconnell.com

Dated: July 29, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 29, 2024, the foregoing Statement and accompanying Affidavit were filed with the United States Bankruptcy Court – District of Massachusetts and served upon all parties entitled to receive notice of filings in the above-captioned proceeding via the Bankruptcy Court's Electronic Case Filing (ECF) system and served via First Class Mail on:

Lolonyon Akouete
800 Red Milles Rd.
Wallkill, NY 12589

Denise Edwards
137 North 25th Street
Wyandanch, NY 11798

By: /s/ Paul W. Carey
Paul W. Carey

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**(CENTRAL DIVISION)**

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

**AFFIDAVIT OF DAVID M. FERRIS IN SUPPORT OF MOTION OF CHAPTER 7 TRUSTEE FOR APPROVAL OF SETTLEMENT AGREEMENT**

1. My name is David M. Ferris. I am the Manager and principal of Ferris Development Group, LLC ("Ferris Development").

2. I have personal knowledge of the information contained in this Affidavit.

3. I submit this Affidavit in support of the Motion of Chapter 7 Trustee for Approval of Settlement Agreement [Dkt. 190] to Approve Settlement (the "Settlement Motion").

4. Ferris Development is a Massachusetts limited liability company with a principal place of business in Southborough, Massachusetts.

5. Ferris Development is in the business of developing and managing real estate projects.

6. In June 2022, the Town of Westborough (the "Town") issued a request for proposals (the "RFP") by which is solicited offers to purchase the former Regal Cinema property located at 231 Turnpike Road, Westborough (the "Premises"). The Premises were owned by Westborough SPE LLC (the "Debtor"). The Town asserted that it had acquired tittle to the Premises by foreclosure of a tax lien.

7. The Town received three proposals by the due date of July 25, 2022.

8. The high bidder was Pulte Homes of New England, LLC which offered $7,942,000.00 contingent upon the Town approving development of 108 residential condominium units. The Town rejected that proposal.

9. Ferris Development offered $2,875,000 for the Premises and proposed developing the Premises into workspace for everyday tradespeople such as electricians, plumbers, painters, and carpenters.

10. Lax Media MA, LLC ("Lax") offered $2,500,001 for the Premises. Lax proposed to reopen a movie theater at the Premises.

11. Despite Ferris Development's bid being clearly higher and better than the bid of Lax, the Town selected the Lax bid on November 2, 2022.

12. On November 14, 2022, Ferris commenced suit against the Town and Lax in the Worcester Superior Court, Civil Action No. 22-CV-1281D (the "Bid Protest Litigation"). In the Bid Protest Litigation Ferris seeks monetary, declaratory, and injunctive relief compelling the Town to sell the Premises to Ferris Development for its bid of $2,875,000. The Bid Protest Litigation remains pending.

13. On August 31, 2023, two creditors of the Debtor filed an involuntary Chapter 7 petition in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") against the Debtor, commencing the Chapter 7 Bankruptcy Proceeding, In re Westborough SPE, LLC, Case No. 23-40709 (the "Bankruptcy Proceeding").

14. On October 11, 2023, the Bankruptcy Court entered an Order of Relief in the Bankruptcy Proceeding, after no parties filed an objection to the entry of an Order for Relief.

15. On October 12, 2023, the Bankruptcy Court appointed Jonathan Goldsmith as Chapter 7 Trustee (the "Trustee") to administer the assets and liabilities of the Debtor (the "Bankruptcy Estate").

16. Shortly after the Bankruptcy Proceeding was filed, Ferris Development engaged in discussions with the Trustee regarding purchasing the Premises. Those negotiations resulted in Ferris Development making an offer to the Trustee on or about November 27, 2023 to purchase the Premises from the Bankruptcy Estate, free and clear of all liens, claims, and encumbrances, for $2,875,000, the same amount Ferris Development bid in connection with the RFP (the "Ferris Offer").

17. The Trustee accepted the Ferris Offer and reported that fact to the Bankruptcy Court in a pleading filed November 27, 2023, in response to the Town's pending motion for relief from the automatic stay.

18. The Trustee did not ultimately file a motion seeking approval of the sale of the Premises to Ferris Development as set forth in the Ferris Offer, however. Instead, the Trustee continued to negotiate with various stakeholders, including Ferris Development, regarding a "global resolution" of the Bankruptcy Estate's claims with respect to the Premises, the Town's claim of ownership of the Premises, and Ferris Development's rights with respect to the Premises, including its claims raised in the Bid Protest Litigation.

19. Throughout those negotiations, Ferris Development acted in good faith. Specifically, Ferris Development negotiated with numerous stakeholders regarding a resolution that would allow for the sale of the Premises for the benefit of the Bankruptcy Estate and its creditors. As part of the global settlement, Ferris Development agreed to settle the Bid Protest Litigation, even if Ferris Development was not ultimately able to purchase the Premises.

20. The negotiations culminated in the settlement described in the Settlement Motion. Pursuant to the Settlement Motion, Ferris Development will have an opportunity to purchase the Premises only if Lax fails to close on a sale of the Premises. Notably, Ferris Development's

purchase price would be 15% higher than the price to be paid by Lax under the Settlement Motion. In addition, Ferris Development would dismiss the Bid Protest Litigation.

21. In exchange, in addition to allowance of its proof of claim filed in the amount of $10,000.00, Ferris Development will receive $100,000.00 from the sale of the Premises if Lax is the successful purchaser of the Premises. That amount represents a portion of the legal fees and other expenses incurred by Ferris Development in connection with its efforts to purchase the Premises, including the Bid Protest Litigation and its extensive negotiations with the Trustee and other parties in interest.

22. Ferris Development asserts that its efforts have preserved value for the Bankruptcy Estate and its creditors.

23. Ferris Development at all times acted in good faith. In the event that Ferris Development purchases the Premises pursuant to the terms set forth in the Sale Motion, Ferris Development is entitled to the protections afforded to good faith purchasers under Section 363(m) of the Bankruptcy Code.

I certify under penalty of perjury that the foregoing is true to the best of my knowledge, information, and belief.

Signed this 25th day of July, 2024.

David M. Ferris

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**(CENTRAL DIVISION)**

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

**DECLARATION RE: ELECTRONIC FILING**

PART I – DECLARATION OF PETITIONER

I, David M. Ferris, Manager and principal of Ferris Development Group, LLC, **hereby declare under penalty of perjury** that all of the information contained in the Affidavit of David M. Ferris in Support of Motion of Chapter 7 Trustee for Approval of Settlement Agreement (the "Document"), filed electronically, is true and correct. I understand that this DECLARATION is to be filed with the Clerk of Court electronically concurrently with the electronic filing of the Document. I understand that failure to file this DECLARATION may cause the Document to be struck and any request contained or relying thereon to be denied, without further notice.

I further understand that pursuant to the Massachusetts Electronic Filing Local Rule (MEFLR)-7(a) all paper documents containing original signatures executed under the penalties of perjury and filed electronically with the Court are the property of the bankruptcy estate and shall be maintained by the authorized CM/ECF Registered User for a period of five (5) years after the closing of this case.

Dated: July 25th, 2024

______________________________ (Affiant)
David M. Ferris, Manager and Principal
Ferris Development Group, LLC

Case 1:26-cv-10037-MGM Document 13-2 Filed 02/11/26 Page 363 of 582

PART II – DECLARATION OF ATTORNEY (If Affiant is Represented by Counsel)

I certify that the affiant signed this form before I submitted the Document, I gave the affiant a copy of the Document and this DECLARATION, and I have followed all other electronic filing requirements currently established by local rule and standing order. This DECLARATION is based on all information of which I have knowledge and my signature below constitutes my certification of the foregoing under Fed. R. Bankr. P. 9011. I have reviewed and will comply with the provisions of MEFR 7.

Dated: July 29, 2024

Signed: ______________________
Paul W. Carey, Esq.
Attorney for Affiant

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:** **Westborough SPE LLC** **Debtor(s)** | **Chapter 7** **23-40709-CJP** |

**PROCEEDING MEMORANDUM AND ORDER**

**MATTER:**
Hybrid Hearing on #280 Emergency Motion filed by Creditor Lolonyon Akouete to Remove Trustee For Cause.

**Decision set forth more fully as follows:**

FOR THE REASONS STATED ON THE RECORD, THE MOTION IS DENIED.

Dated: 08/21/2024

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br>Westborough SPE LLC<br><br>Debtor | Chapter 7<br>23-40709-CJP |

# ORDER

**MATTER:**
#300 Motion filed by Creditor Lolonyon Akouete For Summary Judgment.

DENIED. THE MOTION ITSELF ACKNOWLEDGES MATERIAL FACTS THAT ARE IN DISPUTE. AN EVIDENTIARY HEARING IS SCHEDULED FOR SEPTEMBER 17, 2024 REGARDING THE CHAPTER 7 TRUSTEE'S MOTION TO APPROVE SETTLEMENT (ECF NO. 190) AT WHICH THOSE ISSUES WILL BE DETERMINED TO THE EXTENT RELEVANT TO THE COURT'S CONSIDERATION OF THE SETTLEMENT.

Dated: 08/27/2024

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| In re: Westborough SPE LLC, Debtor | Chapter 7<br>23-40709-CJP |
|---|---|

**ORDER**

**MATTER:**
#302 Motion filed by Creditor Lolonyon Akouete for Appointment of a Court-Appointed Expert.

DENIED. MASS. R. CIV. P. 706 IS NOT APPLICABLE TO THIS FEDERAL BANKRUPTCY PROCEEDING. ALTHOUGH SIGNIFICANT LATITUDE HAS BEEN AFFORDED TO MR. AKOUETE REGARDING HIS FILINGS, HE IS CAUTIONED THAT FUTURE REQUESTS WITHOUT ANY BASIS IN LAW OR SEEKING RELIEF PREVIOUSLY CONSIDERED AND DENIED MAY BE SUMMARILY DENIED, AND HE MAY BE SUBJECT TO SANCTIONS.

THE COURT ALSO NOTES THAT THE TRUSTEE HAS THE BURDEN OF PROOF UNDER FED. R. BANKR. P. 9019 TO DEMONSTRATE THE REASONABLENESS OF THE PROPOSED COMPROMISE. MR. AKOUETE MAY CHALLENGE ANY EVIDENCE PRESENTED OR MAY OFFER EVIDENCE AT THE EVIDENTIARY HEARING SCHEDULED FOR SEPTEMBER 17, 2024 ON THE MOTION TO APPROVE SETTLEMENT WITHIN THE PARAMETERS DISCUSSED AT THE INITIAL HEARING ON THAT MOTION HELD ON AUGUST 20, 2024.

Dated: 08/28/2024

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 23-40709-CJP

Chapter 7

| | |
|---|---|
| In re:<br><br>WESTBOROUGH SPE LLC | TOWN OF WESTBOROUGH'S MOTION FOR INJUNCTION AND SANCTIONS <u>AGAINST LOLONYON AKOUETE</u> |

The Town of Westborough ("Town"), listed in the Debtor's Matrix List of Creditors (Doc. No. 7) in the above-captioned action, hereby moves the Court pursuant to Rules 9013 and 9014 of the Federal Rules of Bankruptcy for an order requiring Mr. Akouete to cease all conduct pursuant to which he purports to be selling the real property located at 231 Turnpike Road, Westborough, Massachusetts (the "Property") and enjoining Mr. Akouete from engaging in such conduct going forward, as well as sanctioning Mr. Akouete for such improper and unauthorized conduct.[1]

It recently came to the Town's attention that Mr. Akouete has listed the Property for sale on a website called "LoopNet" and has taken other steps to solicit offers to purchase the Property. Mr. Akouete's most recent (and subsequently denied) motion is based upon his apparent receipt of offers in response to such conduct. Mr. Akouete has done so despite the fact that the Town holds absolute title to the Property and he has no legal interest in the Property. In other words, regardless of all the other issues pending in these proceedings concerning Mr. Akouete's authority to act on behalf of the purported debtor Westborough SPE LLC (the "LLC")—of which there are

[1] The Town originally intended this filing to serve as an opposition and cross-motion to the Motion to Order Trustee to Evaluate Current Offers filed by Mr. Akouete (Doc. No. 368). Before the Town was able to finalize and file this paper, however, the Court entered an order denying that motion, in which order the Court recognized that Mr. Akouete "ignores the fact that record title to the subject property was not in the debtor's name as of the petition date and that the Trustee will be required to litigate to recover the property before the estate could seek to 'act' on any offer." <u>See</u> Doc. No. 369. As such, the Town files the instant paper as a motion, but nevertheless still asks the Court to consider Mr. Akouete's recently denied motion when considering whether sanctions are appropriate.

many disputed issues—Mr. Akouete has no authority to sell the Property, much less hold himself out to the world as a seller of the Property.

The fact that Mr. Akouete is doing so in an attempt to drum up evidence for the upcoming evidentiary hearing on the Chapter 7 Trustee's Motion to Approve Settlement does not somehow give him rights in the Property that do not otherwise exist. The Court should go beyond denying Mr. Akouete's most recent motion (as it has already done) and also enjoin Mr. Akouete from continuing this course of conduct. Additionally, because Mr. Akouete's conduct continues a pattern of vexatious conduct in these proceedings, disregards the Town's request that he cease and desist without Court intervention (not to mention the Court's prior warnings about baseless filings), and risks significant confusion as to the state of the Property, the Court should sanction Mr. Akouete by, at minimum, ordering him to pay the Town's legal fees for having to make this filing and excluding any evidence that Mr. Akouete procures through this conduct from the evidentiary hearing.

## BACKGROUND

1. On January 5, 2022, the Town obtained a Judgment in Tax Lien Case from the Massachusetts Land Court with respect to the Property. See Declaration of Roger L. Smerage (filed herewith and referred to herein as the "Smerage Decl."), Exhibit A.

2. As a result of this judgment (which is recorded in the Worcester County Registry of Deeds at Book 66983, Page 53), the Town obtained absolute title to the Property. See Tallage Lincoln, LLC v. Williams, 485 Mass. 449, 451-453 (2020).

3. To make a long story short, disputes subsequently arose regarding the status of the Property, driven in part by Mr. Akouete despite the fact that his authority to act for the LLC is doubtful (at best), and this bankruptcy proceeding ultimately resulted when Mr. Akouete's counsel

(engaged apparently for the LLC) and the owner of abutting property (which is subject to reciprocal covenants and easements) filed an involuntary Chapter 7 petition against the LLC.

4. The Town, the Chapter 7 Trustee (acting on behalf of the LLC), the Petitioning Creditors, and certain other creditors and interested parties—but not Mr. Akouete—subsequently entered into a Settlement Agreement and Mutual Release (the "Settlement") to resolve the various disputes concerning the Property.

5. The Chapter 7 Trustee moved pursuant to Rule 9019 for approval of the Settlement, but Mr. Akouete objected to the Settlement. See Doc. Nos. 190, 191.

6. An evidentiary hearing limited to the issue of the value of the Property, as it concerns Mr. Akouete's objection, is scheduled for November 18, 2024.

7. On Sunday, September 29, 2024, Mr. Akouete sent the Trustee an email entitled, "Transparency and Consideration of Interests Before Making a Counteroffer for 231 Turnpike Rd," in which Mr. Akouete copied dozens of individuals, including the undersigned Town Counsel. See Smerage Decl., ¶ 4 & Exhibit B.

8. In that email, Mr. Akouete states that he is "actively working on securing a new buyer for the property at 231 Turnpike Rd," which he (incorrectly) describes as "part of the bankruptcy estate of Westborough SPE, LLC."[2] See id.

9. Mr. Akouete also states in his email that "[y]esterday, I listed the property on LoopNet for market testing purposes, and I have already received several inquiries and one offer." See id.

---

[2] As discussed further herein, the Property itself is not part of the estate. At most, the LLC's legal claim to try to revive the foreclosed right of redemption is an asset of the estate.

10. Moreover, Mr. Akouete attached to the email two documents reflecting his communications with Parsons Commercial Group in which Mr. Akouete affirmatively solicits an offer to purchase the Property. See id.

11. Mr. Akouete has indeed listed the Property for sale on a website called "LoopNet." See Smerage Decl., ¶ 5 & Exhibit C.

12. Nowhere in the listing for the Property does Mr. Akouete disclose that he is not the owner of the Property, that the Town is the owner of the Property, or that the Property is a subject of dispute in these bankruptcy proceedings. See id.

13. Rather, the listing states that "[t]he Retail Property at 231 Turnpike Rd, Westborough, MA 01581 is currently available For Sale. Contact Smart Investors LLC for more information." See id.

14. Smart Investors LLC is an entity affiliated with Mr. Akouete, as reflected by the email address he has used to communicate with the parties to this proceeding. See Smerage Decl., Exhibit B.

15. Representatives of Lax Media, one of the parties to the Settlement, have raised concerns about Mr. Akouete's listing of the Property with the Town, stating that it "is causing a lot of confusion." See Smerage Decl., Exhibit D.

16. On October 1, 2024, the undersigned Town Counsel sent Mr. Akouete a reply email demanding that he cease and desist from his efforts to sell the Property or hold himself out as selling the Property. See Smerage Decl., Exhibit E.

17. Mr. Akouete responded that he would not do so "until the court orders otherwise." See id.

## ARGUMENT

### I. MR. AKOUETE HAS NO LEGAL BASIS TO SOLICIT OFFERS FOR THE SALE OF PROPERTY THAT THE TOWN OWNS

The Town obtained absolute title to the Property on January 5, 2022, and still holds such title, notwithstanding the various disputes concerning the Property's status. See Tallage Lincoln, LLC v. Williams, 485 Mass. at 451-453 (entry of tax title foreclosure judgment "extinguishes the taxpayer's remaining interest in the property—the right of redemption—and converts the municipality's … tax title into absolute title … free and clear of all encumbrances, including mortgages and other liens"). No one else has any legal interest in the Property. That is true of the LLC, the Chapter 7 Trustee, and—most importantly—Mr. Akouete.

Given that Mr. Akouete has no legal interest in the Property, he has no legal right to solicit offers for the sale of the Property. He has nothing to sell. He cannot represent to the world that the Property is his to sell. And yet, through the "LoopNet" listing and other communications, that is exactly what Mr. Akouete has done. He now asks the Court to order the parties to the Settlement to capitulate to the offers that Mr. Akouete has solicited as a result. The Court properly refused to given that the Property is not Mr. Akouete's to sell, any more than the Brooklyn Bridge is Mr. Akouete's to sell.

### II. THE COURT SHOULD ENJOIN MR. AKOUETE'S ATTEMPTS TO SELL THE PROPERTY

Mr. Akouete's actions to market the Property, to which he has no claim of ownership, are sufficiently egregious to warrant the extraordinary relief of a preliminary injunction. See Winter v. Natural Resources Defense Council, 555 U.S. 7, 25 (2008).[3] All factors for issuance of such an

---

[3] Although Fed. R. Bankr. P. 7065 (which makes Fed. R. Civ. P. 65 applicable in bankruptcy adversary proceedings) does not automatically apply in contested matters such as this one, "[t]he [C]ourt may at any stage in a particular matter direct that one or more of the other rules in Part VII," such as Rule 7065, "shall apply." Fed. R. Bankr. P.

injunction are satisfied here. Given that an injunction should be granted "where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable," see Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982), and Mr. Akouete's actions interfere with the Town's property rights in such manner, the Court should enjoin Mr. Akouete from continuing any conduct through which he purports to own or be able to sell the Property.

The Town is likely to succeed on showing that Mr. Akouete's conduct is improper.[4] As noted above, Mr. Akouete has no legal interest in the Property, title to which is currently vested in the Town absolutely, and thus no basis on which to represent to the world (whether through "LoopNet" or otherwise) that he is selling the Property. The fact that the LLC has sought to vacate the Land Court's foreclosure judgment or otherwise might assert claims to unwind the foreclosure judgment and revive the right of redemption under G.L. c. 60 does not change this. Nor does it somehow vest Mr. Akouete with a personal legal interest in the Property.[5] Simply put, Mr. Akouete's actions to list the Property for sale and hold himself out to the world as selling the Property are unlawful and should be restrained.

Additionally, the Town is likely to suffer irreparable harm if Mr. Akouete's conduct is not restrained. Lax Media has already expressed confusion about Mr. Akouete's actions, which is particularly concerning given that Lax Media is the recipient of the Town's 2022 RFP award for

---

9014(c). The Town hereby requests the Court apply Rule 7065 in this matter and further waive the provisions of Fed. R. Civ. P. 65(c) requiring security as the Town is a municipality.

[4] Although the Town has not initiated an adversary proceeding against Mr. Akouete given that his conduct arises in the context of an existing contested matter, the Town could—if necessary—state a claim for declaratory judgment that Mr. Akouete does not own the Property. See 28 U.S.C. § 2201.

[5] Such claims, of course, are now vested in the Chapter 7 Trustee, not the LLC itself, much less its purported managers. Thus, even if Mr. Akouete had any authority to act for the LLC—which the Town disputes (as reflected in its pending § 707 Motion to Dismiss)—the LLC could not take any steps to market or sell the Property unless and until the Chapter 7 Trustee prevailed on such claims. Once again, it must be noted that the Settlement contemplates resolution of those claims.

the Property and has rights to purchase the Property under the Settlement. More generally, Mr. Akouete's actions create risk that the public at large will become confused as to the ownership of the Property. The Settlement is intended to resolve all issues concerning the ownership of the Property and Mr. Akouete's actions jeopardize that. While he is entitled to object to the Settlement, he is not entitled to sow confusion into the market. And because such actions lead to harm that cannot be remedied through a money judgment or other legal remedy, the harm is irreparable and should be redressed through an injunction.

To that end, Mr. Akouete would not be harmed by the entry of the requested injunction, such that the balancing of harms necessarily weighs in favor of the Town. The injunction the Town seeks—that Mr. Akouete be required to take down all listings of the Property for sale and cease representing to third parties that he is selling, or can sell, the Property—does nothing more than prevent Mr. Akouete from taking action to market real property in which he has no legal interest. It in no way prevents Mr. Akouete from preparing for the upcoming evidentiary hearing, or developing evidence for such hearing, through lawful and proper means.[6]

Finally, the requested injunction serves the public interest. As noted above, Mr. Akouete's listing the Property for sale and other actions misrepresenting to the market that he can sell the Property creates significant confusion concerning the Property. The Town, to be clear, is not intending to sell the Property at this time other than through the Settlement to which it has agreed. The public interest is not well-served by Mr. Akouete's conduct implying that the Property is otherwise available for sale. As such, the Court should enjoin that conduct.

[6] Mr. Akouete has asserted in recent filings that he wishes to attend the evidentiary hearing by Zoom. The Town objects to any such request. Mr. Akouete appears intent on introducing documentary and testimonial evidence at the evidentiary hearing and the Town intends to cross-examine Mr. Akouete regarding such evidence.

## III. THE COURT SHOULD SANCTION MR. AKOUETE

The Court should also sanction Mr. Akouete for his latest maneuvering. Bankruptcy Courts such as this one have the inherent power to impose sanctions, whether for contempt of court, "remedying fraud on the court," or "preventing the disruption of ongoing proceedings." See Charbono v. Sumski (In re Charbono), 790 F.3d 80, 85-87 (1st Cir. 2015). Mr. Akouete's conduct with respect to the listing of the Property for sale is a disruption of this Court's ongoing proceedings to say the least, particularly with respect to the upcoming evidentiary hearing on the Settlement.

Mr. Akouete has spent the past year filing baseless and repetitive motions in significant volume. See Doc. Nos. 62, 65, 68, 92, 99, 104, 122, 126, 130, 135, 149, 164, 165, 166, 178, 180, 181, 182, 193, 212, 214, 218, 219, 229, 239, 244, 246, 247, 248, 250, 280, 300, 302, 327, 333, 340, 358, 359. The Town has had to expend significant amounts of time and substantial amounts of resources responding to several of these motions. See Doc. Nos. 113, 138, 153, 172, 183, 223, 330. The Court has put Mr. Akouete on notice that continuing with such conduct would result in sanctions. See Doc. Nos. 336, 353. Now, Mr. Akouete has not only filed another baseless motion to which the Town has had to respond (even though the Court denied the motion before the Town filed this response), but he has done so on the foundation of his unlawful listing of property he does not own (but the Town does) for sale. Such bad faith conduct not only warrants sanctions, but specifically warrants an award of attorneys' fees in favor of the Town for having to prepare this filing and bring Mr. Akouete's continuing egregious behavior to the Court's attention. See In re Charbono, 790 F.3d at 87-88. As an additional form of sanction, the Court should preclude Mr. Akouete from submitting into evidence at the upcoming evidentiary hearing any information or documents resulting from his improper and unauthorized listing of the Property for sale.

## CONCLUSION

For the foregoing reasons, the Court should (1) grant this motion; (2) order Mr. Akouete to take down all sales listings for the Property and refrain from all conduct in which he purports to own or be selling the Property; (3) sanction Mr. Akouete by ordering him to pay the Town's attorneys' fees for this filing and by excluding any evidence Mr. Akouete generates through his improper attempts to sell the Property from the evidentiary hearing on the Settlement; and (4) order all other relief the Court deems just and necessary.

Respectfully submitted,

TOWN OF WESTBOROUGH,

By its attorneys,

Brian W. Riley (BBO# 555385)
Jeffrey T. Blake (BBO# 655773)
Roger L. Smerage (BBO# 675388)
KP Law, P.C.
Town Counsel
101 Arch Street, 12th Floor
Boston, MA 02110-1109
(617) 556-0007
briley@k-plaw.com
jblake@k-plaw.com
rsmerage@k-plaw.com

Dated: October 2, 2024

943278/WBOR/0049

CERTIFICATE OF SERVICE

I, Roger L. Smerage, hereby certify that on the below date, I caused a copy of the foregoing Opposition and Cross-Motion to be served through the Court's CM/ECF system to the following counsel of record or by U.S. mail or email to the following unregistered parties:

Stephen F. Gordon
The Gordon Law Firm LLP
River Place
57 River Street
Wellesley, MA 02481
sgordon@gordonfirm.com
*Attorney for Petitioning Creditors*

Jonathan R. Goldsmith
Goldsmith, Katz & Argenio P.C.
1350 Main Street, 15th Floor
Springfield, MA 01103
trusteedocs1@gkalawfirm.com
*Attorney for Chapter 7 Trustee*

Richard King
Office of US. Trustee
446 Main Street
14th Floor
Worcester, MA 01608
*Attorney for the U.S. Trustee*

Westborough SPE, LLC
c/o Lolonyon Akouete
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703
*Debtor* (by U.S. mail)

Lenard Benson Zide
Butters Brazilian LLP
420 Boylston Street, 4th Floor
Boston, MA 02116
zide@buttersbrazilian.com
*Attorney for Creditor The MobileStreet Trust* (by email)

Paul W. Carey
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
pcarey@mirickoconnell.com
*Attorney for Creditor Ferris Development Group, LLC*

Darin Clagg
24 Kobbs Korner Rd.
Pine Bush, NY 12566
*Creditor* (by U.S. Mail)

Jonathan La Liberte
Sherin and Lodgen LLP
101 Federal Street, 30th Floor
Boston, MA 02110
jclaliberte@sherin.com
*Attorney for Creditor Sherin and Lodgen LLP* (by email)

Lolonyon Akouete
800 Red Milles Rd.
Wallkill, NY 12589
info@smartinvestorsllc.com
*Creditor* (by email)

Denise Edwards
137 North 25th Street
Wyandanch, NY 11798
deniseedwards818@yahoo.com
*Creditor* (by email)

Christine E. Devine
Nicholson Devine LLC
PO Box 7
Medway, MA 02505
*Attorney for Chapter 7 Trustee*

Dated: October 2, 2024

Roger L. Smerage

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br>Westborough SPE LLC<br><br>Debtor | Chapter 7<br>23-40709-CJP |

**ORDER STRIKING ECF NO. 379 AND**
**DIRECTING LOLONYON AKOUETE TO SHOW CAUSE**

**MATTER:**
#379 Supplement to Motion to Vacate Foreclosure Judgment and Avoid Fraudulent Transfer filed by Creditor Lolonyon Akouete with Certificate of Service Re: 190 Motion filed by Trustee Jonathan R. Goldsmith to Approve Re: 189 Settlement Agreement.

STRICKEN. THE TRUSTEE IS PRESENTLY THE PARTY WITH EXCLUSIVE STANDING TO PURSUE CLAIMS OF THE ESTATE AND THE CLAIMS DISCUSSED IN THIS PLEADING ARE THE SUBJECT OF A MOTION TO APPROVE COMPROMISE FILED BY THE TRUSTEE. REGARDLESS OF WHETHER THAT SETTLEMENT IN APPROVED, MR. AKOUETE DOES NOT HAVE STANDING AT THIS TIME TO ASSERT THESE CLAIMS. MR. AKOUETE HAS BEEN INFORMED OF THAT SEVERAL TIMES, *SEE., E.G.,* ORDERS [ECF NOS. 304 AND 336], AND IS **ORDERED TO SHOW CAUSE IN WRITING ON OR BEFORE OCTOBER 22, 2024, WHY HE SHOULD NOT BE SANCTIONED FOR FILING THIS DUPLICATIVE AND FRIVOLOUS REQUEST**. SANCTIONS MAY INCLUDE, BUT ARE NOT LIMITED TO, THE IMPOSITION OF MONETARY SANCTIONS OR IMPLEMENTATION OF A PRE-FILING AUTHORIZATION PROCEDURE FOR MR. AKOUETE'S FUTURE FILINGS WITH THE COURT.

GIVEN THE MULTIPLE ORDERS ALREADY ENTERED IN THIS CASE REGARDING MR. AKOUETE'S FILINGS, MANY OF WHICH HAVE BEEN FRIVOLOUS IN SEEKING RELIEF THAT HAS ALREADY BEEN DETERMINED AND DENIED OR WHICH HAS NO BASIS IN LAW OR IN FACT, PARTIES IN THE CASE ARE NOT REQUIRED TO RESPOND TO MR. AKOUETE'S FILINGS, ABSENT THE MATTER BEING SCHEDULED FOR HEARING WITH AN OBJECTION DEADLINE.

Dated: 10/08/2024

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br>**Westborough SPE LLC**<br>**Debtor(s)** | **Chapter 7**<br>**23-40709-CJP** |

## PROCEEDING MEMORANDUM AND ORDER

**MATTER:**
Telephonic Hearing on #380 Counterclaim and Cross-Motion Filed by Lolonyon Akouete for Equitable Interest, Collusive Foreclosure, Conspiracy to Defraud, Unjust Enrichment and Sanctions Against the Town of Westborough.

**Decision set forth more fully as follows:**

DENIED FOR THE REASONS STATED ON THE RECORD.

Dated: 10/09/2024

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>WESTBOROUGH SPE LLC<br><br>Debtor | Case No. 23-40709-CJP<br>Chapter 7 |

**ORDER DIRECTED TO LOLONYON AKOUETE**

This matter came before the Court on October 8, 2024, for a telephonic hearing (the "Hearing") on the *Motion for Injunction and Sanctions against Lolonyon Akouete* (ECF No. 370) (the "Motion") filed by the Town of Westborough ("Town") and the response thereto filed by Lolonyon Akouete (ECF No. 372) (the "Response"). Upon consideration of the information set forth in the Motion, the affidavit in support thereof, the Response, the arguments at the Hearing, and the record of this case, for the reasons stated on the record during the Hearing, given Mr. Akouete has taken unauthorized actions that improperly imply he has certain authority to market and receive "offers" for the Property (defined below) with respect to which the estate has claims, the Court exercises its inherent power to manage the administration of this bankruptcy proceeding and HEREBY ORDERS AS FOLLOWS:

1. The Town's request for sanctions against Mr. Akouete remains pending. The Court will schedule a hearing on potential sanctions against Mr. Akouete for a future date or provide other relief in connection with the Town's request for sanctions and the show cause orders, ECF Nos. 382 and 383, in the Court's discretion.

2. Mr. Akouete SHALL:

a. Within 48 hours of the entry of this Order, take down, remove, and, if necessary, request that CoStar Group take down and remove, LoopNet listing ID 33330926

concerning the real property located at 231 Turnpike Road, Westborough, Massachusetts (the "Property");

b. Within 48 hours of the entry of this Order, take down and remove any other listing that Mr. Akouete may have made or caused to be made concerning the Property, either individually or through his company Smart Investors LLC, or any agent or employee thereof;

c. Refrain from listing the Property for sale on any website, listing service, or medium for selling real property, or otherwise marketing the Property for sale, either individually or through his company Smart Investors LLC, or any agent or employee thereof; and

d. Immediately cease and desist from:

i. Representing or implying that Mr. Akouete or his company Smart Investors LLC (or any agent or employee thereof) owns, holds title to, or has any right or authority to sell or market the Property;

ii. soliciting offers to purchase the Property or taking other actions related to the sale of the Property, other than by directing potential interested parties to counsel to the Town or the Trustee in strict compliance with the following paragraph; and

iii. engaging in any communication with third parties, including those third parties with whom Mr. Akouete has already been communicating, regarding the Property, whether the result of Mr. Akouete's prior actions to list the Property for sale or otherwise, unless Mr. Akouete (A) identifies himself as a purported creditor of Westborough SPE LLC in Bankruptcy Case No. 23-40709 rather than an agent of the Debtor and states that he has no authority to sell or market the Property; (B) discloses to said third parties that title to the Property currently is held by the Town exclusively and that any and all claims to the Property are held by the Chapter 7 Trustee on behalf of the Debtor's bankruptcy estate; and (C) informs said third parties that any communications concerning any offers for the sale of the Property, or any offer to

purchase the Property, shall be ONLY with Attorney Roger L. Smerage on behalf of the Town and Attorneys Christine Devine and Jonathan Goldsmith on behalf of the Chapter 7 Trustee.

IT IS SO ORDERED. ANY VIOLATION OF THIS ORDER MAY SUBJECT MR. AKOUETE TO A FINDING OF CONTEMPT.

Dated: October 10, 2024

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br>Westborough SPE LLC<br><br>Debtor | Chapter 7<br>23-40709-CJP |

## ORDER

**MATTER:**
#404 Emergency Motion filed by Creditor Lolonyon Akouete for Interim Distribution Due to Family Health Emergency.

WHILE THE COURT IS SYMPATHETIC TO MR. AKOUETE'S FAMILY CIRCUMSTANCES, THE MOTION IS DENIED FOR THE SAME REASONS REFERENCED IN THE NUMEROUS PRIOR ORDERS ENTERED IN THIS CASE DENYING SIMILAR RELIEF. SEE, E.G., ORDER DENYING EMERGENCY MOTION FOR INTERIM DISTRIBUTION PENDING APPEAL (ECF NO. 268), ORDER DENYING SECOND MOTION FOR INTERIM DISTRIBUTION (ECF NO. 204).

WITHIN 14 DAYS OF THE DATE OF THIS ORDER, THE TRUSTEE SHALL FILE A STATUS REPORT REGARDING THE TRUSTEE'S CONTEMPLATED TIMING FOR FILING ANY OBJECTION TO MR. AKOUETE'S CLAIM STATING WHETHER IT WOULD BE REASONABLE FOR THE TRUSTEE TO FILE AN OBJECTION TO MR. AKOUETE'S CLAIM BY A DATE TO BE ESTABLISHED TO BEGIN THE CLAIM RESOLUTION PROCESS AND AVOID FUTURE DELAYS GIVEN THAT THERE APPEAR TO BE ASSETS THAT MAY RESULT IN A DISTRIBUTION TO GENERAL UNSECURED CREDITORS.

Dated: 10/23/2024

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>WESTBOROUGH SPE LLC,<br><br>Debtor | Chapter 7<br>Case No. 23-40709-CJP |

## SCHEDULING ORDER

The Court hereby schedules hearings for **December 3, 2024 at 11:00 a.m.** (the "Hearings") in Courtroom 3, Donohue Federal Building and Courthouse, 595 Main Street, Worcester, Massachusetts, with the option for parties in interest to appear by zoom video, regarding the show cause orders directed to Lolonyon Akouete entered by the Court at ECF Nos. 382 and 383 (the "Show Cause Orders") and the remaining request for sanctions set forth in the *Motion for Injunction and Sanctions against Lolonyon Akouete* (ECF No. 370) (the "Town Sanctions Motion") filed by the Town of Westborough.

To obtain the zoom video access information for the hybrid Hearings, participants must email the Courtroom Deputy at cjp_courtroom_deputy@mab.uscourts.gov on or before December 2, 2024 at 4:00 p.m., providing the contact information for the party seeking to appear by video.

The Town shall serve notice of this Order on Mr. Akouete and other parties in interest and shall file a certificate of service regarding the same.

Mr. Akouete having filed a response to the Town Sanctions Motion at ECF No. 372 and the Show Cause Orders at ECF No. 387, the Court will consider these responses and if it is able to determine the matters prior to the Hearings, it will do so and may enter an order canceling these Hearings.

Dated: November 1, 2024

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

**TRUSTEE'S OBJECTION TO CLAIMS OF LOLONYON AKOUETE**
**(Claim Nos. 4.1 and 4.2)**

Jonathan R. Goldsmith, the Chapter 7 trustee (the "Trustee") of the bankruptcy estate (the "Estate") of Westborough SPE LLC (the "Debtor"), pursuant to 11 U.S.C. § 502, Fed. R. Bankr. P. 3007, and MLBR 3007-1, hereby objects to the claims of Lolonyon Akouete ("Akouete") as set forth below.

In support of this Objection, the Trustee states as follows:

**BACKGROUND**

1. On August 31, 2023 (the "Petition Date"), certain creditors of the Debtor filed an involuntary petition under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

2. On October 11, 2023, this Court entered an Order for Relief in this case [Dkt. No. 26] and this case remains a Chapter 7 case at this time.

3. On October 12, 2023, the United States Trustee appointed Jonathan R. Goldsmith as Chapter 7 trustee [Dkt. No. 29] and the Trustee remains as Trustee at this time.

4. On December 14, 2023, Akouete filed a proof of claim reflected as claim number 4.1 on the claims register, which claim asserts an unsecured claim in the amount of $625,297.02 (the "Original Claim"). The Original Claim consists of the proof of claim form, an Affidavit of

Lolonyon Akoutete (the "Affidavit"), and Exhibit A to the Affidavit which is a narrative of actions taken by Mr. Akouete relative to the Debtor prior to the Petition Date (the "Narrative"). In the Affidavit, among other things, Akouete appears to assert that as of the Petition Date, he was the manager of the Debtor.

5. On June 23, 2024, Akouete filed a Motion to Amend Proof of Claim (the "Motion to Amend") [Dkt. No. 182] and attached thereto an amended proof of claim which is reflected as claim number 4.2 on the claims register (the "Amended Claim"; together with the Original Claim, the "Claims"). The Amended Claim asserts an unsecured claim in the amount of $1,250,594.05 and includes no attachments.

6. The Amended Claim nearly doubles the amount claimed in the Original Claim but includes no clear basis for the substantial increase. Further, the Motion to Amend makes significant misstatements, including, without limitation, that Mr. Akouete "played a pivotal role in recovering over $4,168,646.83 for the Debtor's estate." Currently, the Estate consists of approximately $1.2 million which the Trustee recovered from the State of California. It is unclear what Mr. Akouete is referring to with respect to the very specific amount of $4,168,646.83 referenced in the Amended Claim.

7. The Amended Claim also states that it is "rooted in the Debtor's operating agreement and statutory fees pursuant to state law that range from 10% to 30%" and, further, that Mr. Akouete seeks interest on the claim at a rate of 16%. The Amended Claim, however, does not include a copy of an operating agreement, nor does the Amended Claim reference any statute upon which Mr. Akouete relies for a claim based on "statutory fees."

## OBJECTION TO CLAIM NOS. 4.1 AND 4.2 OF AKOUETE

### I. The Claims Include Insufficient Documentation to Support Allowance in Any Amount.

8. The Claims appear to be based on either (i) entitlement to a "finder's fee" in connection with the Trustee's recovery of $1,293,646 from the State of California (the "California Funds") or (ii) a right to payment for services provided by Mr. Akouete as manager to the Debtor's pursuant to the Debtor's operating agreement.

9. The Trustee objects to the Claims on both bases.

#### A. Objection Regarding Claim Based on a Finder's Fee.

10. Within the Claims and in the attachments to the Claims, Mr. Akouete appears to indicate that one basis for his claim is that he provided services to the Debtor for "asset recovery". See Narrative, ¶ 82, 191, 297, 310, and 358. In the Affidavit, Akouete states that recovery companies usually charge fees ranging from 20-50% of the value of the property recovered. Affidavit, ¶ 8. In the Motion to Amend, Mr. Akouete asserts that he is entitled to 30% compensation. Motion to Amend, ¶ 2.2.

11. Notwithstanding Mr. Akouete's assertions, he recovered no assets for the Debtor. The only assets in the Estate are the funds received from the State of California and, importantly, the Trustee accomplished that recovery, not Mr. Akouete.

12. The Trustee acknowledges that Mr. Akouete provided information to the Trustee which assisted with his recovery of the California Funds, but the Claims do not set forth a basis for Mr. Akouete to claim a statutory "finder's fee" or statutory "asset recovery fee" where he failed to recover any assets.

13. Further, even if Mr. Akouete had recovered the California Funds, under the California Code of Civil Procedure, Section 1582(a)(2)(C), asset investigators must agree that

their compensation will not exceed ten percent (10%) of the amount of the recovered property.[1] *See State of California Unclaimed Property Investigator Handbook*, Controller Malia M. Cohen, January 2023.[2]

14. Further, upon information and belief, for an agreement to be valid between Mr. Akouete and the Debtor regarding funds that had escheated to the State of California, that agreement is required to have been in writing. California Code of Civil Procedure, Section 1582(a)(2)(A). The Claims filed by Mr. Akouete include no written agreement with the Debtor. If an agreement exists, it must be attached to the Claims pursuant to Rule 3001(c) of the Federal Rules of Bankruptcy Procedure. Therefore, the Claims are deficient on their face either because they failed to include the written agreement upon which they are based or, under the California statute, because no written contract exists.

15. Again, Mr. Akouete recovered no funds for the Debtor. The Claims include no written agreement that would entitle Mr. Akouete to an "asset recovery fee" even if he had, in fact, recovered the California Funds. Further, even if he were entitled to a "finder's fee", it would be limited to a maximum of ten percent (10%) of the amount of the recovered property (i.e., no more than $129,364).

16. The Trustee objects to allowance of the Akouete Claims to the extent that they are based upon a right to a "finder's fee" or "asset recovery fee" related to the California Funds.

---

[1] When the 10% cap on investigators fees was challenged, the California Court of Appeal, First District, Division 1 held that Section 1582 is "[c]onstitutionally valid serving a reasonable and legitimate legislative purpose." *Goodman v. Cory*, 142 Cal. App. 3d 737, 744 (Ct. App. 1983).

[2] The Handbook and other relevant information is available on the website of the California Controller at the following link: https://www.sco.ca.gov/upd_form_investigator html.

### B. Objection Based on Services Purportedly Provided as Manager.

17. The Claims also provide insufficient information for Mr. Akouete to prevail on a claim based on services provided to the Debtor as its manager.

18. First, it is not clear that Mr. Akouete was properly appointed as Manager. Aside from Mr. Akouete's own statements in the Affidavit, the Claims include no copies of the underlying documents referenced in the Affidavit which purportedly evidence Mr. Akouete's appointment as manager. The Affidavit and the Narrative reference multiple documents which purport to be relevant to Mr. Akouete's assertion that he was properly appointed as manager of the Debtor, yet the actual underlying documents are not included. As a result, the documents cannot be verified by the Trustee and the Claims are deficient per Fed. R. Bankr. P. 3001(c).

19. For example, and without limitation, the following documents are referenced in the Affidavit and Narrative but not attached to the Claims: (i) the Debtor's operating agreement, (ii) appointment documents purportedly executed by Ms. Jan Blaustein, (iii) conservatorship documents regarding Ms. Blaustein, and (iv) a bill of sale.

20. With respect to any authority granted to Mr. Akouete from Ms. Blaustein, the Trustee is aware that there are some questions as whether Ms. Blaustein was authorized in any capacity to act on behalf of the Debtor at the time that she allegedly appointed Mr. Akouete as manager. Specifically, Walter A Horst and Babcock & Brown Holdings, Inc. ("B&B") filed a pleading in this case which alleges that, after October 1, 2007, Ms. Blaustein lacked authority to act on behalf of B&B, its affiliates, or any customer of B&B. See Response to Motion for Sanctions for Violation of the Automatic Stay (the "B&B Response"), ¶3 [Dkt. No. 187]. Although the Trustee no independent information regarding the substance of the B&B Response,

Mr. Akouete bears the burden of proof regarding the allowability of his Claims and the B&B Response places into question Mr. Akouete's ability to carry that burden.

21. In addition, although the Affidavit purports to quote directly from the Debtor's operating agreement regarding the procedures for the appointment of managers, the Narrative also casts doubt on whether Mr. Akouete was in possession of the Debtor's valid operating agreement when he purports to have been appointed as manager of the Debtor. In addition, it is not clear from the Narrative whether Mr. Akouete has ever seen a full copy of the operating agreement. See Narrative, ¶¶ 443-446 and ¶¶ 454-457.

22. Instead, the Narrative suggests that a former attorney for the Debtor verbally confirmed certain provisions of the operating agreement immediately prior to the Petition Date. It is unclear, however, whether Mr. Akouete ever received a copy of that agreement.

23. Further, nothing in the Claims demonstrates whether and to what extent the Debtor ever had an obligation to pay Mr. Akouete for services provided as manager. It would be quite unorthodox for a company to agree to pay a manager based on percentage recovery of assets. At a minimum, such an agreement would be reduced to writing. Again, no contract or agreement is provided to demonstrate Mr. Akouete's entitlement to be paid as manager and, therefore, the Claims are deficient on their face. Fed. R. Bankr. P. 3001(c).

## II. Mr. Akouete Is Not Employed by the Estate and Cannot be Compensated under Bankruptcy Code §§ 327 and 328.

24. Bankruptcy Code §§ 327 and 328 provide that, subject to court approval, a trustee may employ professionals to provide services to the estate and may compensate those professionals, subject to the court's approval. The Trustee has not requested, and this Court has not approved, Mr. Akouete's employment as a professional entitled to provide services to or be

compensated from the Estate. As such, Mr. Akouete is not entitled to be paid by the estate under Bankruptcy Code §§ 327 and 328.

25. Further, Mr. Akouete has alleged no facts in the Claims that would support allowance of an administrative claim pursuant to Bankruptcy Code § 503(b). In the event that Mr. Akouete seeks allowance of an administrative claim, the Trustee reserves the right to object thereto.

## III. The Trustee Reserves All Rights Regarding any Prepetition *Quantum Meruit* Claims, if Asserted by Mr. Akouete.

26. To be clear, the Trustee acknowledges that Mr. Akouete expended time and effort prior to the Petition Date attempting to obtain the California Funds and, further, that the Estate benefitted from information provided by Mr. Akouete to the Trustee regarding the California Funds. Mr. Akouete also expended time and effort attempting to redeem real property foreclosed by the Town of Westborough, although Mr. Akouete's efforts failed.

27. While reserving all rights to object to the validity and allowability of any future claims or amended claims by Mr. Akouete, the Trustee notes that Mr. Akouete could potentially assert a claim for pre-petition services provided to the Debtor, which services may have benefited the Debtor, and which may entitle Mr. Akouete to a prepetition claim based on principles of *quantum merit*, or similar theories.

28. At a minimum, however, Mr. Akouete would need to amend his claim to satisfy the requirements of a *quantum merit* claim including, without limitation, indicating the actual time spent by Mr. Akouete on tasks that benefited the Debtor, explaining why and how the Debtor benefited from Mr. Akouete's actions, and establishing a reasonable hourly rate for services provided to the Debtor.

29. The burden, however, is on Mr. Akouete to provide the Trustee, and ultimately this Court, with sufficient information to evaluate the time spent and the value received prepetition by the Debtor in return for those services.

**TRUSTEE'S RESERVATION OF RIGHTS**

30. The Trustee reserves the right to supplement this objection and/or to file additional objections regarding the Claims as he determines necessary. In addition, the Trustee reserves the right to expand the basis of his objection if he deems appropriate and in the best interest of the Estate and its creditors.

WHEREFORE, the Trustee respectfully requests this Court enter an Order:

A. Sustaining the Trustee's Objection and disallowing the Claims in full; or, alternatively

B. Providing Mr. Akouete a brief period of time to amend his claim to (i) include any written agreement upon which his claim is based and (ii) supplement his claim to address the issues raised by the Trustee; and

C. Granting the Trustee such other and further relief as is just.

Respectfully submitted,

**Jonathan R. Goldsmith,**
**Chapter 7 Trustee**

by his counsel,

/s/ Christine E. Devine
Christine E. Devine, BBO# 566990
Nicholson Devine LLC
P.O. Box 7
Medway, MA 02053
Phone: 508-533-7240
Email: christine@nicholsondevine.com

Dated: November 6, 2024

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

**ORDER SUSTAINING TRUSTEE'S OBJECTION TO CLAIMS OF LOLO AKOUETE (CLAIM NOS. 4.1 AND 4.2)**

Upon the Objection (the "Objection") of Jonathan R. Goldsmith, Chapter 7 Trustee (the "Trustee") to the claims of Lolonyon Akouete ("Akouete") which are noted as Claims 4.1 and 4.2 on the Claims Register; notice of the Objection having been appropriate and sufficient; and no objection thereto having been filed or any such objection having been withdrawn or overruled; it is hereby ORDERED that the claim to which the Trustee objected shall be treated as follows:

1. Claim No. 4.1 filed by Lolonyon Akouete is disallowed in full; and
2. Claim No. 4.2 filed by Lolonyon Akouete is disallowed in full.

Dated:____________________, 2024

____________________________________
Honorable Christopher J. Panos
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

**CERTIFICATE OF SERVICE**

The undersigned, Christine E. Devine, hereby certifies that on this day a copy of the following has been sent to all parties listed on the attached Service List in the manner noted thereon:

- **Trustee's Objection to Claims of Lolonyon Akouete (Claim Nos. 4.1 and 4.2**

Dated: November 6, 2024

/s/ Christine E. Devine
Christine E. Devine, Esq.
Nicholson Devine LLC
P.O. Box 7
Medway, MA 02053
Phone: 508-533-7240
Email: christine@nicholsondevine.com

Electronic Mail Notice List

The following list of parties and attorneys have received electronic notice via the Court's CM/ECF noticing process:

- **Jeffrey T Blake** jblake@k-plaw.com
- **Paul W. Carey** pcarey@mirickoconnell.com, bankrupt@mirickoconnell.com
- **Jose C. Centeio** jcc@natgolaw.com
- **Christine E. Devine** christine@nicholsondevine.com, devine.christiner109603@notify.bestcase.com
- **Jonathan R. Goldsmith** bankrdocs1@gkalawfirm.com, bankrdocs@gkalawfirm.com
- **Jonathan R. Goldsmith** trusteedocs1@gkalawfirm.com, trusteedocs@gkalawfirm.com;mwolohan@gkalawfirm.com;MA43@ecfcbis.com
- **Stephen F. Gordon** sgordon@gordonfirm.com, vhaggerty@gordonfirm.com;notices@gordonfirm.com;stephenfgordon@gmail.com
- **Richard King** USTPRegion01.WO.ECF@USDOJ.GOV
- **Samual A. Miller** samual.miller@akerman.com
- **Brian W. Riley** briley@k-plaw.com
- **Roger L. Smerage** rsmerage@k-plaw.com

Email and/or First Class Mail, Postage Prepaid Notice List

The following list of parties and attorneys have been serviced via First Class Mail Postage Prepaid and via email as noted:

Lolonyon Akouete Via Email and First Class Mail
800 Red Milles Rd
Wallkill, NY 12589
info@smartinvestorsllc.com

Denise Edwards Via Email and First Class Mail
137 North 25th Street
Wyandanch, NY 11798
deniseedwards818@yahoo.com

Mark S. Lichtenstein Via Email
Akerman LLP
1251 Avenue of the Americas
37th Floor
New York, NY 10020
mark.lichtenstein@akerman.com

Lenard Benson Zide, Esq.
Butters Brazilian LLP
420 Boylston Street, 4th Floor
Boston, MA 02116
zide@buttersbrazilian.com

Counsel to Mobile Street Trust
Via Email

Jonathan La Liberte
Sherin and Lodgen LLP
101 Federal Street, 30th Floor
Boston, MA 02110
jclaliberte@sherin.com

Via Email

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

## NOTICE OF APPRAISAL

NOW COMES Jonathan R. Goldsmith, the Chapter 7 trustee (the "Trustee") in the bankruptcy case (the "Bankruptcy Case" or "Case") of the estate (the "Estate") of the above captioned Debtor and submits the Appraisal Report prepared by Corey Gustafson, MAI, CRE, which is attached hereto as **Exhibit A** (the "Appraisal"). The Appraisal is submitted in connection with the pending Motion of Chapter 7 Trustee for Approval of Settlement Agreement and related Settlement Agreement [Dkt. Nos. 189, 190], the prior Orders of this Court related thereto [Dkt. Nos. 291, 331], and the hearing currently scheduled for November 18, 2024.

Respectfully submitted,

**Jonathan R. Goldsmith,**
**Chapter 7 Trustee**

by proposed counsel,

/s/ Christine E. Devine
Christine E. Devine, BBO# 566990
Nicholson Devine LLC
P.O. Box 7
Medway, MA 02053
Phone: 508-533-7240
Email: christine@nicholsondevine.com

Dated: November 8, 2024

# EXHIBIT A

# APPRAISAL REPORT

## REGAL WESTBOROUGH
231 Turnpike Rd
Westborough, Massachusetts 01581

### VALUATION DATES

As-Is Market Value: October 4, 2024
Date of Report: October 30, 2024



### PREPARED BY

Corey Gustafson MAI, CRE
Core Values Appraisal & Advisory, Inc.
60 Surry Drive Cohasset, MA 02025
Cohasset, MA 02025
File No: 24.MA.RT.10004

### PREPARED FOR

Jonathan Goldsmith
Chapter 7 Trustee of the Estate of Westborough SPE, LLC
Goldsmith, Katz & Argencio, PC
1350 Main Street, 15th Floor
Springfield, MA 01103

CoreVal

Core Values Appraisal & Advisory, Inc.
60 Surry Drive Cohasset, MA 02025
Cohasset, MA 02025

October 30, 2024

Jonathan Goldsmith
Chapter 7 Trustee of the Estate of Westborough SPE, LLC
Goldsmith, Katz & Argencio, PC
1350 Main Street 15th Floor
Springfield, MA 01103

RE: Appraisal Report
**Regal Westborough**
231 Turnpike Rd, Westborough, Massachusetts 01581

Core Values Appraisal & Advisory, Inc. File No: 24.MA.RT.10004

Mr. Goldsmith:

Core Values Appraisal & Advisory, Inc. is proud to present the appraisal that satisfies the agreed upon scope of work with Goldsmith, Katz & Argencio, PC.

The subject site is an irregular interior land parcel containing a gross site area of 29.32 acres (or 1,277,351 SF) and is zoned BA - "Business Highway" District by the Town of Westborough. The usable site area is reduced by wetlands and high-risk flood plains extending through portions of the site. The subject site is improved with a one-story, concrete block-constructed, purpose built retail movie theater property containing 12 screening rooms within 47,872 SF of Gross Building Area (GBA), which is consistent with its NRA. It has commonly been known as the Regal Westborough Cinemas but has been vacant since the last tenant's lease expired in 2017.

The subject property was developed in 1997 and subsequently encumbered by a 20-year lease agreement, expiring in 2017. The tenant vacated the property at this point and has fallen into a state of neglect and disrepair. As a result of the absence of real estate tax payments, the Town recorded an order of Taking in January 2019. This taking was formalized in January 2022 by a Judgment in Tax Lien Case by the Massachusetts Land Court, Department of the Trial Court.

This appraisal seeks to estimate the subject's market value and is predicated upon the definition utilized in this appraisal report. The movie theater industry has experienced turbulent economic conditions and changing consumer preferences over the past decade. While there is an effective ongoing demand for similarly constructed properties, there has been a sharp decline in the users and investors in such properties nationwide. A detailed consideration of the highest and best use, as well as the subject's effective market position, is critical to understanding its value. This appraisal estimates the market value of the subject property if put to its highest and best use considering existing and alternative uses, and redevelopment.

The purpose of this appraisal is to develop an opinion of the As-Is Market Value (Fee Simple Estate). The following table conveys the final opinion of value that is developed in this appraisal:

## MARKET VALUE CONCLUSION

| Valuation Scenario | Interest Appraised | Exposure Time | Effective Date | Value |
|---|---|---|---|---|
| As-Is Market Value | Fee Simple Estate | Three to Six Months | October 4, 2024 | $4,790,000 |

This report conforms to the current Uniform Standards of Professional Appraisal Practice (USPAP).

Core Values Appraisal & Advisory, Inc.
60 Surry Drive Cohasset, MA 02025
Cohasset, MA 02025

## Extraordinary Assumptions

The use of an extraordinary assumption(s) may have impacted the results of the assignment. A complete interior inspection of the subject property was not possible due to restrictions from the Town. We have been provided certain interior photographs and conducted interviews with Town Officials to understand the fit, finish and configuration of the subject property. This appraisal is contingent upon the extraordinary assumption that the information provided to us is accurate and correctly reflects the interior conditions of the subject property. Should information be provided later that would alter our opinion of value, we reserve the right to amend this appraisal on a time and material basis.

## Hypothetical Conditions

No Hypothetical Conditions were made for this assignment.

If there are any specific questions or concerns regarding the attached appraisal report, or if Core Values Appraisal & Advisory, Inc. can be of additional assistance, please contact the individuals listed below.

The information presented below is a basic description of the existing improvements that is used in the valuation of the property. Reliance is placed on information provided by sources deemed dependable for this analysis. It is assumed that there are no hidden defects, and that all structural components are functional and operational, unless otherwise noted. If questions arise regarding the integrity of the improvements or their operational components, it may be necessary to consult additional professional resources.

Respectfully Submitted,

CORE VALUES APPRAISAL & ADVISORY, INC.

Corey Gustafson
Principal
Certified General Real Estate Appraiser
Massachusetts License No. 103759
Expiration Date 10/23/2025
corey@coreval.co

# TABLE OF CONTENTS

**LETTER OF TRANSMITTAL**

**INTRODUCTION**
- Executive Summary 1
- Subject Property Photographs 4
- Identification of Appraisal Assignment 9
- Scope of Work 13

**DESCRIPTIONS & EXHIBITS**
- Regional Area Analysis 16
- Local Area Analysis 23
- Site Description 35
- Exhibits 38
- Improvement Description 42
- Taxes & Assessment 45
- Zoning 48
- National Movie Theater Industry Overview 51
- Market Analysis 60
- Market Analysis - Industrial 64
- Highest & Best Use Analysis 69
  - As Vacant Analysis 69
  - As-Improved Analysis 70

**VALUATION METHODS**
- Site Valuation 74
- Sales Comparison Approach 81
- Reconciliation of Value Conclusions 87
- Certification 88

**ADDENDA** 90
- Qualifications of Appraiser & Appraiser License
- Qualifications of Company

## Property Identification

| | |
|---|---|
| Name | Regal Westborough |
| Property | Retail - Free Standing Retail |
| Address | 231 Turnpike Rd |
| City, State Zip | Westborough, Massachusetts 01581 |
| County | Worcester County |
| MSA | Worcester, MA-CT MSA |
| Market / Submarket | Worcester / The Boroughs |
| Geocode | 42.2871780, -71.6356245 |
| Census Tract | 25-027-742402 |

## Site Description

| | | |
|---|---|---|
| Number of Parcels | 1 | |
| Assessor Parcel Number | 32-48-0 | |
| Land Area | Square Feet | Acres |
| Usable | 745,401 | 17.11 |
| Unusable | 531,950 | 12.21 |
| Total | 1,277,351 | 29.32 |
| Zoning | Business Highway (BA) | |
| Shape | Irregular | |
| Topography | Level at street grade | |
| Flood Zone | Zone X (Unshaded) & Zone A | |
| Seismic Zone | Moderate Risk | |

## Improvement Description

| | |
|---|---|
| Tenancy | Single-Tenant (vacant) |
| Net Rentable Area (NRA) | 47,872 |
| Gross Building Area (GBA) | 47,872 |
| Ground Floor SF | 47,872 |
| Total Buildings | 1 |
| Floors | 1 |
| Year Built | 1997 (Renovated None) |
| Actual Age | 27 Years |
| Effective Age | 45 Years |
| Economic Life | 50 Years |
| Remaining Useful Life | 5 Years |
| Land To Building Ratio | 26.68 : 1 |
| Site Coverage Ratio | 6.4% |
| Parking | 10.3 / 1,000 SF NRA |

## Qualitative Analysis

| | |
|---|---|
| Site Quality | Average |
| Site Access | Good |
| Site Exposure | Average |
| Site Utility | Average |
| Building Quality | Average |
| Building Condition | Fair |
| Building Appeal | Below Average |

## Highest & Best Use

| | |
|---|---|
| Proposed Construction | No |
| As Vacant | Retail development |
| As Improved | Conversion to an alternative retail use |

## Exposure & Marketing Time

| | |
|---|---|
| Exposure Time | Three to Six Months |
| Marketing Time | Three to Six Months |

## Value Conclusion

| VALUATION SCENARIOS | AS-IS MARKET VALUE |
|---|---|
| Interest | Fee Simple Estate |
| Exposure Time | Three to Six Months |
| Effective Date | October 4, 2024 |
| Site Value | $2,220,000 |
| Cost Approach | Not Presented |
| Sales Comparison Approach | $4,790,000 |
| Income Capitalization Approach | Not Presented |
| **FINAL VALUE CONCLUSION** | **$4,790,000** |

# AERIAL PHOTOGRAPH



# SUBJECT PROPERTY PHOTOGRAPHS


Subject View, facing northwest


Subject View, facing southwest


Subject View, facing southeast


Subject View, facing northeast


Typical View, main entrance


Typical View, main entrance



Rear Building Elevation, fenestration and gutter



West Building Elevation



East Drive alongside the subject building



Rear Drive and Pavement



Northeast Parking Lot, along Milk St facing North




Subject View, facing north and parking pavement

# SUBJECT PROPERTY PHOTOGRAPHS (CONTINUED)



Milk Street facing south, subject right



Evidence of Lack of Roof Maintenance



Route 9 facing west, subject ahead and to the right




Route 9 facing east, subject left




Signage at Route 9, facing west



View of Parking Lot in front of Stagecoach Plaza


Typical Interior View


Typical Interior View


Typical Interior View


Typical View of Bathroom, evidence of vandalism


Typical View of Screen Room


Typical Interior View, evidence of graffiti

*The above pictures were provided to the appraiser as evidence of the interior conditions of the subject property.



Typical Interior View



View of Exposed, Pained metal decking



View of Lobby, evidence of water intrusion



View of Concessions, evidence of water intrusion



Water Main

*The above pictures were provided to the appraiser as evidence of the interior conditions of the subject property.

# IDENTIFICATION OF ASSIGNMENT

## PROPERTY IDENTIFICATION

The subject site is an irregular interior land parcel containing a gross site area of 29.32 acres (or 1,277,351 SF) and is zoned BA - "Business Highway" District by the Town of Westborough. The usable site area is reduced by wetlands and high-risk flood plains extending through portions of the site. The subject site is improved with a one-story, concrete block-constructed, purpose built retail movie theater property containing 12 screening rooms within 47,872 SF of Gross Building Area (GBA), which is consistent with its NRA. It has commonly been known as the Regal Westborough Cinemas but has been vacant since the last tenant's lease expired in 2017.

The subject property was developed in 1997 and subsequently encumbered by a 20-year lease agreement, expiring in 2017. The tenant vacated the property at this point and has fallen into a state of neglect and disrepair. As a result of the absence of real estate tax payments, the Town recorded an order of Taking in January 2019. This taking was formalized in January 2022 by a Judgment in Tax Lien Case by the Massachusetts Land Court, Department of the Trial Court.

The assessor parcel Number is: 32-48-0.

## LEGAL DESCRIPTION

The legal description of the subject property was obtained from a Quitclaim Deed (19369/75), executed October 31, 1997, and is as follows:

that certain parcel of land, together with any buildings and improvements thereon, located at 231 Turnpike Road, in the Town of Westborough, Worcester County, Massachusetts, which are shown as Lot #1 on a plan entitled "Plan of Land in Westborough, Worcester County,...", dated April 11, 1997, prepared by Beals and Thomas, Inc. recorded with the Worcester District Registry of Deeds, Plan Book 714, Plan 77 and being more particularly bounded and described according to said plan on Exhibit A attached hereto and made a part hereof.

Said Lot 1 contains 1,277,351 square feet more or less, or 29.324 acres, more or less, according to said plan.

Said Premises are conveyed subject to and together with the benefit of easements, restrictions and other matters of record, insofar as in force and applicable.

Without limitation, said premises are conveyed together with the following:

(i) rights and easements set forth in that certain Declaration of Reciprocal Covenants, Easements and Restriction dated April 9, 1997 and recorded with said Deeds in Book 18745, Page 313 as being for the benefit of said Lot 1 and subject to the rights, easements and restrictions set forth therein as the same affect Lot 1, which are reserved for the benefit of Lots 2 and 3 as shown on said Plan, and (ii) Utility Easement "A", Utility Easement "B" and Utility Easement "D" all as shown on Plan Book 710, Plan 91.

A detailed metes and bounds description is also available on the same deed.

## CLIENT IDENTIFICATION

The client of this specific assignment is Goldsmith, Katz & Argencio, PC.

## INTENDED USE & INTENDED USERS

The intended use of this appraisal is to assist the client in relation to a litigation or dispute involving this asset. Goldsmith, Katz & Argencio, PC is the only intended user of this report.

## PURPOSE

The purpose of this appraisal is to develop an opinion of the As-Is Market Value (Fee Simple Estate).

## PERSONAL PROPERTY & BUSINESS INTANGIBLE

There is no personal property (FF&E) included in this valuation.

## PROPERTY AND SALES HISTORY

**Current Owner**
The subject title is currently recorded in the name of Town of Westborough who acquired title to the property on January 21, 2022 for the improvements for as the result of real estate tax foreclosure, as recorded in the Worcester County Deed Records, Document Number 66983-53.

**Current Pending Sale/Under Contract**
The subject property is not presently offered for sale by the property owner (the Town of Westborough). A communication was sent to the appraiser that Lolonyon Akouete, who has been recognized as both a debtor and a creditor of the subject property, appears to have listed the property for sale. Communications with the Town Manager indicated that the property owner (the Town) did not authorize Mr. Akouete to list the property, which does not appear to be a valid listing. There is no consideration of this listing as evidence of market value, and it is not further considered.

**Current Owner**
The subject title is currently recorded in the name of the Town of Westborough, which acquired title to the property on January 5, 2022, for the improvements as the result of real estate tax foreclosure, as recorded in the Worcester County Deed Records, Document Number 66983-53.

**Three-Year Sales History**
On June 1, 2022, the Town of Westborough posted and advertised an RFP seeking responses for a potential sale of the subject property following its acquisition of the property through a real estate tax lien. The RFP provided for inspection of the property on June 16, 2022, for interested parties and a pre-submittal meeting at the Town Hall. There was a question/inquiry period through June 30, 2022, and final responses to the RFP were due by July 15, 2022. Overall, this provided a 44-day marketing time or approximately six weeks. The RFP was posted without a reserve, minimum sale price, target sale price, asking price or otherwise. Responses to the RFP would be judged on the following maximum criteria:

- A response that meets/exceeds the requirements of the RFP
- A purchase price that offers at or above the property's fair market value (undefined).
- A plan that has a favorable (or better) financial impact on the community (including taxes, fees, and job growth)
- Financial approval from a lending institution that is firm and meets the offered price, or fully absent a financial contingency.

We have been provided the offer prices from the respondents of the RFP, which reportedly included three proposals.

- LAX Media - $2,500,000 (or $52/SF GBA and $3.35/SF usable land area)
- Ferris Development Group - $2,875,000 (or $59/SF GBA and $3.85/SF usable land area)
- Pulte Homes - $7,942,000 (or $136/SF GBA and $8.72/SF usable land area)

LAX Media reportedly planned on renovating the existing structure and continuing its existing uses as a movie theater property. Its purchase price, therefore, reflects the price of the property as a cinema (or movie theater)

property under the market conditions as of June/July 2022. Ferris Development reportedly planned to renovate and convert the existing building into a business center and office building to be known as the "Beehive". The Ferris proposal, therefore, considers the costs necessary for converting the existing building to an alternative use. The Pulte Homes proposal was for complete redevelopment of the site (and razing of the existing building) to develop a 108-unit residential condominium property. Therefore, its purchase price reflects a residential land value (with associated demolition costs) at $73,537 per unit without the benefit of entitlements.

Ultimately, the Town selected the LAX Media response as the winning response (at $2,500,000), which resulted in Ferris Development Group filing litigation claiming that its proposal should have been selected.

Conversations with the Town's Procurement Officer, Shab Kahn, on October 7, 2024, indicated that the Pulte proposal was not accepted due to issues the development would impose on the Town's resources, including its wastewater treatment facility (presently at capacity) and Town schools. The LAX Media proposal was accepted because the Town Officials recognized a lack of entertainment options in the area and felt that the movie theater would be most beneficial for Town residents.

In considering the relevant factors of the RFP, the selection of LAX Media's bid at $2,500,000 does not meet the definition of market value being utilized in this appraisal report due to three critical factors.

- The conditions for the Town's selection process, specifically Other Financial Benefits, as displayed below, are not relevant criteria in the definition of market value. This is an added criterion that may have been relevant to the seller but is not a component of the definition of market value considered here. The appraiser's opinion here does not consider the Town's appropriateness in selecting LAX Media as the winner of the RFP response; their selection process is separate and apart from what is considered in this report.

  (2) **Other Financial Benefits.**

  - A Highly Advantageous rating will be given to a proposal that, in the judgment of the evaluators, presents a plan that has the most favorable financial impact on the community, including taxes, fees, and job growth.
  - An Advantageous rating will be given to a proposal that, in the judgment of the evaluators, presents a plan that has an average financial impact on the community.
  - A Least Favorable rating will be given to a proposal that, in the judgment of the evaluators, presents a plan that has a below average financial impact on the community.

- The property was exposed to the market for only 44 days. A component of the definition of market value is that "a reasonable time is allowed for exposure to the open market". Responses gained from the market, including those from relevant market participants and sales utilized in this report, suggest that extended market periods above 44 days are necessary to maximize the price necessary to achieve its most probable price in the marketplace. However, the Town's Procurement officer noted that approximately 20 interested parties attended the pre-submittal meeting (and property tour). So, while there is evidence of proper public notice of the sale, it is reasonable to consider that a more extended marketing period may have yielded a higher price.
- Lastly, the RFP occurred in 2022 during a period of changing and declining market conditions. After a rapid upswing in commercial real estate market activity in 2021 (due to the historically beneficial capital markets environment), conditions began to deteriorate throughout 2022 and ultimately grind to a near halt in the fourth quarter of 2022 as interest rates were escalating rapidly with the Federal Funds rate changes. As of the date of this report, we are past the period of peak interest rates, market activity is more stabilized, and it's reasonable to consider that the subject property's market value, as of the date of value, varies from what was occurring in July 2022.

Considering the preceding, the responses (including the selection of the LAX Media proposal) are not viewed as evidence of market value as of the date of value and are not further relied upon to indicate market value within this report.

## EXPOSURE & MARKETING TIME

Marketing time and exposure time are both influenced by price. That is, a prudent buyer could be enticed to acquire the property in less time if the price were less. Hence, the time span cited below coincides with the value opinion(s) formed herein.

USPAP Standard rule 1-2(c)(iv) requires an opinion of exposure time, not marketing time, when the purpose of the appraisal is to estimate market value. In the recent past, the volume of competitive properties offered for sale, sale prices, and vacancy rates have fluctuated little. Sale concessions have not been prevalent. The following information is used to estimate exposure time and marketing time for the subject:

### Exposure & Marketing Time

| SOURCE | AVERAGE |
|---|---|
| Exposure Period Conclusion | Three to Six Months |
| Marketing Time Conclusion | Three to Six Months |

**Exposure Time Conclusion**
The subject is a retail (free standing retail) use totaling 47,872 SF (NRA) on 29.3239-acres (1,277,351 SF) located at 231 Turnpike Rd in Westborough, Worcester County, Massachusetts. Considering these factors, a reasonable estimate of exposure time for the subject As-Is Market Value (Fee Simple Estate) is three to six months.

**Marketing Time Conclusion**
A marketing time estimate is a forecast of a future occurrence. History should be considered as a guide, but anticipation of future events & market circumstances should be the prime determinant. Overall market conditions are expected to remain stable to slightly increase, so a marketing time of three to six months is predicted for the subject.

## DEFINITION OF MARKET VALUE

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming that the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;
2. Both parties are well informed or well advised, and acting in what they consider their own best interests;
3. A reasonable time is allowed for exposure in the open market;
4. Payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[1]

## PROPERTY RIGHTS APPRAISED

The property rights appraised constitute the fee simple estate interest.

**Fee Simple Interest**
Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat.[2]

[1] Office of Comptroller of the Currency (OCC), Title 12 of the Code of Federal Regulation, Part 34, Subpart C -Appraisals, 34.42 (g); Office of Thrift Supervision (OTS), 12 CFR 564.2 (g); This is also compatible with the FDIC, FRS and NCUA definitions of market value.

[2] The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, Chicago, Illinois, 2022

## VALUE SCENARIOS

**As-Is Market Value**
The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date.[3]

## SCOPE OF WORK

The scope of work for this appraisal assignment is outlined below:

- The appraisal analyzes the regional and local area profiles including employment, population, household income and real estate trends. The local area was inspected to consider external influences on the subject.
- The appraisal analyzes legal and physical features of the subject including site size, improvement size, flood zone, seismic zone, site zoning, easements, encumbrances, site access and site exposure.
- The appraisal includes a retail market analysis for the Worcester market and The Boroughs submarket using vacancy, absorption, supply and rent data. Conclusions were drawn for the subject's competitive position given its physical and locational features, current market conditions and external influences.
- A review of the National Movie Theater's industry and its impact on commercial real estate values were reviewed. The impact of the industry's performance is considered in the highest and best use estimate in this report.
- The appraisal includes a Highest and Best Use analysis and conclusions have been completed for the highest and best use of the subject property As Vacant and As Improved. The analysis considered legal, locational, physical and financial feasibility characteristics of the subject site and existing improvements.
- In selecting applicable approaches to value, the appraiser considered the agreed upon appraisal scope and assessed the applicability of each traditional approach given the subject's characteristics and the intended use of the appraisal. As a result, this appraisal developed Land Sales Comparison and Sales Comparison Approaches. The values presented represent the As-Is Market Value (Fee Simple Estate).
- The assignment was prepared as an Appraisal Report in accordance with USPAP Standards Rules 2, with the analysis stated within the document and representing a summarized level of analysis.
- The author of this report is aware of the Competency Rule of USPAP and meets the standards.

## ASSISTANCE PROVIDED

No one provided real property appraisal assistance to the individuals signing this report.

[3] The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, Chicago, Illinois, 2022

## SOURCES OF INFORMATION

The following sources were contacted to obtain relevant information:

### Information Provided

| | |
|---|---|
| Property Assessment & Tax | Worcester County Assessor |
| Zoning & Land Use Planning | City of Westborough Zoning |
| Site Size | Worcester County Assessor |
| Building Size | GBA -Public Records<br>NRA - Public Records |
| Supply & Demand | CoStar |
| Flood Map | FEMA |
| Demographics | STDB On-Line |
| Comparable Information | MLS \| Public Records \| Confirmed by Local Agents |
| Legal Description | Not Provided |
| Rent Roll | Property Contact, dated 09/01/2024 |
| Operating Statements | Property Contact |
| Purchase & Sale Document | Signed, Dated 09/01/2024 |

The lack of the unavailable items could affect the results of this analysis. As part of the general assumptions and limiting conditions, the subject is assumed to have no adverse easements, significant items of deferred maintenance, or be impacted by adverse environmental conditions.

## SUBJECT PROPERTY INSPECTION

The use of an extraordinary assumption(s) may have impacted the results of the assignment. A complete interior inspection of the subject property was not possible due to restrictions from the Town. We have been provided certain interior photographs and conducted interviews with Town Officials to understand the fit, finish and configuration of the subject property. This appraisal is contingent upon the extraordinary assumption that the information provided to us is accurate and correctly reflects the interior conditions of the subject property. Should information be provided later that would alter our opinion of value, we reserve the right to amend this appraisal on a time and material basis.

### Property Inspection

| Appraiser | Inspected | Extent | Date | Role |
|---|---|---|---|---|
| Corey Gustafson | Yes | Exterior | October 4, 2024 | Primary Appraiser |

# REGIONAL AREA MAP





The Worcester, MA Metropolitan Statistical Area (MSA) is a significant region in the central part of Massachusetts. It encompasses the city of Worcester and its surrounding areas, benefiting from its strategic location in the heart of the state and the broader New England region. The Worcester MSA is known for its diverse economy, which includes industries such as biotechnology, advanced manufacturing, information technology, healthcare, and medical research. Major employment centers and a skilled labor force support the region's economic stability. Worcester's real estate and living costs are generally lower than those in the Greater Boston area, making it an attractive location for businesses and residents alike. The area also boasts excellent connectivity, with easy access to major highways and proximity to Boston and other key cities in the region.

Worcester is the business hub of central Massachusetts and stands out as a significant economic center in the region. At the heart of Worcester's character is a legacy built on innovation and sustainability, with prominent institutions like the University of Massachusetts Medical School and renowned research facilities and healthcare centers. The Worcester metropolitan area is a knowledge-driven economy. From biotechnology to advanced manufacturing to information technology and healthcare, the area has developed a diverse economic base that attracts top talent, businesses, and investment.

With a population of approximately 874,000, the Worcester, MA MSA is a key regional influence within New England. While it may not compete on a national scale like Boston, Worcester holds significant sway among other metropolitan and micropolitan statistical areas in the region. For instance, the Manchester-Nashua, NH MSA has a population of about 426,594, and the Portland-South Portland, ME MSA has a population of approximately 552,9161. The Worcester MSA is anchored by its robust education, healthcare, high technology, and advanced manufacturing sectors, contributing to its economic stability and growth. The area benefits from a skilled and educated workforce supported by institutions like the University of Massachusetts Medical School. Worcester's economy is diverse and resilient, attracting talent and investment across the region.

Worcester is renowned for its healthcare and education industries, with UMass Memorial Medical Center standing out as a significant institution. US News & World Report rates UMass Memorial Medical Center as high-performing in multiple procedures and conditions. As one of the largest hospitals in the region, it serves as a critical healthcare provider and research institution. The hospital is a teaching facility for the University of Massachusetts Medical School, contributing to the education of future healthcare professionals. Further, several university campuses are positioned in Worcester that add to the economic stability of the area.

## Employment

Employment in the Worcester, MA MSA has shown positive trends over recent years. Total employment has increased annually, reflecting the area's economic growth and stability. As of May 2023, the average hourly wage in the Worcester, MA MSA was $32.58, slightly above the national average of $31.48. Key sectors contributing to employment include healthcare and social assistance (19.4% of local employment), educational services (13.5%), and retail trade (11.5%).

Unemployment rates in the Worcester, MA MSA have remained relatively low, contributing to the region's economic resilience. The area's diverse economic base, supported by healthcare, education, and high technology sectors, continues to attract talent and investment, further bolstering employment opportunities.

The following chart shows the trailing 10 years of employment for the state of Massachusetts, Worcester, MA MSA, and the surrounding area

## State & Regional Employment

| Year | State | % CHG. | Area | % CHG. | County | % CHG. |
|---|---|---|---|---|---|---|
| 2014 | 3,364,853 | 2.4% | 324,722 | 2.6% | 400,662 | 2.5% |
| 2015 | 3,417,296 | 1.5% | 328,556 | 1.2% | 405,741 | 1.3% |
| 2016 | 3,472,327 | 1.6% | 333,290 | 1.4% | 411,693 | 1.4% |
| 2017 | 3,582,389 | 3.1% | 343,029 | 2.8% | 424,610 | 3.0% |
| 2018 | 3,686,198 | 2.8% | 350,945 | 2.3% | 435,855 | 2.6% |
| 2019 | 3,731,900 | 1.2% | 353,354 | 0.7% | 438,243 | 0.5% |
| 2020 | 3,396,014 | (9.9%) | 325,091 | (8.7%) | 402,081 | (9.0%) |
| 2021 | 3,530,207 | 3.8% | 334,850 | 2.9% | 415,848 | 3.3% |
| 2022 | 3,606,318 | 2.1% | 343,375 | 2.5% | 423,910 | 1.9% |
| 2023 | 3,625,293 | 0.5% | 343,796 | 0.1% | 425,288 | 0.3% |
| **CAGR** | **0.8%** | - | **0.6%** | - | **0.7%** | - |

Source: U.S. Bureau of Labor Statistics www.bls.gov

### Corporate Headquarters

Several major corporate headquarters, including UMass Memorial Health, Rand-Whitney, The Hanover Insurance Group, and various advanced manufacturing and high-tech firms, call the Worcester, MA MSA home. These companies represent regional and national corporations across major employment sectors such as healthcare, packaging solutions, and insurance. The presence of these institutions contributes significantly to the economic stability, regional influence, ability to attract talent and investment within New England and growth of the Worcester MSA.

### Fortune 500

The Worcester NECTA, though not home to Fortune 500 companies, hosts several significant employers, noted above and below, contributing to its economic stability and growth.

### Top Employers

| Employer Name | Employees | Industry |
|---|---|---|
| UMass Memorial Health Care | 10,000+ | Healthcare |
| MSC Industrial Supply Co | 5,000-9,999 | Industrial Supply |
| Community Healthlink Inc | 1,000-4,999 | Healthcare |
| Fallon Health | 1,000-4,999 | Healthcare |
| Hanover Insurance Group Inc | 1,000-4,999 | Insurance |
| Integrated Genetics | 1,000-4,999 | Biotechnology |
| MAPFRE Insurance | 1,000-4,999 | Insurance |
| Overlook Masonic Home | 1,000-4,999 | Healthcare |
| St Vincent Hospital | 1,000-4,999 | Healthcare |
| St-Gobain Ceramic Materials | 1,000-4,999 | Manufacturing |
| VNA Care Network | 1,000-4,999 | Healthcare |
| Wachusett Mountain Ski Area | 1,000-4,999 | Recreation |
| Walmart Supercenter | 1,000-4,999 | Retail |
| County Jail | 500-999 | Public Administration |
| Cummings School of Veterinary | 500-999 | Education |
| Eclinicalworks LLC | 500-999 | Health IT |
| Flexcon Co Inc | 500-999 | |
| UMass Memorial Health Care | 10,000+ | Healthcare |

Source: Labor Market Information | Mass.gov

### UMass Memorial Medical Center

UMass Memorial Medical Center is the flagship hospital of the UMass Memorial Health Care system. Established in 1998 through the merger of Memorial Hospital and the University of Massachusetts Medical Center, it has since become a cornerstone of healthcare in central Massachusetts. The center employs over 8,000 healthcare professionals and staff, making it one of the largest employers in the region. UMass Memorial specializes in a wide range of medical services, including cardiology, oncology, pediatrics, and emergency medicine, and is

renowned for its cutting-edge research and teaching facilities in partnership with the University of Massachusetts Medical School. The center's economic impact on Worcester is profound, with its operations contributing significantly to the local economy through job creation, procurement of goods and services, and community investments. In addition to providing essential healthcare services, the facility supports local businesses and fosters economic stability and growth. UMass Memorial Medical Center's commitment to excellence in patient care, medical education, and research ensures that it remains a vital asset to the Worcester community, driving both healthcare innovation and economic prosperity.

**Education**

The Worcester MSA benefits greatly from various colleges and universities, adding to its attraction and overall economic stability. The following are the largest institutions in the area.

- Worcester Polytechnic Institute (WPI): Approximately 7,308 students (5,246 undergraduates and 2,062 graduates)[1]. Specializing in engineering, computer science and business.
- Quinsigamond Community College: Roughly 7,000 students[3]. Specializing in health sciences, business and information technology.
- Massachusetts College of Pharmacy and Health Sciences (MCPHS): Approximately 7,000 students[3]. Specializing in Pharmacy (including a doctor of pharmacy program), nursing and health sciences.
- Worcester State University: Approximately 5,500 students[3]. Specializing in nursing, education and business administration.
- Clark University: Around 3,770 students[2]. Specializing in psychology, geography and international development.
- College of the Holy Cross: About 3,100 students[3]. Specializing in liberal arts, economics and biology.
- Assumption University: Around 2,000 students[3]. Specializing in business, health sciences and liberal arts.

The college education sector has a substantial economic impact on the Worcester economy. According to a recent study, the higher education institutions in Worcester contribute approximately $3 billion annually to the Central Massachusetts economy. This impact is multifaceted, encompassing direct spending by the institutions, student and visitor expenditures, and the economic activities generated by alumni. Worcester's colleges and universities collectively spend around $900 million annually on operations, including purchases from local suppliers and vendors. region. Students contribute significantly to the local economy through their housing, food, transportation, and retail expenditures. Annually, student spending amounts to about $142 million. Additionally, the influx of visitors for campus tours, alumni events, sporting events, and other activities injects another $11 million into the local economy, including $3 million in lodging and $6 million in food[1].

The higher education sector also drives substantial economic activity through capital projects. Annually, these projects generate around $100 million in spending, supporting 1,200 jobs and contributing $240 million to the overall economic impact. Recent examples include the construction of new facilities at Assumption University and Clark University, which provide state-of-the-art educational environments and stimulate the local construction industry[1].

Overall, the college education sector is a cornerstone of Worcester's economy, fostering job creation, supporting local businesses, and driving significant economic growth through both direct and indirect channels[1].

## Unemployment

The following graphs charts the trailing 18 months and trailing 10 years unemployment rate for the United States, Northeast Region, Massachusetts, Worcester, MA-CT MSA, and Worcester County.

### Monthly Unemployment Rate (18 Months)




| | Mar | Apr | May | Jun | Jul | 2023 Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | 2024 Aug |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nation | 3.5% | 3.4% | 3.7% | 3.6% | 3.5% | 3.8% | 3.8% | 3.8% | 3.7% | 3.7% | 3.7% | 3.9% | 3.8% | 3.9% | 4.0% | 4.1% | 4.3% | 4.2% |
| Region | 3.8% | 3.2% | 3.5% | 3.8% | 3.9% | 4.2% | 3.7% | 3.8% | 3.6% | 3.8% | 4.2% | 4.3% | 3.9% | 3.5% | 3.8% | 4.0% | 4.5% | 4.6% |
| State | 3.7% | 2.9% | 3.2% | 3.5% | 3.5% | 3.4% | 3.1% | 3.1% | 2.9% | 3.2% | 3.5% | 3.7% | 3.5% | 3.1% | 3.8% | 4.0% | 4.6% | 4.5% |
| Area | 3.9% | 2.9% | 3.2% | 3.5% | 3.6% | 3.5% | 3.2% | 3.2% | 3.0% | 3.4% | 3.7% | 3.9% | 3.6% | 3.2% | 3.8% | 3.9% | 4.5% | 4.5% |
| County | 4.0% | 3.0% | 3.2% | 3.5% | 3.6% | 3.5% | 3.2% | 3.1% | 2.9% | 3.3% | 3.6% | 3.8% | 3.6% | 3.2% | 3.8% | 4.1% | 4.8% | 4.7% |

### Annual Unemployment Rate (10 Years)




| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| Nation | 6.2% | 5.3% | 4.9% | 4.4% | 3.9% | 3.7% | 8.1% | 5.3% | 3.6% | 3.6% |
| Region | 6.2% | 5.2% | 4.8% | 4.5% | 4.0% | 3.7% | 9.1% | 6.3% | 4.0% | 3.8% |
| State | 5.7% | 4.8% | 4.0% | 3.8% | 3.5% | 3.0% | 9.3% | 5.4% | 3.7% | 3.4% |
| Area | 6.1% | 5.1% | 4.3% | 4.0% | 3.7% | 3.3% | 8.9% | 5.5% | 3.8% | 3.5% |
| County | 6.1% | 5.1% | 4.3% | 4.0% | 3.7% | 3.3% | 9.2% | 5.5% | 3.8% | 3.5% |

## Infrastructure

The Worcester MSA boasts robust infrastructure, ensuring connectivity and accessibility for its residents and businesses. The region is served by several major highways, including Interstate 290, which runs through the heart of Worcester, linking it to Interstate 90 (the Massachusetts Turnpike) and facilitating efficient travel to Boston and other parts of the state. U.S. Route 20 and State Routes 9 and 146 are key arteries enhancing the area's connectivity.

Public transportation in Worcester is primarily managed by the Worcester Regional Transit Authority (WRTA), which provides comprehensive bus services throughout the city and surrounding towns. The WRTA's network

includes numerous routes connecting residential areas with commercial and industrial zones, educational institutions, and healthcare facilities.

Worcester's Union Station, a historic landmark, is a central hub for rail and bus services. The station offers Amtrak and MBTA commuter rail services, providing easy access to Boston and other major cities in the Northeast. Additionally, intercity bus services operate from Union Station, linking Worcester with destinations across New England and beyond.

Worcester Regional Airport is the primary commercial airport in the MSA, offering flights to major hubs such as New York City, Philadelphia, and Fort Lauderdale. The airport has been undergoing continuous improvements to accommodate increasing passenger traffic and enhance the overall travel experience.

The region's commitment to sustainable and efficient urban mobility is reflected in various infrastructure projects. Worcester has invested in creating a bike-friendly environment, with an expanding network of bike lanes and shared-use paths that promote cycling as a viable mode of transportation. Pedestrian pathways have also been improved to ensure safety and accessibility for all residents.

Overall, the Worcester MSA's well-developed infrastructure supports its economic growth and enhances the quality of life for its residents, making it a highly attractive place to live, work, and invest.

**Economy and Commercial Real Estate – Federal Reserve Bank of Boston**[4]

Economic activity was mixed, increasing modestly overall. Employment and wages were flat, and prices increased only slightly. Consumer spending was mixed, as retailers and restaurant owners posted slightly softer sales, but tourism spending grew modestly. Consumers were described as increasingly inclined towards discounted goods and services. Manufacturers reported modestly higher revenues, on average, while staffing firms experienced somewhat softer demand for labor. Contacts reported substantial increases in single-family home sales and small-to-moderate increases in condominium sales. In contrast, commercial real estate activity was mostly flat. The outlook was a mix of optimism—mostly about home sales—and increased caution about the direction of consumer spending and labor demand.

Retail and restaurant sales were slightly weaker overall in recent months, but tourism spending expanded modestly. A clothing retailer experienced improved results that nonetheless still reflected slight declines in sales on a year-over-year basis. A discount retailer also recorded modestly weaker sales from one year earlier, citing flagging sales of higher-priced items such as furniture and flooring, but added perspective by noting that year-ago sales had been especially robust. A Massachusetts restaurant industry contact reported a slight softening of demand throughout the state but added that certain neighborhoods, such as Boston's Seaport, continued to thrive. Hotel occupancy rates in greater Boston were stable in recent months and were up two percent on a year-over-year basis, consistent with annual growth rates observed earlier in the year. Restaurants expected sales to continue to trail last year's results slightly. Retailers were cautiously optimistic that planned improvements in products and pricing would boost sales volumes over the remainder of the year. Tourism contacts remained optimistic for strong hotel and convention activity in the Boston area into 2025.

First District contacts described commercial real estate activity as mostly flat, but with improvements along some dimensions. Leasing activity was generally steady across sectors, an outcome that exceeded seasonal expectations, and rents and vacancy rates were also mostly unchanged. Leasing activity stayed much weaker for office properties than for industrial and retail spaces. Contacts agreed that remote work arrangements had dented office demand in a permanent way and that the market was still adjusting. They cited a growing number of financially distressed office buildings that might eventually be torn down. Nonetheless, contacts saw signs that the office market may have bottomed out, as investors showed renewed interest in the sector. Lending activity was also up slightly—particularly for multifamily and senior housing—but large loan originations remained scarce. One contact noted a modest increase in multifamily construction in Boston's nearby suburbs. The outlook improved slightly on balance, but contacts remained very nervous about distressed office properties and cautioned that softer consumer spending could hurt retail properties.

4 Federal Reserve Beige Book, August 2024

## SUMMARY

The Worcester MSA has demonstrated significant economic resilience and growth. The region boasts a diverse economy, encompassing industries such as biotechnology, advanced manufacturing, information technology, healthcare, and medical research. This diversity, a skilled labor force, and major employment centers underpin the area's economic stability. Worcester's strategic location in central Massachusetts and its excellent connectivity to major highways and proximity to Boston enhance its attractiveness for businesses and residents. The region's real estate and living costs are generally lower than those in the Greater Boston area, further contributing to its appeal.

The healthcare sector, particularly UMass Memorial Medical Center, is crucial to the local economy. It provides essential services and contributes to job creation and economic stability. The presence of prominent institutions like the University of Massachusetts Medical School fosters a knowledge-driven economy, attracting top talent and investment. Employment in the Worcester MSA has shown positive trends, with key sectors such as healthcare, educational services, and retail trade driving job growth. The area's low unemployment rates reflect its economic resilience and ability to attract and retain a skilled workforce.

Overall, the Worcester MSA is a key regional market within New England, drawing investment interest from various sectors. Its vibrant economy, supported by top universities, healthcare facilities, and a diverse business climate, makes it an attractive location for potential investors and residents alike.


West St
Northborough
20
Bartlett St
Lyman St
Juniper Hill Golf Course
Bigelow Nurseries
Ellsworth McAfee Park
Lyman St
Hop Brook F.c
Davis St
Wegmans
MassWildlife's Wayne F. MacCallum Wildlife...
S
Walmart Supercenter
Julio's Liquors
INDIA MARKET
Chick-fil-A
CarMax
Target
135
Flanders R
20
Arturo's Ristorante
Westborough
George H. Nichols Fc
W Main St
South St
Mill Pond School
Hopkinton Rd
Google
Map data ©2024 Google

### INTRODUCTION

The Boroughs, a recognized Worcester MSA submarket, includes Marlborough, Southborough, Northborough, Westborough, and Shrewsbury. This region is known for its vibrant suburban towns and rich history. Marlborough, with its blend of historic charm and modern amenities, offers a thriving business environment and diverse recreational opportunities. Southborough is celebrated for its scenic landscapes and excellent schools, making it a desirable place for families. Northborough, has a variety of dining and shopping options, provides a high quality of life for its residents. Westborough, known for its strategic location and robust economy, attracts businesses and residents alike. Shrewsbury, with its attractive parks is a popular destination for those seeking a suburban lifestyle. The Boroughs local area boast excellent public schools, diverse dining options, and a variety of cultural and recreational activities, making it an attractive place to live and visit.




**Population**

The estimate provided by ESRI for the current 2024 population within the subject neighborhood's 3 mile radius is 34,945 representing a 1.63%change since 2020. ESRI's 2024 population estimate for the subject's 5 mile radius is 78,817, which represents a 2.11% change since 2020.

Looking forward, ESRI estimates that the population within the subject neighborhood's 3 mile radius is forecasted to change to 35,133 by the year 2029. As for the broader area, ESRI forecasts that the population within the subject's 5 mile radius will change to 79,961 over the next five years. The population estimates for the next five years within the subject's 5 mile radius represents a 1.45% change as well as a 1.99% change within the subject's 1 mile radius for the same period.

### Demographics

The following information reflects the demographics for the subject's area.

## Local Area Demographics

| Description | 1 MILE | 3 MILE | 5 MILE | Description | 1 MILE | 3 MILE | 5 MILE |
|---|---|---|---|---|---|---|---|
| POPULATION TOTAL | | | | HOUSEHOLDS | | | |
| 2010 Census | 3,391 | 29,913 | 69,089 | 2010 Census | 1,223 | 11,262 | 25,114 |
| 2020 Census | 4,154 | 34,383 | 77,187 | 2020 Census | 1,464 | 12,755 | 27,932 |
| 2024 Estimate | 4,262 | 34,945 | 78,817 | 2024 Estimate | 1,491 | 13,119 | 28,874 |
| 2029 Projection | 4,347 | 35,133 | 79,961 | 2029 Projection | 1,543 | 13,378 | 29,726 |
| Δ 2010-2020 | 22.50% | 14.94% | 11.72% | Δ 2010-2020 | 19.71% | 13.26% | 11.22% |
| Δ 2020-2024 | 2.60% | 1.63% | 2.11% | Δ 2020-2024 | 1.84% | 2.85% | 3.37% |
| Δ 2024-2029 | 1.99% | 0.54% | 1.45% | Δ 2024-2029 | 3.49% | 1.97% | 2.95% |
| Total Daytime Population | 5,202 | 41,804 | 99,684 | **HOUSEHOLDS BY INCOME (2024 ESTIMATE)** | | | |
| **HOUSING UNITS** | | | | <$15,000 | 6.6% | 4.1% | 3.4% |
| Total (2024 Estimate) | 1,563 | 13,762 | 30,249 | $15,000 - $24,999 | 2.6% | 2.5% | 2.5% |
| Owner Occupied | 46.6% | 61.1% | 67.4% | $25,000 - $34,999 | 2.6% | 3.5% | 3.5% |
| Renter Occupied | 48.8% | 34.3% | 28.0% | $35,000 - $49,999 | 5.2% | 5.7% | 5.6% |
| Vacant Housing Units | 4.6% | 4.7% | 4.5% | $50,000 - $74,999 | 12.7% | 10.1% | 9.0% |
| Total (2029 Projection) | 1,616 | 14,029 | 30,898 | $75,000 - $99,999 | 12.5% | 10.3% | 9.9% |
| Owner Occupied | 49.3% | 63.5% | 68.8% | $100,000 - $149,999 | 20.9% | 17.6% | 17.8% |
| Renter Occupied | 46.2% | 31.9% | 27.4% | $150,000 - $199,999 | 14.1% | 14.0% | 14.8% |
| Vacant Housing Units | 4.5% | 4.6% | 3.8% | $200,000+ | 22.9% | 32.2% | 33.4% |
| **AVERAGE HOUSEHOLD INCOME** | | | | **AVERAGE HOUSEHOLD SIZE** | | | |
| 2024 Estimate | $163,498 | $192,220 | $197,321 | 2024 Estimate | 2.76 | 2.61 | 2.69 |
| 2029 Projection | $182,701 | $216,213 | $221,583 | 2029 Projection | 2.72 | 2.57 | 2.65 |
| Δ 2024-2029 | 11.75% | 12.48% | 12.30% | Δ 2024-2029 | (1.45%) | (1.53%) | (1.49%) |
| **MEDIAN HOUSEHOLD INCOME** | | | | **MEDIAN HOME VALUE** | | | |
| 2024 Estimate | $114,202 | $135,857 | $143,047 | 2024 Estimate | $569,481 | $617,317 | $636,297 |
| 2029 Projection | $122,602 | $153,595 | $159,097 | 2029 Projection | $621,479 | $660,883 | $682,373 |
| Δ 2024-2029 | 7.36% | 13.06% | 11.22% | Δ 2024-2029 | 9.13% | 7.06% | 7.24% |
| **PER CAPITA INCOME** | | | | **AVERAGE HOME VALUE** | | | |
| 2024 Estimate | $62,025 | $71,764 | $72,861 | 2024 Estimate | $591,770 | $639,703 | $668,265 |
| 2029 Projection | $70,652 | $81,874 | $83,029 | 2029 Projection | $648,302 | $690,305 | $723,313 |
| Δ 2024-2029 | 13.91% | 14.09% | 13.96% | Δ 2024-2029 | 9.55% | 7.91% | 8.24% |

Source: Sites To Do Business Online

### Households

The estimates provided by ESRI indicate that the number of households within the subject neighborhood's 3 mile radius is 13,119, which is a 2.85% change since 2020. Within the subject's broader 5 mile radius, ESRI estimates that the number of households is 28,874, a 3.37% change over the same period of time.

By the year 2029, the estimates provided by ESRI indicate that the number of households within the subject neighborhood's 3 mile radius will change by 1.97% to 13,378 households. Additionally, ESRI's estimate for total households over the next five years within the subject's broader 5 mile radius indicates an expected change of 2.95% which will result in a total household estimate of 29,726.

Looking back, the number of households in the subject neighborhood's 3 mile radius changed 13.26% during the ten-year period of 2010 to 2020. Since then it has changed by 2.85%.

### Income

Income estimates provided by ESRI for the subject neighborhood's 3 mile radius indicates that the median household income is $135,857 and that the average household income is $192,220. Further, the estimates provided by ESRI indicate that, for the subject's broader 5 mile radius the median household income is $143,047, and the average household income is $197,321. Given that there are reportedly 28,874 households in the subject's 5 mile radius, it is estimated that the local effective buying income is around $5,697,446,554.

**Conclusion**

The Boroughs is an area of eastern Worcester MSA that benefits greatly from significant transportation amenities given the bevy of highway interchanges that transverse the area from I-495, I-290 and I-90. Additionally, US Route 20 and State Route 9, are two major east-west corridors in Massachusetts that extend from Boston (in the east) to Pittsfield (in the west). These transportation corridors provide access to the diverse network of interstate and local highways in eastern and central Massachusetts. There are significant retail, office and industrial nodes in the area surrounding the major highway interchanges and a diverse set of residential neighborhoods in the intersecting lands ranging from single-family homes to campus-style apartment communities of fair to good quality. The Boroughs is at the edge of the Boston and Worcester MSA's and gains influences from both economic centers, which are to its benefit.

Based on our observation and the data provided by ESRI, it is perceived that the income and population demographics for The Boroughs, which includes the communities of Marlborough, Southborough, Northborough, Westborough, and Shrewsbury, exhibit above-average characteristics in terms of reported population growth and income levels. As previously mentioned, the population growth for the subject's 1-mile radius has increased by 2.60% since 2020. Based on the projections provided by ESRI, it is expected to continue to increase by another 1.99% during the next 5 years. Lastly, we perceive that, since average household incomes are above the national average ($163,498 for the subject's 1-mile radius) and given that the area is well-populated (1,464 households in a 1-mile radius), developments in the area are likely to benefit from ongoing stability.

The Boroughs area, including Northborough and Westborough, has seen recent initiatives to improve the residential and commercial environment. These initiatives include downtown revitalization plans in both Northborough and Westborough. The plans have focused on street lighting upgrades and urban streetscape enhancements, making the areas more appealing and accessible. The proximity to educational institutions in Worcester and highway transportation amenities offer easy access to recreational, educational and economic. The Boroughs are generally recognized for their residential character. Nearby residential areas are culturally vibrant, featuring diverse economic backgrounds, though they face challenges such as highly varying building conditions and rising housing costs. Plans for infill and redevelopment aim to create suitable spaces for neighborhood-serving amenities and housing, ensuring growth that supports local businesses and provides job opportunities. Programs promoting affordable and inclusive housing, home maintenance, and new homeownership opportunities are essential to enhancing the quality of life in the area, making it a welcoming and dynamic environment for all

Recent initiatives in the area have included downtown revitalization plans in Westborough and Northborough. In Northborough, the downtown revitalization plan focuses on three geographic areas. The first scenario targets space on Blake Street from Main to Pierce Streets, aiming to develop dining and entertainment options with apartments or condos on the upper floors of new three-story buildings. The second scenario targets space on Main Street that borders the Assabet River, with potential redevelopment as park space, residential development, and restaurants or shops. The third scenario focuses on the south area of Main Street, bordered by South and Gale Streets and the Town Common, calling for new retail and residential uses in this area. In Westborough, the revitalization efforts have included similar upgrades and enhancements to improve the overall environment and support local businesses.

## LOCAL AREA LAND USES

The following tables and maps highlight the development in and around the subject.

### Local Area Office - Five-Mile Radius

| Class | RBA | Year Built | % Leased | Properties |
|---|---|---|---|---|
| A | 4,532,007 SF | 1992 | #N/A | 35 |
| B | 4,636,222 SF | 1988 | #N/A | 62 |
| C | 431,641 SF | 1972 | #N/A | 15 |
| **Total** | **9,599,870 SF** | **1989** | **0.0** | **112** |

Source: CoStar

### Largest Office Developments - Five-Mile Radius




| PIN | Name | Address, City | Dist. To Subject | RBA | Built | Class | %Leased |
|---|---|---|---|---|---|---|---|
| A | | 333 South St, Shrewsbury | 2.9 mi | 691,000 | 1986 | B | 0 |
| B | | 200 Forest St, Marlborough | 4.1 mi | 657,045 | N/A | B | 100 |
| C | | 1200 W Park Dr, Westborough | 3.2 mi | 480,000 | N/A | A | 0 |
| D | | 1400 W Park Dr, Westborough | 3.2 mi | 420,000 | N/A | A | 0 |
| E | West | 4400 Computer Dr, Westborough | 3.0 mi | 382,000 | 1978 | A | 100 |
| F | East | 4400 Computer Dr, Westborough | 3.1 mi | 346,591 | 1978 | A | 100 |
| G | One Research Drive | 1 Research Dr, Westborough | 2.7 mi | 296,330 | 1981 | A | 77.83 |
| H | | 25 Research Dr, Westborough | 2.9 mi | 282,028 | 1963 | B | 100 |
| I | | 9 Technology Dr, Westborough | 3.3 mi | 250,813 | 1992 | B | 100 |
| J | North | 4400 Computer Dr, Westborough | 3.1 mi | 221,000 | N/A | A | 100 |

Source: CoStar

## Local Area Industrial - Five-Mile Radius

| TYPE | RBA | Year Built | % Leased | Properties |
|---|---|---|---|---|
| Flex | 5,261,184 SF | 1983 | #N/A | 71 |
| Gen-Ind <25,000 FT | 918,282 SF | 1980 | #N/A | 52 |
| Gen-Ind >25,000 FT | 9,839,305 SF | 1987 | #N/A | 98 |
| **Total** | **16,018,771 SF** | **1986** | **90.6** | **222** |

Source: CoStar

## Largest Industrial Developments - Five-Mile Radius




| PIN | Name | Address, City | Dist. To Subject | RBA | Built | Type | % Leased |
|---|---|---|---|---|---|---|---|
| A | | 25-29 Research Dr, Westborough | 2.9 mi | 715,000 | N/A | Flex | |
| B | Building 1 | 175 Bearfoot Rd, Northborough | 3.5 mi | 575,481 | 1971 | Industrial | |
| C | | 165 Flanders Rd, Westborough | 4.1 mi | 540,000 | 1976 | Industrial | |
| D | | 50 Otis St, Westborough | 1.1 mi | 477,000 | 1981 | Flex | |
| E | | 334 South St, Shrewsbury | 3.2 mi | 460,000 | 1990 | Flex | |
| F | | 325 Turnpike Rd, Southborough | 4.5 mi | 369,063 | 1971 | Industrial | |
| G | | 66 Lyman St, Northborough | 2.0 mi | 346,050 | 1987 | Industrial | |
| H | | 1 Beeman Rd, Northborough | 2.3 mi | 342,900 | 1983 | Industrial | |
| I | | 330 Bartlett St, Northborough | 2.8 mi | 300,000 | 2020 | Industrial | |
| J | | 330 Bartlett St, Northborough | 2.8 mi | 300,000 | 2020 | Industrial | |

Source: CoStar

## Local Area Retail - Five-Mile Radius

| Size | RBA | Year Built | % Leased | Properties |
|---|---|---|---|---|
| <5,000 FT | 0 SF | - | - | 0 |
| >5,000 FT-<20,000 FT | 558,768 SF | 1979 | #N/A | 39 |
| >20,000 FT | 4,028,722 SF | 1996 | #N/A | 56 |
| **TOTAL** | **4,587,490 SF** | **1994** | **0.0** | **95** |

Source: CoStar

## Largest Retail Developments - Five-Mile Radius




| PIN | Name | Address, City | Dist. To Subject | RBA | Built | Class | % Leased |
|---|---|---|---|---|---|---|---|
| A | | 6102-6110 Shops Way, Northborough | 2.0 mi | 645,785 | 2011 | A | |
| B | | 30-32 Lyman St, Westborough | 1.3 mi | 215,455 | 1981 | B | |
| C | | 9102-9114 Shops Way, Northborough | 1.8 mi | 197,250 | 2011 | A | |
| D | | 290 Turnpike Rd, Westborough | 0.7 mi | 185,279 | 1988 | B | |
| E | Sears | 521 Donald J Lynch Blvd, Marlborough | 5.0 mi | 163,492 | 1996 | B | |
| F | | 18 Lyman St, Westborough | 1.4 mi | 161,545 | 1979 | B | |
| G | | 166-180 Milk St, Westborough | 0.4 mi | 149,980 | 1995 | B | |
| H | | 338 Turnpike Rd, Westborough | 1.2 mi | 134,000 | N/A | B | |
| I | Target | 330 Turnpike Rd, Westborough | 1.1 mi | 132,914 | 1991 | B | |
| J | | 1100-1300 Union St, Westborough | 1.8 mi | 111,439 | 2007 | A | |

Source: CoStar

## Local Area Multi-Family - Five-Mile Radius

| Class | RBA | Year Built | Units | Properties |
|---|---|---|---|---|
| A | 1,468,385 SF | 2016 | 1026.0 | 3 |
| B | 4,381,813 SF | 1994 | 3612.0 | 19 |
| C | 668,153 SF | 1967 | 724.0 | 8 |
| **TOTAL** | **6,518,351 SF** | **1996** | **5374.0** | **30** |

Source: CoStar

## Largest Multi-Family Developments - Five-Mile Radius




| PIN | Name | Address, City | Dist. To Subject | RBA | Built | Class | Stories |
|---|---|---|---|---|---|---|---|
| A | Chauncy Lake by Dell Webb | 11106 Peters Farm Way, Westborough | 1.8 mi | 854,360 | 2024 | A | 4 |
| B | Arrive Westborough | 297 Turnpike Rd, Westborough | 0.9 mi | 689,616 | 1970 | B | 8 |
| C | Avalon Northborough | 14 Avalon Dr, Northborough | 2.0 mi | 559,572 | 2009 | B | 4 |
| D | Ellington Metro West | 1 Homestead Blvd, Westborough | 4.7 mi | 486,093 | 2002 | A | 4 |
| E | The Commons at Haynes Farm | 100 Arbor Dr, Shrewsbury | 2.8 mi | 470,437 | 1991 | B | 4 |
| F | Park Village West | 135 E Main St, Westborough | 2.0 mi | 348,222 | 1982 | B | 3 |
| G | Shrewsbury Commons | 51 Commons Dr, Shrewsbury | 2.6 mi | 319,874 | 1973 | C | 3 |
| H | Windsor Ridge at Westborough | 1 Windsor Ridge Dr, Westborough | 2.4 mi | 314,856 | 1972 | B | 2 |
| I | Live-Work Apts: Parc Westborou | 346 Turnpike Rd, Westborough | 1.3 mi | 293,764 | 2016 | B | 4 |
| J | Audubon Shrewsbury | 870-890 Hartford Tpke, Shrewsbury | 2.3 mi | 274,780 | 2006 | B | 3 |

Source: CoStar

## Total Development Overlay - Five-Mile Radius




Source: CoStar

The land use in the subject's immediate neighborhood consists of a significant amount of commercial property, comprising a mix of many property types. There is a significant industrial inventory in the local area, often situated along Route 9 and in established industrial nodes. Similarly, retail uses are dominant along I-290 and Route 9. Route 9 is also one of the largest car dealership nodes in eastern/central Massachusetts. Multifamily properties are present throughout the area and in proximity to the primary commercial corridors that traverse the area. Office properties are most often populated along the I-495 corridor.

### Commercial Land Use



## RECENT DEVELOPMENT

Based on CoStar's research, there appears to be about 7 projects that have been recently developed. All of these projects are perceived to be within 4.2 miles of the subject. The range in size of developments is 15,000 SF to the largest development of 854,360 SF. Overall, the average size of recent developments in the area is 209,933 SF. Further, it appears that most of the developments are  in nature.

The following table details our findings:

### Recent Developments in a Five-Mile Radius (2023-2024)




| PIN | Name | Address, City | Dist. To Subject | RBA | Type | Class |
|---|---|---|---|---|---|---|
| A | Chauncy Lake by Dell Webb | 11106 Peters Farm Way, Westborough | 1.8 mi | 854,360 | Multi-Family | A |
| B | | 64 Otis St, Westborough | 1.0 mi | 200,000 | Industrial | A |
| C | Centech Park North | 384-386 South St, Shrewsbury | 3.2 mi | 196,975 | Industrial | A |
| D | Centech Park North | 721 Hartford Tpke, Shrewsbury | 3.0 mi | 103,100 | Industrial | A |
| E | AVIA Residences on Research | 25 Connector Rd, Westborough | 2.5 mi | 75,000 | Multi-Family | B |
| F | | 156 Northboro, Southborough | 3.6 mi | 25,098 | Industrial | B |
| G | | 3 Commerce Rd, Shrewsbury | 4.2 mi | 15,000 | Industrial | B |

Source: CoStar

## DEVELOPMENT PIPELINE

**Under Construction**

Based on CoStar's research, there appears to be about 3 projects that are currently under construction. All of these projects are perceived to be within 4.2 miles of the subject. The range in size of developments when completed is 35,000 SF to the largest development of 133,750 SF. Overall, the average size of future developments in the area is 93,250 SF. Further, most of the developments under construction are industrial in nature.

The following table details our findings:

### Current Developments Under Construction in a Five-Mile Radius




| PIN | Name | Address, City | Dist. To Subject | RBA | Type | Class |
|---|---|---|---|---|---|---|
| A | | 440 Hartford Tpke, Shrewsbury | 4.2 mi | 133,750 | Industrial | A |
| B | The Pointe at Hill Farm | 526 Hartford Tpke, Shrewsbury | 3.9 mi | 111,000 | Multi-Family | B |
| C | Building 2 | 9 Otis St, Westborough | 1.0 mi | 35,000 | Industrial | B |

Source: CoStar

**Proposed**

Based on CoStar's research, there appears to be about 12 projects that are proposed for construction. All of these projects are perceived to be within 4.3 miles of the subject. The range in size of proposed developments is 80,000 SF to the largest proposed development of 715,000 SF. Overall, the average size of proposed developments in the area is 207,286 SF.

The following table details our findings:

### Currently Proposed Development in a Five-Mile Radius




| PIN | Name | Address, City | Dist. To Subject | RBA | Type | Class |
|---|---|---|---|---|---|---|
| A | | 25-29 Research Dr, Westborough | 2.9 mi | 715,000 | Flex | B |
| B | | 1200 W Park Dr, Westborough | 3.2 mi | 480,000 | Office | A |
| C | | 1400 W Park Dr, Westborough | 3.2 mi | 420,000 | Office | A |
| D | | 700 Friberg Pky, Westborough | 2.9 mi | 180,000 | Office | A |
| E | | 201 Bartlett St, Northborough | 2.8 mi | 151,000 | Industrial | B |
| F | | 2300 W Park Dr, Westborough | 3.4 mi | 120,000 | Office | A |
| G | | 2300 W Park Dr, Westborough | 3.4 mi | 120,000 | Office | A |
| H | | Discovery Rd, Grafton | 4.0 mi | 116,000 | Flex | A |
| I | | Discovery Rd, Grafton | 4.0 mi | 116,000 | Flex | A |
| J | | Discovery Rd, Grafton | 4.0 mi | 116,000 | Flex | A |
| K | Building B | 124 Westboro Rd, North Grafton | 4.3 mi | 100,000 | Industrial | B |
| L | Building B | 124 Westboro Rd, North Grafton | 4.3 mi | 100,000 | Industrial | B |

Source: CoStar

## ACCESS/PUBLIC TRANSPORTATION

The Boroughs local area is at the periphery of both the Worcester and Boston MSA's, and therefore enjoys a bevy of transportation options including interstate highways, local highways, commuter rail, public bus, and commercial air service. **Interstate access** is available throughout the local area from I-495, I-290, I-90, Route 9 and US Route 20, providing linkage points to the broader network of interstate highways that transverse eastern/central Massachusetts. Interstate 495 has numerous interchanges in the eastern section of the area, with full interchanges at I-290, US Route 20, MA Route 9, and I-90 (Mass Pike). **Local Highway access** is available in two major east/west corridors in Routes 9 and 20. **Rapid Transit access** is not available in the local area. **Commuter rail service** is available from the MBTA Framingham/Worcester line with stops at Southborough, Westborough and Grafton. The line provides connections to both major economic centers in Massachusetts (Boston and Worcester). **Public bus service** from the WRTA's "Westborough Shuttle". **Commercial air service** is from Boston's Logan International Airport, within 45 to 120 minutes to the east (highly traffic-dependent), and Worcester Regional Airport, approximately 30 minutes to the west. Transportation linkages to and from the local area are good. Both I-495 and Route 9 easily accessible, and transit to/from the downtown cores (of Boston and Worcester) is a positive trait.

### LOCAL AREA SUMMARY

The subject is in a suburban environment, at the peripheries of the Boston and Worcester MSA's, known as The Boroughs. The area has experienced growth and redevelopment in recent years, and this is expected to continue over the next investment cycle. Further, the area benefits from a variety of positive linkage traits in addition to public spaces that make this a desirable suburban, residential location.

# SITE DESCRIPTION

The subject property consists of one parcel with a total site area of 1,277,351 SF (29.32 AC) which is based on information obtained from Worcester County Assessor. It is perceived that there is no surplus or excess land at the subject. For the purposes of this report we have relied on this site area and reserve the right to amend our analysis upon receipt of a formal legal plan. The following summarizes the salient characteristics of the subject site.

| | |
|---|---|
| Address | 231 Turnpike Rd, Westborough, Massachusetts. |
| Census Tract | 25-027-742402 |

| | | |
|---|---|---|
| **Number of Parcels** | 1 | |
| **Assessor Parcel** | 32-48-0 | |
| **Land Area** | Square Feet | Acres |
| Economic Unit (Primary) Site Size | 745,401 | 17.11 |
| Usable Site Size | 745,401 | 17.11 |
| Unusable Site Size | 531,950 | 12.21 |
| **Total Land Area** | 1,277,351 | 29.32 |
| **Excess/Surplus Land** | No | |
| **Corner** | No | |
| **Permitted Building Height** | | |
| **Floor Area Ratio (FAR)** | Not Available | |
| **Site Topography** | Level At street grade | |
| **Site Shape** | Irregular | |
| **Site Grade** | At street grade | |
| **Site Quality** | Average | |
| **Site Access** | Good | |
| **Site Exposure** | Average | |
| **Site Utility** | Average | |
| **Utilities** | All to site | |

**Adjacent Properties**

| | |
|---|---|
| North | Vacant, Raw Land and SFR neighborhood of good quality |
| South | A one-story, multitenant, neighborhood shopping center, a freestanding restaurant building and a freestanding machinery dealer. |
| East | A low-density, mixed-use neighborhood comprised typically of one-story, Class C commercial uses |
| West | Vacant, Raw Land |
| Accessibility | Access to the subject site is considered good overall. |

## STREET & TRAFFIC DETAIL

| Street Improvements | Type | Direction | Lanes | Lights | Curbs | Sidewalks | Signals | Median | Parking | Center Lane | Bike Lane |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Route 9 | Major arterial | Two-Way | 6 | x | | | x | | | | |
| Milk Street | Connector | Two-Way | 2 | x | | | | | | x | |

**Frontage**

| | |
|---|---|
| Route 9 | 131 Feet (on unusable site area). Ingress/egress is available from access easements |
| Milk Street | 445 Feet |

| Traffic Counts | Location | Source | Count |
|---|---|---|---|
| Route 9 | Route 9 | MassDOT | 54,317 |
| Milk Street | Milk Street | MassDOT | 12,477 |
| | **TOTAL** | | **66,794** |

**Exposure & Visibility**
Exposure of the subject is average noting frontage on Turnpike Rd.

**Flood Plain**
**Zone X (Unshaded).** This is referenced by Panel Number 25027C 0642F, dated July 16, 2014. Zone X (unshaded) is a moderate and minimal risk area. Areas of moderate or minimal hazard are studied based upon the principal source of flood in the area. However, buildings in these zones could be flooded by severe, concentrated rainfall coupled with inadequate local drainage systems. Local storm water drainage systems are not normally considered in a community's flood insurance study. The failure of a local drainage system can create areas of high flood risk within these zones. Flood insurance is available in participating communities, but is not required by regulation in these zones. Nearly 25% of all flood claims filed are for structures located within these zones. Minimal risk areas outside the 1% and 0.2% annual chance floodplains. No BFEs or base flood depths are shown within these zones. (Zone X (unshaded) is used on new and revised maps in place of Zone C.)

**Zone A**. Panel Number 25027C 0642F, dated July 16, 2024. Zone A is a High-Risk Special Flood Hazard Area (SFHA). Special Flood Hazard Areas represent the area subject to inundation by 1% annual chance flood. Structures located within the SFHA have a 26% chance of flooding during the life of a standard 30-year mortgage. Federal floodplain management regulations and mandatory flood insurance purchase requirements apply in these zones. Areas subject to inundation by the 1% annual chance flood event. Because detailed hydraulic analyses have not been performed, no Base Flood Elevations (BFEs) or flood depths are shown.

The subject property's high-risk flood areas are generally in unimproved areas of the site and do not appear to impact the improvements.

**Wetlands**
The subject property is also impacted by designated wetlands. These areas are generally consistent with those impacted by the abovementioned flood areas. The wetlands areas are not considered to be useable (buildable) areas of the subject site.

**Seismic**
The subject is in a moderate risk area.

**Easements**
A preliminary title report was not available for review.

A review of public records revealed a Declaration of Reciprocal Covenants, Easements and Restrictions dated April 9, 1997, and recorded in Book/Page 18745/313. The document provided for the joint development of Lots 1 (subject),

2 and 3 as a combined shopping center. The document generally provides for the joint, perpetual and non-exclusive use of "lots adjacent to parking facilities in the common areas of the shopping center."

Easements for Access – the "owners, occupants and Permittees of each Parcel are hereby granted non-exclusive easements in the Common Areas Driveways and sidewalks of the Common Areas of each Owner's Parcel for access to or from such Parcel . . . "

Signage – the document provides for an easement appurtenant on Lot 3 of the shopping center to erect tenant signage for the benefit of Lots 1, 2 and 3. Further, "for so long as Lot 1 is used for a cinema, the Owner of Lot 1 shall have as appurtenant to Lot 1 for the use of the Occupants of Lot 1 an easement to use the reader board on such pylon sign for the designation of films showing in the Lot 1 Building and the owner of Lot 1 shall maintain such reader board at its sole cost and expense".

Maintenance – The Lots will provide for joint maintenance of the shopping center. The operator of the shopping center shall be entitled to a 10% management fee of the total costs of the preceding period. The CAM expenses are apportioned at 57.6% to Lot 1 (subject property), 35.8% to Lot 2 and 6.6% to Lot 3.

**Soils**

A detailed soils analysis was not available for review. Based on the development of the subject, it appears the soils are stable and suitable for the existing improvements.

**Hazardous Waste**

I have not conducted an independent investigation to determine the presence or absence of toxins on the subject property. If questions arise, the reader is strongly cautioned to seek qualified professional assistance in this matter. Please see the Assumptions and Limiting Conditions for a full disclaimer.

**Site Conclusion**

In conclusion, the site's physical characteristics appear to be supportive of the subject's current use and there were no significant detriments discovered that would inhibit development in accordance with its highest and best use.

The subject's Declaration of Reciprocal Covenants, Easements and Restrictions provides for sharing certain joint CAM costs amongst the property owners. The inspection of the property revealed significantly degraded common areas (including paving and landscaping) that contribute to a reduced condition of the overall shopping center. While the condition of the subject property and its common areas are considered, we do not have any information regarding outstanding capital expenditures due to the Lots 2 and 3 owners. **If there are outstanding costs associated with the property's neglect due to owners of Lots 2 and 3, that any purchaser of the property would be required to pay, those would represent additional deductions to value that are not presently considered in this appraisal report.**

# PLAT MAP


LOT 1
LOT 2
564,773 ± S.F.
or 12.965 ± AC.
LOT 3
245,854 ± S.F.
or 5.644 ± AC.
PARCEL 4
(NON BUILDING LOT)
102,128 ± S.F.
or 2.345 ± AC.
MILK STREET
OAK STREET
BOSTON – WORCESTER
TURNPIKE
LOCUS MAP
NOT TO SCALE
DAVIS STREET
ASSABET RIVER
ROUTE 9
OWNER:
TRUSTEE OF NORTHSIDE
REALTY TRUST
16210/372
PLAN OF LAND
IN
WESTBOROUGH, MA
(WORCESTER COUNTY)
BEALS AND THOMAS, INC.

# GIS Aerial Map




National Flood Hazard Layer FIRMette
FEMA
71°38'26"W 42°17'27"N
AREA OF MINIMAL FLOOD HAZARD
Zone X
TOWN OF WESTBOROUGH
250344
25027C0642F
eff. 7/16/2014
Zone A
71°37'49"W 42°17'1"N
0 250 500 1,000 1,500 2,000 Feet
1:6,000
Basemap Imagery Source: USGS National Map 2023
Legend
SEE FIS REPORT FOR DETAILED LEGEND AND INDEX MAP FOR FIRM PANEL LAYOUT
SPECIAL FLOOD HAZARD AREAS
Without Base Flood Elevation (BFE) Zone A, V, A99
With BFE or Depth Zone AE, AO, AH, VE, AR
Regulatory Floodway
OTHER AREAS OF FLOOD HAZARD
0.2% Annual Chance Flood Hazard, Areas of 1% annual chance flood with average depth less than one foot or with drainage areas of less than one square mile Zone X
Future Conditions 1% Annual Chance Flood Hazard Zone X
Area with Reduced Flood Risk due to Levee. See Notes. Zone X
Area with Flood Risk due to Levee Zone D
OTHER AREAS
NO SCREEN Area of Minimal Flood Hazard Zone X
Effective LOMRs
Area of Undetermined Flood Hazard Zone D
GENERAL STRUCTURES
Channel, Culvert, or Storm Sewer
Levee, Dike, or Floodwall
OTHER FEATURES
20.2 17.5 Cross Sections with 1% Annual Chance Water Surface Elevation
Coastal Transect
Base Flood Elevation Line (BFE)
Limit of Study
Jurisdiction Boundary
Coastal Transect Baseline
Profile Baseline
Hydrographic Feature
MAP PANELS
Digital Data Available
No Digital Data Available
Unmapped
N
The pin displayed on the map is an approximate point selected by the user and does not represent an authoritative property location.
This map complies with FEMA's standards for the use of digital flood maps if it is not void as described below. The basemap shown complies with FEMA's basemap accuracy standards
The flood hazard information is derived directly from the authoritative NFHL web services provided by FEMA. This map was exported on 9/25/2024 at 9:44 AM and does not reflect changes or amendments subsequent to this date and time. The NFHL and effective information may change or become superseded by new data over time.
This map image is void if the one or more of the following map elements do not appear: basemap imagery, flood zone labels, legend, scale bar, map creation date, community identifiers, FIRM panel number, and FIRM effective date. Map images for unmapped and unmodernized areas cannot be used for regulatory purposes.

# WETLANDS MAP





The subject site is an irregular interior land parcel containing a gross site area of 29.32 acres (or 1,277,351 SF) and is zoned BA - "Business Highway" District by the Town of Westborough. The usable site area is reduced by wetlands and high-risk flood plains extending through portions of the site. The subject site is improved with a one-story, concrete block-constructed, purpose built retail movie theater property containing 12 screening rooms within 47,872 SF of Gross Building Area (GBA), which is consistent with its NRA. It has commonly been known as the Regal Westborough Cinemas but has been vacant since the last tenant's lease expired in 2017.

The subject property was developed in 1997 and subsequently encumbered by a 20-year lease agreement, expiring in 2017. The tenant vacated the property at this point and has fallen into a state of neglect and disrepair. As a result of the absence of real estate tax payments, the Town recorded an order of Taking in January 2019. This taking was formalized in January 2022 by a Judgment in Tax Lien Case by the Massachusetts Land Court, Department of the Trial Court.

| | |
|---|---|
| **Property Type** | Retail - Free Standing Retail |
| **Tenancy** | Single-Tenant (vacant) |
| **Net Rentable Area (NRA)** | 47,872 |
| **Gross Building Area (GBA)** | 47,872 |
| **Total Buildings** | 1 |
| **Floors** | 1 |
| **Year Built** | 1997; Renovated: None |
| **Age/Life Analysis** | |
| Actual Age | 27 |
| Effective Age | 45 |
| Economic Life | 50 |
| Remaining Useful Life | 5 |
| **Overall Building Quality** | Average |
| **Overall Building Condition** | Fair |
| **Overall Building Appeal** | Below Average |
| **Land to Building Ratio** | 26.68 : 1 |
| **Site Coverage Ratio** | 6.42% (Based On Total Usable Site Area) |
| **Floor Area Ratio (FAR)** | 0.06 |
| **Total Parking Spaces** | 495 - Surface - Asphalt spaces |
| **Parking Ratio** | 10.3 / 1,000 SF NRA |
| **Anchor Ratio** | 100% |

| Component Description | |
|---|---|
| Foundation | Poured, reinforced concrete. There is no basement level. |
| Exterior Walls/Framing | Textured concrete block with alternating color pattern. The building's exterior exhibits signs of above-average levels of deterioration due to water damage from leaking gutters. It appears there has been no maintenance of the building's exterior since the tenant vacated in 2017. |
| Roof | Flat roof with tar and gravel; the subject property has been vacant since 2017. We are aware of no recent roof replacement, and it's likely the roof covering is out of warranty with no recent maintenance. An exterior inspection revealed natural brush growth extending above the parapet walls, which is a good indicator that maintenance is absent. Further interior photographs (from 2022) reveal evidence of extensive interior roof leaking. With no further maintenance, it's likely this water intrusion has only exacerbated in recent years. |
| Elevator | There is one elevator at the property, we are not aware of its functionality but assume that its condition is consistent with the overall observations of the subject property. |
| Heating & AC (HVAC) | Cooling: Yes Heating: Forced air unit Fuel: Gas It is likely that the existing HVAC system is no longer functional. There are reports of water line breaks inside the building, which suggests it is no longer being heated in winter months. |
| Lighting | Interior photographs indicated recessed fluorescent fixtures in acoustic tile ceilings, decorative wall sconces (in screening rooms) and suspended fixtures in the lobby. |
| Electrical | Master meter: We assume it is a modern three-phase, four-wire system, but given an extended period of absentee ownership, it is likely the system may require repairs before it can be occupied again. |
| Interior Walls | Typically painted drywall. There is evidence of vandalism impacting the interior fit-out from the provided photos from 2022. There is no evidence that any of this has been cured in recent years. |
| Doors and Windows | The main entrance has modern, fixed-pane, thermal pane storefront windows that are predominantly boarded up at present. The main entrance also includes a steel I-beam-constructed, decorative awning structure that is emblematic of cinema uses. The remaining doors and windows on the building's exterior are similarly boarded up to prevent unwanted intrusion. The Westborough RFP indicated that several windows are broken, which is likely hidden by the fenestration boards. |
| Ceilings | Variation of exposed, painted metal decking and suspended acoustic tile. Interior photographs suggest there is significant water damage to the interior. |
| Plumbing | There are six, multiuser restrooms with average quality finishes in poor to fair condition. The interior photographs show evidence of vandalism and destruction including one wall that appears to be full broken through. |
| Floor Covering | A mixture of commercial carpets of average quality and presumed to be in poor condition. Porcelain tiled floors are in the lobby. Interior photographs of the screening rooms suggest that all floor coverings have been removed with exposed concrete remaining. |
| Fire Protection | Wet fire sprinkler; The 2022 RFP indicates that this system has ruptured and requires repair. |
| Site Improvements | Pole lighting |
| Landscaping | The existing landscaping is significantly overgrown and clearly has not been maintained in several years. Bushes and trees are overgrown and may require |

| | |
|---|---|
| | replacement. The parking areas and buildings periphery exhibit wasted grass space that is now overgrown with weeds. |
| Signage | There is a monument style sign along Turnpike Rd. |
| Parking | The subject provides 495 surface - asphalt parking spaces, or 10.3 spaces per 1,000 SF of NRA, which is within market standards (3-5/1,000 SF) for retail (free standing retail) property type. However, this parking ratio incorporates areas that are available to be utilized by Lots 2 and 3 of the shopping center as well. Even accounting for those building areas, the subject offers above-standard parking ratio.<br><br>The parking areas have been poorly maintained in recent years and extensive cracking and alligatoring is evident through the subject site. The parking area is degraded above the level typically seen in operating retail environments. Repairs to the parking area are required. |
| Site Coverage Ratio | 6.4% (47,872 SF footprint / 745,401 SF site), which is within market standards (20-35%) for similar free-standing retail buildings in the area. |
| Functional Design | The building features a functional Free Standing Retail design with typical site coverage and adequate off-street parking. |
| ADA Comment | This analysis assumes that the subject complies with all ADA requirements. Please refer to the Assumptions and Limiting Conditions section. |
| Hazardous Materials | A Phase I report was not provided. This appraisal assumes that the improvements are constructed free of all hazardous waste and toxic materials, including (but not limited to) unseen asbestos and mold. Please refer to the Assumptions and Limiting Conditions section regarding this issue. |
| Interior Finish/Build-Out | The main building entrance is off of the south building elevation, which has a modern storefront for a cinema with a decorative awning structure. The entrance opens up to the main lobby of the property, where ticket sales, concession stands and restrooms are available. In the rear corridor of the building, there are 12 individual screening rooms with stadium seating configurations. |
| Deferred Maintenance | An exterior inspection, reading of the 2022 RFP and conversations with some Town officials (including the Assessor's Office, Building Departing, Procurement and the Town Manager) have indicated that extensive deferred maintenance is in place at the subject property. To properly quantify the extent of the deferred maintenance, a licensed, qualified expert must be sought as this would be beyond the scope and qualifications of the appraiser. Rather, the impact of deferred maintenance is recognized in our overall estimate of the property's condition. |

The subject property is located within the City of Westborough. Real property in the Commonwealth of Massachusetts is assessed at the City or Town level and must be assessed every three years with State Statutes requiring officials to determine the "full and fair cash value, or (FFCV)" of each parcel. However, most municipalities adjust annual assessment levels during the triannual reassessment period. Massachusetts statutes require that all property be valued for the purposes of real estate taxation at Full and Fair Cash Value is:

> *"the amount a willing buyer would pay a willing seller on the open market"*[5]

Full and Fair Cash Value is expected to represent the "unencumbered fee simple interest" in the property regardless of less-than-ownership interests such as leaseholds.

Taxes on real estate in the Commonwealth of Massachusetts are assessed on January 1 of each year. The Fiscal Year for the Commonwealth of Massachusetts is July 1 to June 30. The assessment date in all cities and towns is January 1st prior to the beginning of the Fiscal Year (FY) for which the tax is assessed. For example, for FY 2025 (July 1, 2024 to June 30, 2025), the assessment date is January 1, 2024. Assessment levels are typically set in the fourth quarter of the calendar year of the assessment date (approximately October) and varies by Municipality. Similarly, tax rates are typically set in a similar schedule. As of the date of this report, as of the date of this report the City of Westborough has not finalized its current FY assessments or tax rates, and 2024 is the most current year available.

Tax rates in towns are set by Boards of Assessors, which are elected officials. In cities, an Assessor is an appointed position. In both cities and towns within the Commonwealth, real estate is reassessed upon the sale or conversion of real estate, where the FFCV has changed by more than 50%.

**Proposition 2 ½**
Also, of note is Proposition 2 ½. It was a ballot initiative passed in 1980 to limit property tax increases. The initiative became law and came into force in 1982.

There are two fundamental components of Proposition 2½:

- Ceiling: The total taxes assessed within any city or town under the provisions of Chapter 21C shall not exceed two and one-half percent of the full and fair cash valuation in said city or town in any fiscal year. Any city or town in which total taxes exceed this limit shall be subject to the provisions of paragraph (d) of Chapter 21C. The Commissioner of Revenue, per MGL Ch. 58 §10C, is responsible for biannually determining an equalized valuation for each city and town in the Commonwealth.
- Increase limit: The annual property tax increase cannot exceed 2.5% plus the amount attributable to new property.

While this is not a limit on any one specific tax parcel, it does effectively provide relative limits to real estate taxation increases for property owners.

**Community Preservation Act (CPA)**
The Community Preservation Act (CPA), which was signed into law by Governor Paul Cellucci and Lieutenant Governor Jane Swift on September 14, 2000, allows communities to create a local Community Preservation Fund to create a dedicated fund for open space preservation, preservation of historic resources, development of affordable housing, and the acquisition and development of outdoor recreational facilities. Community preservation monies are raised locally by imposing a surcharge of not more than 3% of the tax levy against real property, and municipalities must adopt CPA by ballot referendum. To date, 172 municipalities in the state have adopted CPA, or approximately 49% of the state's 351 cities and towns. The City of Westborough. has approved the CPA and assessment parcels within the municipality are not subject to an additional 0.5% surcharge to real estate taxes (after a $100,000 deduction in assessment).

The assessed value and property tax for the current year are summarized in the following table:

## CURRENT TAXATION & ASSESSMENT DESCRIPTION

The subject's assessed values and property taxes for the current year are summarized in the following table.

5 Boston Gas Co. v. Assessors of Boston, 334 Mass. 549, 566 (1956)

## Current Assessment & Taxes (2024)

| Taxing Authority | | | | | Tax Rate | 16.4100 |
|---|---|---|---|---|---|---|
| **ASSESSOR PARCEL #** | **Land** | **Improvements** | **Total** | **Exemptions** | **Taxable** | **BASE TAX** |
| 32-48-0 | $712,000 | $1,101,300 | $1,813,300 | $0 | $1,813,300 | $29,756 |
| **Subtotal** | **$712,000** | **$1,101,300** | **$1,813,300** | **$0** | **$1,813,300** | **$29,756** |
| Subtotal $/NRA | $14.87 | $23.01 | $37.88 | $0.00 | $37.88 | $0.62 |
| **Additional Tax Charges** | | | | | | |
| CPA | | | | | | $1,406 |
| **Total Additional Tax Charges $/NRA / Total** | | | | | **$0.03** | **$1,406** |
| **Total Base Tax $/NRA / $ Total** | | | | | **$0.65** | **$31,162** |

Source: Westborough Assessment & Taxation

The subject's assessment history is shown in the following table

### Subject Property Assessment And Tax History

| Year | Total Assessed Value | Tax Rate | Base Taxes | CPA | Total Taxes | Taxes/SF | Change |
|---|---|---|---|---|---|---|---|
| 2024 | $1,813,300 | 0.01641 | $29,756 | $1,406 | $31,162 | $0.62 | -15.1% |
| 2023 | $2,082,000 | 0.01684 | $35,061 | $1,669 | $36,730 | $0.73 | -4.9% |
| 2022 | $1,994,900 | 0.01849 | $36,886 | $1,752 | $38,638 | $0.77 | -24.1% |
| 2021 | $2,622,100 | 0.01854 | $48,614 | $2,338 | $50,952 | $1.02 | -49.3% |
| 2020 | $5,239,100 | 0.01832 | $95,980 | $4,707 | $100,687 | $2.00 | - |

The subject property's assessment level has steadily decreased in the past several years. It peaked at $9,264,800 in FY 2018, immediately following the previous tenant's lease expiration. In an affidavit from the Town's Assessor dated September 11, 2024, the assessor notes that "the property has aged, has been vacant, and has not been maintained, other than the Town's basic maintenance efforts, for substantial periods of time." Further from the Affidavit:

- *"Extended vacancy is a significant factor in valuations of land and buildings. Over time, damage, depreciation, and deferred maintenance accumulate and compound one another, and the convergence of these developments often result in decreases in property values. Diminution in property value like the Property at issue in this matter is not uncommon for chronically vacant properties."*
- *"Since FY2018 and FY2019, the Property has experienced significant water damage, damage caused by break-ins, destructive vandalism, accumulation of graffiti, and mold, despite the Town's efforts to secure the Property, all of which contribute significantly to the Property's depreciation in value."*
- *"In addition to these material effects, which directly affect the Property's value, the cumulative deterioration of and damage to the Property affects its market value by stigmatizing the Property as chronically vacant and essentially blighted."*
- *"Additionally, the fact that the building on the Property was constructed and used exclusively as a movie theater, and what that building would cost today to replace, bears significantly on the lower assessed value of the Property."*

The notes from the Assessor provide important and relevant context to the condition of the property and its trend over time. However, the definition of value that the Assessor's use, varies significantly from what is being considered in this report. The Assessor's estimate of value is not considered a relevant indicator of market value as it pertains to the estimate by the appraiser. We have no other opinion on the applicability of the assessor's estimate of value as it relates to market value as defined herein.

## TAX COMPARABLES

Total taxes for the property are $31,162, which is less than the general range for comparable free standing retail uses in the area. Comparable details are highlighted in the following table.

### Tax Comparable

| | Subject | | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 | Low | High | Avg. |
|---|---|---|---|---|---|---|---|---|---|---|
| Name | Regal Westborough | | Target | Carmax | Stage Coach Plaza | Herb Chambers | Autobahn | - | - | - |
| Address | 231 Turnpike Rd | | 330 Turnpike Rd | 170 Turnpike Rd | 225-7 Turnpike Rd | 312 Turnpike Rd | 88 Turnpike Rd | - | - | - |
| City | Westborough, MA | | Westborough, MA | Westborough, MA | Westborough, MA | Westborough, MA | Westborough, MA | - | - | - |
| Taxing Authority | Westborough | | Westborough | Westborough | Westborough | Westborough | Westborough | | | |
| APN | 32-48-0 | | 25-7 | 27-60A | 32-49 | 30 | 34-162 | - | - | - |
| Year Built | 1997 | | 1991 | 2016 | 1997 | 2009 | 1966 | 1966 | 2016 | 1995.8 |
| NRA | 47,872 | | 131,742 | 45,413 | 29,448 | 78,437 | 25,240 | 25,240 | 131,742 | 62,056 |
| Assessment Period | 2024 | Pro Forma | 2024 | 2024 | 2,024 | 2,024 | 2,024 | | | |
| Assessed Total | $1,813,300 | $1,858,633 | $13,796,400 | $11,052,200 | $4,333,300 | $13,790,700 | $2,408,500 | - | - | - |
| Assessed $PSF | $37.88 | $39 | $104.72 | $243.37 | $147.15 | $175.82 | $95.42 | $95.42 | $243.37 | $153.30 |
| Taxes Total | $31,162 | $30,500 | $237,637 | $190,353 | $74,583 | $237,539 | $41,418 | - | - | - |
| Taxes $PSF | $0.65 | $0.64 | $1.80 | $4.19 | $2.53 | $3.03 | $1.64 | $1.64 | $4.19 | $2.64 |

Because we perceive that the assessment is inferior to the comparables above, we have estimated that the current assessment level is appropriate. However, any renovation/reconfiguration of the property would likely incur a reassessment in a range indicated by the cited comparables.

## CONCLUSION

In this section, we analyzed the subject's historical and current assessment and considered its tax burden as it relates to its current stabilized market value on a fee-simple basis. The conclusion shown above is supported by comparable data and will be utilized going forward in the analyses that follow.

# ZONING AND OTHER LEGAL PERMISSIONS

The subject is located in the Business Highway (BA) zoning area which is summarized below.

## Zoning Summary

| | |
|---|---|
| Zone | BA, Business Highway |
| Zoning Authority | Town of Westborough |
| Purpose | The Business Highway District encompasses the majority of land fronting on Route 9 lying west of Connector Road. The area is highlighted by a series of strip centers, restaurants and other non-residential uses, but residential development is not contained in the mix. The Westborough Master Plan dated May 2003 identifies a perceived, but unrealized provision for multifamily housing. Smaller housing units available at prices available to a wider range of family types and incomes is lacking in Westborough. The purpose of the multifamily Special Permit in the BA district is to allow residential units to be incorporated to the mix of uses in the highway business district, where residents could benefit from proximity to shopping and services, while maintaining an appropriate mix and scale of development. |
| Permitted Uses | Nursery/commercial greenhouse, outdoor recreation, sale of christmas trees, religious uses, other educational uses, municipal use, social clubs, indoor recreation, banks/office space, restaurants and brew pubs, other retail sales/services, display and sale of natural products, public/private utility, research laboratory, home occupations. |
| Conditional Uses | SFR, duplex, boarding house, multifamily, farms (with pigs), recreational camps, cemetery, hospital/sanitarium/convalescent/or rest home, motor vehicle service station, hotel/motel, microbrewery or distillery, earth removal, manufacturing, processing and warehouse. |
| Prohibited Use | Open Space communities, mobile homes, campgrounds, mobile home parks, senior living overlay, drive-in theater/amusement park or similar, mixed-use residential/commercial with industrial components, airports, trucking terminals, adult entertainment uses, brewery/distillery, all other uses, ground-mounted solar, marijuana establishments. |
| Current Use | Movie Theater |

## Zoning Requirements

| | |
|---|---|
| **Density** | |
| Maximum Height/Stories | 60 ' or 4 Stories |
| Maximum Site Coverage | 40 |
| Minimum Lot Size | 15,000 SF |
| Minimum Frontage | 125 LF |
| **Minimum Setbacks Requirements** | |
| Front yard | 25' |
| Rear yard | 25' |
| Side yard | 25' |
| **Parking** | |
| Parking Spaces (Commercial) | 1.0 per 200 SF Retail |
| Parking Spaces (Multifamily) | 1.0 per Dwelling Unit |
| Total Spaces Required | 239 |
| Parking Spaces Provided | 495 |
| **Other Comments** | **The available parking at the subject property is partly shared with Stage Coach Plaza inline retail center. Incorporating this center into the parking ratio would still equate to a ratio exceeding those required by the Zoning Bylaws of Westborough.** |

## Zoning Conformity

Based upon a review of the applicable zoning information, the existing subject property appears to be a legal, conforming use.

Source: City of Westborough Planning & Zoning Department

### SEWER MORATORIUM

On April 15, 2024, the Town of Westborough issued a moratorium on new sewer connections, expansions and increases for a period of one year. Specifically: "*the purposes of this Regulation are to protect public health, safety and the environment and to protect the integrity of the Town sanitary sewer systems by prohibiting new connections, system expansions and increases in flow for a temporary period of time to allow the Town to study system-wide capacity issues and to determine whether and upon what terms and conditions such increases in flow may be permitted in the future.*"

Speaking with Town officials from the Public Works Department, the Town is studying the wastewater treatment facility's usage and formulating a long-term plan for its upgrade. The existing facility is at capacity. While the Moratorium is for one year, it's reasonable to consider that it will be further extended as any actual redevelopment of the wastewater treatment facility will likely require several years to complete. This assessment of the situation is predicated upon conversations with the Town's Public Works Department.

The expansion of the wastewater treatment facility increases the uncertainty of development for any use that would require any expansion (or new) sewer connections. Presumably, uses of the subject property of equal occupancy intensity are not further impacted by this moratorium.

### ZONING CONCLUSION

The subject property was originally approved for development through a special permit for use as a movie theater in 1997, and it would be a legal, conforming use to continue this use going forward. There are a variety of uses permitted by right in the BA District, including (but not limited to) outdoor recreation, other educational uses, indoor recreation, office space, restaurants, brew pubs, other retail sales and services and a research laboratory. There are a variety of alternative uses that are available for use at the subject property. More intensive uses (such as multifamily) through a special permit may be difficult to achieve approval given current capacity issues with the Town's wastewater treatment facility. However, movie theater or a use of similar occupancy density should likely be permissible by the Town.

# ZONING MAP


Parcels
Downtown Business District
Downtown Planning Overlay
IC Overlay District
Industrial ID Overlay District
Industrial IE Overlay District
Senior Living Overlay
AA Apartment, Garden
AE Adult Entertainment
BA Business, Highway
BB Business, Downtown
C Conservation
G-2 Gateway 2
IA Industrial A
IB Industrial B
M State Owned
M-1 Town Owned
MUD Mixed Use District
OTH All other Zones
R Residential, Single
BA
AA
M-1
M
IB

## NATIONAL MOVIE THEATER INDUSTRY OVERVIEW

The following section contains excerpts from the IBISWorld Report – Movie Theaters in the US, September 2024.

Demand for movie theaters has been on a consistent dip thanks to intense competition from online streaming platforms. The industry experienced its most significant drop in performance amid the outbreak of COVID-19, which fueled at-home viewership. The pandemic created substantial disruptions for the industry as theatres temporarily closed and audiences stayed home, which resulted in industry revenue plummeting 73.2% in 2020. Although the industry experienced robust growth in 2021 and 2022 as restrictions eased and audiences returned, revenue has yet to return to its pre-pandemic total. Revenue has fallen at a CAGR of 6.1% to $15.3 billion through the end of 2024. Profitability has returned following pandemic lows thanks to theatres implementing monthly subscription programs and offering premium concessions, but overall profit remains depressed from where it was in 2019.

In 2020, social distancing restrictions aimed at curbing the spread of COVID-19 forced movie theaters to close during their busiest time, the summer blockbuster season. Even when movie theaters were eventually allowed to reopen, limited-capacity seating prevented revenue growth that year. Pent-up demand brought moviegoers back to the theater in 2021, contributing to a massive period of growth that extended into 2022. Growth has since returned to typical marginal rates in 2024, when revenue will hike 1.3%. Despite intense competition from streaming services, resumed economic activity and lifted travel restrictions fueled moviegoing as more people engaged in out-of-the-house activities. Rising ticket prices and focusing on a quality theater experience have supported revenue while increasing 3D ticket sales and promoting higher-value concession items.

Movie theaters will continue to struggle with difficulties brought on by the pandemic through the end of 2029. The emergence of streaming services will contribute to a shrinking theatrical release window, which will detract from the value of attending a movie at the theater. Still, recovering employment and consumer spending will help movie theaters move forward, encouraging consumers to spend disposable income on entertainment. Favorable economic conditions will enable Movie Theaters industry revenue to recover, mounting at a CAGR of 1.4% to $16.4 billion through the end of 2029.

**Key External Drivers**

| Key External Drivers | Impact |
|---|---|
| Per capita disposable income | Positive |
| Number of K-12 students | Positive |
| Number of broadband connections | Negative |
| Consumer spending | Positive |

| Industry Structure Characteristic | Level | Trend |
|---|---|---|
| Concentration | Moderate | |
| Barriers To Entry | High | Increasing |
| Regulation and Policy | Low | Steady |
| Life Cycle | Mature | |
| Revenue Volatility | Very High | |
| Assistance | Low | Steady |
| Competition | High | Steady |
| Innovation | Moderate | |

## KEY TAKEAWAYS

**Performance**

The COVID-19 pandemic hit movie theaters hard, but they're bouncing back. Despite crushing losses in 2020, innovative strategies and pent-up demand have driven a significant recovery, although challenges like inflation and streaming competition persist.

Shorter theatrical release windows will damage revenue. Vertically integrated production studios increasingly turn to streaming to avoid piracy and boost revenue for other businesses under their ownership.

Movie theaters are evolving to offer more than just films. From luxury seating to live events and in-theater dining, cinemas are transforming into multi-experience venues to entice audiences and draw them away from their couches and back to the big screen.

**External Environment**

Alcohol sales boost theater revenue. Many theaters can now serve beer, wine and spirits due to new laws. This change gives moviegoers another reason to step out and catch a film, and results in a significant increase to revenue from concessions.

Government grants and tax incentives help movie theaters cover costs and upgrade facilities. These support programs allow theaters to enhance their offerings and maintain local cinema culture despite financial challenges.

Industry trade organizations help film exhibitors by researching and lobbying for pro-business laws. They advocate for the film industry's interests, addressing piracy issues and promoting policies that benefit theaters.

**Performance Snapshot**

**The COVID-19 pandemic hit movie theaters hard, but they're bouncing back.** Despite crushing losses in 2020, innovative strategies and pent-up demand have driven a significant recovery, although challenges like inflation and streaming competition persist.

**Shorter theatrical release windows will damage revenue.** Vertically integrated production studios increasingly turn to streaming to avoid piracy and boost revenue for other businesses under their ownership.

**Movie theaters are evolving to offer more than just films.** From luxury seating to living events and in-theater dining, cinemas are transforming into multi-experience venues to entice audiences and draw them away from their couches and back to the big screen.

Revenue

$15.3bn

'19-'24 ↓ 6.1 %

2024 Revenue CAGR

↑ 1.3 %

Revenue Volatility

Very High




## CURRENT PERFORMANCE

**What's driving current industry performance?**

### Movie theaters were devastated by COVID-19

As lockdown orders and social distancing guidelines rolled out at the start of the outbreak of COVID-19, attendance at movie theaters nearly evaporated.

The industry lost nearly three-quarters of its revenue in 2020, thanks to a dramatic drop in demand. This led to many employment terminations as some theatre owners attempted to reduce costs while other movie theatres were forced into closing.

The following years brought consumers back to the theaters at a lower capacity. Though competition from the emergence of streaming has been fierce, pent-up demand during the pandemic led to a boom in revenue in 2021.

The COVID-19 pandemic accelerated the adoption of shorter release cycles and hybrid release models, where movies are simultaneously released in theaters and on streaming platforms. This trend has challenged the traditional theatrical window and hindered movie theater revenue performance.

### Drop in disposable income amid inflation

Movie theaters rely on consumers having enough extra spending money to justify going out and making discretionary purchases, like movie theater tickets and concessions.

Following the height of the pandemic, disposable income rose in unison with improving macroeconomic conditions. As social distancing guidelines eased in 2021, pent-up demand for entertainment and increased disposable income contributed to the substantial recovery period.

Widespread inflation in 2022 pushed grocery store and energy bills upwards dramatically, leading to a drop in disposable income. Dropping per capita, disposable income puts pressure on movie theaters to keep their prices low, but many movie theaters can't drop their prices because of their already cumbersome revenue-generation challenges.

**Tough competition has pummeled movie theaters**

A growing reliance on streaming services to see popular movies has dramatically reduced demand for box office tickets. Theaters have been partially left out of the loop as production companies increasingly send their films directly to their streaming services at a premium upcharge.

Marvel Studios is a great example of a decade-long trend across the movie industry toward interconnected universes that encourage audiences to return to the theaters regularly, but the popularity of Disney+, Max, Amazon Prime and other services have made these releases accessible outside of the theater.

In the summer of 2020, AMC entered into a never-before-seen agreement with Universal to permit a theatrical release window of a mere 17 days in exchange for a share of Universal's streaming revenue.

Movie theater chains have introduced subscription-based models that offer customers select movie access for a monthly fee. These subscription services often include additional perks, such as discounts on concessions.

**The experience has become critical to success**

In part because of the prevalence of streaming, movie theaters have looked to revolutionize the experience of attending a movie screening. Movie theaters have expanded their offerings beyond traditional films to include alternative content such as live events, sports broadcasts and gaming competitions to attract a wider audience. The success of the "Taylor Swift: The Eras Tour" Concert Movie has motivated AMC to commit to developing more concert films.

The sale of alcohol and in-theater service has become increasingly common as movie theaters aim to justify the price of admission. Concessions are also a key source of additional revenue, with alcohol sales providing a much-needed boost to movie theatre sales. Major player AMC has begun to launch its own branded concession stand snacks and merchandise, including collectible popcorn buckets.

Movie theaters have invested in state-of-the-art projection systems, immersive sound technology and specialized seating to provide a more captivating and immersive movie-watching experience. IMAX and 3D movie screenings offer a more immersive experience, command higher ticket prices and have grown more popular, especially with younger kids.

In response to the pandemic and social distancing measures, drive-in theaters experienced a resurgence in popularity, offering a safe and nostalgic alternative to traditional indoor cinemas.

**Theaters look toward innovation amid adversity**

Among the most notable trends, the industry's pivot towards streaming can't be ignored. Major studios, including Disney and Warner Bros., experimented with near simultaneous releases on their streaming platforms and in theaters, which drew both applause and criticism. While initially deemed a temporary measure, this hybrid model has carved out a more permanent niche in the landscape, indicating that streaming and theatrical releases can co-exist and even complement each other.

The rise of younger demographics influencing market dynamics looms large. Gen Z and Millennials are not passive consumers; their preferences reshape content offerings and viewing experiences. Social media buzz and online reviews hold more sway than ever before, driving box office performance significantly.

Despite their pandemic woes, giants like AMC expanded aggressively, acquiring struggling competitors and solidifying their market dominance. Meanwhile, boutique and independent cinemas leaned into niche markets, showcasing indie films, cult classics and locally-produced content that attract dedicated film buffs.

Recognizing the need to differentiate from home viewing, theaters have invested heavily in IMAX, 4D experiences and luxury seating. These premium experiences offer more than just a movie; they provide an event, a night out that justifies the outing and a higher price relative to streaming. Chains like AMC and Cinemark have doubled down on their loyalty programs and subscription services, aiming to cultivate a more engaged and regular audience base.

**What influences industry volatility?**

**2020: The exception to the rule**

Movie theaters typically experience low revenue volatility, but restrictions rolled out during the COVID-19 pandemic dropped revenue by nearly three-quarters in 2020.

Ticket sales have rebounded with the COVID-19 vaccine rollout and the dissipation of concerns surrounding the virus, leading to solid growth in 2021 and 2022. Despite this growth, revenue has remained dramatically low and some theaters may never reach pre-pandemic sales.

**Inexpensive admissions stabilize revenue**

Entertainment industries follow changes in per capita disposable income, consumer confidence and consumer spending as the public can spend more money on events.

A movie ticket is considerably cheaper than a ticket to a sporting event or concert, decreasing the threshold of spending money needed to attend and lessening the losses experienced by other industries when disposable income is low.

Streaming platforms offer a vast library of movies and TV shows at users' fingertips, 24/7. This eliminates the need to visit theaters, causing people to choose the comfort of their homes over a trip to the cinema. Services like Netflix, Disney+ and HBO Max regularly release new content, with shrinking theatrical windows making waiting for a film to hit streaming a more viable option.

Subscriptions offer an all-you-can-watch buffet at a fixed monthly rate. This is often more economical than buying individual movie tickets, especially for families or frequent watchers, pulling audience attention (and wallets) away from theaters.

**Revenue flows with the hype for new movies**

Theaters get most of their revenue from admissions and most moviegoers only go to the theater when there's a specific film they're interested in seeing. Summer blockbusters and holiday releases typically draw massive crowds, while other periods can be almost deserted. This inconsistency makes revenue highly unpredictable month-to-month.

Successful marketing strategies for big-name and high-budget sequels to successful movies bring in more admission sales, but this has become less common as more and more movies go directly to streaming services.

A handful of films often generate a large portion of annual revenue. If expected blockbusters underperform or fail, it significantly depletes overall earnings, making the financial landscape unpredictable.

Shifts in what genres or types of films are popular can happen swiftly. What drew crowds last year might flop this time around, leading to an unreliable forecast for success and revenue.




## HOW DO SUCCESSFUL BUSINESSES OVERCOME VOLATILITY?

**Access to multiskilled and flexible workforce**
Theaters must have access to a steady stream of casual employees for wage cost considerations and, at the same time, to cover demand peaks on a daily, weekly and annual basis. A versatile team that can adapt to various roles will ensure seamless operations and help theaters maintain service standards and efficiency.

**Develop a loyal customer base**
A loyal customer base helps sustain consistent attendance and revenue, making fluctuations in box office performance surmountable. Positive word-of-mouth, rewards programs and good customer service encourage repeat visits that support long-term viability.

## WHAT'S DRIVING THE INDUSTRY OUTLOOK?

**Revenue will finally return to growth**
As the industry recovers from the setback of COVID-19 and inflationary pressure begins to ease, revenue will climb as more and more people who stopped attending movies return to the box office.

Rising per capita disposable income is poised to help drive consumer spending on movie theater admissions, especially for premium-priced tickets, like IMAX and 3D, along with concessions items. Consumer confidence will also rebound from previous drops, encouraging consumers to spend more time on recreational activities and make more discretionary purchases, like tickets to a new movie.

Film production has resumed and a steady flow of blockbuster movies will ensure that theaters have new releases that entice audiences. However, many of these flicks will go to streaming services.

Studios and theaters may explore more flexible release strategies, including dynamic pricing models, staggered releases and hybrid distribution approaches that cater to diverse audience preferences and optimize revenue streams.

**Streaming service subscriptions will constrain growth**

The trend toward streaming services and on-demand at-home entertainment has been rapidly accelerated by COVID-19 and a lessened reliance on movie theaters to see the current big movie will continue to subdue revenue growth.

Many production companies, like Apple, have their own streaming services and are creating highly anticipated films that won't see the inside of a movie theater.

Movie theaters must adapt their business models and collaborate with studios to create mutually beneficial strategies that maintain the theatrical experience while accommodating streaming platforms. However, production companies are gaining heavy bargaining power and movie theaters are losing their position to make demands when signing contracts regarding release windows.

The industry may witness more partnerships between theaters, studios, streaming platforms and content creators to co-produce, co-distribute, or cross-promote content, enabling greater consumer flexibility and access.

**Shrinking theater-only windows will bring down revenue**

Theatrical release windows still give movie theaters a few months of protection, but a shrinking time window will damage box office sales even more.

Production companies can mitigate losses from piracy by going to streaming sooner rather than later, which encourages them to negotiate for shorter windows.

Movie theaters are competing more with the success of popular television series on streaming services, like Succession and The Last of Us, which take up more of viewers' free time. Limited series have been a popular trend in streaming, with stories typically told over 2 hours instead of being told throughout about 10-hour-long episodes.

Many production studios, especially those under Disney, have turned projects initially slated for feature films into television series. Considering the size of a typical audience for a Marvel Studio film in the last decade, the loss of these potential customers is significant. This shift will continue to cut the supply of productions that movie theaters can use to bring in consumers, challenging growth.

**Theaters make adjustments to adapt to new conditions**

Theaters will raise ticket and concession prices to compensate for dampened attendance. Still, the industry's elasticity of demand will make this a more than imperfect solution to its challenges. Some theaters are exploring dynamic seating arrangements that adjust based on factors like ticket sales, seat preferences and group sizes, optimizing the seating layout to maximize occupancy and revenue while ensuring a comfortable viewing experience for patrons.

As streaming platforms dominate mainstream content, theaters may increasingly cater to niche audiences by showcasing independent films, foreign cinema, classic movies and cult favorites that offer unique and diverse viewing experiences.

Movie theaters will continue focusing on providing unique and immersive experiences to attract audiences. This could involve the further integration of new technologies. The adoption of technologies like Dolby Atmos, Barco Escape and IMAX with Laser has enhanced the audiovisual experience in theaters, offering viewers immersive soundscapes and stunning visuals that go beyond traditional setups.

Laser projectors have gained popularity in theaters due to their superior image quality, brightness, and energy efficiency compared to traditional lamp-based projectors. Additionally, the development of LED cinema screens offers theaters greater screen size and aspect ratio flexibility.

**New service offerings pave the way for a return to theaters**

Theaters will focus on offering something special you can’t get at home, emphasizing exclusivity and immersion. The days of sticky floors and cramped seats are numbered. Expect a surge in luxury theaters offering plush reclining seats, gourmet food options and even in-seat service. This push toward an elevated experience is designed to lure moviegoers willing to pay a premium for comfort and exclusivity.

AMC Theatres have significantly expanded their Dolby Cinema locations, and Regal Cinemas has focused on adding more 4DX theaters across major cities. In 2024, Sony purchased the chain theater Alamo Drafthouse. This points to the value of theaters setting new standards with features like reclining seats, in-theater dining, and

bar service. These chains aim to make the movie-going experience more comfortable and upscale, attracting customers looking for more than just a film screening.

Indie films, documentaries and international movies are gaining more screen time as audiences diversify their tastes. Smaller, specialized theaters are popping up, catering to niche markets and fostering a more personalized viewing experience.

Theaters are hosting special events like director Q&As, classic movie nights and early releases that can't be found on streaming platforms. For example, Fathom Events has partnered with various theaters to bring live performances, operas and exclusive content to the big screen.

### WHAT PRODUCTS OR SERVICES DO SUCCESSFUL BUSINESSES OFFER?

**Ability to quickly adopt new technology**
Movie theaters must adopt LED and laser projection systems to take advantage of lower energy costs and higher-quality audio and video. In addition, upgrading screens to 3D or IMAX capability permits companies to justify higher ticket prices and distinguishes theaters from at-home streaming options.

**Proximity to key markets**
Locating near urban centers or popular shopping areas ensures high foot traffic and increases convenience for consumers, enabling moviegoers to choose theaters over other entertainment options.

### HOW DO BUSINESSES USE LOCATION TO THEIR ADVANTAGE?

**Carry out all necessary maintenance to keep facilities in good condition**
Well-maintained facilities ensure a positive and safe customer experience, making theaters inviting and comfortable, attracting repeat customers and generating positive word-of-mouth. Neglecting maintenance can result in costly repairs and potential safety issues.

**Operate in a highly visible location**
Movie theaters thrive in locations that are accessible and easy to spot. A prime location in a bustling area draws foot traffic and makes it convenient for moviegoers to stop by.

**Ensure car parking availability**
Convenient parking is crucial for attracting audiences. Ample parking reduces the hassle for customers, making their moviegoing experience more enjoyable and encouraging repeat visits.

### HOW DO SUCCESSFUL BUSINESSES HANDLE CONCENTRATION?

**Generate repeat customers**
Movie theaters rely on returning patrons for sustainable revenue. Offering loyalty programs, amenities, exclusive screenings and excellent customer service helps sustain attendance during slower periods. Customer retention can lead to increased long-term profitability by reducing the need for costly customer acquisition efforts.

**Provide a related range of goods and/or services**
A range of product offerings creates a more engaging and profitable entertainment experience. Providing more than just movies, special events and private screenings – like gourmet snacks, arcade games and rentable event spaces – caters to diverse customer needs and boosts overall revenue.

### HOW CAN POTENTIAL ENTRANTS OVERCOME BARRIERS TO ENTRY?

**Attract local support**
Engaging with the community through local group sponsorships, events and outreach fosters goodwill and helps theaters stay integrated into the fabric of the neighborhood. Positive relationships with local residents lead to increased attendance and a loyal customer base.

**Develop effective cost controls**
Effective expense management, including operational, staffing and marketing costs, ensures financial stability. By optimizing spending, theaters can maintain profitability, invest in improving the customer experience and offer competitive pricing.

## HOW DO SUCCESSFUL BUSINESSES COMPETE WITH SUBSTITUTES?

**Provide superior after-sales service**
Offering perks like membership rewards or advanced booking options for future visits based on activity makes the theater experience unique compared to streaming services. Attendance benefits create ongoing engagement that will have a cyclical effect in building the customer relationship, resulting in customer loyalty.

**Promote products effectively**
Highlighting the unique aspects of the theater experience – such as gourmet concessions, IMAX screenings or special events – can draw audiences away from substitute entertainment options like streaming and gaming.

## HOW DO SUCCESSFUL BUSINESSES MANAGE BUYER & SUPPLIER POWER?

**Being part of a group buying, promotion and marketing scheme**
Theaters can obtain bulk discounts using group buying and coordinated marketing plans, reducing costs and increasing bargaining power against suppliers to ensure better profitability.

**Offer a competitively priced product**
Competitive pricing keeps customers coming back, lessening the impact of high supplier costs for new movie releases and helping sustain a theater's profitability.

**The above section contains selected excerpts from the IBISWorld – Movie Theaters in the US Industry Report – September 2024.**

**Conclusion**
The movie theater industry in the US faces significant challenges from streaming services, leading to increased volatility and reduced demand. The COVID-19 pandemic accelerated the adoption of shorter release cycles and hybrid release models, where movies are simultaneously released in theaters and on streaming platforms. This trend has challenged the traditional theatrical window and hindered movie theater revenue performance.

A growing reliance on streaming services to see popular movies has dramatically reduced demand for box office tickets. Theaters have been partially left out of the loop as production companies increasingly send their films directly to their streaming services at a premium upcharge. The popularity of streaming platforms like Disney+, Max, and Amazon Prime has made movie releases accessible outside of the theater, reducing the incentive for audiences to visit theaters.

Additionally, movie theater chains have introduced subscription-based models that offer customers select movie access for a monthly fee. These subscription services often include additional perks, such as discounts on concessions, and offer a path for more sustainable operations.

Overall, these challenges are causing the industry to experience increased volatility and reduced demand, and it is crucial to correctly identify these threats to understand the current state of the movie theater industry.

In this section, market conditions which influence the subject property are analyzed. An overview of Retail supply and demand conditions for the Worcester market and The Boroughs submarket are presented. Key supply and demand statistics for the most recent quarter, last year and historical averages over the past 10 years are summarized in the tables below.

## Retail Market and Submarket Data Summary (10 Years)

| | | Inventory Supply (SF) | | Vacancy (%) | |
|---|---|---|---|---|---|
| QTR | Year | Market | Submarket | Market | Submarket |
| Q3 | 2024 | 49,451,920 | 5,202,876 | 3.9% | 5.0% |
| Q2 | 2024 | 49,451,920 | 5,202,876 | 3.6% | 4.5% |
| Q1 | 2024 | 49,451,920 | 5,202,876 | 4.5% | 9.1% |
| Q4 | 2023 | 49,451,920 | 5,202,876 | 4.2% | 8.2% |
| | 2023 | 49,534,455 | 5,202,876 | 4.2% | 6.8% |
| | 2022 | 49,459,120 | 5,202,876 | 4.4% | 6.4% |
| | 2021 | 49,630,188 | 5,208,211 | 4.7% | 7.9% |
| | 2020 | 49,608,142 | 5,208,211 | 4.6% | 5.8% |
| | 2019 | 49,467,543 | 5,196,273 | 3.9% | 4.1% |
| | 2018 | 49,311,389 | 5,185,620 | 3.6% | 4.3% |
| | 2017 | 49,188,258 | 5,178,466 | 3.3% | 3.4% |
| | 2016 | 49,358,472 | 5,242,725 | 3.9% | 5.8% |
| | 2015 | 49,343,543 | 5,108,132 | 4.4% | 5.3% |
| | 2014 | 48,683,046 | 5,108,132 | 4.4% | 5.5% |

| | | Rent $/SF | | Net Absorption (SF) | |
|---|---|---|---|---|---|
| QTR | Year | Market | Submarket | Market | Submarket |
| Q3 | 2024 | $17.86 | $22.40 | (120,434) | (23,200) |
| Q2 | 2024 | $17.55 | $22.70 | 423,419 | 235,131 |
| Q1 | 2024 | $17.25 | $21.87 | (138,810) | (45,752) |
| Q4 | 2023 | $16.76 | $17.36 | 66,105 | 16,009 |
| | 2023 | $16.76 | $17.90 | 74,533 | (94,654) |
| | 2022 | $16.82 | $19.47 | 33,627 | 73,180 |
| | 2021 | $16.08 | $17.58 | (42,458) | (108,533) |
| | 2020 | $14.70 | $15.22 | (220,785) | (75,135) |
| | 2019 | $14.84 | $20.87 | (6,247) | 17,955 |
| | 2018 | $13.77 | $16.12 | (46,406) | (36,853) |
| | 2017 | $12.40 | $15.47 | 151,588 | 63,428 |
| | 2016 | $12.44 | $13.60 | 288,570 | 100,034 |
| | 2015 | $12.90 | $14.48 | 602,916 | 10,195 |
| | 2014 | $12.44 | $14.70 | 489,824 | 42,794 |

Source: CoStar Property®

The Worcester Retail market demonstrates positive conditions. There has been no variance in supply over the last year. Vacancy has continued to decrease over the last year to the most recent figure at 3.9%. Asking rents increased in each quarter of 2024. Net absorption was positive for the last year.

The Boroughs Retail submarket demonstrates mostly stable conditions. Vacancy increased through the pandemic and post-pandemic periods through year-end 2023. The past four quarters have generally recognized a reverse of this trend over the past four quarters with the most recent quarter at 5.0%. Asking rents were relatively also negatively impacted by the pandemic over the past five years (2019 through 2023), showing declines from $20.87 (2019) to a low of $17.90 (2023). Similar to vacancy, asking rents have also reversed the trend over the past year, indicating improvements to an all-time high in Q2 2024 of $22.40/SF. The Q3 indication is relatively on pace with that figure. Net absorption has been positive in The Boroughs in 2024 indicating an increasingly improving retail environment.

## VACANCY

The following tables provide a visual illustration of the long-term and short term Retail vacancy for the Worcester market and The Boroughs submarket.







## RENTAL RATES

The following tables provide a visual illustration of the rental Retail trends for the Worcester market and The Boroughs submarket in the short and long term:







## MARKET RENT & VACANCY






## DELIVERIES

The following tables provide the recently delivered and under-construction Retail supply for the Worcester market and The Boroughs submarket:

### Deliveries (SF)

| QTR | Year | Market | % of Total | Submarket | % of Total |
|---|---|---|---|---|---|
| Q3 | 2024 | 0 | 0.0% | 0 | 0.0% |
| Q2 | 2024 | 0 | 0.0% | 0 | 0.0% |
| Q1 | 2024 | 0 | 0.0% | 0 | 0.0% |
| Q4 | 2023 | 34,850 | 0.1% | 0 | 0.0% |
| | 2023 | 132,269 | 0.3% | 0 | 0.0% |
| | 2022 | 173,916 | 0.4% | 3,000 | 0.1% |
| | 2021 | 68,847 | 0.1% | 0 | 0.0% |
| | 2020 | 162,006 | 0.3% | 11,938 | 0.2% |
| | 2019 | 184,698 | 0.4% | 10,653 | 0.2% |

### Under Construction (SF)

| QTR | Year | Market | Buildings | Submarket | Buildings |
|---|---|---|---|---|---|
| Q3 | 2024 | 5,000 | 1 | 0 | 0 |
| Q3 | 2023 | 29,992 | 5 | 0 | 0 |
| Q3 | 2022 | 156,805 | 8 | 3,000 | 1 |
| Q3 | 2021 | 30,864 | 4 | 0 | 0 |
| Q3 | 2020 | 141,381 | 11 | 0 | 0 |






## SALE PRICE & INVENTORY







## CONCLUSION

Overall, investors would recognize these general retail conditions in the Market and Submarket as positively influencing real estate values. In the past year, rent profiles have increased, vacancy has decreased, and absorption has been over-positive.

The subject property benefits from its position in the submarket, specifically along the MA Route 9 corridor, a primary commercial artery. The subject's competitive position along this artery will be further detailed in the Subject Property Analysis section later in this report.

In this section, market conditions which influence the subject property are analyzed. An overview of Industrial supply and demand conditions for the Worcester market and The Boroughs submarket are presented. Key supply and demand statistics for the most recent quarter, last year and historical averages over the past 10 Years are summarized in the tables below.

## INDUSTRIAL MARKET AND SUBMARKET DATA SUMMARY (10 YEARS)

| | | INVENTORY SUPPLY (SF) | | VACANCY (%) | |
|---|---|---|---|---|---|
| QTR | Year | Market | Submarket | Market | Submarket |
| Q3 | 2024 | 98,930,424 | 10,504,247 | 7.5% | 5.3% |
| Q2 | 2024 | 98,711,024 | 10,504,247 | 7.0% | 4.8% |
| Q1 | 2024 | 98,698,424 | 10,504,247 | 7.2% | 6.1% |
| Q4 | 2023 | 98,494,724 | 10,504,247 | 7.6% | 5.8% |
| | 2023 | 98,494,724 | 10,504,247 | 7.6% | 5.8% |
| | 2022 | 95,974,367 | 10,464,149 | 5.5% | 2.9% |
| | 2021 | 94,559,023 | 9,941,474 | 3.5% | 1.1% |
| | 2020 | 94,334,985 | 9,942,225 | 4.7% | 3.1% |
| | 2019 | 92,761,843 | 9,174,787 | 5.0% | 2.8% |
| | 2018 | 92,097,829 | 9,174,787 | 5.0% | 2.7% |
| | 2017 | 91,499,101 | 8,934,681 | 5.4% | 3.6% |
| | 2016 | 91,365,192 | 8,894,801 | 8.4% | 3.2% |
| | 2015 | 91,696,170 | 8,894,801 | 9.2% | 5.7% |
| | 2014 | 92,265,683 | 8,894,801 | 8.3% | 7.2% |

| | | Rent $/SF | | Net Absorption (SF) | |
|---|---|---|---|---|---|
| QTR | Year | Market | Submarket | Market | Submarket |
| Q3 | 2024 | $7.39 | $14.44 | (288,951) | (53,186) |
| Q2 | 2024 | $7.08 | $14.68 | 195,553 | 136,869 |
| Q1 | 2024 | $7.31 | $14.06 | 652,759 | (36,850) |
| Q4 | 2023 | $7.10 | $14.06 | (370,986) | (258,307) |
| | 2023 | $7.10 | $14.06 | 255,514 | (261,348) |
| | 2022 | $7.37 | $18.88 | (535,478) | 303,384 |
| | 2021 | $6.31 | $7.77 | 1,344,466 | 226,098 |
| | 2020 | $5.67 | $8.74 | 1,824,909 | 709,573 |
| | 2019 | $5.09 | $8.02 | 546,419 | (2,371) |
| | 2018 | $5.09 | $7.84 | 785,813 | 86,062 |
| | 2017 | $4.72 | $7.80 | 2,876,051 | 3,616 |
| | 2016 | $4.37 | $6.42 | 418,081 | 224,676 |
| | 2015 | $4.11 | $6.21 | (1,355,505) | 137,788 |
| | 2014 | $3.87 | $5.84 | 575,423 | (21,242) |

Source: CoStar Property®

The Worcester Industrial market demonstrates positive conditions. There has been little variance in supply over the last year. Vacancy has continued to decrease slightly over the last year to the most recent figure at 7.5%. Asking rents increased in each quarter of 2024. Net absorption was positive for the last year.

The Boroughs Industrial submarket demonstrates mostly stable conditions. Vacancy had minor fluctuations between 4.8% and 6.1% throughout 2024. Asking rents were relatively stable as well ranging from a low of $14.06/SF to a high of $14.68/SF with the most recent figure in-between at $14.44/SF. Rents in this submarket are historically above that of the Worcester MSA. Net absorption was negative in 2024.

The following tables provide a visual illustration of the long-term and short term Industrial vacancy for the Worcester market and The Boroughs submarket.







The following tables provide a visual illustration of rental Industrial trends for the Worcester market and The Boroughs submarket in the short and long term:







The following tables provide the recently delivered and under-construction industrial supply for the Worcester market and The Boroughs submarket:

## DELIVERIES (SF)

| QTR | YEAR | MARKET | % OF TOTAL | SUBMARKET | % OF TOTAL |
|---|---|---|---|---|---|
| Q3 | 2024 | 219,400 | 0.2% | 0 | 0.0% |
| Q2 | 2024 | 26,000 | 0.0% | 0 | 0.0% |
| Q1 | 2024 | 1,203,700 | 1.2% | 0 | 0.0% |
| Q4 | 2023 | 416,383 | 0.4% | 0 | 0.0% |
| | 2023 | 2,675,775 | 2.7% | 40,098 | 0.4% |
| | 2022 | 1,894,594 | 2.0% | 522,675 | 5.0% |
| | 2021 | 357,146 | 0.4% | 9,464 | 0.1% |
| | 2020 | 1,732,224 | 1.8% | 767,438 | 7.7% |
| | 2019 | 664,014 | 0.7% | 0 | 0.0% |

## Under Construction (SF)

| QTR | YEAR | MARKET | BUILDINGS | SUBMARKET | BUILDINGS |
|---|---|---|---|---|---|
| Q3 | 2024 | 3,987,881 | 8 | 168,750 | 2 |
| Q3 | 2023 | 5,392,625 | 17 | 75,098 | 3 |
| Q3 | 2022 | 4,187,063 | 27 | 537,675 | 7 |
| Q3 | 2021 | 192,910 | 3 | 0 | 0 |
| Q3 | 2020 | 710,424 | 7 | 600,000 | 2 |

The subject site is an irregular interior land parcel containing a gross site area of 29.32 acres (or 1,277,351 SF) and is zoned BA - "Business Highway" District by the Town of Westborough. The usable site area is reduced by wetlands and high-risk flood plains extending through portions of the site. The subject site is improved with a one-story, concrete block-constructed, purpose built retail movie theater property containing 12 screening rooms within 47,872 SF of Gross Building Area (GBA), which is consistent with its NRA. It has commonly been known as the Regal Westborough Cinemas but has been vacant since the last tenant's lease expired in 2017.

The subject property was developed in 1997 and subsequently encumbered by a 20-year lease agreement, expiring in 2017. The tenant vacated the property at this point and has fallen into a state of neglect and disrepair. As a result of the absence of real estate tax payments, the Town recorded an order of Taking in January 2019. This taking was formalized in January 2022 by a Judgment in Tax Lien Case by the Massachusetts Land Court, Department of the Trial Court.

The market generally classifies the subject as a standard retail investment property that, if exposed to the open market, would command good interest from regional buyers who are actively pursuing similar investment properties. Buyer demand is increasing associated with improving credit conditions, which have been sustained over the past 24 calendar months. The subject property has an advantageous position along the Route 9 corridor but has limitations. The aerial view below provides additional clarity and highlights several of the larger commercial uses.




The above graphic does not include all the retail/commercial uses along the corridor, but it's meant to demonstrate where the retail "gravity" lies along the corridor. There is a prominent retail cluster to the west, in proximity to the US Route 20 interchange with several larger big box users (including Walmart, Target and Lowe's) and the community shopping center, Speedway Plaza. The subject property, while near this node, is east of it. Similarly, there is a cluster of retail uses, including the Westborough Shopping Center and a cluster of car dealerships centered around the Route 30 and Lyman Street intersections with Route 9 – which are linkage points to downtown Westborough. A further cluster of office and hotel uses is closer to I-495 along the Route 9 corridor. The subject property is at the Milk Street intersection with Route 9, also a linkage point to downtown Westborough, but it benefits from only one other proximate retail use, Westmeadow Plaza. The subject property is between two major interchanges on Route 9 with I-495 to the east and US Route 20 to the west. Land and uses closer to those interchanges are likely to be more favored.

The subject property and Westmeadow Plaza are generally occupied by various discount retailers and local users. National and name-brand tenants, suggesting better credit quality, are generally in the areas to the east and west of the subject's position along Route 9. Further, the balance of the subject's center, Stagecoach Plaza, suggests a below-average tenant appeal. Lot 3 is a restaurant building formally occupied by Pizzeria Uno that is now vacant. The balance of the plaza is occupied by the Red Heat Tavern, SpaTech Institute and Integrated Martial Arts. These are local tenants and are not indicative of a high-performing retail center.

Based on the above factors, the subject is considered to have below-average investment appeal. Further, the subject is considered to have below average overall tenant appeal with a competitive position for attracting and retaining tenants. However, the tenants will likely be on the lower end of the credit quality spectrum.

The following SWOT Analysis chart summarizes the major property strengths and weaknesses while outlining potential opportunities or threats to the subject's competitive position and overall marketability.

## SWOT Analysis

| **Strengths** | **Weaknesses** |
|---|---|
| The subject site has frontage along Route 9, a major commercial thoroughfare in eastern Worcester County and benefitting from significant commercial exposure. | The subject property has not been adequately maintained in recent years, reportedly since the last tenant vacated in about 2017. Years of limited (or no) capital improvement have rapidly advanced its effective age and suffering an above-average level of physical depreciation. |
| The subject's construction has wide adaptability to a variety of alternative uses given its size, shape and high ceiling heights. | The subject's site shape is irregular with only a drive extending to Route 9. While it benefits from a monument sign, the actual improvements are somewhat hidden from passing traffic which limits its full potential for commercial exposure. |
| **Opportunities** | **Threats** |
| The subject property is well situated on the periphery of the Worcester MSA and in close proximity to the Boston MSA, gaining economic influence from both economic centers. | The subject property is a purpose built movie theater. The cinema industry, nation-wide (if not globally) is challenged as more at-home options for viewing of movies become available. The industry has been in decline and few new developments are evident. |

### MOST PROBABLE BUYER

Based on the type of property and the income-generating potential of the improvements, it is our opinion that the most probable buyer for the subject would be a regional investor that would seek to renovate and potentially convert the subject property to an alternative use.

## INTRODUCTION

The highest and best use of the subject property provides the foundation for the valuation section. Highest and best use is defined in the 7th edition of *The Dictionary of Real Estate Appraisal* (Appraisal Institute, Chicago, 2022), as follows:

1. The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.
2. The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use or for some alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price that it would be willing to bid.
3. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.

The highest and best use analysis uses the following steps for the subject:

- Highest & Best Use As Vacant
- Determination of the ideal improvements
- Highest & Best Use As Improved
- Conclusion of the Highest & Best Use

The analysis of highest and best use can be considered the logical end of a spectrum of market analysis procedures, running from the macroeconomic overview of a general market study through more detailed marketability studies and analyses of financial feasibility to the formal analysis of the highest and best use. In theory, the highest and best use is commonly described as that reasonable and most profitable use that will support its highest present value. The highest and best use, or most profitable use, must be legally permissible, physically possible, financially feasible, and maximally productive.

This section develops the highest and best use of the subject property As-Vacant and As Improved.

## AS VACANT ANALYSIS

In this section, the highest and best use of the subject as vacant is concluded after considering financial feasibility, maximal productivity, marketability, legal and physical factors.

**Legally Permissible**
Private restrictions, zoning, building codes, historic district controls, and environmental regulations are considered if applicable to the subject site. The legal factors influencing the highest and best use of the subject site are primarily government regulations such as zoning ordinances. Permitted uses of the subject's Business Highway (BA) include the Highway Business District encompasses the majority of land fronting on Route 9 lying west of connector road. the area is highlighted by a series of strip centers, restaurants and other non-residential uses, but residential development is not contained in the mix. The Westborough master plan, dated May 2003, identifies a perceived but unrealized provision for multifamily housing. smaller housing units available at prices available to a wider range of family types and incomes is lacking in Westborough. The purpose of the multifamily special permit in the BA district is to allow residential units to be incorporated to the mix of uses in the highway business district, where residents could benefit from proximity to shopping and services, while maintaining an appropriate mix and scale of development. projects. Zoning change is not likely; therefore, uses outside of those permitted by the BA zoning are not considered moving forward in the as-vacant analysis.

Further, the subject property is presently impacted by a sewer connection moratorium. Uses, such as dense residential uses, that may require an increase in wastewater disposal would not be accepted by the Town at present. Further, conversations with Town officials suggest that the Moratorium, or even the ability to accept dense-occupant development would not be possible in the near-term. This casts increasing near-term risk on the subject property's use for a multifamily, or condominium, development.

**Physically Possible**
The test of what is physically possible for the subject site considers physical and locational characteristics that influence its highest and best use. In terms of physical features, the subject site totals 29.3239-acres (1,277,351 SF), it is irregular in shape and has a level topography. The site has average exposure and good overall access. Significant components of the subject's site are negatively impacted by wetlands and high-risk flood zones. The usable site size is reduced to 745,401 SF (or 17.11 acres). The subject property provides an advantageous site size and access from a primary commercial artery (Route 9) and a well-traveled local connector road in Milk Street. As previously mentioned, there is a moratorium on sewer connections in the town, so dense-occupant uses are not likely possible to be built on the site due to off-site constraints.

**Financial Feasibility**
Based on the subject's market analysis and an examination of costs, a newly constructed retail building would likely have a value commensurate with its cost; however, a speculative build is not prudent and the site should only be developed for an identified user. Office uses are presently depressed nationwide, as the post-pandemic environment has continued to trouble this sector. Office developments are presently being shelved in the Boston Metropolitan Area and beyond. Office uses are not further considered. While multifamily has a need throughout eastern/central Massachusetts, the impact of the wastewater treatment capacity in the Town is limiting this as a potential opportunity for the foreseeable future in Westborough. The town of Westborough has experienced repeated and ongoing investment in industrial uses along the Route 9 corridor in recent years. The subject site maintains good connectivity to the area's highway. Industrial development maintains ongoing effective demand in the local area, and construction remains financially feasible.

**Maximum Productivity**
There is only one use that creates value and, at the same time, conforms to the requirements of the first three tests. Financial feasibility, maximal productivity, marketability, legal, and physical factors have been considered and the highest and best use of the subject site as vacant concluded to be retail development This determination includes considering specialty retail property types such as self-storage. As discussed throughout this report, the subject property maintains an attractive position along Rout 9. However, it is not positioned in the principal nodes along the corridor and is somewhat of an interstitial location. Further, its lack of frontage along Route 9 inhibits commercial exposure. Uses such as Self-Storage would be attracted to such a location for its superior access traits, but do not necessarily require street frontage and are not intensive uses from an occupancy standpoint.

## AS IMPROVED ANALYSIS

In addition to legal and physical considerations, analysis of the subject property as-improved requires consideration of alternative uses. The five possible alternative treatments of the property are demolition (not warranted as the improvements contribute substantial value to the site), expansion (not warranted, no excess or surplus land), renovation (not warranted), conversion (not applicable), and continued use "as-is".

Among the five alternative uses, conversion to an alternative retail use is the Highest and Best Use of the subject As Improved.

**Legal Factors**
The legal factors influencing the highest and best use of the subject property are primarily governmental regulations such as zoning and building codes. The subject's improvements were constructed in 1997 and are a legal, conforming use as the result of a special permit issuance. The subject is considered a legal, conforming use as configured, but there are several alternative retail uses permissible in the BA – Highway Business District by the Town of Westborough that could be considered. The legal factors influencing the highest and best use of the property support the subject's use as-is and a variety of alternative uses.

**Physical & Locational Factors**
The physical and location characteristics of the subject improvements have been previously discussed in this report. The project is of average quality construction and in fair condition, with attractive site coverage and parking ratios. Therefore, the improved property meets the physical and location criteria as the highest and best use of the property.

In summary, the subject's improvements were constructed in 1997 but are nearing the end of their economic life due to physical deterioration and its purpose-built configuration, which increases its functional obsolescence.

The project is of average quality construction and in fair condition, with adequate service amenities – including existing access to the Town water/sewer. The subject improvements as-is are sufficiently supported by site features, including its large size, generally level topography, good access and average exposure.

Further, the subject's location supports the subject's improvements with similar developments in the subject's immediate market area. Physical and location factors influencing the highest and best use of the property support the subject's improvements as-is; but its ultimate use remains in question.

**Alternative Uses & Feasibility Factors**
In addition to legal and physical considerations, analysis of the subject property as-is requires the treatment of two important issues:

1. consideration of alternative uses for the property; and
2. the marketability of the most probable use.

The five possible alternative treatments of the property are demolition, expansion, renovation, conversion, and the subject's use as-is.

- Demolition: The subject improvements contribute significantly above the current land value. Therefore, demolition is not applicable in this case. Further, there is ample evidence in the market of participants adapting former movie theater properties for alternative uses, suggesting that such structures have enduring utility.
- Expansion: The subject property comprises approximately 29.32 acres, of which 17.11 acres are considered usable (outside of wetlands and floodplains). The subject property maintains an abundance of land with site coverage and parking ratios that are above standard. Expansion of the facility is a reasonable possibility. However, the town's sensitivity to increasing the sewer connections may negatively impact the potential for an expansion of the facility; therefore, while expansion may be a viable option for the subject, it is not considered a viable option.
- Renovation: The subject property is approximately 27 years old and is presently in a state of disrepair due to years of limited (or no) maintenance and an absence of capital investment. A significant renovation, including curing of all deferred maintenance of the building and site, would increase the improvement's contribution to overall value. Renovation, in the form of capital expenditures, will increase the subject's value appreciably and is an appropriate consideration.
- Conversion: The subject property is developed as a purpose-built movie theater. As detailed in the National Movie Theater market analysis, the industry is experiencing declining conditions, and few operators are looking to expand their inventory of properties. A review of available market activity indicates several theaters throughout New England have been purchased for conversion to alternative uses in recent years. The below tables contains a sampling of sales that were uncovered in New England in recent years, which have varying applicability to the subject property.

## New England Cinema Sales

### Conversion Away from Theater

| Property Address | City, State | Sale Date | Sale Price | Bldg SF | Price/SF |
|---|---|---|---|---|---|
| 100 Commerce Way | Seekonk, MA | 7/11/2024 | $9,500,000 | 42,432 | $224 |
| 17 Columbia Street | South Kingstown, RI | 5/6/2024 | $1,100,000 | 6,000 | $183 |
| 866 West Main St | Middletown | 3/27/2024 | $3,000,000 | 40,293 | $74 |
| 14-26 Pine Street | Waltham | 3/1/2023 | $4,500,000 | 20,000 | $225 |
| 37 Doty Street | West Wareham, MA | 12/7/2021 | $5,200,000 | 27,202 | $191 |
| 10 Ashleigh Drive | Derry, NH | 12/30/2020 | $1,435,000 | 36,055 | $40 |
| | *Minimum* | *12/30/2020* | *$6,000* | *6,000* | *$40* |
| | *Maximum* | *7/11/2024* | *$9,500,000* | *42,432* | *$225* |
| | *Average* | *3/14/2023* | *$4,122,500* | *28,664* | *$156* |
| | *Median* | *9/13/2023* | *$3,750,000* | *31,629* | *$187* |

Of the cited sales above, only Pine Street in Waltham would truly not be considered comparable due to its urban location in the inner suburbs of Boston. The balance of the set contains generally comparable theater properties that reflect variations in market conditions as well as locational and physical attributes. These properties are relatively indicative of the market for theater conversions.

- **Continued Use "As-Is":** The final option is the continued use of the property "As-Is." This is legal, physically possible, and financially feasible. We further considered available sales from the New England region of properties purchased for continued use as cinemas.

## New England Cinema Sales

### Continued Use as Theater

| Property Address | City, State | Sale Date | Sale Price | Bldg SF | Price/SF |
|---|---|---|---|---|---|
| 1200 Quaker Lane | East Greenwich | 11/30/2023 | $2,000,000 | 57,100 | $35 |
| 70 Railroad Street | Great Barrington | 7/24/2023 | $1,000,000 | 18,750 | $53 |
| 111-15 Main Street | North Adams | 1/27/2023 | $100,000 | 12,096 | $8 |
| 1296 Washington Street | West Newton | 8/11/2022 | $5,600,000 | 28,495 | $197 |
| | *Minimum* | *8/11/2022* | *$100,000* | *12,096* | *$8* |
| | *Maximum* | *11/30/2023* | *$5,600,000* | *57,100* | *$197* |
| | *Average* | *4/16/2023* | *$2,175,000* | *29,110* | *$73* |
| | *Median* | *4/26/2023* | *$1,500,000* | *23,623* | *$44* |

The high-end of the range is indicated by the same in West Newton, which is an urban sale in Boston's inner suburbs. This is far above what is reasonable to consider as an indicator for the subject property. Alternatively, the North Adams property was bought subject to a deed restriction on the marquee for which the buyer had to renovate to its historical standard. Given its size and location in a sparsely populated area, it's likely not a primary indicator of value. The Quaker Land and Railroad Street sales ($35/SF to $53/SF) are likely good indicators of value for properties that are purchased for continued use as cinemas. Further, we note that LAX Media offered $2,100,000 for the subject property (or $45/SF) to continue using the subject property as a cinema. This and the sales above are likely reasonable data points for the subject property's continued use as a cinema.

Among the five alternative uses, the subject's conversion to an alternative use is likely its highest and best use. It is evident that sales in the marketplace for continued use as cinemas are few. Further, the properties that are sold for continued use as movie theaters are often by a nonprofit, or there is a legal restriction compelling their continued use. Further, we note several cases in the New England region where a poorly performing (or vacant) theater is converted into another retail, office or industrial use.

**Marketability Factors**

As previously indicated in the Market Analysis, the subject property has above-average marketability. Its condition reflects poor maintenance and below-average appeal in its existing condition. Retail supply/demand conditions and immediate market area trends generally support viable short—and long-term operations of the subject's use as a converted property.

Based on our analysis of the subject property and investigation of comparable properties in the marketplace, if renovated and converted to another retail or industrial use, the subject would be considered to have very good overall tenant appeal with an above-average competitive position for attracting and retaining tenants.

**As-Improved Conclusion**

Legal, physical, and market considerations have been analyzed to evaluate the highest and best use of the property. This analysis is presented to evaluate the type of use that will generate the greatest level of future benefits possible from the property. Based on the previous discussion, the highest and best use of the subject property as-proposed is concluded to be continued use as a mixed-use property.

# VALUATION METHODS

In traditional valuation theory, the three approaches to estimating the value of an asset are the cost approach, sales comparison approach, and income capitalization approach. Each approach assumes valuation of the property at the property's highest and best use. From the indications of these analyses, an opinion of value is reached based upon expert judgment within the outline of the appraisal process.

## SITE VALUATION

The site value is a specific scope requirement of this assignment. Considering the subject property's underlying redevelopment potential and noting the advanced age of the improvements, the inclusion of estimate of vacant land value is deemed appropriate. Therefore, a valuation of the subject site has been provided herein.

## COST APPROACH

The cost approach considers the cost to replace the proposed improvements, less accrued depreciation, plus the market value of the land. The cost approach is based on the understanding that market participants relate value to cost. The value of the property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation in the structure from all causes. Profit for coordination by the entrepreneur is included in the value indication.

The Cost Approach is not a specific scope requirement of this assignment. The Cost Approach has limited applicability due to the age of the improvements and lack of market based data to support an estimate of accrued depreciation. Based on the preceding information, the Cost Approach will not be presented.

## SALES COMPARISON APPROACH

The sales comparison approach estimates value based on what other purchasers and sellers in the market have agreed to as price for comparable properties. This approach is based upon the principle of substitution, which states that the limits of prices, rents, and rates tend to be set by the prevailing prices, rents, and rates of equally desirable substitutes. In conducting the sales comparison approach, I gather data on reasonably substitutable properties and make adjustments for transactional and property characteristics. The resulting adjusted prices lead to an estimate of the price one might expect to realize upon sale of the property.

The Sales Comparison Approach is a specific scope requirement of this assignment. Considering the applicability of this approach in relation to the subject property's characteristics, we consider the application of this approach to be warranted.

## INCOME CAPITALIZATION APPROACH

The income capitalization approach ("income approach") simulates the reasoning of an investor who views the cash flows that would result from the anticipated revenue and expense on a property throughout its lifetime. The net income developed in our analysis is the balance of potential income remaining after vacancy and collection loss, and operating expenses. This net income is then capitalized at an appropriate rate to derive an estimate of value or discounted by an appropriate yield rate over a typical projection period in a discounted cash flow analysis. Thus, two key steps are involved: (1) estimating the net income applicable to the subject and (2) choosing appropriate capitalization rates and discount rates. The appropriate rates are ones that will provide both a return on the investment and a return of the investment over the life of the particular property.

The Income Approach is not a scope requirement for this assignment. The subject property type is not typically analyzed on an income basis by buyers and sellers, reducing the applicability of this valuation technique. Therefore, the Income Approach is not developed.

## CORRELATION AND CONCLUSION

Based on the agreed-upon scope with the client, the subject's specific characteristics and the interest appraised, this appraisal developed Land Sales Comparison and Sales Comparison Approaches. The values presented represent the As-Is Market Value (Fee Simple Estate)

## INTRODUCTION

This section values the subject site by comparing it with substitute land sales or listings within the local market area or in competitive areas throughout the region. Land value is influenced by a number of factors; most notably development and use potential. These factors, as well as others, are factored in the following analysis.

## UNIT OF COMPARISON

The most relevant unit of comparison for competing retail land is the $/Acres. All of the comparable sales presented in this section were reported on this basis.

## ADJUSTMENTS

Adjustments to the comparable sales were considered and made when warranted for expenditures after purchase, property rights transferred, conditions of sale, financing terms, and market conditions.

1. Property Rights - All of the sales comparables were fee simple sales reflecting the property rights appraised herein per the agreed upon scope of work.
2. Financing - The sales all reflected typical cash equivalent, lender-financed transactions and no adjustments were required for financing terms.
3. Sale Conditions - None of the comparables required a condition of sale adjustment, as all were confirmed to be arm's length transactions.
4. Expenditures After Sale - Expenses that the buyer incurs after purchase (demolition, cleanup costs, etc.). Some of the sales included some former improvements to their sites that required demolition at the buyer's expense. In those instances, the appropriate adjustments were applied.
5. Market Conditions (Time) - Based on the analysis performed, which includes research and interpretation of value trends of the comparables presented herein, a market conditions adjustment of 3% is applied on an Annual basis reflecting the relatively consistent appreciation that occurred between the oldest comparable sale date up through the effective valuation date.

## QUANTITATIVE ADJUSTMENT PROCESS

Quantitative percentage adjustments are also made for location and physical characteristics such as size, location quality, access, exposure, as well as other applicable elements of comparison. Where possible the adjustments applied are based on paired data or other statistical analysis. It should be stressed that the adjustments are subjective in nature and are meant to illustrate the logic in deriving a value opinion for the subject property by the Land Sales Comparison Approach.

## COMPARABLE SELECTION

A thorough search was made for similar land sales in the area. The parameters of the survey were highest and best use, zoning, proximity to the subject, size, and date of sale. In selecting comparables, emphasis was placed on confirming recent sales of sites that are similar to the subject property in terms of location and physical characteristics. Overall, the sales used represent the best comparables available for this analysis.

## PRESENTATION

The following Land Sales Comparison Table, location map and exhibits summarize the sales data. Following these items, the sales are adjusted for applicable elements of comparison and the site value is concluded.

## LAND SALES COMPARISON TABLE

| | Subject | Comp 1 | | Comp 2 | | Comp 3 | | Comp 4 | | Comp 5 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Regal Westborough | Development Land | | Development Land | | Development land | | Development Land | | Vacant Land | |
| Address | 231 Turnpike Rd | 339 Boston Post Rd E | | 21 Jungle Rd | | 29 Research Dr | | 1029 Grafton | | 305 Belmont Street | |
| City | Westborough | Marlborough | | Leominster | | Westborough | | Worcester | | Worcester | |
| State | MA | MA | | MA | | MA | | MA | | MA | |
| Zip | 01581 | 01752 | | 01453-5207 | | 01581 | | 01604 | | 01604-1681 | |
| County | Worcester | Middlesex | | Worcester | | Worcester | | Worcester | | Worcester | |
| Submarket | The Boroughs | Marlborough | | Fitchburg/Leominster | | The Boroughs | | Worcester Metro | | Worcester Metro | |
| Parcel | 32-48-0 | 73-28, 73-27, 73-24 | | 301-1 | | 35-133-0 | | 38-026-00044 | | 57-004-B103B, 57-004-B1-02 | |
| **Sale Information** | | | | | | | | | | | |
| Transaction Price | | $4,000,000 | | $1,100,000 | | $13,250,000 | | $4,300,000 | | $3,300,000 | |
| Transaction Price $/Acres | | $217,513 | | $202,057 | | $372,233 | | $255,952 | | $117,096 | |
| Property Rights [1] | | Fee Simple | | Fee Simple | | Fee Simple | | Fee Simple | | Fee Simple | |
| Financing [2] | | Cash to Seller | | Cash to Seller | | Cash to Seller | | Cash to Seller | | Cash to Seller | |
| Sale Conditions [3] | | Arms-Length | | Arms-Length | | Arms-Length | | Arms-Length | | Arms-Length | |
| Expenditures After Sale [4] | | $0 | | $10,000 | 0.9% | $265,000 | 2.0% | $0 | | $0 | |
| Market Conditions [5] | | 5/3/2024 | 1% | 2/28/2024 | 2% | 3/15/2023 | 5% | 3/17/2023 | 5% | 2/16/2023 | 15% |
| Sale Status | | Recorded | | Recorded | | Recorded | | Recorded | | Recorded | |
| Recording Number | | 82738-088 | | 10723/276 | | 68919-068 | | 68959/58 | | 68834-044 | |
| Marketing Status | | - | | Off Market | | Off Market | | Off Market | | - | |
| Marketing Period (Months) | | - | | 5.8 Months | | - | | - | | - | |
| Total Transactional Adjustments | | $2,753 | 1% | $5,507 | 3% | $25,201 | 7% | $11,928 | 5% | $17,564 | 15% |
| **Adjusted $/Acres** | | **$220,266** | | **$207,564** | | **$397,434** | | **$267,880** | | **$134,660** | |
| **Physical Information** | | | | | | | | | | | |
| Square Feet | 745,401 | 801,054 | | 237,141 | | 1,550,563 | | 731,808 | | 1,227,607 | |
| Acres | 17.11 | 18.39 | | 5.44 | (20%) | 35.60 | 5% | 16.80 | | 28.18 | 5% |
| Location | Average | Below Average | 5% | Below Average | 5% | Average | | Good | (10%) | Good | (10%) |
| Access | Good | Good | | Very Good | (5%) | Excellent | (10%) | Above Average | 5% | Very Good | (5%) |
| Exposure | Average | Good | (10%) | Below Average | 5% | Good | (10%) | Average | | Above Average | (5%) |
| Shape | Irregular | Irregular | | Generally Rectangular | (15%) | Irregular | | Irregular | | Irregular | (5%) |
| Zoning | BA | B & A2 | | Industrial | | IB | | RL 7, BL 1.0, BG 2.0 | | RL-7 & BG-2 | 10% |
| Topography | Level | Slope to Rear | | Level | | Level | | Level | | Level | |
| Entitlements | | - | (20%) | - | (15%) | - | (25%) | - | | - | (20%) |
| Total Physical Adjustments | | ($55,066) | (25%) | ($93,404) | (45%) | ($158,974) | (40%) | ($13,394) | (5%) | ($40,398) | (30%) |
| **Adjusted $/Acres** | | **$165,200** | | **$114,160** | | **$238,460** | | **$254,486** | | **$94,262** | |




| Comparable | Label | Address | Miles from Subject |
|---|---|---|---|
| Comparable 1 | 1 | 339 Boston Post Rd E, Marlborough, MA, 01752 | 7.3 |
| Comparable 2 | 2 | 21 Jungle Rd, Leominster, MA, 01453-5207 | 14.8 |
| Comparable 3 | 3 | 29 Research Dr , Westborough, MA, 01581 | 3.0 |
| Comparable 4 | 4 | 1029 Grafton, Worcester, MA, 01604 | 6.8 |
| Comparable 5 | 5 | 305 Belmont Street, Worcester, MA, 01604-1681 | 7.2 |

## LAND SALE EXHIBITS




COMPARABLE 1



COMPARABLE 2



COMPARABLE 3



COMPARABLE 4




COMPARABLE 5

## LAND SALES ADJUSTMENT DISCUSSION

The comparable land sales indicate an overall unadjusted value range from $117,096/Acre to $372,233/Acre, and average of $232,970/Acre. After adjustments, the comparables indicate a narrower range for the subject site between $94,262/Acre and $254,486/Acre with an average of $173,314/Acre. The adjustment process is described below.

**Land Sale 1 ($165,200/Acre Adjusted)** – - This comparable is a former McGee Farm property that has been sold for use as a multifamily development containing 140 units within 162,920 SF. The property was fully entitled at the time of sale. The land was only partially cleared and generally raw at the time of sale; further, the site is noncontiguous. The property appears to be heavily impacted by high-risk flood zones and wetlands in its rear. Information regarding this sale was obtained from CoStar comps and verified with public records and published sources.

This comparable was adjusted slightly for market conditions to recognize slightly improving market conditions as of the date of value. It is inferior with respect to location due to demographic characteristics that reflect a less dense environment with a lower consumer profile. It is superior in terms of exposure because it is along a primary commercial roadway with significantly greater frontage. This property sold with entitlements in place and a downward adjustment was assigned for this superior characteristic. On an overall basis, this comparable is considered superior to the subject, notwithstanding its inferior location, primarily due to its superior exposure and entitlements.

**Land Sale 2 ($114,160/Acre Adjusted)** – This property is a generally rectangular, corner, land parcel that has an industrial zoning and is vacant, raw land. Public sewer is available at the street to the southwest along Jungle Road. This comparable is a development site purchased for industrial use. According to the broker, the property was approved for a 67,500 SF industrial building to be delivered in 2025 and was fully permitted at the time of sale. The property was under contract for about a year, while the buyer got all the approvals in place. There was a SFR on-site that needs to be razed by the buyer. Information regarding this sale was obtained from CoStar Comps, verified with public records and published sources and confirmed with the listing broker.

This comparable was adjusted slightly for market conditions to recognize slightly improving market conditions as of the date of value. The property included some minor commercial improvements that required demolition by the buyer and an adjustment was assigned for this factor. This site is smaller than the subject site, and a downward adjustment was assigned for economies of scale. It is inferior with respect to location due to demographic characteristics that reflect a less dense environment with a lower consumer profile. This property is superior in terms of access as it is near a full highway interchange. It is inferior with respect to exposure because it is along a secondary roadway. This site has a better, more efficient shape, and a downward adjustment was assigned. This property sold with entitlements in place and a downward adjustment was assigned for this superior characteristic. On an overall basis, this comparable is considered superior to the subject, notwithstanding its inferior location, primarily due to its superior exposure and entitlements.

**Land Sale 3 ($238,460/Acre Adjusted)** – This property is an under-utilized development parcel along Route 9 and just west of the I-495 intersection. This comparable is a parcel that was purchased for the development of a life sciences campus by a national life sciences investor. Two month's earlier, Alexandria Real Estate had also purchased a neighboring BJ's Wholesale Club for $32MM. Approvals for the development began in 2022 with Samuels & Associates proposing demolition of the existing improvements and development of a 715,000 SF life sciences, office and manufacturing campus; it was approved in September of 2022. Information regarding this sale was obtained from CoStar Comps, and verified with public records and other published sources.

This comparable was adjusted slightly for market conditions to recognize slightly improving market conditions as of the date of value. The property included some minor commercial improvements that required demolition by the buyer and an adjustment was assigned for this factor. This site is larger than the subject site and an upward adjustment was assigned for economies of scale. This property is superior in terms of access as it is near a full highway interchange. It is superior in terms of exposure because it is along Route 9 along a more heavily traveled portion of the roadway. This property sold with entitlements in place, and a downward adjustment was assigned for this superior characteristic; further, the entitlements offer a more dense development than what is possible at the subject property. On an overall basis, this comparable is considered superior to the subject, notwithstanding its larger size, primarily due to its superior exposure and entitlements.

**Land Sale 4 ($254,486/Acre Adjusted)** – This property is a highly irregularly shaped land parcel with an interior block position. It maintains limited frontage to Grafton Street. It has been improved with only minor commercial improvements and appears to have been utilized for yard storage. This comparable is an arms-length transfer of a development parcel that sold without entitlements. There was not a defined development plan at the time of sale. Information regarding this sale was obtained from CoStar Comps and verified with public records and published sources.

This comparable was adjusted slightly for market conditions to recognize slightly improving market conditions as of the date of value. It is superior in terms of location due to demographic characteristics that reflect a denser environment with a greater consumer profile. This property is inferior with respect to access as it is along a secondary roadway further from major interchanges. On an overall basis, the applied adjustments generally offset one another.

**Land Sale 5 ($94,262/Acre Adjusted)** – This property is a part of a larger, 46-acre campus known as the Reactory Biomanufacturing Campus. It consists of two, noncontiguous parcels on that campus. This comparable is the sale of Lots 7 and 8 on the campus; there was a third lot that sold for an additional $700,000 that is not represented in this comparable. The reactor campus has seen development of a series of biomanufacturing facilities associated with the Abbvie Research Laboratory. Plans reportedly call for development of a 470,000 SF facility.

This comparable was adjusted for market conditions to recognize slightly improving market conditions as of the date of value; further the adjustment for this comparables market conditions was increased to reflect the fact that the purchase price appears to have been agreed to in 2020. This site is larger than the subject site and an upward adjustment was assigned for economies of scale. It is superior in terms of location due to demographic characteristics that reflect a denser environment with a greater consumer profile. This property is superior in terms of access as it is near a full highway interchange. It is superior in terms of exposure because it is along Route 9 along a stretch with more beneficial complementary uses. This site has a better, more efficient shape and a downward adjustment was assigned. This property sold with entitlements in place and a downward adjustment was assigned for this superior characteristic. On an overall basis, this comparable is considered superior to the subject, notwithstanding its larger size and inferior zoning, primarily due to its superior location, exposure and entitlements.

## LAND VALUE CONCLUSION

The comparables indicate a unit value, based on a general bracketing analysis, between $94,262/Acre and $254,486/Acre. Based on the subject's overall locational and physical features, a unit value conclusion of $130,000/Acre is supported. The following table summarizes the comparable land sales analysis and applies the unit value conclusion to the site area to provide an indication of the as-vacant land value.

## Land Sales Comparison Approach Conclusion(Acres)

| | Transaction | Adjustment | | | | Net | Gross |
|---|---|---|---|---|---|---|---|
| | Price | Transactional[1] | Adjusted | Property[2] | Final | Adj. | Adj. |
| 1 | $217,513 | 1% | $220,266 | (25%) | $165,200 | (24%) | 36% |
| 2 | $202,057 | 3% | $207,564 | (45%) | $114,160 | (44%) | 68% |
| 3 | $372,233 | 7% | $397,434 | (40%) | $238,460 | (36%) | 57% |
| 4 | $255,952 | 5% | $267,880 | (5%) | $254,486 | (1%) | 20% |
| 5 | $117,096 | 15% | $134,660 | (30%) | $94,262 | (20%) | 75% |
| *HIGH* | *$372,233* | *15%* | *$397,434* | *(5%)* | *$254,486* | *(1%)* | *75%* |
| *AVG* | *$232,970* | *6%* | *$245,561* | *(29%)* | *$173,314* | *(25%)* | *51%* |
| *MED* | *$217,513* | *5%* | *$220,266* | *(30%)* | *$165,200* | *(24%)* | *57%* |
| *LOW* | *$117,096* | *1%* | *$134,660* | *(45%)* | *$94,262* | *(44%)* | *20%* |

| | Subject Acres | | $/Acre | | Value |
|---|---|---|---|---|---|
| Usable Land | 17.11 | x | $130,000 | = | $2,224,300 |
| **INDICATED VALUE (ROUNDED TO NEAREST $10,000)** | | | **$129,749** | | $2,220,000 |

[1]Cumulative [2]Additive

# SALES COMPARISON APPROACH

## INTRODUCTION

In the Sales Comparison Approach, the value of a property is estimated by comparing it with similar, recently sold properties in the surrounding or competing areas. Inherent in this approach is the principle of substitution, which holds that when a property is replaceable in the market, its value tends to be set by the cost of buying an equally desirable property, assuming that no costly delay occurs in making the substitution.

## COMPARABLE SELECTION

Through the analysis of sales of verified arm's-length transactions, market value and price trends are identified. The sales utilized are comparable to the subject in physical, functional, and economic characteristics.

Comparable sales are presented, which were selected due to their similarity in physical, locational, and qualitative attributes. They represent the most recent and relevant comparable sale available for this analysis. Emphasis was given to the subject's location and similarly positioned properties.

## UNIT OF COMPARISON

The most relevant unit of comparison is the price per SF NRA. This best reflects the unit of comparison used by buyers and sellers in this market for the subject property type.

## ADJUSTMENTS

Adjustments to the comparable sales were considered and made when warranted for property rights, financing terms, conditions of sale, expenditures after sale and market conditions.

1. Property Rights - All of the sales comparables were fee simple sales reflecting the property rights appraised herein per the agreed upon scope of work.
2. Financing - The sales all reflected typical cash equivalent, lender-financed transactions and no adjustments were required for financing terms.
3. Sale Conditions - All were confirmed to be arm's length transactions, and no adjustments for Comparables 1, 2, 3, 4, and 5 required a condition of sale adjustment.
4. Expenditures After Sale - Expenses that the buyer incurs after purchase (deferred maintenance, HVAC repairs, etc.). No adjustments are warranted based on review of the sales.
5. Market Conditions (Time) - Based on the analysis performed, which includes research and interpretation of value trends of the comparables presented herein, a market conditions adjustment of 3% is applied on an annual basis reflecting the relatively consistent appreciation that occurred between the oldest comparable sale date up through the effective valuation date.

## QUANTITATIVE ADJUSTMENT PROCESS

Quantitative percentage adjustments are also made for location and physical characteristics such as size, age, site and parking ratios, access, exposure, quality and condition, as well as other applicable elements of comparison. Where possible the adjustments applied are based on paired data or other statistical analysis. It should be stressed that the adjustments are subjective in nature and are meant to illustrate the logic in deriving a value opinion for the subject property by the Sales Comparison Approach.

## PRESENTATION

The subject and comparable property attributes are presented on the following Improved Sales Comparison Table, location map and photographs. This is followed by analysis of the subject and comparable sales and the value conclusion indicated using the Sales Comparison Approach.

## IMPROVED SALES COMPARISON TABLE

| | Subject | Comp 1 | | Comp 2 | | Comp 3 | | Comp 4 | | Comp 5 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Regal Westborough | Former Showcase Cinemas | | Former Campus Cinema | | Island Cinemas | | Former Flagship Cinemas | | Former Flagship Cinemas | |
| Address | 231 Turnpike Rd | 100 Commerce Way | | 17 Columbia St | | 866 W Main Rd | | 37 Doty Street | | 10 Ashleigh Drive | |
| City | Westborough | Seekonk | | South Kingstown | | Middletown | | Wareham | | Derry | |
| State | MA | MA | | RI | | RI | | MA | | NH | |
| Zip | 01581 | 02771-5820 | | 02879 | | 02842 | | 02576 | | 03038 | |
| County | Worcester | Bristol | | Washington | | Newport | | Plymouth | | Rockingham | |
| Submarket | The Boroughs | Attleboro/New Bedford | | Washington County | | Newport County | | Route 3 South | | Stratford County | |
| **Sale Information** | | | | | | | | | | | |
| Transaction Price | | $9,500,000 | | $1,100,000 | | $3,000,000 | | $5,200,000 | | $1,435,000 | |
| Transaction Price $/SF NRA | | $224 | | $187 | | $75 | | $198 | | $36 | |
| Property Rights [1] | | Fee Simple | | Fee Simple | | Fee Simple | | Fee Simple | | Fee Simple | |
| Financing [2] | | Cash to Seller | | Cash to Seller | | Cash to Seller | | Cash to Seller | | Cash to Seller | |
| Sale Conditions [3] | | Arms-Length | | Arms-Length | | Arms-Length | | Arms-Length | | Arms-Length | |
| Expenditures After Sale [4] | | $0 | | $0 | | $0 | | $0 | | $0 | |
| Market Conditions [5] | | 7/11/2024 | 0.7% | 5/6/2024 | 1.2% | 3/27/2024 | 1.6% | 12/7/2021 | 8.8% | 12/30/2020 | 11.9% |
| Sale Status | | Recorded | | Recorded | | Recorded | | Recorded | | Closed | |
| Recording Number | | 28935-192 | | 1879000446 | | 1825000067 | | 56129-190 | | 6215/2854 | |
| Marketing Status | | Off Market | | Off Market | | Off Market | | Off Market | | Not Marketed | |
| Marketing Period (Days) | | - | | - | | - | | - | | - | |
| Total Transactional Adjustments | | $2 | 1% | $2 | 1% | $1 | 1% | $18 | 9% | $4 | 11% |
| **Adjusted $/SF (NRA)** | | **$226** | | **$189** | | **$76** | | **$216** | | **$40** | |
| **Physical Information** | | | | | | | | | | | |
| NRA (SF) | 47,872 | 42,432 | | 5,889 | (30%) | 39,876 | | 26,284 | | 39,871 | |
| Year Built/Ren | 1997 / None | 1997 | | 1900 | | 1969 / 1969 | | 2003 | | 2003 / 2003 | |
| Location | Average | Good | (10%) | Below Average | 5% | Average | | Fair | 10% | Below Average | 5% |
| Access | Good | Very Good | (5%) | Good | | Good | | Excellent | (10%) | Average | 10% |
| Exposure | Average | Good | (10%) | Above Average | (5%) | Above Average | (5%) | Below Average | 5% | Average | |
| Quality | Average | Good | (10%) | Below Average | 5% | Below Average | 5% | Good | (10%) | Average | |
| Condition | Fair | Good | (20%) | Fair | | Fair | | Good | (20%) | Average | (10%) |
| Parking Ratio | 10.3 | 28.3 | | 2.4 | | 4.8 | | 12.6 | | - | |
| Site Coverage | 6.4% | 5.9% | | 19.5% | | 29.4% | | 1.6% | | 10.4% | |
| Basement | No | - | | Yes | (10%) | - | (5%) | - | | - | |
| Total Physical Adjustments | | ($124) | (55%) | ($66) | (35%) | ($4) | (5%) | ($54) | (25%) | $2 | 5% |
| **Adjusted $/SF (NRA)** | | **$102** | | **$123** | | **$72** | | **$162** | | **$42** | |




| Comparable | Label | Address | Miles from Subject |
|---|---|---|---|
| Comparable 1 | 1 | 100 Commerce Way, Seekonk, MA, 02771-5820 | 37.5 |
| Comparable 2 | 2 | 17 Columbia St, South Kingstown, RI, 02879 | 58.9 |
| Comparable 3 | 3 | 866 W Main Rd, Middletown, RI, 02842 | 55.2 |
| Comparable 4 | 4 | 37 Doty Street, Wareham, MA, 02576 | 55.6 |
| Comparable 5 | 5 | 10 Ashleigh Drive, Derry, NH, 03038 | 45.1 |

# SALES COMPARISON APPROACH



## IMPROVED SALES PHOTOGRAPHS



COMPARABLE 1




COMPARABLE 2



COMPARABLE 3



COMPARABLE 4



COMPARABLE 5

## ANALYSIS OF COMPARABLE SALES

The comparable sales indicate an overall unadjusted unit value range from $36/SF to $224/SF, and an average of $144/SF. After adjustments, the comparables indicate a narrower range for the subject property from $42/SF to $162/SF, and $100/SF on average. The adjustment process is summarized below.

Sale No. 1 ($102/SF Adjusted) - This property is a one-story, purpose-built movie theater property that was built in 1998. While thee are some wetlands on-site, they generally exist in setback area and do not impact the usable area of the site. The property was 100% occupied by the owner, and the sale involved a leaseback period to the seller. A national supermarket store operator purchased the building and plans to convert it to a grocery store. Information regarding this sale was obtained from CoStar Comps and was verified with public records (including Assessor, Recorder of Deeds, Zoning and GIS data) and published sources. Although attempts were made to confirm the pertinent details of this transaction with parties that were first-hand to this transaction, they were either unavailable or unwilling to do so.

This comparable was adjusted upward slightly for improved market conditions. This property is superior to the subject property in terms of location due to superior demographic characteristics, including greater consumer profile. This property is superior in terms of access as it is more proximate major linkage traits. It is superior in terms of exposure because it benefits from a more prominent retail node with greater shadow anchors. This property was built to a higher construction quality, and an appropriate adjustment was assigned for this factor. This property was an operating theater at the time of sale and was in superior condition to the subject property. On an overall basis, this comparable was adjusted downward.

Sale No. 2 ($123/SF Adjusted) - This property is a one-story, movie theater property that was built circa 1900. The stated GBA includes an unfinished basement level (4,524 SF), but is not included in the NRA. This comparable was purchased for conversion from a movie theater to use as a marijuana dispensary. Information regarding this sale was obtained from CoStar Comps and was verified with public records (including Assessor, Recorder of Deeds, Zoning and GIS data) and published sources. Although attempts were made to confirm the pertinent details of this transaction with parties that were first-hand to this transaction, they were either unavailable or unwilling to do so.

This comparable was adjusted upward slightly for improved market conditions. The building is much smaller than the subject property and a significant downward adjustment was assigned as a result. This property is inferior to the subject property in terms of location due to inferior demographic characteristics, including lesser consumer profile. It is superior in terms of exposure because it has greater frontage along its commercial frontage. This property was built to a lower construction quality, and an appropriate adjustment was assigned for this factor. This property included a full, unfinished basement level and an adjustment was assigned for this factor. On an overall basis, this comparable was adjusted downward.

Sale No. 3 ($72/SF Adjusted) - This property is a one-story, purpose-built movie theater property that was built in 1969. The property was in above-average condition, as the seller renovated it in 2019, including the addition of luxury reclining seats in all 10 auditoriums. Before the renovation, the cinema could seat 1,430 people, but it was reduced to 721. The cinema operated through January 2024 before the sale. Information regarding this sale was obtained from CoStar Comps and was verified with public records (including Assessor, Recorder of Deeds, Zoning and GIS data) and published sources. Although attempts were made to confirm the pertinent details of this transaction with parties that were first-hand to this transaction, they were either unavailable or unwilling to do so.

This comparable was adjusted upward slightly for improved market conditions. It is superior in terms of exposure because it has greater frontage and proximate shadow anchors. This property was built to a lower construction quality, and an appropriate adjustment was assigned for this factor. This property included a partial unfinished basement level and an adjustment was assigned for this factor. On an overall basis, the adjustments for this comparable generally offset.

Sale No. 4 ($162/SF Adjusted) - This property is a one-story, purpose-built movie theater property that was built in 2003. At the time of sale, Flagship Cinemas operated the property. The project proposes converting the former Flagship Cinema location into an Eversource training facility with associated parking and delivery areas, utility and stormwater improvements. The facility will also be a utility crew storm/power outage staging area for crew assignments and emergency response. Information regarding this sale was obtained from CoStar Comps and was verified with public records (including Assessor, Recorder of Deeds, Zoning and GIS data) and published

sources. Although attempts were made to confirm the pertinent details of this transaction with parties that were first-hand to it, they were either unavailable or unwilling to do so.

This comparable was adjusted upward slightly for improved market conditions. This property is inferior to the subject property with respect to location due to demographic characteristics, including greater consumer profile. This property is superior in terms of access as it is more proximate major linkage traits. It is inferior with respect to exposure because it is not in a dense retail environment and has limited exposure to passing traffic. This property was an operating theater at the time of sale and was in superior condition to the subject property. On an overall basis, this comparable was adjusted downward.

Sale No. 5 ($42/SF Adjusted) - This property is a purpose-built movie theater property that was built in 2003. The comparable is an arms-length transaction in an off-market transaction, as the buyer engaged the seller directly. The property was vacant at the time of sale and planned for conversion to an alternative use. The buyer originally planned to convert the facility to a new car dealership, but the impact of the COVID pandemic caused them to change plans for use as a warehouse facility. The interior cinema configuration would be removed, at a reported cost approximating $1,200,000. A high-risk flood zone affected a portion of the site, but the improvements were not impacted. Information regarding this sale was obtained from CoStar Comps and verified with public records (including Assessor, Recorder of Deeds, Zoning and GIS data) and published sources. Details of this transaction, including sale price, sale date and sale conditions, were confirmed with Ralph Valentine of the Valentine Group.

This comparable was adjusted upward slightly for improved market conditions. This property is inferior to the subject property with respect to location due to demographic characteristics, including greater consumer profile. This property is inferior with respect to access as it is further from major linkage traits. This property is superior in terms of condition because it was an operating theater at the time of sale. On an overall basis, this comparable was adjusted upward.

**Summary Conclusion**

Based on general bracketing, the comparable sales support an adjusted unit value range from $42/SF to $162/SF, with a unit value of $100/SF concluded for the subject property. The following table summarizes the analysis of the comparables, reports the reconciled price per SF value conclusion, and presents the concluded value of the subject property by the Sales Comparison Approach.

## Improved Sales Comparison Approach Conclusion (NRA)

| | Transaction Price | Adjustment Transactional[1] | Adjusted | Property[2] | Final | Net Adj. | Gross Adj. |
|---|---|---|---|---|---|---|---|
| 1 | $224 | 1% | $226 | (55%) | $102 | (54%) | 56% |
| 2 | $187 | 1% | $189 | (35%) | $123 | (34%) | 56% |
| 3 | $75 | 1% | $76 | (5%) | $72 | (4%) | 17% |
| 4 | $198 | 9% | $216 | (25%) | $162 | (18%) | 64% |
| 5 | $36 | 11% | $40 | 5% | $42 | 17% | 37% |
| *HIGH* | *$224* | *11%* | *$226* | *5%* | *$162* | *17%* | *64%* |
| *AVG* | *$144* | *5%* | *$149* | *(23%)* | *$100* | *(19%)* | *46%* |
| *MED* | *$187* | *1%* | *$189* | *(25%)* | *$102* | *(18%)* | *56%* |
| *LOW* | *$36* | *1%* | *$40* | *(55%)* | *$42* | *(54%)* | *17%* |

| Subject SF (NRA) | | $/SF Conclusion | | Value |
|---|---|---|---|---|
| 47,872 | x | $100 | = | $4,787,200 |
| INDICATED VALUE (ROUNDED TO NEAREST $10,000) | | $100 | | $4,790,000 |

[1]Cumulative [2]Additive

# Reconciliation Of Value Conclusions

Based on the agreed upon scope with the client, the subject's specific characteristics and the interest appraised, this appraisal developed Land Sales Comparison and Sales Comparison Approaches. The values presented represent the As-Is Market Value (Fee Simple Estate).
The Reconciliation of Value Conclusions is the final step in the appraisal process and involves the weighing of the individual valuation techniques in relationship to their substantiation by market data, and the reliability and applicability of each valuation technique to the subject property. Below, the individual strengths and weaknesses of each approach are analyzed.

As previously discussed, the Cost Approach was not presented in this analysis. This approach has limited application due to the age of the improvements and lack of market based evidence to support accrued depreciation. Additionally, investors typically do not place emphasis on replacement cost in establishing value for properties with stabilized income in place such as the subject. The exclusion of the Cost Approach does not diminish the credibility of the value conclusion.

The price per square foot method has been presented in the Sales Comparison Approach. There have been several recent sales of properties similar to the subject in the market area in the current market conditions, which increases the validity of this approach. The most likely buyer for the subject would most likely be a developer/investor that would look to reposition the subject property. Comparables were selected from the market place that were similarly purchased cinema properties for conversion.

The Income Approach to value is generally considered to be the best and most accurate measure of the value of income-producing properties. The value estimate by this approach best reflects the analysis that knowledgeable buyers and sellers carry out in their decision-making processes regarding this type of property. Sufficient market data was available to reliably estimate gross income, vacancy, expenses and capitalization rates for the subject property. The subject property is not presently considered an investment opportunity so much as a development opportunity. Therefore, the income approach has reduced applicability.

After considering all factors relevant to the valuation of the subject property, equal emphasis is placed on the Sales Comparison and Income Approaches in the following As-Is market value.

## Reconciliation of Value

| | |
|---|---|
| Valuation Scenarios | As-Is Market Value |
| Interest | Fee Simple Estate |
| Date | October 4, 2024 |
| **Land Value** | |
| Land Conclusion | $2,220,000 |
| $/SF Usable Land | $3 |
| **Cost Approach** | |
| **Cost Conclusion** | **$2,220,000** |
| $/SF NRA | $46 |
| **SALES COMPARISON APPROACH** | |
| SALES COMPARISON APPROACH | |
| Indicated Value | $4,790,000 |
| $/SF NRA | $100 |
| **Final Conclusion** | |
| Final Conclusion | **$4,790,000** |
| $/SF NRA | $100 |

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions of the signer are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- The signer of this report has no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.
- Corey Gustafson has performed no services, specifically as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.
- The signer is not biased with respect to the property that is the subject of this report or to the parties involved with this assignment.
- The engagement in this assignment was not contingent upon developing or reporting predetermined results.
- The compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- The reported analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the *Code of Professional Ethics* and *Standards of Professional Appraisal Practice* of the Appraisal Institute, and the *Uniform Standards of Professional Appraisal Practice*, as set forth by the Appraisal Standards Board of the Appraisal Foundation.
- Corey Gustafson inspected the property that is the subject of this report.
- No one provided significant real property appraisal assistance to the appraisers signing the certification.
- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
- As of the date of this report, Corey Gustafson has completed the continuing education program for Designated Members of the Appraisal Institute.



Corey Gustafson MAI, CRE
Certified General Real Estate Appraiser
Massachusetts License No. 103759
Expiration Date 10/23/2025

# ASSUMPTIONS & LIMITING CONDITIONS

- Information presented in this report has been obtained from reliable sources, and it is assumed that the information is accurate.
- This analysis assumes that the information provided for this appraisal accurately reflect the current condition of the subject property.
- This report shall be used for its intended purpose only, and by the party to whom it is addressed. Possession of this report does not include the right of publication.
- The appraiser may not be required to give testimony or to appear in court by reason of this appraisal, with reference to the property in question, unless prior arrangements have been made.
- The statements of value and all conclusions shall apply as of the dates shown herein.
- There is no present or contemplated future interest in the property by the appraiser which is not specifically disclosed in this report.
- Without the written consent or approval of the author neither all, nor any part of, the contents of this report shall be conveyed to the public through advertising, public relations, news, sales, or other media. This applies particularly to value conclusions and to the identity of the appraiser and the company with which the appraiser is connected.
- This report must be used in its entirety. Reliance on any portion of the report independent of others, may lead the reader to erroneous conclusions regarding the property values. Unless approval is provided by the author no portion of the report stands alone.
- We assume no responsibility for matters legal in character, nor do we render any opinion as to title, which is assumed to be marketable. All existing liens, encumbrances, and assessments have been disregarded, unless otherwise noted, and the property is appraised as though free and clear, under responsible ownership, and competent management.
- The appraisal has provided exhibits to assist the client(s)/intended user(s) to understand from a graphical standpoint some of the salient issues which impact the subject property. We have made no survey of the property and if further verification is required, a survey by a registered surveyor is advised.
- The appraiser assumes no responsibility for determining if the property requires environmental approval by the appropriate governing agencies, nor if it is in violation thereof, unless otherwise noted herein. This analysis assumes that no asbestos or other hazardous materials are stored or found in or on the subject property. If evidence of hazardous materials of any kind occurs, the reader should seek qualified professional assistance. If hazardous materials are discovered and if future market conditions indicate an impact on value and increased perceived risk, a revision of the concluded values may be necessary.
- The valuation stated herein assumes professional management and operation of the buildings throughout the lifetime of the improvements, with an adequate maintenance and repair program.
- The liability of Core Values Appraisal & Advisory, Inc., its principals, agents, and employees is limited to the client. Further, there is no accountability, obligation, or liability to any third party. If this report is placed in the hands of anyone other than the client, the client shall make such party aware of all limiting conditions and assumptions of the assignment and related discussions. The appraiser is in no way responsible for any costs incurred to discover or correct any deficiency in the property.
- The appraiser is not qualified to detect the presence of toxic or hazardous substances or materials which may influence or be associated with the property or any adjacent properties, has made no investigation or analysis as to the presence of such materials, and expressly disclaims any duty to note the degree of fault. Core Values Appraisal & Advisory, Inc. and its principals, agents, employees, shall not be liable for any costs, expenses, assessments, or penalties, or diminution in value, property damage, or personal injury (including death) resulting from or otherwise attributable to toxic or hazardous substances or materials, including without limitation hazardous waste, asbestos material, formaldehyde, or any smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, solids or gasses, waste materials or other irritants, contaminants or pollutants.
- The appraiser assumes no responsibility for determining if the subject property complies with the Americans with Disabilities Act (ADA). Core Values Appraisal & Advisory, Inc., its principals, agents, and employees, shall not be liable for any costs, expenses, assessments, penalties or diminution in value resulting from non-compliance.
- This appraisal assumes that the subject meets an acceptable level of compliance with ADA standards; if the subject is not in compliance, the eventual renovation costs and/or penalties would negatively impact the present value of the subject. If the magnitude and time of the cost were known today, they would be reduced from the reported value conclusion.
- Unless otherwise noted herein, a detailed soils study was not provided for this analysis. The subject's soils and sub-soil conditions are assumed to be suitable based upon a visual inspection of the subject property and surrounding properties, which did not indicate evidence of excessive settling or unstable soils. No certification is made regarding the stability or suitability of the soil or sub-soil conditions.

CoreVal

# Professional Services Agreement

Core Values Appraisal & Advisory, Inc.

Core Values Appraisal & Advisory, Inc.
60 Surry Drive
Cohasset, MA 02025
www.coreval.co

Corey Gustafson MAI, CRE
Principal

September 18, 2024

Jonathan Goldsmith, Chapter 7 Trustee
Of the Estate of Westborough SPE, LLC
Goldsmith, Katz & Argenio, PC
1350 Main Street, 5th Floor
Springfield, MA 01103
Phone: (413) 747-0700
Email: jgoldsmith@gkalawfirm.com

RE: Mr. Goldsmith

We are pleased to submit this proposal and our Terms and Conditions for this assignment.

## PROPOSAL SPECIFICATIONS

| | |
|---|---|
| Property to Be Appraised | 231 Turnpike Road, Westborough, MA 01581 |
| Purpose: | To estimate the Market Value of the referenced real estate |
| Scope of Assignment | This assignment will incorporate two phases if needed. The first phase contemplates the development of a narrative appraisal report in support of potential litigation involving bankruptcy proceedings involving the subject property. The second phase considers hourly valuation services related to potential testimony that may be necessary due to said bankruptcy proceedings. |
| Valuation Premise: | Retrospective |
| Rights Appraised: | Fee Simple |
| Intended Use: | Potential Litigation |
| Intended User: | The intended user is Jonathan Goldsmith, Chapter 7 Trustee of the Estate of Westborough SPE, LLC ("Client"), and such other parties and entities (if any) expressly recognized by Core Values Appraisal & Advisory, Inc. (Coreval) as intended users (each an "Intended Users" and collectively the "Intended Users") provided that any Intended User's use of, and reliance upon, any report produced by Coreval under this Agreement shall be subject to the Terms and Conditions attached hereto and incorporated herein (including, without limitation, any limitations of liability set forth in the attached Terms and Conditions). |
| Reliance: | Reliance on any reports produced by Coreval under this Agreement is limited to parties and entities explicitly acknowledged in writing by Coreval as Intended Users of the respective reports, provided all conditions required by Coreval or stated herein have been met. Any parties or entities other than the Intended Users who obtain a copy of the report or any part of it (including the Client, if not named as an Intended User), whether through direct dissemination or other means, are not permitted to use or rely on any opinions or conclusions contained in the report. Coreval will not be responsible for any unauthorized use of the report, its conclusions, or contents, nor will it have any liability in connection with such use. |

CoreVal

# Professional Services Agreement

Core Values Appraisal & Advisory, Inc.

| | |
|---|---|
| | Unless expressly identified in this Agreement, there are no third-party beneficiaries of this Agreement related to this appraisal assignment or any reports produced by Coreval under this Agreement, and no other person or entity shall have any rights, benefits, or interests under this Agreement or with respect to any reports produced by Coreval under this Agreement. |
| Scope of Inspection: | A full interior and exterior inspection of the property will be conducted and arranged with the property contact and performed by Coreval.<br><br>If this expected property inspection is not possible due to unforeseen issues (such as lack of on-site personnel cooperation, physical obstructions, or appraiser/property contact health and safety concerns), the client will be promptly advised. The client may continue this assignment based on other inspection options agreed upon by Coreval and the client or provide Coreval with a written notice to cancel. If Coreval determines that a credible appraisal result cannot be achieved due to inspection limitations, it will promptly provide the client with a written cancellation of this assignment. |
| Valuation Approaches: | All three traditional approaches to value will be considered. |
| Report Type: | Appraisal Report |
| Appraisal Standards: | USPAP |
| Appraisal Fee: | **Phase 1 - $5,500.** If canceled by either party before completion, the fee will be based on Coreval's hourly rates for the time expended, plus actual expenses.<br>**Phase 2** – Hourly only at a rate of **$250/hour** for preparation, deposition, testimony, travel, phone calls., etc. associated with the valuation of the referenced property. |
| Expenses: | The fee includes all associated expenses except to the extent otherwise provided in the attached Terms and Conditions. |
| Retainer: | **Phase 1**—This assignment requires a 100% retainer. The full fee must be paid before the draft appraisal report is delivered.<br>**Phase 2** – Invoices will be submitted monthly for committed hours. All worked hours will be invoiced with payment due **promptly upon Bankruptcy Court approval of same. In addition, upon completion of testimony provided and receipt of an invoice for services from Coreval, the Client will submit a request for approval of such fees within three business days of receipt of such invoice.** |
| Payment Terms: | Final payment is due upon delivery of the final report or within thirty (30) days of your receipt of the draft report, whichever is sooner. The full appraisal fee is considered earned upon delivery of the draft report. We will invoice you for the assignment in its entirety at the completion of the assignment. |
| Delivery Instructions: | Coreval encourages our clients to join in our environmental sustainability efforts by accepting an electronic copy of the report.<br>Delivery Schedule: An Adobe PDF file via email will be delivered to jgoldsmith@gkalawfirm.com. The client has requested 0 bound final copy (ies). |
| Draft Report: | 30 calendar days after the Start Date, and assuming adequate receipt of the requested property information. |
| Final Report: | Due within three business days of receipt of requested revisions from the client, unless otherwise communicated by the assigned appraiser. |
| Start Date: | The appraisal process will start upon receipt of your signed agreement and the property-specific data. |
| Acceptance Date: | These specifications are subject to modification or withdrawal if this proposal is not accepted within three business days from the date of this letter. |

CoreVal

# Professional Services Agreement

Core Values Appraisal & Advisory, Inc.

When executed and delivered by all parties, this letter, together with the Terms and Conditions and the Specific Property Data Request attached hereto and incorporated herein, will serve as the Agreement for appraisal services by and between Coreval and Client. Each person signing below represents that it is authorized to enter into this Agreement and to bind the respective parties, including all intended users, hereto.

Notwithstanding anything to the contrary here or in the Terms & Conditions attached, this agreement is subject to and conditional upon the approval of the US Bankruptcy Court for the District of Massachusetts.

We appreciate this opportunity to be of service to you on this assignment. If you have additional questions, please contact us.

Sincerely,
**Core Values Appraisal & Advisory, Inc.**

[signature]

Corey Gustafson MAI, CRE
(617) 582.3131
corey@coreval.co

## AGREED AND ACCEPTED

For Client Company ("Client")

[signature] Trustee — Signature

9/26/2024 — Date

Jonathan Goldsmith, Trustee — Name

Trustee — Title

413 747-0700 — Phone Number

jgoldsmith@gkalawfirm.com — E-Mail Address

Professional Services Agreement
Core Values Appraisal & Advisory, Inc.

CoreVal

## TERMS AND CONDITIONS

1. The Terms and Conditions herein are part of an assignment agreement (the "Agreement") for appraisal services ("Services") between Coreval, Inc. ("Coreval") and the client signing this Agreement and for whom the Services will be performed (the "Client") for the property identified herein (the "Property") and shall be deemed a part of such Agreement as though fully set forth therein. In addition, with respect to any appraisal report prepared by Coreval pursuant to the Agreement (the "Report"), any use of, or reliance on, the Report by any Intended User constitutes acceptance of these Terms and Conditions as well as acceptance of all qualifying statements, limiting conditions, and assumptions stated in the Report. The Agreement shall be governed and construed by the laws of the state where the Coreval office executing this Agreement is located without regard to conflicts of laws principles.
2. Client shall be responsible for the payment of all fees stipulated in this Agreement. Payment of the fees and preparation of the Report are not contingent upon any predetermined value or on any action or event resulting from the analyses, opinions, conclusions, or use of the Report. Final payment is due as provided in the Proposal Specifications Section of this Agreement. If a draft Report is requested, the fee is considered earned upon delivery of the draft Report. It is understood that the Client may cancel this assignment in writing at any time prior to delivery of the completed Report. In such event, the Client is obligated to pay Coreval for the time and expenses incurred (including, but not limited to, travel expenses to and from the job site) prior to the effective date of cancellation, with a minimum charge of $500. Hard copies of the Reports are available at a cost of $250 per original color copy and $100 per photocopy (black and white), plus shipping fees of $30 per Report.
3. If Coreval is subpoenaed or ordered to give testimony, produce documents or information, or otherwise required or requested by Client or a third party to participate in meetings, phone calls and conferences (except routine meetings, phone calls and conferences with the Client for the sole purpose of preparing the Report), litigation, or other legal proceedings (including preparation for such proceedings) because of, connected with or in any way pertaining to this assignment, the Report, Coreval's expertise, or the Property, Client shall pay Coreval's additional out-of-pocket costs and expenses, including but not limited to Coreval's reasonable attorneys' fees, and additional time incurred by Coreval based on Coreval's then-prevailing hourly rates and related fees. Such charges include and pertain to, but are not limited to, time spent in preparing for and providing court room testimony, depositions, travel time, mileage and related travel expenses, waiting time, document review and production, and preparation time (excluding preparation of the Report), meeting participation, and Coreval's other related commitment of time and expertise. Hourly charges and other fees for such participation will be provided upon request. In the event Client requests additional Services beyond the scope and purpose stated in the Agreement, Client agrees to pay additional fees for such services and to reimburse related expenses, whether or not the completed Report has been delivered to Client at the time of such request.
4. Coreval shall have the right to terminate this Agreement at any time for cause effective immediately upon written notice to Client on the occurrence of fraud or the willful misconduct of Client, its employees or agents, or without cause upon 5 days written notice.
5. In the event Client fails to make payments when due then, from the date due until paid, the amount due and payable shall bear interest at the maximum rate permitted in the state where the Coreval office executing this Agreement is located. EACH PARTY, AFTER HAVING THE OPPORTUNITY TO CONSULT WITH COUNSEL OF ITS CHOICE, KNOWINGLY AND VOLUNTARILY, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION IN ANY WAY RELATED TO THIS AGREEMENT.
6. Coreval assumes there are no major or significant items or issues affecting the Property that would require the expertise of a professional building contractor, engineer, or environmental consultant for Coreval to prepare a valid Report hereunder. Client acknowledges that such additional expertise is not covered in the fee and agrees that, if such additional expertise is required, it shall be provided by others at the discretion and direction of the Client, and solely at Client's additional cost and expense.
7. Client acknowledges that Coreval is being retained hereunder as an independent contractor to perform the Services described herein and nothing in this Agreement shall be deemed to create any other relationship between Client and Coreval. Unless otherwise stated in this Agreement, Client shall not designate or disclose Coreval or any of its agents or employees as an expert or opinion witness in any court, arbitration, or other legal proceedings without the prior written consent of Coreval.
8. This assignment shall be deemed concluded and the Services hereunder completed upon delivery to Client of the Report discussed herein.
9. All statements of fact in the Report which are used as the basis of Coreval's analyses, opinions, and conclusions will be true and correct to Coreval's actual knowledge and belief. Coreval does not make any representation or warranty,

express or implied, as to the accuracy or completeness of the information or the condition of the Property furnished to Coreval by Client or others. TO THE FULLEST EXTENT PERMITTED BY LAW, COREVAL DISCLAIMS ANY GUARANTEE OR WARRANTY AS TO THE OPINIONS AND CONCLUSIONS PRESENTED ORALLY OR IN ANY REPORT, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF FITNESS FOR ANY PARTICULAR PURPOSE EVEN IF KNOWN TO COREVAL. Furthermore, the conclusions and any permitted reliance on and use of the Report shall be subject to the assumptions, limitations, and qualifying statements contained in the Report.

10. Coreval shall have no responsibility for legal matters, including zoning, or questions of survey or title, soil or subsoil conditions, engineering, or other similar technical matters. The Report will not constitute a survey of the Property analyzed.
11. The Client shall supply Coreval with any materials related to the assignment that Coreval requests, provided these materials are in the Client's possession or control. Additionally, the Client shall grant Coreval adequate access to the Property for analysis purposes and permits entry unless otherwise agreed upon in advance.
12. The data gathered in the course of the assignment (except data furnished by Client, "Client Information") and the Report prepared pursuant to the Agreement are, and will remain, the property of Coreval. With respect to Client Information provided by Client, Coreval shall not violate the confidential nature of the appraiser-client relationship by improperly disclosing any confidential and proprietary Client Information furnished to Coreval. Notwithstanding the foregoing to the contrary, Coreval is authorized by Client to disclose all or any portion of the Report and related data as may be required by applicable law, statute, government regulation, legal process, or judicial decree, including to appropriate representatives of the Appraisal Institute if such disclosure is required to enable Coreval or its employees and agents to comply with the Bylaws and Regulations of the Appraisal Institute as now or hereafter in effect.
13. Unless specifically noted, in preparing the Report Coreval will not be considering the possible existence of asbestos, PCB transformers, or other toxic, hazardous, or contaminated substances and/or underground storage tanks (collectively, "Hazardous Materials") on or affecting the Property, or the cost of encapsulation or removal thereof. Further, Client represents that there are no major or significant repairs, improvements or deferred maintenance of the Property that would require the expertise of a professional cost estimator, engineer, architect or contractor. If any such repairs, improvements or maintenance are needed, the estimates for such repairs, improvements or maintenance are to be prepared by other parties pursuant to a separate written agreement in Client's sole discretion and direction, and are not deemed part of the Services or otherwise covered as part of the fee hereunder.
14. In the event Client intends to use the Report in connection with a tax matter, Client acknowledges that Coreval provides no warranty, representation or prediction as to the outcome of such tax matter. Client understands and acknowledges that any relevant taxing authority (whether the Internal Revenue Service or any other federal, state or local taxing authority) may disagree with or reject the Report or otherwise disagree with Client's tax position, and further understands and acknowledges that the taxing authority may seek to collect additional taxes, interest, penalties or fees from Client beyond what may be suggested by the Report. Client agrees that Coreval shall have no responsibility or liability to Client or any other party for any such taxes, interest, penalties or fees and that Client will not seek damages or other compensation from Coreval relating to any such taxes, interest, penalties or fees imposed on Client, or for any attorneys' fees, costs or other expenses relating to Client's tax matters.
15. LIMITATION OF LIABILITY. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY:
    a. EXCEPT TO THE EXTENT ARISING FROM SECTION 16, OR SECTION 17 IF APPLICABLE, IN NO EVENT SHALL EITHER PARTY OR ANY OF ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR CONTRACTORS BE LIABLE TO THE OTHER PARTY, FOR ANY LOST OR PROSPECTIVE PROFITS OR ANY OTHER INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, PUNITIVE, INDIRECT OR OTHER EXEMPLARY LOSSES OR DAMAGES, WHETHER BASED IN CONTRACT, WARRANTY, INDEMNITY, NEGLIGENCE, STRICT LIABILITY OR OTHER TORT OR OTHERWISE, REGARDLESS OF THE FORESEEABILITY OR THE CAUSE THEREOF.
    b. EXCEPT TO THE EXTENT ARISING FROM SECTION 16, OR SECTION 17 IF APPLICABLE, AGGREGATE DAMAGES IN CONNECTION WITH THIS AGREEMENT FOR EITHER PARTY (EXCLUDING THE OBLIGATION TO PAY THE FEES AND COSTS REQUIRED HEREUNDER) SHALL NOT EXCEED THE TOTAL FEES PAYABLE TO COREVAL UNDER THIS AGREEMENT.
    c. COREVAL SHALL HAVE NO LIABILITY WITH RESPECT TO ANY LOSS, DAMAGE, CLAIM OR EXPENSE INCURRED BY OR ASSERTED AGAINST CLIENT ARISING OUT OF, BASED UPON OR RESULTING FROM CLIENT'S OR ANY INTENDED USER'S FAILURE TO PROVIDE ACCURATE OR COMPLETE INFORMATION OR DOCUMENTATION PERTAINING TO ANY SERVICES OR REPORT ORDERED UNDER OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING CLIENT'S OR ANY INTENDED USER'S FAILURE, OR THE FAILURE OF ANY OF CLIENT'S OR ANY INTENDER USER'S RESPECTIVE OFFICERS, DIRECTORS,

MEMBERS, PRINCIPALS, AGENTS OR EMPLOYEES, TO PROVIDE A COMPLETE AND ACCURATE COPY OF THE REPORT TO ANY THIRD PARTY. COREVAL SHALL HAVE NO LIABILITY WHATSOEVER FOR REPORTS OR DELIVERABLES THAT ARE SUBMITTED IN DRAFT FORM.

d. THE LIMITATIONS OF LIABILITY IN SUBSECTIONS 15(A) AND 15(B) ABOVE SHALL NOT APPLY IN THE EVENT OF A FINAL FINDING BY A COURT OF COMPETENT JURISDICTION THAT SUCH LIABILITY IS THE RESULT OF A PARTY'S FRAUD OR WILLFUL MISCONDUCT.

16. (a) Client shall not disseminate, distribute, make available or otherwise provide any Report prepared hereunder to any third party (including without limitation, incorporating or referencing the Report, in whole or in part, in any offering, including, but not limited to any offering of the Property or any securities offering as defined by applicable law, or other material intended for review by other third parties) except (i) to any third party (a) identified in the Agreement as an Intended User subject to the terms and conditions of this Agreement or (b) otherwise expressly acknowledged in a separate writing executed by Coreval, such third party and Client, setting forth that such third party is an "Intended User" of the Report and providing Coreval with an acceptable release from such third party with respect to such Report or wherein Client provides acceptable indemnity protections to Coreval against any claims resulting directly from the distribution of the Report to such third party; (ii) to any third party service provider (including accountants, attorneys, rating agencies and auditors) using the Report in the course of providing Services for the sole benefit of an Intended User and limited to the Intended Use of the Report as defined in this Agreement, or (iii) to the extent required by applicable law, statute, government regulation, legal process, or judicial decree.

b. In the event Coreval consents, in writing, to Client incorporating or referencing the Report in any offering or other materials intended for review by other parties, Client shall not distribute, file, or otherwise make such other materials available to any such parties unless and until Client has provided Coreval with complete copies of such offering or other materials and Coreval has approved the inclusion of the Report, or reference to the Report and/or Coreval, in such offering and other materials in writing. Further, Coreval's consent to such inclusion of the Report, or reference to the Report and/or Coreval, in any securities offering is subject to (i) Coreval's and Coreval's securities counsel's review and approval, in writing, of any inclusion of the Report, or reference to the Report and/or Coreval, in such securities offering; (ii) Client shall not modify the Report, any such inclusion of or reference to the Report and/or Coreval in such securities offering once approved by Coreval and its securities counsel in writing; and (iii) Client shall reimburse Coreval for its out-of-pocket costs and expenses, including attorneys' fees, arising from legal review of such securities offering and related materials on Coreval's behalf.

a. In the absence of satisfying the conditions of this Section 16 with respect to any party who is not designated as an Intended User, in no event shall the receipt of a Report by such party extend any right to the party to use and rely on such Report, and Coreval shall have no liability for such unauthorized use and reliance on any Report.

b. In the event Client breaches the provisions of this Section 16, Client shall indemnify, defend and hold Coreval and its affiliates and their officers, directors, employees, contractors, agents and other representatives (Coreval and each of the foregoing an "Indemnified Party" and collectively the "Indemnified Parties"), fully harmless from and against all losses, liabilities, damages and expenses (collectively, "Damages") claimed against, sustained or incurred by any Indemnified Party arising out of or in connection with such breach, regardless of any negligence on the part of any Indemnified Party in preparing the Report.

17. In the event Client incorporates or references the Report, in whole or in part, in any offering, including, but not limited to any offering of the Property or any securities offering as defined by applicable law, or other material intended for review by other parties, Client shall indemnify, defend and hold each of the Indemnified Parties harmless from and against any Damages in connection with (i) any transaction contemplated by this Agreement or in connection with the Report or the engagement of or performance of Services by any Indemnified Party hereunder, (ii) any Damages claimed by any user or recipient of the Report, whether or not an Intended User, (iii) any actual or alleged untrue statement of a material fact, or the actual or alleged failure to state a material fact necessary to make a statement not misleading in light of the circumstances under which it was made with respect to all information furnished to any Indemnified Party or made available to a prospective party to a transaction, or (iv) an actual or alleged violation of applicable law by an Intended User (including, without limitation, securities laws) or the negligent or intentional acts or omissions of an Intended User (including the failure to perform any duty imposed by law); and will reimburse each Indemnified Party for all reasonable fees and expenses (including fees and expenses of counsel) (collectively, "Expenses") as incurred in connection with investigating, preparing, pursuing or defending any threatened or pending claim, action, proceeding or investigation (collectively, "Proceedings") arising therefrom, and regardless of whether such Indemnified Party is a formal party to such Proceeding. Client agrees not to enter into any waiver, release or

settlement of any Proceeding (whether or not any Indemnified Party is a formal party to such Proceeding) without the prior written consent of Coreval (which consent will not be unreasonably withheld or delayed) unless such waiver, release or settlement includes an unconditional release of each Indemnified Party from all liability arising out of such Proceeding.

18. Time Period for Legal Action. Unless the time period is shorter under applicable law, except in connection with Section16 and Section 17, Coreval and Client agree that any legal action or lawsuit by one party against the other party or its affiliates, officers, directors, employees, contractors, agents, or other representatives, whether based in contract, warranty, indemnity, negligence, strict liability or other tort or otherwise, relating to (a) this Agreement, (b) any Services or Reports under this Agreement or (c) any acts or conduct relating to such Services or Reports, shall be filed within two (2) years from the date of delivery to Client of the Report to which the claims or causes of action in the legal action or lawsuit relate. The time period stated in this section shall not be extended by any incapacity of a party or any delay in the discovery or accrual of the underlying claims, causes of action or damages.
19. Miscellaneous.
    a. This Agreement contains the entire agreement and understanding of the parties with respect to the subject matter hereof. This Agreement may not be amended, modified or discharged, nor may any of its terms be waived except by written agreement of both parties. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. A signed copy of this Agreement transmitted by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Agreement for all purposes.
    b. Neither party shall assign this Agreement in whole or in part (other than by operation of law) to any person or entity without the prior written consent of the other party. Subject to the foregoing, this Agreement and all of its provisions shall be binding upon and shall inure to the benefit of the parties and their respective successors and permitted assigns.
    c. No consent or waiver, either expressed or implied, by a party to or of any breach or default, shall be construed to be a consent or waiver to or of any other breach or default in the performance of any obligations hereunder. Failure of a party to complain or declare the other party in default shall not constitute a waiver by such party of rights and remedies hereunder.
    d. Except as hereinafter provided, no delay or failure in performance by a party shall constitute a default hereunder to the extent caused by Force Majeure. Unless the Force Majeure substantially frustrates performance of the Services, Force Majeure shall not operate to excuse, but only to delay, performance of the Services. If Services are delayed by reason of Force Majeure, Coreval promptly shall notify Client. Once the Force Majeure event ceases, Coreval shall resume performance of the Services as soon as possible. As used herein, "Force Majeure" means any event beyond the control of the Party claiming inability to perform its obligations and which such Party is unable to prevent by the exercise of reasonable diligence, including, without limitation, the combined action of workers, fire, acts of terrorism, catastrophes, changes in laws, condemnation of property, governmental actions or delays, national emergency, war, civil disturbance, floods, unusually severe weather conditions, endemic or pandemic, or other acts of God. Inability to pay or financial hardship shall not constitute Force Majeure regardless of the cause thereof and whether the reason is outside a party's control.
    e. Any provision of this Agreement that, by its language, contemplates performance or observation subsequent to any termination or expiration of this Agreement shall survive such termination or expiration and shall continue in full force and effect.
    f. If any provision of this Agreement, or application thereof to any person or circumstance, shall to any extent be invalid, then such provision shall be modified, if possible, to fulfill the intent of the parties reflected in the original provision. The remainder of this Agreement, or the application of such provision to person or circumstance other than those as to which it is held invalid, shall not be affected thereby, and each provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

**APPLICATION OF CHAPTER 7 TRUSTEE**
**<u>TO EMPLOY APPRAISER</u>**
**(Expedited Determination Requested)**

NOW COMES Jonathan R. Goldsmith, the Chapter 7 trustee (the "Trustee") in the bankruptcy case (the "Bankruptcy Case" or "Case") of the above captioned debtor (the "Debtor") and, pursuant to 11 U.S.C. §§ 327(a) and 330, Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure, and MLBR 2014-1, hereby requests that this Court authorize the employment of Corey Gustafson and Core Values Appraisal & Advisory, Inc. (together, the "Appraiser") as appraiser to the Trustee in connection with the pending Settlement Agreement [Dkt. No. 189] and, if necessary, to provide testimony regarding the appraisal to be conducted as set forth in more detail below. In support of this Application, the Trustee submits the Affidavit of Corey Gustafson (the "Affidavit"), which is attached as **<u>Exhibit A</u>**. In addition, attached for Court approval as **<u>Exhibit B</u>** is the proposed services agreement between the Trustee and the Appraiser.

**In addition, pursuant to MLBR 9013-1(g) and for the reasons set forth in more detail below, the Trustee requests that the Court grant the relief requested herein on an expedited basis.**

In support hereof, the Trustee states as follows:

## BACKGROUND

1. On August 31, 2023 (the "Petition Date"), certain creditors of the Debtor filed an involuntary petition under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

2. On October 11, 2023, this Court entered an Order for Relief in this case [Dkt. No. 26] and this case remains a Chapter 7 case at this time.

3. On October 12, 2023, the United States Trustee appointed Jonathan R. Goldsmith as Chapter 7 trustee [Dkt. No. 29] and the Trustee remains as Trustee at this time.

## PENDING SETTLEMENT AGREEMENT

4. The Trustee is currently seeking approval of an extensively negotiated settlement agreement among multiple parties ("Settlement Agreement") [Dkt. No. 189] and the Trustee has a motion pending seeking allowance of that Settlement Agreement (the "Motion to Approve") [Dkt. No. 190].

5. Mr. Lolonyon Akouete ("Mr. Akouete"), an alleged creditor of the Debtor, has filed an objection to the Settlement Agreement and this Court initially scheduled an evidentiary hearing on approval of the Settlement Agreement for September 17, 2024. That hearing has been rescheduled at the Trustee's request to November 18, 2024 (the "Evidentiary Hearing").

6. One issue that Mr. Akouete has raised in his objection to the Settlement Agreement is the lack of availability of an independent appraisal. In addition, Mr. Akouete has requested in multiple pleadings that this Court require the Trustee to obtain an appraisal [Dkt. No. 219] or that the Court direct that estate funds be used to allow Mr. Akouete to obtain an appraisal [Dkt. No. 302]. In Mr. Akouete's most recent request on August 28, 2024, he requested

the “appointment of a court-appointed expert” to “provide an impartial and accurate valuation” [Dkt. No. 302].

7. At prior recent hearings in this Case, this Court has indicated that at the Evidentiary Hearing the Court will first consider and assess the value of the Property in order to determine whether the multiple compromises reflected in the Settlement Agreement meet the standard for approval under Fed. R. Bankr. P. 9019.

8. As set forth in detail in the motion filed by the Trustee which resulted in rescheduling the Evidentiary Hearing (the “Motion to Reschedule”) [Dkt. No. 319], the Trustee initially believed that obtaining an appraisal would be unnecessary in connection with the Settlement Agreement and the Trustee had hoped to avoid the costs to the estate and the time delay that would be associated with an appraisal.

9. As set forth in the Motion to Reschedule, part of the Trustee’s basis for choosing to not obtain an appraisal was the Trustee’s review and consideration of the Town of Westborough’s Request for Proposal (“RFP”) process and the results of that process. More specifically, the Trustee relied, in part, on the bid by Mr. Ferris which he submitted during the RFP process. Mr. Ferris has now proposed to substantially increase the price that he is willing to pay for the Property. As a result, the Trustee has determined that obtaining an appraisal is the most appropriate course of action at this point.

10. As a fiduciary to the Estate, the Trustee believes it is his responsibility to consider and assess the changed circumstances that result from Mr. Ferris’s new proposal.

11. In addition, the Trustee believes that obtaining an appraisal is the best way to provide the Court with the information which the Court requires to determine whether to approve the Settlement Agreement.

## EMPLOYMENT OF APPRAISER

12. As a result of the forgoing, the Trustee proposes to employ Corey Gustafson and Core Values Appraisal & Advisory, Inc.as Appraiser (i.e. Appraiser). The Appraiser will provide the Trustee with a written appraisal report and will be prepared to testify before the Court. The proposed services agreement between the Trustee and the Appraiser regarding this engagement is attached hereto **Exhibit B** (the "Agreement"). The Trustee will execute the Agreement after Court approval of same.

13. The Trustee has chosen the Appraiser because of his experience appraising commercial real estate and providing testimony in connection with real property valuations. Attached hereto as **Exhibit C** is a copy of Mr. Gustafson's *curriculum vitae* which demonstrates that he is well qualified to perform the services required by the estate.

14. The Appraiser has also informed the Trustee that he would be able to complete the requested appraisal within approximately 30 days, which is as prompt as any other appraiser with which the Trustee has inquired (notably, one appraiser indicated that approximately 90 days would be required).

15. For services to be provided, the Trustee requests authority to pay the Appraiser as follows:

a. **Appraisal**: payment of a flat fee of Five Thousand Five Hundred Dollars ($5,500.00) to prepare and deliver an appraisal of the Property; and

b. **Testimony**: payment of an hourly fee of $250 per hour for time spent preparing for and testifying at an Evidentiary Hearing.

16. The Trustee seeks authority to pay the Appraiser the flat fee portion of Appraiser's compensation (i.e., $5,500) upon the Appraiser's delivery of the appraisal, without the need for further Court approval.

17. If it is necessary for the Appraiser to prepare for and testify at an Evidentiary Hearing, the Appraiser will submit an application for compensation for those services at the rate of $250 per hour and payment shall be subject to Court approval.

18. The Trustee believes the fee for the Appraiser's services as well as the expected timeline to complete the appraisal are reasonable. Further, there are sufficient funds in the Estate to pay the fees required by the Appraiser.

19. The Trustee believes that Mr. Gustafson is well qualified to perform the services required by the Trustee.

**DISINTERESTEDNESS OF APPRAISER**

20. The Trustee has filed the Affidavit herewith in which the Appraiser attests to no conflicts with the Debtor and to "disinterestedness" as required by the Bankruptcy Code. The Affidavit is consistent with the requirements of MLBR 2014-1.

21. To the best of the Trustee's knowledge, information and belief, other than as set forth in the Affidavit, the Appraiser does not have any connection with the Debtor, the parties to the Settlement Agreement, any other parties in interest, their respective attorneys, the United States Trustee, or any person employed in the Office of the United States Trustee.

22. To the best of the Trustee's knowledge, the Appraiser is a "disinterested person" as that term is defined in 11 U.S.C. §101(14).

23. As stated in the Affidavit, the Appraiser has received no retainer for services to be rendered from any source.

24. Based on the foregoing, the Trustee submits that the engagement of the Appraiser on the terms set forth herein would be in the best interest of the estate and its creditors.

**REQUEST FOR EXPEDITED DETERMINATION**

25. Pursuant to MLBR 9013-1(g), the Trustee requests that the Court grant the relief requested herein on an expedited basis. As grounds therefore, the Trustee states that the Appraisal must be competed and uploaded to the Court's docket by November 8, 2024, the evidentiary hearing is scheduled for November 18, 2024, and the Appraiser has informed the Trustee that the appraisal will take approximately 30 days to complete.

26. As such, the Trustee seeks expedited determination so that the Appraiser will be able to complete the necessary tasks on a timely basis.

WHEREFORE, the Trustee respectfully requests that this Court enter an Order authorizing the Trustee to engage Corey Gustafson and Core Values Appraisal & Advisory, Inc., on the terms and conditions set forth above and for such other and further relief as is just.

Respectfully submitted,

**Jonathan R. Goldsmith,**
**Chapter 7 Trustee**

by proposed counsel,

/s/ Christine E. Devine

Christine E. Devine, BBO# 566990
Nicholson Devine LLC
P.O. Box 7
Medway, MA 02053
Phone: 508-533-7240
Email: christine@nicholsondevine.com

Dated: September 23, 2024

# <u>Exhibit A</u>

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

**AFFIDAVIT OF COREY GUSTAFSON MAI, CRE, IN SUPPORT OF TRUSTEE'S APPLICATION TO EMPLOY APPRAISER**

Pursuant to Fed. R. Bankr. P. 2014(a) and 2016, Corey Gustafson, being duly sworn, deposes and says:

1. I am the President and Owner of Core Values Appraisal & Advisory, Inc., which is based in Cohasset, Massachusetts (together, the "Firm").

2. I make this affidavit (the "Affidavit") in support of the Application By Trustee to Employ Appraiser (the "Application") filed by Jonathan Goldsmith, the above-referenced Chapter 7 trustee of the above-captioned Debtor (the "Trustee").

3. I have reviewed the Application and made a general inquiry into the facts set forth herein prior to making this Affidavit.

4. To the best of my knowledge, based upon my review of our client matters, neither I nor any member of the Firm represent any interest adverse to the bankruptcy estate, nor have any connection with the Debtor, the parties to the Settlement Agreement, any other parties in interest, their respective attorneys, the United States Trustee, or any person employed in the Office of the United States Trustee.

5. The Firm and I will conduct a review of the real property located at 231 Turnpike Road, Westborough, Massachusetts and all structures thereon (the "Property") and (i) prepare a detailed written appraisal in a manner that is customary in the commercial real estate industry (the "Appraisal") and (ii) if requested by the Trustee, provide testimony at an evidentiary hearing regarding the Property and the Appraisal as is set forth in detail in the Application.

6. I and the Firm have agreed to be compensation as follows:

a. For the Appraisal, a flat fee of $5,500 to be paid upon delivery of the appraisal (the "Appraisal Fee"); and

b. For preparation and testimony at an evidentiary hearing, payment of fees at an hourly rate of $250 per hour (the "Testimony Fee"), which shall be subject to review and approval by this Court.

7. Both the Appraisal Fee nor the Testimony Fee will belong wholly to me and the Firm, and will not be divided, shared or pooled, directly or indirectly, with any other person or business.

8. The Firm and I have conducted, and will continue to conduct, research into any relationships we may have with the Debtor, parties to the Settlement Agreement, other parties in interest, their respective attorneys, the United States Trustee, or any person employed in the Office of the United States Trustee.

9. Although the Firm and I have undertaken, continue to undertake, an investigation to identify any contacts with the Debtor or parties in interest, it is possible that such contacts have not been revealed. To the extent any such contacts are discovered, I will notify the Court by filing and serving a supplement to this Affidavit.

10. I shall amend this statement immediately upon learning that (a) any of the within representations are incorrect, or (b) there is any change of circumstances thereto.

11. I have received no retainer for services to be rendered from any source.

12. I have reviewed the provisions of MLBR 2016-1.

13. I have read the Application which this affidavit accompanies and, to the best of my knowledge, information and belief, the contents of said Application are true and correct.

[Signature Page Follows]

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated: September 18, 2024

Corey Gustafson, MAI, CRE

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

**DECLARATION RE: ELECTRONIC FILING**

I, Corey Gustafson, **hereby declare under penalty of perjury** that all of the information contained in my Affidavit (the "Document"), filed electronically, is true and correct. I understand that this DECLARATION is to be filed with the Clerk of Court electronically concurrently with the electronic filing of the Document. I understand that failure to file this DECLARATION may cause the Document to be struck and any request contained or relying thereon to be denied, without further notice.

I further understand that pursuant to the Massachusetts Electronic Filing Local Rule (MEFLR)-7(b) all paper documents containing original signatures executed under the penalties of perjury and filed electronically with the Court are the property of the bankruptcy estate and shall be maintained by the authorized CM/ECF Registered User for a period of five (5) years after the closing of this case.

Dated: September 19, 2024 ______________________ (Affiant)
Corey Gustafson

# <u>Exhibit B</u>

# Professional Services Agreement
Core Values Appraisal & Advisory, Inc.

CoreVal

Core Values Appraisal & Advisory, Inc.
60 Surry Drive
Cohasset, MA 02025
www.coreval.co

Corey Gustafson MAI, CRE
Principal

September 18, 2024

Jonathan Goldsmith, Chapter 7 Trustee
Of the Estate of Westborough SPE, LLC
Goldsmith, Katz & Argenio, PC
1350 Main Street, 5th Floor
Springfield, MA 01103
Phone: (413) 747-0700
Email: jgoldsmith@gkalawfirm.com

RE: Mr. Goldsmith

We are pleased to submit this proposal and our Terms and Conditions for this assignment.

## PROPOSAL SPECIFICATIONS

| | |
|---|---|
| Property to Be Appraised | 231 Turnpike Road, Westborough, MA 01581 |
| Purpose: | To estimate the Market Value of the referenced real estate |
| Scope of Assignment | This assignment will incorporate two phases if needed. The first phase contemplates the development of a narrative appraisal report in support of potential litigation involving bankruptcy proceedings involving the subject property. The second phase considers hourly valuation services related to potential testimony that may be necessary due to said bankruptcy proceedings. |
| Valuation Premise: | Retrospective |
| Rights Appraised: | Fee Simple |
| Intended Use: | Potential Litigation |
| Intended User: | The intended user is Jonathan Goldsmith, Chapter 7 Trustee of the Estate of Westborough SPE, LLC (“Client”), and such other parties and entities (if any) expressly recognized by Core Values Appraisal & Advisory, Inc. (Coreval) as intended users (each an “Intended Users” and collectively the “Intended Users”) provided that any Intended User‘s use of, and reliance upon, any report produced by Coreval under this Agreement shall be subject to the Terms and Conditions attached hereto and incorporated herein (including, without limitation, any limitations of liability set forth in the attached Terms and Conditions). |
| Reliance: | Reliance on any reports produced by Coreval under this Agreement is limited to parties and entities explicitly acknowledged in writing by Coreval as Intended Users of the respective reports, provided all conditions required by Coreval or stated herein have been met. Any parties or entities other than the Intended Users who obtain a copy of the report or any part of it (including the Client, if not named as an Intended User), whether through direct dissemination or other means, are not permitted to use or rely on any opinions or conclusions contained in the report. Coreval will not be responsible for any unauthorized use of the report, its conclusions, or contents, nor will it have any liability in connection with such use. |

# Professional Services Agreement

Core Values Appraisal & Advisory, Inc.

CoreVal

| | |
|---|---|
| | Unless expressly identified in this Agreement, there are no third-party beneficiaries of this Agreement related to this appraisal assignment or any reports produced by Coreval under this Agreement, and no other person or entity shall have any rights, benefits, or interests under this Agreement or with respect to any reports produced by Coreval under this Agreement. |
| Scope of Inspection: | A full interior and exterior inspection of the property will be conducted and arranged with the property contact and performed by Coreval.<br><br>If this expected property inspection is not possible due to unforeseen issues (such as lack of on-site personnel cooperation, physical obstructions, or appraiser/property contact health and safety concerns), the client will be promptly advised. The client may continue this assignment based on other inspection options agreed upon by Coreval and the client or provide Coreval with a written notice to cancel. If Coreval determines that a credible appraisal result cannot be achieved due to inspection limitations, it will promptly provide the client with a written cancellation of this assignment. |
| Valuation Approaches: | All three traditional approaches to value will be considered. |
| Report Type: | Appraisal Report |
| Appraisal Standards: | USPAP |
| Appraisal Fee: | **Phase 1 - $5,500.** If canceled by either party before completion, the fee will be based on Coreval's hourly rates for the time expended, plus actual expenses.<br>**Phase 2** – Hourly only at a rate of **$250/hour** for preparation, deposition, testimony, travel, phone calls., etc. associated with the valuation of the referenced property. |
| Expenses: | The fee includes all associated expenses except to the extent otherwise provided in the attached Terms and Conditions. |
| Retainer: | **Phase 1**—This assignment requires a 100% retainer. The full fee must be paid before the draft appraisal report is delivered.<br>**Phase 2** – Invoices will be submitted monthly for committed hours. All worked hours will be invoiced with payment due **promptly upon Bankruptcy Court approval of same. In addition, upon completion of testimony provided and receipt of an invoice for services from Coreval, the Client will submit a request for approval of such fees within three business days of receipt of such invoice.** |
| Payment Terms: | Final payment is due upon delivery of the final report or within thirty (30) days of your receipt of the draft report, whichever is sooner. The full appraisal fee is considered earned upon delivery of the draft report. We will invoice you for the assignment in its entirety at the completion of the assignment. |
| Delivery Instructions: | Coreval encourages our clients to join in our environmental sustainability efforts by accepting an electronic copy of the report.<br>Delivery Schedule: An Adobe PDF file via email will be delivered to jgoldsmith@gkalawfirm.com. The client has requested 0 bound final copy (ies). |
| Draft Report: | 30 calendar days after the Start Date, and assuming adequate receipt of the requested property information. |
| Final Report: | Due within three business days of receipt of requested revisions from the client, unless otherwise communicated by the assigned appraiser. |
| Start Date: | The appraisal process will start upon receipt of your signed agreement and the property-specific data. |
| Acceptance Date: | These specifications are subject to modification or withdrawal if this proposal is not accepted within three business days from the date of this letter. |

Professional Services Agreement
Core Values Appraisal & Advisory, Inc.

CoreVal

When executed and delivered by all parties, this letter, together with the Terms and Conditions and the Specific Property Data Request attached hereto and incorporated herein, will serve as the Agreement for appraisal services by and between Coreval and Client. Each person signing below represents that it is authorized to enter into this Agreement and to bind the respective parties, including all intended users, hereto.

Notwithstanding anything to the contrary here or in the Terms & Conditions attached, this agreement is subject to and conditional upon the approval of the US Bankruptcy Court for the District of Massachusetts.

We appreciate this opportunity to be of service to you on this assignment. If you have additional questions, please contact us.

Sincerely,
**Core Values Appraisal & Advisory, Inc.**

Corey Gustafson MAI, CRE
(617) 582.3131
corey@coreval.co

# AGREED AND ACCEPTED

For Client Company ("Client")

| | |
|---|---|
| Signature | Date |
| Name | Title |
| Phone Number | jgoldsmith@gkalawfirm.com<br>E-Mail Address |

CoreVal

## TERMS AND CONDITIONS

1. The Terms and Conditions herein are part of an assignment agreement (the "Agreement") for appraisal services ("Services") between Coreval, Inc. ("Coreval") and the client signing this Agreement and for whom the Services will be performed (the "Client") for the property identified herein (the "Property") and shall be deemed a part of such Agreement as though fully set forth therein. In addition, with respect to any appraisal report prepared by Coreval pursuant to the Agreement (the "Report"), any use of, or reliance on, the Report by any Intended User constitutes acceptance of these Terms and Conditions as well as acceptance of all qualifying statements, limiting conditions, and assumptions stated in the Report. The Agreement shall be governed and construed by the laws of the state where the Coreval office executing this Agreement is located without regard to conflicts of laws principles.
2. Client shall be responsible for the payment of all fees stipulated in this Agreement. Payment of the fees and preparation of the Report are not contingent upon any predetermined value or on any action or event resulting from the analyses, opinions, conclusions, or use of the Report. Final payment is due as provided in the Proposal Specifications Section of this Agreement. If a draft Report is requested, the fee is considered earned upon delivery of the draft Report. It is understood that the Client may cancel this assignment in writing at any time prior to delivery of the completed Report. In such event, the Client is obligated to pay Coreval for the time and expenses incurred (including, but not limited to, travel expenses to and from the job site) prior to the effective date of cancellation, with a minimum charge of $500. Hard copies of the Reports are available at a cost of $250 per original color copy and $100 per photocopy (black and white), plus shipping fees of $30 per Report.
3. If Coreval is subpoenaed or ordered to give testimony, produce documents or information, or otherwise required or requested by Client or a third party to participate in meetings, phone calls and conferences (except routine meetings, phone calls and conferences with the Client for the sole purpose of preparing the Report), litigation, or other legal proceedings (including preparation for such proceedings) because of, connected with or in any way pertaining to this assignment, the Report, Coreval's expertise, or the Property, Client shall pay Coreval's additional out-of-pocket costs and expenses, including but not limited to Coreval's reasonable attorneys' fees, and additional time incurred by Coreval based on Coreval's then-prevailing hourly rates and related fees. Such charges include and pertain to, but are not limited to, time spent in preparing for and providing court room testimony, depositions, travel time, mileage and related travel expenses, waiting time, document review and production, and preparation time (excluding preparation of the Report), meeting participation, and Coreval's other related commitment of time and expertise. Hourly charges and other fees for such participation will be provided upon request. In the event Client requests additional Services beyond the scope and purpose stated in the Agreement, Client agrees to pay additional fees for such services and to reimburse related expenses, whether or not the completed Report has been delivered to Client at the time of such request.
4. Coreval shall have the right to terminate this Agreement at any time for cause effective immediately upon written notice to Client on the occurrence of fraud or the willful misconduct of Client, its employees or agents, or without cause upon 5 days written notice.
5. In the event Client fails to make payments when due then, from the date due until paid, the amount due and payable shall bear interest at the maximum rate permitted in the state where the Coreval office executing this Agreement is located. EACH PARTY, AFTER HAVING THE OPPORTUNITY TO CONSULT WITH COUNSEL OF ITS CHOICE, KNOWINGLY AND VOLUNTARILY, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION IN ANY WAY RELATED TO THIS AGREEMENT.
6. Coreval assumes there are no major or significant items or issues affecting the Property that would require the expertise of a professional building contractor, engineer, or environmental consultant for Coreval to prepare a valid Report hereunder. Client acknowledges that such additional expertise is not covered in the fee and agrees that, if such additional expertise is required, it shall be provided by others at the discretion and direction of the Client, and solely at Client's additional cost and expense.
7. Client acknowledges that Coreval is being retained hereunder as an independent contractor to perform the Services described herein and nothing in this Agreement shall be deemed to create any other relationship between Client and Coreval. Unless otherwise stated in this Agreement, Client shall not designate or disclose Coreval or any of its agents or employees as an expert or opinion witness in any court, arbitration, or other legal proceedings without the prior written consent of Coreval.
8. This assignment shall be deemed concluded and the Services hereunder completed upon delivery to Client of the Report discussed herein.
9. All statements of fact in the Report which are used as the basis of Coreval's analyses, opinions, and conclusions will be true and correct to Coreval's actual knowledge and belief. Coreval does not make any representation or warranty,

Professional Services Agreement
Core Values Appraisal & Advisory, Inc.

CoreVal

express or implied, as to the accuracy or completeness of the information or the condition of the Property furnished to Coreval by Client or others. TO THE FULLEST EXTENT PERMITTED BY LAW, COREVAL DISCLAIMS ANY GUARANTEE OR WARRANTY AS TO THE OPINIONS AND CONCLUSIONS PRESENTED ORALLY OR IN ANY REPORT, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF FITNESS FOR ANY PARTICULAR PURPOSE EVEN IF KNOWN TO COREVAL. Furthermore, the conclusions and any permitted reliance on and use of the Report shall be subject to the assumptions, limitations, and qualifying statements contained in the Report.

10. Coreval shall have no responsibility for legal matters, including zoning, or questions of survey or title, soil or subsoil conditions, engineering, or other similar technical matters. The Report will not constitute a survey of the Property analyzed.
11. The Client shall supply Coreval with any materials related to the assignment that Coreval requests, provided these materials are in the Client's possession or control. Additionally, the Client shall grant Coreval adequate access to the Property for analysis purposes and permits entry unless otherwise agreed upon in advance.
12. The data gathered in the course of the assignment (except data furnished by Client, "Client Information") and the Report prepared pursuant to the Agreement are, and will remain, the property of Coreval. With respect to Client Information provided by Client, Coreval shall not violate the confidential nature of the appraiser-client relationship by improperly disclosing any confidential and proprietary Client Information furnished to Coreval. Notwithstanding the foregoing to the contrary, Coreval is authorized by Client to disclose all or any portion of the Report and related data as may be required by applicable law, statute, government regulation, legal process, or judicial decree, including to appropriate representatives of the Appraisal Institute if such disclosure is required to enable Coreval or its employees and agents to comply with the Bylaws and Regulations of the Appraisal Institute as now or hereafter in effect.
13. Unless specifically noted, in preparing the Report Coreval will not be considering the possible existence of asbestos, PCB transformers, or other toxic, hazardous, or contaminated substances and/or underground storage tanks (collectively, "Hazardous Materials") on or affecting the Property, or the cost of encapsulation or removal thereof. Further, Client represents that there are no major or significant repairs, improvements or deferred maintenance of the Property that would require the expertise of a professional cost estimator, engineer, architect or contractor. If any such repairs, improvements or maintenance are needed, the estimates for such repairs, improvements or maintenance are to be prepared by other parties pursuant to a separate written agreement in Client's sole discretion and direction, and are not deemed part of the Services or otherwise covered as part of the fee hereunder.
14. In the event Client intends to use the Report in connection with a tax matter, Client acknowledges that Coreval provides no warranty, representation or prediction as to the outcome of such tax matter. Client understands and acknowledges that any relevant taxing authority (whether the Internal Revenue Service or any other federal, state or local taxing authority) may disagree with or reject the Report or otherwise disagree with Client's tax position, and further understands and acknowledges that the taxing authority may seek to collect additional taxes, interest, penalties or fees from Client beyond what may be suggested by the Report. Client agrees that Coreval shall have no responsibility or liability to Client or any other party for any such taxes, interest, penalties or fees and that Client will not seek damages or other compensation from Coreval relating to any such taxes, interest, penalties or fees imposed on Client, or for any attorneys' fees, costs or other expenses relating to Client's tax matters.
15. LIMITATION OF LIABILITY. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY:
    a. EXCEPT TO THE EXTENT ARISING FROM SECTION 16, OR SECTION 17 IF APPLICABLE, IN NO EVENT SHALL EITHER PARTY OR ANY OF ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR CONTRACTORS BE LIABLE TO THE OTHER PARTY, FOR ANY LOST OR PROSPECTIVE PROFITS OR ANY OTHER INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, PUNITIVE, INDIRECT OR OTHER EXEMPLARY LOSSES OR DAMAGES, WHETHER BASED IN CONTRACT, WARRANTY, INDEMNITY, NEGLIGENCE, STRICT LIABILITY OR OTHER TORT OR OTHERWISE, REGARDLESS OF THE FORESEEABILITY OR THE CAUSE THEREOF.
    b. EXCEPT TO THE EXTENT ARISING FROM SECTION 16, OR SECTION 17 IF APPLICABLE, AGGREGATE DAMAGES IN CONNECTION WITH THIS AGREEMENT FOR EITHER PARTY (EXCLUDING THE OBLIGATION TO PAY THE FEES AND COSTS REQUIRED HEREUNDER) SHALL NOT EXCEED THE TOTAL FEES PAYABLE TO COREVAL UNDER THIS AGREEMENT.
    c. COREVAL SHALL HAVE NO LIABILITY WITH RESPECT TO ANY LOSS, DAMAGE, CLAIM OR EXPENSE INCURRED BY OR ASSERTED AGAINST CLIENT ARISING OUT OF, BASED UPON OR RESULTING FROM CLIENT'S OR ANY INTENDED USER'S FAILURE TO PROVIDE ACCURATE OR COMPLETE INFORMATION OR DOCUMENTATION PERTAINING TO ANY SERVICES OR REPORT ORDERED UNDER OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING CLIENT'S OR ANY INTENDED USER'S FAILURE, OR THE FAILURE OF ANY OF CLIENT'S OR ANY INTENDER USER'S RESPECTIVE OFFICERS, DIRECTORS,

MEMBERS, PRINCIPALS, AGENTS OR EMPLOYEES, TO PROVIDE A COMPLETE AND ACCURATE COPY OF THE REPORT TO ANY THIRD PARTY. COREVAL SHALL HAVE NO LIABILITY WHATSOEVER FOR REPORTS OR DELIVERABLES THAT ARE SUBMITTED IN DRAFT FORM.

d. THE LIMITATIONS OF LIABILITY IN SUBSECTIONS 15(A) AND 15(B) ABOVE SHALL NOT APPLY IN THE EVENT OF A FINAL FINDING BY A COURT OF COMPETENT JURISDICTION THAT SUCH LIABILITY IS THE RESULT OF A PARTY'S FRAUD OR WILLFUL MISCONDUCT.

16. (a) Client shall not disseminate, distribute, make available or otherwise provide any Report prepared hereunder to any third party (including without limitation, incorporating or referencing the Report, in whole or in part, in any offering, including, but not limited to any offering of the Property or any securities offering as defined by applicable law, or other material intended for review by other third parties) except (i) to any third party (a) identified in the Agreement as an Intended User subject to the terms and conditions of this Agreement or (b) otherwise expressly acknowledged in a separate writing executed by Coreval, such third party and Client, setting forth that such third party is an "Intended User" of the Report and providing Coreval with an acceptable release from such third party with respect to such Report or wherein Client provides acceptable indemnity protections to Coreval against any claims resulting directly from the distribution of the Report to such third party; (ii) to any third party service provider (including accountants, attorneys, rating agencies and auditors) using the Report in the course of providing Services for the sole benefit of an Intended User and limited to the Intended Use of the Report as defined in this Agreement, or (iii) to the extent required by applicable law, statute, government regulation, legal process, or judicial decree.

b. In the event Coreval consents, in writing, to Client incorporating or referencing the Report in any offering or other materials intended for review by other parties, Client shall not distribute, file, or otherwise make such other materials available to any such parties unless and until Client has provided Coreval with complete copies of such offering or other materials and Coreval has approved the inclusion of the Report, or reference to the Report and/or Coreval, in such offering and other materials in writing. Further, Coreval's consent to such inclusion of the Report, or reference to the Report and/or Coreval, in any securities offering is subject to (i) Coreval's and Coreval's securities counsel's review and approval, in writing, of any inclusion of the Report, or reference to the Report and/or Coreval, in such securities offering; (ii) Client shall not modify the Report, any such inclusion of or reference to the Report and/or Coreval in such securities offering once approved by Coreval and its securities counsel in writing; and (iii) Client shall reimburse Coreval for its out-of-pocket costs and expenses, including attorneys' fees, arising from legal review of such securities offering and related materials on Coreval's behalf.

a. In the absence of satisfying the conditions of this Section 16 with respect to any party who is not designated as an Intended User, in no event shall the receipt of a Report by such party extend any right to the party to use and rely on such Report, and Coreval shall have no liability for such unauthorized use and reliance on any Report.

b. In the event Client breaches the provisions of this Section 16, Client shall indemnify, defend and hold Coreval and its affiliates and their officers, directors, employees, contractors, agents and other representatives (Coreval and each of the foregoing an "Indemnified Party" and collectively the "Indemnified Parties"), fully harmless from and against all losses, liabilities, damages and expenses (collectively, "Damages") claimed against, sustained or incurred by any Indemnified Party arising out of or in connection with such breach, regardless of any negligence on the part of any Indemnified Party in preparing the Report.

17. In the event Client incorporates or references the Report, in whole or in part, in any offering, including, but not limited to any offering of the Property or any securities offering as defined by applicable law, or other material intended for review by other parties, Client shall indemnify, defend and hold each of the Indemnified Parties harmless from and against any Damages in connection with (i) any transaction contemplated by this Agreement or in connection with the Report or the engagement of or performance of Services by any Indemnified Party hereunder, (ii) any Damages claimed by any user or recipient of the Report, whether or not an Intended User, (iii) any actual or alleged untrue statement of a material fact, or the actual or alleged failure to state a material fact necessary to make a statement not misleading in light of the circumstances under which it was made with respect to all information furnished to any Indemnified Party or made available to a prospective party to a transaction, or (iv) an actual or alleged violation of applicable law by an Intended User (including, without limitation, securities laws) or the negligent or intentional acts or omissions of an Intended User (including the failure to perform any duty imposed by law); and will reimburse each Indemnified Party for all reasonable fees and expenses (including fees and expenses of counsel) (collectively, "Expenses") as incurred in connection with investigating, preparing, pursuing or defending any threatened or pending claim, action, proceeding or investigation (collectively, "Proceedings") arising therefrom, and regardless of whether such Indemnified Party is a formal party to such Proceeding. Client agrees not to enter into any waiver, release or

CoreVal

settlement of any Proceeding (whether or not any Indemnified Party is a formal party to such Proceeding) without the prior written consent of Coreval (which consent will not be unreasonably withheld or delayed) unless such waiver, release or settlement includes an unconditional release of each Indemnified Party from all liability arising out of such Proceeding.

18. Time Period for Legal Action. Unless the time period is shorter under applicable law, except in connection with Section16 and Section 17, Coreval and Client agree that any legal action or lawsuit by one party against the other party or its affiliates, officers, directors, employees, contractors, agents, or other representatives, whether based in contract, warranty, indemnity, negligence, strict liability or other tort or otherwise, relating to (a) this Agreement, (b) any Services or Reports under this Agreement or (c) any acts or conduct relating to such Services or Reports, shall be filed within two (2) years from the date of delivery to Client of the Report to which the claims or causes of action in the legal action or lawsuit relate. The time period stated in this section shall not be extended by any incapacity of a party or any delay in the discovery or accrual of the underlying claims, causes of action or damages.
19. Miscellaneous.
    a. This Agreement contains the entire agreement and understanding of the parties with respect to the subject matter hereof. This Agreement may not be amended, modified or discharged, nor may any of its terms be waived except by written agreement of both parties. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. A signed copy of this Agreement transmitted by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Agreement for all purposes.
    b. Neither party shall assign this Agreement in whole or in part (other than by operation of law) to any person or entity without the prior written consent of the other party. Subject to the foregoing, this Agreement and all of its provisions shall be binding upon and shall inure to the benefit of the parties and their respective successors and permitted assigns.
    c. No consent or waiver, either expressed or implied, by a party to or of any breach or default, shall be construed to be a consent or waiver to or of any other breach or default in the performance of any obligations hereunder. Failure of a party to complain or declare the other party in default shall not constitute a waiver by such party of rights and remedies hereunder.
    d. Except as hereinafter provided, no delay or failure in performance by a party shall constitute a default hereunder to the extent caused by Force Majeure. Unless the Force Majeure substantially frustrates performance of the Services, Force Majeure shall not operate to excuse, but only to delay, performance of the Services. If Services are delayed by reason of Force Majeure, Coreval promptly shall notify Client. Once the Force Majeure event ceases, Coreval shall resume performance of the Services as soon as possible. As used herein, "Force Majeure" means any event beyond the control of the Party claiming inability to perform its obligations and which such Party is unable to prevent by the exercise of reasonable diligence, including, without limitation, the combined action of workers, fire, acts of terrorism, catastrophes, changes in laws, condemnation of property, governmental actions or delays, national emergency, war, civil disturbance, floods, unusually severe weather conditions, endemic or pandemic, or other acts of God. Inability to pay or financial hardship shall not constitute Force Majeure regardless of the cause thereof and whether the reason is outside a party's control.
    e. Any provision of this Agreement that, by its language, contemplates performance or observation subsequent to any termination or expiration of this Agreement shall survive such termination or expiration and shall continue in full force and effect.
    f. If any provision of this Agreement, or application thereof to any person or circumstance, shall to any extent be invalid, then such provision shall be modified, if possible, to fulfill the intent of the parties reflected in the original provision. The remainder of this Agreement, or the application of such provision to person or circumstance other than those as to which it is held invalid, shall not be affected thereby, and each provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

# Exhibit C

# PROFILE

EXPERIENCED REAL PROPERTY VALUATION LEADER

## Corey Gustafson MAI, CRE



Core Values Appraisal & Advisory, Inc.
Principal, New England Market Leader
Boston, MA 02110
T +1 617 528 3131
E corey@coreval.co

### State Certifications

- – Connecticut
- – Delaware
- – District of Columbia
- – Connecticut
- – Maine
- – Massachusetts
- – Maryland
- – New Hampshire
- – New Jersey
- – New York
- – Pennsylvania
- – Rhode Island
- – Vermont
- – Virginia
- – West Virginia

### Education

- Embry Riddle Aeronautical University, Bachelor of Science in Aeronautical Science

### Professional Experience

As an experienced valuation professional, Mr. Gustafson's expertise spans leadership, management, professional development, training, strategic decision-making, and recruitment. His comprehensive understanding of all types of real estate valuation services, including appraisals, feasibility studies, real estate portfolios, financial reporting, estate planning, litigation support, property tax consulting, and sale-leasebacks, instills confidence in his ability to deliver successful outcomes. With a career that began as a staff appraiser in Chicago, he has advanced quickly into leadership roles at four nationally recognized valuation platforms. Most recently, Mr. Gustafson elected to forge his own valuation platform and instill the principles he has learned in successful organizations at both national and international levels. Core Values Appraisal & Advisory (CVAA) reflects the growth he experienced as a real estate professional. CVAA strives to be of service to their clients in the moment and readily be able to provide data integrity and analysis that is unmatched in the commercial real estate valuation space.

Corey Gustafson most recently served as Managing Director and New England Market Leader of CBRE Valuation and Advisory Services, overseeing the six-state New England Region. For his service in 2023, he was recognized as the Managing Director MVP for the United States. Before joining CBRE, Gustafson served as the Northeast Regional Managing Director for Apprise by Walker & Dunlop, with responsibilities in over 14 states. He was accountable for leadership, management, recruitment, business development and product development in this role. He established and led valuation offices in Boston, Hartford, New York, Philadelphia, Washington DC and Richmond. The role at Apprise provided a unique opportunity to aid in developing the next generation of valuation software. Prior to this, he was a managing director for Colliers International, where he led the firm's operations in the New England Region. He significantly increased the office's production during his tenure, demonstrating his ability to deliver results. His exceptional performance was acknowledged with the Everest Award at

# PROFILE

the company for two consecutive years (2018 and 2019), underscoring his successful track record.

### Pro Affiliations / Accreditations

- Member of the Appraisal Institute (MAI)
- Board of Directors, The Appraisal Institute Massachusetts-Rhode Island – Maine Chapter
- Counsellors of Real Estate (CRE) – New England Chapter

## Valuation Experience

### Debt & Equity

Mr. Gustafson has a wealth of experience in valuing a diverse range of property types, including retail, office, industrial and multifamily valuations. His retail valuations have covered a spectrum from single-tenant NNN leased (STNL) assets to regional shopping centers. Office valuations have ranged from free-standing, Class C owner-occupied buildings through Class A, institutional-quality, multibuilding campuses. Industrial valuations have spanned from small flex industrial properties through new construction warehouse distribution facilities, manufacturing space and cold storage. His multifamily properties have included small balance loan assets through suburban multiplying campuses and urban Class A apartment towers.  In particular, Mr. Gustafson's expertise has been in the life science valuations.  In addition to valuations for debt collateralization, he has extensive experience in fair market value estimates for financial reporting purposes.

### Litigation

Mr. Gustafson is experienced in estimating values relating to temporary easements, avigation easements, determining appropriate land rental rates, valuation of utility corridors, right-of-way and other corridor valuations and appraisal review services. He is an approved appraiser with the Departments of Transportation in Massachusetts, Maine, New Hampshire, Vermont, Connecticut, and Rhode Island.

Significant valuation assignments have included working as the lead appraisal firm on the O'Hare Modernization Project in Chicago, IL. This included the valuation of full takings, partial takings, damage estimates, and temporary construction easements for hundreds of properties for the purposes of an expansion of the O'Hare International Airport and construction of the Western O'Hare Bypass Highway. Additional assignments concerning significant eminent domain action include the WooSox Baseball Park development and the Merritt 7 railroad station development. Having completed additional appraisal, review and consulting assignments for right-of-way authorities, airport authorities, municipalities and law firms, Mr. Gustafson has a long history of valuation assignments related to condemnation, consultation, taxation protest and litigation support.

## Appraisal Education

- Successfully completed all courses and experience requirements to qualify for the MAI designation. Mr. Gustafson was awarded the designation in 2011 and has completed the requirements under the Appraisal Institute's continuing education program.
- *Business Practices and Ethics*, as offered by the Appraisal Institute

# PROFILE

- *Fundamentals of Separating Real Property, Personal Property and Intangible Business Assets*, as offered by the Appraisal Institute.
- *Residential and Commercial Valuation of Solar*, as offered by the Appraisal Institute
- *Data Science in Real Estate*, as offered by MIT SA+P
- *Certification of Completion for the Valuation of Conservation Easements* program, November 2, 2010, as offered by the American Society of Appraisers, the American Society of Farm Managers and Rural Appraisers and the Appraisal Institute and endorsed by the Land Trust Alliance.
- *Uniform Standards of Federal Land Acquisitions: Practical Applications*, as offered by the Appraisal Institute.
- *Residential and Commercial Valuation of Solar*, as offered by the Appraisal Institute
- *Eminent Domain and Condemnation Appraisal Practice in Massachusetts*, as offered by the Appraisal Institute

## Awards

- *Everest Award, Colliers International, 2018 – Top Producer, Valuations, in United States*
- *Everest Award, Colliers International, 2019 – Top Producer, Valuations, in United States*
- *CBRE Annual Recognition Award, MD MVP, 2023*

# PROFILE

## Representative Projects for Debt & Equity Valuations

| Project | Description |
|---|---|
| One Broadway, Cambridge, MA | Class A CBD Office Tower |
| 620 Memorial Drive, Cambridge, MA | Class A Laboratory Tower |
| One and Two International Place, Boston, MA | Class A, Trophy, two-tower office complex |
| 75-101 Federal Street, Boston, MA | Class A, CBD office tower |
| The District, Burlington, MA | Class A & B, 1MM+ SF office and retail development |
| Crosspoint, Lowell, MA | A Class A, suburban three-tower office development is undergoing repositioning and re-tenancy following extensive renovation. |
| Prospect Hill, Waltham, MA | Class B, suburban office complex |
| Stoney Brook, Waltham, MA | Class A suburban office asset |
| 301 Binney Street, Cambridge, MA | Class A laboratory asset |
| MIT Investment Management Corp. | Cambridge Portfolio including a mixture of office, life science, retail and development land, valuations for financial reporting |
| Cambridge Crossing | Life Science Development Parcels |
| Clippership Wharf, Boston, MA | Proposed, multibuilding, mixed-use (retail and residential) development of 478 attached housing units (apartment and condo). The property is further impacted by a ground lease. The property was valued for financial reporting purposes. |
| Echelon Seaport, Boston | A multi-tower, Class A, mixed-use (retail and residential) complex incorporating condominium ownership and rental units. The property is further impacted by a ground lease. The property was valued for financial reporting purposes. |
| Park Lane Seaport, Boston | A two-tower, Class A mixed-use (retail/residential/garage) complex that contains both rental and condominium ownership. The property is further impacted by a ground lease. The property was valued for financial reporting purposes. |
| Wellesley Office Park | An eight-building, Class B office park in suburban Boston for financial reporting purposes. |
| The Quad | A four-building, mixed-construction (Office/R&D/Industrial) complex that was acquired for repositioning. |

# PROFILE

## Representative Clients and Projects for Litigation

| Client/Project | Description |
|---|---|
| USACE / Mineral Rights | Developed an opinion of subsurface interests in the Oil and Gas Mineral Rights which can be used to estimate just compensation for the Benefit of the USACE. |
| NHDOT | Exit 4A Project: Establishing a full highway interchange and new associated roadways, requiring full and partial takings on approximately 150 parcels. |
| City of Worcester / Polar Park | Completed valuations of all full and partial takings associated with the development of the WooSox baseball stadium as well as a valuation of the completed baseball stadium |
| TAR – Charles Town Navy Yard | Targeted Asset Review program concerning the Charlestown Navy Yard and 15 State Street, concerning a multiyear consulting assignment dealing with the potential repositioning of the assets. |
| Connecticut DOT – Merritt 7 Railroad Station | A before/after valuation with a larger parcel determination and estimates of damages, parts taken, and special benefits |
| MBTA – Brookline Hills MBTA | A valuation of air rights takings and establishment of permanent easements for the purposes of expanding the Brookline High School of MBTA railroad tracks and reconfiguration of parking areas |
| Rhode Island DOT – Pawtucket Commuter Station | Developed a fair market value opinion of a parcel of land for possible eminent domain action for constructing the Pawtucket/Central Falls Commuter Rail Station Project |
| Town of Winchester | Appraisal Review Services for Tr-Community Bikeway Project Easements for the purpose of designing a 7-mile bike path connecting neighboring towns of Winchester, Woburn and Stoneham |
| Clarendon & Pittsfield RR | A 23-mile rail right-of-way from Whitehall Village NY to Rutland VT (Rail Corridor) |
| The Riverside Reload Center, Rockingham, VT | Rail Corridor and improvements |
| Chicago Metropolitan Water Reclamation District | Valuation for Acquisition Purposes, Melrose Park, IL |
| Commonwealth Edison Utility | Utility Corridor Valuation and Easement Valuation of impressment purposes within the Illinois Tollway right-of-way |
| SW Reliability Project | Appraisal Consulting Assignment (Utility Corridor) for the Illinois Tollway |
| Chicago Executive Airport | Appraisal Review Services for the benefit of Chicago Executive Airport |
| OMP and Western O'Hare By-Pass Project | Corridor Segments C01, CO2, CO3, C04, C05, and W04 (204 parcels) for full and partial acquisition and impressment of temporary easements |
| HNTB | Partial taking and damage estimates are for the benefit of the Illinois Department of Transportation in constructing a drainage culvert for a package of parcels. |
| Lansing Municipal Airport | Valuation for impressment of avigation easements for a package of parcels |

# Unofficial Property Record Card - Westborough, MA

## General Property Data

**Parcel ID** 32-48-0
**Account Number**
**Prior Parcel ID**
**Property Owner** TOWN OF WESTBOROUGH
**Property Location** 231 TURNPIKE RD
**Property Use** TAX TIT IMP
**Mailing Address** 34 WEST MAIN STREET
**Most Recent Sale Date** 1/21/2022
**Legal Reference** 66983-53
**City** WESTBOROUGH
**Grantor**
**Mailing State** MA **Zip** 01581
**Sale Price** 0
**ParcelZoning** BA
**Land Area** 29.336 acres

## Current Property Assessment

**Card 1 Value** **Building Value** 585,500 **Xtra Features Value** 515,800 **Land Value** 712,000 **Total Value** 1,813,300

## Building Description

| | | | | | |
|---|---|---|---|---|---|
| **Building Style** | THEATER | **Foundation Type** | CONCRETE | **Flooring Type** | CARPET |
| **# of Living Units** | 0 | **Frame Type** | STEEL | **Basement Floor** | N/A |
| **Year Built** | 1997 | **Roof Structure** | FLAT | **Heating Type** | FORCED H/A |
| **Building Grade** | COMM V GOOD | **Roof Cover** | TAR+GRAVEL | **Heating Fuel** | GAS |
| **Building Condition** | N/A | **Siding** | BRICK VENR | **Air Conditioning** | 100% |
| **Finished Area (SF)** | 47872 | **Interior Walls** | DRYWALL | **# of Bsmt Garages** | 0 |
| **Number Rooms** | 0 | **# of Bedrooms** | 0 | **# of Full Baths** | 0 |
| **# of 3/4 Baths** | 0 | **# of 1/2 Baths** | 6 | **# of Other Fixtures** | 0 |

## Legal Description

## Narrative Description of Property

**This property contains 29.336 acres of land mainly classified as TAX TIT IMP with a(n) THEATER style building, built about 1997 , having BRICK VENR exterior and TAR+GRAVEL roof cover, with 1 commercial unit(s) and 0 residential unit(s), 0 room(s), 0 bedroom(s), 0 bath(s), 6 half bath(s).**

## Property Images





Disclaimer: This information is believed to be correct but is subject to change and is not warranteed.

**Previous Assessments**

| Year | Code | Building | Yard Items | Land Value | Category | Total |
|---|---|---|---|---|---|---|
| 2024 | 937 - TAX TIT IMP | 585,500 | 515,800 | 712,000 | Final Value | 1,813,300 |
| 2023 | 364 - THEATER | 1,060,200 | 318,100 | 703,700 | Final Value | 2,082,000 |
| 2022 | 364 - THEATER | 1,060,200 | 231,000 | 703,700 | Final Value | 1,994,900 |
| 2021 | 364 - THEATER | 1,060,200 | 231,000 | 1,330,900 | Final Value | 2,622,100 |
| 2020 | 364 - THEATER | 887,700 | 201,900 | 4,149,500 | Final Value | 5,239,100 |
| 2019 | 364 - THEATER | 887,700 | 201,900 | 4,149,500 | Final Value | 5,239,100 |
| 2018 | 364 - THEATER | 5,109,400 | 201,900 | 3,953,500 | Final Value | 9,264,800 |
| 2017 | 364 - THEATER | 5,109,400 | 201,900 | 3,953,500 | Final Value | 9,264,800 |
| 2016 | 364 - THEATER | 5,109,400 | 201,900 | 3,953,500 | Final Value | 9,264,800 |
| 2015 | 364 - THEATER | 4,753,900 | 238,600 | 3,757,500 | Final Value | 8,750,000 |
| 2014 | 364 - THEATER | 4,753,900 | 238,600 | 3,757,500 | Final Value | 8,750,000 |
| 2013 | 364 - THEATER | 5,935,700 | 157,700 | 3,757,500 | Final Value | 9,850,900 |
| 2012 | 364 - THEATER | 5,378,000 | 158,800 | 3,795,700 | Final Value | 9,332,500 |
| 2011 | 364 - THEATER | 5,116,600 | 158,800 | 4,057,100 | Final Value | 9,332,500 |
| 2010 | 364 - THEATER | 5,612,000 | 181,800 | 4,057,100 | Final Value | 9,850,900 |
| 2009 | 364 - THEATER | 5,416,000 | 181,800 | 4,253,100 | Final Value | 9,850,900 |
| 2008 | 364 - THEATER | 4,984,700 | 183,300 | 3,933,200 | Final Value | 9,101,200 |
| 2007 | 364 - THEATER | 4,984,700 | 183,300 | 3,737,100 | Final Value | 8,905,100 |
| 2006 | 364 - THEATER | 4,984,700 | 183,300 | 3,266,700 | Final Value | 8,434,700 |
| 2005 | 364 - THEATER | 5,094,700 | 193,100 | 3,266,700 | Final Value | 8,554,500 |
| 2004 | 364 - THEATER | 5,094,700 | 193,100 | 3,266,700 | Final Value | 8,554,500 |
| 2003 | 364 - THEATER | 5,094,700 | 193,100 | 3,266,700 | Final Value | 8,554,500 |
| 2002 | 364 - THEATER | 0 | 0 | 0 | Final Value | 0 |
| 2001 | 364 - THEATER | 0 | 0 | 0 | Final Value | 0 |
| 2000 | 364 - THEATER | 0 | 0 | 0 | Final Value | 0 |
| 1999 | 364 - THEATER | 0 | 0 | 0 | Final Value | 0 |
| 1998 | 364 - THEATER | 0 | 0 | 0 | Final Value | 0 |

## Building Areas with Alternative Finishes

| Area | Percent Usable | Alternate Type | Alternate Percent | Quality | # of Tenants |
|---|---|---|---|---|---|

## Building Areas

| Sub Area | Sketched Area | Finished Area | Perimeter |
|---|---|---|---|
| FFL 1ST FLOOR | 47,872 | 47,872 | 1,028 |
| CNP CANOPY | 1,050 | 0 | 178 |

**Inspection Info**

| Inspection Date | Inspector ID | Results |
|---|---|---|
| 12/12/2012 | 40 | 2 - MEAS/EXT INS |

**Building Permits**

| Date | Number | Description | Amount |
|---|---|---|---|
| 2017-11-27 | CG-2017-00177 | DEMO - DEMOLITION | |
| 2017-11-07 | CG-2017-00168 | DEMO - DEMOLITION | |
| 2013-03-21 | 134-2013 | MN - MANUAL | |
| 2003-10-21 | 470/2003 | SIGN - SIGN | |
| 1995-07-21 | 314/95 | MN - MANUAL | |

**Comments**

| |
|---|
| **486-1997 5-97 STEEL + EXT WALL. 110-94/SEE WHITE CARD FOR 32/2B, MEASURED PAVING WITH GIS TOOL - REGAL LEASE EXPIRED 11/2017 TAX BILL WAS CHANGED BACK TO OWNER OF TITLE ON DEED FY2018 EXPENSE DATA TO BE ENTERED FY19 I&E RETURNED BY PO/UNABLE TO FORWARD.** |

HOME | SEARCH | SUMMARY | INTERIOR | EXTERIOR | SALES | ABOUT

| Printable Record Card | Yard Items | Permits |

WebPro

Card 1 of 1

**Building Information**

| | |
|---|---|
| **Building Type** THEATER | **Frame** STEEL |
| **Living Units** | **House Color** |
| **Primary Exterior Siding** BRICK VENR | **Grade** COMM V GOOD |
| **Second Exterior Siding** CONC BLOCK | **Story Height** 2 |
| **Roof Structure** FLAT | **Year Built** 1997 |
| **Roof Cover** TAR+GRAVEL | **Foundation** CONCRETE |

**Condominium Information**

| | |
|---|---|
| **Condo Complex Name** N/A | **Unit Number** N/A |
| **Unit Location** N/A | **Unit Ownership** 0% |

HOME | SEARCH | SUMMARY | INTERIOR | EXTERIOR | SALES | ABOUT

| Printable Record Card | Rooms and Bedrooms | Building Sq. Footage |

WebPro

Card 1 of 1

| | | | |
|---|---|---|---|
| **Primary Interior Walls** | DRYWALL | **Electric** | TYPICAL |
| **Second Interior Walls** | 0 | **Insulation** | TYPICAL |
| **Primary Floor Cover** | CARPET | **Heat Fuel** | GAS |
| **Second Floor Cover** | N/A | **Heat Type** | FORCED H/A |
| **Basement Floor** | N/A | **Fireplaces** | 0 |
| **# Basement Garages** | 0 | **Full Baths** | 0 |
| **Wood Stove Flues** | 0 | **Additional Full Bath** | 0 |
| **Solar Hot Water** | No | **3/4 Bath** | 0 |
| **Central Vacuum** | No | **Additional 3/4 Bath** | 0 |
| **Common Wall** | 0 | **1/2 Bath** | 6 |
| **Percent Sprinkled** | 100% | **Additional 1/2 Bath** | 0 |
| **Heating Systems** | 1 | **Kitchens** | 2 |
| **Percent Heated** | 100% | **Additional Kitchens** | 0 |
| **Air Conditioned** | 100% | **Other Fixtures** | 0 |

**Sales**

| Sale Date | Sale Price | Legal Reference | Grantor | Land Use Code at Sale |
|---|---|---|---|---|
| 1/21/2022 | 0 | 66983-53 | | 364 |

**Special Features and Yard Items**

| Type | Quantity | Units | Quality | Condition | Built |
|---|---|---|---|---|---|
| 66 - CANOPY | 1 | 600 | G | Good | 1997 |
| 77 - LITE-SIN | 6 | 1 | G | Good | 1998 |
| 78 - LITE-DBL | 9 | 1 | G | Good | 1997 |
| 84 - SIGN-ILU | 1 | 184 | G | Good | 1998 |
| 85 - PAVING | 1 | 169020 | G | Good | 1998 |
| 87 - FENCE-4 | 1 | 390 | G | Good | 1998 |

**Zoning Data**

| ZoningCode | Percent |
|---|---|
| BA | 100 |

**Utilities**

| UtilitiesCode |
|---|

**Location**

| Topography | Streetcode | Traffic | Ass.Map | Census | Fl.Hazard |
|---|---|---|---|---|---|
| | | | | | |

**District Data**

| DistrictCode | Percent |
|---|---|
| D - DEFAULT | |


LOCUS MAP
OAK STREET
LOT 1
1,277,351 ± S.F.
or 29.324 ± AC.
LOT 2
564,773 ± S.F.
or 12.965 ± AC.
LOT 3
245,654 ± S.F.
or 5.644 ± AC.
PARCEL 4
102,128 ± S.F.
or 2.345 ± AC.
OAK STREET
MILK STREET
BOSTON – WORCESTER TURNPIKE
OWNER:
TRUSTEE OF NORTHSIDE
REALTY TRUST
18210/372
PLAN OF LAND
WESTBOROUGH, MA
BEALS AND THOMAS, INC.




Stage Coach Plaza
Westborough, Massachusetts

New England Management & Realty Corp.
55 New York Avenue
Framingham, Massachusetts

# UTILITY SERVICES EXHIBIT PLAN

Scale: 1"= 250'

Date: MARCH 20, 1997

File No.: 0045028M

BEALS AND THOMAS, INC.

# Former Showcase Cinemas

Comparable 1



## Sale Information

| | | |
|---|---|---|
| Buyer | Demoulas Super Markets In | |
| Seller | NAI Entertainment Hldg LL | |
| Sale Date | 7/11/2024 | |
| Transaction Status | Recorded | |
| Sale Price | $9,500,000 | $224 /SF NRA |
| Analysis Price | $9,500,000 | $224 /SF NRA |
| Recording Number | 28935-192 | |
| Rights Transferred | Fee Simple | |
| Financing | Cash to Seller | |
| Conditions of Sale | Arms-Length | |

## Property

| | |
|---|---|
| Type | Retail, Movie Theatre |
| Gross Building Area (GBA) | 42,432 SF |
| Net Rentable Area (NRA) | 42,432 SF |
| Buildings | 1 Building, 1 Floor |
| Parking | 1200 Spaces (28.3/1,000 SF NRA) |
| Year Built | 1997 |
| Land Area | 16.43 Acres (715,691 SF) |
| Site Coverage Ratio | 5.93% |
| FAR | 0.06 |
| Zoning | HB |
| Shape | Generally Rectangular |
| Topography | Level |
| Corner | No |

100 Commerce Way
Seekonk, MA 02771-5820




County
Bristol

Submarket
Attleboro/New Bedford

APN
2650070000003340

## Confirmation

| | |
|---|---|
| Date | 10/9/2024 |

## Remarks

This property is a one-story, purpose-built movie theater property that was built in 1998. While thee are some wetlands on-site, they generally exist in setback area and do not impact the usable area of the site.

The property was 100% occupied by the owner, and the sale involved a leaseback period to the seller. A national supermarket store operator purchased the building and plans to convert it to a grocery store. Information regarding this sale was obtained from CoStar Comps and was verified with public records (including Assessor, Recorder of Deeds, Zoning and GIS data) and published sources. Although attempts were made to confirm the pertinent details of this transaction with parties that were first-hand to this transaction, they were either unavailable or unwilling to do so.

# Former Campus Cinema

Comparable 2



## Sale Information

| | | |
|---|---|---|
| Buyer | Trinity Hldg Llc | |
| Seller | Campus Cinema Llc | |
| Sale Date | 5/6/2024 | |
| Transaction Status | Recorded | |
| Sale Price | $1,100,000 | $187 /SF NRA |
| Analysis Price | $1,100,000 | $187 /SF NRA |
| Recording Number | 001879000446 | |
| Rights Transferred | Fee Simple | |
| Financing | Cash to Seller | |
| Conditions of Sale | Arms-Length | |

## Property

| | |
|---|---|
| Type | Retail, Movie Theatre |
| Gross Building Area (GBA) | 10,413 SF |
| Net Rentable Area (NRA) | 5,889 SF |
| Buildings | 1 Building, 2 Floors |
| Parking | 14 Spaces (2.4/1,000 SF NRA) |
| Year Built | 1900 |
| Land Area | 0.57 Acres (24,830 SF) |
| Site Coverage Ratio | 19.53% |
| FAR | 0.42 |
| Zoning | CD |
| Shape | Generally Rectangular |
| Topography | Level |
| Corner | No |

17 Columbia St
South Kingstown, RI 02879




County
Washington

Submarket
Washington County

APN
57-1-175

## Confirmation

| | |
|---|---|
| Date | 10/9/2024 |

## Remarks

This property is a one-story, movie theater property that was built circa 1900. The stated GBA includes an unfinished basement level (4,524 SF), but is not included in the NRA.

This comparable was purchased for conversion from a movie theater to use as a marijuana dispensary. Information regarding this sale was obtained from CoStar Comps and was verified with public records (including Assessor, Recorder of Deeds, Zoning and GIS data) and published sources. Although attempts were made to confirm the pertinent details of this transaction with parties that were first-hand to this transaction, they were either unavailable or unwilling to do so.

# Island Cinemas

Comparable 3




## Sale Information

| | | |
|---|---|---|
| Buyer | Aquidneck Acquisition Llc | |
| Seller | Mmr Llc | |
| Sale Date | 3/27/2024 | |
| Transaction Status | Recorded | |
| Sale Price | $3,000,000 | $75 /SF NRA |
| Analysis Price | $3,000,000 | $75 /SF NRA |
| Recording Number | 001825000067 | |
| Rights Transferred | Fee Simple | |
| Financing | Cash to Seller | |
| Conditions of Sale | Arms-Length | |

## Property

| | |
|---|---|
| Type | Retail, Vacant - Residential |
| Gross Building Area (GBA) | 47,912 SF |
| Net Rentable Area (NRA) | 39,876 SF |
| Buildings | 1 Building, 1 Floor |
| Parking | 191 Spaces (4.8/1,000 SF NRA) |
| Year Built | 1969 (Renovated 1969) |
| Land Area | 3.11 Acres (135,472 SF) |
| Site Coverage Ratio | 29.43% |
| FAR | 0.35 |
| Zoning | GB |
| Shape | Generally Rectangular |
| Topography | Level |
| Corner | No |

866 W Main Rd
Middletown, RI 02842




County
Newport

Submarket
Newport County

APN
106-150; -151; -152

## Confirmation

| | |
|---|---|
| Date | 10/9/2024 |

## Remarks

This property is a one-story, purpose-built movie theater property that was built in 1969.

The property was in above-average condition, as the seller renovated it in 2019, including the addition of luxury reclining seats in all 10 auditoriums. Before the renovation, the cinema could seat 1,430 people, but it was reduced to 721. The cinema operated through January 2024 before the sale. Information regarding this sale was obtained from CoStar Comps and was verified with public records (including Assessor, Recorder of Deeds, Zoning and GIS data) and published sources. Although attempts were made to confirm the pertinent details of this transaction with parties that were first-hand to this transaction, they were either unavailable or unwilling to do so.

# Former Flagship Cinemas

Comparable 4



## Sale Information

| | | |
|---|---|---|
| Buyer | NSTAR Electric Company | |
| Seller | Steamship Associates, LLC | |
| Sale Date | 12/7/2021 | |
| Transaction Status | Recorded | |
| Sale Price | $5,200,000 | $198 /SF NRA |
| Analysis Price | $5,200,000 | $198 /SF NRA |
| Recording Number | 56129-190 | |
| Rights Transferred | Fee Simple | |
| Financing | Cash to Seller | |
| Conditions of Sale | Arms-Length | |

## Property

| | |
|---|---|
| Type | Retail, Movie Theatre |
| Gross Building Area (GBA) | 26,284 SF |
| Net Rentable Area (NRA) | 26,284 SF |
| Buildings | 1 Building, 2 Floors |
| Parking | 330 Spaces (12.6/1,000 SF NRA) |
| Year Built | 2003 |
| Land Area | 19 Acres (827,640 SF) |
| Site Coverage Ratio | 1.64% |
| FAR | 0.03 |
| Zoning | IND |
| Shape | Generally Rectangular |
| Topography | Level |
| Corner | No |

37 Doty Street
Wareham, MA 02576




County
Plymouth

Submarket
Route 3 South

APN
103-A1

## Confirmation

| | |
|---|---|
| Date | 10/9/2024 |

## Remarks

This property is a one-story, purpose-built movie theater property that was built in 2003.

At the time of sale, Flagship Cinemas operated the property. The project proposes converting the former Flagship Cinema location into an Eversource training facility with associated parking and delivery areas, utility and stormwater improvements. The facility will also be a utility crew storm/power outage staging area for crew assignments and emergency response. Information regarding this sale was obtained from CoStar Comps and was verified with public records (including Assessor, Recorder of Deeds, Zoning and GIS data) and published sources. Although attempts were made to confirm the pertinent details of this transaction with parties that were first-hand to it, they were either unavailable or unwilling to do so.

# Former Flagship Cinemas

Comparable 5



## Sale Information

| | | |
|---|---|---|
| Buyer | Appletree Properties, LLC | |
| Seller | Slate Asset Management | |
| Sale Date | 12/30/2020 | |
| Transaction Status | Closed | |
| Sale Price | $1,435,000 | $36 /SF NRA |
| Analysis Price | $1,435,000 | $36 /SF NRA |
| Recording Number | 6215/2854 | |
| Rights Transferred | Fee Simple | |
| Financing | Cash to Seller | |
| Conditions of Sale | Arms-Length | |

## Property

| | |
|---|---|
| Type | Special Purpose, Movie Theater |
| Gross Building Area (GBA) | 39,871 SF |
| Net Rentable Area (NRA) | 39,871 SF |
| Buildings | 1 Building, 2 Floors |
| Foundation | Concrete |
| Year Built | 2003 (Renovated 2003) |
| Land Area | 8.3328 Acres (362,978 SF) |
| Site Coverage Ratio | 10.39% |
| FAR | 0.11 |
| Zoning | IND4 |
| Shape | Irregular |
| Topography | Level |

10 Ashleigh Drive
Derry, NH 03038




County
Rockingham

Submarket
Stratford County

APN
8-280

## Confirmation

| | |
|---|---|
| Name | Ralph Valentine |
| Company | The Valentine Group |
| Affiliation | Buyers Broker |
| Date | 10/9/2024 |

## Remarks

This property is a purpose-built movie theater property that was built in 2003.

The comparable is an arms-length transaction in an off-market transaction, as the buyer engaged the seller directly. The property was vacant at the time of sale and planned for conversion to an alternative use. The buyer originally planned to convert the facility to a new car dealership, but the impact of the COVID pandemic caused them to change plans for use as a warehouse facility. The interior cinema configuration would be removed, at a reported cost approximating $1,200,000. A high-risk flood zone affected a portion of the site, but the improvements were not impacted. Information regarding this sale was obtained from CoStar Comps and verified with public records (including Assessor, Recorder of Deeds, Zoning and GIS data) and published sources. Details of this transaction, including sale price, sale date and sale conditions, were confirmed with Ralph Valentine of the Valentine Group.

# Development Land

Comparable 1




## Sale Information

| | | |
|---|---|---|
| Buyer | 339 Boston Post Road Owner LLC | |
| Seller | Heritage Farm LLC | |
| Sale Date | 5/3/2024 | |
| Transaction Status | Recorded | |
| Sale Price | $4,000,000 | $4.99 /SF Land |
| Analysis Price | $4,000,000 | $4.99 /SF Land |
| Recording Number | 82738-088 | |
| Rights Transferred | Fee Simple | |
| Financing | Cash to Seller | |
| Conditions of Sale | Arms-Length | |

## Property

| | |
|---|---|
| Land Area | 18.3897 Acres (801,054 SF) |
| Number of Parcels | 4 |
| Zoning | B & A2 |
| Shape | Irregular |
| Topography | Slope to Rear |
| Corner | No |

339 Boston Post Rd E
Marlborough, MA 01752




County
Middlesex

Submarket
Marlborough

APN
73-28, 73-27, 73-24

## Confirmation

| | |
|---|---|
| Date | 10/10/2024 |

## Remarks

This comparable is a former McGee Farm property that has been sold for use as a multifamily development containing 140 units within 162,920 SF. The property was fully entitled at the time of sale. The land was only partially cleared and generally raw at the time of sale; further, the site is noncontiguous. The property appears to be heavily impacted by high-risk flood zones and wetlands in its rear. Information regarding this sale was obtained from CoStar comps and verified with public records and published sources.

# Development Land

Comparable 2




## Sale Information

| | |
|---|---|
| Buyer | 21 Jungle Road LLC |
| Seller | G and T Realty Trust |
| Sale Date | 2/28/2024 |
| Transaction Status | Recorded |
| Sale Price | $1,100,000 — $4.64 /SF Land |
| Analysis Price | $1,100,000 — $4.64 /SF Land |
| Recording Number | 10723/276 |
| Rights Transferred | Fee Simple |
| Financing | Cash to Seller |
| Conditions of Sale | Arms-Length |
| Marketing Time | 175 days |

## Property

| | |
|---|---|
| Land Area | 5.444 Acres (237,141 SF) |
| Number of Parcels | 1 |
| Zoning | Industrial |
| Shape | Generally Rectangular |
| Topography | Level |
| Corner | Yes |

21 Jungle Rd
Leominster, MA 01453-5207




County
Worcester

Submarket
Fitchburg/Leominster

APN
301-1

## Confirmation

| | |
|---|---|
| Name | Taylor Healey |
| Company | Foster-Healey Real Estate |
| Affiliation | Seller's Broker |
| Date | 10/10/2024 |

## Remarks

This property is a generally rectangular, corner, land parcel that has an industrial zoning and is vacant, raw land. Public sewer is available at the street to the southwest along Jungle Road.

This comparable is a development site purchased for industrial use. According to the broker, the property was approved for a 67,500 SF industrial building to be delivered in 2025 and was fully permitted at the time of sale. The property was under contract for about a year, while the buyer got all the approvals in place. There was a SFR on-site that needs to be razed by the buyer. Information regarding this sale was obtained from CoStar Comps, verified with public records and published sources and confirmed with the listing broker.

# Development land

Comparable 3



## Sale Information

| | | |
|---|---|---|
| Buyer | ARE-MA Region No. 104 Owner, LLC | |
| Seller | Triboro Real Estate, LLC | |
| Sale Date | 3/15/2023 | |
| Transaction Status | Recorded | |
| Sale Price | $13,250,000 | $8.55 /SF Land |
| Analysis Price | $13,250,000 | $8.55 /SF Land |
| Recording Number | 68919-068 | |
| Rights Transferred | Fee Simple | |
| Financing | Cash to Seller | |
| Conditions of Sale | Arms-Length | |

## Property

| | |
|---|---|
| Land Area | 35.596 Acres (1,550,563 SF) |
| Number of Parcels | 1 |
| Zoning | IB |
| Shape | Irregular |
| Topography | Level |
| Corner | No |
| Utilities | All to Site |

29 Research Dr
Westborough, MA 01581




County
Worcester

Submarket
The Boroughs

APN
35-133-0

## Confirmation

| | |
|---|---|
| Date | 10/10/2024 |

## Remarks

This property is an under-utilized development parcel along Route 9 and just west of the I-495 intersection.

This comparable is a parcel that was purchased for the development of a life sciences campus by a national life sciences investor. Two month's earlier, Alexandria Real Estate had also purchased a neighboring BJ's Wholesale Club for $32MM. Approvals for the development began in 2022 with Samuels & Associates proposing demolition of the existing improvements and development of a 715,000 SF life sciences, office and manufacturing campus; it was approved in September of 2022. Information regarding this sale was obtained from CoStar Comps, and verified with public records and other published sources.

# Development Land

Comparable 4



## Sale Information

| | | |
|---|---|---|
| Buyer | Brandt Lane Development, LLC | |
| Seller | The Brandt Living Trust | |
| Sale Date | 3/17/2023 | |
| Transaction Status | Recorded | |
| Sale Price | $4,300,000 | $5.88 /SF Land |
| Analysis Price | $4,300,000 | $5.88 /SF Land |
| Recording Number | 68959/58 | |
| Rights Transferred | Fee Simple | |
| Financing | Cash to Seller | |
| Conditions of Sale | Arms-Length | |

## Property

| | |
|---|---|
| Land Area | 16.8 Acres (731,808 SF) |
| Number of Parcels | 1 |
| Zoning | RL 7, BL 1.0, BG 2.0 |
| Shape | Irregular |
| Topography | Level |
| Corner | No |

1029 Grafton
Worcester, MA 01604




County
Worcester

Submarket
Worcester Metro

APN
38-026-00044

## Confirmation

| | |
|---|---|
| Date | 10/10/2024 |

## Remarks

This property is a highly irregularly shaped land parcel with an interior block position. It maintains limited frontage to Grafton Street. It has been improved with only minor commercial improvements and appears to have been utilized for yard storage.

This comparable is an arms-length transfer of a development parcel that sold without entitlements. There was not a defined development plan at the time of sale. Information regarding this sale was obtained from CoStar Comps and verified with public records and published sources.

Prepared by Corey Gustafson

corey@coreval.co

# Vacant Land

Comparable 5




## Sale Information

| | | |
|---|---|---|
| Buyer | Galaxy Development LLC | |
| Seller | New Garden Park Inc | |
| Sale Date | 2/16/2023 | |
| Transaction Status | Recorded | |
| Sale Price | $3,300,000 | $2.69 /SF Land |
| Analysis Price | $3,300,000 | $2.69 /SF Land |
| Recording Number | 68834-044 | |
| Rights Transferred | Fee Simple | |
| Financing | Cash to Seller | |
| Conditions of Sale | Arms-Length | |

## Property

| | |
|---|---|
| Land Area | 28.182 Acres (1,227,607 SF) |
| Number of Parcels | 2 |
| Zoning | RL-7 & BG-2 |
| Shape | Irregular |
| Topography | Level |
| Corner | Yes |
| Utilities | All to Site |

305 Belmont Street
Worcester, MA 01604-1681




County
Worcester

Submarket
Worcester Metro

APN
57-004-B103B, 57-004-B1-02

## Confirmation

| | |
|---|---|
| Date | 10/10/2024 |

## Remarks

This property is a part of a larger, 46-acre campus known as the Reactory Biomanufacturing Campus. It consists of two, noncontiguous parcels on that campus.

This comparable is the sale of Lots 7 and 8 on the campus; there was a third lot that sold for an additional $700,000 that is not represented in this comparable. The reactor campus has seen development of a series of biomanufacturing facilities associated with the Abbvie Research Laboratory. Plans reportedly call for development of a 470,000 SF facility.

Prepared by Corey Gustafson

corey@coreval.co

# Development Land

Comparable 6



## Sale Information

| | | |
|---|---|---|
| Buyer | Baystone Ashland Llc | |
| Seller | Ashland Chestnut Realty LLC | |
| Sale Date | 1/25/2023 | |
| Transaction Status | Recorded | |
| Sale Price | $4,176,000 | $13.45 /SF Land |
| Analysis Price | $4,176,000 | $13.45 /SF Land |
| Recording Number | 81204-444 | |
| Rights Transferred | Fee Simple | |
| Financing | Cash to Seller | |
| Conditions of Sale | Arms-Length | |

## Property

| | |
|---|---|
| Land Area | 7.1271 Acres (310,457 SF) |
| Number of Parcels | 1 |
| Zoning | WMUSDA - A |
| Shape | Irregular |
| Topography | Level |
| Corner | Yes |
| Utilities | All to Site |

130 Chestnut Street
Ashland, MA 01721




County
Middlesex

Submarket
Hopkinton/Holliston

APN
20-271

## Confirmation

| | |
|---|---|
| Date | 10/10/2024 |

## Remarks

This property is an irregularly shaped corner land parcel positioned along a secondary roadway.

This comparable is an arms-length transfer of a development parcel. The property was approved for development of a 17-unit multifamily campus with 10,500 SF of retail space and 357 parking spaces, in the September preceding the sale. Information regarding this sale was obtained from CoStar Comps and verified with public records and published sources.

Prepared by Corey Gustafson

corey@coreval.co

Please visit our web site at http://www.mass.gov/dpl/boards/RA

COREY W GUSTAFSON
33 ARCH STREET
28TH FLOOR
BOSTON, MA 02110

(RA)

Fold, Then Detach Along All Perforations

COMMONWEALTH OF MASSACHUSETTS
DIVISION OF OCCUPATIONAL LICENSURE
BOARD OF
REAL ESTATE APPRAISERS
ISSUES THE FOLLOWING LICENSE CERT
GEN. REAL ESTATE APPRAISER

COREY W GUSTAFSON
33 ARCH STREET
28TH FLOOR
BOSTON, MA 02110

LICENSEE SIGNATURE

| LICENSE NUMBER | EXPIRATION DATE | SERIAL NUMBER |
|---|---|---|
| 103759 | 10/23/2025 | 498896 |

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned, Christine E. Devine, hereby certifies that on this day a copy of the following has been sent to all parties listed on the attached Service List in the manner noted thereon:

- **Notice of Appraisal.**

Dated: November 8, 2024

/s/ Christine E. Devine
Christine E. Devine, Esq.
Nicholson Devine LLC
P.O. Box 7
Medway, MA 02053
Phone: 508-533-7240
Email: christine@nicholsondevine.com

Electronic Mail Notice List

The following list of parties and attorneys have received electronic notice via the Court's CM/ECF noticing process:

- **Jeffrey T Blake** jblake@k-plaw.com
- **Paul W. Carey** pcarey@mirickoconnell.com, bankrupt@mirickoconnell.com
- **Jose C. Centeio** jcc@natgolaw.com
- **Christine E. Devine** christine@nicholsondevine.com, devine.christiner109603@notify.bestcase.com
- **Jonathan R. Goldsmith** bankrdocs1@gkalawfirm.com, bankrdocs@gkalawfirm.com
- **Jonathan R. Goldsmith** trusteedocs1@gkalawfirm.com, trusteedocs@gkalawfirm.com;mwolohan@gkalawfirm.com;MA43@ecfcbis.com
- **Stephen F. Gordon** sgordon@gordonfirm.com, vhaggerty@gordonfirm.com;notices@gordonfirm.com;stephenfgordon@gmail.com
- **Richard King** USTPRegion01.WO.ECF@USDOJ.GOV
- **Samual A. Miller** samual.miller@akerman.com
- **Brian W. Riley** briley@k-plaw.com
- **Roger L. Smerage** rsmerage@k-plaw.com

Email and/or First Class Mail, Postage Prepaid Notice List

The following list of parties and attorneys have been serviced via First Class Mail Postage Prepaid and via email as noted:

Lolonyon Akouete Via Email and First Class Mail
800 Red Milles Rd
Wallkill, NY 12589
info@smartinvestorsllc.com

Denise Edwards Via Email and First Class Mail
137 North 25th Street
Wyandanch, NY 11798
deniseedwards818@yahoo.com

Mark S. Lichtenstein Via Email
Akerman LLP
1251 Avenue of the Americas
37th Floor
New York, NY 10020
mark.lichtenstein@akerman.com

Lenard Benson Zide, Esq.
Butters Brazilian LLP Via Email
420 Boylston Street, 4th Floor
Boston, MA 02116
zide@buttersbrazilian.com

Jonathan La Liberte Via Email
Sherin and Lodgen LLP
101 Federal Street, 30th Floor
Boston, MA 02110
jclaliberte@sherin.com

Corey Gustafson Via Email
Core Values Appraisal & Advisory, Inc.
60 Surry Drive
Cohasset, MA 02025
corey@coreval.co

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br>Westborough SPE LLC<br><br>Debtor | Chapter 7<br>23-40709-CJP |

**ORDER**

**MATTER:**
#413 Expedited Motion filed by Trustee Jonathan R. Goldsmith For Authority (Re: 190 Motion to Approve) To Withdraw Settlement Motion and to Convert November 18th Hearing to Non-Evidentiary Status Conference.

GRANTED IN PART AND DENIED IN PART AS FOLLOWS.

THE TRUSTEE IS HEREBY AUTHORIZED TO WITHDRAW THE MOTION OF CHAPTER 7 TRUSTEE FOR APPROVAL OF SETTLEMENT AGREEMENT [ECF NO. 190] ("SETTLEMENT MOTION") AND THE SETTLEMENT MOTION IS WITHDRAWN. THE EVIDENTIARY HEARING SCHEDULED FOR NOVEMBER 18, 2024 IS CANCELED.

THE COURT HEREBY RESCHEDULES THE NOVEMBER 18, 2024 STATUS CONFERENCES REGARDING THE (i) TOWN OF WESTBOROUGH'S MOTION FOR RELIEF FROM AUTOMATIC STAY [ECF NO. 20] AND (ii) THE TOWN OF WESTBOROUGH'S MOTION TO DISMISS BANKRUPTCY CASE [ECF NO. 69] FILED IN THE MAIN CASE AND (ii) THE NOTICE OF REMOVAL REGARDING TOWN OF WESTBOROUGH V. WESTBOROUGH SPE LLC FILED BY THE CHAPTER 7 TRUSTEE, JONATHAN R. GOLDSMITH [ECF NO. 1], (iv) THE MOTION OF THE TOWN OF WESTBOROUGH TO REMAND AND/OR ABSTAIN FROM HEARING TAX FORECLOSURE ACTION [ECF NO. 2], AND (v) THE MOTION OF LOLONYON AKOUETE IN SUPPORT OF THE CHAPTER 7 TRUSTEE'S NOTICE OF REMOVAL AND REQUEST FOR DECISION ON DEBTOR'S MOTION TO VACATE FORECLOSURE JUDGMENT [ECF NO. 3] FILED IN AP NO. 24-4006 TO TUESDAY, NOVEMBER 19, 2024 AT 1:30 P.M. THE COURT ALSO SCHEDULES A GENERAL STATUS CONFERENCE IN THE MAIN CASE [ECF NO. 1] FOR THAT SAME DATE AND TIME.

THE STATUS CONFERENCES SHALL BE CONDUCTED IN COURTROOM 3, HAROLD DONOHUE FEDERAL BUILDING AND COURTHOUSE, 595 MAIN STREET, WORCESTER, MASSACHUSETTS 01608, WITH THE OPTION FOR PARTIES IN INTEREST TO APPEAR BY ZOOM VIDEO. TO OBTAIN THE VIDEO ACCESS INFORMATION, PARTIES IN INTEREST SHALL EMAIL THE COURTROOM DEPUTY AT: CJP_COURTROOM_DEPUTY@MAB.USCOURTS.GOV BY NO LATER THAN NOVEMBER 18 2024 AT 4:30 P.M. PROVIDING THE CONTACT INFORMATION FOR THE PARTY SEEKING TO APPEAR BY VIDEO.

Dated: 11/13/2024

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

**TRUSTEE'S (I) SECOND OBJECTION TO CLAIMS OF LOLONYON AKOUETE AND**
**<u>(II) REQUEST FOR ENTRY OF PRETRIAL SCHEDULING ORDER</u>**
**(Claim Nos. 4.1, 4.2, and 4.3)**

Jonathan R. Goldsmith, the Chapter 7 trustee (the "Trustee") of the bankruptcy estate (the "Estate") of Westborough SPE LLC (the "Debtor"), pursuant to 11 U.S.C. § 502, Fed. R. Bankr. P. 3007, and MLBR 3007-1, hereby objects to the claims of Lolonyon Akouete ("Akouete") and, further, requests that this Court enter a preliminary scheduling and pretrial order as set forth below.

In support of this Objection, the Trustee states as follows:

**<u>BACKGROUND</u>**

1. On August 31, 2023 (the "Petition Date"), certain creditors of the Debtor filed an involuntary petition under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

2. On October 11, 2023, this Court entered an Order for Relief in this case [Dkt. No. 26] and this case remains a Chapter 7 case at this time.

3. On October 12, 2023, the United States Trustee appointed Jonathan R. Goldsmith as Chapter 7 trustee [Dkt. No. 29] and the Trustee remains as Trustee at this time.

**<u>OBJECTION</u>**

4. Mr. Akouete has filed three (3) proof of claim forms in this case as follows:

a. Claim number 4.1 on the claims register, which claim asserts an unsecured claim in the amount of $625,297.02;

b. Amended Claim number 4.2 on the claims register, which amends the prior claim and asserts an unsecured claim in the amount of $1,250,594.05; and

c. Amended Claim number 4.3 on the claims register, which amends the prior claims and asserts an unsecured claim in the amount of $3,146,823.50. Claim No 4.1, Claim No 4.2, and Claim No. 4.3 are collectively referred to herein as the "Claims".

5. On November 6, 2024, the Trustee filed the Trustee's Objection to Claims of Lolonyon Akouete (Claim Nos. 4.1 and 4.2) [Dkt. No. 410] (the "First Objection to Akouete Claims").

6. Regarding Mr. Akouete's recent submission of his Claim No. 4.3, the Trustee hereby restates and reaffirms the objections set forth in the First Objection to Akouete Claims, which objections may be summarized as follows: (i) Akouete has no entitlement to a "finder's fee" in connection with the Trustee's recovery of $1,293,646 from the State of California (the "California Funds"), (ii) Akouete has pointed to no other statutory basis pursuant to which he is entitled to an allowable claim against the estate,[1] (iii) Akouete has no right to payment for services provided by Mr. Akouete "as manager" of the Debtor and all of Mr. Akouete's attempts to become manager of the Debtor were (at best) ineffective or (at worst) fraudulent, (iv) Akouete is not employed by the Estate or by the Trustee and, therefore is not entitled to compensation from the Estate for any purported post-petition services provided, and (v) Akouete has failed to provide sufficient information to establish a claim based on a *quantum meruit* basis or similar.

---

[1] On November 10, 20024, Mr. Akouete filed a Response to Trustee's Objection to Claims of Lolonyon Akouete [Dkt. No. 416] and in that pleading Mr. Akouete references various "whistleblower" statutes. All of the references to whistleblower statutes are inapplicable to Mr. Akouete's purported claims and the Trustee reserves the right to object further should Mr. Akouete explain and further pursue such claims.

7. In the First Objection to Akouete Claims, the Trustee noted Mr. Akouete could potentially supplement his Claims to demonstrate the value of his pre-petition efforts on behalf of the Debtor to attempt to justify a reasonable claim based on *quantum meruit* principles. Mr. Akouete declined to do so and, instead, filed Claim No. 4.3 which, without any reasonable basis, increased Mr. Akouete's claim by more than $1.8 million. There is simply no legal basis for Mr. Akouete to assert that his claim is increasing during this Chapter 7 bankruptcy case when Mr. Akouete is not employed by the estate.

**PRELIMINARY SCHEDULING AND PRETRIAL ORDER**

8. Regarding the Akouete Claims, the Trustee requests that the parties have 90 days to complete discovery from and after the entry of a preliminary scheduling and pretrial order ("Pretrial Order") by this Court.

WHEREFORE, the Trustee respectfully requests this Court enter an Order (i) sustaining the Trustee's Objections to the Akouete Claims, (ii) entering a Pretrial Order as set forth above and (iii) granting such other and further relief as is just.

Respectfully submitted,

**Jonathan R. Goldsmith,**
**Chapter 7 Trustee**

by his counsel,

/s/ Christine E. Devine
Christine E. Devine, BBO# 566990
Nicholson Devine LLC
P.O. Box 7
Medway, MA 02053
Phone: 508-533-7240
Email: christine@nicholsondevine.com

Dated: December 13, 2024

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

**CERTIFICATE OF SERVICE**

The undersigned, Christine E. Devine, hereby certifies that on this day I caused a copy of the following to be served on all parties listed on the attached Service List in the manner noted thereon:

- **TRUSTEE'S (I) SECOND OBJECTION TO CLAIMS OF LOLONYON AKOUETE AND (II) REQUEST FOR ENTRY OF PRETRIAL SCHEDULING ORDER (Claim Nos. 4.1, 4.2, and 4.3)**.

Dated: December 13, 2024

/s/ Christine E. Devine
Christine E. Devine, Esq.
Nicholson Devine LLC
P.O. Box 7
Medway, MA 02053
Phone: 508-533-7240
Email: christine@nicholsondevine.com

Electronic Mail Notice List

The following list of parties and attorneys have received electronic notice via the Court's CM/ECF noticing process:

- **Jeffrey T Blake jblake@k-plaw.com**
- **Paul W. Carey pcarey@mirickoconnell.com, bankrupt@mirickoconnell.com**
- **Jose C. Centeio jcc@natgolaw.com**
- **Brian Charville bcharville@ferrisdevelopment.com**
- **Christine E. Devine christine@nicholsondevine.com, devine.christiner109603@notify.bestcase.com;angelina@nicholsondevine.com**
- **Jonathan R. Goldsmith bankrdocs1@gkalawfirm.com, bankrdocs@gkalawfirm.com**
- **Jonathan R. Goldsmith trusteedocs1@gkalawfirm.com, trusteedocs@gkalawfirm.com;mwolohan@gkalawfirm.com;MA43@ecfcbis.com**
- **Stephen F. Gordon sgordon@gordonfirm.com, vhaggerty@gordonfirm.com;notices@gordonfirm.com;stephenfgordon@gmail.com**
- **Richard King USTPRegion01.WO.ECF@USDOJ.GOV**
- **Samual A. Miller samual.miller@akerman.com**
- **Brian W. Riley briley@k-plaw.com**
- **Roger L. Smerage rsmerage@k-plaw.com**

Email and/or First Class Mail Service List

The following list of parties and attorneys have been served via as noted:

Lolonyon Akouete — Via Email
800 Red Mills Rd
Wallkill, NY 12589
info@smartinvestorsllc.com

Denise Edwards — Via Email
137 North 25th Street
Wyandanch, NY 11798
deniseedwards818@yahoo.com

Mark S. Lichtenstein — Via Email
Akerman LLP
1251 Avenue of the Americas
37th Floor
New York, NY 10020
mark.lichtenstein@akerman.com

Lenard Benson Zide, Esq.
Butters Brazilian LLP — Via Email
420 Boylston Street, 4th Floor
Boston, MA 02116
zide@buttersbrazilian.com

Jonathan La Liberte — Via Email
Sherin and Lodgen LLP
101 Federal Street, 30th Floor
Boston, MA 02110
jclaliberte@sherin.com

Case 23-40709 Doc 476-3 Filed 01/16/25 Entered 01/16/25 Page 561 of 582

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

RESPONSE OF LOLONYON AKOUETE TO TRUSTEE'S SECOND OBJECTION TO CLAIMS AND REQUEST FOR ENTRY OF PRETRIAL SCHEDULING ORDER

To the Honorable Christopher J. Panos, United States Bankruptcy Judge:

Lolonyon Akouete (the "Claimant"), creditor and former Manager of Westborough SPE LLC (the "Debtor"), respectfully submits this response to the Trustee's Second Objection to Claims (the "Objection") and request for entry of a pretrial scheduling order, and states as follows:

## I. INTRODUCTION

1. The Trustee's Second Objection seeks to undermine valid claims filed by the Claimant by making unsupported assertions about the Claimant's entitlement to compensation, the basis for the claims, and the validity of the services rendered.
2. The Claimant's claims are grounded in the Administrative Services Agreement dated October 30, 1997 (the "Agreement"), which clearly provides for compensation for services rendered by the Manager. Section 2(b) of the Agreement explicitly states that compensation shall be "[b] such other amount as BBAS determines, in its sole discretion, is reasonable to compensate it for the Services that it has provided during the year." The $3,146,823.50 requested in Claim No. 4.3 represents a reasonable amount determined by the Claimant, in his role as successor Manager, based on the substantial services rendered and value added to the Estate.

## II. RESPONSE TO THE OBJECTION

### A. Claim No. 4.3 and Determination of Compensation

3. The Trustee's argument that the Claimant's compensation is excessive ignores the explicit terms of Section 2(b) of the Agreement, which entrusts the Manager with the discretion to determine reasonable compensation for services rendered. As the successor Manager, the Claimant is entitled to exercise this discretion.
4. The $3,146,823.50 claim reflects the Claimant's efforts to manage and preserve the Debtor's property, secure unclaimed assets, and maximize estate value—efforts that resulted in the recovery of $6,293,646.83 for the Estate, including $5 million in real estate value saved from an unconstitutional tax foreclosure scheme and $1.2 million in unclaimed funds recovered from the California State Controller's Office. These substantial achievements justify the compensation amount determined by the Claimant.

**B. Role as Successor Manager**

5. The Claimant's role as successor Manager is well-documented and supported by the Durable Power of Attorney executed on June 26, 2023, and provisions in the Operating Agreement of Westborough SPE LLC. Section 1(e) of the Operating Agreement states that "the overall management and control of the business and affairs of the Company, and the sole and exclusive authority to make all decisions and take all actions as to the business and affairs of the Company, shall be vested in the Manager." Furthermore, Section 1(g) affirms that the Manager's signature on agreements and instruments conclusively binds the Company, evidencing the Manager's authority to act on behalf of the Company.
6. Section 1(h) of the Operating Agreement entitles the Manager to reimbursement for all expenses incurred in managing and conducting the Company's business and affairs, further underscoring the Manager's broad powers and authority. The Claimant's actions align with these provisions, as his efforts were critical to the recovery and preservation of the Estate's value.
7. Without the Claimant's interventions, the Debtor would have lost valuable assets, including real estate and unclaimed funds. The Claimant's services were essential to preserving the Debtor's ability to recover these assets and maximize their value.

**C. Details of the Adversary Proceeding**

8. On April 15, 2024, the Claimant initiated Adversary Proceeding No. 24-04017 by filing a complaint seeking declaratory relief to affirm his appointment as Manager and an injunction to prevent interference with his management of the Company.
9. The Defendant, Jonathan Goldsmith, filed an answer on May 15, 2024, denying the Claimant's allegations. A Rule 26(f) conference was held, and a discovery plan was submitted on August 9, 2024.
10. On July 30, 2024, the Claimant filed a Motion for Summary Judgment, supported by the Durable Power of Attorney, the Operating Agreement, and additional evidence of his managerial authority. The motion sought a ruling that his appointment as Manager was valid and binding.
11. On August 15, 2024, the Court issued an order staying the adversary proceeding, stating that determining the Manager of the Debtor was not presently relevant in the context of the Chapter 7 case. All pending motions, including the Motion for Summary Judgment, were also stayed.
12. The Claimant has expressed his intent to seek relief from the automatic stay if the current claims are not resolved expeditiously, to pursue a quicker resolution in the Delaware Court of Chancery.

**D. No Need for Extended Discovery**

13. The Trustee's request for a 90-day discovery period is unnecessary. The Claimant's role as Manager and the validity of the claims can be adjudicated promptly based on the existing evidence, including the Durable Power of Attorney, the Operating Agreement, and records of the Claimant's recovery efforts.

## III. PRAYER FOR RELIEF

WHEREFORE, the Claimant respectfully requests that this Court:

1. Deny the Trustee's Objection to Claim No. 4.3 and related claims;

2. Hold an evidentiary hearing to adjudicate the Claimant's role as Manager of the Debtor;
3. Allow the Claimant's claims as valid unsecured claims against the Estate;
4. Deny the Trustee's request for a 90-day discovery period as unnecessary; and
5. Grant such other and further relief as this Court deems just and proper.

DATED: December 13, 2024, Respectfully submitted:

By creditor,

Lolonyon Akouete
800 Red Milles Rd
Wallkill NY 12589
info@smartinvestorsllc.com
(443) 447-3276

## ADMINISTRATIVE SERVICES AGREEMENT

ADMINISTRATIVE SERVICES AGREEMENT dated as of October 30, 1997 (the "Agreement"), between BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC., a Delaware corporation ("BBAS"), and WESTBOROUGH SPE LLC, a Delaware limited liability company ("Westborough").

### RECITALS

WHEREAS, Westborough has acquired from Northside Realty Trust ("Northside") all of Northside's right, title and interest in and to certain real property in Westborough, Massachusetts (the "Property") that it has leased to Interstate Theatres Corporation (the "Tenant") pursuant to a lease agreement dated as of October 30, 1997 (the "Lease");

WHEREAS, the Property consists of a building that Westborough and Interstate have agreed will be operated as a cinema;

WHEREAS, to purchase the Property, Westborough borrowed money (the "Loan") from The Northwestern Mutual Life Insurance Company (the "Noteholder");

WHEREAS, to obtain the Loan, Hoyts Cinemas Corporation, a Delaware corporation, Hoyts Cinemas Limited, an Australian corporation, and Hoyts Cinemas America Limited, a Barbados company, among others (together the "Guarantors"), were required to guarantee the Lease, which was assigned to the Noteholder as security for the Loan;

WHEREAS, Westborough, the Tenant, the Noteholder, the Guarantors and Mignonette Investments Limited, a British Virgin Islands limited liability company as equity investor ("Mignonette"), entered into a Participation Agreement dated as of October 30, 1997 (the "Participation Agreement") to outline their responsibilities with respect to the Property, the Lease and related agreements; and

WHEREAS, Westborough wishes to engage BBAS to provide certain administrative services with respect to the Property during the term of the Lease and BBAS is willing to provide such services, all in accordance with the terms hereof.

### AGREEMENT

NOW, THEREFORE, it is agreed as follows:

1. *Administrative Services.*

Westborough hereby appoints BBAS to act as servicer in respect of its interest in the Property and the Lease and related documents, including but not limited to

the Participation Agreement. Pursuant to this appointment, during the term of the Lease, BBAS will perform the following services (the "Services"):

(a) prepare and maintain the accounting books and records of Westborough;

(b) prepare the financial statements of Westborough and send them to the holders of the outstanding Notes (as such term is defined in the Participation Agreement) as provided in Section 6.8 of the Participation Agreement;

(c) prepare federal, state and local income and such other tax returns as may be required for Westborough, the Property and with respect to the Lease;

(d) monitor the receipt of rent from the Tenant under the Lease, the payment of principal and interest to the Noteholder and return on equity to Mignonette;

(e) maintain bank accounts if requested to do so by Westborough to faciltate the receipt, payment and transfer of funds;

(f) withhold and remit to the appropriate taxing authority any withholding taxes required to be withheld on amounts to be paid to the Noteholder or Mignonette or otherwise;

(g) receive and review and forward any notices sent to the Tenant pursuant to the Lease and related documents;

(h) keep track of insurance certificates to be provided by the Tenant pursuant to Section 12 of the Lease and review such certificates to assure compliance with the terms set forth in the Lease;

(i) consult with Westborough to discuss any matters relating the Property, the Lease, or the Lessee (i) whenever Westborough shall request or (ii) whenever BBAS shall deem it advisable; and

(j) perform such other services with respect to the Property or the Lease or Westborough as Westborough shall reasonably request or as shall be reasonably necessary to carry out the purpose of this Agreement.

2. *Compensation for Services.*

In consideration of BBAS performing the Services described in Section 1(a) through (j) hereof, Westborough shall pay BBAS an annual administrative services fee equal to the greater of (a) $5,000 per annum, or (b) such other amount as BBAS determines, in its sole discretion, is reasonable to compensate it for the Services that it has provided during the year. This annual fee shall be payable annually in advance. In the event that the Lessee shall fail to pay rent when due, BBAS shall consult with Westborough on how best to collect the rent, but

Westborough nonetheless shall be obligated to pay the fee to BBAS whether or not the rent is collected.

3. *Expenses.*

Westborough shall reimburse BBAS for all direct, reasonable out-of-pocket expenses that BBAS incurs in performing the Services, including but not limited to compensation paid to third parties hired pursuant to Section 4 of this Agreement.

4. *Other Parties.*

It is acknowledged and agreed that BBAS may, in order to perform the Services set out in Section 1, engage any other party, including but not limited to lawyers, accountants, consultants and advisors to provide the Services or render advice with respect to the Lease, the Property or the Lessee where BBAS believes this is appropriate. Such engagement shall be at Westborough's expense.

5. *Disclaimer.*

BBAS will use its reasonable best efforts in performing the Services but is not warranting or guaranteeing that any result whatsoever will be obtained. BBAS or one of its affiliates shall review the information that it provides to Westborough, the Tenant or the Noteholder, but, to the extent permissible by applicable law, it shall have no liability for errors and omissions in such information, except for liability arising out of gross negligence or willful misconduct by BBAS or one of its affiliates.

6. *Indemnity.*

Westborough agrees to indemnify, defend and hold harmless BBAS and its affiliates (and the directors, officers, employees and controlling persons of BBAS and its affiliates) to the fullest extent lawful against any and all claims, damages, losses, liabilities and expenses as incurred (including all reasonable fees and disbursements of the indemnitees' counsel that are incurred in connection with the investigation of and preparation for any such pending or threatened claims and any litigation or other proceedings arising therefrom in any action between Westborough and any indemnitee or between any indemnitee and a third party) relating to BBAS' performance of the Services under this Agreement, unless caused by the gross negligence or willful misconduct of BBAS.

7. *Governing Law and Jurisdiction*.

This Agreement shall be governed by and construed in accordance with the laws of the State of California. A court of competent jurisdiction in the City and County of San Francisco, California, or such other location to which both parties agree, shall have exclusive jurisdiction over all disputes arising out of this agreement. Nothing in this paragraph constitutes a waiver of the right of any party to remove an action to a United States District Court, as permitted by the laws of the United States.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

BABCOCK & BROWN
ADMINISTRATIVE SERVICES, INC.

By: James D. Jaworski
Its: Vice President

WESTBOROUGH SPE LLC

BY: BABCOCK & BROWN
ADMINISTRATIVE SERVICES, INC.
ITS: MANAGER

By: F. Jan Blaustein
Its: President

CERTIFICATE OF SERVICE

I, Lolonyon Akouete, hereby certify that the above document is served by email and mailing a copy of the same, first-class mail, to the following:

Stephen F. Gordon, Attorney of the Petitioners
(Email: sgordon@gordonfirm.com)
The Gordon Law Firm LLP
River Place 57 River Street Wellesley, MA 02481

Scott A. Schlager on behalf of,
Nathanson & Goldberg, P.C., a creditor.
(Email: sas@natgolaw.com)
183 State Street, 5th Floor Boston, MA 02109

Assistant U.S. Trustee
Richard King
Office of US. Trustee
446 Main Street 14th Floor
Worcester, MA 01608
USTPRegion01.WO.ECF@USDOJ.GOV

Jonathan R. Goldsmith
Chapter 7 Trustee
trusteedocs1@gkalawfirm.com
Goldsmith, Katz & Argenio P.C.
1350 Main Street, 15th Floor.
Springfield, MA 01103

Dyann Blaine
20 Queensbrook Place
Orinda, CA 94563
dyann.blaine@gmail.com

Jan Blaustein Scholes
7501 E Thompson Peak Pkwy
Scottsdale, AZ 85255
jan.scholes2@gmail.com

Mark S. Lichtenstein
AKERMAN LLP
1251 Avenue of the Americas, 37th Flr.
New York, New York 10020
mark.lichtenstein@akerman.com

Paul W. Carey, Attorney of Creditor
FERRIS DEVELOPMENT GROUP, LLC
(Email: pcarey@mirickoconnell.com)
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street, Worcester, MA 01608

Brian W. Riley, Attorney of Creditor
Jeffrey T. Blake, Attorney of Creditor
Roger L. Smerage, Attorney of Creditor
TOWN OF WESTBOROUGH
(Email: briley@k-plaw.com)
(Email: jblake@k-plaw.com)
(Email: rsmerage@k-plaw.com)
KP Law, P.C. 101 Arch Street,
12th Floor Boston, MA 02110

Gary M Ronan
David M Abromowitz
Goulston&storrs
GRonan@goulstonstorrs.com
DAbromowitz@goulstonstorrs.com
400 Atlantic Avenue
Boston, MA 02110

Peter Blaustein
950 Vista Road
Hillsborough, CA 94010
pblaustein@gmail.com

Walter Horst
Babcock & Brown
1264 Rimer Drive
Moraga, CA 94556
walter.horst@babcockbrown.com

Samual A. Miller, Esq.
AKERMAN LLP
420 South Orange Avenue
Suite 1200
Orlando, FL 32801
samual.miller@akerman.com
sharlene.harrison-carera@akerman.com

Lolonyon Y Akouete

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| In re:<br><br>WESTBOROUGH SPE LLC<br><br>Debtor | ) | Chapter 7<br>Case No. 23-40709-CJP |

**CONTESTED MATTER CASE MANAGEMENT ORDER**

In accordance with the Order entered at ECF No. 430 and upon consideration of the *Objection to Claims of Lolonyon Akouete (Claim Nos. 4.1 and 4.2)* [ECF No. 410] (the "First Objection") and *Trustee's (I) Second Objection to Claims of Lolonyon Akouete and (II) Request for Entry of Pretrial Scheduling Order (Claim Nos. 4.1, 4.2 and 4.3)* [ECF No. 462] (the "Second Objection") filed by the Chapter 7 Trustee Jonathan R. Goldsmith (the "Trustee"), and the responses thereto of the claimant Lolonyon Akouete (collectively, the "Responses") (the First and Second Objections and the Responses, as will supplemented pursuant to this order by the Supplemental Objection (as defined herein), collectively, the "Contested Matter"), and in order to ensure discovery is proportional and improve the quality of the evidentiary hearing regarding the Contested Matter, the Court hereby ORDERS as follows.

While the operative claim of a party is usually the latest amended claim, given what appears to be the different grounds asserted by Mr. Akouete for Claim Nos. 4-1 and 4-2 and Claim No. 4.3, and that the Trustee has reaffirmed his objections to Claim Nos. 4-1 and 4-2 in the Second Objection by referencing the First Objection, absent further clarification by the Trustee, the Contested Matter is with respect to the First, Second, and Supplemental Objections addressing all of the proofs of claim filed by Mr. Akouete, and not just the objections to Claim No. 4.3.

As has been discussed at various conferences, although the First and Second Objections specify they are being brought under 11 U.S.C. § 502, the specific provisions of that section are not identified. If an objection is being made by the Trustee under § 502(b)(4) to the extent Mr. Akouete is determined to be a manager of the debtor, or other specific subsection of § 502(b), the Trustee shall identify the specific provisions of § 502 relied on and make any further arguments in support of such objection in a supplement to the First and Second Objections that shall be filed no later than **February 24, 2025 at 11:59 p.m.** (the "Supplemental Objection"). Mr. Akouete shall respond to any Supplemental Objection on or before **March 3, 2025 at 11:59 p.m.**

All of the deadlines established in this order apply to resolution of the Contested Matter, which, as previously stated, is comprised of the First and Second Objections and the prospective Supplemental Objection, and the relevant responses of Mr. Akouete.

## I. DISCOVERY AND APPLICABILITY OF RULES

1. **Applicability of Rules**. The provisions of Fed. R. Civ. P. 16, as made applicable to bankruptcy adversary proceedings by Fed. R. Bankr. P. 7016, except Fed. R. Civ. P. 16(b), shall also

apply to the Contested Matter unless the Court orders otherwise in a subsequent order. No other changes are intended to Fed. R. Bankr. P. 9014(c) as to the applicability of Part VII rules to the Contested Matter and Fed. R. Bankr. P. 9014(c) is incorporated by reference.

2. **Scope of Discovery and Numerical Limitations.** If the parties cannot agree whether the intended scope of discovery is proportional to the needs of the case as contemplated by Fed. R. Civ. P. 26(b)(1) or with respect to other matters agreed to by the parties in their discovery plan, any party may request further orders and conferences with the Court on those issues. In addition to the numerical limitations imposed on interrogatories pursuant to MLBR 7033-1, requests for admissions under Fed. R. Bank. P. 7036 and MLBR 7036-1 shall be limited to twenty-five (25) requests, including discrete subparts.

3. **Discovery Deadline.** Discovery, including depositions, shall be completed by **April 7, 2025**, unless the Court, upon appropriate motion, alters the time and manner of discovery.

4. **Discovery Disputes.** Before moving for an order related to a discovery dispute under MLBR 7026-1(c), a party must confer with the party with whom there is a dispute. If that conference does not resolve all issues, before filing any discovery motion, a party shall file a request for a telephonic discovery conference with the Court pursuant to Fed. R. Civ. P. 16(b)(3)(B)(v). Any such request shall be no longer than two (2) pages, limited only to requesting a conference and providing a brief, general summary of the issues to be discussed at a conference without argument. No response to a request for conference may be filed without leave of Court.

If no resolution is reached after the telephonic discovery conference with the Court, a discovery motion may be filed. Pursuant to MLBR 7026-1(c), all discovery motions must be accompanied by a certification that the moving party has made a reasonable good faith effort to reach an agreement with the opposing party on the matter that is the subject of the motion in accordance with Rule 37(a)(1). In the event the Court is required to take action on a discovery motion, the successful party may be awarded the fees and costs of bringing the discovery motion to be paid by the unsuccessful party and or its counsel as the circumstances may warrant.

5. **Non-Waiver of Attorney–Client Privilege or Work Product Protection.** Absent further order of the Court, in accordance with Fed. R. Evid. 502(d), except when a party intentionally waives attorney–client privilege or work product protection by disclosing such information to an adverse party, the disclosure of attorney–client privileged or work product protected information shall not constitute a waiver in this proceeding, or in any other federal or state proceeding. A party that produces attorney–client privileged or work product protected information to an adverse party without intending to waive the privilege or protection must notify the adversary that it did not intend a waiver by its disclosure promptly upon discovering the disclosure. Fed. R. Evid. 502(b)(2) shall not apply to disclosures made in connection with discovery in this case otherwise protected by this Order. Any dispute regarding whether the disclosing party has asserted properly the attorney–client privilege or work product protection shall be brought promptly to the attention of the Court if the parties are not able to resolve such dispute.

## II. DISPOSITIVE MOTIONS AND PREHEARING MEMORANDA

6. **Motions for Summary Judgment and Other Dispositive Motions.** The parties are

reminded that many cases are not appropriate for summary judgment under Fed. R. Civ. P. 56, as made applicable by Fed. R. Bankr. P. 7056 and 9014(c), because the existence of a disputed material fact will require resolution by an evidentiary hearing and are strongly encouraged to consider the strengths of any summary judgment motion that they may contemplate filing. The deadline to file any summary judgment motion or other dispositive motion is by **April 21, 2025**.

In the event a party files a motion for summary judgment, the deadline for the filing of the Joint Prehearing Memorandum shall be automatically extended. If the Court denies a pending motion(s) for summary judgment, the Joint Prehearing Memorandum shall be due fourteen (14) days after the Court's order denying the motion for summary judgment. Any motion for summary judgment shall constitute each moving party's consent to the entry of a final order by this Court as to the matters addressed in such motion. If a party responding to a motion for summary judgment fails to state that it does not consent to the entry of a final order by this Court, that party will be deemed to have consented to the entry of a final order.

7. **Joint Prehearing Memorandum.** If no dispositive motion has been filed by the deadline in the preceding paragraph, the parties shall file by **April 30, 2025**, a Joint Prehearing Memorandum signed by all counsel and unrepresented parties, which shall supersede the pleadings to the extent of any inconsistencies and govern the course of the evidentiary hearing and which shall set forth the following:

(A) A statement as to the Court's jurisdiction as to each matter in dispute and a statement as to whether the parties consent to the entry of a final order as to each matter by this Court.

(B) The name of each witness, separately identifying those whom each party expects to present and those whom each party may call if the need arises, together with any objection to the witness.

i. If a party requires an interpreter at the hearing for one of that party's witnesses, it will be the responsibility of that party to arrange and pay for the interpreter. The Court does not provide interpreters.

(C) A list of witnesses whose testimony is expected to be presented by means of a deposition and, if taken stenographically, a transcript of the pertinent portions of the deposition testimony, together with any objection to such testimony.

(D) If applicable, direct testimony of valuation shall be given by affidavit, which may authenticate an appraisal or report. The affidavits are to be exchanged no later than 30 days prior to the evidentiary hearing date. The valuation witnesses are to be present and available for cross-examination at the evidentiary hearing. The affidavit of any valuation witness not present and available for cross-examination will be stricken.

(E) A list of witnesses intended to be called as experts, together with any statement(s) as to any objection to their qualification, and a certification that the expert's report has been served on the opposing party(ies).

(F) An appropriate identification of each document or other exhibit, other than those to be used for impeachment, in the sequence in which they will be offered, including

summaries of other evidence, separately identifying those exhibits which each party expects to offer and those which each party may offer if the need arises.

(G) A statement confirming that the parties have exchanged copies of the exhibits.

(H) A statement disclosing any records of regularly conducted business activity under Fed. R. Evid. 803(6) that the parties intend to present by certification, as permitted by the Fed. R. Evid. 902(11) and (12), rather than by testimony of a foundation witness.

(I) A statement of any objection, together with the grounds therefor, reserved as to the admissibility of a deposition designated by another party and/or to the admissibility of documents or exhibits. Objections not so disclosed, other than objections under Fed. R. Evid. 402 and 403, shall be deemed waived unless excused by the Court for good cause shown.

(J) A statement indicating whether the parties have discussed mediation and whether the parties wish to resolve their dispute by mediation. In the event that parties agree to mediation, the Court will consider, on an expedited basis, any motion to postpone the evidentiary hearing to accommodate mediation. *See generally* Appendix 7 of the MLBR.

(K) Facts which are admitted and which require no proof.

(L) The issues of fact which remain to be litigated (evidence at the evidentiary hearing shall be limited to these issues).

(M) The issues of law to be determined.

(N) A brief statement summarizing the movant's case.

(O) A brief statement summarizing the respondent's case.

(P) The estimated length of the evidentiary hearing.

(Q) **A statement acknowledging that the Joint Prehearing Memorandum supersedes the pleadings in the case to the extent of any inconsistencies and governs the course of the evidentiary hearing.**

In the rare instance where, despite their substantial good faith efforts, the parties cannot agree on a Joint Prehearing Memorandum, then each shall file, by the date for the filing of the Joint Prehearing Memorandum, a separate Prehearing Memorandum that conforms to the requirements set forth in this Order which shall include a statement setting forth a reason why a joint submission could not be filed. The parties, nonetheless, should also file a Joint Prehearing Memorandum including as much of the required information set forth in this Order as possible – even if they cannot agree on all portions and wish to file individual submissions with respect to the disputed portions.

## III. FINAL PREHEARING CONFERENCE AND MISCELLANEOUS

8. **Final Prehearing Conference and/or Evidentiary Hearing.** A final prehearing conference

to discuss the scheduling of the evidentiary hearing or the evidentiary hearing itself will be scheduled upon consideration of the Joint Prehearing Memorandum.

9. **Exhibits.**

(A) **Prior to the evidentiary hearing, the parties shall have conferred to determine which exhibits may be admitted into evidence without objection. The parties shall also determine whether authenticity and other foundation-related stipulations may be made as to exhibits – even where there may be relevance or other objections to admitting evidence. Agreement as to admissibility of exhibits eliminates time during the hearing that would otherwise be devoted to testimony establishing the foundation for admission of each document, reserving any other objections for the evidentiary hearing. Based on its experience, the Court expects that, in most cases, parties will be able to stipulate to the admission of a majority of documents into evidence. The parties shall be prepared to report to the Court regarding progress in stipulating to exhibits at any prehearing conference that may be scheduled.**

Parties shall pre-mark and group stipulated exhibits together in one or more separate binders prepared prior to and available at the commencement of the hearing. Each binder shall include a table of contents and each document or other exhibit shall be given a separate exhibit number, starting with number 1, and be tabbed in the binder.

(B) Parties shall also pre-mark proposed exhibits that are reasonably anticipated to be offered at the hearing that have not been stipulated and assemble them into separate binders prepared prior to and available at the commencement of the hearing. Each binder shall include a table of contents. Each document or other exhibit shall be given a separate exhibit number and be tabbed in the binder. The movant shall number exhibits with numbers M-1, M-2, M-3, etc.; the respondent with numbers R-101, R-102, R-103, etc.

(C) Parties shall bring sufficient copies of exhibit binders to the hearing so that copies are available for the Judge, Courtroom Deputy, Law Clerk, witness, and counsel. Counsel shall also be prepared to assemble and submit to the Court after conclusion of the evidentiary hearing an electronic binder and hard-copy binder(s) of exhibits as admitted at the hearing.

(D) Judge Panos's Courtroom is equipped with an electronic evidence presentation system for displaying exhibits and it is expected that parties will use this equipment to present hearing exhibits. Please contact the Courtroom Deputy (cjp_courtroom_deputy@mab.uscourts.gov, (508) 770-8927) for additional information, including to schedule a demonstration.

(E) **Provisions or statements in admitted exhibits that are not specifically referenced in testimony or argument at the evidentiary hearing (or in post-hearing briefs or proposed findings of fact and rulings of law if directed to be filed by the Court) may be, but will not necessarily be, considered by the Court.**

10. **Leave of Court Required for Modification; Sanctions.** This Order and deadlines established by the Court may not be modified absent further order of the Court. Failure to

strictly comply with all of the provisions of this Order may result in the entry of a dismissal or sanctions, as the circumstances warrant in accordance with Fed. R. Civ. P. 16 and 37.

By the Court,

Dated: February 14, 2025

Christopher J. Panos
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br>**Westborough SPE LLC**<br>**Debtor(s)** | **Chapter 7**<br>**23-40709-CJP** |

**PROCEEDING MEMORANDUM AND ORDER**

**MATTER:**
Telephonic Hearing on #565 Motion filed by Creditor Lolonyon Akouete to Remove Trustee For Cause.

**Decision set forth more fully as follows:**

FOR THE REASONS STATED ON THE RECORD, THE MOTION TO REMOVE TRUSTEE IS DENIED.

Dated: 03/14/2025

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>WESTBOROUGH SPE LLC,<br><br>Debtor. | Chapter 7<br>Case No. 23-40709-CJP |

**ORDER ON MOTION FOR ISSUANCE OF LETTER ROGATORY TO THE HIGH COURT OF JUSTICE OF THE BRITISH VIRGIN ISLANDS**

Upon consideration of the motion requesting issuance of a letter rogatory [ECF No. 611] (the "Motion") of Lolonyon Akouete, the limited objection thereto [ECF No. 612] of the petitioning creditors, and Mr. Akouete's response [ECF No. 614], the Motion is granted in part and the Court has issued a letter rogatory in the form attached as Exhibit 1 hereto. Mr. Akouete may obtain a certified copy of the attached, without paying the certified copy fee associated with obtaining certified copies from this Court, by contacting the Clerk's Office.

Entered this 7th day of April, 2025.

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

**EXHIBIT 1 TO ORDER ON MOTION FOR ISSUANCE OF LETTER ROGATORY**
**<u>TO THE HIGH COURT OF JUSTICE OF THE BRITISH VIRGIN ISLANDS</u>**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) | |
| | ) | |
| Debtor. | ) | |

To the Appropriate Judicial Authority of the British Virgin Islands:

**<u>REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE (LETTER ROGATORY)</u>**

The United States Bankruptcy Court for the District of Massachusetts respectfully requests international judicial assistance to obtain evidence to be used in a civil proceeding before this Court in the above-captioned chapter 7 case of Westborough SPE LLC.

A contested matter is currently pending, and the information requested is relevant to administration of this case by the chapter 7 Trustee of Westborough SPE LLC's bankruptcy estate and certain litigation involving claims against this estate. The Requesting Party, as defined herein, seeks information to establish ownership and control of Westborough SPE LLC that he asserts is relevant to litigation of his claims. Mignonette Investments Limited is alleged to have been the sole member and ultimate beneficial owner of Westborough SPE LLC. Under certain circumstances, Mignonette Investments Limited could be entitled to distribution of proceeds of assets of Westborough SPE LLC.

This Court seeks the assistance of the Honorable Court of the British Virgin Islands in the interests of justice.

The party seeking the information (the "Requesting Party") is:

Lolonyon Akouete
800 Red Milles Rd
Wallkill NY 12589
info@smartinvestorsllc.com
(443) 447-3276

The chapter 7 Trustee ("Trustee") appointed in this liquidation proceeding and his counsel are:

Jonathan R. Goldsmith, Trustee
c/o Christine E. Devine
Nicholson Devine LLC
PO Box 7
Medway, MA 02053
508-533-7240
Email: christine@nicholsondevine.com

The assistance requested is that the Appropriate Judicial Authority of the British Virgin Islands compel the production of the following corporate records from:

**Mignonette Investments Limited**
Company Number: 243736
Registered Agent: Equity Trust/TMF Group
Registered Office: Palm Grove House P.O. Box 438 Road Town Tortola, BRITISH VIRGIN ISLANDS

and

**The Attorney General's Chambers of the British Virgin Islands or other appropriate authority responsible to maintain government records.**

**DOCUMENTS TO BE PRODUCED:**

1. Certificate of Incorporation;
2. Memorandum and Articles of Association, including any amendments;
3. Register of Members (shareholders), past and present;
4. Register of Directors and Officers, including appointment and resignation records;
5. Beneficial Ownership disclosures maintained under the Beneficial Ownership Secure Search System Act, 2017 (BOSS Act);
6. Name and address of the Registered Agent and the company's registered office;
7. Any documents or filings indicating changes in beneficial ownership, control, or directorship from 2017 to the present.

**PROCEDURES AND SPECIAL REQUESTS:**

The Court respectfully requests that:

- Mignonette Investments Limited be compelled to produce the requested documents to both the Requesting Party and the Trustee as soon as possible consistent with the laws and practices of the British Virgin Islands.
- Mignonette Investments Limited be compelled to certify and authenticate documents produced as true and accurate copies of its records consistent with the laws and practices of the British Virgin Islands.
- Notice of the time and place for the production or review of documents be provided to the Requesting Party and Trustee.

**REIMBURSEMENT FOR COSTS:**

If costs are incurred in executing this request, the **Requesting Party** shall bear any fees and costs in connection with this request.

Signed on this 7th day of April, 2025.

By the Court,

[signature]

Christopher J. Panos
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: Westborough SPE LLC<br>Debtor | Chapter 7<br>23-40709-CJP |

## ORDER

**MATTER:**
#668 Motion filed by Creditor Lolonyon Akouete For Expedited Determination that Action Against California State Controller's Office Is Not A Violation of Automatic Stay.

DENIED. IT APPEARS THAT MR. AKOUETE SEEKS TO ASSERT CLAIMS THAT COULD ONLY BELONG TO THE ESTATE AND BE ASSERTED BY THE TRUSTEE ON BEHALF OF THE ESTATE. MR. AKOUETE HAS NO AUTHORITY TO ASSERT SUCH CLAIMS, AND ANY ATTEMPT TO DO SO WOULD APPEAR TO BE AN ATTEMPT TO EXERCISE CONTROL OVER PROPERTY OF THE ESTATE IN VIOLATION OF SECTION 362(a).

Dated: 04/30/2025

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| In re: | |
|---|---|
| Westborough SPE LLC<br>Debtor(s) | Chapter 7<br>23-40709-CJP |

## PROCEEDING MEMORANDUM AND ORDER

**MATTER:**
#671 Motion filed by Creditor Lolonyon Akouete to Compel Trustee Abandonment of Claim Under 11 U.S.C. Sec. 554(b) or Alternatively, Motion for Authority to Pursue Claim on Behalf of Estate (Derivative Standing).

**Decision set forth more fully as follows:**

FOR THE REASONS STATED ON THE RECORD, THE MOTION IS DENIED.

Dated: 05/06/2025

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br><br>**Westborough SPE LLC**<br><br>**Debtor** | **Chapter 7**<br>**23-40709-CJP** |

**PROCEEDING MEMORANDUM AND ORDER**

**MATTER:**
#679 Motion filed by Creditor Loloyon Akouete To Address Trustee's Bad Faith, Retaliatory Conduct, Inconsistent Positions, and Abuse of Process Relating to Creditor Akouete's Claim.

**Decision set forth more fully as follows:**

DENIED FOR THE REASONS STATED ON THE RECORD. SUMMARIZING AND FURTHER DETAILING THOSE REASONS, AFTER CONSIDERATION OF THE MOTION AND RESPONSIVE PLEADINGS, THE COURT'S REVIEW OF ALL PLEADINGS FILED IN RELATION TO THE TRUSTEE'S OBJECTION TO MR. AKOUETE'S CLAIM, AND THE COURT'S OBSERVATION OF THE PARTIES ON THE RECORD AT HEARINGS IN THIS MATTER AND IN CONNECTION WITH THE RELIEF THEY HAVE REQUESTED IN THEIR RESPECTIVE FILINGS WITH THE COURT, MR. AKOUETE HAS NOT SHOWN CAUSE FOR THE EXTRAORDINARY RELIEF THAT HE HAS REQUESTED IN THE MOTION.

FIRST, MR. AKOUETE ASKS THAT THIS COURT TAKE "JUDICIAL NOTICE" OF ALLEGED AND CONCLUSORY FACTS THAT ARE CLEARLY SUBJECT TO REASONABLE DISPUTE AND, THEREFORE, COULD NOT BE SUBJECT TO JUDICIAL NOTICE UNDER FED. R. EVID. 201. THERE CAN BE NO GOOD FAITH BASIS FOR SUCH A REQUEST--PARTICULARLY BECAUSE THIS IS NOT THE FIRST TIME MR. AKOUETE HAS MADE SUCH A REQUEST AND THE COURT PREVIOUSLY IDENTIFIED THAT ONLY CERTAIN TYPES OF FACTS WOULD BE APPROPRIATE FOR JUDICIAL NOTICE AS CONTEMPLATED BY FED. R. EVID. 201(b), *SEE* ORDER AT ECF NO. 717 ENTERED ON MAY 21, 2025, IN CONNECTION WITH SIMILAR ALLEGATIONS REGARIDNG THE TRUSTEE'S CONDUCT. MR. AKOUETE MAY BE SUBJECT TO SANCTIONS IF HE FILES SIMILAR REQUESTS IN THE FUTURE.

*Proceeding Memorandum and Order Page 2 of 2*

THE BALANCE OF THE RELIEF SOUGHT IN MR. AKOUETE'S MOTION ESSENTIALLY SEEKS SANCTIONS FOR THE "TRUSTEE'S CONTRADICTORY POSITIONS, RETALIATORY CONDUCT, ABUSE OF PROCESS, BAD FAITH, AND PROTRACTED LITIGATION TACTICS EVIDENCED IN SETTLEMENT PROPOSALS AND SUBSEQUENT COMMUNICATIONS," INCLUDING IN THE FORM OF OVERRULING THE TRUSTEE'S OBJECTION TO HIS CLAIM, LIMITING THE TRUSTEE'S OBJECTIONS, AND OTHER UNSPECIFIED "SANCTIONS." MR. AKOUETE DISCLOSES SETTLEMENT OFFERS AND NEGOTIATIONS WITH THE TRUSTEE TO SUPPORT THE PROPOSITION THAT THE TRUSTEE HAS "RECOGNIZED" THE "VALIDITY AND LEGITIMACY" OF MR. AKOUETE'S CLAIM AND THAT THE TRUSTEE HAS MADE "INADEQUATE" SETTLEMENT PROPOSALS. WHILE EVIDENCE OF SETTLEMENT NEGOTIATIONS MAY BE ADMISSIBLE FOR SOME PURPOSES, IT IS NOT ADMISSIBLE TO PROVE THE VALIDITY OR AMOUNT OF A CLAIM. EVEN AFTER CONSIDERING THE REFERENCED SETTLEMENT NEGOTIATIONS IN THE CONTEXT OF ALLEGATIONS OF BAD FAITH AND DELAY, THE COURT DOES NOT FIND THAT THE TRUSTEE HAS ACTED IN BAD FAITH OR HAS ACTED IN A RETALIATORY MANNER, PROTRACTED LITIGATION, OR ABUSED PROCESS. THE TRUSTEE HAS TIMELY FILED A MOTION FOR SUMMARY JUDGMENT, AS HAS MR. AKOUETE. THE COURT WILL DETERMINE THE CLAIM OBJECTION ON ITS MERITS EITHER BY SUMMARY JUDGMENT OR AFTER TRIAL.

Dated: 06/12/2025

By the Court,

Christopher J. Panos
United States Bankruptcy Judge