**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

______________ District of Massachusetts
(State)

Case number (*If known*): ______________ Chapter 7

❑ Check if this is an amended filing

Official Form 205

# Involuntary Petition Against a Non-Individual

12/15

**Use this form to begin a bankruptcy case against a non-individual you allege to be a debtor subject to an involuntary case. If you want to begin a case against an individual, use the *Involuntary Petition Against an Individual* (Official Form 105). Be as complete and accurate as possible. If more space is needed, attach any additional sheets to this form. On the top of any additional pages, write debtor's name and case number (if known).**

## Part 1: Identify the Chapter of the Bankruptcy Code Under Which Petition Is Filed

**1. Chapter of the Bankruptcy Code**

*Check one:*

☒ Chapter 7
❑ Chapter 11

## Part 2: Identify the Debtor

**2. Debtor's name**

Westborough SPE LLC

**3. Other names you know the debtor has used in the last 8 years**

Include any assumed names, trade names, or *doing business as* names.

______________
______________
______________

**4. Debtor's federal Employer Identification Number (EIN)**

❑ Unknown

94 – 3286768
EIN

**5. Debtor's address**

**Principal place of business**

1241 Deer Park Ave
Number Street

Suite 1 #1501

North Babylon NY 11703
City State ZIP Code

______________
County

**Mailing address, if different**

______________
Number Street

______________
P.O. Box

______________
City State ZIP Code

**Location of principal assets, if different from principal place of business**

231 Turnpike Road
Number Street

______________

Westborough MA 01581
City State ZIP Code

Debtor Westbrough SPE LLC Case number (*if known*)______________
Name

**6. Debtor's website** (URL) ______________________________________________

**7. Type of debtor**

☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
☐ Partnership (excluding LLP)
☐ Other type of debtor. Specify: ______________________________________________

**8. Type of debtor's business**

*Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
☐ Railroad (as defined in 11 U.S.C. § 101(44))
☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))
☒ None of the types of business listed.
☐ Unknown type of business.

**9. To the best of your knowledge, are any bankruptcy cases pending by or against any partner or affiliate of this debtor?**

☒ No
☐ Yes. Debtor ______________________________ Relationship ______________
District ______________ Date filed ______________ Case number, if known______________
MM / DD / YYYY

Debtor ______________________________ Relationship ______________
District ______________ Date filed ______________ Case number, if known______________
MM / DD / YYYY

**Part 3: Report About the Case**

**10. Venue**

*Check one:*

☒ Over the last 180 days before the filing of this bankruptcy, the debtor had a domicile, principal place of business, or principal assets in this district longer than in any other district.

☐ A bankruptcy case concerning debtor's affiliates, general partner, or partnership is pending in this district.

**11. Allegations**

Each petitioner is eligible to file this petition under 11 U.S.C. § 303(b).

The debtor may be the subject of an involuntary case under 11 U.S.C. § 303(a).

The Debtor has less than twelve (12) creditors.

*At least one box must be checked*:

☒ The debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount.

☐ Within 120 days before the filing of this petition, a custodian, other than a trustee, receiver, or an agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

**12. Has there been a transfer of any claim against the debtor by or to any petitioner?**

☒ No
☐ Yes. Attach all documents that evidence the transfer and any statements required under Bankruptcy Rule 1003(a).

Debtor Westborough SPE LLC
Name

Case number (*if known*)

| 13. Each petitioner's claim | Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien |
|---|---|---|---|
| | Nathanson & Goldberg, P.C. | Legal Fees and Costs | $ $100,507.83 |
| | The MobileStreet Trust | CAM Charges | $ $356,681.00 |
| | | | $ |
| | | Total of petitioners' claims | $ 457,188.83 |

**If more space is needed to list petitioners, attach additional sheets. Write the alleged debtor's name and the case number, if known, at the top of each sheet. Following the format of this form, set out the information required in Parts 3 and 4 of the form for each additional petitioning creditor, the petitioner's claim, the petitioner's representative, and the petitioner's attorney. Include the statement under penalty of perjury set out in Part 4 of the form, followed by each additional petitioner's (or representative's) signature, along with the signature of the petitioner's attorney.**

## Part 4: Request for Relief

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

Petitioners request that an order for relief be entered against the debtor under the chapter of 11 U.S.C. specified in this petition. If a petitioning creditor is a corporation, attach the corporate ownership statement required by Bankruptcy Rule 1010(b). If any petitioner is a foreign representative appointed in a foreign proceeding, attach a certified copy of the order of the court granting recognition.

I have examined the information in this document and have a reasonable belief that the information is true and correct.

**Petitioners or Petitioners' Representative**

**Name and mailing address of petitioner**

Nathanson & Goldberg, P.C.
Name

183 State Street, 5th FL
Number Street

Boston, MA 02109
City State ZIP Code

**Name and mailing address of petitioner's representative, if any**

Scott A. Schlager, Esquire
Name

Nathanson & Goldberg, P.C., 183 State St., 5th FL
Number Street

Boston, MA 02109
City State ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ______
MM / DD / YYYY

✘ Scott A. Schlager August 31, 2023
Signature of petitioner or representative, including representative's title

**Attorneys**

Stephen F. Gordon, Esquire
Printed name

The Gordon Law Firm LLP
Firm name, if any

57 River Street, Suite 200
Number Street

Wellesley, MA 02481
City State ZIP Code

Contact phone 617-456-1270 Email sgordon@gordonfirm.com

Bar number 203600

State MA

✘ /s/ Stephen F. Gordon
Signature of attorney

Date signed 8/31/2023
MM / DD / YYYY

Debtor Westborough SPE LLC
Name

Case number (if known)

**Name and mailing address of petitioner**

The MobileStreet Trust
Name

~~14 Drew Street~~ 12 Cole Rd.
Number Street

~~Woburn, MA 01801~~ Wayland MA 01778
City State ZIP Code

**Name and mailing address of petitioner's representative, if any**

Allen Hight
Name

24 lancaster Rd
Number Street

Northborough MA 01532
City State ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 08/30/2023
MM / DD / YYYY

✘ Allen Hight Agent
Signature of petitioner or representative, including representative's title

Printed name

Firm name, if any

Number Street

City State ZIP Code

Contact phone Email

Bar number

State

✘
Signature of attorney

Date signed
MM / DD / YYYY

**Name and mailing address of petitioner**

Name

Number Street

City State ZIP Code

**Name and mailing address of petitioner's representative, if any**

Name

Number Street

City State ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on
MM / DD / YYYY

✘
Signature of petitioner or representative, including representative's title

Printed name

Firm name, if any

Number Street

City State ZIP Code

Contact phone Email

Bar number

State

✘
Signature of attorney

Date signed
MM / DD / YYYY

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) | |
| | ) | |
| Debtor. | ) | |

EMERGENCY MOTION OF PETITIONING CREDITORS
FOR IMMEDIATE ENTRY OF AN ORDER FOR RELIEF OR, IN THE ALTERNATIVE,
AN ORDER FORBIDDING THE MANAGER OF THE ALLEGED DEBTOR
FROM FILING ANYTHING IN THE COURTS OF CALIFORNIA

To The Honorable Christopher J. Panos, United States Bankruptcy Judge:

Now come the Petitioning Creditors herein and, on an emergency basis created by the Manager of the Alleged Debtor, move for the immediate entry of an Order for Relief (which will result in the immediate appointment of a Chapter 7 Trustee) or, in the alternative or in addition, for an Order forbidding the Manager of the Alleged Debtor from filing anything in the Courts of the State of California. In support of their Emergency Motion, the Petitioning Creditors state as follows:

1. On August 31, 2023, an Involuntary Petition commenced the within case.

2. A Summons was issued upon the Involuntary Petition and the Alleged Debtor accepted service of the Summons on September 2, 2023.

3. A Return of Service was filed with this Court on September 8, 2023.

4. The Court set September 29, 2023 as the deadline for filing an Answer to the Involuntary Petition.

5. No Answer contesting the Involuntary Petition has been filed (the Alleged Debtor filed *pro se* a pleading entitled "Answer" but in it consented to the Involuntary Petition).

6. The Alleged Debtor, through its Manager, Lolonyon Akouete (the "Manager") has been extraordinarily active in this case. For example, the Manager has already filed the Debtor's Schedules and Statement of Financial Affairs, has moved this Court for the entry of an Order for Relief and, most importantly, has filed an Emergency Motion for Relief from Stay to permit him to bring an action in the State of California regarding the bankruptcy estate's rights to escheated funds being held by the California State Controller (the "Alleged Debtor's Motion For Relief From Stay").

7. This Court has set October 10, 2023 as the deadline for Objections to the Alleged Debtor's Motion For Relief From Stay.

8. The Manager has communicated to counsel for the Petitioning Creditors his belief that 11 U.S.C. 303(f) would operate to permit him to commence an action in the State of Californica on the grounds that, until entry of an Order for Relief, he "may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced."

9. The undersigned counsel for the Petitioning Creditors responded to the Manager that his commencing an action in the State of California would violate 11 U.S.C. §362(a)(3)(Automatic stay) which stays "any act to obtain possession or property of the estate or of property from the estate or to exercise control over property of the estate …"

10. The escheated funds being held by the California State Controller are property of the bankruptcy estate created by the filing of the Involuntary Petition (see 11 U.S.C. §541(a)).

11. The Petitioning Creditors thought that the filing of the Manager's Motion For Relief From Stay constituted an acknowledgement, admission and agreement that the Manager

could not commence an action in the State of California regarding estate property without relief from stay.

12. At 9:21 a.m. this morning, October 2, 2023, the Manager sent the email annexed hereto as Exhibit A (with all of its attachments) threatening to file a Complaint to recover escheated property of the Debtor from the California State Controller and challenging counsel for the Petitioning Creditors to "request court intervention."

13. The entry of an Order for Relief will deprive the Manager of any claim that he is acting pursuant to rights granted under 11 U.S.C. §303(f).

14. The Manager's fear that rights may be lost unless the Manager immediately commences an action in California is misplaced. Pursuant to 11 U.S.C. §108, the Chapter 7 Trustee to be appointed herein will have at least 60 days, and likely 2 years, after the entry of the Order for Relief to take the action that the Manager threatens to take today.

Request for Emergency Determination

15. Given the Manager's inexplicable activism, his threatened violation of the automatic stay, and his threat, complete with drafted pleadings (Exhibit A) that he will file something in California as soon as today, emergency relief is required to prevent the Manager from taking unnecessary and impermissible action to the detriment of the Bankruptcy Estate and the rights of its soon to be appointment Chapter 7 Trustee.

Wherefore, the Petitioning Creditors pray, on an emergency basis, that this Court either (a) enter an Order for Relief removing all doubt as to the Manager's post-Petition authority

and/or (b) enter an Order that the Manager is prohibited from filing any pleadings in the State of California regarding the Debtor, and for such other and further relief as may be just.

PETITIONING CREDITORS,

By their attorneys,

/s/ Stephen F. Gordon
Stephen F. Gordon (BBO No. 203600)
The Gordon Law Firm LLP
57 River Place, Suite 200
Wellesley, Massachusetts 02481
Tel: (617) 261-0100
Fax: (617) 261-0789
E-mail: sgordon@gordonfirm.com

Dated: October 2, 2023

## CERTIFICATE OF SERVICE

I, Stephen F. Gordon, hereby certify that on October 2, 2023, the foregoing Motion was served by operation of the Court's ECF System on all individuals designated to receive service by ECF:

- Stephen F. Gordon sgordon@gordonfirm.com, vhaggerty@gordonfirm.com;notices@gordonfirm.com;stephenfgordon@gmail.com
- Richard King USTPRegion01.WO.ECF@USDOJ.GOV
- Scott Adam Schlager sas@natgolaw.com

and by email upon Manager of the Alleged Debtor:

Lolonyon Akouete (info@smartinvestorsllc.com)

/s/ Stephen F. Gordon
Stephen F. Gordon (BBO No. 203600)

P:\Clients-GLF\Westborough SPE\Plead (Bktcy)\Emer Mtn f Order.docx

# EXHIBIT A

**From:** Lolonyon Akouete <info@smartinvestorsllc.com>
**Sent:** Monday, October 2, 2023 9:21 AM
**To:** Stephen Gordon <sgordon@gordonfirm.com>
**Cc:** Scott A. Schlager <sas@natgolaw.com>
**Subject:** ** CAUTION! SUSPICIOUS EMAIL **Re: Trustee's Escheat Claim

Stephen, I will file the attached documents to prevent delay. If you object, request court intervention.

Thank you.
Lolonyon Akouete
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703
info@smartinvestorsllc.com
(443) 447-3276

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Lolonyon Akouete, Manager of Westborough SPE, LLC<br>1241 Deer Park Ave., Suite 1, #1051 North Babylon, NY 11703<br>TELEPHONE NO.: 443-447-3276 FAX NO. *(Optional)*:<br>E-MAIL ADDRESS: info@smartinvestorsllc.com<br>ATTORNEY FOR *(Name)*: Plaintiff, WESTBOROUGH SPE LLC | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SACRAMENTO**<br>STREET ADDRESS: 813 6th Street<br>MAILING ADDRESS: 720 9th Street<br>CITY AND ZIP CODE: Sacramento, CA 95814<br>BRANCH NAME: Civil Division | |
| CASE NAME: | |

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|
| [x] **Unlimited** (Amount demanded exceeds $25,000)<br>[ ] **Limited** (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [x] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [x] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   - a. [ ] Large number of separately represented parties
   - b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   - c. [ ] Substantial amount of documentary evidence
   - d. [ ] Large number of witnesses
   - e. [x] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   - f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply)*: a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action *(specify)*: 1, Retrieval of Escheated Property Under CCP §1541
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: October 2, 2023

Lolonyon Akouete
(TYPE OR PRINT NAME)

(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
- Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease
    - Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
- Confession of Judgment *(non-domestic relations)*
- Sister State Judgment
- Administrative Agency Award *(not unpaid taxes)*
- Petition/Certification of Entry of Judgment on Unpaid Taxes
- Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition



For your protection and privacy, please press the Clear This Form button after you have printed the form.

Print this form | Save this form | Clear this form

LOLONYON AKOUETE
Manager of Westborough SPE, LLC
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703
info@smartinvestorsllc.com
(443) 447-3276
WESTBOROUGH SPE LLC, IN PRO PER

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SACRAMENTO

| | |
|---|---|
| WESTBOROUGH SPE LLC, a Delaware limited liability company,<br>Plaintiff,<br><br>vs.<br><br>MALIA M. COHEN, California State Controller<br>Defendant. | CASE No.:<br><br>COMPLAINT TO RECOVER ESCHEATED PROPERTY [C.C.P. §1541]<br><br>DEPARTMENT: 53/54 |

**COMES NOW,** the Plaintiff, Westborough SPE LLC (hereinafter referred to as "Westborough"), by and through its manager, and for its Complaint against Defendant Malia M. Cohen, California State Controller (hereinafter referred to as the "Controller"), alleges as follows:

## PARTIES

1. Plaintiff Westborough is a Delaware limited liability company, with its principal place of business located at 1241 Deer Park Ave., Suite 1, #1051, North Babylon, NY 11703. Westborough is represented by its Manager, Lolonyon Akouete.

2. Defendant Malia M. Cohen is the California State Controller, with offices located at 300 Capitol Mall, Sacramento, California.

3. Rob Bonta is the Attorney General of the State of California and has an office in the County of Sacramento, California.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter and parties pursuant to the California Code of Civil Procedure §1541.

2. Venue is proper in this Court as the escheated property is held in Sacramento County by the Defendant.

## FACTS

1. On June 15, 2022, MUFG UNION BANK N A reported an abandoned checking account belonging to Plaintiff with a balance of $1,293,646.83, which has since been held with the State Controller Property ID# 1019294209.

2. Plaintiff initiated an expedited claim process for the recovery of said property which was approved on December 13, 2022, but subsequently denied by Harpreet Nakhwal in the legal department due to inaccurate information.

3. On July 13, 2023, Plaintiff provided updated information and documentation to counter the inaccurate information and requested a reevaluation of the claim, but has yet to receive any response.

4. The delay in processing the claim has led to Plaintiff's inability to pay its debts, resulting in the filing of an involuntary Chapter 7 bankruptcy case against the entity (Case No. 23-40709-CJP).

5. Plaintiff's denied claim was initially based on inaccurate information asserting that F. Jan Blaustein Scholes is under Guardianship/Conservatorship. However, there is no existing Guardianship/Conservatorship proceeding either in Arizona, where Jan currently resides, or California, her previous residence.

6. Jan's son Peter was appointed as her conservator in Hawaii following a stroke, but she has since recovered, and there has been no foreign registration in Arizona or California as mandated by A.R.S. Section 14-12401 and pursuant to the Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act (28 U.S.C. Section 1738A).

## CAUSE OF ACTION (Retrieval of Escheated Property Under CCP §1541)

1. Plaintiff repeats and realleges paragraphs 1 through 10 above.

2. California Code of Civil Procedure sections 1540 and 1541 stipulate a procedure for owners of unclaimed property held by the State to submit a claim for the return of the property. The Controller is obligated to consider a submitted claim within 180 days of its submission, and the claimant is authorized to initiate a civil action if the Controller fails to adjudicate the claim within the specified timeframe.

3. Plaintiff contends that the State Controller, through its agents, failed to adhere to the stipulated procedure in processing and evaluating the reevaluated claim for Property ID# 1019294209, causing financial distress and hardship to the Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment against Defendant as follows:

A. For an order directing the immediate release of the escheated property, with Property ID# 1019294209, plus interest accrued thereon to Plaintiff;

B. For costs of suit incurred herein; and

C. For such other and further relief as the Court deems just and proper.

Date: 10/02/2023

Lolonyon Akouete
Manager of Westborough SPE, LLC
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703
info@smartinvestorsllc.com
(443) 447-3276

IN PRO PER

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

***FOR COURT USE ONLY***
***(SOLO PARA USO DE LA CORTE)***

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
MALIA M. COHEN, California State Controller.

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
WESTBOROUGH SPE LLC, by and through its manager, Lolonyon Akouete.

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

***¡AVISO!*** *Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* SACRAMENTO SUPERIOR COURT
813 6th Street, Sacramento, CA 95814 Civil Division

CASE NUMBER:
*(Número del Caso):*

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Lolonyon Akouete Manager of Westborough SPE, LLC. 1241 Deer Park Ave., Suite 1, #1051 North. (443) 447-3276

DATE: October 2, 2023
*(Fecha)*

Clerk, by
*(Secretario)* ______________________ , Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

under:
- ☐ CCP 416.10 (corporation)
- ☐ CCP 416.20 (defunct corporation)
- ☐ CCP 416.40 (association or partnership)
- ☐ CCP 416.60 (minor)
- ☐ CCP 416.70 (conservatee)
- ☐ CCP 416.90 (authorized person)
- ☐ other *(specify):*

4. ☐ by personal delivery on *(date)*:

**Page 1 of 1**



**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

Print this form | Save this form | Clear this form

LOLONYON AKOUETE
Manager of Westborough SPE, LLC
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703
info@smartinvestorsllc.com
(443) 447-3276
WESTBOROUGH SPE LLC, IN PRO PER

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SACRAMENTO

| | |
|---|---|
| WESTBOROUGH SPE LLC, a Delaware limited liability company,<br>Plaintiff,<br><br>vs.<br><br>MALIA M. COHEN, California State Controller<br>Defendant. | CASE No.:<br><br>POINTS AND AUTHORITIES IN SUPPORT OF COMPLAINT TO RECOVER ESCHEATED PROPERTY [C.C.P. §1541]<br><br>DEPARTMENT: 53/54 |

**I. INTRODUCTION**

Westborough SPE, LLC (hereinafter "WSPE") respectfully submits these Points and Authorities, narrating a grievous account of administrative oversight and neglect by the California State Controller (hereinafter "the Controller"), which unjustly denied WSPE's rightful claim to its escheated property.

**II. STATEMENT OF FACTS**

**A. Formation and Management of WSPE**

WSPE, established and functioning under Delaware's jurisdiction since 1997, owns a theatre in Westborough, Massachusetts. Initially managed by Babcock and Brown Administrative Services, Inc ("BBAS Inc"), WSPE's managerial role transitioned to Lolonyon Akouete (Lolo) and Denise Edwards (Denise) following proper legal protocols.

**B. The Escheated Property**

An abandoned checking account belonging to WSPE, with a substantial balance, was reported and is currently held by the Controller.

**C. The Flawed Claim Denial**

Despite Lolo and Denise's exhaustive efforts and provision of supporting documents to validate their claim, the Controller's office denied it, citing an inaccurate assumption about Jan's incapacitation.

## III. LEGAL ANALYSIS

**A. The Rightful Claim under Section 1540**

The denial of the claim by the Controller is unfounded and contradicts the evidence provided by WSPE, illustrating Jan's legal competency and the managerial transition to Lolo and Denise.

**B. Invocation of Section 1541**

Given the Controller's unwarranted denial and failure to process the claim within the statutory period, WSPE resorts to Section 1541 to institute this complaint.

## IV. ARGUMENT

**A. Controller's Failure to Acknowledge Valid Documentation**

WSPE provided compelling evidence, including Durable Power of Attorney and WSPE's Operating Agreement, which the Controller disregarded, leading to an unjust denial of the claim.

**B. Inaccuracy in Assumptions**

The claim denial, premised on the erroneous assumption of Jan's incapacitation, is invalidated by the absence of any guardianship or conservatorship over her, as corroborated by legal documents from the State of Arizona.

**C. Legal Standings of Lolo and Denise**

Their status as WSPE's legally appointed managers, validated by the Secretary of the Commonwealth Corporations Division and the Secretary of State for the State of Delaware Corporations Division, underscores their legal standing to claim the escheated property.

## V. CONCLUSION

WSPE, armed with undeniable evidence and legal statutes, seeks the court's intervention for a just and expedited resolution. The Controller's denial, rooted in inaccuracies and oversight, necessitates judicial scrutiny to uphold WSPE's rights to its property.

## VI. EXHIBITS

1. Denial letters dated 2-8-2023 and 4-12-2023.
2. Durable Power of Attorney and Written Consent of Manager signed by Ms. Scholes
3. Westborough SPE LLC Operating Agreement
4. Certificate of Revival and Good Standing
5. Claim Affirmation Form - Claim ID 21014485
6. Documentation of Managerial Transition from BBAS Inc to BBAS LLC to BBPM LLC

## PRAYER FOR RELIEF

WSPE beseeches the Court for:

1. An order compelling the Controller to release the escheated property, including the accrued interest, to WSPE.
2. Costs of the suit and other justifiable reliefs as deemed appropriate.

This refined submission illuminates the Controller's procedural inadequacy and seeks the court's intervention to effectuate justice, reinstating WSPE's rightful claim to its escheated property.

Date: 10/02/2023

[signature]
Lolonyon Akouete
Manager of Westborough SPE, LLC
IN PRO PER

Date:

denise edwards
Denise Edwards
Manager of Westborough SPE, LLC
IN PRO PER

# Exhibit 1

Denial letters dated 2-8-2023 and 4-12-2023.

# MALIA M. COHEN
## California State Controller

RECEIVED FEB 15 2023

February 8, 2023

Westborough SPE LLC
c/o Denise Edwards
1241 Deer Park Ave., Suite 1 #1051
North Babylon, NY 11703

Re: Unclaimed Property Claim Identification Number 4853303

Dear Ms. Edwards:

This letter is in response to the above-referenced Unclaimed Property Claim. The claim was referred to the Legal Office for review. As explained in more detail below, after review, the claim must be denied.

This claim was submitted for one property identified as number 1019294209. This property was remitted to the State Controller's Office by MUFG Union Bank as a checking account in the amount of $1,293,646.83. The owner is reported as "Westborough SPE LLC" at a last known address of "50 California St., Suite 3610, San Francisco, CA 94111."

It appears to be your contention that you are entitled to these funds because you purchased the assets of Westborough SPE LLC. In support of your claim you submitted a Bill of Sale, a Certificate of Revival of Westborough SPE LLC from Delaware Secretary of State, a Foreign Limited Liability Company Application for Registration from the Massachusetts Secretary of State, proof of FEIN, and Westborough SPE, LLC's Motion to Vacate Foreclosure Judgment filed with the Land Court for the Commonwealth of Massachusetts.

Based upon the documentation submitted and our research, it appears that Westborough SPE, LLC was a Delaware entity. Based upon information received by the State Controller's Office, Westborough SPE, LLC was manager run as opposed to member or owner run. The manager was Babcock & Brown Administrative Services, Inc., a Delaware corporation. Officers of Babcock & Brown Administrative Services, Inc. included Jan Blaustein Scholes, James Jaworski, and Dyann Blaine.

Westborough SPE LLC
February 8, 2023
Page 2

The Bill of Sale dated November 21, 2022, between Westborough SPE, LLC and Denise Edwards and Lolonyon Alouete was signed by "Jan Blaustein Scholes, its President." Jan Blaustein Scholes has suffered from multiple strokes since 2004. In 2019 the Hawaii Third Circuit, Kona Division granted Conservatorship and Guardianship over the person and estate of Frances Jan Blaustein Scholes to her son, Peter Blaustein. As Jan Blaustein Scholes has been judicially declared to lack capacity, she is unable to enter into contracts. After review, the Bill of Sale was signed by Jan Blaustein Scholes after she was declared to be incapacitated and had a Conservatorship and Guardianship entered over her person and estate. Therefore, the Bill of Sale is void. As the Bill of Sale is void, you could not have acquired any interest in Westborough SPE LLC and your claim for this property must be denied.

Additionally, it should be noted that even if it is determined that Jan Blaustein Scholes had the capacity to enter into the contact, it does not appear that you would be entitled to the funds in question. It appears that Jan Blaustein Scholes signed the Bill of Sale as the President of Babcock & Brown Administrative Services Inc. and not of Westborough SPE, LLC. It appears that Babcock & Brown Administrative Services Inc. acted only as the manager of Westborough SPE, LLC and did not have an ownership interest of Westborough SPE, LLC. At this time our office is lacking sufficient information to determine whether an officer of the managing entity, Babcock & Brown Administrative Services Inc., would have authority to sell the assets of Westborough SPE LLC.

For the reasons discussed above, the claim is denied.

Sincerely,

[signature]

HARPREET K. NAKHWAL
Staff Counsel

HKN/jh

cc: Coleen Kimler, Bureau Chief, Unclaimed Property Division, State Controller's Office

MALIA M. COHEN
CALIFORNIA STATE CONTROLLER

April 12, 2023

Westborough SPE LLC
c/o Denise Edwards and Lolonyon Akouete
1241 Deer Park Ave., Suite 1 #1051
North Babylon, NY 11703

Re: Unclaimed Property Claim Identification Number 4853303

Dear Ms. Edwards and Mr. Akouete:

This letter is in regard to the above-referenced unclaimed property claim. In my letter dated February 8, 2023, the claim was denied. You subsequently submitted additional documentation in support of your claim. As explained in more detail below, after review of the additional documentation, the denial of your claim must be affirmed.

In my previous letter I explained that there were several deficiencies with the claim. The first issue being that it was established that the Bill of Sale was signed by Jan Blaustein Scholes after she was declared to be incapacitated and had a Conservatorship and Guardianship entered over her person and estate. As Ms. Scholes has been judicially declared to lack capacity, she could not have entered into a contract to sell assets of Westborough SPE LLC. The second issue was that even if it is determined that Ms. Scholes had the capacity and ability to enter into the contract, there was insufficient information to determine whether she, an officer of the managing entity, Babcock & Brown Administrative Services, Inc., would have authority to sell the assets of Westborough SPE LLC.

You have now submitted several documents that appear to try and address the second issue. However, after review of the evidence now submitted, there does not appear to be any evidence to refute the fact that a Conservatorship and Guardianship was entered over the person and estate of Jan Blaustein Scholes and that she was declared to be incapacitated by the Hawaii Third Circuit, Kona Division.

300 Capitol Mall, Suite 1850, Sacramento, CA 95814 | P.O. Box 942850, Sacramento, CA 94250
Phone: 916.445.2636 | Fax: 916.322.1220

Westborough SPE LLC
April 12, 2023
Page 2

Without expressing an opinion on the new documentation submitted, the claim must remain denied because you have failed to remedy the fact that Jan Blaustein Scholes lacked the capacity to enter into a contract.

Sincerely,

Harpreet K Nakhwal

HARPREET K. NAKHWAL
Staff Counsel

HKN/jh

cc: Coleen Kimler, Bureau Chief, Unclaimed Property Division, State Controller's Office

# Exhibit 2

Durable Power of Attorney and Written Consent of Manager signed by Ms. Scholes

# DURABLE POWER OF ATTORNEY

This Durable Power of Attorney is made on this 26 day of June, 2023, by Babcock and Brown Parallel Member LLC, a Delaware limited liability company (the "Grantor").

WHEREAS, pursuant to the Operating Agreement ("Operating Agreement") of Westborough SPE LLC (the "Company") dated as of 20th October 1997 (the "LLC Agreement"), Babcock and Brown Administrative Services Inc., a Delaware corporation, was designated as the manager of the Company;

WHEREAS, Babcock and Brown Administrative Services Inc. has merged into the Grantor, and as a result, the Grantor is the successor of all the rights and obligations of Babcock and Brown Administrative Services Inc.;

WHEREAS, Section 1(g) of the LLC Agreement provides that any manager of the Company may delegate all or any of its powers or duties under the LLC Agreement to another manager or to any member or any other person or entity by an instrument in writing;

NOW, THEREFORE, the Grantor hereby appoints Mr. Lolonyon Akouuete and Ms. Denise Edward as its attorney in fact (the "Attorney"), with powers to be exercised jointly with member or manager of the Grantor, to act on behalf of the Grantor in connection with any and all matters relating to the management and operation of the Company, including but not limited to:

1. the right to sell, buy, lease, mortgage, assign, rent or dispose of any real property on behalf of the Company; and
2. the right to execute, acknowledge, and deliver any and all documents, contracts, agreements, checks, drafts, promissory notes, mortgages, deeds of trust, leases, deeds, easements, and other instruments of any nature whatsoever, as may be necessary or desirable, and to perform all acts and do everything that the Grantor could do; and
3. the right to open a bank account/s, deposit, endorse, or withdraw funds to or from any of the Company's bank accounts or safe deposit box;
4. the right to initiate, defend commence or settle legal actions on the Company's behalf;
5. the right to retain any accountant, attorney, or other adviser deemed necessary to protect the Company's interests relative to any foregoing unlimited power;
6. the right to bind the Grantor by executing documents or instruments on its behalf, and any such executed documents or instruments shall be binding upon and enforceable against the Grantor.

The Grantor undertakes to:

- ratify and confirm whatever the Attorney does or purports to do in good faith in exercising the powers conferred by this Power of Attorney; and
- Indemnify the Attorney against all claims, losses, costs, expenses, damages or liability incurred by her as a result of acting in good faith pursuant to this power of attorney (including any costs incurred in enforcing this indemnity).

See Exhibit A hereto for additional rights with respect to the Company property.

This Power of Attorney shall be governed by and construed in accordance with the laws of the State of Delaware. The powers and duties of an Agent under a durable power of attorney are explained more fully in Delaware Code, Title 12, Chapter 49A, Section 49A-114 and Sections 49A-201 through 49A-217.

By signing below, I have read or had explained to me this notice and I understand its contents. I have had an attorney licensed in the State of Arizona review and approve of me signing this Durable Power of Attorney.

This Power of Attorney shall be effective from the signing date below and shall continue in full force and effect until revoked by the Grantor in writing.

**Reliance on This Power of Attorney**

Any person, including my Agent(s), may rely upon this power of attorney or a copy of it unless that person knows it has terminated or is invalid.

**Revocation of Prior Power of Attorney**

If you have previously executed a power of attorney granting authority covered in this document, indicate below whether or not you wish to revoke the prior power of attorney. INITIAL your selection below:

✓ All my previously executed powers of attorney are hereby revoked, except those powers of attorney described in § 49A-103(a) of Title 12 of the Delaware Code, none of which are personal powers of attorney described within the meaning of § 49A-102(9) of Title 12 of the Delaware Code.

**IN WITNESS WHEREOF**, the Grantor has executed this Power of Attorney as of the date first written above as an instrument under seal.

BABCOCK AND BROWN PARALLEL MEMBER LLC

By: [signature]

Name: F. Jan Blaustein Scholes

Title: Manager, duly authorized

I, DJIGBODI LOKOSSOU, swear that I am not related to the Principal by blood, marriage, or adoption; and that I am not entitled to any portion of the estate of the Principal under the Principal's current will or codicil, or under any current trust instrument of the Principal.

[signature] Lokossou

Witness Signature

DJIGBODI LOKOSSOU

Print Witness Name

State of Arizona

COUNTY OF Arizona

This Durable **Power** of **Attorney** was signed by the Principal, witnessed by the person aforesaid, and acknowledged before me, the Subscriber, a Notary Public, as the free act and deed of the Principal this 26 day of June, 2023.

[signature]

Notary Public

My Commission Expires: 02-28-2027 (seal)

BILLIE J WAHL
Notary Public - Arizona
Maricopa County
Commission # 642362
My Comm. Expires Feb 28, 2027

**EXHIBIT "A"**

**Real Property § 49A-204**

1. To demand, buy, lease, receive, accept as a gift or as security for an extension of credit, or otherwise acquire or reject an interest in real property or a right incident to real property;
2. To sell; exchange; convey with or without covenants, representations, or warranties; quitclaim; release; surrender; retain title for security; encumber; partition; consent to partitioning; subject to an easement or covenant; subdivide; apply for zoning or other governmental permits; plat or consent to platting; develop; grant an option concerning; lease; sublease; contribute to an entity in exchange for an interest in that entity; or otherwise grant or dispose of an interest in real property or a right incident to real property;
3. To pledge or mortgage an interest in real property or right incident to real property as security to borrow money or pay, renew, or extend the time of payment of a debt of the Principal or a debt guaranteed by the Principal;
4. To release, assign, satisfy, or enforce by litigation or otherwise a mortgage, deed of trust, conditional sale contract, encumbrance, lien, or other claim to real property which exists or is asserted;
5. To manage or conserve an interest in real property or a right incident to real property owned or claimed to be owned by the Principal, including:
    a. Insuring against liability or casualty or other loss;
    b. Obtaining or regaining possession of or protecting the interest or right by litigation or otherwise;
    c. Paying, assessing, compromising, or contesting taxes or assessments or applying for and receiving refunds in connection with them; and
    d. Purchasing supplies, hiring assistance or labor, and making repairs or alterations to the real property;
6. To use, develop, alter, replace, remove, erect, or install structures or other improvements upon real property in or incident to which the Principal has, or claims to have, an interest or right;
7. To participate in a reorganization with respect to real property or an entity that owns an interest in or right incident to real property and receive, and hold, and act with respect to stocks and bonds or other property received in a plan of reorganization, including:
    a. Selling or otherwise disposing of them;
    b. Exercising or selling an option, right of conversion, or similar right with respect to them; and
    c. Exercising any voting rights in person or by proxy;
8. To change the form of title of an interest in or right incident to real property; and
9. To dedicate to public use, with or without consideration, easements or other real property in which the Principal has, or claims to have, an interest.

**Tangible Personal Property § 49A-205**

1. To demand, buy, receive, accept as a gift or as security for an extension of credit, or otherwise acquire or reject ownership or possession of tangible personal property or an interest in tangible personal property;
2. To sell; exchange; convey with or without covenants, representations, or warranties; quitclaim; release; surrender; create a security interest in; grant options concerning; lease; sublease; or otherwise dispose of tangible personal property or an interest in tangible personal property;
3. To grant a security interest in tangible personal property or an interest in tangible personal property as security to borrow money or pay, renew, or extend the time of payment of a debt of the Principal or a debt guaranteed by the Principal;
4. To release, assign, satisfy, or enforce by litigation or otherwise, a security interest, lien, or other claim on behalf of the Principal, with respect to tangible personal property or an interest in tangible personal property;
5. To manage or conserve tangible personal property or an interest in tangible personal property on behalf of the Principal, including:
    a. Insuring against liability or casualty or other loss;
    b. Obtaining or regaining possession of or protecting the property or interest, by litigation or otherwise;
    c. Paying, assessing, compromising, or contesting taxes or assessments or applying for and receiving refunds in connection with taxes or assessments;
    d. Moving the property from place to place;
    e. Storing the property for hire or on a gratuitous bailment; and
    f. Using and making repairs, alterations, or improvements to the property; and
6. To change the form of title of an interest in tangible personal property.

**Claims and Litigation § 49A-212**

1. To assert and maintain before a court or administrative agency a claim, claim for relief, cause of action, counterclaim, offset, recoupment, or defense, including an action to recover property or other thing of value, recover damages sustained by the Principal, eliminate or modify tax liability, or seek an injunction, specific performance, or other relief;
2. To bring an action to determine adverse claims or intervene or otherwise participate in litigation;
3. To seek an attachment, garnishment, order of arrest, or other preliminary, provisional, or intermediate relief and use an available procedure to effect or satisfy a judgment, order, or decree;
4. To make or accept a tender, offer of judgment, or admission of facts, submit a controversy on an agreed statement of facts, consent to examination, and bind the Principal in litigation;

5. To submit to alternative dispute resolution, settle, and propose or accept a compromise;
6. To waive the issuance and service of process upon the Principal, accept service of process, appear for the Principal, designate persons upon which process directed to the Principal may be served, execute and file or deliver stipulations on the Principal's behalf, verify pleadings, seek appellate review, procure and give surety and indemnity bonds, contract and pay for the preparation and printing of records and briefs, receive, execute, and file or deliver a consent, waiver, release, confession of judgment, satisfaction of judgment, notice, agreement, or other instrument in connection with the prosecution, settlement, or defense of a claim or litigation;
7. To act for the Principal with respect to bankruptcy or insolvency, whether voluntary or involuntary, concerning the Principal or some other person, or with respect to a reorganization, receivership, or application for the appointment of a receiver or trustee which affects an interest of the Principal in property or other thing of value;
8. To pay a judgment, award, or order against the Principal or a settlement made in connection with a claim or litigation; and
9. To receive money or other thing of value paid in settlement of or as proceeds of a claim or litigation.

**Taxes § 49A-216**

1. To prepare, sign, and file federal, state, local, and foreign income, gift, generation skipping transfer, payroll, property, Federal Insurance Contributions Act (26 U.S.C. § 3101 et seq.), and other tax returns, claims for refunds, requests for extension of time, petitions regarding tax matters, and any other tax-related documents, including receipts, offers, waivers, consents, including consents and agreements under § 2032A of the Code, closing agreements, and any power of attorney required by the Internal Revenue Service or other taxing authority with respect to a tax year upon which the statute of limitations has not run and the following 25 tax years;
2. To pay taxes due, collect refunds, post bonds, receive confidential information, and contest deficiencies determined by the Internal Revenue Service or other taxing authority;
3. To exercise any election available to the Principal under federal, state, local, or foreign tax law; and
4. To act for the Principal in all tax matters for all periods before the Internal Revenue Service, or other taxing authority.

# WRITTEN CONSENT OF THE MANAGER OF BABCOCK AND BROWN PARALLEL MEMBER LLC IN LIEU OF A MEETING

The undersigned, being the manager of BABCOCK AND BROWN PARALLEL MEMBER LLC, a Delaware limited liability company (the "**Company**"), acting by written consent without a meeting pursuant to Section 18-404 of the Delaware Limited Liability Company Act, does hereby consent to the adoption of the following resolutions:

**WHEREAS**, F. Jan Blaustein Scholes ("**Scholes**") is the Manager of the Company; and

**WHEREAS**, F. Jan Blaustein Scholes is over the age of eighteen and is of sound mind and is not under a conservatorship or guardianship in the State of Arizona; and

**WHEREAS**, F. Jan Blaustein Scholes resides in the State of Arizona and is executing this document in the State of Arizona.

**NOW THEREFORE LET IT BE:**

**RESOLVED**, that a Durable Power of Attorney be executed authorizing Lolonyon Akouete and Denise Edwards to undertake the actions specified therein;

**RESOLVED**, that the Bill of Sale executed on November 21, 2022, be amended as follows:

(i) The Title of the Document shall be amended to delete "Bill of Sale" and substitute "Transfer of Manager Role";

(ii) The WHEREAS clause shall be amended to delete the word "sell" and "transfer her Manager role of Westborough SPE LLC" shall be substituted therefore. In addition, "Buyer desires to buy" shall be deleted and the following substituted therefore "Subsequent Manager desires to assume the Role as Manager(s) of Westborough SPE LLC". In addition "and all assets thereof" shall be deleted.

(iii) Paragraph 1 shall be deleted in its entirety and "The consideration paid heretofore for a change in Manager is $100.00 which was tendered by Money Order to Scholes".

(iv) Paragraphs 1(a)-(b) shall be deleted in their entirety.

(v) Paragraph 2 shall be deleted in its entirety and F. Jan Blaustein Scholes is not under a conservatorship/guardianship in the State of Arizona where she currently resides and is of sound legal mind, and understands the consequences of this Agreement to Transfer Manager Role".

(vi) Paragraph 3 shall be deleted in its entirety and the following substituted therefore "Westborough SPE LLC has an outstanding debt owed to the Town of Westborough for unpaid obligations which as of May 2023 equated to approximately $920,000.00. In addition, there are unclaimed funds in the State of California of approximately $1,200,000.00 belonging to Westborough SPE LLC. Akouete and Edwards have become Managers of Westborough SPE LLC and that

is hereby ratified and confirmed. Akouete and Edwards are authorized to take whatever actions necessary to recover and protect the property located at Turnpike Road, Westborough, Massachusetts and recover the unclaimed funds in the State of California."

(vii) Paragraph 5 shall be deleted and the following substituted therefore "This Agreement shall be governed by the laws of the State of Arizona as to contract formation and capacity and the State of Delaware as to limited liability company actions".

(viii) Paragraph 6 shall remain and is hereby ratified and confirmed and Westborough SPE LLC was lawfully reinstated in both Delaware and Massachusetts.

(ix) Paragraph 8 shall be added, "If any provision of this Agreement shall to any extent be held void or unenforceable (as to duration, scope, activity, subject or otherwise) by a court of competent jurisdiction, such provision shall be deemed to be modified so as to constitute a provision conforming as nearly as possible to the original provision while still remaining valid and enforceable. In such event, the remainder of this Agreement (or the application of such provision to persons or circumstances other than those in respect of which it is deemed to be void or unenforceable) shall not be affected thereby. Each other provision of this Agreement, unless specifically conditioned upon the voided aspect of such provision, shall remain valid and enforceable to the fullest extent permitted by law; any other provisions of this Agreement that are specifically conditioned on the voided aspect of such invalid provision shall also be deemed to be modified so as to constitute a provision conforming as nearly as possible to the original provision while still remaining valid and enforceable to the fullest extent permitted by law."

(x) Paragraph 9 shall be added "Time shall be of the essence as to each term hereof."

(xi) Paragraph 10 shall be added "Each party recognizes that this Agreement is a legally binding contract and acknowledges that it, he or she has had the opportunity to consult with legal counsel of choice. In any construction of the terms of this Agreement, the same shall not be construed against either party on the basis of that party being the drafter of such terms."

(xii) Paragraph 11 shall be added "Scholes has engaged an attorney licensed in the State of Arizona to represent her interests with respect to this Agreement and the attorney has reviewed the document and consents to its signing."

**RESOLVED**, that the manager be, and each of them individually hereby is, authorized and directed to do and perform or cause to be done and performed all such acts, deeds, and things, and to make, execute, and deliver, or cause to be made, executed, and delivered, all such agreements, undertakings, documents, instruments, or certificates in the name of the Company and to retain such counsel, agents, and advisors and to incur and pay such expenses, fees, and taxes as shall, in the opinion of the manager of the Company executing the same, be deemed necessary or advisable (such necessity or advisability to be conclusively evidenced by the execution thereof) to effectuate or carry out fully the purpose and interest of all of the foregoing resolutions; and that any and all such actions heretofore or hereafter taken by the manager

relating to and within the terms of these resolutions be, and they hereby are, adopted, affirmed, approved, and ratified in all respects as the act and deed of the Company; and

**RESOLVED**, that an executed copy of this Written Consent shall be filed with the minutes of the proceedings of the managers.

**IN WITNESS WHEREOF**, the undersigned manager has duly executed this Written Consent as of June 23, 2023 as an instrument under seal.

Signature: ______________________ Date: 2/22/23

F. Jan Blaustein Scholes, Manager

I, ______________________, swear that I am not related to the Principal by blood, marriage, or adoption; and that I am not entitled to any portion of the estate of the Principal under the Principal's current will or codicil, or under any current trust instrument of the Principal.

State of Arizona

COUNTY OF Arizona

This Durable **Power** of **Attorney** was signed by the Principal, witnessed by the person aforesaid, and acknowledged before me, the Subscriber, a Notary Public, as the free act and deed of the Principal this 26 day of June, 2023.

______________________
Notary Public

My Commission Expires: 02-28-2027 (seal)

BILLIE J WAHL
Notary Public - Arizona
Maricopa County
Commission # 642362
My Comm. Expires Feb 28, 2027

# Exhibit 3

Westborough SPE LLC Operating Agreement

WESTBOROUGH SPE LLC

LIMITED LIABILITY COMPANY AGREEMENT

October 22, 1997

TABLE OF CONTENTS


| | |
|---|---|
| RECITALS | 1 |
| FORMATION, MANAGEMENT, PURPOSES, NAME | 1 |
| CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS; AND LIABILITY OF MEMBERS | 6 |
| RETURN OF CONTRIBUTIONS | 7 |
| SHARE OF DISTRIBUTIONS, PROFITS, LOSSES AND OTHER ITEMS | 7 |
| SUBSTITUTION AND ASSIGNMENT OF A MEMBER'S INTEREST | 9 |
| BOOKS AND RECORDS; BANK ACCOUNTS | 9 |
| OTHER BUSINESS | 10 |
| DISSOLUTION AND CONTINUATION OF THE COMPANY | 10 |
| MISCELLANEOUS | 11 |

WESTBOROUGH SPE LLC

LIMITED LIABILITY COMPANY AGREEMENT

This Limited Liability Company Agreement (the "Agreement"), dated as of the 22nd day of October, 1997, is by and between MIGNONETTE INVESTMENTS LIMITED, a British Virgin Islands entity organized under the BVI International Business Companies Act (the "Member"), and BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC., a Delaware corporation, as the Manager.

R E C I T A L S:

A. The Member formed a limited liability company (the "Company") pursuant to and in accordance with the Delaware Limited Liability Company Act (the "LLC Act") by the filing on the date hereof of a Certificate of Formation with the Secretary of State of the State of Delaware for the purposes described therein and herein.

B. The Member and Babcock & Brown Administrative Services, Inc. desire to enter into this Agreement to provide for, among other things, the management of the business and affairs of the Company, the distribution of monies and allocation of profits and losses as to the Member, and the respective rights, interests, obligations and duties of the Member and of the Manager to each other and to the Company and its assets, business, liabilities and obligations.

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, the parties hereto hereby agree as follows:

OPERATING AGREEMENT

1. Formation, Management, Purposes, Name

(a) The rights and liabilities of the parties hereto shall be determined pursuant to the LLC Act and this Agreement. To the extent that the rights or obligations of the parties are different by reason of any provision of this Agreement than they would be in the absence of any such provision, or even if this Agreement is inconsistent with the LLC Act, this Agreement shall control, except to the extent the LLC Act provides that the applicable provisions thereof as to any

such matter may not be modified by a limited liability company's members, or ... as otherwise provided in this Agreement, in which event the provisions hereof shall be applicable to the extent, if any, allowed by the LLC Act.

The name of the Member and its address are set forth on Schedule A attached hereto. If any additional Members and/or substitute Members are hereinafter added as Members in the Company their names and respective addresses shall be added by amendment of said Schedule A.

The registered office and the registered agent of the Company in the State of Delaware shall be as set forth in the Certificate, as such office and agent may be changed, and as the Certificate may, as a consequence thereof, be amended from time to time by the Manager.

(b) The name of the limited liability company formed hereby is Westborough SPE LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager deems appropriate or advisable. The Manager shall file, or shall cause to be filed, the Certificate of Formation and any fictitious name certificates, foreign state registrations and similar filings, and any amendments to any thereof, that the Manager considers necessary, appropriate or advisable, including, without limitation, an Application for Registration as a foreign limited liability company in the Commonwealth of Massachusetts.

(c) The Company is formed for the sole purpose of, and the nature of the sole business to be conducted by the Company is, to acquire, own, construct, lease, operate, maintain and, consistent with its investment purposes, to sell, exchange, convey and otherwise transfer, and otherwise to deal with, in any manner deemed desirable, the real property generally described in Schedule C attached hereto, and any other real property and any personal property, tangible or intangible, appurtenant to any thereof or hereafter acquired as necessary or convenient in connection with such real property, and to own interests in and be a member and/or manager, partner, general or limited, venturer, stockholder or other holder of interests in any entity holding direct or indirect interests in any such assets or engaged in any such activity, and in connection with all of the above, the Company may engage in any lawful act or activity for which limited liability companies may be formed under the LLC Act and in any and all activities necessary, advisable, convenient or incidental thereto. The purposes of the Company may not be broadened without the unanimous consent of all the Members and the Manager, nor may it be broadened if such would violate or cause a default under any agreement to which the Company is a party or by which it is bound.

In furtherance of the conduct of the purposes described above, the Company shall have the power and authority to do any and all lawful activities, business or actions which an Company may take under the LLC Act and, except as limited by the LLC Act, any activities, business or actions which a business corporation or a limited partnership would be entitled to engage in or take pursuant to the applicable laws of the State of Delaware, or under other applicable law, so long as such powers are necessary or convenient to the conduct, promotion or attainment of the business, trade, purposes or activities of the Company.

(d) Babcock & Brown Administrative Services Inc. is hereby designated as the Manager of the Company. One or more Managers may be designated and the number of Managers may be determined at any time by "Consent of the Members"; provided, however, that any such Consent providing for the Company to have more than one Manager shall only be made by amendment of this Agreement and shall also indicate those circumstances in which each Manager will be authorized to act alone and those circumstances in which more than one or all of the Managers will be required to act on behalf of the Company. A Manager may be removed by Consent of the Members at any time and for any reason or for no reason.

(e) Except as otherwise specifically provided in this Section 1 and in Section 8 of this Agreement: (i) the overall management and control of the business and affairs of the Company, and the sole and exclusive authority to make all decisions and take all actions as to the business and affairs of the Company, shall be vested in the Manager, who shall have the sole power and authority to make any decision and to take any action and to exercise any power on behalf of the Company which the Company has the right, power and authority to take or otherwise engage in; and (ii) the Members shall have no voting rights, consent or approval over or as to any such matters.

Notwithstanding the above, the Manager may not file, on behalf of the Company, a petition in bankruptcy or for reorganization or insolvency or any other similar matter without the unanimous consent of the Members.

The Manager shall devote, and shall cause its members, partners, officers, directors and employees, if any, to devote such time to the affairs of the Company as such Manager, in its sole discretion, determines is necessary for performance by the Manager of its duties, provided no such persons shall be required to devote full time to such affairs. The Manager shall have the right and power to manage, operate, and control the Company, and to do all things and take



GS2- 136229-1

"Consent of the Members" shall mean action of the holders of more than two-thirds of the Percentage Interests of all the Members, as such Percentage Interests are initially set forth on Schedule A hereto and as such Percentage Interests may be changed pursuant to the other provisions of this Agreement.

No Manager may resign or retire from, abandon or otherwise terminate its status as a Manager without the Consent of the Members.

(f) No Member, acting in its capacity as a Member (but nothing herein limiting any Member's capacity as a Manager if a Member is also a Manager), shall have any authority, power or privilege to act on behalf of or to bind the Company.

(g) The signature of the Manager or, if more than one Manager any time, of any Manager on any agreement, contract, instrument or other document shall be sufficient to bind the Company and any other Manager in respect thereof, shall be deemed the action of the Company and of any other Manager, and shall conclusively evidence the authority of such executing Manager and the Company with respect thereto, and no third party need look to any other evidence or require joinder or consent of any other party to bind the Company or to evidence such Manager's authority.

Without in any way amending, modifying, expanding or limiting the foregoing provisions of this paragraph (g), an individual or individuals may be authorized in writing by the Manager to execute any documents to be filed with the Secretary of State of the Commonwealth of Massachusetts and/or authorized to execute, acknowledge, deliver and record any recordable instruments on behalf of the Company purporting to effect an interest in real property, whether to be recorded with the registry of deeds or district office of the Land Court, and in the event of any such authorization the Application for Registration for the Company in the Commonwealth of Massachusetts shall include or, as appropriate, be amended to set forth such authorization.

Any Manager may, from time to time, by an instrument in writing, delegate all or any of its powers or duties hereunder to another Manager, if any, or to an officer, manager, member, or partner of any other Manager or to any Member or any other person or entity. Such writing may fully authorize such other Manager or such other person or entity, acting alone or with others, all as

may be provided in such written delegation, without requirement of any other act [illegible] of the delegating Manager, to take any action of any type and to do anything and everything which the delegating Manager may be authorized to take or do hereunder (including, without limitation, executing checks, drafts, promissory notes, mortgages, deeds of trust, leases, deeds, easements, and contracts of any nature whatsoever) and may delegate such authority generally or as to any specified matter or specific terms, all as may be provided in writing by any such Manager. Any documents or other instruments executed by any person or entity to whom any such delegation has been made shall be binding upon and enforceable against the Company, and shall be the valid act and deed of the Company, if executed by such delegee, and any third party shall be fully protected in relying upon the authority of any such delegee pursuant to a written delegation by the (or a) Manager.

(h) The Manager shall be entitled to reimbursement from the Company for all expenses incurred by such Manager in managing and conducting the business and affairs of the Company. The Manager shall determine which expenses, if any, are allocable to the Company in a manner which is fair and reasonable to the Manager(s) and the Company, and if such allocation is made in good faith it shall be conclusive in the absence of manifest error.

(i) Any Manager, or the sole Manager if there is only one, may cause the Company to enter into one or more loans, agreements, leases, contracts or other arrangements for the furnishing to or by the Company of money, goods, services or space with any Member, Manager or an affiliate thereof, and may pay compensation thereunder for such goods, services or space, provided in each case the terms of any such arrangements are at least as advantageous to the Company as those which would be available to the Company under similar arrangements between unrelated parties, and if the determination of such terms is made in good faith it shall be conclusive in the absence of manifest error.

(j) In the performance of its duties and obligations hereunder, and in the exercise of its powers hereunder, the Manager shall act in good faith. The Company shall indemnify, defend and hold harmless the Manager, each Member, any person appointed to act for or on behalf of the Company pursuant to Section 1(g), and each such person's officers, directors, partners, members, shareholders, employees, and agents, and the employees, officers and agents of the Company (all indemnified persons being referred to as "Indemnified Persons" for purposes of this Section 1(j)), from any liability, loss, or damage incurred by an Indemnified Person by reason of any act performed or omitted to be performed by such Indemnified Person in connection with the business of the Company, and

from liabilities or obligations of the Company imposed on such person by virtue of such person's position with or relationship to the Company, including reasonable attorneys' fees and costs and any amounts expended in the settlement of any such claims of liability, loss, or damage; provided, however, that, if the liability, loss, damage, or claim arises out of any action or inaction of an Indemnified Person, indemnification under this Section 1(j) shall be available only if (i) the Indemnified Person, at the time of such action or inaction, determined, in good faith, that its course of conduct was consistent with this Agreement or otherwise in the best interests of the Company, and (ii) the action or inaction did not constitute fraud, gross negligence or willful misconduct by the Indemnified Person. Any indemnification under this Section 1(j) shall be recoverable only from the assets of the Company and not from any assets of any of the Members.

2. Capital Contributions; Capital Accounts; and Liability of Members.

(a) The Member has contributed in cash to the capital of the Company the amount set forth opposite such Member's name on Schedule B hereto.

Additional capital contributions may be made (but are not required to be made) by the Member, or any of them if more than one, if necessary or desirable to enable the Company to meet its obligations.

Any third party may rely on a certificate or other statement from the Manager as to Member or Members of the Company and the respective Percentage Interests of the Members at any time. All capital contributions by the Member(s) shall be reflected on the books and records of the Company.

Upon approval of the Manager, any Member may make a loan or loans to the Company on such terms as the Manager may determine. No such loan shall be considered a contribution to the capital of the Company.

(b) No Member shall be obligated to contribute any additional capital or make any loans to the Company. No interest or preferred return shall accrue on any contributions to the capital of the Company. No Member shall have any rights or priority over any other Members as to contributions or as to distributions or compensation by way of income, except as may otherwise be specifically provided for elsewhere in this Agreement.

(c) If there is more than one Member at any time and the Company has not elected to be taxed as a corporation under the Internal Revenue Code, a separate capital account ("Capital Account") shall be established for each Member,

and shall be maintained in accordance with applicable regulations under the Internal Revenue Code of 1986, consistent with such regulations, there shall be credited to each Member's Capital Account the amount of any contribution of capital made by such Member to the Company, and such Member's share of the net profits, and items thereof, of the Company, and there shall be charged against each Member's Capital Account the amount of all distributions to such Members, and such Member's share of the net losses, and items thereof, of the Company.

(d) The liability of any Member for the losses, debts and obligations of the Company shall be limited to its capital contributions then made but not then previously repaid to or withdrawn by them in accordance with the terms of this Agreement. No Member, in its capacity as a Member or as Manager, shall have any liability to restore any negative balance in its Capital Account. In no event shall any Member, in its capacity as a Member, nor any Manager, whether or not also a Member, be personally liable for any judgments, debts, liabilities or obligations of the Company.

(e) The Member(s), unanimously if more than one, shall have the right at any time to require the Manager to elect to treat the Company as a corporation under the Internal Revenue Code.

3. Return of Contributions. No Member shall have the right to withdraw or to be repaid any capital contributed by it or to receive any property or other payment in respect of its interest in the Company, including, without limitation, as a result of the withdrawal or resignation of such Member from the Company, except as specifically provided in this Agreement.

4. Share of Distributions, Profits, Losses and Other Items.

(a) All cash available for distribution shall be distributed to the Member, or among the Members if there is more than one Member, first to return any unrepaid capital contributions, pro-rata among the Members with such amounts in proportion to each respective Member's unrepaid capital contribution, and then among the Members according to their respective Percentage Interests. Distributions to the Members shall be made at such times and in such amounts as shall be reasonably determined by the Manager. Except as provided in the next paragraph, all distributions to Members shall be made in cash.

If the Manager elects, with the Consent of the Members, to distribute any assets of the Company in kind, such assets shall be distributed on the basis of

their fair market value as determined by the Manager, and if the determination of such fair market value ... shall be conclusive in the absence of manifest error.

(b) If and so long as the Company is taxed as a partnership, allocations of income, profit, gain and loss, shall be made as follows: (i) items of net income and gain shall be allocated among the Members in the manner necessary to increase each Member's Capital Account to an amount equal to the amount of cash such Member would be entitled to receive pursuant to Section 4(a) if an amount of cash equal to the net positive Capital Account balances (after such allocation) were distributed to the Members in the order and priority specified in Section 4(a), and (ii) items of net loss and deduction shall be allocated among the Members in the manner necessary to reduce each Member's Capital Account to an amount equal to the amount of cash such Member would be entitled to receive pursuant to Section 4(a) if an amount of cash equal to the net positive Capital Account balances (after such allocation) were distributed to the Members in the order and priority specified in Section 4(a).

Notwithstanding the foregoing, all allocations of items that cannot have economic effect (except "partner nonrecourse deductions") shall be allocated to the Members in accordance with the Members' interests in the Company, which, unless otherwise required by Code Section 704(b) and the Regulations promulgated thereunder, shall be in proportion to the Percentage Interests of the Members, and all "partner nonrecourse deductions" and "partner minimum gain" shall be allocated in accordance with the provisions of Treasury Regulations Section 1.704-2.

All items of depreciation, gain, loss, deduction or credit shall be determined in accordance with the Code and, except to the extent otherwise required by the Code, shall be allocated to and among the Members in the same percentages in which the Members share in net profits and net losses.

(c) Except as otherwise specifically provided herein, all tax elections shall be made by the Manager as it shall deem appropriate.

5. <u>Substitution and Assignment of a Member's Interest</u>. A Member may sell, assign, give, pledge, hypothecate, encumber or otherwise transfer (including, without limitation, any assignment or transfer by operation of law or by order of court) all or any part of such Member's interest in the Company, without the consent or approval of any other Member or of the Manager.

6. Books and Records; Bank Accounts.

(a) The Manager shall keep or cause to be kept complete and accurate books and records of the Company using such method as the Manager may elect. Such books and records shall be maintained and be available, in addition to any documents and information required to be furnished to the Members under the LLC Act, at an office of the Company for examination and copying by any Member, or its duly authorized representative, at its reasonable request and at its expense during ordinary business hours. Any Member may, at any time, at its own expense, cause an audit or review of the Company books to be made by a certified public accountant of its own selection.

A current list of the full name and last known address of each Member and of the Manager, a copy of this Agreement, any amendments thereto and the Certificate of Formation, executed copies of all powers of attorney, if any, pursuant to which this Agreement, any amendment, or the Certificate of Formation has been executed, copies of the Company's financial statements and federal, state and local income tax returns and reports, if any, for the five most recent years, shall be maintained at the registered office of the Company required by the LLC Act.

If the Company is taxed as a partnership, then on or before the due date (including extensions) of the federal income tax return of the Company for each fiscal year of the Company, the Manager shall cause each Member to be furnished with copies of the Company's federal income tax return and Schedule K-1's for each respective Member for the fiscal year then ended.

If the Company is taxed as a corporation, the Manager shall timely (including extensions) file all requisite federal, state and local tax returns.

(b) Bank accounts and/or other accounts of the Company shall be maintained in such banking and/or other financial institution(s) as shall be selected by the Manager, and withdrawals shall be made and other activity conducted on such signature or signatures as shall be designated by the Manager.

(c) The fiscal year of the Company shall end on December 31 of each year.

7. Other Business. The Members, the Manager and any affiliates of any of them may engage in and possess interests in other business ventures and

investment opportunities of every kind and description, independently or with others, including serving as managers and general partners of other limited liability companies and partnerships with purposes similar to those of, and/or in competition with, the Company. Neither the Company nor any other Member or Manager shall have any rights in or to such ventures or opportunities or the income or profits therefrom.

8. Dissolution and Continuation of the Company.

(a) The Company shall be dissolved and its affairs wound up upon:

(i) The election, made in writing by the Manager, with the Consent of the Members, to dissolve the Company at any time which is 90 days or more after notice of such election to all Members;

(ii) The sale, disposition or abandonment of all or substantially all of the assets of the Company; or

(iii) The entry of a decree of judicial dissolution under the LLC Act.

The Company shall have no specific date of dissolution.

(b) Upon the dissolution of the Company for any reason, the Manager shall commence to wind up the affairs of the Company and to liquidate its assets. After the sale or other disposition of all of the assets of the Company to be disposed of in the liquidation, and gains and losses thereon shall be calculated. If the Company is taxed as a partnership, such gains and losses shall be allocated in the manner described in Section 4 hereof, and applied to the Capital Accounts of each Member to whom the allocations are made pursuant to the other provisions hereof.

(c) Following the payment of all debts and liabilities of the Company to persons other than the Members and the payment of all expenses of liquidation, and subject to the reserves which the Manager, or other liquidating party, may determine is reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds shall be applied to the payment of any debts and liabilities to the Members, if any, and then shall be distributed to the Member(s) (i) in accordance with Section 4(a)

if the Company is taxed as a corporation, and (ii) in accordance with each Member's respective Capital Account(s) as of the date of such distribution, after giving effect to all contributions, distributions, and allocations for all periods, if the Company is taxed as a partnership.

(d) The assets of the Company shall be a Member's source of all distributions with respect to the Company, the return of its capital contributions thereto and its share of profits and losses thereof, and each such Member shall have no recourse therefor (upon dissolution or otherwise) against any other Members.

(e) Upon the completion of the liquidation of the Company and the distribution of all Company's funds, the Company shall terminate, and the Manager shall, or if none, the Members may authorize one or more Members to, execute and record such articles of dissolution for the Company and any and all other documents necessary to effectuate the dissolution and termination of the Company.

9. Miscellaneous.

(a) Subject to the restrictions on transfers set forth herein, the terms of this Agreement shall be binding upon and shall inure to the benefit of the Members and the Manager, their respective permitted successors, successors-in-title, heirs and assigns; and each and every successor-in-interest to any Member, whether such successor acquires such interest by way of inheritance, gift, purchase, foreclosure or any other method, and the Members shall hold such interest subject to all of the terms and provisions of this Agreement. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of any Member (including any Member acting in his capacity as a creditor of the Company).

(b) No change, modification or amendment of this Agreement shall be valid or binding unless such change, modification or amendment shall be in writing and duly executed by all of the Members and, if (but only if) such affects the rights or obligations of the Manager, executed by the Manager.

(c) This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted and enforced in accordance with the laws of the State of Delaware, notwithstanding any choice of law rules to the contrary.

(d) This Agreement may be executed in any number of counterparts, all of which together shall for all purposes constitute one Agreement, binding on all the Members and the Manager notwithstanding that all Members and the Manager have not signed the same counterpart.

(e) Any and all notices under this Agreement shall be effective (i) on the fourth business day after being sent by registered or certified mail, return receipt requested, postage prepaid, or (ii) on the second business day after being sent by express mail, telecopy, or commercial expedited delivery service providing a receipt for delivery. All such notices in order to be effective shall be addressed, if to the Company at its registered office under the LLC Act, if to a Member at the last address of record on the Company books, and copies of such notices shall also be sent to the last address for the recipient which is known to the sender, if different from the address so specified.

(f) As used herein, the singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires. The word "person shall mean a natural person, a trust of any nature, or any incorporated or unincorporated entity or association of any type or form.

(g) If any provisions of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it si held invalid, shall not be affected hereby.

(h) Words such as "herein", "hereinafter", "hereof", "hereto", "hereby", and "hereunder", when used in reference to the Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(i) This Agreement, including the Certificate of Formation, which is hereby incorporated herein, embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

IN WITNESS WHEREOF, the Members have executed this Limited Liability Company Agreement of Westborough SPE LLC as of the date first above written.

MEMBER:

MIGNONETTE INVESTMENTS LIMITED

By: ______________________________
Authorized Signatory

MANAGER:

BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

By: ______________________________
Its President

IN WITNESS WHEREOF, the Members have executed this Limited Liability Company Agreement of Westborough SPE LLC as of the date first above written.

MEMBER:

MIGNONETTE INVESTMENTS LIMITED

By: ______________________
Authorized Signatory

For F.M.C. LIMITED
CORPORATE DIRECTORS

MANAGER:

BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

By: ______________________
Its ______________________

SCHEDULE A
TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
WESTBOROUGH SPE LLC

MEMBER

| NAME AND ADDRESSES OF MEMBER | PERCENTAGE INTEREST |
|---|---|
| Mignonette Investments Limited | 100% |

SCHEDULE B
TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
WESTBOROUGH SPE LLC

MEMBER

| MEMBER | INITIAL CASH CAPITAL CONTRIBUTION |
|---|---|
| Mignonette Investments Limited | $10,000 |

SCHEDULE C
TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
WESTBOROUGH SPE LLC

PROPERTY DESCRIPTION

Case 4:23-cv-10374-MJJ Document 13-4 Filed 02/13/26 Page 54 of 840

# Exhibit 4

Certificate of Revival and Good Standing

# Delaware

The First State



*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF REVIVAL OF "WESTBOROUGH SPE LLC", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2022, AT 5 O`CLOCK P.M.*




Jeffrey W. Bullock, Secretary of State

2811561 8100
SR# 20224086804

Authentication: 204937171
Date: 11-26-22

You may verify this certificate online at corp.delaware.gov/authver.shtml

# STATE OF DELAWARE
# CERTIFICATE OF REVIVAL OF
# A DELAWARE LIMITED LIABILITY COMPANY
# PURSUANT TO TITLE 6, SEC. 18-1109

1. Name of the Limited Liability Company WESTBOROUGH SPE LLC

2. Date of the original filing with the Delaware Secretary of State:
   10/22/1997

3. The name and address of the Registered Agent is
   THE INCORPORATORS LTD.
   300 CREEK VIEW ROAD, SUITE 209
   NEWARK, DE 19711

4. (Insert any other matters the members determine to include herein).

5. This Certificate of Revival is being filed by one or more persons authorized to Execute and file the Certificate of Revival.

In witness whereof, the above name Limited Liability Company does hereby certify that the Limited Liability Company is paying all annual Taxes, penalties and interest due to the State of Delaware.

BY: Denise Edwards
Authorized Person

Name: Denise Edwards
Print or Type

State of Delaware
Secretary of State
Division of Corporations
Delivered 05:00 PM 11/22/2022
FILED 05:00 PM 11/22/2022
SR 20224086804 - File Number 2811561

# Delaware

The First State



*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "WESTBOROUGH SPE LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-EIGHTH DAY OF NOVEMBER, A.D. 2022.*







2811561 8300

SR# 20224104318

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 204939237

Date: 11-28-22

# *The Commonwealth of Massachusetts*

## *Secretary of the Commonwealth*

*State House, Boston, Massachusetts 02133*

**William Francis Galvin**
**Secretary of the Commonwealth**

**December 15, 2022**

TO WHOM IT MAY CONCERN:

I hereby certify that a certificate of registration of a Foreign Limited Liability Company was filed in this office by

**WESTBOROUGH SPE LLC**

in accordance with the provisions of Massachusetts General Laws Chapter 156C
on **December 12, 2022**.

I further certify that said Limited Liability Company has filed all annual reports due and paid all fees with respect to such reports; that said Limited Liability Company has not filed a certificate of cancellation or withdrawal; that there are no proceedings presently pending under the Massachusetts General Laws Chapter 156C, § 72 for revocation of said Limited Liability Company's authority to transact business in the Commonwealth; and that said Limited Liability Company is in good standing with this office.

I also certify that the names of all managers listed in the most recent filing are: **DENISE EDWARDS, LOLONYON AKOUETE**

I further certify that the name of persons authorized to act with respect to real property instruments listed in the most recent filings are: **DENISE EDWARDS, LOLONYON AKOUETE**




In testimony of which,
I have hereunto affixed the
Great Seal of the Commonwealth
on the date first above written.

William Francis Galvin

Secretary of the Commonwealth

Processed By:NGM

# **Exhibit 5**

Claim Affirmation Form - Claim ID 21014485

*Initiated Date:* 06/09/2023
*Source:* WEB
*Relationship:* Business
*Printed Date:* 06/09/2023

OFFICIAL USE ONLY

*Claim ID:* **21014485**

## Claim Affirmation Form (continued)

**Section B - Required Documentation**

Please see the attached "Documentation Required for Business Owner Claims"

**Section C - Claimant Information**

Each of the undersigned claimants certifies, under penalty of perjury, that the claimant has read the claim and knows the contents thereof and that the claimant is the owner of said claim and the person entitled to receive the money and property set forth in said claim.
Each claimant agrees to indemnify and hold harmless the State, its officers, and employees from any loss resulting from the payment of said claim.
**EACH CLAIMANT MUST SIGN THIS AFFIRMATION OR THE CLAIM WILL BE RETURNED.**
For claims filed for a business, the authorized owner's signature is required. For claims filed for an estate or trust, the signature of the executor, administrator or trustee is required.

**Claimant Information**

| CURRENT LEGAL LAST NAME OR BUSINESS NAME | CURRENT LEGAL FIRST NAME | MIDDLE | SSN OR FEDERAL TAX ID |
|---|---|---|---|
| WESTBOROUGH SPE LLC | | | 94-3286768 |

| CURRENT MAILING ADDRESS | CITY | STATE/PROVINCE | ZIP CODE | COUNTRY |
|---|---|---|---|---|
| 1241 Deer Park Ave, Suite 1 #1051 | NORTH BABYLON | NY | 11703 | |

| DRIVER LICENSE NUMBER | DATE OF BIRTH | EMAIL ADDRESS |
|---|---|---|
| 186 170 972 | 10-08-1986 | LOLOACT2@GMAIL.COM |

| DAYTIME PHONE | SIGNATURE | DATE |
|---|---|---|
| (443) 447-3276 | [signature] | 06/29/2023 |

**Additional Claimant Information (if Applicable)**

| CURRENT LEGAL LAST NAME OR BUSINESS NAME | CURRENT LEGAL FIRST NAME | MIDDLE | SSN OR FEDERAL TAX ID |
|---|---|---|---|
| | | | |

| CURRENT MAILING ADDRESS | CITY | STATE/PROVINCE | ZIP CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| DRIVER LICENSE NUMBER | DATE OF BIRTH | EMAIL ADDRESS |
|---|---|---|
| | | |

| DAYTIME PHONE | SIGNATURE | DATE |
|---|---|---|
| | | |

**Section D - Affidavit Notarization**

**(YOUR SIGNATURE(S) MUST BE NOTARIZED IF THE CLAIM AMOUNT IS $1,000 OR GREATER.**
**ALL** CLAIMS FOR SECURITIES OR SAFE DEPOSIT BOXES MUST BE NOTARIZED.)

**A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.**

State of New York, County of ULSTER
Subscribed and sworn to (or affirmed) before me on this 29 day of JUNE, 2023 by
LOLONYON AKODETE, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature [signature] (seal)

JOEL VOZZO
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01VO6213484
Qualified in Ulster County
Commission Expires 11/09/2025

**PRIVACY NOTIFICATION**

The Information Practices Act of 1977 and the Federal Privacy Act require this Bureau to inform you that your Social Security number and other documents are requested for property identification and processing of your claim.

You have the right to view your records at this office by writing :
Division Chief, Unclaimed Property Division, P.O. Box 942850, Sacramento, CA 94250 - 5873.

Unclaimed Property Division
MAILING ADDRESS P.O. Box 942850, Sacramento, CA 94250-5873
10600 White Rock Road, Rancho Cordova, CA 95670
(800) 992-4647 (Nationwide) or (916) 323-2827 (Outside of US)

*Initiated Date:* 06/09/2023
*Source:* WEB
*Relationship:* Business
*Printed Date:* 06/09/2023

OFFICIAL USE ONLY

*Claim ID:* **21014485**

# MALIA M. COHEN
## California State Controller
## UNCLAIMED PROPERTY DIVISION
*Unclaimed Property Claim Affirmation Form*

**WESTBOROUGH SPE LLC**
**1241 DEER PARK AVE, SUITE 1 #1051**
**NORTH BABYLON, NY 11703**

This is to inform you that the property listed below may belong to you.

This property was turned over to the State Controller's Unclaimed Property Division, as required by law, for safekeeping until it can be claimed by the rightful owner or their heirs. California's unclaimed property law requires businesses to submit property, such as bank accounts, stocks, bonds, and the contents of safe deposit boxes, to the state if there has been no activity on the account, or the business has had no contact with the owner, generally for three years.

To claim this property, or the net proceeds of any sale of property as required by law, please complete Sections C and D of this form and return it with the required documentation to the address below. If you do not have all of the items required, please send as much information as possible to prove you are the owner of the property.

Once your signed Claim Affirmation Form and required documentation have been received, please allow up to 180 days for processing. For more information about this program including filing instructions, forms, or to inquire about your claim status, please visit the State Controller's website at www.claimit.ca.gov. Claimants may also contact the Unclaimed Property Division by phone at (800) 992-4647. International callers should call (916) 323-2827 for inquiries.

**PLEASE NOTE:** Properties recently transferred to the State Controller's Office may not appear on our website. If you have an outstanding debt with a California state agency, city or county, your unclaimed property payment may be intercepted to pay the debt.

| **Section A - Property Owner Information** | | | |
|---|---|---|---|
| Owner(s) Name<br>WESTBOROUGH SPE LLC | | Reported Owner Address<br>50 CALIFORNIA ST STE 3610, SAN FRANCISCO, CA 94111-0000 | |
| Type of Property<br>Checking Accounts | | Reported By<br>MUFG UNION BANK N A | Property ID Number<br>1019294209 |
| Cash Reported<br>¤1,293,646.83 | Shares Reported | Name of Security Reported | |

Unclaimed Property Division
MAILING ADDRESS P.O. Box 942850, Sacramento, CA 94250-5873
10600 White Rock Road, Rancho Cordova, CA 95670
(800) 992-4647 (Nationwide) or (916) 323-2827 (Outside of US)

# Controller Malia M. Cohen

California State Controller's office
Unclaimed Property Division

**BUSINESS CLAIM**
**FILING INSTRUCTIONS AND REQUESTED DOCUMENTATION**

**To claim property on behalf of a business, please provide the information requested in the business filing instructions found here:**

Filing Instructions for Business Claims

The link above provides detailed information on what documentation will be required in order to verify your ownership of the property. Having the same company name as that on an account does not establish ownership because companies can have the same name. To make sure our office is able to verify that you are the rightful owner, you must provide all the required documentation.

Although the Tax ID or FEIN (Federal Employer ID Number) is our primary means of identification, sometimes we cannot verify a claim based on the Tax ID or FEIN because it was not provided by the company when they transferred the property to us. In these cases, we will need additional documentation, as described in the filing instructions, to verify your claim. If you have these documents available, please submit them when you file your claim to ensure the processing of your claim is not delayed.

IRS Department of the Treasury
Internal Revenue Service

OGDEN UT 84201-0038

000424.285966.81865.21656 1 AB 0.491 693

WESTBOROUGH SPE LLC
A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON NY 11703

000424

CUT OUT AND RETURN THE VOUCHER BELOW IF YOU HAVE AN INQUIRY OR A RESPONSE.
DO NOT USE IF YOU ARE MAKING A PAYMENT.

The IRS address must appear in the window. 0457217447

BODCD-

Use for inquiries only
Letter Number: LTR0147C
Letter Date : 2022-12-
Tax Period : 000000

*943286768*

INTERNAL REVENUE SERVICE

OGDEN UT 84201-0038

WESTBOROUGH SPE LLC
A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON NY 11703

943286768 RW WEST 00 2 000000 670 00000000000

IRS Department of the Treasury
Internal Revenue Service

OGDEN UT 84201-0038

In reply refer to: 0457217447
Dec. 23, 2022 LTR 147C 0
94-3286768 000000 00
00005433
BODC: SB

WESTBOROUGH SPE LLC
A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON NY 11703

000424

Employer identification number: 94-3286768

Dear Taxpayer:

Thank you for your inquiry dated Dec. 14, 2022.

Your employer identification number (EIN) is 94-3286768. Please keep this letter in your permanent records. Enter your name and EIN on all federal business tax returns and on related correspondence.

You can get any of the forms or publications mentioned in this letter by visiting our website at www.irs.gov/forms-pubs or by calling 800-TAX-FORM (800-829-3676).

If you have questions, you can call us at 800-829-0115.

If you prefer, you can write to us at the address at the top of the first page of this letter.

When you write, include a copy of this letter, and provide your telephone number and the hours we can reach you in the spaces below.

Telephone number ( ) ____________________________ Hours ________________________

Keep a copy of this letter for your records.

Thank you for your cooperation.

0457217447
Dec. 23, 2022 LTR 147C 0
94-3286768 000000 00
00005434

WESTBOROUGH SPE LLC
A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON NY 11703

Sincerely yours,

Dwayne Wilson
Department Manager, Accounts Mgmt.

Enclosures:
Copy of this letter

IRS Department of the Treasury
Internal Revenue Service

OGDEN UT 84201-0038

In reply refer to: 0457217447
Dec. 23, 2022 LTR 147C 0
94-3286768 000000 00
00005433
BODC: SB

WESTBOROUGH SPE LLC
A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON NY 11703

000424

Employer identification number: 94-3286768

Dear Taxpayer:

Thank you for your inquiry dated Dec. 14, 2022.

Your employer identification number (EIN) is 94-3286768. Please keep this letter in your permanent records. Enter your name and EIN on all federal business tax returns and on related correspondence.

You can get any of the forms or publications mentioned in this letter by visiting our website at www.irs.gov/forms-pubs or by calling 800-TAX-FORM (800-829-3676).

If you have questions, you can call us at 800-829-0115.

If you prefer, you can write to us at the address at the top of the first page of this letter.

When you write, include a copy of this letter, and provide your telephone number and the hours we can reach you in the spaces below.

Telephone number ( )____________________ Hours __________________

Keep a copy of this letter for your records.

Thank you for your cooperation.

0457217447
Dec. 23, 2022 LTR 147C 0
94-3286768 000000 00
00005434

WESTBOROUGH SPE LLC
A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON NY 11703

Sincerely yours,

Dwayne Wilson
Department Manager, Accounts Mgmt.

Enclosures:
Copy of this letter

# Exhibit 6

Documentation of Managerial Transition from BBAS Inc to BBAS LLC to BBPM LLC

# Delaware

The First State

Page 1

*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THAT THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF CONVERSION OF A DELAWARE CORPORATION UNDER THE NAME OF "BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC." TO A DELAWARE LIMITED LIABILITY COMPANY, CHANGING ITS NAME FROM "BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC." TO "BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC", FILED IN THIS OFFICE ON THE THIRD DAY OF JANUARY, A.D. 2000, AT 9 O`CLOCK A.M.*

SECRETARY'S OFFICE · 1793 · DELAWARE · 1855

Jeffrey W. Bullock, Secretary of State

2811627 8100V
SR# 20232925381

Authentication: 203683809
Date: 07-05-23

You may verify this certificate online at corp.delaware.gov/authver.shtml

W891911

# State of Delaware - Division of Corporations

**FAX**

## DOCUMENT FILING SHEET

| Priority 1 (Two Hr. Service) | Priority 2 (Same Day) | Priority 3 (24 Hour) | Priority 4 (Must Approvals) | Priority 5 (Reg. Approvals) | Priority 6 (Reg. Work) |
|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ■ |

DATE SUBMITTED ~~12-23-99~~ 01-03-00

REQUESTOR NAME CORPAMERICA INC.

ADDRESS 30 OLD RUDNICK LANE
DOVER, DE 19901

ATTN. Rose

PHONE 302-736-4300

FILE DATE ~~01-03-00~~ ~~12-23-99~~

FILE TIME 0900

NAME of COMPANY / ENTITY Babcock & Brown Administrative Services LLC

~~99~~ 001001228
SRV NUMBER

2811627
FILE NUMBER

9168016
FILER'S NUMBER

RESERVATION NO.

TYPE of DOCUMENT Formation/Conversion

DOCUMENT CODE ~~00000~~ 17217

CHANGE of NAME ____ CHANGE of AGENT / OFFICE ____ CHANGE of STOCK ____

**CORPORATIONS**

| | | |
|---|---|---|
| FRANCHISE TAX | YEAR ____ | $ ____ |
| FILING FEE TAX | | $ ____ |
| RECEIVING & INDEXING | | $ ____ |
| CERTIFIED COPIES | NO. 1 | $ ____ |
| SPECIAL SERVICES | | $ ____ |
| KENT COUNTY RECORDER | | $ ____ |
| NEW CASTLE COUNTY RECORDER | | $ ____ |
| SUSSEX COUNTY RECORDER | | $ ____ |
| | TOTAL: | $ ____ |

**METHOD of RETURN**

X MESSENGER /PICKUP
___ FED. EXPRESS Acct.# ____
___ REGULAR MAIL
___ FAX No. ____
___ OTHER ____

**COMMENTS / FILING INSTRUCTIONS**

Converting to Babcock & Brown Administrative Services, Inc.
*EFFECTIVE 12/31/99*

**CREDIT CARD CHARGES**

You have my authorization to charge my credit card for this service:

☐☐☐☐-☐☐☐☐-☐☐☐☐-☐☐☐☐ Exp. Date ____

Signature ____ Printed Name ____

XX

AGENT USE ONLY

**INSTRUCTIONS**

1. Fully shade in the required Priority square using a dark pencil or marker, staying within the square.
2. Each request must be submitted as a separate item, with its own Filing sheet as the FIRST PAGE.

SODDFS3 03-06-95

STATE OF DELAWARE
DIVISION OF CORPORATIONS
FILED 09:00 AM 01/03/2000
001001228 – 2811627

**STATE OF DELAWARE**

**CERTIFICATE OF CONVERSION**

**FROM A CORPORATION TO A LIMITED LIABILITY COMPANY**

**PURSUANT TO SECTION 266 OF THE**

**DELAWARE GENERAL CORPORATION LAW**

(1) The name of the corporation immediately prior to filing this Certificate is **Babcock & Brown Administrative Services, Inc.**

(2) The date the Certificate of Incorporation was filed on is October 23, 1997.

(3) The original name of the corporation as set forth in the Certificate of Incorporation is Babcock & Brown Administrative Services, Inc.

(4) The name of the limited liability company as set forth in the formation is **Babcock & Brown Administrative Services LLC**.

(5) The conversion has been approved in accordance with the provisions of Section 266.

By: Jan Blaustein Scholes, Authorized Officer

Dated: December 31, 1999

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 01/03/2000
001001228 - 2811627

**CERTIFICATE OF FORMATION**

**OF**

**BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC**

This Certificate of Formation of Babcock & Brown Administrative Services LLC, a Delaware limited liability company (the "Company"), dated as of December 31, 1999, is being duly executed and filed by Babcock & Brown Inc., a California corporation, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, et seq.) (the "Delaware Act").

FIRST: The name of the limited liability company formed hereby is **Babcock & Brown Administrative Services LLC**.

SECOND: The address of the registered office of the Company in the State of Delaware is c/o CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901.

THIRD: The name and address of the registered agent for service of process on the Company in the State of Delaware is CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901.

IN WITNESS WHEREOF, the undersigned, an authorized person as described in the Delaware Act, has executed this Certificate of Formation as of the date first above written.

Authorized Person:

Babcock & Brown Inc.,
a California corporation

By: Jan Blaustein Scholes
Its: Vice President

# Delaware

The First State



*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:*

*"BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC", A DELAWARE LIMITED LIABILITY COMPANY,*

*WITH AND INTO "BABCOCK & BROWN PARALLEL MEMBER LLC" UNDER THE NAME OF "BABCOCK & BROWN PARALLEL MEMBER LLC", A LIMITED LIABILITY COMPANY ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, AS RECEIVED AND FILED IN THIS OFFICE ON THE TWENTY-NINTH DAY OF AUGUST, A.D. 2011, AT 2:33 O`CLOCK P.M.*

Jeffrey W. Bullock, Secretary of State

2811627 8100M
SR# 20232925381

Authentication: 203683808
Date: 07-05-23

You may verify this certificate online at corp.delaware.gov/authver.shtml

Case 22-40709 Doc 14-14 Filed 10/24/23 Entered 10/24/23 14:58:28 Page 74 of 840

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:33 PM 08/29/2011
FILED 02:33 PM 08/29/2011
SRV 110960806 - 4370415 FILE

# DELAWARE
# CERTIFICATE OF MERGER
# OF
# BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC
# WITH AND INTO
# BABCOCK & BROWN PARALLEL MEMBER LLC

August 28, 2011

Pursuant to Section 18-209 of the Delaware Limited Liability Company Act (the "DLLCA"), Babcock & Brown Parallel Member LLC, a Delaware limited liability company (the "Company"), in connection with the merger (the "Merger") of Babcock & Brown Administrative Services LLC, a Delaware limited liability company ("Target"), with and into the Company, hereby certifies as follows:

FIRST: The respective names and states of formation or incorporation of the constituent companies to the Merger are as follows:

| Name | State of Formation or Incorporation |
|---|---|
| Babcock & Brown Parallel Member LLC | Delaware |
| Babcock & Brown Administrative Services LLC | Delaware |

SECOND: An Agreement and Plan of Merger, dated as of August 29, 2011, between the Company and Target (the "Merger Agreement"), setting forth the terms and conditions of the Merger, has been approved, adopted, certified, executed and acknowledged by each of the Company and Target.

THIRD: The Company shall be the surviving limited liability company (the "Surviving Company") of the Merger. The name of the Surviving Company is "Babcock & Brown Parallel Member LLC".

FOURTH: The Merger shall become effective upon the filing of this Certificate of Merger with the Secretary of State of the State of Delaware.

FIFTH: An executed copy of the Merger Agreement is on file at the office of the Surviving Company located at 50 California Street, Suite 3610, San Francisco, California 94111. A copy of the Merger Agreement will be furnished by the Surviving Company, on request and without cost, to any member of the Surviving Company or any member of Target.

[Signature page follows.]

The undersigned is signing this Certificate of Merger as of the date first written above.

BABCOCK & BROWN PARALLEL MEMBER LLC

By: ~~[signature]~~

Name: Chaye Besherse
Title: Secretary

*Signature page to Delaware Certificate of Merger*

# State of Delaware
# Certificate of Correction
# of a Limited Liability Company
# to be filed pursuant to Section 18-211(a)

1. The name of the Limited Liability Company is: BABCOCK & BROWN PARALLEL MEMBER LLC.

2. That a Certificate of CANCELLATION was filed by the Secretary of State of Delaware on 15 March 2019, and that said Certificate requires correction as permitted by Section 18-211 of the Limited Liability Company Act.

3. The inaccuracy or defect of said Certificate is: (must give specific reason)

   Due to a clerical error, the cancellation was filed prematurely. The entity is the Manager of Westborough SPE, LLC and there are still significant assets that need to be liquidated.

4. The Certificate is hereby corrected to read as follows:

   The Certificate of Cancellation/Withdrawal is rendered null and void.

**IN WITNESS WHEREOF**, the undersigned have executed this Certificate on the 23 day of June, A.D. 2023.

By: [signature]
Authorized Person

Name: F Jan Blaustein Schol
Print or Type

State of Delaware
Secretary of State
Division of Corporations
Delivered 07:21 AM 06/30/2023
FILED 07:21 AM 06/30/2023
SR 20232897300 - File Number 4370415

# Delaware

The First State



*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "BABCOCK & BROWN PARALLEL MEMBER LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE FIFTH DAY OF JULY, A.D. 2023.*

SECRETARY'S OFFICE 1793 DELAWARE 1855

Jeffrey W. Bullock, Secretary of State

4370415 8300

SR# 20232917389

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 203677211

Date: 07-05-23

# FW-001 Request to Waive Court Fees

**CONFIDENTIAL**

*Clerk stamps date here when form is filed.*

*Fill in court name and street address:*

**Superior Court of California, County of**
SACRAMENTO
Hall of Justice Building
813 6th Street, Room 212, 2nd Floor
Sacramento, CA 95814
Department 53/54

*Fill in case number and name:*

**Case Number:**

**Case Name:**

If you are getting public benefits, are a low-income person, or do not have enough income to pay for your household's basic needs and your court fees, you may use this form to ask the court to waive your court fees. The court may order you to answer questions about your finances. If the court waives the fees, you may still have to pay later if:

- You cannot give the court proof of your eligibility,
- Your financial situation improves during this case, or
- You settle your civil case for **$10,000** or more. The trial court that waives your fees will have a lien on any such settlement in the amount of the waived fees and costs. The court may also charge you any collection costs.

**1** **Your Information** *(person asking the court to waive the fees):*
Name: Lolonyon Akouete
Street or mailing address: 800 Red Mills Road
City: Wallkill State: NY Zip: 21589
Phone: (443) 447-2176

**2** **Your Job,** if you have one *(job title):* **Unemployed**
Name of employer: None. I am a member of a religious order.
Employer's address: N/A. I take on various odd jobs to earn extra money.

**3** **Your Lawyer,** if you have one *(name, firm or affiliation, address, phone number, and State Bar number):*
N/A

a. The lawyer has agreed to advance all or a portion of your fees or costs *(check one):* Yes ☐ No ☒
b. *(If yes, your lawyer must sign here)* Lawyer's signature: *N/A*
*If your lawyer is not providing legal-aid type services based on your low income, you may have to go to a hearing to explain why you are asking the court to waive the fees.*

**4** **What court's fees or costs are you asking to be waived?**
☒ Superior Court (See *Information Sheet on Waiver of Superior Court Fees and Costs* (form FW-001-INFO).)
☐ Supreme Court, Court of Appeal, or Appellate Division of Superior Court (See *Information Sheet on Waiver of Appellate Court Fees* (form APP-015/FW-015-INFO).)

**5** **Why are you asking the court to waive your court fees?**
a. ☐ I receive *(check all that apply; see form FW-001-INFO for definitions):*
☐ Food Stamps ☐ Supp. Sec. Inc. ☐ SSP ☐ Medi-Cal ☐ County Relief/Gen. Assist. ☐ IHSS
☐ CalWORKS or Tribal TANF ☐ CAPI ☐ WIC ☐ Unemployment
b. ☒ My gross monthly household income (before deductions for taxes) is less than the amount listed below. *(If you check 5b, you must fill out 7, 8, and 9 on page 2 of this form.)*

| Family Size | Family Income | Family Size | Family Income | Family Size | Family Income |
|---|---|---|---|---|---|
| 1 | $2,430.00 | 3 | $4,143.34 | 5 | $5,856.67 |
| 2 | $3,286.67 | 4 | $5,000.00 | 6 | $6,713.34 |

*If more than 6 people at home, add $856.67 for each extra person.*

c. ☒ I do not have enough income to pay for my household's basic needs *and* the court fees. I ask the court to: *(check one and you **must** fill out page 2):*
☒ waive all court fees and costs ☐ waive some of the court fees ☐ let me make payments over time

**6** ☐ Check here if you asked the court to waive your court fees for this case in the last six months.
*(If your previous request is reasonably available, please attach it to this form and check here):* ☐

**I declare under penalty of perjury under the laws of the State of California that the information I have provided on this form and all attachments is true and correct.**

Date: October 2, 2023

Lolonyon Akouete
*Print your name here*

*Sign here*

Your name: Lolonyon Akouete

**Case Number:**

*If you checked 5a on page 1, do not fill out below. If you checked 5b, fill out questions 7, 8, and 9 only. If you checked 5c, you **must** fill out this entire page. If you need more space, attach form MC-025 or attach a sheet of paper and write Financial Information and your name and case number at the top.*

**7** [x] Check here if your income changes a lot from month to month. If it does, complete the form based on your average income for the past 12 months.

**8 Your Gross Monthly Income**

a. List the source and amount of ***any*** income you get each month, including: wages or other income from work before deductions, spousal/child support, retirement, social security, disability, unemployment, military basic allowance for quarters (BAQ), veterans payments, dividends, interest, trust income, annuities, net business or rental income, reimbursement for job-related expenses, gambling or lottery winnings, etc.

(1) Independent Investigator, CA State Controller $250.00
(2) Real Estate Consolting $0.00
(3) $
(4) $

b. **Your total monthly income**: $250.00

**9 Household Income**

a. List the income of all other persons living in your home who depend in whole or in part on you for support, or on whom you depend in whole or in part for support.

| | Name | Age | Relationship | Gross Monthly Income |
|---|---|---|---|---|
| (1) | N/A | | | $ |
| (2) | | | | $ |
| (3) | | | | $ |
| (4) | | | | $ |

b. **Total monthly income of persons above:** $

**Total monthly income *and* household income** *(8b plus 9b)*: $250.00

**10 Your Money and Property**

a. Cash $0.00

b. All financial accounts *(List bank name and amount)*:
(1) DCU Federal Credit Union $589.65
(2) Heritage Financial Cresit Union $39.14
(3) TD Ameritrade Account $50.00

c. Cars, boats, and other vehicles

| | Make / Year | Fair Market Value | How Much You Still Owe |
|---|---|---|---|
| (1) | Lexus LS400 1998, not running | $1,190.00 | $0.00 |
| (2) | | $ | $ |
| (3) | | $ | $ |

d. Real estate

| | Address | Fair Market Value | How Much You Still Owe |
|---|---|---|---|
| (1) | N/A | $ | $ |
| (2) | | $ | $ |

e. Other personal property (jewelry, furniture, furs, stocks, bonds, etc.):

| | Describe | Fair Market Value | How Much You Still Owe |
|---|---|---|---|
| (1) | N/A | $ | $ |
| (2) | | $ | $ |

**11 Your Monthly Deductions and Expenses**

a. List any payroll deductions and the monthly amount below:
(1) N/A $0.00
(2) $
(3) $
(4) $

b. Rent or house payment & maintenance $0.00
c. Food and household supplies $0.00
d. Utilities and telephone $38.47
e. Clothing $0.00
f. Laundry and cleaning $0.00
g. Medical and dental expenses $0.00
h. Insurance (life, health, accident, etc.) $0.00
i. School, child care $0.00
j. Child, spousal support (another marriage) $0.00
k. Transportation, gas, auto repair and insurance $31.50
*l.* Installment payments *(list each below)*:
Paid to:
(1) SMILE DIRECT CLUB USBAKERSFIELD CA $88.81
(2) MYNEUROGYM $97.00
(3) ADOBE *ACROPRO SUBS $21.59

m. Wages/earnings withheld by court order $0.00
n. Any other monthly expenses *(list each below)*.
Paid to: How Much?
(1) $
(2) $
(3) $

**Total monthly expenses** *(add 11a –11n above)*: $277.37

To list any other facts you want the court to know, such as unusual medical expenses, etc., attach form MC-025 or attach a sheet of paper and write Financial Information and your name and case number at the top.

*Check here if you attach another page.* [ ]

***Important!* If your financial situation or ability to pay court fees improves, you must notify the court within five days on form FW-010.**



**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

Print this form | Save this form | Clear this form

**CM-015**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | *FOR COURT USE ONLY* |
|---|---|
| Lolonyon Akouete Manager of Westborough SPE, LLC<br>1241 Deer Park Ave., Suite 1, #1051 North Babylon, NY 11703<br>TELEPHONE NO.: (443) 447-3276 FAX NO. *(Optional)*:<br>EMAIL ADDRESS *(Optional)*: info@smartinvestorsllc.com<br>ATTORNEY FOR *(Name)*: Plaintiff: WESTBOROUGH SPE LLC | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SACRAMENTO**<br>STREET ADDRESS: 813 6th Street<br>MAILING ADDRESS: 720 9th Street<br>CITY AND ZIP CODE: Sacramento, CA 95814<br>BRANCH NAME: Civil Division | |
| PLAINTIFF/PETITIONER: WESTBOROUGH SPE LLC, a Delaware limited liability company<br>DEFENDANT/RESPONDENT: MALIA M. COHEN, California State Controller | CASE NUMBER:<br>JUDICIAL OFFICER: |
| **NOTICE OF RELATED CASE** | DEPT:. |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: Town of Westborough v. Westborough SPE, LLC , et al
   b. Case number: 19 TL 000768
   c. Court: ☐ same as above
   ☒ other state or federal court *(name and address):* Commonwealth of Massachusetts Land Court
   d. Department: Department of The Trial Court. Three Pemberton Square, Room 507 Boston, MA 02108
   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☒ other (*specify):* Land Court
   f. Filing date: January 4, 2023
   g. Has this case been designated or determined as "complex?" ☐ Yes ☒ No
   h. Relationship of this case to the case referenced above *(check all that apply):*
   ☐ involves the same parties and is based on the same or similar claims.
   ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
   ☒ involves claims against, title to, possession of, or damages to the same property.
   ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
   ☐ Additional explanation is attached in attachment 1h
   i. Status of case:
   ☒ pending
   ☐ dismissed ☐ with ☐ without prejudice
   ☐ disposed of by judgment

2. a. Title: Westborough SPE LLC v. Town of Westborough et al
   b. Case number: 4:23-cv-12017-MRG
   c. Court: ☐ same as above
   ☒ other state or federal court *(name and address):* Massachusetts District Court (Worcester)
   d. Department: CIVIL, 595 Main Street Worcester, Massachusetts 01608

**CM-015**

| PLAINTIFF/PETITIONER: WESTBOROUGH SPE LLC, a Delaware limited liability company<br>DEFENDANT/RESPONDENT: MALIA M. COHEN, California State Controller | CASE NUMBER: |
|---|---|

2. *(continued)*
   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☒ other (*specify*): 28:1331 Federal
   f. Filing date: August 31, 2023
   g. Has this case been designated or determined as "complex?" ☐ Yes ☒ No
   h. Relationship of this case to the case referenced above *(check all that apply)*:
      ☐ involves the same parties and is based on the same or similar claims.
      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      ☒ involves claims against, title to, possession of, or damages to the same property.
      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
      ☐ Additional explanation is attached in attachment 2h
   i. Status of case:
      ☒ pending
      ☐ dismissed ☐ with ☐ without prejudice
      ☐ disposed of by judgment

3. a. Title: Debtor - Westborough SPE LLC, Involuntary Chapter: 7 Bankruptcy
   b. Case number: 23-40709-CJP
   c. Court: ☐ same as above
      ☒ other state or federal court *(name and address)*: United States Bankruptcy Court District of Massachusetts
   d. Department: (Worcester) 595 Main Street, Worcester, MA 01608
   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☒ other (*specify*): Bankruptcy
   f. Filing date: August 31, 2023
   g. Has this case been designated or determined as "complex?" ☐ Yes ☒ No
   h. Relationship of this case to the case referenced above *(check all that apply)*:
      ☒ involves the same parties and is based on the same or similar claims.
      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      ☒ involves claims against, title to, possession of, or damages to the same property.
      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
      ☐ Additional explanation is attached in attachment 3h
   i. Status of case:
      ☒ pending
      ☐ dismissed ☐ with ☐ without prejudice
      ☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached: ________

Date: October 2, 2023

Westborough SPE LLC, by its manager, Lolonyon Akouete
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ ______________________________
(SIGNATURE OF PARTY OR ATTORNEY)

**CM-015**

| PLAINTIFF/PETITIONER: WESTBOROUGH SPE LLC, a Delaware limited liability company<br>DEFENDANT/RESPONDENT: MALIA M. COHEN, California State Controller | CASE NUMBER: |
|---|---|

**PROOF OF SERVICE BY FIRST-CLASS MAIL**

**NOTICE OF RELATED CASE**

***(NOTE: You cannot serve the*** **Notice of Related Case** ***if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)***

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

2. I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*

   a. ☐ deposited the sealed envelope with the United States Postal Service.

   b. ☐ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:

   a. on *(date):*

   b. from *(city and state):*

4. The envelope was addressed and mailed as follows:

   a. Name of person served:

      Street address:
      City:
      State and zip code:

   b. Name of person served:

      Street address:
      City:
      State and zip code:

   c. Name of person served:

      Street address:
      City:
      State and zip code:

   d. Name of person served:

      Street address:
      City:
      State and zip code:

☐ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: ____________________

______________________________ ▶ ______________________________

(TYPE OR PRINT NAME OF DECLARANT) (SIGNATURE OF DECLARANT)



**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

Print this form | Save this form | Clear this form

**EFS-005-CV**

| ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO: | FOR COURT USE ONLY |
|---|---|
| NAME: Lolonyon Akouete Manager of Westborough SPE, LLC<br>FIRM NAME:<br>STREET ADDRESS: 1241 Deer Park Ave., Suite 1, #1051 NY 11703<br>CITY: North Babylon STATE: NY ZIP CODE: 11703<br>TELEPHONE NO.: (443) 447-3276 FAX NO. :<br>E-MAIL ADDRESS: info@smartinvestorsllc.com<br>ATTORNEY FOR (*name*): | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SACRAMENTO<br>STREET ADDRESS: 813 6th Street<br>MAILING ADDRESS: 720 9th Street<br>CITY AND ZIP CODE: Sacramento, CA 95814<br>BRANCH NAME: Gordon D. Schaber Civil | CASE NUMBER: |
| Plaintiff/Petitioner: WESTBOROUGH SPE LLC,<br>Defendant/Respondent: MALIA M. COHEN, California State Controller | JUDICIAL OFFICER: |
| **CONSENT TO ELECTRONIC SERVICE AND NOTICE OF ELECTRONIC SERVICE ADDRESS** | DEPARTMENT: |

1. [X] The following party or [ ] the attorney for:
   a. [X] plaintiff *(name): WESTBOROUGH SPE LLC, a Delaware limited liability company*
   b. [ ] defendant *(name):*
   c. [ ] petitioner *(name):*
   d. [ ] respondent *(name):*
   e. [ ] other *(describe):*

   consents to electronic service of notices and documents in the above-captioned action.

2. The electronic service address of the person identified in item 1 is *(specify):*
   info@smartinvestorsllc.com

Date: Oct 2, 2023

Lolonyon Akouete ▶ [signature]

TYPE OR PRINT NAME (SIGNATURE OF PARTY OR ATTORNEY)



Form Approved for Optional Use
Judicial Council of California
EFS-005-CV [Rev. July 1, 2016]

**CONSENT TO ELECTRONIC SERVICE AND NOTICE OF ELECTRONIC SERVICE ADDRESS (Electronic Filing and Service)**

Cal. Rules of Court, rule 2.251
*www.courts.ca.gov*

EFS-005-CV

| CASE NAME: | CASE NUMBER: |
|---|---|

(Note: *If you serve* Consent to Electronic Service and Notice of Electronic Service Address *by mail, you should use form POS-030,* Proof of Service by First-Class Mail–Civil, *instead of using this page.)*

## PROOF OF ELECTRONIC SERVICE

***CONSENT TO ELECTRONIC SERVICE AND NOTICE OF ELECTRONIC SERVICE ADDRESS***

1. I am at least 18 years old.
   a. My residence or business address is *(specify):*

   b. My electronic service address is *(specify):*

2. I electronically served a copy of the *Consent to Electronic Service and Notice of Electronic Service Address* as follows:
   a. Name of person served:
   b. Electronic service address of person served:
      On behalf of *(name or names of parties represented, if person served is an attorney):*
   c. On *(date):*
   d. At *(time):*

☐ Electronic service of the *Consent to Electronic Service and Notice of Electronic Service Address* on additional persons is described in an attachment.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

(TYPE OR PRINT NAME OF DECLARANT) ▶ (SIGNATURE OF DECLARANT)



**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

Print this form | Save this form | Clear this form

LOLONYON AKOUETE
Manager of Westborough SPE, LLC
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703
info@smartinvestorsllc.com
(443) 447-3276
WESTBOROUGH SPE LLC, IN PRO PER

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SACRAMENTO

| | |
|---|---|
| WESTBOROUGH SPE LLC, a Delaware limited liability company,<br>Plaintiff,<br><br>vs.<br><br>MALIA M. COHEN, California State Controller<br>Defendant. | CASE No.:<br><br>PROPOSED ORDER TO RELEASE ESCHEATED PROPERTY [C.C.P. §1541]<br><br>DEPARTMENT: 53/54 |

This matter comes before the Court on Plaintiff Westborough SPE LLC's ("WSPE") Complaint to Recover Escheated Property pursuant to C.C.P. §1541, dated October 2, 2023. The Court, having reviewed the submitted materials and after consideration, HEREBY ORDERS:

1. **Escheated Property Return**:

The Defendant, Malia M. Cohen, California State Controller (the "Controller"), is directed to release immediately the escheated property, with Property ID# 1019294209, to the Plaintiff. The property, originally reported as abandoned by MUFG UNION BANK N A on June 15, 2022, shall be returned along with any interest accrued thereon.

2. **Information Accuracy Verification**:

The Plaintiff’s information that F. Jan Blaustein Scholes is not under Guardianship/Conservatorship and that no such proceeding exists in Arizona or California is acknowledged. The Controller is directed to process the claim in light of this verified information.

3. **Financial Distress Alleviation**:

The Controller is instructed to expedite the processing and resolution of this matter to mitigate the financial distress and hardship caused to the Plaintiff as evidenced by the involuntary Chapter 7 bankruptcy case (Case No. 23-40709-CJP).

4. **Costs of Suit**:

The Defendant shall bear the costs of the suit incurred by the Plaintiff.

5. **Additional Relief**:

This Court retains jurisdiction to entertain any issues arising out of or related to this order or the final judgment to be entered and reserves the authority to amend this order as necessary.

6. **Implementation**:

This order shall be effective immediately upon its issuance.

**IT IS SO ORDERED.**

Date:

____________________________________

JUDGE OF THE SUPERIOR COURT

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 23-40709-CJP

Chapter 7

| In re:<br><br>WESTBOROUGH SPE LLC | TOWN OF WESTBOROUGH'S MOTION FOR RELIEF FROM AUTOMATIC STAY AND OPPOSITION TO APPOINTMENT OF A BANKRUPTCY TRUSTEE |
|---|---|

The Town of Westborough ("Town"), listed in the Debtor's Matrix List of Creditors (Doc. No. 7) in the above-captioned action, hereby moves the Court for an order providing relief from the automatic stay provisions of 11 U.S.C. § 362(a) to the extent those provisions stay the cases of Town of Westborough v. Westborough SPE, LLC, et al. (Mass. Land Ct. No. 19 TL 000768) (the "Tax Foreclosure Action") and Westborough SPE, LLC v. Town of Westborough, et al. (D. Mass. No. 4:23-cv-12017-MRG) (the "Civil Action"). As set forth below, the former is a tax title foreclosure action between the Town and the Debtor currently underway in the Massachusetts Land Court, in which judgment had already entered against the Debtor long before the commencement of this bankruptcy proceeding, but which judgment the Debtor was seeking to vacate. The latter is an action the Debtor filed—through the law firm listed as a petitioning creditor here—in U.S. District Court on the very same day that creditor (and another) commenced this involuntary Chapter 7 proceeding.

For the reasons discussed herein, if either action (or both) is covered by the automatic stay, relief is appropriate to allow the actions to proceed so as to allow the Town to dispose of the property subject to the Tax Foreclosure Action through a long-awaited sale and to deposit the surplus proceeds into the court for the Debtor (or anyone else claiming a right to them, including the Debtor's apparent former owners) to claim in light of Tyler v. Hennepin County, 598 U.S. 631

(2023). For those same reasons, the Town opposes the appointment of a bankruptcy trustee with respect to disposition of that property, including an interim trustee as requested by the Debtor's Motion to Appoint Interim Trustee (Doc. No. 10).[1]

## BACKGROUND

In 1997, the Debtor acquired real property located at 231 Turnpike Road, Westborough, Massachusetts (the "Property"). The Debtor withdrew from doing business in Massachusetts in 2007 and was administratively dissolved in 2014 for failure to pay taxes in the State of Delaware. See Exhibits A (MA Certificate of Withdrawal) and B (DE Administrative Dissolution). Notwithstanding the dissolution of the Debtor, the lessee of the Property (Regal Cinemas) continued to lease the Property and pay property taxes to the Town. See Declaration of Kristi Williams ("Williams Decl.") at ¶ 5. However, when the lease expired in late 2017, the lessee vacated the Property and stopped making tax payments. See id. at ¶ 6. Subsequently, property taxes on the Property accrued, and at the Town's Annual Town Meeting in March 2018, Town Meeting voted to authorize the Town to acquire and dispose of the Property. See id. at ¶ 7; Exhibit C (2018 ATM Results) at pp. 13-14. As noted in the Town Manager's Statement for the article in question, the Town intended to act proactively "to ensure that the [Property] does not become a blight to the neighborhood … because of neglect, vandalism and/or exposure to the elements" and "to put the [Property] to productive use and to contribute again to the Town's tax revenue." See id. Unfortunately, as discussed below, the Town's efforts have been hampered, in large part due to the actions of the Debtor and its counsel.

---

[1] The Town was not served with a copy of the Debtor's motion when it was filed on September 11, 2023.

After the March 2018 Town Meeting vote, the Town issued a Request for Proposals to sell the Property. See Williams Decl. at ¶ 8.[2] The Town's Select Board voted to accept the proposal of Lax Media LLC ("Lax Media") on November 20, 2018, issued a notice of award to Lax Media on November 28, 2018, and notified the other bidders of the Town's selection on December 3, 2018. See id. at ¶ 9. On December 28, 2018, the Town recorded an instrument of taking on the Property and all improvements thereon pursuant to G.L. c. 60, §§ 53-54 as a result of unpaid FY2018 taxes in the amount of $106,944.99. See Exhibit D (Instrument of Taking). Subsequently, the Town incurred certain costs of insuring, securing, and maintaining the Property. See Williams Decl. at ¶ 10. The Town is also responsible, to the extent provided by G.L. c. 60, § 77, for payment of a portion of common area maintenance and snow removal to The MobileStreet Trust, the owner of two abutting parcels that, with the Property, are all subject to a Declaration of Reciprocal Covenants, Easements and Restrictions (the "Reciprocal Agreement"). See Exhibit E (Reciprocal Agreement) at § 3.1.

On or about April 3, 2019, the Town Manager's office received an email from an attorney representing the successor-in-interest of Babcock and Brown Administrative Services, Inc. ("Babcock & Brown"), the company that had been the Debtor's manager, requesting information concerning the Property and indicating their client may have a claim to the Property. See Williams Decl. at ¶ 11. The Town elected not to proceed with its acquisition of the Property at that time in light of the potential claim to the Property and identification of a party that may be able to pay the outstanding tax liabilities on the Property. See id. at ¶ 12. On April 30, 2019, the Select Board

[2] The RFP provided that "Proposers are advised that the Town intends to acquire title to the Premises prior to or simultaneously with the closing. The Board of Selectmen has been authorized by Town Meeting to acquire the Premises."

voted to authorize Town Counsel to terminate the pending purchase and sale agreement with Lax Media. See id. at ¶ 13.

However, neither Babcock & Brown nor its successor-in-interest paid off the outstanding taxes on the Property. See Williams Decl. at ¶ 14. As a result, since six months had passed after the Town's recording of the instrument of taking without the Debtor redeeming the Property, the Town commenced the Tax Foreclosure Action in the Massachusetts Land Court on July 8, 2019 to foreclose the Debtor's right of redemption. See Exhibit F (Tax Foreclosure Complaint). On January 5, 2022, the Land Court entered judgment in favor of the Town and against the Debtor.[3] See Exhibit G (Tax Foreclosure Judgment).

On May 26, 2022, the Town issued a new request for proposals for the purchase and redevelopment of the Property. See Williams Decl. at ¶ 15. The Town received three proposals, including one from Lax Media. See id. at ¶ 16. Lax Media offered a purchase price of $2,500,001, which was higher than the estimated fair market value of the Property ($2,082,000). See id. at ¶ 17.[4] The Town's Select Board evaluated the proposals based on five categories and selected Lax Media's proposal, which received the score of "highly advantageous" in three categories and "advantageous" in the remaining two. See id. at ¶ 18.[5]

---

[3] Thus, the Land Court judgment issued more than a year before the U.S. Supreme Court's May 2023 decision in Tyler, discussed further below.

[4] The Debtor's Schedule A/B (Doc. No. 8) lists a purported current value of $7,942,000 for the Property, based upon the highest bid that the Town received. As a Massachusetts Superior Court judge noted in a related proceeding to which the Debtor is not a party, that bid sought "to raze the existing structure and build 108 condominium units," which was not feasible because "[t]here was a moratorium on additional water and sewer connections in Westborough due to capacity constraints that [the bidder] would have to overcome." See Memorandum of Decision and Order on Plaintiff's Motion for Preliminary Injunction, at pp. 2-3, Ferris Development Group, LLC v. Town of Westborough, et al., No. 2285CV02181 (Mass. Superior Ct. Jan. 13, 2023); see also, infra, note 5. The Town rejected the highest bid because the water moratorium precluded the proposed development.

[5] In November 2022, one of the other bidders filed suit against the Town and Lax Media in Massachusetts Superior Court for breach of implied contract, declaratory judgment, and injunctive relief as a result of the Town's awarding the bid to Lax Media. See Ferris Development Group, LLC v. Town of Westborough, et al., Mass. Superior Court Case No. 2285CV01281. The Superior Court denied the plaintiff's motion for preliminary injunction, finding that plaintiff failed to show a likelihood of success on the merits. Memorandum of Decision and Order on Plaintiff's

On December 22, 2022, the Debtor (under the purported control of two new managers) applied for registration to do business in Massachusetts. See Exhibit H (Application for Registration). On January 4, 2023—which was one day short of the first year anniversary of the issuance of the judgment entered in the Tax Foreclosure Action and the final day to petition to vacate the judgment (see G.L. c. 60, § 69)the Debtor filed a motion with the Land Court to vacate the judgment. See Exhibit I (Motion to Vacate).[6] The Town opposed the motion to vacate[7] for various reasons, including the significant questions that the Town had regarding the ownership and identity of the Debtor, including whether the individuals purporting to own the Debtor and advancing the motion to vacate (Lolonyon Akouete and Denise Edwards) had actually acquired the Debtor, much less any interest in the Property. After several extensions, the Land Court was prepared to hold an evidentiary hearing "to determine whether Westborough SPE, LCC [sic], having appeared in this case, is the taxpayer who has the right to redeem the subject property" and a pre-hearing conference was scheduled for August 31, 2023 to determine the hearing schedule. See Exhibit J (Land Court Docket) at May 16, 2023 entry.

Lax Media has been holding its bid firm and keeping its terms in place pending the outcome of the Tax Foreclosure Action. See Williams Decl. at ¶ 19. Despite the Town's efforts to secure and maintain the Property since the time that Regal Cinemas vacated it, the Property has been vandalized and has experienced burst pipes. See id. at ¶ 20. The Debtor does not dispute the condition of the property and, in fact, explicitly references the deterioration of the Property in its

---

Motion for Preliminary Injunction, at pp. 9-11, Ferris Development Group, LLC v. Town of Westborough, et al., No. 2285CV02181 (Mass. Superior Ct. Jan. 13, 2023). As the Debtor is not a party to the Superior Court action, that action is not subject to the automatic stay.

[6] Although the Debtor is a limited liability company, its motion was not signed by an attorney, which is impermissible under Massachusetts law. See Dickey v. Inspectional Servs. Dep't of Boston, 482 Mass. 1003, 1004 (2019).

[7] As noted therein, the tax title account balance on the Property as of the date of the Town's opposition was $638,755.20, exclusive of expenses incurred under the Reciprocal Agreement.

motion for appointment of a trustee. See Doc. No. 8 at p. 1 & Ex. 1. As of May 3, 2023, the Town's tax title account for the Property reflects an amount of $918,314.60 due to the Town, exclusive of expenses under the Reciprocal Agreement. See id. at Ex. 2.

On August 31, 2023, petitioner Nathanson & Goldberg, P.C. (which has represented the Debtor in the Tax Foreclosure Action since February 22, 2023) and The MobileStreet Trust (which is the other party subject to the Reciprocal Agreement) filed an involuntary Chapter 7 petition against the Debtor, commencing these proceedings. The Land Court cancelled the pre-hearing conference on the Debtor's motion to vacate, which was scheduled for 2:00 pm that same day, and ordered the Debtor to file a status report by October 31, 2023 (with additional status reports due every 60 days thereafter). See Exhibit J (Land Court Docket) at August 31, 2023 entry.

On the same day (August 31, 2023), the Debtor—through Nathanson & Goldberg, P.C. (one of the petitioners here)—commenced the Civil Action. In the Civil Action, the Debtor seeks declaratory relief and other relief relating to the surplus proceeds of the Town's sale of the Property (which has not occurred because of the Debtor's actions in the Tax Foreclosure Action) under Tyler. See Exhibit K (Civil Action Complaint). The Debtor also filed a suggestion of bankruptcy in the Civil Action on August 31, 2023. See Exhibit L (Civil Action Suggestion).

## ARGUMENT

### I. RELIEF FROM THE STAY IS APPROPRIATE TO ALLOW THE TOWN TO BRING THE TAX FORECLOSURE ACTION TO A CONCLUSION

#### A. Relief for Cause Is Warranted

There is cause under 11 U.S.C. § 362(d)(1) to relieve the Town from the automatic stay with respect to the Tax Foreclosure Action (and the Civil Action, should the Court find that the stay applies). The Bankruptcy Code does not provide a definition of what constitutes "cause," and therefore, courts have discretion to determine when relief is appropriate on a case-by-case basis.

In re Hurvitz, 554 B.R. 35, 40 (Bankr. D. Mass. 2016). Courts consider three factors to determine "whether cause exists to lift the automatic stay to permit the continuation of pending litigation," namely "(1) whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of a civil suit; (2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship of the debtor; and (3) whether the creditor has a probability of prevailing on the merits of his case." Id. (formatting and quotations omitted).

Here, all three factors weigh heavily in favor of lifting the automatic stay for the Town. Permitting the Tax Foreclosure Action to proceed will not prejudice the Debtor or the bankruptcy estate because the Property is not an asset of the estate and one of the creditors represents the Debtor in that action. On the other hand, the Town will suffer great hardship as a result of the stay, as it will be unable to bring the tax recovery process (which started in 2018) to a conclusion, return the Property to the tax rolls and productive use, and cease incurring significant expenses to maintain the Property. Finally, the Town has a strong probability of prevailing in the Tax Foreclosure Action, as it has already obtained judgment in its favor and the Debtor's motion to vacate that judgment rests on extremely dubious grounds, both procedurally (having been brought by an unrepresented LLC) and substantively (given the questions surrounding the Debtor's ownership and the fact that the Town provided the Debtor sufficient notice in line with the applicable statutes and the Land Court's directions).

The conduct of the Debtor and the Debtor's litigation counsel, one of the petitioners here, has caused the Town to lose municipal revenue and to incur unnecessary expense. The Town has not received real estate tax or water/sewer fees on the Property since 2017. With interest, this amounts to $695,620.24 due and owing to the Town as of May 3, 2023. See Doc. No. 8 at Ex. 2. This lack of payment establishes that the Town is not adequately protected, justifying relief from

the stay. See McCullough v. Horne (In re McCullough), 495 B.R. 692, 695-696 (Bankr. W.D.N.C. 2013) (history of lack of prepetition payments to creditor combined with insufficient postpetition payments left creditor inadequately protected). Additionally, since the tax taking in 2018 and, in particular, since the Land Court entered judgment foreclosing the Debtor's right of redemption in January 2022, the Town has incurred significant costs to maintain the Property. See Doc. No. 8 at Ex. 2. For example, the Town has expended over $109,000 to insure the Property. See id. The Town has also paid almost $15,000 to board the Property and over $10,000 in utility costs, despite the fact that the building on the Property is vacant. See id. Additionally, the Town is responsible, to the extent provided by G.L. c. 60, § 77, to The MobileStreet Trust for payment of a portion of common area maintenance and snow removal under the Reciprocal Agreement. The Town continues to bear these costs and will continue to do so until it sells the Property, thereby recouping the outstanding tax title balance inclusive of expenses.[8]

That sale cannot happen until the Land Court adjudicates the Debtor's motion to vacate in the Tax Foreclosure Action. Absent the delays caused by the Debtor and the Debtor's litigation counsel, the Land Court could have disposed of the Debtor's motion to vacate long ago. Assuming that the Land Court denied that motion and allowed the Town's judgment to stand, the Town could have consummated the sale of the Property. Instead, that sale has been—and continues to be—delayed as a result of the Debtor's actions. Indeed, the involuntary petition in this matter, filed on behalf of the Debtor's Land Court counsel (Nathanson & Goldberg) mere hours before the Land Court pre-hearing conference on the motion to vacate in the Tax Foreclosure Action (at which it

[8] The Town has also spent $6,000 to have the Property appraised, over $20,000 preparing the RFPs on the Property, and almost $60,000 in legal fees for the tax title matter. See Doc. No. 8 at Ex. 2.

was expected that the Court would establish the hearing schedule), was a desperate attempt to delay the Land Court conference.

These delays have been made all the more glaring in light of the Debtor's filings in the Civil Action. Although the Debtor spent the past eight months contesting the Town's right to sell the Property in the Land Court, the Debtor now asks the U.S. District Court to hold that surplus sales proceeds from the Town's sale of the Property belong to Debtor under Tyler. Specifically, the Debtor alleges that it demands payment of surplus proceeds "[u]pon any sale of the Property by the Town." See Ex. K at ¶ 107. The Debtor continues by alleging that it "is entitled to a declaration that if the Town … sells the [Property] that [the Debtor] is entitled to the difference between the amount owed and what the property sells for." Id. at ¶ 109.[9]

Allowing the Tax Foreclosure Action to proceed is not inconsistent with the purposes of the automatic stay. The stay is designed to allow "debtors to resolve their debts in a more orderly fashion, ... and at the same time safeguard[] their creditors by preventing 'different creditors from bringing different proceedings in different courts, thereby setting in motion a free-for-all in which opposing interests maneuver to capture the lion's share of the debtor's assets.'" Heaney v. Lamento (In re Whiz Kids Dev., LLC), 576 B.R. 731, 760 (Bankr. D. Mass. 2017), quoting Soares v. Brockton Credit Union (In re Soares), 107 F.3d 969, 975 (1st Cir. 1997). The Tax Foreclosure Action has nothing to do with capturing the debtor's assets, however.

Rather, the Tax Foreclosure Action was a statutory action by which the Town sought to foreclose the Debtor's right of redemption in the tax title to the Property (see G.L. c. 60, § 65) in

[9] As the Sixth Circuit recently recognized, "the Supreme Court has [never] held that a plaintiff whose property is foreclosed and sold at a public auction for failure to pay taxes is entitled to recoup the fair market value of the property," and Tyler does not change that. Freed v. Thomas, --- F.4th ----, 2023 WL 5733164, at *2 (6th Cir. Sept. 6, 2023). Thus the Debtor's claims in the Civil Action relating to the alleged fair market value of the Property are misplaced, even if the Debtor (or whomever properly "owns" the Debtor) is entitled to the difference between the sale price and the tax title account balance.

order to permit the Town to recover the tax title balance (caused by the Debtor's failure to pay taxes on the Property) through a sale to a third party. As the Supreme Judicial Court has explained, "[w]hen a tax collector conducts a tax taking, … the municipality obtains 'tax title' to the property, which is best understood as legal ownership of the property subject to the owner's right of redemption." Tallage Lincoln, LLC v. Williams, 485 Mass. 449, 451 (2020). Because the Land Court had entered judgment in favor of the Town and against the Debtor foreclosing the right of redemption prior to the filing of the bankruptcy petition, the Debtor did not own the Property at the time of the filing of the bankruptcy action (assuming that the Debtor, in its current form with questionable ownership of the LLC, had any ownership interest in the Property to begin with). See id. at 452 ("Upon entry of such judgment, the municipality … takes absolute title to the property."). As the SJC has explained, a tax title foreclosure "extinguishes the taxpayer's remaining interest in the property—the right of redemption—and converts the municipality's … tax title into absolute title … free and clear of all encumbrances, including mortgages and other liens," such that "the taxpayer loses any equity he or she has accrued in the property, no matter how small the amount of taxes due or how large the amount of equity." Id. at 452-453.[10]

Thus, permitting the Land Court to bring that action to final resolution by adjudicating the Debtor's motion to vacate the foreclosure judgment will neither imperil the Debtor's assets nor the rights of other creditors. Allowing a creditor relief from the automatic stay to proceed with its state law remedies under such circumstances is entirely appropriate. See Bushnell v. Bank of the West (In re Bushnell), 469 B.R. 306, 309-310 (B.A.P. 8th Cir. 2012) (affirming lifting of stay to

[10] This is now modified by Tyler, which held that "a taxpayer is entitled to the surplus in excess of the debt owed" when real property is taken and sold pursuant to a tax title statute. See 598 U.S. at 642. Nevertheless, the Debtor's potential right to the surplus of proceeds from the sale of the Property (which the Town questions given its concerns about the present ownership of the Debtor) does not give it equity in the Property itself. Thus, the Land Court should be allowed to conclude the Tax Foreclosure Action so that the Town can sell the Property and deposit the surplus proceeds into the court (potentially in the Civil Action) for determination of who is entitled to those surplus proceeds.

allow bank holding foreclosure deed to evict debtor that had improperly reentered property). As the Land Court has spent the past several years presiding over the disposition of the Property and, absent the stay, will soon conclude that action, there is no benefit to anyone in having the issue transferred to this Court and incurring additional legal expense as a result of the automatic stay.

Indeed, this Court has provided relief from the automatic stay to allow similar proceedings to conclude post-petition, even where the Town had not yet succeeded in obtaining judgment foreclosing the debtor's right of redemption. See In re Tomaselli, No. 14-10736-JNF, 2014 WL 4322404, at *5 (Bankr. D. Mass. Aug. 29, 2014). As Judge Feeney explained in Tomaselli, the "[Bankruptcy] Court is not the appropriate forum for the Debtor to raise specialized state law issues involving betterment liens and tax liens that have been the subject of prior rulings in other courts," such as the Land Court. Id. at *7. Given that the Town here has obtained judgment foreclosing the Debtor's right of redemption, and the only thing left for the Land Court to do in the Tax Foreclosure Action is to adjudicate the Debtor's dubious motion to vacate, the reasoning of Tomaselli applies even more so here.

Cause for relief from stay is not limited to a lack of adequate protection or a finding of bad faith motive for filing the bankruptcy case. In re Shady Grove Tech Ctr. Assocs. Ltd. P'shp, 216 B.R. 386, 388 (Bankr. D. Md. 1998) (internal quotations and citations omitted). Here, cause exists to grant the Town relief from the automatic stay to the extent it applies to the Tax Foreclosure Action and the Civil Action.

**B. Relief Is Appropriate Because the Debtor Has No Equity in the Property**

The Court may also lift the automatic stay "with respect to ... an act against property … if the debtor does not have an equity in such property; and … such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2). As discussed above, whatever equity the Debtor ever had or has in the Property was extinguished on January 5, 2022 when the Land Court entered

judgment in the Tax Foreclosure Action. Although the Debtor seeks to vacate that judgment, until such time as the judgment is vacated (which cannot happen while the stay is in effect with respect to the Tax Foreclosure Action), the Debtor lacks any equity or ownership interest in the Property.

Indeed, because the Debtor's right of redemption on the Property was foreclosed and absolute title to the Property transferred to the Town prior to the commencement of this proceeding, the Property itself is not even part of the Debtor's bankruptcy estate, such that the stay should not apply to the Property at all. See U.S. Bank, N.A. v. Vertullo (In re Vertullo), 610 B.R. 399, 404 (B.A.P. 1st Cir. 2020) ("For property to be protected by the automatic stay, it must be property of the bankruptcy estate."). Nor does the fact that the Debtor may have a pending petition pursuant to G.L. c. 60, § 69, or an interest in any surplus sale proceeds under Tyler change the fact that the Debtor lacks equity in the Property itself. Finally, the Property is not necessary for reorganizing the Debtor as this is not a Chapter 11 proceeding. Thus, the Court should also lift the stay under subsection (d)(2).

**C. Relief for Single Asset Real Estate Is Warranted**

Additionally, relief from the stay should be granted to the Town pursuant to 11 U.S.C. § 362(d)(3) because the Town's claim concerns a single asset real estate. Under the Bankruptcy Code, the term "single asset real estate" means "real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental." 11 U.S.C. § 101(51B). The Property meets this definition, as

it appears that the Property (which is commercial real estate) was the sole income-generating asset of the Debtor prior to its administrative dissolution.[11]

Under subsection (d)(3), the Court may provide relief "with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless" the Debtor "has commenced monthly payments that … are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate" within 90 days of the order of relief. 11 U.S.C. § 362(d)(3).[12] Relief from the automatic stay for single asset real estate may be granted in Chapter 7 cases, such as this one, where the debtor has not made interest payments to a secured creditor within 90 days.[13] See Suntrust Bank v. Global One, L.L.C. (In re Global One, L.L.C.), 411 B.R. 524, 528-529 (Bankr. S.D. Ga. 2009). As discussed above, it is undisputed that the Debtor has not paid the Town interest on the tax lien (much less the principal) for several years and has not established any ability (or legal right) to make such payments going forward should the Court enter an order of relief pursuant to 11 U.S.C. § 303(h). Thus, relief from the stay is appropriate under subsection (d)(3), as well.

## II. THE STAY DOES NOT APPLY TO THE DEBTOR'S CIVIL ACTION

The automatic stay provisions of 11 U.S.C. § 362 typically apply to "judicial, administrative, or other action[s] or proceeding[s] against the debtor." 11 U.S.C. § 362(a)(1)

---

[11] In its schedules, the Debtor lists the Property as its sole asset exclusive of an unspecified unclaimed checking account in California. See Doc. No. 8 at p. 7-8. Although the Debtor states that it is the "Owner" of the Property in its schedules, as discussed above, absolute title to the Property transferred to the Town upon the Land Court's entry of judgment in the Tax Foreclosure Action.

[12] Interest accrues on a municipal tax title account at a rate of 14% per annum from delinquency to taking and a rate of 16% per annum after taking. G.L. c. 59, § 57; G.L. c. 60, § 62.

[13] Although the statute allows a debtor to avoid such relief from the stay by alternatively filing "a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time" within the 90-day period, such alternative does not apply in a Chapter 7 proceeding. See 11 U.S.C. § 362(d)(3)(A).

(emphasis added); see, e.g., id. § 362(a)(2) (staying "the enforcement, against the debtor or against property of the estate, of a judgment"); id. §§ 362(a)(4)-(5) (staying acts "to create, perfect, or enforce" liens against property of the estate or the debtor). The automatic stay thus "does not freeze litigation where the debtor is the plaintiff." Worth v. Tamarack Am., Div. of Great Am. Ins. Co., 47 F. Supp. 2d 1087, 1099 n.9 (S.D. Ind. 1999); see 4Kids Entertainment, Inc. v. Upper Deck Co., 797 F. Supp. 2d 236, 241 (S.D.N.Y. 2011) ("automatic stay does not extend to claims brought by the debtors against other parties"); cf. Roberts v. C.I.R., 175 F.3d 889, 894-896 (11th Cir. 1999). As the First Circuit has explained, the filing of a bankruptcy petition "has absolutely no effect on the debtors' ability to bring suit against other parties." DiMaio Family Pizza & Luncheonette, Inc. v. The Charter Oak Fire Ins. Co., 448 F.3d 460, 463 (1st Cir. 2006); see Pinpoint IT Servs., LLC v. Atlas IT Export, LLC (In re Atlas IT Export, LLC), 491 B.R. 192, 195 (B.A.P. 1st Cir. 2013) (noting that "claims asserted by the debtor may continue" no matter how closely related to stayed claims against the debtor).

The automatic stay thus does not apply to the Civil Action. The Debtor brought the Civil Action against the Town. Regardless of how related the Debtor's claims may be to the issues being litigated in the Tax Foreclosure Action (as discussed above), the commencement of this involuntary bankruptcy proceeding does not stay the Civil Action.

## III. APPOINTMENT OF A BANKRUPTCY TRUSTEE IS UNNECESSARY TO THE DISPOSITION OF THE PROPERTY

Appointment of a bankruptcy trustee is not automatic in an involuntary Chapter 7 proceeding such as this one. Specifically, 11 U.S.C. § 303 provides that:

> At any time after the commencement of an involuntary case under chapter 7 of this title but before an order for relief in the case, the court, on request of a party in interest, after notice to the debtor and a hearing, and if necessary to preserve the property of the estate or to prevent loss to the estate, may order the United States trustee to appoint an interim trustee under section 701 of this title to take possession of the property of the estate and to operate any business of the debtor.

11 U.S.C. § 303(g) (emphasis added). The relief that the Debtor requests pursuant to this provision—appointment of an interim trustee—is extremely rare. In re Diamondhead Casino Corp., 540 B.R. 499, 505 (Bankr. D. Del. 2015) ("a request for an interim trustee should be denied in the absence of an exceptionally strong need for doing so or where no facts are alleged showing a necessity for the appointment.") (quotations and citations omitted). The Debtor has not demonstrated why such appointment is necessary in this case.

Indeed, appointment of a trustee is not necessary to preserve the Property, for the reasons discussed above. A bankruptcy "trustee can only exercise the same right to redeem that the bankrupt had." Town of Agawam v. Connors, 159 F.2d 360, 364 (1st Cir. 1947). Here, the Debtor no longer had any right to redeem the Property and was, at most, left with the statutory right to request vacatur of the Land Court's judgment within one year.[14] Because the Debtor no longer possesses a right to redeem the Property, the same would be true of any trustee appointed in this proceeding. At most, the trustee (like the Debtor) would have the right to have the Debtor's motion to vacate adjudicated in the Land Court. Given that the Debtor was prepared to do just that before its counsel in the Land Court commenced this proceeding, the Court should simply allow the Land Court to proceed without appointing a trustee.

## CONCLUSION

For the foregoing reasons, the Court should grant the Town relief from the automatic stay and order that the stay does not bar the Tax Foreclosure Action or the Civil Action from proceeding. Additionally, the Court should decline to appoint a trustee in this proceeding with respect to the Property.

---

[14] As noted above, the Debtor's motion was filed on the last day of the one year in question but was not signed by an attorney, calling its validity into question.

Respectfully submitted,

TOWN OF WESTBOROUGH,

By its attorneys,

Brian W. Riley (BBO# 555385)
Jeffrey T. Blake (BBO# 655773)
Roger L. Smerage (BBO# 675388)
KP Law, P.C.
Town Counsel
101 Arch Street, 12th Floor
Boston, MA 02110-1109
(617) 556-0007
briley@k-plaw.com
jblake@k-plaw.com
rsmerage@k-plaw.com

Dated: October 3, 2023

882073/WEST/0042

Case 23-40709 Doc 164 Filed 10/03/23 Entered 10/03/23 14:28:23 Desc Main Document Page 17 of 18

**CERTIFICATE OF CONFERENCE HELD PURSUANT TO MLBR 9013-1(b)**

I, Roger L. Smerage, hereby state that on October 3, 2023, I attempted in good faith to confer with Attorney Stephen Gordon (counsel for the Petitioning Creditors) regarding this Motion for Relief from the Automatic Stay filed by the Town of Westborough by telephone and email. No resolution has been reached as of today's date.

TOWN OF WESTBOROUGH,

By its attorney,



Roger L. Smerage
KP Law, P.C.
Town Counsel
101 Arch Street, 12th Floor
Boston, MA 02110-1109
(617) 556-0007

Date: October 3, 2023

CERTIFICATE OF SERVICE

I, Roger L. Smerage, hereby certify that on the below date, I caused a copy of the foregoing Motion for Relief from Automatic Stay and Opposition to Appointment of a Bankruptcy Trustee to be served through the Court's CM/ECF system to the following counsel of record or by U.S. mail to the following unregistered parties:

Stephen F. Gordon
The Gordon Law Firm LLP
River Place
57 River Street
Wellesley, MA 02481
sgordon@gordonfirm.com
*Attorney for Petitioning Creditors*

Scott A. Schlager
Nathanson & Goldberg, P.C.
183 State Street, 5th Floor
Boston, MA 02109
sas@natgolaw.com
*Attorney for Creditor Nathanson & Goldberg, P.C.*

Richard King
Office of US. Trustee
446 Main Street
14th Floor
Worcester, MA 01608
*Attorney for the U.S. Trustee*

Westborough SPE, LLC
c/o Lolonyon Akouete
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703
*Debtor*

Dated: October 3, 2023

Roger L. Smerage

# Appendix

2023 WL 5733164
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Donald FREED,
Plaintiff-Appellant/Cross-Appellee,
v.
Michelle THOMAS, Defendant-Appellee,
County of Gratiot, Michigan,
Defendant-Appellee/Cross-Appellant,
Michigan Department of Attorney
General, Intervenor-Appellee.

Nos. 21-1248/1288/1339
|
Argued: August 1, 2023
|
Decided and Filed: September 6, 2023

**Synopsis**
**Background:** Property owner brought § 1983 action against county and county treasurer in her individual capacity, asserting a taking in violation of Fifth Amendment and an excessive fine in violation of Eighth Amendment after county foreclosed on property for unpaid taxes and, after selling property at auction, retained the entire proceeds. The United States District Court for the Eastern District of Michigan, No. 1:17-cv-13519, Bernard A. Friedman, Senior District Judge, 2018 WL 5831013, dismissed for lack of subject matter jurisdiction. Owner appealed. The Court of Appeals, 976 F.3d 729, reversed and remanded. On remand, the District Court granted summary judgment to owner on takings claim but declined to award amount of damages sought by owner, and it also held that claims against county treasurer were barred by qualified immunity. Owner appealed and county cross-appealed.

**Holdings:** The Court of Appeals, Siler, Circuit Judge, held that:

under Fifth Amendment's takings clause, compensation which county was required to make to owner was not required to include the difference between property's asserted value and the amount that it actually sold for at auction;

foreclosure was not an excessive fine in violation of Eighth Amendment even if sale at auction "destroyed" taxpayer's equity far in excess of tax delinquency;

treasurer's conduct did not violate clearly established law, and thus treasurer had qualified immunity to owner's takings claim; and

county's policy of prohibiting the refunding of surplus proceeds to property owners following foreclosure sale of properties for unpaid taxes had direct causal link to the unconstitutional taking, and thus county could be subject to liability under § 1983.

Affirmed.

Appeal from the United States District Court for the Eastern District of Michigan at Bay City. No. 1:17-cv-13519—Bernard A. Friedman, District Judge.

**Attorneys and Law Firms**

ARGUED: Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for Appellant/Cross-Appellee. Douglas J. Curlew, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellee and Appellee/Cross-Appellant. Matthew B. Hodges, MICHIGAN ATTORNEY GENERAL'S OFFICE, Lansing, Michigan, for Intervenor-Appellee. Theodore W. Seitz, DYKEMA GOSSETT PLLC, Lansing, Michigan, for Amicus Curiae. ON BRIEF: Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for Appellant/Cross-Appellee. Douglas J. Curlew, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellee and Appellee/Cross-Appellant. Matthew B. Hodges, MICHIGAN ATTORNEY GENERAL'S OFFICE, Lansing, Michigan, for Intervenor-Appellee. Theodore W. Seitz, DYKEMA GOSSETT PLLC, Lansing, Michigan, for Amicus Curiae.

Before: SILER, GIBBONS, and LARSEN, Circuit Judges.

**OPINION**

SILER, Circuit Judge.

***1** Although Plaintiff Donald Freed prevailed on his Fifth Amendment claim before the district court, he appeals because the district court declined to award him the fair market value of his property minus his debt. Freed argues that the district court erred by (1) violating his Fifth or Eighth Amendment rights by awarding him "the difference between the foreclosure sale and [his] debt" instead of the fair market value of his property; (2) granting qualified immunity to Michelle Thomas, Gratiot County's ("the County") treasurer; and (3) denying without prejudice his motion for attorney's fees. The County cross-appeals, arguing that the district court improperly held it liable for Freed's 42 U.S.C. § 1983 claims. We affirm.

## I.

After Freed fell behind approximately $1,100 on his property taxes, Thomas, acting on behalf of the County and pursuant to Michigan's General Property Tax Act (GPTA), foreclosed on Freed's property and sold it at a public auction for $42,000. The County retained the entire proceeds. Freed sued the County and Thomas under § 1983, alleging (1) an unconstitutional taking under the Fifth and Fourteenth Amendments by state and local officials; and (2) an unconstitutional excessive fine under the Eighth Amendment. The district court, applying *Wayside Church v. Van Buren County*, 847 F.3d 812 (6th Cir. 2017), dismissed Freed's complaint for lack of subject matter jurisdiction, finding that the Tax Injunction Act (TIA) and principles of comity prevented it from hearing the case.

We reversed and remanded. *Freed v. Thomas*, 976 F.3d 729 (6th Cir. 2020), *reh'g en banc denied* (Nov. 4, 2020). We held that (1) the TIA did "not preclude the exercise of federal jurisdiction ... because Freed is not attempting to enjoin Michigan's assessment, levy, or collection of a state tax"; (2) the doctrine of comity did not prevent this suit from proceeding "because Freed is not challenging the validity of Michigan's tax procedures"; and (3) we were not bound by *Wayside Church* because the opinion's discussion of the TIA and comity issues was simply "persuasive dictum." *Id.* at 734, 737–38, 740. We also noted that the Supreme Court overruled *Wayside Church*'s subject matter jurisdiction analysis when it held "that [a] property owner may bring a takings claim [in federal court] under § 1983 upon the taking of his property without just compensation by a local government." *Id.* at 733–34 (quoting *Knick v. Township of Scott*, ––– U.S. ––––, 139 S. Ct. 2162, 2179, 204 L.Ed.2d 558 (2019)) (alterations in original).

On remand, the district court granted summary judgment in favor of Freed on his Fifth Amendment claim and denied summary judgment on his Eighth Amendment claim. It rejected Freed's argument that he was entitled to the fair market value of his property, minus his debt, and instead held that Freed was "owed just compensation in the amount of the difference between the foreclosure sale and [his] debt, plus interest on this amount from the date of the foreclosure sale." This meant that Freed was owed about $40,900 plus interest—approximately $56,800 less than he was seeking. The court also held that Freed's claims against Thomas were barred by qualified immunity.

***2** Freed appealed, and the County cross-appealed. Freed also filed a motion for attorney's fees following the entry of judgment, which the district court denied without prejudice under Federal Rule of Civil Procedure 54(d)(2)(B). It noted that "it would be premature to decide plaintiff's motion" pending the appeal and ordered the period for filing a motion for attorney's fees be extended until fourteen days after the appeal mandate is issued. Freed appealed the denial of his attorney's fees motion.

## II.

We review a district court's grant of summary judgment de novo. *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021).

### A.

#### 1.

Freed first argues that the district court should have awarded him the fair market value of his property pursuant to either the Fifth or the Eighth Amendment.

##### a.

The Supreme Court recently resolved a case with similar facts. Hennepin County, Minnesota, sold the delinquent

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

taxpayer's house "for $40,000 to satisfy a $15,000 tax bill" and kept the remaining $25,000. *Tyler v. Hennepin County*, 598 U.S. 631, 634, 143 S.Ct. 1369, 215 L.Ed.2d 564 (2023). The district court there dismissed for failure to state a claim, and the Eighth Circuit affirmed. *Id.* at 636, 143 S.Ct. 1369. The Supreme Court unanimously reversed, affirming "the principle that a taxpayer is entitled to the surplus in excess of the debt owed." *Id.* at 642, 143 S.Ct. 1369.

Here, the district court held at the motion for summary judgment stage that Freed's Fifth Amendment rights were violated, and it held that Freed was owed the difference between the foreclosure sale amount and his debt, plus interest. This holding squares with *Tyler*. Freed asserts though that he is entitled to an additional $56,800 because the purported fair market value of the property was $98,800 and the property sold for only $42,000. However, neither this court nor the Supreme Court has ever held that a plaintiff whose property is foreclosed and sold at a public auction for failure to pay taxes is entitled to recoup the fair market value of the property. *Cf. United States v. Davis*, 815 F.3d 253, 260 (6th Cir. 2016) (holding that the government does not violate the Fifth Amendment by selling a property at a public auction, even if the property sells for less than its fair market value). Furthermore, the best evidence of a foreclosed property's value is the property's sales price, not what it was worth before the foreclosure.[1] *See BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 548–49, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

1 Freed stated at oral argument that although the property was sold at a public auction, the procedures used by the county restricted who could bid on the property and in what manner, and this caused the property to sell for less than it was worth. But Freed did not make this argument before the district court or in his opening brief, and it is therefore waived. *Amezola-Garcia v. Lynch*, 846 F.3d 135, 139 n.1 (6th Cir. 2016) ("[A]rguments not raised in a party's opening brief are deemed waived.").

The Michigan Supreme Court, in addressing this exact issue, held that awarding the fair market value of a property instead of the price obtained at a public tax foreclosure sale "would run contrary to the general principle that just compensation is measured by the value of the property *taken*" and would "not only ... [take] money away from the public" but would also allow plaintiffs to "benefit from their tax delinquency." *Rafaeli, LLC v. Oakland County*, 505 Mich. 429, 952 N.W.2d 434, 465–66 (2020). Freed is entitled to the amount of the sale above his debt and no more. *See Hall v. Meisner*, 51 F.4th 185, 194 (6th Cir. 2022) (explaining the longstanding principle that following a public sale, a debtor is "entitled to any surplus proceeds from the sale, which represented the value of the equitable title thus extinguished" (citing *Resol. Tr. Corp.*, 511 U.S. at 541, 114 S.Ct. 1757)). This is precisely what the district court held, and Freed's Fifth Amendment takings argument is therefore meritless.

**b.**

***3** Freed's Eighth Amendment argument fares no better. He argues that Defendants "destroy[ed] [his] equity far in excess of the tax delinquency" in violation of the Eighth Amendment.

The Eighth Amendment protects "against excessive fines [and] guards against abuses of [the] government's punitive or criminal-law-enforcement authority." *Timbs v. Indiana*, ––– U.S. ––––, 139 S. Ct. 682, 686, 203 L.Ed.2d 11 (2019). However, in *Hall*, we affirmed the district court's dismissal of the plaintiffs' Eighth Amendment Excessive Fines claim on the ground that the GPTA is not punitive. *See Hall*, 51 F.4th at 196–97 (adopting district court's reasoning as the panel's own); *Hall v. Meisner*, No. 20-12230, 2021 WL 2042298, at *14 (E.D. Mich. May 21, 2021) (concluding that the GPTA is not punitive); *see also Rafaeli*, 952 N.W.2d at 447 (holding that the GPTA "is not punitive in nature" because "[i]ts aim is to encourage the timely payment of property taxes and to return tax-delinquent properties to their tax-generating status, not necessarily to punish property owners for failing to pay their property taxes"). The Supreme Court did not reach the merits of the Eighth Amendment claim in *Tyler*. *See* 598 U.S. at 647–48, 143 S.Ct. 1369. *But see id.* at 648–50, 143 S.Ct. 1369 (Gorsuch, J., concurring). Accordingly, our holding in *Hall* remains binding. *See Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) (A prior published "decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." (citation omitted)). Therefore, Freed's arguments that he is owed the fair market value of the property under either the Fifth Amendment or the Eighth Amendment fail, and we affirm.

**2.**

The district court granted qualified immunity to Thomas in her individual capacity because it found that she "did

not violate a right that was 'clearly established at the time of defendant['s] alleged misconduct.' "[2] To overcome Thomas's claim of qualified immunity, Freed "must show that (1) the [officials] violated one of [his] constitutional rights and (2) that right was clearly established." *Howell v. NaphCare, Inc.*, 67 F.4th 302, 317 (6th Cir. 2023) (citation omitted). The clearly established prong is the only one at issue here. "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 317–18 (citation omitted).

2 The district court also granted qualified immunity to Thomas in her official capacity because "the claims against defendant Thomas [are] duplicative of those against the county."

At the time the lawsuit was filed, the contested provisions of the GPTA had been enforced as written for nearly two decades, and "[s]tate statutes, like federal ones, are entitled to the presumption of constitutionality until their invalidity is judicially declared." *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 153, 64 S.Ct. 474, 88 L.Ed. 635 (1944). The Michigan Supreme Court held that Michigan's retention of surplus proceeds was an unconstitutional taking several years *after* Freed filed this lawsuit. *See Rafaeli*, 952 N.W.2d at 466. And "the Supreme Court has *never* denied qualified immunity to a public official who enforced a properly enacted statute that no court had invalidated." *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 441 (6th Cir. 2016).

***4** The only support on which Freed relies to argue that Thomas's conduct violated a clearly established right is *United States v. Lawton*, 110 U.S. 146, 3 S.Ct. 545, 28 L.Ed. 100 (1884). However, *Lawton* pertained to a statute requiring that surplus proceeds from a tax sale "be paid to the owner of the property." *United States v. Taylor*, 104 U.S. 216, 218, 26 L.Ed. 721 (1881). The GPTA, on the other hand, did not provide that surplus proceeds would be returned to the owner. *Rafaeli*, 952 N.W.2d at 452–53. Freed has failed to demonstrate that *Lawton*, which was premised on a statutory right to recover surplus proceeds, sufficiently put Thomas on notice that her administration of the GPTA was unconstitutional.[3] Therefore, the district court did not err by granting qualified immunity to Thomas, and we affirm.

3 Although *Lawton* notes that withholding surplus from an owner when the owner is statutorily entitled to it would violate the Fifth Amendment, the Court held that "this case was governed by the rulings of this court in *U.S. v. Taylor*." 110 U.S. at 149, 3 S.Ct. 545. In *Taylor*, the Supreme Court held that the appellee was entitled to surplus proceeds because the government statutorily required it, not because it would be unconstitutional to withhold the surplus proceeds. 104 U.S. at 218, 222. And Freed cannot rely on the Supreme Court's recent opinion in *Tyler* for qualified immunity purposes because the events in this case occurred well before *Tyler* was decided. *District of Columbia v. Wesby*, 583 U.S. 48, 63, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018) ("To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.").

### 3.

Following the district court's opinion and order holding that Freed's Fifth Amendment rights had been violated, Freed filed a motion for attorney's fees which the court denied without prejudice. Freed argues that the court "should have render[ed] a timely and normal decision on the motion."

The court's order denying Freed's attorney's fees motion, however, is not appealable because it is "not a 'final decision' under 28 U.S.C. § 1291." *JPMorgan Chase Bank, N.A. v. Winget*, 920 F.3d 1103, 1104, 1107 (6th Cir. 2019) (holding that a district court's order on attorney's fees made "where the post-judgment proceedings are *ongoing*," is not a final, appealable order). We therefore dismiss Freed's attorney's fees appeal for lack of jurisdiction.[4]

4 Freed also asks us to remand this matter to the district court with instructions to enter judgment against the state because the district court failed to explicitly name Michigan as a party in the judgment. Michigan joined this case solely for the purpose of defending the constitutionality of the statute and participated in all stages of the litigation; the district court correctly permitted intervention, pursuant to 28 U.S.C. § 2403(b), which provides that "[t]he State shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party *as to court costs* to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality." (emphasis added). And the district court did not err by omitting Michigan from the judgment. *See Tennessee v. Garner*, 471 U.S. 1, 22, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ("The State is a party only by virtue of 28 U.S.C. § 2403(b) and is not subject to liability.").

**B.**

In its cross-appeal, the County argues that the district court erred in holding that it was liable for Freed's constitutional claims under § 1983 pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In municipal liability cases under § 1983, "the question [is] whether there is a direct causal link between a municipal [or county] policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

***5** The policy at issue here is the prohibition on refunding surplus proceeds to property owners under MCL § 211.78, which Defendants acknowledge was unconstitutional. That leaves the question of whether the County was responsible for the constitutional violation.

The County argues that it was merely following a state statute when it foreclosed on Freed's home and thus it cannot be said that the County had a custom or policy that led to the unconstitutional taking. We disagree. The statute here provides that "foreclosure of forfeited property by a county is voluntary." MCL § 211.78(6). And as the district court correctly points out, the County, through its treasurer, repeatedly "chose to act as the foreclosing governmental unit and ... retained the proceeds of [Freed's] foreclosure sale." The County's decision to voluntarily and repeatedly serve as the foreclosing governmental unit and retain the proceeds was a policy decision with a "direct causal link" to the constitutional violation in this case. *Harris*, 489 U.S. at 385, 109 S.Ct. 1197; *see also* *DePiero v. City of Macedonia*, 180 F.3d 770, 787 (6th Cir. 1999) (finding municipal liability where a state statute authorized but did not require a city to take a certain action); *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (recognizing that a municipality may be subject to *Monell* liability where it makes a deliberate choice beyond what a statute requires). We hold that the district court did not err in finding the County liable.

**AFFIRMED**.

**All Citations**

--- F.4th ----, 2023 WL 5733164

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4322404
Only the Westlaw citation is currently available.
United States an ruptcy Court, D. Massachusetts.

In re oyce TOMASELLI, Debtor.

No. 14 10736 NF.
|
Signed Aug. 29, 2014.

**Attorneys and Law Firms**

Kevin W. Lawless, Newburyport, MA, for Debtor.

**MEMORAND M**

JOAN N. FEENEY, United States Bankruptcy Judge.

***1** Whereas, Joyce Tomaselli (the "Debtor") filed a voluntary Chapter 7 petition on February 27, 2014; and

Whereas, the Debtor filed an Application for Waiver of Chapter 7 Filing Fee disclosing that her monthly income was $600; and

Whereas, John Aquino was appointed Chapter 7 Trustee; and

Whereas, the Debtor filed Schedules and a Statement of Financial Affairs on February 27, 2014; and

Whereas, on Schedule A–Real Property, the Debtor listed a co-ownership interest in property located at "113–115 North End Boulevard, Salisbury, MA 01952" (the "Property"), which she valued at $499,000.00, subject to a secured claim in the sum of $251,680.00; and

Whereas, the Debtor owns the Property as a joint tenant with the right of survivorship with her sister, Gracemarie Tomaselli, who also is a Chapter 7 debtor in Case No. 13–15744–JNF; and

Whereas, in addition to the Property, the Debtor listed on Schedule A a distressed, uninhabited property located at 125 Haverhill Street, Lawrence, Massachusetts, and unimproved land in Rockland, Maine; and

Whereas, on Schedule B–Personal Property, the Debtor listed exempt assets and miscellaneous assets with minimal value, but she did not disclose any claims or defenses that she may have against the Town of Salisbury; and

Whereas, on Schedule on Schedule C–Property Claimed as Exempt, the Debtor claimed an exemption in the Property pursuant to 11 U.S.C. § 522(d)(1) in the sum of $132,000;[1] and

[1] The Chapter 7 Trustee filed a Limited Objection to the Debtor's original claim of exemption in the Property on Schedule C as the amount claimed by the Debtor exceeded the statutory exemption amount of $22, 975. The Debtor subsequently amended her claim of exemption in the Property claiming an exemption under 11 U.S.C. § 522(d)(1) in the sum of $22,975. On June 18, 2014, the Debtor withdrew her amended Schedule C, leaving the originally filed Schedule C in its place. On August 7, 2014, the Debtor filed another amended Schedule C, claiming a homestead under Mass. Gen. Laws Ch. 188, § 1. On August 12, 2014, the Court determined that the Trustee's Objection was moot because the Debtor filed an amended Schedule C claiming a homestead exemption in property located in Lawrence, Massachusetts pursuant to Mass. Gen. Laws ch. 188, § 1. On August 11, 2014, the Trustee filed an Objection to that claim of exemption, setting forth numerous reasons why his Objection to the Debtor's newly minted claim of exemption should be sustained, including her testimony under oath at the meeting of creditors that she intended to live at the Property. On August 20, 2014, the Court sustained the Trustee's Objection.

Whereas, on Schedule D–Creditors Holding Secured Claims, despite the reference to secured claims on Schedule A, the Debtor did not list any creditors with claims secured by the Property; and

Whereas, on Schedule E–Creditors Holding Unsecured Priority Claims, the Debtor listed the Rockland Maine Tax Collector and the Town of Salisbury, Massachusetts as holding two claims, one for "1993–2000; ad valorem real estate tax and disputed betterment charges, disputed sewer user [sic] charges, dispute water charges and all related interest charges" in the amount of $25,880.00 of which $21,336.00 was entitled to priority, and one for "1993–2000; ad valorem real estate tax and disputed betterment charges, disputed sewer user [sic] charges, disputed water charges and all related interest charges," in the amount of $225,800.00, of which $19,024.00 was

entitled to priority; and

Whereas, on Schedule F–Creditors Holding Unsecured Nonpriority Claims, the Debtor listed two law firms with claims for attorneys' fees relating to a case pending in the Land Court, Department of the Massachusetts Trial Court, i.e., Kopelman and Paige, P.C. and Coppola and Coppola, as well as the Penobscot Bay Road Maintenance Association with a $400 claim for road maintenance; and

Whereas, on Schedule H–Codebtors, the Debtor listed Gracemarie Tomaselli with respect to the creditors listed on Schedules E and F; and

Whereas, on her Statement of Financial Affairs, in response to question 4 regarding suits and administrative proceedings pending within one year preceding the filing, the Debtor listed a proceeding pending in the Land Court, captioned *Town of Salisbury v. Gracemarie R. Tomaselli and Joyce Tomaselli,* Case No. 06 TL 133120, which she described as a "Tax Lien Case–Complaint to Foreclose Right of Redemption; and

***2** Whereas, the Debtor further described the proceeding as follows:

> Debtor ordered to pay a disputed tax balance of $250,000 on or before September 30, 2013 or her right to redeem will be extinguished and Town of Salisbury may foreclose on property and Debtor would lose over $250,000 in equity in property;

and

Whereas, the Debtor disclosed three additional cases, including an adversary proceeding in the case of Gracemarie Tomaselli (Case No. 13–15744–JNF); and

Whereas, except for Schedule C, the Debtor has never amended her Schedules or Statement of Financial Affairs; and

Whereas, on March 20, 2014, the Town of Salisbury filed a Motion for Relief from the Automatic Stay asserting that the Property has a current assessed valuation of $287,500 and seeking permission to continue a foreclosure proceeding affecting the Property pending in the Land Court;[2] and

[2] The Court granted the Town of Salisbury relief from the automatic stay in Gracemarie Tomaselli's case on January 13, 2014.

Whereas, the Town of Salisbury attached to its Motion the docket of proceedings in the Land Court, as well as copies of documents filed by the parties in the Land Court proceeding, including a 21–page decision containing detailed findings of fact and an analysis of applicable law, *see* *Town of Salisbury v. Tomaselli,* No. 06 TL 133120(GHP), 2013 WL 142831 (Mass.Land Ct. Jan.14, 2013), and an "Order on Plaintiff's Motion for Finding and Legal Fees, and on Defendants' Motion to Strike," dated August 2, 2013, in which the Land Court stated:

> If the Town elects not to file a request for a higher finding amount, the defendants may redeem by paying good funds in the amount of the $250,889.32 [sic] on or before Monday, September 30, 2013; if they do not timely redeem by making that payment by that date, judgment will enter upon the request of the Town, forever barring the defendants' right of redemption;"

and

Whereas, implicit in the Land Court's ruling is a determination that the Town of Salisbury's betterment lien against the Property is valid; and

Whereas, on April 3, 2014, the Debtor filed an Opposition to the Motion for Relief from the Automatic Stay, asserting among other things, that "the amount outstanding [for] taxes, betterment fees, sewer fees, statutory interest and fines claimed by the Town of $212,828.35 is grossly excessive, arbitrary, inaccurate, invalid and without any logical or justifiable factual foundation;" and

Whereas, on April 15, 2014, the Debtor filed an Amended Opposition reiterating the above objection; and

Whereas, on April 16, 2014, the Court conducted a hearing on the Motion for Relief from the Automatic Stay and the Debtor's Opposition, ordered the parties to submit supplemental papers by April 28, 2014 and continued the hearing to April 30, 2014; and

Whereas, the parties complied with the Court's order and supplemented the record; and

Whereas, on April 29, 2014, the Court ordered the Chapter 7 Trustee to personally appear at the April 30, 2014 hearing to report the results of his investigation of the Debtor's assets; and

***3** Whereas, on April 30, 2014, the Court entered the following order:

> [T]he Court directs both parties to file by May 7, 2014 at 4:30 p.m. all documents they rely on in support of their respective positions and to serve them on the Chapter 7 Trustee. In addition, the parties shall brief

the issue of the effect of 11 U.S.C. § 108(b) on the debtor's interest in the Salisbury property in light of the Land Court's order. A continued hearing shall be held on June 11, 2014 at 1:30 p.m.;

and

Whereas, on June 11, 2014, the Court continued the hearing on the Town of Salisbury's Motion to June 25, 2014 and, thereafter, until August 12, 2014 to afford the Chapter 7 Trustee an opportunity to review the voluminous submissions and determine his position with respect to the merits of the lift stay motion; and

Whereas, at the August 12, 2014 hearing the Court took the lift stay motion under advisement; and

Whereas, the Trustee has not filed an objection to the Motion for Relief from Stay or contested the validity of the betterment lien; and

Whereas, in *In re Tomaselli,* Case No. 13–15744–JNF, Slip op. at 4 (Bankr.D.Mass. Jan. 13, 2014), the bankruptcy case filed by the Debtor's sister, Gracemarie Tomaselli, the Court set forth litigation involving the Debtor and her sister which has generated published decisions, including but not limited to, the following:

*Tomaselli v. Town of Salisbury,* 439 Mass. 1107, 790 N.E.2d 1090 (Mass.2003), *denying appeal from Town of Salisbury v. Tomaselli,* 57 Mass.App.Ct. 1116, 786 N.E.2d 437 (Mass.App.Ct.2003)(affirming directed verdict in favor of the Town of Salisbury regarding an action arising from the termination of an alcoholic beverage license for a restaurant operated by the Debtor and her sister at the Property);

*Tomaselli v. Board of Assessors of Salisbury,* 455 Mass. 1102, 914 N.E.2d 331 (2009), *denying appeal from Tomaselli v. Board of Assessors of Salisbury,* 74 Mass.App.Ct. 1104, 903 N.E.2d 1144 (Mass.App.Ct.2009) (affirming a decision of the Appellate Tax Board, which dismissed the Debtor's appeal regarding betterment assessments);

*Tomaselli v. Beaulieu,* No. 08–10666, 2010 WL 1460261 (D. Mass. April 1, 2010) (adopting Report and Recommendation of Magistrate Dein, No. 08–10666, 2010 WL 1460259 (D.Mass. Mar.10, 2010) (holding counsel to the Town of Salisbury, Kopelman and Paige, P.C. and two of its attorneys, were entitled to absolute immunity to law suit in action removed from the Essex Superior Court);

*Tomaselli v. Beaulieu,* No. 08–10666, 2010 WL 2105347 (D.Mass. May 7, 2010, 2010) (adopting Report and Recommendation of Magistrate Dein, No. 08–10666 (holding counsel who represented the Town of Salisbury in the Land Court proceeding, Coppola and Coppola and two of its attorneys, were entitled to absolute immunity to law suit in action removed from the Essex Superior Court);

*Tomaselli v. Beaulieu,* 967 F.Supp.2d 423, 2013 WL 4780085, (D.Mass. August 30, 2013)(overruling the Tomasellis's objections to the Magistrate Judge's Report and Recommendation and sustaining the Defendants' objection to the Report and Recommendation which contained a recommendation that the Tomasellis'state claims not be decided on the merits and dismissing the Tomasellis' complaint in its entirety with prejudice);

***4** Slip op. at 4; and

Whereas, in *Tomaselli v. Beaulieu,* the District Court stated:

> Given the age of the underlying dispute, the effort expended in litigating it by all parties and the court, and the fact that the Magistrate Judge did address the merits of the state law claims, it is appropriate that the court exercise its discretion to reach a final judgment on the entire dispute. Moreover, this court is in full agreement with the recommendations pertaining to the merits of the state claims. Accordingly, the motion to dismiss the complaint is allowed as to all claims contained therein.

*Tomaselli v. Beaulieu,* 967 F.Supp.2d 423, 432–33 (D.Mass.2013); and

Whereas, the Debtor disclosed only some of those actions in her bankruptcy filings; and

Whereas, the United States Magistrate Judge, whose Report and Recommendation was adopted by the District Court on August 30, 2013, *see Tomaselli v. Beaulieu,* 967 F.Supp.2d 423 (D.Mass.2013), set forth, in detail, the history of the "long-running dispute between the plaintiffs, Gracemarie Tomaselli and Joyce Tomaselli, and the Town of Salisbury, Massachusetts, relating to a sewer betterment assessment that was imposed by the Town in 1992 and the manner in which the Town calculated the related sewer user fees," *Id.* at 433 (footnote omitted), as well as the claims asserted by the Debtor and her sister, which were dismissed, namely,

> claims pursuant to 42 U.S.C. § 1983 alleging violations of their First, Fifth and Fourteenth Amendment due process and equal protection rights and their comparable rights under the Massachusetts Declaration of Rights (Counts I–V), claims of unfair or deceptive acts or practices in violation of Mass. Gen. Laws ch.

93A (Counts VI and VII), claims that the defendants engaged in or conspired to enter into a criminal enterprise in violation of the Racketeer Influence and Corrupt Organization Act (“RICO”), 18 U.S.C. § 1961 (Counts VIII and I ), and a claim of conspiracy to commit and the commission of conversion, defamation, intentional infliction of emotional distress, abuse of process, invasion of privacy, intentional interference with advantageous business relations, misrepresentation and negligent misrepresentation (Count ),

*Id.* and

Whereas, the Court takes judicial notice of the history of litigation between the Debtor and the Town of Salisbury set forth in *Tomaselli v. Beaulieu,* 967 F.Supp.2d 423 (D.Mass.2013); and

Whereas, in the case of Gracemarie Tomaselli, the Chapter 7 Trustee abandoned the debtor’s interest in the Property; and

Whereas, in *Grella v. Salem Five Cent Savs. Bank,* 42 F.3d 26 (1st Cir.1994), the First Circuit stated:

> [T]he hearing on a motion for relief from stay is meant to be a summary proceeding, and the statute requires the bankruptcy court’s action to be quick .... *see* 11 U.S.C. § 362(e). Section § 362(e) provides that a bankruptcy court must hold a preliminary hearing on a motion to lift the stay within thirty days from the date the motion is filed, or the stay will be considered lifted. A final hearing must be commenced within thirty days after the preliminary hearing. *S ee* 11 U.S.C. § 362(e).
>
> ***5** The limited grounds set forth in the statutory language, read in the context of the overall scheme of § 362, and combined with the preliminary, summary nature of the relief from stay proceedings, have led most courts to find that such hearings do not involve a full adjudication on the merits of claims, defenses, or counterclaims, but simply a determination as to whether a creditor has a colorable claim to property of the estate.

*Grella,* 42 F.3d at 31–32 (case citations omitted); and

Now, therefore, based upon its review of the record of proceedings in the Land Court, and the absence of an objection filed by the Chapter 7 Trustee, as well as the decisions issued by other state and federal courts, the Court concludes that the Town of Salisbury has stated a colorable claim to relief and has established “cause” within the meaning of 11 U.S.C. § 362(d)(1) for relief from the automatic stay to proceed with its foreclosure of the Debtor’s right of redemption with respect to the Property which has been taken for nonpayment of taxes, municipal charges and assessments. *See Town of Salisbury v. Tomaselli,* No. 06–TL 133120, 2013 WL 142831 (Land Court Jan. 14, 2014). Thus, the Court grants it relief from the automatic stay to proceed with the action pending in the Land Court.

A party is entitled to relief under § 362(d)(1) for “cause,” which includes lack of adequate protection. *See* 11 U.S.C. § 362(d)(1). Under 11 U.S.C. § 362(g), in any hearing under subsection (d) or (e) of this section concerning relief from the stay “(1) the party requesting such relief has the burden of proof on the issue of the debtor’s equity in property; and (2) the party opposing such relief has the burden of proof on all other issues.” 11 U.S.C. § 362(g).

The Property is a vacant building that has no water or sewer service. The Land Court entered an order providing that the Debtor and Gracemarie Tomaselli could redeem the Property with a payment of $212,828.35 with interest allowed by statute from the date of the court’s finding to the date of payment. *See Town of Salisbury v. Tomaselli,* No. 06–TL 133120, 2013 WL 142831 (Land Court Jan. 14, 2014). In so doing, it stated:

> Our Supreme Judicial Court has, however, recognized a limited exception to this otherwise firm principle. In *Norwood v. Norwood Civic Ass’n,* the court found that the remedy provided for in G.L. c. 60, § 98, may in certain limited circumstances be asserted as a defense to foreclosure proceedings under G.L. c. 60, § 65. 340 Mass. 518, 524, 165 N.E.2d 124 (1960). Under the exception outlined in *Norwood,* a party who has not paid the tax up front, and who has not already commenced a separate action under G.L. c. 60, § 98, may respond to foreclosure proceedings brought by the municipality by raising the defense, “in order to avoid circuity of action.” *Id.* If the party is able to establish facts demonstrating that the tax on which the foreclosure proceeding rests is wholly void, the tax is treated as eliminated from the tax title account, and the action for foreclosure of the resultant tax taking by definition cannot proceed. *Id.*
>
> * This judicially created exception, however, is painfully narrow, and strictly applied. It only is available in an instance where the illegality or void nature of the assessment is entire, and so renders the underlying tax wholly void. The Norwood exception was applied in that case where it was asserted that the real estate involved was unlawfully taxed because it was by statute fully exempt from taxation. The Norwood exception to the need to bring a separate and timely Superior Court action under section 98 does not exist where some of the tax amounts underlying the

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

foreclosure are due, and others not. In addition, on similar reasoning, the exception is available only "[w]here a taxpayer owns in the town no real estate subject to taxation...." *Id.* at 523, 340 Mass. 518, 165 N.E.2d 124. For if there is some real estate lawfully taxed to some degree in the municipality, the Land Court foreclosure proceeding cannot be used to adjudicate the validity or the amount of less than all the taxes due to the town. If the party assessed owns any taxable real estate in the municipality, or if any part of the tax assessed is legally due, the rule is that the claimed 'illegal tax' is to be treated as merely excessive; the exclusive remedy for an excessive tax is abatement under G.L. c. 59, § 59. *Sears, Roebuck and Co. v. Somerville,* 363 Mass. 756, 757–58, 298 N.E.2d 693 (1973); *Norwood,* 340 Mass. at 523, 165 N.E.2d 124; *Harron Communications Corp. v. Bourne,* 40 Mass.App.Ct. 83, 87, 661 N.E.2d 667 (1996). "It is immaterial whether there has been ... the calculation of the tax upon a wrong or an inapplicable principle, or other invalidity, the statute afford ample means for obtaining relief and securing justice by a complaint for abatement." *Sears, Roebuck and Co.,* 363 Mass. at 757–758, n. 3, 298 N.E.2d 693.

*Town of Salisbury v. Tomasellis,* 2013 WL 142831 at *7.[3]

3 In *Tomaselli v. Bd. of Assessors of Salisbury,* 74 Mass.App.Ct. 1104 (2009), *review denied,* 455 Mass. 1102, 914 N.E.2d 331 (2009), the Massachusetts Appellate Court affirmed the determination of the Appellate Tax Board denying the Debtor and her sister relief from betterment assessments and sewer user charges imposed upon them by the Town of Salisbury. The court rejected the Property owners' argument "that the board should not have dismissed their appeal with respect to the betterment assessments, that the board erroneously decided their sewer user appeal, and that the board committed due process violations. The Appellate Court stated:

> The appellate route from the refusal to abate a betterment assessment is to the Superior Court pursuant to G.L. c. 80, § 7, or, pursuant to § 10, to the county commissioners. Neither c. 80, nor G.L.c. 58A, § 6, which establish the board's jurisdiction, confers jurisdiction upon the board over betterment assessments.
>
> The Tomasellis' characterization of the betterment assessments as an "illegal tax" does not affect this analysis. To the extent that the Tomasellis are attempting to assert illegality as a defense to the assessment, the board's overall lack of jurisdiction over betterment assessments precludes consideration of the issue. To the extent that the Tomasellis are attempting to assert a separate claim, the remedy for assessment of an illegal tax is through an action at law pursuant to G.L. c. 60, § 98, and is subject to the requirements set forth in that section.

* * *

> The town appears to concede on appeal that the Tomasellis' application for abatement and ensuing appeal of the sewer user charge were timely. Appellees' brief at 31 n. 3. However, the Tomasellis' arguments fail on their merits.
>
> There was substantial evidence to support the conclusion that the $280.60 sewer usage charge in question was assessed correctly. The Tomasellis did not demonstrate that the method used by the town to calculate the charge was unlawful.

74 Mass.App.Ct. at 1104 (footnotes omitted).

The Debtor referenced a broker's comparative market analysis indicating potential equity in the Property but did not offer adequate protection payments or any evidence that the vacant Property is insured or maintained in a good state of repair. In opposing the Motion, she relies solely on the alleged illegality of the Town's betterment lien on the Property. As noted above, the Debtor has raised this argument before, and it has been uniformly rejected by all of the courts in which she raised it.

Section 362(g)(2) of the Bankruptcy Code places the burden on the debtor of proving the absence of cause, and cause includes lack of adequate protection. The Court finds that the Debtor did not prove the absence of cause, as she continues to rely on the illegality of the Town's betterment assessment and failure to comply with statutory requirements, issues which have been addressed in numerous prior court actions, including the Land Court.

In addition, the Debtor did not establish her standing to contest the Town of Salisbury's Motion for Relief from Stay. She no longer claims an exemption in the Property and has failed to argue or establish that her Chapter 7 case will likely yield a surplus entitling her to a distribution after payment of all allowed claims in full. *See generally Kowal v. Malkemus In re Thompson ,* 965 F.2d 1136 (1st Cir.1992); *In re Cho uette,* 290 B.R. 183 (Bankr.D.Mass.2002). Moreover, the claims asserted by the Debtor as a defense to the Motion for Relief from the Automatic Stay mirror those asserted by Gracemarie Tomaselli in her earlier bankruptcy case where the Court granted relief from the automatic stay despite claims that the Debtor and her sister have asserted in state and federal courts spanning many years. The Debtor has failed to advance any persuasive legal or factual authority for the Court to find that the Town of Salisbury has not set forth a colorable claim to relief or that its lien is invalid as a result of a successful action at law under Mass. Gen. Laws ch. 60, § 98.

* Significantly, the Trustee failed to object to the lift stay motion, signaling his likely intention not to market

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

and sell or otherwise administer the Property such that it will be deemed abandoned upon the closing of the case. The Debtor originally claimed her interest in the Property as totally exempt on Schedule C, although her initial claim of exemption exceeded the statutory amount. The Debtor has attempted to amend her exemptions to claim the Lawrence property as her homestead. The Court, however, has sustained the Trustee's Objection to the validity of her claimed exemption in the distressed real estate in Lawrence, Massachusetts. Moreover, any claims and defenses that the Debtor may have against the Town of Salisbury now belong to the Trustee and the Debtor's bankruptcy estate, although they were not disclosed on Schedule B. Accordingly, to the extent that the Debtor continues to maintain that the actions of the Town of Salisbury over the past twenty plus years have been wrongful, those claims belong to the Trustee until such time as the Trustee indicates an intention to abandon them.

Not only has the Town of Salisbury stated a colorable claim for relief, the elements required for abstention also are present here. *See generally* 11 U.S.C. § 1334(c)(1). In view of the protracted litigation in state and federal courts and the Trustee's failure to object to the Motion for Relief from the Automatic Stay, the Land Court (or any other state court) is better positioned to resolve the remaining issues, if any, involving the Debtor's rights with respect to the Property. Indeed, this Court is not the appropriate forum for the Debtor to raise specialized state law issues involving betterment liens and tax liens that have been the subject of prior rulings in other courts.

For those reasons, the Court shall enter an order granting the Motion for Relief from the Automatic Stay filed by the Town of Salisbury and overruling the Debtor's Opposition.

**All Citations**

Not Reported in B.R., 2014 WL 4322404

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.


© 2023 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 23-40709-CJP

Chapter 7

In re:

WESTBOROUGH SPE LLC

[PROPOSED] ORDER GRANTING TOWN OF WESTBOROUGH'S MOTION FOR RELIEF FROM AUTOMATIC STAY AND OPPOSITION TO APPOINTMENT OF A BANKRUPTCY TRUSTEE

Before the Court is the Motion for Relief from Automatic Stay and Opposition to Appointment of a Bankruptcy Trustee (the "Motion") filed by the Town of Westborough ("Town"), listed in the Debtor's Matrix List of Creditors (Doc. No. 7) in the above-captioned action. For the reasons set forth in the Motion, the Motion is hereby GRANTED and the Court ORDERS that the automatic stay under 11 U.S.C. § 362(a) is lifted, to the extent it applies, as to the cases of Town of Westborough v. Westborough SPE, LLC, et al. (Mass. Land Ct. No. 19 TL 000768) (the "Tax Foreclosure Action") and Westborough SPE, LLC v. Town of Westborough, et al. (D. Mass. No. 4:23-cv-12017-MRG) (the "Civil Action"). Moreover, the Court declines the Debtor's request to appoint an interim bankruptcy trustee pursuant to 11 U.S.C. § 303(g) with respect to the disposition of the real property located at 231 Turnpike Road, Westborough, Massachusetts (the "Property"), as the Property is not part of the Debtor's bankruptcy estate for the reasons set forth in the Motion and disposition of the Property will be more appropriately addressed by the Massachusetts Land Court in the Tax Foreclosure Action.

IT IS SO ORDERED.

___________________________________ Date: ____________
( , U.S. Bankruptcy Judge)

883509/WBOR/0042

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 23-40709-CJP

Chapter 7

In re:

WESTBOROUGH SPE LLC

LIST OF E HIBITS

Pursuant to Rule 5 of Appendix 8 of the Local Bankruptcy Rules for the U.S. Bankruptcy Court for the District of Massachusetts, the Town of Westborough ("Town"), listed in the Debtor's Matrix List of Creditors (Doc. No. 7) in the above-captioned action, hereby lists the exhibits that are filed separately in con unction with the Town's Motion for Relief from Automatic Stay and Opposition to Appointment of a Bankruptcy Trustee:

| Exhibit | Description | No. of Pages |
|---|---|---|
| A | MA Certificate of Withdrawal | 2 |
| B | DE Administrative Dissolution | 1 |
| C | 2018 ATM Results | 31 |
| D | Instrument of Taking | 1 |
| E | Reciprocal Agreement | 41 |
| F | Tax Foreclosure Complaint | 2 |
| G | Tax Foreclosure Judgment | 1 |
| H | Application for Registration | 4 |
| I | Motion to acate | 12 |
| J | Land Court Docket | 10 |
| K | Civil Action Complaint | 34 |
| L | Civil Action Suggestion | 2 |

883944/WBOR/0042

Case [illegible] Document 13-4 Filed [illegible] Page 1[illegible] of 840

# Exhibit A

CERTIFICATE OF WITHDRAWAL
OF A FOREIGN LIMITED LIABILITY COMPANY

(Under Section 53 of the Massachusetts Limited Liability Company Act)

To the State Secretary
Commonwealth of Massachusetts

Federal Employer
Identification Number
94-3286768

It is hereby certified that:

1. The name of the limited liability company (the "company") is Westborough SPE LLC.

2. The jurisdiction where the company was organized is Delaware.

3. The address of the principal office of the company, wherever located, is 2 Harrison Street, 6th Floor, San Francisco, CA 94105.

4. The name and the business address of the registered agent of the company in the Commonwealth of Massachusetts is 84 State Street Boston MA 02109.

5. The company is withdrawing because it is not doing business in the Commonwealth of Massachusetts.

6. All fees and taxes owed by the company have been paid or provided for.

IN WITNESS WHEREOF AND UNDER THE PENALTIES OF PERJURY, the undersigned does hereby affirm and swear, that to the undersigned's knowledge and belief the foregoing statements are true as of this 19th day of November 2007.

[signature]
Dyann Blaine, Authorized Person

THE COMMONWEALTH OF MASSACHUSETTS

I hereby certify that, upon examination of this document, duly submitted to me, it appears that the provisions of the General Laws relative to corporations have been complied with, and I hereby approve said articles; and the filing fee having been paid, said articles are deemed to have been filed with me on:

November 20, 2007 3:19 PM

WILLIAM FRANCIS GALVIN

*Secretary of the Commonwealth*

232335-1-0

# Exhibit B

# State of Delaware

Entity Details

11/21/2022 12:18:17AM

File Number: 2811561

Incorporation Date / Formation Date: 10/22/1997

Entity Name: WESTBOROUGH SPE LLC

Entity Kind: Limited Liability Company

Entity Type: General

Residency: Domestic

State: DELAWARE

Status: Cancelled, Failure to Pay Tax

Status Date: 6/1/2014

**Registered Agent Information**

Name: CORPORATION SERVICE COMPANY

Address: 251 LITTLE FALLS DRIVE

City: WILMINGTON

Country:

State: DE

Postal Code: 19808

Phone: 302-636-5401

**Tax Information**

Last AnnualReport Filed: 0

Tax Due: $ 1593

Annual Tax Assessment: $250

Total Authorized Shares:

**Filing History (Last 5 Filings)**

| Seq | Description | No of Pages | Filing Date mm/dd/yyyy | Filing Time | Effective Date mm/dd/yyyy |
|---|---|---|---|---|---|
| 1 | L.P./L.L.C. Restoration | 3 | 7/13/1999 | 9:00 AM | 7/13/1999 |
| 2 | LLC | 1 | 10/22/1997 | 9:00 AM | 10/22/1997 |

# Exhibit C

**NN N MEE N**
**M**
**he o n of estboro gh**

Pledge of Allegiance.

1:02 pm Mr. John Arnold, Moderator, declared the meeting in session.

*Narrative:*

"I am John Arnold, our elected Moderator. I hereby call to order the 2018 Annual Town Meeting. I want to thank everyone for coming today. We need four things in order to have a Town Meeting. 1) a Moderator, I'm John E. Arnold of 251 West Main St. 2) our elected Town Clerk, Wendy Mickel 3) a signed Warrant posted with a return of service dated February 28, 2018 and 4) a quorum. Our bylaws state that this being our Annual Town Meeting, no quorum is necessary, therefore I declare the meeting in session.

"Before us, we have the Board of Selectmen, our executive branch of government, and various Department heads, Town Counsel, The Planning Board, the DPW, and our Police Fire Chiefs. At the table up front, to the right we have the Advisory Finance Committee, appointed by me, a group of 9 citi ens, who report and recommend to this legislative body, and this Town Meeting. They review and report on all the warrant articles.

Please be sure to pick up The AFC booklet that is available ust beyond check-in and any other information from different boards and committees on the table as well. Printing is not free, so please take one copy to keep for the entire meeting.

I'd like to thank Mark Stockman, Steve Masciarelli and Westborough T for their technology services. The Women's Club has their table of snacks and drinks available. Also, there is babysitting available. If you need to come and go during the meeting please do so quietly as there are rules about disrupting the meeting. It is required that if you leave the premises/lobby check-in area, you must turn in your voting device. You are allowed to leave and return but, you cannot take the device with you. You will be issued a new one when you return to the meeting.

As my first duty, Our Town Bylaws require me, to nominate a Deputy Moderator who will preside if I am unable to serve or if we need to use additional rooms. I will nominate and recommend former Moderator, Joseph Harrington, 4 Jefferson Rd. who has been briefed and is ready to serve as the Deputy Moderator. It is the meeting who will decide by vote who will serve as Deputy Moderator. I only nominate.

This will be our first chance to try out the electronic voting devices. Every voter should have a device if you are a voter. It should be already turned on with some numbers on it. For any motions when we take a vote, pressing number 1 on the device is a vote of YES, (you are in favor of the motion) and pressing number 2 on the device is a vote of NO (that you oppose the motion). When voting begins the green light goes on for a voting time of 15 seconds after 15 seconds, voting ends. It takes a few seconds to register on the screen that the Town Clerk and I share and we will agree on the vote total on the screen and then I will read aloud. If you accidentally press the wrong number all you have to do is press the correct number you want. The last number you press is the vote that is accepted.

This would be the first chance to try out our devices the Nomination of Joseph Harrington. When I say voting begins, you may press 1 or 2. Once your device says received the network system has received your vote. When the light goes off, voting has ended.

The vote for Mr. Harrington was: **in fa or and opposed**. The nomination carries. Mr. Harrington is now our Deputy Moderator.

Mr. Harrington will you please stand and raise your right hand while I give The Oath of Office: Mr. Harrington, do you solemnly swear that having been appointed Deputy Moderator, you will faithfully and impartially perform the duties of this office, so help you God Mr. Harrington responded with a Yes.

I will hold off on the teller nominations as we have electronic voting. I will do that if we for some reason do not have the electronic voting service.

It is now the time to act on the admission of non-voters to the town meeting floor. The rules of town meeting are that any registered voter may attend and any registered voter may ask to speak, however, if a non-voter wishes to speak it needs town meeting approval.

I have not received any requests from non-voters to speak on specific articles for this Town Meeting.

I want to point out the Non-   oter section in the balcony. No one sitting in that section will be recogni  ed. If you are a voter and wish to speak then you must move from that section to be recogni  ed. There is also a section in the front for the Press.

Are there any first time voters    Any who have attended for 50 or more years. Any for 25 or more. Thank you all for your interest and attendance at this Town Meeting.

I want to thank the Boy Scouts for providing the microphone service. We have 2 standing microphones. You have the option to stand at a microphone or raise your hand and a Boy Scout will bring you a microphone. I will try to pick those sitting if I am aware of you needing a microphone.

Finally, about the cell phones. I ask you to please put them on mute, vibrate or turn off. Please take any calls to the lobby as not to disrupt the meeting.

I want to now do a quick review of the <u>Rules of Town Meeting</u>. The rules relating to Town Meeting indicate we are taking votes on those who are present and voting. That means that only registered voters who have checked-in with the Town Clerk's staff are eligible to vote. When you leave the hall, you are no longer eligible to vote. If you leave the room briefly, take your voting device with you, show it to the Town Clerk's staff. If at any time you are going to leave the building, you must turn in your electronic device to the check-in tellers. When you return, you will get another device. You personally are responsible for your handset. It's very important if you leave you return the device. You must be in the room when voting.

The rules are very simple. You must raise your hand to speak and I will recogni  e you. Only one person at a time is allowed to speak. For a person making a presentation, you are allowed to speak for no more than 10 minutes. For a voter who wishes to comment or speak to a motion, you are limited to no more than 2 minutes. Each person is allowed to speak no more than two times on an article without the vote of town meeting, unless you are directed to answer a question. Discussion and deliberations is limited to the topic in the motion. If you have comments about other topics about town meeting there are other forums to speak to that. Please ask and I can direct you to the other forums. We are here today acting as the town's legislature, and our deliberations are by design focused on the items before us, however if at any time you have a question about Town Meeting you may rise and say Point of Order, state you question and I will help you as best as I can.

In the event of an Emergency, Emergency personnel are here to help and assist as needed. Please stay quiet and wait for instructions from Emergency personnel. Emergency exits are in the rear of the room. Please only use in an emergency.

**rtic e   ne** was the election of town officers. 11 people ran for 9 positions. I ask anyone who ran to please stand and be thanked for serving. We have two new Selectmen, which is unusual  Shelby Marshall    Syed Hashmi, I ask you both to stand. Also, anyone whose term ended but you chose not to run again, please stand and be recogni  ed for your service. From the elected boards and the townspeople of Westborough, we thank you for your service. And at this time I think it would be appropriate to introduce Westborough's new Police Chief. Chief Jeffrey Lourie is down front  please stand as we welcome you.  I reali  ed that I failed to introduce our Fire Chief when I was first Elected and a new moderator. Here is our new Fire Chief, Chief Purcell. Please stand. And a special thank you to outgoing Selectmen  Den  il Drewry and George Barrette and our newly retired Police Chief Al Gordon. Thank you all for your service.

And now we move on to **rtic e**."

**MM N E M E**
WORCESTER, SS

TO ANY CONSTABLE IN THE TOWN OF WESTBOROUGH, IN THE COUNTY OF WORCESTER, GREETINGS:

In the name of the Commonwealth of Massachusetts, you are directed to notify and warn the inhabitants of the Town of Westborough, qualified to vote in elections and town affairs, to meet in various precincts in Westborough on Tuesday, the 6th day of March, 2018 at 8:00 A.M. for the following purposes:

**E nn a o n E ection oard of e ect en**
To bring in their votes for:

| | | |
|---|---|---|
| Two | (2) | Selectman (3 years) |
| One | (1) | Planning Board member (5 years) |
| One | (1) | School Committee members (3 years) |
| Three | (3) | Trustees of Public Library (3 years) |
| One | (1) | Trustees of Public Library (1 year) |
| One | (1) | Westborough Housing Authority (5 years) |

Polls will be open from 8 A.M. to 8 P.M. in the following places:

Precincts l 5 Westborough High School, 90 West Main Street

And to act on the following articles at the ad ourned session of said meeting on March 17, 2018, at 1:00 P.M. in the Westborough High School Auditorium and Gymnasium on West Main Street.

The Town Manager's Statements printed in italics are not part of the formal articles of the warrant. They constitute additional information offered for the benefit of the voters, true and correct as of the time of posting of the warrant, but sub ect to change as called for. They are not to be construed so as to broaden or limit the scope of the formal articles.

**E o n eports d isor inance o ittee**
To see if the Town will vote to hear the reports of the several town officers and committees, and to dissolve any committees established by Town Meeting that have fulfilled their mission, or take any other action thereon.

<u>Hank Rauch, Advisory Finance Committee</u> - *Motion: I move that the town vote to receive the reports of the various officers and committees and that the report of the Advisory Finance Committee be acted upon item by item under the various articles of the warrant.*

**ote**
**es**
**No**

The Moderator noted to "Please notice the 2017 Annual Report is dedicated to Polly Howard. She served on the Advisory Finance Committee and many other boards and committees. Also, included with the dedication to Polly are those who have served our Town and recently passed away a moment of silence, please."

Mr. Malloy, Town Manager gave the "State of the Town" presentation

**E isca ear perating dgets oard of e ect en**
To see what sums the Town will vote to raise and appropriate for the support of the several offices, departments, boards and commissions of the Town of Westborough for Fiscal Year 2019 beginning July 1, 2018, and ending June 30, 2019, or take any other action thereon.

*Town Manager's Statement – The Town budgets, including all expenses are estimated to increase/decrease as follows:*

| | | | M | M |
|---|---|---|---|---|
| | | | | |
| *General* | *$ 88,499,236* | *$ 93,543,074* | *$ 5,043,838* | *5.7%* |
| *Water* | *$ 3,887,847* | *$ 4,012,808* | *$ 124,961* | *3.2%* |
| *Sewer* | *$ 1,939,985* | *$ 1,972,721* | *$ 32,736* | *1.7%* |
| *Wastewater* | *$ 4,155,382* | *$ 4,441,321* | *$ 285,939* | *6.9%* |
| *Country Club* | *$ 415,000* | *$ 427,567* | *$ 12,567* | *3.0%* |
| | | | | |
| *Total* | *$ 98,897,450* | *$ 104,397,491* | *$ 5,500,041* | *5.6%* |

*Town Manager's Statement*
*The motion for this article is a simple majority vote.*

Hank Rauch, Advisory Finance Committee - *Motion: I move that the town vote to raise and appropriate such sums of money as may be necessary to defray the expenses of the several town departments for the ensuing fiscal year and that each total read by the Moderator be considered a separate motion made for each of the line items making up that total in the column marked FY19 AFC Rec Budget. I further move that the total amount raised be reduced by the transfer from Country Club Retained Earnings of $50,000 and that the balance be raised and appropriated.*

(1:43 pm)
**ote a ine ite s not estioned es**
**No**
**Motion carries**

**estion reas rer o ector Expenses**
**es**
**No**
**Motion carries**

**estion ns rance Expenses**
**es**
**No**
**Motion carries**

**estion ire Dept b ance Expenses**
**es**
**No**
**Motion carries**

**estion aste ater reat ent P ant Expenses**
**es**
**No**
**Motion carries.**

**estion estboro gh choo Dept. dget**

Dominic Capriole - motion to amend the school budget to a reduction in the school budget of 1 50,765,755.

Mrs. Kung, moved the question
Yes 204
No 30
Debate has ended.

The Town Bylaw requires that a ote to the amendment that is less than the higher amount the rules are that we vote on the higher amount first. If that fails, then we vote to the lesser.

**ote to the origina otion**
**es**
**No**
**Motion carries**

**E eg ar ec rring rtic es o n Manager**

To see what action the Town may take on the following items, through C which may be voted as a block, or singly, or in any combination, but however voted, will be treated for accounting purposes as if each item were voted as a separate article:

**. eser e nds d isor inance o ittee** To see if the Town will vote to raise and appropriate the sum of Two Hundred Fifty Thousand Dollars ( 250,000) or such other amount as the Town Meeting may approve, for the Finance Committee General Reserve Fund, transfer Fifty Thousand Dollars ( 50,000), or such other amount as the Town Meeting may approve, from Water retained earnings for the Water Enterprise Reserve Fund, transfer Fifty Thousand Dollars ( 50,000), or such other amount as the Town Meeting may approve, from Sewer retained earnings for the Sewer Enterprise Reserve Fund, and transfer Twenty Thousand Dollars ( 20,000) from Country Club retained earnings for the Country Club Enterprise Reserve Fund, or such other amounts as the Town Meeting may approve, in accordance with Section 6 of Chapter 40 of the Massachusetts General Laws, or take any other action thereon.

*Town Manager's Statement – These accounts provide funding for unforeseen expenses during the year through various reserve funds. The motion for this article is a simple majority vote.*

**. econstr ction and pro e ent of o n oads hapter DP** To see if the Town will vote to transfer from available funds the sum of Seven Hundred Eighty Nine Thousand Six Hundred and Thirty Four Dollars ( 789,634) or such other amount as the Town Meeting may approve, to construct, reconstruct, or improve the town roads, and further, to authori e the Board of Selectmen to apply for and accept a grant in this full amount, more or less, which is to be the State's contribution and/or reimbursement under chapter 90 of the Massachusetts General Laws for work done under this article, or to take any other action thereon.

*Town Manager's Statement – This article allows the Town to borrow from itself thus avoiding interest costs to pay the upfront costs under the Chapter 90 funds (which is a reimbursable program) from Mass DOT for the purpose of repairing town roads. The Town undertakes an annual study that establishes the Town needs to be spending $1.1 million to maintain streets in Town. This means the Town is approximately $300,000 short of funding necessary maintenance on town streets. The motion for this article is a simple majority vote.*

**. ea thcare ei b rse ent cco nt o n Manager** To see if the Town will vote to raise and appropriate the sum of Twenty Thousand Dollars ( 20,000) or such other amount as the Town Meeting may approve, to fund the Healthcare Reimbursement Account as agreed with the Town's Collective Bargaining Units, or take any other action thereon.

*Town Manager's Statement – This article funds the Town's Healthcare Reimbursement Account by setting aside an estimated amount (based on use through January) to allow the Town to meet its obligation to the Collective Bargaining Units in exchange for various health insurance plan design changes. The Town funds the amount that was estimated to be used during the current fiscal year to replenish the fund. The motion for this article is a simple majority vote.*

**D. e toc ing andra Pond andra Pond ardens ecreation Depart ent** To see if the Town will vote to raise and appropriate the sum of Four Thousand Dollars ( 4,000) or such other amount as the Town Meeting may approve, to re-stock Sandra Pond, or take any other action thereon.

*Town Manager's Statement – This article funds the fish re-stocking at Sandra Pond as the Town has done in the past. For the past several years, this has been done with outside funds which no longer are able to fund the re-stocking. The motion for this article is a simple majority vote.*

*Syed Hashmi, Board of Selectmen - Motion: I move that the Town vote to approve Article 4, Sections A-D and that the Town vote to raise and appropriate the sum of $250,000, transfer and appropriate $50,000 from Water Retained Earnings, transfer and appropriate $50,000 from Sewer Retained Earnings and transfer and appropriate $20,000 from Country Club Retained Earnings for the purpose of Article 4A as printed in the warrant; transfer from available funds the sum of $789,634 for the purpose of Article 4B as printed in the warrant; raise and appropriate the sum of $20,000 for the purpose of Article 4C as printed in the warrant; and raise and appropriate the sum of $4,000 for the purpose of Article 4D as printed in the warrant.*

**ote**
**es**

**No**
**Motion carries**

**E apita pro e ent P an o n Manager apita Expendit re P anning o ittee**
To see what action the Town may take on the following items, through I which may be voted as a block, or singly, or in any combination, but however voted, will be treated for accounting purposes as if each item were voted as a separate article:

**. Passenger Mini s o nci on ging**
To see if the Town will vote to transfer from Free Cash and appropriate the sum of Eighty One Thousand Four Hundred Thirty Three Dollars ( 81,433) or such other amount as the Town Meeting may approve, for the purpose of replacing a 2006 mini-bus, or take any other action thereon.

*Town Manager's Statement – This article would fund the replacement of a 2006 mini bus for $81,433. The 2006 is unreliable and replacement parts have become difficult to obtain and the cost of maintenance and down time has increased. This mini-bus has an estimated useful life of 7-10 years and is used to transport senior citizens. The motion for this article is a simple majority vote.*

**. DP E ip ent P b ic or s**
To see if the Town will vote to transfer from Free Cash and appropriate the sum of Two Hundred Fifty Thousand Dollars ( 250,000) or such other amount as Town Meeting may approve, for the purpose of replacing the 1986 Chevy C170 Catch Basin Cleaner and other DPW equipment, or take any other action thereon.

*Town Manager's Statement – This article would fund the replacement of 31 year old catch basin cleaner that is unreliable and parts are difficult to obtain and the cost of maintenance and down time has increased. This piece of equipment is used to meet the Town's required compliance with EPA Stormwater Regulations related to maintaining catch basins for street drainage and has an estimated useful life of 7-10 years. The motion for this article is a simple majority vote.*

**. ire Depart ent b ance ire**
To see if the Town will vote to transfer from Ambulance Reserved Receipts Account and appropriate the sum of One Hundred Eighty Thousand Dollars ( 180,000) and to transfer from Free Cash and appropriate the sum of Ninety Five Thousand Dollars ( 95,000) or such other amount as Town Meeting may approve, for the purpose of replacing an ambulance in the Fire Department, or take any other action thereon.

*Town Manager's Statement – This article would fund the planned recurring program to replace one of the Town's three ambulances every three years so that the oldest ambulance in the fleet is between 9-10 years old at the time of replacement. Ambulances have an expected life span of 10 years and as a piece of emergency equipment, the Town seeks to ensure reliability. The motion for this article is a simple majority vote.*

**D. errain ehic e ire**
To see if the Town will vote to transfer from Free Cash and appropriate the sum of Thirty One Thousand Dollars ( 31,000) or such other amount as Town Meeting may approve, for the purpose of purchasing an all terrain vehicle for the Fire Department, or take any other action thereon.

*Town Manager's Statement – This article would fund the addition of an all-terrain vehicle (ATV) to the Fire Department that can be used off road on town trails to ensure that more expensive ambulances are not used off road. The Town has borrowed ATV's from neighboring communities several times over the past six months which has highlighted the need to have one ready and available in Town. The motion for this article is a simple majority vote.*

**E. apita tabi i ation nd**
To see if the Town will vote to transfer from Free Cash and appropriate the sum of One Hundred Thousand Dollars ( 100,000) or such other amount as Town Meeting may approve, to the Capital Stabili ation Fund, or take any other action thereon.

*Town Manager's Statement – This request is to fund the capital stabilization fund which currently has a balance of $238,611. Last year, $210,000 was appropriated to help offset the costs associated with the replacement of Rescue 1. This request would add $100,000 to the Capital Stabilization Fund toward the purchase of the replacement of future large purchases. The motion for this article is a simple majority vote.*

**. Phone ste pgrades M**

To see if the Town will vote to transfer from Free Cash and appropriate the sum of Twenty Four Thousand Eight Hundred Dollars ( 24,800) or such other amount as Town Meeting may approve, for the purpose of replacing the phone systems in the Public Works Department and Senior Center, or take any other action thereon.

*Town Manager's Statement – The MIS/GIS Department has the responsibility of overseeing all of the Town's phone systems. Most have been replaced over the years so that the Fire Department, Town Hall, Police Department and Library are all on the same phone system. The manufacturer of the DPW phone system went out of business in 2013. The expected return on investment (through the reduction of the number of lines needed through tolling) is 5.4 years. The motion for this article is a simple majority vote.*

**. r iser ep ace ent Po ice**

To see if the Town will vote to transfer from Free Cash and appropriate the sum of One Hundred Fifteen Thousand Dollars ( 115,000) or such other amount as Town Meeting may approve, for the purpose of replacing two police cruisers, or take any other action thereon.

*Town Manager's Statement – This article would fund the replacement of two police cruisers. Those being replaced have high mileage, many idling hours and those costing the department the most to maintain. The department is on a regular replacement schedule which includes the mobile data terminals and radar units. The life expectancy of a police cruiser is five years; this article would replace the Town's two oldest cruisers. The motion for this article is a simple majority vote.*

**. e er rinder nsta ation at P p tation P b ic or s**

To see if the Town will vote to transfer from Sewer Retained Earnings and appropriate the sum of Sixty Five Thousand Dollars ( 65,000) or such other amount as Town Meeting may approve, for the purpose of installing a grinder pump at the Longmeadow Pump Station, or take any other action thereon.

*Town Manager's Statement – This article would fund the second of a multi-year plan to install grinder pumps at various pump stations. Specifically, this appropriation would fund the installation of a grinder pump at the Longmeadow Pump Station. Wastewater Grinder Pumps can effectively precondition solids, including non-dispersible solids into smaller pieces that can pass through pumps without clogging or damaging the pumps. The motion for this article is a simple majority vote.*

**. ep ace ire drants P b ic or s**

To see if the Town will vote to transfer from Water Retained Earnings and appropriate the sum of Thirty Thousand Dollars ( 30,000) or such other amount as Town Meeting may approve, for the purpose of replacing ten (10) fire hydrants in FY18, or take any other action thereon.

*Town Manager's Statement – This article would fund the second year of a recurring program to replace fire hydrants to replace antiquated hydrants in need of replacement. Parts for the older hydrants are difficult to obtain, newer hydrants open more easily and are more efficient. The motion for this article is a simple majority vote.*

**. eapons ep ace ent Po ice**

To see if the Town will vote to transfer from Free Cash and appropriate the sum of Seventy One Thousand Five Hundred Dollars ( 71,500) or such other amount as Town Meeting may approve, for the purpose of replacing the police department's weapons, or take any other action thereon.

*Town Manager's Statement – This article would fund the replacement of all of the police department's weapons. The department's patrol rifles are 13 years old and the handguns will be 15 years old. Both are beyond the 8-10 year life span recommended by experts for police department weapons. The motion for this article is a simple majority vote.*

*Bruce Tretter, Board of Selectman - Motion:*
*I move that the Town vote to transfer from Free Cash and appropriate The sum of $81,433 for the purposes of Article 5A; transfer from Free Cash and appropriate the sum of $250,000 for the purposes of Article 5B; transfer from Free Cash and appropriate the sum of $95,000 and transfer from Ambulance Reserved Receipts the sum of $180,000 for the purposes of Article 5C; transfer from Free Cash and appropriate the sum of $31,000 for the purposes of Article 5D; transfer from Free Cash and appropriate the sum of $100,000 to the Capital Stabilization Fund for the purpose of Article 5E; transfer from Free Cash and appropriate the sum of $24,800 for the purposes of Article 5F; transfer from Free Cash and appropriate the sum of $115,000 for the purpose of Article 5G; transfer from Sewer Retained Earnings and appropriate the sum of $65,000 for the purpose of 5H; transfer from Water Retained Earnings the sum of $30,000 for the purpose of Article 5I; and transfer from Free Cash and appropriate the sum of $71,500 to replace the weapons, and other equipment for the purpose of Article 5J; and further moved that the size of the town's fleet*

*will increase by the purchase of one ATV.*

**ote**
**es**
**No**
**Motion carries**

----------

Point of Order Ha el Nourse, 80 Nourse St.
*I move that article 41 & 42 of the Town Warrant concerning the disposition of the Spurr House be moved for discussion and action at this time, prior to Article 6.*

ote:
Yes 103
No 95
Motion fails a 2/3 vote not achieved.
----------

**E ennis o rt Pic e a o rt ea ocation of nds ecreation Dept**
To see if the Town will vote to transfer from Article 13 of the 2017 Annual Town Meeting, Recreation Parking Lot at former State Hospital Property Article and appropriate the sum of Fifty Four Thousand Seven Hundred Thirty Five and 86/100 Dollars ( 54,735.86) or such other amount as Town Meeting may approve, for the purpose of installing surfacing for a new tennis court and pickle ball court on Lyman Street, or take any other action thereon.

*Town Manager's Statement – The parking lots at the former state hospital property have been constructed and bids came in below the original appropriation of $244,500 which allows the Recreation Department to surface a new tennis court that has been under construction and to surface a pickle ball court, which the Town has been receiving requests to provide a location for pickle ball. The motion for this article is a simple majority vote.*

*<u>Earl Storey, Recreation Commission</u> - Motion: I move that the Town vote to transfer from Article 13 of the 2017 Annual Town Meeting and appropriate $54,735.86 for the purpose stated in the article as printed in the warrant.*

**ote**
**es**
**No**
**Motion carries.**

**E eria o er for eographica nfor ation ste Director**
To see if the Town will vote to transfer from free cash, water retained earnings or sewer retained earnings and appropriate the sum of Eighty Five Thousand Six Hundred Seventy Nine Dollars ( 85,679) or such other amount as Town Meeting may approve for the purpose of having an update to the 2009 orthophotographs that accompany the GIS, or take any other action thereon.

*Town Manager's Statement – This article would fund an update to the orthophotos used in conjunction with the Town's Geographic Information System (GIS) that were last updated in 2014 and 2009. This data is used by various town departments as well as commercial businesses and developers. This article is a simple majority vote.*

*Shelby Marshall, Board of Selectmen - Motion: I move that the Town vote to transfer from Free Cash and appropriate $42,839; transfer from Water Retained Earnings and appropriate $21,420; and transfer from Sewer Retained Earnings and appropriate $21,420 for the purpose stated in the article as printed in the warrant.*

**ote**
**es**
**No**
**Motion carries**

**E o ntr b tor he ter ep ace ent o ntr b perating o ittee**
To see if the Town will vote to transfer from Country Club Retained Earnings and appropriate the sum

of Two Thousand Five Hundred Dollars ( 2,500) or such other amount as Town Meeting may approve, for the purpose of replacing the storm shelter at the Country Club, or take any other action thereon.

*Town Manager's Statement – The Country Club has a shelter on the golf course to protect golfers at the far end of the golf course that has deteriorated and needs to be replaced. The funds for this project are being appropriated from the Country Club Operating Committee's Funds and not the General Fund. The motion for this article is a simple majority vote.*

*Dexter Blois, Country Club Committee - Motion:*
*I move that the Town vote to transfer from Country Club Retained Earnings and appropriate $2,500 for the purpose stated in the article as printed in the warrant.*

**ote**
**es**
**No**
**Motion arries.**

**E o ntr b Mo er ease o ntr b perating o ittee**

To see if the Town will vote to authori e the Country Club Operating Committee to lease purchase a Fairway Mower pursuant to MGL Chapter 44, Section 21C, or such other enabling statute, for a term of five (5) years and an annual amount not to exceed 13,500, or take any other action thereon.

*Town Manager's Statement – The Country Club Operating Committee needs to replace the mower used on the fairways at the golf course and is seeking to lease/purchase a new fairway mower. The motion for this article requires a 2/3 majority vote.*

*Dexter Blois, WCC -Motion:*
*I move that the Town vote to approve the lease/purchase for a period of 5 years in an amount not to exceed $13,500 per year to be paid from the Country Club Fund for the purpose stated in the article as printed in the warrant.*

**ote**
**es**
**No**
**ote Motion arries**

**E D ertification e a ation oard of ssessors**

To see if the Town will vote to transfer from Free Cash and appropriate the sum of Twenty Five Thousand Dollars ( 25,000) or such other amount as Town Meeting may approve, for the purpose of funding the required Department of Revenue certification revaluation of the Town and subsequent interim valuation ad ustments, or take any other action thereon.

*Town Manager's Statement – This appropriation would fund the revaluation certification required by the Department of Revenue that the Board of Assessors needs to undertake every five years as well as interim valuation adjustments. The motion for this article is a simple majority vote.*

*Leigh Emery, BOS - Motion: I move that the Town vote to transfer from Free Cash and appropriate $25,000 for the purpose stated in the article as printed in the warrant.*

**ote**
**es**
**No**
**Motion arries.**

**E ic ea e ac o n Manager**

To see if the Town will vote to transfer from Free Cash and appropriate the sum of Two Thousand Five Hundred Dollars ( 2,500) or such other amount as Town Meeting may approve, for the purpose of paying a contractual sick leave buy back from an unanticipated retirement, or take any other action thereon.

*Town Manager's Statement – The Town's Personnel Policies and Union Contracts provide a maximum payout for accumulated and unused sick leave at the time of retirement with a maximum amount paid out of $3,000. During the past year, there were two unanticipated retirements that would be funded by this article (the amount sought is the difference*

*between what was anticipated and the total amount due). The motion for this article is a simple majority vote.*

Ian Johnson, Board of Selectmen - Motion:
*I move that the Town vote to transfer from Free Cash and appropriate $2,500 for the purpose stated in the article as printed in the warrant.*

**ote**
**es**
**No**
**Motion arries**

**E ree Pr ning tate ospita DP Director**
To see if the Town will vote to transfer from Free Cash and appropriate the sum of Twenty Five Thousand Twenty Dollars ( 25,020) or such other amount as Town Meeting may approve, for the purpose of pruning approximately 90 trees on the former State Hospital property, or take any other action thereon.

*Town Manager's Statement – This Article would fund pruning a large number of trees on the portion of the State Hospital property that the Town will be retaining. Many of the trees have not been pruned in many years and are in dire need of being properly pruned. The motion for this article is a simple majority vote.*

John Walden, DPW Director - Motion: *I move that the Town vote to transfer from Free Cash and appropriate $25,020 for the purpose stated in the article as printed in the warrant.*

Derek Saari, Conservation Comm. spoke to article

**ote**
**es**
**No**
**Motion carries.**

**E ree Pr ning Do nto n DP Director**
To see if the Town will vote to transfer from Free Cash and appropriate the sum of Eleven Thousand Twenty Five Dollars ( 11,025) or such other amount as Town Meeting may approve, for the purpose of pruning approximately 35 trees in the downtown area, or take any other action thereon.

*Town Manager's Statement – This Article would fund pruning approximately 35 trees in the downtown area. Many of the trees have not been pruned in many years and are in dire need of being properly pruned. The motion for this article is a simple majority vote.*

John Walden, DPW - Motion: *I move that the Town vote to transfer from free cash and appropriate $11,025 for the purpose stated in the article as printed in the warrant.*

**ote**
**es**
**No**
**Motion carries.**

**E and c isition pen pace o ittee**
To see if the Town will vote to raise and appropriate, transfer from available funds, including, without limitation, the Walkup Robinson Account, and/or borrow the sum of Four Hundred Fifty Thousand Dollars ( 450,000) or such other amount as Town Meeting may approve for the purpose of acquiring the parcels of land located at 10 12 Mill Road and any and all costs incidental or related thereto, and further to authori e the Board of Selectmen to acquire said parcels by gift, purchase and/or eminent domain for open space purposes on such terms and conditions as the Board of Selectmen deems in the best interests of the Town, with said parcels to be used for general municipal purposes, or take any other action thereon.

*Town Manager's Statement – This Article seeks to provide authorization for the Board of Selectmen to acquire approximately 20 acres of property adjacent to the Veterans Freedom Park on behalf of the Open Space Committee using funds in the Walkup Robinson Fund, which presently has a balance of $1,914,987. The motion for this article requires a 2/3 majority vote.*

Case 23-40709 Doc 21-4 Filed 10/31/23 Entered 10/31/23 14:28:38 Desc Exhibit Document Page 12 of 32

*Mark Silverberg, Open Space–Motion: I Move that the Board of Selectmen is authorized to acquire, by purchase, gift, eminent domain or otherwise, the parcels of land located at 10 and 12 Mill Road, Westborough, MA, on such terms and conditions as the Board of Selectmen deems in the best interests of the Town; such land to be acquired for* general municipal *conservation and* active *recreation purposes under the control of BOS that the Board of Selectmen is authorized to execute any documents and enter into any agreements associated with such acquisition; that the sum of $450,000 is hereby appropriated to be expended at the direction of the Board of Selectmen to pay costs of acquiring said parcels, and for the payment of all costs incidental and related thereto; that to meet such appropriation the Treasurer, with the approval of the Board of Selectmen is authorized to borrow such amount under M.G.L. Chapter 44 or any other enabling authority; that the repayment of the bonds shall be from the Walkup Robinson Fund and that any premium received by the Town upon the sale of any bonds or notes approved by this vote, less any such premium applied to the payment of the costs of issuance of such bonds or notes, may be applied to the payment of costs approved by this vote in accordance with Chapter 44, Section 20 of the General Laws, thereby reducing the amount authorized to be borrowed to pay such costs by a like amount; and that the Board of Selectmen is authorized to execute any documents or agreements or to take any other action necessary to carry out this project.*

*Request to - Amend motion to delete the word "active" from the motion (AFC & BOS)*
ote to amend motion:
Yes 16
No 148
Amendment defeated

*Janet Anderson, Chauncy St. – Amend motion to add "and passive"…*
ote to amend motion:
Yes 150
No 23
Motion carries

*Paul George, Robin Road - Amend motion to remove the language "general municipal" from the motion*
ote to amendment:
Yes 163
No 10
Amendment carries

*James Tashjian, West Main Street – Amend motion to add after purposes and before under:* and such uses which are permitted under the Walkup Robinson Trust Provisions

ote to amend motion:
Yes 154
No 20
Motion carries

**ended Motion**

*I Move that the Board of Selectmen is authorized to acquire, by purchase, gift, eminent domain or otherwise, the parcels of land located at 10 and 12 Mill Road, Westborough, Massachusetts, on such terms and conditions as the Board of Selectmen deems in the best interests of the Town; such land to be acquired for conservation and passive and active recreation purposes such uses which are permitted under the Walkup Robinson Trust Provisions under the control of the Board of Selectmen that the Board of Selectmen is authorized to execute any documents and enter into any agreements associated with such acquisition; that the sum of $450,000 is hereby appropriated to be expended at the direction of the Board of Selectmen to pay costs of acquiring said parcels, and for the payment of all costs incidental and related thereto; that to meet such appropriation the Treasurer, with the approval of the Board of Selectmen is authorized to borrow such amount under M.G.L. Chapter 44 or any other enabling authority; that the repayment of the bonds shall be from the Walkup Robinson Fund and that any premium received by the Town upon the sale of any bonds or notes approved by this vote, less any such premium applied to the payment of the costs of issuance of such bonds or notes, may be applied to the payment of costs approved by this vote in accordance with Chapter 44, Section 20 of the General Laws, thereby reducing the amount authorized to be borrowed to pay such costs by a like amount; and that the Board of Selectmen is authorized to execute any*

*documents or agreements or to take any other action necessary to carry out this project.*

**ote to ain otion ith a end ents**
**es**
**No**
**Motion carries a ote achie ed**

**E o n e er ste DP Director o n Engineer**
To see if the Town will vote to transfer and appropriate from sewer Retained Earnings and appropriate the sum of Two Million Dollars ( 2,000,000), or such other amount as Town Meeting may approve, for the design for repair, replacement and upgrade of the Banyan and Cumberland Sewer Pump Stations, or take any other action thereon.

*Managers Statement – This article would provide funding from the Sewer Retained Earnings Account for the design, bidding, and rehabilitation of the Banyan and Cumberland Sewer Pump Stations. The Town operates 33 sewer pump stations with life spans in the 20-30 year rang before rehabilitation is recommended. These two stations are near 30 years old and Cumberland has a deteriorated wet well that is need of full replacement. At this time, the Town has nearly 4 million in the Sewer Retained Earnings Account and can fund this upgrade without borrowing; however, future pump station improvements of this magnitude will likely require the Town to borrow funds to undertake this work. This Article requires a simple majority vote.*

*John Walden, DPW Director - Motion: I move that the Town vote to transfer from Sewer Retained Earnings and appropriate $2,000,000 for the purpose stated in the article as printed in the warrant.*

Carl Balduf, Engineer spoke to the article.

**ote**
**es**
**No**

**E ater apita E ip ent and Pro ects DP Director onser ation fficer**
To see if the Town will vote to transfer from Water Retained Earnings and appropriate the sum of Fifty Nine Thousand ( 59,000) dollars or such other amount as Town Meeting may approve, for the purpose of surveying and installing signage at the boundaries of the Andrews 1/1R, Andrews 2, Wilkinson, Chauncy 1, Chauncy 2 and the Indian Meadows well fields, and performing other related maintenance such as, but not limited to, removing vegetation that is interfering with the associated water supply utilities, cleaning debris from tributaries to reduce flooding and removing invasive vegetation at the Hopkinton Road well field, or take any other action thereon.

*Town Manager's Statement- This Article would find the necessary maintenance and the survey of the Town's water supply boundaries and the installation of signage indicating the boundary area. These are the last remaining water supply boundaries that need to be surveyed. The maintenance will include clearing debris from tributaries and the removal of dead, dying, hazardous, and invasive vegetation. The motion for this article is a simple majority.*

*John Walden, DPW - Motion: I move that the Town vote to transfer from Water Retained Earnings and appropriate $59,000 for the purpose stated in the article as printed in the warrant*

*Derek Saari spoke to article*

**ote**
**es**
**No**
**Motion carries.**

**E ater apita E ip ent and Pro ects DP Director onser ation fficer**
To see if the Town will vote to transfer from Water Retained Earnings and appropriate the sum of Twenty One Thousand ( 21,000) dollars or such other amount as Town Meeting may approve, for the purpose of performing necessary repairs and maintenance such as but not limited to, armoring the eroded stream banks, debris removal, vegetation removal, and rebuilding existing culvert headwalls on two

tributaries that feed Sandra Pond Reservoir, or take any other action thereon.

*Town Manager's Statement – This Article would fund necessary repairs on two severely eroded tributaries that feed the Town's drinking water supply. The motion for this article is a simple majority.*

*<u>John Walden, DPW - Motion</u>: I move that the Town vote to transfer from Water Retained Earnings and appropriate $21,000 for the purpose stated in the article as printed in the warrant.*

*Derek Saari spoke to article*

**ote**
**es**
**No**
**Motion carries.**

---

Leigh Emery, Chairman of the Board of Selectmen - Motion to recess until 7pm tonight.
**es**
**No**

---

**p Meeting res ed**

**E thori ation and ppropriation to c ire Dispose of rnpi e oad oard of e ect en**

To see if the Town will vote to authori e the Board of Selectmen to acquire, by purchase, gift, and/or eminent domain, a parcel of land with buildings and other improvements thereon located at 231 Turnpike Road and containing approximately 29.34 acres, for general municipal and/or economic revitali ation purposes, and to raise and appropriate, transfer from available funds, and/or borrow a sum of money to be expended at the direction of the Selectmen for the cost of acquiring said property and any and all costs incidental or related thereto to authori e the Selectmen to apply for, accept and expend any grants from any source whatsoever that may be available to pay any portion of this pro ect, and to execute any and all documents and/or other instruments as may be necessary or convenient to accomplish the foregoing purposes, or take any other action thereon.

*Town Manager's Statement – This article would authorize the Selectmen to acquire the former Regal Cinema property on Route 9 (Turnpike Road) for the purposes of redevelopment and economic development. Regal Cinemas, which leased the property, vacated the premises in late 2017, at the end of their 20 year lease and paid property taxes through November. Since no taxes have been paid on the property since and the ownership of the property is unclear, as the record owner was administratively dissolved in 2009, it is likely that the Town will eventually acquire the property through a tax taking. The acquisition of this property by the Town will be a proactive measure to ensure that the property does not become a blight to the neighborhood in the meantime because of neglect, vandalism and/or exposure to the elements. Rather, the Town intends to put the property to productive use and to contribute again to the Town's tax revenue. The motion for this article requires a 2/3 majority vote.*

*<u>Ian Johnson, BOS - Motion</u>: I move that the Board of Selectmen is authorized to acquire, by purchase, gift, eminent domain or otherwise, in fee simple, a parcel of land located at 231 Turnpike Road, Westborough, MA, as shown on the taking plan attached to the warrant for this town meeting and to be recorded herewith, including all buildings and structures thereon and all privileges and appurtenances thereto belonging thereon, consisting of approximately 29.34 acres, for general municipal and economic development purposes, and for all purposes and uses accessory thereto, and that the Board of Selectmen is authorized to execute any documents and enter into any agreements associated with such acquisition; that the sum of $6,000,000.00 is hereby appropriated to be expended at the direction of the Board of Selectmen to pay costs of acquiring said property, and for the payment of all costs incidental and related thereto; that to meet such appropriation the Treasurer, with the approval of the Board of Selectmen is authorized to borrow such amount under M.G.L. Chapter 44 or any other enabling authority; that the Board of Selectmen is authorized to apply for, accept and expend any grants from any source whatsoever that may be available to pay any portion of this project, provided that the amount of the authorized borrowing shall be reduced by the amount of such aid received prior to the issuance of bonds or notes under this vote; that any premium received by the Town upon the sale of any bonds or notes approved by this vote, less any such premium applied to the payment of the costs of issuance of such bonds or notes, may be applied*

*to the payment of costs approved by this vote in accordance with Chapter 44, Section 20 of the General Laws, thereby reducing the amount authorized to be borrowed to pay such costs by a like amount; and that the Board of Selectmen is authorized to take any other action necessary to carry out this project.*

**ote**
**es**
**No**
**Motion carries a ote achie ed**

**E ibrar Expansion Design ibrar oard of r stees**

To see if the Town will vote to appropriate 490,000 for architectural and engineering services for the planning and design of the library expansion, including all costs incidental or related thereto to see whether to meet this appropriation, the Town will vote to borrow said sum under the provisions of Chapter 44 of the General Laws or any other enabling authority or take any other action thereon.

*Town Manager's Statement – The Library Board of Trustees is seeking to renovate and expand the library and has asked to continue the design process through a $490,000 debt issuance. This project is expected to be partially funded through a MA State Library Construction Grant estimated to be approved during the Summer of 2019 with construction funds to be sought at the Fall 2019 Town Meeting, if approved by Town Meeting in 2019, this debt authorization will be reimbursable at the same rate. The full estimated cost of this project is approximately $23.8 million with $9.4 million expected from the State for the local share total of approximately $11,900,000. The motion for this article requires a 2/3 majority vote.*

*Maureen Ambrosino, Library Director - Motion: I move to pass over the Article.*

**ote**
**es**
**No**
**Motion carries a ote achie ed**

**E r strong Mod ar orro ing rtic e end ent choo Depart ent**

To see if the Town will vote to increase the previously authori ed borrow amount under Article 20 at the 2017 Annual Town Meeting and said article as amended by Article 3 of the November 2017 Special Town Meeting, from 1.5 million to 4.15 million. This article allows the construction of four new classrooms at Armstrong School. The total amount includes 750,000 in State Fire Code upgrades necessary to bring the existing Armstrong school building up to current State Building Codes, and the cost to date incurred in designing, bidding a modular classroom approach for this facility or some other amount as may be voted by Town Meeting or take any other action thereon.

*Town Manager's Statement – This article seeks to increase the borrowing authorization for the demolition and replacement of the Armstrong Elementary modular units. The original article appropriated $1.5 million dollars to replace the four modular in-kind with four new modular. When the cost came in above the anticipated cost, the School Building Committee sought an amendment at the Special Town Meeting in November 2017 to the original article to expand the use of the original borrowing authority to include the design, bidding and construction of a new addition to the Armstrong School. The full cost at this time is estimated to be $4.15 million to build on-site four new classrooms. The motion for this Article requires a 2/3 majority vote.*

*Steve Doret, School Committee - Motion: I move that the amount appropriated and authorized to be borrowed for the demolition and replacement of the Armstrong Elementary modular units and the design, bidding and construction of a new addition to the Armstrong School pursuant to the vote of the Town under Article 20 at the 2017 Annual Town Meeting, as amended by a vote of the Town under Article 3 of the November 2017 Special Town Meeting, is hereby increased from $1,500,000 to a total amount of $4,150,000; that up to $750,000 of the total amount appropriated and authorized to be borrowed may be used to make Fire Code required upgrades to the existing building; that to meet this additional appropriation the Treasurer with the approval of the Board of Selectmen is authorized to borrow an additional amount of $2,650,000 for such purpose under Chapter 44 of the General Laws or any other enabling authority; that any premium received by the Town upon the sale of any bonds or notes approved by this vote, less any such premium applied to the payment of the costs of issuance of such bonds or notes, may be applied to the payment of costs approved by this vote in accordance with Chapter 44, Section 20 of the General Laws, thereby reducing the amount authorized to be borrowed to pay such costs by a like amount; and that the Board of Selectmen is*

*authorized to take any other action necessary to carry out this project.*

**ote**
**es**
**No**
**Motion carries a ote achie ed.**

**E igh choo M ti a era ec rit and ard eading ste ith i Directiona p ifier D as necessar for ire and Po ice Depart ent adio o nications M ti a era ec rit ste choo Depart ent**

To see if the Town will vote to raise and appropriate, transfer from available funds or borrow four hundred and two thousand and five hundred dollars ( 402,500) or such other funds as may be authori ed by the Town Meeting for the purpose of designing, procuring and installing a Multi-Camera Security System at the High School, and all costs incidental and related thereto, or take any other action thereon.

*Town Manager's Statement – The Article seeks authority to borrow $402,500 to design, procure and install a Multi-Camera Security System at the High School. The motion for this Article requires a 2/3 majority vote.*

*Dave Crandall, School Committee - Motion: I move that $402,500 is appropriated for the purpose of designing, procuring and installing a Multi-Camera Security System at the High School, and all costs incidental and related thereto; that to meet this appropriation the Treasurer with the approval of the Board of Selectmen is authorized to borrow $402,500 under G.L. c.44, §7(1) or any other enabling authority; that any premium received by the Town upon the sale of any bonds or notes approved by this vote, less any such premium applied to the payment of the costs of issuance of such bonds or notes, may be applied to the payment of costs approved by this vote in accordance with Chapter 44, Section 20 of the General Laws, thereby reducing the amount authorized to be borrowed to pay such costs by a like amount; and that the Board of Selectmen is authorized to take any other action necessary to carry out this project.*

*Ed Behn, 5 Thomas Rice Rd. – Request to Amend Main Motion:*
*that $402,500 is appropriated and be transferred from* Free Cash *for the purpose of designing, procuring and installing a Multi-Camera Security System at the High School, and all costs incidental and related thereto.*

*Dexter Blois, Old Nourse - Motion to terminate debate*
ote to terminate debate:
Yes 157
No 13
Debate terminated

ote to amended motion (Mr. Behn):
Yes 84
No 86
Motion defeated.

**ote to Main Motion**
**es**
**No**
**Motion carries a ote achie ed**

**E o n harter hange M Director to nfor ation echno og Director o n Manager**

To see if the Town will vote to authori e the Board of Selectmen to petition the General Court for special legislation as set forth below to amend the Town Charter to make editorial changes provided however, that the General Court may make clerical or editorial changes of form only to the bill, unless the Board of Selectmen approves amendments to the bill before enactment by the General Court, and that the Board of Selectmen is authori ed to approve amendments which shall be within the scope of the general public ob ectives of the petition, or take any other action thereon:

**N E E E E E N E**

A. MIS/GIS Director

Section 1 Notwithstanding the provisions of section 10 of chapter 43B of the General Laws, or of any other general or special law to the contrary, the charter of the Town of Westborough is hereby amended by amending Section 4-2(b)(iv) to change “MIS/GIS Director” to “Information Technology Director”

*Town Manager’s Statement – During 2017 the Board of Selectmen approved two position title changes to bring these title more up-to-date. One was changing MIS/GIS Director to “Information Technology Director” and this position is listed specifically as one of the appointments of the Town Manager. To make the Charter consistent with the approved position description, the Town needs to amend the Charter as proposed above.*

Syed Hashmi, BOS - Motion *I move that the Town approve the article as printed in the warrant*

**ote**
**es**
**No**
**Motion carries**

**E end enera a s rtic e o n Manager**

To see if the Town will vote to amend the General Bylaws, Article 8, Section 3 by removing the strikethrough language and inserting the underlined language as follows:

(A) The Town Treasurer/Collector hereinafter referred to as the "Treasurer/Collector" shall annually and may periodically furnish to each department, board, or commission, hereinafter referred to as the "licensing authority", that issues licenses or permits including renewals and transfers, a list of any person, corporation, or business enterprise, hereinafter referred to as the "party", that has neglected or refused to pay any local taxes, fees, assessments, betterments or other municipal charges ~~for not less than a twelve month period,~~ and that such party has not filed in good faith a pending application for an abatement of such tax or a pending petition before the appellate tax board.

(B) The licensing authority may deny, revoke, or suspend any license or permit, including renewals and transfers of any party whose name appears on said list furnished to the licensing authority from the Treasurer/Collector or with respect to any activity, event or other matter which is the sub ect of such license or permit and which activity, event or matter is carried out or exercised or is to be carried out or exercised on or about real estate owned by any party whose name appears on said list furnished to the licensing authority from the Treasurer/Collector provided however, that written notice is given to the party and the Treasurer/Collector, as required by applicable provisions of law, and the party is given a hearing, to be held no earlier than fourteen (14) days after said notice. Said list shall be prima facie evidence for denial, revocation or suspension of said license or permit to any party. The Treasurer/Collector shall have the right to intervene in any hearing conducted with respect to such license denial, revocation or suspension. Any findings made by the licensing authority with respect to such license denial, revocation or suspension shall be made only for the purpose of such proceeding and shall not be relevant to or introduced in any other proceeding at law, except for any appeal from such license denial, revocation or suspension. Any license or permit denied, suspended or revoked under this Bylaw shall not be reissued or renewed until the license authority receives a certificate issued by the Treasurer/Collector that the party is in good standing with respect to any and all local taxes, fees, assessments, betterments or other municipal charges, payable to the Town as of the date of issuance of said certificate.

(C) Any party shall be given an opportunity to enter into a payment agreement, thereby allowing the licensing authority to issue a certificate indicating said limitations to the license or permit and the validity of said license shall be conditional upon the satisfactory compliance with said agreement. Failure to comply with said agreement shall be grounds for the suspension or revocation of said license or permit provided however, that the holder be given notice and a hearing as required by applicable provisions of law.

(D) The Board of Selectmen may waive such denial, suspension or revocation if it finds there is no direct or indirect business interest by the property owner, its officers or stockholders, if any, or members of his immediate family, as defined in Section One of Chapter 262 of the Mass.

General Laws in the business or activity conducted in or on said property.

(E) This Section shall not apply to the following license or permits:

| | | |
|---|---|---|
| (1) | Open Burning | (MGL Ch. 48, S13) |
| (2) | Bicycle Permits | (MGL Ch. 85, S11A) |
| (3) | Sale of Articles for Charitable Purposes | (MGL Ch. 101, S33) |
| (4) | Children Work Permits | (MGL Ch. 149, S69) |
| (5) | Clubs, Associations Dispensing Food or Beverage Licenses | (MGL Ch. 140, S21E) |
| (6) | Dog Licenses | (MGL Ch. 140, S137) |
| (7) | Fishing, Hunting, Trapping Licenses | (MGL Ch. 131, S12) |
| (8) | Marriage Licenses | (MGL Ch. 207, S28) |
| (9) | Theatrical Events, Public Exhibition Permits (ATM 1999) | (MGL Ch. 140, S181) |

Or to take any other action thereon.

*Town Manager Statement – This Article would authorize the Treasurer to notify Town departments periodically prior to granting licenses and permits to property owners that have outstanding tax or other bills and charges from the Town. Presently the Town can only withhold a permit or license if the property owner is more than 12 months behind in the taxes or charges and can only provide this list annually to various permit issuing authorities. This statute was amended in 2016 to allow greater flexibility by notifying Town departments more regularly. The motion for this article is a simple majority vote.*

Shelby Marshall, BOS - Motion *I move that the Town approve the article as printed in the warrant.*

**ote**
**es**
**No**
**Motion carries**

**E end enera a s and cceptance of the tretch Energ ode oard of e ect en**

To see if the Town will vote to amend Article 63, Section 1 of the General Bylaws, by deleting the current Section 1 Building Code (Replaced by State Building Code) and replacing it with a new Section 1 entitled "Stretch Energy Code" as follows for the purpose of regulating the design and construction of buildings for the effective use of energy, pursuant to Appendix 115.AA of the Massachusetts Building Code, 780 CMR, the Stretch Energy Code, including future editions, amendments or modifications thereto, with an effective date of January 1, 2019, a copy of which is on file with the Town Clerk or to take any other action thereon.

SECTION 1 - STRETCH ENERGY CODE

(A) Definitions

International Energy Conservation Code (IECC) The International Energy Conservation Code (IECC) is a building energy code created by the International Code Council. It is a model code adopted by many state and municipal governments in the United States for the establishment of minimum design and construction requirements for energy efficiency, and is updated on a three-year cycle. The baseline energy conservation requirements of the MA State Building Code are the IECC with Massachusetts amendments, as approved by the Board of Building Regulations and Standards.

Stretch Energy Code Codified by the Board of Building Regulations and Standards as 780 CMR Appendix 115.AA of the Massachusetts building code, the Stretch Energy Code is an appendix to the Massachusetts building code, based on further amendments to the International Energy Conservation Code (IECC) to improve the energy efficiency of buildings built to this code.

(B) Purpose

The purpose of 780 CMR 115.AA is to provide a more energy efficient alternative to the Base Energy Code applicable to the relevant sections of the building code for new buildings.

(C) Applicability

This code applies to residential and commercial buildings. Buildings not included in this scope shall comply with 780 CMR 115.AA, as indicated.

(D) Stretch Code

The Stretch Code, as codified by the Board of Building Regulations and Standards as 780 CMR Appendix 115.AA, including any future editions, amendments or modifications, is herein incorporated by reference into the Town of Westborough General Bylaws, Article 63.

The Stretch Code is enforceable by the inspector of buildings or building commissioner and effective as of January 1, 2019.

Or take any other action thereon.

*Town Manager's Summary – The adoption of the Stretch Energy Code is required for the Town to be eligible and apply for the Green Communities Act. It would put in place additional energy efficiency requirements for both residential and commercial building. The motion for this Article requires a simple majority vote.*

Leigh Emery, BOS - Motion: *I move that the Town vote to approve this article as printed in the warrant.*

**ote**
**es**
**No**
**Motion carries.**

**E end enera a s P astic ag ed ction a o n Manager**
To see if the Town will vote to amend the General Bylaws, by adding the following new Article as follows:

**rtic e P astic ag ed ction**

This bylaw shall be known as the Plastic Bag Reduction Bylaw.

Section 1 Purpose and Intent

The production and use of thin-film single-use plastic checkout bags have significant impacts on the environment, including, but not limited to contributing to the potential death of aquatic and land animals through ingestion and entanglement contributing to pollution of the natural environment creating a burden to solid waste collection and recycling facilities clogging storm drainage systems and requiring the use of millions of barrels of crude oil nationally for their manufacture. The purpose of this bylaw is to protect the Town's unique natural beauty and its water and natural resources by eliminating single-use plastic checkout bags that are distributed in the Town of Westborough and to promote the use of reusable bags.

Section 2 Definitions

"Checkout bag" means a carryout bag provided by a store to a customer at the point of sale. Checkout bags shall not include bags, whether plastic or not, in which loose produce or products are placed by the consumer to deliver such items to the point of sale or checkout area of the store.

"Grocery Store" means a retail establishment where more than fifty percent (50 ) of the gross floor area is devoted to the sale of food products for home preparation and consumption, which typically also offers home care and personal care products.

"Retail Store" means any business facility that sells goods directly to the consumer whether for or not for profit, including, but not limited to, retail stores, restaurants, pharmacies, convenience and grocery

stores, liquor stores, seasonal and temporary businesses.

"Reusable checkout bag" means a bag with handles that is specifically designed and manufactured for multiple reuse and is either polyester, polypropylene, cotton or other durable material, or durable plastic that is at least 4.0 Mils in thickness.

"Thin-film single -use plastic bags" are those bags typically with handles, constructed of high-density polyethylene (HDPE), low density polyethylene (LDPE), linear low density polyethylene (LLDPE), polyvinyl chloride (P C), polyethylene terephthalate ( PET), or polypropylene (other than woven and non -woven polypropylene fabric), if said film is less than 4.0 mils in thickness.

"Recyclable paper bag" means a paper bag that is 100 percent recyclable and contains at least 40 post consumer recycled content, and displays the words "recyclable" and "made from 40 post-consumer recycled content" in a visible manner on the outside of the bag.

Section 3 Use Regulations

(A) Thin-film single-use plastic bags shall not be distributed, used, or sold for checkout or other purposes at any retail store or grocery store within the Town of Westborough.

(B) If a grocery or retail store provides or sells checkout bags to customers, the bags must be one of the following (1) recyclable paper bags, or (2) reusable checkout bags. The grocery or retail store may charge for said bags.

(C) Thin-film plastic bags used to contain dry cleaning, newspapers, produce, meat, bulk foods, wet items and other similar merchandise, typically without handles, are still permissible.

Section 4 Effective Date

This bylaw shall take effect six (6) months following Town Meeting approval of the bylaw. Upon application of the owner or the owner s representative, the Board of Selectmen or their designee may exempt a grocery retail store from the requirements of this section for a period of up to six (6) months upon a finding by the Board of Selectmen or their designee that (1) the requirements of this section would cause undue hardship or (2) a grocery or retail store requires additional time in order to draw down an existing inventory of checkout bags.

Section 5 Enforcement

Enforcement of this bylaw shall be the responsibility of the Board of Selectmen or their designee. The Board of Selectmen or their designee shall determine the monitoring process to be followed, which may be limited to responding to citi en reports, incorporating the process into other town duties as appropriate.

Any grocery or retail store distributing plastic checkout bags in violation of this bylaw shall be sub ect to a noncriminal disposition fine as specified in Article 31 of the General Bylaws, Noncriminal Disposition of Certain iolations of Bylaws and Rules and Regulations. Any such fines shall be paid to the Town of Westborough. No licenses shall be renewed for any establishment with outstanding violations under this section.

Section 6 Severability

If any provision of this bylaw is declared invalid or unenforceable the other provisions shall not be affected thereby.
And further to amend Article 31, Section 2(C) by adding violations to Article 33 as follows:

Article 33 iolation of the Plastic Bag Reduction Bylaw first offense written warning 2nd offense 50 per offense 3rd and subsequent offenses - 100 per offense.

Or to take any other action thereon.

*Town Manager Statement – This Article would eliminate the use of plastic bags at check out in grocery and retails stores; it does allow certain plastic bags, such as those used in produce/bulk sales. The bylaw would allow the sale of recyclable paper bags and reusable bags. The bylaw allows a six month timeframe for stores to comply and provides for penalties through non-criminal disposition for violations. The motion for this article is a simple majority vote.*

*Bruce Tretter, BOS - Motion: I move that the Town vote to approve this article as printed in the Warrant; except where references to all Selectman in the article, be changed as needed to Selectmen.*

Motion to move the question and terminate debate
ote:
Yes 135
No 10
Debate ended

Dexter Blois, Old Nourse St - Motion to amend - 50 per offense "and all thereafter."
ote:
Yes 133
No 12
Amendment passes

**ote Main Motion as a ended**

**es**
**No**
**Motion carries**

Note: Mr. Tretter announced the 20th Anniversary of WCLT and the Earth Day Cleanup to take place on Saturday, April 21st, rain or shine 6:30am at Bellows Rd and West Meadow Pla a main clean up time 9:30am congregate at Bay State Commons distribute bags. 11:30-Noon, Pi a for those who help.

**E end oning a s rtic e Definitions P anning oard**

To see if the Town will amend its oning Bylaws, Article 5 Definitions, by adding the following new definitions:

Floor Area Ratio (FAR):
The ratio of the sum of the gross floor area of all buildings on a lot to the total site area of the lot.

Gross Floor Area:
The sum, in square feet, of the hori ontal areas of a building (or several buildings on the same lot) measured from the exterior face of the exterior walls, or from the center line of a party wall separating two buildings, including garages, basements, covered porches, and half stories. Floors where the headroom is greater than five feet, measured from the top of the floor oists of the top story to the bottom of the roof rafters, is included in the measurement of gross floor area. Gross floor area does not include "crawl spaces" as defined by current building code "attics" and "open decks". Where the text of this bylaw refers to the floor area, the term means gross floor area unless the term habitable floor area is used.

Or take any other action thereon.

*Town Manager's Summary – This Article seeks to add new definitions to clarify terms used currently in the zoning bylaws yet which are not currently defined. The motion for this Article requires a 2/3 majority vote.*

*Hazel Nourse, Planning Board - Motion: I move that the Town vote to approve this article as printed in the warrant.*

**ote**
**es**
**No**
**Motion carries ote achie ed**

**E end oning a s Pre Existing Non onfor ing ses or tr ct res P anning oard**

To see if the Town of Westborough will vote to amend its oning Bylaws by deleting Article 2 District

Page 145 of 840

Regulations, Section 2410. PRE-E ISTING NONCONFORMING USES OR STRUCTURES (E TENSIONS AND ALTERATIONS) in its entirety. And by inserting in its place the following new language and subsections:

2410. PRE-E ISTING NONCONFORMING USES OR STRUCTURES (E TENSIONS) This section shall not apply to billboards, signs and other advertising devices sub ect to the provisions of Section 29 through 33, inclusive, of Chapter 93 of Chapter 93D, General Laws.

The Board of Appeals, by Special Permit, may authori e lawfully pre-existing, non-conforming uses or structures to be changed or altered provided that such extension, alteration or enlargement meets all the following requirements:

2410.1 All the special permit guidelines of section 1330

2410.2 That it will not be substantially more detrimental or ob ectionable to the neighborhood than the existing non-conforming structure or use to the neighborhood.

2411. Building construction and Special Permits. Construction or operations under a Building or Special Permit obtained in conformity with this oning Bylaw or lawful amendments thereto, shall conform to any subsequent amendments of the oning Bylaw unless the use or construction is commenced within a period of not more than six (6) months after the issuance of such Permit, and in cases involving construction, unless such construction is continued through to completion as continuously and expeditiously as is reasonable.

2412. Non-conforming Single and Two Family Residential Structures. Non-conforming single and two family residential structures may be reconstructed, extended, altered, or structurally changed upon a determination by the oning Enforcement Officer that such proposed reconstruction, extension, alteration, or change does not increase the non-conforming nature of said structure. The aggregate sum of the gross floor area of all additions to a structure since the date when the structure became non-conforming under the provisions of this subsection shall not be greater than 50 of the gross floor area of the dwelling unit or one thousand (1000) square feet, whichever is smaller, unless a Special Permit is issued by the oning Board of Appeals under Section 2410 allowing a larger gross floor area. The following circumstances shall not be deemed to increase the non-conforming nature of said structure:

2412.1 Alteration to a structure which complies with all current setback, yard, building coverage, and building height requirements but is located on a lot with insufficient area, where the alteration will also comply with all of said current requirements.

2412.2 Alteration to a structure which complies with all current setback, yard, building coverage, and building height requirements but is located on a lot with insufficient frontage, where the alteration will also comply with all of said requirements.

2412.3 Alteration to a structure which encroaches upon one or more required yard or setback areas, where the alteration will comply with all current setback, yard, building coverage and building height requirements the provisions of this subsection shall apply regardless of whether the lot complies with current area and frontage requirements.

2412.4 Alteration to the side, front or rear of a structure which encroaches upon a required yard or setback area, where the alteration will not encroach upon such area to a distance greater than the existing structure the provisions of this subsection shall apply regardless of whether the lot complies with the current area and frontage requirements.

2413. Notwithstanding Section 2412, in the event that the oning Enforcement Officer determines that the non-conforming nature of such structure would be increased by the proposed reconstruction, extension, alteration, or change, the Board of Appeals may, by special permit, allow such reconstruction, extension, alteration, or change where the proposed modification will not be substantially more detrimental than the existing non-conforming structure to the neighborhood.

2414. Pre-Existing non-conforming use: Any increase in the area or extent of the non-conforming use of

a structure or land made by Special Permit from the Special Permit Granting Authority, is limited to a fifty percent (50 ) increase in the non-conforming floor area or land area at the time the use became non-conforming.

Or take any other action thereon.

*Town Manager's Statement – This Article seeks to allow non-conforming single and two family residential structures to be reconstructed, extended, altered, or structurally changed up to 50% or 1,000 square feet by-right upon a determination by the Zoning Enforcement Officer. Currently, any increase in square footage for a non-conforming structure or use requires action by the ZBA. The property owner can still appeal to the ZBA for increases greater than 50% or 1,000 square feet. The amendment is a benefit to the property owner making proposed modest additions a simpler and less expensive process. The motion for this Article requires a 2/3 majority vote.*

*Tim Paris, Planning Board - Motion: I move that the Town vote to approve this article as printed in the warrant.*

**ote**
**es**
**No**
**Motion carries a ote achie ed**

**E end oning a s arden and igh ise part ents P anning oard**
To see if the Town will vote to amend its oning Bylaws, Article 2 District Regulations, Section 2600 Dimensional Schedule, Subsection 2610 Use Category, by amending the Use Category Table for Garden Apartments (AA) and High-Rise Apartments (AB) by creating new requirements for affordable units as shown below in **bo d**:

| | USE CATEGORY | | | | |
|---|---|---|---|---|---|
| | Garden Apartment (AA) | High-Rise Apartment (AB) | Senior Living Overlay | All Other | |
| Min. number of affordable unit ( ) | **p r** | **p r** | 20 (p) (r) | | |

Or take any other action thereon.

*Town Manager's Statement – This amendment is for multi-family residential projects. The 20% affordable requirement is the Commonwealth's threshold for receiving credit for all units in an affordable rental project. The 20% requirement can be reduced if the developer offers an alternative to the 20% provided that other affordable housing contributions are offered and are deemed acceptable to the Town. This is the same provision adopted at the most recent Town Meeting for age restricted housing in the Senior Living Overlay District. The motion for this Article requires a 2/3 majority vote.*

*Footnotes (p) and (r) currently exist in the Zoning Bylaws. These shall remain unchanged and are shown below for informational purposes.*

*(p) Units that are to be designated affordable must comply with the requirements of the Massachusetts Department of Housing and Community Development or a successor agency. Such units shall have deed restrictions regarding affordability which will continue in perpetuity and will allow the units to "count" as State recognized affordable units. All such affordable units shall be priced at levels affordable to individuals or families earning no more than 80% of Area Median Income (AMI) as published by the State/US Department of Housing and Urban Development (HUD).*

*(r) Applicants for affordable housing projects shall be expected to meet the 20% minimum number of affordable units provided herein. The Special Permit Granting Authority may, however, in its discretion decrease the minimum 20% affordable housing requirement to no less than 10% provided that other affordable housing contributions are made to the Town which the Special Permit Granting Authority deems sufficient to meet affordable housing needs. Such alternative contributions may include, contributions to the Town's Senior/Disabled Tax Relief Fund, creation of affordable housing units elsewhere in Town, or other alternatives deemed suitable to the Special Permit Granting Authority.*

*Mark Silverberg, Planning Board - Motion: I move that the Town vote to approve this article as printed in the warrant.*

**ote**
**es**
**No**
**Motion carries ote achie ed.**

**E end oning a s M ti a i o sing in igh a siness District**
**P anning oard**

To see if the Town will vote to amend its oning Bylaws, Article 4, Special Regulations, Section 5200, Multi-Family Housing in the Highway Business District (BA) by amending the third sentence in Section 5262 as follows (additions and deletions in bold):

Section 5262. AFFORDABLE HOUSING

All **ti fa i** residential proposals made in the BA one shall allocate a minimum of 20 of the total number of dwelling units ~~**for o nership condo ini s or of the tota d e ing nits for renta apart ents**~~ as housing that is affordable to households earning 80 or less of median income for the Worcester Metropolitan Statistical Area as determined by the most recent calculation of the U.S. Department of Housing and Urban Development.

So that the new third sentence reads as follows:

All multi-family residential proposals made in the BA one shall allocate a minimum of 20 of the total number of dwelling units as housing that is affordable to households earning 80 or less of median income for the Worcester Metropolitan Statistical Area as determined by the most recent calculation of the U.S. Department of Housing and Urban Development.

And by adding the following paragraphs immediately at the end of Section 5262:

**he ini of of the nits that are to be designated affordab e st co p ith the re ire ents of the Massach setts Depart ent of o sing and o nit De e op ent or a s ccessor agenc . ch nits sha ha e deed restrictions regarding affordabi it hich i contin e in perpet it and i a o the nits to co nt as tate recogni ed affordab e nits. s ch affordab e nits sha be priced at e e s affordab e to indi id a s or fa i ies earning no ore than of rea Median nco e M as p b ished b the tate Depart ent of o sing and rban De e op ent D .**

**ti fa i residentia proposa s nder this section sha be expected to eet the ini n ber of affordab e nits pro ided herein. he pecia Per it ranting thorit a ho e er in its discretion decrease the ini affordab e ho sing re ire ent to no ess than pro ided that other affordab e ho sing contrib tions are ade to the o n hich the pecia Per it ranting thorit dee s s fficient to eet affordab e ho sing needs. ch a ternati e contrib tions a inc de contrib tions to the o n s enior Disab ed ax e ief nd creation of affordab e ho sing nits e se here in o n or other a ternati es dee ed s itab e to the pecia Per it ranting thorit .**

Or take any other action thereon.

*Town Manager's Statement – This Article amend the Zoning Bylaws for multi-family residential projects in the Highway Business District (BA). The 20% affordable requirement is the Commonwealth's threshold for receiving credit for all units in an affordable rental project. The 20% requirement can be reduced if the developer offers an alternative to the 20% provided that other affordable housing contributions are offered and are deemed acceptable to the Town. This is the same provision adopted at our most recent Town Meeting for age restricted housing in the Senior Living Overlay District. The motion for this Article requires a 2/3 majority vote.*

*Mark Silverberg, Planning Board - Motion: I move that the Town vote to approve this article as printed in the warrant.*

**ote**
**es**
**No**
**Motion carries ote achie ed**

**E end oning a s Do nto n P anning er a District ffordab e o sing P anning oard**

To see if the Town will vote to amend its oning Bylaws, Article 4, Special Regulations, Section 4900, Downtown Planning Overlay District (DPOD) by creating a new Section 4955 as follows:

Section 4955. AFFORDABLE HOUSING

Mixed-use pro ects proposed in the Downtown Planning Overlay District shall be required to provide an affordable housing component for all pro ects containing a residential component. A minimum of 20 of the residential units shall be designated affordable and shall comply with the requirements of the Massachusetts Department of Housing and Community Development or a successor agency. Such units shall have deed restrictions regarding affordability which will continue in perpetuity and will allow the units to "count" as State recogni ed affordable units. All such affordable units shall be priced at levels affordable to individuals or families earning no more than 80 of Area Median Income (AMI) as published by the State/US Department of Housing and Urban Development (HUD).

Mixed-use pro ects containing residential components shall be expected to meet the 20 minimum number of affordable units provided herein. The Special Permit Granting Authority may, however, in its discretion decrease the minimum 20 affordable housing requirement to no less than 10 provided that other affordable housing contributions are made to the Town which the Special Permit Granting Authority deems sufficient to meet affordable housing needs. Such alternative contributions may include, contributions to the Town's Senior/Disabled Tax Relief Fund, creation of affordable housing units elsewhere in Town, or other alternatives deemed suitable to the Special Permit Granting Authority.

Or take any other action thereon.

*Town Manager's Statement – This Article amends the Zoning Bylaw for mixed-use residential projects in the Downtown Planning Overlay District (DPOD). The 20% affordable requirement is the Commonwealth's threshold for receiving credit for all units in an affordable project. The 20% requirement can be reduced if the developer offers an alternative to the 20% provided that other affordable housing contributions are offered and are deemed acceptable to the Town. This is the same provision adopted at our most recent Town Meeting for age restricted housing in the Senior Living Overlay District. The motion for this Article requires a 2/3 majority vote.*

*Mark Silverberg, Planning Board - Motion: I move that the Town vote to approve this article as printed in the warrant.*

**ote**
**es**
**No**
**Motion carries ote achie ed.**

**E end oning a s ate a District oning end ent P anning oard**

To see if the Town will vote to amend its oning Bylaws, Article 4, Special Regulations, Section 5100, Gateway 2 District by creating a new Section 5153 as follows:

Section 5153. AFFORDABLE HOUSING

Proposals in the Gateway 2 District that contain a multi-family residential component shall be required to provide an affordable housing percentage. A minimum of 20 of the residential units shall be designated affordable and shall comply with the requirements of the Massachusetts Department of Housing and Community Development or a successor agency. Such units shall have deed restrictions regarding affordability which will continue in perpetuity and will allow the units to "count" as State recogni ed affordable units. All such affordable units shall be priced at levels affordable to individuals or families earning no more than 80 of Area Median Income (AMI) as published by the State/US Department of Housing and Urban Development (HUD).

Case 23-40709 Doc 21-3 Filed 02/12/24 Entered 02/12/24 14:28:28 Desc Main
Page 149 of 840

Pro ects containing multi-family residential components shall be expected to meet the 20 minimum number of affordable units provided herein. The Special Permit Granting Authority may, however, in its discretion decrease the minimum 20 affordable housing requirement to no less than 10 provided that other affordable housing contributions are made to the Town which the Special Permit Granting Authority deems sufficient to meet affordable housing needs. Such alternative contributions may include, contributions to the Town's Senior/Disabled Tax Relief Fund, creation of affordable housing units elsewhere in Town, or other alternatives deemed suitable to the Special Permit Granting Authority.

Or take any other action thereon.

*Town Manager's Statement – This Article amends the Zoning Bylaws for multi-family residential projects in the Gateway 2 District (G2). The 20% affordable requirement is the Commonwealth's threshold for receiving credit for all units in an affordable rental project. The 20% requirement can be reduced if the developer offers an alternative to the 20% provided that other affordable housing contributions are offered and are deemed acceptable to the Town. This is the same provision adopted at our most recent Town Meeting for age restricted housing in the Senior Living Overlay District. The motion for this Article requires a 2/3 majority vote.*

<u>Mark Silverberg, Planning Board - Motion</u>: *I move that the Town vote to approve this article as printed in the warrant.*

**ote**
**es**
**No**
**Motion carries ote achie ed**

**E dopting oca Expedited Per itting hapter D P anning oard**

To see if the Town will vote to accept the provisions of Chapter 43D of the Massachusetts General Laws as amended pursuant to Section 11 of Chapter 205 of the Acts of 2006, and to approve the filing of a formal proposal with the Interagency Permitting Board for the designation as a Priority Development Site for land at 800, 1200, 1300 1400 West Park Drive identified on the Assessor's Map 36 as Parcels 12, 12A, 12B 22 or take any other action thereon.

*Town Manager's Statement – Chapter 43D was passed by the Commonwealth of Massachusetts in August of 2006 as an economic development tool. The designation of 43D is parcel site specific and a separate vote for each site must be taken by Town Meeting. This vote is specific to the properties zoned Industrial (IB) located at 800, 1200, 1300 & 1400 West Park Drive. If accepted, the Town must agree to issue a decision on all local permits within six months of the filing date. The permitting authority does not have to grant the permit, it simply must render a decision within 180 days. The 43D designation places the site in a priority status for infrastructure improvement grant programs available through the State. The State will also actively market the site through its business development agencies. The motion for this article is a simple majority vote.*

<u>James Ball, Planning Board - Motion</u>: *I move that the Town vote to approve this article as printed in the warrant.*

**ote**
**es**
**No**
**Motion carries ote achie ed**

**E ccept ift of and ranger oad DP Director o n Engineer**

To see if the Town will vote to accept, by gift and for general municipal purposes, a certain parcel of land off Granger Road identified as Assessors Map 35, Parcel 30A and shown as "Non-Buildable Lot 4625 SF /-" on a plan of land entitled "Site layout Plan aara Gardens, Westborough, Ma 01581", prepared by hs t group inc., , a copy of which is on file with the office of the Town Clerk and recorded with the Worcester South Registry of Deeds in Plan Book 923, Plan 65, on such terms and conditions as the Board of Selectmen deems in the best interests of the Town, or to take any other action thereon.

*Town Managers Statement – This article allows the Town to receive an approximately 30' wide by 135' long piece of land that once was anticipated as a roadway connection between the recently created Zaara Drive and Granger Road. The two roads do not connect, thereby making the land "surplus". The Board of Appeals recognized this and required that the land be conveyed to the Town in an amendment to the Zaara Drive Comprehensive Permit in 2016. The motion for this article requires a 2/3 vote.*

*Carl Balduf, Town Engineer - Motion: I move that the Town approve the article as printed in the warrant.*

**ote**
**es**
**No**
**Motion carries ote achie ed**

**E oad a cceptance eeton Path DP Director o n Engineer**
To see if the Town will vote to accept Beeton Path as a public way, from its beginning at the sideline of Fisher Street at STA 0 00 /- to its end at STA 6 69 /-, as heretofore laid out by the Board of Selectmen and shown on a plan entitled "Road Acceptance Plan of Beeton Path in Westborough, Massachusetts", Scale 1" 40', prepared by Guerriere Halnon Inc., dated January 9, 2018 (latest revision) and on file in the office of the Town Clerk, and further to authori e the Board of Selectmen to acquire, by purchase, gift, and/or eminent domain the fee to or easement in said street for all purposes for which public ways are used in the Town of Westborough, and any drainage, utility, access, water and/or other easements related thereto, and sub ect to a 10,000 maintenance bond being established and held under the supervision of the Planning Board, or take any other action thereon.

*Managers Statement - This article is one of the steps required to make Beeton Path a Public Way. This is a subdivision road created by conditional approval of the Planning Board off Fisher Street about twenty years ago. The road was partially completed after it was approved and four of the six lots developed. The owner has worked with the Engineering Division over the past year to complete remaining items such as finish paving and is now ready to turn it over to the Town.*

*John Walden, DPW Director - Motion: I move that the Town approve the article as printed in the warrant*

Carl Balduf, Town Engineer spoke to the article

**ote**
**es**
**No**
**Motion carries ote achie ed**

**E oad a cceptance pp eseed Dri e DP Director o n Engineer**
To see if the Town will vote to accept Appleseed Drive as a public way, from its beginning at the sideline of Harvest Way at STA 0 00 /- to its end at STA 20 64 /- at the sideline of Adams Street, as heretofore laid out by the Board of Selectmen and shown on a plan entitled "Acceptance Plan of Appleseed Drive in Westborough, Mass owned by: Casa Builders and Developers Corp. Sheet 5 of 5 Sheets, Hori ontal Scale 1" 40 Feet", prepared by Thompson-Liston Associates Inc., dated September 20, 2002 (latest revision) and on file in the office of the Town Clerk, and further to authori e the Board of Selectmen to acquire, by purchase, gift, and/or eminent domain, the fee to or easement in said street for all purposes for which public ways are used in the Town of Westborough, and any drainage, utility, access, and/or other easements related thereto, or take any other action thereon.

*Managers Statement - This roadway was accepted at Town Meeting in 2003, however, various deeds were not furnished to the Town and the plans and deeds were not recorded at the Registry of deeds to complete the acceptance process. Statutory time limits do not allow these documents to be recorded long after the original acceptance, therefore, the acceptance must be voted again. The motion for this article requires a 2/3rds vote.*

*John Walden, DPW Director - Motion: I move that the Town approve the article as printed in the warrant.*

Carl Balduf, Town Engineer spoke to article.

**ote**
**es**
**No**
**Motion carries ote achie ed**

**E oad a cceptance ar est a DP Director o n Engineer**
To see if the Town will vote to accept Harvest Way as a public way, from its beginning at the sideline of

Nash  Street at STA 0  00  /- to its end at STA 10  60  /-, as heretofore laid out by the Board of Selectmen and shown on a plan entitled "Acceptance Plan of Harvest Way in Westborough, Mass owned by: Casa Builders and Developers Corp., Hori  ontal Scale 1"    40 Feet", prepared by Thompson-Liston Associates Inc., dated September 20, 2002 (latest revision) and on file in the office of the Town Clerk, and further to authori  e the Board of Selectmen to acquire, by purchase, gift, and/or eminent domain, the fee to or easement in said street for all purposes for which public ways are used in the Town of Westborough, and any drainage, utility, access, or other easements related thereto, or take any other action thereon.

*Managers Statement - Similar to Appleseed Drive, this roadway was accepted at Town Meeting in 2003, however, various deeds were not furnished to the Town and the plans and deeds were not recorded at the Registry of deeds to complete the acceptance process. Statutory time limits do not allow these documents to be recorded long after the original acceptance, therefore, the acceptance must be voted again.  The motion for this article requires a 2/3rds vote.*

*John Walden, DPW Director - Motion:  I move that the Town approve the article as printed in the warrant.*

**ote**
**es**
**No**
**Motion carries          ote achie  ed**

**E          est Main   treet   igh  a    ide  a    Ease   ents  DP    Director    o   n Engineer**

To see if the Town will vote to authori  e the Board of Selectmen to acquire, by purchase, gift, and/or eminent domain and on such terms and conditions as the Board of Selectmen deems in the best interests of the Town, permanent and/or temporary easements for public way purposes, including, without limitation, for the purpose of constructing and/or reconstructing a public sidewalk, in, on and under the following parcels along the south side of West Main Street from Nourse Street to Kendall Drive:

| Map/Lot | Owner |
|---|---|
| 15-272 | Chi |
| 15-125A | Balasubramanian |
| 15-126 | Grattan-Richardson |
| 9-61A | Croft |
| 8-33 | Martin |
| 8-34 | Stedman |
| 8-35 | Masters |
| 8-36 | Swain |
| 8-37 | Aldrin |
| 8-38 | Bentley |
| 8-39 | Collins |
| 8-40 | Reardon |
| 8-41 | Arnold |
| 8-42 | Spiegel |
| 8-125 | Starr |
| 8-126 | Marks, Trustee |
| 8-127 | Milewski |
| 8-128 | Jernberg |
| 8-129 | Gonsalves |
| 8-130 | Smith |
| 8-131 | Salsman |
| 8-186 | Adams |
| 8-187 | Siegal |
| 8-188 | Barnes |
| 8-189 | Forryan |
| 8-190 | Giblin |
| 8-191 | Mattheson |
| 8-190 | Giblin |
| 8-219 | Chandler |

| | |
|---|---|
| 8-220 | Arnold |
| 8-221 | Coffee |
| 8-290A | Grady |
| 8-290 | Lord-Patterson |
| 8-291 | Welsh |

Or take any other action relative thereto.

*Town Manager's Statement – This article provides the authority for the Board of Selectmen to obtain easements along the south side of West Main Street for the purposes of installing a sidewalk. The easements may be temporary for tying in driveways and adjusting landscaping or permanent to accommodate handicap ramps, walls, or the sidewalk itself. The layout is fairly wide and it is anticipated that most of the work may be performed within Town right of way. Project funding will be through the Chapter 90 program. The motion for this article is a simple majority vote.*

*John Walden, DPW Director Motion: I move that the Town approve the article as printed in the warrant.*

*Mr. Balduf spoke to the article.*

**ote**
**es**
**No**
**Motion carries ote achie ed**

**E cceptance of ti it Ease ents o te to ashington treet EM a p s DP Director**

To see if the Town will vote to authori e the Board of Selectmen to acquire, by purchase, gift, and/or eminent domain, an easement for public utility purposes in, on and under the parcels shown on a set of plans entitled "Definitive Subdivision Southborough Westborough, MA", prepared by Beals and Thomas recorded with the Worcester County Registry of Deeds in Plan Book 883, Plan 119 as (i) "Future 30' Wide Utility Easement 2,183_ S.F." on Sheet 3.3 of the Plan, (ii) "Utility Easement-2A 9,210_ S.F." shown as Detail E on Sheet 3.39 of the Plan ("Utility Easement-2A"), and (iii) a thirty-foot area along the Westborough/Southborough town line as shown on Sheet 3.3 of the Plan within the limits of Washington Street as shown on Sheet 3.3 of the Plan between Utility Easement-2A and "Utility Easement-2 99,510_ S.F.", on such terms and conditions as the Board of Selectmen deems in the best interests of the Town, or take any other action relative thereto.

*Town Manager's Statement – The easements described in this article will allow a future extension of Westboro's water system so that the existing main on Washington Street may be extended to Route 9 and then looped back to West Park Drive. The main extension is a future requirement of EMC's subdivision approval and will be constructed at their cost. It is the Town's best interest to accept these easements currently so that the rights are in place when EMC needs to do the work. A portion of the main has already been installed as part of the already constructed Washington Street relocation. The motion for this article is a simple majority vote.*

*John Walden, DPW - Motion: I move that the Town approve the article as printed in the warrant.*
*Carl Balduf, Town Engineer spoke to the article*

**ote**
**es**
**No**
**Motion carries ote achie ed**

**E Non inding Po on aising the ega ge to P rchase obacco Prod cts oard of ea th**

To see if residents support the Board of Health amending their tobacco sales regulations to change the minimum legal sales age an individual must be before that individual can be sold tobacco products in Westborough from age 18 to age 21

*Town Manager's Statement – The Board of Health has the legal authority to adopt these regulations, but through their discussions, they determined they wanted to obtain the opinion of Town Meeting as a non-binding poll as an additional piece of data prior to making a decision and setting new regulations.*

*No Motion Required – Non-Binding Poll*

**ote**
**es**
**No**

**E ransfer e aining a ance of th nni ersar o ittee ift nd oard of e ect en**

To see if the Town will vote to transfer the remaining balance in the 300th Anniversary Committee Gift Account to the Westborough Spirit Committee Gift Account for the purpose of organi e and lead an annual event, or take any other action thereon.

*Town Manager's Statement – The 300th Anniversary Committee has approximately $36,000 remaining in their Gift Account which under MA General Laws would be closed out to the General Fund. The 300th Anniversary Committee, based upon the popularity of having events that bring the community together approached the Board of Selectmen with the concept of creating a permanent committee that would put on a premier event every year and this would be the seed money for that effort and allow the balance to be transferred to a new Westborough Spirit Committee Gift Account instead of being closed out to the General Fund. The motion on this Article requires a simple majority vote.*

*Syed Hashmi, BOS - Motion: I move that the Town vote to transfer the remaining balance of $36,548 from the 300th Anniversary Gift Account to the Westborough Spirit Committee Gift Account for the purposes of the Article as printed in the warrant.*

**ote**
**es**
**No**
**Motion carries a orit ote.**

**E thori ation for the oard of e ect en to se the p rr o se oard of e ect en**

To see if the Town will vote to authori e the Board of Selectmen to sell, in accordance with all applicable Commonwealth of Massachusetts bidding laws, that property shown as 7 Parkman Street on a Plan entitled Spurr House 7 Parkman Street, Westborough MA, dated February 27, 2018, prepared by Westborough GIS, on file with the Town Clerk, said property being approximately 9,127 square feet, including any improvements, or take any other action thereon.

*Town Manager's Statement – The Fall 2015 Town Meeting vote authorizing the Board of Selectmen to sell 7 Parkman Street (the "Spurr House") expired 18 months after the Town Meeting vote and the authority for the Selectmen to sell the property has expired and the Selectmen have decided not to demolish the house as per the original Town Meeting vote, but to continue to have the property for sale. The motion for this article requires a 2/3rds vote.*

*Ian Johnson, BOS - Motion: I move that the Town vote to authorize the BOS to sell in accordance with all applicable Commonwealth of Massachusetts Bidding Laws, that the property shown as 7 Parkman Street on a plan entitled Spurr House, 7 Parkman Street, Westborough, Massachusetts, dated February 27, 2018, prepared by Westborough, GIS, on file with the Town Clerk, said property being approximately 9,127 square feet including improvements.*

*Furthermore, that the Town meeting vote authorizes the Town Moderator to appoint a committee (to be named the Spurr House Sale Advisory Committee) and requests that the BOS work with the Committee to assist and advise the BOS in the development of the sale process (i.e., RFP) and to assist in showing the property for sale.*

*The town Meeting vote shall provide for the following;*

- *Provide authorization to sell the property during a period of 18 months from the date of the Town Meeting vote on this article.*
- *The Spurr House Sale Advisory Committee shall be made up of one member from the Planning Board, one member from the Advisory Finance Committee, two members from the Neighborhood and one member at large.*
- *The Spurr House Sale Advisory Committee shall report back to each Town Meeting until a sale is complete or the authorization to sell has expired.*
- *The laws referred to earlier in the motion shall include Chap 30B, Section 16 (Real property; disposition or acquisition), specifically A, C and G therein.*

Case 23-40709 Doc 21-4 Filed 01/31/24 Entered 01/31/24 14:28:53 Desc Exhibit Page 31 of 32

*The Committee shall have a budget of $5000; these funds shall be transferred from Free Cash to accomplish the purposes of this article"*

Ha el Nourse - Motion to amend the main motion a member of the Historical Commission be added to the list of members of the Spurr House Sale Advisory Committee.
Amended motion to read as follows:

*The town Meeting vote shall provide for the following;*

*Provide authorization to sell the property during a period of 18 months from the date of the Town Meeting vote on this article.*

*The Spurr House Sale Advisory Committee shall be made up of one member from the Planning Board, one member from the Advisory Finance Committee, one member from the Historical Commission, two members from the Neighborhood and one member at large.*

*The Spurr House Sale Advisory Committee shall report back to each Town Meeting until a sale is complete or the authorization to sell has expired.*

*The laws referred to earlier in the motion shall include Chap 30B, Section 16 (Real property; disposition or acquisition), specifically A, C and G therein.*

*The Committee shall have a budget of $5000; these funds shall be transferred from Free Cash to accomplish the purposes of this article"*

ote: to amend the main motion
Yes 98
No 17
Amendment carries

**ote to the a ended ain otion**
**es**
**No**
**Motion carries a orit ote.**

**E Petitioned arrant rtic e p rr o se Petition**

To see if the Town will vote to rescind the Application to demolish the Spurr House and create the Spurr House "Preparation and Sale Committee" (the Committee), to be made up of two Parkman Street neighborhood members, one member from the Planning Board, one member from the Finance Committee and one member to be appointed by the Town Moderator. The Committee shall be empowered by the Town Meeting to execute the sale of the Spurr House on behalf of the Town. The sale process shall be governed by and shall follow the requirements of Mass General Law Chapter 30B, section 16 and specifically subsections a, c and g therein. The Committee shall have access to Town Counsel for the purpose of advising and recommending all documents required to complete the Sale process by the Committee on behalf of the Town. Any RFP created by the Committee shall maintain to the town that portion of the Spurr House lot to be reserved to the Town as indicated on the surveyed plan and to allow the lot sale such that a legal residential lot shall remain.

The Committee shall be provided all prior materials collected and/or created in the prior sale process attempt for this property, including the property appraised value, property survey, deed description, property drawing and opinions of Town Counsel. The Committee shall have free access to all town departments and resources to help accomplish the goal of the Committee which is to create an RFP, to properly bid and receive proposals to its RFP to sell the property, to properly notice the sale in local newspaper(s) and Central Register as required by MGL Chapter 30B, section 16 for disposal of real property. The committee shall have a budget of 5,000 and therefore requires the town to raise and appropriate, transfer from available funds 5,000 to accomplish the purpose of this article or such other amount as may be voted by Town Meeting or take any action there on.

<u>Mr. Doret, Motion</u>: *I move that the Town vote to pass over this article.*

**ote**
**es**
**No**

**Motion to pass o er**

Leigh Emery, BOS moves to dissolve the 2018 ATM.
**ote**
**es**
**No**
10:37 pm 2018 Annual Town meeting dissolved.

Given under our hands the 27th day of February in the year Two Thousand and Eighteen.

ss/Den il Drewry, Chairman

ss/Leigh Emery, ice Chairman

ss/George Barrette

ss/Ian Johnson

ss/Bruce Tretter

SELECTMEN OF WESTBOROUGH

Worcester, ss

I have this day served the within Warrant by posting up attested copies thereof at the Town Library Bulletin Board and Town Hall Bulletin Board in said Westborough and by mailing a copy thereof to the residence of the Town Moderator all on February 28, 2018.

ss/Constable of Westborough

Worcester, ss

Attest:
ss/Wendy L. Mickel, Town Clerk

# Exhibit D

This instrument must be filed for record or registration within 60 days from its date

STATE TAX FORM 301
Revised 3/2009

G.L. c. 60 §§53 and 54

**COMMONWEALTH OF MASSACHUSETTS**
**TOWN OF WESTBOROUGH**
**OFFICE OF THE COLLECTOR OF TAXES**

I, Robert C. Haley, Collector of Taxes for the Town of Westborough, acting under General Laws Chapter 60, Sections 53 and 54, hereby take for the city/town the real property described below:

## DESCRIPTION OF PROPERTY

PROPERTY: Land and any building(s) thereon CONTAINING: 29.336 AC (more or less)
LOCATION: 231 Turnpike Road
ASSESSORS: 32-48-0
REGISTRY: Worcester District Registry of Deeds Book 19369, Page 75

This land is taken because taxes, as defined in Chapter60, Section 43, assessed on the property to Westborough SPE LLC for the fiscal year 2018 were not paid within 14 days after a demand for payment was made on Westborough SPE LLC on June 4, 2018. After notice of intention to take the land was given as required by law, they remain unpaid along with interest and incidental expenses and costs to the date of taking as follows:

| | |
|---|---|
| Fiscal Year 2018 Taxes Remaining Unpaid | $ 106,944.99 |
| Interest to Date of Taking | $ 12,673.18 |
| Incidental Expenses and Costs to Date of Taking | $ 10.00 |
| Total for which Land is Taken | $ 119,628.17 |

Signature of Collector of Taxes

Executed as a sealed instrument on December 28, 2018

ROBERT C. HALEY
Printed/Typed Name of Collector of Taxes

**COMMONWEALTH OF MASSACHUSETTS**

Worcester District, ss

December 28, 2018

On this 28th day of December, 2018, before me, the undersigned notary public, personally appeared Robert C. Haley, proved to me through satisfactory evidence of identification, which were MA Drivers License, and personally known to me, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose, as Collector of Taxes for the City/Town of Westborough.

Signature of Notary Public

My commission expires April 23, 2021

DEBORAH E. LEDOUX
Notary Public
Commonwealth of Massachusetts
My Commission Expires April 23, 2021

Deborah E. Ledoux
Printed/Typed Name of Notary Public

THIS FORM APPROVED BY THE COMMISSIONER OF REV

ATTEST: WORC. Kathryn A. Toomey, Register

2019 00004568
Bk: 59943 Pg: 371
Page: 1 of 1 01/16/2019 02:16 PM WD

# Exhibit E

MSS/NRTHSIDE/COREA 7 36661

DECLARATION OF RECIPROCAL COVENANTS, EASEMENTS AND RESTRICTIONS

THIS DECLARATION OF RECIPROCAL COVENANTS, EASEMENTS AND RESTRICTIONS is made this 9th day of April, 1997, by **LESLIE S. CAREY, as Trustee of Northside Realty Trust** under a Declaration of Trust dated January 14, 1994 recorded with the Worcester District Registry of Deeds in Book 15975, Page 213, having a mailing address at 55 New York Avenue, Framingham, Massachusetts 01701 (hereinafter referred to as "Grantor").

**PRELIMINARY RECITALS**

A. Grantor is the owner of certain premises (the "Shopping Center Site") located on Boston-Worcester Turnpike and Milk Street in Westborough, Worcester County, Massachusetts, shown as Lot 1, Lot 2 and Lot 3 on a plan of land entitled "Compiled Plan of Land in Westborough, MA" dated July 14, 1995, with the latest revision date of February 15, 1996 prepared by Beals and Thomas, Inc., recorded with the Worcester District Registry of Deeds in Plan Book 706, Plan 56 (the "Plan"), and as shown on the Site Plan (defined below) attached hereto and made a part hereof as Exhibit B.

97 APR 16 AM 11:04

B. Grantor desires to provide for the joint development, operation and use of Lot 1, Lot 2 and Lot 3 as one integrated shopping center.

C. In order to provide for the integrated development, operation and use of Lot 1, Lot 2 and Lot 3, Grantor desires to provide for the benefit and burden, respectively, of Lot 1, Lot 2 and Lot 3, certain rights, easements, servitudes, charges, restrictions, and privileges, all as hereinafter provided.

NOW THEREFORE, the Grantor, for itself, its successors and assigns, declares that Lot 1, Lot 2 and Lot 3, are and shall be sold, conveyed, occupied and owned, subject to and with the benefit of the covenants, conditions, restrictions, easements, charges and liens hereafter set forth.

**ARTICLE I**

**DEFINITIONS**

**SECTION 1.1. TERMS DEFINED.**

Whenever used in this Agreement the terms defined in this Article shall have the meanings ascribed to them in this Article:

(a) "Abutting Highways" shall mean Boston-Worcester Turnpike (Route 9) and Milk Street, and any other road, street, avenue, highway or other public way abutting the

Return to Leslie S Carey
NEW ENGLAND MANAGEMENT
& REALTY CORP.
55 New York Avenue
Framingham, MA 01701

Shopping Center Site, or replacing in whole or in part said Boston-Worcester Turnpike or Milk Street.

(b) "Agreement" shall mean this Declaration of Reciprocal Covenants, Easements and Restrictions.

(c) "Common Areas" shall mean all portions of the Shopping Center Site shown on Exhibit A other than where buildings are located or are permitted to be located, and shall include parking areas, entrances and exits, roadways, walkways, sidewalks, traffic lanes, traffic signs, lighting fixture poles, landscaped areas, and other similar areas and facilities.

(d) "Condemnation" or "Condemn" shall mean (i) taking or appropriation of any portion of the Shopping Center Site pursuant to an exercise of the power of eminent domain, and (ii) (but only with the consent of the owners of the Shopping Center Site) any conveyance in lieu of condemnation, or under threat thereof, to a grantee having the power of condemnation with respect to the property in question.

(e) "Driveways" shall mean the areas shown and designated as such on Exhibit A.

(f) "Easement Plan" shall mean the plan entitled "Utility Services Exhibit Plan" dated March 20, 1997, prepared by Beals and Thomas, Inc., a copy of which is attached hereto as Exhibit C, showing the location of the Shopping Center easements.

(g) "Entrances and Exits" shall mean the portions of the on-site roadways of the Shopping Center Site immediately adjoining and connecting with Abutting Highways.

(h) "Lot 1" shall mean that portion of the Shopping Center Site designated as Lot 1 on the Plan.

(i) "Lot 1 Building" shall mean the building now or hereafter constructed on Lot 1 as shown on Exhibit A hereto and designated thereon as "Cinema Building".

(j) "Lot 1 Owner" or "Owner of Lot 1" shall mean the Owner or Owners (legally and beneficially) of record, at the relevant time, of all or any portions of Lot 1.

(k) "Lot 2" shall mean that portion of the Shopping Center Site designated as Lot 2 on the Plan.

(l) "Lot 2 Building" shall mean the building now or hereafter on Lot 2 as shown on Exhibit A hereto and designated thereon as "Restaurant/Retail".

(m) "Lot 2 Owner" or "Owner of Lot 2" shall mean the Owner or Owners (legally and beneficially) or record, at the relevant time, of all or any portions of Lot 2.

(n) "Lot 3" shall mean that portion of the Shopping Center Site designated as Lot 3 on the Plan.

(o) "Lot 3 Building" shall mean the building constructed on Lot 3 as shown on Exhibit A hereto and designated thereon as "Lot 3 Building".

(p) "Lot 3 Owner" or "Owner of Lot 3" shall mean the Owner or Owners (legally and beneficially) or record, at the relevant time, of all or any portions of Lot 3.

(q) "Common Sidewalk" shall mean the sidewalks (i) connecting the Reserve Parking Area to Milk Street and the parking area to the rear of the Lot 1 Building, (ii) connecting the parking area to the rear of Lot 1 to land now or formerly of Andrew J. Lane Company, and (iii) connecting the parking area on Lot 2 to the parking area on Lot 3, as more particularly shown on Exhibit A.

(r) "Occupant" shall mean any person legally entitled to the use and occupancy of any improvement on the Shopping Center Site, whether a Party or a tenant, subtenant, licensee or concessionaire in the Shopping Center Site.

(s) "Operator" shall mean the Owner of Lot 2 from time to time and any successor thereto designated in accordance with the provision of Section 3.1(H) below.

(t) "Owner" shall mean the owner (legally or beneficially) of record of the fee simple interest in a Parcel or portion of a Parcel.

(u) "Parcel", "Parcel(s)" or "Parcels" means Lot 1, Lot 2 and/or Lot 3, as the context may appropriately require.

(v) "Party" and "Parties" means the Owner of Lot 1, the Owner of Lot 2, and the Owner of Lot 3 from time to time, and their successors and assigns, except that:

(A) successors and assigns of less than a fee simple interest (such as tenants) are not Parties (unless covered by (B) below), and the predecessor or assignor that retains the fee simple title remains a Party;

(B) a Party that retains possession of a Parcel under a mortgage remains a Party, and the mortgagee is not a Party unless it takes possession after a default under the mortgage, provided however, that a mortgagee which takes possession under a so-called conditional assignment of lease shall not be a Party; and

(C) successors and assigns of less than all of a Parcel or of an undivided interest in a Parcel (such as joint tenants or tenants in common) are not Parties, and the predecessor or assignor remains a Party.

A Party ceases to have rights under this Agreement and shall no longer be a Party after it transfers its interest to an assign that qualifies as a Party. A former Party who has assigned or transferred its interest to a successor Party, is released from its obligations under this Agreement only after it (i) transfers its Parcel to a Person who qualifies as a Party; and (ii) pays all amounts and performs all obligations owed to the other Parties at the time of the transfer; (iii) notifies the other Parties of the transfer; and (iv) delivers to the other Parcel Owners an instrument in recordable form pursuant to which the transferee covenants to assume and carry out all of the covenants and obligations of the transferor under this Agreement. Until the transferring Party is so released from its obligations, both the transferring Party and the transferee Party are jointly and severally liable under this Agreement.

(w) "Permits" shall mean a Special Permit dated December 6, 1995 issued by the Town of Westborough Planning Board and recorded with said Deeds in Book ___, Page ___ * ; a Conditional Approval for Definitive Plan dated June 26, 1996 issued by the Town of Westborough Planning Board and recorded with said Deeds in Book ___, Page ___ ** ; and a variance issued by the Town of Westborough Board of Zoning Appeals dated October 6, 1996, notice of which is recorded with said Deeds in Book 18341, Page 191.

(x) "Permittees" shall mean the officers, director, partners, employees, agents, contractors, subcontractors, customers, patrons, clients, visitors, licensees and invitees of an Occupant.

(y) "Person(s)" shall mean an individual, partnership, firm, association, corporation, trust and any other form of legal entity, and the singular includes the plural.

(z) "Plan" shall mean that certain subdivision plan entitled "Compiled Plan of Land in Westborough, MA" dated July 14, 1995 prepared by Beals and Thomas, Inc., a copy of which plan is attached hereto and made a part hereof as Exhibit B.

(aa) "Protected Area" shall mean that portion of Lot 1 designated as "Protected Area" on Exhibit A.

(bb) "Site Plan" shall mean that certain plan entitled "Stage Coach Plaza Westborough, Massachusetts" dated February 20, 1997, prepared for New England Management & Realty Corp. by Beals and Thomas, Inc., a copy of which is attached hereto as Exhibit A.

(cc) "Shopping Center Site" shall mean Lot 1, Lot 2 and Lot 3.

(dd) "Termination Date" shall have the meaning given to said term in this Agreement.

* Instrument No. 36656
** Instrument No. 36655

(ee) "Utility Facilities" shall mean utility facilities (excluding laterals) now or hereafter installed in the Shopping Center Site, providing for water, gas, electricity, sanitary sewer, storm sewer, drainage, telephone or other utility service to the buildings and Common Areas from time to time located on the Shopping Center Site.

**SECTION 1.2. ADDITIONS, REPLACEMENTS OR ALTERATIONS.**

Any reference in any definition to any improvement whatsoever shall be deemed also to be a reference to any reconstruction, alteration or replacement thereof, unless the express language or context of such reference shall otherwise indicate.

## ARTICLE II

## GRANT OF EASEMENTS

**SECTION 2.1. DEFINITIONS AND DOCUMENTATION.**

This Article II sets forth the easements and the terms and conditions thereof which shall be binding upon each of the Parcels and the Owners, Occupants and Permittees thereof, and shall run with the land.

As used in this Article II, the word "in", in respect of an easement granted "in" a particular Parcel, shall be deemed to mean, as the context may require "in", "to" "on", "over", "through", "upon' "across", and/or "under". As to the easements herein granted:

(A) A particular easement in a Parcel shall bind and burden such Parcel which shall, for the purpose of this Article, be deemed to be the servient tenement;

(B) The grant of a particular easement in favor of a Parcel shall benefit such Parcel which shall, for the purposes of this Article, be deemed to be the dominant tenement;

(C) All easements granted in this Article II shall exist by virtue of this Agreement, without the necessity of confirmation by any other documents. However, the Owner of a Parcel shall, as to any easement, at the request of the Owner of any other Parcel, upon the submission of an appropriate document in form and substance reasonably acceptable to the Owner(s), execute and acknowledge such a document memorializing the existence, or the extinguishment (in whole or in part), or the release in respect of all or any portion of any Parcel, as the case may be, of any easement, in accordance with the terms and provisions of this Agreement.

(D) All easements hereby granted are, unless limited herein, irrevocable and shall have the duration herein specified.

SECTION 2.2. EASEMENTS.

(A) EASEMENTS FOR USE OF PARKING AREAS.

(1) The Owners, Occupants and Permittees of each Parcel are hereby granted easements to use the parking facilities and walkways in the Common Areas on the Shopping Center Site for the parking and passage of motor vehicles (so long as, with respect to trucks, there is no unreasonable interference with customer and employee parking), and passage by pedestrians.

(2) The Owners, Occupants and Permittees of each Parcel are hereby granted easements to use those portions of the Lots adjacent to the parking facilities in the Common Areas on the Shopping Center Site designated by the Operator for the storage of snow and ice collected from the removal of snow from the common areas, provided that there is no unreasonable interference with customer and employee parking), the use of the buildings on the Lots and passage by pedestrians.

(3) Except as otherwise provided in this Section, the easements provided in this Subsection (A) shall be for the joint, non-exclusive use of the Parcel Owners, the Occupants and others included as Permittees of any thereof.

(4) The easements provided in this Subsection (A) are perpetual.

(5) The aforesaid easements in the Common Areas on each Parcel for vehicle parking by the Occupants and Permittees of the Parcel(s) to which the easements is (are) appurtenant, are subject to the following limitations:

(a) Occupants' employees may not use such parking easements on the other Parcel(s), unless any portion of the other Parcel has been designated an employee parking area by the Owner thereof;

(b) Such parking easements may be used by a Permittee only as long as the Permittee is patronizing or otherwise has business with any of the Occupants of the Shopping Center Site; and

(c) Lot 2 and Lot 3 may use the respective parking easements to satisfy parking requirements imposed by the Town of Westborough Zoning By-Law to the extent of the aggregate building area now shown on Exhibit A. Without limiting the

foregoing, the Owners, Occupants and Permittees of Lot 2 are expressly granted the right and easement to use 15 of the parking spaces located on Lot 3 to satisfy the requirements of the Town of Westborough Zoning By-Law. At the request of the Lot 2 Owner, the Lot 3 Owner shall designate 15 specific parking spaces on Lot 3 for the exclusive use of the Owner, Occupants and Permittees of Lot 2.

(B) **EASEMENTS FOR ACCESS.**

(1) The Owners, Occupants and Permittees of each Parcel are hereby granted non-exclusive easements in the Driveways and sidewalks of the Common Areas on each Owner's Parcel for access to or from such Parcel by the Owner and the Occupants and Permittees of the Parcel to which such easement is appurtenant; and nonexclusive easements to use the roadways on the Common Areas and the Entrances and Exits on the Shopping Center Site to provide passage by motor vehicles (passenger and truck) and by pedestrians between each Parcel and between the Parcels and the Abutting Highways.

(2) The easements provided in this Subsection (B) shall be for the joint, non-exclusive use of the Parcel Owners, the Occupants and others included as Permittees of any thereof, except that loading docks located adjacent to any premises shall be for the exclusive use of the Occupant thereof and shall not be subject to the access easement granted hereunder.

(3) The easements provided in this Subsection (B) are perpetual.

(C) **EASEMENT FOR UTILITY FACILITIES.**

(1) The Owner of each Parcel is hereby granted the following easements in the other Parcels for Utility Facilities:

(a) easements for all pipe(s) comprising the Utility Facilities for the purpose of using, operating, maintaining, repairing, relocating, replacing or enlarging any of such Utility Facilities, subject to the provisions of Subparagraph (3) below. The term "pipe(s)", as used in this Subsection (C) shall mean "pipe(s)", and/or "line(s)", and/or "conduit(s)", and/or "wire(s)", and/or "cable(s)", and/or "other means of providing utility facilities", as the context may require.

(b) easements for the purposes of installing therein in the future, other pipe(s) not part of the Utility Facilities, to provide gas, water, fire loops and hydrants therefor, electric power, other forms of energy, signal, telephone, sanitary sewer and storm sewer services, or any of them, to or from any present or future facilities and for the purpose of using, operating, maintaining, repairing, relocating, replacing or enlarging any or all of such pipe(s), to the extent required by the facilities from time to time on the Parcels, subject to the provisions of Subparagraph (3) below; and

(c) easements for the purpose of installing pipe(s) to connect any and all of the pipe(s) comprising the Utility Facilities with any other facilities to the extent that the connection thereof is necessary to service such facility, and after any such connection, for the purpose of using, operating, maintaining, repairing, relocating, replacing or enlarging any or all of such pipe(s), subject to the provisions of Subparagraph (3) below.

(2) For the purpose of exercising the rights granted in Subparagraph (1) above, each Parcel Owner, and its respective employees, agents and contractors, shall have the right to enter upon and use the other Parcel to such extent and as long as reasonably necessary to accomplish such purposes, subject to the provisions of Subparagraph (3) below.

(3) The rights of any Parcel Owner to do any work under Subparagraph (1) above, to the extent that entry on another Parcel or work on pipe(s) which may be located across another Parcel are concerned shall be subject to the following conditions and requirements:

(a) the location of the easement shall be subject to the reasonable approval of the Parcel Owner on whose Parcel the Utility Facilities are to be located;

(b) not less than thirty (30) days prior written notice shall be given to the other Parcel Owner(s) that the Parcel Owner anticipates doing such work, together with notification of the proposed area of such work, and the anticipated date of start and completion of such work; but if the work involved is emergency repair work, only such advance notice, written or oral, as is reasonably practical, needs to be given;

(c) after such work, the pipe(s) in question shall be underground and not beneath or reasonably close to any buildings on the

other Parcel, but this Subparagraph (c) shall not require the moving of any pipe(s) installed prior to the date of execution hereof, nor permit any such work, if, as the result thereof, any Person(s) utilizing the Utility Facilities to provide utilities to or from improvements owned by it would be required to relocate any connection between the Utility Facilities and such improvement in order for such Person to continue to be able to utilize the Utility Facilities therefor, or if its ability so to utilize the same is otherwise materially adversely affected unless all such Person(s) shall consent to such work or the Parcel Owner proposing such work shall agree (and place the money therefor in escrow, if reasonably required by such Person[s]) to pay all costs (direct or indirect) which will be incurred by such Person(s) as a consequence of the performance of the work by such Parcel Owner;

(d) after the completion of such work, the Parcel Owner shall, at its own cost and expense, restore the portion of the other Parcel so used to as good condition as the same was in immediately prior to the commencement of such work; and

(e) the Parcel Owner shall exercise best efforts to minimize interference with use and enjoyment the other of Parcel by the Owner(s) of such Parcel.

(4) The easements granted pursuant to this Subsection C shall be located in the areas shown on the Easement Plan but, notwithstanding the foregoing, each Parcel Owner shall have the right to relocate any pipe(s) located on its parcel pursuant to an easement granted by this Subsection (c) within the applicable "Easement Relocation Area" shown on the Easement Plan if reasonably deemed by it to be necessary for the use and enjoyment of its parcel and if it complies with the conditions in Subparagraph (3) above.

(5) The easements provided in this Subsection (C) are perpetual.

(D) **EASEMENT FOR SELF-HELP.**

The Owner of each Parcel, its employees, agents and contractors, are hereby granted easements to enter upon the other Parcels for the purpose of performing any obligation which the other Parcel Owner is required to perform on the other Parcel, pursuant to the terms of this Agreement, but which such other Parcel Owner fails or refuses to perform and which the non-defaulting Parcel Owner has the right then so to perform under Section 7.2 hereof,

provided that the defaulting Parcel Owner is first served with notice and allowed the period of time set forth in Section 7.2 hereof to cure such default.

The Owner of each Parcel, its employees, agents and contractors, are hereby granted easements to enter upon the other Parcels for the purpose of performing any obligation which the Operator is required to perform pursuant to the terms of this Agreement, but which such Operator fails or refuses to perform and which the other Parcel Owners have the right then so to perform under Section 3.1(I) hereof.

In exercising the easements granted pursuant to this Subsection (D), the Parcel Owners shall use reasonable efforts to minimize any interference with or interruption of business conducted on the other Parcels.

The easements provided in this Subsection (D) are perpetual.

**SECTION 2.3. SIGNS.**

(A) Except as the parties may hereafter agree and as proved in Paragraph (B) below, no free standing signs shall be erected in the Shopping Center Site other than a pylon sign and a box sign at the locations shown therefor on Exhibit A hereto.

(B) If at any time in the future, necessary approvals and permits are obtained for the construction of a pylon sign at the entrance to Lot 1 on Milk Street listing any tenants (as opposed to a sign merely identifying the Shopping Center Site), then the Owner of Lot 2 and the Owner of Lot 3 shall each have, as appurtenant to their Lot, for the use of the Occupants of Lot 2 and the Occupants of Lot 3, an easement to install illuminated panel signs on such pylon sign at positions thereon located beneath any panel sign(s) installed by any Occupant(s) of Lot 1. Such signs shall be limited to identifying the Occupants of Lot 2 and Lot 3, and shall conform to all applicable rules, regulations and by-laws of the Town of Westborough. The panel signs erected on the pylon sign shall be maintained by the Occupants utilizing such signs at the sole cost and expense of such Occupants.

(C) The Owner of Lot 1 and the Owner of Lot 3 shall each have, as appurtenant to their Lot, for the use of the Occupants of Lot 2 and the Occupants of Lot 3, an easement to install illuminated panel signs on the pylon sign at the entrance to Lot 3 on Boston-Worcester Turnpike (Route 9) at positions thereon located beneath the reader board installed by any Occupant(s) of Lot 1. Such signs shall be limited to identifying the Occupants of Lot 2 and Lot 3, and shall conform to all applicable rules, regulations and by-laws of the Town of Westborough. For so long as Lot 1 is used for a cinema, the Owner of Lot 1 shall have as appurtenant to Lot 1 for the use of the Occupants of Lot 1 an easement to use the reader board on such pylon sign for the designation of films showing in the Lot 1 Building and the owner of Lot 1 shall maintain such reader board at its sole cost and expense.

(D) No exterior signs shall be erected or placed on any premises in the Shopping Center Site except non-flashing and non-moving signs which, in size and number, shall have a reasonable relationship to the premises to which they relate, and which comply with all local zoning and other applicable governmental requirements. Neither the Parcel Owner nor any tenant or Occupant of the Shopping Center Site shall paint signs on or affix paper signs to any part of the exterior of the buildings in the Shopping Center, or in any windows. All exterior signs shall be placed upon the marquee or against the parapet of each store. Notwithstanding any of the foregoing provisions of this Section, any national or regional "chain store" tenant may have a reasonable number of signs designating its parcel pick-up stations(s) (if any) and non-moving, non-flashing signs on the exterior of its store of the same number, size, design and degree of illumination as are customarily utilized by it for a majority of its other stores of substantially the same size. All Parcel Owners shall engage only the sign company or companies designated from time to time by the Operator for the erection and placement of signs in the Shopping Center or shall obtain the prior written approval of the Operator to use any other sign company or companies.

**SECTION 2.4. AMENDMENT OF EASEMENTS.**

Any of the easements, rights or licenses granted hereby may only be released, extinguished, amended, waived or modified by instrument in recordable form, executed by all of the Owners with the written consent of the holders of all mortgages encumbering the Parcels and recorded.

**SECTION 2.5. CONTROL.**

Each Party may, utilizing reasonable means, exclude unauthorized persons or prevent unauthorized acts in the Common Areas. Each Party may restrict access to its Parcel on any one day that the Occupant(s) of the other Parcel are not open for business as necessary to prevent the acquisition of prescriptive rights by anyone, but shall notify the other Party of its planned closing and shall coordinate the closing with the other Party to minimize interference with the operation of the Shopping Center Site.

## ARTICLE III

## MAINTENANCE, MANAGEMENT AND OPERATION OF SHOPPING CENTER COMMON AREA AND COMMON UTILITY FACILITIES

**SECTION 3.1. COMMON AREA OPERATION AND MAINTENANCE.**

(A) Commencing on the date that the first Occupant within the Shopping Center Site opens for business (the "Operation Commencement Date"), the Lot 2 Owner (for purposes of this Section 3.1 called the "Operator"), shall, until it shall be removed for cause, elect otherwise, in both cases in accordance with the provisions of Section I below, operate and maintain or cause to be operated and maintained the Common Area of the Shopping

Center Site in accordance with, and subject to, the terms and conditions of this Section 3.1. Such operation and maintenance of the Common Area shall include, but not be limited to:

(1) Maintaining the surfaces of the driveways, entrances and exits, parking areas and common sidewalks in a level, smooth and evenly covered condition with the type of surfacing material originally installed or such substitute as shall in all respects be equal in quality, use, and durability;

(2) Maintaining the bridge for the driveway connecting Lot 2 to Lot 3;

(3) Maintaining the sewage pump station located on Lot 3 (unless and until the same shall be maintained by public authority);

(4) Removing all papers, debris, and refuse and sweeping the Common Area to the extent reasonably necessary to keep the Common Area in a neat, clean, and orderly condition;

(5) Placing, keeping in repair, and replacing any necessary directional signs, markers, and lines, and operating, keeping in repair, and replacing when necessary such artificial lighting facilities as shall be reasonably required (such lighting to be operated during those hours of darkness when any Occupant is conducting its business within the Shopping Center and until one (1) hour after closing of business; provided, however, that if illumination is required by any Occupant after ten (10) o'clock p.m., such Occupant shall pay for the cost of such illumination on a pro rata basis with any other Occupants also requesting such additional illumination, such pro rata basis to be in accordance with the square footage of the premises of such Occupants);

(6) Maintaining all Utility Facilities used to provide services to more than one Lot (unless maintained by any public authority);

(7) Paying any utility costs for which the Common Area may be separately metered if such is the case;

(6) Maintaining all landscaped areas, making such replacements of shrubs, and other landscaping as is necessary, and keeping said areas at all times adequately weeded, mowed and watered, except for such of the same as shall be the responsibility of the Lot Owners pursuant to Section 3.3 hereof;

(8) Maintaining the box and monument or pylon signs (other than the panels to be maintained by the Lot Owners) located within the Common Area as shown on Exhibit A in good order and condition;

(9) Snow and ice removal from and the sanding of driveways, parking areas, exits and entrances and Common Sidewalks;

(10) All costs incurred with respect to, and the perpetual maintenance of, the traffic signal at the intersection of Oak Street and the entrance to the Shopping Center, including, without limitation, any costs or obligations incurred by the Operator pursuant to any traffic signal maintenance agreement between the Operator and the Town of Westborough;

(11) Providing such off-site services as shall be required by the Permits or as otherwise shall be required by applicable public authority for the use of the Shopping Center Site as a whole, as opposed to such of the same as may be required by the particular use made of the Lots by the Owners, Occupants and Permittees thereof; and

(12) The employment of such personnel as is reasonably necessary to accomplish the foregoing and securing such insurance as is required in connection with such employment.

(B) As a part of said operation, the Operator shall obtain and maintain general public liability insurance insuring the Operator and all Parcel Owners, Occupants and the holders of all mortgages encumbering the Parcels, as their respective interest may appear, provided that the Operator is notified in writing of such Occupants and mortgagees, against claims for personal injury, death, or property damage occurring in, upon, or about the Common Area. The limits of liability of all such insurance shall not be less than Ten Million Dollars ($10,000,000.00) combined single limit for personal injury, death, and damage to property. Such liability insurance policy shall be primary to any other liability policy carried by any Parcel Owner and shall include blanket contractual liability coverage for the liability assumed under Section 11.3 hereof. All such insurance shall be maintained in force commencing upon the Operation Commencement Date. The Parcel Owners may agree on higher limits of insurance consistent with standards for first class shopping centers. All of the insurance required to be maintained pursuant to this Subsection (B) shall be effected under valid and enforceable policies of insurance issued by insurers of recognized responsibility licensed to do business in the Commonwealth of Massachusetts and shall contain an agreement by such insurer to give at least ten (10) days prior written notice to the other Parcel Owners (and any other parties named as insureds therein) in the event of cancellation or material change in the coverage or amount of insurance so provided. A certificate evidencing renewal or replacement of the policies required by this Subsection (B) shall be delivered to each Parcel Owner (and any other party named as an insured under the then existing policy) within ten (10) days after the Operation Commencement Date and thereafter a certificate evidencing the renewal or replacement of the policies required by this Subsection (B) shall be delivered to each Parcel Owner (and any other party named as an insured under the then existing policy) at least thirty (30) days prior to the expiration thereof.

(C) The Operator shall, from time to time, but not more often than once each calendar month, send to each Parcel Owner a written statement of the total costs and expenses of operation and maintenance including, but not limited to, those items set forth in Subsections (A) and (B) hereof and any expenses allocated in accordance with Subsection (E) below (said statement to be accompanied by such bills, invoices, and other documentation as shall be necessary for proper analysis of such expenses). The Operator shall also be entitled to a management fee of ten percent (10%) of the total of such costs for the preceding period. Within thirty (30) days after receipt of such statement, each Parcel Owner shall pay, or cause to be paid, to the Operator its pro rata share of the total amount of said costs and expenses as set forth in Subsection (D) below. In the alternative, the Operator may elect to estimate the total costs and expenses of such maintenance and operation and the corresponding management fee on an annual basis and to render to each Parcel Owner a written statement of pro rata share of the same. Until such estimate shall be revised or such method of estimation shall be terminated by the Operator, each Parcel Owner shall pay to the Operator 1/12 of its pro rata on the first day of each month thereafter. At the end of the year chosen by the Operator for billing on an estimated basis, or at such earlier time as the Operator shall elect to cease billing on an estimated basis, Operator shall calculate the actual amount of such costs and expenses incurred during such period and refund any excess to the Parcel Owners or bill the Parcel Owners for their pro rata share of any deficiency and the Parcel Owners shall pay the Operator the same within thirty days after such bill. Notwithstanding the foregoing, for so long as the Owner of Lot 2 is the Operator, the Operator shall be entitled to a minimum management fee of $41,872.00 per annum. Immediately following any calendar year in which the management fee billed to the Parcel Owners in accordance with the foregoing shall be more than $41,872.00, the Parcel Owners shall thereupon pay to the Operator their pro rata share of the difference between the amount billed and $41,872.00.

(D) In the event that the Operator reasonably shall determine that any item of work for which Operator is responsible will cost more than $25,000.00 in the aggregate, Operator may assess the Lot Owners for their proportionate share thereof prior to the commencement of such work by written notice of assessment to the Lot Owners. Each Lot Owners share of such assessment shall be due and payable to the Operator within 15 days after the receipt of such notice of assessment.

(E) The Common Area maintenance expense, including any assessment therefor, shall be prorated among the Parcel Owners as follows:

| | |
|---|---|
| Lot 1 | 57.6% |
| Lot 2 | 35.8% |
| Lot 3 | 6.6% |
| Total | 100% |

The foregoing percentages shall be each Parcel Owner's "proportionate share" of Common Area maintenance expense.

Notwithstanding the foregoing, certain of the costs and expenses of the operation and the maintenance of the Shopping Center shall be allocated to the various Parcel Owners as follows:

1. All of the costs of providing police details or traffic control measures required by the Permits or otherwise required on account of the operation of a theatre on Lot 1 will be allocated to the Lot 1 Owner.

2. The costs of maintaining those portions of the pylon sign identifying the theatre on Lot 1 and the films being exhibited in the Lot 1 building (as opposed to the structure of the same) will be allocated to the Lot 1 Owner. The costs of those portions of the pylon sign identifying the occupants of Lots 2 and 3 shall be allocated to the Owner of Lots 2 and 3. The Operator shall include any such changes in the written statements provided for in Subsection (c) above.

F. If any Parcel Owner shall fail to pay in a timely manner its pro rata share of the Common Area maintenance expenses, the same shall be deemed delinquent, and the amount thereof shall bear interest thereafter at the rate provided in Section 7.1 until paid. Any and all delinquent amounts with said interest shall be a lien and charge upon all of the property of such Parcel Owner in accordance with Section 7.3 hereof.

G. Nothing contained in this Section 3.1 shall affect the right of any Parcel Owner to assess its Occupant(s) for Common Area maintenance expenses and for such management fees as the owner deems appropriate, subject, however, to any limitations contained in its rental agreement(s) with any such Occupant(s).

H. The Operator shall indemnify, defend (if requested), and hold the other Parcel Owners harmless from all claims and losses, and all costs and expenses relating thereto (including reasonable attorney's fees) arising out of or from (a) any occurrence in the Common Area, unless the claim or loss results from the negligence of another Parcel Owner or the Occupants of such other Parcel Owner's Parcel, or (b) any failure by Operator to perform imposed on the Operator under this Agreement, or the breach of such obligation.

I. Notwithstanding any preceding provisions of this Section 3.1 which may be to the contrary, should the Owner of Lot 2 elect to resign as Operator by written notice to either one of the other Parcel Owners, the Parcel Owners shall, within thirty (30) days thereafter, proceed to reach an agreement among themselves as to who shall assume the duties, obligations rights, and remedies of the Operator set forth herein. In the event that such agreement has not been reached within said thirty (30) day period, then the Parcel Owners shall employ an independent party or entity as the new Operator to assume the rights and obligations provided for hereunder. Any agreement of the Parcel Owners hereunder shall require the agreement of the owners of not less than sixty percent (60%) of the proportionate share of the Common Area maintenance expense of the Shopping Center, based upon the ground floor area of the buildings on each Parcel Owner's Parcel.

In addition to the foregoing, the Parcel Owners shall have the right to remove the Operator "for cause" pursuant to the following provisions:

1. The Parcel Owner's owning not less than sixty percent (60%) of the proportionate share of the Common Area maintenance expense of the Shopping Center may remove the Operator upon thirty (30) days prior written notice; and

2. For so long as Lot 2 and Lot 3 are in common ownership, if the Lot 1 Owner, in its reasonable judgment, feels that Operator's maintenance and operation of the Common Areas does not meet the general shopping center standards prevailing in the market area in which the Shopping Center is located, the Lot 1 Owner shall notify Operator specifying the Lot 1 Owner's reasons. Operator shall have a period of sixty (60) days after receipt of the Lot 1 Owner's notice within which to attempt to cure the problems set forth in the Lot 1 Owner's notice. Prior to the end of the sixty (60) day period, Operator and the Lot 1 Owner agree to discuss the corrective actions taken by Operator. In the event, the Lot 1 Owner, in the Lot 1 Owner's reasonable judgment, still feels that Operator's maintenance and operation of the Common Areas does not meet general shopping center standards, the Lot 1 Owner shall have the right, upon not less than thirty (30) days prior written notice to Operator, to assume the maintenance obligations of Operator pursuant to this Agreement and the Lot 1 Owner must honor, pay and perform all outstanding maintenance contracts (of not more than one year in duration) that Operator had entered into in good faith, unless such maintenance contracts may be terminated without cost to the Operator.

J. In addition to the foregoing, except to the extent that any such failure is caused by any of the causes set forth in Section 7.5 hereof, if the Operator shall fail to perform its maintenance obligations hereunder or fail to provide the required insurance, then any other Parcel Owner may, upon ten (10) days' prior notice to the Operator, do so, and the curing Parcel Owner may then bill the Operator for the expense incurred. If immediate remedial action is necessary to protect the interest of a Parcel Owner in the Shopping Center Site or its Parcel, or to prevent the interruption or further interruption of the conduct of business on such Parcel Owner's Parcel or in the Shopping Center Site (including, without limitation, interruption which may result if snow is not removed promptly from the paved parking areas or if burned out or malfunctioning parking lot lighting is not promptly repaired), or to prevent injury to persons or damage to property, than a Parcel Owner may cure a default by the Operator without the requirement of the ten (10) day notice hereunder, but after oral or written notice to the Operator.

If the Operator shall not pay said bill within fifteen (15) days, the curing Parcel Owner shall have a lien on the property of the Operator for the amount of said bill, which amount shall bear interest at the rate set forth in Section 7.1 hereof until paid; provided, however, that such curing Parcel Owner shall also have the right to bill the other Parcel Owners for their pro rata shares of the costs incurred, and provided, further, that any such lien shall be subject to the provisions of Section 7.3 below. The foregoing shall not be construed as preventing the Operator from assessing the other Parcel Owners for their pro

rata share of the amounts reimbursed by the Operator to the curing Parcel Owner (except as to any amounts previously paid by the other Parcel Owners directly to the curing Parcel Owner pursuant to the foregoing); provided, however, that the Operator shall not be entitled to a management fee as to such amounts and shall not be entitled to reimbursement for any interest or collection costs paid by the Operator to the curing Parcel Owner.

K. In the event that an Operator ceases to have an obligation to perform the duties described herein, said Operator shall cease to have any liability or responsibility for any acts, events, or circumstances occurring subsequent to and not as a result of its performance or non-performance of its duties while Operator.

L. During any period of time when no person is obligated to maintain the entire Common Area, each Parcel Owner shall have the obligation to maintain its own Parcel in accordance with Subsection (A) above.

**SECTION 3.2. LIABILITY INSURANCE.**

Each Parcel Owner shall cause to be maintained general liability insurance against claims of bodily or personal injury and death and property damage occasioned by accident or other event occurring in or upon, or resulting from a condition existing upon, or arising from its Parcel, with limits of at least $10,000,000 (combined single limit). Such liability insurance policy shall be primary to any other liability policy carried by any Parcel Owner and shall include blanket contractual liability coverage for the liability assumed under this Agreement. All such insurance shall be maintained in force commencing upon the date of the execution of this Agreement. The Parcel Owners may agree on higher limits of insurance consistent with standards for first class shopping centers. All of the insurance required to be maintained pursuant to this Subsection (D) shall be effected under valid and enforceable policies of insurance issued by insurers of recognized responsibility licensed to do business in the Commonwealth of Massachusetts and shall contain an agreement by such insurer to give at least ten (10) days prior written notice to the other Parcel Owner (and any other parties named as insureds therein) in the event of cancellation or material change in the coverage or amount of insurance so provided. A certificate evidencing renewal or replacement of the policies required by this Subsection (D) shall be delivered to each Parcel Owner (and any other party named as an insured under the then existing policy) within ten (10) days after the date of recording of this Agreement and thereafter a certificate evidencing the renewal or replacement of the policies required by this Subsection (D) shall be delivered to each Parcel Owner (and any other party named as an insured under the then existing policy) at least thirty (30) days prior to the expiration thereof.

**SECTION 3.3. MAINTENANCE OF SHOPPING CENTER SITE.**

Each Parcel Owner, at its sole cost and expense, shall maintain the exterior of the improvements (whether or not occupied) on its Parcel and unimproved areas in a clean and neat condition, including:

(A) **Sidewalks** - maintaining the sidewalks other than the common sidewalks;

(B) **Building Landscaping** - maintaining the landscaped areas; including mowing, weeding, watering, raking and fertilizing, and promptly replacing unrecoverable diseased or dead plantings;

(C) **Canopy, Gutters** - maintaining the canopy and the gutters and downspouts on the buildings; and

(D) **Rear Building and Canopy Lighting** - maintaining the rear building and canopy lighting in good working condition and replacing burned-out bulbs promptly.

**SECTION 3.4. OPERATION OF SHOPPING CENTER SITE.**

Each Parcel Owner shall perform or cause to be performed the following obligations on its Parcel:

(A) **Trash** - pick up trash and debris daily in and empty trash receptacles and dumpsters serving the Parcel and keep them reasonably free of vermin;

(B) **Rear Building and Canopy Lighting** - light the rear building from dusk until at least 12:00 midnight each day of the week, and light the canopy lighting from dusk until at least 10:30 p.m. each day of the week; and

(C) **Sidewalk** - sweep the sidewalks, other than the common sidewalks, weekly and promptly remove snow and ice from the sidewalk.

**SECTION 3.5. ADDITIONAL COVENANTS RESPECTING THE COMMON AREAS.**

The Parcel Owner of Lot 2, acting as the Operator, covenants and agrees to construct, or cause to be constructed, the Common Areas shown on Exhibit A, including, without limitation, the Common Sidewalk, the Driveways, the Entrances and Exits, and the Utility Facilities, which construction shall be substantially complete on or before June 15, 1997, subject to delay for causes set forth in Section 7.5 of this Agreement.

Each Parcel Owner covenants and agrees with respect to its Parcel, as follows:

(A) It will not change, modify or alter the size or location of the Common Areas on its Parcel as shown on Exhibit A hereto, or change the configuration of, alter the location of or reduce the size of, or eliminate any of the parking spaces, driveways, accessways or Entrances and Exits located on its Parcel as shown on Exhibit A.

(B) It will not use or permit the use of the Common Area(s) on its parcel for any purpose other than the parking and passage of vehicles and movement of pedestrian traffic, landscaping, directional and traffic control signals, and it will not construct or locate, or allow construction or location of, any fence, barricade, structure, building, or other obstruction which would interfere with the intended use thereof, or the free flow of traffic to, across or from the parking areas on its Parcel, except to the extent reasonably required for, or appropriate in connection with:

(1) the proper exercise of the easements granted pursuant to Article II hereof, or any rights specifically granted to the Parcel Owners under this Agreement, and

(2) the performance by each Parcel Owner of its maintenance obligations set forth in this Agreement.

(3) the construction and maintenance of such perimeter fences and barricades as shall be required by public authority.

(C) The Common Areas of the Parcels shall not be used for sales of advertising purposes or for the operation of amusement devices.

(D) Each Parcel Owner shall use reasonable efforts to cause its Occupants to cause their employees to park their vehicles in any designated areas on their Parcels, provided that no portion of the Protected Area shall be designated for employee parking.

(E) There shall be no charge made for the use of the Common Areas in addition to the costs to be assessed to the Parcel Owners in accordance with the provisions of this Article IV.

**SECTION 3.6. NO ENLARGEMENT.**

There shall be no enlargement to any Parcel such that the Shopping Center Site is enlarged.

**SECTION 3.7. ADDITIONAL COVENANTS RESPECTING BUILDINGS.**

No Parcel Owner shall place or erect any structures or improvements on its Parcel except (i) the present and proposed buildings (in the locations therefor) shown on Exhibit A, containing at most, the amounts of ground floor area designated on Exhibit A; (ii) and additions to stores if and to the extent shown on Exhibit A and (iii) subject to the provisions of this Agreement, the Common Areas and Utility Facilities; provided, however, notwithstanding the foregoing, the operator and owner of Lot 2 and Lot 3 expressly reserve, and shall have, the right to enlarge the present and proposed buildings and to construct additional buildings on Lot 2 and Lot 3 respectively, as long as: (a) such buildings do not

materially interfere with the driveways, entrances or exits of the Shopping Center; and (b) the total ground floor area of buildings on Lot 2 or Lot 3, as the case may be, does not exceed the maximum amount of ground floor area permitted to be constructed on such Parcels pursuant to the Special Permit (referenced in the definition of Permits above).

No building or structure constructed in the Shopping Center Site shall contain a basement or floor space above the ground floor level except for mezzanines in the Lot 1 Building, provided that any such mezzanine located in Lot 1 Building shall be used solely for non-selling purposes. No covered or uncovered outdoor area shall be placed in the Shopping Center Site unless shown on Exhibit A or located within an area where building is permitted.

Each Parcel Owner agrees that all construction performed by it or on its behalf shall be done in a diligent, good, and workmanlike manner with the use of first class materials, and in accordance with all applicable building and zoning laws and all other laws, ordinances, orders, codes, rules, regulations and requirements of all federal, state, municipal, public and governmental agencies and governments.

**SECTION 3.8. RELEASE OF LIABILITY AND MUTUAL WAIVER OF SUBROGATION.**

(A) Each Parcel Owner (the "Releasing Party") hereby releases each of the other Parcel Owners (the "Released Party") from any liability which the Released Party would, but for this Section, have had to the Releasing Party during the term of this Agreement resulting from the occurrence of any casualty against which the Releasing Party carries insurance, or is required to carry insurance, which casualty may have resulted in whole or in part from any act or neglect of the Released Party, its servants, agents or employees, other than the willful act of the Released Party, its servants, agents or employees; and to the extent permitted by law, each Releasing Party will also release from all such liability any Person holding under the respective Released Party from any such liability to it, as if such Person were expressly a party to this Agreement with the Releasing Party.

(B) All releases which are the subject of this Section 3.7 shall be effective (i) only for so long as and to the extent that policies (if any) insuring the interest of the Releasing Party hereunder, contain a clause providing in effect that such release will not vitiate or adversely affect such policy or the right of the insured to recover thereunder, and (ii) only for so long as and to the extent that such release is reciprocal as to the Releasing Party. Each Party shall obtain a clause as described in (i) above in each of its policies, if it is available, and if no additional premium is charged therefor. If a Releasing Party maintains insurance and is unable to obtain such a clause, or if a material additional premium is charged therefor, the Releasing Party shall promptly notify the Released Party whereupon the Releasing Party shall have

no obligation to obtain such a clause unless, in case a material additional premium is charged therefor, the Released Party agrees to pay the amount of the additional premium within ten (10) business days after notice to the Released Party of the applicability of this sentence and of the additional amount and thereafter promptly pays such amount.

**SECTION 3.9. CLEARING OF AREA.**

If any Parcel Owner shall not be obligated to, and shall elect not to, repair, reconstruct, or replace all or any portion of any improvement on its Parcel damaged by fire or other casualty, such Parcel Owner shall, nevertheless, cause the portion of such improvement not so replaced, reconstructed, repaired or restored to be demolished in its entirety and replaced with paved parking facilities or landscaped area comparable to the paved parking facilities or landscaped area, as the case may be, then existing within the parking areas.

**SECTION 3.10. MECHANICS' LIENS.**

If a mechanic's lien is filed against any Parcel in connection with any work or construction done on another Parcel, the Party permitting or causing the lien to be filed shall take prompt action to protect the Parcel upon which such lien has been filed and the Parcel Owner which owns such Parcel, such action to include removal of such lien if requested by the Parcel Owner of the Parcel upon which such lien has been filed, or if required by any Mortgagee, purchaser or lessee of such Parcel or a portion thereof.

**SECTION 3.11. EFFECT OF CONSTRUCTION ON SHOPPING CENTER SITE OPERATION.**

Each Parcel Owner shall take reasonable necessary safety measures to protect the other Parcel Owner and its Occupants and Permittees from injury or damage by work or construction performed on its Parcel. Each Parcel Owner shall do its work and construction so that it does not unreasonably interfere with the Occupants and Permittees on the remainder of the Shopping Center Site and shall erect protective fences and other safeguards so that businesses on the other Parcel Owner's Parcels can continue operating during work and construction on its Parcel. Each Parcel Owner shall confine its construction activities to an area within a 10' radius of the building lines for the building(s) on its Parcel as shown on Exhibit A, and all materials and equipment used in such construction shall be stored solely within the boundaries of the Parcel on which such construction is being performed, provided that the Lot 1 Owner shall not store any materials or equipment south of the third row of parking on the southerly side of the Lot 1 Building. Each constructing Parcel Owner shall restore all areas it disturbs on any other Parcel Owner's Parcel to their condition prior to construction.

## ARTICLE IV

## EXCULPATION

No Parcel Owner, and no partner, shareholder, fiduciary or disclosed or undisclosed principal of any Parcel Owner and no officers, directors and stockholders of a Parcel Owner or on the part of the officers, directors and stockholders of any corporate successor in interest of a Parcel Owner or on the part of the members of any firm, partnership, or joint venture if any successor in interest be a firm, partnership, or joint venture (all, in this Article IV, being included in the meaning of the expression "Parcel Owner"), shall be under any personal liability with respect to any of the provisions of this Agreement, and if any Parcel Owner is in breach or default with respect to such Parcel Owner's obligations, or otherwise under this Agreement, the other Parcel Owner shall look solely to the interest of the defaulting Parcel Owner in its Parcel for the satisfaction of any monetary obligations of such defaulting party. It is expressly understood and agreed that each Parcel Owner's liability hereunder for monetary obligations shall in no event exceed such Parcel Owner's equity interest in its Parcel.

No provision of this Article shall be deemed to excuse any default or other breach on a Parcel Owner's part nor shall any right or remedy of any other Parcel Owner be thereby otherwise limited or derogated, including, without limitation, the right to injunctive or other equitable relief.

No provision of this Article shall operate to limit or derogate from each Parcel Owner's rights or remedies as to funds accruing from any eminent domain proceeding or the proceeds of any insurance (for which each Parcel Owner(s) shall remain personally liable) nor shall they render one Parcel Owner liable for the obligations or other liabilities of any other Parcel Owner to others.

Notwithstanding the foregoing, no provision of this Article shall be construed to affect the obligation of the Lot Owners to reimburse the Operator for the costs incurred by Operator in the performance of its obligations hereunder or to pay the Operator for the associated management fee as provided herein, which obligation shall remain the unlimited personal liability of each Parcel Owner.

## ARTICLE V

## REAL ESTATE TAXES, WATER AND SEWER RENTS AND OTHER CHARGES

### SECTION 5.1. COVENANT TO PAY.

Each Parcel Owner respectively covenants to pay, before any penalty may be added thereto for the non-payment thereof, with respect to its respective Parcel, all real estate taxes and assessments thereon, all water and sewer rents thereon, all utility charges for its Parcel,

all assessments hereafter made by governmental authorities for improvements on its Parcel, and all other liens, assessments, impositions, or other charges for the non-payment of which a lien could be imposed upon its Parcel (all of the foregoing being herein called a "Tax").

**SECTION 5.2. RIGHT TO CONTEST OR APPEAL.**

Each Parcel Owner, respectively, shall have the right to contest the validity of the amount of any Tax levied against its Parcel by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such tax, pay same under protest, or take such other steps as it may deem appropriate; provided, however, such Parcel Owner shall take no action or defer payment beyond such period as shall cause or allow the institution of any foreclosure proceedings or similar action against its Parcel.

## ARTICLE VI

## CONDEMNATION/FIRE AND CASUALTY

**SECTION 6.1. RESTORATION.**

If any portion of a Parcel is taken by Condemnation, this Agreement shall not be affected thereby, except that the portion of such Parcel so taken shall be relieved and released from the terms of this Agreement, and the Parcel Owner whose Parcel was subject to such Condemnation shall apply the proceeds of the Condemnation Award attributable thereto (subject to the prior rights, ff any, of the Mortgagee of such Parcel) and such additional funds as may be necessary, to the restoration of the remaining parking areas on its Parcel as near as possible to the condition which existed prior to the Condemnation.

**SECTION 6.2. WAIVER OF AWARD.**

The provisions of this Article VI are intended to establish the rights as between the Parcel Owners in the event of a Condemnation and such provisions shall not limit, affect or prejudice the claims which may be asserted by the Parcel Owners against the Condemnor. The Condemnation Award in respect of Condemnation, whether before or after the Termination Date, shall, as between the Parcel Owners, belong to the Parcel Owner(s) of the Parcel(s) affected by such Condemnation; provided, however, that each Parcel Owner who enjoys any easement, right or interest created by this Agreement in a Parcel shall be entitled to make its own separate claim against the Condemnor for the value attributable to any such easement, right or interest to the extent that such easement no longer benefits the Parcels not so Condemned, provided that such claim shall not affect the claim of the Parcel Owner of the Parcel affected by such condemnation.

**SECTION 6.3. FIRE INSURANCE.**

Each Parcel Owner agrees to maintain fire and extended coverage insurance in "all risk" form on the buildings located on its Parcel in the full amount of their replacement cost, subject to the maintenance of commercially reasonable and customary "deductibles" and co-insurance provisions.

**SECTION 6.4. DAMAGE.**

(A) If any building in the Shopping Center Site is damaged by fire or other casualty, the Parcel Owner on whose Parcel the building is located shall either promptly (i) repair or rebuild the building to at least its prior condition, or (ii) raze the building, fill in any excavation, pave or plant grass in the area affected by the damage, and perform such other work needed to put the area in a sightly condition.

(B) If any parking area, driveway or other Common Area is damaged by fire or casualty, the Parcel Owner on whose Parcel such area is located shall either promptly (i) repair or rebuild the area to at least its prior condition, or (ii) perform such work needed to put the area in a sightly condition.

(C) Notwithstanding the foregoing, the following provisions will apply to damage to the Lot 1 Building resulting from fire or other casualty:

1. PARTIAL DAMAGE. In case the Lot 1 Building shall be partially damaged, but not substantially damaged (as that term is hereinafter defined) by fire, by any hazard included within so-called extended coverage and all risk endorsements, or by casualty, the Lot 1 Owner shall forthwith proceed to repair such damage and restore the Lot 1 Building to substantially its condition at the time of such damage (subject, however, to zoning and building laws then in existence).

2. SUBSTANTIAL DAMAGE. In case the Lot 1 Building shall be substantially (as that term is hereinafter defined) damage or destroyed by fire or other casualty, the risk of which is covered by the Lot 1 Owner's Fire Insurance, the Lot 1 Owner shall, proceeding with all reasonable dispatch after such damage and the determination of the net amount of insurance proceeds available to the Lot 1 Owner, expend so much as may be necessary to, repair or rebuild the Lot 1 Building to substantially its condition at the time of such damage or destruction (subject, however, to building and zoning laws then in existence), but the Lot 1 Owner shall not be responsible for any delay which may result from any cause beyond its reasonable control. so long as the Lot 1 Owner has maintained the insurance coverage required hereunder, should the net amount of insurance proceeds to insufficient to cover the cost of

restoration, the Lot 1 Owner shall not be responsible for any such insufficiency and shall not required to complete such restoration.

3. SUBSTANTIAL DAMAGE AFTER DECEMBER 31, 2007. However, in case the Lot 1 Building shall be substantially damaged or destroyed by fire any hazard included within so-called extended coverage and all risk endorsements, or by casualty, on or after December 31, 2007, the Lot Owner shall have no obligation under this subparagraph to restore the Lot 1 Building.

4. DEFINITION OF SUBSTANTIAL DAMAGE. The terms "substantially damaged" and "substantial damage" as used in this paragraph shall have reference to damage of such character that the Lot 1 Building cannot reasonably be expected to be repaired or restored within one hundred twenty (120) days from the time that such repair or restoration work would be commenced.

## ARTICLE VII

## DEFAULT, SELF-HELP AND OTHER, REMEDIES

### SECTION 7.1. COSTS.

Costs to perform an obligation shall be paid by the Parcel Owner obligated to perform. If a Parcel Owner owes money to another Parcel Owner under this Agreement, the owed Parcel Owner shall submit a bill in reasonable detail to the owing Parcel Owner for its share. The owing Parcel Owner shall pay the amount owed within thirty (30) days after receiving the bill, and the amounts not paid within the thirty (30) days shall bear interest of two percent (2%) a year over the "Prime Rate") (herein defined as the prime interest rate charged by large U.S. money center commercial banks as published Monday through Friday under "Money Rates" in The Wall Street Journal), but in no event above the maximum rate permitted by law. Interest shall be calculated daily on the outstanding principal balance, and the interest rate shall change when the Prime Rate changes. If The Wall Street Journal discontinues publishing the Prime Rate, the Parcel Owners shall agree on a substitute source for the Prime Rate.

### SECTION 7.2. RIGHTS OF SELF-HELP.

If any Parcel Owner (hereinafter the "Defaulting Parcel Owner") fails to perform any of the provisions, covenants or conditions of this Agreement on its part to be performed (including, without limitation, the making of any payment to any other Party which the Defaulting Party has agreed herein to make or the payment of any real estate taxes or assessments) at the time and in the manner herein provided for the performance thereof, then any other Parcel Owner (hereinafter the "Non-Defaulting Parcel Owner") may give to the

Defaulting Parcel Owner a notice (the "Default Notice") specifying the alleged default. The provisions of this Section 7.2 shall not apply to the failure of the Operator to perform its obligations under Section 3.1 hereof, which failure shall be governed by the provisions of Section 3.1(I).

In no event may a Parcel Owner terminate this Agreement if another Parcel Owner defaults. Any Parcel Owner may enjoin a Parcel Owner who defaults or who threatens to default, may enjoin an Occupant who violates or threatens to violate any term of this Agreement, and may seek any other available legal and equitable remedies for the default. A Parcel Owner may assess the costs of any suit or proceeding (including reasonable attorneys' fees) to prevent or remedy a default against the defaulting Parcel Owner or the violating Occupant. Any agreement which violates this Agreement shall be void as against this Agreement and may be set aside as it violates this Agreement on the petition of a Parcel Owner. Upon receipt of the Default Notice, the Defaulting Parcel Owner shall remedy the default, within the time period after the giving of the Default Notice as listed below:

| OBLIGATION | TIME PERIOD |
|---|---|
| granting utility easements | 60 days (then the requesting Parcel Owner has power of attorney to execute for the granting Parcel Owner) |
| initial construction of Common Areas | 60 days |
| restoring construction damage | 5 days |
| protecting during construction | 5 days |
| building maintenance | 60 days |
| remove trash from buildings | 3 days |
| rear building and canopy lights | 10 days |
| sidewalk sweeping | 7 days |
| removing ice and snow from sidewalks | 4 hours |
| paying real estate taxes and special assessments | any time after delinquency |

| | |
|---|---|
| paying other liens and charges against the Shopping Center Site | within five days before the foreclosure date |
| carrying insurance | 15 days |
| other obligations | 30 days |

A Defaulting Parcel Owner shall be in default ("Default") under this Agreement if, and only if, it shall fail to effect such remedial action within the time so limited. If the Defaulting Parcel Owner shall commence such remedial action within the applicable time but shall fail to complete the same within such time for reasons beyond its control, it shall not be deemed to be in default under this Agreement as long as it shall continue to use due diligence to complete such remedial action.

If a Defaulting Parcel Owner is in Default under this Agreement, the Non-Defaulting Parcel Owner may proceed to make payment or take such action as shall be necessary to remedy the Default for the account of the Defaulting Parcel Owner. Thereafter, on demand, the Defaulting Parcel Owner shall reimburse the Non-Defaulting Parcel Owner for the expenses (including counsel fees) incurred by the Non-Defaulting Parcel Owner in paying such sum or taking such action, together with all penalty sums reasonably required to be paid by it, if any, arising from such Default, with interest at the rate provided in Section 7.1. In the case of emergency and if the Defaulting Parcel Owner does not act in an expeditious manner, the Non-Defaulting Parcel Owner may exercise its rights hereunder without the necessity of written notice, as otherwise hereby required (but with telephonic notice, to the extent practicable).

At the time the Non-Defaulting Parcel Owner gives notice to the Defaulting Party as aforesaid, it shall also give notice of such default to all Mortgagee(s) holding a Mortgage(s) encumbering the Parcel owned by the Defaulting Parcel Owner of which the Non-Defaulting Parcel Owner has notice and such Mortgagee(s) shall have the right but not the obligation to cure such default, within the same period of time granted to the Defaulting Parcel Owner to so cure.

**SECTION 7.3. LIEN.**

Any amount due under Section 7.2 from a Defaulting Parcel Owner to a Non-Defaulting Parcel Owner shall, upon recording of a notice of lien, thereafter be deemed to constitute a lien (the "Default Lien") against the Parcel of the Defaulting Parcel Owner.

The Defaulting Parcel Owner shall, at the request of the Non-Defaulting Parcel Owner, execute and acknowledge such instruments as the Non-Defaulting Parcel Owner deems necessary to confirm and record the existence of such Default Lien. Upon failure or refusal of the Defaulting Parcel Owner to execute and acknowledge any such instrument, the

Non-Defaulting Parcel Owner shall have full power of attorney with respect thereto. Upon the satisfaction of such obligations for which a notice of lien was recorded, the Non-Defaulting Parcel Owner shall record an appropriate release of such notice of lien upon payment by the Defaulting Parcel Owner of the reasonable costs, including reasonable attorney's fees and filing fees, of preparing and recording such release.

**SECTION 7.4. REMEDIES CUMULATIVE.**

Subject to any provision in this Agreement which states that a remedy is exclusive, any remedies herein specifically provided for are cumulative and shall be deemed additional to any and all other remedies to which a Parcel Owner may be entitled in law or in equity, and shall include the right of setoff and the right to restrain by injunction any violation or threatened violation by the other Parcel Owner(s) of any of the terms, covenants or conditions of this Agreement, and by decree, to compel performance of any such terms, covenants or conditions, it being agreed that the remedy at law for the breach of any such term, covenant or condition (except those, if any, requiring the payment of a liquidated sum) is not adequate.

**SECTION 7.5. FORCE MAJEURE.**

Parcel Owners are excused from performing an obligation under this Agreement while delayed or prevented from performing that obligation by a cause not within its reasonable control (excluding financial inability to pay amounts due under this Agreement, but including breach of this Agreement by another Parcel Owner resulting in such delay or prevention), acts of God, fire, earthquake, flood, explosion, action of the elements,, war, invasion, insurrection, riot, mob violence, sabotage, inability to procure or general shortage of labor, equipment, facilities, materials, or supplies in the open market (if promptly ordered), failure of transportation, strikes, lockouts, action of labor unions, condemnation, requisition, and governmental prohibition or delay. To be excused under this Section 7.5, a delayed Parcel Owner shall notify the other Parcel Owners of such delay within five (5) days after the start of the delay.

## ARTICLE VIII

## NOTICES

**SECTION 8.1. PLACE AND MANNER OF NOTICE.**

Every notice, demand, request, or other communication which any Parcel Owner is required or desires to give or make or communicate upon or to the other Parcel Owner, shall be in writing and shall be mailed by registered or certified mail, postage prepaid, return receipt requested to such address or addresses as the respective Parcel Owner shall at any time, or from time to time, designate by written notice to the other Parcel Owner(s) with a copy by registered or certified mail, postage prepaid, return receipt requested to the address

or addresses of the mortgagee(s) of such Parcel Owner of which the other Parcel Owner(s) are aware.

**SECTION 8.2. WHEN EFFECTIVE.**

Any notice hereunder shall be deemed to have been received on the delivery date endorsed by the Postal Service on the return receipt, except that any notice which is (according to the terms of this Article) correctly addressed but which is returned by the Postal Service as undeliverable shall be deemed to have been received on the earliest date on which the Postal Service attempted delivery as indicated by Postal Service endorsement on the return receipt form.

## ARTICLE IX

## USE RESTRICTIONS

**SECTION 9.1. INTRODUCTION.**

No Parcel or part of a Parcel may be used in violation of any restriction set forth in this Article IX, except as expressly provided as an exception to the restriction in this Article IX.

**SECTION 9.2. GENERAL.**

In order to insure that the parking areas of the Shopping Center Site shall not be overburdened and to preserve the character of the Shopping Center Site as an active center of retail trade offering a variety of goods and services capable of attracting the widest possible spectrum of shoppers, neither Parcel Owner may, while the other Parcel shall be utilized substantially for retail purposes, use or suffer or permit the use of its Parcel for:

(A) for the conduct of a business operation which regularly or with significant frequency sells merchandise of the types of qualifies now commonly known as "odd lot" , "close out", "clearance", "discontinued" , "cancellation", "second" , "factory reject", "sample", "floor model", "demonstrator", "obsolescent", "over-stock", "distressed", "bankruptcy", "fire sale" or "damaged"; or

(B) for any purpose other than the conduct of a "retail business", so-called, which term shall mean the include mail-order catalog store operations of the Sears Roebuck and Montgomery Ward type, banks, finance company businesses, service and self-service dry cleaning and laundry businesses, shoe repair shops, barber shops, beauty shops, dance studios, health salons, and real estate brokerage, stock brokerage and insurance brokerage businesses, travel agencies, and private postal service businesses such as that operated by "mailboxes, Etc.", as well as ordinary retail businesses selling merchandise,

provided that the Lot 1 Building may be used for the operation of a movie theater; or

(C) for a stand alone alcoholic beverage ("Bar") business of any kind; provided that any portion of Lots 2 and Lot 3 may be used for a Bar as part of a full service sit down restaurant;

(D) for (a) a "carhop" or "carry-out" restaurant business without reasonably adequate inside seating facilities and which advertises that customers may consume food items while occupying vehicles parked on the parking areas of a Parcel; or (b) a banquet hall business which serves its guests on a special, catered basis as distinguished from a restaurant business open to the public at large on a random basis; or

(E) for any "amusement operation," so-called, which term shall mean and include any activity consisting wholly or in substantial part of the furnishing of entertainment or amusement facilities, whether or not as a business or as a part or aspect of a business (including, without limitation, off-track betting parlors, "penny arcades," amusement games or devices (electronic or otherwise), strip-shows; and "discos", so-called), and live entertainment of any kind, provided that the foregoing shall not be construed to prohibit the operation of a movie theater in the Lot 1 Building or the use of amusement games or devices as a part thereof; or for a massage parlor, so-called or the business of the sale of so-called "adult" material such as, without limitation, magazines, books and photographs; or

(F) for any business using a substantial amount of outdoor space in its regular operations, such as lumber yards, boat sales yards and the like; or

(G) for any office or storage operations except: (a) office and storage operations which are a part of the conduct of a retail business in the shopping Center; and (b) professional offices.

(H) the operation of a hotel, motel or tourist court; or

(I) any automobile or truck sales, storage, service, fueling, washing or repair operation; or

(J) for any propose or business which is noxious or unreasonably offensive because of the regular emission of noise, smoke, dust or odors.

**SECTION 9.3. LOT 1.**

Except as specifically provided in Exhibit D attached hereto and made a part hereof, Lot 1 may be used for (a) as a theater and public auditorium for use for telecasts, meetings, presentations of motion pictures, and other public presentations and entertainment as are generally shown in theaters; and (b) for other entertainment uses incidental to the primary use of the Lot 1 Building, including, without limitation, the incidental operation of video games and entertainment and vending machines; and (c) for the incidental retail preparation and sale of food, beverages and refreshments for consumption on the Lot 1 Building; provided, however, that no alcoholic beverages shall be sold unless Tenant at its own expense obtains all governmental licenses and permits required, and (d) for the incidental sale of promotional and related items such as records, audio and video tapes, compact discs, books, magazines, toys and novelties; provided, however, that not more than 200 square feet shall be devoted to such sales without Landlord's consent, which consent may be withheld in Landlord's sole and absolute discretion if such additional sales space would violate the exclusive use clauses of the leases of other tenants in the Shopping Center, and Lot 1 shall be occupied, owned and conveyed subject to the restrictions set forth in Exhibit D attached hereto.

**SECTION 9.4. LOT 2.**

Except as specifically provided in Exhibit D attached hereto and made a part hereof, Lot 2 may be used for the operation of a restaurant(s) or for any other lawful retail purposes, and Lot 2 shall be occupied, owned and conveyed subject to the restrictions set forth in Exhibit D attached hereto.

**SECTION 9.5. LOT 3.**

Except as specifically provided in Exhibit D attached hereto and made a part hereof, Lot 3 may be used for the operation of a restaurant(s) or for any other lawful retail purposes, and Lot 3 shall be occupied, owned and conveyed subject to the restrictions set forth in Exhibit D attached hereto.

## ARTICLE X

## TERMINATION

**SECTION 10.1. TERMINATION DATE.**

Except for the Parking Area Easements under Section 2.2(A), the Access Easements under Section 2.2(B), the Utility Easements under Section 2.2(C), and the Self Help Easements under Section 2.2(D), which are perpetual, and except for the restrictions set forth in Article IX of this Agreement which are governed by Section 10.2 hereof, this Agreement terminates on the Termination Date, which is the date, sixty (60) years from the date this

Agreement is recorded or any earlier date as agreed by all Parcel Owners, and shall continue thereafter for successive periods of ten (10) years, unless any Parcel Owner and the Mortgagee holding a mortgage(s) encumbering the Parcel of such Parcel Owner shall give notice to the other Parcel Owner, at least six (6) months prior to the expiration of the initial sixty (60) year period hereunder or any such ten (10) year extension period hereof, as the case may be, that this Agreement shall terminate as of the end of such initial period or extension period, as the case may be.

**SECTION 10.2. NOTICE OF EXTENSION OF RESTRICTIONS.**

A notice of extension of the provisions of Article IX of this Agreement shall be recorded in the Worcester District Registry of Deeds prior to the expiration of thirty (30) years from the date of recording of this Agreement, and prior to the expiration of twenty (20) years from the date of recording of the first notice of extension hereunder, and thereafter prior to the expiration of the term of this Agreement. All such notice(s) of extension shall be in the form and contain the information required by M.G.L. c. 184, §27 (as the same may be from time to time amended) and shall be executed by all of the Parcel Owners.

## ARTICLE XI

## MISCELLANEOUS

**SECTION 11.1. NO WAIVER.**

No waiver of any default by a Parcel Owner shall be implied from any omission by such Parcel Owner to take any action in respect to such default in the performance of any term, provision or covenant of this Agreement, nor shall such failure be deemed a waiver of any subsequent default in the performance of the same term, provision or covenants, or any other term, provision or covenant of this Agreement.

**SECTION 11.2. NO RELATIONSHIP OF PRINCIPAL AND AGENT.**

Neither anything contained in this Agreement nor any act of the Parcel Owner(s) shall be deemed or construed by any Parcel Owner or by any third person to create the relationship of principal and agent, of partnership, of joint venture, or of any association between the Parcel Owners, nor shall anything contained in this Agreement or any act of the parties be construed to render either of the Parcel Owners liable for the debts or obligations of the other Parcel Owners, except as specifically provided herein.

**SECTION 11.3. INDEMNIFICATION AND MINIMUM INTERFERENCE.**

Each Parcel Owner shall indemnify, defend (if requested), and hold the other harmless from all claims and losses, and all costs and expenses relating thereto (including

reasonable attorney's fees) connected with the use of its Parcel and the operations of the Occupants of its Parcel, unless the claim or loss results from the negligence of the other Parcel Owner or the Occupants of its Parcel. In addition, each Parcel Owner shall indemnify and hold the other harmless on account of any damage or injury caused by such Parcel Owner or by the Occupants of its Parcel as a result of exercising any of its rights or in performing any of its obligations hereunder, except to the extent that such other Parcel Owner or the Occupants of its Parcel shall have caused or contributed to any such damage or injury. Each Parcel Owner shall promptly notify the other Parcel Owner of any claim against the notifying Parcel Owner for which the notifying Parcel Owner intends to seek indemnification as provided herein. Each Parcel Owner further agrees that in exercising its rights hereunder it will do so in a manner so as to minimize the effect or interference with the rights of the other Parcel Owner in and to its Parcel. Each Parcel Owner before exercising any rights hereunder in any other Parcel shall first attempt to use its Parcel to accomplish the intended purpose provided such Parcel Owner can do so in a reasonable and financially practical manner.

**SECTION 11.4. CAPTIONS.**

The captions of the Articles and Sections of this Agreement are for convenience only and shall not be considered or referenced to in resolving questions of interpretation and construction.

**SECTION 11.5. GOVERNING LAW.**

This Agreement shall be construed, interpreted and applied in accordance with the laws of the Commonwealth of Massachusetts.

**SECTION 11.6. AMENDMENT.**

This Agreement may not be altered, modified, amended, renewed, extended or terminated unless by an instrument in writing duly executed by the parties then bound by this Agreement and the holders of all mortgages encumbering the Parcels.

**SECTION 11.7. COUNTERPARTS.**

Several copies of this Agreement shall be signed, and each shall be deemed an original.

**SECTION 11.8. NO GIFT OR DEDICATION.**

Nothing herein contained shall be deemed to be a gift or dedication of any portion of the Shopping Center Site to the general public or for any public purposes whatsoever, it being the intention of the Parties that this Agreement shall be strictly limited to and for the purposes herein expressed.

**SECTION 11.9. COVENANTS RUN WITH THE LAND.**

It is intended that the covenants and agreements set forth in this Agreement shall be construed as both covenants and conditions, and that they shall run with the land and be affirmatively enforceable against the Parcel Owners (but subject to the provisions of the exculpation clause set forth in Article IV above), the Parcels and any grantee, personal representative, heir, successor and assign thereof, and shall continue to be easements, servitudes, charges and encumbrances appertaining to and upon, and covenants benefiting, binding and running with the land, buildings and improvements now or later existing within the Shopping Center Site.

**SECTION 11.10. APPROVALS.**

No Parcel Owner may unreasonably withhold or delay its approval under this Agreement unless this Agreement expressly provides that its approval is discretionary. Unless a different time limit is expressly provided in this Agreement, a Parcel Owner's approval shall be given or withheld within thirty (30) days after it receives the item to be approved, or the item is deemed approved by that Parcel Owner. If a time period shorter than thirty (30) days is provided, the shorter period shall be stated in the request for approval. Failure to state the shorter time period means that a Parcel Owner has thirty (30) days to give or withhold its approval.

**SECTION 11.11. TITLE.**

This Agreement is superior to all liens and encumbrances on the Shopping Center Site except those title exceptions listed in Exhibit F, but the Parcel Owner's rights under Section 7.3 (regarding lien rights) are subordinate to any and all mortgages on any Parcel. The Parcel Owners represent and warrant to each other that the title exceptions listed in Exhibit F do not interfere with or prevent the exercise of the rights and easements granted hereunder, and each Parcel Owner agrees, for the benefit of the other, not to enter into any modification of existing leases or new leases which will permit uses that violate the use restrictions referenced in Article IX hereof.

**SECTION 11.12. ESTOPPEL CERTIFICATE.**

At the request of any other Parcel Owner, each Parcel Owner shall certify to the requesting Parcel Owner's prospective mortgagee or prospective assignee or transferee, whether, to the certifying Parcel Owner's knowledge: (i) there is any default under the Agreement (and, ff any, describing the default); (ii) the Agreement has been assigned, modified or amended (and ff so, describing it); and (iii) the Agreement as of that date is in full force. Such certification waives any claim of the certifying Parcel Owner based on facts contrary to those asserted in the certificate against any bona fide encumbrancer or purchaser for value to whom the certification was made, and who acted in reasonable reliance on the certificate and without knowledge of the contrary facts.

**SECTION 11.13. RIGHTS AND OBLIGATIONS OF SUCCESSOR AND ASSIGNS.**

The rights in this Agreement are appurtenant to each Parcel and benefit each Person who qualifies as a Parcel Owner under this Agreement. The obligations in this Agreement are equitable servitudes on and covenants running with each Parcel and bind personally each Person who qualifies as a Party under this Agreement (and Article IX regarding use binds the Occupants of the Parcels), except as otherwise provided herein.

**SECTION 11.14. PARTIAL INVALIDITY.**

If this Agreement is invalid or unenforceable in part or under certain circumstances, the rest of this Agreement and its application under other circumstances is valid and enforceable to the fullest extent permitted by law.

[END OF PAGE]

IN WITNESS WHEREOF, this instrument has been executed as a sealed instrument as of the day and year first above written.

**TRUSTEES OF NORTHSIDE REALTY TRUST**

Leslie S. Carey, Trustee

Leslie S. Carey, as Trustee of
Northside Realty Trust and not
individually

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss. April 9, 1997

Then personally appeared the above-named Leslie S. Carey, as Trustee of Northside Realty Trust, as aforesaid, and acknowledged the foregoing instrument to be her free act and deed, before me

Marshall A. Gould

Notary Public Marshall A. Gould
My Commission expires: 8-31-2001




Stage Coach Plaza
Westborough, Massachusetts

New England Management & Realty Corp.
55 New York Avenue
Framingham, Massachusetts

LOT-1 REA EXHIBIT PLAN

Scale: 1"= 200'

Date: FEBRUARY 20, 1997

File No.: 0045028M

BEALS AND THOMAS, INC.

EXHIBIT "A" (Page Two of Two)






**Stage Coach Plaza**
Westborough, Massachusetts

**New England Management & Realty Corp.**
55 New York Avenue
Framingham, Massachusetts

# LOT–2 & 3 REA EXHIBIT PLAN

Scale: 1"= 200' Date: FEBRUARY 20, 1997

File No.: 0045028M

BEALS AND THOMAS, INC.

Case 23-40709 … Filed 02/11/26 … Page 197 of 840






Stage Coach Plaza
Westborough, Massachusetts

New England Management & Realty Corp.
55 New York Avenue
Framingham, Massachusetts

# UTILITY SERVICES EXHIBIT PLAN

Scale: 1"= 250' Date: MARCH 20, 1997

File No.: 0045028M

BEALS AND THOMAS, INC.

BOOK 18745 PAGE 353

mss\nrthside\restrict.2

**EXHIBIT D**

**RESTRICTIONS**

The following restrictions shall be applicable to Lot 1, Lot 2, and Lot 3:

1. Recognizing that certain uses create extraordinary demands for the parking capacity at the Shopping Center, no portion of the Protected Area shall be operated as or for: (i) a table service restaurant, (ii) any food service facility in excess of 3,500 square fee, or (iii) any facility utilizing an on-premises alcoholic beverage license. In addition, Landlord shall not permit the operation of a bowling alley, pool hall, skating rink, video store, children's entertainment complex or facility or game room, adult entertainment facility (including, but not limited to an adult bookstore, video store, nude or semi-nude entertainment facility), health club, gym, aerobics or fitness studio in the Shopping Center, or permit the construction of any additional building in any portion of the Protected Area or any expansion of the Shopping Center within the Protected Area. The respective Owners agree that all tenants of the Shopping Center shall be bound by the terms of this Section.

2. No sales of merchandise of any kind and no carnivals or Shopping Center promotions shall be permitted in the parking areas of the Shopping Center.

The following restrictions shall be applicable to Lot 2 and Lot 3:

3. No portion of Lot 2 or Lot 3 shall be used as a movie theater or for the staging of shows for profit.

4. The Lot 2 Owner and Lot 3 Owner will not sell or permit to be sold popcorn in or from any premises (a) within any so-called food court (or the like) located in the Shopping Center, (b) fronting on the corridors and pathways leading between the Late Lighting Area and the Lot 1 Building, or (c) within two hundred (200) feet of any wall of the Lot 1 Building, or in or from any part of the sidewalks, parking areas, any mall areas, or other common areas of the Shopping Center, which prohibition shall not apply to the incidental sale thereof by the operator of any store or restaurant in the Shopping Center within such store or restaurant if and to the extent permitted by such store's or restaurant's occupancy agreement executed heretofore; and

ATTEST: WORC. Anthony J. Vigliotti, Register

# Exhibit F

**COMMONWEALTH OF MASSACHUSETTS**
**LAND COURT**
**DEPARTMENT OF THE TRIAL COURT**

19 JUL -8 PM 2:00

The undersigned hereby represent(s):

*that* the land hereinafter described was taken on December 28, 2018 for non-payment of taxes by the Town of Westborough in the County of Worcester by instrument dated December 28, 2018 and recorded on January 16, 2019 at the Worcester District Registry of Deeds in Book 59943, Page 371.

*that* more than six months from the date of said taking has elapsed and no redemption has been made;

*that* the proceedings aforesaid have been conducted according to law;

*that* the instruments were recorded or registered within sixty (60) days from the date of taking;

*that* the assessed value of said land and building is $5,239,100.00;

*that* said land is described as a certain parcel of land situated in the Town of Westborough, County of Worcester and said Commonwealth, bounded:

(Description must be same as in tax deed)

PROPERTY: Land and any building(s) thereon CONTAINING 29.336 AC (more or less)
LOCATION: 231 Turnpike Road
ASSESSORS: 32-48-0
REGISTRY: Worcester District Registry of Deeds Book 19369, Page 75

*that* the following are the names and addresses of all persons known to the undersigned who have any interest in said land other than the plaintiff, to wit:

**Westborough SPE, LLC**

Wherefore your plaintiff(s) pray(s) that the rights of all persons entitled to redeem from said proceedings may be foreclosed: that said Court enter a judgment that the title of the plaintiff to said land under said proceedings is absolute and that all rights of redemption are barred; and for such other and further relief as may seem meet and proper to said Court.

Name [signature] Street 34 West Main Street
Robert Haley, Treasurer/Collector City or Town Westborough, MA 01581

On this 23rd day of May, 2019 personally appeared before me the within named Robert Haley known to me to be the signer of the foregoing complaint, and made oath that the statements therein contained so far as made of his own knowledge are true and so far as made upon information and belief that his believes them to be true.

Before me: (PRINT) Susan A. Bush
Notary Public: (SIGN) [signature]
My Commission Expires: 9-9-2022

*(See over)

SUSAN A. BUSH
Notary Public
Commonwealth of Massachusetts
My Commission Expires September 9, 2022

No.

**Complaint To Foreclose**

**Tax Lien**

---

*Examiner*

**LET JUDGMENT ISSUE**

---

*Justice*

From the Office of

Dawn E. Bloom
Berenson & Bloom
116 Pleasant Street, Suite 340
Easthampton, MA 01027
BBO# 659839

LCP-5-8/88

NOTE: *60 days after July 12, 1933
30 days before July 12, 1933

CAVEAT: Notice of this complaint should be filed in the local registry upon the proper form (LCN2) as soon as complaint is entered in this office.

# Exhibit G

| JUDGMENT IN TAX LIEN CASE | DOCKET NUMBER 19 TL 000768 | Commonwealth of Massachusetts Land Court Department of the Trial Court |
|---|---|---|

CASE NAME

2022 00008115
Bk: 66983 Pg: 53
Page: 1 of 1 01/21/2022 10:39 AM WD

Town of Westborough, Plaintiff(s)

v.

Westborough SPE, LLC, Defendant(s)

After consideration by the Court, it is **ADJUDGED** and **ORDERED** that all rights of redemption are forever foreclosed and barred under the following instruments:

| Land Type | Instrument Date | Book Number | Page Number | Document Number | Certificate of Title Number |
|---|---|---|---|---|---|
| Recorded | 12/28/2018 | 59943 | 371 | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

This Judgment must be recorded and/or registered by the Plaintiff in the appropriate Registry of Deeds and/or Registration District pursuant to G. L. c. 60, § 75.

**By the Court: Deborah J. Patterson**

**Attest:**

A TRUE COPY
ATTEST:
Deborah J. Patterson
RECORDER

Deborah J. Patterson

**DATE ENTERED:** 01/05/2022

**RECORDER:** Deborah J. Patterson



ATTEST: WORC. Kathryn A. Toomey, Register

# Exhibit H

F

# The Commonwealth of Massachusetts

**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Room 1717, Boston, Massachusetts 02108-1512

## Foreign Limited Liability Company Application for Registration

**(General Laws Chapter 156C, Section 48)**

Federal Identification No.: 94-3286768

(1a) The exact name of the limited liability company:

WESTBOROUGH SPE LLC

(1b) If different, the name under which it proposes to do business in the Commonwealth of Massachusetts:

(2) The jurisdiction* where the limited liability company was organized:

Delaware

(3) The date of organization in that jurisdiction: 10/22/1997

(4) The general character of the business the limited liability company proposes to do in the Commonwealth:

Acquire, own, develop, construct, rehabilitate, improve, maintain, finance, manage, operate, lease, sell, convey, assign, mortgages and otherwise deal with real estate, and to own interests in businesses engaged in any of the foregoing, and to carry on any related lawful business, trade, purpose or activity.

(5) The business address of its principal office:

1241 Deer Park Ave, Suite 1 #1051
North Babylon, NY 11703

(6) The business address of its principal office in the Commonwealth, if any:

N/A

(7) The name and business address, if different from principal office location, of each manager:

Denise Edwards

Lolonyon Akouete

(8) The name and business address of each person authorized to execute, acknowledge, deliver and record any recordable instrument purporting to affect an interest in real property recorded with a registry of deeds or district office of the land court:

| NAME | ADDRESS |
|---|---|
| Denise Edwards | 1241 Deer Park Ave, Suite 1 #1051<br>North Babylon, NY 11703 |
| Lolonyon Akouete | 1241 Deer Park Ave, Suite 1 #1051<br>North Babylon, NY 11703 |

(9) The name and street address of the resident agent in the Commonwealth:

| | |
|---|---|
| Universal Registered Agents, Inc. | 4 Central Street<br>Woburn, MA 01801 |

(10) The latest date of dissolution, if specified: ______________________________

(11) Additional matters:

Signed by (by at least one authorized signatory): ______________________________

I Ashton Villegas on behalf of Universal Registered Agents, Inc.,

resident agent of the above limited liability company, consent to my appointment as resident agent pursuant to G.L. c156C § 48 (or attach resident agent's consent hereto).

* *Attach a certificate of existence or good standing issued by an officer or agency properly authorized in home state.*

# Delaware

The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "WESTBOROUGH SPE LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-EIGHTH DAY OF NOVEMBER, A.D. 2022.

Jeffrey W. Bullock, Secretary of State

2811561 8300

SR# 20224104318

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 204939237

Date: 11-28-22

THE COMMONWEALTH OF MASSACHUSETTS

I hereby certify that, upon examination of this document, duly submitted to me, it appears that the provisions of the General Laws relative to corporations have been complied with, and I hereby approve said articles; and the filing fee having been paid, said articles are deemed to have been filed with me on:

December 12, 2022 03:52 PM

William Francis Galvin

WILLIAM FRANCIS GALVIN

*Secretary of the Commonwealth*

# Exhibit I

LAND COURT
FILED

COMMONWEALTH OF MASSACHUSETTS

2023 JAN -4 PM 2:20

WORCESTER, ss.

LAND COURT
19 TL 000768

THE TOWN OF WESTBOROUGH,

Plaintiff,

v.

WESTBOROUGH SPE, LLC

Defendant.

**DEFENDANT WESTBOROUGH SPE, LLC'S MOTION TO VACATE FORECLOSURE JUDGMENT**

Defendant, Westborough SPE, LLC ("WSPE"), hereby moves this Honorable Court to vacate the judgment foreclosing WSPE's right of redemption dated January 5, 2022.

## I. FACTS

Until January 5, 2022, WSPE was the record owner of property located at 231 Turnpike Road in Westborough, Massachusetts, Worcester County Registry of Deeds at Book 19369, Page 75 (the "Property"). *See* Exhibit 1, *Title Examination Report Prepared by Michael H. Delaney, Esq. (Jul. 10, 2019)*, at 1.

WSPE was formed as a Delaware limited liability company on October 22, 1997. *See* Exhibit 2. On October 29, 1997, WSPE subsequently registered in Massachusetts as a foreign limited liability company. *See* Exhibit 3. According to its annual reports, WSPE's sole business purpose was to serve as the owner the Property. *See* Exhibit 4, (the "Annual Reports") (all providing that WSPE's business purpose is to serve as "owner of a theatre in Westborough, Massachusetts").

From 1997 to 2017, WSPE leased the Property to Interstate Theatres Corporation for use as a movie theatre. *See* Exhibit 1, at 6.

Babcock & Brown Administrative Services, Inc. ("BBAS") served as manager of WSPE since WSPE's formation in 1997. Beginning in 1997, Frances Jan Blaustein Scholes ("Jan"), then-president of BBAS, was authorized to execute, acknowledge, deliver, and record any recordable instrument on behalf of WSPE purporting to affect an interest in real property. *See* Exhibit 2. According to Annual Reports filed with the Massachusetts Secretary of Commonwealth, Dyann Blaine ("Dyann") was also authorized to execute, acknowledge, deliver, and record any recordable instrument purporting to affect an interest in real property on behalf of WSPE. *See* Exhibit 4.

In 2004, Jan suffered her first major stroke, which left her physically and mentally incapable of properly executing her responsibilities as manager and real estate signatory for WSPE to their full extent. Thereafter, Jan reduced her responsibilities and eventually retired from BBAS in 2007. Upon Jan's retirement, Dyann took over Jan's roles and responsibilities for both BBAS and WSPE.

On November 20, 2007, Dyann filed a Certificate of Withdrawal in the Commonwealth of Massachusetts. *See* Exhibit 5. On April 24, 2008, Dyann Blaine also filed a Certificate of Withdrawal in the Commonwealth of Massachusetts for BBAS. *See* Exhibit 6, *Foreign Certificate of Withdrawal of BBAS.*

Babcock & Brown Limited ("BBL") went into liquidation in 2009. In a September 27, 2018 Annual Report to Creditors and Noteholders, Liquidator David Lombe addressed the Property and questions as to its ownership. *See* Exhibit 7, *Annual Report to Creditors and Noteholders of BBL*, at 3. The Liquidator states that after investigation and enquiries within the

Babcock & Brown Group, he determined that BBAS "managed the property on behalf of a third party and the property is not owned by BBL."

On December 28, 2018, the Turnpike Road Property was taken by the Town of Westborough (the "Town") for non-payment of real estate taxes. *See* Exhibit 8, *Foreclosure Complaint by Town of Westborough* (the "Complaint"). On July 8, 2019, the Town filed the Complaint with the Massachusetts Land Court that is the basis of this lawsuit. The Complaint provides as follows:

> [T]he following are the names and addresses of all persons known to the undersigned who have any interest in said land other than the plaintiff, to wit:
>
> **Westborough SPE, LLC**

The Complaint does not list the address of Westborough SPE, LLC, nor does it identify Jan as a person who has an interest in the Property.

The title examination report as filed with this Court on August 26, 2019, lists the equity owner and lessee, respectively, as the parties entitled to notice:

> Westborough SPE, LLC
> c/o Babcock & Brown Administrative Services, Inc. MANAGER
> 2 Harrison St, 6th Floor
> San Francisco, CA 94105-0000
> ATT'N: Dyann Blaine and/or F. Jan Bluestein
>
> Interstate Theatres Corporation
> One Exeter Plaza
> Boston, MA 02116

According to the Court docket, notices of the foreclosure proceedings were sent on September 22, 2020. This included a notice to Jan at 151 E. 31st, Apt. 28B, New York, NY 10016. On October 21, 2020, proof of unsuccessful service was filed with this Court related to such notice. Although Jan once lived at that address, she moved out in 2015 and never returned. On April 8, 2021, another notice by certified mail was sent to Jan,

this time at a different address: 888 Avenue of the Americas, New York, NY 10001. This notice was also returned as unsuccessful and filed with the Court on May 4, 2021.

On September 7, 2021, a registered process server attempted to serve Jan "by leaving at the last and usual place of abode of F. Jan Bluestein a/k/a Jan Blaustein, 34 Stern Lane, Atherton, California 94027 with a "Limited Assistance Representation (LAR) Document. Document placed at front gate with knowledge of male who answered electronic intercom." *See* Exhibit 9.

In 2006, Jan and her then-husband Myron Scholes ("Myron") purchased the property at 34 Stern Lane, Atherton, California 94027 (the "Stern Lane Property"), as joint owners. Jan and Myron lived together at the Stern Lane Property until 2013 when Myron filed for divorce, prompting Jan to move out of the Stern Lane Property and never return. On September 4, 2015, Jan and Myron, as joint owners, conveyed the Stern Lane Property to Myron individually pursuant to the terms of their divorce agreement.

On April 2, 2019, Jan's son Peter Blaustein ("Peter") filed a petition for appointment of himself as Jan's conservator and guardian with the Hawaii Third Circuit, Kona Division. *See* Exhibit 10, *Printable Docket Record for Jan's Conservatorship and Guardianship Proceeding*. On July 8, 2019, the Hawaii Third Circuit granted Peter's petition, finding that Jan "is an incapacitated person," that a "basis exist[s] for appointment of a conservator and guardian," and that Peter is qualified to serve in both capacities. (text for June 3, 2019 docket entry). Jan currently lives in an assisted living facility in New Mexico.

On January 5, 2022, this Court issued its final judgment of foreclosure in connection with the Town's tax taking of the Property.

On November 22, 2022, WSPE filed a Certificate of Revival in Delaware. *See* Exhibit 11, *WSPE Certificate of Revival - Delaware*. As of November 28, 2022, WSPE is duly formed and in good standing in Delaware. *See* Exhibit 12, *Delaware Good Standing of WSPE*. On December 12, 2022, WSPE filed an Application for Registration as Foreign Limited Liability Company in Massachusetts. *See* Exhibit 13, *Foreign LLC Application for Registration of WSPE*.

Shortly after reviving good standing status in Delaware and Massachusetts, WSPE filed a claim with the California Unclaimed Property Division ("CUPD") for approximately $1.2 million. *See* Exhibit 14. On December 14, 2022, the CUPD sent a reply letter to WSPE requesting additional information pursuant to the claim.

## II. APPLICABLE LAW

Motions to vacate a decree of foreclosure must be commenced within one year of the final judgment. M.G.L. c. 60, sec. 69A. Such motions may be granted if the court "after 'careful consideration, finds that to do so is required to accomplish justice.'" *Tallage LLC v. Meaney*, 2015 WL 4207424 (2015) (quoting *Town of Sharon*, 18 Mass. App. Ct. at 542)). Tax redemption statutes "are remedial in nature and are therefore 'interpreted liberally in favor of a person seeking to recover his land.'" *City of Pittsfield v. Randall*, 63 Mass. App. Unpub. 1107 (2005) (quoting *Union Trust Co. v. Reed*, 213 Mass. 199, 201 (1912)). This Court has recognized that "'the only legitimate interest of a town in seeking to foreclose rights of redemption is the collection of the taxes due on the property, together with other costs and interests.'" *Tallage LLC*, 2015 WL 4207424. When the owner of the property pays the taxes, the statute has served its purpose.

Within the one-year period, courts may use their discretion to vacate a judgment for various reasons, including incapacity or mental illness. *Town of Sharon v. Kafka*, 18 Mass. App.

01. Sherin and Lodgen\4880-8358-9189.v3-1/2/23

Ct. 541, 543 (1984). In *Tallage LLC v. Meaney*, this Court vacated its foreclosure judgment after the property owners filed a motion to vacate within one year of the Court's foreclosure decree, but after the property had been sold to a third party. *See generally* 2015 WL 4207427 (June 26, 2015). After a fact-intensive inquiry, the Court concluded that the property owners (the Meaneys) were overwhelmed due to health issues in the family. The Court credited the Meaneys' claim that they acted promptly to resolve the overdue water and sewer bills once they were able to focus on the past-due notices. The Court acknowledged that notice was delivered to the property owners and that they should have been more attentive; however, the Court determined that "extraordinary circumstances"—including that the owners were "overwhelmed with Mrs. Meaney's and the children's health issues at the time the notices were sent"—"justif[ied] this Court's exercise of discretion to vacate the foreclosure."

This Court has vacated foreclosure judgments without a showing of "extraordinary circumstances" when property owners were properly notified of the foreclosure proceedings, the owners filed a motion to vacate the foreclosure in the one-year period following the foreclosure decree, and the town has not transferred the property to a third party. *See, e.g., City of Pittsfield v. Randall*, 63 Mass. App. Ct. 1107 at *2 (2005) (unpublished opinion) (affirming vacation of foreclosure judgement where defendant received proper notice and "made no real effort to redeem the property until one month after a default decree had entered," without explanation for delay).

If the property owner files its motion to vacate after the one-year anniversary of the final foreclosure decree, this Court's discretion to vacate the foreclosure is typically limited to situations in which the property owner has been deprived of due process. *See Town of Russell v. Barlow*, 2016 WL 3745960, at *13 (Mass. Land Ct. July 13, 2016) ("While courts are consistent

in applying the statutory deadline, strict application of the one-year limitation may be excused when there has been a denial of due process.").

In *Jones v. Flowers*, the U.S. Supreme Court addressed a situation in which a property owner filed a motion to vacate after the town sold the property to a third party and after the time limit for post-sale redemption had passed. *See* 547 U.S. 220, 224 (2006). Even though the town published notice of the foreclosure sale in a local newspaper, the town attempted to serve the property owner by two separate certified mail letters sent to the address of the foreclosed property, and the property owner's ex-wife continued to live at the property at the time the certified mail envelopes were returned to the town unclaimed, the Court held that "when mailed notice of a tax sale is returned unclaimed, the State must take additional reasonable steps to attempt to provide notice to the property owner before selling his property, if it is practicable to do so." The Court declined to prescribe the specific steps that the town should have taken to satisfy the property owner's due process rights, but determined that "[w]hat steps are reasonable in response to new information depends upon what the new information reveals."

## III. ANALYSIS

As cases such as *Tallage LLC v. Meaney* and *City of Pittsfield v. Randall* demonstrate, courts have broad discretion to vacate a foreclosure decree when a motion to vacate is filed within one year of the judgement. As cases such as *Town of Russell v. Barlow* explain, the courts' discretion to vacate a foreclosure decree after one year is typically limited to instances of due process violations. In the instant case, WSPE files the motion to vacate within the one-year period, and Jan's strokes which significantly affected her physical and mental abilities should, in themselves, support the Court's exercise of discretion to grant the Motion to Vacate.

In addition to Jan's serious health issues, there is also a due process violation in this case because Jan was never properly served with notice of the foreclosure proceedings. After receiving two notices of unsuccessful service via U.S. certified mail, the Town should have, pursuant to *Jones v. Flowers*, taken additional steps to confirm Jan's correct physical address before "serving" notice on a male individual who lived at Jan's former residence six years after Jan deeded this property to her ex-husband pursuant to a divorce, especially when the deed and the divorce proceedings are public records that are easily accessible online.

The combination of WSPE's timely filing within the one-year period, Jan's serious health issues, and the due process violation related to improper service provides ample support for the Land Court's exercise of discretion to vacate the foreclosure decree.

**A. <u>Discretionary Factors</u>**

We respectfully ask the Court to consider the incidence of Jan's strokes, which left her physically and mentally incapacitated, as an extraordinary circumstance that significantly interfered with Jan's ability to focus on the past-due tax notices. Like the property owner in *Tallage LLC v. Meaney*, 2015 WL 4207427, Jan's serious health issues interfered with her ability to devote the necessary time or attention to addressing the past due taxes at the time these notices became due and during the initial foreclosure proceedings. On the date the Complaint was filed with this Court (July 8, 2019), Jan's son Peter Blaustein was appointed her conservator and guardian. Like the Meaneys, Jan took prompt action to respond to the foreclosure proceedings as soon as she was ready and able to do so. Once Jan was informed of the proceedings and the opportunity to reclaim the Property on behalf of WSPE, she took action to connect with those who were in a position to assist WSPE. Within the past two months, WSPE restored its "good standing" statuses in Delaware and Massachusetts, filed a claim for $1.2 million currently held

by the California Unclaimed Property Division ("CUPD"), and retained counsel to prepare this Motion to Vacate and other pleadings. WSPE reasonably anticipates that this $1.2 million will be more than enough to pay the past-due taxes, utility charges, and other fees required to properly exercise its right of redemption. WSPE is diligently pursuing the claim with the CUPD and anticipates that the CUPD will release these funds to WSPE within the next 90 days (on or before April 1, 2023).

Because the Property has not yet been transferred to a third party, only the Town and WSPE's interests should be considered as the Court weighs the various factors at issue in this case. As courts have indicated, tax redemption statutes should be interpreted in favor of the party seeking to recover the property. It is in WSPE's best interest to restore their title to the Property, and it is in the Town's best interest to receive full payment of the past-due taxes and fees that gave rise to these foreclosure proceedings in the first place.

**B. Due Process Violation**

In addition to the discretionary factors discussed in **Section III.A**, above, there is also a due process violation in this case because the Town never properly served Jan with notice of the foreclosure proceedings. As was the case in *Jones v. Flowers*, two U.S. certified mail packages (with two different New York addresses) intended to notify Jan of the proceedings were returned "undeliverable." The undelivered certified mail packages did not constitute sufficient service, as the Court docket indicates "unsuccessful service" for each package. The Town then hired a process server to attempt to serve Jan at a third address, 34 Stern Lane in Atherton, California, which the process server represented to be Jan's "last known address."

The process server indicated he left the notice at the front gate of 34 Stern Lane, with knowledge of a man who was heard over the intercom. Because Jan is not a man, the process

server's indication of "service" based on a male presence at the address should have informed the town that proper service was not made, and the Town should have taken additional steps to determine if this was Jan's residence considering the new information. We respectfully request this Court to take judicial notice that Jan's divorce from her ex-husband, Myron,[1] and the 2015 deed of the 34 Stern Lane property from Myron and Jan as joint owners to Myron individually are matters of public record.[2] If the Town had taken the next reasonable steps to attempt to confirm Jan's presence at the 34 Stern Lane property, the information would have revealed that (a) Jan no longer lived at the address, (b) Jan deeded her interest in the property to Myron approximately 6 years earlier, and (c) the only individual that the process server actually "served" was Myron.

After the certified mail notices were returned undelivered in *Jones v. Flowers,* the U.S. Supreme Court determined that this was insufficient notice, but declined to prescribe the specific steps that a town should take to satisfy a property owner's due process rights. Instead, the Court provided that "[w]hat steps are reasonable in response to new information depends upon what the new information reveals." *See* 547 U.S. 220, 234 (2006). *Jones v. Flowers* is a residential foreclosure case in which the town attempted to serve the property owner at the exact property address that was the subject of the foreclosure—in that case, the town was found to have violated the property owner's due process rights by failing to take additional steps to determine his address after serving notice on the owner's daughter who was living in the property. In a commercial foreclosure case such as this, the Town should be held to the same (if not a higher) standard of due diligence in determining a proper service address for the property owner or

[1] The record of the divorce is accessible on the San Mateo Superior Court website, at https://odyportal-ext.sanmateocourt.org/Portal-External/Home/Dashboard/29 (insert "Scholes, Frances" into the search bar).
[2] The 2015 deed is accessible on the San Mateo County Clerk – Recorder Online Index, at https://apps.smcacre.org/recorderworks/ (insert "Scholes" into the Name search box).

representative thereof. Because the individual sought to be served in a foreclosure of abandoned commercial property is always going to reside at an address different then the property subject to the foreclosure proceedings, the Town must exercise some level of due diligence to determine the address of the property owner or the property owner's representative. While the town took some steps to locate Jan by identifying one of her former residential addresses (34 Stern Lane in Atherton), they should have conducted a more logical and diligent effort to locate Jan's current mailing address.

The Town should not be able to meet its standard of due diligence under *Jones v. Flowers* by simply picking multiple addresses that were connected to Jan at some distant point in the past without any indication that Jan was actually residing at any of these addresses. Delivering notice of the foreclosure proceedings to an unknown, unidentified, and unseen male at the Stern Lane Property was no more likely to apprise Jan of the proceedings than if notice were left at a random location. Accordingly, Jan was never properly served with notice of the foreclosure proceedings, which constitutes a due process violation pursuant to *Jones v. Flowers*.

## IV. <u>REQUEST FOR RELIEF</u>

WHEREFORE, Defendant Westborough SPE LLC respectfully moves the Court to vacate the judgment entered against them, allow them to pay outstanding taxes and fees on the Property, and exercise its right to redeem the Property.

Respectfully submitted,

WESTBOROUGH SPE,

LLC By its manager,

____________________________

01. Sherin and Lodgen\4880-8358-9189.v3-1/2/23

Lolonyon Akouete
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703
loloact2@gmail.com
(443) 447-3276

Dated: January 4, 2023

# Exhibit J

# 19 TL 000768 Town of Westborough v. Westborough SPE, LLC , et al.

- Case Type:
- Tax Lien
- Case Status:
- Closed
- File Date
- 07/08/2019
- DCM Track:
-
- Initiating Action:
- Tax Lien - one tax taking
- Status Date:
- 07/08/2019
- Case Judge:
- Speicher, Hon. Howard P.
- Next Event:
-
- **Property Information**

  Turnpike Road
  Westborough
  RECORD

All Information | Party | Event | Docket | Financial | Checks | Receipt | Disposition

## Party Information

**Town of Westborough**
- Plaintiff

**Party Attorney**
- Attorney
- Bloom, Esq., Dawn E
- Bar Code
- 659839
- Address
- 43039 Boardwalk Loop
  Punta Gorda, FL 33982
- Phone Number
- (413)529-9936
- Attorney
- Leahy, Esq., Iris Ann
- Bar Code
- 697783
- Address
- Law Office of Iris A. Leahy
  4 Open Square Way
  Suite 217
  Holyoke, MA 01040
- Phone Number
- (413)322-8318

More Party Information

**Westborough SPE, LLC**
- Defendant

**Party Attorney**
- Attorney
- Nathanson, Esq., Alvin S
- Bar Code
- 367480
- Address
- Nathanson and Goldberg, P.C.
  183 State St
  Fifth Floor
  Boston, MA 02109
- Phone Number
- (617)210-4810
- Attorney
- Schlager, Esq., Scott Adam
- Bar Code
- 695421

- Address
- Nathanson and Goldberg, P.C.
  183 State St
  5th Floor
  Boston, MA 02109
- Phone Number
- (617)909-4511

More Party Information

**F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Adminstrative Services, Inc.**
- Defendant

**Party Attorney**

More Party Information

**Dyann Blaine, R.E. Signatory and Agent for Westborough SPE LLC**
- Defendant

**Party Attorney**

More Party Information

**James D. Jaworski, Treasurer of Brown & Babcock Administrative Services, Inc.**
- Defendant

**Party Attorney**

More Party Information

**David Lombe, Liquidator for Babcock and Brown Limited**
- Defendant

**Party Attorney**

More Party Information

**Joseph Scarcella, Esq., Johnson Winter & Slattery, Counsel for David Lombe, Liquidator for Babcock and Brown Limited**
- Defendant

**Party Attorney**

More Party Information

**Interstate Theaters Corporation**
- Defendant

**Party Attorney**

More Party Information

## Events

| Date | Session | Location | Type | Event Judge | Result |
|---|---|---|---|---|---|
| 06/15/2020 02:00 PM | C.J. Piper | Courtroom 404 - Fourth Floor | Motion | Piper, Hon. Gordon H. | Held via video |
| 01/10/2023 09:00 AM | J. Speicher | Courtroom 1102 - Eleventh Floor | Hearing on Lis Pendens | Speicher, Hon. Howard P. | Held via video |
| 01/19/2023 10:00 AM | Tax Session | | Motion to Vacate Judgment | Patterson, Deborah J. | Rescheduled |
| 02/09/2023 02:00 PM | Tax Session | | Motion to Vacate Judgment | Patterson, Deborah J. | Rescheduled |
| 02/23/2023 02:00 PM | Tax Session | Courtroom 403 - Fourth Floor | Motion to Vacate Judgment | Patterson, Deborah J. | Rescheduled |
| 03/23/2023 02:00 PM | Tax Session | Courtroom 403 - Fourth Floor | Motion to Vacate Judgment | Patterson, Deborah J. | Not held |
| 05/16/2023 10:15 AM | J. Speicher | Courtroom 401 - Fourth Floor | Motion | Speicher, Hon. Howard P. | Held via video |
| 08/17/2023 02:00 PM | J. Speicher | Courtroom 401 - Fourth Floor | Pre-Trial Conference | Speicher, Hon. Howard P. | Rescheduled |
| 08/31/2023 02:00 PM | J. Speicher | Courtroom 401 - Fourth Floor | Pre-Trial Conference | Speicher, Hon. Howard P. | Not held |

## Docket Information

| Docket Date | *Docket Text* | Amount Owed | *Image Avail.* |
|---|---|---|---|
| 07/08/2019 | Complaint filed. | | Image |
| 07/08/2019 | Case assigned to the Tax Track per Land Court Standing Order 1:04. | | |
| 07/08/2019 | Land Court filing complaint tax Receipt: 405581 Date: 07/09/2019 | $200.00 | |
| 07/08/2019 | Land Court initial deposit tax Receipt: 405581 Date: 07/09/2019 | $300.00 | |

| Docket Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 07/08/2019 | Land Court surcharge Receipt: 405581 Date: 07/09/2019 | $15.00 | |
| 07/10/2019 | Michael H. Delaney, Esq. appointed as Title Examiner. | | |
| 08/26/2019 | Report filed by Michael H. Delaney, Esq.. | | Image |
| 08/28/2019 | Land Court examiner costs | $150.00 | |
| 09/05/2019 | Checklist sent. | | |
| 11/07/2019 | Letter of Diligent Search Filed. | | |
| 12/31/2019 | Checklist completed. | | |
| 05/12/2020 | Scheduled<br>Event: Motion for Alternative Service<br>Date: 06/15/2020 Time: 02:00 PM<br><br>Zoom instructions to be sent by the Recorder's Office in advance of the hearing date.<br><br>Judge: Piper, Hon. Gordon H. | | |
| 05/19/2020 | Motion for Alternative Service and Supporting Memorandum, filed. | | Image |
| 06/15/2020 | Event Resulted: Motion scheduled on:<br>06/15/2020 02:00 PM<br>Has been: Held via video<br><br>June 15, 2020. Hearing held on Plaintiff's Motion for Alternative Service via videoconference. Attorneys Shirin Everett and Dawn Bloom appeared for plaintiff. Jon Steinberg, Assessor for the town of Westborough, also observed the hearing. Attorney Bloom reported that the defendant owner of the parcel in question is a defunct Delaware limited liability company which withdrew from Massachusetts in 2007, had its registration in Delaware cancelled in 2014, and has listed as its agent for service in Delaware a corporation service company that is no longer active in that role. Attorney Bloom indicated that the manager listed on its Massachusetts registration is a defunct entity named Babcock & Brown Administrative Services, Inc., that Mr. Steinberg was able to contact a related Delaware corporation by the name of Babcock & Brown operating in San Francisco, and that the related corporation's officers indicated that it has no interest in the property. Attorney Everett reported that after the town of Westborough had begun proceedings to acquire title to the property by eminent domain, an Australian law firm notified the town that it represented the administrator of the liquidation of an Australian entity named Babcock & Brown LP, and that it was investigating whether Babcock & Brown LP might hold any interest in the property; the town has since received requests from that law firm concerning the status of eminent domain proceedings, but has received no response to several requests by the municipality that that entity address the basis for its potential claim to any interest in the property. Attorney Bloom indicated that the plaintiff asserts that the defendant owes approximately $400,000 to the town in unpaid real estate taxes and interest, and also owes another $300,000 pursuant to a reciprocal maintenance agreement concerning the property's shared parking lot. Attorney Bloom also indicated that there appears to be no mortgage currently encumbering the property, as there is a recorded discharge of the most recent mortgage of record. Plaintiff to attempt to make direct service on (1) all individuals named in the proposed citation for whom plaintiff has identified an address; (2) the Australian law firm of Johnson, Winter, & Slattery; and (3) Mr. David Lombe, whom counsel identified as the administrator of the Babcock & Brown LP liquidation. Court ALLOWED plaintiff's motion for alternative service by publication. Plaintiff to submit to the court's tax lien department a proposed form of an order of notice for publication in a newspaper of general circulation in the town of Westborough as to the defendant entity, no longer in legal existence, and its successors. Following return dates on all summonses and the published citation, plaintiffs to request default enter under Mass. R. Civ. P. 55 (a) against all parties not timely filing answer or responsive pleading. Upon entry of any indicated default(s), plaintiffs to file motion with the Recorder requesting entry of a finding of the amount and time for redemption from the tax taking. If any additional party appears or answers, parties promptly to request, in writing, further case management conference. (Piper, C.J.)<br><br>(Notice of Docket Entry sent by email to Attorneys Dawn Bloom and Shirin Everett) | | |
| 09/01/2020 | Land Court additional deposit tax Receipt: 417793 Date: 09/01/2020 | $400.00 | |
| 09/15/2020 | Citation by Publication in Village News, issued. Returnable 11/09/2020. | | |
| 09/22/2020 | Citation issued as to the land described as: Property: Land and any building(s) thereon Containing 29.336 AC (more or less) Location: 231 Turnpike Road Assessors: 32-48-0 Registry: Worcester District Registry of Deeds Book 19369, Page 75. Returnable 11/16/2020. | | |
| 09/22/2020 | Land Court notices mailing - Certified Mail<br>Issue Date: 09/22/2020<br>Service: Service<br>Method: Certified Mail<br>Cost Per: 11.95<br><br>Interstate Theaters Corporation<br>Mailing Address<br>101 E. Blount Ave.<br>Knoxville, TN 37920<br>Tracking Number: 71901706197000959805 | $59.75 | |

| Docket Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| | Interstate Theaters Corporation<br>Mailing Address<br>c/o CT Corporation System, Reg. Agent<br>155 Federal St., Suite 700<br>Boston, MA 02110<br>Tracking Number: 71901706197000959812<br><br>James D. Jaworski, Treasurer of Brown & Babcock Administrative Services, Inc.<br>Mailing Address<br>1715 Easton Dr.<br>Burlingame, CA 94010<br>Tracking Number: 71901706197000959829<br><br>Dyann Blaine, R.E. Signatory and Agent for Westborough SPE LLC<br>Mailing Address<br>20 Queensbrook Pl.<br>Orinda, CA 94563<br>Tracking Number: 71901706197000959836<br><br>F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Adminstrative Services, Inc.<br>Mailing Address<br>151 E. 31st<br>Apt. 28B<br>New York, NY 10016<br>Tracking Number: 71901706197000959843 Receipt: 418144 Date: 09/23/2020 | | |
| 09/23/2020 | Land Court notices mailing out of country - Registered Mail<br><br>RE 550 804 582US<br>David Lombe, Liquidator for Babcock and Brown Unlimited<br>Deloitte Financial Advisory Pvt. Ltd.<br>Grosvenor Place Level 9<br>225 George St.<br>Sydney, NSW 2000<br>Australia<br><br>RE 550 804 596US<br>Joseph Scarella, Esq. Johnson Winter & Slattery, Counsel for<br>David Lombe, Liquidator for Babcock and Brown Unlimited<br>20 Bond Street, Level 25<br>Sydney, NSW 2000<br>Australia Receipt: 418145 Date: 09/23/2020 | $52.50 | |
| 10/01/2020 | Successful Service<br>Method : Certified Mail<br>Issued : 09/22/2020<br>Service : Service<br>Served : 09/26/2020<br>Return : 09/30/2020<br>On : James D. Jaworski, Treasurer of Brown & Babcock Administrative Services, Inc.<br>Signed By :<br>Reason : Successful<br>Comment :<br>Tracking #: 71901706197000959829 | | Image |
| 10/01/2020 | Successful Service<br>Method : Certified Mail<br>Issued : 09/22/2020<br>Service : Service<br>Served : 09/28/2020<br>Return : 09/30/2020<br>On : Interstate Theaters Corporation<br>Signed By :<br>Reason : Successful<br>Comment :<br>Tracking #: 71901706197000959812 | | Image |
| 10/01/2020 | Successful Service<br>Method : Certified Mail<br>Issued : 09/22/2020<br>Service : Service<br>Served : 09/28/2020<br>Return : 10/01/2020<br>On : Interstate Theaters Corporation<br>Signed By :<br>Reason : Successful<br>Comment :<br>Tracking #: 71901706197000959805 | | Image |
| 10/06/2020 | Tear Sheet Received. | | |

| Docket Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 10/06/2020 | Citation published September 25, 2020. Returnable 11/09/2020 | | |
| 10/20/2020 | Land Court notice by publications Receipt: 418637 Date: 10/20/2020 | $5.00 | |
| 10/20/2020 | Land Court newspaper payments Voided on 10/20/2020.<br><br>Void Check number: 33258<br>Void Status Date: 10/20/2020<br>Void Reason: Printer Jam<br>Void Comments: | $0.00 | |
| 10/20/2020 | Land Court newspaper payments | $252.92 | |
| 10/21/2020 | Unsuccessful Service.<br>Method : Certified Mail<br>Issued : 09/22/2020<br>Service : Service<br>Served : 09/30/2020<br>Return : 10/02/2020<br>On : F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Adminstrative Services, Inc.<br>Signed By :<br>Reason : Unsuccessful<br>Comment : attempted - not known<br>Tracking #: 71901706197000959843 | | Image |
| 11/03/2020 | Registered Mail Service on Joseph Scarcella, Esq., Johnson Winter & Slattery, Counsel for David Lombe, Liquidator for Babcock and Brown Limited successful.<br>Served on 10/14/2020 | | Image |
| 11/23/2020 | Request to issue Citation to be served by Deputy Sheriff, filed | | |
| 12/10/2020 | Citation by Deputy Sheriff to F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Adminstrative Services, Inc., Dyann Blaine, R.E. Signatory and Agent for Westborough SPE LLC, David Lombe, Liquidator for Babcock and Brown Limited, Joseph Scarcella, Esq., Johnson Winter & Slattery, Counsel for David Lombe, Liquidator for Babcock and Brown Limited issued. Returnable 02/01/2021. | | |
| 01/19/2021 | Appearance of Iris Ann Leahy, Esq. for Town of Westborough, filed | | |
| 01/19/2021 | Citation by Deputy Sheriff to Dyann Blaine, R.E. Signatory and Agent for Westborough SPE LLC, returned with service thereon. | | |
| 02/19/2021 | Request to issue Special Citation, filed | | |
| 04/08/2021 | Special Citation issued as to land described as: Property: Land and any building(s) thereon Containing 29.336 AC (more or less) Location: 231 Turnpike Road Assessors: 32-48-0 Registry: Worcester District Registry of Deeds Book 19369, Page 75. Returnable 05/31/2021. | | |
| 04/08/2021 | Land Court notices mailing - Certified Mail<br>Issue Date: 04/08/2021<br>Service: Service<br>Method: Certified Mail<br>Cost Per: 11.96<br><br>F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Adminstrative Services, Inc.<br>Mailing Address<br>888 Avenue of the Americas<br>New York, NY 10001<br>Tracking Number: 71901706197000977816 Receipt: 422168 Date: 04/08/2021 | $11.96 | |
| 05/04/2021 | Unsuccessful Service.<br>Method : Certified Mail<br>Issued : 04/08/2021<br>Service : Service<br>Served :<br>Return : 04/15/2021<br>On : F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Adminstrative Services, Inc.<br>Signed By :<br>Reason : Unsuccessful<br>Comment : attempted - not known<br>Tracking #: 71901706197000977816 | | Image |
| 05/21/2021 | Request to issue Special Citation, filed | | |
| 06/09/2021 | Special Citation issued as to land described as: Property: Land and any building(s) thereon Containing 29.336 AC (more or less) Location: 231 Turnpike Road Assessors: 32-48-0 Registry: Worcester District Registry of Deeds Book 19369, Page 75. Returnable 08/02/2021. | | |
| 06/10/2021 | Land Court notices mailing - Certified Mail<br>Issue Date: 06/10/2021<br>Service: Service | $11.96 | |

| Docket Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| | Method: Certified Mail<br>Cost Per: 11.96<br><br>F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Adminstrative Services, Inc.<br>Mailing Address<br>34 Stern Lane<br>Atherton, CA 94027<br>Tracking Number: 71901706197000980878 Receipt: 423362 Date: 06/10/2021 | | |
| 08/09/2021 | Request to issue Citation to be served by Deputy Sheriff, filed | | |
| 08/17/2021 | Citation by Deputy Sheriff to F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Adminstrative Services, Inc. issued. Returnable 10/11/2021. | | |
| 09/20/2021 | Citation by Deputy Sheriff to F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Adminstrative Services, Inc., returned with service thereon. | | Image |
| 10/01/2021 | Unsuccessful Service.<br>Method : Certified Mail<br>Issued : 06/10/2021<br>Service : Service<br>Served :<br>Return : 09/21/2021<br>On : F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Adminstrative Services, Inc.<br>Signed By :<br>Reason : Unsuccessful<br>Comment : no such number<br>Tracking #: 71901706197000980878 | | Image |
| 11/01/2021 | Citation by Deputy Sheriff to David Lombe, Liquidator for Babcock and Brown Limited, Joseph Scarcella, Esq., Johnson Winter & Slattery, Counsel for David Lombe, Liquidator for Babcock and Brown Limited, returned with service thereon. | | |
| 11/01/2021 | Affidavit as to Military Service filed. | | |
| 11/01/2021 | Motion for General Default filed. | | |
| 11/01/2021 | Printout from www.usps.com showing that the envelope with Tracking #:71901706197000980878 was returned to the sender on September 15, 2021 because the item had been unclaimed, filed. | | |
| 12/28/2021 | Motion for General Default allowed. (Patterson, Rec.)<br><br>Judge: Patterson, Deborah J. | | |
| 01/04/2022 | Letter from attorney Leahy, received. | | |
| 01/05/2022 | Final Judgment entered as to tax-taking(s): Property: Land and any building(s) thereon Containing 29.336 AC (more or less) Location: 231 Turnpike Road Assessors: 32-48-0 Registry: Worcester District Registry of Deeds Book 19369, Page 75.<br><br>Judge: Patterson, Deborah J. | | |
| 01/10/2022 | Land Court overpayment refund disbursement<br>Notice of Disposition sent to: Iris Ann Leahy, Esq. 4 Open Square Way Suite 217 Holyoke, Massachusetts 01040 | $155.91 | |
| 01/04/2023 | Land Court cost- vacation of judgment tax lien Receipt: 437156 Date: 01/04/2023 | $11.00 | |
| 01/04/2023 | Defendant's Westborough SPE, LLC's Motion to Vacate foreclosure Judgment, filed. | | Image |
| 01/05/2023 | Scheduled<br>Judge: Patterson, Deborah J.<br>Event: Motion to Vacate Judgment<br>Date: 01/19/2023 Time: 02:00 PM | | |
| 01/05/2023 | Ex Parte Motion for Approval of Memorandum of Lis Pendens,filed. | | Image |
| 01/05/2023 | Summons and Hearing Notice issued on Application for Lis Pendens.<br>Judge: Speicher, Hon. Howard P.<br>Event: Hearing on Lis Pendens<br>Date: 01/10/2023 Time: 09:00 AM | | |
| 01/10/2023 | Hearing on defendant's motion for approval of a memorandum of lis pendens held by videoconference. Attorney Iris Ann Leahy appeared for the plaintiff. No attorney appeared on behalf of defendant Westborough SPE, LLC; however, Lolonyon Akouete, a non-attorney and manager of defendant, purported to appear pro se on behalf of the defendant. Attorney Leahy reported that there is no imminent sale pending of the subject property because there is a hearing on a motion to vacate scheduled for January 19, 2023 on the defendant's request to redeem the property. The court advised Mr. Akouete that an organization such as an LLC cannot be represented by a non-attorney, and that the court cannot go | | |

| Docket Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| | forward on the motion until the defendant engages an attorney to sign and file the motion on its behalf. Accordingly, the court took no action on the motion for approval of a memorandum of lis pendens. | | |
| 01/13/2023 | Event Resulted: Motion to Vacate Judgment scheduled on: 01/19/2023 10:00 AM Has been: Rescheduled. Motion to continue hearing to February 9, 2023 at 2:00pm, filed. | | Image |
| 01/13/2023 | Scheduled Judge: Patterson, Deborah J. Event: Motion to Vacate Judgment Date: 02/09/2023 Time: 02:00 PM | | |
| 01/30/2023 | Plaintiff's Memorandum in Opposition to defendant Westborough SPE, LLC'S Motion to Vacate Foreclosure Judgment, filed. | | Image |
| 01/31/2023 | Affidavit of Frances Juan Blaustein Scholes, filed by email. | | Image |
| 02/01/2023 | Plaintiff's Objection to Pro Se Filings by the Defendant, filed. | | Image |
| 02/02/2023 | Emergency motion to continue the hearing, filed. | | Image |
| 02/02/2023 | Event Resulted: Motion to Vacate Judgment scheduled on: 02/09/2023 02:00 PM Has been: Rescheduled to February 23, 2023 at 2:00pm Deborah J. Patterson, Presiding | | |
| 02/02/2023 | Emergency motion to continue the hearing Allowed. Motion to Vacate Judgment continued to February 23, 2023 at 2:00pm, no further continuance will be granted. <br><br>Judge: Patterson, Deborah J. | | |
| 02/02/2023 | Scheduled Judge: Patterson, Deborah J. Event: Motion to Vacate Judgment Date: 02/23/2023 Time: 02:00 PM | | |
| 02/22/2023 | Defendant, Westborough SPE, LLC, response to Plaintiff Memorandum in Opposition to Defendant's Motion to Vacate Foreclosure Judgment filed by email. | | Image |
| 02/22/2023 | Appearance of Scott Adam Schlager, Esq. for Westborough SPE, LLC, filed | | Image |
| 02/22/2023 | Appearance of Alvin S Nathanson, Esq. for Westborough SPE, LLC, filed | | Image |
| 02/22/2023 | Defendant Westborough SPE, LLC's emergency motion for a brief continuance of hearing scheduled for February 22, 2023 because of recent engagement of legal counsel, filed. | | Image |
| 02/23/2023 | Event Resulted: Motion to Vacate Judgment scheduled on: 02/23/2023 02:00 PM Has been: Rescheduled Deborah J. Patterson, Presiding | | |
| 02/23/2023 | Defendant Westborough SPE, LLC's Emergency Motion for a brief continuance of hearing scheduled for February 22, 2023 because of recent engagement of legal counsel is ALLOWED. Motion to Vacate to be heard on March 23, 2023 at 2:00pm. <br><br>Judge: Kelley, Ellen M. | | |
| 02/23/2023 | Scheduled Judge: Patterson, Deborah J. Event: Motion to Vacate Judgment Date: 03/23/2023 Time: 02:00 PM | | |
| 03/08/2023 | Supplement to Plaintiff's opposition to defendant Westborough, SPE, LLC's motion to vacate foreclosure judgment, filed. | | Image |
| 03/23/2023 | Notice, filed by Attorney Schlager.. | | Image |
| 03/23/2023 | Notice, filed by Attorney Schlager. | | Image |
| 03/23/2023 | Defendant Westborough SPE, LLC's Emergency Motion for a writ of Mandamus Ordering the Town of Westborough by and Through its Treasurer to Produce with Certification Signed Under the Penalties of Perjury the Amount for Redemption of Real Property Located at 231 Turnpike Road, Westborough, Massachusetts and Request for Extension of time , filed. | | Image |
| 03/23/2023 | Defendant Westborough Spe, Llc's Emergency Motion In Limine To Exclude Any And All Testimony Of Plaintiff's Witnesses, Peter Blaustein, Legal Guardian, Convervator, Power Of Attorney For F. Jan Blaustein A/K/A Jan Blaustein Scholes, And Dyann Blaine, As To Corporate Authority Or Causation, Barring Admission Of Any Evidence Of Unclaimed Fund Denial In California; And Barring Admission Of Any Evidence Of A Lay Witness As To Corporate Authority, That Is Irrelevant, Or Any Evidence That Is Speculative, Or Any Evidence That Is Unfairly Prejudicial, filed | | Image |

| Docket Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 03/23/2023 | Event Resulted: Motion to Vacate Judgment scheduled on:<br>03/23/2023 02:00 PM<br>Has been: Not held | | |
| 03/23/2023 | Case has been ASSIGNED to the Honorable Howard P. Speicher | | |
| 03/29/2023 | Scheduled<br>Judge: Speicher, Hon. Howard P.<br>Events: Date: 05/16/2023 Time: 10:15 AM<br><br>Defendant Westborough SPE, LLC's Emergency Motion for a writ of Mandamus Ordering the Town of Westborough by and Through its Treasurer to Produce with Certification Signed Under the Penalties of Perjury the Amount for Redemption of Real Property Located at 231 Turnpike Road, Westborough, Massachusetts and Request for Extension of time<br><br>Defendant Westborough SPE, LLC's Motion for Issuance of a Memorandum of Lis Pendens and/or Temporary Equitable Relief and for Permission to File a verification of its Motion to Vacate, filed.<br><br>Defendant Westborough Spe, Llc's Emergency Motion In Limine To Exclude Any And All Testimony Of Plaintiff's Witnesses, Peter Blaustein, Legal Guardian, Convervator, Power Of Attorney For F. Jan Blaustein A/K/A Jan Blaustein Scholes, And Dyann Blaine, As To Corporate Authority Or Causation, Barring Admission Of Any Evidence Of Unclaimed Fund Denial In California; And Barring Admission Of Any Evidence Of A Lay Witness As To Corporate Authority, That Is Irrelevant, Or Any Evidence That Is Speculative, Or Any Evidence That Is Unfairly Prejudicial | | |
| 04/11/2023 | Defendant Westborough SPE, LLC's Motion for Issuance of a Memorandum of Lis Pendens and/or Temporary Equitable Relief and for Permission to File a verification of its Motion to Vacate, filed. | | Image |
| 04/13/2023 | Defendant Westborough SPE, LLC's Emergency Motion for Preliminary Injunctive Relief (Temporary Restraining Order), filed. | | Image |
| 04/18/2023 | Notice, filed. | | Image |
| 05/03/2023 | Plaintiff Town of Westborough's Opposition to Defendant Westborough SPE, LLC'S Emergency Motion for a Writ of Mandamus , filed. | | Image |
| 05/03/2023 | Plaintiff Town of Westborough's Opposition to Defendant Westborough SPE, LLC'S Motion for Issuance of a Memorandum of Lis Pendens and/or Temporary Equitable Relief and for Permission to File a Verification of its Motion to Vacate,filed. | | Image |
| 05/04/2023 | Assent of to the Entry of Judgment. | | Image |
| 05/04/2023 | Waiver of Notice and Assent to the Entry of Judgment, filed. | | Image |
| 05/04/2023 | Opposition, filed. | | Image |
| 05/05/2023 | Citation by Deputy Sheriff to , returned with service thereon. | | Image |
| 05/05/2023 | Defendant Westborough SPE, LLC's Emergency Motion to Strike Peter Blaustein's Unlawful Filing of a Waiver of Notice and Assent to the Entry of Judgment and Motion for the Imposition of Mass. R. CIV P. Rule 11 Sanctions Against Attorney Iris A. Leahy, the Town of Westborough, and Peter Blaustein, for Assisting in the Perpetration of an Alleged Fraud on the Court, Unauthorized Practice of Law, and Conduct Prejudicial to the Administration of Justice, filed. | | Image |
| 05/15/2023 | Defendant Westborough SPE, LLC's Reply to Plaintiff Town of Westborough's Opposition to Defendant Westborough SPE, LLC'S Motion for Issuance of a Memorandum of Lis Pendens and/or Temporary Equitable Relief and for Permission to File a Verification of its Motion to Vacate,filed. | | Image |
| 05/16/2023 | Hearing on Westborough SPE, LLC's motion for a writ of mandamus, motion for issuance of a memorandum of lis pendens, motion for preliminary injunctive relief, and motion in limine held by videoconference. Attorneys Iris Ann Leahy and Scott Adam Schlager appeared and argued. Attorneys Alvin Nathanson and Edward Englander also appeared. Following argument, the motion in limine is DENIED without prejudice. Likewise, the motion for a writ of mandamus, motion for issuance of a memorandum of lis pendens, and motion for preliminary injunctive relief are DENIED. The court will hold an evidentiary hearing on Westborough SPE, LLC's motion to vacate judgment, to be scheduled in late July 2023, to determine whether Westborough SPE, LCC, having appeared in this case, is the taxpayer who has the right to redeem the subject property. Counsel are instructed to file requests for production of documents, if any, by June 2, 2023. Counsel must respond to the requests for production of documents by July 6, 2023, after which the court will schedule a pretrial conference. No other discovery, such as interrogatories or depositions, may be conducted. | | |
| 05/30/2023 | Letter from Attorney Leahey, filed. | | Image |
| 05/30/2023 | Plaintiff's Request for Production of Documents, filed. | | Image |
| 05/31/2023 | Westborough SPE LLC's First Notice of Supplemental Authority in support of its Motion to Vacate, filed. | | Image |
| 06/02/2023 | Defendant Westborough SPE, LLC's First Request for the Production of Documents to Plaintiff,Town of Westborough, filed. | | Image |

| Docket Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 06/02/2023 | Defendant Westborough SPE, LLC's First Request for the Production of Documents to Defendant F. Jan Blaustein a/k/a Jan Blaustein Scholes,R.E. Signatory & Agent for Westborough SPE, LLC's and Pres. of Babcock & Brown Administrative Services.,INC, filed. | | Image |
| 06/30/2023 | Defendant Westborough SPE, LLC's Notice of Supplementation, filed. | | Image |
| 07/06/2023 | Defendant Westborough SPE, LLC's Second Notice of Supplementation, filed. | | Image |
| 07/11/2023 | Defendant Westborough SPE, LLC's Responses and Objections to Plaintiff'f (First) Request for Production of Documents,filed | | |
| 07/11/2023 | Plaintiff Town of Westborough's Response to Defendant's First Request for the Production of Documents to Plaintiff Town of Westborough, filed. | | |
| 07/13/2023 | Scheduled<br>Judge: Speicher, Hon. Howard P.<br>Event: Pre-Hearing on Motion to Vacate Judgment<br>Date: 08/10/2023 Time: 02:00 PM rescheduled to August 17, 2023 at 2pm. | | |
| 07/27/2023 | Motion to continue Pre-trial Conference, filed. | | Image |
| 07/27/2023 | Defendant Westborough SPE, LLC's Opposition to the Town of Westborough's Motion to continue Pre-trial Conference, filed. | | Image |
| 07/28/2023 | Plaintiff Town of Westborough's amended motion to continue the pre-hearing conference on the pending motion to vacate is ALLOWED. The pre-hearing conference is rescheduled to August 31, 2023 at 2:00 P.M. by videoconference. | | |
| 07/28/2023 | Event Resulted: Pre-Trial Conference scheduled on:<br>08/17/2023 02:00 PM<br>Has been: Rescheduled For the following reason: Request of Plaintiff(s)<br>Hon. Howard P. Speicher, Presiding | | |
| 07/28/2023 | Scheduled<br>Judge: Speicher, Hon. Howard P.<br>Event: Pre-Trial Conference<br>Date: 08/31/2023 Time: 02:00 PM | | |
| 07/28/2023 | Amended Motion to continue Pre-trial Conference, filed. | | Image |
| 08/24/2023 | Notice of Statutory Attorneys' Lien by Nathanson & Goldberg P.C., filed. | | Image |
| 08/24/2023 | Defendant Westborough SPE LLC's (First) Notice of Supplementation to Plaintiff's (First) Request for Production of Documents,fiiled. | | Image |
| 08/24/2023 | Westborough SPE, LLC Limited Liability Agreement,filed. | | Image |
| 08/25/2023 | Joint Pre-Trial Memorandum, filed. | | Image |
| 08/31/2023 | SUGGESTION OF BANKRUPTCY, FILED. | | Image |
| 08/31/2023 | Notice of Docket Entry:<br>Counsel for defendant Westborough SPE, LLC, to report to the court on the status of the bankruptcy petition by October 31, 2023 and every sixty days thereafter.<br>Notice of the docket entry sent. | | |
| 08/31/2023 | Event Resulted: Pre-Trial Conference scheduled on:<br>08/31/2023 02:00 PM<br>Has been: Not held per request of the defendant.<br>Hon. Howard P. Speicher, Presiding | | |

## Financial Summary

| Cost Type | Amount Owed | Amount Paid | Amount Dismissed | Amount Outstanding |
|---|---|---|---|---|
| Cost | $367.17 | $367.17 | $0.00 | $0.00 |
| | $367.17 | $367.17 | $0.00 | $0.00 |

- **Money on Deposit**

| Account | Applied Amount |
|---|---|
| Land Court Deposit Holding | $141.17 |
| | $141.17 |

- **Money Distributed by Court**

| Payment Type | Amount |
|---|---|
| Disbursement | $558.83 |
| | $558.83 |

## Check Information

| Created | Payee Name | Description | Account | Check | Amount |
|---|---|---|---|---|---|
| 08/28/2019 | Michael H. Delaney | Case: 19 TL 000768 Land Court examiner costs | LCD | 31780 | $150.00 |
| 10/20/2020 | Gatehouse Media MA 390711 | Case: 19 TL 000768 Land Court newspaper payments | LCD | 33258 | $252.92 |
| 10/20/2020 | Gatehouse Media MA 390711 | Case: 19 TL 000768 Land Court newspaper payments | LCD | 33259 | $252.92 |
| 10/20/2020 | Gatehouse Media MA 390711 | Case: 19 TL 000768 Land Court newspaper payments | LCD | 33258 | -$252.92 |
| 01/10/2022 | Town of Westborough | Case: 19 TL 000768 Land Court overpayment refund d | LCD | 34880 | $155.91 |

## Receipts

| Receipt Number | Receipt Date | Received From | Payment Amount |
|---|---|---|---|
| 405581 | 07/09/2019 | Town of Westborough | $515.00 |
| 417793 | 09/01/2020 | Bloom, Esq., Dawn E | $400.00 |
| 418144 | 09/23/2020 | Bloom, Esq., Dawn E | $59.75 |
| 418145 | 09/23/2020 | Bloom, Esq., Dawn E | $52.50 |
| 418637 | 10/20/2020 | Bloom, Esq., Dawn E | $5.00 |
| 422168 | 04/08/2021 | Bloom, Esq., Dawn E | $11.96 |
| 423362 | 06/10/2021 | Bloom, Esq., Dawn E | $11.96 |
| 437156 | 01/04/2023 | Aaron B. O'Neal | $11.00 |
| | | | $1,067.17 |

## Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Judgment Entered | 01/05/2022 | Speicher, Hon. Howard P. |

# Exhibit K

**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF MASSACHUSETTS**

---------------------------------X

**WESTBOROUGH SPE LLC**, a Delaware limited liability company,

*Plaintiff.*

v.

**TOWN OF WESTBOROUGH**, *a municipal corporation of The Commonwealth of Massachusetts*; **SHELBY MARSHALL**, *individually and in the official capacity as Select Board Member*; **IAN JOHNSON**, *individually and in the official capacity as Select Board Member*; **ALLEN EDINBERG**, *individually and in the official capacity as Select Board Member*; **SEAN KEOGH**, *individually and in the official capacity as Select Board Chair*; **PATRICK WELCH**, *individually and in the official capacity as Select Board Vice-Chair*; **PETER BLAUSTEIN**, *individually,*

Defendants.

---------------------------------X

Civil Action #: ______________________

**<u>JURY TRIAL DEMANDED</u>**

**VERIFIED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

Plaintiff Westborough SPE LLC ("**Plaintiff**") brings this Verified Complaint for declaratory and other relief, including under 42 U.S.C. §1983, and alleges, on knowledge as to its own actions, and otherwise upon information and belief:

## 1. PRELIMINARY STATEMENT

1. This civil action seeks to vindicate Plaintiff's constitutional and common law rights and hold responsible municipal defendants and co-conspirators accountable for their unlawful actions that deprived Plaintiff of 100% of its commercial real property located at 231 Turnpike Road, Westborough, Massachusetts ("**Locus**").

2. This lawsuit also seeks declaratory relief as to the constitutionality of M.G.L. c. 60, §§28 and 64, and actions of the Massachusetts Land Court vis-à-vis the tax title foreclosure process as applied to the Plaintiff.

3. Massachusetts tax deeds fail federal and Massachusetts due process scrutiny for two reasons. First, they allow municipalities like the Town of Westborough to keep property that is far beyond the amount for which they have a claim in violation of the Supreme Court's holding in *Tyler v. Hennepin Cty. Minnesota*, 598 U.S. 631 (2023). Second, they allow a municipality to take title from the taxpayer without providing a pre-seizure hearing. Neither problem is acceptable under constitutional analysis.

4. This case arises out of an actual case and controversy. The Town of Westborough, Massachusetts ("**Town of Westborough**") seized Plaintiff's commercial real property having an approximate fair market value of $5,235,000.00 ($9,264,800.00 assessed value) as payment for tax debt of $119,628.17 in 2018, without a hearing, in a tax foreclosure process saddled with constitutional due process violations.

5. The Town of Westborough violated the Takings Clause of the United States Constitution when it took the Plaintiff's real property without compensation, and a property owner may bring a Fifth Amendment claim under §1983 at such time. *See Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2164 (2019) citing *Jacobs v. United States*, 290 U.S. 13 (1933).

6. In *Wayside Church v. Van Buren S.*, 847 F.3d 812, 823 (6th Cir. 2017), Justice Kethledge stated in his dissent: "In this case the defendant Van Buren County took property worth $206,000 to satisfy a $16,750 debt, and then refused to refund any of the difference. In some legal precincts that sort of behavior is called theft." A footnote in *Tallage Lincoln, LLC v. Williams*, 485 Mass. 449, 453 n.4 (2020), framed the constitutional issue this way:

> Several of our sister States have determined that excess value from a tax taking must be made available to the taxpayer as a matter of constitutional law. *See*, *e.g.*, *Thomas Tool Servs., Inc. v. Croydon*, 145 N.H. 218, 220 (2000) (tax lien procedure resulting in equity windfall to purchaser of tax deed violated takings clause of New Hampshire Constitution); *Bogie v. Barnet*, 129 Vt. 46, 55 (1970) (retention of excess value by town amounts to unlawful taking for public use without compensation contrary to Vermont Constitution).
>
> In *Kelly v. Boston*, 348 Mass. 385, 388 (1965), [the Supreme Judicial Court ("SJC")] considered the legislative history of the statutory scheme governing tax lien foreclosures and determined that the Legislature intended that the process result in forfeiture of the taxpayer's equity to the municipality. The parties in that case did not raise any constitutional challenge, and [the SJC] did not address the constitutionality of the statutory scheme.

7. As acknowledged in the quotation above from *Tallage Lincoln, LLC v. Williams*, *supra*, at least two other New England states have recognized that the tax lien and foreclosure process still used in Massachusetts is an unconstitutional taking of private property. Vermont led the way in *Bogie v. Town of Barnet*, 129 Vt. 46, 55, 270 A.2d 898 (1970). The Vermont Constitution, Chapter 1, Article 2, requires that "whenever any person's property is taken for the use of the public, the owner ought to receive an equivalent in money." The court in *Bogie v. Barnet* held as follows (129 Vt. at 49, 270 A.2d at 900):

> A policy which encouraged municipal governments to promote situations where it was authorized to acquire the property of its own taxpayers at unconscionable discounts, to the enrichment of the town treasury or enlargement of its land holdings, is fraught with danger and we find not contemplated by the legislative enactment.

8. The Supreme Court recognized the unconstitutionality of equity theft as far back as the 1800s in *United States v. Lawton*, 110 U.S. 146, (1884), when it said, in connection with a similar direct bidding-off by the United States in a tax sale:

> To withhold the surplus from the owner would be to violate the fifth amendment to the constitution, and deprive him of his property without due process of law or take his property for public use without just compensation. If he affirms the propriety of selling or taking more than enough of his land to pay the tax and penalty and interest and costs, and applies for the surplus money, he must receive at least that.
>
> The corresponding rights under the Vermont Constitution upon a taking by public authority appear in Chapter I, Article 2. Satisfaction of the statutory procedures, although they may meet the test of due process, does not negate the obligation to account for the excess proceeds received from the sale.

9. U.S. Constitution, Amend. 5, states that: "No person shall be … deprived of … property, without due process of law; nor shall private property be taken for public use, without just compensation."

10. Massachusetts Courts are left with no option but to enforce Massachusetts law on tax title foreclosures and permit "equity theft", because the legislature has failed to act quickly in response to newly enacted Supreme Court precedent established in *Tyler v. Hennepin Cnty.*, 598 U.S. 631 (2023) ("***Tyler***").

11. The federal excessive fines standard under U.S. Const. Amend 8 ("Excessive bail shall not be required, nor excessive fines imposed ….") is laid out in *United States v. Bajakajian*, 524 U.S. 321, 327–28 (1998). A fine is excessive when it is punitive and grossly disproportionate to the offense. *Id*. at 333–34. The law already gives municipalities, like the Town of Westborough in this case, a right to collect a tax debt with substantial interest and costs. Taking more than that is grossly disproportionate to the non-criminal failure to pay a debt, especially where the failure arises from poverty, medical problems, or lack of knowledge.

12. The Supreme Court is the "ultimate interpreter of the Constitution" and the United States Constitution is the "supreme law of the land." *Baker v. Carr*, 369 U.S. 186, 211 (1962); *Cooper v. Aaron*, 358 U.S. 1, 18-20 (1958); U.S. Const. art. VI (Supremacy Clause).

13. Thus, it would be constitutional error to assert that the Massachusetts Land Court ("**Land Court**") can stand by and wait for remedial state legislative action when it is required to implement the holding of *Tyler* immediately, especially as to Plaintiff's dispute with the Town of Westborough.

14. The Land Court has an unfettered constitutional obligation, under the Due Process, Takings, and Supremacy Clauses of the United States Constitution, to cure the scourge of real property equity theft no matter if the Massachusetts General Court ("Legislature") ever enacts any legislation.

15. The Land Court's standard form tax lien complaint, employed by municipal tax lien foreclosure claimants as the starting point in any tax lien foreclosure case, awards successful claimants with "absolute title" to real property irrespective of how minimal the taxes owed are and how substantial the homeowner's equity is when the Land Court judgment is entered. This directly contravenes the May 25, 2023 ruling in *Tyler*, the Takings Clause of the United States Constitution, and abridges fundamental constitutional property rights of real property holders, including those rights secured under the Due Process, Takings, and Supremacy Clauses of the United States Constitution.

16. By statute, M.G.L. c. 60, § 50B, every community in Massachusetts must include in its annual budget the necessary monies to pay for tax foreclosure proceedings. This appropriation is estimated by the municipal treasurer and must be at least $80 for each tax title ripe for foreclosure held by the community involving property having a current assessed valuation greater than $100,000.00. Massachusetts has ingrained and granted its imprimatur to the tax foreclosure practice as currently implemented through statutory enactment.

## 2. JURISDICTION

17. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under rights conferred by the United States Constitution and the Civil Rights Act of 1871, 42 U.S. Code §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution, under 42 U.S.C. §§ 1985(2) and 1986, and federal law.

18. This Court also has original subject matter jurisdiction under 28 U.S.C. § 1343(a)(2).

19. This Court has ancillary jurisdiction over Massachusetts state-law claims under 28 U.S.C. § 1367.

20. This Court has subject matter jurisdiction over Plaintiff's declaratory judgment claims under 28 U.S.C. § 2201(a), 28 U.S.C. § 2202, and Fed. R. Civ. P. 57.

21. This Court also has subject matter jurisdiction pursuant to 28 U.S.C § 1332. A limited liability company (LLC) is a citizen of all states in which each of its members is a citizen (*see Mgmt. Nominees, Inc. v. Alderney Investments, LLC*, 813 F.3d 1321, 1325 (10th Cir. 2016)). The 100% Member of Plaintiff is Mignonette Investments Limited, a British Virgin Islands limited partnership and thus the Plaintiff is only a citizen of the British Virgin Islands.

22. No Defendant has a citizenship of the British Virgin Islands and thus there is complete diversity.

23. The amount in controversy exceeds $75,000.00 exclusive of interest and costs.

24. This Court has the authority to provide preliminary and permanent injunctive relief under Rule 65 of the Federal Rules of Civil Procedure.

25. This Court has personal jurisdiction over all defendants because they have made and established contacts within The Commonwealth of Massachusetts to permit the exercise of personal jurisdiction over them.

## 3. VENUE

26. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that at least one defendant has its principal place of business in Boston, Suffolk County, Massachusetts and 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

## 4. PARTIES

27. Plaintiff Westborough SPE LLC ("**Plaintiff**") is a limited liability company formed under the laws of the State of Delaware and does business in Westborough, Massachusetts. Plaintiff has a single 100% member: Mignonette Investments Limited — a British Virgin Islands limited partnership. Plaintiff was the record owner of the real property located at the Locus before the Town of Westborough's unlawful actions.

28. Defendant Town of Westborough is a Massachusetts municipal corporation ("**Town of Westborough**") having a usual place of business at 34 West Main Street, Westborough, Massachusetts 01581.

29. Upon information and belief, Defendant Shelby Marshall ("**Marshall**"), individually and in the official capacity as Select Board Member resides at 7 Charles Street, Westborough, Massachusetts 01581.

30. Upon information and belief, Defendant Ian Johnson ("**Johnson**"), individually and in the official capacity as Select Board Member resides at 9 Bertis Adams Way, Westborough, Massachusetts 01581.

31. Upon information and belief, Defendant Allen Edinberg (“**Edinberg**”), individually and in the official capacity as Select Board Member resides at 8 Nash Street, Westborough, Massachusetts 01581.

32. Upon information and belief, Defendant Sean Keogh (“**Keogh**”), individually and in the official capacity as Select Board Chair resides at 28 Longmeadow Road, Westborough, Massachusetts 01581.

33. Upon information and belief, Defendant Patrick Welch (“**Welch**”), individually and in the official capacity as Select Board Vice-Chair resides at 15 Chauncy Circle, Westborough, Massachusetts 01581.

34. Defendants Marshall, Johnson, Edinberg, Keogh, and Welch are collectively referred to as the (“**Select Board**”).

35. Upon information and belief, Defendant Peter Blaustein (“**Mr. Blaustein**”), individually, resides at 950 Vista Road, Hillsborough, California 94010. Mr. Blaustein is the son of F. Jan Blaustein Scholes, a former general counsel and executive at Babcock & Brown Administrative Services, Inc. and manager of Babcock & Brown Parallel Member LLC, its successor in interest and who transferred her manager role to Lolonyon Akouete and Denise Edwards by written agreement in accordance with the Plaintiff’s LLC Operating Agreement.

## 5. RIPENESS/STANDING

36. This case is ripe for adjudication because it has created a direct and immediate dilemma for the parties—the Town of Westborough has foreclosed on the Locus.

37. Plaintiff meets all three Article III standing requirements under *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiff has a personal stake in the outcome of this litigation because its real property (its most significant financial asset) has been improperly seized

by the Town of Westborough for the nonpayment of property taxes. The improper foreclosure of Plaintiff's real property at the Locus constitutes an injury in fact that this Court can redress. The Land Court, Judge Locke (given his control over the Trial Court), the Attorney General, and the Town of Westborough have the power to prevent the Town of Westborough's unlawful taking of Plaintiff's real property at the Locus.

38. The constitutional injuries endured by the Plaintiff, as detailed here, are directly traceable to Town of Westborough actors.

## 6. FACTS

### a. <u>TOWN OF WESTBOROUGH'S PREMATURE AND UNLAWFUL REQUEST FOR PROPOSAL ("RFP")</u>.

39. In or about early June 2022, the Town of Westborough issued an RFP by which it solicited offers to purchase the former Regal Cinema property located at the Locus, consisting of a lot of around 29 acres and containing a structure that was formerly used as a movie theater, which the Town of Westborough had acquired by foreclosure of a tax lien ("**RFP**").

40. The Select Board of the Town of Westborough ("**Select Board**") scored the proposals as "highly advantageous", "advantageous", or "least favorable" with respect to each of the five above criteria.

41. Question 5 in the RFP Addendum asked: Will the closing happen after the redemption period expires?" The Town of Westborough answered: "The Town is willing to consider closing on the property after the redemption period has expired, provided the closing occurs no later than January 30, 2023, and, further, that **<u>the Town may give preference to proposers who are willing to close on the property prior to the expiration of the redemption period</u>**." (Emphasis added).

42. Since the judgment of foreclosure in the tax lien case (Land Court Case # 19 TL 000768-HPS), issued on January 5, 2022, Plaintiff could petition the Land Court to redeem he property until January 5, 2023, which Plaintiff indeed did.

43. The Town of Westborough received three proposals to its RFP by the due date of July 25, 2022.

(a) The high bidder was Pulte Homes of New England, LLC, which offered $7,942,000.00 and proposed to raze the existing movie theater structure and replace it with 108 non-age-restricted residential condominium units ("**Pulte Proposal**"). The Select Board for the Town of Westborough ultimately rejected this proposal.

(b) The other two proposals were commercial in nature:

(i) Lax Media LLC and its Massachusetts subsidiary proposed to re-open a movie theater.

(ii) Ferris Development proposed to make the property the second of its "Beehive" locations, an innovative approach to workspace for tradespeople. Beehive sites offer physical space for everyday trades (such as electricians, plumbers, painters, and carpenters). Ferris Development offered to pay $2,875,000. Lax Media LLC and its Massachusetts subsidiaries proposed $2,500,001.

44. According to the minutes and agendas of the Town of Westborough Select Board, they met in executive session to discuss the RFP matter at least seven times after receiving the RFP proposals. These executive sessions took place on August 2nd, August 23rd, September 6th, September 13th, September 27th, October 11th, and October 26th, 2022.

45. On November 2, 2022, the Town of Westborough Select Board met in open session to discuss the RFP matter. They took less than five minutes to announce that they had given Lax

three ratings of "highly advantageous" and two of "advantageous (without specifying which of the criteria won each rating); Ferris Development received two (2) ratings of "highly advantageous", three (3) ratings of "advantageous", and Pulte received two (2) ratings of "highly advantageous", one (1) rating of "advantageous", and two (2) ratings of "least advantageous".

46. The Select Board then voted on November 2, 2022 to award the purchase and sale agreement to the Lax entities. Under the terms of the RFP, The Town of Westborough and Lax were to enter into a purchase and sale agreement within 30 days from the date of the vote.

47. The Town of Westborough, going through the RFP process highlighted above, shows that the Town of Westborough initially decided not to sell the property through the tax title process described in M.G.L. c. 60.

48. The Town of Westborough's action of going through the RFP and selecting the Lax Entities as the winning bidder illustrates that the Town of Westborough, its Select Board, Attorney, Town Manager, and Chief Assessor have recklessly disregarded their obligation to pay fair market value for the taken property. By not selecting the highest bidder Pulte, the Town has sought to minimize the value paid to the Plaintiff in violation of law.

49. The Town of Westborough through their RFP process failed to follow their own criteria. "A public authority [like the Select Board of the Town of Westborough] inviting bids may not, like Humpty Dumpty, choose to let words it uses in an invitation mean what the public authority chooses those words to mean. When words in an invitation are invested with a meaning known only to the issuer of the invitation to bid, the legislative aims that bids be submitted on a common basis is thwarted. Fairness and equality require that bidders have the opportunity to bid in the same way and on the same information such that they bear the same risk of rejection." *See White's Farm Dairy, Inc. v. City of New Bedford*, 1999 Mass. Super. LEXIS 294 at *34-35.

50. The Town of Westborough flouted their legal duty by offering the Locus up for sale before adjudication of Plaintiff's property rights.

51. The Select Board for the Town of Westborough rated the Lax Entities' proposal higher than that of Ferris Development because the Town expected that the Lax entities' proposal would generate higher tax revenue than that of Ferris Development.

52. The property valuations relied upon by the Town of Westborough in determining projected tax revenue are facially suspect. The assessors claimed to estimate that Lax Entities' proposal would yield a property worth $9,329,750, while Ferris Development's would produce a fair market value of only $5,501,830. It strains credulity to suggest that Ferris Development would invest $2,875,000 to purchase the property and another $2 million +/- to develop it only to be content with a resulting parcel worth scantly more than the purchase and development cost. Given the contraction in the movie theater use segment in recent years, and the example of the failure of a cinema use on the very site that was at issue, it is unlikely that Lax entities could almost quadruple its purchase money investment by continuing a movie theater use. No real estate valuation professional in the United States would assign a higher valuation or capitalization rate to a movie theater than to a shared work storage space or housing units.

53. This constitutes prima facie evidence that the Town of Westborough was covering up a process that did not follow its own RFP, that violated the Plaintiff's constitutional rights, and that defies economic logic—seeking to resume a prior failed use of the property as a movie theater.

54. While "The town has broad power to control and dispose of real property on the terms and conditions it deems appropriate," and is not required to "transfer land to the highest bidder" (*see Mangano v. Town of Wilmington*, 51 Mass. App. Ct. 857, 859 (2001)), Towns must not violate bedrock constitutional principles in the exercise of their discretion.

55. The Town of Westborough has stated on the record in a Plymouth County Superior Court proceeding:

> "the Town had a rational basis for accepting Lax Media's proposal over that of [Ferris Development Group] because Lax Media's proposal provided greater financial benefits to the Town and was able to proceed more quickly than FDG's, even if FDG's proposal reflected greater financial resources. Because Lax Media and FDG received the same score on price proposal and sustainability, and the Select Board reasonably determined Lax Media's proposal was better than FDG's on two of the three remaining criteria, the Town's decision was not arbitrary and the Court should not substitute its judgment for that of the Select Board. Because the Select Board's decision was based on grounds upon which reasonable persons would rely, FDG does not have a likelihood of success on the merits of its claims here."
>
> *See* Opposition of the Town of Westborugh, *Ferris Development Group, LLC v. Town of Westborough et als.*, Superior Court Dept. Civil Action #2285cv01281 (Worcester Cty.) at pp. 12-13.

56. Furthermore, the Chief Assessor for the Town of Westborough stated:

> "The Assessor estimated Lax Media's use of the Property as a cinema would produce an estimated $192,507.33 in tax revenue annually, which was significantly more than [Ferris Development Group's] estimated annual tax revenue of $101,821.29 because of the more developed state the facility would be in as a cinema as opposed to a warehouse and meeting place for tradespeople…Moreover, the cinema use would also bring in tax revenue through ticket sales and meals taxes and personal property taxes on the high-technology fixtures installed…The cinema use would provide an evening destination for the entire community, stimulating nearby restaurants, whereas [Ferris Development Group's] proposal is an untested experiment following in the footsteps of the failed WeWork business model…[Ferris Development Group's] dismissal of the number of jobs Lax Media's cinema use would create is remarkable given that the cinema was estimated to create 10 full-time jobs, 20 part-time jobs, and several seasonal jobs…"
>
> *See Id.* at pages 13-14.

57. The Town of Westborough has a self-interest that it believes contravenes Plaintiff's constitutional rights—generating increased tax revenues for the Town of Westborough (which are suspect and speculative justifications), creating jobs, and continuing a prior use as it will have a lower effect on municipal services. This is all to the detriment of Plaintiff's Constitutional rights.

**b. The Town of Westborough and Its Agents Engaged in An Unconstitutional Taking of Property Without Just Compensation.**

58. The Land Court, by request of the Town of Westborough, has granted official imprimatur to an unconstitutional practice. It is the practice—sanctioned by statute[1]—of using unpaid real estate property taxes to seize real property for a municipality's own benefit, selling (or attempting to sell) it for amounts that far exceed the amount of unpaid taxes, retaining not just the amount owed for unpaid taxes, but all of the sale proceeds, including all of the property owner's equity in the real property. This is the practice of "equity theft".

59. The Town of Westborough's desire to retain the value of sale proceeds in excess of the unpaid taxes due on real property and associated charges violates the United States Constitution's prohibitions on the taking of private property for public use without just compensation and constitutes an excessive fine for the nonpayment of property taxes.

60. The willful intent has been manifested not only by the Town of Westborough Select Board, but also by and through its attorneys, treasurer/collector, and Town of Westborough officials and agents. This intent has been publicly broadcast in newspapers throughout Massachusetts. *See*, *e.g.*,

[1] M.G.L. c. 60, § 53 provides, "If a tax on land is not paid within fourteen days after demand therefor and remains unpaid at the date of taking, the collector may take such land for the town, first giving fourteen days' notice of his intention to exercise such power of taking, which notice may be served in the manner required by law for the service of subpoenas on witnesses in civil cases or may be published, and shall conform to the requirements of section forty five. He shall also, fourteen days before the taking, post a notice so conforming in two or more convenient and public places . . ."

M.G.L. c. 60, § 54 provides in pertinent part, "The instrument of taking shall be under the hand and seal of the collector and shall contain a statement of the cause of taking, a substantially accurate description of each parcel of land taken, the name of the person to whom the same was assessed, the amount of the tax thereon, and the incidental expenses and costs to the date of taking. Such an instrument of taking shall not be valid unless recorded within sixty days of the date of taking. If so recorded it shall be prima facie evidence of all facts essential to the validity of the title so taken . . . ."

https://www.metrowestdailynews.com/story/news/2022/08/05/westborough-ma-fields-proposals-former-regal-cinemas-property/10230187002/ (accessed August 17, 2023).

61. The Land Court has refused to impose any administrative orders or a moratorium on tax title foreclosure cases in The Commonwealth based on the United States Supreme Court *Tyler* decision.

62. The Land Court has stated that if a municipality or other plaintiff in a tax foreclosure case seeks to foreclose on a tax title, that Massachusetts law permits this to occur and that any resulting risk of liability, including for compensation owed to the former owner, is for the municipality to consider and assess in proceeding. Accordingly, the Massachusetts Land Court has vitiated the central holding of *Tyler* which prohibits municipalities from confiscating equity after conducting tax lien foreclosure sales.

63. The Land Court has refused to immediately honor the *Tyler* ruling and has continually issued *absolute* titles in violation of federal law and Supreme Court precedent, especially in 19 TL 000768-HPS that applies to the Plaintiff.

64. Since the Land Court has exclusive statutory jurisdiction over all tax lien foreclosure cases in Massachusetts, these cases must be litigated exclusively in the Land Court, which controls discovery, the course of proceedings, and enters judgments which have violated the core tenets of *Tyler*, especially through the foreclosure final judgment issued in *Town of Westborough v. Westborough SPE, LLC, et als.*, 19 TL 000768 (Land Ct. applies

65. The Land Court's standard form tax lien complaint is unconstitutional because it seeks to award "absolute title" which violates *Tyler*.

66. Every "absolute title" awarded by the Land Court, through judgments entered upon standard form tax lien complaints from May 25, 2023 to present date and beyond, is and will be

void ab initio—and of no legal force and effect. All such judgments, and the land titles to which they relate, will be subject to collateral attack for years to come because the Land Court has refused to comply with *Tyler* from the decision date. If "the court which renders judgment has no jurisdiction to render it, either because the proceedings, or the law under which they are taken, are unconstitutional, or for any other reason, the judgment is void and may be questioned collaterally…" *In re Neilson*, 131 U.S. 176, 182 (1889).

67. These tax title foreclosure judgments and land title litigations will continue for years and will infect thousands of land titles going forward, opening the floodgates to litigation on this issue.

68. By adhering to the rule of law announced in *Tyler*, the Land Court could minimize these invalid judgments and land titles.

69. The Land Court's obligation to uphold constitutional rulings of the United States Supreme Court is not subject to or conditioned upon any antecedent action by the Massachusetts General Court ("Legislature") or any other legislative body. No legislative action is required to implement the core *Tyler* ruling given the Land Court's exclusive jurisdiction over tax lien foreclosure cases and its mechanical and administrative ability to ensure that no municipal tax lien claimant is ever awarded with any tax lien judgment which embeds the right to "take" real property equity.

70. Courts, such as the Land Court, cannot stand idle and watch municipalities like the Town of Westborough violate the United States Constitution based on the inaction of a legislative body, especially where there is an active case and controversy.

**<u>The Town of Westborough Initiates a Tax Taking Against Plaintiff</u>**

71. On January 16, 2019, the Town of Westborough recorded an instrument of Tax Taking under M.G.L. c. 60, §§ 53 and 54 against the Locus for nonpayment of property taxes.

72. On July 8, 2019, the Town of Westborough commenced the action to foreclose the tax lien (*Town of Westborough v. Westborough SPE, LLC, et als.*, Massachusetts Land Court, Case # 19 TL 000768-HPS).

73. On July 24, 2019, a Notice of the foreclosure action was recorded in the Worcester District Registry of Deeds at Book 60751, Page 221.

74. On August 26, 2019, a Land Court Title Examiner, Michael H. Delaney, Esq. ("Attorney Delaney"), completed and subsequently filed a Title Report under M.G.L. c. 60, § 66, and reported that the parties interested and entitle to notice were "Westborough SPE, LLC c/o Babcock & Brown Administrative Services, Inc….Att'n Dyann Blaine and/or F. Jan Bluestein" and "Interstate Theaters Corporation".

75. Plaintiff acquired its ownership interest in the Locus by Quitclaim Deed recorded at Book 19369, Page 75 in the Worcester District Registry of Deeds on November 21, 1997 ("Deed"). The Deed stated that the grantee was Westborough SPE LLC, a Delaware limited liability company with a principal place of business at c/o Babcock & Brown Administrative Services, Inc., Two Harrison Street, San Francisco, CA 94105. Westborough SPE LLC paid $9,151,449.00 in consideration for the Locus in 1997.

76. Upon information and belief, Attorney Delaney searched the online records of The Secretary of The Commonwealth of Massachusetts Corporations Division ("MA Corporations Division") for Westborough SPE LLC. The MA Corporations Division is a mere repository of corporate filings and no one at the MA Corporations Division can confirm or deny the accuracy of any document filed with it, except to confirm the date and time said document was filed.

77. Upon information and belief, Attorney Delaney did not search any records of the Secretary of State for the State of Delaware Corporations Division.

78. Had Attorney Delaney searched he would have discovered that Babcock and Brown Administrative Services, Inc. had become Babcock and Brown Administrative Services LLC which later merged into Babcock and Brown Parallel Member LLC, a Delaware limited liability company.

79. Thus, Babcock and Brown Parallel Member LLC was the successor-in-interest manager to Babcock and Brown Administrative Services, Inc.

80. Babcock and Brown Parallel Member LLC was never provided notice of the foreclosure.

81. When the Town of Westborough "took" Plaintiff's Property with the judgment of foreclosure entering on January 5, 2022, through a tax taking that violated due process (including, but not limited to improper notice), it did not pay for said property.

82. Plaintiff has been deprived of all use and benefit of its real property at the Locus since the Town of Westborough's tax title foreclosure, and Plaintiff has received no compensation whatsoever. The only thing that the Town of Westborough has done was force Plaintiff to have incurred significant legal expenses because of the Town of Westborough and their agents' unconstitutional actions.

83. The Town, through its Tax Collector/Treasurer, asserted that it is due the sum of $918,314.60 for taxes, interest, and incidental expenses as through May 16, 2023. *See* **Exhibit A** attached and incorporated by reference. The Tax Collector in the affidavit readily concedes though that this sum is no longer accurate. On May 3, 2023, Linda A. Smith, Treasurer/Collector for the Town of Westborough ("Town Treasurer") certified that as of May 16, 2023 ("**Town's**

**Certification**"), a grand total of $918,314.60 was owed, consisting of: $119,628.17 (2018 Taxes), $103,133.80 (2019 Taxes), $10-2,963.48 (2020 Taxes), $55,915.95 (2021 Taxes), $36,885.70 (2021 Taxes), and $35,183.54 (2023 Taxes). It also included interest in the amount of $239,341.73, $58,138.22 in legal fees owed to KP Law and The Law Offices of Iris A. Leahy, Esq., miscellaneous water and sewer liens, NSTAR lien, $14,438.55 to Boston Board Up, $109,882.55 in insurance costs, $6000 in appraisal costs, $20,591.22 for a Request for Proposal (RFP) bid process to sell the Locus, and other miscellaneous recording costs and fees as Itemized in **Exhibit A**.

84. The Town Treasurer certified in the Town's Certification that the 2023 assessed value of the Property is currently $2,082,000.00 compared with $9,264,800.00 in 2018. According to the Town of Westborough's Appraisal, the market value of the Locus is $4,790,000 as of August 3, 2018 as determined by Mark S. Reenstierna, Massachusetts Certified General Real Estate Appraiser #3803 communicated to Jonathan Steinberg, MAA, Chief Assessor for the Town of Westborough on September 4, 2018. A second appraisal was performed by William J. Pastuszek, Jr., MAI, SRA, MRA, Massachusetts Certified General Real Estate Appraiser License #10 on behalf of Shepherd Associates, LLC for the Town of Westborough and determined that the as-is opinion of value of the fee simple interest in the Locus as of January 28, 2018 was $5,500,000 to $6,000,000.

85. Attorney Iris A. Leahy ("**Attorney Leahy**") and attorneys from KP Law, P.C. ("**KP Law**"), acting on behalf of the Town of Westborough, were encouraged to allow the Town of Westborough's tax title foreclosure of the Locus, because they have earned and continue to earn substantial legal fees stemming from the Plaintiff's challenge.

86. The Locus consists of a parcel of land containing about 29.34 acres (around 1,277,876 square feet) improved with a single-story movie theater.

87. On March 16, 2023, David M. Ferris, Esq. on behalf of Ferris Development Group, LLC executed a contingent Offer to Purchase the Locus for $2,400,000.00 ("**Minimum Current Market Price**").

88. The Town's Certification stated that the assessed value of the Locus for 2023 is $2,082,000.00. Current Minimum Market Price is $2,400,000.00. The surplus ("**Surplus**"), consisting of the market value less outstanding taxes, interest, charges of keeping, and charges of sale, as of May 16, 2023, exceeded $918,314.60 (minimum amount of "equity theft") as alleged in the Town's Certification. See M.G.L. c. 60, § 28.

89. Assuming arguendo that the Town decided to proceed with Pulte's offer during the RFP of nearly $7 Million, the resultant "equity theft" as of May 16, 2023 would have been nearly $6,081,685.40.

90. Under current Massachusetts law, the Town of Westborough is entitled to this Surplus when and if the Town sells the Property subject only to additional permissible deductions, under M.G.L. c. 60, § 28, due, once again, to the mere passage of time.

91. The Town of Westborough has stated that it refuses to release the proceeds to Westborough SPE LLC's duly authorized successor managers, Lolonyon Akouete, and Denise Edwards according to the records of the Massachusetts Secretary of The Commonwealth Corporations Division and the Secretary of State for the State of Delaware Corporations Division, the Durable Power of Attorney (governed by Delaware law) executed by F. Jan Blaustein Scholes as Manager ("Ms. Scholes") of Babcock and Brown Parallel Member LLC as successor in interest

to Babcock and Brown Administrative Services, Inc. and a Written Consent of Manager signed by Ms. Scholes.

92. Ms. Scholes executed and had notarized the Durable Power of Attorney and Written Consent of Manager in Maricopa County, Arizona.

93. Plaintiff's LLC Operating Agreement is governed by Delaware law and allows for an existing manager to transfer the role of manager to another manager or co-manager.

94. Plaintiff's LLC Operating Agreement does not allow a Manager to resign as Manager without Member Consent.

95. No Member Consent was ever provided for the resignation of any manager by Mignonette Investments Limited.

**The Town of Westborough Has Informed Plaintiff's Managers That It Will Refuse to Tender Proceeds to the Plaintiff**

96. The command of M.G.L. c. 60, § 28 is clear: "The collector shall *upon demand* give a written account of every sale on distress or seizure and charges, and pay to the owner any surplus above the taxes, interest and charges of keeping and sale."

97. The Town of Westborough has stated that it will refuse to tender sale proceeds to Plaintiff's Managers even though Plaintiff is a manager-managed LLC.

98. Since Plaintiff timely made a statutory demand, it is entitled to "any surplus" after payment of the expenses under M.G.L. c. 60, §28. Attempts to place a contrary construction upon M.G.L. c. 60, §28 would violate the Due Process Clause since "the touchstone of due process is the protection against the arbitrary action of the government…" *Wolf v. McDonnell*, 418 U.S. 539, 558 (1974).

99. There is no legal, equitable, or factual base on which the Town of Westborough could assert that it may retain any surplus from a sale for itself.

100. The Town of Westborough's actions to seize the Surplus violates the Fifth Amendment, Due Process Clause, Federal Civil Rights Act (42 U.S.C. § 1983), M.G.L. c. 60, § 28, and common law (including, but not limited to conversion, fraud, and deceit), and the retention of any such Surplus, within the meaning of M.G.L. c. 60, § 28, would violate Massachusetts criminal larceny statutes. *See* M.G.L. c. 266, § 30(1).

**C. <u>Unconstitutional Documents/Postings by The Land Court.</u>**

101. The Home Page of the Land Court website, which upon information and belief is operated by the Land Court, states: "A tax lien foreclosure is a type of court case in which a city or town (or sometimes a third party) can seek to obtain <u>full ownership</u> of property if the property taxes, water bills, or sewer bills are not paid…" (Emphasis added). See Land Court Website, https://www.mass.gov/land-court-tax-lien-foreclosure-cases-resources#:~:text=The%20Land%20Court%20has%20jurisdiction%20over%20all%20tax%20lien%20foreclosures%20in%20Massachusetts (accessed August 14, 2023).

102. Land Court websites have spread false information that contradicts the Supreme Court's holding in *Tyler* and that the Town of Westborough and other municipalities rely contradicts.

103. The Land Court Homepage Link - "Simple Chart of the Tax Lien Foreclosure Process" states at Section #8: "If you do not pay the amount back by a certain date, the plaintiff can file a motion for judgment and hearing notice. The Court will schedule a hearing on the Motion for Judgment. At this hearing, the Court may make a judgment of foreclosure. *If the Court makes a judgment of foreclosure, your ability to get the property back ends, and the plaintiff gets full ownership of the property. <u>You will lose the whole property, even if it is worth much more than you owe</u>.* (See FAQ #18 and FAQ #19)". See https://www.mass.gov/doc/simple-introductory-tax-lien-flowchart/download (Accessed August 14, 2023) which is incorporated by reference.

104. The Massachusetts Standard Form Tax Lien Complaint – Form TL-5 (04-2021) at Section #5 states: "Plaintiff(s) requests that the Court enter judgment foreclosing all rights of all persons entitled to redeem and declaring that title to the described real estate is **absolute** and that all rights of redemption are barred. Plaintiff(s) requests such other and further relief as the Court deems proper." (Emphasis Added). *See* https://www.mass.gov/doc/tax-lien-complaint/download (Accessed August 14, 2023) which is incorporated by reference.

105. The Land Court's online Tax lien foreclosure informational outline states: "A tax lien foreclosure is a process through which you can lose ownership of your property if you do not pay your real estate taxes or water/sewer bill. This can result in you losing all of your property's value, even if the amount you owe is much less than your property's value." *See* https://www.mass.gov/info-details/tax-lien-foreclosure-informational-outline (Accessed August 14, 2023) which is incorporated by reference.

## COUNT ONE
## DECLARATORY RELIEF

106. Plaintiff repeats and realleges the paragraphs above.

107. Upon any sale of the Property by the Town of Westborough, if it effects such a sale, it is demanded that the Town and its Treasurer/Tax Collector, comply with the dictate of M.G.L. c. 60, § 28. The cited statutory subsection embeds the constitutional requirements of the Takings Clause of the Fifth Amendment to the United States Constitution ("Fifth Amendment") into it. "The Takings Clause of the Fifth Amendment states that 'private property [shall not] be taken for public use, without just compensation.'" *Knick v. Scott*, 588 U.S.___ (2019) Slip. Op. at p. 1. (brackets in original). "A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Id.*, 588 U.S. ___ at 2. The "property

owner has suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation…" *Id.*

108. On January 05, 2022, Final Judgment entered as to tax-taking by the Town of Westborough in the Land Court case (19 TL 000768-HPS) at the Locus.

109. Plaintiff is entitled to a declaration that if the Town of Westborough sells the Locus that Plaintiff is entitled to the difference between the amount owed and what the property sells for.

110. Plaintiff is entitled to a declaration that as a result of the Town of Westborough and its agents' unconstitutional behavior that it must forfeit any interest on amounts owed by Plaintiff for property taxes.

111. Plaintiff is entitled to a declaration that as a result of the Town of Westborough and its agents' unconstitutional behavior that it shall not be entitled to collect legal fees and costs incurred by Attorney Leahy and KP Law.

112. Plaintiff is entitled to a declaration as to the rights and obligations of Plaintiff and Defendants vis-à-vis the constitutionality of holding an RFP prior to expiration of Plaintiff's right of redemption period.

113. Plaintiff is entitled to a declaration as to the constitutionality of the Massachusetts tax-title foreclosure process as it has been directly applied by the Town of Westborough to Plaintiff.

## COUNT TWO

### UNCONSTITUTIONAL TAKING UNDER THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION; VIOLATION OF 42 U.S.C. § 1983

114. Plaintiff repeats and realleges the paragraphs above.

115. Defendants at all times relevant to this action were acting under color of state law.

116. Defendants unlawfully deprived Plaintiff of 100% of its real property located at the Locus without just compensation and without due process of law, all in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

117. This claim is being made pursuant to 42 U.S.C. § 1983 and § 1988.

118. The Fifth Amendment of the United States Constitution, made applicable to the states via the Fourteenth Amendment, is a constitutional provision and right requiring the payment of just compensation upon a taking of private property by Defendants. *See Knick v. Twp. Of Scott*, 588 U.S. ____ (2019).

119. The Town of Westborough's actions and those of the 1983 Defendants vis-à-vis tax title foreclosure of the Locus have constituted a complete taking of Plaintiff's real property without any compensation for such taking.

120. James Malloy, the former Town Manager for the Town of Westborough stated in a November 29, 2018 article in the Westboro Telegram & Gazette "the town will have to hold on to the money from the new owner for three years in case a claim is filed against the town…[Malloy] said that would not stop the selling and development of the property." *See* **Exhibit B** attached and incorporated by reference. The Town of Westborough had actual knowledge that selling the Locus in an RFP could subject the Town of Westborough to liability.

121. At all times relevant hereto, the defendants acted under a policy or custom of the Town of Westborough of depriving real property owners that owe unpaid property taxes of their real property to avoid having to pay compensation in an eminent domain proceeding.

122. In an Affidavit dated May 14, 2020, by Shirin Everett, Esq. of KP Law, P.C., legal counsel to the Town of Westborough, Attorney Shirin stated: "We advised the Town Manager that if real estate taxes were not being paid [at the Locus], the Town [of Westborough] could eventually acquire the title to the Property through a Land Court foreclosure process. We advised the Town

as to the steps the Town needs to take to demand payment of WSPE [Plaintiff], to record an Instrument of Taking after waiting the statutory 14-day period, and filing a petition to foreclose on the Property in Land Court." *See* **Exhibit C** at Paragraph #6, attached and incorporated by reference for the Affidavit of Shirin Everett, Esq. ("**Attorney Affidavit**").

123. Attorney Shirin further notesd that "[a] vote taken under Article 18 of the March 6, 2018 Annual Town Meeting, authorized the Board of Selectmen [for the Town of Westborough] to acquire the Property [the Locus] by eminent domain for economic revitalization and general municipal purposes, and appropriated the sum of $6,000,000 to pay damages for the Property and to pay for costs incidental or related thereto. It was the Town's intent that, should it take the Property by eminent domain rather than through the tax-foreclosure process, it would pay damages to WSPE [Plaintiff] or to any other entity or person that established that it owned the Property." *nonpayment* at Paragraph #10.

124. The Town of Westborough's unconstitutional municipal policy, practice, and custom vis-à-vis tax-title foreclosure in-lieu of condemnation proceedings to avoid having to pay just compensation for the taking of real property ("**Tax-Title Foreclosure Policy**") was the moving force of the constitutional violation suffered by the Plaintiff. *See Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 694-95 (1978).

125. Not only was the Town of Westborough's formal Tax-Title Foreclosure Policy caused the violation of Plaintiff's constitutional rights, but also it was designated employees with final policymaking authority that caused the rights violation, including Attorney Everett (KP Law), the Town Manager, and the Board of Selectmen.

126. All these aforementioned parties were either employees of the Town of Westborough, engaged in the business of the municipality, or were acting with the authority granted to them by the Town of Westborough.

127. Attorney Everett (KP Law) acted jointly with the Town of Westborough and acted under an engagement letter authorized by the Town of Westborough.

128. Peter Blaustein acted jointly with the government and was under the Town of Westborough's control, where Town Counsel, Attorney Leahy, drafted a "Waiver of Notice and Assent to the Entry of Judgment" for Peter Blaustein to sign, have notarized, and which was filed in Land Court proceeding 19 TL 000768-HPS on May 4, 2023. In that document, Peter Blaustein claimed to be a "Party of Interest by and/or through a Power of Attorney, as Court-Appointed Guardian, and as Conservator for F. Jan Blaustein a/k/a Jan Blaustein Scholes, in the above-referenced tax lien case, hereby waives her right to notice and assents to the previous entry of judgment with regards to the parcel listed below [Locus]". *See* **Exhibit D** attached and incorporated by reference. This document had a prejudicial effect on the Land Court proceeding and Plaintiff through its legal counsel moved to strike said document, but the Land Court Judge refused to strike said document from the Docket.

129. Defendants' actions did not substantially advance a legitimate state interest.

130. Defendants' policy and practice regarding tax title foreclosure of the Locus has denied Plaintiff any viable use of their property.

131. The Town of Westborough has taken Plaintiff's property for public use without providing just compensation.

132. The Town of Westborough provided no compensation to Plaintiff for the taking of their real property, thereby depriving Plaintiff of their constitutional rights in violation of the Fifth Amendment of the United States Constitution.

133. The Town of Westborough interfered with Plaintiff's distinct, investment-backed expectations as to their business and real property.

134. As a result of Defendants' actions and failure to pay just compensation, Plaintiff has been injured and suffered damages in an amount to be determined at trial.

135. Defendants cannot assert a compelling interest for disregarding Plaintiff's long-established constitutional property rights.

136. The Land Court's conduct has caused and will continue to cause Plaintiff to suffer immediate and irreparable harm to its constitutional rights to due process. No money damages can remedy this harm because real property is unique, and Plaintiff has no legal avenue by which to recover any money damages against the Town of Westborough.

## COUNT THREE

## VIOLATION OF 42 U.S.C. §§ 1985(2) and 1986

142. Plaintiff repeats and realleges the paragraphs above.

143. The first clause of § 1985(2) permits an action for damages when:

> "two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified."

144. § 1986 permits damages against any:

> "person who, having knowledge that any of the wrongs conspired to be done, and mentioned in [§ 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do."

145. § 1985(2), "contain[s] no language requiring that the conspirators act with intent to deprive their victims of [constitutional rights]." *Kush v. Rutledge*, 460 U.S. 719, 725 (1983).

146. The Town of Westborough, Town of Westborough Select Board, Attorney Leahy, KP Law, Peter Blaustein, Dyann Blaine, and Walter Horst conspired to deter, by force, intimidation, and threats, F. Jan Blaustein Scholes from testifying freely, fully, and truthfully.

147. Furthermore, upon information and belief, Peter Blaustein has told F. Jan Blaustein Scholes that he would not allow her to move to a nicer nursing home facility if she continued "cooperating" with Lolonyon Akouete and Denise Edwards, the successor managers of the Plaintiff. Mr. Akouete an Ms. Edwards owe a fiduciary duty to the Plaintiff to ensure that its greatest asset—real property at the Locus—is not wrongfully seized by the Town of Westborough for payment of outstanding tax obligations amounting to a mere fraction of the real property's value.

148. Upon information and belief, the Select Board and KP Law had actual knowledge of Attorney Leahy's actions in wrongfully contacting Mr. Horst, Ms. Blaine, Peter Blaustein, and F. Jan Blaustein Scholes, witnesses in the Land Court proceeding (19 TL 000768-HPS).

149. Neither the Select Board nor KP Law, who had the power to stop Attorney Leahy's improper actions, acted to so stop Attorney Leahy.

150. As a result of defendants' conduct, Plaintiff suffered damages in an amount to be determined at trial.

**COUNT FOUR**

**EXCESSIVE FINES VIOLATION OF THE UNITED STATES CONSTITUTION**

**(AGAINST TOWN OF WESTBOROUGH)**

151. Plaintiff repeats and realleges the paragraphs above.

152. The Eighth Amendment to the United States Constitution prohibits the imposition of excessive fines.

153. Confiscating the entire value of Plaintiff's real property, including the excess or surplus equity in Plaintiff's property because of non-payments of real estate taxes is an excessive fine under the Eighth Amendment to the United States Constitution.

154. Defendant is engaged in assessing and collecting prohibited excessive fines.

155. Plaintiff faces a threat of irreparable harm if, after a trial on the merits, a permanent injunction is not granted, in that there is a threat that its property rights will continue to be violated by Defendant.

156. Plaintiff has no adequate legal remedy to protect their property interests from the ongoing unconstitutional and unlawful conduct herein described.

157. Plaintiff has been injured and damaged by the unlawful excessive fines under the United States Constitution and is entitled to relief as a result.

**WHEREFORE**, Plaintiff requests judgment as follows:

A. Enter an order that the Defendants have violated Plaintiff's constitutional rights by taking its real property for public use without just compensation and violating Plaintiff's due process rights;

B. Enter an order for damages and/or compensation for the value of the real property taken by Defendants;

C. Enter an order for all damages available under federal law as applicable, including, but not limited to, an award for nominal and punitive damages;

D. Issue a Declaratory Judgment that M.G.L. c. 60, § 28 is unconstitutional as applied and/or facially;

E. Issue a Declaratory Judgment that M.G.L. c. 60, §§ 53 and 54 are unconstitutional as applied and/or facially;

F. Issue a Declaratory Judgment that Massachusetts' statutory scheme of tax title takings and allowance for "equity theft" is unconstitutional;

G. Issue a Declaratory Judgment that the Town of Westborough's appropriation of Plaintiff's real estate equity is an excessive fine in violation of the United States Constitution;

H. Issue a Declaratory Judgment that as a result of the Town of Westborough's actions, by and through its Select Board, and agents, that legal fees paid to further the Town's unconstitutional and/or unlawful actions should be removed from amounts Plaintiff owes to the Town;

I. Issue preliminary and permanent injunctions enjoining the Land Court, Town of Westborough, and Judges of the Trial Courts of The Commonwealth of Massachusetts from enforcing the foregoing challenged statutory provisions until further order of this Court.

J. Issue such other declarations as are necessary and proper for a full adjudication of this matter as presented to the Court;

K. Award Plaintiff costs and attorneys' fees under 42 U.S.C. § 1988, or under any other applicable statute or authority.

L. Grant Plaintiff any other relief that the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

**Dated**: August 31st, 2023

Respectfully submitted,

**WESTBOROUGH SPE LLC**, Plaintiff,

By its attorneys,

*Scott A. Schlager*

By: ______________________________

Scott A. Schlager, BBO#695421
Nathanson & Goldberg, P.C.
183 State Street, 5th Floor
Boston, Massachusetts 02109
Tel. (617) 909-4511
Fax. (617) 210-4824
sas@natgolaw.com

**VERIFICATION**

I, Lolonyon Akouete, declare as follows:

1. I am the co-Manager of Westborough SPE LLC, a Delaware limited liability company, Plaintiff in the above-captioned case. I have authorized the filing of this complaint and in accordance with the limited liability company operating agreement of Plaintiff.

2. I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing Verified Complaint for Declaratory and Other Relief, and if called on to testify I would competently testify about these matters.

3. I have personal knowledge of Westborough SPE LLC, its activities, and its intentions, including those set out in the foregoing Verified Complaint for Declaratory and Other Relief, and if called on to testify I would competently testify about these matters.

4. I verify under penalty of perjury under the laws of the United States that the factual statements in this Complaint about myself, my activities, and my intentions are true and correct, as are the factual statements about Plaintiff, its activities, and its intentions. I have reviewed the allegations made in the complaint. As to those allegations of which I do not have personal knowledge, I rely on information and belief, and I believe them to be true. 28 U.S.C. § 1746.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 31st DAY OF AUGUST 2023.**

/s/ Lolonyon Akouete

Lolonyon Akouete, Manager

**VERIFICATION**

Denise Edwards, being duly sworn, deposes and says:

1. I am the co-Manager of Westborough SPE LLC, a Delaware limited liability company, Plaintiff in the above-captioned case. I have authorized the filing of this complaint and in accordance with the limited liability company operating agreement of Plaintiff.

2. I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing Verified Complaint for Declaratory and Other Relief, and if called on to testify I would competently testify about these matters.

3. I have personal knowledge of Westborough SPE LLC, its activities, and its intentions, including those set out in the foregoing Verified Complaint for Declaratory and Other Relief, and if called on to testify I would competently testify about these matters.

4. I verify under penalty of perjury under the laws of the United States that the factual statements in this Complaint about myself, my activities, and my intentions are true and correct, as are the factual statements about Plaintiff, its activities, and its intentions. I have reviewed the allegations made in the complaint. As to those allegations of which I do not have personal knowledge, I rely on information and belief, and I believe them to be true. 28 U.S.C. § 1746.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 31st DAY OF AUGUST 2023.**

Denise Edwards

Denise Edwards, Manager

# Exhibit L

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS (WORCESTER)

Case # 4:23-cv-12017-MRG

| | |
|---|---|
| WESTBOROUGH SPE LLC, | ) |
| Plaintiff, | ) |
| v. | ) |
| TOWN OF WESTBOROUGH et als. | ) |
| Defendant. | ) |

**SUGGESTION OF BANKRUPTCY**

An Involuntary Petition under Chapter 7 of the United States Bankruptcy Code has been filed with the United States Bankruptcy Court for the District of Massachusetts as of 10:32 AM Eastern Time on Thursday, August 31, 2023 that has been assigned case number 23-40709 and suggests that this action has been stayed by the operation of Title 11 U.S.C. § 362.

The undersigned certifies that a copy hereof has been furnished to counsel of record via the electronic filing system on August 31, 2023.

**I declare under penalty of perjury that the foregoing is true and correct**.

DEFENDANT WESTBOROUGH SPE LLC,

By its attorneys,

/s/ Scott A. Schlager

Scott A. Schlager, BBO#695421
NATHANSON & GOLDBERG, P.C.
183 State Street, 5th Floor
Boston, Massachusetts 02109
Tel: 617-909-4511 | Fax: 617-210-4824 | sas@natgolaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I, Scott A. Schlager, Esq. hereby certify that a copy of the above Suggestion of Bankruptcy was served electronically to all parties of record via the ECF filing system on Thursday, August 31, 2023.

**/s/ Scott A. Schlager, BBO#695421**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 23-40709-CJP

Chapter 7

In re:

WESTBOROUGH SPE LLC

<u>CERTIFICATE OF SERVICE</u>

I, Roger L. Smerage, hereby certify that on the below date, I caused a copy of the foregoing Exhibits to the Town of Westborough's Motion for Relief from Automatic Stay and Opposition to Appointment of a Bankruptcy Trustee to be served through the Court's CM/ECF system to the following counsel of record or by U.S. mail to the following unregistered parties:

Stephen F. Gordon
The Gordon Law Firm LLP
River Place
57 River Street
Wellesley, MA 02481
sgordon@gordonfirm.com
*Attorney for Petitioning Creditors*

Scott A. Schlager
Nathanson & Goldberg, P.C.
183 State Street, 5th Floor
Boston, MA 02109
sas@natgolaw.com
*Attorney for Creditor Nathanson & Goldberg, P.C.*

Richard King
Office of US. Trustee
446 Main Street
14th Floor
Worcester, MA 01608
*Attorney for the U.S. Trustee*

Westborough SPE, LLC
c/o Lolonyon Akouete
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703
*Debtor*

Dated: October 3, 2023

Roger L. Smerage

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 23-40709-CJP

Chapter 7

| | |
|---|---|
| In re:<br><br>WESTBOROUGH SPE LLC | TOWN OF WESTBOROUGH'S LIMITED OPPOSITION TO PETITIONING CREDITORS' MOTION FOR ORDER OF RELIEF AND APPOINTMENT OF A BANKRUPTCY TRUSTEE |

The Town of Westborough ("Town"), listed in the Debtor's Matrix List of Creditors (Doc. No. 7) in the above-captioned action, hereby submits a limited opposition to the Petitioning Creditors' motion seeking an order of relief and appointment of a Chapter 7 Trustee (Doc. No. 14). For the reasons stated in the Town's Motion for Relief from Automatic Stay and Opposition to Appointment of a Bankruptcy Trustee (Doc. No. 20), appointment of a trustee with respect to the real property located at 231 Turnpike Road, Westborough, Massachusetts (the "Property") is not warranted in this matter.[1]

Specifically, the Property is not an asset of the Debtor's bankruptcy estate. The Massachusetts Land Court had entered judgment in favor of the Town and against the Debtor in the Town's tax title action, thus foreclosing the right of redemption, prior to the filing of the bankruptcy petition. See Town of Westborough v. Westborough SPE, LLC, et al. (Mass. Land Ct. No. 19 TL 000768).[2] As such, the Debtor did not own the Property at the time of the filing of the bankruptcy action (assuming that the Debtor, in its current form with questionable ownership of the LLC, had any ownership interest in the Property to begin with). See Tallage Lincoln, LLC v.

[1] The Town hereby incorporates its Opposition to the Debtor's Motion to Appoint Interim Trustee (Doc. No. 10) by reference.

[2] A copy of the Land Court judgment was submitted as Exhibit G to the Town's Motion. See Doc. No. 21-6.

Williams, 485 Mass. 449, 452 (2020). ("Upon entry of such judgment, the municipality … takes absolute title to the property."). As the SJC has explained, a tax title foreclosure "extinguishes the taxpayer's remaining interest in the property—the right of redemption—and converts the municipality's … tax title into absolute title … free and clear of all encumbrances, including mortgages and other liens," such that "the taxpayer loses any equity he or she has accrued in the property, no matter how small the amount of taxes due or how large the amount of equity." Id. at 452-453.[3] Although the Debtor seeks to vacate that judgment, unless the judgment is vacated, the Debtor lacks any equity or ownership interest in the Property.

As the Town explained in opposing the Debtor's prior request for appointment of an interim trustee pursuant to 11 U.S.C. § 303(g) (see Doc. No. 20 at pp. 14-15), appointment of a trustee is not necessary to preserve the Property. A bankruptcy "trustee can only exercise the same right to redeem that the bankrupt had." Town of Agawam v. Connors, 159 F.2d 360, 364 (1st Cir. 1947). Here, the Debtor no longer had any right to redeem the Property and was, at most, left with the statutory right to request vacatur of the Land Court's judgment within one year.[4] Because the Debtor no longer possesses a right to redeem the Property, the same would be true of any trustee appointed in this proceeding.

For the foregoing reasons, the Town opposes the Petitioning Creditors' request for an order of relief and appointment of a trustee as it relates to the Property.

---

[3] This is now modified by Tyler v. Hennepin County, 598 U.S. 631 (2023), which held that "a taxpayer is entitled to the surplus in excess of the debt owed" when real property is taken and sold pursuant to a tax title statute. See 598 U.S. at 642; see also Freed v. Thomas, --- F.4th ----, 2023 WL 5733164, at *2 (6th Cir. Sept. 6, 2023) ("the Supreme Court has [never] held that a plaintiff whose property is foreclosed and sold at a public auction for failure to pay taxes is entitled to recoup the fair market value of the property"). Nevertheless, the Debtor's potential right to the surplus of proceeds from the sale of the Property (which the Town questions given its concerns about the present ownership of the Debtor) does not give it equity in the Property itself. Thus, the Property would not be a concern of any bankruptcy trustee.

[4] As noted in the Town's Motion, the Debtor's motion in the Land Court was filed on the last day of the one year in question but was not signed by an attorney, calling its validity into question.

Respectfully submitted,

TOWN OF WESTBOROUGH,

By its attorneys,

Brian W. Riley (BBO# 555385)
Jeffrey T. Blake (BBO# 655773)
Roger L. Smerage (BBO# 675388)
KP Law, P.C.
Town Counsel
101 Arch Street, 12th Floor
Boston, MA 02110-1109
(617) 556-0007
briley@k-plaw.com
jblake@k-plaw.com
rsmerage@k-plaw.com

Dated: October 4, 2023

884137/WEST/0042

CERTIFICATE OF SERVICE

I, Roger L. Smerage, hereby certify that on the below date, I caused a copy of the foregoing Limited Opposition to Petitioning Creditors' Motion for Order of Relief and Appointment of a Bankruptcy Trustee to be served through the Court's CM/ECF system to the following counsel of record or by U.S. mail to the following unregistered parties:

Stephen F. Gordon
The Gordon Law Firm LLP
River Place
57 River Street
Wellesley, MA 02481
sgordon@gordonfirm.com
*Attorney for Petitioning Creditors*

Scott A. Schlager
Nathanson & Goldberg, P.C.
183 State Street, 5th Floor
Boston, MA 02109
sas@natgolaw.com
*Attorney for Creditor Nathanson & Goldberg, P.C.*

Richard King
Office of US. Trustee
446 Main Street
14th Floor
Worcester, MA 01608
*Attorney for the U.S. Trustee*

Westborough SPE, LLC
c/o Lolonyon Akouete
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703
*Debtor*

Dated: October 4, 2023

Roger L. Smerage

# Appendix

2023 WL 5733164
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Donald FREED,
Plaintiff-Appellant/Cross-Appellee,
v.
Michelle THOMAS, Defendant-Appellee,
County of Gratiot, Michigan,
Defendant-Appellee/Cross-Appellant,
Michigan Department of Attorney
General, Intervenor-Appellee.

Nos. 21-1248/1288/1339
|
Argued: August 1, 2023
|
Decided and Filed: September 6, 2023

**Synopsis**

**Background:** Property owner brought § 1983 action against county and county treasurer in her individual capacity, asserting a taking in violation of Fifth Amendment and an excessive fine in violation of Eighth Amendment after county foreclosed on property for unpaid taxes and, after selling property at auction, retained the entire proceeds. The United States District Court for the Eastern District of Michigan, No. 1:17-cv-13519, Bernard A. Friedman, Senior District Judge, 2018 WL 5831013, dismissed for lack of subject matter jurisdiction. Owner appealed. The Court of Appeals, 976 F.3d 729, reversed and remanded. On remand, the District Court granted summary judgment to owner on takings claim but declined to award amount of damages sought by owner, and it also held that claims against county treasurer were barred by qualified immunity. Owner appealed and county cross-appealed.

**Holdings:** The Court of Appeals, Siler, Circuit Judge, held that:

under Fifth Amendment's takings clause, compensation which county was required to make to owner was not required to include the difference between property's asserted value and the amount that it actually sold for at auction;

foreclosure was not an excessive fine in violation of Eighth Amendment even if sale at auction "destroyed" taxpayer's equity far in excess of tax delinquency;

treasurer's conduct did not violate clearly established law, and thus treasurer had qualified immunity to owner's takings claim; and

county's policy of prohibiting the refunding of surplus proceeds to property owners following foreclosure sale of properties for unpaid taxes had direct causal link to the unconstitutional taking, and thus county could be subject to liability under § 1983.

Affirmed.

Appeal from the United States District Court for the Eastern District of Michigan at Bay City. No. 1:17-cv-13519—Bernard A. Friedman, District Judge.

**Attorneys and Law Firms**

ARGUED: Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for Appellant/Cross-Appellee. Douglas J. Curlew, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellee and Appellee/Cross-Appellant. Matthew B. Hodges, MICHIGAN ATTORNEY GENERAL'S OFFICE, Lansing, Michigan, for Intervenor-Appellee. Theodore W. Seitz, DYKEMA GOSSETT PLLC, Lansing, Michigan, for Amicus Curiae. ON BRIEF: Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for Appellant/Cross-Appellee. Douglas J. Curlew, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellee and Appellee/Cross-Appellant. Matthew B. Hodges, MICHIGAN ATTORNEY GENERAL'S OFFICE, Lansing, Michigan, for Intervenor-Appellee. Theodore W. Seitz, DYKEMA GOSSETT PLLC, Lansing, Michigan, for Amicus Curiae.

Before: SILER, GIBBONS, and LARSEN, Circuit Judges.

**OPINION**

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

SILER, Circuit Judge.

***1** Although Plaintiff Donald Freed prevailed on his Fifth Amendment claim before the district court, he appeals because the district court declined to award him the fair market value of his property minus his debt. Freed argues that the district court erred by (1) violating his Fifth or Eighth Amendment rights by awarding him "the difference between the foreclosure sale and [his] debt" instead of the fair market value of his property; (2) granting qualified immunity to Michelle Thomas, Gratiot County's ("the County") treasurer; and (3) denying without prejudice his motion for attorney's fees. The County cross-appeals, arguing that the district court improperly held it liable for Freed's 42 U.S.C. § 1983 claims. We affirm.

**I.**

After Freed fell behind approximately $1,100 on his property taxes, Thomas, acting on behalf of the County and pursuant to Michigan's General Property Tax Act (GPTA), foreclosed on Freed's property and sold it at a public auction for $42,000. The County retained the entire proceeds. Freed sued the County and Thomas under § 1983, alleging (1) an unconstitutional taking under the Fifth and Fourteenth Amendments by state and local officials; and (2) an unconstitutional excessive fine under the Eighth Amendment. The district court, applying *Wayside Church v. Van Buren County*, 847 F.3d 812 (6th Cir. 2017), dismissed Freed's complaint for lack of subject matter jurisdiction, finding that the Tax Injunction Act (TIA) and principles of comity prevented it from hearing the case.

We reversed and remanded. *Freed v. Thomas*, 976 F.3d 729 (6th Cir. 2020), *reh'g en banc denied* (Nov. 4, 2020). We held that (1) the TIA did "not preclude the exercise of federal jurisdiction ... because Freed is not attempting to enjoin Michigan's assessment, levy, or collection of a state tax"; (2) the doctrine of comity did not prevent this suit from proceeding "because Freed is not challenging the validity of Michigan's tax procedures"; and (3) we were not bound by *Wayside Church* because the opinion's discussion of the TIA and comity issues was simply "persuasive dictum." *Id.* at 734, 737–38, 740. We also noted that the Supreme Court overruled *Wayside Church*'s subject matter jurisdiction analysis when it held "that [a] property owner may bring a takings claim [in federal court] under § 1983 upon the taking of his property without just compensation by a local government." *Id.* at 733–34 (quoting *Knick v. Township of Scott*, ––– U.S. ––––, 139 S. Ct. 2162, 2179, 204 L.Ed.2d 558 (2019)) (alterations in original).

On remand, the district court granted summary judgment in favor of Freed on his Fifth Amendment claim and denied summary judgment on his Eighth Amendment claim. It rejected Freed's argument that he was entitled to the fair market value of his property, minus his debt, and instead held that Freed was "owed just compensation in the amount of the difference between the foreclosure sale and [his] debt, plus interest on this amount from the date of the foreclosure sale." This meant that Freed was owed about $40,900 plus interest—approximately $56,800 less than he was seeking. The court also held that Freed's claims against Thomas were barred by qualified immunity.

***2** Freed appealed, and the County cross-appealed. Freed also filed a motion for attorney's fees following the entry of judgment, which the district court denied without prejudice under Federal Rule of Civil Procedure 54(d)(2)(B). It noted that "it would be premature to decide plaintiff's motion" pending the appeal and ordered the period for filing a motion for attorney's fees be extended until fourteen days after the appeal mandate is issued. Freed appealed the denial of his attorney's fees motion.

**II.**

We review a district court's grant of summary judgment de novo. *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021).

**A.**

**1.**

Freed first argues that the district court should have awarded him the fair market value of his property pursuant to either the Fifth or the Eighth Amendment.

**a.**

The Supreme Court recently resolved a case with similar facts. Hennepin County, Minnesota, sold the delinquent

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

taxpayer's house "for $40,000 to satisfy a $15,000 tax bill" and kept the remaining $25,000. *Tyler v. Hennepin County*, 598 U.S. 631, 634, 143 S.Ct. 1369, 215 L.Ed.2d 564 (2023). The district court there dismissed for failure to state a claim, and the Eighth Circuit affirmed. *Id.* at 636, 143 S.Ct. 1369. The Supreme Court unanimously reversed, affirming "the principle that a taxpayer is entitled to the surplus in excess of the debt owed." *Id.* at 642, 143 S.Ct. 1369.

Here, the district court held at the motion for summary judgment stage that Freed's Fifth Amendment rights were violated, and it held that Freed was owed the difference between the foreclosure sale amount and his debt, plus interest. This holding squares with *Tyler*. Freed asserts though that he is entitled to an additional $56,800 because the purported fair market value of the property was $98,800 and the property sold for only $42,000. However, neither this court nor the Supreme Court has ever held that a plaintiff whose property is foreclosed and sold at a public auction for failure to pay taxes is entitled to recoup the fair market value of the property. *Cf. United States v. Davis*, 815 F.3d 253, 260 (6th Cir. 2016) (holding that the government does not violate the Fifth Amendment by selling a property at a public auction, even if the property sells for less than its fair market value). Furthermore, the best evidence of a foreclosed property's value is the property's sales price, not what it was worth before the foreclosure.[1] *See BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 548–49, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

1 Freed stated at oral argument that although the property was sold at a public auction, the procedures used by the county restricted who could bid on the property and in what manner, and this caused the property to sell for less than it was worth. But Freed did not make this argument before the district court or in his opening brief, and it is therefore waived. *Amezola-Garcia v. Lynch*, 846 F.3d 135, 139 n.1 (6th Cir. 2016) ("[A]rguments not raised in a party's opening brief are deemed waived.").

The Michigan Supreme Court, in addressing this exact issue, held that awarding the fair market value of a property instead of the price obtained at a public tax foreclosure sale "would run contrary to the general principle that just compensation is measured by the value of the property *taken*" and would "not only ... [take] money away from the public" but would also allow plaintiffs to "benefit from their tax delinquency." *Rafaeli, LLC v. Oakland County*, 505 Mich. 429, 952 N.W.2d 434, 465–66 (2020). Freed is entitled to the amount of the sale above his debt and no more. *See Hall v. Meisner*, 51 F.4th 185, 194 (6th Cir. 2022) (explaining the longstanding principle that following a public sale, a debtor is "entitled to any surplus proceeds from the sale, which represented the value of the equitable title thus extinguished" (citing *Resol. Tr. Corp.*, 511 U.S. at 541, 114 S.Ct. 1757)). This is precisely what the district court held, and Freed's Fifth Amendment takings argument is therefore meritless.

**b.**

***3** Freed's Eighth Amendment argument fares no better. He argues that Defendants "destroy[ed] [his] equity far in excess of the tax delinquency" in violation of the Eighth Amendment.

The Eighth Amendment protects "against excessive fines [and] guards against abuses of [the] government's punitive or criminal-law-enforcement authority." *Timbs v. Indiana*, ––– U.S. ––––, 139 S. Ct. 682, 686, 203 L.Ed.2d 11 (2019). However, in *Hall*, we affirmed the district court's dismissal of the plaintiffs' Eighth Amendment Excessive Fines claim on the ground that the GPTA is not punitive. *See Hall*, 51 F.4th at 196–97 (adopting district court's reasoning as the panel's own); *Hall v. Meisner*, No. 20-12230, 2021 WL 2042298, at *14 (E.D. Mich. May 21, 2021) (concluding that the GPTA is not punitive); *see also Rafaeli*, 952 N.W.2d at 447 (holding that the GPTA "is not punitive in nature" because "[i]ts aim is to encourage the timely payment of property taxes and to return tax-delinquent properties to their tax-generating status, not necessarily to punish property owners for failing to pay their property taxes"). The Supreme Court did not reach the merits of the Eighth Amendment claim in *Tyler*. *See* 598 U.S. at 647–48, 143 S.Ct. 1369. *But see id.* at 648–50, 143 S.Ct. 1369 (Gorsuch, J., concurring). Accordingly, our holding in *Hall* remains binding. *See Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) (A prior published "decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." (citation omitted)). Therefore, Freed's arguments that he is owed the fair market value of the property under either the Fifth Amendment or the Eighth Amendment fail, and we affirm.

**2.**

The district court granted qualified immunity to Thomas in her individual capacity because it found that she "did

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

not violate a right that was 'clearly established at the time of defendant['s] alleged misconduct.' "[2] To overcome Thomas's claim of qualified immunity, Freed "must show that (1) the [officials] violated one of [his] constitutional rights and (2) that right was clearly established." *Howell v. NaphCare, Inc.*, 67 F.4th 302, 317 (6th Cir. 2023) (citation omitted). The clearly established prong is the only one at issue here. "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 317–18 (citation omitted).

2 The district court also granted qualified immunity to Thomas in her official capacity because "the claims against defendant Thomas [are] duplicative of those against the county."

At the time the lawsuit was filed, the contested provisions of the GPTA had been enforced as written for nearly two decades, and "[s]tate statutes, like federal ones, are entitled to the presumption of constitutionality until their invalidity is judicially declared." *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 153, 64 S.Ct. 474, 88 L.Ed. 635 (1944). The Michigan Supreme Court held that Michigan's retention of surplus proceeds was an unconstitutional taking several years *after* Freed filed this lawsuit. *See Rafaeli*, 952 N.W.2d at 466. And "the Supreme Court has *never* denied qualified immunity to a public official who enforced a properly enacted statute that no court had invalidated." *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 441 (6th Cir. 2016).

***4** The only support on which Freed relies to argue that Thomas's conduct violated a clearly established right is *United States v. Lawton*, 110 U.S. 146, 3 S.Ct. 545, 28 L.Ed. 100 (1884). However, *Lawton* pertained to a statute requiring that surplus proceeds from a tax sale "be paid to the owner of the property." *United States v. Taylor*, 104 U.S. 216, 218, 26 L.Ed. 721 (1881). The GPTA, on the other hand, did not provide that surplus proceeds would be returned to the owner. *Rafaeli*, 952 N.W.2d at 452–53. Freed has failed to demonstrate that *Lawton*, which was premised on a statutory right to recover surplus proceeds, sufficiently put Thomas on notice that her administration of the GPTA was unconstitutional.[3] Therefore, the district court did not err by granting qualified immunity to Thomas, and we affirm.

3 Although *Lawton* notes that withholding surplus from an owner when the owner is statutorily entitled to it would violate the Fifth Amendment, the Court held that "this case was governed by the rulings of this court in *U.S. v. Taylor*." 110 U.S. at 149, 3 S.Ct. 545. In *Taylor*, the Supreme Court held that the appellee was entitled to surplus proceeds because the government statutorily required it, not because it would be unconstitutional to withhold the surplus proceeds. 104 U.S. at 218, 222. And Freed cannot rely on the Supreme Court's recent opinion in *Tyler* for qualified immunity purposes because the events in this case occurred well before *Tyler* was decided. *District of Columbia v. Wesby*, 583 U.S. 48, 63, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018) ("To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.").

### 3.

Following the district court's opinion and order holding that Freed's Fifth Amendment rights had been violated, Freed filed a motion for attorney's fees which the court denied without prejudice. Freed argues that the court "should have render[ed] a timely and normal decision on the motion."

The court's order denying Freed's attorney's fees motion, however, is not appealable because it is "not a 'final decision' under 28 U.S.C. § 1291." *JPMorgan Chase Bank, N.A. v. Winget*, 920 F.3d 1103, 1104, 1107 (6th Cir. 2019) (holding that a district court's order on attorney's fees made "where the post-judgment proceedings are *ongoing*," is not a final, appealable order). We therefore dismiss Freed's attorney's fees appeal for lack of jurisdiction.[4]

4 Freed also asks us to remand this matter to the district court with instructions to enter judgment against the state because the district court failed to explicitly name Michigan as a party in the judgment. Michigan joined this case solely for the purpose of defending the constitutionality of the statute and participated in all stages of the litigation; the district court correctly permitted intervention, pursuant to 28 U.S.C. § 2403(b), which provides that "[t]he State shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party *as to court costs* to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality." (emphasis added). And the district court did not err by omitting Michigan from the judgment. *See Tennessee v. Garner*, 471 U.S. 1, 22, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ("The State is a party only by virtue of 28 U.S.C. § 2403(b) and is not subject to liability.").

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

**B.**

In its cross-appeal, the County argues that the district court erred in holding that it was liable for Freed's constitutional claims under § 1983 pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In municipal liability cases under § 1983, "the question [is] whether there is a direct causal link between a municipal [or county] policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

***5** The policy at issue here is the prohibition on refunding surplus proceeds to property owners under MCL § 211.78, which Defendants acknowledge was unconstitutional. That leaves the question of whether the County was responsible for the constitutional violation.

The County argues that it was merely following a state statute when it foreclosed on Freed's home and thus it cannot be said that the County had a custom or policy that led to the unconstitutional taking. We disagree. The statute here provides that "foreclosure of forfeited property by a county is voluntary." MCL § 211.78(6). And as the district court correctly points out, the County, through its treasurer, repeatedly "chose to act as the foreclosing governmental unit and ... retained the proceeds of [Freed's] foreclosure sale." The County's decision to voluntarily and repeatedly serve as the foreclosing governmental unit and retain the proceeds was a policy decision with a "direct causal link" to the constitutional violation in this case. *Harris*, 489 U.S. at 385, 109 S.Ct. 1197; *see also* *DePiero v. City of Macedonia*, 180 F.3d 770, 787 (6th Cir. 1999) (finding municipal liability where a state statute authorized but did not require a city to take a certain action); *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (recognizing that a municipality may be subject to *Monell* liability where it makes a deliberate choice beyond what a statute requires). We hold that the district court did not err in finding the County liable.

**AFFIRMED**.

**All Citations**

--- F.4th ----, 2023 WL 5733164

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) | |
| | ) | |
| Debtor. | ) | |

OPPOSITION TO THE TOWN OF WESTBOROUGH'S MOTION FOR RELIEF FROM AUTOMATIC STAY, LIMITED OPPOSITION TO PETITIONING CREDITORS' MOTION FOR ORDER OF RELIEF, AND OPPOSITION TO APPOINTMENT OF A BANKRUPTCY TRUSTEE

## I. INTRODUCTION

WESTBOROUGH SPE, LLC ("WSPE"), by and through its manager, Lolonyon Akouete, vehemently objects to the Town of Westborough's (the "Town") Motion for Relief from Automatic Stay and its Opposition to the Appointment of a Bankruptcy Trustee. This objection is rooted in the pervasive deprivation of WSPE's right to due process and the unlawful antagonism exhibited by the Town and the Land Court.

## II. ARGUMENT

### A. Due Process Violation

WSPE's rights have been egregiously violated, akin to the circumstances illuminated in Town of Russell v. Barlow and Jones v. Flowers. The inadequate service, characterized by undelivered mail packages and notices left at inappropriate locations, nullifies the tax foreclosure judgment's legitimacy.

### B. Hostility and Intimidation by the Town

The Town's counsel initiated an orchestrated campaign of hostility, evidenced by the undue involvement of numerous individuals in the land court proceeding. The tactical intimidation included the participation of the Treasurer, Town Manager, Assessor, Detective Croft from the Westborough Police Department, Finance Director, Select Board Members, and attorneys Everett, McEnaney, and Sirigu.

The Town's attorney's contact with the California State Controller's Office, requesting documents regarding WSPE's claim and alleging unethical behavior by its managers, constitutes defamation, further exacerbating WSPE's compromised position.

### C. Prejudicial Consequences of Lifting the Stay

Granting the Town's motion will culminate in profound prejudice against WSPE. The animosity and bias demonstrated by the Town and the Land Court jeopardize WSPE's statutory and constitutional rights, underscoring the necessity of maintaining the automatic stay in the land court proceeding. This pervasive hostility accentuates the necessity for the appointment of an impartial and objective trustee. Such an appointment is essential to restore fairness, to counterbalance the existing hostility, and to ensure that WSPE's rights are protected and that justice is served.

## D. WSPE's Equity and Assets

WSPE's considerable equity in the property at 231 Turnpike Road, complemented by the escheated asset of 1.2 million dollars in the state of California, establishes its robust financial posture. The Town's motion, if granted, would precipitate unjust enrichment at WSPE's expense.

## E. Unlawful Collusion

In a bid to circumvent the glaring due process violations, the Town enlisted Dyann Blaine and Peter Blaustein to sign a Waiver of Notice and Assent to the Entry of Judgment. Blaine, a former officer of Babcock & Brown Administrative Services, Inc., had previously acted beyond her authority by wrongfully withdrawing WSPE's Massachusetts registration on November 20, 2007. This act of collusion is indicative of the lengths the Town is willing to go to seize WSPE's property unlawfully.

We apologize for the inconvenience caused by the uncollected taxes due to the breach of fiduciary duty by WSPE's former manager. However, as courts have indicated, tax redemption statutes should be interpreted in favor of the party seeking to recover the property. Therefore, it is in WSPE's best interest to regain their title to the property, and it is in the Town's best interest to receive full payment of the past-due taxes and fees that caused the foreclosure proceedings in the first place.

## III. CONCLUSION

Given the severe due process violations, explicit hostility, and the collateral consequences of lifting the automatic stay, WSPE implores this Honorable Court to deny the Town's motion. The appointment of a trustee is imperative to instill fairness and justice, ensuring an unbiased and equitable examination of WSPE's legitimate claims and interests.

WSPE's plans to petition for the removal of the case to the Bankruptcy Court, where the impartial adjudication of its rights and interests can be safeguarded. Justice, impartiality, and due process should not only be upheld but should be the foundational principles that guide the proceedings herein.

## EXHIBITS

1. Certificate of Revival and Good Standing
2. Durable Power of Attorney and Written Consent of Manager signed by Ms. Scholes
3. Westborough SPE LLC Operating Agreement
4. Documentation of Managerial Transition from BBAS Inc to BBAS LLC to BBPM LLC
5. Westborough SPE LLC - 19 TL 00768 Joint Pre-Trial Memorandum
6. Unlawful Waiver of Notice and Assent to the Entry of Judgment
7. Email correspondence between the State Controller's and the town's attorneys

DATED: October 6, 2023

Respectfully submitted:

WESTBOROUGH SPE, LLC
By its manager,

Lolonyon Akouete
Manager of Westborough SPE, LLC

CERTIFICATE OF SERVICE

I, Lolonyon Akouete, manager for the Debtor, hereby certify that the above document is served by email and mailing a copy of the same, first-class mail, to the following:

Stephen F. Gordon, Attorney of the Petitioners
(Email: sgordon@gordonfirm.com)
The Gordon Law Firm LLP
River Place 57 River Street Wellesley, MA 02481

Scott A. Schlager on behalf of,
Nathanson & Goldberg, P.C., a creditor.
(Email: sas@natgolaw.com)
183 State Street, 5th Floor Boston, MA 02109

Assistant U.S. Trustee
Richard King
Office of US. Trustee
446 Main Street 14th Floor
Worcester, MA 01608
USTPRegion01.WO.ECF@USDOJ.GOV

Paul W. Carey, Attorney of Creditor
FERRIS DEVELOPMENT GROUP, LLC
(Email: pcarey@mirickoconnell.com)
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street, Worcester, MA 01608

Brian W. Riley, Attorney of Creditor
Jeffrey T. Blake, Attorney of Creditor
Roger L. Smerage, Attorney of Creditor
TOWN OF WESTBOROUGH
(Email: briley@k-plaw.com)
(Email: jblake@k-plaw.com)
(Email: rsmerage@k-plaw.com)
KP Law, P.C. 101 Arch Street,
12th Floor Boston, MA 02110

WESTBOROUGH SPE, LLC
By its manager,

Lolonyon Akouete
1241 Deer Park Ave., Suite 1,
#1051
North Babylon, NY 11703
info@smartinvestorsllc.com
(443) 447-3276

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

| | | |
|---|---|---|
| In re:<br><br>WESTBOROUGH SPE LLC,<br><br>Debtor. | ) | Chapter 7<br>Case No. 23-40709-CJP |

EXHIBITS

WESTBOROUGH SPE, LLC ("WSPE"), by and through its manager, Lolonyon Akouete, is hereby providing a list of exhibits in compliance with the Local Bankruptcy Rule 5. These documents are filed separately along with WSPE's opposition to the Town of Westborough's Motion for Relief from Automatic Stay, Limited Opposition to Petitioning Creditors' Motion for Order of Relief, and Opposition to Appointment of a Bankruptcy Trustee.

| Exhibit | Description | No. of Pages |
|---|---|---|
| 1 | Certificate of Revival and Good Standing | 4 |
| 2 | Durable Power of Attorney and Written Consent of Manager signed by Jan | 8 |
| 3 | Westborough SPE LLC Operating Agreement | 19 |
| 4 | Documentation of Managerial Transition from BBAS Inc to BBAS LLC to BBPM LLC | 9 |
| 5 | Westborough SPE LLC - 19 TL 00768 Joint Pre-Trial Memorandum | 73 |
| 6 | Unlawful Waiver of Notice and Assent to the Entry of Judgment | 1 |
| 7 | Email correspondence between the State Controller's and the town's attorneys | 1 |

DATED: October 6, 2023

Respectfully submitted:

WESTBOROUGH SPE, LLC
By its manager,

Lolonyon Akouete
Manager of Westborough SPE, LLC

CERTIFICATE OF SERVICE

I, Lolonyon Akouete, manager for the Debtor, hereby certify that the above document is served by email and mailing a copy of the same, first-class mail, to the following:

Stephen F. Gordon, Attorney of the Petitioners
(Email: sgordon@gordonfirm.com)
The Gordon Law Firm LLP
River Place 57 River Street Wellesley, MA 02481

Scott A. Schlager on behalf of,
Nathanson & Goldberg, P.C., a creditor.
(Email: sas@natgolaw.com)
183 State Street, 5th Floor Boston, MA 02109

Assistant U.S. Trustee
Richard King
Office of US. Trustee
446 Main Street 14th Floor
Worcester, MA 01608
USTPRegion01.WO.ECF@USDOJ.GOV

Paul W. Carey, Attorney of Creditor
FERRIS DEVELOPMENT GROUP, LLC
(Email: pcarey@mirickoconnell.com)
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street, Worcester, MA 01608

Brian W. Riley, Attorney of Creditor
Jeffrey T. Blake, Attorney of Creditor
Roger L. Smerage, Attorney of Creditor
TOWN OF WESTBOROUGH
(Email: briley@k-plaw.com)
(Email: jblake@k-plaw.com)
(Email: rsmerage@k-plaw.com)
KP Law, P.C. 101 Arch Street,
12th Floor Boston, MA 02110

WESTBOROUGH SPE, LLC
By its manager,

________________________
Lolonyon Akouete
1241 Deer Park Ave., Suite 1,
#1051
North Babylon, NY 11703
info@smartinvestorsllc.com
(443) 447-3276

# <u>Exhibit 1</u>

## Certificate of Revival and Good Standing

# Delaware

Page 1

The First State

*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF REVIVAL OF "WESTBOROUGH SPE LLC", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2022, AT 5 O`CLOCK P.M.*

Jeffrey W. Bullock, Secretary of State

2811561 8100
SR# 20224086804

Authentication: 204937171
Date: 11-26-22

You may verify this certificate online at corp.delaware.gov/authver.shtml

# STATE OF DELAWARE
# CERTIFICATE OF REVIVAL OF
# A DELAWARE LIMITED LIABILITY COMPANY
# PURSUANT TO TITLE 6, SEC. 18-1109

1. Name of the Limited Liability Company WESTBOROUGH SPE LLC

2. Date of the original filing with the Delaware Secretary of State:
   10/22/1997

3. The name and address of the Registered Agent is
   THE INCORPORATORS LTD.
   300 CREEK VIEW ROAD, SUITE 209
   NEWARK, DE 19711

4. (Insert any other matters the members determine to include herein).

5. This Certificate of Revival is being filed by one or more persons authorized to Execute and file the Certificate of Revival.

In witness whereof, the above name Limited Liability Company does hereby certify that the Limited Liability Company is paying all annual Taxes, penalties and interest due to the State of Delaware.

BY: Denise Edwards
Authorized Person

Name: Denise Edwards
Print or Type

State of Delaware
Secretary of State
Division of Corporations
Delivered 05:00 PM 11/22/2022
FILED 05:00 PM 11/22/2022
SR 20224086804 - File Number 2811561

# Delaware

Page 1

The First State

*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "WESTBOROUGH SPE LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-EIGHTH DAY OF NOVEMBER, A.D. 2022.*



Jeffrey W. Bullock, Secretary of State




2811561 8300

SR# 20224104318

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 204939237

Date: 11-28-22

# The Commonwealth of Massachusetts
## Secretary of the Commonwealth
State House, Boston, Massachusetts 02133

**William Francis Galvin**
**Secretary of the**
**Commonwealth**

**December 15, 2022**

TO WHOM IT MAY CONCERN:

I hereby certify that a certificate of registration of a Foreign Limited Liability Company was filed in this office by

**WESTBOROUGH SPE LLC**

in accordance with the provisions of Massachusetts General Laws Chapter 156C on **December 12, 2022**.

I further certify that said Limited Liability Company has filed all annual reports due and paid all fees with respect to such reports; that said Limited Liability Company has not filed a certificate of cancellation or withdrawal; that there are no proceedings presently pending under the Massachusetts General Laws Chapter 156C, § 72 for revocation of said Limited Liability Company's authority to transact business in the Commonwealth; and that said Limited Liability Company is in good standing with this office.

I also certify that the names of all managers listed in the most recent filing are: **DENISE EDWARDS, LOLONYON AKOUETE**

I further certify that the name of persons authorized to act with respect to real property instruments listed in the most recent filings are: **DENISE EDWARDS, LOLONYON AKOUETE**

In testimony of which,
I have hereunto affixed the
Great Seal of the Commonwealth
on the date first above written.

William Francis Galvin

Secretary of the Commonwealth

Processed By:NGM

# <u>Exhibit 2</u>

Durable Power of Attorney and Written Consent of Manager signed by Jan

# <u>Exhibit 3</u>

## Westborough SPE LLC Operating Agreement

# WESTBOROUGH SPE LLC

# LIMITED LIABILITY COMPANY AGREEMENT

October 22, 1997

LIMITED LIABILITY COMPANY AGREEMENT

TABLE OF CONTENTS


| | |
|---|---|
| RECITALS | 1 |
| FORMATION, MANAGEMENT, PURPOSES, NAME | 1 |
| CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS; AND LIABILITY OF MEMBERS | 6 |
| RETURN OF CONTRIBUTIONS | 7 |
| SHARE OF DISTRIBUTIONS, PROFITS, LOSSES AND OTHER ITEMS | 7 |
| SUBSTITUTION AND ASSIGNMENT OF A MEMBER'S INTEREST | 9 |
| BOOKS AND RECORDS; BANK ACCOUNTS | 9 |
| OTHER BUSINESS | 10 |
| DISSOLUTION AND CONTINUATION OF THE COMPANY | 10 |
| MISCELLANEOUS | 11 |

WESTBOROUGH SPE LLC

LIMITED LIABILITY COMPANY AGREEMENT

This Limited Liability Company Agreement (the "Agreement"), dated as of the 22nd day of October, 1997, is by and between MIGNONETTE INVESTMENTS LIMITED, a British Virgin Islands entity organized under the BVI International Business Companies Act (the "Member"), and BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC., a Delaware corporation, as the Manager.

R E C I T A L S:

A. The Member formed a limited liability company (the "Company") pursuant to and in accordance with the Delaware Limited Liability Company Act (the "LLC Act") by the filing on the date hereof of a Certificate of Formation with the Secretary of State of the State of Delaware for the purposes described therein and herein.

B. The Member and Babcock & Brown Administrative Services, Inc. desire to enter into this Agreement to provide for, among other things, the management of the business and affairs of the Company, the distribution of monies and allocation of profits and losses as to the Member, and the respective rights, interests, obligations and duties of the Member and of the Manager to each other and to the Company and its assets, business, liabilities and obligations.

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, the parties hereto hereby agree as follows:

OPERATING AGREEMENT

1. Formation, Management, Purposes, Name

(a) The rights and liabilities of the parties hereto shall be determined pursuant to the LLC Act and this Agreement. To the extent that the rights or obligations of the parties are different by reason of any provision of this Agreement than they would be in the absence of any such provision, or even if this Agreement is inconsistent with the LLC Act, this Agreement shall control, except to the extent the LLC Act provides that the applicable provisions thereof as to any

such matter may not be modified by a limited liability company's members, or modified as provided in this Agreement, in which event the provisions hereof shall be applicable to the extent, if any, permitted by the LLC Act.

The name of the Member and its address are set forth on Schedule A attached hereto. If any additional Members and/or substitute Members are hereinafter added as Members in the Company their names and respective addresses shall be added by amendment of said Schedule A.

The registered office and the registered agent of the Company in the State of Delaware shall be as set forth in the Certificate, as such office and agent may be changed, and as the Certificate may, as a consequence thereof, be amended from time to time by the Manager.

(b) The name of the limited liability company formed hereby is Westborough SPE LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager deems appropriate or advisable. The Manager shall file, or shall cause to be filed, the Certificate of Formation and any fictitious name certificates, foreign state registrations and similar filings, and any amendments to any thereof, that the Manager considers necessary, appropriate or advisable, including, without limitation, an Application for Registration as a foreign limited liability company in the Commonwealth of Massachusetts.

(c) The Company is formed for the sole purpose of, and the nature of the sole business to be conducted by the Company is, to acquire, own, construct, lease, operate, maintain and, consistent with its investment purposes, to sell, exchange, convey and otherwise transfer, and otherwise to deal with, in any manner deemed desirable, the real property generally described in Schedule C attached hereto, and any other real property and any personal property, tangible or intangible, appurtenant to any thereof or hereafter acquired as necessary or convenient in connection with such real property, and to own interests in and be a member and/or manager, partner, general or limited, venturer, stockholder or other holder of interests in any entity holding direct or indirect interests in any such assets or engaged in any such activity, and in connection with all of the above, the Company may engage in any lawful act or activity for which limited liability companies may be formed under the LLC Act and in any and all activities necessary, advisable, convenient or incidental thereto. The purposes of the Company may not be broadened without the unanimous consent of all the Members and the Manager, nor may it be broadened if such would violate or cause a default under any agreement to which the Company is a party or by which it is bound.

In furtherance of the conduct of the purposes described above, the Company shall have the power and authority to do any and all lawful activities, business or actions which an Company may take under the LLC Act and, except as limited by the LLC Act, any activities, business or actions which a business corporation or a limited partnership would be entitled to engage in or take pursuant to the applicable laws of the State of Delaware, or under other applicable law, so long as such powers are necessary or convenient to the conduct, promotion or attainment of the business, trade, purposes or activities of the Company.

(d) Babcock & Brown Administrative Services Inc. is hereby designated as the Manager of the Company. One or more Managers may be designated and the number of Managers may be determined at any time by "Consent of the Members"; provided, however, that any such Consent providing for the Company to have more than one Manager shall only be made by amendment of this Agreement and shall also indicate those circumstances in which each Manager will be authorized to act alone and those circumstances in which more than one or all of the Managers will be required to act on behalf of the Company. A Manager may be removed by Consent of the Members at any time and for any reason or for no reason.

(e) Except as otherwise specifically provided in this Section 1 and in Section 8 of this Agreement: (i) the overall management and control of the business and affairs of the Company, and the sole and exclusive authority to make all decisions and take all actions as to the business and affairs of the Company, shall be vested in the Manager, who shall have the sole power and authority to make any decision and to take any action and to exercise any power on behalf of the Company which the Company has the right, power and authority to take or otherwise engage in; and (ii) the Members shall have no voting rights, consent or approval over or as to any such matters.

Notwithstanding the above, the Manager may not file, on behalf of the Company, a petition in bankruptcy or for reorganization or insolvency or any other similar matter without the unanimous consent of the Members.

The Manager shall devote, and shall cause its members, partners, officers, directors and employees, if any, to devote such time to the affairs of the Company as such Manager, in its sole discretion, determines is necessary for performance by the Manager of its duties, provided no such persons shall be required to devote full time to such affairs. The Manager shall have the right and power to manage, operate, and control the Company, and to do all things and take

all actions as it deems necessary or appropriate to carry on the business and

"Consent of the Members" shall mean action of the holders of more than two-thirds of the Percentage Interests of all the Members, as such Percentage Interests are initially set forth on Schedule A hereto and as such Percentage Interests may be changed pursuant to the other provisions of this Agreement.

No Manager may resign or retire from, abandon or otherwise terminate its status as a Manager without the Consent of the Members.

(f) No Member, acting in its capacity as a Member (but nothing herein limiting any Member's capacity as a Manager if a Member is also a Manager), shall have any authority, power or privilege to act on behalf of or to bind the Company.

(g) The signature of the Manager or, if more than one Manager any time, of any Manager on any agreement, contract, instrument or other document shall be sufficient to bind the Company and any other Manager in respect thereof, shall be deemed the action of the Company and of any other Manager, and shall conclusively evidence the authority of such executing Manager and the Company with respect thereto, and no third party need look to any other evidence or require joinder or consent of any other party to bind the Company or to evidence such Manager's authority.

Without in any way amending, modifying, expanding or limiting the foregoing provisions of this paragraph (g), an individual or individuals may be authorized in writing by the Manager to execute any documents to be filed with the Secretary of State of the Commonwealth of Massachusetts and/or authorized to execute, acknowledge, deliver and record any recordable instruments on behalf of the Company purporting to effect an interest in real property, whether to be recorded with the registry of deeds or district office of the Land Court, and in the event of any such authorization the Application for Registration for the Company in the Commonwealth of Massachusetts shall include or, as appropriate, be amended to set forth such authorization.

Any Manager may, from time to time, by an instrument in writing, delegate all or any of its powers or duties hereunder to another Manager, if any, or to an officer, manager, member, or partner of any other Manager or to any Member or any other person or entity. Such writing may fully authorize such other Manager or such other person or entity, acting alone or with others, all as

may be provided in such written delegation, without requirement of any other act of the delegating Manager, to take any action of any type and to do anything and everything which the delegating Manager may be authorized to take or do hereunder (including, without limitation, executing checks, drafts, promissory notes, mortgages, deeds of trust, leases, deeds, easements, and contracts of any nature whatsoever) and may delegate such authority generally or as to any specified matter or specific terms, all as may be provided in writing by any such Manager. Any documents or other instruments executed by any person or entity to whom any such delegation has been made shall be binding upon and enforceable against the Company, and shall be the valid act and deed of the Company, if executed by such delegee, and any third party shall be fully protected in relying upon the authority of any such delegee pursuant to a written delegation by the (or a) Manager.

(h) The Manager shall be entitled to reimbursement from the Company for all expenses incurred by such Manager in managing and conducting the business and affairs of the Company. The Manager shall determine which expenses, if any, are allocable to the Company in a manner which is fair and reasonable to the Manager(s) and the Company, and if such allocation is made in good faith it shall be conclusive in the absence of manifest error.

(i) Any Manager, or the sole Manager if there is only one, may cause the Company to enter into one or more loans, agreements, leases, contracts or other arrangements for the furnishing to or by the Company of money, goods, services or space with any Member, Manager or an affiliate thereof, and may pay compensation thereunder for such goods, services or space, provided in each case the terms of any such arrangements are at least as advantageous to the Company as those which would be available to the Company under similar arrangements between unrelated parties, and if the determination of such terms is made in good faith it shall be conclusive in the absence of manifest error.

(j) In the performance of its duties and obligations hereunder, and in the exercise of its powers hereunder, the Manager shall act in good faith. The Company shall indemnify, defend and hold harmless the Manager, each Member, any person appointed to act for or on behalf of the Company pursuant to Section 1(g), and each such person's officers, directors, partners, members, shareholders, employees, and agents, and the employees, officers and agents of the Company (all indemnified persons being referred to as "Indemnified Persons" for purposes of this Section 1(j)), from any liability, loss, or damage incurred by an Indemnified Person by reason of any act performed or omitted to be performed by such Indemnified Person in connection with the business of the Company, and

from liabilities or obligations of the Company imposed on such person by virtue of such person's position with or relationship to the Company, including reasonable attorneys' fees and costs and any amounts expended in the settlement of any such claims of liability, loss, or damage; provided, however, that, if the liability, loss, damage, or claim arises out of any action or inaction of an Indemnified Person, indemnification under this Section 1(j) shall be available only if (i) the Indemnified Person, at the time of such action or inaction, determined, in good faith, that its course of conduct was consistent with this Agreement or otherwise in the best interests of the Company, and (ii) the action or inaction did not constitute fraud, gross negligence or willful misconduct by the Indemnified Person. Any indemnification under this Section 1(j) shall be recoverable only from the assets of the Company and not from any assets of any of the Members.

2. Capital Contributions; Capital Accounts; and Liability of Members.

(a) The Member has contributed in cash to the capital of the Company the amount set forth opposite such Member's name on Schedule B hereto.

Additional capital contributions may be made (but are not required to be made) by the Member, or any of them if more than one, if necessary or desirable to enable the Company to meet its obligations.

Any third party may rely on a certificate or other statement from the Manager as to Member or Members of the Company and the respective Percentage Interests of the Members at any time. All capital contributions by the Member(s) shall be reflected on the books and records of the Company.

Upon approval of the Manager, any Member may make a loan or loans to the Company on such terms as the Manager may determine. No such loan shall be considered a contribution to the capital of the Company.

(b) No Member shall be obligated to contribute any additional capital or make any loans to the Company. No interest or preferred return shall accrue on any contributions to the capital of the Company. No Member shall have any rights or priority over any other Members as to contributions or as to distributions or compensation by way of income, except as may otherwise be specifically provided for elsewhere in this Agreement.

(c) If there is more than one Member at any time and the Company has not elected to be taxed as a corporation under the Internal Revenue Code, a separate capital account ("Capital Account") shall be established for each Member,

and shall be maintained in accordance with applicable regulations under the Internal Revenue Code of 1986, [illegible] consistent with such regulations, there shall be credited to each Member's Capital Account the amount of any contribution of capital made by such Member to the Company, and such Member's share of the net profits, and items thereof, of the Company, and there shall be charged against each Member's Capital Account the amount of all distributions to such Members, and such Member's share of the net losses, and items thereof, of the Company.

(d) The liability of any Member for the losses, debts and obligations of the Company shall be limited to its capital contributions then made but not then previously repaid to or withdrawn by them in accordance with the terms of this Agreement. No Member, in its capacity as a Member or as Manager, shall have any liability to restore any negative balance in its Capital Account. In no event shall any Member, in its capacity as a Member, nor any Manager, whether or not also a Member, be personally liable for any judgments, debts, liabilities or obligations of the Company.

(e) The Member(s), unanimously if more than one, shall have the right at any time to require the Manager to elect to treat the Company as a corporation under the Internal Revenue Code.

3. <u>Return of Contributions</u>. No Member shall have the right to withdraw or to be repaid any capital contributed by it or to receive any property or other payment in respect of its interest in the Company, including, without limitation, as a result of the withdrawal or resignation of such Member from the Company, except as specifically provided in this Agreement.

4. <u>Share of Distributions, Profits, Losses and Other Items</u>.

(a) All cash available for distribution shall be distributed to the Member, or among the Members if there is more than one Member, first to return any unrepaid capital contributions, pro-rata among the Members with such amounts in proportion to each respective Member's unrepaid capital contribution, and then among the Members according to their respective Percentage Interests. Distributions to the Members shall be made at such times and in such amounts as shall be reasonably determined by the Manager. Except as provided in the next paragraph, all distributions to Members shall be made in cash.

If the Manager elects, with the Consent of the Members, to distribute any assets of the Company in kind, such assets shall be distributed on the basis of

their fair market value as determined by the Manager, and if the determination of such [illegible] absence of manifest error.

(b) If and so long as the Company is taxed as a partnership, allocations of income, profit, gain and loss, shall be made as follows: (i) items of net income and gain shall be allocated among the Members in the manner necessary to increase each Member's Capital Account to an amount equal to the amount of cash such Member would be entitled to receive pursuant to Section 4(a) if an amount of cash equal to the net positive Capital Account balances (after such allocation) were distributed to the Members in the order and priority specified in Section 4(a), and (ii) items of net loss and deduction shall be allocated among the Members in the manner necessary to reduce each Member's Capital Account to an amount equal to the amount of cash such Member would be entitled to receive pursuant to Section 4(a) if an amount of cash equal to the net positive Capital Account balances (after such allocation) were distributed to the Members in the order and priority specified in Section 4(a).

Notwithstanding the foregoing, all allocations of items that cannot have economic effect (except "partner nonrecourse deductions") shall be allocated to the Members in accordance with the Members' interests in the Company, which, unless otherwise required by Code Section 704(b) and the Regulations promulgated thereunder, shall be in proportion to the Percentage Interests of the Members, and all "partner nonrecourse deductions" and "partner minimum gain" shall be allocated in accordance with the provisions of Treasury Regulations Section 1.704-2.

All items of depreciation, gain, loss, deduction or credit shall be determined in accordance with the Code and, except to the extent otherwise required by the Code, shall be allocated to and among the Members in the same percentages in which the Members share in net profits and net losses.

(c) Except as otherwise specifically provided herein, all tax elections shall be made by the Manager as it shall deem appropriate.

5. Substitution and Assignment of a Member's Interest. A Member may sell, assign, give, pledge, hypothecate, encumber or otherwise transfer (including, without limitation, any assignment or transfer by operation of law or by order of court) all or any part of such Member's interest in the Company, without the consent or approval of any other Member or of the Manager.

6. Books and Records; Bank Accounts.

(a) The Manager shall keep or cause to be kept complete and accurate books and records of the Company using such method as the Manager may elect. Such books and records shall be maintained and be available, in addition to any documents and information required to be furnished to the Members under the LLC Act, at an office of the Company for examination and copying by any Member, or its duly authorized representative, at its reasonable request and at its expense during ordinary business hours. Any Member may, at any time, at its own expense, cause an audit or review of the Company books to be made by a certified public accountant of its own selection.

A current list of the full name and last known address of each Member and of the Manager, a copy of this Agreement, any amendments thereto and the Certificate of Formation, executed copies of all powers of attorney, if any, pursuant to which this Agreement, any amendment, or the Certificate of Formation has been executed, copies of the Company's financial statements and federal, state and local income tax returns and reports, if any, for the five most recent years, shall be maintained at the registered office of the Company required by the LLC Act.

If the Company is taxed as a partnership, then on or before the due date (including extensions) of the federal income tax return of the Company for each fiscal year of the Company, the Manager shall cause each Member to be furnished with copies of the Company's federal income tax return and Schedule K-1's for each respective Member for the fiscal year then ended.

If the Company is taxed as a corporation, the Manager shall timely (including extensions) file all requisite federal, state and local tax returns.

(b) Bank accounts and/or other accounts of the Company shall be maintained in such banking and/or other financial institution(s) as shall be selected by the Manager, and withdrawals shall be made and other activity conducted on such signature or signatures as shall be designated by the Manager.

(c) The fiscal year of the Company shall end on December 31 of each year.

7. Other Business. The Members, the Manager and any affiliates of any of them may engage in and possess interests in other business ventures and

investment opportunities of every kind and description, independently or with others, including serving as managers and general partners of other limited liability companies and partnerships with purposes similar to those of, and/or in competition with, the Company. Neither the Company nor any other Member or Manager shall have any rights in or to such ventures or opportunities or the income or profits therefrom.

8. Dissolution and Continuation of the Company.

(a) The Company shall be dissolved and its affairs wound up upon:

(i) The election, made in writing by the Manager, with the Consent of the Members, to dissolve the Company at any time which is 90 days or more after notice of such election to all Members;

(ii) The sale, disposition or abandonment of all or substantially all of the assets of the Company; or

(iii) The entry of a decree of judicial dissolution under the LLC Act.

The Company shall have no specific date of dissolution.

(b) Upon the dissolution of the Company for any reason, the Manager shall commence to wind up the affairs of the Company and to liquidate its assets. After the sale or other disposition of all of the assets of the Company to be disposed of in the liquidation, and gains and losses thereon shall be calculated. If the Company is taxed as a partnership, such gains and losses shall be allocated in the manner described in Section 4 hereof, and applied to the Capital Accounts of each Member to whom the allocations are made pursuant to the other provisions hereof.

(c) Following the payment of all debts and liabilities of the Company to persons other than the Members and the payment of all expenses of liquidation, and subject to the reserves which the Manager, or other liquidating party, may determine is reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds shall be applied to the payment of any debts and liabilities to the Members, if any, and then shall be distributed to the Member(s) (i) in accordance with Section 4(a)

if the Company is taxed as a corporation, and (ii) in accordance with each Member's respective Capital Account(s) as of the date of such distribution, after giving effect to all contributions, distributions, and allocations for all periods, if the Company is taxed as a partnership.

(d) The assets of the Company shall be a Member's source of all distributions with respect to the Company, the return of its capital contributions thereto and its share of profits and losses thereof, and each such Member shall have no recourse therefor (upon dissolution or otherwise) against any other Members.

(e) Upon the completion of the liquidation of the Company and the distribution of all Company's funds, the Company shall terminate, and the Manager shall, or if none, the Members may authorize one or more Members to, execute and record such articles of dissolution for the Company and any and all other documents necessary to effectuate the dissolution and termination of the Company.

9. Miscellaneous.

(a) Subject to the restrictions on transfers set forth herein, the terms of this Agreement shall be binding upon and shall inure to the benefit of the Members and the Manager, their respective permitted successors, successors-in-title, heirs and assigns; and each and every successor-in-interest to any Member, whether such successor acquires such interest by way of inheritance, gift, purchase, foreclosure or any other method, and the Members shall hold such interest subject to all of the terms and provisions of this Agreement. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of any Member (including any Member acting in his capacity as a creditor of the Company).

(b) No change, modification or amendment of this Agreement shall be valid or binding unless such change, modification or amendment shall be in writing and duly executed by all of the Members and, if (but only if) such affects the rights or obligations of the Manager, executed by the Manager.

(c) This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted and enforced in accordance with the laws of the State of Delaware, notwithstanding any choice of law rules to the contrary.

(d) This Agreement may be executed in any number of counterparts, all of which together shall for all purposes constitute one Agreement, binding on all the Members and the Manager notwithstanding that all Members and the Manager have not signed the same counterpart.

(e) Any and all notices under this Agreement shall be effective (i) on the fourth business day after being sent by registered or certified mail, return receipt requested, postage prepaid, or (ii) on the second business day after being sent by express mail, telecopy, or commercial expedited delivery service providing a receipt for delivery. All such notices in order to be effective shall be addressed, if to the Company at its registered office under the LLC Act, if to a Member at the last address of record on the Company books, and copies of such notices shall also be sent to the last address for the recipient which is known to the sender, if different from the address so specified.

(f) As used herein, the singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires. The word "person shall mean a natural person, a trust of any nature, or any incorporated or unincorporated entity or association of any type or form.

(g) If any provisions of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it si held invalid, shall not be affected hereby.

(h) Words such as "herein", "hereinafter", "hereof", "hereto", "hereby", and "hereunder", when used in reference to the Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(i) This Agreement, including the Certificate of Formation, which is hereby incorporated herein, embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

IN WITNESS WHEREOF, the Members have executed this Limited Liability Company Agreement of Westborough SPE LLC as of the date first above written.

MEMBER:

MIGNONETTE INVESTMENTS LIMITED

By: ______________________________
Authorized Signatory

MANAGER:

BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

By: [signature]
Its President

IN WITNESS WHEREOF, the Members have executed this Limited Liability Company Agreement of Westborough SPE LLC as of the date first above written.

MEMBER:

MIGNONETTE INVESTMENTS LIMITED

By: ______________________
Authorized Signatory

For F.M.C. LIMITED
CORPORATE DIRECTORS

MANAGER:

BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

By: ______________________
Its ______________________

# SCHEDULE A
# TO
# LIMITED LIABILITY COMPANY AGREEMENT
# OF
# WESTBOROUGH SPE LLC

## MEMBER

| NAME AND ADDRESSES OF MEMBER | PERCENTAGE INTEREST |
| --- | --- |
| Mignonette Investments Limited | 100% |

# SCHEDULE B
# TO
# LIMITED LIABILITY COMPANY AGREEMENT
# OF
# WESTBOROUGH SPE LLC

## MEMBER

| MEMBER | INITIAL CASH CAPITAL CONTRIBUTION |
|---|---|
| Mignonette Investments Limited | $10,000 |

SCHEDULE C
TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
WESTBOROUGH SPE LLC

PROPERTY DESCRIPTION

# DURABLE POWER OF ATTORNEY

This Durable Power of Attorney is made on this 26 day of June, 2023, by Babcock and Brown Parallel Member LLC, a Delaware limited liability company (the "Grantor").

WHEREAS, pursuant to the Operating Agreement ("Operating Agreement") of Westborough SPE LLC (the "Company") dated as of 20th October 1997 (the "LLC Agreement"), Babcock and Brown Administrative Services Inc., a Delaware corporation, was designated as the manager of the Company;

WHEREAS, Babcock and Brown Administrative Services Inc. has merged into the Grantor, and as a result, the Grantor is the successor of all the rights and obligations of Babcock and Brown Administrative Services Inc.;

WHEREAS, Section 1(g) of the LLC Agreement provides that any manager of the Company may delegate all or any of its powers or duties under the LLC Agreement to another manager or to any member or any other person or entity by an instrument in writing;

NOW, THEREFORE, the Grantor hereby appoints Mr. Lolonyon Akouuete and Ms. Denise Edward as its attorney in fact (the "Attorney"), with powers to be exercised jointly with member or manager of the Grantor, to act on behalf of the Grantor in connection with any and all matters relating to the management and operation of the Company, including but not limited to:

1. the right to sell, buy, lease, mortgage, assign, rent or dispose of any real property on behalf of the Company; and
2. the right to execute, acknowledge, and deliver any and all documents, contracts, agreements, checks, drafts, promissory notes, mortgages, deeds of trust, leases, deeds, easements, and other instruments of any nature whatsoever, as may be necessary or desirable, and to perform all acts and do everything that the Grantor could do; and
3. the right to open a bank account/s, deposit, endorse, or withdraw funds to or from any of the Company's bank accounts or safe deposit box;
4. the right to initiate, defend commence or settle legal actions on the Company's behalf;
5. the right to retain any accountant, attorney, or other adviser deemed necessary to protect the Company's interests relative to any foregoing unlimited power;
6. the right to bind the Grantor by executing documents or instruments on its behalf, and any such executed documents or instruments shall be binding upon and enforceable against the Grantor.

The Grantor undertakes to:

- ratify and confirm whatever the Attorney does or purports to do in good faith in exercising the powers conferred by this Power of Attorney; and
- Indemnify the Attorney against all claims, losses, costs, expenses, damages or liability incurred by her as a result of acting in good faith pursuant to this power of attorney (including any costs incurred in enforcing this indemnity).

See Exhibit A hereto for additional rights with respect to the Company property.

This Power of Attorney shall be governed by and construed in accordance with the laws of the State of Delaware. The powers and duties of an Agent under a durable power of attorney are explained more fully in Delaware Code, Title 12, Chapter 49A, Section 49A-114 and Sections 49A-201 through 49A-217.

By signing below, I have read or had explained to me this notice and I understand its contents. I have had an attorney licensed in the State of Arizona review and approve of me signing this Durable Power of Attorney.

This Power of Attorney shall be effective from the signing date below and shall continue in full force and effect until revoked by the Grantor in writing.

**Reliance on This Power of Attorney**
Any person, including my Agent(s), may rely upon this power of attorney or a copy of it unless that person knows it has terminated or is invalid.

**Revocation of Prior Power of Attorney**
If you have previously executed a power of attorney granting authority covered in this document, indicate below whether or not you wish to revoke the prior power of attorney. INITIAL your selection below:

✓ All my previously executed powers of attorney are hereby revoked, except those powers of attorney described in § 49A-103(a) of Title 12 of the Delaware Code, none of which are personal powers of attorney described within the meaning of § 49A-102(9) of Title 12 of the Delaware Code.

**IN WITNESS WHEREOF**, the Grantor has executed this Power of Attorney as of the date first written above as an instrument under seal.

BABCOCK AND BROWN PARALLEL MEMBER LLC

By: [signature]
Name: F. Jan Blaustein Scholes
Title: Manager, duly authorized

I, DJIGBOD LOKOSSOU, swear that I am not related to the Principal by blood, marriage, or adoption; and that I am not entitled to any portion of the estate of the Principal under the Principal's current will or codicil, or under any current trust instrument of the Principal.

[signature] Lokossou
Witness Signature

DJIGBODI LOKOSSOU
Print Witness Name

State of Arizona

COUNTY OF Arizona

This Durable **Power** of **Attorney** was signed by the Principal, witnessed by the person aforesaid, and acknowledged before me, the Subscriber, a Notary Public, as the free act and deed of the Principal this 26 day of June, 2023.

[signature]
Notary Public

My Commission Expires: 02-28-2027 (seal)

BILLIE J WAHL
Notary Public - Arizona
Maricopa County
Commission # 642362
My Comm. Expires Feb 28, 2027

**EXHIBIT "A"**

**Real Property § 49A-204**

1. To demand, buy, lease, receive, accept as a gift or as security for an extension of credit, or otherwise acquire or reject an interest in real property or a right incident to real property;
2. To sell; exchange; convey with or without covenants, representations, or warranties; quitclaim; release; surrender; retain title for security; encumber; partition; consent to partitioning; subject to an easement or covenant; subdivide; apply for zoning or other governmental permits; plat or consent to platting; develop; grant an option concerning; lease; sublease; contribute to an entity in exchange for an interest in that entity; or otherwise grant or dispose of an interest in real property or a right incident to real property;
3. To pledge or mortgage an interest in real property or right incident to real property as security to borrow money or pay, renew, or extend the time of payment of a debt of the Principal or a debt guaranteed by the Principal;
4. To release, assign, satisfy, or enforce by litigation or otherwise a mortgage, deed of trust, conditional sale contract, encumbrance, lien, or other claim to real property which exists or is asserted;
5. To manage or conserve an interest in real property or a right incident to real property owned or claimed to be owned by the Principal, including:
    a. Insuring against liability or casualty or other loss;
    b. Obtaining or regaining possession of or protecting the interest or right by litigation or otherwise;
    c. Paying, assessing, compromising, or contesting taxes or assessments or applying for and receiving refunds in connection with them; and
    d. Purchasing supplies, hiring assistance or labor, and making repairs or alterations to the real property;
6. To use, develop, alter, replace, remove, erect, or install structures or other improvements upon real property in or incident to which the Principal has, or claims to have, an interest or right;
7. To participate in a reorganization with respect to real property or an entity that owns an interest in or right incident to real property and receive, and hold, and act with respect to stocks and bonds or other property received in a plan of reorganization, including:
    a. Selling or otherwise disposing of them;
    b. Exercising or selling an option, right of conversion, or similar right with respect to them; and
    c. Exercising any voting rights in person or by proxy;
8. To change the form of title of an interest in or right incident to real property; and
9. To dedicate to public use, with or without consideration, easements or other real property in which the Principal has, or claims to have, an interest.

Case 3:24-cv-00137-MGY Document 13-4 Filed 02/12/24 Page 318 of 840
Document Page 315 of 1247

**Tangible Personal Property § 49A-205**

1. To demand, buy, receive, accept as a gift or as security for an extension of credit, or otherwise acquire or reject ownership or possession of tangible personal property or an interest in tangible personal property;
2. To sell; exchange; convey with or without covenants, representations, or warranties; quitclaim; release; surrender; create a security interest in; grant options concerning; lease; sublease; or otherwise dispose of tangible personal property or an interest in tangible personal property;
3. To grant a security interest in tangible personal property or an interest in tangible personal property as security to borrow money or pay, renew, or extend the time of payment of a debt of the Principal or a debt guaranteed by the Principal;
4. To release, assign, satisfy, or enforce by litigation or otherwise, a security interest, lien, or other claim on behalf of the Principal, with respect to tangible personal property or an interest in tangible personal property;
5. To manage or conserve tangible personal property or an interest in tangible personal property on behalf of the Principal, including:
    a. Insuring against liability or casualty or other loss;
    b. Obtaining or regaining possession of or protecting the property or interest, by litigation or otherwise;
    c. Paying, assessing, compromising, or contesting taxes or assessments or applying for and receiving refunds in connection with taxes or assessments;
    d. Moving the property from place to place;
    e. Storing the property for hire or on a gratuitous bailment; and
    f. Using and making repairs, alterations, or improvements to the property; and
6. To change the form of title of an interest in tangible personal property.

**Claims and Litigation § 49A-212**

1. To assert and maintain before a court or administrative agency a claim, claim for relief, cause of action, counterclaim, offset, recoupment, or defense, including an action to recover property or other thing of value, recover damages sustained by the Principal, eliminate or modify tax liability, or seek an injunction, specific performance, or other relief;
2. To bring an action to determine adverse claims or intervene or otherwise participate in litigation;
3. To seek an attachment, garnishment, order of arrest, or other preliminary, provisional, or intermediate relief and use an available procedure to effect or satisfy a judgment, order, or decree;
4. To make or accept a tender, offer of judgment, or admission of facts, submit a controversy on an agreed statement of facts, consent to examination, and bind the Principal in litigation;

5. To submit to alternative dispute resolution, settle, and propose or accept a compromise;
6. To waive the issuance and service of process upon the Principal, accept service of process, appear for the Principal, designate persons upon which process directed to the Principal may be served, execute and file or deliver stipulations on the Principal's behalf, verify pleadings, seek appellate review, procure and give surety and indemnity bonds, contract and pay for the preparation and printing of records and briefs, receive, execute, and file or deliver a consent, waiver, release, confession of judgment, satisfaction of judgment, notice, agreement, or other instrument in connection with the prosecution, settlement, or defense of a claim or litigation;
7. To act for the Principal with respect to bankruptcy or insolvency, whether voluntary or involuntary, concerning the Principal or some other person, or with respect to a reorganization, receivership, or application for the appointment of a receiver or trustee which affects an interest of the Principal in property or other thing of value;
8. To pay a judgment, award, or order against the Principal or a settlement made in connection with a claim or litigation; and
9. To receive money or other thing of value paid in settlement of or as proceeds of a claim or litigation.

**Taxes § 49A-216**

1. To prepare, sign, and file federal, state, local, and foreign income, gift, generation skipping transfer, payroll, property, Federal Insurance Contributions Act (26 U.S.C. § 3101 et seq.), and other tax returns, claims for refunds, requests for extension of time, petitions regarding tax matters, and any other tax-related documents, including receipts, offers, waivers, consents, including consents and agreements under § 2032A of the Code, closing agreements, and any power of attorney required by the Internal Revenue Service or other taxing authority with respect to a tax year upon which the statute of limitations has not run and the following 25 tax years;
2. To pay taxes due, collect refunds, post bonds, receive confidential information, and contest deficiencies determined by the Internal Revenue Service or other taxing authority;
3. To exercise any election available to the Principal under federal, state, local, or foreign tax law; and
4. To act for the Principal in all tax matters for all periods before the Internal Revenue Service, or other taxing authority.

# WRITTEN CONSENT
# OF THE MANAGER
# OF BABCOCK AND BROWN PARALLEL MEMBER LLC
# IN LIEU OF A MEETING

The undersigned, being the manager of BABCOCK AND BROWN PARALLEL MEMBER LLC, a Delaware limited liability company (the "**Company**"), acting by written consent without a meeting pursuant to Section 18-404 of the Delaware Limited Liability Company Act, does hereby consent to the adoption of the following resolutions:

**WHEREAS**, F. Jan Blaustein Scholes ("**Scholes**") is the Manager of the Company; and

**WHEREAS**, F. Jan Blaustein Scholes is over the age of eighteen and is of sound mind and is not under a conservatorship or guardianship in the State of Arizona; and

**WHEREAS**, F. Jan Blaustein Scholes resides in the State of Arizona and is executing this document in the State of Arizona.

**NOW THEREFORE LET IT BE:**

**RESOLVED**, that a Durable Power of Attorney be executed authorizing Lolonyon Akouete and Denise Edwards to undertake the actions specified therein;

**RESOLVED**, that the Bill of Sale executed on November 21, 2022, be amended as follows:

(i) The Title of the Document shall be amended to delete “Bill of Sale” and substitute “Transfer of Manager Role”;

(ii) The WHEREAS clause shall be amended to delete the word “sell” and “transfer her Manager role of Westborough SPE LLC” shall be substituted therefore. In addition, “Buyer desires to buy” shall be deleted and the following substituted therefore “Subsequent Manager desires to assume the Role as Manager(s) of Westborough SPE LLC”. In addition “and all assets thereof” shall be deleted.

(iii) Paragraph 1 shall be deleted in its entirety and “The consideration paid heretofore for a change in Manager is $100.00 which was tendered by Money Order to Scholes”.

(iv) Paragraphs 1(a)-(b) shall be deleted in their entirety.

(v) Paragraph 2 shall be deleted in its entirety and F. Jan Blaustein Scholes is not under a conservatorship/guardianship in the State of Arizona where she currently resides and is of sound legal mind, and understands the consequences of this Agreement to Transfer Manager Role”.

(vi) Paragraph 3 shall be deleted in its entirety and the following substituted therefore “Westborough SPE LLC has an outstanding debt owed to the Town of Westborough for unpaid obligations which as of May 2023 equated to approximately $920,000.00. In addition, there are unclaimed funds in the State of California of approximately $1,200,000.00 belonging to Westborough SPE LLC. Akouete and Edwards have become Managers of Westborough SPE LLC and that

is hereby ratified and confirmed. Akouete and Edwards are authorized to take whatever actions necessary to recover and protect the property located at Turnpike Road, Westborough, Massachusetts and recover the unclaimed funds in the State of California."

(vii) Paragraph 5 shall be deleted and the following substituted therefore "This Agreement shall be governed by the laws of the State of Arizona as to contract formation and capacity and the State of Delaware as to limited liability company actions".

(viii) Paragraph 6 shall remain and is hereby ratified and confirmed and Westborough SPE LLC was lawfully reinstated in both Delaware and Massachusetts.

(ix) Paragraph 8 shall be added, "If any provision of this Agreement shall to any extent be held void or unenforceable (as to duration, scope, activity, subject or otherwise) by a court of competent jurisdiction, such provision shall be deemed to be modified so as to constitute a provision conforming as nearly as possible to the original provision while still remaining valid and enforceable. In such event, the remainder of this Agreement (or the application of such provision to persons or circumstances other than those in respect of which it is deemed to be void or unenforceable) shall not be affected thereby. Each other provision of this Agreement, unless specifically conditioned upon the voided aspect of such provision, shall remain valid and enforceable to the fullest extent permitted by law; any other provisions of this Agreement that are specifically conditioned on the voided aspect of such invalid provision shall also be deemed to be modified so as to constitute a provision conforming as nearly as possible to the original provision while still remaining valid and enforceable to the fullest extent permitted by law."

(x) Paragraph 9 shall be added "Time shall be of the essence as to each term hereof."

(xi) Paragraph 10 shall be added "Each party recognizes that this Agreement is a legally binding contract and acknowledges that it, he or she has had the opportunity to consult with legal counsel of choice. In any construction of the terms of this Agreement, the same shall not be construed against either party on the basis of that party being the drafter of such terms."

(xii) Paragraph 11 shall be added "Scholes has engaged an attorney licensed in the State of Arizona to represent her interests with respect to this Agreement and the attorney has reviewed the document and consents to its signing."

**RESOLVED**, that the manager be, and each of them individually hereby is, authorized and directed to do and perform or cause to be done and performed all such acts, deeds, and things, and to make, execute, and deliver, or cause to be made, executed, and delivered, all such agreements, undertakings, documents, instruments, or certificates in the name of the Company and to retain such counsel, agents, and advisors and to incur and pay such expenses, fees, and taxes as shall, in the opinion of the manager of the Company executing the same, be deemed necessary or advisable (such necessity or advisability to be conclusively evidenced by the execution thereof) to effectuate or carry out fully the purpose and interest of all of the foregoing resolutions; and that any and all such actions heretofore or hereafter taken by the manager

relating to and within the terms of these resolutions be, and they hereby are, adopted, affirmed, approved, and ratified in all respects as the act and deed of the Company; and

**RESOLVED**, that an executed copy of this Written Consent shall be filed with the minutes of the proceedings of the managers.

**IN WITNESS WHEREOF**, the undersigned manager has duly executed this Written Consent as of June 23, 2023 as an instrument under seal.

Signature: ________________________ Date: 2/23/23 ________

F. Jan Blaustein Scholes, Manager

I, ________________________, swear that I am not related to the Principal by blood, marriage, or adoption; and that I am not entitled to any portion of the estate of the Principal under the Principal's current will or codicil, or under any current trust instrument of the Principal.

State of Arizona

COUNTY OF Arizona

This Durable **Power** of **Attorney** was signed by the Principal, witnessed by the person aforesaid, and acknowledged before me, the Subscriber, a Notary Public, as the free act and deed of the Principal this 26 day of June, 2023.

________________________
Notary Public

My Commission Expires: 02-28-2027 (seal)

BILLIE J WAHL
Notary Public - Arizona
Maricopa County
Commission # 642362
My Comm. Expires Feb 28, 2027

# <u>**Exhibit 4**</u>

Documentation of Managerial Transition from BBAS Inc to BBAS LLC to BBPM LLC

# Delaware

The First State



*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THAT THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF CONVERSION OF A DELAWARE CORPORATION UNDER THE NAME OF "BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC." TO A DELAWARE LIMITED LIABILITY COMPANY, CHANGING ITS NAME FROM "BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC." TO "BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC", FILED IN THIS OFFICE ON THE THIRD DAY OF JANUARY, A.D. 2000, AT 9 O`CLOCK A.M.*

Jeffrey W. Bullock, Secretary of State

SECRETARY'S OFFICE 1793 DELAWARE 1855

2811627 8100V
SR# 20232925381

Authentication: 203683809
Date: 07-05-23

You may verify this certificate online at corp.delaware.gov/authver.shtml

W891911

# State of Delaware - Division of Corporations

**FAX**

## DOCUMENT FILING SHEET

| Priority 1 (Two Hr. Service) | Priority 2 (Same Day) | Priority 3 (24 Hour) | Priority 4 (Must Approvals) | Priority 5 (Reg. Approvals) | Priority 6 (Reg. Work) |
|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ■ |

DATE SUBMITTED ~~12-23-99~~ 01-03-00     01-03-00

REQUESTOR NAME CORPAMERICA INC.

ADDRESS 30 OLD RUDNICK LANE
DOVER, DE 19901

ATTN. Rose

PHONE 302-736-4300

FILE DATE ~~12-23-99~~

FILE TIME 0900

NAME of COMPANY / ENTITY Babcock & Brown Administrative Services LLC

~~99~~ 001001228
SRV NUMBER

2811627
FILE NUMBER

9168016
FILER'S NUMBER

RESERVATION NO.

TYPE of DOCUMENT Formation/Conversion

DOCUMENT CODE ~~[illegible]~~ 17217

CHANGE of NAME ____ CHANGE of AGENT / OFFICE ____ CHANGE of STOCK ____

**CORPORATIONS**

| | | |
|---|---|---|
| FRANCHISE TAX | YEAR ____ | $ ____ |
| FILING FEE TAX | | $ ____ |
| RECEIVING & INDEXING | | $ ____ |
| CERTIFIED COPIES | NO. 1 | $ ____ |
| SPECIAL SERVICES | | $ ____ |
| KENT COUNTY RECORDER | | $ ____ |
| NEW CASTLE COUNTY RECORDER | | $ ____ |
| SUSSEX COUNTY RECORDER | | $ ____ |
| | TOTAL: | $ ____ |

**METHOD of RETURN**

X MESSENGER /PICKUP
____ FED. EXPRESS Acct.# ____
____ REGULAR MAIL
____ FAX No. ____
____ OTHER ____

**COMMENTS / FILING INSTRUCTIONS**

Converting to Babcock & Brown Administrative Services, Inc.
*EFFECTIVE 12/31/99*

**CREDIT CARD CHARGES**

You have my authorization to charge my credit card for this service:

☐☐☐☐ - ☐☐☐☐ - ☐☐☐☐ - ☐☐☐☐    Exp. Date ____

Signature ____ Printed Name ____

XX

AGENT USE ONLY

**INSTRUCTIONS**

1. Fully shade in the required Priority square using a dark pencil or marker, staying within the square.
2. Each request must be submitted as a separate item, with its own Filing sheet as the FIRST PAGE.

SODDFS3 03-06-95

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 01/03/2000
001001228 - 2811627

**STATE OF DELAWARE**

**CERTIFICATE OF CONVERSION**

**FROM A CORPORATION TO A LIMITED LIABILITY COMPANY**

**PURSUANT TO SECTION 266 OF THE**

**DELAWARE GENERAL CORPORATION LAW**

(1) The name of the corporation immediately prior to filing this Certificate is **Babcock & Brown Administrative Services, Inc.**

(2) The date the Certificate of Incorporation was filed on is October 23, 1997.

(3) The original name of the corporation as set forth in the Certificate of Incorporation is Babcock & Brown Administrative Services, Inc.

(4) The name of the limited liability company as set forth in the formation is **Babcock & Brown Administrative Services LLC**.

(5) The conversion has been approved in accordance with the provisions of Section 266.

By: Jan Blaustein Scholes, Authorized Officer

Dated: December 31, 1999

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 01/03/2000
001001228 - 2811627

**CERTIFICATE OF FORMATION**

**OF**

**BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC**

This Certificate of Formation of Babcock & Brown Administrative Services LLC, a Delaware limited liability company (the "Company"), dated as of December 31, 1999, is being duly executed and filed by Babcock & Brown Inc., a California corporation, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, et seq.) (the "Delaware Act").

FIRST: The name of the limited liability company formed hereby is **Babcock & Brown Administrative Services LLC**.

SECOND: The address of the registered office of the Company in the State of Delaware is c/o CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901.

THIRD: The name and address of the registered agent for service of process on the Company in the State of Delaware is CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901.

IN WITNESS WHEREOF, the undersigned, an authorized person as described in the Delaware Act, has executed this Certificate of Formation as of the date first above written.

Authorized Person:

Babcock & Brown Inc.,
a California corporation

By: Jan Blaustein Scholes
Its: Vice President

# Delaware

The First State

Page 1

***I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:***

***"BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC", A DELAWARE LIMITED LIABILITY COMPANY,***

***WITH AND INTO "BABCOCK & BROWN PARALLEL MEMBER LLC" UNDER THE NAME OF "BABCOCK & BROWN PARALLEL MEMBER LLC", A LIMITED LIABILITY COMPANY ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, AS RECEIVED AND FILED IN THIS OFFICE ON THE TWENTY-NINTH DAY OF AUGUST, A.D. 2011, AT 2:33 O`CLOCK P.M.***



Jeffrey W. Bullock, Secretary of State




2811627 8100M
SR# 20232925381

Authentication: 203683808
Date: 07-05-23

You may verify this certificate online at corp.delaware.gov/authver.shtml

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 02:33 PM 08/29/2011*
*FILED 02:33 PM 08/29/2011*
*SRV 110960806 - 4370415 FILE*

**DELAWARE**
**CERTIFICATE OF MERGER**
**OF**
**BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC**
**WITH AND INTO**
**BABCOCK & BROWN PARALLEL MEMBER LLC**

August 28, 2011

Pursuant to Section 18-209 of the Delaware Limited Liability Company Act (the "DLLCA"), Babcock & Brown Parallel Member LLC, a Delaware limited liability company (the "Company"), in connection with the merger (the "Merger") of Babcock & Brown Administrative Services LLC, a Delaware limited liability company ("Target"), with and into the Company, hereby certifies as follows:

FIRST: The respective names and states of formation or incorporation of the constituent companies to the Merger are as follows:

| Name | State of Formation or Incorporation |
|---|---|
| Babcock & Brown Parallel Member LLC | Delaware |
| Babcock & Brown Administrative Services LLC | Delaware |

SECOND: An Agreement and Plan of Merger, dated as of August 29 , 2011, between the Company and Target (the "Merger Agreement"), setting forth the terms and conditions of the Merger, has been approved, adopted, certified, executed and acknowledged by each of the Company and Target.

THIRD: The Company shall be the surviving limited liability company (the "Surviving Company") of the Merger. The name of the Surviving Company is "Babcock & Brown Parallel Member LLC".

FOURTH: The Merger shall become effective upon the filing of this Certificate of Merger with the Secretary of State of the State of Delaware.

FIFTH: An executed copy of the Merger Agreement is on file at the office of the Surviving Company located at 50 California Street, Suite 3610, San Francisco, California 94111. A copy of the Merger Agreement will be furnished by the Surviving Company, on request and without cost, to any member of the Surviving Company or any member of Target.

[Signature page follows.]

The undersigned is signing this Certificate of Merger as of the date first written above.

BABCOCK & BROWN PARALLEL MEMBER LLC

By: ______________________

Name: Chaye Besherse
Title: Secretary

*Signature page to Delaware Certificate of Merger*

# State of Delaware
# Certificate of Correction
# of a Limited Liability Company
# to be filed pursuant to Section 18-211(a)

1. The name of the Limited Liability Company is: BABCOCK & BROWN PARALLEL MEMBER LLC.

2. That a Certificate of CANCELLATION was filed by the Secretary of State of Delaware on 15 March 2019, and that said Certificate requires correction as permitted by Section 18-211 of the Limited Liability Company Act.

3. The inaccuracy or defect of said Certificate is: (must give specific reason)

Due to a clerical error, the cancellation was filed prematurely. The entity is the Manager of Westborough SPE, LLC and there are still significant assets that need to be liquidated.

4. The Certificate is hereby corrected to read as follows:

The Certificate of Cancellation/Withdrawal is rendered null and void.

**IN WITNESS WHEREOF**, the undersigned have executed this Certificate on the 23 day of June, A.D. 2023.

By: [signature]
Authorized Person

Name: F Jan Blaustein Schol
Print or Type

State of Delaware
Secretary of State
Division of Corporations
Delivered 07:21 AM 06/30/2023
FILED 07:21 AM 06/30/2023
SR 20232897300 - File Number 4370415

# Delaware

The First State



*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "BABCOCK & BROWN PARALLEL MEMBER LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE FIFTH DAY OF JULY, A.D. 2023.*




Jeffrey W. Bullock, Secretary of State

4370415 8300

SR# 20232917389

Authentication: 203677211

Date: 07-05-23

You may verify this certificate online at corp.delaware.gov/authver.shtml

# Exhibit 5

Westborough SPE LLC - 19 TL 00768 Joint Pre-Trial Memorandum

COMMONWEALTH OF MASSACHUSETTS
LAND COURT
DEPARTMENT OF THE TRIAL COURT

SUFFOLK, ss. LAND COURT
CASE NO. 19 TL 000768

| | |
|---|---|
| TOWN OF WESTBOROUGH, | ) |
| Plaintiff, | ) |
| v. | ) |
| WESTBOROUGH SPE, LLC | ) |
| Defendant. | ) |

**JOINT PRE-TRIAL MEMORANDUM**
**(<u>SECOND</u>~~FIRST~~ DRAFT)**

Pursuant to the Order of this Court, in preparation for the Pre-Hearing on the Motion to Vacate Judgment, Plaintiff Town of Westborough and the Defendant Westborough SPE, LLC, by their undersigned counsels, submit the following Joint Pre-Trial Memorandum. The first draft of which was provided by the Plaintiff to the Defendant per said Order<u> on Friday, August 4, 2023 at 4:20 PM Eastern Time and the second draft provided to the Defendant on Tuesday, August 22nd, 2023 at 9:00 AM Eastern Time</u>.

1. **Legal Issues, Claims and Defenses**

The locus ~~is a vacant~~<u>consists of</u> commercial property <u>consisting of an approximately 29 acre parcel and having a structure that was </u>formerly leased and operated as a movie theater<u> by Hoyts and their successor in interest Regal Cinemas</u>. The legal issue before this Court is whether the Defendant that filed a Motion to Vacate Foreclosure Judgment is the same

**Formatted:** Superscript

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

taxpayer as was the Defendant when the Judgment of Foreclosure entered in the above-referenced case upon 231 Turnpike Avenue in Westborough, Massachusetts.

**Plaintiff's Claims and Defenses**:

The Plaintiff, Town of Westborough, is opposed to the Motion to Vacate for the following reasons:

a. As a matter of equity, a petition to vacate a prior decree foreclosing the right of redemption under a tax title is "extraordinary in nature and ought to be granted only after careful consideration and in instances where . . . [it is] required to accomplish justice." Sharon v. Kafka, 18 Mass. App. Ct. 541, 542 (1984); Lynch v. Boston, 313 Mass. 478, 480 (1943). It would not accomplish justice to vacate the decree of foreclosure as the Defendant does not have a legal interest in the locus and therefore, does not have standing to petition to vacate the prior decree of foreclosure entered by this Court. This Honorable Court should not vacate the decree of foreclosure and allow redemption by this party as it would not be based in equity.

b. The Motion to Vacate was filed on the last day before the tolling of the one (1) year period allowed for a Defendant to put forth such a motion for consideration of this Court. Said motion should have been rejected as it was filed Pro Se in violation of the filing requirements for a corporate entity in the Land Court of the Commonwealth of Massachusetts. Thus, this Court should not be able to consider the motion.

c. According to the docket in this case, on June 30, 2023, with the assistance of legal counsel, Defendant filed a supplement to the Motion to Vacate over one year and five months after the Judgment entered. Said supplement substantially changes the

Formatted: Font: Bold

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Defendant's position, arguments and evidence related to its claim of ownership from the Defendant's Motion to Vacate and is not properly characterized as a supplement.

d. According to the docket in this case, on July 6, 2023, with the assistance of legal counsel, Defendant filed a second supplement to Defendant's Motion to Vacate over one year and five months after the Judgment entered. This supplement substantially changes the Defendant's position, arguments and evidence related to its claim of ownership from the Motion to Vacate as originally filed and is not properly characterized as a supplement.

e. Plaintiff believes Jan Blaustein (a/k/a F. Jan Blaustein Scholes) did not and does not have a legal interest in Westborough SPE LLC or any assets of said corporation and therefore could not have transferred any interest in the corporation or its assets via the "Bill of Sale" (subsequently amended to be named "Transfer of Manager Role").

f. Plaintiff believes Jan Blaustein (a/k/a F. Jan Blaustein Scholes) did not and does not have the required mental capacity to enter legal contracts.

g. Plaintiff believes the recent evidence the Defendant has presented related to the merger of Babcock & Brown Administrative Services LLC into and with Babcock & Brown Parallel Member LLC further confirms Plaintiff's position that Jan Blaustein (a/k/a F. Jan Blaustein Scholes) did not and/or does not have a legal interest in Westborough SPE LLC its management or its assets at the time of signing the "Bill of Sale" and subsequently the "Transfer of Manager Role".

h. Plaintiff believes the documents presented by Defendant called the "DURABLE POWER OF ATTORNEY" & "WRITTEN CONSENT OF THE MANAGER OF BABCOCK AND BROWN PARALLEL MEMBER LLC IN LIEU OF MEETING"

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

dated June 26, 2023, signed by F. Jan Blaustein Scholes as Manager of Babcock and Brown Parallel Member, LLC were executed in exchange for $600,000.00 from the Defendant. Therefore, undue influence and unclean hands are a concern.

i. The "DURABLE POWER OF ATTORNEY" references an operating agreement for Westborough SPE LLC dated October 20, 1997. To Plaintiff's knowledge, said operating agreement has not been presented by the Defendant as evidence. Rather, the Defendant presented as evidence an unsigned operating agreement dated October 22, 1997. For more information see below under "General Facts".

j. Plaintiff believes all parties known to hold an interest in the locus in the tax lien foreclosure case were properly noticed and that there is no existence of a due process violation.

**Defendant's Legal Issues, Claims, and Defenses**:

**1. Request for Superior Court Business Litigation Session Jury Demand for All Issues So Triable.**

While the Land Court only holds bench trials, a party can request that the Land Court frame jury triable questions for a Superior Court jury to decide. The Superior Court's determination on framed issues binds the Land Court, although the Land Court can receive evidence, hear arguments, and decide the remaining issues before rendering a decision in the case pursuant to the authority granted under M.G.L. c. 185, §§ 15 and 17. To preserve a jury right in a Land Court case, a party must make a proper jury demand and perfect the demand. A party perfects a jury demand by both:

- (i) Having the Land Court frame jury questions on any material **issues of fact**. Counsel typically files a motion/request with the Land Court to frame questions for a Superior Court jury trial. In deciding the motion, the Land Court may consider whether the proposed jury

Formatted: Font: Bold
Formatted: Font: Bold, Underline
Formatted: Font: Bold
Formatted: Font: Bold, Underline
Formatted: Font: Bold
Formatted: List Paragraph, Line spacing: single
Formatted: Font: Not Bold
Formatted: Indent: First line: 0.25"
Formatted: Underline
Formatted: Font: Bold, Underline
Formatted: Font: Not Bold
Formatted: Font: Times New Roman, 12 pt, Font color: Auto
Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 23-40709 Doc 146-4 Filed 06/26/23 Entered 06/26/23 14:28:38 Desc Main Document Page 53 of 124

questions relate to a jury triable issue. *See, e.g.*, *Ne. Univ. v. Nahant Pres. Tr., Inc.*, 2019 WL 5959579, at *2 (Mass. Land Ct. Oct. 24, 2019).

- and (ii) Timely filing certified copies of the framed jury questions and other relevant documents in the Superior Court in the county for the land at issue. While a party generally must file these documents within 30 days from the deadline to make a jury demand, which requires a party to act promptly in having the Land Court frame jury questions, tax/title proceedings are usually perfunctorily administered by the Recorder of the Land Court, and do not require a trial.

The parties generally waive a jury demand if the court holds a bench trial without objection and thus Defendant expressly preserves its rights to a jury demand and objects accordingly. *Trs. of Wash. W. Condo. Tr. v. Ashkouri*, 43 N.E.3d 727, at *3 (Mass. App. Ct. 2016) (unpublished opinion under Mass. App. Ct. Rule 1:28); *but see CMJ Mgmt. Co. v. Wilkerson*, 75 N.E.3d 605, 612-13 (Mass. App. Ct. 2017) (excusing failure to object to bench trial because court impermissibly struck jury demand as a sanction)). The parties have an opportunity to object if there is a jury demand because the trial judge must ask the parties whether they intend to have a jury trial or bench trial before swearing any witnesses (*see Cort v. Majors*, 82 N.E.3d 1089, 1092 (Mass. App. Ct. 2017)).

Westborough SPE LLC hereby objects to a bench trial in this matter if its motion for involuntary dismissal (discussed *infra*) is not granted.

**2. Which Party Has the Burden of Proof?/Failure of Land Court Title Examiner and Town of Westborough to Review Delaware Corporate Records.**

The Land Court has exclusive, original jurisdiction over proceedings for foreclosure and redemption of tax titles. M.G.L. c. 185, § 1(b); *see generally Tallage Lincoln, LLC v. Williams*,

Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Not Bold
Formatted: Underline
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Indent: First line: 0.25"
Formatted: Font: Italic
Formatted: Font: Bold
Formatted: Font: Bold, No underline
Formatted: Font: Bold
Formatted: List Paragraph, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"
Formatted: List Paragraph, Line spacing: single
Formatted: Font: Italic
Formatted: Font: Times New Roman, 12 pt, Font color: Auto
Formatted: Font: Times New Roman, 12 pt, Font color: Auto

485 Mass. 449, 450 (2020) (explaining in detail "the archaic and arcane process of tax lien foreclosure") (footnote omitted).

In *Tallage Lincoln, LLC v. Williams*, 485 Mass. 449 (2020), the Supreme Judicial Court recently provided a comprehensive review of the law regarding the collection of real estate taxes in the Commonwealth. "When a taxpayer fails to pay his or her real estate taxes, the statutory scheme provides municipal tax collectors with two primary ways to collect the taxes: by conducting a tax sale, *see* M.G. L. c. 60, §§ 43-45, or by executing a tax taking, *see* M.G. L. c. 60, § 53." *Id.* at 451. Tax takings have become the predominant method of tax collection. *See id.* (tax sales "have largely been replaced by tax takings"). Section 53 provides in pertinent part:

> If a tax on land is not paid within fourteen days after demand therefor and remains unpaid at the date of taking, the collector may take such land for the town, first giving fourteen days' notice of his intention to exercise such power of taking, which notice may be served in the manner required by law for the service of subpoenas on witnesses in civil cases or may be published ...

When a municipal tax collector conducts a tax taking, "the municipality obtains 'tax title' to the property, which is best understood as legal ownership of the property subject to the owner's right of redemption. M.G. L. c. 60, § 53." *Id.* After such a taking, "the municipality must create a 'tax title account,' to which it can 'certify' (*i.e.*, add) subsequent missed tax payments, as well as any other fees, charges, and interest accrued, without having to conduct another taking. M.G. L. c. 60, §§ 50, 61." *Id.* If the taxpayer does not redeem the property by paying the balance of the tax title account within six months of the taking, "the municipality can petition the Land Court to foreclose the taxpayer's right of redemption" pursuant to M.G. L. c. 60, § 65. *Id.* Section 65 provides in pertinent part:

> Except as provided in section sixty-two, whoever then holds the title to land acquired by a sale or taking for taxes may bring a petition in the land court for the foreclosure of all rights of redemption of said land either six months from the sale or taking.... Such petition shall be made in the form to be prescribed by said court and shall set forth a description of the land to which

Formatted: Font: Italic

Formatted: Font: Italic

Formatted: Font: Italic

Formatted: Font: Italic

Formatted: Font: Italic

Formatted: Indent: Left: 0.25", First line: 0", Line spacing: single

Formatted: Font: Italic

Formatted: Font: Italic

Formatted: Font: Italic

Formatted: Font: Italic

Formatted: Indent: Left: 0.25", First line: 0", Line spacing: single

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

it applies, with its assessed valuation, the petitioner's source of title, giving a reference to the place, book and page of record, and such other facts as may be necessary for the information of the court.

"[I]f the municipality does not wish to proceed against the taxpayer itself, it can assign the tax title to a private party" pursuant to G. L. c. 60, § 2C (bulk sale of tax receivables and liens) or M.G.L. c. 60, § 52 (tax title auction). *Tallage Lincoln, LLC*, 485 Mass. at 451.

Formatted: Font: Italic

Once a petition is filed pursuant to § 65, the Land Court causes a title examination to be conducted to determine interested parties and provides notice to those parties of the proceedings. M.G.L. c. 60, § 66. Here, the title examiner (Michael H. Delaney, Esq.) and the Town of Westborough knew that the record title holder to the Property, Westborough SPE LLC was a Delaware limited liability company (Pursuant to the Quitclaim Deed recorded at Book 19369, Page 75 on November 21, 1997), yet, upon information and belief, the title examiner and the Town of Westborough failed to search the records of the Delaware Secretary of State Division of Corporations. Had the title examiner and the Town of Westborough diligently searched Delaware records, they would have easily identified that Babcock and Brown Administrative Services, Inc., a Delaware Corporation, and predecessor manager of Westborough SPE LLC, became Babcock and Brown Administrative Services LLC, which merged and became Babcock and Brown Parallel Member LLC. As Westborough SPE LLC was and is a manager-managed LLC, the Land Court Title Examiner and/or the Town of Westborough had a legal duty to identify the proper manager of the title holder, which only could be ascertained with certainty from a diligent search of Delaware Secretary of State Division of Corporations records. The Massachusetts Secretary of The Commonwealth Corporations Division is merely a repository of filed documents and does not opine on corporate status or authority for non-Massachusetts entities or non-Massachusetts corporations—they either have a foreign registration document or they do not—which is not

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

entirely dispositive. Their role is **circumscribed**. Moreover, https://www.sec.state.ma.us/divisions/terms.htm explicitly states that any online records are "For Information Purposes Only". The Secretary of the Commonwealth is merely a custodian/keeper of the records.

If no interested party timely appears and responds to the petition, as was the case here, "the municipality or assigned private party may immediately move the court to enter a judgment of foreclosure of the right of redemption. G. L. c. 60, § 67." *Tallage Lincoln, LLC*, 485 Mass. at 452.8 "Upon entry of such judgment, the municipality or private party assignee takes absolute title to the property. M.G.L. c. 60, § 69." Id.9 "[T]he foreclosure judgment extinguishes the taxpayer's remaining interest in the property—the right of redemption—and converts the municipality's or third party's tax title into absolute title. G. L. c. 60, § 64." *Id.*10 Of particular note here, "the foreclosing party takes title free and clear of all encumbrances, including mortgages and other liens." Id. at 452-53 (citations omitted).

Section 64 provides in pertinent part:

> The title conveyed by a tax collector's deed or by a taking of land for taxes shall be absolute after foreclosure of the right of redemption by decree of the land court as provided in this chapter. The land court shall have exclusive jurisdiction of the foreclosure of all rights of redemption from titles conveyed by a tax collector's deed or a taking of land for taxes....

However, there is a caveat to the finality of a foreclosure judgment: "the taxpayer may move to vacate the judgment if [it] pays the redemption amount, plus interest, within one year. G. L. c. 60, § 69A." *Tallage Lincoln, LLC*, 485 Mass. at 453.11 "After one year, the judgment is final and can be vacated only upon a showing of a denial of due process." *Id.*, *citing Town of North Reading v. Welch*, 46 Mass. App. Ct. 818, 819-820 (1999). "A petition brought within one year requires a showing of some extenuating circumstance, while a petition brought after the one-year limitations period can prevail only upon a showing of a due process violation." *Town of Bourne v. Coffey*, 101



Formatted: Font: Bold, Underline
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Times New Roman, 12 pt, Font color: Auto
Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Mass. App. Ct. 496, 500 n.10 (2022) (emphasis in original). In *Vincent Realty Corp. v. Boston*, 375 Mass. 775, 778 (1978), the Supreme Judicial Court considered a petition to vacate brought within one year of the foreclosure decree. The court recognized that "[M.G. L. c. 60, §] 69A does not give one the automatic right to redeem, but sets the time period within which petitions to vacate should be brought." *Vincent Realty Corp.*, supra at 780 n.6. *Vincent Realty* instructs that, even when filed within the one-year limitations period, "a petition to vacate a prior decree foreclosing the right of redemption under a tax title is 'extraordinary in nature and ought to be granted only after careful consideration and in instances where they are required to accomplish justice' " (citation omitted). *Id.* The *Vincent Realty* Court went on to conclude that no such "extenuating circumstances" existed to warrant allowance of the petition to vacate.

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Town of Andover v. State Fin. Servs., Inc.*, 432 Mass. 571, 574 (2000), *quoting Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

A municipality's failure to assess taxes correctly on "normal" land (that is, land that's not low value) invalidates the subsequent tax title unless the municipality shows that the erroneous assessment wasn't substantial or misleading. *See Christian v. Mooney*, 400 Mass. 753, 761-762 (1987).

M.G.L. c. 59, § 11 makes clear that if "[t]here [is] no person in possession of the [taxed] parcel," § 11 requires a town's assessors:

> to assess the property in question to the "owner" and that mean[s] the owner "appearing of record" as determined by resort to the records in the appropriate registry of deeds and registry of probate. The [assessors are] required to exercise reasonable diligence to try to determine the



Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Indent: Left: 0.25", First line: 0", Line spacing: single
Formatted: Font: Times New Roman, 12 pt, Font color: Auto
Formatted: Font: Times New Roman, 12 pt, Font color: Auto

owner from those sources, but if the board [can]not thereby determine the owner it [may] lawfully assess the property to "persons unknown," or ... assess it to [a] fictitious "John Doe."

*Hardy v. Jaeckle*, 371 Mass. 573, 579-580 (1976).

"Taxes assessed upon land ... shall with all incidental charges and fees be a lien thereon from January first in the year of assessment." M.G.L. c. 60, § 37. If assessed taxes go unpaid, a municipality may execute (as the Town did in this case) a tax taking under id. at § 53. See Tallage Lincoln, LLC, 485 Mass. at 451. Chapter 60, § 37 further provides that:

[n]o tax title ... shall be held to be invalid by reason of any error or irregularity which is neither substantial nor misleading, whether such error or irregularity occurs in the proceedings of the collector or the assessors or in the proceedings of any other official or officials charged with duties in connection with the establishment of such tax title,

but "[o]nce an error has been shown, the party who asserts the insubstantiality of the error has the burden of proving that fact," " 'according to the circumstances of each case.' " *Bartevian v. Cullen*, 369 Mass. 819, 822-823 & n. 4 (1976), *quoting Fall River v. Conanicut Mills*, 294 Mass. 98, 100 (1936); *see also Pass v. Town of Seekonk*, 4 Mass. App. Ct. 447, 450 (1976) (same).

**3. Defendant Objects to Non-Live Testimony, Except by Expert Witnesses.**

Defendant objects to written testimony, except for expert testimony, because it can prevent the trial judge from fully assessing a witness's credibility. The parties also risk the trial judge may overlook information that they have to obtain from reading testimony. Live cross-examination and redirect and rebuttal testimony must occur at trial. *See, e.g., Harris v. Ward*, 2018 WL 4691071, at *1 n.2 (Mass. Land Ct. Sept. 27, 2018), judgment entered, 2018 WL 4685890 (Mass. Land Ct. Sept. 27, 2018).).

**4. Defendant's Motion for Involuntary Dismissal/Determination of the Right to Redeem.**

In a bench trial, a defendant (or other defending party) can move for involuntary dismissal after the opposing party presents its evidence. Unlike a jury trial, a party does not make a motion for directed verdict and the court can treat a motion for directed verdict as a motion for involuntary dismissal (*Skowronski v. Sachs*, 818 N.E.2d 635, 638 (Mass. App. Ct. 2004)).



**Formatted:** Font: Italic
**Formatted:** Line spacing: Double
**Formatted:** Font: Italic
**Formatted:** Font: Italic
**Formatted:** Font: Italic
**Formatted:** Line spacing: single
**Formatted:** Font: Bold, Underline
**Formatted:** Indent: First line: 0.25"
**Formatted:** Font: Italic
**Formatted:** Font: Italic
**Formatted:** Font: Italic
**Formatted:** Underline
**Formatted:** Font: Bold
**Formatted:** Font: Bold, Underline
**Formatted:** Indent: First line: 0.25"
**Formatted:** Font: Italic
**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto
**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

A moving party must show that the opposing party lacks a right to relief based on the facts and the law (Mass. R. Civ. P. 41(b)(2)). The trial judge then determines if the evidence contains facts supporting a rational inference in the opposing party's favor, as viewed in the best light for the opposing party. Alternatively, the trial judge can evaluate the evidence and resolve any credibility, ambiguity, or inconsistency issues as the trier of fact. The trial judge decides the motion when made or after the close of the evidence. A dismissal operates as a decision on the merits (unless otherwise stated) and requires findings of fact if the trial judge uses the standard of review as a trier of fact. (Mass. R. Civ. P. 41(b)(2), (3), (c) and 52(a), (c); *M.G. v. G.A.*, 112 N.E.3d 837, 843-44 (Mass. App. Ct. 2018).).

Formatted: Font: Italic

The Town of Westborough, Massachusetts lacks a right to relief based on both the facts and the law. Massachusetts Courts have generally interpreted tax redemption statutes – because of their remedial nature—liberally in favor of a person seeking to recover his land. It is the policy of the law to favor redemption from tax sales. *West v. Bd. of Selectmen of Yarmouth*, 345 Mass. 547, 550 (1963) citing *United Trust Co. v. William S. Reed, et al.*, 213 Mass. 199, 201 (1912). "The record title continues to be in the town. The property is held subject to the [] right to redeem. In equity and good conscience [the party seeking redemption] should be allowed to exercise that right." *West*, 345 Mass. 547. at 551.

Formatted: Font: Italic

Formatted: Font: Italic

Formatted: Font: Italic

**Managers of an LLC have a right to redeem on behalf of LLC similar to a Trustee redeeming on behalf of Trust.**

Formatted: Font: Bold, Underline

Formatted: Font: Bold, Underline

Formatted: Indent: First line: 0", Line spacing: single

Formatted: Indent: First line: 0.25", Space After: 12 pt

Lolonyon Akouete and Denise Edwards as successor managers have the right to redeem on behalf of the LLC, Westborough SPE LLC. An LLC Manager is a fiduciary just like a trustee is a fiduciary in a trust structure. "Succeeding trustees, suing to redeem trust land sold for taxes, their predecessor having left his affairs considerably involved, the value of the property being about $2,000, while the amount due was only $14, were entitled to redeem." *Glazier v. Everett*, 224

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 1:26-cv-10037-MJJ Document 3-4 Filed 01/07/26 Page 25 of 120

Mass. 184 (1916); *see also* *Widersum v. Bender*, 172 Mass. 436 (1899); *Holbrook v. Brown*, 214 Mass. 542 (1913)). The only legitimate interest of a town in seeking to foreclose rights of redemption is the collection of the taxes due on the property, together with other costs and interest. § 37.49. Right of redemption, 18B Mass. Prac., Municipal Law and Practice § 37.49 (5th ed.). Under the Delaware statute, a limited liability company's operating agreement specifies the rights and duties of its members and managers, including the terms under which it can be amended. *See, e.g.*, Del.Code. Ann. §§ 18–215, 18–302. The Managers of Westborough SPE LLC have the right to manage the affairs of the LLC, including the right to deal with all real property matters.

**5. The Statutory Scheme is Unconstitutional and Will Be Subject to a US District Court Filing Shortly.**

Numerous Courts in this Commonwealth have acknowledged the harshness of the statutory scheme resulting in a loss of equity. As noted by the Supreme Judicial Court in *Tallage Lincoln, LLC*, 485 Mass. at 453 n.4:

> "In Kelly v. Boston, 348 Mass. 385, 388, 204 N.E.2d 123 (1965), this court considered the legislative history of the statutory scheme governing tax lien foreclosures and determined that the Legislature intended that the process result in forfeiture of the taxpayer's equity to the municipality. The parties in that case did not raise any constitutional challenge, and [the court] did not address the constitutionality of the statutory scheme. Here, too, the parties have not raised a constitutional challenge, and we do not address the constitutionality of the statutory scheme."

Now, finally, in *Tyler v. Hennepin Cty.*, 598 U.S. ____ (2023), the U.S. Supreme Court held in a unanimous decision that a municipality pocketing the excess between taxes owed and what the property sells for is unconstitutional and that the County could not "use the toehold of the tax debt to confiscate more property than was due", and by doing so, the County had "effected a 'classic taking in which the government directly appropriates private property for its own use.'" In support of its conclusion, the U.S. Supreme Court found that the principle that a



Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Bold
Formatted: Font: Bold, Underline
Formatted: Indent: First line: 0.25"
Formatted: Font: Italic
Formatted: Underline
Formatted: Font: Italic
Formatted: Indent: First line: 0.25", Line spacing: Double
Formatted: Font: Times New Roman, 12 pt, Font color: Auto
Formatted: Font: Times New Roman, 12 pt, Font color: Auto

government cannot take morefrom a taxpayer than they owe traces its origins at least as far back as the Magna Carta in 1215. Moreover, the U.S. Supreme Court observed that Minnesota's rule was a minority rule and currently 36 states and the federal government require that excess value be returned to the taxpayer. The Court concluded that "[t]he taxpayer must render unto Caesar what is Caesar', but no more."

**6. Even If Westborough SPE LLC Could Not Afford to Pay The Redemption Amount It Can Make An Offer To Redeem And Seek An Order Granting Additional Time to Make The Redemption Payment.**

Formatted: Font: Bold

Formatted: Font: Bold, Underline

Formatted: Line spacing: single

Formatted: Font: Bold

Inability to pay the redemption amount may ultimately lead to foreclosure of the right of redemption, but it does not prevent a party from participating in the proceeding. For example, even if Westborough SPE LLC could not afford to pay the redemption amount, it can make an offer to redeem and thus in the alternative, seeks an order granting additional time to make the redemption payment. See M.G.L. c. 60, § 68 (the court may "make a finding allowing the party to redeem, within a time fixed by the court"). *Town of Bourne v. Coffey*, 101 Mass. App. Ct. 496, 502, n. 14, review denied, 490 Mass. 1107 (2022).

Formatted: Indent: First line: 0.25", Line spacing: Double

Formatted: Font: Italic

**7. Any Steps to "wind up" Westborough SPE LLC By Dyann Blaine and/or Walter Horst and/or Any Other Babcock and Brown Affiliated agent(s) were taken in contravention of the LLC's Written Operating Agreement and invalid under Delaware law which governs the affairs of a Delaware limited liability company.**

Formatted: Font: Bold, Underline

Formatted: Indent: Left: 0.25", Space After: 12 pt, Line spacing: single

Formatted: Font: Bold, Underline

Formatted: Font: Bold, Underline

Any steps taken to "wind up" the affairs of Westborough SPE LLC by Walter Horst, Dyann Blaine, or any other party acting on behalf of any Babcock and Brown subsidiaries, were acting in contravention of the LLC Operating Agreement and thus were in breach of their fiduciary duties.

In any event, upon finding that limited liability company's (LLC's) affairs were not wound up in compliance with the Delaware Limited Liability Company Act, a Delaware court could nullify the certificate of cancellation, to effectively revive the LLC and allow claims to be brought by and against it. 6 Del. Code § 18-804(b)(3). Moreover, under Delaware law, a limited liability

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

company's (LLC's) failure to comply with statutory requirements for winding up its affairs results in revocation or nullification of certificate of cancellation. 6 Del. Code § 18-804(b)(3). Since Babcock and Brown failed to obtain the consent of the sole member of Westborough SPE LLC, Mignonette Investments Limited, its resignation and "winding up" was in contravention of the LLC's Operating Agreement and thus violative of Delaware LLC Law. Failure to comply with the statutory requirements for winding up an LLC results in revocation or nullification of the certificate of cancellation. *See Metro Commc'n Corp., BVI v. Advanced Mobilecomm Techs.*, Inc., 854 A.2d 121, 139–140 (Del.Ch.2004). "[I]f the Court finds that an LLC's affairs were not wound up in compliance with the Delaware Limited Liability Company Act, it may nullify the certificate of cancellation, which effectively revives the LLC and allows claims to be brought by and against it." *Matthew v. Laudamiel*, No. 5957–VCN, 2012 WL 605589, at *22, n. 148 (Del.Ch. Feb. 21, 2012).

Page 11 of the LLC Operating Agreement at Section 9(c) states "This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted and enforced in accordance with the laws of the State of Delaware, notwithstanding any choice of law rules to the contrary." Id. As a general principle, "[w]here the parties have expressed a specific intent as to the governing law, Massachusetts courts will uphold the parties' choice as long as the result is not contrary to public policy" (citation omitted). *Hodas v. Morin*, 442 Mass. 544, 549-550 (2004). Massachusetts applies "the law of the State of incorporation to internal corporate affairs." *Harrison v. NetCentric Corp.*, 433 Mass. 465, 469-72 (2001). Under well settled Delaware law, "[l]imited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members." *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 880 (Del. Ch. 2009). Parties who create a Delaware

Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Line spacing: Double
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Times New Roman, 12 pt, Font color: Auto
Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 1:26-cv-10037-WGY Document 13-4 Filed 02/12/26 Page 343 of 840

LLC are free, by contract, to expand, restrict, or eliminate fiduciary and other duties that would otherwise be owed by a member or a manager of an LLC. *See* Del. Code Ann. tit. 6, § 18-1101(c), 1101(e).

Formatted: Font: Italic

~~a.~~

Formatted: Normal, No bullets or numbering

2. **Factual Issues**

**(a) Statement of Agreed Facts**

**General Facts:**

a. In or about September/early October 1997, David Ambromowitz, Esq. of Goulston & Storrs PC was engaged by the formation client (whose identity is protected under the attorney-client privilege) to draft a limited liability company operating agreement for Westborough SPE LLC under Delaware law and form Westboorugh SPE LLC in Delaware and register said entity as a foreign operating limited liability company in Massachusetts.

~~a.~~b. On October 22, 1997, Westborough SPE LLC was formed~~/incorporated~~ in the State of Delaware as File Number 2811561.

c. On October 29, 1997, ~~according to the~~F. Jan Blaustein a/k/a F. Jan Blaustein Scholes, in her official capacity as President of Babcock & Brown Administrative Service, Inc., a Delaware corporation ~~website of the Corporations Division, Business Entity Summary provided by the Secretary of the Commonwealth of Massachusetts (SOC), Westborough SPE LLC~~ executed an "Application for Registration of Westborough SPE LLC (a Foreign Limited Liability Company)" (hereinafter "Foreign Registration") and caused the same to be filed with the Secretary of The Commonwealth Corporations Division.

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Westborough SPE LLC's State of Formation was the State of Delaware (See Foreign Registration at Section 3)., The Foreign Registration stated that the Federal Taxpayer Identification number of the LLC had been applied for, but was not ready at the time of the Foreign Registration. See Foreign Registration at Section 1. ~~organized under the laws of the State of Delaware, registered as a Foreign Limited Liability Company in Massachusetts and~~ The Secretary of The Commonwealth Division of Corporations ~~was~~ assigned ~~the entity~~ Westborough SPE LLC an initial identification number of 000593094.

d. The Internal Revenue Service ("IRS") assigned Westborough SPE LLC an FEIN # of 94-3286768 on _________________, 1997.

e. At no point in time has the IRS changed the FEIN# of Westborough SPE LLC.

f. Westborough SPE LLC would have been required to obtain a new FEIN# from the IRS if it was (i) incorporated; (ii) changed its name; or (iii) changed ownership of the 100% Member. See https://www.irs.gov/businesses/small-businesses-self-employed/do-you-need-a-new-ein (accessed August 21, 2023).

~~b.~~g. The LLC Operating Agreement at page 11, Section 9(c) states: "This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted and enforced in accordance with the laws of the State of Delaware, notwithstanding any choice of law rules to the contrary."

~~c. Westborough SPE LLC was canceled as an entity in the State of Delaware due to failure to pay taxes.~~

h. On November 20, 2007, Dyann Blaine, a purportedly authorized person, filed a Certificate of Withdrawal of a Foreign Limited Liability Company dated

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

Case 1:26-cv-10037-LTS Document 16-3 Filed 02/12/26 Page 35 of 840

November 19, 2007 ("Massachusetts Certificate of Withdrawal") signed under the "PENALTIES OF PERJURY".

i. The Massachusetts Certificate of Withdrawal at Section 3 stated that the principal office of Westborough SPE LLC as of the date of the filing of the Massachusetts Certificate of Withdrawal was 2 Harrison Street, 6th Floor, San Francisco, California 94105, which was the same address as Babcock & Brown Administrative Services, Inc.

j. Section 5 of the Massachusetts Certificate of Withdrawal stated "The company is withdrawing because it is not doing business in the Commonwealth of Massachusetts."

k. By Quitclaim Deed recorded at Book 19369, Page 75 on October 31, 1997 in the Worcester District Registry of Deeds, Leslie S. Carey, Trustee of Northside Realty Trust u/d/t dated January 14, 1994 duly recorded with the Worcester District Registry of Deeds on January 14, 1994 in Book 15975, Page 213 and having an address c/o New England Management and Realty Corporation, 55 New York Avenue, Framingham, Massachusetts 01701 conveyed to Westborough SPE LLC, a Delaware Limited Liability Company with a principal place of business at c/o Babcock & Brown Administrative Services, Inc., Two Harrison Street, San Francisco, CA 94105 for consideration of $9,151,449.00 the "certain parcel of land, together with any buildings and improvements thereon, located at 231 Turnpike Road, in the Town of Westborogh, Worcester County, Massachusetts, which are shown as Lot #1 on a plan entitled 'Plan of Land in Westborough, Worcester County, . . . ', dated

Formatted: Superscript

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 24-40709 Doc 13-4 Filed 02/12/26 Page 35 of 840

April 11, 1997, prepared by Beals and Thomas, Inc. recorded with the Worcester District Registry of Deeds, Plan Book 714, Plan 77 and being more particularly bounded and described according to said plan on Exhibit A attached [thereto] and made a part [thereof]".

l. A Notice of Lease was Recorded at Book 19369, Page 79 in the Worcester District Registry of Deeds on November 21, 1997 ("Notice of Lease"). Said Notice of Lease was prepared by Gould & Ettenberg, P.C., having an office at 370 Main Street, Worcester, MA 01608. Lessor under the Lease was Westborough SPE LLC c/o Babcock & Brown Administrative Services, Inc. and Lessee was Interstate Theatres Corporation, One Exeter Plaza, Boston, Massachusetts 02116 ("Interstate Theatres"). In 1988, The Hoyts Group of Australia purchased Interstate Theatres and entered the United States market. The Hoyts Group was sold in 1994 in a joint venture comprised of the San Francisco-based private equity firm Hellman & Friedman LLC (through Hellman & Friedman Asia-Pacific Investments BV) and Lend Lease Corp. At the time of the acquisition, Hoyts claimed to be the 10th largest operator out of 300 groups nationally of movie theatres. On or about May 2, 1999, Hellman & Friedman sold their interest in Hoyts to Consolidated Press Holdings Ltd. of Australia ("CPH"), the family office of Billionaire Kerry Packer (now deceased). CPH sold the United States theatres for $200 million in February 2003 to Regal Entertainment.

m. The Notice of Lease stated that the Date of Execution of the Lease was October 30, 1997 and the Lease Commencement Date was November 21, 1997. The

Formatted: Superscript

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Notice of Lease also stated that the Term of Lease was Twenty (20) years and had an expiration date of November 21, 2017. The Lease stated that "Lessee has the right to extend for four (4) additional (5) year periods". Thus, Tenant had the right to extend the Lease until at least November 21, 2037.

n. The Worcester County Registry of Deeds does not indicate that the Locus was sold prior to the Town of Westborough acquiring ownership by the Foreclosure in this tax-title matter.

o. M.G.L. Chapter 156C, Section 2 (8) defines "Manager" as "a person who is designated as a manager of a limited liability company pursuant to the operating agreement." Section 2 (10) defines "Person" as "a natural person, partnership, whether general or limited and whether domestic or foreign, limited liability company, foreign limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity."

p. M.G.L. Chapter 156C, Section 25 (Manager's membership in company) specifically states "A manager need not be a member of the limited liability company."

q. M.G.L. Chapter 156C, Section 37 (Resignation of manager) states "A manager may resign as a manager of a limited liability company at the time or upon the happening of events specified in the operating agreement and in accordance with the operating agreement. An operating agreement may provide that a manager shall not have the right to resign as manager of a limited liability company. Regardless of whether the operating agreement provides that a

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 23-40709 Doc 146-3 Filed 02/12/26 Entered 02/12/26 14:28:73 Desc Main Document Page 353 of 1840

manager does not have the right to resign as a manager of a limited liability company, a manager may resign as a manager of a limited liability company at any time upon prior written notice to each member and each other manager at each member's and each other manager's address as set forth on the records of the limited liability company as of the date of the notice. If the resignation of a manager violates the operating agreement, in addition to any remedies otherwise available under applicable law, a limited liability company may recover from the resigning manager damages for breach of the operating agreement and offset the damages against any amounts otherwise distributable to the resigning manager."

r. M.G.L. Chapter 156C, Section 48 (Registration of foreign limited liability company) states "A foreign limited liability company shall be considered to be doing business in the commonwealth for the purpose of this section if it would be considered to be doing business in the commonwealth for the purposes of Part 15 of subdivision A of Chapter 156D if it were a foreign corporation." M.G.L. Chapter 156D, Section 15.02 (Authority to Transact Business Required) states: "(a) a foreign corporation that transacts business or has a usual place of business in the commonwealth shall deliver the certificate required by section 15.03 to the secretary of state for filing. (b) The following activities, among others, do constitute transacting business within the meaning of subsection (a): (1) the ownership or leasing of real estate in the commonwealth…".

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

s. M.G.L. Chapter 156C, Section 35 (Liability for distribution in excess of terms of operating agreement) states "(a) a member or manager who votes for or assents to a distribution in violation of the operating agreement shall be personally liable to the limited liability company for the amount of the distribution that exceeds what could have been distributed without violating the operating agreement. (b) Each member or manager held liable under subsection (a) for an unlawful distribution is entitled to contribution: (1) from each other member or manager who could be held liable under said subsection (a) for the unlawful distribution; and (2) from each member for the amount the member received knowing that the distribution was made in violation of the operating agreement."

t. M.G.L. Chapter 156C, Section 54 states that: "(a) a Foreign limited liability company doing business in the commonwealth which rails to register with the state secretary shall, for each year that such failure shall continue, be fined not more than five hundred dollars. No such failure shall affect the validity of any contract involving the foreign limited liability company…The failure of a foreign limited liability company to register with the state secretary shall not prevent the foreign limited liability company from defending any action, suit or proceeding in any of the courts of the commonwealth."

u. M.G.L. Chapter 156C, Section 16 (Execution of certificate by authorized person) states "(c) The execution of a certificate by an authorized person constitutes an affirmation, under the penalties of perjury, that the facts stated therein are true."

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 3:24-cv-10037-MGY Document 13-4 Filed 02/12/26 Page 375 of 1240

v. On November 20, 2007, when Dyann Blaine filed the Massachusetts Certificate of Withdrawal, Westborough SPE LLC, still had a Lease at the Locus and thus the Certificate of Withdrawal was improper.

d. withdrawn in Massachusetts from doing business in the Commonwealth.

e.w. When a foreign corporation withdraws from transacting business in the Commonwealth with the consent of the Secretary of the Commonwealth, the corporation shall set forth it is not transacting business in the Commonwealth and that it surrenders its authority to transact business in the Commonwealth. G.L. c. 156D, Section 15.20. Additionally, the foreign corporation revokes the authority of its registered agent to accept service on its behalf "and appoints the secretary of state as its agent for service of process in any proceeding based on a cause of action arising during the time it was authorized to transact business in the commonwealth". M.G.L. c. 156C & c. 156D, Section 15.20. The withdrawn corporation additionally commits to notify the SOC of any future changes to their mailing address. M.G.L. c. 156D, Section 15.20.

f. After Westborough SPE LLC withdrew from transacting business in the Commonwealth, there is no evidence of filings by the corporation with the SOC to update or change the corporation's mailing address.

g.x. On November 22, 2022, Denise Edwards, as successor Co-Manager of Westborough SPE LLC, executed and filed in thewith the Secretary of State for the State of Delaware a Certificate of Revival for Westborough SPE LLC with the certification that she was authorized to do so.

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

Case 3:24-cv-10081-MGM Document 3-4 Filed 01/12/24 Page 35 of 240

h.y. On December 12, 2022, according to the website of the Corporations Division, Business Entity Summary provided by the Denise Edwards, as successor co-manager, filed a "Foreign Limited Liability Company Application for Registration" with the Secretary of the Commonwealth of Massachusetts (SOC)., Westborough SPE LLC, certified that it was organized under the laws of the State of Delaware, and Jeffrey W. Bullock, Secretary of The State of Delaware certified that Westborough SPE LLC was duly formed under the laws of the State of Delaware and was in good standing and had legal existence so far as the records of that office showed as of November 28, 2022. registered as a new Foreign Limited Liability Company in Massachusetts and was This re-registration of Westborough SPE LLC was assigned the an entity identification number of 001623747 which was different than the original entity identification number .of 000593094. It is standard policy of the Massachusetts SOC to issue a new entity identification number when a prior entity had been withdrawn from registration. Both registrations with the Massachusetts SOC had identical FEIN#'s.

z. The foreign limited liability company, Westborough SPE LLC (entity identification number of 000593094), was not revived in the Commonwealth of Massachusetts as there is no means to reinstate from a withdrawal of a corporation. Delaware permits reinstatement of an entity pursuant to Section 18-1109 of the Limited Liability Company Act of the State of Delaware, by first paying all taxes due to the State of Delaware at the time the limited liability company became cancelled and subsequently filing a Certificate of Revival of

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

a Limited Liability Company and payment of a Certificate fee in the amount of $220.00.

~~i.~~aa. The successor co-manager of Westborough SPE LLC, Denise Edwards filed a Certificate of Revival in Delaware on November 22, 2022.

**Formatted:** Numbered + Level: 1 + Numbering Style: a, b, c, … + Start at: 27 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.75"

~~j. Employees of the Corporations Division of the Commonwealth of Massachusetts have confirmed the two corporations of Westborough SPE LLC share the same name but are registered independently of each other and they cannot confirm the corporations are the same entity.~~

~~k.~~bb. The Corporations Division of the Commonwealth of Massachusetts is tasked as a third party record keeper, to receive and record documents, especially those ~~and do not challenge Foreign~~ pertaining to domestic and foreign ~~Limited Liability Company~~ limited liability companies. ~~filings as long as basic evidence is included with the filing to show that a corporation exists in the company's home state and is in good standing there~~.

~~l. Both Westborough SPE LLC entities, in the Commonwealth of Massachusetts, do not share the same principal places of business, resident agents and/or managers.~~

~~m. The principal place of business for the newest Westborough SPE LLC shares the same address as the retail store, Staples.~~

~~n. At no time was Jan Blaustein (a/k/a F. Jan Blaustein Scholes) the President of Westborough SPE LLC.~~

~~o.~~cc. ~~Through her position as an attorney at Babcock & Brown Administrative Services, LLC,~~ F. Jan Blaustein Scholes a/k/a Jan Blaustein a/k/a Jan Bluestein ~~Jan Blaustein~~

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

(a/k/a F. Jan Blaustein Scholes) was appointed a Manager of was listed in the records of the Massachusetts SOC as a real property signatory for Westborough SPE LLC.

p. dd. Babcock & Brown Administrative Services, Inc., a Delaware corporation, served as the original manager of Westborough SPE LLC from its time of formation until the time it filed its Massachusetts Certtificate of Withdrawal. LLC was an entity that provided administrative management services to Westborough SPE LLC.

q. ee. Babcock & Brown Administrative Services, Inc. LLC did not own hold a membership interest in Westborough SPE LLC. The 100% Membership Interest was held by Mignonette Investments Limited, a British Virgin Islands limited partnership. or have any legal right, title or interest in the assets of Westborough SPE LLC.

r. Jan Blaustein Scholes was admitted to the State Bar of California on December 21, 1997, but was designated by said Bar as inactive as of February 2, 2010 but was subsequently designated by the Bar as active on October 16, 2014. From July 1, 2016, to the present Jan Blaustein Scholes is not eligible to practice law in the State of California.

s. Jan Blaustein suffered several strokes that impaired her health and well-being leading to issues with her memory and executive functions.

t. Per the Defendant's evidence of the unsigned affidavit produced for Jan Blaustein, she cannot recall or produce documents related to the ownership of Westborough SPE LLC but is aware that Babcock & Brown did not hold a direct or indirect ownership interest in Westborough SPE LLC.

u. Defendant has submitted as evidence an unsigned operating agreement from Mignonette Investments Limited titled "WESTBOROUGH SPE LLC LIMITED

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

Case 23-40709 Doc 146-4 Filed 06/11/24 Entered 06/11/24 ... Page 375 of 1247

LIABILITY COMPANY AGREEMENT" dated October 22, 1997, authorizing Babcock & Brown Administrative Services LLC to manage the business affairs of the company Westborough SPE LLC. No successor manager was identified in the agreement. No signed agreement has been presented.

ff. Westborough SPE LLC has provided a fully executed limited liability company operating agreement governed by Delaware law to counsel for the Town of Westborough.

v.gg. In said operating agreement the owner of Westborough SPE LLCThe 100% Member of Westborough SPE LLC was identified under "Schedule A" as "Mignonette Investments Limited", a British Virgin Islands limited partnership as the sole "Member" with an interest of "100%"..

hh. In said operating agreement, the owner of Westborough SPE LLC was identified under "Schedule B" as "Mignonette Investments Limited" as the sole "Member" with an investment ofMignonette Investments Limited made a "$10,000.00" in "Initial Cash Capital Contribution".

ii. On December 31, 1999, Jan Blaustein Scholes, as Authorized Officer (i.e. President of Babcock & Brown Administrative Services, Inc.) executed a Delaware Certificate of Conversion pursuant to Section 264 of the Delaware General Corporation Law and filed the same with the Delaware Secretary of State on January 03, 2000, converting Babcock & Brown Administrative Services, Inc. to Babcock & Brown Administrative Services LLC, a Delaware limited liability company.

jj. On January 03, 2000, Jan Blaustein Scholes filed a Certificate of Formation of Babcock & Brown Administrative Services LLC with the Delaware Secretary of State. Jan

Formatted: Numbered + Level: 1 + Numbering Style: a, b, c, … + Start at: 27 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.75"

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Blaustein Scholes executed the Certificate of Formation of Babcock & Brown Administrative Services LLC as Vice President of Babcock & Brown Inc., a California corporation, and the parent corporation of Babcock & Brown Administrative Services, Inc. and Babcock & Brown Administrative Services LLC.

kk. The records of the Massachusetts SOC were never updated to reflect this change in Manager, but the records of the Delaware Secretary of State were updated. The records of the place of incorporation (i.e. in this case Delaware) are dispositive as to the current status of an entity with respect to its name.

ll. Pursuant to section 18-209 of the Delaware Limited Liability Company Act, on August 28, 2011, Chaye Besherse, as Secretary of Babcock & Brown Parallel Member LLC executed a Delaware Certificate of Merger of Babcock & Brown Administrative Services LLC with and into Babcock & Brown Parallel Member LLC, a Delaware limited liability company ("Certificate of Merger") and filed the same with the Delaware Secretary of State on August 29, 2011.

mm. The merger of Babcock & Brown Administrative Services LLC with Babcock & Brown Parallel Member LLC occurred pursuant to an Agreement and Plan of Merger dated as of August 29, 2011. Babcock & Brown Paralllel Member LLC pursuant to Section Third of the Certificate of Merger stated "The Company shall be the surviving limited liability company…of the Merger. The name of the Surviving Company is 'Babcock & Brown Parallel Member LLC'".

~~w.~~nn. No document evidencing the change from Babcock & Administrative Services, Inc. to Babcock & Brown Parallel Member LLC to its merger with Babcock & Brown Parallel Member LLC was ever filed with the Massachusetts SOC.

Formatted: Numbered + Level: 1 + Numbering Style: a, b, c, … + Start at: 27 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.75"

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 4:26-cv-10379-MJJ Document 13-4 Filed 02/17/26 Page 31 of 120

x. In said operating agreement, Babcock & Brown Administrative Services LLC was not identified as a "Member" and solely as a manager.

y. Jan Blaustein (a/k/a F. Jan Blaustein Scholes) was at no time a "Member" or owner of Westborough SPE LLC or Mignonette Investments Limited.

oo. Per According to a written statement given by Walter Horst, CFO of Babcock & Brown Inc., a California corporation and parent to the successor-in-interest manager Babcock & Brown Parallel Member LLC to Babcock & Brown Administrative Services, Inc. to Attorney Iris A. Leahy, Esq. of the Town of Westborough, on June 23, 2009, Attorney Judith A. Hall, former Associate General Counsel for Babcock & Brown, Inc. in California, on behalf of Babcock & Brown Administrative Services LLC, as successor in interest to Babcock & Brown Administrative Services, Inc. submitted in writing to Phillip Green (a/k/a Phil Green), the Australian-based former Chief Executive Officer of Babcock & Brown's Australian parent entity of Westborough SPE LLC a written Termination Notice of the Administrative Services Agreement dated October 30, 1997 ("First Termination Notice"). This termination of administrative services stated that it was effective August 31, 2009. No written copy of this First Termination Notice or copy of the Administrative Services Agreement dated October 30, 1997 has been provided to counsel for Westborough SPE LLC and its effectiveness and authenticity is thus challenged by Westborough SPE LLC.

z.pp. Phillip Green was not listed in Westborough SPE LLC's operating agreement as a Member or co-manager of Westborough SPE LLC and thus did not have the authority to accept Babcock & Brown Parallel Member LLC's resignation as Manager of Westborough SPE LLC.

Formatted: Numbered + Level: 1 + Numbering Style: a, b, c, … + Start at: 27 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.75"

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

~~aa.~~qq. Per Walter Horst, since the ~~first letter of resignation~~First Termination Notice was not acknowledged by Philip Green, an individual who was not listed in Westborough SPE LLC's operating agreement as either a co-manager or member and thus had no authority whatsoever to accept a resignation of manager role on behalf of Babcock & Brown Parallel Member LLC, ~~he~~ sent ~~another~~ a second written ~~letter of resignation~~Notice of Termination in his role as Treasurer for Babcock & Brown Administrative Services LLC dated April 30, 2011 ("Second Termination Notice"), ~~which was presented in writing~~ to TMF Group f/k/a Equity Trust (based in Hong Kong), Attention: Serena Kwok, General Manager, Trade Support, 31/F, The Center, 99 Queen's Road Central, Hong Kong, as administrative agent for ~~Westborough SPE LLC~~Mignonette Investments Limited, a British Islands limited partnership and 100% Member of Westborough SPE LLC. The letter ~~states~~ stated in relevant part, "this letter serves as notice to the Member of the Manager's intent to resign as Manager of the Company effective as of May 30, 2011."

~~bb. Per the State of Delaware, on or about August 29, 2011, Babcock & Brown Administrative Services LLC merged with Babcock & Brown Parallel Member LLC.~~

~~cc. At the time of the above-referenced merger, between Babcock & Brown Administrative Services LLC and Babcock & Brown Parallel Member LLC, Babcock & Brown Administrative Services LLC had already resigned (twice) as an administrative service provider of Westborough SPE LLC.~~

rr. Westborough SPE LLC's fully executed operating agreement required the member to acknowledge receipt of a written notice of termination and to consent to the resignation of a manager of Westborough SPE LLC.



Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 3:24-cv-01037-X Document 13-4 Filed 09/12/24 Page 30 of 840 PageID

ss. According to the British Virgin Islands Financial Services Commission, the Director of Mignonette Investments Limited was Abraxas International Limited ("Abraxas International"). Thus, only Abraxas International was authorized to act on behalf of Mignonette Investments Limited. Abraxas International is the Hong Kong operating entity for TMF Group, which was previously controlled by Padnall Enterprises Limited, a private company limited by shares registered in Hong Kong. See TMF Group Annual Report for 2022, accessible via http://www.tmf-group.com/-/media/files/financial-results/tmf-group-annual-report-2022.pdf (accessed August 21, 2023).

tt. The Second Termination Notice stated specifically "Pursuant to Section 1(e) of the LLC [Operating] Agreement and Section 18-602 of the Delaware Limited Liability Company Act, this letter serves as notice to the Member of the Manager's intent to resign as Manager of the Company effective as of May 30, 2011."

uu. Walter Horst acknowledged the requirements of Section 1(e) of Westborough SPE LLC's Operating Agreement which

vv. On March 15, 2019, Walter Horst executed and filed in the State of Delaware a Certificate of Cancellation Babcock & Brown Parallel Member LLC.

ww. On June 23, 2023, F. Jan Blaustein Scholes, as an Authorized Person, executed a State of Delaware Certificate of Correction of a Limited Liability Company to be filed pursuant to Section 18-211(a) of the Delaware Limited Liability Company Act ("Delaware Certificate of Correction"). Said Delaware Certificate of Correction corrects that certain Certificate of Cancellation filed on March 15, 2019. The Delaware Certificate of Correction at Section 3 states "The inaccuracy or defect of said Certificate

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

is…Due to a clerical error, the cancellation was filed prematurely. The entity is the Manager of Westborough SPE LLC and there are still significant assets that need to be liquidated." Section 4 states "The Certificate is hereby corrected to read as follows: The Certificate of Cancellation/Withdrawal is rendered null and void."

~~dd.~~xx. Jeffrey W. Bullock, Secretary of State of the State of Delaware, certified that "Babcock & Brown Parallel Member LLC" was duly formed under the laws of the State of Delaware and was in good standing and has a legal existence as of July 5, 2023. This Certificate of Goodstanding can be authenticated at corp.delaware.gov/authver.shtml and using Authentication #203677211 and SR#20232917389.

Formatted: Numbered + Level: 1 + Numbering Style: a, b, c, … + Start at: 27 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.75"

~~ee.~~yy. ~~A document titled~~The document titled "Bill of Sale" dated November 21, 2022, between "Westborough SPE, LLC", "Denise Edwards" and "Lolonyon Akouete" ~~was~~ and executed by "Jan Blaustein Scholes~~, its President~~" was corrected under a Durable Power of Attorney under Delaware Law and Written Consent of the Manager of Babcock & Brown Parallel Member LLC, F. Jan Blaustein Scholes.

~~ff.~~zz. On December 5, 2022, Defendant mailed a money order via the United States Postal Service, Serial No. 28358694832, in the amount of $150.00, to Jan Blaustein which served as the original consideration for the document originally labeled as a "Bill of Sale" but which was subsequently changed by written instrument to represent a transfer of management role, as allowed under the written LLC Operating Agreement.

~~gg.~~aaa. On June 26, 2023, said "Bill of Sale" was amended to be named "Transfer of Manager Role".

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 23-40709 Doc 164-4 Filed 06/26/23 Entered 06/26/23 14:28:13 Desc Exhibit D Page 35 of 840

hh. The amendments to the "Bill of Sale" as amended to be named the "Transfer of Manager Role" includes the following notable amendments:

i. Substantial reduction in the amount of consideration;

ii. Change in the title and intention of the document;

iii.bbb. Change in the terms of the document and agreementspeak for themselves.

ii. On June 23, 2023, a Certificate of Correction of a Limited Liability Company was executed and filed in the State of Delaware for Babcock & Brown Parallel Member LLC and signed by "F. Jan Blaustein Schol".

**Tax Title Procedural Facts:**

a. The locus, consists of athree (3) parcels of commercial real estate property located commonly known asat 231 Turnpike Road, in the Town of Westborough, Worcester County, Massachusetts as more particularly described in the Quitclaim Deed ("Locus").

a. and was a movie theater in operation by Regal Cinemas (a/k/a Interstate Theaters Corporation) until 2017 but has been vacant and deteriorating since.

b. The land where the movie theater is located is subdivided into three separate parcels and is described by some as a mall and/or a plaza. The three parcels in the mall share common area maintenance expenses by a Reciprocal Covenants, Easements and Restrictions Agreement by which 57% of the common area maintenance and snow removal expenses are to be paid by the owner of the locus.

c.b. $453,710.64 in unpaid Property Taxes, plus interest, an NSTAR Lien, costs associated with Boston Board Up, Insurance, EverSource costs, appraisal costs, Legal Fees for KP Law through 2/28/23 in the amount of $24, 110.75, Request for

Formatted: Numbered + Level: 1 + Numbering Style: a, b, c, … + Start at: 27 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.75"

Formatted: Underline

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 4:24-cv-10037-MRG Document 13-4 Filed 02/12/24 Page 36 of 180

Proposal Costs in the amount of $20,591.22, Legal fees to Iris Leahy, Esq. as of 4/28/23 in the amount of $34,027.47, filing fees, withdrawal, and recording fees equal a grand total of $918,314.60 as of May 16, 2023, as certified by the Town of Westborough Treasurer/Collector, Linda A. Smith on May 3, 2023, and common expenses have not been paid since Regal Cinemas (a/k/a Interstate Theaters) ceased operation and occupancy of the locus. While Regal Cinemas (a/k/a Interstate Theaters Corporation) occupied the locus, they were making payments for real estate taxes, common expenses, and to an assignment of lease mortgage described belowware associated with the Locus.

d. In the Spring of 2017, Regal Cinemas (a/k/a Interstate Theaters Corporation) attempted to secure a lease extension to continue their occupancy of the locus. To do so Robbie Pope of Regal Cinemas (a/k/a Interstate Theaters Corporation) contacted Allen Hight, of Northside Realty Trust (NRT). NRT who previously managed and leased the two non-locus parcels in the mall prior to those two non-locus parcels being sold to Mobile Street LLC.

e.c. At the time of Regal Cinemas' (a/k/a Interstate Theaters Corporation) attempt to secure a lease extension, the locus wasThe Locus is owned by Westborough SPE, LLC, a Delaware limited liability company as indicated by the Quitclaim Deed described above. and was not managed by NRT and/or was not owned by Mobile Street LLC.

f. Prior to the title vesting in Westborough SPE, LLC, it was the understanding of Mr. Hight of NRT that Hoyts Cinema was planning to take title to the property and

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 23-40709 Doc 164-4 Filed 07/06/23 Entered 07/06/23 14:28:18 Desc Main
Document Page 367 of 840

retained Babcock & Brown Administrative Services, Inc., a law firm operating out of San Francisco.

g. Per Mr. Hight, Babcock & Brown Administrative Services, Inc. was organizing the Hoyts Cinemas entity with the goal of Hoyts Cinemas owning the locus. However, rather than Hoyts Cinema taking title to the locus Westborough SPE, LLC took title and Regal Cinemas (a/k/a Interstate Theaters Corporation) leased the property and operated the movie theater. All correspondence such as billings, maintenance issue notices, and annual expense reconciliations from NRT regarding the locus were instructed to be sent to Regal Cinemas (a/k/a Interstate Theaters Corporation) at 231 Turnpike Road, Westborough, Massachusetts. This is the address of the locus.

h. In the Spring of 2017, Mobile Street LLC was interested in purchasing the locus and Regal Cinemas (a/k/a Interstate Theaters Corporation) was interested in continuing their lease so both parties in conjunction with the Town and several attorneys tried unsuccessfully to locate anyone with an ownership interest in Westborough SPE, LLC.

i.d. The Instrument of Taking on the locus was executed on December 28, 2018, and recorded on January 16, 2019, at the Worcester District Registry of Deeds in Book 59943, Page 371, pursuant to M.G.L. c. 60, §§43, 53 and 54.

j.e. The Town of Westborough considered taking the locus via its eminent domain powers, but the process was halted before completion and the Town proceeded to try to collect the taxes and the locus back on the tax rolls via a tax title foreclosure instead.

Commented [SAS1]: Not relevant.

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

f. On July 18, 2019, Plaintiff filed a Tax Lien Complaint to foreclose upon the tax title lien on the locus naming the equity owner Westborough SPE, LLC pursuant to M.G.L. c. 60, § 65.

g. Westborough SPE, LLC (i.e. with a comma) was not a properly named equity owner and the Town never amended their Complaint to correct this error.

h. Westborough SPE LLC, a Delaware limited liability company (i.e. without the comma) is the properly named equity owner as per the original Quitclaim Deed to vis-à-vis the Locus.

i. The Land Court engaged a title examiner to determine interested parties pursuant to § 66, as a result of which the 2019 Title Report was prepared.

~~k.~~ j. The 2019 Title Report identified Westborough SPE, LLC as an interested party entitled to notice. However, pursuant to the Quitclaim Deed referenced above, the proper owner was Westborough SPE LLC (i.e., with no comma), a Delaware limited liability company.

k. The Notice of Filing was drafted by Plaintiff's Counsel and recorded at the Worcester District Registry of Deeds on July 24, 2019, in Book 60751, Page 221, pursuant to MGL c. 60, § 75.

l. Land Court Notices were sent by certified mail on September 22, 2020 to:

(1) Interstate Theaters Corporation
101 E. Blount Ave.
Knoxville, TN 37920
Tracking Number: 71901706197000959805

(2) Interstate Theaters Corporation
c/o CT Corporation System, Reg. Agent
155 Federal St., Suite 700
Boston, MA 02110
Tracking Number: 71901706197000959812

**Formatted:** Numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.75" + Indent at: 1"

**Formatted:** Normal, Line spacing: single

**Formatted:** Indent: First line: 0.5", Line spacing: single

**Formatted:** Line spacing: single

**Formatted:** Indent: First line: 0.5", Line spacing: single

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

(3) James D. Jaworski, Treasurer of Brown & Babcock Administrative Services, Inc.
1715 Easton Dr.
Burlingame, CA 94010
Tracking Number: 71901706197000959829

(4) Dyann Blaine, R.E. Signatory and Agent for Westborough SPE LLC
20 Queensbrook Pl.
Orinda, CA 94563
Tracking Number: 71901706197000959836

(5) F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Adminstrative Services, Inc.
Mailing Address
151 E. 31st
Apt. 28B
New York, NY 10016
Tracking Number: 71901706197000959843 Receipt: 418144
Date: 09/23/2020

l.

m. Additional Land Court Notices were sent to Australia via registered mail on September 23, 2020 to:

RE 550 804 582US
David Lombe, Liquidator for Babcock and Brown Unlimited
Deloitte Financial Advisory Pvt. Ltd.
Grosvenor Place Level 9
225 George St.
Sydney, NSW 2000
Australia

RE 550 804 596US
Joseph Scarella, Esq. Johnson Winter & Slattery, Counsel for David Lombe, Liquidator for Babcock and Brown Unlimited
20 Bond Street, Level 25
Sydney, NSW 2000
Australia Receipt: 418145 Date: 09/23/2020

Formatted: Line spacing: single
Formatted: Indent: Left: 1", Hanging: 0.5", Line spacing: single
Formatted: Indent: First line: 0.5", Line spacing: single
Formatted: Line spacing: single
Formatted: Indent: First line: 0.5", Line spacing: single
Formatted: Line spacing: single
Formatted: Indent: Left: 1", Hanging: 0.5", Line spacing: single
Formatted: Indent: First line: 0.5", Line spacing: single
Formatted: Indent: Left: 1"
Formatted: Normal, Indent: Left: 0.5", First line: 0.5", Line spacing: single, No bullets or numbering
Formatted: Line spacing: single
Formatted: Indent: Left: 1", Line spacing: single
Formatted: Line spacing: single
Formatted: Indent: Left: 0.5", First line: 0.5", Line spacing: single
Formatted: Indent: Left: 0.5", First line: 0.5", Line spacing: single
Formatted: Normal, No bullets or numbering
Formatted: Font: Times New Roman, 12 pt, Font color: Auto
Formatted: Font: Times New Roman, 12 pt, Font color: Auto

n. Unsuccessful service was attempted on F. Jan Blaustein Scholes as indicated by the Return of Service filed with the Court on October 02, 2020.

o. On April 08, 2021 an additional Land Court notice was sent via Certified Mail to:

F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Adminstrative Services, Inc.
888 Avenue of the Americas
New York, NY 10001
Tracking Number: 71901706197000977816 Receipt: 422168 Date: 04/08/2021

Formatted: Indent: Left: 1", Line spacing: single, No bullets or numbering

Formatted: Indent: Left: 1", Line spacing: single, No bullets or numbering

p. Judgment in Tax Lien entered on behalf of the Town of Westborough on January 5, 2022, and was recorded on January 21, 2022, in Book 66983, Page 53.

q. No Land Court Notice was ever provided to Babcock & Brown Parallel Member LLC, a Delaware limited liability company, as successor in interest to Babcock & Brown Administrative Services LLC as successor in interest to Babcock & Brown Administrative Services Inc.

~~m.~~

Formatted: Normal, Indent: Left: 0.75", No bullets or numbering

~~**Request for Proposal (RFP) Facts:**~~

Formatted: Underline

~~a. In June 2022, pursuant to the Uniform Procurement Act, G.L. c. 30B, known as a Request for Proposal (RFP), the Town of Westborough through its select board solicited proposals for the offer of purchase of the locus.~~

~~b. RFP documents were made available via BidNetDirect.com.~~

~~c. On November 29, 2022, Lolonyon Akouete requested RFP documents from BidNEtDirect.com and identified his organization as Smart Investors, LLC. Smart Investors, LLC was registered in Maryland as a domestic LLC on July 30, 2009, but the entity was forfeited for failure to file a property return in 2010~~

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

or thereafter. Lolonyon Akouete identified himself as the Resident Agent and CEO/Owner of Smart Investors, LLC.

d. RFP proposals were to be submitted by July 25, 2022.

e. The Town of Westborough received three (3) proposals for the purchase of the locus.

f. The Town of Westborough selected a proposal by LAX MEDIA INC for $2,500,000.00.

g. LAX MEDIA INC has agreed to several extensions to hold their proposed bid firm and to keep the terms and conditions of purchase in place. A purchase and sale contract has not been executed to date.

h. An unselected proposal to purchase the locus for $2,785,000.00 was made by Ferris Development Group, LLC.

i. On November 14, 2022, with the assistance of legal counsel, Ferris Development Group, LLC filed a suit in the Worcester Superior Court against the Town of Westborough to challenge the Town's selection of LAX MEDIA INC's proposal.

j. On January 18, 2023, the Honorable. James G. Reardon, Jr. ordered the Motion for Preliminary Injunction brought by Ferris Development Group, LLC denied.

**Ferris Development Group, LLC Involvement in This Case:**

a. On March 21, 2023, David M. Ferris as the Manager of Ferris Development Group, LLC and Lolonyon Akouete as Manager of Westborough SPE, LLC signed an agreement titled "Offer to Purchase – 231 Turnpike Road, Westborough, Massachusetts".

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

b. Said Offer to Purchase is an agreement to enter into a subsequent sale of the locus if the Defendant in this case is successful in receiving a vacation of the judgment of foreclosure.

c. David M. Ferris individually and/or through Ferris Development Group, LLC has loaned funds to Lolonyon Akouete to pay a retainer for the Defendant's legal fees in this case payable to Attorney Schlager and Attorney Alvin Nathanson by and/or through their firm Nathanson & Goldberg, P.C.

d. Defendant has presented financial account information of David M. Ferris as Defendant's only proof of funds to redeem. Defendant has not presented evidence of the funds to redeem in the Defendant's possession.

e. Westborough SPE LLC and Ferris Development Group, LLC do not have a purchase and sale executed for the purchase of the locus.

**Motion to Vacate Procedural Facts Related to the Same:**

a. On or about December 6, 2022, the previous Treasurer for the Town of Westborough, Robert Haley, received an email from Lolonyon Akouete identifying himself as "Lolo" an "asset recovery specialist" who has "acquired Westborough SPE, LLC and we would like to redeem."

b. On or about December 12, 2022, Lolonyon Akouete spoke with Mr. Haley and stated he received a bill of sale from F. Jan Blaustein a/k/a F. Jan Blaustein of Babcock & Brown Administrative Services, Inc. and would like to redeem the locus from tax title.

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

Case 23-40709 Doc 176-4 Filed 07/11/23 Entered 07/11/23 14:28:13 Desc Main Document Page 37 of 40

~~c.~~a. On January 4, 2023, Defendant's Motion to Vacate, which was drafted by its predecessor counsel Sherin & Lodgen LLP, was signed and filed by Lolonyon Akouete as Manager of Westborough SPE, LLC in his capacity as manager and docketed by this Court on January 4, 2023, because Sherin & Lodgen LLP refused to file said Motion, prejudicing its Client, as a result of non-payment of approximately $25,000.00 in outstanding legal fees, which withdrawal was in violation of Mass. R. Prof. C. Rule 1.16 preventing withdrawal where it causes a material adverse effect on the interests of the client.

~~d. At the time of the signature and filing of the Motion to Vacate, Lolonyon Akouete did not have a license to practice law in the Commonwealth of Massachusetts; therefore said Motion was filed pro se on behalf of a corporation.~~

~~e. Defendant filed the Motion to Vacate "pro se" and included prior legal counsels' law firm name, "Sherin and Lodgen", in the footnote area of each page, in violation of the terms of the Disengagement Letter from Attorney Matthew A. Morris to Westborough SPE LLC via Lolonyon Akouete and Denise Edwards dated January 3, 2023.~~

~~f. On January 4, 2023, via email correspondence, Staff Attorney John Harrington alerted Lolonyon Akouete that an LLC cannot appear "pro se" and must be represented by legal counsel.~~

~~g. On January 4, 2023, Lolonyon Akouete responded to Attorney Harrington via email correspondence and confirmed his understanding of the requirement for the LLC to be represented by legal counsel in this case.~~

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

Case 3:24-cv-10071-MGM Document 13-4 Filed 02/12/26 Page 374 of 840

b. By letter to the Court dated February 1, 2023, and docketed on the same date, Plaintiff asserted an objection to previous and future pro se filings in this case by the Defendant.

c. On February 2, 2023, Lolonyon Akouete requested on an emergency basis a continuance in order to retain legal counsel for Westborough SPE LLC to address the concerns presented in the February 1, 2023 letter.

h. Undersigned counsel, Alvin S. Nathanson, Esq. and Scott A. Schlager, Esq. filed their Notices of Appearance on behalf of Westborough SPE LLC on February 22, 2023.

**Other Relevant Facts:**

a. Denise S. Edwards as an Investigator of Unclaimed Property in California entered an agreement with Frances Jan Blaustein Scholes (a/k/a Jan Blaustein) for 10% of the unclaimed funds of $1,293,646.83 if successful in reuniting the funds with Ms. Blaustein.

b. On December 8, 2022, Denise S. Edwards made a formal claim for the above-referenced funds of Westborough SPE LLC.

c. The above referenced claim for the abandoned funds was denied by the California State Controller's Office in writing on February 8, 2023.

d. On April 24, 2023, Lolonyon Akouete via emails contacted Walkers Global and Kaizen Group to request quotes to restore Mignonette Investments Limited to "recover an asset and properly liquidate the company."

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

~~e. Lolonyon Akouete does not have proof of a legal interest in Mignonette Investments Limited as a former shareholder, former director, or former member.~~

~~i.~~d. **Statement of Contested Facts (with a short explanation of the Parties' respective positions on those facts)**

a. **Whether the actual owners of Westborough SPE LLC were ever successfully located and/or identified.**

Formatted: Font: Bold

Plaintiff's Position on This Contested Fact:

- Per the evidence presented by the Defendant in response to the Plaintiff's Request for Production of Documents, Lolonyon Akouete continues to do diligent search work to try to locate the actual owners of Westborough SPE LLC but to date has been unsuccessful.
- On March 3, 2023, Walter Horst the current Chief Financial Officer of Babcock & Brown and previous Treasurer for Babcock & Brown Administrative Services LLC, stated in an email to Lolonyon Akouete that "Westborough parent is Mignonette Investments. From there the trail ended in Hong Kong and we were unable to identify the owner. As we have resigned providing services I am unable to assist." This supports the Plaintiff's position that the true owner of Westborough SPE LLC has not been identified and the assets of the corporation and management of the same do not belong to the Defendant that filed the Motion to Vacate.
- Per the Defendant's evidence in response to the Plaintiff's Request for the Production of Documents, an email from Julie Ip, Senior Legal Counsel for TMF-Group, advised Lolonyon Akouete that "Mignonette Investments Limited has been

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 3:24-cv-10071-MGM Document 13-4 Filed 02/12/24 Page 37 of 140

struck off and that therefore no one can carry on the company's affairs or deal with the assets of the company."

- Walter Horst, CFO of Babcock & Brown suggested that Lolonyon Akouete contact TMF Group to gather more information about Mignonette Investments Limited. TMF Group was the Resident Agent of Mignonette Investments Limited until they resigned as agent in writing on March 29, 2017.
- The evidence the Defendant submitted to this Court and is using to support their position that Mignonette Investments Limited was the only member/owner of Westborough SPE LLC, was the unsigned operating agreement dated October 22, 1997. For obvious reasons, this is not strong proof of ownership.
- The Defendant produced evidence via a Credit eform e-Report dated May 25, 2023, that Mignonette Investments Limited has "no visible assets" and has been struck off.

Defendant's Position on This Contested Fact:

- This fact is irrelevant, because under the executed limited liability company operating agreement for Westborough SPE LLC, the Durable Power of Attorney for Babcock & Brown Parallel Member LLC as successor in interest to Babcock & Brown Administrative Services LLC as successor in interest to Babcock & Brown Administrative Services, Inc., and the Written Consent of Manager, Lolonyon Akouete and Denise Edwards, as Managers have the full power and fiduciary duty to act on behalf of Westborough SPE LLC.

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

- An LLC Manager has a fiduciary duty of care to prevent waste of limited liability company assets, including real property assets.

**b. Whether the Defendant possesses the funds adequate to redeem should this Court allow the Defendant's Motion to Vacate.**

Formatted: Font: Bold

Formatted: Line spacing: single

Plaintiff's Position on This Contested Fact:

- The Defendant has provided proof via a Charles Schwab account statement for a period from April 1-30, 2023, that David M. Ferris has funds adequate to redeem if this Court allows the Defendant's Motion to Vacate.
    - David M. Ferris is not a party to the above-referenced case and does not have the right to redeem.
- The Defendant has not provided proof that the Defendant possesses funds adequate to redeem. Rather, the Defendant has provided proof that should the Motion to Vacate be allowed, an Offer of Purchase will cause a Purchase and Sale to be executed with David M. Ferris for the purchase of the locus. The proof of funds presented by the Defendant does not present evidence that the Defendant has adequate funds to redeem.
- Lolonyon Akouete asserted in several emails to Plaintiff's legal counsel, Westborough SPE LLC will not pay the principal, interest, fees and costs in full of the tax title account if Defendants Motion to Vacate is allowed.

Defendant's Position on this Contested Fact:

- Should this Court allow Plaintiff's Motion to Vacate it will be able to present adequate evidence of sufficient funds.
- It is not the subject of the Court's inquiry in a tax-title redemption matter on a Motion to Vacate to concern itself with how the party in interest

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

entitled to redeem, in this case Westborough SPE LLC, obtained the funds adequate for redemption.

- If the Land Court issues an Order allowing Westborough SPE LLC to redeem its real property, the Town's only interest is in ensuring that it gets paid the reasonable amounts allowed under the statutory scheme.

**c. Whether the "Bill of Sale" dated November 21, 2022, between Westborough SPE, LLC and Denise Edwards and Lolonyon Akouete that was signed by "Jan Blaustein Scholes, its President" is valid to transfer any interest in Westborough SPE LLC and/or its assets.**

Plaintiff's Position on this Contested Fact:

- As far as Plaintiff is aware, Jan Blaustein was incapacitated at the time of execution of the "Bill of Sale" and had a Conservatorship, Guardian and Power of Attorney over her person and estate. Therefore, the "Bill of Sale" is void and could not have transferred any interest in Westborough SPE LLC or its assets.
- Even if Jan Blaustein can be determined to be competent or capable at the time of executing the "Bill of Sale", she did not have an interest to transfer as she signed the document as President of Babcock & Brown Administrative Services, Inc. which was a previous entity that managed Westborough SPE LLC before they resigned from the role.
- Via email on July 2, 2023, Attorney Schlager as legal counsel for the Defendant, advised Plaintiff's legal counsel of the following, "Our Firm did not speak with Jan Blaustein." Thus, Defendant's legal counsel cannot make declarations on the sound mental health of Jan Blaustein as he has no first-hand knowledge or evidence. Rather, the evidence presented initially by the

Formatted: Font: Bold

Formatted: Line spacing: single

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 1:24-cv-10371-WGY Document 13-4 Filed 02/21/24 Page 37 of 840

Defendant contradicts Attorney Schlager's claims of Jan Blaustein's competence.

Defendant's Position on this Contested Fact:

- Plaintiff has provided no evidence of incapacity.
- Plaintiff has provided no evidence that F. Jan Blaustein Scholes was under a conservatorship/guardianship in the State of Arizona. Ms. Scholes did not resided in Hawaii when the Bill of Sale or the subsequent amended documents (durable power of attorney and written consent of manager) were executed. There is no full faith and credit clause recognition under US Law for conservatorships/guardianships.
- Westborough SPE LLC contends that Peter Blaustein has attempted to exercise undue influence over F. Jan Blaustein Scholes.
- F. Jan Blaustein Scholes has informed Denise Edwards that Peter Blaustein has attempted to insert himself in this matter where he does not belong and has no standing to intervene.
- Only a licensed medical professional can declare someone incapacitated and the Plaintiff has not provided any expert testimony on the subject of capacity. Without evidence, any testimony by Peter Blaustein or any others should be barred by a Daubert-Lanigan Motion.
- F. Jan Blaustein Scholes was authorized to transfer the manager role of Westborough SPE LLC pursuant to the written LLC Operating Agreement. She does not have to be a Member or have a membership interest to transfer her membership role.

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

- Only a licensed medical professional in accordance with a guardianship/conservatorship proceeding in the state where Ms. Blaustein Scholes resides can make a determination of incapacity.
- Since there was no guardianship/conservatorship proceeding in Arizona, there was no guardianship/conservatorship recognized under Arizona law, and thus Ms. Blaustein Scholes was not under a guardianship/conservatorship when she executed the durable power of attorney and written consent of manager.

**d. Whether the amended "Bill of Sale" document renamed to "Transfer of Manager Role" is adequate to transfer an interest in the management of Westborough SPE LLC and/or its assets and whether said documents are legally binding or void.**

Formatted: Font: Bold

Formatted: Line spacing: single

Plaintiff's Position on this Contested Fact:

- Jan Blaustein was no longer a manager of Westborough SPE LLC at the time she signed the "Bill of Sale" and "Transfer of Manager Role".
- On June 22, 2023, Plaintiff's legal counsel, Iris A. Leahy, received an email from Peter Blaustein with the subject line "did the case end?" stating the following: "Denise and Lolo contacted my mom and said they won $600K for her. is that right? I doubt it but double checking."
- On June 22, 2023, Attorney Leahy emailed Attorney Schlager and asked if he knew anything about the money "won" for Jan Blaustein by Lolonyon Akouete and Denise Edwards.
- Jan Blaustein signed the "DURABLE POWER OF ATTORNEY" dated June 26, 2023 to Lolonyon Akouete and Denise Edwards and the "WRITTEN CONSENT OF THE MANAGER OF BABCOCK AND

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 3:24-cv-10237-MGY Document 13-4 Filed 02/12/24 Page 398 of 840
Document Page 381 of 840

BROWN PARALLEL MEMBER LLC IN LIEU OF MEETING" dated June 26, 2023. These documents were signed while not in the presence of legal guardianship and were arguably signed with undue influence over a person that lacked the mental capacity to be bound by such documents.

- On June 22, 2023, On July 2, 2023, Attorney Schalger on behalf of the Defendant response as follows, "Our Firm did not speak with Jan Blaustein.

Defendant's Position on this Contested Fact:

- F. Jan Blaustein Scholes was never a Manager of Westborough SPE LLC.
- Babcock & Brown Administrative Services, Inc. which became Babcock & Brown Administrative Services LLC which merged into Babcock & Brown Parallel Member LLC, a Delaware limited liability company was the predecessor manager.
- F. Jan Blaustein Scholes was the duly authorized manager of Babcock & Brown Parallel Member LLC.
- Thus, F. Jan Blaustein Scholes had the requisite authority on behalf of Babcock & Brown Parallel Member LLC to transfer her membership role over Westborough SPE LLC pursuant to the Westborough SPE LLC Operating Agreement.
- Peter Blaustein is not a party to this case and thus has no standing to participate.
- The Durable Power of Attorney and Written Consent of Manager were not signed under undue influence. To the contrary, it is Peter Blaustein who was attempting to exercise undue influence over his mother.

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 3:24-cv-10371-MGY Document 13-4 Filed 02/12/26 Page 389 of 840

**e. Whether the Defendant had the requisite authority to revive Westborough SPE LLC and file it as a new Foreign Corporation in the Commonwealth of Massachusetts.**

Formatted: Font: Bold

Formatted: Line spacing: single

Plaintiff's Position on This Contested Fact:

- Defendant presented evidence of an unsigned Operating Agreement of Westborough SPE LLC dated October 22, 1997, in which Babcock & Brown Administrative Services, Inc. was designated as a managing entity of Westborough SPE LLC but explicitly not designated as an equity owner/member.
- No person that owned or was a member of Westborough SPE LLC gave permission to Lolonyon Akouete and/or Denise Edwards to revive Westborough SPE LLC in Delaware or to appoint themselves as managers of Westborough SPE LLC.
- Jan Blaustein (a/k/a F. Jan Blaustein Scholes) did not have the legal ability to transfer any interest or authority in Westborough SPE LLC as she did not have an interest to transfer.
- At the time of the signature on the "Bill of Sale" and subsequently amended document called "Transfer of Manager Role", Jan Blaustein (a/k/a F. Jan Blaustein Scholes) was not mentally competent pursuant to the Order of Court granting Conservatorship and Guardianship to her son, Peter Blaustein.
- At the time of the signature on the "Bill of Sale" dated November 21, 2022, and subsequently amended to be titled "Transfer of Manager Role" dated June 26, 2023, Jan Blaustein (a/k/a F. Jan Blaustein Scholes) was under a Power of Attorney she granted to her son, Peter Blaustein. Without capacity,

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Jan Blaustein could not have transferred an interest in Westborough SPE LLC.

- The amendments made to the "Bill of Sale" on June 26, 2023, were approximately one year and five months after this Court entered a Judgment of Foreclosure upon the locus.
- Amending the "Bill of Sale" to completely change the purpose and intention of the document is arguably an admission by the Defendant that the "Bill of Sale" was inadequate as a basis to provide the Defendant with the authority to revive Westborough SPE LLC or to appear as the Defendant in this case when the Motion to Vacate was filed.

Defendant's Position on this Contested Fact:

- Defendant has provided a fully executed copy of the Westborough SPE LLC Operating Agreement.
- Lolonyon Akouete and Denise Edwards, via the Durable Power of Attorney and Written Consent of the Manager possessed the requisite authority to act as manager of Westborough SPE LLC.
- Purusant to the LLC Operating Agreement, a manager has the authority to act on behalf of the LLC. In addition, the manager has a fiduciary duty of care and loyalty.
- Babcock & Brown's prior agents breached their fiduciary duty to Westborough SPE LLC when they attempted to resign as manager of the LLC in contravention of the LLC Operating Agreement and Delaware law.
- The timing of the amendments has no significance.

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

- The Bill of Sale became a transfer of manager role and that is the dispositive fact.
- The original Bill of Sale document was not drafted by an attorney and thus had to be corrected to correct inaccuracies in the intent of the parties.

f. **Whether the "Durable Power of Attorney" dated June 26, 2023, by "Babcock & Brown Parallel Member LLC" (sic) appointing as attorney in fact "Mr. Lolonyon Akouete and Ms. Denise Edwards" is relevant to this matter.**

Plaintiff's Position on This Contested Fact:

- Plaintiff does not believe that the above-referenced document is relevant or pertinent to the matter before this Court as Babcock & Brown Administrative Services, Inc. merged with Babcock & Brown Parallel Member LLC *after* Babcock & Brown Administrative Services, Inc. resigned twice as administrative manager of Westborough SPE LLC.
- Further, the Durable Power of Attorney does not revoke or affect any personal powers of attorney. Therefore, Peter Blaustein still holds a power of attorney over Jan Blaustein.

Defendant's Position on this Contested Fact:

- The durable power of attorney is governed under Delaware Law.
- The durable power of attorney allows Lolonyon Akouete full authority to act on behalf of Babcock & Brown Parallel Member LLC, which was the immediate predecessor manager for Westborough SPE LLC.

g. **Whether the "WRITTEN CONSENT OF THE MANAGER OF BABCOCK AND BROWN PARALLEL MEMBER LLC IN LIEU OF MEETING" dated June 26, 2023, by "F. Jan Blaustein Scholes, Manager" of "Babcock & Brown Parallel Member LLC" (sic) confirming the Durable Power of Attorney and substantially amending**

Formatted: Font: Bold
Formatted: Line spacing: single
Formatted: Font: Bold
Formatted: Line spacing: single
Formatted: Font: Times New Roman, 12 pt, Font color: Auto
Formatted: Font: Times New Roman, 12 pt, Font color: Auto

**the Bill of Sale dated November 21, 2022, is evidence of an interest in Westborough SPE LLC and/or its assets.**

Plaintiff's Position on This Contested Fact:

- Again, the Plaintiff does not believe this document is relevant to the pending matter and if anything believes it presents further evidence that invalidates the Defendant's position that they have a legal interest in Westborough SPE LLC and/or the ability to manage the corporation.

Defendant's Position on this Contested Fact:

- The plaintiff fails to recognize that there is a difference between a member-managed limited liability company and a manager-managed limited liability company. Westborough SPE LLC is of the later kind—it is manager-managed pursuant to its written LLC Operating Agreeent which is governed under Delaware Law.
- The LLC Operating Agreement confers upon the Manager the authority to manage the entity and take all actions and steps necessary to preserve the LLC's assets and interests in accordance with its fiduciary duty of care and loyalty.
- Just like a Trustee of a Trust has the authority to redeem property, so too does a manager of a limited liability company. "Succeeding trustees, suing to redeem trust land sold for taxes, their predecessor having left his affairs considerably involved, the value of the property being about $2,000, while the amount due was only $14, were entitled to redeem." *Glazier v. Everett*, 224 Mass. 184 (1916); *see also Widersum v. Bender*, 172 Mass. 436 (1899); *Holbrook v. Brown*, 214 Mass. 542 (1913)). The only legitimate interest of a town in seeking to foreclose rights of redemption is the collection of the taxes due on the property, together with other costs and interest. § 37.49. Right of redemption, 18B Mass. Prac., Municipal Law and Practice § 37.49 (5th ed.). Under the Delaware statute, a limited liability company's operating agreement specifies the rights and duties of its members and managers, including the terms under which it can be amended. *See, e.g.*, Del.Code. Ann. §§ 18–215, 18–302. Westborough SPE LLC's Operating

Formatted: Justified

Formatted: Font: Italic

Formatted: Font: Italic

Formatted: Font: Italic

Formatted: Font: Italic

Formatted: Font: Italic

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Agreement would demand that the manager exercise rights to redeem on behalf of Westborough SPE LLC in order to avoid corporate waste.

Formatted: Indent: Left: 1.5", No bullets or numbering

**h. Whether the Defendant before this Court is the same Defendant that the Judgment entered in the above-referenced case.**

Formatted: Font: Bold

Formatted: Line spacing: single

Plaintiff's Position on This Contested Fact:

- **Evidence submitted to date has clearly shown that the Defendant that filed the Motion to Vacate is not the same entity that is attempting to vacate the judgment ordered by this Court and to subsequently redeem.**

Formatted: Font: Bold

Formatted: Line spacing: single

Defendant's Position on this Contested Fact:

- Plaintiff's position clearly indicates a lack of fundamental knowledge of the structure of Delaware limited liability companies.
- A limited liability company has the right to change its manager in accordance with its LLC Operating Agreement and law of the state of formation.
- Westborough SPE LLC did just that in accordance with its fully executed LLC Operating Agreement and Delaware Law.
- Westborough SPE LLC, a Delware limited liability company was the record owner of the property pursuant to the Quitclaim Deed described above. Besides the improper tax-title foreclosure, there has been no recorded change in ownership of the property.
- Thus, Westborough SPE LLC has and continues to be the proper party in interest for redemption. Delaware law recognizes reinstatement of a limited liability company. Westborough SPE LLC's prior manager violated fiduciary duties and acted in direct contravention with the LLC Operating

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Agreement that clearly stated a manager has no right to resign without permission of the Member, in this case Mignonette Investments Limited.

- Westborough SPE LLC was lawfully reinstated in the State of Delaware and a subsequent foreign registration was re-filed in Massachusetts in order to correct the gross deviation from the LLC Operating Agreement and gross negligence of Walter Horst and Dyann Blaine.
- Massachusetts SOC identification numbers are not dispositive as to an entity.
- Both entries of the MA SOC vis-à-vis Westborough SPE LLC have the same FEIN#.
- If an entity has the same FEIN# it is dispositively the same entity.

I. In the event that the Land Court does not allow redemption, that the Town of Westborough must return the difference between the amount owed to the Town of Westborough and what the Town sells the Locus for.

Defendant's Position:

- Under *Tyler v. Hennepin County Minnesota*, 598 U.S. ___ (2023), the Town of Westborough must not engage in "equity theft" and must return the difference between the amount owed to the Town of Westborough and the amount it sells the property for, in the event that the Land Court does not allow redemption/motion to vacate.

PLAINTIFF's POSITION:

-

~~j.~~e. **Witnesses**

Formatted: Indent: Left: 0.75", No bullets or numbering

Formatted: Font: Italic

Formatted: Normal, No bullets or numbering

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Plaintiff's Witnesses:

a. Krisi Williams, Town Manager, Town of Westborough

b. Linda Smith, Treasurer/Collector, Town of Westborough

c. Jon Steinberg, Chief Assessor, Town of Westborough

d. Peter Blaustein, POA and Legal Guardian of Jan Blaustein (a/k/a F. Jan Blaustein Scholes)

e. Dyann Blaine, former legal counsel of Babcock & Brown Limited, LLC, former manager of Westborough SPE LLC

f. Walter Horst, former Managing Member of Babcock & Brown Limited, LLC, current CFO of Babcock & Brown Limited, LLC

Defendant's Witnesses:

a. Lolonyon Akouete

b. Denise Edwards

c. Walter Horst

d. Dyann Blaine

e. Philip Green

f. Terrence ("Terry") Moriarty, former CFO of Hoyts Group

g. David Ambromowitz, Esq., Goulston & Storrs P.C.

h. Robert Edward Paul, Riemer & Braunstein LLP

i. Keeper of the Records, TMF Group

j. Jon Steinberg, Chief Assessor, Town of Westborough

k. David Ferris, Esq.

**Formatted:** Indent: Left: 1", No bullets or numbering

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

l. Brian Charville, Esq., Ferris Development Group

m. Keeper of the Records, Charles Schwab Corporation.

n. Krisi Williams, Town Manager, Town of Westborough

o. Linda Smith, Treasurer/Collector, Town of Westborough

p. Jon Steinberg, Chief Assessor, Town of Westborough

q. The Entire Select Board for the Town of Westborough

r. Christopher M. Perry, Esq., Bredan J. Perry & Associates, P.C.

s. Allen Hight

t. Billie J. Wahl, Notary Public, Maricopa County, Arizona, Commission #642362, Classic Residence Hyatt, Scottsdale, Arizona

u. Medical Director, Classic Residence Hyatt, Scottsdale, Arizona

v. Chaye Besherse

w. Keeper of the Records, Delaware Secretary of State Division of Corporations

x. Keeper of the Records, Massachusetts Secretary of the Commonwealth Corporations Division

y. Keeper of the Records, Worcester County Registry of Deeds

z. Sivakumar Shanmugasundaram

aa. Udayana Kotta

bb. Jegan Gomangalam

cc. Uday Kotta

dd. Michael H. Delaney, Esq., Land Court Title Examiner

ee. Deborah H. Patterson, Recorder, Land Court Department

ff. Hon. Gordon H. Piper, Chief Justice, Land Court Department

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

gg. The Honorable Andrea Campbell, Attorney General of The Commonwealth of Massachusetts

a.

k. f. **Exhibits**

**(a) List of Agreed to Exhibits**

PLAINTIFF'S EXHIBITS:

The below correspond numerically to the Exhibits produced via the Plaintiff's Response to Defendant's First Request for Production of Documents. (ALL EXHITS REDLINED BELOW ARE CONTESTED)

Exhibit 1:

- ~~Email chain from Chaye Besherse of Babcock & Brown, dated April 19, 2018~~ (Hearsay)

Exhibit 2:

- Notice of Resignation of Babcock & Brown, dated April 30, 2011

Exhibit 3:

- ~~Corporations Division, Business Entity Summary, Westborough SPE LLC, Id. No. 000593094 & Id. No. 001623747~~ (Objection: must obtain certified copy from Commonwealth of Massachusetts)

Exhibit 4:

- State of Delaware, Entity Details, dated July 2, 2023

Exhibit 5:

- The Commonwealth of Massachusetts, Foreign Certificate of Withdrawal, Babcock & Brown Administrative Services, Inc., dated April 17, 2008

Exhibit 6:

Formatted: Indent: Left: 1", No bullets or numbering

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 3:24-cv-10037-MGY Document 13-4 Filed 02/12/24 Page 39 of 840

- ~~Arizona Notary Public Reference Manual, dated January 2023~~ (Objection: No expert to opine and introduce; Not certified copy)

Exhibit 7:

- ~~Secretary of the Commonwealth, Foreign Limited Liability Company Information~~ (Objection: What specific information)

Exhibit 8:

- First Mortgage, Security Agreement and Fixture Filing, from Westborough SPE LLC to The Northwestern Mutual Life Insurance Company, dated October 30, 1997, recorded at the Worcester District Registry of Deeds in Book 19369, Page 85.

Exhibit 9:

- Satisfaction of First Mortgage, Security Agreement and Fixture Filing and Assignment of Lease, dated January 16, 2018, recorded at the Worcester District Registry of Deeds in Book 58446, Page 152

Exhibit 10:

- Tax Lien Motion and Notice of Hearing, signed by Attorney Dawn E. Bloom, dated May 18, 2020

Exhibit 11:

- Westborough Massachusetts, Website Publication

Exhibit 12:

- ~~Deloitte Annual Report of Creditors and Noteholders, dated September 27, 2018, executed by David J F Lombe, Liquidator~~ (Objection: Hearsay. If you want it to be admissible then you must name David Lombe and the other Receiver and author of the report as a witness, he must testify in person, and Defendant shall have the right to cross-examine)

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

Exhibit 14:

- News article, telegram.com Worcester Massachusetts, "Regal Cinemas ownership claim emerges in Westboro", by Elaine Thompson, dated June 11, 2019, updated June 12, 2019 (Objection: Hearsay)

Exhibit 15:

- Printable Case View, Generated January 3, 2023, Docket for Conservatorship & Guardianship In Re Frances Jan Blaustein Scholes (Objection: must be a certified copy; Must have an expert to testify)

Exhibit 16: (Objection: Relevance)

- ~~TLO Search, Jan B. Scholes, dated February 12, 2021~~
- ~~ClustrMaps search of 34 Stern LN~~
- ~~MapQuest Directions, Atherton, CA to San Francisco, CA~~
- ~~Product Details, A Journey To Ladakh, Paperback, dated January 1, 2014~~
- ~~RecorderWorks, search result, Deed of Trust, date of search May 19, 2021~~
- ~~County of San Mateo, Tax Collector, Property Tax Account at 34 Stern LN~~
- ~~Transcript Spring 2007, Insight, Alumni Guest Columnist Sound Off, For Women Only, "Women Must Work Together to Achieve True Equality", by Jan Blaustein Scholes '77~~
- ~~Linkedin.com, Jan Blaustein Scholes, Managing Director, date of search September 9, 2021 with note of Attorney Leahy~~

Exhibit 17:

- ~~The State Bar of California, Jan Blaustein Scholes #77272, License Status: Not Eligible to Practice Law~~ (Objection: Relevance)

Exhibit 18:



Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

- The New York Times, "A Tax Shelter, Deconstructed", by David Cay Johnston, July 13, 2003 (Objection: Hearsay)

Exhibit 19:

- Superior Court of California, County of San Francisco, Document Scanning Lead Sheet, dated August 30, 2013, Complaint, Lee Debroff vs. Jan Blaustein Scholes, et al. (Objection: must have certified copy. Hearsay)

Exhibit 20:

- TLO Search, Jan Blaustein Scholes, dated February 1, 2023
- Vi at Grayhawk Info, printed February 1, 2023

Exhibit 21:

- ~~Affidavit of Peter L. Blaustein, dated May 3, 2023~~ (Objection: Hearsay; Objection no Standing to Testify)
- ~~Waiver of Notice and Assent to the Entry of Judgment of Peter Blaustein as Party of Interest by and/or through a Power of Attorney, as Court-Appointed Guardian, and as Conservator of F. Jan Blaustein (a/k/a Jan Blaustein Scholes), dated May 3, 2023~~ (Objection: Hearsay and subject to a motion to strike)

Exhibit 22:

- ~~Uniform Statutory Form Power of Attorney (California Probate Code Section 4401), from Frances Jan Blaustein Scholes to Peter L. Blaustein, dated September 11, 2014~~ (Objection: relevance; Objection: Hearsay)

Exhibit 23:

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

- Waiver of Notice and Consent to Conservatorship, in the Circuit Court of the Third Circuit, State of Hawaii, signed by Frances Jan Blaustein Scholes dated April 19, 2019 (Objection: must have a certified copy; Hearsay)

Exhibit 24:

- Email correspondence chain, Iris Leahy, Peter Blaustein, Dyann Blaine, dated July 5, 2023 (Objection: Hearsay; Objection: Relevance)

Exhibit 26:

- Email correspondence chain, Iris Leahy, Peter Blaustein, Dyann Blaine, dated May 4, 2023 (Objection: Hearsay; Objection: Relevance)

Exhibit 29:

- Affidavit of Dyann Blaine, dated April 28, 2023 (Objection: Hearsay; Objection: Relevance)

Exhibit 30:

- TLO Search, Peter Laurance Blaustein, dated February 1, 2023

Exhibit 33:

- Email correspondence chain, Iris Leahy, Peter Blaustein, dated February 21, 2023(Objection: Hearsay; Objection: Relevance; Objection: Advocate-witness rule)

Exhibit 34:

- Email correspondence chain, Iris Leahy, Dyann Blaine, Peter Blaustein, dated February 21, 2023(Objection: Hearsay; Objection: Relevance; Objection: Advocate-witness rule)

Exhibit 39:

- Email correspondence chain, Iris Leahy, Peter Blaustein, dated February 22, 2023 (Objection: Hearsay; Objection: Relevance; Objection: Advocate-witness Rule)

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Exhibit 48:

- Town of Westborough Massachusetts, Office of the Treasurer/Collector, Certified Figures, dated May 3, 2023

Exhibit 49:

- ~~Email correspondence chain, Jon Steinberg, Peter Hoffman, Chaye Besherse, dated April 19, 2018~~ (Objection: Hearsay; Objection: Relevance)

Exhibit 50:

- ~~Email correspondence chain, Kenneth Fries, selectmen@town.westborough.ma.us, kwilliam@town.westborough.ma.us, dated October 22, 2018~~ (Objection: Hearsay; Objection: Relevance)

Exhibit 54:

- ~~Affidavit of Jonathan Steinberg, dated May 14, 2020~~ (Objection: Hearsay; Objection: Relevance)
- ~~Email correspondence chain, Walter Horst, Jon Steinberg, Michael Larkin, Chaye Besherse, David Lombe, Ingrid Oey, Jim Malloy, dated October 17, 2017~~ (Objection: Hearsay; Objection: Relevance)

Exhibit 57:

- bidnet direct. RFP 22 0080 – Sale of Property at 231 Turnpike Road, Westborough

Exhibit 63:

- ~~KP LAW Letter, dated March 18, 2019, from Shirin Everett, Esq. to Westborough SPE, LLC c/o Babcock & Brown Administrative Services, Inc.~~
- ~~KP LAW Letter, dated April 11, 2019, from Shirin Everett, Esq. to Mr. Joseph~~

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

Scarcella, Johnson Winter & Slattery (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

- Johnson Winter & Slattery Letter, dated April 17, 2019, from Johnson Winter & Slattery to Ms. Shirin Everett(Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)
- KP LAW Letter, dated May 6, 2019, from Shirin Everett, Esq. to Mr. Joseph Scarcella, Johnson Winter & Slattery (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 65:

- Johnson Winter & Slattery Letter, dated April 4, 2019, from Johnson Winter & Slattery to Town of Westborough MA, Attention: Mr. Jim Malloy and Mr. Jon Steinberg(Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)
- Email correspondence chain, Robert Haley, Dawn Bloom, Iris Leahy, Alan Kovacs, Shirin Everett, Joseph Scarcella, Emily Barrett, dated October 1, 2020 (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)
- Email correspondence chain, Alan Kovacs, Iris Leahy, dated February 12, 2021(Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 67:

- Babcock and Brown Limited Insolvency Case Information, Voluntary Administrator, David Lombe, Appointment Date March 13, 2009, Sydney, Australia (Objection: Hearsay; Objection: Certified Copy Required)
- Babcock and Brown Limited/Deloitte Australia/Reconstructing, Insolvency & Financial Advisory, Summary Update (November 2019) (Objection: Hearsay; Objection: Relevance)

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 3:24-cv-10071-MGM Document 103-4 Filed 02/11/26 Page 394 of 817

Exhibit 69:

- Email correspondence chain, Lenard B. Zide, Dawn Bloom, dated September 5, 2019
- Email correspondence chain, Allen Hight, Dawn Bloom, Lenard B. Zide, dated January 17, 2020
- Email correspondence chain, Allen Hight, Dawn Bloom, dated February 28, 2020
- Letter from Allen Hight to Dawn Bloom, Esq., dated May 18, 2020 (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 72:

- Email correspondence chain, Iris Leahy, Scott A. Schlager, Alvin Nathanson, Peter Blaustein, Dyann Blaine, dated January 17, 2020 (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 73:

- Email correspondence chain, Scott A. Schlager, Iris Leahy, Alvin Nathanson, Lolonyon Akouete, dated March 31, 2023
  - Attachment: Notice of Resignation Letter of Babcock & Brown Administrative Services signed by Walter Horst dated April 30, 2011.
  - Attachment: Mignonette Investments Limited, British Virgin Islands (BVI) Financial Services Commission, Registry of Corporate Affairs, Register of Companies Search Report (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 74:

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

Case 1:26-cv-10037-WGY Document 3-4 Filed 02/12/26 Page 395 of 840 / Page 316 of 827

- Email correspondence chain, John R. Harrington, Lolonyon Akouete, Iris Leahy, dated January 4, 2023 (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 75:

- Email correspondence chain, Scott A. Schlager, Iris Leahy, Alvin Nathanson, dated July 2, 2023 (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 76:

- Email correspondence chain, John R. Harrington, Lolonyon Akouete, Iris Leahy, dated January 4, 2023 (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 77:

- Email correspondence chain, Lolonyon Akouete, Iris Leahy, Denise Edwards, dated February 9, 2023 (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 79:

- Email correspondence chain, Iris Leahy, Scott A. Schlager, Alvin Nathanson, dated March 31, 2023 (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 80:

- Email correspondence chain, Lolonyon Akouete, Iris Leahy, Denise Edwards, dated February 9, 2023 (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)
    - Attachment: Bill of Sale, made on November 21, 2022, executed by Jan Blaustein Scholes on December 8, 2022 (Objection: must introduce corrected document)

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Exhibit 81:

- Email correspondence chain, Lolonyon Akouete, Iris Leahy, Denise Edwards, dated February 9, 2023
    - Attachment: IRS Forms 4506, signed by Denies S. Edwards, dated December 21, 2022, one form with no attestation clause box checked, one form with attestation clause box checked
    - Attachment: Letters from IRS to Westborough SPE LLC, A Delaware Limited Liability Co % F Jan Blaustein, 1241 Deer Park Ave Ste 1 No 1051, North Babylon, NY 11703, dated December ___, 2022 (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 82:

- Letter from California State Controller, Unclaimed Property Division, Unclaimed Property Claim Affirmation Form to Westborough SPE LLC, c/o Denise Edwards, 137 N 25th St., Wyandanch, NY 11798, "Printed Date: 12/01/2022"
    - Checking Accounts – Cash Reported $1,293,646.83 – Shares Reported 0.0000
    - Signed by Denise Edwards on December 8, 2022 (Objection: Hearsay; Objection: Relevance)

Exhibit 83:

- Email correspondence, Harpreet Nakhwal, Iris Leahy, dated February 23, 2023
    - Attachment: Letter from California State Controller, Denial of Unclaimed Property Claim Identification Number 4853303, to Denise Edwards, dated February 8, 2023 (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Formatted: Indent: Left: 1", No bullets or numbering

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Exhibit 84:

- ~~Email correspondence chain, Harpreet Nakhwal, Iris Leahy, dated February 23, 2023~~ (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 85:

- ~~Email correspondence chain, Iris Leahy, Scott A. Schlager, Alvin Nathonson, dated April 18, 2023~~ (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 86:

- ~~Email correspondence chain, Iris Leahy, Scott A. Schlager, Alvin Nathonson, dated April 18, 2023~~
  - ~~Attachment: Bill of Sale, made on November 21, 2022, executed by Jan Blaustein Scholes on December 8, 2022~~ (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 87:

- ~~Email correspondence chain, Scott A. Schlager, Iris Leahy, Alvin Nathonson, dated April 18, 2023~~ (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 88:

- ~~Email correspondence chain, Scott A. Schlager, Iris Leahy, Alvin Nathanson, Lolonyon Akouete, dated March 31, 2023~~
  - ~~Attachment: Notice of Resignation Letter of Babcock & Brown Administrative Services signed by Walter Horst dated April 30, 2011.~~
  - ~~Attachment: Mignonette Investments Limited, British Virgin Islands (BVI) Financial Services Commission, Registry of Corporate Affairs, Register of~~

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

**Formatted:** Font: Times New Roman, 12 pt, Font color: Auto

Companies Search Report (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 89:

- Email correspondence chain, Matthew A. Morris, Iris Leahy, dated December 14, 2022
  - Attachment: State of Delaware Certificate of Revival and Good Standing, signed by Denise Edwards, dated November 22, 2022
  - Attachment: State of Delaware Entity Search Status Copy, dated December 14, 2022
  - Attachment: State of Delaware Entity Search Status Copy, dated November 21, 2022
  - Attachment: Westborough SPE LLC, Massachusetts Corporations Division, Business Entity Summary, dated December 14, 2022 (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Exhibit 90:

- Invoice No. 286882 of Sherin Lodgen, to Westborough SPE LLC, dated January 17, 2023, for Processional Services Rendered for the period ending January 10, 2023 (Objection: Attorney Client Privilege)

Exhibit 91:

- Email correspondence chain, Lolonyon Akouete, Iris Leahy, Denise Edwards, dated February 10, 2023
  - Attachment: Affidavit of Frances Jan Blaustein Scholes, signed by Frances Jan Blaustein Scholes, dated January 23, 2023 (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 3:24-cv-10271-MGY Document 3-4 Filed 02/12/26 Page 410 of 847

Exhibit 92:

- ~~Email correspondence chain, Lolonyon Akouete, Iris Leahy, dated January 14, 2023~~
  - ~~Attachment: Bill of Sale, made on November 21, 2022, executed by Jan Blaustein Scholes on December 8, 2022~~ (Objection: Hearsay; Objection: Relevance; Objection: Witness-advocate rule)

DEFENDANT'S EXHIBITS:

Exhibit 1:

Westborough SPE LLC has not yet determined which exhibits it will introduce at trial and thus reserves the right to introduce any document admissible under the Massachusetts Guide to Evidence.

Notwithstanding the foregoing, Defendant incorporates by reference all documents listed by the Plaintiff above.

Plaintiff would add the following documents:

93: Quitclaim Deed

94: Westborough SPE LLC fully executed operating agreement

95: Durable Power of Attorney

96: Written Consent of Manager

Formatted: Indent: Left: 0"

**(b) List of Contested Exhibits**

a. Plaintiff objects to any and all of Defendant's Exhibits that relate to Babcock & Brown Parallel Member as this information is not relevant to

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

this case. Said evidence is not probative and unnecessarily distracts from the issues before this Court. [DEFENDANT: Defendant contends that there is no adequate basis for Plaintiff's objection. Babcock & Brown Parallel Member LLC is the successor by merger of Babcock & Brown Administrative Services LLC which was the successor in interest to Babcock & Brown Administrative Services, Inc. This is extremely probative and will prove that the Town of Westborough committed a material due process violation by serving the wrong party—Babcock & Brown Parallel Member LLC was the true manager of Westborough SPE LLC at the time the tax-title proceedings were instituted. ]

b. Plaintiff objects to any and all of Defendant's Exhibits that relate to Mignonette Investments Limited as this information is not relevant to this case. Said evidence is not probative and unnecessarily distracts from the issues before this Court. [DEFENDANT: Defendant contends that there is no adequate basis for Plaintiff's objection. Mignonette Investments Limited is a British Virgin Islands limited partnership and is the 100% member of Westborough SPE LLC. This information is extremely relevant because it shows the Member of Westborough SPE LLC.]

~~b.~~c.

~~l.~~g. **Discovery Status**

Plaintiff's Position on Discovery Status:

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Plaintiff is satisfied with the progress and status of discovery to date.

Defendant's Position on Discovery Status:

**Defendant is not satisfied with the progress and status of discovery to date. Defendant would respectfully request deposition testimony.**

**h. MOTIONS IN LIMINE.**

Defendant Westborough SPE LLC reserves its rights to file Motions in limine and Daubert-Lanigan Motions.

Formatted: Indent: Left: 1"

Formatted: Font: Not Bold, No underline

Respectfully submitted,

TOWN OF WESTBOROUGH
By its Attorney,

Date: August 421, 2023

______________________________
Iris A. Leahy, Esq.
Law Office of Iris A. Leahy
4 Open Square Way, Suite 217
Holyoke, MA 01040
BBO # 697783
Phone: (413) 322-8318
Fax: (413)322-8661
[INSERT EMAIL]

Formatted: Right

WESTBOROUGH SPE LLC, a Delaware limited liability company,
By its Attorneys,

Formatted: Right, Indent: Left: 0", First line: 0"

______________________________
Scott A. Schlager, BBO#695421
Alvin S. Nathanson, BBO#367480
Nathanson & Goldberg, P.C.
183 State Street, 5th Floor
Tel. (617) 909-4511
Fax. (617) 210-4824
sas@natgolaw.com | asn@natgolaw.com

Formatted: Right

Formatted: Superscript

**CERTIFICATE OF SERVICE**

I, Iris A. Leahy, attorney for the Plaintiff, hereby certify that I have served the foregoing, First Draft of the Joint Pre-Trial Memorandum, via email only:

Formatted: Indent: First line: 0.5"

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Scott A. Schlager, Esq.
Alvin S. Nathanson, Esq.
Nathanson & Goldberg, P.C.
183 State Street, 5th Floor
Boston, MA 02109

TOWN OF WESTBOROUGH
By its Attorney,

Date: August 4, 2023

______________________________

Iris A. Leahy, Esq.
Law Office of Iris A. Leahy
4 Open Square Way, Suite 217
Holyoke, MA 01040
BBO # 697783
Phone: (413) 322-8318
Fax: (413)322-8661

**CERTIFICATE OF SERVICE**

Formatted: Font: Bold, Underline

Formatted: Centered

I, Scott A. Schlager, Esq., attorney for the Defendant Westborough SPE LLC, a Delaware limited liability company, hereby certify that I have served the foregoing, Second Draft of the Joint Pre-Trial Memorandum, via email only:

Iris A. Leahy, Esq.
Law Office of Iris A. Leahy
4 Open Square Way, Suite 217
Holyoke, MA 01040

Formatted: Space After: 0 pt

**/s/ Scott A. Schlager, BBO# 695421**

Formatted: Font: Bold, Underline

WESTBOROUGH SPE LLC, a Delaware limited liability company,
By its Attorneys,

______________________________

Scott A. Schlager, BBO#695421
Alvin S. Nathanson, BBO#367480
Nathanson & Goldberg, P.C.
183 State Street, 5th Floor
Tel. (617) 909-4511
Fax. (617) 210-4824

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Case 3:26-cv-10037-MGY Document 3-4 Filed 02/11/26 Page 415 of 840

sas@natgolaw.com | asn@natgolaw.com

Formatted: Font: Bold, Underline

Formatted: Right, Space After: 0 pt

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

Formatted: Font: Times New Roman, 12 pt, Font color: Auto

# <u>Exhibit 6</u>

Unlawful Waiver of Notice and Assent to the Entry of Judgment

**COMMONWEALTH OF MASSACHUSETTS**
**TRIAL COURT**
**LAND COURT DEPARTMENT**

**TAX LIEN CASE NO: 19 TL 000768**

| | |
|---|---|
| **TOWN OF WESTBOROUGH** | ) |
| **Plaintiff** | ) |
| **v.** | ) |
| | ) |
| **WESTBOROUGH SPE, LLC, et al.** | ) |
| **Defendant** | ) |

**WAIVER OF NOTICE AND ASSENT TO THE ENTRY OF JUDGMENT**

I, Peter Blaustein, as Party of Interest by and/or through a Power of Attorney, as Court-Appointed Guardian, and as Conservator for F. Jan Blaustein a/k/a Jan Blaustein Scholes, in the above-referenced tax lien case, hereby waives her right to notice and assents to the previous entry of judgment with regards to the parcel listed below:

DESCRIPTION OF PROPERTY:

PROPERTY: Land and any building(s) thereon CONTAINING: 29.336 AC (more or less)
LOCATION: 231 Turnpike Road
ASSESSORS: 32-48-0
REGISTRY: Worcester District Registry of Deeds Book 19369, Page 75

WHEREFORE, I respectfully move this Honorable Court to enter an order allowing this waiver of notice and assent to the entry of judgment in favor of the Plaintiff.

Dated: May 3, 2023

Respectfully submitted by

Peter Blaustein ,
Printed Name Title

[signature]
Signature

State of California, County of San Mateo )ss.
On May 3rd, 2023 before me Dina N. Kolesnikov, Notary Public, personally appeared Peter Blaustein, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct. WITNESS my hand and official seal.
Notary Signature [signature]

DINA N. KOLESNIKOV
COMM. #2386495
Notary Public - California
San Mateo County
My Comm. Expires Dec. 12, 2025
NR01

# Exhibit 7

Email correspondence between the State Controller's and the town's attorneys

**AttyLeahy@outlook.com**

| | |
|---|---|
| **From:** | Nakhwal, Harpreet <HNakhwal@sco.ca.gov> |
| **Sent:** | Thursday, February 23, 2023 12:33 PM |
| **To:** | attyleahy@outlook.com |
| **Subject:** | Unclaimed Property-Westborough SPE LLC |
| **Attachments:** | MX-5071_20230223_092811.pdf |

Ms. Leahy,

Your inquiry regarding a claim for Unclaimed Property submitted for property reported with the owner as Westborough SPE LLC was forwarded to me. I attempted to contact you via telephone yesterday and left you a voicemail.

We are considering your inquiry a request under California's Public Records Act. Attached, please find a copy of my letter addressing the claim received for the unclaimed property in question.

I would also like to clarify that while people may register with the State Controller's Office as an investigator for purposes of unclaimed property claims, they are not registered investigators of the California State Controller's Office, Unclaimed Property Division.

If you would like to discuss further, please feel free to call me at the number listed below.

**Harpreet K. Nakhwal** | Staff Counsel
Office of State Controller Malia M. Cohen
Legal Office
300 Capitol Mall, Suite 1850
Sacramento, CA 95814
Tel: (916) 322-6430| Fax: (916) 322-1220

CONFIDENTIALITY NOTICE: This communication and its contents is from an attorney and may contain confidential and legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act (18 U.S.C. §§2510-22, 2701-11, 3121-26). If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br><br>WESTBOROUGH SPE, LLC,<br><br>Alleged Debtor | Chapter 7<br>Case No. 23-40709-CJP |

**ORDER FOR RELIEF IN INVOLUNTARY CASE**

Upon consideration of the involuntary petition filed against Westborough SPE LLC, the above-named alleged debtor ("Westborough SPE" or "Alleged Debtor"), on August 31, 2023 [Dkt. No. 1] and the evidence of the service of the involuntary summons [Dkt. No. 12] filed by counsel to the petitioners, the involuntary petition not having been timely controverted,[1] an ORDER FOR RELIEF under Chapter 7 of Title 11 of the United States Code, is hereby ENTERED.

Dated: October 11, 2023

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

[1] The Court notes that Westborough SPE, pursuant to a "Motion and Answer to Petition for Involuntary Bankruptcy" [Dkt. No. 5] filed by the manager of the Alleged Debtor, also purported to consent to the entry for an order for relief. Pursuant to MLBR 9010-1(g), MLBR 9029-3, and D. Mass. LR 83.5.5, a limited liability company may not appear without counsel.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>WESTBOROUGH SPE LLC<br><br>Debtor | Chapter 7, No. 23-40709 |

**TRUSTEE'S LIMITED OBJECTION TO TOWN OF WESTBOROUGH'S MOTION FOR RELIEF FROM AUTOMATIC STAY AND OPPOSITION TO APPOINTMEN TOF BANKRUPTCY TRUSTEE**

NOW comes JONATHAN R. GOLDSMITH, Trustee ("Trustee"), through his counsel and submits this limited objection to the Motion of the Town of Westborough for Relief from the Automatic Stay [docket No. 20, the "Motion"]. In support thereof, the Trustee respectfully states as follows:

1. In light of his recent appointment, the Trustee is not yet in a position to respond to the various unnumbered paragraphs of the Motion, and reserves his right to do so.

2. On August 31, 2023, an Involuntary Petition was filed against the Debtor.

3. On October 3, 2023, the Town of Westborough filed the subject Motion.

4. Subsequent to the filing of the Motion, the Court entered an Order for Relief in the Involuntary case [docket No. 26].

5. On October 12, 2023, the Office of the U.S. Trustee filed the Certificate of Appointment of Interim Trustee, noting the appointment of Jonathan R. Goldsmith [docket No. 29].

6. The 341 Meeting of Creditors in this case is scheduled for November 15, 2023.

7. In light of the foregoing and considering what appears to be complex facts and issues surrounding the grounds by which the Town of Westborough seeks relief from stay, the Trustee moves this Honorable Court to either deny the Motion or alternatively continue the hearing for at least 45 days. A continuance of the hearing will enable the Trustee to conduct the 341 Meeting, allow him time to analyze the Debtor's dispute with the Town of Westborough and, if appropriate, seek the employment of special counsel to assist the Trustee in the matter.

WHEREFORE, the Trustee respectfully requests that:

1. the Town of Westborough's Motion for Relief be denied; or
2. alternatively continue the hearing on the Motion for 45 days; and
3. for other and further relief as is just and proper.

JONATHAN R. GOLDSMITH, TRUSTEE IN BANKRUPTCY FOR WESTBOROUGH SPE LLC

Dated: October 24, 2023

By: */s/ Jonathan R. Goldsmith, Esq.*
JONATHAN R. GOLDSMITH, ESQ.
(BBO No. 548285)
GOLDSMITH, KATZ & ARGENIO, P.C.
1350 Main Street, 15th Floor
Springfield, MA 01103
Tel: (413) 747-0700

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | Chapter 7, No. 23-40709 |
| WESTBOROUGH SPE LLC | ) | |
| Debtor | ) | |

**TRUSTEE'S SUPPLEMENTAL OBJECTION TO TOWN OF WESTBOROUGH'S MOTION FOR RELIEF FROM AUTOMATIC STAY AND OPPOSTION TO THE APPOINTMENT OF A BANKRUPTCY TRUSTEE**

NOW comes JONATHAN R. GOLDSMITH, the duly appointed and acting Trustee ("Trustee"), and hereby submits this Supplemental Objection to the Town of Westborough's Motion for Relief from the Automatic Stay and Opposition to Appointment of a Bankruptcy Trustee[1] (the "Motion").

As a preliminary matter, the Trustee submits that he has now received an offer ("Offer") from Ferris Development Group, LLC ("Ferris") to purchase the subject property at 231 Turnpike Road, Westborough, Massachusetts ("Property") for the sum of Two Millon Eight Hundred and Seventy-Five Thousand Dollars ($2,875,000.00), which the Trustee has accepted, subject to Bankruptcy Court approval on a Motion to Sell and the contingencies noted therein. A copy of the Offer is attached hereto as Exhibit "A".

A sale of the Property to Ferris will, upon information and belief, be sufficient to pay all outstanding taxes and costs owed to the Town of Westborough ("Town") and also provide funds to distribute a dividend (possibly payment in full) to all scheduled creditors of the bankruptcy case. The Trustee also submits that a sale pursuant to 11 U.S.C. §363 will expedite payment to the Town and the creditors of the Bankruptcy Estate.

[1] The Trustee does not respond to the portion of the Motion for Relief from Stay in Opposition to the Appointment of a Bankruptcy Trustee, as the Trustee deems this issue moot.

In the event that the Trustee is unable to obtain an order on a stipulation of the parties vacating the Judgment issued by the Land Court in the case of *Town of Westborough v. Westborough SPE, LLC, et al* (Mass. Land Ct. No. 19 TL 000768), then it is the intent of the Trustee to file a notice of removal of the said Land Court action to Federal Court pursuant to Federal Rule of Bankruptcy Procedure 9027, which provides, inter alia, that the Trustee has until 90 days after the Order for Relief was entered in the case to file said notice. The Order for Relief was filed on October 11, 2023.

In light of the foregoing, the Trustee requests that the Motion be denied. In further support of his Objection, the Trustee responds to each and every allegations set forth in the Motion. For ease in reviewing the Trustee's responses to each and every of the unnumbered allegations in the Motion, the Trustee has noted his responses to the Motion as noted on Exhibit "B" attached hereto.

WHEREFORE, the Trustee respectfully requests that:

1. the Town of Westborough's Motion for Relief be denied; and
2. for other and further relief as is just and proper.

JONATHAN R. GOLDSMITH, TRUSTEE IN BANKRUPTCY FOR WESTBOROUGH SPE LLC

Dated: 11/27/23

By: */s/ Jonathan R. Goldsmith, Esq.*
JONATHAN R. GOLDSMITH, ESQ.
(BBO No. 548285)
GOLDSMITH, KATZ & ARGENIO, P.C.
1350 Main Street, 15th Floor
Springfield, MA 01103
Tel: (413) 747-0700

# *Exhibit "A"*

MIRICK O'CONNELL

ATTORNEYS AT LAW

**Paul W. Carey**
Mirick O'Connell
100 Front Street
Worcester, MA 01608
pcarey@mirickoconnell.com
t 508.860.1590
f 508.983.6238

November 27, 2023

**VIA E-MAIL**
*jgoldsmith@gkalawfirm.com*

Jonathan R. Goldsmith Esq.
Goldsmith, Katz & Argenio, P.C.
1350 Main Street
Suite 1505
Springfield, MA 01103

Re: Offer to Purchase – 231 Turnpike Road, Westborough, Massachusetts ("Premises")

Dear Jonathan:

This letter will serve as Ferris Development Group, LLC's offer to purchase the land and improvements located at 231 Turnpike Road, Westborough.

| | |
|---|---|
| Purchase Price: | $2,875,000 |
| Purchasing Entity: | Ferris Development Group, LLC, or its nominee |
| Tenants: | None; to be delivered vacant |
| Purchase and Sale: | A purchase and sale agreement ("P&S") to be prepared by Buyer between Buyer and Seller, in form and scope satisfactory to both parties, will be executed within ten (10) days following Seller's acceptance of this Offer to Purchase. The P&S will incorporate the material terms stated in this Offer to Purchase. |
| Inspection Period: | Until 6 p.m. Boston time on the seventh day following full P&S signing. Buyer in its sole discretion may withdraw from the P&S up until that time. |
| Deposit: | Simultaneous with acceptance of this Offer, a refundable deposit of Two Hundred Eighty Seven Thousand Five Hundred Dollars ($287,500) ("Deposit") will be tendered |

| | |
|---|---|
| | by Buyer to Seller to be held in his Trustee's account. The deposit shall be fully refundable only if Buyer withdraws this Offer to Purchase prior to the end of the Inspection Period or, thereafter, upon (a) Seller's breach of the terms of this Offer to Purchase or the P&S, or (b) failure of the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") to enter within 60 days from execution of this Offer to Purchase a final and unappealed order approving the sale of the Premises to Buyer on the terms set forth herein. |
| Financing Contingency: | None |
| Bankruptcy Court Approval: | Sale of the Premises is subject to approval by the Bankruptcy Court. Seller shall file a motion for approval of the sale to Buyer within seven days of the execution of the P&S upon terms acceptable to Buyer. The motion shall request a hearing on the sale motion within not more than 45 days and Seller shall obtain final Bankruptcy Court approval not later than 60 days from execution of this Offer to Purchase. The sale motion shall require any counteroffers to be on substantially the same terms as this Offer to Purchase excepting only the Purchase Price, which shall exceed the Purchase Price by not less than 5%. |
| Closing: | Closing will take place not later than the third (3rd) day following entry of a final, unappealed order of the Bankruptcy Court approving the sale to Buyer. |
| Sale Free and Clear: | The sale of the Premises shall be free and clear of all liens, claims, and encumbrances accruing prior to the Closing including, without limitation, any claims as to ownership, claims for taxes and municipal charges, claims for any common area, easement, or other charges and obligations with respect to the Premises and any sharing arrangements to which it may be subject. |
| Brokerage: | Both Seller and Buyer shall warrant in the P&S that there are no brokers involved in this potential transaction, and no commissions due to brokers. |

MIRICK O'CONNELL

Jonathan R. Goldsmith Esq.
November 27, 2023
Page 3

| | |
|---|---|
| Closing Costs: | Both Buyer and Seller will pay their own legal and other transaction costs. Recordation, transfer fees and title costs shall be allocated to the parties pursuant to local custom (e.g. Seller pays any grantor's tax). |

If the Seller is in agreement with the terms outlined in this Offer to Purchase, please sign a copy and return it to us by 5:00 p.m. Boston time on November 27, 2023. This offer will become null and void if not accepted by that time.

Sincerely,

**BUYER**

**Ferris Development Group, LLC**
a Massachusetts limited liability company

By: David M. Ferris
Its: Manager, duly authorized

Agreed and Accepted:

**SELLER**

**Jonathan Goldsmith, in his capacity as Chapter 7 Trustee of Westborough SPE, LLC** a Delaware limited liability company

By: Jonathan Goldsmith, Trustee

# *Exhibit "B"*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 23-40709-CJP

Chapter 7

| | |
|---|---|
| In re:<br><br>WESTBOROUGH SPE LLC | TOWN OF WESTBOROUGH'S MOTION FOR RELIEF FROM AUTOMATIC STAY AND OPPOSITION TO APPOINTMENT OF A BANKRUPTCY TRUSTEE |

The Town of Westborough ("Town"), listed in the Debtor's Matrix List of Creditors (Doc. No. 7) in the above-captioned action, hereby moves the Court for an order providing relief from the automatic stay provisions of 11 U.S.C. § 362(a) to the extent those provisions stay the cases of Town of Westborough v. Westborough SPE, LLC, et al. (Mass. Land Ct. No. 19 TL 000768) (the "Tax Foreclosure Action") and Westborough SPE, LLC v. Town of Westborough, et al. (D. Mass. No. 4:23-cv-12017-MRG) (the "Civil Action"). As set forth below, the former is a tax title foreclosure action between the Town and the Debtor currently underway in the Massachusetts Land Court, in which judgment had already entered against the Debtor long before the commencement of this bankruptcy proceeding, but which judgment the Debtor was seeking to vacate. The latter is an action the Debtor filed—through the law firm listed as a petitioning creditor here—in U.S. District Court on the very same day that creditor (and another) commenced this involuntary Chapter 7 proceeding.

***Response:*** ***The Trustee's response to the foregoing paragraph is set forth in his preamble to his Objection and as noted below.***

For the reasons discussed herein, if either action (or both) is covered by the automatic stay, relief is appropriate to allow the actions to proceed so as to allow the Town to dispose of the property subject to the Tax Foreclosure Action through a long-awaited sale and to deposit the

surplus proceeds into the court for the Debtor (or anyone else claiming a right to them, including the Debtor's apparent former owners) to claim in light of Tyler v. Hennepin County, 598 U.S. 631 (2023). For those same reasons, the Town opposes the appointment of a bankruptcy trustee with respect to disposition of that property, including an interim trustee as requested by the Debtor's Motion to Appoint Interim Trustee (Doc. No. 10).[1]

***Response:*** ***The Trustee denies the allegations set forth in the foregoing paragraph, except that he admits that surplus funds are property of the bankruptcy estate under Tyler v. Hennepin County, 598 U.S. 631 (2023). Further answering, the Trustee notes that the Debtor timely filed a Motion Seeking to Vacate Foreclosure Judgment.***

## BACKGROUND

In 1997, the Debtor acquired real property located at 231 Turnpike Road, Westborough, Massachusetts (the "Property"). The Debtor withdrew from doing business in Massachusetts in 2007 and was administratively dissolved in 2014 for failure to pay taxes in the State of Delaware. See Exhibits A (MA Certificate of Withdrawal) and B (DE Administrative Dissolution). Notwithstanding the dissolution of the Debtor, the lessee of the Property (Regal Cinemas) continued to lease the Property and pay property taxes to the Town. See Declaration of Kristi Williams ("Williams Decl.") at ¶ 5. However, when the lease expired in late 2017, the lessee vacated the Property and stopped making tax payments. See id. at ¶ 6. Subsequently, property taxes on the Property accrued, and at the Town's Annual Town Meeting in March 2018, Town Meeting voted to authorize the Town to acquire and dispose of the Property. See id. at ¶ 7; Exhibit C (2018 ATM Results) at pp. 13-14. As noted in the Town Manager's Statement for the article in

[1] The Town was not served with a copy of the Debtor's motion when it was filed on September 11, 2023.

question, the Town intended to act proactively "to ensure that the [Property] does not become a blight to the neighborhood ... because of neglect, vandalism and/or exposure to the elements" and "to put the [Property] to productive use and to contribute again to the Town's tax revenue." See id. Unfortunately, as discussed below, the Town's efforts have been hampered, in large part due to the actions of the Debtor and its counsel.

***Response:*** ***The Trustee has insufficient knowledge to admit or deny the allegations contained in the foregoing paragraph.***

After the March 2018 Town Meeting vote, the Town issued a Request for Proposals to sell the Property. See Williams Decl. at ¶ 8.[2] The Town's Select Board voted to accept the proposal of Lax Media LLC ("Lax Media") on November 20, 2018, issued a notice of award to Lax Media on November 28, 2018, and notified the other bidders of the Town's selection on December 3, 2018. See id. at ¶ 9. On December 28, 2018, the Town recorded an instrument of taking on the Property and all improvements thereon pursuant to G.L. c. 60, §§ 53-54 as a result of unpaid FY2018 taxes in the amount of $106,944.99. See Exhibit D (Instrument of Taking). Subsequently, the Town incurred certain costs of insuring, securing, and maintaining the Property. See Williams Decl. at ¶ 10. The Town is also responsible, to the extent provided by G.L. c. 60, § 77, for payment of a portion of common area maintenance and snow removal to The MobileStreet Trust, the owner of two abutting parcels that, with the Property, are all subject to a Declaration of Reciprocal Covenants, Easements and Restrictions (the "Reciprocal Agreement"). See Exhibit E (Reciprocal Agreement) at § 3.1.

***Response:*** ***The Trustee has insufficient knowledge to admit or deny the allegations contained in the foregoing paragraph.***

---

[2] The RFP provided that "Proposers are advised that the Town intends to acquire title to the Premises prior to or simultaneously with the closing. The Board of Selectmen has been authorized by Town Meeting to acquire the Premises."

On or about April 3, 2019, the Town Manager's office received an email from an attorney representing the successor-in-interest of Babcock and Brown Administrative Services, Inc. ("Babcock & Brown"), the company that had been the Debtor's manager, requesting information concerning the Property and indicating their client may have a claim to the Property. See Williams Decl. at ¶ 11. The Town elected not to proceed with its acquisition of the Property at that time in light of the potential claim to the Property and identification of a party that may be able to pay the outstanding tax liabilities on the Property. See id. at ¶ 12. On April 30, 2019, the Select Board voted to authorize Town Counsel to terminate the pending purchase and sale agreement with Lax Media. See id. at ¶ 13.

***Response:*** ***The Trustee has insufficient knowledge to admit or deny the allegations contained in the foregoing paragraph.***

However, neither Babcock & Brown nor its successor-in-interest paid off the outstanding taxes on the Property. See Williams Decl. at ¶ 14. As a result, since six months had passed after the Town's recording of the instrument of taking without the Debtor redeeming the Property, the Town commenced the Tax Foreclosure Action in the Massachusetts Land Court on July 8, 2019 to foreclose the Debtor's right of redemption. See Exhibit F (Tax Foreclosure Complaint). On January 5, 2022, the Land Court entered judgment in favor of the Town and against the Debtor.[3] See Exhibit G (Tax Foreclosure Judgment).

***Response:*** ***The Trustee admits that the outstanding taxes on the Property have not been paid off, but the Trustee is without sufficient knowledge to admit or deny the remaining allegations contained in the foregoing paragraph.***

---

[3] Thus, the Land Court judgment issued more than a year before the U.S. Supreme Court's May 2023 decision in Tyler, discussed further below.

On May 26, 2022, the Town issued a new request for proposals for the purchase and redevelopment of the Property. See Williams Decl. at ¶ 15. The Town received three proposals, including one from Lax Media. See id. at ¶ 16. Lax Media offered a purchase price of $2,500,001, which was higher than the estimated fair market value of the Property ($2,082,000). See id. at ¶ 17.[4] The Town's Select Board evaluated the proposals based on five categories and selected Lax Media's proposal, which received the score of "highly advantageous" in three categories and "advantageous" in the remaining two. See id. at ¶ 18.[5]

***Response:*** ***The Trustee has insufficient knowledge to admit or deny the allegations contained in the foregoing paragraph. Further answering, the Trustee submits that he has received an offer for the Property that is $375,000.00 higher than the Lax Media offer.***

On December 22, 2022, the Debtor (under the purported control of two new managers) applied for registration to do business in Massachusetts. See Exhibit H (Application for Registration). On January 4, 2023—which was one day short of the first year anniversary of the

---

[4] The Debtor's Schedule A/B (Doc. No. 8) lists a purported current value of $7,942,000 for the Property, based upon the highest bid that the Town received. As a Massachusetts Superior Court judge noted in a related proceeding to which the Debtor is not a party, that bid sought "to raze the existing structure and build 108 condominium units," which was not feasible because "[t]here was a moratorium on additional water and sewer connections in Westborough due to capacity constraints that [the bidder] would have to overcome." See Memorandum of Decision and Order on Plaintiff's Motion for Preliminary Injunction, at pp. 2-3, Ferris Development Group, LLC v. Town of Westborough, et al., No. 2285CV02181 (Mass. Superior Ct. Jan. 13, 2023); see also, infra, note 5. The Town rejected the highest bid because the water moratorium precluded the proposed development.

[5] In November 2022, one of the other bidders filed suit against the Town and Lax Media in Massachusetts Superior Court for breach of implied contract, declaratory judgment, and injunctive relief as a result of the Town's awarding the bid to Lax Media. See Ferris Development Group, LLC v. Town of Westborough, et al., Mass. Superior Court Case No. 2285CV01281. The Superior Court denied the plaintiff's motion for preliminary injunction, finding that plaintiff failed to show a likelihood of success on the merits. Memorandum of Decision and Order on Plaintiff's Motion for Preliminary Injunction, at pp. 9-11, Ferris Development Group, LLC v. Town of Westborough, et al., No. 2285CV02181 (Mass. Superior Ct. Jan. 13, 2023). As the Debtor is not a party to the Superior Court action, that action is not subject to the automatic stay.

issuance of the judgment entered in the Tax Foreclosure Action and the final day to petition to vacate the judgment (see G.L. c. 60, § 69) the Debtor filed a motion with the Land Court to vacate the judgment. See Exhibit I (Motion to Vacate).[6] The Town opposed the motion to vacate[7] for various reasons, including the significant questions that the Town had regarding the ownership and identity of the Debtor, including whether the individuals purporting to own the Debtor and advancing the motion to vacate (Lolonyon Akouete and Denise Edwards) had actually acquired the Debtor, much less any interest in the Property. After several extensions, the Land Court was prepared to hold an evidentiary hearing "to determine whether Westborough SPE, LCC [sic], having appeared in this case, is the taxpayer who has the right to redeem the subject property" and a pre-hearing conference was scheduled for August 31, 2023 to determine the hearing schedule. See Exhibit J (Land Court Docket) at May 16, 2023 entry.

***Response:*** ***The Trustee admits that the Debtor filed a Motion with the Land Court to vacate said judgment, but is without sufficient information to admit or deny the remaining allegations set forth in the foregoing paragraph.***

Lax Media has been holding its bid firm and keeping its terms in place pending the outcome of the Tax Foreclosure Action. See Williams Decl. at ¶ 19. Despite the Town's efforts to secure and maintain the Property since the time that Regal Cinemas vacated it, the Property has been vandalized and has experienced burst pipes. See id. at ¶ 20. The Debtor does not dispute the condition of the property and, in fact, explicitly references the deterioration of the Property in its

[6] Although the Debtor is a limited liability company, its motion was not signed by an attorney, which is impermissible under Massachusetts law. See Dickey v. Inspectional Servs. Dep't of Boston, 482 Mass. 1003, 1004 (2019).

[7] As noted therein, the tax title account balance on the Property as of the date of the Town's opposition was $638,755.20, exclusive of expenses incurred under the Reciprocal Agreement.

motion for appointment of a trustee. See Doc. No. 8 at p. 1 & Ex. 1. As of May 3, 2023, the Town's tax title account for the Property reflects an amount of $918,314.60 due to the Town, exclusive of expenses under the Reciprocal Agreement. See id. at Ex. 2.

***Response:*** ***The Trustee has insufficient knowledge to admit or deny the allegations contained in the foregoing paragraph.***

On August 31, 2023, petitioner Nathanson & Goldberg, P.C. (which has represented the Debtor in the Tax Foreclosure Action since February 22, 2023) and The MobileStreet Trust (which is the other party subject to the Reciprocal Agreement) filed an involuntary Chapter 7 petition against the Debtor, commencing these proceedings. The Land Court cancelled the pre-hearing conference on the Debtor's motion to vacate, which was scheduled for 2:00 pm that same day, and ordered the Debtor to file a status report by October 31, 2023 (with additional status reports due every 60 days thereafter). See Exhibit J (Land Court Docket) at August 31, 2023 entry.

***Response:*** ***The Trustee admits the allegations contained in the foregoing paragraph.***

On the same day (August 31, 2023), the Debtor—through Nathanson & Goldberg, P.C. (one of the petitioners here)—commenced the Civil Action. In the Civil Action, the Debtor seeks declaratory relief and other relief relating to the surplus proceeds of the Town's sale of the Property (which has not occurred because of the Debtor's actions in the Tax Foreclosure Action) under Tyler. See Exhibit K (Civil Action Complaint). The Debtor also filed a suggestion of bankruptcy in the Civil Action on August 31, 2023. See Exhibit L (Civil Action Suggestion).

***Response:*** ***The Trustee admits the allegations contained in the foregoing paragraph.***

## ARGUMENT

## I. RELIEF FROM THE STAY IS APPROPRIATE TO ALLOW THE TOWN TO BRING THE TAX FORECLOSURE ACTION TO A CONCLUSION

A. <u>Relief for Cause Is Warranted</u>

There is cause under 11 U.S.C. § 362(d)(1) to relieve the Town from the automatic stay with respect to the Tax Foreclosure Action (and the Civil Action, should the Court find that the stay applies). The Bankruptcy Code does not provide a definition of what constitutes "cause," and therefore, courts have discretion to determine when relief is appropriate on a case-by-case basis. <u>In re Hurvitz</u>, 554 B.R. 35, 40 (Bankr. D. Mass. 2016). Courts consider three factors to determine "whether cause exists to lift the automatic stay to permit the continuation of pending litigation," namely "(1) whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of a civil suit; (2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship of the debtor; and (3) whether the creditor has a probability of prevailing on the merits of his case." <u>Id</u>. (formatting and quotations omitted).

***<u>Response:</u>*** ***The Trustee denies that there is cause to grant the Town relief from stay but admits that the <u>Hurvitz</u> Court considered three factors in determining whether cause exists to lift stay, none of which factors support lifting of the stay at this time.***

Here, all three factors weigh heavily in favor of lifting the automatic stay for the Town. Permitting the Tax Foreclosure Action to proceed will not prejudice the Debtor or the bankruptcy estate because the Property is not an asset of the estate and one of the creditors represents the Debtor in that action. On the other hand, the Town will suffer great hardship as a result of the stay, as it will be unable to bring the tax recovery process (which started in 2018) to a conclusion, return the Property to the tax rolls and productive use, and cease incurring significant expenses to maintain the Property. Finally, the Town has a strong probability of prevailing in the Tax Foreclosure Action, as it has already obtained judgment in its favor and the Debtor's motion to vacate that judgment rests on extremely dubious grounds, both procedurally (having been brought by an unrepresented LLC) <u>and</u> substantively (given the questions surrounding the Debtor's

ownership and the fact that the Town provided the Debtor sufficient notice in line with the applicable statutes and the Land Court's directions).

***Response:*** ***The Trustee denies the allegations contained in the foregoing paragraph. Further answering, the Trustee submits that the consummation of the sale with Ferris Development Group, LLC will most likely provide for the timely payment of outstanding taxes and the return of the Property to the tax rolls.***

The conduct of the Debtor and the Debtor's litigation counsel, one of the petitioners here, has caused the Town to lose municipal revenue and to incur unnecessary expense. The Town has not received real estate tax or water/sewer fees on the Property since 2017. With interest, this amounts to $695,620.24 due and owing to the Town as of May 3, 2023. See Doc. No. 8 at Ex. 2. This lack of payment establishes that the Town is not adequately protected, justifying relief from the stay. See McCullough v. Horne (In re McCullough), 495 B.R. 692, 695-696 (Bankr. W.D.N.C. 2013) (history of lack of prepetition payments to creditor combined with insufficient postpetition payments left creditor inadequately protected). Additionally, since the tax taking in 2018 and, in particular, since the Land Court entered judgment foreclosing the Debtor's right of redemption in January 2022, the Town has incurred significant costs to maintain the Property. See Doc. No. 8 at Ex. 2. For example, the Town has expended over $109,000 to insure the Property. See id. The Town has also paid almost $15,000 to board the Property and over $10,000 in utility costs, despite the fact that the building on the Property is vacant. See id. Additionally, the Town is responsible, to the extent provided by G.L. c. 60, § 77, to The MobileStreet Trust for payment of a portion of common area maintenance and snow removal under the Reciprocal Agreement. The Town

continues to bear these costs and will continue to do so until it sells the Property, thereby recouping the outstanding tax title balance inclusive of expenses.[8]

__Response:__ ***The Trustee denies the foregoing allegations; further answering, the Trustee submits that the Town is adequately protected in that there is equity in the Property far in excess of the outstanding taxes and costs incurred by the Town in maintaining the Property.***

That sale cannot happen until the Land Court adjudicates the Debtor's motion to vacate in the Tax Foreclosure Action. Absent the delays caused by the Debtor and the Debtor's litigation counsel, the Land Court could have disposed of the Debtor's motion to vacate long ago. Assuming that the Land Court denied that motion and allowed the Town's judgment to stand, the Town could have consummated the sale of the Property. Instead, that sale has been—and continues to be—delayed as a result of the Debtor's actions. Indeed, the involuntary petition in this matter, filed on behalf of the Debtor's Land Court counsel (Nathanson & Goldberg) mere hours before the Land Court pre-hearing conference on the motion to vacate in the Tax Foreclosure Action (at which it was expected that the Court would establish the hearing schedule), was a desperate attempt to delay the Land Court conference.

__Response:__ ***The Trustee denies the allegations contained in the foregoing paragraph. Further answering, the Trustee submits that the litigation can be removed to the Federal Court system.***

[8] The Town has also spent $6,000 to have the Property appraised, over $20,000 preparing the RFPs on the Property, and almost $60,000 in legal fees for the tax title matter. See Doc. No. 8 at Ex. 2.

These delays have been made all the more glaring in light of the Debtor's filings in the Civil Action. Although the Debtor spent the past eight months contesting the Town's right to sell the Property in the Land Court, the Debtor now asks the U.S. District Court to hold that surplus sales proceeds from the Town's sale of the Property belong to Debtor under Tyler. Specifically, the Debtor alleges that it demands payment of surplus proceeds "[u]pon any sale of the Property by the Town." See Ex. K at ¶ 107. The Debtor continues by alleging that it "is entitled to a declaration that if the Town … sells the [Property] that [the Debtor] is entitled to the difference between the amount owed and what the property sells for." Id. at ¶ 109.[9]

***Response:*** ***The Trustee has insufficient knowledge to admit or deny the allegations contained in the foregoing paragraph.***

Allowing the Tax Foreclosure Action to proceed is not inconsistent with the purposes of the automatic stay. The stay is designed to allow "debtors to resolve their debts in a more orderly fashion, ... and at the same time safeguard[] their creditors by preventing 'different creditors from bringing different proceedings in different courts, thereby setting in motion a free-for-all in which opposing interests maneuver to capture the lion's share of the debtor's assets.'" Heaney v. Lamento (In re Whiz Kids Dev., LLC), 576 B.R. 731, 760 (Bankr. D. Mass. 2017), quoting Soares v. Brockton Credit Union (In re Soares), 107 F.3d 969, 975 (1st Cir. 1997). The Tax Foreclosure Action has nothing to do with capturing the debtor's assets, however.

[9] As the Sixth Circuit recently recognized, "the Supreme Court has [never] held that a plaintiff whose property is foreclosed and sold at a public auction for failure to pay taxes is entitled to recoup the fair market value of the property," and Tyler does not change that. Freed v. Thomas, --- F.4th ----, 2023 WL 5733164, at *2 (6th Cir. Sept. 6, 2023). Thus the Debtor's claims in the Civil Action relating to the alleged fair market value of the Property are misplaced, even if the Debtor (or whomever properly "owns" the Debtor) is entitled to the difference between the sale price and the tax title account balance.

Rather, the Tax Foreclosure Action was a statutory action by which the Town sought to foreclose the Debtor's right of redemption in the tax title to the Property (see G.L. c. 60, § 65) in order to permit the Town to recover the tax title balance (caused by the Debtor's failure to pay taxes on the Property) through a sale to a third party. As the Supreme Judicial Court has explained, "[w]hen a tax collector conducts a tax taking, … the municipality obtains 'tax title' to the property, which is best understood as legal ownership of the property subject to the owner's right of redemption." Tallage Lincoln, LLC v. Williams, 485 Mass. 449, 451 (2020). Because the Land Court had entered judgment in favor of the Town and against the Debtor foreclosing the right of redemption prior to the filing of the bankruptcy petition, the Debtor did not own the Property at the time of the filing of the bankruptcy action (assuming that the Debtor, in its current form with questionable ownership of the LLC, had any ownership interest in the Property to begin with). See id. at 452 ("Upon entry of such judgment, the municipality … takes absolute title to the property."). As the SJC has explained, a tax title foreclosure "extinguishes the taxpayer's remaining interest in the property—the right of redemption—and converts the municipality's … tax title into absolute title … free and clear of all encumbrances, including mortgages and other liens," such that "the taxpayer loses any equity he or she has accrued in the property, no matter how small the amount of taxes due or how large the amount of equity." Id. at 452-453.[10]

***Response:*** ***The Trustee has insufficient knowledge to admit or deny the allegations contained in the foregoing paragraph. Further answering, removing the State Court litigation to***

[10] This is now modified by Tyler, which held that "a taxpayer is entitled to the surplus in excess of the debt owed" when real property is taken and sold pursuant to a tax title statute. See 598 U.S. at 642. Nevertheless, the Debtor's potential right to the surplus of proceeds from the sale of the Property (which the Town questions given its concerns about the present ownership of the Debtor) does not give it equity in the Property itself. Thus, the Land Court should be allowed to conclude the Tax Foreclosure Action so that the Town can sell the Property and deposit the surplus proceeds into the court (potentially in the Civil Action) for determination of who is entitled to those surplus proceeds.

***the Federal Court /Bankruptcy Court will allow the matter to be resolved in a more orderly fashion and at the same time safeguard all creditors of the Bankruptcy Estate.***

Thus, permitting the Land Court to bring that action to final resolution by adjudicating the Debtor's motion to vacate the foreclosure judgment will neither imperil the Debtor's assets nor the rights of other creditors. Allowing a creditor relief from the automatic stay to proceed with its state law remedies under such circumstances is entirely appropriate. See Bushnell v. Bank of the West (In re Bushnell), 469 B.R. 306, 309-310 (B.A.P. 8th Cir. 2012) (affirming lifting of stay to allow bank holding foreclosure deed to evict debtor that had improperly reentered property). As the Land Court has spent the past several years presiding over the disposition of the Property and, absent the stay, will soon conclude that action, there is no benefit to anyone in having the issue transferred to this Court and incurring additional legal expense as a result of the automatic stay.

***Response:*** ***The Trustee denies the allegations contained in the foregoing paragraph.***

Indeed, this Court has provided relief from the automatic stay to allow similar proceedings to conclude post-petition, even where the Town had not yet succeeded in obtaining judgment foreclosing the debtor's right of redemption. See In re Tomaselli, No. 14-10736-JNF, 2014 WL 4322404, at *5 (Bankr. D. Mass. Aug. 29, 2014). As Judge Feeney explained in Tomaselli, the "[Bankruptcy] Court is not the appropriate forum for the Debtor to raise specialized state law issues involving betterment liens and tax liens that have been the subject of prior rulings in other courts," such as the Land Court. Id. at *7. Given that the Town here has obtained judgment foreclosing the Debtor's right of redemption, and the only thing left for the Land Court to do in the Tax Foreclosure Action is to adjudicate the Debtor's dubious motion to vacate, the reasoning of Tomaselli applies even more so here.

***Response:*** ***The Trustee states that the foregoing paragraph calls for a legal***

***conclusion and no response is required.***

Cause for relief from stay is not limited to a lack of adequate protection or a finding of bad faith motive for filing the bankruptcy case. In re Shady Grove Tech Ctr. Assocs. Ltd. P'shp, 216 B.R. 386, 388 (Bankr. D. Md. 1998) (internal quotations and citations omitted). Here, cause exists to grant the Town relief from the automatic stay to the extent it applies to the Tax Foreclosure Action and the Civil Action.

***Response:*** ***The Trustee denies the allegations contained in the foregoing paragraph.***

**B. Relief Is Appropriate Because the Debtor Has No Equity in the Property**

The Court may also lift the automatic stay "with respect to ... an act against property ... if the debtor does not have an equity in such property; and ... such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2). As discussed above, whatever equity the Debtor ever had or has in the Property was extinguished on January 5, 2022 when the Land Court entered judgment in the Tax Foreclosure Action. Although the Debtor seeks to vacate that judgment, until such time as the judgment is vacated (which cannot happen while the stay is in effect with respect to the Tax Foreclosure Action), the Debtor lacks any equity or ownership interest in the Property.

***Response:*** ***The Trustee denies the allegations contained in the foregoing paragraph.***

Indeed, because the Debtor's right of redemption on the Property was foreclosed and absolute title to the Property transferred to the Town prior to the commencement of this proceeding, the Property itself is not even part of the Debtor's bankruptcy estate, such that the stay should not apply to the Property at all. See U.S. Bank, N.A. v. Vertullo (In re Vertullo), 610 B.R. 399, 404 (B.A.P. 1st Cir. 2020) ("For property to be protected by the automatic stay, it must be

property of the bankruptcy estate."). Nor does the fact that the Debtor may have a pending petition pursuant to G.L. c. 60, § 69, or an interest in any surplus sale proceeds under Tyler change the fact that the Debtor lacks equity in the Property itself. Finally, the Property is not necessary for reorganizing the Debtor as this is not a Chapter 11 proceeding. Thus, the Court should also lift the stay under subsection (d)(2).

***Response:*** ***The Trustee denies the allegations contained in the foregoing paragraph.***

**C. Relief for Single Asset Real Estate Is Warranted**

Additionally, relief from the stay should be granted to the Town pursuant to 11 U.S.C. § 362(d)(3) because the Town's claim concerns a single asset real estate. Under the Bankruptcy Code, the term "single asset real estate" means "real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental." 11 U.S.C. § 101(51B). The Property meets this definition, as it appears that the Property (which is commercial real estate) was the sole income-generating asset of the Debtor prior to its administrative dissolution.[11]

***Response:*** ***The Trustee denies the allegations contained in the foregoing paragraph.***

Under subsection (d)(3), the Court may provide relief "with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an

---

[11] In its schedules, the Debtor lists the Property as its sole asset exclusive of an unspecified unclaimed checking account in California. See Doc. No. 8 at p. 7-8. Although the Debtor states that it is the "Owner" of the Property in its schedules, as discussed above, absolute title to the Property transferred to the Town upon the Land Court's entry of judgment in the Tax Foreclosure Action.

interest in such real estate, unless" the Debtor "has commenced monthly payments that ... are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate" within 90 days of the order of relief. 11 U.S.C. § 362(d)(3).[12] Relief from the automatic stay for single asset real estate may be granted in Chapter 7 cases, such as this one, where the debtor has not made interest payments to a secured creditor within 90 days.[13] See Suntrust Bank v. Global One, L.L.C. (In re Global One, L.L.C.), 411 B.R. 524, 528-529 (Bankr. S.D. Ga. 2009). As discussed above, it is undisputed that the Debtor has not paid the Town interest on the tax lien (much less the principal) for several years and has not established any ability (or legal right) to make such payments going forward should the Court enter an order of relief pursuant to 11 U.S.C. § 303(h). Thus, relief from the stay is appropriate under subsection (d)(3), as well.

***Response:*** ***The Trustee denies the allegations contained in the foregoing paragraph.***

## II. THE STAY DOES NOT APPLY TO THE DEBTOR'S CIVIL ACTION

The automatic stay provisions of 11 U.S.C. § 362 typically apply to "judicial, administrative, or other action[s] or proceeding[s] against the debtor." 11 U.S.C. § 362(a)(1) (emphasis added); see, e.g., id. § 362(a)(2) (staying "the enforcement, against the debtor or against property of the estate, of a judgment"); id. §§ 362(a)(4)-(5) (staying acts "to create, perfect, or enforce" liens against property of the estate or the debtor). The automatic stay thus "does not freeze litigation where the debtor is the plaintiff." Worth v. Tamarack Am., Div. of Great Am.

[12] Interest accrues on a municipal tax title account at a rate of 14% per annum from delinquency to taking and a rate of 16% per annum after taking. G.L. c. 59, § 57; G.L. c. 60, § 62.

[13] Although the statute allows a debtor to avoid such relief from the stay by alternatively filing "a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time" within the 90-day period, such alternative does not apply in a Chapter 7 proceeding. See 11 U.S.C. § 362(d)(3)(A).

Ins. Co., 47 F. Supp. 2d 1087, 1099 n.9 (S.D. Ind. 1999); see 4Kids Entertainment, Inc. v. Upper Deck Co., 797 F. Supp. 2d 236, 241 (S.D.N.Y. 2011) ("automatic stay does not extend to claims brought by the debtors against other parties"); cf. Roberts v. C.I.R., 175 F.3d 889, 894-896 (11th Cir. 1999). As the First Circuit has explained, the filing of a bankruptcy petition "has absolutely no effect on the debtors' ability to bring suit against other parties." DiMaio Family Pizza & Luncheonette, Inc. v. The Charter Oak Fire Ins. Co., 448 F.3d 460, 463 (1st Cir. 2006); see Pinpoint IT Servs., LLC v. Atlas IT Export, LLC (In re Atlas IT Export, LLC), 491 B.R. 192, 195 (B.A.P. 1st Cir. 2013) (noting that "claims asserted by the debtor may continue" no matter how closely related to stayed claims against the debtor).

The automatic stay thus does not apply to the Civil Action. The Debtor brought the Civil Action against the Town. Regardless of how related the Debtor's claims may be to the issues being litigated in the Tax Foreclosure Action (as discussed above), the commencement of this involuntary bankruptcy proceeding does not stay the Civil Action.

***Response:*** ***The Trustee admits the allegations in the foregoing paragraph, but since the Federal District Court case is interwoven with the Land Court case, the stay should continue at this time.***

## III. APPOINTMENT OF A BANKRUPTCY TRUSTEE IS UNNECESSARY TO THE DISPOSITION OF THE PROPERTY

Appointment of a bankruptcy trustee is not automatic in an involuntary Chapter 7 proceeding such as this one. Specifically, 11 U.S.C. § 303 provides that:

> At any time after the commencement of an involuntary case under chapter 7 of this title but before an order for relief in the case, the court, on request of a party in interest, after notice to the debtor and a hearing, and if necessary to preserve the property of the estate or to prevent loss to the estate, may order the United States trustee to appoint an interim trustee under section 701 of this title to take possession of the property of the estate and to operate any business of the debtor.

11 U.S.C. § 303(g) (emphasis added). The relief that the Debtor requests pursuant to this provision—appointment of an interim trustee—is extremely rare. In re Diamondhead Casino Corp., 540 B.R. 499, 505 (Bankr. D. Del. 2015) ("a request for an interim trustee should be denied in the absence of an exceptionally strong need for doing so or where no facts are alleged showing a necessity for the appointment.") (quotations and citations omitted). The Debtor has not demonstrated why such appointment is necessary in this case.

Indeed, appointment of a trustee is not necessary to preserve the Property, for the reasons discussed above. A bankruptcy "trustee can only exercise the same right to redeem that the bankrupt had." Town of Agawam v. Connors, 159 F.2d 360, 364 (1st Cir. 1947). Here, the Debtor no longer had any right to redeem the Property and was, at most, left with the statutory right to request vacatur of the Land Court's judgment within one year.[14] Because the Debtor no longer possesses a right to redeem the Property, the same would be true of any trustee appointed in this proceeding. At most, the trustee (like the Debtor) would have the right to have the Debtor's motion to vacate adjudicated in the Land Court. Given that the Debtor was prepared to do just that before its counsel in the Land Court commenced this proceeding, the Court should simply allow the Land Court to proceed without appointing a trustee.

***Response:*** ***The Trustee denies the allegations contained in the foregoing paragraph; further answering the issue regarding the appointment of a Trustee is now moot.***

[14] As noted above, the Debtor's motion was filed on the last day of the one year in question but was not signed by an attorney, calling its validity into question.

## CONCLUSION

For the foregoing reasons, the Court should grant the Town relief from the automatic stay and order that the stay does not bar the Tax Foreclosure Action or the Civil Action from proceeding. Additionally, the Court should decline to appoint a trustee in this proceeding with respect to the Property.

***Response:*** ***The Trustee denies the allegations contained in the foregoing paragraph.***

Respectfully submitted,

TOWN OF WESTBOROUGH,

By its attorneys,

Brian W. Riley (BBO# 555385)
Jeffrey T. Blake (BBO# 655773)
Roger L. Smerage (BBO# 675388)
KP Law, P.C.
Town Counsel
101 Arch Street, 12th Floor
Boston, MA 02110-1109
(617) 556-0007
briley@k-plaw.com
jblake@k-plaw.com
rsmerage@k-plaw.com

Dated: October 3, 2023

882073/WEST/0042

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>WESTBOROUGH SPE LLC<br><br>Debtor | Chapter 7, No. 23-40709 |

**CERTIFICATE OF SERVICE**

I, JONATHAN R. GOLDSMITH, ESQ., of GOLDSMITH, KATZ & ARGENIO, P.C., 1350 Main Street, 15th Floor, Springfield, MA 01103, do hereby certify that I served a copy of the within Supplemental Objection upon those parties listed below by electronic mail or by mailing, first class mail, postage prepaid, on this 27th day of November, 2023:

Stephen F. Gordon, Esq.
The Gordon Law Firm, LLP
River Place
57 River Street
Wellesley, MA 02481

Richard King, Esq.
Office of the U.S. Trustee
446 Main Street, 14th Floor
Worcester, MA 01608

Westborough SPE, LLC
c/o Lolonyon Akouete
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703

Scott A. Schlager, Esq.
Nathanson & Goldberg, P.C.
183 State Street, 5th Floor
Boston, MA 02109

Roger L. Smerage, Esq.
KP Law, P.C.
101 Arch Street, 12th Floor
Boston, MA 02110-1109

/s/ Jonathan R. Goldsmith, Esq.
JONATHAN R. GOLDSMITH, ESQ.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br>**Westborough SPE LLC**<br>**Debtor** | **Chapter 7**<br>**23-40709-CJP** |

## PROCEEDING MEMORANDUM AND ORDER

**MATTER:**
Hybrid Hearing on #20 Motion of the Town of Westborough for Relief from the Automatic Stay (231 Turnpike Road, Westborough, MA).

**Decision set forth more fully as follows:**

THE HEARING IS CONTINUED TO 12/21/2023 AT 1:30 P.M.IN COURTROOM 1, 12TH FLOOR, JOHN W. MCCORMACK POST OFFICE AND COURT HOUSE, 5 POST OFFICE SQUARE, BOSTON, MASSACHUSETTS 02109, WITH AN OPTION FOR PARTIES TO APPEAR BY ZOOM VIDEO.

TO OBTAIN THE ZOOM VIDEO ACCESS INFORMATION FOR THE CONTINUED HEARING, PARTICIPANTS SHALL EMAIL THE COURTROOM DEPUTY, HALINA MAGEROWSKI, AT CJP_COURTROOM_DEPUTY@MAB.USCOURTS.GOV, NO LATER THAN 12/20/2023 AT 1:30 P.M., PROVIDING THE CONTACT INFORMATION FOR THE PARTY SEEKING TO APPEAR BY VIDEO.

Dated: 12/01/2023

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 23-40709-CJP

Chapter 7

In re:

WESTBOROUGH SPE LLC

JOINT MOTION TO CONTINUE HEARING

NOW COME Movant Town of Westborough ("Town") and the Chapter 7 Trustee (the "Trustee," and together, the "Parties") and hereby respectfully and jointly request that the Court further continue the hearing on the Town's Motion for Relief from Automatic Stay and Opposition to Appointment of a Bankruptcy Trustee (Doc. No. 20, the "Motion for Relief"), currently scheduled for Thursday, December 21, 2023, at 12:30 p.m., for at least forty-five (45) days, until a date convenient for the Court no sooner than Monday, February 5, 2024.

In support of this Motion, the Parties state as follows:

1. The Town filed the Motion for Relief on October 3, 2023, seeking an order of the Court allowing the Town's tax title foreclosure action pending in Massachusetts Land Court, Town of Westborough v. Westborough SPE, LLC, et al. (Mass. Land Ct. No. 19 TL 000768) (the "Tax Foreclosure Action"), concerning the property located at 231 Turnpike Road, Westborough, Massachusetts (the "Property") to proceed, namely to allow the Land Court to adjudicate the motion to vacate judgment that the Debtor in this proceeding had purported to file in the Land Court in January 2023, which adjudication was halted by the filing of an involuntary Chapter 7 petition by the Debtor's own counsel in the Tax Foreclosure Action (along with another party).

2. After the Trustee was appointed and the original hearing date on the Motion for Relief was continued until November 30, 2023, the Trustee filed an objection to the Motion for

Relief in which the Trustee raised the prospect of a bankruptcy sale of the Property (even though the Town currently holds title to the Property) and the possibility of removing the Tax Foreclosure Action to the Bankruptcy Court. No other party has objected to the Motion for Relief.

3. Additionally, around the time of the November 30, 2023 hearing, the Trustee advanced an informal oral proposal to settle certain issues and outstanding litigation concerning the Property in the context of this bankruptcy proceeding.

4. During the November 30, 2023 hearing, the Court continued the hearing for three weeks until December 21, 2023 in order to allow the Trustee to further explore the possibility of settlement and the question of removal of the Tax Foreclosure Action (despite the Town's objections to such removal), as well as to consider whether to commence an adversary proceeding under 11 U.S.C. § 548(a) to seek to avoid the tax title foreclosure judgment that entered in the Tax Foreclosure Action on January 5, 2022.

5. On December 5, 2023, the Trustee sent the Town's undersigned counsel a written settlement proposal. The Town's undersigned counsel has provided the proposal to the Town Manager, who in turn provided it to the Town's Select Board, the entity which controls the Town's legal strategy and ultimately must approve any settlement. Although the Town's undersigned counsel has met with the Select Board once in executive session pursuant to G.L. c. 30A, § 21(a)(3), to discuss the settlement proposal, the Select Board requires additional time to consider the proposal and how/whether it would like to proceed. In light of the limitations under the Open Meeting Law (G.L. c. 30A, §§ 18-25), the Select Board may only deliberate on this issue at duly-posted meetings, even when convening in executive session, such that the process requires more time than it would for a private party.

6. In light of the need for such additional time to further explore the possibility of settlement, as well as the scheduling concerns presented by the upcoming winter holidays (Christmas Eve and Day–December 24-25, 2023; and New Year's Eve and Day–December 31, 2023 and January 1, 2024), the Parties respectfully request a further continuance of the hearing on the Motion for Relief for a period of at least forty-five (45) days from the current scheduled date of December 21, 2023.

7. Additionally, the Parties stipulate that the time for the Trustee to remove the Tax Foreclosure Action shall be similarly extended, such that the allowance of this Motion does not prejudice the Trustee's rights of removal (whatever they may be); provided however that neither by this stipulation or otherwise does the Town consent to removal of the Tax Foreclosure Action or waive any objections to removal that are not based on timing.

WHEREFORE, the Town and the Trustee respectfully request that the Court allow this Motion and further continue the hearing presently scheduled for Thursday, December 21, 2023 at 12:30 p.m. until Monday, February 5, 2024, or until such other time and date thereafter as is convenient for the Court.

Respectfully submitted,

TOWN OF WESTBOROUGH,

By its attorneys,

*/s/ Roger L. Smerage*

Brian W. Riley (BBO# 555385)
Jeffrey T. Blake (BBO# 655773)
Roger L. Smerage (BBO# 675388)
KP Law, P.C.
Town Counsel
101 Arch Street, 12th Floor
Boston, MA 02110-1109
(617) 556-0007
briley@k-plaw.com
jblake@k-plaw.com
rsmerage@k-plaw.com

JONATHAN R. GOLDSMITH, TRUSTEE IN BANKRUPTCY FOR WESTBOROUGH SPE LLC

*/s/ Jonathan R. Goldsmith (with permission)*

Jonathan R. Goldsmith (BBO# 548285)
GOLDSMITH, KATZ & ARGENIO, P.C.
1350 Main Street, 15th Floor
Springfield, MA 01103
Tel: (413) 747-0700
Email: jgoldsmith@gkalawfirm.com

Dated: December 15, 2023

894808/WBOR/0049

Case 1:25-cv-10071-MJJ Document 13-4 Filed 02/11/25 Page 446 of 840

CERTIFICATE OF SERVICE

I, Roger L. Smerage, hereby certify that on the below date, I caused a copy of the foregoing Joint Motion to Continue Hearing to be served through the Court's CM/ECF system to the following counsel of record or by U.S. mail to the following unregistered parties:

Stephen F. Gordon
The Gordon Law Firm LLP
River Place
57 River Street
Wellesley, MA 02481
sgordon@gordonfirm.com
*Attorney for Petitioning Creditors*

Jonathan R. Goldsmith
Goldsmith, Katz & Argenio P.C.
1350 Main Street, 15th Floor
Springfield, MA 01103
trusteedocs1@gkalawfirm.com
*Attorney for Chapter 7 Trustee*

Richard King
Office of US. Trustee
446 Main Street
14th Floor
Worcester, MA 01608
*Attorney for the U.S. Trustee*

Westborough SPE, LLC
c/o Lolonyon Akouete
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703
*Debtor*
(by U.S. mail)

Scott A. Schlager
Nathanson & Goldberg, P.C.
183 State Street, 5th Floor
Boston, MA 02109
sas@natgolaw.com
*Attorney for Creditor Nathanson & Goldberg, P.C.*

Paul W. Carey
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
pcarey@mirickoconnell.com
*Attorney for Creditor Ferris Development Group, LLC*

Dated: December 15, 2023

Roger L. Smerage

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

| | |
|---|---|
| In re:<br><br>WESTBOROUGH SPE LLC,<br><br>Debtor. | Chapter 7<br>Case No. 23-40709-CJP |

**AFFIDAVIT OF LOLONYON AKOUETE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

I, Lolonyon Akouete, being duly sworn, depose and state as follows:

1. I am a creditor and interested party in the bankruptcy case of Westborough SPE LLC (the "Debtor"), Case No. 23-40709-CJP, pending in the United States Bankruptcy Court for the District of Massachusetts. I submit this affidavit based upon personal knowledge and official discovery conducted in this case.
2. **Exhibit A** is a true, correct, and authenticated copy of the Limited Liability Company Agreement ("Operating Agreement") of Westborough SPE LLC dated October 22, 1997. I obtained Exhibit A directly from Attorney David M. Abromowitz of Goulston & Storrs PC, who represented that this document is the original executed Operating Agreement. I further verified its authenticity by comparison with an identical unsigned version provided by Walter Horst, CFO of Babcock & Brown, during discovery.
3. **Exhibit B** contains true, correct, and certified copies of official Delaware Secretary of State records for Babcock & Brown Administrative Services, Inc. ("BBAS Inc.") and Babcock & Brown Administrative Services LLC ("BBAS LLC"). These documents, obtained through subpoena and personally verified by comparison with independently produced discovery documents from Walter Horst, establish the continuous existence and authority of BBAS entities relevant to the managerial authority of Westborough SPE LLC.
4. **Exhibit C** consists of a Resignation Letter dated October 1, 2007, signed by Jan Blaustein Scholes, explicitly omitting BBAS LLC from the entities from which she resigned. It also includes a Written Consent from Babcock & Brown dated the same day, incorrectly implying Scholes' resignation from BBAS LLC without the consent or acknowledgment required by Mignonette Investments Limited, violating the explicit provisions of the Operating Agreement.
5. **Exhibit D** contains two critical documents obtained directly from Babcock & Brown through discovery: a Termination Notice of Administrative Services Agreement (June 8, 2009) and a Notice of Resignation (April 30, 2011). These documents failed to comply with mandatory notice and acknowledgment provisions of the Operating Agreement, invalidating BBAS LLC's purported resignation and confirming managerial authority remained intact.
6. **Exhibit E** is the Memorandum and Articles of Association of Mignonette Investments Limited, obtained through subpoena, verifying the existence, corporate structure, and governance of the sole Member. Pursuant to §§ 5.1, 10.1, 11.3, and 15.1 of the Operating Agreement (Exhibit A), managerial resignations and mergers explicitly require consent

from Mignonette Investments Limited, consent which was never granted concerning BBAS LLC.

7. **Exhibit F** is a true and correct copy of a Durable Power of Attorney and Written Consent executed by F. Jan Blaustein Scholes on June 26, 2023. Originally mischaracterized as a sale, this document was amended to reflect a delegation of managerial authority, explicitly authorized by Scholes in her capacity as President of BBAS LLC.
8. **Exhibit G,** obtained via subpoena from Babcock & Brown, is a Participation Agreement dated October 30, 1997. This agreement explicitly acknowledges Scholes' authority as President of BBAS Inc., Manager of Westborough SPE LLC, and identifies Derek Andrew representing Mignonette Investments Limited through F.M.C. Limited Corporate Directors.
9. **Exhibit H** is an Affidavit from Attorney David Abromowitz dated April 4, 2025, authenticating Scholes' role as the primary representative of Babcock & Brown Administrative Services and identifying Derek Andrews as representative for Mignonette Investments Limited.
10. **Exhibit I** is the Limited Liability Company Agreement of BBAS LLC, obtained directly through subpoena from Babcock & Brown, explicitly confirming Jan Blaustein Scholes' broad executive and managerial authority as President and Vice President.
11. Collectively, Exhibits A through I clearly establish that:

a. BBAS LLC's purported resignation and merger were procedurally and substantively defective under the governing Operating Agreement;

b. Managerial authority over Westborough SPE LLC remained uninterrupted and properly vested with Jan Blaustein Scholes, who lawfully delegated this authority to me;

c. My managerial authority over Westborough SPE LLC is legitimate, documented, and fully compliant with all relevant corporate governance requirements.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 21st DAY OF APRIL 2025

4/22/25
Date

LOLONYON Y AKOUETE

STATE OF NEW YORK

County of Ulster

On this 22nd day of April, 20 25, the undersigned notary public, personally appeared Frances Lolonyon Y. Akouete, proved to me through satisfactory evidence of identification, which was drivers license, to be the person whose name is signed on the preceding document, and acknowledged to the undersigned that she signed it voluntarily for its stated purpose.

Official Signature of Notary:

Notary's Printed or Typed Name: Heather B Holt

My Commission Expires: 12|06|2025

HEATHER B HOLT
Notary Public - State of New York
NO. 01HO6426156
Qualified in Ulster County
My Commission Expires Dec 6, 2025

# Exhibit A

Limited Liability Company Agreement of Westborough SPE LLC dated October 22, 1997.

# WESTBOROUGH SPE LLC

# LIMITED LIABILITY COMPANY AGREEMENT

October 22, 1997

LIMITED LIABILITY COMPANY AGREEMENT

TABLE OF CONTENTS

RECITALS 1

FORMATION, MANAGEMENT, PURPOSES, NAME 1

CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS; AND LIABILITY OF MEMBERS 6

RETURN OF CONTRIBUTIONS 7

SHARE OF DISTRIBUTIONS, PROFITS, LOSSES AND OTHER ITEMS 7

SUBSTITUTION AND ASSIGNMENT OF A MEMBER'S INTEREST 9

BOOKS AND RECORDS; BANK ACCOUNTS 9

OTHER BUSINESS 10

DISSOLUTION AND CONTINUATION OF THE COMPANY 10

MISCELLANEOUS 11

WESTBOROUGH SPE LLC

LIMITED LIABILITY COMPANY AGREEMENT

This Limited Liability Company Agreement (the "Agreement"), dated as of the 22nd day of October, 1997, is by and between MIGNONETTE INVESTMENTS LIMITED, a British Virgin Islands entity organized under the BVI International Business Companies Act (the "Member"), and BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC., a Delaware corporation, as the Manager.

R E C I T A L S:

A. The Member formed a limited liability company (the "Company") pursuant to and in accordance with the Delaware Limited Liability Company Act (the "LLC Act") by the filing on the date hereof of a Certificate of Formation with the Secretary of State of the State of Delaware for the purposes described therein and herein.

B. The Member and Babcock & Brown Administrative Services, Inc. desire to enter into this Agreement to provide for, among other things, the management of the business and affairs of the Company, the distribution of monies and allocation of profits and losses as to the Member, and the respective rights, interests, obligations and duties of the Member and of the Manager to each other and to the Company and its assets, business, liabilities and obligations.

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, the parties hereto hereby agree as follows:

OPERATING AGREEMENT

1. Formation, Management, Purposes, Name

(a) The rights and liabilities of the parties hereto shall be determined pursuant to the LLC Act and this Agreement. To the extent that the rights or obligations of the parties are different by reason of any provision of this Agreement than they would be in the absence of any such provision, or even if this Agreement is inconsistent with the LLC Act, this Agreement shall control, except to the extent the LLC Act provides that the applicable provisions thereof as to any

such matter may not be modified by a limited liability company's members, or [illegible] provided in this Agreement in which event the provisions hereof shall be applicable to the extent, if any, required by the LLC Act.

The name of the Member and its address are set forth on Schedule A attached hereto. If any additional Members and/or substitute Members are hereinafter added as Members in the Company their names and respective addresses shall be added by amendment of said Schedule A.

The registered office and the registered agent of the Company in the State of Delaware shall be as set forth in the Certificate, as such office and agent may be changed, and as the Certificate may, as a consequence thereof, be amended from time to time by the Manager.

(b) The name of the limited liability company formed hereby is Westborough SPE LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager deems appropriate or advisable. The Manager shall file, or shall cause to be filed, the Certificate of Formation and any fictitious name certificates, foreign state registrations and similar filings, and any amendments to any thereof, that the Manager considers necessary, appropriate or advisable, including, without limitation, an Application for Registration as a foreign limited liability company in the Commonwealth of Massachusetts.

(c) The Company is formed for the sole purpose of, and the nature of the sole business to be conducted by the Company is, to acquire, own, construct, lease, operate, maintain and, consistent with its investment purposes, to sell, exchange, convey and otherwise transfer, and otherwise to deal with, in any manner deemed desirable, the real property generally described in Schedule C attached hereto, and any other real property and any personal property, tangible or intangible, appurtenant to any thereof or hereafter acquired as necessary or convenient in connection with such real property, and to own interests in and be a member and/or manager, partner, general or limited, venturer, stockholder or other holder of interests in any entity holding direct or indirect interests in any such assets or engaged in any such activity, and in connection with all of the above, the Company may engage in any lawful act or activity for which limited liability companies may be formed under the LLC Act and in any and all activities necessary, advisable, convenient or incidental thereto. The purposes of the Company may not be broadened without the unanimous consent of all the Members and the Manager, nor may it be broadened if such would violate or cause a default under any agreement to which the Company is a party or by which it is bound.

In furtherance of the conduct of the purposes described above, the Company shall have the power and authority to do any and all lawful activities, business or actions which an Company may take under the LLC Act and, except as limited by the LLC Act, any activities, business or actions which a business corporation or a limited partnership would be entitled to engage in or take pursuant to the applicable laws of the State of Delaware, or under other applicable law, so long as such powers are necessary or convenient to the conduct, promotion or attainment of the business, trade, purposes or activities of the Company.

(d) Babcock & Brown Administrative Services Inc. is hereby designated as the Manager of the Company. One or more Managers may be designated and the number of Managers may be determined at any time by "Consent of the Members"; provided, however, that any such Consent providing for the Company to have more than one Manager shall only be made by amendment of this Agreement and shall also indicate those circumstances in which each Manager will be authorized to act alone and those circumstances in which more than one or all of the Managers will be required to act on behalf of the Company. A Manager may be removed by Consent of the Members at any time and for any reason or for no reason.

(e) Except as otherwise specifically provided in this Section 1 and in Section 8 of this Agreement: (i) the overall management and control of the business and affairs of the Company, and the sole and exclusive authority to make all decisions and take all actions as to the business and affairs of the Company, shall be vested in the Manager, who shall have the sole power and authority to make any decision and to take any action and to exercise any power on behalf of the Company which the Company has the right, power and authority to take or otherwise engage in; and (ii) the Members shall have no voting rights, consent or approval over or as to any such matters.

Notwithstanding the above, the Manager may not file, on behalf of the Company, a petition in bankruptcy or for reorganization or insolvency or any other similar matter without the unanimous consent of the Members.

The Manager shall devote, and shall cause its members, partners, officers, directors and employees, if any, to devote such time to the affairs of the Company as such Manager, in its sole discretion, determines is necessary for performance by the Manager of its duties, provided no such persons shall be required to devote full time to such affairs. The Manager shall have the right and power to manage, operate, and control the Company, and to do all things and take

all actions as it deems necessary or appropriate to carry on the business and

"Consent of the Members" shall mean action of the holders of more than two-thirds of the Percentage Interests of all the Members, as such Percentage Interests are initially set forth on Schedule A hereto and as such Percentage Interests may be changed pursuant to the other provisions of this Agreement.

No Manager may resign or retire from, abandon or otherwise terminate its status as a Manager without the Consent of the Members.

(f) No Member, acting in its capacity as a Member (but nothing herein limiting any Member's capacity as a Manager if a Member is also a Manager), shall have any authority, power or privilege to act on behalf of or to bind the Company.

(g) The signature of the Manager or, if more than one Manager any time, of any Manager on any agreement, contract, instrument or other document shall be sufficient to bind the Company and any other Manager in respect thereof, shall be deemed the action of the Company and of any other Manager, and shall conclusively evidence the authority of such executing Manager and the Company with respect thereto, and no third party need look to any other evidence or require joinder or consent of any other party to bind the Company or to evidence such Manager's authority.

Without in any way amending, modifying, expanding or limiting the foregoing provisions of this paragraph (g), an individual or individuals may be authorized in writing by the Manager to execute any documents to be filed with the Secretary of State of the Commonwealth of Massachusetts and/or authorized to execute, acknowledge, deliver and record any recordable instruments on behalf of the Company purporting to effect an interest in real property, whether to be recorded with the registry of deeds or district office of the Land Court, and in the event of any such authorization the Application for Registration for the Company in the Commonwealth of Massachusetts shall include or, as appropriate, be amended to set forth such authorization.

Any Manager may, from time to time, by an instrument in writing, delegate all or any of its powers or duties hereunder to another Manager, if any, or to an officer, manager, member, or partner of any other Manager or to any Member or any other person or entity. Such writing may fully authorize such other Manager or such other person or entity, acting alone or with others, all as

may be provided in such written delegation, without requirement of any other act of the delegating Manager to take any action of any type and to do anything and everything which the delegee may be authorized to take or do hereunder (including, without limitation, executing checks, drafts, promissory notes, mortgages, deeds of trust, leases, deeds, easements, and contracts of any nature whatsoever) and may delegate such authority generally or as to any specified matter or specific terms, all as may be provided in writing by any such Manager. Any documents or other instruments executed by any person or entity to whom any such delegation has been made shall be binding upon and enforceable against the Company, and shall be the valid act and deed of the Company, if executed by such delegee, and any third party shall be fully protected in relying upon the authority of any such delegee pursuant to a written delegation by the (or a) Manager.

(h) The Manager shall be entitled to reimbursement from the Company for all expenses incurred by such Manager in managing and conducting the business and affairs of the Company. The Manager shall determine which expenses, if any, are allocable to the Company in a manner which is fair and reasonable to the Manager(s) and the Company, and if such allocation is made in good faith it shall be conclusive in the absence of manifest error.

(i) Any Manager, or the sole Manager if there is only one, may cause the Company to enter into one or more loans, agreements, leases, contracts or other arrangements for the furnishing to or by the Company of money, goods, services or space with any Member, Manager or an affiliate thereof, and may pay compensation thereunder for such goods, services or space, provided in each case the terms of any such arrangements are at least as advantageous to the Company as those which would be available to the Company under similar arrangements between unrelated parties, and if the determination of such terms is made in good faith it shall be conclusive in the absence of manifest error.

(j) In the performance of its duties and obligations hereunder, and in the exercise of its powers hereunder, the Manager shall act in good faith. The Company shall indemnify, defend and hold harmless the Manager, each Member, any person appointed to act for or on behalf of the Company pursuant to Section 1(g), and each such person's officers, directors, partners, members, shareholders, employees, and agents, and the employees, officers and agents of the Company (all indemnified persons being referred to as "Indemnified Persons" for purposes of this Section 1(j)), from any liability, loss, or damage incurred by an Indemnified Person by reason of any act performed or omitted to be performed by such Indemnified Person in connection with the business of the Company, and

from liabilities or obligations of the Company imposed on such person by virtue of such person's position with or relationship to the Company, including reasonable attorneys' fees and costs and any amounts expended in the settlement of any such claims of liability, loss, or damage; provided, however, that, if the liability, loss, damage, or claim arises out of any action or inaction of an Indemnified Person, indemnification under this Section 1(j) shall be available only if (i) the Indemnified Person, at the time of such action or inaction, determined, in good faith, that its course of conduct was consistent with this Agreement or otherwise in the best interests of the Company, and (ii) the action or inaction did not constitute fraud, gross negligence or willful misconduct by the Indemnified Person. Any indemnification under this Section 1(j) shall be recoverable only from the assets of the Company and not from any assets of any of the Members.

2. Capital Contributions; Capital Accounts; and Liability of Members.

(a) The Member has contributed in cash to the capital of the Company the amount set forth opposite such Member's name on Schedule B hereto.

Additional capital contributions may be made (but are not required to be made) by the Member, or any of them if more than one, if necessary or desirable to enable the Company to meet its obligations.

Any third party may rely on a certificate or other statement from the Manager as to Member or Members of the Company and the respective Percentage Interests of the Members at any time. All capital contributions by the Member(s) shall be reflected on the books and records of the Company.

Upon approval of the Manager, any Member may make a loan or loans to the Company on such terms as the Manager may determine. No such loan shall be considered a contribution to the capital of the Company.

(b) No Member shall be obligated to contribute any additional capital or make any loans to the Company. No interest or preferred return shall accrue on any contributions to the capital of the Company. No Member shall have any rights or priority over any other Members as to contributions or as to distributions or compensation by way of income, except as may otherwise be specifically provided for elsewhere in this Agreement.

(c) If there is more than one Member at any time and the Company has not elected to be taxed as a corporation under the Internal Revenue Code, a separate capital account ("Capital Account") shall be established for each Member,

and shall be maintained in accordance with applicable regulations under the Internal Revenue Code of 1986, as amended. Subject to, and to the extent consistent with such regulations, there shall be credited to each Member's Capital Account the amount of any contribution of capital made by such Member to the Company, and such Member's share of the net profits, and items thereof, of the Company, and there shall be charged against each Member's Capital Account the amount of all distributions to such Members, and such Member's share of the net losses, and items thereof, of the Company.

(d) The liability of any Member for the losses, debts and obligations of the Company shall be limited to its capital contributions then made but not then previously repaid to or withdrawn by them in accordance with the terms of this Agreement. No Member, in its capacity as a Member or as Manager, shall have any liability to restore any negative balance in its Capital Account. In no event shall any Member, in its capacity as a Member, nor any Manager, whether or not also a Member, be personally liable for any judgments, debts, liabilities or obligations of the Company.

(e) The Member(s), unanimously if more than one, shall have the right at any time to require the Manager to elect to treat the Company as a corporation under the Internal Revenue Code.

3. Return of Contributions. No Member shall have the right to withdraw or to be repaid any capital contributed by it or to receive any property or other payment in respect of its interest in the Company, including, without limitation, as a result of the withdrawal or resignation of such Member from the Company, except as specifically provided in this Agreement.

4. Share of Distributions, Profits, Losses and Other Items.

(a) All cash available for distribution shall be distributed to the Member, or among the Members if there is more than one Member, first to return any unrepaid capital contributions, pro-rata among the Members with such amounts in proportion to each respective Member's unrepaid capital contribution, and then among the Members according to their respective Percentage Interests. Distributions to the Members shall be made at such times and in such amounts as shall be reasonably determined by the Manager. Except as provided in the next paragraph, all distributions to Members shall be made in cash.

If the Manager elects, with the Consent of the Members, to distribute any assets of the Company in kind, such assets shall be distributed on the basis of

their fair market value as determined by the Manager, and if the determination of such fair market value shall be conclusive and binding in the absence of manifest error.

(b) If and so long as the Company is taxed as a partnership, allocations of income, profit, gain and loss, shall be made as follows: (i) items of net income and gain shall be allocated among the Members in the manner necessary to increase each Member's Capital Account to an amount equal to the amount of cash such Member would be entitled to receive pursuant to Section 4(a) if an amount of cash equal to the net positive Capital Account balances (after such allocation) were distributed to the Members in the order and priority specified in Section 4(a), and (ii) items of net loss and deduction shall be allocated among the Members in the manner necessary to reduce each Member's Capital Account to an amount equal to the amount of cash such Member would be entitled to receive pursuant to Section 4(a) if an amount of cash equal to the net positive Capital Account balances (after such allocation) were distributed to the Members in the order and priority specified in Section 4(a).

Notwithstanding the foregoing, all allocations of items that cannot have economic effect (except "partner nonrecourse deductions") shall be allocated to the Members in accordance with the Members' interests in the Company, which, unless otherwise required by Code Section 704(b) and the Regulations promulgated thereunder, shall be in proportion to the Percentage Interests of the Members, and all "partner nonrecourse deductions" and "partner minimum gain" shall be allocated in accordance with the provisions of Treasury Regulations Section 1.704-2.

All items of depreciation, gain, loss, deduction or credit shall be determined in accordance with the Code and, except to the extent otherwise required by the Code, shall be allocated to and among the Members in the same percentages in which the Members share in net profits and net losses.

(c) Except as otherwise specifically provided herein, all tax elections shall be made by the Manager as it shall deem appropriate.

5. Substitution and Assignment of a Member's Interest. A Member may sell, assign, give, pledge, hypothecate, encumber or otherwise transfer (including, without limitation, any assignment or transfer by operation of law or by order of court) all or any part of such Member's interest in the Company, without the consent or approval of any other Member or of the Manager.

6. Books and Records; Bank Accounts.

(a) The Manager shall keep or cause to be kept complete and accurate books and records of the Company using such method as the Manager may elect. Such books and records shall be maintained and be available, in addition to any documents and information required to be furnished to the Members under the LLC Act, at an office of the Company for examination and copying by any Member, or its duly authorized representative, at its reasonable request and at its expense during ordinary business hours. Any Member may, at any time, at its own expense, cause an audit or review of the Company books to be made by a certified public accountant of its own selection.

A current list of the full name and last known address of each Member and of the Manager, a copy of this Agreement, any amendments thereto and the Certificate of Formation, executed copies of all powers of attorney, if any, pursuant to which this Agreement, any amendment, or the Certificate of Formation has been executed, copies of the Company's financial statements and federal, state and local income tax returns and reports, if any, for the five most recent years, shall be maintained at the registered office of the Company required by the LLC Act.

If the Company is taxed as a partnership, then on or before the due date (including extensions) of the federal income tax return of the Company for each fiscal year of the Company, the Manager shall cause each Member to be furnished with copies of the Company's federal income tax return and Schedule K-1's for each respective Member for the fiscal year then ended.

If the Company is taxed as a corporation, the Manager shall timely (including extensions) file all requisite federal, state and local tax returns.

(b) Bank accounts and/or other accounts of the Company shall be maintained in such banking and/or other financial institution(s) as shall be selected by the Manager, and withdrawals shall be made and other activity conducted on such signature or signatures as shall be designated by the Manager.

(c) The fiscal year of the Company shall end on December 31 of each year.

7. Other Business. The Members, the Manager and any affiliates of any of them may engage in and possess interests in other business ventures and



GS2- 136229-1

investment opportunities of every kind and description, independently or with others, including serving as managers and general partners of other limited liability companies and partnerships with purposes similar to those of, and/or in competition with, the Company. Neither the Company nor any other Member or Manager shall have any rights in or to such ventures or opportunities or the income or profits therefrom.

8. <u>Dissolution and Continuation of the Company</u>.

(a) The Company shall be dissolved and its affairs wound up upon:

(i) The election, made in writing by the Manager, with the Consent of the Members, to dissolve the Company at any time which is 90 days or more after notice of such election to all Members;

(ii) The sale, disposition or abandonment of all or substantially all of the assets of the Company; or

(iii) The entry of a decree of judicial dissolution under the LLC Act.

The Company shall have no specific date of dissolution.

(b) Upon the dissolution of the Company for any reason, the Manager shall commence to wind up the affairs of the Company and to liquidate its assets. After the sale or other disposition of all of the assets of the Company to be disposed of in the liquidation, and gains and losses thereon shall be calculated. If the Company is taxed as a partnership, such gains and losses shall be allocated in the manner described in Section 4 hereof, and applied to the Capital Accounts of each Member to whom the allocations are made pursuant to the other provisions hereof.

(c) Following the payment of all debts and liabilities of the Company to persons other than the Members and the payment of all expenses of liquidation, and subject to the reserves which the Manager, or other liquidating party, may determine is reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds shall be applied to the payment of any debts and liabilities to the Members, if any, and then shall be distributed to the Member(s) (i) in accordance with Section 4(a)

if the Company is taxed as a corporation, and (ii) in accordance with each Member's respective Capital Account(s) as of the date of such distribution, after giving effect to all contributions, distributions, and allocations for all periods, if the Company is taxed as a partnership.

(d) The assets of the Company shall be a Member's source of all distributions with respect to the Company, the return of its capital contributions thereto and its share of profits and losses thereof, and each such Member shall have no recourse therefor (upon dissolution or otherwise) against any other Members.

(e) Upon the completion of the liquidation of the Company and the distribution of all Company's funds, the Company shall terminate, and the Manager shall, or if none, the Members may authorize one or more Members to, execute and record such articles of dissolution for the Company and any and all other documents necessary to effectuate the dissolution and termination of the Company.

9. <u>Miscellaneous</u>.

(a) Subject to the restrictions on transfers set forth herein, the terms of this Agreement shall be binding upon and shall inure to the benefit of the Members and the Manager, their respective permitted successors, successors-in-title, heirs and assigns; and each and every successor-in-interest to any Member, whether such successor acquires such interest by way of inheritance, gift, purchase, foreclosure or any other method, and the Members shall hold such interest subject to all of the terms and provisions of this Agreement. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of any Member (including any Member acting in his capacity as a creditor of the Company).

(b) No change, modification or amendment of this Agreement shall be valid or binding unless such change, modification or amendment shall be in writing and duly executed by all of the Members and, if (but only if) such affects the rights or obligations of the Manager, executed by the Manager.

(c) This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted and enforced in accordance with the laws of the State of Delaware, notwithstanding any choice of law rules to the contrary.

(d) This Agreement may be executed in any number of counterparts, all of which together shall for all purposes constitute one Agreement, binding on all the Members and the Manager notwithstanding that all Members and the Manager have not signed the same counterpart.

(e) Any and all notices under this Agreement shall be effective (i) on the fourth business day after being sent by registered or certified mail, return receipt requested, postage prepaid, or (ii) on the second business day after being sent by express mail, telecopy, or commercial expedited delivery service providing a receipt for delivery. All such notices in order to be effective shall be addressed, if to the Company at its registered office under the LLC Act, if to a Member at the last address of record on the Company books, and copies of such notices shall also be sent to the last address for the recipient which is known to the sender, if different from the address so specified.

(f) As used herein, the singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires. The word "person shall mean a natural person, a trust of any nature, or any incorporated or unincorporated entity or association of any type or form.

(g) If any provisions of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it si held invalid, shall not be affected hereby.

(h) Words such as "herein", "hereinafter", "hereof", "hereto", "hereby", and "hereunder", when used in reference to the Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(i) This Agreement, including the Certificate of Formation, which is hereby incorporated herein, embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

IN WITNESS WHEREOF, the Members have executed this Limited Liability Company Agreement of Westborough SPE LLC as of the date first above written.

MEMBER:

MIGNONETTE INVESTMENTS LIMITED

By: ______________________________
Authorized Signatory

MANAGER:

BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

By: F. [signature]
Its President

IN WITNESS WHEREOF, the Members have executed this Limited Liability Company Agreement of Westborough SPE LLC as of the date first above written.

MEMBER:

MIGNONETTE INVESTMENTS LIMITED

By: ______________________
Authorized Signatory

For F.M.C. LIMITED
CORPORATE DIRECTORS

MANAGER:

BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

By: ______________________
Its ______________________

SCHEDULE A
TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
WESTBOROUGH SPE LLC

MEMBER

| NAME AND ADDRESSES OF MEMBER | PERCENTAGE INTEREST |
|---|---|
| Mignonette Investments Limited | 100% |

SCHEDULE B
TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
WESTBOROUGH SPE LLC

MEMBER

| MEMBER | INITIAL CASH CAPITAL CONTRIBUTION |
|---|---|
| Mignonette Investments Limited | $10,000 |

# SCHEDULE C
# TO
# LIMITED LIABILITY COMPANY AGREEMENT
# OF
# WESTBOROUGH SPE LLC

## PROPERTY DESCRIPTION

# Exhibit B

Official Delaware Secretary of State Corporate Records for BBAS Inc. and BBAS LLC.

# Delaware

The First State

Page 1

I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THAT THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF CONVERSION OF A DELAWARE CORPORATION UNDER THE NAME OF "BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC." TO A DELAWARE LIMITED LIABILITY COMPANY, CHANGING ITS NAME FROM "BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC." TO "BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC", FILED IN THIS OFFICE ON THE THIRD DAY OF JANUARY, A.D. 2000, AT 9 O`CLOCK A.M.

C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

2811627 8100V
SR# 20251460210
You may verify this certificate o... html

Authentication: 203387794
Date: 04-08-25

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 01/03/2000
001001228 – 2811627

**STATE OF DELAWARE**

**CERTIFICATE OF CONVERSION**

**FROM A CORPORATION TO A LIMITED LIABILITY COMPANY**

**PURSUANT TO SECTION 266 OF THE**

**DELAWARE GENERAL CORPORATION LAW**

(1) The name of the corporation immediately prior to filing this Certificate is **Babcock & Brown Administrative Services, Inc.**

(2) The date the Certificate of Incorporation was filed on is October 23, 1997.

(3) The original name of the corporation as set forth in the Certificate of Incorporation is Babcock & Brown Administrative Services, Inc.

(4) The name of the limited liability company as set forth in the formation is **Babcock & Brown Administrative Services LLC.**

(5) The conversion has been approved in accordance with the provisions of Section 266.

By: Jan Blaustein Scholes, Authorized Officer

Dated: December 31, 1999

# Delaware

The First State



I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC", FILED IN THIS OFFICE ON THE THIRD DAY OF JANUARY, A.D. 2000, AT 9 O`CLOCK A.M.




C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

2811627 8100
SR# 20251460210
You may verify this certificate onli... ...ml

Authentication: 203387795
Date: 04-08-25

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 01/03/2000
001001228 – 2811627

# CERTIFICATE OF FORMATION

# OF

# BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC

This Certificate of Formation of Babcock & Brown Administrative Services LLC, a Delaware limited liability company (the "Company"), dated as of December 31, 1999, is being duly executed and filed by Babcock & Brown Inc., a California corporation, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, et seq.) (the "Delaware Act").

FIRST: The name of the limited liability company formed hereby is **Babcock & Brown Administrative Services LLC.**

SECOND: The address of the registered office of the Company in the State of Delaware is c/o CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901.

THIRD: The name and address of the registered agent for service of process on the Company in the State of Delaware is CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901.

IN WITNESS WHEREOF, the undersigned, an authorized person as described in the Delaware Act, has executed this Certificate of Formation as of the date first above written.

Authorized Person:

Babcock & Brown Inc.,
a California corporation

By: Jan Blaustein Scholes
Its: Vice President

# Delaware

The First State

Page 1

I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC", FILED IN THIS OFFICE ON THE TWENTY-THIRD DAY OF OCTOBER, A.D. 1997, AT 9 O`CLOCK A.M.

C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

2811627 8100
SR# 20251460210
You may verify this certificate online a... ...ml

Authentication: 203387797
Date: 04-08-25

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 10/23/1997
971358220 – 2811627

# CERTIFICATE OF INCORPORATION

# OF

# BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

FIRST. The name of the Corporation is Babcock & Brown Administrative Services, Inc.

SECOND. Its registered office in the State of Delaware is to be located at 30 Old Rudnick Lane, in the City of Dover, County of Kent. The Registered Agent in charge thereof is CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901.

THIRD. The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

FOURTH. The total number of shares of stock which this corporation is authorized to issue is Five Thousand (5,000) shares at One Dollar ($1.00) per share, for a total authorized capital of Five Thousand Dollars ($5,000.00).

FIFTH. The name and mailing address of the incorporator is as follows:

CorpAmerica, Inc.
30 Old Rudnick Lane
Dover, DE 19901

SIXTH. The Board of Directors shall have the power to adopt, amend or repeal the by-laws.

SEVENTH. No director shall be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty by such director as a director. Notwithstanding the foregoing sentence, a director shall be liable to the extent provided by applicable law, (i) for breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith of law, (iii) pursuant to Section 174 of the Delaware General Corporation Law or (iv) for any transaction from which the director derived an improper personal benefit. No amendment to or repeal of this Article Seventh shall apply to or have any effect on the liability or alleged liability of any director of the Corporation for or with respect to any acts or missions of such director occurring prior to such amendment.

I, THE UNDERSIGNED, for the purpose of forming a corporation under the laws of the State of Delaware, do make, file and record this Certificate, and do certify that the facts herein stated are true, and I have accordingly hereunto set my hand this 23rd day of October, 1997.

CorpAmerica, Inc., Incorporator

By: Rose L. Redman
Rose L. Redman, Assistant Secretary

# Delaware

The First State



I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF AMENDMENT OF "BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC", FILED IN THIS OFFICE ON THE TWENTY-FIRST DAY OF NOVEMBER, A.D. 1997, AT 9 O`CLOCK A.M.




C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

2811627 8100
SR# 20251460210
You may verify this certificate onlin… …ml

Authentication: 203387796
Date: 04-08-25

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 11/21/1997
971400696 – 2811627

# CERTIFICATE OF AMENDMENT
# OF
# CERTIFICATE OF INCORPORATION
# OF
# BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

Babcock & Brown Administrative Services, Inc., a corporation duly organized and existing under and by virtue of the General Corporation Law of the State of Delaware, DOES HEREBY CERTIFY:

FIRST: The following amendment was adopted by the directors and sole stockholder in the manner prescribed by the Delaware General Corporation Law:

Article FOURTH of the Certificate of Incorporation is hereby amended to read in its entirety as follows:

"THIRD. The Corporation is formed for the sole purpose of, and the nature of the sole business to be conducted by the Corporation is, to own interest in and be a member and/or manager, partner, general or limited, venturer, stockholder or other holder of any interest in any entity holding direct or indirect interests in the real property generally described in Exhibit A attached hereto, and any other real property and any personal property, tangible or intangible, appurtenant to any thereof or hereafter acquired as necessary or convenient in connection with such real property, and in connection with all of the above, the Corporation may engage in any lawful act or activity for which corporations may be formed under the laws of the State of Delaware and in any and all activities necessary, advisable, convenient or incidental thereto. Additionally, the Corporation may engage in similar activities with respect to any entity or entities holding direct or indirect interests in real property to be later identified, which property shall be purchased in a transaction involving The Northwestern Mutual Life Insurance Company, as Lender, Hoyts Cinemas Corporation, and/or its affiliates, the Corporation, and any others. The purposes of the Corporation may not be broadened if such would violate or cause a default under any agreement to which the Corporation is a party or by which it is bound."

IN WITNESS WHEREOF, Babcock & Brown Administrative Services, Inc. has caused this Certificate of Amendment of the Certificate of Incorporation to be duly executed by its Secretary this 21st day of November, 1997.

[signature]
Monique Belkin, Secretary

NO. 4601 P. 2/4 — DEC. 2. 1997 1:33PM CSC

EXHIBIT A

METES AND BOUNDS DESCRIPTION

Lot 1
Westborough, Massachusetts
W-45.30

A certain parcel of land in the Commonwealth of Massachusetts, County of Worcester, Town of Westborough situated on the northerly side of Boston Worcester Turnpike, Route 9, and shown as Lot 1 on a plan entitled "Plan of Land in Westborough, Worcester County,...", dated April 11, 1997, prepared by Beals and Thomas, Inc. More particularly bounded and described as follows:

Beginning at a point in the east bank of the Assabet River at Boston Worcester Turnpike, thence running:

| | |
|---|---|
| N 30 58 22 W | 1123.34 feet to a point, said course being by land now or formerly of Brown Realty Trust, thence turning and running: |
| N 86 07 42 E | 1022.91 feet to a point, thence turning and running; |
| N 03 52 18 W | 501.72 feet to a point, thence turning and running; |
| N 86 07 42 E | 627.83 feet to a point, thence turning and running; |
| N 58 30 39 E | 523.55 feet to a point, said four courses being by land now or formerly of P.V. Davis Construction Company, Inc., thence turning and running; |
| S 18 32 25 E | 9.51 feet to a Worcester County Highway bound, thence turning and running; |
| S 17 00 25 E | 69.96 feet to a point, thence turning and running; |
| S 15 35 25 E | 79.20 feet to a Worcester County Highway bound, thence turning and running; |
| S 11 50 25 E | 63.36 feet to a point, thence turning and running; |
| S 09 15 25 E | 67.32 feet to a Worcester County Highway bound point, thence turning and running; |
| S 06 35 25 E | 66.00 feet to a point, thence turning and running; |
| S 06 25 25 E | 74.57 feet to a Worcester County Highway bound, thence turning and running; |
| S 05 48 30 E | 73.06 feet to a Worcester County Highway bound, thence turning and running; |
| S 04 09 29 E | 190.38 feet to a point, thence turning and running; |

Metes and Bounds Description
Lot 1
Westborough, Massachusetts
W-45.30
Page 2 of 2

| | |
|---|---|
| Southerly | by a curve to the right having a radius of 1000.00 feet and a length of 215.67 feet to a point, said last 10 courses being by the westerly line of Milk Street, thence turning and running; |
| S 52 34 33 W | 376.10 feet to a point, thence turning and running; |
| S 86 07 42 W | 209.07 feet to a point, thence turning and running. |
| N 49 56 56 W | 33.00 feet to a point, thence turning and running; |
| Northwesterly | by a curve to the left having a radius of 335.00 feet and a length of 76.89 feet to a point, thence turning and running; |
| S 86 07 42 W | 213.61 feet to a point, thence turning and running; |
| N 03 47 36 W | 319.22 feet to a point, thence turning and running; |
| S 86 07 42 W | 337.66 feet to a point, thence turning and running; |
| S 03 52 18 E | 112.44 feet to a point, thence turning and running; |
| S 86 07 42 W | 437.86 feet to a point, said last nine courses being by Lot 2, thence turning and running; |
| S 03 52 18 E | 925.00 feet to a point, said course being in part by Lot 2 and in part by land now or formerly of Lillian E. Brown Life Estate, thence turning and running; |
| S 86 07 42 W | 148.31 feet to the point of beginning said course being by the northerly line of Boston Worcester Turnpike. |

Containing 1,277,351 square feet more or less, or 29.324 acres, more or less.

Subject to any and all existing rights and easements of record.

The plan referenced herein is recorded herewith as Plan Book 714 Plan 77.

# Delaware

The First State

Page 1

I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC", A DELAWARE LIMITED LIABILITY COMPANY,

WITH AND INTO "BABCOCK & BROWN PARALLEL MEMBER LLC" UNDER THE NAME OF "BABCOCK & BROWN PARALLEL MEMBER LLC", A LIMITED LIABILITY COMPANY ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, AS RECEIVED AND FILED IN THIS OFFICE ON THE TWENTY-NINTH DAY OF AUGUST, A.D. 2011, AT 2:33 O`CLOCK P.M.




C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

2811627 8100M
SR# 20251460210
You may verify this certificate onl... ...ol

Authentication: 203387793
Date: 04-08-25

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:33 PM 08/29/2011
FILED 02:33 PM 08/29/2011
SRV 110960806 - 4370415 FILE

**DELAWARE**
**CERTIFICATE OF MERGER**
**OF**
**BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC**
**WITH AND INTO**
**BABCOCK & BROWN PARALLEL MEMBER LLC**

August 28, 2011

Pursuant to Section 18-209 of the Delaware Limited Liability Company Act (the "DLLCA"), Babcock & Brown Parallel Member LLC, a Delaware limited liability company (the "Company"), in connection with the merger (the "Merger") of Babcock & Brown Administrative Services LLC, a Delaware limited liability company ("Target"), with and into the Company, hereby certifies as follows:

FIRST: The respective names and states of formation or incorporation of the constituent companies to the Merger are as follows:

| Name | State of Formation or Incorporation |
| --- | --- |
| Babcock & Brown Parallel Member LLC | Delaware |
| Babcock & Brown Administrative Services LLC | Delaware |

SECOND: An Agreement and Plan of Merger, dated as of August 29, 2011, between the Company and Target (the "Merger Agreement"), setting forth the terms and conditions of the Merger, has been approved, adopted, certified, executed and acknowledged by each of the Company and Target.

THIRD: The Company shall be the surviving limited liability company (the "Surviving Company") of the Merger. The name of the Surviving Company is "Babcock & Brown Parallel Member LLC".

FOURTH: The Merger shall become effective upon the filing of this Certificate of Merger with the Secretary of State of the State of Delaware.

FIFTH: An executed copy of the Merger Agreement is on file at the office of the Surviving Company located at 50 California Street, Suite 3610, San Francisco, California 94111. A copy of the Merger Agreement will be furnished by the Surviving Company, on request and without cost, to any member of the Surviving Company or any member of Target.

[Signature page follows.]

The undersigned is signing this Certificate of Merger as of the date first written above.

BABCOCK & BROWN PARALLEL MEMBER LLC

By: C Besherse
Name: Chaye Besherse
Title: Secretary

*Signature page to Delaware Certificate of Merger*

# Delaware

The First State



I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THAT "BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC" HAS FILED THE FOLLOWING DOCUMENTS:

CERTIFICATE OF INCORPORATION, FILED THE TWENTY-THIRD DAY OF OCTOBER, A.D. 1997, AT 9 O`CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE TWENTY-FIRST DAY OF NOVEMBER, A.D. 1997, AT 9 O`CLOCK A.M.

CERTIFICATE OF CONVERSION, CHANGING ITS NAME FROM "BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC." TO "BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC", FILED THE THIRD DAY OF JANUARY, A.D. 2000, AT 9 O`CLOCK A.M.

CERTIFICATE OF FORMATION, FILED THE THIRD DAY OF JANUARY, A.D. 2000, AT 9 O`CLOCK A.M.

CERTIFICATE OF MERGER, FILED THE TWENTY-NINTH DAY OF AUGUST, A.D. 2011, AT 2:33 O`CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIMITED LIABILITY COMPANY, "BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC".




C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

Authentication: 203387818

Date: 04-08-25

2811627 8340

SR# 20251460210

You may verify this certificate o... .shtml

# Exhibit C

Resignation Letter of Jan Blaustein Scholes and Written Consent dated October 1, 2007.

**JAN BLAUSTEIN SCHOLES**
34 Stern Lane
Atherton, CA 94027

October 1, 2007

To Whom It May Concern
2 Harrison Street, 6th Floor
San Francisco, CA 94105

Dear Sirs:

I hereby resign as a Vice President of each of the companies listed on Schedule I attached hereto with immediate effect.

Sincerely,

Jan Blaustein Scholes

sf_legal 24038v1

**SCHEDULE I**

Alliance PP2 FX1 GP, L.L.C.
Alliance PP2 FX1, L.L.C.
Alliance PP2 FX2 GP, L.L.C.
Alliance PP2 FX2, L.L.C.
Alliance PP2 FX3 GP, L.L.C.
Alliance PP2 FX3, L.L.C.
Alliance PP2 FX4 GP, L.L.C.
Alliance PP2 FX4, L.L.C.
Alliance PP2 FX5 GP, L.L.C.
Alliance PP2 FX5, L.L.C.
Alliance PP2 Holdings, L.L.C.
Babcock & Brown Blue Canyon 1 LLC
Babcock & Brown Combine Hills 1 LLC
Babcock & Brown Commercial Realty Development LLC
Babcock & Brown GP LLC
Babcock & Brown Holdings Inc.
Babcock & Brown Ireland Holdings LLC
Babcock & Brown Kumeyaay LLC
Babcock & Brown PFI L.L.C.
Babcock & Brown Power Operating Partners LLC
Babcock & Brown Sweetwater 1 LLC
Babcock & Brown Sweetwater 2 LLC
Babcock & Brown Sweetwater 3 LLC
Babcock & Brown Wind Park Jersey LLC
BBPOP Wind Equity LLC
Caprock Wind Investments LLC
Harrison Partners LLC
J&J Wharf Co. LLC
Marelda Bel Air Mall LLC
Marelda Glynn Place Mall LLC
Marelda Greenville Mall LLC
Marelda Myrtle Beach Mall LLC
Marelda Retail Development LLC
Marelda Retail Holdings LLC
Marelda TRS LLC
Marelda University Village Mall LLC
Marelda Valdosta Mall LLC
Trans Bay Holdings LLC

**BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC**

**ACTION BY WRITTEN CONSENT OF MEMBER**

**October 1, 2007**

The undersigned, being the sole member of Babcock & Brown Administrative Services LLC, a Delaware limited liability company (the "Company"), hereby adopts the following resolution on behalf of the Company in accordance with the Delaware Limited Liability Company Act and the Company's Limited Liability Company Agreement dated as of December 31, 1999:

**WHEREAS**, the Member is aware of the resignation of Jan Blaustein Scholes as President and Vice President of the Company effective October 1, 2007, and it is

**RESOLVED,** that Karen R. Fagerstrom be and she hereby is appointed to serve as President of the Company until her resignation.

**IN WITNESS WHEREOF,** the undersigned have caused this Written Consent to be duly executed on the date first set forth above.

**BABCOCK & BROWN LP**

By: Babcock & Brown GP LLC
Its: General Partner

By: Dyann Blaine
Its: Vice President

sf_legal 16870v1

# Exhibit D

Termination Notice (June 8, 2009) and Notice of Resignation (April 30, 2011) from BBAS LLC.

BABCOCK & BROWN

Babcock & Brown LP
One Letterman Drive · Bldg D · San Francisco CA 94129 USA
T +1 415 512 1515 · F +1 415 267 1500 · www.babcockbrown.com

June 8, 2009

Westborough SPE LLC
Attn: Phil Green

***via email to philgreen@greevestgroup.com.au***

**RE: Administrative Services Agreement - Termination Notice**

Dear Phil:

We refer to that certain Administrative Services Agreement (the "Administrative Services Agreement") dated October 30, 1997 by and between Babcock & Brown Administrative Services LLC ("BBAS"), successor in interest to Babcock & Brown Administrative Services, Inc., and Westborough SPE LLC ("Westborough") pursuant to which BBAS has provided certain administrative services to Westborough.

Please accept this letter as BBAS's written notice of its intent to terminate the Administrative Services Agreement effective August 31, 2009 (the "Termination Date").

Prior to the Termination Date, BBAS will cooperate fully with Westborough to ensure a smooth transition to another administrative services provider. Mark Stevens will lead the transition efforts and can be contacted at mark.stevens@babcockbrown.com or 415.512.1515.

Please sign below to acknowledge receipt of this letter and fax it to my attention at 415-267-1500.

Sincerely,

Babcock & Brown Administrative Services LLC

By: Karen R. Fagerstrom
Title: President

**ACKNOWLEDGED:**

Westborough SPE LLC

BABCOCK & BROWN

Babcock & Brown LP
One Letterman Drive · Bldg D · San Francisco CA 94129 USA
T +1 415 512 1515 · F +1 415 267 1500 · www.babcockbrown.com

**NOTICE OF RESIGNATION**

April 30, 2011

Westborough SPE LLC
c/o Equity Trust
31/F, The Center
99 Queen's Road Central, Hong Kong

Attention: Serena Kwok, General Manager, Trade Support

RE: Westborough SPE LLC (the “Company”)

Dear Ms. Kwok:

We refer to the Company’s Limited Liability Company Agreement dated as of October 22, 1997 (the "LLC Agreement") between Mignonette Investments Limited (the “Member”) and Babcock & Brown Administrative Services LLC, as successor to Babcock & Brown Administrative Services, Inc. (the "Manager").

Pursuant to Section 1(e) of the LLC Agreement and Section 18-602 of the Delaware Limited Liability Company Act, this letter serves as notice to the Member of the Manager’s intent to resign as Manager of the Company effective as of May 30, 2011.

Sincerely,

Babcock & Brown Administrative Services LLC

By: Walter Horst
Title: Treasurer

| Audit Trail [PDT] | Username | Event | Comment |
|---|---|---|---|

**Subject :** **RE: Babcock and Brown Massachusetts, USA Real Estate Asset**
**From :** Walter Horst <walter.horst@babcockbrown.com>
**Date :** **1 year ago** Tue, 17 Oct 2017 17:20:43 -0700
**To :** Jon Steinberg <jsteinberg@town.westborough.ma.us>
**Cc :** Michael Larkin <Michael.Larkin@babcockbrown.com>, Chaye Besherse <Chaye.Besherse@babcockbr....
**Attachments :** image001.png (2KB)

Hi Jon,

Babcock & Brown was an administrative manager of Westborough prior to our resignation. We were never under contract to incorporate the LLC or acquire the property on behalf of a third party investor. This existed when I started with Babcock & Brown in 2008, and anyone that might have had more knowledge of this left Babcock & brown in 2009/2010.

When we did some Know Your Customer compliance procedures, we were unable to identify an individual owner, and therefore we resigned from providing services to Westborough. I believe there was an entity in the ownership chain called Mignonette Investments, or something like that, but when we reached out to individuals who supposedly owned that entity, we were unsuccessful in anyone claiming responsibility.

I have cc'd Chaye, my paralegal, who was involved in some of the research we performed several years ago, and she might have some information that may be useful to you.

Babcock & Brown Administrative services was our entity but has been liquidated after we resigned from providing services to Westborough.

Best regards,

**Walter A. Horst**

**Chief Financial Officer**

2 Theatre Square, Suite 240 · Orinda, CA 94563

D 925 317 3510 · F 925 317 3501 · M 925 699 3542

walter.horst@babcockbrown.com

BABCOCK & BROWN

**From:** Jon Steinberg [mailto:jsteinberg@town.westborough.ma.us]
**Sent:** Tuesday, October 17, 2017 5:10 PM
**To:** Walter Horst <walter.horst@babcockbrown.com>
**Cc:** Michael Larkin <Michael.Larkin@babcockbrown.com>
**Subject:** Re: Babcock and Brown Massachusetts, USA Real Estate Asset

# Exhibit E

Memorandum and Articles of Association of Mignonette Investments Limited.

IBC No. **243736**

territory of the british virgin islands

the international business companies act, cap. 291

MEMORANDUM AND ARTICLES OF ASSOCIATION OF

**MIGNONETTE INVESTMENTS LIMITED**

INCORPORATED THE **11th** DAY OF **August, 1997**

integro

TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT
(CAP.291)

CERTIFICATE OF INCORPORATION (SECTIONS 14 AND 15)

No. 243736

*The Registrar of Companies of the British Virgin Islands* HEREBY CERTIFIES *pursuant to the International Business Companies Act, Cap. 291 that all the requirements of the Act in respect of incorporation having been satisfied,*

MIGNONETTE INVESTMENTS LIMITED

is incorporated in the British Virgin Islands as an International Business Company this 11th day of August, 1997.

Given under my hand and seal at
Road Town, in the Territory of the
British Virgin Islands

REGISTRAR OF COMPANIES

CRTI0013

TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT, CAP. 291

# MEMORANDUM OF ASSOCIATION

# OF

# MIGNONETTE INVESTMENTS LIMITED

1. The Name of the Company is **MIGNONETTE INVESTMENTS LIMITED.**

2. The Registered Office of the Company will be situate at Tropic Isle Building, P.O. Box 438, Road Town, Tortola, British Virgin Islands or at such other place within the British Virgin Islands as the directors may from time to time determine.

3. The Registered Agent of the Company will be Integro Trust (BVI) Limited, Tropic Isle Building, P.O. Box 438, Road Town, Tortola, British Virgin Islands or such other person or company being a person or company entitled to act as a registered agent as the directors may from time to time determine.

4. The Objects for which the Company is established are:

(1) To buy, sell, underwrite, invest in, exchange or otherwise acquire, and to hold, manage, develop, deal with and turn to account any bonds, debentures, shares (whether fully paid or not), stocks, options, commodities, futures, forward contracts, notes or securities of governments, states, municipalities, public authorities or public or private limited or unlimited companies in any part of the world, precious metals, gems, works of art and other articles of value, and whether on a cash or margin basis and including short sales, and to lend money either unsecured or against the security of any of the aforementioned property.

(2) To buy, own, hold, subdivide, lease, sell, rent, prepare building sites, construct, reconstruct, alter, improve, decorate, furnish, operate, maintain, reclaim or otherwise deal with and/or develop land and buildings and otherwise deal in real estate in all its branches, to make advances upon the security of land or houses or other property or any interest therein, and whether erected or in course of erection and whether on first mortgage or charge or subject to a prior mortgage or mortgages or charge or charges, and to develop land and buildings as may seem expedient but without prejudice to the generality of the foregoing.

(3) To borrow or raise money by the issue of debentures, debenture stock (perpetual or terminable), bonds, mortgages, or any other securities founded or based upon all or any of the assets or property of the Company or without any security and upon such terms as to priority or otherwise as the Company shall think fit.

(4) To guarantee loans and to lend money with or without guarantee or security to any

persons, firms or corporations.

(5) To engage in any other business or businesses whatsoever, or in any acts or activities, which are not prohibited under any law for the time being in force in the British Virgin Islands.

(6) To do all such other things as are incidental to or the Company may think conducive to the attainment of all or any of the above objects.

And it is hereby declared that the intention is that each of the objects specified in each paragraph of this clause shall, except where otherwise expressed in such paragraph, be an independent main object and be in nowise limited or restricted by reference to or inference from the terms of any other paragraph or the name of the Company.

5. (1) The Company has no power to:

(a) carry on business with persons resident in the British Virgin Islands;

(b) own an interest in real property situate in the British Virgin Islands, other than a lease referred to in paragraph (e) of subsection (2);

(c) carry on banking or trust business, unless it is licensed under the Banks and Trust Companies Act, 1990;

(d) carry on business as an insurance or reinsurance company, insurance agent or insurance broker, unless it is licensed under an enactment authorizing it to carry on that business;

(e) carry on the business of company management unless it is licensed under the Company Management Act, 1990; or

(f) carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands.

(2) For purposes of paragraph (a) of subsection (1), the company shall not be treated as carrying on business with persons resident in the British Virgin Islands by reason only that:

(a) it makes or maintains deposits with a person carrying on banking business within the British Virgin Islands;

(b) it makes or maintains professional contact with solicitors, barristers, accountants, bookkeepers, trust companies, administration companies, investment advisers or other similar persons carrying on business within the British Virgin Islands;

(c) it prepares or maintains books and records within the British Virgin Islands;

(d) it holds, within the British Virgin Islands, meetings of its directors or members;

(e) it holds a lease of property for use as an office from which to communicate with members or where books and records of the company are prepared or maintained;

(f) it holds shares, debt obligations or other securities in a company incorporated under the International Business Companies Act or under the Companies Act; or

(g) shares, debt obligations or other securities in the company are owned by any person resident in the British Virgin Islands or by any company incorporated under the International Business Companies Act or under the Companies Act.

6. The shares in the Company shall be issued in the currency of the United States of America.

7. The authorised capital of the Company is US$50,000 divided into 50,000 shares with a par value of US$1.00 each. The directors shall have the authority to determine by resolution at their discretion whether shares are to be issued as registered shares or to bearer.

8. The shares shall be divided into such number of classes and series as the directors shall by resolution from time to time determine and until so divided shall comprise one class and series.

9. The directors shall by resolution have the power to issue any class or series of shares that the Company is authorised to issue in its capital, original or increased, with or subject to any designations, powers, preferences, rights, qualifications, limitations and restrictions.

10. Shares issued as registered shares may be exchanged for shares issued to bearer, and shares issued to bearer may be exchanged for registered shares.

11. Where shares are issued to bearer, the bearer, identified for this purpose by the number of the share certificate, shall be requested to give to the Company the name and address of an agent or attorney for service of any notice, information or written statement required to be given to members, and service upon such agent or attorney shall constitute service upon the bearer of such shares. In the absence of such name and address being given it shall be sufficient for purpose of service for the Company to publish the notice, information or written statement in one or more newspapers published or circulated in the British Virgin Islands and in a newspaper in the place where the Company has its principal office.

12. The Company shall by resolution of the directors have the power to amend or modify any of the conditions contained in this Memorandum of Association and to increase or reduce the authorised capital of the Company in any way which may be permitted by law.

WE, the undersigned Registered Agent, subscribe our name to this Memorandum of Association.

---

NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER

---

**Integro Trust (BVI) Limited**
Tropic Isle Building
P.O. Box 438
Road Town, Tortola
British Virgin Islands

Claudette I. Francis (sgd.)
Authorised Signatory

Registered Agent

---

DATED this 11th day of August, 1997

WITNESS to the above signature:

N. Hull (sgd.)
Road Town
Tortola
British Virgin Islands

Secretary

TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT, CAP. 291

# ARTICLES OF ASSOCIATION

# OF

# MIGNONETTE INVESTMENTS LIMITED

1. References in these Articles to the Act shall mean The International Business Companies Act, Cap. 291. The following Regulations shall constitute the Articles of the Company. In these Articles words and expressions defined in the Act shall have the same meaning and, unless otherwise required by the context, the singular shall include the plural and vice-versa, the masculine shall include the feminine and neuter and references to persons shall include corporations and all legal entities capable of having a legal existence.

## SHARES

2. The authorised capital of the Company is US$50,000 divided into 50,000 shares with a par value of US$1 each, which may be issued as either registered shares or as shares issued to bearer as the directors may by resolution determine.

3. Every person whose name is entered as a member in the share register being the holder of registered shares, and every person who subscribes for shares issued to bearer, shall, without payment, be entitled to a certificate signed by two directors or two officers or by one director and one officer of the Company or under the common seal of the Company with or without the signature of any director or officer of the Company specifying the share or shares held and the par value thereof, provided that in respect of a registered share, or shares, held jointly by several persons the Company shall not be bound to issue more than one certificate, and delivery of a certificate for a share to one of several joint holders shall be sufficient delivery to all.

4. In the case of bearer shares, each certificate for shares issued to bearer shall carry an identifying number, and the Company shall maintain a register of the name and address of an agent or attorney which may be given to the Company by the bearer, identified for this purpose by such identifying number, for service of any notice, information or written statement required to be given to members.

5. If a certificate is worn out or lost it may be renewed on production of the worn-out certificate, or on satisfactory proof of its loss together with such indemnity as the directors may reasonably require. Any member receiving a share certificate shall indemnify and hold the Company and its officers harmless from any loss or liability which it or they may incur by reason of wrongful or fraudulent use or representation made by any person by virtue of the possession of such certificate.

## SHARE CAPITAL AND VARIATION OF RIGHTS

6. Subject to the provisions of these Articles, the unissued shares of the Company (whether forming part of the original or any increased capital) and treasury shares (if any) shall be at the disposal of the directors who may, without limiting or affecting any rights previously conferred on the holders of any existing shares or class or series of shares, offer, allot, grant options over or otherwise dispose of them to such persons at such times and for such consideration, being not less than the par value of the shares being disposed of, and upon such terms and conditions as the company may, by resolution of the directors, determine.

7. No shares of the Company may be issued until the consideration in respect of the shares is fully paid, and when issued the share is for all purposes fully paid and nonassessable save that a share issued for a promissory note or other written obligation for payment of a debt may be issued subject to forfeiture in the manner prescribed in Regulation 22.

8. Shares of the Company shall be issued for money, services rendered, personal property (including other shares, debt obligations or other securities in the company), an estate in real property, a promissory note or other binding obligation to contribute money or property, or any combination thereof.

9. Without prejudice to any special rights previously conferred on the holders of any existing shares or class of shares, any share of the Company may be issued with such preferred, deferred or other special rights or such restrictions, whether in regard to dividend, voting, return of capital or otherwise as the directors may from time to time determine.

10. Subject to the provisions of the Act in this regard, shares may be issued on the terms that they are redeemable, or, at the option of the Company, are liable to be redeemed on such terms and in such manner as the directors before or at the time of the issue of the shares may determine.

11. The directors may redeem any such share at a premium.

12. If at any time the share capital is divided into different classes of shares, the rights attached to any class (unless otherwise provided by the terms of issue of the shares of that class) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of not less than three-fourths of the issued shares of that class and of any other class of shares which may be affected by such variation.

13. The rights conferred upon the holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

14. Except as required by law, the persons named in the share register shall be recognised by the Company as holding the equitable, contingent, future or partial interest in any share or any interest in any fractional part of a share or (except only as by these Regulations or by law otherwise provided) any other rights in respect of any share thereof by the registered holder.

## TRANSFER OF SHARES

15. Registered shares in the Company may be transferred by a written instrument signed by the transferor and containing the name and address of the transferee or in such other manner or form and subject to such evidence as the directors shall consider appropriate. Shares issued to bearer shall be transferred by delivery of the certificate evidencing same.

16. The holder of registered shares may request that such shares be exchanged for shares issued to bearer and the directors shall cancel the certificate evidencing registered shares and the entry in the share register and instead issue a certificate evidencing shares issued to bearer with and subject to such evidence of intent as the directors may consider appropriate.

17. The holder of a certificate evidencing shares issued to bearer may request that such shares be exchanged for registered shares and the directors shall cancel the certificate evidencing shares issued to bearer and instead issue a certificate evidencing registered shares and enter the name and address of the holder thereof in the share register with and subject to such evidence of intent as the directors may consider appropriate.

18. Upon receipt of notification of any change of name and address of any agent or attorney given to the Company for the purpose of service of any notice, information or written statement required to be given to members, identified by reference to the number of the certificate to bearer, the directors shall forthwith amend the register maintained for this purpose.

## TRANSMISSION OF SHARES

19. The personal representatives, guardian or trustee as the case may be of a deceased, incompetent or bankrupt sole holder of a registered share shall be the only persons recognised by the Company as having any title to the share. In the case of a share registered in the names of two or more holders, the survivor or survivors, and the personal representative, guardian or trustee as the case may be of the deceased, incompetent or bankrupt, shall be the only persons recognised by the company as having any title to the share but they shall not be entitled to exercise any rights as a member of the Company until they have proceeded as set forth in the following two Regulations.

20. Any person becoming entitled by operation of law or otherwise to a share or shares in consequence of the death, incompetence or bankruptcy of any member may be registered as a member upon such evidence being produced as may reasonably be required by the directors. An application by any such person to be registered as a member for all purposes shall be deemed to be a transfer of shares of the deceased, incompetent or bankrupt member and the directors shall treat it as such.

21. Any person who has become entitled to a share or shares in consequence of the death, incompetence or bankruptcy of any member may, instead of being registered himself, request in writing that some person to be named by him be registered as a transferee of such share or shares and such request shall likewise be treated as if it were a transfer.

## FORFEITURE OF SHARES

22. Where shares of the company are issued for a promissory note or other written binding obligation to contribute money or property and the terms of the promissory note or other written binding obligation are not met:

(i) Written notice specifying a date for payment to be made shall be served on the member who defaults in making payment pursuant to the promissory note or other written binding obligation to pay a debt;

(ii) The written notice referred to in (i) above shall name a further date not earlier than the expiration of 14 days from the date of service of the notice on or before which the payment required by the notice is to be made and shall contain a statement that in the event of non-payment at or before the time named in the notice the shares, or any of them, in respect of which payment is not made will be liable to be forfeited;

(iii) Where notice has been issued and the requirements of the notice have not been complied with, the directors may, at any time before tender of payment, by resolution of directors forfeit and cancel the shares to which the notice relates;

and the Company shall have no obligation to refund any monies to the member whose shares have been cancelled and that member shall be discharged from any further obligation to the Company.

## ACQUISITION OF OWN SHARES

23. Subject to the provisions of the Act in this regard, the directors may, on behalf of the Company, purchase, redeem or otherwise acquire any of the Company's own shares for such consideration as they consider fit, and either cancel or hold such shares as Treasury shares. The directors may dispose of any shares held as Treasury shares on such terms and conditions as they may from time to time determine. Shares may be purchased or otherwise acquired in exchange for newly issued shares in the Company.

## ALTERATION IN CAPITAL

24. Subject to the terms of any resolution passed for the purpose of increasing the authorised capital of the Company, such increased capital may be divided into shares of such respective amounts, and with such rights or privileges (if any) as may be thought expedient.

25. Any capital raised by the creation of new shares shall be considered as part of the original capital, and shall be subject to the same provisions as if it had been part of the original capital.

26. The company may by resolution:

(a) consolidate and divide all or any of its share capital into shares of larger amount than its existing shares;

(b) cancel any shares which, at the date of the passing of the resolution, have not been taken or agreed to be taken by any person and diminish the amount of its authorised share capital by the amount of the shares so cancelled;

(c) sub-divide its shares or any of them into shares of smaller amount than is fixed by the Memorandum of Association and so that subject to the provisions of Regulation 10 the resolution whereby any share is sub-divided may determine that as between the holders of the shares resulting from such sub-division one or more of the shares may have such preferred or other special rights over or may have such qualified or deferred rights or be subject to any such restrictions as compared with the other or others as the Company has power to attach to unissued or new shares;

(d) subject to any confirmation or consent required by law, reduce its authorised and issued share capital or any capital redemption reserve fund or any share premium account in any manner.

27. Where any difficulty arises in regard to any consolidation and division under this regulation the directors may settle the same as they think expedient.

## MEETINGS OF MEMBERS

28. The directors may convene meetings of the members of the Company at such times and in such manner and places as the directors consider necessary or desirable, and they shall convene such a

meeting upon the written request of members holding more than 50 per cent of the votes of the outstanding voting shares in the Company.

29. Seven days' notice at the least specifying the place, the day and the hour of the meeting and the general nature of the business to be conducted shall be given in manner hereinafter mentioned to such persons whose names on the date the notice is given appear as members in the share register of the Company and are entitled to vote at the meeting and to the agent or attorney of record of the holders of bearer shares.

30. A meeting of the members shall be deemed to have been validly held, notwithstanding that it is held in contravention of the requirement to give notice in Regulation 29, if notice of the meeting is waived by at least 60 per cent in number of the members or holders of bearer shares having a right to attend and vote at the meeting; and for this purpose, the presence of a member at the meeting shall be deemed to constitute waiver on his part.

31. The inadvertent failure of the directors to give notice of a meeting to a member or to the agent or attorney as the case may be, or the fact that a member or such agent or attorney has not received the notice, does not invalidate the meeting.

## PROCEEDINGS AT MEETINGS OF MEMBERS

32. No business shall be transacted at any meeting unless a quorum of members is present at the time when the meeting proceeds to business. A quorum shall consist of the holder or holders present in person or by proxy of not less than one-third of the shares of each class or series of shares entitled to vote as a class or series thereon and the same proportion of the votes of the remaining shares entitled to vote thereon.

33. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting shall be dissolved.

34. At every meeting the members present shall choose some one of their number to be the Chairman. If the members are unable to choose a Chairman for any reason, then the person representing the greatest number of voting shares present at the meeting shall preside as Chairman failing which the oldest individual person shall take the chair.

35. The Chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

36. At any meeting a resolution put to the vote of the meeting shall be decided on a show of hands by simple majority unless a poll is (before or on the declaration of the result of the show of hands) demanded:

(a) by the Chairman; or

(b) by any member or members present in person or by proxy.

37. Unless a poll be so demanded, a declaration by the Chairman that a resolution has, on a show of hands, been carried, and an entry to that effect in the book containing the minutes of the proceedings of the Company, shall be sufficient evidence of the fact, without proof of the number or proportion of the votes recorded in favour of or against such resolution.

38. If a poll is duly demanded it shall be taken in such manner as the Chairman directs, and the result

of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded. The demand for a poll may be withdrawn.

39. In the case of an equality of votes, whether on a show of hands, or on a poll, the Chairman of the meeting at which the show of hands takes place, or at which the poll is demanded, shall be entitled to a second or casting vote.

## VOTES OF MEMBERS

40. At any meeting of members whether on a show of hands or on a poll every holder of a voting share present in person or by proxy shall have one vote for every voting share of which he is the holder.

41. A resolution which has been notified to all members for the time being entitled to vote and which has been approved by a majority of the votes of those members in the form of one or more documents in writing or by facsimile, telex, telegram, cable or other written electronic communication shall forthwith, without the need for any notice, become effectual as a resolution of the members.

42. If a committee be appointed for any member who is of unsound mind he may vote by his committee.

43. If two or more persons are jointly entitled to a share or shares:

(a) each of them may be present in person or by proxy at a meeting of members and may speak as a member;

(b) if only one of them is present in person or by proxy, he may vote on behalf of all of them; and

(c) if two or more are present in person or by proxy, they must vote as one.

44. Votes may be given either personally or by proxy.

45. The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote.

46. An instrument appointing a proxy shall be in such form as the Chairman of the meeting shall accept as properly evidencing the wishes of the member appointing the proxy.

47. The instrument appointing a proxy shall be in writing under the hand of the appointer unless the appointer is a corporation or other form of legal entity other than one or more individuals holding as joint owners in which case the instrument appointing a proxy shall be in writing under the hand of an individual duly authorised by such corporation or legal entity to execute the same. The Chairman of any meeting at which a vote is cast by proxy so authorised may call for a notarially certified copy of such authority which shall be produced within 7 days of being so requested or the vote or votes cast by such proxy shall be disregarded. In the case of a proxy being given by the holder of a share issued to bearer, it shall be sufficient for the appointer to identify himself by writing the identifying number of the certificate evidencing the shares issued to bearer.

## CORPORATIONS OR TRUSTS ACTING BY REPRESENTATIVES AT MEETINGS

48. Any corporation or other form of corporate legal entity or any voting trust which is a member of the Company may by resolution of its directors, trustees or other governing body authorise such

person as it thinks fit to act as its representative at any meeting of the members or of any class of members of the Company, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation or trust which he represents as that corporation or trust could exercise if it were an individual member of the Company.

## DIRECTORS

49. Subject to any subsequent amendment to change the number of directors, the number of the directors shall be not less than one nor more than seven.

50. The first directors shall be elected by the subscriber(s) to the Memorandum. Thereafter, additional directors may be elected either by the members or the existing directors for such term as the members or the directors may determine.

51. Each director holds office until his successor takes office or until his earlier death, resignation or removal.

52. A vacancy arising in the board of directors may be filled either by the members or by the remaining directors.

53. A director shall not require a share qualification, but nevertheless shall be entitled to attend and speak at any meeting of the members and at any separate meeting of the holders of any class of shares in the Company.

54. A director by writing under his hand deposited at the Registered Office of the Company may from time to time appoint another director or any other person to be his alternate. Every such alternate shall be entitled to be given notice of meetings of the directors and to attend and vote as a director at any such meeting at which the director appointing him is not personally present and generally at such meeting to have and exercise all the powers, rights, duties and authorities of the director appointing him. Every such alternate shall be deemed to be an officer of the Company and shall not be deemed to be an agent of the director appointing him. If undue delay or difficulty would be occasioned by giving notice to a director of a resolution of which his approval is sought in accordance with Regulation 79 his alternate (if any) shall be entitled to signify approval of the same on behalf of that director. The remuneration of an alternate shall be payable out of the remuneration payable to the director appointing him, and shall consist of such portion of the last-mentioned remuneration as shall be agreed between such alternate and the director appointing him. A director by writing under his hand deposited at the Registered Office of the Company may at any time revoke the appointment of an alternate appointed by him. If a director shall die or cease to hold the office of director, the appointment of his alternate shall thereupon cease and terminate.

55. The directors may, by resolution, fix the emoluments of directors in respect of services rendered or to be rendered in any capacity to the Company. The directors may also be paid such travelling, hotel and other expenses properly incurred by them in attending and returning from meetings of the directors, or any committee of the directors or meetings of the members, or in connection with the business of the Company as shall be approved by resolution of the directors.

56. Any director who, by request, goes or resides abroad for any purposes of the Company or who performs services which in the opinion of the Board go beyond the ordinary duties of a director, may be paid such extra remuneration (whether by way of salary, commission, participation in profits or otherwise) as shall be approved by resolution of the directors.

57. The Company may pay to a director who at the request of the Company holds any office (including a directorship) in, or renders services to any company in which the Company may be interested,

such remuneration (whether by way of salary, commission, participation in profits or otherwise) in respect of such office or services as shall be approved by resolution of the directors.

58. The office of director shall be vacated if the director:

(a) is removed from office by a resolution of members or by a resolution of directors, or

(b) becomes bankrupt or makes any arrangement or composition with his creditors generally, or

(c) becomes of unsound mind, or of such infirm health as to be incapable of managing his affairs, or

(d) resigns his office by notice in writing to the Company.

59. (a) A director may hold any other office or position of profit under the Company (except that of auditor) in conjunction with his office of director, and may act in a professional capacity to the Company on such terms as to remuneration and otherwise as the directors shall arrange.

(b) A director may be or become a director or other officer of, or otherwise interested in any company promoted by the Company, or in which the Company may be interested, as a member or otherwise, and no such director shall be accountable for any remuneration or other benefits received by him as director or officer or from his interest in such other company. The directors may also exercise the voting powers conferred by the shares in any other company held or owned by the Company in such manner in all respects as they think fit, including the exercise thereof in favour of any resolutions appointing them, or any of their number, directors or officers of such other company, or voting or providing for the payment of remuneration to the directors or officers of such other company. A director may vote in favour of the exercise of such voting rights in manner aforesaid, notwithstanding that he may be, or be about to become, a director or officer of such other company, and as such in any other manner is, or may be, interested in the exercise of such voting rights in manner aforesaid.

(c) No director shall be disqualified by his office from contracting with the Company, either as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any director shall be in any way interested be voided, nor shall any director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement, by reason of such director holding that office or of the fiduciary relationship thereby established. The nature of a director's interest must be declared by him at the meeting of the directors at which the question of entering into the contract or arrangement is first taken into consideration, and if the director was not at the date of that meeting interested in the proposed contract or arrangement, or shall become interested in a contract or arrangement after it is made, he shall forthwith after becoming so interested advise the Company in writing of the fact and nature of his interest. A general notice to the directors by a director that he is a member of a specified firm or company, and is to be regarded as interested in any contract or transaction which may, after the date of notice, be made with such firm or company shall (if such director shall give the same at a meeting of the directors, or shall take reasonable steps to secure that the same is brought up and read at the next meeting of directors after it is given) be a sufficient declaration of interest in relation to such contract or transaction with such firm or company. A director may be counted as one of a quorum upon a motion in respect of any contract or arrangement which he shall make with the

Company, or in which he is so interested as aforesaid, and may vote upon such motion.

## OFFICERS

60. The directors of the Company may, by a resolution of directors, appoint officers of the Company at such times as shall be considered necessary or expedient, and such officers may consist of a President, one or more Vice-Presidents, a Secretary and a Treasurer and such other officers as may from time to time be deemed desirable. The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modification in such duties as may be prescribed by the directors thereafter, but in the absence of any specific allocation of duties it shall be the responsibility of the President to manage the day to day affairs of the Company, the Vice-Presidents to act in order of seniority in the absence of the President but otherwise to perform such duties as may be delegated to them by the President, the Secretary to maintain the registers, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the Company by applicable law, and the Treasurer to be responsible for the financial affairs of the Company.

61. Any person may hold more than one office and no officer need be a director or member of the Company. The officers shall remain in office until removed from office by the directors whether or not a successor is appointed.

62. Any officer who is a body corporate may appoint any person its duly authorised representative for the purpose of representing it and of transacting any of the business of the officers.

## POWERS OF DIRECTORS

63. The business of the Company shall be managed by the directors who may pay all expenses incurred preliminary to and in connection with the formation and registration of the Company, and may exercise all such powers of the Company as are not by the Ordinance or by these Regulations required to be exercised by the members subject to any delegation of such powers as may be authorised by these Regulations and to such requirements as may be prescribed by resolution of the members. But no requirement made by resolution of the members shall prevail if it be inconsistent with these Regulations nor shall such requirement invalidate any prior act of the directors which would have been valid if such requirement had not been made.

64. The Board of Directors may entrust to and confer upon any director or officer any of the powers exercisable by it, except such powers as are exercisable under the Act by resolutions of the directors upon such terms and conditions and with such restrictions as it thinks fit, and either collaterally with, or to the exclusion of, its own powers, and may from time to time revoke, withdraw, alter or vary all or any of such powers. The directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulation that may be imposed on it by the directors.

65. The directors may from time to time and at any time by power of attorney appoint any company, firm or person or body of persons, whether nominated directly or indirectly by the directors, to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the directors under these Regulations) and for such period and subject to such conditions as they may think fit, and any such powers of attorney may contain such provisions for the protection and convenience of persons dealing with any such attorney as the directors may think fit and may also authorise any such attorney to delegate all or any of the powers, authorities and discretions vested in him, except that no officer or attorney of the Company may have any power of authority with respect to matters requiring a

resolution of directors under the Act, nor may any officer or attorney have any power to pass or purport to pass resolutions on behalf of the Company.

66. Any director who is a body corporate may appoint any person its duly authorised representative for the purpose of representing it at Board Meetings and of transacting any of the business of the directors.

67. All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as the directors shall from time to time by resolution determine.

68. The directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertakings, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

69. The continuing directors may act notwithstanding any vacancy in their body, save that if the number of directors shall have been fixed at two or more persons and by reason of vacancies having occurred in the Board there shall be only one continuing director he shall be authorised to act alone only for the purpose of appointing another director.

## PROCEEDINGS OF DIRECTORS

70. The meetings of the Board of Directors and any committee thereof shall be held at such place or places as the directors shall decide.

71. The directors may elect a Chairman of their meetings and determine the period for which he is to hold office; but if no such Chairman is elected, or if at any meeting the Chairman is not present at the time appointed for holding the same, the directors present may choose one of their number to be Chairman of the meeting.

72. The directors may meet together for the dispatch of business, adjourn and otherwise regulate their meetings as they think fit. Questions arising at any meeting shall be decided by a majority of votes; in case of an equality of votes the Chairman shall have a second or casting vote. A director may at any time summon a meeting of the directors. If the Company shall have only one director the provisions hereinafter contained for meetings of the directors shall not apply but such sole director shall have full power to represent and act for the Company in all matters and in lieu of minutes of a meeting shall record in writing and sign a note or memorandum of all matters requiring a resolution of the directors. Such note or memorandum shall constitute sufficient evidence of such resolution for all purposes.

73. A director shall be given not less than three days notice of a meeting of the directors.

74. Notwithstanding Regulation 73 above, a meeting of directors held in contravention of that regulation shall be valid if a majority of the directors entitled to vote at the meeting have waived the notice of the meeting; and, for this purpose, the presence of a director at the meeting shall be deemed to constitute waiver on his part.

75. The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

76. A meeting of directors is duly constituted for all purposes if at the commencement of the meeting

there are present in person or by alternate not less than one-third of the total number of directors with a minimum of two.

77. If within half an hour from the time appointed for the meeting a quorum is not present the meeting shall be dissolved.

78. Any one or more members of the Board of Directors or any committee thereof may participate in a meeting of such Board or committee by means of a conference telephone or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time. Participation by such means shall constitute presence in person at a meeting.

79. A resolution which has been notified to all directors and which has been approved by a majority of the directors for the time being entitled to receive notice of a meeting of the directors or of a committee of the directors and taking the form of one or more documents in writing or by facsimile, telex, telegram, cable or other written electronic communication shall be as valid and effectual as if it had been passed at a meeting of the directors or of such committee duly convened and held, without the need for any notice.

## INDEMNITY

80. Subject to the provisions of the Act and of any other statute for the time being in force every director or other officer of the Company shall be entitled to be indemnified out of the assets of the Company against all losses or liabilities which he may sustain or incur in or about the execution of the duties of his office or otherwise in relation thereto, and no director or other officer shall be liable for any loss, damage or misfortune which may happen to, or be incurred by the Company in the execution of the duties of his office, or in relation thereto.

## SEAL

81. The directors shall provide for the safe custody of the common seal of the Company. The common seal when affixed to any instrument, except as provided in Regulation 3, shall be witnessed by a director or any other person so authorised from time to time by the directors. The directors may provide for a facsimile of the common seal and approve the signature of any director or authorised person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the seal had been affixed to such instrument and the same had been signed as hereinbefore described. An imprint of the common seal shall be kept at the Registered Office of the Company.

## DIVIDENDS AND RESERVES

82. The directors may by resolution declare a dividend but no dividend shall be declared and paid except out of surplus and unless the directors determine that immediately after the payment of the dividend:

(a) the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business; and

(b) the realisable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in the books of account, and its capital.

83. Dividends when and if declared may be paid to one class of holder to the exclusion of the holders of other classes, or in unequal amounts to holders of the various classes of shares.

84. Dividends may be declared and paid in money, shares or other property.

85. In computing the surplus for the purpose of resolving to declare and pay a dividend, the directors may include in their computation the net unrealised appreciation of the assets of the Company.

86. The directors may from time to time pay to the members such interim dividends as appear to the directors to be justified by the surplus of the Company.

87. Subject to the rights of holders of shares entitled to special rights as to dividends, all dividends shall be declared and paid according to the par value of the shares in issue, excluding those shares which are held by the Company as Treasury shares at the date of declaration of the dividend.

88. The directors may, before recommending any dividend, set aside out of the profits of the Company such sums as they think proper as a reserve or reserves which shall, at the discretion of the directors, be applicable for meeting contingencies, or for any other purpose to which the profits of the Company may be properly applied, and pending such application may, at the like discretion, either be employed in the business of the Company or be invested in such investments as the directors may from time to time think fit.

89. If several persons are registered as joint holders of any share, any of them may give effectual receipt for any dividend or other monies payable on or in respect of the share.

90. In the case of shares issued to bearer, the directors may provide for the payment of dividend by reference to counterfoils or warrants issued with the certificate for such shares, and the production of such dividend counterfoil or warrant shall evidence entitlement to receipt of such dividend in the same way and to the same extent as production of the certificate itself. At the time of presentation of the counterfoil or warrant, the directors may issue such further counterfoils or warrants as may be required to permit receipt by the holder thereof of subsequent dividends.

91. Notice of any dividend that may have been declared shall be given to each member in manner hereinafter mentioned and all dividends unclaimed for three years after having been declared may be forfeited by the directors for the benefit of the Company.

92. No dividend shall bear interest against the Company.

## BOOKS AND RECORDS

93. The Company shall keep such accounts and records as the directors consider necessary or desirable in order to reflect the financial position of the Company.

94. The Company shall keep minutes of all meetings of directors, members, committees of directors, committees of officers and committees of members, and copies of all resolutions consented to by directors, members, committees of directors, committees of officers and committees of members.

95. The books, records and minutes required by Regulations 93 and 94 shall be kept at the Registered Office of the Company or at such other place as the directors determine, and shall be open to the inspection of the directors at all times.

96. The directors shall from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the books, records and minutes of the Company or any of them shall be open to the inspection of members not being directors, and no member (not being a director) shall have any right of inspecting any book, record, minute or document of the Company except as conferred by Law or authorised by resolution of the directors.

## AUDIT

97. The directors may by resolution call for the accounts of the Company to be examined by an auditor or auditors to be appointed by them at such remuneration as may from time to time be agreed.

98. The auditor may be a member of the Company but no director or officer shall be eligible during his continuance in office.

99. Every auditor of the Company shall have a right of access at all times to the books of account and vouchers of the Company, and shall be entitled to require from the officers of the Company such information and explanations as he thinks necessary for the performance of his duties.

100. The report of the auditor shall be annexed to the accounts upon which he reports, and the auditor shall be entitled to receive notice of, and to attend, any meeting at which the Company's audited profit and loss account and balance sheet is to be presented.

## NOTICES

101. Any notice, information or written statement required to be given to members shall be served :-

(a) in the case of members holding registered shares, by mail (airmail service if available) addressed to each member at the address shown in the share register; and

(b) in the case of members holding shares issued to bearer

(i) by mail (airmail service if available) addressed to the agent or attorney whose name and address has been given for service of notice by the bearer of the share (identified for this purpose by the number of the share certificate), or

(ii) in the absence of an address for service being given, or if the notice, information or written statement cannot be served for any other reason, by publishing the notice, information or written statement in one or more newspapers published or circulated in the British Virgin Islands and in a newspaper in the place where the Company has its principal office.

102. All notices directed to be given to the members shall, with respect to any registered share to which persons are jointly entitled, be given to whichever of such persons is named first in the share register, and notice so given shall be sufficient notice to all the holders of such share.

103. Any notice, if served by post, shall be deemed to have been served within ten days of posting, and in proving such service it shall be sufficient to prove that the letter containing the notice was properly addressed and put into the Post Office.

## PENSION AND SUPERANNUATION FUNDS

104. The directors may establish and maintain or procure the establishment and maintenance of any non-contributory or contributory pension or superannuation funds for the benefit of, and give or procure the giving of donations, gratuities, pensions, allowances or emoluments to any person who are or were at any time in the employment or service of the Company or any company which is a subsidiary of the Company or is allied to or associated with the Company or with any such subsidiary, or who are or were at any time directors or officers of the Company or of any such other company as aforesaid or who hold or held any salaried employment or office in the Company or such other company, or any persons in whose welfare the Company or any such other company

as aforesaid is or has been at any time interested, and to the wives, widows, families and dependents of any such person, and may make payments for or towards the insurance of any such persons as aforesaid, and may do any of the matters aforesaid either alone or in conjunction with any such other company as aforesaid. A director holding any such employment or office shall be entitled to participate in and retain for his own benefit any such donation, gratuity, pension, allowance or emolument.

## WINDING UP

105. If the Company shall be wound up, the Liquidator may, in accordance with a resolution of members, divide amongst the members in specie or in kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the members or different classes of members. The Liquidator may vest the whole or any part of such assets in trustees upon such trusts for the benefit of the contributories as the Liquidator shall think fit, but so that no member shall be compelled to accept any shares or other securities whereon there is any liability.

## ARBITRATION

106. Whenever any difference arises between the Company on the one hand and any of the members, their executors, administrators or assigns on the other hand touching the true intent and construction or the incidence or consequences of these presents or of the Act touching anything done or executed omitted or suffered in pursuance of the Act or touching any breach or alleged breach or otherwise relating to the premises or to these presents or to any Act affecting the Company or to any of the affairs of the Company such difference shall unless the parties agree to refer the same to a single arbitrator be referred to two arbitrators one to be chosen by each of the parties to the difference and the arbitrators shall before entering on the reference appoint an umpire.

107. If either party to the reference makes default in appointing an arbitrator either originally or by way of substitution (in the event that an appointed arbitrator shall die, be incapable of acting or refuse to act) for ten days after the other party has given him notice to appoint the same such other party may appoint an arbitrator to act in the place of the arbitrator of the defaulting party.

## AMENDMENT TO ARTICLES

108. The Company may alter or modify the conditions contained in these Regulations as originally drafted or as amended from time to time by a resolution of directors.

WE, the undersigned Registered Agent, subscribe our name to these Articles of Association.

---

NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER

---

Integro Trust (BVI) Limited
Tropic Isle Building
P.O. Box 438
Road Town, Tortola
British Virgin Islands

Claudette I. Francis (sgd.)

Authorised Signatory

Registered Agent

---

DATED this 11th day of August, 1997

WITNESS to the above signature:

N. Hull (sgd.)
Road Town
Tortola
British Virgin Islands

Secretary

# Exhibit F

Durable Power of Attorney and Written Consent executed by F. Jan Blaustein Scholes on June 26, 2023.

# DURABLE POWER OF ATTORNEY

This Durable Power of Attorney is made on this 26 day of June, 2023, by Babcock and Brown Parallel Member LLC, a Delaware limited liability company (the "Grantor").

WHEREAS, pursuant to the Operating Agreement ("Operating Agreement") of Westborough SPE LLC (the "Company") dated as of 20th October 1997 (the "LLC Agreement"), Babcock and Brown Administrative Services Inc., a Delaware corporation, was designated as the manager of the Company;

WHEREAS, Babcock and Brown Administrative Services Inc. has merged into the Grantor, and as a result, the Grantor is the successor of all the rights and obligations of Babcock and Brown Administrative Services Inc.;

WHEREAS, Section 1(g) of the LLC Agreement provides that any manager of the Company may delegate all or any of its powers or duties under the LLC Agreement to another manager or to any member or any other person or entity by an instrument in writing;

NOW, THEREFORE, the Grantor hereby appoints Mr. Lolonyon Akouuete and Ms. Denise Edward as its attorney in fact (the "Attorney"), with powers to be exercised jointly with member or manager of the Grantor, to act on behalf of the Grantor in connection with any and all matters relating to the management and operation of the Company, including but not limited to:

1. the right to sell, buy, lease, mortgage, assign, rent or dispose of any real property on behalf of the Company; and
2. the right to execute, acknowledge, and deliver any and all documents, contracts, agreements, checks, drafts, promissory notes, mortgages, deeds of trust, leases, deeds, easements, and other instruments of any nature whatsoever, as may be necessary or desirable, and to perform all acts and do everything that the Grantor could do; and
3. the right to open a bank account/s, deposit, endorse, or withdraw funds to or from any of the Company's bank accounts or safe deposit box;
4. the right to initiate, defend commence or settle legal actions on the Company's behalf;
5. the right to retain any accountant, attorney, or other adviser deemed necessary to protect the Company's interests relative to any foregoing unlimited power;
6. the right to bind the Grantor by executing documents or instruments on its behalf, and any such executed documents or instruments shall be binding upon and enforceable against the Grantor.

The Grantor undertakes to:

- ratify and confirm whatever the Attorney does or purports to do in good faith in exercising the powers conferred by this Power of Attorney; and
- Indemnify the Attorney against all claims, losses, costs, expenses, damages or liability incurred by her as a result of acting in good faith pursuant to this power of attorney (including any costs incurred in enforcing this indemnity).

See Exhibit A hereto for additional rights with respect to the Company property.

This Power of Attorney shall be governed by and construed in accordance with the laws of the State of Delaware. The powers and duties of an Agent under a durable power of attorney are explained more fully in Delaware Code, Title 12, Chapter 49A, Section 49A-114 and Sections 49A-201 through 49A-217.

By signing below, I have read or had explained to me this notice and I understand its contents. I have had an attorney licensed in the State of Arizona review and approve of me signing this Durable Power of Attorney.

This Power of Attorney shall be effective from the signing date below and shall continue in full force and effect until revoked by the Grantor in writing.

**Reliance on This Power of Attorney**

Any person, including my Agent(s), may rely upon this power of attorney or a copy of it unless that person knows it has terminated or is invalid.

**Revocation of Prior Power of Attorney**

If you have previously executed a power of attorney granting authority covered in this document, indicate below whether or not you wish to revoke the prior power of attorney. INITIAL your selection below:

✓ All my previously executed powers of attorney are hereby revoked, except those powers of attorney described in § 49A-103(a) of Title 12 of the Delaware Code, none of which are personal powers of attorney described within the meaning of § 49A-102(9) of Title 12 of the Delaware Code.

**IN WITNESS WHEREOF**, the Grantor has executed this Power of Attorney as of the date first written above as an instrument under seal.

BABCOCK AND BROWN PARALLEL MEMBER LLC

By: [signature]

Name: F. Jan Blaustein Scholes

Title: Manager, duly authorized

I, DJIGBODI LOKOSSOU, swear that I am not related to the Principal by blood, marriage, or adoption; and that I am not entitled to any portion of the estate of the Principal under the Principal's current will or codicil, or under any current trust instrument of the Principal.

[signature] — Witness Signature

DJIGBODI LOKOSSOU — Print Witness Name

State of Arizona

COUNTY OF Arizona

This Durable **Power** of **Attorney** was signed by the Principal, witnessed by the person aforesaid, and acknowledged before me, the Subscriber, a Notary Public, as the free act and deed of the Principal this 26 day of June, 2023.

[signature]
Notary Public

My Commission Expires: 02-28-2027 (seal)

BILLIE J WAHL
Notary Public - Arizona
Maricopa County
Commission # 642362
My Comm. Expires Feb 28, 2027

**EXHIBIT "A"**

**Real Property § 49A-204**

1. To demand, buy, lease, receive, accept as a gift or as security for an extension of credit, or otherwise acquire or reject an interest in real property or a right incident to real property;
2. To sell; exchange; convey with or without covenants, representations, or warranties; quitclaim; release; surrender; retain title for security; encumber; partition; consent to partitioning; subject to an easement or covenant; subdivide; apply for zoning or other governmental permits; plat or consent to platting; develop; grant an option concerning; lease; sublease; contribute to an entity in exchange for an interest in that entity; or otherwise grant or dispose of an interest in real property or a right incident to real property;
3. To pledge or mortgage an interest in real property or right incident to real property as security to borrow money or pay, renew, or extend the time of payment of a debt of the Principal or a debt guaranteed by the Principal;
4. To release, assign, satisfy, or enforce by litigation or otherwise a mortgage, deed of trust, conditional sale contract, encumbrance, lien, or other claim to real property which exists or is asserted;
5. To manage or conserve an interest in real property or a right incident to real property owned or claimed to be owned by the Principal, including:
   a. Insuring against liability or casualty or other loss;
   b. Obtaining or regaining possession of or protecting the interest or right by litigation or otherwise;
   c. Paying, assessing, compromising, or contesting taxes or assessments or applying for and receiving refunds in connection with them; and
   d. Purchasing supplies, hiring assistance or labor, and making repairs or alterations to the real property;
6. To use, develop, alter, replace, remove, erect, or install structures or other improvements upon real property in or incident to which the Principal has, or claims to have, an interest or right;
7. To participate in a reorganization with respect to real property or an entity that owns an interest in or right incident to real property and receive, and hold, and act with respect to stocks and bonds or other property received in a plan of reorganization, including:
   a. Selling or otherwise disposing of them;
   b. Exercising or selling an option, right of conversion, or similar right with respect to them; and
   c. Exercising any voting rights in person or by proxy;
8. To change the form of title of an interest in or right incident to real property; and
9. To dedicate to public use, with or without consideration, easements or other real property in which the Principal has, or claims to have, an interest.

**Tangible Personal Property § 49A-205**

1. To demand, buy, receive, accept as a gift or as security for an extension of credit, or otherwise acquire or reject ownership or possession of tangible personal property or an interest in tangible personal property;
2. To sell; exchange; convey with or without covenants, representations, or warranties; quitclaim; release; surrender; create a security interest in; grant options concerning; lease; sublease; or otherwise dispose of tangible personal property or an interest in tangible personal property;
3. To grant a security interest in tangible personal property or an interest in tangible personal property as security to borrow money or pay, renew, or extend the time of payment of a debt of the Principal or a debt guaranteed by the Principal;
4. To release, assign, satisfy, or enforce by litigation or otherwise, a security interest, lien, or other claim on behalf of the Principal, with respect to tangible personal property or an interest in tangible personal property;
5. To manage or conserve tangible personal property or an interest in tangible personal property on behalf of the Principal, including:
    a. Insuring against liability or casualty or other loss;
    b. Obtaining or regaining possession of or protecting the property or interest, by litigation or otherwise;
    c. Paying, assessing, compromising, or contesting taxes or assessments or applying for and receiving refunds in connection with taxes or assessments;
    d. Moving the property from place to place;
    e. Storing the property for hire or on a gratuitous bailment; and
    f. Using and making repairs, alterations, or improvements to the property; and
6. To change the form of title of an interest in tangible personal property.

**Claims and Litigation § 49A-212**

1. To assert and maintain before a court or administrative agency a claim, claim for relief, cause of action, counterclaim, offset, recoupment, or defense, including an action to recover property or other thing of value, recover damages sustained by the Principal, eliminate or modify tax liability, or seek an injunction, specific performance, or other relief;
2. To bring an action to determine adverse claims or intervene or otherwise participate in litigation;
3. To seek an attachment, garnishment, order of arrest, or other preliminary, provisional, or intermediate relief and use an available procedure to effect or satisfy a judgment, order, or decree;
4. To make or accept a tender, offer of judgment, or admission of facts, submit a controversy on an agreed statement of facts, consent to examination, and bind the Principal in litigation;

5. To submit to alternative dispute resolution, settle, and propose or accept a compromise;
6. To waive the issuance and service of process upon the Principal, accept service of process, appear for the Principal, designate persons upon which process directed to the Principal may be served, execute and file or deliver stipulations on the Principal's behalf, verify pleadings, seek appellate review, procure and give surety and indemnity bonds, contract and pay for the preparation and printing of records and briefs, receive, execute, and file or deliver a consent, waiver, release, confession of judgment, satisfaction of judgment, notice, agreement, or other instrument in connection with the prosecution, settlement, or defense of a claim or litigation;
7. To act for the Principal with respect to bankruptcy or insolvency, whether voluntary or involuntary, concerning the Principal or some other person, or with respect to a reorganization, receivership, or application for the appointment of a receiver or trustee which affects an interest of the Principal in property or other thing of value;
8. To pay a judgment, award, or order against the Principal or a settlement made in connection with a claim or litigation; and
9. To receive money or other thing of value paid in settlement of or as proceeds of a claim or litigation.

**Taxes § 49A-216**

1. To prepare, sign, and file federal, state, local, and foreign income, gift, generation skipping transfer, payroll, property, Federal Insurance Contributions Act (26 U.S.C. § 3101 et seq.), and other tax returns, claims for refunds, requests for extension of time, petitions regarding tax matters, and any other tax-related documents, including receipts, offers, waivers, consents, including consents and agreements under § 2032A of the Code, closing agreements, and any power of attorney required by the Internal Revenue Service or other taxing authority with respect to a tax year upon which the statute of limitations has not run and the following 25 tax years;
2. To pay taxes due, collect refunds, post bonds, receive confidential information, and contest deficiencies determined by the Internal Revenue Service or other taxing authority;
3. To exercise any election available to the Principal under federal, state, local, or foreign tax law; and
4. To act for the Principal in all tax matters for all periods before the Internal Revenue Service, or other taxing authority.

# WRITTEN CONSENT OF THE MANAGER OF BABCOCK AND BROWN PARALLEL MEMBER LLC IN LIEU OF A MEETING

The undersigned, being the manager of BABCOCK AND BROWN PARALLEL MEMBER LLC, a Delaware limited liability company (the "**Company**"), acting by written consent without a meeting pursuant to Section 18-404 of the Delaware Limited Liability Company Act, does hereby consent to the adoption of the following resolutions:

**WHEREAS**, F. Jan Blaustein Scholes ("**Scholes**") is the Manager of the Company; and

**WHEREAS**, F. Jan Blaustein Scholes is over the age of eighteen and is of sound mind and is not under a conservatorship or guardianship in the State of Arizona; and

**WHEREAS**, F. Jan Blaustein Scholes resides in the State of Arizona and is executing this document in the State of Arizona.

**NOW THEREFORE LET IT BE:**

**RESOLVED**, that a Durable Power of Attorney be executed authorizing Lolonyon Akouete and Denise Edwards to undertake the actions specified therein;

**RESOLVED**, that the Bill of Sale executed on November 21, 2022, be amended as follows:

(i) The Title of the Document shall be amended to delete "Bill of Sale" and substitute "Transfer of Manager Role";

(ii) The WHEREAS clause shall be amended to delete the word "sell" and "transfer her Manager role of Westborough SPE LLC" shall be substituted therefore. In addition, "Buyer desires to buy" shall be deleted and the following substituted therefore "Subsequent Manager desires to assume the Role as Manager(s) of Westborough SPE LLC". In addition "and all assets thereof" shall be deleted.

(iii) Paragraph 1 shall be deleted in its entirety and "The consideration paid heretofore for a change in Manager is $100.00 which was tendered by Money Order to Scholes".

(iv) Paragraphs 1(a)-(b) shall be deleted in their entirety.

(v) Paragraph 2 shall be deleted in its entirety and F. Jan Blaustein Scholes is not under a conservatorship/guardianship in the State of Arizona where she currently resides and is of sound legal mind, and understands the consequences of this Agreement to Transfer Manager Role".

(vi) Paragraph 3 shall be deleted in its entirety and the following substituted therefore "Westborough SPE LLC has an outstanding debt owed to the Town of Westborough for unpaid obligations which as of May 2023 equated to approximately $920,000.00. In addition, there are unclaimed funds in the State of California of approximately $1,200,000.00 belonging to Westborough SPE LLC. Akouete and Edwards have become Managers of Westborough SPE LLC and that

is hereby ratified and confirmed. Akouete and Edwards are authorized to take whatever actions necessary to recover and protect the property located at Turnpike Road, Westborough, Massachusetts and recover the unclaimed funds in the State of California."

(vii) Paragraph 5 shall be deleted and the following substituted therefore "This Agreement shall be governed by the laws of the State of Arizona as to contract formation and capacity and the State of Delaware as to limited liability company actions".

(viii) Paragraph 6 shall remain and is hereby ratified and confirmed and Westborough SPE LLC was lawfully reinstated in both Delaware and Massachusetts.

(ix) Paragraph 8 shall be added, "If any provision of this Agreement shall to any extent be held void or unenforceable (as to duration, scope, activity, subject or otherwise) by a court of competent jurisdiction, such provision shall be deemed to be modified so as to constitute a provision conforming as nearly as possible to the original provision while still remaining valid and enforceable. In such event, the remainder of this Agreement (or the application of such provision to persons or circumstances other than those in respect of which it is deemed to be void or unenforceable) shall not be affected thereby. Each other provision of this Agreement, unless specifically conditioned upon the voided aspect of such provision, shall remain valid and enforceable to the fullest extent permitted by law; any other provisions of this Agreement that are specifically conditioned on the voided aspect of such invalid provision shall also be deemed to be modified so as to constitute a provision conforming as nearly as possible to the original provision while still remaining valid and enforceable to the fullest extent permitted by law."

(x) Paragraph 9 shall be added "Time shall be of the essence as to each term hereof."

(xi) Paragraph 10 shall be added "Each party recognizes that this Agreement is a legally binding contract and acknowledges that it, he or she has had the opportunity to consult with legal counsel of choice. In any construction of the terms of this Agreement, the same shall not be construed against either party on the basis of that party being the drafter of such terms."

(xii) Paragraph 11 shall be added "Scholes has engaged an attorney licensed in the State of Arizona to represent her interests with respect to this Agreement and the attorney has reviewed the document and consents to its signing."

**RESOLVED**, that the manager be, and each of them individually hereby is, authorized and directed to do and perform or cause to be done and performed all such acts, deeds, and things, and to make, execute, and deliver, or cause to be made, executed, and delivered, all such agreements, undertakings, documents, instruments, or certificates in the name of the Company and to retain such counsel, agents, and advisors and to incur and pay such expenses, fees, and taxes as shall, in the opinion of the manager of the Company executing the same, be deemed necessary or advisable (such necessity or advisability to be conclusively evidenced by the execution thereof) to effectuate or carry out fully the purpose and interest of all of the foregoing resolutions; and that any and all such actions heretofore or hereafter taken by the manager

relating to and within the terms of these resolutions be, and they hereby are, adopted, affirmed, approved, and ratified in all respects as the act and deed of the Company; and

**RESOLVED**, that an executed copy of this Written Consent shall be filed with the minutes of the proceedings of the managers.

**IN WITNESS WHEREOF**, the undersigned manager has duly executed this Written Consent as of June 23, 2023 as an instrument under seal.

Signature: ______________________ Date: [illegible]

F. Jan Blaustein Scholes, Manager

I, ______________________, swear that I am not related to the Principal by blood, marriage, or adoption; and that I am not entitled to any portion of the estate of the Principal under the Principal's current will or codicil, or under any current trust instrument of the Principal.

State of Arizona

COUNTY OF Arizona

This Durable **Power** of **Attorney** was signed by the Principal, witnessed by the person aforesaid, and acknowledged before me, the Subscriber, a Notary Public, as the free act and deed of the Principal this 26 day of June, 2023.

______________________
Notary Public

My Commission Expires: 02-28-2027 (seal)

BILLIE J WAHL
Notary Public - Arizona
Maricopa County
Commission # 642362
My Comm. Expires Feb 28, 2027

# Exhibit G

Participation Agreement dated October 30, 1997.

CONFORMED COPY

---

# PARTICIPATION AGREEMENT

Dated as of October 30, 1997

RE:
Leveraged Lease of Theater Premises

Among

INTERSTATE THEATRES CORPORATION
Tenant

HOYTS CINEMAS CORPORATION
Lease Guarantor

HOYTS CINEMAS LIMITED
Lease Guarantor

HOYTS CINEMAS AMERICA LIMITED
Lease Guarantor

WESTBOROUGH SPE LLC
Company

MIGNONETTE INVESTMENTS LIMITED
Equity Investor

and

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY
Note Purchaser

---

620497.08.00.B
1452358

# TABLE OF CONTENTS


| SECTION | HEADING | PAGE |
| --- | --- | --- |
| Parties | | 1 |
| Recitals | | 1 |
| SECTION 1. | COMMITMENTS OF THE PARTICIPANTS | 2 |
| Section 1.1. | Issue and Sale of Notes | 2 |
| Section 1.2. | Investments and Payments by the Equity Investor | 3 |
| Section 1.3. | The Closing Date | 3 |
| Section 1.4. | Expiration of Commitments | 3 |
| Section 1.5. | Several Commitments | 3 |
| SECTION 2. | TRANSACTIONAL EXPENSES | 3 |
| Section 2.1. | Transactional Expenses to Be Borne by the Company on Behalf of the Equity Investor | 3 |
| Section 2.2. | Transactional Expenses to Be Borne by the Tenant | 4 |
| Section 2.3. | Transactional Expenses to Be Borne by the Company | 4 |
| SECTION 3. | WARRANTIES AND REPRESENTATIONS | 4 |
| Section 3.1. | Warranties and Representations of the Company | 4 |
| Section 3.2. | Warranties and Representations of the Tenant | 7 |
| Section 3.3. | Warranties and Representations of the Guarantors | 10 |
| Section 3.4. | Private Offering | 14 |
| Section 3.5. | Representations and Covenants of the Participants; Transfer of Beneficial Interest and Notes | 15 |
| SECTION 4. | CONDITIONS | 19 |
| Section 4.1. | Conditions Precedent to Investment by Each Participant | 19 |
| Section 4.2. | Additional Conditions Precedent to Note Purchase | 23 |
| SECTION 5. | SPECIAL RIGHTS OF NOTE PURCHASER | 24 |
| SECTION 6. | COMPANY COVENANTS | 25 |
| Section 6.1. | Office for Notices | 25 |
| Section 6.2. | Maintenance of Existence, Rights | 25 |
| Section 6.3. | Maintenance of Property | 25 |
| Section 6.4. | Insurance | 25 |
| Section 6.5. | Payment of Taxes and Other Charges; Compliance with Laws | 26 |
| Section 6.6. | Negative Covenants | 26 |

Section 6.7. Mergers and Consolidations ........ 27
Section 6.8. Financial Information and Reports ........ 27
Section 6.9. Repurchase of Notes ........ 28
Section 6.10. Transactions with Affiliates ........ 28
Section 6.11. Post Closing Undertaking of the Company ........ 28

SECTION 7. COVENANTS OF THE GUARANTORS ........ 28

Section 7.1. Corporate Existence, Etc ........ 28
Section 7.2. Insurance ........ 28
Section 7.3. Taxes, Claims for Labor and Materials; Compliance with Laws ........ 29
Section 7.4. Maintenance, Etc ........ 29
Section 7.5. Nature of Business ........ 29
Section 7.6. Limitations on Consolidated Total Debt ........ 29
Section 7.7. Fixed Charges Coverage Ratio ........ 30
Section 7.8. Sale of Assets ........ 30
Section 7.9. Mergers and Consolidations ........ 31
Section 7.10. Limitations on Restrictive Agreements ........ 32
Section 7.11. HCL's Shareholders' Equity ........ 32
Section 7.12. Reports and Rights of Inspection ........ 32
Section 7.13. Consummation of Second Transaction ........ 35
Section 7.14. Post Closing Undertaking ........ 36

SECTION 8. TENANT'S INDEMNITIES ........ 36

SECTION 9. INDEMNITIES OF THE COMPANY AND THE EQUITY INVESTOR ........ 36

SECTION 10. MISCELLANEOUS ........ 37

Section 10.1. Amendments ........ 37
Section 10.2. Notices ........ 37
Section 10.3. Survival ........ 37
Section 10.4. Successors and Assigns ........ 37
Section 10.5. Governing Law ........ 38
Section 10.6. Counterparts ........ 38
Section 10.7. Headings and Table of Contents ........ 38
Section 10.8. Conditions to Purchase of Beneficial Interest by Tenant ........ 38
Section 10.9. Rent Payment Instructions ........ 39
Section 10.10. Certain Rights of Tenant and Guarantor Reserved ........ 39
Section 10.11. Note Purchaser Consent ........ 40

| | | |
|---|---|---|
| SCHEDULE I | — | Financial Statements |
| EXHIBIT A | — | Lease Agreement |
| EXHIBIT B | — | First Mortgage, Security Agreement and Fixture Filing |
| EXHIBIT C | — | Lease Guaranty |
| EXHIBIT D | — | Assignment of Lease |
| EXHIBIT E | — | Assignment of Guaranty |
| EXHIBIT F | — | Officer's Certificate of the Company Manager |
| SCHEDULE 7.10 | — | List of Restrictive Agreements |
| ANNEX I | — | Definitions |
| ANNEX II | — | Schedule of Amortization |
| ANNEX III | — | Form of 10.25% Senior Secured Note due November 21, 2017 |
| ANNEX IV | — | Forms of Opinions of Counsel |

# PARTICIPATION AGREEMENT

THIS PARTICIPATION AGREEMENT dated as of October 30, 1997 is among INTERSTATE THEATRES CORPORATION, a Massachusetts corporation (the *"Tenant"*), HOYTS CINEMAS CORPORATION, a Delaware corporation (*"HCC"*), HOYTS CINEMAS LIMITED, an Australian corporation (*"HCL"*), HOYTS CINEMAS AMERICA LIMITED, a Barbados company (*"HCA"*, HCA, together with HCC and HCL being hereinafter sometimes individually referred to as a *"Guarantor"* and collectively as the *"Guarantors"*), WESTBOROUGH SPE LLC, a Delaware limited liability company (the *"Company"*), MIGNONETTE INVESTMENTS LIMITED, a British Virgin Islands limited liability company (the *"Equity Investor"*) and THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY (the *"Note Purchaser"*). The Equity Investor and the Note Purchaser are herein sometimes referred to collectively as the *"Participants"* and individually as a *"Participant"*.

## RECITALS

A. The capitalized terms used in this Participation Agreement shall have the respective meanings specified in Annex I attached hereto, unless otherwise herein defined.

B. It is intended by the parties hereto that, on the Closing Date, title to the Premises shall pass to the Company pursuant to a Quitclaim Deed between Northside Realty Trust, as seller (the *"Developer"*), and the Company, as purchaser, providing for the sale by the Developer of the Premises to the Company for the consideration specified therein.

C. The Company has entered into or proposes to enter into:

(1) a Lease Agreement (the *"Lease"*) substantially in the form attached hereto as Exhibit A between the Company, as lessor, and the Tenant, as lessee, providing for the lease of the Premises; and

(2) a First Mortgage, Security Agreement and Fixture Filing (the *"Mortgage"*) substantially in the form attached hereto as Exhibit B between the Company and the Note Purchaser, as beneficiary and secured party.

D. Concurrently with the execution and delivery of this Agreement, the Guarantors will enter into a Lease Guaranty (the *"Lease Guaranty"*) substantially in the form attached hereto as Exhibit C under which the Guarantors will absolutely and unconditionally guarantee the payment of all Basic Rent, Additional Rent and all other amounts due and to become due under the Lease and the performance of all obligations of the Tenant under the Lease.

SECTION 1. COMMITMENTS OF THE PARTICIPANTS.

*Section 1.1. Issue and Sale of Notes.*

(a) *The Notes.* In order to finance 90% of the Acquisition Cost of the Premises, the Company proposes to issue and sell its 10.25% Senior Secured Notes due November 20, 2017 (the *"Notes"*) in an aggregate principal amount of $9,406,742.40. The Notes are to be issued hereunder and secured by the Mortgage, to be dated the date of issue, to bear interest at the rate of 10.25% per annum prior to maturity and to bear interest on overdue principal and premium, if any, and (to the extent legally enforceable) on any overdue installment of interest at the rate of 12.25% per annum until paid, to be expressed to be payable as follows:

(i) seventy-nine (79) consecutive quarterly installments of interest and principal payable in accordance with the amortization schedule set forth in Annex II hereto, payable on February 21, 1998 and on the twenty-first day of each May, August, November and February thereafter to and including August 21, 2017; followed by

(ii) a final installment on November 21, 2017 in an amount equal to the entire principal and interest remaining unpaid as of said date;

and to be otherwise substantially in the form attached hereto as Annex III. Interest shall be computed on the basis of a 360-day year of twelve consecutive 30-day months.

(b) *Commitment of Note Purchaser.* Subject to the terms and conditions hereof and on the basis of the representations and warranties hereinafter set forth, the Company agrees to issue and sell to the Note Purchaser, and the Note Purchaser agrees to purchase from the Company, on the Closing Date hereinafter provided for, Notes of the Company at a price of 100% of the principal amount thereof and in an aggregate principal amount equal to $9,406,742.40, which shall equal 90% of the Acquisition Cost. The Notes delivered to the Note Purchaser on the Closing Date will be in the form of a single Note, in a principal amount equal to 100% of the aggregate principal amount of the Note and registered in the name of the Note Purchaser or its nominee.

(c) *Failure to Deliver.* If on the Closing Date the Company fails to tender to the Note Purchaser the Notes to be purchased by the Note Purchaser or if the conditions to the obligation of the Note Purchaser specified in **Section 4** have not been fulfilled, the Note Purchaser may thereupon elect to be relieved of all further obligations under this Agreement.

(d) *Security for the Notes.* The Notes will be entitled to the benefits of and will be secured by (1) the Mortgage, (2) an Assignment of Lease (the *"Lease Assignment"*) substantially in the form attached hereto as Exhibit D, among the Company, the Tenant and the Note Purchaser, pursuant to which the Company will grant a valid and perfected first Lien on the Premises and create a valid and perfected first Lien on the right, title and interest of the Company in and to the Lease, including, without limitation, a present

assignment and right to receive payment of all Basic Rent, Additional Rent and other amounts payable thereunder, and (3) an Assignment of Guaranty (the *"Guaranty Assignment"*) substantially in the form attached hereto as Exhibit E, among the Company, the Guarantors and the Note Purchaser, pursuant to which the Company shall assign to the Note Purchaser all of its right, title and interest in and to the Lease Guaranty.

(e) *Prepayment.* Except to the extent otherwise provided for in the Mortgage, the Notes shall not be subject to prepayment or redemption in whole or in part prior to the expressed maturity date thereof.

*Section 1.2. Investments and Payments by the Equity Investor.* (a) Subject to the terms and conditions hereof and on the basis of the representations and warranties hereinafter set forth, on the Closing Date the Equity Investor will advance to the Company an amount equal to 10% of Acquisition Cost.

(b) If on the Closing Date the conditions to the obligations of the Equity Investor specified in **Section 4.1** have not been fulfilled, the Equity Investor may thereupon elect to be relieved of its obligation to make the investment provided for in paragraph (a) of this **Section 1.2**.

*Section 1.3. The Closing Date.* The equity investment by the Equity Investor pursuant to **Section 1.2(a)** will be made, and the Notes will be delivered to the Note Purchaser hereunder, on such date (the *"Closing Date"*), not later than the expiration of the commitments of the Participants as set forth in **Section 1.4**, as the Tenant shall designate to each Participant by not less than one Business Day's prior written notice. The payment by the Equity Investor pursuant to **Section 1.2(a)** and payment for the Notes shall be made available for the account of the Company, at 10:00 A.M., Boston time on the Closing Date in Federal Reserve or otherwise immediately available funds current in Boston, Massachusetts, at such account as shall be specified in writing by the Company (or the Tenant, as the case may be), at least one Business Day prior to the Closing Date.

*Section 1.4. Expiration of Commitments.* The commitment of the Equity Investor under **Section 1.2(a)** and the commitment of the Note Purchaser hereunder shall expire at the close of business on November 21, 1997.

*Section 1.5. Several Commitments.* The obligations hereunder of the Participants shall be several and not joint and no Participant shall be liable or responsible for the acts or defaults of any other Participant.

## SECTION 2. TRANSACTIONAL EXPENSES.

*Section 2.1. Transactional Expenses to Be Borne by the Company on Behalf of the Equity Investor.* If the Company shall have purchased the Premises from the Developer in accordance with the provisions of **Section 4,** the Company will pay all reasonable out-of-pocket expenses relating to the transactions contemplated by this Agreement, including but not limited to: (a) the cost of producing the Operative Documents; (b) the reasonable fees

and expenses of counsel for the Company; (c) the reasonable fees and expenses of Chapman and Cutler, special counsel for the Note Purchaser; (d) all recording and filing fees, stamp taxes and other recording or filing taxes in connection with the recordation or filing of any of the Operative Documents and in connection with any financing statements or other documents filed to perfect, maintain and protect the rights of the parties under the Operative Documents; (e) the premium for the title insurance, the cost of the survey and the cost for the appraisal required by **Section 4.1**; (f) the cost of delivering to the main office of the Note Purchaser, insured to the satisfaction of the Note Purchaser, the Notes purchased by the Note Purchaser on the Closing Date; and (g) the reasonable fees and expenses of each of the counsel for the Tenant and the Guarantors named in **Section 4.1(i)** but excluding any other expenses incurred by the Tenant or the Guarantors; *provided, however,* that the aggregate amount of all fees and expenses described in clause (g) of this **Section 2.1** to be paid by the Company and included in the Acquisition Cost of the Premises may not exceed $100,000.

*Section 2.2. Transactional Expenses to Be Borne by the Tenant.* The Tenant will pay the amount of all fees and expenses described in **Section 2.1** in the event the Company does not purchase the Premises from the Developer in accordance with **Section 4**. Without limiting the foregoing, the Tenant will pay as Additional Rent pursuant to the Lease: (a) the cost of delivering to or from the home office of any holder of a Note from or to the Company, insured to the satisfaction of such holder, any Notes surrendered pursuant to the Mortgage and any Note issued in substitution or replacement for the surrendered Notes; and (b) the reasonable out-of-pocket expenses of the Equity Investor, the Company and the holders of the Notes, including reasonable fees and expenses of their counsel, in connection with any amendments, waivers, consents or modifications requested with respect to any of the Operative Documents by any party other than the Company or the Equity Investor and all recording and filing fees, stamp taxes and other recording or filing taxes in connection with the recordation or filing of any such amendments, waivers, consents or modifications and in connection with any continuation statements or other documents filed to maintain and protect the rights of the parties under the Operative Documents.

*Section 2.3. Transactional Expenses to Be Borne by the Company.* The Company will pay the reasonable out-of-pocket expenses of the holders of the Notes, the Tenant and the Guarantors, including reasonable fees of their counsel, in connection with any amendments, waivers, consents or modifications requested by the Company or the Equity Investor with respect to any of the Operative Documents and all recording and filing fees, stamp taxes and other recording or filing taxes in connection with the recordation or filing of any such amendments, waivers, consents or modifications and in connection with any continuation statements or other documents filed to maintain and protect the rights of the parties under the Operative Documents.

SECTION 3. WARRANTIES AND REPRESENTATIONS.

*Section 3.1. Warranties and Representations of the Company.* The Company represents and warrants on and as of the Closing Date that:

(a) The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has the power and authority and all necessary entity qualifications to enter into and perform its obligations under the Operative Documents to which it is a party. The Company is duly licensed, qualified and is in good standing as a foreign corporation in each jurisdiction wherein such licensing or qualification is necessary in order to perform its obligations under the Operative Documents to which it is a party. The Company has no Subsidiaries.

(b) The Company has no Indebtedness other than the Notes.

(c) The Operative Documents to which the Company is a party have been duly authorized, executed and delivered by the Company and constitute legal, valid and binding obligations of the Company enforceable against the Company in accordance with the respective terms thereof, except as such terms may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and except as equitable remedies such as specific performance may be in the discretion of the courts.

(d) The execution and delivery by the Company of the Operative Documents to which the Company is a party and the sale of the Notes and compliance by the Company with all of the provisions thereof do not and will not contravene any law or any order of any court or governmental authority or agency applicable to or binding on the Company or contravene the provisions of, or constitute a default under, or result in the creation of any Lien (other than Permitted Encumbrances) upon the Property of the Company under, its charter or by-laws or any indenture, mortgage, contract or other agreement or instrument to which the Company is a party or by which it or any of its Property may be bound or affected.

(e) There are no proceedings pending or threatened, nor is there any existing basis for any such proceedings, against or affecting the Company in any court or before any governmental authority or arbitration board or tribunal which, if adversely determined, could materially and adversely affect the Properties, business, profits or condition (financial or otherwise) of the Company or impair the ability of the Company to perform its obligations under the Operative Documents to which the Company is a party. The Company is not in default with respect to any order of any court or governmental authority or arbitration board or tribunal.

(f) The Company is not in violation of any law, including, without limitation any Environmental Law, ordinance, franchise, governmental rule or regulation to which it is subject; and the Company has not failed to obtain, any license, permit, franchise or other governmental authorization necessary to the ownership of the Premises, which violation or failure to obtain would materially adversely affect the Properties, business, profits or condition (financial or otherwise) of the Company, or impair the ability of the Company to perform the obligations contained in the Operative Documents to which the Company is a party.

(g) The Premises are free and clear of any Liens or encumbrances which result from claims against the Company not arising out of or directly related to the transactions contemplated by the Operative Documents. The Company has not conveyed any interest in the Premises to any Person or subjected the Premises to any Lien not arising out of or relating to the transactions contemplated by the Operative Documents. The Company has full right, power and authority to grant, warrant, pledge, assign, demise, convey, transfer and mortgage the Premises pursuant to the Mortgage. Other than the Premises, the Company owns no Property.

(h) No Mortgage Default or Mortgage Event of Default has occurred and is continuing. The Company is not in violation of any Operative Document to which it is a party.

(i) No approval, consent or withholding of objection on the part of any regulatory body, state, Federal or local, is necessary in connection with the execution, delivery and performance by the Company of the Operative Documents to which it is a party or compliance by the Company with any of the provisions of such Operative Documents, which has not been obtained and furnished to the Note Purchaser, the Tenant and the Guarantors.

(j) The proceeds from the sale of the Notes and the Beneficial Interest will be applied to the Acquisition Cost of the Premises, and to pay certain costs and expenses incurred in connection with the transactions contemplated by the Operative Documents. None of the transactions contemplated in the Operative Documents (including without limitation thereof, the use of proceeds from the issuance of the Notes) will violate or result in a violation of Section 7 of the Securities Exchange Act of 1934, as amended, or any regulation issued pursuant thereto, including, without limitation, Regulations G, T and X of the Board of Governors of the Federal Reserve System, 12 C.F.R., Chapter II. The Company does not own or intend to carry or purchase any *"margin security"* within the meaning of said Regulation G. None of the proceeds from the sale of the Notes will be used to purchase or carry (or refinance any borrowing, the proceeds of which were used to purchase or carry), any *"security"* within the meaning of the Securities Exchange Act of 1934, as amended.

(k) The consummation of the transactions provided for in this Agreement and in the Operative Documents to which the Company is a party and compliance by the Company with the provisions of the Operative Documents to which the Company is a party, including the Notes issued thereunder, will not involve any prohibited transaction within the meaning of ERISA or Section 4975 of the Code. The Company does not maintain or contribute to an *"employee pension benefit plans"*, as defined in ERISA. The Company does not maintain, contribute to or have any direct or indirect liability or contingent liability with respect to any "employee pension benefit plan" under Title IV of ERISA.

(l) The Company is not an *"investment company"*, or a company *"controlled"* by an *"investment company"*, as such terms are defined in the Investment Company Act of 1940, as amended.

*Section 3.2. Warranties and Representations of the Tenant.* The Tenant warrants and represents on and as of the Closing Date that:

(a) The Tenant is a wholly-owned Subsidiary of HCC.

(b) The Tenant is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts and has the corporate power and authority and all necessary licenses and permits (1) to carry on its present business and operations, (2) to own or lease its Properties, and (3) to enter into and perform its obligations under the Operative Documents to which it is a party, except where the failure to have any such license or permit for the items described in the preceding clauses (1) and (2) would not have a Tenant Material Adverse Effect. The Tenant is duly licensed or qualified and is in good standing as a foreign corporation in each jurisdiction wherein the nature of the business transacted by it or the nature of the Property owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed or qualified would not have a Tenant Material Adverse Effect.

(c) The Operative Documents to which the Tenant is a party have been duly authorized, executed and delivered by the Tenant and constitute legal, valid and binding obligations of the Tenant enforceable against the Tenant in accordance with the respective terms thereof, except as such terms may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and except as equitable remedies such as specific performance may be in the discretion of the courts.

(d) The execution and delivery by the Tenant of the Operative Documents to which the Tenant is a party and compliance by the Tenant with all of the provisions thereof do not contravene any existing law or any existing order of any court or governmental authority or agency applicable to or binding on the Tenant or contravene the provisions of, or constitute a default under, or result in the creation of any Lien upon the Property of the Tenant under, its charter or by-laws or any indenture, mortgage, contract or other agreement or instrument to which the Tenant is a party or by which it or any of its Property may be bound or affected.

(e) There are no proceedings pending or (to the Tenant's knowledge, after due inquiry) threatened, nor (to the Tenant's knowledge, after due inquiry) is there any existing basis for any such proceedings, against or affecting the Tenant in any court or before any governmental authority or arbitration board or tribunal which, if adversely determined, would have a Tenant Material Adverse Effect. The Tenant is not (to the Tenant's knowledge, after due inquiry) in default with respect to any order of any court or governmental authority or arbitration board or tribunal which default would have a Tenant Material Adverse Effect.

(f) The Tenant is not in violation of any term of any charter instrument, by-law or other agreement or instrument to which it is a party or by which it may be bound, except in the case of any such agreement or instrument, a violation of which would not have a Tenant Material Adverse Effect. The Tenant is in compliance with all laws, ordinances,

governmental rules and regulations to which it is subject, failure to comply with which would have a Tenant Material Adverse Effect, and has obtained all licenses, permits, franchises and other governmental authorizations material to the conduct of its business, including, without limitation, the leasing and operation of the Premises, except where failure to obtain any such license, permit, franchise or other governmental authorization pertaining to the leasing and operation of the Premises would not have a Tenant Material Adverse Effect.

(g) The written statements furnished to any Participant by the Tenant, the Guarantors and any Person authorized or employed by the Tenant or the Guarantors as agent, broker, dealer or otherwise in connection with the negotiation of the transactions contemplated by this Agreement, do not, when taken as a whole, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading. There is no fact known to the Tenant or any Guarantor which the Tenant or the Guarantors have not disclosed to each Participant in writing which would have a Tenant Material Adverse Effect.

(h) The Company has good and marketable title in fee simple to the Premises free and clear of all Liens, other than Permitted Encumbrances and Liens which are the responsibility of the Company or the Equity Investor pursuant to **Section 9**. Without limiting the foregoing, there are no taxes (including, without limitation, stamp taxes), fees or assessments due, assessed or levied against the Premises as contemplated by this Agreement by any Australian, Barbados or United States Federal, state or local governmental or public authority or agency (including any taxing authority) which are unpaid on and as of the Closing Date.

(i) (1) Assuming the accuracy of the Company's representations and warranties contained in **Section 3.1**, the Lease is in full force and effect and has not been modified or amended. No offset exists with respect to any Rent or other sums payable or to become payable to the Company, as landlord under the Lease. The Company holds no deposit or other security for performance by the Tenant under the Lease and no Rent payable to the Company as landlord under the Lease has been paid in advance.

(2) To the Tenant's knowledge, after due inquiry, the Company, as landlord under the Lease, has no unsatisfied obligations to the Tenant arising out of or incurred in connection with the lease of the Premises to the Tenant pursuant to the Lease.

(3) To the Tenant's knowledge, after due inquiry, no Lease Event of Default or Lease Default has occurred and is continuing.

(j) The amount of each installment of Basic Rent payable under the Lease on each Payment Date on which such payments are due during the Primary Term equals or exceeds the sum of the interest payments and the payments or prepayments of principal due on each such date on the Notes. The amount of the Termination Value Purchase Price under the Lease payable on any date equals or exceeds the sum of the principal amount of the Notes

which will remain unpaid on such date plus accrued interest thereon, assuming all scheduled payments of principal and interest have been previously made.

(k) The Premises is covered by the insurance required by Section 12 of the Lease and all premiums due in respect of such insurance have been paid.

(l) No approval, consent or withholding of objection on the part of any regulatory body, state, Federal or local, which has not been obtained is necessary in connection with the execution, delivery and performance by the Tenant of the Operative Documents to which it is a party or compliance by the Tenant with any of the provisions of such Operative Documents.

(m) To the Tenant's knowledge, after due inquiry, all tax returns and reports required by law to be filed by Tenant have been duly filed, and no taxes, assessments, contributions, fees or other governmental charges upon it or any of its assets or income which are due and payable thereon are delinquent, except to the extent that (1) such taxes, assessments, contributions, fees or charges are being contested in good faith and by proper proceedings and against which appropriate reserves are being maintained or (2) the failure to file any such returns or pay any such tax, assessment, contribution, fee or charge would not have a Tenant Material Adverse Effect.

(n) Assuming the accuracy of the representations and warranties of the other parties hereto contained in **Sections 3.4** and **3.5**, none of the transactions contemplated by the Operative Documents (including, without limitation, the use of the proceeds from the sale of the Notes) will result in a violation of Section 7 of the Securities Exchange Act of 1934, as amended, or any regulations issued pursuant thereto, including, without limitation, Regulations G, T and X of the Board of Governors of the Federal Reserve System, 12 C.F.R., Chapter II.

(o) To the Tenant's knowledge, after due inquiry, the consummation of the transactions provided for in this Agreement and in the other Operative Documents to which the Tenant is a party and compliance by the Tenant therewith will not involve any prohibited transaction within the meaning of ERISA or Section 4975 of the Code. The representation by the Tenant in the preceding sentence is made in reliance upon and subject to the accuracy of the representations of the Participants in **Section 3.5(c)** and disclosures pursuant thereto as to the source of the funds used by the Participants to make their respective investments pursuant to this Agreement. Neither the Tenant nor any ERISA Affiliate thereof has incurred or could be reasonably expected to incur in connection with the withdrawal from any Multiemployer Plan, the termination of a Plan or any other Reportable Event, any liability which would have a Tenant Material Adverse Effect.

(p) The Premises has not suffered damage or destruction which renders it inoperable and, under applicable zoning, use, Environmental Laws and other laws, ordinances, rules and regulations, such Property may be used as a movie theater. Without limiting the foregoing, no portion of the real property constituting a portion of the Premises is located in an *"area of special flood hazard,"* as that term is defined in the regulations of

the Federal Insurance Administration, Department of Housing and Urban Development, under the National Flood Insurance Act of 1968, as amended (24 C.F.R. §1909.1).

(q) To the Tenant's knowledge, after due inquiry, (1) the Premises has been constructed in a good and workmanlike manner in conformity with good construction and engineering practice, and the Premises conforms in all material respects to the description thereof contained in the Lease, and (2) such construction has been in accordance with all laws, ordinances, rules, regulations or orders applicable thereto, including, without limitation, any thereof relating to matters of health, safety or environmental protection, other than immaterial violations that would not, in any case or in the aggregate, prevent or interfere with the continued satisfactory operation of the Premises, result in the imposition of material penalties on any Participant, or involve material costs of correction.

(r) To the Tenant's knowledge, after due inquiry, and except as reflected in the environmental report referred to in Section 4.1(g), the operations of Tenant at the Premises comply in all material respects with all Environmental Laws to which Tenant is subject, none of the operations of Tenant are subject to any judicial or administrative proceedings alleging the violation of any Environmental Laws, none of the operations of Tenant are the subject of any federal, state or local investigation evaluating whether any remedial action is needed to respond to a release of any Hazardous Substance into the environment, which remedial action may materially and adversely affect the Premises, the Tenant has not filed any notice under any federal, state or local law indicating past or present treatment, storage or disposal of a Hazardous Substance at the Premises or reporting a spill or release of a Hazardous Substance at the Premises into the environment, and the Tenant does not have any contingent liability in connection with any release of any Hazardous Substance at the Premises into the environment, which contingent liability if liquidated would not be adequately covered by insurance or other indemnification rights.

*Section 3.3. Warranties and Representations of the Guarantors.* Each Guarantor represents and warrants, as applicable, in respect of itself only, on and as of the Closing Date that:

(a) (1) HCC is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the corporate power and authority and all necessary licenses and permits (i) to carry on its present business and operations, (ii) to own or lease its Properties, and (iii) to enter into and perform its obligations under the Operative Documents to which HCC is a party except, in the case of any such license or permit, the nonpossession of which would not have a Guarantor Material Adverse Effect. HCC is duly licensed or qualified and is in good standing as a foreign corporation in each jurisdiction wherein such licensing or qualification is necessary in order to perform its obligations under the Operative Documents to which it is a party, except where the failure to be so licensed or qualified would not have a Guarantor Material Adverse Effect.

(2) HCL is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the corporate power and

authority and all necessary licenses and permits (i) to carry on its present business and operations, (ii) to own or lease its Properties, and (iii) to enter into and perform its obligations under the Operative Documents to which HCL is a party except, in the case of any such license or permit, the nonpossession of which would not have a Guarantor Material Adverse Effect. HCL is duly licensed or qualified and is in good standing as a foreign corporation in each jurisdiction wherein such licensing or qualification is necessary in order to perform its obligations under the Operative Documents to which it is a party, except where the failure to be so licensed or qualified would not have a Guarantor Material Adverse Effect.

(3) HCA is a company duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the corporate power and authority and all necessary licenses and permits (i) to carry on its present business and operations, (ii) to own or lease its Properties, and (iii) to enter into and perform its obligations under the Operative Documents to which HCA is a party except, in the case of any such license or permit, the nonpossession of which would not have a Guarantor Material Adverse Effect. HCA is duly licensed or qualified and is in good standing as a foreign corporation in each jurisdiction wherein such licensing or qualification is necessary in order to perform its obligations under the Operative Documents to which it is a party, except where the failure to be so licensed or qualified would not have a Guarantor Material Adverse Effect.

(4) The Guarantors are members of an affiliated group of entities.

(5) All of the outstanding shares of capital stock or similar equity interests of each Subsidiary which are owned by a Guarantor or its Subsidiaries have been validly issued, are fully paid and are nonassessable (except in the case of any Subsidiary of any Guarantor other than the Tenant, where the failure of any such shares to be so validly issued, fully paid and non-assessable would not have Guarantor Material Adverse Effect) and all such shares are owned by such Guarantor or Subsidiary, as the case may be, free and clear of any Lien, except that some or all of such shares of capital stock or similar equity interests may be subject to the Lien of a pledge thereof to one or more Institutional Investors or other financial institutions.

(b) (1) The Guarantors have delivered to the Note Purchaser copies of the financial statements of the Guarantors and their Subsidiaries listed on Schedule II. All of said financial statements (including in the each case the related schedules and notes) fairly present in all material respects the consolidated or combined, as the case may be, financial position of each Guarantor and its respective Subsidiaries as of the respective dates specified in such financial statements and the consolidated or combined, as the case may be, results of their operations and cash flows for the respective periods so specified and have been prepared in accordance with GAAP consistently applied throughout the periods involved except as set forth in the notes thereto (subject, in the case of any interim financial statements, to normal year-end adjustments).

(2) Since January 2, 1997, there has been no change in the condition, financial or otherwise, of HCL and HCA and their consolidated Subsidiaries, on a combined basis, as

shown on the combined balance sheets thereof as of such date except changes, none of which individually or in the aggregate would have a Guarantor Material Adverse Effect.

(3) No Guarantor, and no Subsidiary of any Guarantor, is in default and no waiver of default is currently in effect, in the payment of any principal or interest on any Indebtedness of the Guarantors or any of their respective Subsidiaries and no event or condition exists with respect to any Indebtedness of the Guarantors or any of their respective Subsidiaries that would permit (or that with notice or the lapse of time, or both, would permit) one or more Persons to cause such Indebtedness to become due and payable before its stated maturity or before its regularly scheduled dates of payment, except for such defaults, events and conditions which would not individually or in the aggregate have a Guarantor Material Adverse Effect.

(c) The Operative Documents to which the Guarantors are parties have been duly authorized, executed and delivered by each Guarantor and constitute valid and binding obligations of each Guarantor enforceable against each Guarantor in accordance with the respective terms thereof, except as such terms may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and except as equitable remedies such as specific performance may be in the discretion of the courts.

(d) The execution and delivery by the Guarantors of the Operative Documents to which the Guarantors are parties and compliance by the Guarantors with all of the provisions thereof do not and will not contravene any law or any order of any court or governmental authority or agency applicable to or binding on the Guarantors or contravene the provisions of, or constitute a default under, or result in the creation of any Lien upon the Property of any Guarantor under, its respective charter or by-laws or any indenture, mortgage, contract or other agreement or instrument to which any Guarantor is a party or by which it or any of such Guarantor's Property may be bound or affected.

(e) There are no proceedings pending or (to the Guarantor's knowledge, after due inquiry) threatened, nor (to the Guarantor's knowledge, after due inquiry) is there any existing basis for any such proceedings, against or affecting any Guarantor in any court or before any governmental authority or arbitration board or tribunal which, if adversely determined, would have a Guarantor Material Adverse Effect. No Guarantor is (to the knowledge of such Guarantor, after due inquiry) in default with respect to any order of any court or governmental authority or arbitration board or tribunal, which default would have a Guarantor Material Adverse Effect.

(f) No Guarantor is in violation of any term of any charter instrument, by-law or other material agreement or instrument to which it is a party or by which it may be bound, which violation would have a Guarantor Material Adverse Effect. Each Guarantor is in compliance with all laws, ordinances, governmental rules and regulations to which it is subject, failure to comply with which would have a Guarantor Material Adverse Effect, and has obtained all licenses, permits, franchises and other governmental authorizations necessary to the conduct of its business, except where the failure to have any such license, permit, franchise or authorization would not have a Guarantor Material Adverse Effect.

(g) The written statements furnished to any Participant by the Guarantors, the Tenant or any Person authorized or employed by the Guarantors or the Tenant as agent, broker, dealer or otherwise in connection with the negotiation of the transactions contemplated by this Agreement, do not, when taken as a whole, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading. There is no fact known to the Tenant or any Guarantor which the Guarantors or the Tenant have not disclosed to each Participant in writing which would have a Guarantor Material Adverse Effect.

(h) The Lease Guaranty is in full force and effect according to its terms and is not in default.

(i) No approval, consent or withholding of objection on the part of any Australian, Barbados or United States regulatory body, state, Federal or local, which has not been obtained is necessary in connection with the execution, delivery and performance by the Guarantors of the Operative Documents to which the Guarantors are parties or compliance by the Guarantors with any of the provisions of such Operative Documents.

(j) To the Guarantors' knowledge, after due inquiry, all tax returns and reports required by law to be filed by each Guarantor have been duly filed, and no taxes, assessments, contributions, fees or other governmental charges upon it or any of its assets or income which are due and payable thereon are delinquent, except to the extent that (1) such taxes, assessments, contributions, fees or charges are being contested in good faith and by proper proceedings and against which appropriate reserves are being maintained or (2) the failure to file any such return or pay any such tax, assessment, contribution, fee or charge would not have a Guarantor Material Adverse Effect.

(k) To the Guarantors' knowledge, after due inquiry, (1) the consummation of the transactions provided for in this Agreement and in the other Operative Documents to which the Guarantors are parties and compliance by the Guarantors with the provisions of the Lease Guaranty and with the provisions of the other Operative Documents to which the Guarantors are parties, will not involve any prohibited transaction within the meaning of ERISA or Section 4975 of the Code. The representation by the Guarantors in the preceding sentence is made in reliance upon and subject to the accuracy of the representations of the Participants in **Section 3.5(c)** and disclosures pursuant thereto as to the source of the funds used by the Participants to make their respective investments pursuant to this Agreement. None of the Guarantors nor any ERISA Affiliate thereof has incurred or could reasonably be expected to incur in connection with the withdrawal from any Multiemployer Plan, the termination of a Plan or any other Reportable Event, any liability which would have a Guarantor Material Adverse Effect.

(2) Each Non-U.S. Pension Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities; none of the Guarantors nor any of their respective Subsidiaries have incurred any obligation in connection with the termination of or withdrawal from any Non-

U.S. Pension Plan; and all contributions required to be made with respect to each Non-U.S. Pension Plan have been timely made, except where any such obligation or the nonpayment of any such contribution would not have a Guarantor Material Adverse Effect.

*Section 3.4. Private Offering.* (a) The Company warrants and represents to the Tenant, the Guarantors and the Participants that neither the Company nor any Person authorized or employed by the Company as agent, broker, dealer or otherwise in connection with the placement of the Notes, the Beneficial Interest or any similar Security has offered any of the Notes, the Beneficial Interest or any similar Security for sale to, or solicited offers to buy any thereof from, or otherwise approached or negotiated with respect thereto with, any prospective purchaser.

(b) The Tenant warrants and represents to the Company and the Participants that neither the Tenant nor, except as provided in **Section 3.4(c),** any Person authorized or employed by the Tenant as agent, broker, dealer or otherwise in connection with the placement of the Notes, the Beneficial Interest or any similar Security has offered any of the Notes, the Beneficial Interest or any similar Security for sale to, or solicited offers to buy any thereof from, or otherwise approached or negotiated with respect thereto with, any prospective purchaser, except as expressly contemplated by **Section 3.4(c)**.

(c) The Guarantors warrant and represent to the Participants that:

(1) neither the Guarantors nor any Affiliate of any thereof or Babcock & Brown (the only Person authorized or employed by the Guarantors as agent, broker or otherwise in connection with the offering or sale of the Beneficial Interest or any similar Security) has offered any of the Beneficial Interest or any similar Security for sale to, or solicited offers to buy any thereof from, or otherwise approached or negotiated with respect thereto with, any prospective purchaser, other than the Equity Investor and not more than ten other Institutional Investors, each of which was offered the Beneficial Interest at private sale for investment and which the Guarantors or such agent had reasonable grounds to believe, and did believe, and, as to the Equity Investor, after reasonable inquiry does believe, has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Beneficial Interest; and

(2) neither the Guarantors nor any Affiliate of any thereof or Babcock & Brown (the only Person authorized or employed by the Guarantors as agent, broker, dealer or otherwise in connection with the offering or sale of the Notes or any similar Security) has offered any of the Notes or any similar Security for sale to, or solicited offers to buy any thereof from, or otherwise approached or negotiated with respect thereto with, any prospective purchaser, other than the Note Purchaser and ten other institutional investors, each of which was offered a portion of the Notes at private sale for investment and each of which the Guarantors or such agent had reasonable grounds to believe, and did believe, and, as to the Note Purchaser, after reasonable inquiry does believe, has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Notes.

(d) The Equity Investor warrants and represents to the Tenant and the Note Purchaser that neither the Equity Investor or any Person affiliated therewith nor any Person authorized or employed by the Equity Investor as agent, broker, dealer or otherwise in connection with the placement of the Beneficial Interest, the Notes or any similar Security has offered any of the Beneficial Interest, the Notes or any similar Security for sale to, or solicited offers to buy any thereof from, or otherwise approached or negotiated with respect thereto with, any prospective purchaser.

(e) The Company, the Equity Investor, the Tenant and the Guarantors each for itself agree that neither it nor anyone acting on its behalf will offer:

(1) the Beneficial Interest or any part thereof or any similar Security for issue or sale to, or solicit any offer to acquire any of the Beneficial Interest from, anyone so as to bring the issuance and sale of the Beneficial Interest within the provisions of Section 5 of the Securities Act of 1933, as amended, or

(2) the Notes or any part thereof or any similar Security for issue or sale to, or solicit any offer to acquire any of the Notes from, anyone so as to bring the issuance and sale of the Notes within the provisions of Section 5 of the Securities Act of 1933, as amended.

*Section 3.5. Representations and Covenants of the Participants; Transfer of Beneficial Interest and Notes.*

(a) *Representations and Covenants of the Equity Investor.* The Equity Investor warrants and represents to the Note Purchaser, the Company, the Tenant and the Guarantors that:

(1) The Equity Investor is a limited liability company duly organized, validly existing and in good standing under the laws of the British Virgin Islands and has the power and authority to carry on its present business and operations, to own or lease its Properties and to enter into and perform its obligations under the Operative Documents to which it is a party.

(2) The Operative Documents to which the Equity Investor is a party have been duly authorized, executed and delivered by the Equity Investor and constitute legal, valid and binding obligations of the Equity Investor enforceable against the Equity Investor in accordance with their respective terms, except as such terms may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and except as equitable remedies such as specific performance may be in the discretion of the courts.

(3) The execution and delivery by the Equity Investor of the Operative Documents to which it is a party and compliance by the Equity Investor with all of the provisions thereof do not and will not contravene any law or any order of any court or governmental authority or agency applicable to or binding on the Equity Investor

or contravene the provisions of, or constitute a default under, its charter or by-laws or any indenture, mortgage, contract or any agreement or instrument to which the Equity Investor is a party or by which it or any of its Property may be bound or affected.

(4) No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery or performance by the Equity Investor of the Operative Documents to which the Equity Investor is a party.

(5) The Premises are free of Liens and encumbrances of other Persons resulting from claims against the Equity Investor not related to the transactions contemplated by the Operative Documents. Without limiting the foregoing, there are no taxes (including, without limitation, any stamp tax), fees or assessments due, assessed or levied against the Equity Investor by any Australian or United States Federal, state or local governmental or public authority or agency (including any taxing authority) arising out of the acquisition of the Premises as contemplated by this Agreement which are unpaid on and as of the Closing Date.

(6) The Equity Investor is not a party in interest with respect to any employee benefit plan whose name has been disclosed to the Note Purchaser pursuant to **Section 3.5(c)** and the Securities of the Equity Investor are not employer securities with respect to any such plan.

(7) The Equity Investor has not assigned or transferred any of its right, title or interest in or to the Beneficial Interest.

(b) *Purchase for Investment.* Each Participant represents to each other Participant, the Company, the Tenant and the Guarantors that such Participant is purchasing the Interest (as hereinafter defined) to be acquired by it for the account of such Participant for investment and with no present intention of distributing or reselling such Interest or any part thereof, but without prejudice, however, to the right of such Participant at all times to sell or otherwise dispose of all or any part of such Interest under a registration under the Securities Act of 1933, as amended, or under an exemption from such registration available under such Act and otherwise in compliance with all applicable laws (including, without limitation, ERISA); *provided* that the disposition of such Interest shall at all times be within its control, subject, in the case of the Beneficial Interest, to compliance with the provisions of **Section 3.5(e)** and, in the case of the Notes, **Section 3.5(f)**.

The Beneficial Interest and the Notes are sometimes referred to in this **Section 3.5** collectively as the *"Interests"* and individually as an *"Interest"*.

(c) *Source of Funds.* Each Participant represents that at least one of the following statements is an accurate representation as to the source of funds (a *"Source"*) to be used by such Participant to make its investment pursuant to Section 1:

(1) if such Participant is an insurance company, the Source is an "insurance company general account" as defined in Department of Labor Prohibited Transaction Exemption (*"PTE"*) 95-60 (issued July 12, 1995) and there is no employee benefit plan established or maintained by the Tenant or the Equity Investor, treating as a single plan all plans maintained by the same employer or employee organization, with respect to which the amount of the reserves and liabilities of all general account contracts held by or on behalf of such plan(s) exceed ten percent (10%) of the total reserves and liabilities of such general account (exclusive of separate account liabilities) *plus* surplus, as set forth in the NAIC Annual Statement filed with the Note Purchaser's state of domicile; or

(2) if such Participant is an insurance company, the Source is either (i) an insurance company pooled separate account, within the meaning of PTE 90-1 (issued January 29, 1990), or (ii) a bank collective investment fund, within the meaning of the PTE 91-38 (issued July 12, 1991) and, except as such Participant has disclosed to the Tenant and the Equity Investor in writing pursuant to this paragraph (2), no employee benefit plan or group of plans maintained by the same employer or employee organization beneficially owns more than 10% of all assets allocated to such pooled separate account or collective investment fund; or

(3) if such Participant is an insurance company, the Source constitutes assets of an "investment fund" (within the meaning of Part V of the QPAM Exemption) managed by a "qualified professional asset manager" or "QPAM" (within the meaning of Part V of the QPAM Exemption), no employee benefit plan's assets that are included in such investment fund, when combined with the assets of all other employee benefit plans established or maintained by the same employer or by an affiliate (within the meaning of Section V(c)(1) of the QPAM Exemption) of such employer or by the same employee organization and managed by such QPAM, exceed 20% of the total client assets managed by such QPAM, the conditions of Part l(c) and (g) of the QPAM Exemption are satisfied, neither the QPAM nor a Person controlling or controlled by the QPAM (applying the definition of "control" in Section V(e) of the QPAM Exemption) owns a 5% or more interest in the Tenant or the Equity Investor and (A) the identity of such QPAM and (B) the names of all employee benefit plans whose assets are included in such investment fund have been disclosed to the Tenant and the Equity Investor in writing pursuant to this paragraph (3); or

(4) the Source is a "governmental plan" (as defined in Section 3(32) of ERISA); or

(5) the Source is one or more employee benefit plans, or a separate account or trust fund comprised of one or more employee benefit plans, each of which has been identified to the Tenant and the Equity Investor in writing pursuant to this paragraph (5); or

(6) the Source does not include assets of any employee benefit plan, other than a plan exempt from the coverage of ERISA.

If the Note Purchaser or any subsequent transferee of the Notes indicates that it or such transferee is relying on any representation contained in paragraph (2), (3) or (5) above, the Tenant shall deliver to the Note Purchaser on the date of Closing and on the date of any applicable transfer of the Notes a certificate, which shall either state that (A) it is neither a party in interest nor a "disqualified person" (as defined in Section 4975(e)(2) of the Code), with respect to any plan identified pursuant to paragraphs (2) or (5) above, or (B) with respect to any plan, identified pursuant to paragraph (3) above, neither it nor any "affiliate" (as defined in Section V(c) of the QPAM Exemption) has at such time, and during the immediately preceding one year, exercised the authority to appoint or terminate said QPAM as manager of any plan identified in writing pursuant to paragraph (3) above or to negotiate the terms of said QPAM's management agreement on behalf of any such identified plan. As used in this **Section 3.5**, the terms "employee benefit plan", "governmental plan", "party in interest" and "separate account" shall have the respective meanings assigned to such terms in Section 3 of ERISA.

(d) *Reaffirmation on the Closing Date.* The advance of funds by the Equity Investor on the Closing Date shall constitute a reaffirmation by the Equity Investor of its representations and warranties set forth in this **Section 3.5** as of the Closing Date, and the purchase of the Notes by the Note Purchaser on the Closing Date shall constitute reaffirmation by the Note Purchaser of its representations and warranties set forth in this **Section 3.5** as of the Closing Date.

(e) *Restrictions on Transfer of Equity Investor's Interests.* The Equity Investor agrees that it will not at any time transfer or assign any of the Beneficial Interest unless (1) the transferee or assignee is organized under the laws of any state of the United States, (2) the transferee or assignee is an "affiliated company" or is acceptable to the Note Purchaser, the Tenant and the Guarantors as evidenced by their respective written consents delivered to the Equity Investor, such consents not to be unreasonably withheld or delayed, (3) the transferee or assignee shall execute and deliver an agreement in form and substance satisfactory to the Note Purchaser, the Tenant and the Guarantors whereby the transferee or assignee agrees to be bound by all of the terms of and to undertake all of the obligations of the Equity Investor under each of the Operative Documents to which it is a party and makes representations of the scope provided for as to the Equity Investor in each of the Operative Documents, and (4) all Australian, Barbados and United States Federal, state and local taxes (including, without limitation, stamp taxes), fees and assessments due or to become due in connection with such transfer or assignment of the Beneficial Interest shall have been paid in full and evidence thereof shall have been delivered to the Note Purchaser, the Tenant and the Guarantors. The term *"affiliated company"* shall mean any company (the *"Parent"*) owning not less than 80% of the Equity Interests of the Equity Investor, any company (the *"Holding Company"*) owning, directly or indirectly, not less than 80% of the Equity Interests of the Parent, and any company not less than 80% of the Equity Interests of which is owned, directly or indirectly, by the Holding Company, the Parent or the Equity Investor. Prior to transferring its Beneficial Interest, the Equity Investor shall give written notice to the Note Purchaser, the Tenant and the Guarantors specifying the name and address of the transferee and such additional information as may be required to demonstrate compliance with the preceding provisions of this **Section 3.5(e)**, accompanied by the opinion of independent

counsel for the transferring Equity Investor (at the expense of the transferring Equity Investor or the new Equity Investor) that a registration of the Beneficial Interest under the Securities Act of 1933, as amended, has been performed or, if applicable, no such registration is necessary in connection with such transfer or assignment (the cost of such opinion, together with any out-of-pocket expenses of the Note Purchaser, the Tenant and the Guarantors directly incurred in connection with any such transfer, to be paid by the transferring Equity Investor). Upon any such transfer or assignment of the Beneficial Interest as above provided, the transferee or assignee shall be deemed the "Equity Investor" for all purposes of the Operative Documents and shall be deemed to have made all payments previously made by the transferring or assigning Equity Investor; each reference in the Operative Documents to the Equity Investor shall thereafter be deemed to mean such transferee or assignee; and the transferring or assigning Equity Investor shall be relieved of all obligations and liabilities of the Equity Investor arising subsequent to the date of such transfer or assignment (other than any obligation or liability under any guaranty referred to in clause (iii) above); *provided* that in no event shall any such transfer or assignment waive or release the transferor or assignor from any liability on account of any breach of any representations or warranties, covenants or obligations set forth in this Agreement or for any fraudulent or willful misconduct. Any transfer or assignment of the Beneficial Interest in violation of this **Section 3.5(e)** shall be void and of no effect.

(f) *Restrictions on Transfer of Notes.* Anything contained in this Agreement or any of the other Operative Documents to the contrary notwithstanding, the Note Purchaser may transfer all or any part of the Notes and its rights under and pursuant to the Operative Documents, in whole or in part, to any Person; *provided* that (i) such Person is an Institutional Investor and (ii) such Person is not a Competitor; and *provided, further*, that if the Note Purchaser wishes to transfer to any Person other than an Institutional Investor, it may do so, *provided* that it shall first have obtained the prior written consent of any of the Guarantors, which consent shall not be unreasonably withheld or delayed.

SECTION 4. CONDITIONS.

*Section 4.1. Conditions Precedent to Investment by Each Participant.* The obligations of each Participant to make its investment pursuant hereto on the Closing Date shall be subject to the following conditions:

(a) *Execution of Operative Documents.* On or before the Closing Date, the Operative Documents shall have been duly executed and delivered by the parties thereto and shall be in full force and effect, and no default shall exist in the performance by any party thereto of any of its obligations thereunder.

(b) *Recording.* Either (1) the Quitclaim Deed and the Lease (or notices or memoranda thereof) and such other documents as are deemed necessary or appropriate by such Participant shall on the Closing Date have each been recorded or filed for record in such public offices as may be necessary or appropriate in order to protect the rights of the Company thereunder and if such Participant is the Note Purchaser to perfect the right, title and interest of the Note Purchaser in and to the,

the Premises, the Lease and the Lease Guaranty, or (2) the transactions contemplated hereunder are to be closed by a so-called "New York-style" closing with the Title Company providing policies of title insurance to the parties dated the Closing Date and in the form required by **Section 4.1(g)**, and all of the foregoing documents shall have been delivered to the Title Company on the day of or prior to the Closing Date.

(c) *Closing Certificate of Tenant.* On the Closing Date, such Participant shall have received an Officer's Certificate of the Tenant dated the Closing Date, the truth and accuracy of which shall be a condition to the obligation of such Participant to make the investment by such Participant contemplated by **Section 1** on the Closing Date, to the effect that the warranties and representations of the Tenant set forth in **Section 3.2** and **3.4(b)** hereof are true on the Closing Date with the same effect as though made on and as of that date and that no Lease Default or Lease Event of Default has occurred and is continuing.

(d) *Closing Certificate of Guarantors.* On the Closing Date, such Participant shall have received an Officer's Certificate of each Guarantor dated the Closing Date, the truth and accuracy of such shall be a condition to the obligation of such Participant to make the investment of such Participant contemplated by **Section 1** on the Closing Date, to the effect that the warranties and representations of the Guarantors set forth in **Section 3.3** and **3.4(c)** hereof are true on the Closing Date with the same effect as though made on and as of that date and that no Lease Default or Lease Event of Default under the Lease has occurred and is continuing.

(e) *Survey.* At least two Business Days prior to the Closing Date, the Company shall have caused a physical survey of the parcel of real estate constituting the Premises, showing the location of the improvements on such parcel of real estate, to be made by a registered civil engineer or surveyor licensed in the Commonwealth of Massachusetts in accordance with the standard detail requirements for land title surveys adopted by the American Land Title Association (*"ALTA"*) (including the items 3, 4, 6, 7 (in its entirety), 8, 9, 10, 11 and 14 (number of stories, and finish floor elevations if the building is in a flood zone) checked on Table A — Optional Survey Responsibilities and Specifications) and the American Congress on Surveying & Mapping, as revised and in effect as of the date hereof, and shall have furnished to such Participant and its special counsel a plat of survey duly certified by such engineer or surveyor which shall show no material encroachments upon such real estate parcel by adjoining buildings or structures and no encroachments on adjoining premises by the buildings or improvements erected thereon.

(f) *Evidence of Title.* At least two Business Days prior to the Closing Date, the Company shall have obtained the commitment of First American Title Insurance Company (the *"Title Company"*), to issue policies of mortgage title insurance on a standard ALTA Form Mortgage Title Insurance Policy (Loan Policy-1970 Form, if available, or if the 1970 is unavailable, the 1992 Form) with a Comprehensive Endorsement, Access Endorsement, Endorsement requiring the Title Company to first obtain the Note Purchaser's consent before the Title Company exercises its options

under paragraph 6(b)(i) of the Conditions and Stipulations sections of the ALTA Policy (if the 1992 form is used), Zoning Endorsement, and Endorsement deleting Item 7 from the Exclusions from Coverage (if the 1992 form is used) and otherwise in form and substance satisfactory to you and your special counsel (*"ALTA Policy"*) in the aggregate amount which will provide for mortgage title insurance in an amount not less than the aggregate principal amount of Notes then and thereafter issued, covering the Premises, and showing good and marketable record title to the Premises to be vested in the Company subject only to:

(1) the Liens and encumbrances, if any, permitted by the Mortgage;

(2) such exceptions as are standard under an ALTA Policy (but such policy shall not be subject to a standard survey or mechanic's lien exception); and

(3) such other exceptions as shall be satisfactory to such Participant and its special counsel; and

agreeing to insure the Note Purchaser, upon the proper execution and recording of the Mortgage, against loss or damage sustained by reason of such Mortgage not being a first and paramount lien upon the title to the Premises, subject only to the exceptions referred to in the foregoing clauses (1) through (3).

(g) *Environmental Report.* At least five Business Days prior to the Closing Date, such Participant and its special counsel shall have received a copy of an environmental assessment of the Premises prepared by Beals & Thomas, Inc., which shall be in form and substance reasonably satisfactory to such Participant and its special counsel.

(h) *Appraisal Report.* At least one Business Day prior to the Closing Date each Participant shall have received from Lynch Murphy Walsh & Partners Incorporated an MAI-approved report dated such date with respect to the fair market value of the Premises which shall be in form and substance reasonably satisfactory to such Participant and its special counsel.

(i) *Opinions of Counsel.* On the Closing Date, such Participant shall have received the favorable written opinions of Riemer & Braunstein, independent Massachusetts counsel for the Tenant and the Guarantors, Arnold Bloch Leibler, independent Australian counsel for HCL, R.H. Maraj, independent Barbados counsel for HCA, and Skadden, Arps, Slate, Meagher & Flom LLP, independent Delaware counsel for the Tenant and the Guarantors substantially in the respective forms set forth in Annex IV hereto.

(j) *Engineers' or Architects' Certificate.* Not less than one Business Day prior to the Closing Date, such Participant and its special counsel shall have received executed copies of a certificate of an engineer or architect employed by the Tenant and

licensed to do business in the Commonwealth of Massachusetts, to the effect that the signer has reviewed the Plans of the Premises, and based on such review, (1) the Premises has been completed in accordance with the Plans and (2) no other facilities are or will be necessary to permit the operation and maintenance of the Premises in accordance with good engineering and operational practices.

(k) *Cost Certificate.* Not less than one Business Day prior to the Closing Date, such Participant and its special counsel shall have received an Officer's Certificate of the Tenant dated the Closing Date stating in reasonable detail the actual construction cost of the Premises, exclusive of the cost of any Tenant's Trade Property.

(l) *Insurance Certificate.* On or before the Closing Date, such Participant and its special counsel shall have received an Officer's Certificate of the Tenant dated the Closing Date accompanied by certificates or other satisfactory evidence of the maintenance of the insurance required pursuant to Section 12 of the Lease.

(m) *Corporate Existence and Authority of Tenant.* On the Closing Date, the Participants and their special counsel shall have received, in form and substance reasonably satisfactory to the Participants and their special counsel, such documents and evidence with respect to the Tenant as any Participant may reasonably request in order to establish the existence and good standing of the Tenant, the authorization of the transactions contemplated by the Operative Documents, the taking of all corporate proceedings in connection therewith and compliance with the conditions set forth in this **Section 4.1**.

(n) *Corporate Existence and Authority of Guarantors.* On the Closing Date, the Participants and their special counsel shall have received, in form and substance reasonably satisfactory to the Participants and their special counsel, such documents and evidence with respect to each Guarantor as any Participant may reasonably request in order to establish the existence and good standing of the Guarantors, the authorization of the transactions contemplated by the Operative Documents, the taking of all corporate proceedings in connection therewith and compliance with the conditions set forth in this **Section 4.1**.

(o) *Related Transactions.* The other Participant shall make the investment contemplated for such other Participant by **Section 1**.

(p) *Real Property Foreign Investment.* On the Closing Date, the Developer shall deliver to the Company, the Equity Investor and the Note Purchaser an affidavit in form reasonably satisfactory to the Participants certifying that the Developer is not a "foreign person" for purposes of Section 1445 of the Code.

(q) *Proceedings Satisfactory.* All proceedings taken in connection with the transactions contemplated hereby and all documents and papers relating thereto shall be reasonably satisfactory to such Participant and its special counsel, and such

Participant and such special counsel shall have received copies of such documents and papers as such Participant or such special counsel may reasonably request in connection therewith or as a basis for such special counsel's closing opinion, all in form and substance reasonably satisfactory to such Participant and such special counsel.

*Section 4.2. Additional Conditions Precedent to Note Purchase.* The obligation of the Note Purchaser to purchase and pay for Notes pursuant hereto on the Closing Date shall be subject to the conditions specified in **Section 4.1** and the following additional conditions:

(a) *Recording of Mortgage.* Either (1) the Mortgage and the Lease Assignment shall on the Closing Date have been recorded or filed in all public offices as may be necessary or appropriate in order to perfect the Lien and security interest granted by the Mortgage and the Lease Assignment as against creditors of and purchasers from the Company and the Equity Investor or (2) the transactions contemplated hereunder are to be closed by a so-called "New York-style" closing, and the Mortgage and the Lease Assignment shall have been delivered to the Title Company on the day of or prior to the Closing Date.

(b) *Legal Investment.* The Notes shall on the Closing Date qualify as a legal investment for the Note Purchaser under any laws regulating investments to which it may be subject.

(c) *Closing Certificate of Company and Company Manager.* (1) On the Closing Date, the Note Purchaser shall have received an Officer's Certificate of the Company dated the Closing Date, the truth and accuracy of which shall be a condition to the obligation of the Note Purchaser to make the investment by the Note Purchaser contemplated by **Section 1** hereof on the Closing Date, to the effect that the representations and warranties of the Company set forth in **Sections 3.1** and **Section 3.4(a)** hereof are true on the Closing Date with the same effect as though made on and as of that date, and that to the knowledge of the Company, no Mortgage Default or Mortgage Event of Default has occurred and is continuing.

(2) On the Closing Date, the Note Purchaser shall have received an Officer's Certificate of the Company Manager dated the Closing Date, the truth and accuracy of which shall be a condition to the obligation of the Note Purchaser to make the investment of the Note Purchaser contemplated by **Section 1** on the Closing Date, in the form attached hereto as Exhibit F.

(d) *Compliance Certificate.* On the Closing Date, the Note Purchaser and its special counsel shall have received an Officer's Certificate from each of the Guarantors dated the Closing Date, the truth and accuracy of which shall be a condition to the obligation of the Note Purchaser to make the investment of the Note Purchaser contemplated by **Section 1** on the Closing Date, to the effect that after giving effect to the issuance of the Notes, and the transactions contemplated hereby (including, without limitation, the delivery of the Lease Guaranty), the ratio of

Consolidated Total Indebtedness to Consolidated EBITDA for the immediately preceding four fiscal quarter period does not exceed 5.50 to 1.00.

(e) *Corporate Existence and Authority of Company, Company Manager, Equity Investor and Equity Investor Manager.* On the Closing Date, the Note Purchaser and its special counsel shall have received, in form and substance reasonably satisfactory to the Note Purchaser and its special counsel, such documents and evidence with respect to the Company, the Company Manager, the Equity Investor and the Equity Investor Manager as the Note Purchaser may reasonably request in order to establish the existence and good standing of the Company, the Company Manager, the Equity Investor and the Equity Investor Manager, the authorization of the transactions contemplated by the Operative Documents, the taking of all corporate proceedings in connection therewith and compliance with the conditions set forth in **Section 4.1**.

(f) *Opinions of Counsel.* On the Closing Date, the Note Purchaser shall have received the favorable written opinions of Chapman and Cutler, special counsel for the Note Purchaser, and of Goulston & Storrs, independent counsel for the Company, substantially in the respective forms set forth in Annex IV hereto.

(g) *Reconciliation to U.S. GAAP.* Not less than one Business Day prior to the Closing Date, the Note Purchaser shall have received, in form and substance satisfactory to the Note Purchaser a reconciliation between Australian GAAP and U.S. GAAP with regard to the profit and loss account of the Guarantors for the fiscal year ended July 3, 1997.

(h) *Funding Instructions.* Not less than one Business Day prior to the Closing Date, the Note Purchaser shall have received written instructions executed by an authorized financial representative of the Company directing the manner of payment of funds and setting forth (1) the name and address of the transferee bank, (2) the transferee bank's ABA number, (3) the account name and number into which the purchase price for the Notes is to be deposited, and (4) the name and telephone number of the account representative responsible for verifying receipt of such funds.

(i) *Payment of Special Counsel Fees.* On the Closing Date, reasonable fees and expenses of Chapman and Cutler, special counsel to the Note Purchaser in connection with the transactions contemplated hereby, as set forth in an invoice delivered to the Company and the Tenant, shall be paid.

## SECTION 5. SPECIAL RIGHTS OF NOTE PURCHASER.

Notwithstanding any provision to the contrary in this Agreement, the Mortgage or the Notes relating to the manner and place of payment, but, subject always to the Lease Assignment pursuant to which the Tenant agrees on the terms and conditions therein set forth to pay Basic Rent, the Casualty Value Purchase Price, the Make-Whole Amount, if any, and any Additional Rent due and owing to Note Purchaser directly to the Note Purchaser, all amounts payable to the Note Purchaser with respect to any Notes held by the Note Purchaser

or a nominee for the Note Purchaser shall be paid by the Company to the Note Purchaser (without any presentment thereof and without any notation of such payment being made thereon) by check, duly mailed, by first class mail, postage prepaid, or delivered to the Note Purchaser at the address for payments for the Note Purchaser appearing beneath its signature at the foot of this Agreement or, if wire transfer to a bank account is designated by the Note Purchaser beneath its signature at the foot of this Agreement or in a written notice from the Note Purchaser to the Company, by wire transfer of immediately available Federal Reserve funds to the bank so designated for credit to the account and marked for attention as so designated, *provided* that such bank has facilities for the receipt of a wire transfer, or in such other manner or to such other address in the United States as may be designated by the Note Purchaser in a written notice from the Note Purchaser to the Company. In the case of any wire transfer, the Company will make such transfer from the office of the Company on each date any payment or prepayment of principal or interest on the Notes is due not later than 10:00 a.m., Chicago, Illinois time, *provided* that funds therefor have been received by the Company in cash or in solvent credits acceptable to it or if not so received promptly upon receipt.

SECTION 6. COMPANY COVENANTS.

From and after the Closing Date and continuing so long as any amount remains unpaid on any Note, the Company covenants with the Note Purchaser, the Tenant and the Guarantors and their successors and assigns as follows:

*Section 6.1. Office for Notices.* The Company will keep an office while any of the Notes issued hereunder are outstanding at the notice address set forth herein, where notices, presentations and/or demands to or upon the Company in respect of said Notes or any other Operative Document may be given or made, until such time as the Company shall so notify the holders of the Notes of any change of location of such office.

*Section 6.2. Maintenance of Existence, Rights.* The Company will at all times preserve its existence and will obtain and maintain, or will cause to be obtained and maintained, in full force and effect all franchises, privileges, rights, licenses and permits and all other consents, approvals and authorizations of any governmental authority necessary for the ownership and efficient operation and maintenance of its business and Property.

*Section 6.3. Maintenance of Property.* The Company will at all times maintain, preserve and keep, or will cause to be maintained, preserved and kept, its Property and assets (whether owned in fee or a leasehold interest) in good repair and working order and from time to time will make, or will cause to be made, all necessary repairs, replacements, renewals and additions so that at all times the efficiency thereof shall be maintained.

*Section 6.4. Insurance.* The Company will maintain, or will cause to be maintained, insurance coverage by financially sound and reputable insurers in such forms and amounts and against such risks as are required of it by the terms of Section 2.6 of the Mortgage.

*Section 6.5. Payment of Taxes and Other Charges; Compliance with Laws.* (a) The Company will promptly pay and discharge or will cause to be paid promptly or discharged all lawful taxes, assessments and governmental charges or levies imposed upon the Company or upon or in respect of all or any part of the Property, assets and business of the Company, all trade accounts payable in accordance with usual and customary business terms, and all claims for work, labor or materials which if unpaid might become a Lien or charge upon any property or assets of the Company, other than Permitted Encumbrances which are not by the terms of the Operative Documents the responsibility of the Company.

(b) The Company will promptly comply with all laws, ordinances or governmental rules and regulations to which it is subject, including without limitation, the Occupational Safety and Health Act of 1970, as amended, ERISA, the Americans with Disabilities Act of 1990, and all Environmental Laws.

*Section 6.6. Negative Covenants.* The Company will not, directly or indirectly:

(a) engage in any business other than the ownership and operation of the Premises, the leasing of the Premises to the Tenant under the Lease and the financing thereof through the issuance of the Notes as provided in this Agreement and the Mortgage;

(b) incur, assume, guarantee or otherwise create or be or become liable in respect of any Indebtedness other than the Notes;

(c) make, or permit to remain outstanding, any investment, loan or advance to, or own or acquire any stock or Securities of, any Person;

(d) pay or declare any dividend, or make any other distribution if, after giving effect thereto, a Mortgage Default or Mortgage Event of Default would exist or if the making of such dividend or other distribution would adversely affect the ability of the Company to perform its obligations under this Agreement or any other Operative Document to which it is a party;

(e) create by its acts or suffer to be created or exist any mortgage, security interest, lien, charge or encumbrance of any kind whatsoever upon any part of the Premises or any part or portion thereof or upon any rents, income, revenues, issues and profits thereof, other than the Mortgage and Liens, claims and encumbrances expressly permitted by the terms thereof;

(f) enter into any lease of the Premises, whether as lessor or as lessee, other than the Lease;

(g) sell, transfer, exchange or otherwise dispose of any part of the Premises or any part or portion thereof, other than as expressly permitted by the Mortgage;

(h) create, organize or establish any Person, including, without limitation any Subsidiary or partnership; or

(i) hire any employee.

*Section 6.7. Mergers and Consolidations.* The Company will not consolidate with or be a party to a merger with any other Person.

*Section 6.8. Financial Information and Reports.* The Company will keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to the business and affairs of the Company, in accordance with GAAP consistently maintained and will furnish to each holder of outstanding Notes in duplicate:

(a) As soon as available and in any event within 90 days after the close of each fiscal year of the Company, copies of:

(1) a balance sheet of the Company as of the close of such fiscal year, and

(2) statements of income, retained earnings and cash flows of the Company for such fiscal year,

in each case setting forth in comparative form the figures for the preceding fiscal year, all in reasonable detail and certified by the chief financial officer of the Company to the effect that such financial statements have been prepared in accordance with GAAP, are complete and correct and present fairly, in all material respects, the financial condition of the Company;

(b) Within the period provided in paragraph (a) above, the written statement of the Company, signed by the chief financial officer, stating whether there existed as of the date of such financial statements and whether, to the best of his knowledge, there exists on the date of the certificate any Mortgage Default, Mortgage Event of Default, Lease Default or Lease Event of Default and specifying the nature and period of existence thereof and the action the Company is taking and proposes to take with respect thereto;

(c) Within five Business Days after becoming aware of the same, the Company shall notify the holders of the Notes in writing of any condemnation proceedings or casualty occurrence to which the Premises has become subject; and

(d) Such additional information as such holder may reasonably request concerning the Company.

The Company will permit each holder of outstanding Notes (or such Persons as any such holder may designate) to examine all of its books of account, records, reports and other

papers, to make copies and extracts therefrom and to discuss its affairs, finances and accounts with its officers, all at such reasonable times and as often as any such holder may reasonably request. Any visitation shall be at the sole expense of the holder of the Notes, unless a Mortgage Default or Mortgage Event of Default shall have occurred and be continuing, in which case, any such visitation shall be at the sole expense of the Company.

*Section 6.9. Repurchase of Notes.* Neither the Company nor any Affiliate of the Company, directly or indirectly, may repurchase or make any offer to repurchase any Notes.

*Section 6.10. Transactions with Affiliates.* The Company will not enter into or be a party to, any transaction or arrangement with any Affiliate (including without limitation, the purchase from, sale to or exchange of property or assets with, or the rendering of any service by or for, any Affiliate), except in the ordinary course of and pursuant to the reasonable requirements of the Company's business and upon fair and reasonable terms no less favorable to the Company than would obtain in a comparable arm's-length transaction with a Person other than an Affiliate.

*Section 6.11. Post Closing Undertaking of the Company.* The Company will, not more than ten days following the Closing Date, cause such amendments and modifications to the organizational documents and instruments of the Company Manager as shall in the opinion of the Note Purchaser be necessary to cause the Company Manager to be a corporation the purpose of which shall be solely to act as the managing member of the Company and another special purpose limited liability company which will own the Property which will be the subject of the financing contemplated by **Section 7.13**.

SECTION 7. COVENANTS OF THE GUARANTORS.

From and after the Closing Date and continuing so long as any amount remains unpaid on any Note, each Guarantor covenants and agrees severally in the case of **Sections 7.1** through **7.5** and jointly and severally in the case of **Sections 7.6** through **7.14**, in each such case with the Note Purchaser and its successors and assigns as follows:

*Section 7.1. Corporate Existence, Etc.* (a) Such Guarantor will preserve and keep in full force and effect, and will cause each of its Subsidiaries to preserve and keep in full force and effect, its corporate existence and all licenses and permits necessary to the proper conduct of its business, except in the case of any such license or permit or the existence of any such Subsidiary the failure of which to maintain in force and effect would not have a Guarantor Material Adverse Effect and except that the foregoing shall not prevent any transaction permitted by **Section 7.8** or **7.9**.

(b) The Tenant or its successors will at all times be and remain a Subsidiary of a Guarantor.

*Section 7.2. Insurance.* Such Guarantor will maintain, and will cause each of its Subsidiaries to maintain, insurance coverage by financially sound and reputable insurers and

in such forms and amounts and against such risks as are customary for corporations of established reputation engaged in the same or a similar business and owning and operating similar properties.

*Section 7.3. Taxes, Claims for Labor and Materials; Compliance with Laws.* (a) Such Guarantor will promptly pay and discharge, and will cause each of its Subsidiaries promptly to pay and discharge, all lawful taxes, assessments and governmental charges or levies imposed upon such Guarantor or any such Subsidiary, respectively, or upon or in respect of all or any part of the property or business of such Guarantor or any such Subsidiary, all trade accounts payable in accordance with usual and customary business terms, and all claims for work, labor or materials, which if unpaid might become a Lien upon any property of such Guarantor or any of its Subsidiaries; *provided* such Guarantor or such Subsidiaries shall not be required to pay any such tax, assessment, charge, levy, account payable or claim if either (1) (i) the validity, applicability or amount thereof is being contested in good faith by appropriate actions or proceedings which will prevent the forfeiture or sale of any property of such Guarantor or such Subsidiary or any material interference with the use thereof by such Guarantor or such Subsidiary, and (ii) such Guarantor or such Subsidiary shall set aside on its respective books, reserves deemed by it to be adequate with respect thereto or (2) the failure to pay any such tax, assessment, charge, levy, account or claim would not have a Guarantor Material Adverse Effect.

(b) Such Guarantor will promptly comply and will cause each of its Subsidiaries to promptly comply with all laws, ordinances or governmental rules and regulations to which it is subject, including, without limitation, the Occupational Safety and Health Act of 1970, as amended, ERISA, the Americans with Disabilities Act of 1990, and all Environmental Laws, the violation of which would have a Guarantor Material Adverse Effect.

*Section 7.4. Maintenance, Etc.* Such Guarantor will maintain, preserve and keep, and will cause each of its Subsidiaries to maintain, preserve and keep, its Properties which are used or useful in the conduct of its business (whether owned in fee or a leasehold interest) in good repair and working order and from time to time will make all necessary repairs, replacements, renewals and additions so that at all times the efficiency thereof shall be maintained, except where the failure to so maintain, preserve and keep such Properties or make such repairs, replacements, renewals and additions would not have a Guarantor Material Adverse Effect.

*Section 7.5. Nature of Business.* No Guarantor and no Subsidiary of such Guarantor will engage in any business if, as a result, the general nature of the business, taken on a consolidated basis, which would then be engaged in by such Guarantor and its Subsidiaries would be substantially changed from the general nature of the business engaged in by such Guarantor and its Subsidiaries on the date of this Agreement.

*Section 7.6. Limitations on Consolidated Total Debt.* The Guarantors will not as at the end of each fiscal quarter permit the ratio of Consolidated Total Indebtedness to Consolidated EBITDA for the immediately preceding four fiscal quarter period ending at such date to exceed 5.50 to 1.00.

*Section 7.7.* *Fixed Charges Coverage Ratio.* The Guarantors will not as at the end of each fiscal quarter permit the ratio of Consolidated EBITDA Available for Fixed Charges for the four consecutive fiscal quarter period ending at such date to Consolidated Fixed Charges for such four consecutive fiscal quarter period to be less than 1.0 to 1.0.

*Section 7.8.* *Sale of Assets.* (a) Subject always to clause (b) of this **Section 7.8**, the Guarantors will not, and will not permit any Subsidiary, to sell, lease, transfer, abandon or otherwise dispose of assets (except assets (including, without limitation, obsolete assets) sold in the ordinary course of business for fair market value as determined by a Guarantor or the affected Subsidiary); *provided* that the foregoing restrictions do not apply to:

(1) the sale, lease, transfer or other disposition of assets of a Guarantor or a Subsidiary to a Guarantor or a Wholly-owned Subsidiary; or

(2) the sale or other disposition on an arms-length basis of assets which are obsolete or uneconomic to use; or

(3) leases, subleases and similar transfers of all or any portion of an asset; *provided* that after giving effect to such transfer such asset remains an asset owned by the applicable Guarantor or Subsidiary in accordance with GAAP; or

(4) the sale or other disposition of assets for cash or other Property to a Person or Persons other than an Affiliate of any Guarantor if:

(i) such assets (valued at net book value) do not, together with all other assets of the Guarantors and their Subsidiaries previously disposed of during the same fiscal year pursuant to this clause (4), exceed 15% of Consolidated Total Net Assets determined as of the end of the immediately preceding fiscal year; and

(ii) immediately after the consummation of the transaction and after giving effect thereto, no Lease Default or Lease Event of Default would exist; *provided*, *however*, that for purposes of any calculation pursuant to this clause (4), there shall not be included any assets the proceeds of which (net of out-of-pocket expenses and taxes payable in connection with such sale and any Indebtedness which is or will be repaid with such proceeds) were or are applied within twelve months of the sale of such assets to the acquisition of fixed or capital assets or other assets similar to the assets which have been sold or otherwise disposed of and intended to be used in the operation of the business of any Guarantor or any of its Subsidiaries; or

(5) a transaction expressly permitted by the terms of Section 30.6 of the Lease or **Section 7.9**.

Notwithstanding the foregoing, in the event any Guarantor or Subsidiary proposes to sell, lease, transfer, abandon or otherwise dispose of assets and such assets may not be disposed of

within the limitations of clause (a)(1), (a)(2), (a)(3) or (a)(4) of this **Section 7.8** and the Note Purchaser shall withhold its consent to such disposition not otherwise permitted, then and in such event, the Guarantors shall at their option have the right to either (y) purchase (or have another Person purchase) all of the then outstanding Notes and pay interest accrued thereon to the date of purchase, but without premium, or (z) direct the Tenant to purchase the Premises and terminate the Lease pursuant to Section 15 of the Lease and in connection therewith the Company shall concurrently prepay the Notes in full pursuant to Section 5.5 of the Mortgage.

(b) Anything contained in clause (a) of this **Section 7.8** to the contrary notwithstanding, HCC shall not permit any of the issued and outstanding capital stock of each of its Wholly-owned Subsidiaries as of the Closing Date to be owned by HCL, HCA or any Subsidiary of HCL or HCA other than HCC or any Subsidiary of HCC; *provided* that HCC may request the consent of the Note Purchaser to the disposition of all or any part of the capital stock of any such Wholly-owned Subsidiary within the limitations of **Section 7.8(a)** and such consent by the Note Purchaser shall not be unreasonably withheld or delayed.

*Section 7.9. Mergers and Consolidations.* No Guarantor will consolidate with or be a party to a merger with any other Person unless and to the extent (a) after giving effect to such consolidation or merger, the surviving Person shall have a net worth determined in accordance with GAAP equal to or greater than the net worth determined in accordance with GAAP of such Guarantor immediately prior to such consolidation or merger, (b) in the case of a consolidation or merger involving HCC, the surviving corporation shall be organized under the laws of any state of the United States or the District of Columbia, and in the case of a consolidation or merger involving HCL, the surviving corporation shall be organized under the laws of Australia, (c) the due and punctual performance and observance of all of the covenants of such Guarantor in this Agreement and the other Operative Documents to which it is a party are expressly assumed in writing by the surviving corporation, (d) the surviving corporation shall furnish to the Participants an opinion of counsel to the effect that the instrument of assumption has been duly authorized, executed and delivered and constitutes the legal, valid and binding contract and agreement of the surviving corporation enforceable in accordance with its terms, except as enforcement of such terms may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors' rights generally and by general equitable principles, (e) each of the Guarantors which is not a party to such consolidation or merger shall have acknowledged in writing that the due and punctual performance and observance of all of the covenants of such Guarantor in this Agreement and the other Operative Documents to which it is a party remain legal, valid and binding obligations of such Guarantor and such Guarantor shall furnish to the Participants an opinion of counsel to the effect that such merger or consolidation does not adversely affect the legal, valid and binding nature of such obligations, and (f) (1) immediately prior to such consolidation or merger, no Lease Default or Lease Event of Default exists and (2) immediately after giving effect to such consolidation or merger, (i) no Lease Default or Lease Event of Default would exist and (ii) the ratio on a *pro forma* basis of Consolidated Total Indebtedness (which will include the surviving corporation) to Consolidated EBITDA (which will include the surviving

corporation) for the immediately preceding four fiscal quarter period shall not exceed 5.50 to 1.00.

*Section 7.10. Limitations on Restrictive Agreements.* The Guarantors will not, and will not permit any of their respective Subsidiaries to, enter into, or suffer to exist, any agreement with any Person which, directly or indirectly, limits the ability of any Subsidiary to (a) pay dividends or make other equity distributions to any Guarantor, (b) prepay any Indebtedness owed to any Guarantor, or (c) transfer any of its Property to any Guarantor, except for any such limitations contained in any agreement in existence on the Closing Date relating to any Indebtedness of any Guarantor or any of their respective Subsidiaries and listed on **Schedule 7.10** attached hereto and renewals or replacements of any such agreements, *provided* that any such renewal or replacement agreement shall not be materially more onerous in respect of the payment of dividends or the making of other equity distributions, the prepayment of any such Indebtedness or the transfer of any such Property than the agreement replaced or renewed; and *provided further* that this **Section 7.10** shall not in any event be deemed or construed to prohibit any anti-assignment clause contained in any lease or other contract.

*Section 7.11. HCL's Shareholders' Equity.* HCL will at all times keep and maintain its total shareholders' equity determined in accordance with Australian GAAP at an amount not less than Aust. $100,000,000.

*Section 7.12. Reports and Rights of Inspection.* The Guarantors will keep, and will cause each Subsidiary to keep, proper books of record and account in which full and correct entries will be made of all dealings or transactions of, or in relation to, the business and affairs of HCL and its Subsidiaries, and of HCA and its Subsidiaries, in accordance with GAAP consistently applied (except for changes disclosed in the financial statements furnished to the Note Purchaser pursuant to this **Section 7.12** and concurred in by the independent public accountants referred to in **Section 7.12**), and will furnish to the Note Purchaser (in duplicate if so specified below or otherwise requested):

(a) *Quarterly Statements.* As soon as available and in any event within 75 days after the end of each quarterly fiscal period (except the last) of each fiscal year, copies of:

(1) a consolidated balance sheet of HUSH Holdings U.S. Inc. and its Subsidiaries as of the close of such quarterly fiscal period setting forth in comparative form the consolidated figures for the fiscal period then most recently ended,

(2) a consolidated statement of income of HUSH Holdings U.S. Inc. and its Subsidiaries for such quarterly fiscal period and for the portion of the fiscal year ending with such quarterly fiscal period, in each case setting forth in comparative form the consolidated figures for the corresponding period of the preceding fiscal year, and

(3) a consolidated statement of cash flows of HUSH Holdings U.S. Inc. and its Subsidiaries for the portion of the fiscal year ending with such quarterly fiscal period setting forth in comparative form the consolidated figures for the corresponding period of the preceding fiscal year,

all in reasonable detail and certified as complete and correct by an authorized financial officer of HUSH Holdings U.S. Inc.;

(b) *Semiannual Statements.* As soon as available and in any event within 90 days after the end of the sixth fiscal month of each fiscal year, copies of:

(1) a combined balance sheet of HCL, HCA and their Subsidiaries as of the close of such semiannual fiscal period, setting forth in comparative form the combined figures for the fiscal period then most recently ended,

(2) a combined profit and loss account of HCL, HCA and their Subsidiaries for such semiannual fiscal period and for the portion of the fiscal year ending with such semiannual fiscal period, in each case setting forth in comparative form the combined figures for the corresponding periods of the preceding fiscal year, and

(3) a combined statement of cash flows of HCL, HCA and their Subsidiaries for the portion of the fiscal year ending with such semiannual fiscal period, setting forth in comparative form the combined figures for the corresponding periods of the preceding fiscal year,

all in reasonable detail and certified as having been prepared in accordance with GAAP by an authorized financial officer of HCL;

(c) *Annual Statements.* As soon as available and in any event within 120 days after the close of each fiscal year of HCL and HCA, copies of:

(1) combined balance sheets of each of HCL and HCA and their respective Subsidiaries as of the close of such fiscal year, and

(2) combined profit and loss accounts and cash flows of each of HCL and HCA and their respective Subsidiaries for such fiscal year,

in each case setting forth in comparative form the combined figures for the preceding fiscal year, all in reasonable detail and accompanied by a report thereon of a firm of independent public accountants of recognized national standing selected by HCL and HCA to the effect that the combined financial statements present fairly, in all material respects, the combined financial position of each of HCL and HCA and their respective Subsidiaries as of the end of the fiscal year being reported on and the combined results of the operations and cash flows for said year in conformity with GAAP and that the examination of such accountants in connection with such financial statements has been

conducted in accordance with generally accepted auditing standards and included such tests of the accounting records and such other auditing procedures as said accountants deemed necessary in the circumstances;

(d) *Shareholder and Other Reports.* Promptly upon their becoming available, one copy of each financial statement, report, notice or proxy statement sent by either HCL, HCA or HUSH Holdings U.S. Inc. to its creditors or shareholders generally and of each regular or periodic report, and any registration statement or prospectus filed by either HCL or HCA or any Subsidiary with any Australian or Barbados securities exchange or the United States Securities and Exchange Commission or any successor agency of any thereof, and copies of any orders in any proceedings to which HCL or HCA or any of their respective Subsidiaries is a party, issued by any governmental agency, Australian, Barbados or United States Federal or state or otherwise, having jurisdiction over HCL or HCA or any of their respective Subsidiaries, if such order would have a Guarantor Material Adverse Effect;

(e) *Officer's Certificates.* Within the periods provided in paragraphs (b) and (c) above, a certificate of the chief financial officer of HCL stating that such officer has reviewed (or caused to be reviewed) the provisions of this Agreement and setting forth: (1) the information and computations (in sufficient detail) required in order to establish whether HCL and HCA were in compliance with the requirements of **Sections 7.6** through **7.8** and **Section 7.11** at the end of the period covered by the financial statements then being furnished, and (2) whether there existed as of the date of such financial statements and whether, to such officer's knowledge, after due inquiry from the Tenant (except with regard to **Sections 7.6** through **Section 7.8** and **Section 7.11**) there exists on the date of the certificate or existed at any time during the period covered by such financial statements any Lease Default or Lease Event of Default and, if any such condition or event exists on the date of the certificate, specifying the nature and period of existence thereof and the action HCL and HCA are taking and propose to take with respect thereto;

(f) *Australian GAAP Reconciliation.* Within the periods provided in paragraphs (b) and (c) above, a certificate of the Chief Financial Officer of HCL reconciling any change in Australian GAAP adopted by HCL with U.S. GAAP which may have occurred during such period; and

(g) *Requested Information.* With reasonable promptness, such other data and information in respect of any Guarantor or its Subsidiaries as the Note Purchaser may reasonably request.

Without limiting the foregoing, HCL and HCA will permit the Note Purchaser, so long as the Note Purchaser is the holder of any Note, (or such Persons as the Note Purchaser may designate), to visit and inspect for purposes of monitoring the credit, under their guidance, any of the Properties of HCL, HCA or any Subsidiary thereof, to examine all of their books of account, records, reports and other papers, to make copies and extracts therefrom and to so discuss their respective affairs, finances and accounts with their respective officers,

employees, and, in the presence of officers of HCL and HCA, independent public accountants (and by this provision HCL and HCA authorize said accountants to so discuss with the Note Purchaser the finances and affairs of HCL and HCA and their Subsidiaries), all at such reasonable times and as often as may be reasonably requested. Any visitation or inspection shall be at the sole expense of the Note Purchaser, unless a Lease Default or Lease Event of Default shall have occurred and be continuing with respect to a default asserted in writing, in which case, any such visitation or inspection shall be at the sole expense of HCL and HCA. HCL and HCA also agree that if either thereof furnishes financial information of the scope and character contemplated by clause (b) of this **Section 7.12** to (1) any of its creditors or (2) shareholders generally more frequently than on a six fiscal month basis, then and in such event HCL or HCA, as the case may be, shall furnish the same such financial information to the Note Purchaser on such more frequent basis to such other creditor or shareholder.

The Note Purchaser agrees with the Tenant and the Guarantors that it will keep confidential in accordance with its internal policies and procedures in effect from time to time any written information with respect to any Guarantor or its Subsidiaries which is furnished pursuant to this Agreement and which is designated by a Guarantor or its Subsidiaries to the Note Purchaser in writing as confidential, *provided* that the Note Purchaser may disclose any such information (1) as has become generally available to the public (other than as a consequence of its actions) or to the Note Purchaser on a non-confidential basis from a source other than any Guarantor or its Subsidiaries or as was shown to the Note Purchaser on a non-confidential basis prior to its disclosure by a Guarantor or its Subsidiaries, (2) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over the Note Purchaser or to the National Association of Insurance Commissioners or similar organizations or their successors, (3) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation, (4) to the extent that the Note Purchaser reasonably believes it appropriate in order to protect its investment in the Notes or in order to comply with any law, order, regulation or ruling applicable to the Note Purchaser, (5) in accordance with the Note Purchaser's usual and customary procedures relating to confidentiality, to its officers, trustees, employees, auditors or counsel or to rating agencies or another holder of the Notes, (6) to Persons who are parties to similar confidentiality agreements in favor of the Guarantors, or (7) to the prospective transferee in connection with any contemplated transfer of any of the Notes by the Note Purchaser *provided* that such prospective transferee agrees in a customary and usual manner in connection with such transfers for the benefit of the Guarantors to be bound by this paragraph. By its acceptance of a Note, any transferee shall be bound by the terms of this paragraph.

*Section 7.13. Consummation of Second Transaction.* The Note Purchaser and the Guarantors agree that they shall use all reasonable commercial efforts to consummate the closing of a second lease financing (the *"Second Financing Transaction"*) of a movie theater property to be acquired by a Subsidiary of a Guarantor for an acquisition price of approximately $5,500,000, pursuant to which a Subsidiary of a Guarantor will be the lessee of such property and The Northwestern Mutual Life Insurance Company (*"NML"*) will be

the sole debt participant, with the operative documents relating to such financing to be in substantially the same form as the Operative Documents and with the Securities to be purchased by NML to finance 90% of such acquisition price to bear interest at the rate of 9.875% per annum (computed on the basis of a 360-day year of twelve 30-day months) and with such Securities to mature in twenty years from the date of issuance and to have a weighted average life to maturity (calculated in accordance with standard financial practice) of approximately 13 years. Notwithstanding the foregoing, the Note Purchaser shall have no obligation to participate in the second financing transaction if the closing does not occur on or prior to April 1, 1998.

*Section 7.14. Post Closing Undertaking.* The Guarantors will not more than 15 days following the Closing Date deliver to the Note Purchaser a complete and correct list of each of the Guarantors' Subsidiaries, showing as to each Subsidiary, the correct name thereof, the jurisdiction of its incorporation and the percentage of shares of each class of its Capital Stock or similar equity interests outstanding owned by each Guarantor and each other Subsidiary.

## SECTION 8. TENANT'S INDEMNITIES.

The Tenant hereby agrees, whether or not any of the transactions contemplated hereby shall be consummated, to perform and observe, for the benefit of the Participants and their respective successors and assigns, all of the terms and provisions of Sections 6(a) and 8 of the Lease to the full extent and in the same manner and upon the same conditions as if set forth in full herein. The indemnities contained in Sections 6(a) and 8 of the Lease, and the agreements of the Tenant in this **Section 8**, shall survive the termination of this Agreement and the other Operative Documents and shall survive the transfer of any Note or the Beneficial Interest and payment of any or all Notes and extinguishment of the Beneficial Interest.

## SECTION 9. INDEMNITIES OF THE COMPANY AND THE EQUITY INVESTOR.

Each of the Company and the Equity Investor (referred to in this Section as the "*Indemnitors*") hereby jointly and severally agrees for the benefit of the other Indemnitor, the Tenant, the Guarantors and the Note Purchaser (referred to in this Section as the "*Indemnitees*") that at all times the Premises shall be free of any Lien arising as a result of claims against any Indemnitor not related to the transactions contemplated by the Operative Documents and to any Indemnitor's interest in the Premises (other than Permitted Encumbrances) and arising as a result of any act or omission on the part of an Indemnitor and that each Indemnitor will at its own cost and expense promptly take such action as may be necessary duly to discharge any such Lien, *provided* that no such Lien need be discharged so long as it is being contested by means of a Permitted Contest. Each Indemnitor further agrees to indemnify and hold harmless the Indemnitees from and against any costs or expenses (including legal fees and expenses) incurred, in each case, as a result of the imposition or enforcement of any such Lien.

SECTION 10. MISCELLANEOUS.

*Section 10.1. Amendments.* (a) This Agreement may, from time to time and at any time, be amended, supplemented or modified, by an instrument or instruments in writing executed by the Tenant, the Guarantors and the Required Holders (and without the consent of the Company or the Equity Investor), except in the case of any amendment, supplement or modification to **Sections 1**, **2**, **3.1** through **3.4**, **3.5(a)** through **(e)**, **4**, **6** and **9**, in which case such amendment, supplement or modification to **Sections 1, 2, 3.1** through **3.4**, **3.5(a)** through **(e)**, **4, 6** or **9**, as the case may be, shall require the consent of all of the parties hereto. Without limiting the foregoing, the parties hereto acknowledge and agree that the Required Holders in their sole discretion shall have the right to waive any Lease Default or Lease Event of Default pursuant to Section 19(a)(4) of the Lease and to make any decision with respect to the declaration or nondeclaration of a Lease Default or Lease Event of Default pursuant to said Section 19(a)(4) (or waiver thereof) and/or the waiver in any fashion whatsoever of compliance by the Tenant with one or more of the provisions contained in Section 30 of the Lease, in any such case, without the consent or concurrence of the Company or the Equity Investor.

(b) The Note Purchaser understands and agrees with the Guarantors as long as no Lease Default or Lease Event of Default has occurred and is continuing, it will not enter into any written amendment to the Mortgage without the prior written concurrence of at least one of HCL or HCC, which concurrence shall not be unreasonably withheld or delayed.

*Section 10.2. Notices.* All communications under this Agreement shall be in writing and shall be personally delivered or sent by first class mail, postage prepaid, or by prepaid courier or express service guaranteeing overnight delivery or by telecopier (with original being promptly sent as otherwise provided above), and shall be deemed to have been given (unless otherwise required by the specific provisions hereof in respect of any matter) when delivered in person or otherwise actually received.

*Section 10.3. Survival.* All warranties, representations and covenants made by any party herein or in any certificate or other instrument delivered by any party to any other party under this Agreement shall be considered to have been relied upon by such other party (excepting only that the covenants of the Guarantors shall have been deemed and have been exclusively relied upon by the Note Purchaser and not the Company or the Equity Investor) and shall survive the consummation of the transactions contemplated hereby on the Closing Date regardless of any investigation made by such other party or on behalf of such other party.

*Section 10.4. Successors and Assigns.* This Agreement shall be binding upon and shall inure to the benefit of, and shall be enforceable by, the parties hereto and their respective successors and permitted assigns including each permitted successive holder of the Beneficial Interest and each permitted successive holder of any Note issued and delivered pursuant to this Agreement or the Indenture whether or not an express assignment to any such holder of rights under this Agreement has been made.

*Section 10.5. Governing Law.* The Note Purchaser, the Equity Investor, the Company, the Tenant, HCC, HCL, and HCA have agreed that the local law of a single state should govern their respective rights and duties under this Agreement and the other Operative Documents, regardless of whether a proceeding to enforce those rights is brought in the courts of another state. The parties hereby agree that their respective rights and duties under this Agreement shall be governed by the internal laws of the Commonwealth of Massachusetts.

Any legal action or proceeding with respect to this Agreement or any document relating thereto shall be brought in the courts of the Commonwealth of Massachusetts or of the United States of America for the Eastern District of Massachusetts and in no other courts, and, by execution and delivery of this Agreement, each party hereto hereby accepts for itself and in respect of its property generally and unconditionally, the jurisdiction of the aforesaid courts. Each party hereto hereby irrevocably and unconditionally waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of *forum non conveniens* which it may now or hereafter have to the bringing of any action or proceeding in such respective jurisdiction and waives personal service of any and all process upon it. Each party hereto consents that all such service of process may be made by delivery to it at the address of such party set forth below or, in the case of HCA, HCL, the Company and the Equity Investor, to their agent referred to below at such agent's address set forth below. HCA and HCL hereby irrevocably appoint Hoyts Cinemas Corporation, with an office on the date hereof at One Exeter Plaza, Boston, Massachusetts 02116-2836, as its agent for the purpose of accepting service of any process within the Commonwealth of Massachusetts. The Company and the Equity Investor hereby irrevocably appoint Corporation Service Company with an office on the date hereof at 84 State Street, Fifth Floor, Boston, Massachusetts 02109, as their agent for the purpose of accepting service of any process within the Commonwealth of Massachusetts. Nothing contained in this **Section 10.5** shall affect the right of any party to this Participation Agreement to serve legal process in any other manner permitted by law or to bring any action or proceeding in the courts of any jurisdiction against any party or to enforce a judgment obtained in the courts of any other jurisdiction.

*Section 10.6. Counterparts.* This Agreement may be executed in any number of counterparts, each executed counterpart constituting an original but all together only one Agreement.

*Section 10.7. Headings and Table of Contents.* The headings of the sections of this Agreement and the Table of Contents are inserted for purposes of convenience only and shall not be construed to affect the meaning or construction of any of the provisions hereof.

*Section 10.8. Conditions to Purchase of Beneficial Interest by Tenant.* Anything to the contrary herein or in the other Operative Documents notwithstanding, the Tenant shall not purchase or otherwise acquire the Beneficial Interest or any part thereof unless, as a condition thereto and simultaneously therewith, the Tenant shall, by agreement or agreements in writing containing covenants substantially equal to the covenants of the Tenant set forth in the Operative Documents (a) expressly assume the Indebtedness evidenced by the

Notes as the full, recourse obligations of the Tenant, (b) grant to the Note Purchaser a first Lien on and security interest in the Premises and (c) cause the Guarantors to enter into a guaranty of the Notes and the performance by the Tenant of its obligations under such agreement or agreements, all in form and substance reasonably satisfactory to the holders of the Notes and their special counsel in their sole and absolute judgment and at the expense of the Tenant and the Guarantors.

*Section 10.9. Rent Payment Instructions.* The parties hereto understand and agree that for administrative convenience and without the effect or result of amending, altering or modifying the terms of the other Operative Documents, including, without limitation, the terms and provisions on which the Lease and the Lease Guaranty have been assigned to the Note Purchaser pursuant to the Lease Assignment and the Guaranty Assignment, it is desirable that the Tenant shall, and the Note Purchaser hereby instructs the Tenant pursuant to the Lease Assignment to, make all payments of Rent as follows: (a) prior to the occurrence of a Lease Default or Lease Event of Default, pay the entirety of the Basic Rent, the Termination Value Purchase Price, Make-Whole Amount, if any, and all other sums due and owing under the Lease (other than the Percentage Rent, if any) directly to the holders of the Notes and to pay the Percentage Rent, if any, directly to the Company and (b) following the occurrence of a Lease Default or Lease of Event of Default, all Basic Rent and all Additional Rent (including, without limitation, Percentage Rent, if any) shall be paid directly to the holders of the Notes for application in accordance with the terms of the Mortgage. In furtherance of the foregoing, the Tenant understands and agrees that prior to delivery of the Note Purchaser Notice hereinafter referred to, the Tenant shall in any and all events pay the entirety of each installment of Basic Rent and any Termination Value Purchase Price payment and any Additional Rent consisting of the Make Whole Amount, if any, as and when due under the Lease directly to the Note Purchaser in the manner and at the address provided for the Note Purchaser set forth below its signature to this Agreement and prior to the receipt of a notice from the Note Purchaser (the *"Note Purchaser Notice"*) to the effect that a Lease Default or Lease Event of Default has occurred and is continuing, shall pay any Additional Rent consisting of Percentage Rent, if any, to the Company at its address set forth below its signature to this Agreement and that from and after the date of such Note Purchaser Notice, the Tenant shall pay all Rent, including without limitation, Percentage Rent, if any, to the Note Purchaser as herein above provided and by its execution of this Agreement, the Company ratifies, confirms and agrees with the Note Purchaser and the Tenant that the Tenant shall be protected and held harmless from any liability whatsoever to the Company in making as herein provided payments to the Note Purchaser after the date of such Note Purchaser Notice and agrees that the Tenant will not be liable to the Company for making such payments as herein provided without any inquiry whatsoever or for any acts or omissions or any error of judgment or mistake of fact or law of the Tenant in connection therewith.

*Section 10.10. Certain Rights of Tenant and Guarantor Reserved.* The Company understands and agrees with the Tenant and the Guarantors that the Tenant and the Guarantors have, provided always that the Tenant is in all material respects in full compliance with the terms and provisions of the Lease and the Guarantors are in full compliance with the terms and provisions of the Lease Guaranty, reserved any rights which

they may have against the Company arising as a result of any material misrepresentation by the Company contained in **Section 3.1** of this Agreement or the breach by the Company of any of its covenants, agreements or other obligations under the Operative Documents to the extent of any actual damages suffered as a result thereof by the Tenant or the Guarantors, in each case notwithstanding the terms and provisions of the Lease, but subject always, to full compliance in all material respects by the Tenant with the terms of the Lease and full compliance by the Guarantors with the terms and provisions of the Lease Guaranty. Without limiting the foregoing, the Company agrees that it will satisfy the terms and conditions of Section 3 of the Mortgage upon the terms and conditions therein set forth upon written direction from the Tenant to do so, provided only that no Lease Default or Lease Event of Default shall the have occurred and be continuing.

*Section 10.11. Note Purchaser Consent.* It is understood and agreed by the parties hereto that if the consent of the Note Purchaser to any consent, amendment, waiver or other modification to the terms and provisions of this Agreement or any of the other Operative Documents is given by the Required Holders, then such consent of the Required Holders to such consent, amendment, waiver or other modification, as the case may be, shall be deemed and construed to constitute the consent of the Note Purchaser.

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be executed and delivered, all as of the date first above written.

TENANT

INTERSTATE THEATRES CORPORATION

By: /s/ Terence P. Moriarty
Its: Treasurer & Secretary

c/o Hoyts Cinemas Corporation
One Exeter Plaza
Boston, Massachusetts 02116-2836
Attention: Chief Financial Officer
Facsimile: (617) 421-1819

GUARANTOR

HOYTS CINEMAS CORPORATION

By: /s/ Terence P. Moriarty
Its: Treasurer & Secretary

One Exeter Plaza
Boston, Massachusetts 02116-2836
Attention: Chief Financial Officer
Facsimile: (617) 421-1819

GUARANTOR:

HOYTS CINEMAS LIMITED

By: /s/ Kevin Healy
Its: Attorney-In-Fact

Level 6
505-523 George Street
Sidney, NSW 2001, GPO Box 110
Australia
Attention: Chief Financial Officer
Facsimile: 011-61-9-273-7322

GUARANTOR: HOYTS CINEMAS AMERICA LIMITED

By: /s/ Terence P. Moriarty
Its: Attorney-In-Fact

c/o Hoyts Cinemas Corporation
One Exeter Plaza
Boston, Massachusetts 02116-2836
Attention: Chief Financial Officer
Facsimile: (617) 421-1819

with a copy to:

Hoyts Cinemas Limited
Level 6
505-523 George Street
Sidney, NSW 2001, GPO Box 110
Australia
Attention: Chief Financial Officer
Facsimile: 011-61-9-273-7322

COMPANY WESTBOROUGH SPE LLC

By: BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

By: /s/ F. Jan Blaustein
Its: President

2 Harrison Street, 6th Floor
San Francisco, California 94105
Attention: Chief Financial Officer
Facsimile: (415) 267-1500

EQUITY INVESTOR:

MIGNONETTE INVESTMENTS LIMITED

For F.M.C. LIMITED CORPORATE DIRECTORS

By: /s/ Derek Andrew
Its: Director
Attention: Derek Andrew
Facsimile: 1-809-494-2704

NOTE PURCHASER

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY

By /s/ Richard A. Strait
Its Vice President

720 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention: Securities Department
Facsimile: (414) 299-7124

Payments

All payments on or in respect of the Notes to be by bank wire transfer of Federal or other immediately available funds (identifying each payment as "Westborough SPE LLC, 10.25% Senior Secured Notes due November 21, 2017, PPN 95715# AA 0, principal, premium or interest") to:

Bankers Trust Company (ABA #0210-01033)
16 Wall Street
Insurance Unit, 4th Floor
New York, New York 10005

for credit to: The Northwestern Mutual Life Insurance Company
Account Number 00-000-027

Notices

All notices and communications to be addressed as first provided above, except notices with respect to payments and written confirmation of each such payment to be addressed, Attention: Securities Operations.

Name of Nominee in which Notes are to be issued: None

Taxpayer I.D. Number: 39-0509570

# Exhibit H

Affidavit of Attorney David Abromowitz dated April 4, 2025.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 |
| WESTBOROUGH SPE LLC, | ) | Case No. 23-40709-CJP |
| | ) | |
| Debtor. | ) | |

**AFFIDAVIT OF DAVID ABROMOWITZ, ESQ.**
**OF GOULSTON & STORRS PC**

I, David Abromowitz, being duly deposed and sworn, aver as follows:

1. I am an attorney in good standing licensed to practice law in the Commonwealth of Massachusetts and have been for over forty years.

2. Since September 1983, I have worked as a lawyer at Goulston & Storrs PC in Boston (the “Firm”), first as an Associate, then as a Director and Shareholder, and currently as Of Counsel.

3. In 1997 and 1998, I worked on a matter pertaining to the formation of Westborough SPE LLC (the “LLC”) and the negotiation of a lease to which the LLC was a party (the “Matter).

4. Based upon my best memory and my review of the Firm’s readily available records concerning the Matter, the following table identifies (a) the client representatives with whom the Firm communicated in connection with the Matter, and (b) the contact information evident from the Firm’s records for each person:

| Name | Contact Information |
|---|---|
| James B. McCaffrey | Telephone: 212-935-7800; Fax: 212-935-8949 |
| F. Jan Blaustein | Telephone: 415-512-1515; Fax: 415-267-1500<br><br>Babcock & Brown Administrative Services<br>2 Harrison Street<br>San Francisco, CA 94105 |
| Phillip Green | Telephone: 011.612.9233.4033;<br>Fax: 011.612.9231.5619<br><br>Level 37, The Chifley Tower<br>2 Chifley Square<br>Sydney, Australia NSW 2000 |
| Monique Belkin | Telephone: 415-512-1515; Fax: 415-267-1500<br><br>Babcock & Brown Administrative Services<br>2 Harrison Street<br>San Francisco, CA 94105 |
| Derek Andrews (Mignonette) | Fax: 1-809-494-2704<br><br>Integro Trust (BVI) Limited<br>P.O. Box 438<br>Tropic Isle Building<br>Wickhams Cay, Road Town,<br>Tortola, British Virgin Islands |

Signed under the pains and penalties of perjury this 4th day of April 2025.

/s/ David Abromowitz
David Abromowitz, Esq.

# Exhibit I

Limited Liability Company Agreement of Babcock & Brown Administrative Services LLC.

## BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC

## LIMITED LIABILITY COMPANY AGREEMENT

This LIMITED LIABILITY COMPANY AGREEMENT, dated as of December 31, 1999 is entered into by and among **Babcock & Brown Inc.**, a California corporation ("BBI"), and any and all Persons who hereafter become "Members." Each Member, in consideration of the agreements of the other Members contained in this Agreement, agrees as follows:

## ARTICLE I
## DEFINITIONS

The following terms shall have the following meanings, unless otherwise clearly indicated to the contrary.

***"Additional Member"*** means a Person admitted to the Company as a Member pursuant to Section 11.2.

***"Affiliate"*** with respect to any Person means any Person that directly or indirectly Controls, is Controlled by, or is under common Control with the Person in question.

***"Agreement"*** means this Limited Liability Company Agreement, as it may be amended, supplemented or restated from time to time.

***"Assignee"*** has the meaning specified in Section 10.3.

***"Capital Account"*** means an account to be maintained for each Member, the balance of which shall equal the amount of Capital Contributions made by such Member plus allocations to such Member of Net Profit pursuant to Article 4 and other additions made in accordance with generally accepted accounting principles, decreased by the amount of cash and the fair market value of property distributed to such Member by the Company, allocations to such Member of Net Loss pursuant to Article 4 and other deletions made in accordance with generally accepted accounting principles; provided, however, that in the event of a redemption or other purchase by the Company of less than all of the Percentage Interest of any Member, the Capital Account of such Member shall be reduced in proportion to the portion of its Percentage Interest redeemed or purchased.

***"Capital Contributions"*** shall mean, with respect to any Member, the amount of money and the net fair market value of property contributed by such Member to the Company pursuant to this Agreement.

***"Certificate of Formation"*** means the Certificate of Formation of the Company, as filed on December 31, 1999 with the Secretary of State of Delaware, as such Certificate of Formation may be amended, supplemented or restated from time to time.

***"Code"*** means the United States Internal Revenue Code of 1986, as amended.

***"Company"*** means the limited liability company organized pursuant to the Certificate of Formation.

***"Control"*** means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

***"Delaware Act"*** means the Delaware Limited Liability Company Act, 6 Del. Code Ann. tit. 6, §§18-101, et seq., as it may be amended from time to time, and any successor thereto.

***"Distribution"*** means each distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution, redemption, repurchase or otherwise.

***"Event of Withdrawal"*** means, with respect to any Person, the occurrence of any event described in subsection (4) of Section 18-801 of the Delaware Act.

***"Fair Market Value"*** means, with respect to any asset as of any date, the price a willing buyer would pay a willing seller in an arm's-length transaction, determined using any reasonable valuation method.

***"Fiscal Period"*** means any interim accounting period within a Taxable Year which is permitted or required by Code Section 706.

***"Fiscal Year"*** means the Company's annual accounting period established pursuant to Section 7.2.

***"Indemnified Person"*** has the meaning specified in Section 13.1.1.

***"Limited Liability Company Interest"*** has the meaning specified for such term in the Delaware Act.

***"Liquidator"*** has the meaning specified in Section 14.3.

***"Member"*** means each of the members named on Schedule I attached hereto and any Person admitted to the Company as a Substituted Member or Additional Member; but only so long as such Person is shown as a Member on the Company's books and records.

***"Membership Interest"*** means a Member's rights in the Company, collectively, including the Member's Percentage Interest, Limited Liability Company Interest, any right to vote or participate in management, and any right under the Delaware Law to information concerning the business and affairs of the Company.

***"Net Profit"*** and ***"Net Loss"*** shall mean, for each Fiscal Year or other period, an amount equal to the Company's income or loss for such year or period (including any gain or loss realized on the sale or other disposition of assets), determined in accordance with generally accepted accounting principles.

***"Percentage Interest,"*** with respect to any Member, means the percentage interest of that Member set forth in the column "Member's Percentage Interest" in Schedule I hereto, as such percentage interest may be adjusted from time to time pursuant to the terms of this Agreement.

***"Person"*** means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trusts companies, land trusts, business trusts and other organizations, whether or not legal entities, and governments and agencies and political subdivisions thereof.

***"Securities Act"*** means the United States Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

***"Substituted Member"*** means a Person that is admitted as a Member of the Company pursuant to Section 11.1.

***"Taxable Year"*** means the Company's accounting period for federal income tax purposes determined pursuant to Section 8. 1.

***"Tax Matters Member"*** has the same meaning as "Tax Matters Partner" set forth in Code Section 6231.

***"Transfer"*** means a transaction by which a Member assigns all or any portion of its Membership Interest to another Person, and includes a sale, conveyance, assignment, transfer, gift, pledge, encumbrance, hypothecation, mortgage, exchange or any other disposition, whether voluntary or involuntary.

***"Treasury Regulations"*** means the income tax regulations promulgated under the Code and effective as of the date hereof, including any future amendments to such regulations and any corresponding provisions of succeeding regulations which (a) are mandatory or (b) call for an election by

the Company as to the application of the amendment or succeeding regulation to the Company if the Members so elect; provided that any such amendments and succeeding regulations do not adversely affect the economic interests of the Members hereunder.

## ARTICLE II
## ORGANIZATIONAL MATTERS

**2.1 Organization of Company.** The Company was organized as a limited liability company pursuant to the provisions of the Delaware Act on December 31, 1999. Except as expressly provided herein to the contrary, the rights and obligations of the Members, and the administration and termination of the Company, shall be governed by the Delaware Act.

**2.2 Name.** The name of the Company shall be **Babcock & Brown Administrative Services LLC**. The Members may change the name of the Company at any time and from time to time. Notification of any such change shall be promptly given to all Members. The Company's business may be conducted under such name or names as the Members deem advisable.

**2.3 Purpose.** The Corporation is formed for the sole purpose of, and the nature of the sole business to be conducted by the Corporation is, to own interest in and be a member and/or manager, partner, general or limited, venturer, stockholder or other holder of any interest in any entity holding direct or indirect interests in the real property generally described in Exhibit A attached hereto, and any other real property and any personal property, tangible or intangible, appurtenant to any thereof or hereafter acquired as necessary or convenient in connection with such real property, and in connection with all of the above, the Corporation may engage in any lawful act or activity for which corporations may be formed under the laws of the State of Delaware and in any and all activities necessary, advisable, convenient or incidental thereto. Additionally, the Corporation may engage in similar activities with respect to any entity or entities holding direct or indirect interests in real property to be later identified, which property shall be purchased in a transaction involving The Northwestern Mutual Life Insurance Company, as Lender, Hoyts Cinemas Corporation, and/or its affiliates, the Corporation, and any others. The purposes of the Corporation may not be broadened if such would violate or cause a default under any agreement to which the Corporation is a party or by which it is bound.

**2.4 Principal Office; Registered Office.** The principal office of the Company shall be at 2 Harrison Street, San Francisco, CA 94105, or at any other place designated by the Members from time to time. The records of the Company shall be maintained at the principal executive office of the Company or at such other location determined by the Members. The address of the registered office of the Company in the State of Delaware shall be c/o CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901 and the registered agent for service of process on the Company in the State of Delaware at such registered office shall be CorpAmerica, Inc. The

Company may maintain offices at such other place or places as the Members may determine.

**2.5 Term**. The Company shall continue in existence until 11:59 p.m. Delaware time, on March 31, 2050 or until the earlier termination of the Company in accordance with the provisions of Article XIV.

## ARTICLE III
## CAPITAL CONTRIBUTIONS

**3.1 Members.** Each Member named on Schedule I attached hereto has made the Capital Contribution set forth opposite that Member's name on Schedule I in exchange for that Member's Percentage Interest listed on Schedule I. No Member shall be required to make any additional Capital Contributions to the Company (other than in connection with a voluntary purchase of additional Membership Interests of the Company).

**3.2 Capital Accounts.** The Company shall maintain a separate Capital Account for each Member.

**3.3 Interest.** The Company shall not pay interest on Capital Contributions or on balances in Capital Accounts.

**3.4 No Withdrawal.** No Member shall be entitled to withdraw any part of his Capital Contribution or Capital Account or to receive any Distribution from the Company, except as expressly provided herein.

**3.5 Loans from Members.** Loans by Members to the Company shall not be considered Capital Contributions or result in any increase in the amount of the Capital Account of that Member. The amount of any such loan shall be a debt of the Company to such Member, payable or collectible in accordance with the terms and conditions upon which such loan is made; provided that the terms of any such loan shall not be less favorable to the Company than would be available to the Company from unrelated lenders.

**3.6 Issuance of Memberships.** If Company capital and revenues are insufficient to meet the Company's cash requirements and the Company is unable to obtain loans on terms the Members deem acceptable, the Company may issue additional Membership Interests in exchange for additional contributions to the capital of the Company, on such terms as are determined by the Members, which may include priority over existing Membership Interests as to Limited Liability Company Interests, voting rights and/or participation in management. Membership Interests shall be offered first to all existing Members in proportion to their Percentage Interests and, in the event that any Member fails to purchase any or all of his, her or its respective share, the Company may offer the remaining unsold Membership Interests to other Persons, including other Members, and any Person

who purchases any such Membership Interest shall be admitted as a Member. Notwithstanding any provision in this Agreement to the contrary, this Agreement shall be amended to reflect the sale of the additional Membership Interests, and the addition of additional Members and any other changes in allocations of Percentage Interests, voting rights and participation in management.

## ARTICLE IV
## DISTRIBUTIONS AND ALLOCATIONS

### 4.1 Distributions of Cash.

**4.1.1 Tax Distributions.** The Company shall distribute to the Members prior to June 15 of each Fiscal Year an amount equal to the lesser of (a) the amount of cash held by the Company that the Company can then distribute to its Members without violating any restrictions imposed by law or by any contractual covenants of the Company, or (b) the amount by which the sum of the Members' Cumulative Estimated Tax Liabilities exceeds the aggregate amount of Distributions previously made to the Members pursuant to this Section 6.1. For purposes of this paragraph, a Member's "Cumulative Estimated Tax Liability" means the product of (i) the aggregate amount of taxable income and gain (net of or offset by items of deduction, loss, and credit) of the Company that has been recognized for income tax purposes and allocated to such Member for all Fiscal Years of the Company through the end of the preceding Fiscal Year times (ii) the highest marginal combined federal and state income tax rate applicable to any of the Members (determined after giving effect to the deduction, if allowable, of state income taxes for federal income tax purposes), as reasonably determined by the Tax Matters Member. All cash required to be distributed pursuant to this Section 4.1.1 shall be allocated among the Members in proportion to the respective amounts by which each Member's Cumulative Estimated Tax Liability exceeds the aggregate amount of distributions previously made to such Member pursuant to this Section 4.1.1.

**4.1.2 Current Distributions.** All cash of the Company derived from operations and not required to be distributed pursuant to Section 4.1.1 may be distributed at such times and in such amounts as the Members shall determine. All Distributions of cash pursuant to this Section 4.1.2 shall be allocated to the Members in accordance with their respective Percentage Interests.

**4.1.3 Liquidating Distributions.** After the payment of the debts and liabilities of the Company and the establishment of reserves, as provided in Article 14, any property or assets of the Company, including proceeds from the liquidation thereof, remaining upon the dissolution and liquidation of the Company shall be distributed among the Members in proportion to such Members' Capital Accounts. Such Distributions shall be made after allocating all items of Net Profit or Net Loss to the Members as provided in this Agreement.

**4.2 Allocations of Net Profit and Net Loss.**

**4.2.1 Allocation of Net Profit.** Net Profit for each Fiscal Year (or portion thereof) shall be allocated first to Members who have been previously allocated Net Loss in proportion to such allocations of Net Loss, and thereafter to Members in accordance with their Percentage Interests.

**4.2.2 Allocation of Net Loss.** Except as provided in Section 4.2.3, Net Loss for each Fiscal Year (or portion thereof) shall be allocated to Members in accordance with their Percentage Interests.

**4.2.3 Loss Limitation.** Notwithstanding Section 4.2.2, Net Loss shall not be allocated to any Member to the extent such allocation would case such Member to have a deficit balance in its Capital Account that exceeds the amount the Member is obligated to restore to the Company pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), less the amount of any item described in paragraph (d)(4), (d)(5) or (d)(6) of Treasury Regulations Sections 1.704-1(b)(2)(ii), and any Net Loss that cannot be allocated to a Member by virtue of this Section 4.2.3 shall be allocated to other Members in accordance with Section 4.2.2.

**4.3 Tax Allocations.** Items of income, deduction, gain, loss, or credit that are recognized for income tax purposes shall be allocated among the Members in such manner as to reflect equitably the amounts credited to or debited against each member's Capital Account (or which will be so credited and debited), whether in such year, in prior years, or in subsequent years. The Company shall establish and maintain records that indicate the extent to which the Capital Account of each Member, as of the last day of each Fiscal Year, includes amounts that have and have not been reflected in the taxable income of such Member. Taxable income and gain in each Fiscal Year shall be allocated among the Members whose Capital Accounts have been allocated the related credits, and items of deduction, loss, and credit in each fiscal Year shall be allocated among the Members whose Capital Accounts have been allocated the related debits.

**4.3.1 Allocation Rules**. In performing the allocations under Section 4.3, the following rules shall apply unless manifestly unreasonable:

(a) Items of income and gain of the Company shall be allocated to the Members in a manner that complies with the gain chargeback requirements of Treasury Regulations Section 1.704-2(f) and 1.704-2(i)(4).

(b) If any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), 1.704-l(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)

(d)(6), items of Company gross income and gain shall be specially allocated to such Member for tax purposes in an amount and manner sufficient to eliminate as quickly as possible any deficit balance created by such adjustments, allocations, or distributions in the Member's capital account maintained for tax purposes. Any special allocation under this Section 4.3.1(b) shall be taken into account in computing subsequent allocations of income, deduction, gain, loss, and credit so that the net amount of allocations of income, deduction, gain, loss, and credit shall, to the extent possible, be equal to the net amount that would have been allocated if the unexpected adjustment, allocation, or distribution had not occurred.

(c) The Company shall take into account the allocations in Sections 4.3.1(a) and 4.3.1(b) (the "Regulatory Allocations") in computing subsequent allocations pursuant to Section 4.3 so that the net amount of any items so allocated and all other items allocated to each Member pursuant to this Section 4.3.1(c) shall, to the extent possible, be equal to the amount that would have been allocated to each Member had the Regulatory Allocations not been in this Agreement.

**4.3.2. Daily Determination.** For purposes of determining the tax items allocable to any period, such items shall be determined on a daily basis, using any permissible method under Code Section 706 and the Regulations thereunder.

**4.3.3. Contributed Property.** In accordance with Code Section 704(b) and Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company or revealed by the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its value as reflected on the books of the Company. Any elections or other decisions relating to such allocations shall be made in any mariner that reasonably reflects the intent of this Agreement.

## ARTICLE V
## MANAGEMENT

### 5.1 In General.

**5.1.1 Management by Members.** The Members may exercise all powers of the Company and do all lawful acts and things as they may determine to be necessary or appropriate in the ordinary course of the trade or business of the Company. Unless the Act or this Agreement requires a greater vote or consent, all matters requiring the vote, consent, approval, authorization or determination by the

Members shall require the vote or consent of Members holding a majority of Percentage Interests outstanding. The members shall have the power and authority to appoint officers and to delegate to such officers such authority and duties as the Members may determine.

**5.1.2 Officers.** The officers of the Company shall include a chairman, president, secretary, and chief financial officer and may include one or more vice presidents, assistant secretaries and assistant financial officers. The officers shall serve at the pleasure of the Members. Any individual may hold any number of offices. If any Member is not an individual, such Member's directors, officers, partners, members and employees may serve as officers of Company. The officers shall exercise such powers and perform such duties as specified in this Agreement and as shall be determined from time to time by the Members. Subject to the rights, if any, of an officer under a contract of employment, any officer may be removed, either with or without cause, by the Members at any time. Any officer may resign at any time by giving written notice to the Members, which resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. A vacancy in any office because of death, resignation, removal disqualification or any other cause shall be ruled by the Members. The salaries of officers and agents of the company shall be fixed by the Members. The initial officers of the Company shall be as follows:

| | |
|---|---|
| **President:** | **Jan Blaustein Scholes** |
| **Chief Financial Officer:** | **James D. Jaworski** |
| **Secretary:** | **Monique Belkin** |
| **Vice Presidents:** | **Jan Blaustein Scholes**<br>**David G. Crane**<br>**Jay David Gayner**<br>**Robert S. Tomczak** |

**5.1.3 Execution of Documents.** With respect to all of its obligations, powers and responsibilities under this Agreement, the officers of the Company, and each of them, is authorized to execute and deliver, for and on behalf of the Company, such promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, contracts, agreements, assignments, documents, deeds, leases, loan agreements, mortgages, security agreements, guaranties, certificates, registrations, applications, notices and other documents, instruments and agreements ("Agreements") on such terms and conditions as the Members deem proper. Notwithstanding the foregoing, any officer, acting alone, is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the company's accounts. All checks, drafts, and other instruments obligating the Company to pay money in an

amount equal to or less than $10,000 may be signed by any one officer acting alone. All checks, drafts, and other instruments obligating the Company to pay money in an amount greater than $10,000 shall be signed on behalf of the Company by any two officers acting together.

**5.2 Company Qualifications and Filings.** The officers shall cause to be filed such Agreements as may be necessary or appropriate for the continuation, qualification and operation of a limited liability company in the State of Delaware and any other jurisdiction in which the Company may elect to do business, including California. Subject to applicable law, any and all filings in and reports to any state, and all amendments thereto may omit the names and addresses of the Members, information relating to the Members' Capital Contributions and shares of Net Profits and Net Losses and information relating to compensation of the Members, or may state such information in the aggregate rather than with respect to each individual Member. The Company shall not be required to deliver or mail a copy of the Certificate of Formation or any amendment thereto to any Member.

**5.3 Compensation and Reimbursement of Members.**

**5.3.1 Compensation.** Except as provided in this Section 5.3 or elsewhere in this Agreement, no Member shall be compensated for its services to the Company.

**5.3.2 Reimbursement.** Each Member shall be reimbursed on a monthly basis for all reasonable actual out-of-pocket expenses, disbursements and advances it pays or incurs in connection with the formation and business of the Company, including all expenses, disbursements and advances for legal, accounting, printing and banking matters, consultants and other third parties, reasonable travel expenses, and filing fees.

**5.4 Outside and Competing Activities.** Subject to the application of general common law principles of Delaware corporate law, (a) each Member, their respective Affiliates and their respective stockholders, directors, partners, managers, members, officers, controlling persons, partners and employees may engage or invest in, independently or with others, any business activity of any type or description, including those that might be the same as or similar to, or in direct or indirect competition with, the Company's business. Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom; (b) no Member shall be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company; and (c) each Member shall have the right to hold any investment opportunity or prospective economic advantage for its own account or to recommend such opportunity to Persons other than the Company. The Members acknowledge that the Members and their Affiliates may own and/or manage other businesses, including businesses that may compete with the Company's business and may compete for the Member's time; each Member hereby waives any and all rights

and claims which it may otherwise have against any Member and its officers, directors, shareholders, partners, members, managers, agents, employees, and Affiliates as a result of any such ownership or management. The Members shall devote to the management of the Company only such time as may reasonably be required to cause the affairs of the Company to be conducted in an efficient and businesslike manner.

**5.5 Conflicts of Interest.**

**5.5.1 In General.** Notwithstanding that a conflict of interest may exist, any Member or any Affiliates of any Member may engage in any transaction (including the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as (a) such transaction is not expressly prohibited by this Agreement, and (b) the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from Persons capable of similarly performing them and in similar transactions between parties operating at arm's length.

**5.5.2 Determination of Reasonableness.** Any such transaction shall be conclusively determined to be fair and reasonable to the Company and at least as favorable to the Company as similar transactions between parties operating at arm's length if the Members holding a majority of the Percentage Interests (excluding the Percentage Interest of any Member having an interest (other than solely as a Member) in such transaction) affirmatively vote or consent in writing to approve the transaction. Unless otherwise expressly provided herein, whenever this Agreement provides that any Person shall act in a manner which is, or provide terms which are, fair and reasonable to the Company or any Member, any determination of fairness and reasonableness shall consider the relative interests of each party to such agreement, transaction or situation and the benefits and burdens relating to such interests, any customary or accepted industry practices, and any applicable United States generally accepted accounting practices or principles.

**5.5.3 Acts in Good Faith.** So long as a Member acts in good faith, the resolution, action or terms so made, taken or provided by the Member shall not constitute a breach of this Agreement. Whenever in this Agreement any Person is permitted or required to take any action or to make a decision in its "<u>good faith</u>" or under another express standard, that Person shall act under such express standard and shall not be subject to any other or different standards imposed by this Agreement or any other agreement contemplated herein. Whenever in this Agreement any Person is permitted or required to take any action or to make a decision in its "<u>sole discretion</u>" or "<u>discretion</u>," with "<u>complete discretion</u>" or under a grant of similar authority or latitude, that Person shall be entitled to consider only such interests and factors as it wishes, provided that, except as provided in Section 11.1, that Person shall act in good faith.

**5.6 Purchase of Memberships.** The Members may cause the Company to purchase or otherwise acquire Membership Interests or may purchase or otherwise acquire Membership Interests on behalf of the Company. As long as such Membership Interests are owned by or on behalf of the Company, such Membership Interests shall not be considered outstanding for any purpose.

**5.7 Reliance on Advisors.** The Members may consult with counsel, accountants or other independent consultants in respect of Company affairs and be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel, accountants or other independent consultants, provided that they shall have been selected with reasonable care.

**5.8 Member Authority.** Unless expressly and duly authorized in writing to do so by the Members, no Member shall have any power or authority to bind or act on behalf of the Company in any way to pledge its credit or to render it liable for any purpose.

## ARTICLE VI
## NO RIGHT OF PARTITION

No Member shall have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular or individual assets of the Company.

## ARTICLE VII
## BOOKS, RECORDS, ACCOUNTING AND REPORTS

**7.1 Records and Accounting.** The officers shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists and copies of documents required to be provided pursuant to Section 7.3 or pursuant to applicable laws.

**7.2 Fiscal Year.** The Fiscal Year of the Company shall be the 12-month period ending on December 31 of each year or such other annual accounting period as may be established by the Members.

**7.3 Reports.**

**7.3.1 Annual Reports.** Within 120 days after the end of each Fiscal Year, the Company shall deliver to each Member an annual report containing a Company balance sheet as of the end of such Fiscal Year, and Company statements of income, changes in cash flows and changes in Members' equity for such Fiscal

Year, each of which shall be prepared according to United States generally accepted accounting principles.

**7.3.2 Tax Reports.** The Company shall use reasonable efforts to deliver or cause to be delivered, as early as possible each year, to each Person who was a Member at any time during the previous Taxable Year all information necessary for the preparation of such Person's United States federal income tax returns and any state, local and foreign income tax returns which such Person is required to file as a result of the Company being engaged in a trade or business within such state, local or foreign jurisdiction, including a statement showing such Person's share of income, gains, losses, deductions and credits for such year for United States federal income tax purposes (and, if applicable, state, local or foreign income tax purposes) and the amount of any Distributions made to or for the account of such Person pursuant to this Agreement. Upon the written request of any such Person made not later than 30 days after the end of each Fiscal Year and at the sole expense of such Person, the Company shall use reasonable efforts to deliver or cause to be delivered any additional information necessary for the preparation of any state, local and foreign income tax returns which must be filed by such Person.

## ARTICLE VIII
## TAX MATTERS

**8.1 Tax Elections.** The Taxable Year shall be the Fiscal Year set forth in Section 7.2, unless the Members shall determine otherwise in compliance with applicable laws. The Members shall determine whether to make or revoke any available election pursuant to the Code. Each Member will upon request supply the information necessary to give proper effect to such election.

**8.2 Tax Controversies.** BBI is designated the Tax Matters Member, and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees to cooperate with BBI and to do or refrain from doing any or all things reasonably requested by BBI with respect to the conduct of such proceedings. The Tax Matters Member shall have sole discretion to determine whether the Company (either in its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any taxing authority. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes) shall be paid by such Member, and if paid by the Company, shall be recoverable from such Member.

## ARTICLE IX
## VOTING; AMENDMENTS

**9.1 Action Without Meeting.** Any action that may be taken at a Members' meeting may be taken without a meeting if written consents to the action are solicited, and if within 90 days after delivery of the request for written consents, such consents are received from Members owning not less than the minimum Percentage Interests that would be necessary to authorize or take such action at a meeting. A written consent to the taking of any action shall have no force and effect if it is received more than 90 days after the date of the delivery of the written request soliciting consents to such action. The Company shall promptly provide notice of any action taken pursuant to this Section 9.1 to all the Members.

**9.2 Amendments.** This Agreement may be amended upon the affirmative vote of the Members holding not less than a majority of the Percentage Interests; provided, that without the consent of each Member directly affected thereby, no amendment shall modify the limited liability of a Member, increase the liabilities or responsibilities of (including requiring additional future capital contributions of Members or otherwise obligating any Member as to any matter not otherwise covered by this Agreement), or diminish the rights or protections of, a Member under this Agreement, or modify the method provided in this Agreement for determining allocations and Distributions and the definitions relating thereto. This Section 9.2 may be amended only with the approval by written consent or affirmative vote of all Members. As promptly as practicable following the execution and delivery of any amendment to this Agreement, the Company shall provide all of the Members with written notice and a copy of such amendment.

## ARTICLE X
## TRANSFER AND CONVERSION OF LIMITED LIABILITY COMPANY INTERESTS

**10.1 Transfer in General.** A Membership Interest, or any part thereof, may not be Transferred to any Person other than a Member. Any Transfer or purported Transfer which is not permitted under this Section 10.1 shall be void and shall not bind or be recognized by the Company and the Company shall recognize the purported Transferor as continuing to be the owner of the Membership Interest purported to be Transferred.

**10.2 Opinion of Counsel.** Except as may otherwise be agreed by the Members, no Transfer shall be made if, in the opinion of counsel for the Company, (a) such Transfer would violate the Act or any applicable state securities or "blue sky" laws, or any other applicable provision of law in any respect, (b) such Transfer would require registration of the Membership Interest (or any part thereof) Transferred under the Act, (c) such Transfer would result in the Company having to register as an investment company under the Investment Company Act of 1940, as

amended, or in the assets of the Company being considered plan assets within the meaning of the Employee Retirement Income Security Act of 1974, as amended, (d) such Transfer would cause the Company to be treated as an association taxable as a corporation for purposes of the federal income tax laws, (e) such Transfer would cause a default under the terms of any material agreement to which the Company is a party or (f) such Transfer would cause a termination of the Company under Section 708 of the Code.

**10.3 Assignee's Rights.** A Transfer permitted under this Agreement shall be effective as of the date determined by the Members. Net Profits, Net Losses and other Company items shall be allocated between the Transferor and the assignee (the "Assignee") according to Code Section 706. Distributions made before the effective date of such Transfer shall be paid to the Transferor, and Distributions made after such date shall be paid to the Assignee. Unless and until an Assignee becomes a Member pursuant to Article XI, the Assignee shall not be entitled to any of the rights granted to a Member hereunder or under applicable law, other than the rights (a) to receive allocations of Net Profits and Net Losses and Distributions as if such Assignee were a Member, (b) to Transfer the Assignee's Limited Liability Company Interest (subject to the conditions of this Article X), and (c) to receive reports and information as specified in Section 7.3. Further, such Assignee shall be bound by any limitations and obligations contained herein with respect to Members.

## ARTICLE XI
## ADMISSION OF MEMBERS

**11.1 Substituted Members.** An Assignee may request admission as a Substituted Member on the form prescribed by the Members. No Assignee shall become a Substituted Member without the prior written consent of Members, other than the assigning Member, holding at least a majority of the Percentage Interests, which consents may be withheld in the sole discretion of any Member for any reason or for no reason.

**11.2 Death, Incompetency or Bankruptcy of a Member.** If any Member who is a natural person dies or if a court of competent jurisdiction adjudges such a Member to be competent, that Member's executor, administrator, guardian, conservator or other legal representative will have the rights conferred under Section 18-705 of the Act. Upon the bankruptcy of any Person who is a Member, that Person will cease to be a Member as provided in Section 18-304 of the Act.

**11.3 Additional Members.** A Person may be admitted to the Company as an Additional Member only upon furnishing to the Company (a) a letter of acceptance, in form satisfactory to the Members, of all the terms and conditions of this Agreement, and (b) such other documents or instruments as may be reasonably necessary or appropriate to effect his admission as a Member. Such admission shall become effective on the date on which Members holding at least a majority of the

Percentage Interests consent (in their sole discretion) thereto and the conditions set forth above have been satisfied.

**11.4 Representations of New Members.** Each Person admitted to the Company as a Substituted or Additional Member shall become a party to, and agree, to be bound by, this Agreement.

## ARTICLE XII
## WITHDRAWAL OF MEMBERS

No Member shall have any right to withdraw from the Company without the prior written consent of the Members.

## ARTICLE XIII
## INDEMNIFICATION; LIABILITY

**13.1 Indemnification.**

**13.1.1 In General.** The Company shall, to the full extent permitted by law, indemnify, defend and hold harmless each Member, each officer of the Company and each of their respective Affiliates, officers, directors, controlling persons, partners, members, employees and shareholders, together with their respective successors and assigns, heirs, executors and administrators (each, an "Indemnified Person") from and against any and all losses, claims, costs, damages, liabilities, expenses (including legal fees and expenses), judgments, fines, settlements and other amounts arising from or incurred or imposed upon such Indemnified Person in connection with any and all claims, demands, actions, suits or other proceedings, whether civil, criminal, administrative or investigative, which relate to the status or activities as a Member, or officer or to the Company's property, business or affairs ("Claims"). An Indemnified person's expenses paid or incurred in investigating, preparing or defending itself against any Claim shall be reimbursed as paid or incurred. This Section 13.1 shall not apply with respect to any Indemnified Person for that portion of any Claim determined by the final decision (from which an appeal cannot be taken or is not timely taken) of a court of competent jurisdiction to have been caused by his gross negligence, will or wanton misconduct or knowing violation of law. Any payments made to or on behalf of a Person who is later determined not to be entitled to such payments shall be refunded to the Company promptly following such determination.

**13.1.2 Non-Exclusive.** The right to indemnification and the advancement of expenses conferred in this Section 13.1 shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute, agreement, vote of the Members or otherwise.

**13.1.3 Insurance.** The Company may maintain insurance, at its expense, to protect any Person against any expense, liability or loss, to the extent that the Company would have the power to indemnify such Person against such expense, liability or loss under the Delaware Act.

**13.2 Limitation on Liability.** Each Member may exercise any of the powers granted to it by this Agreement either directly or by or through its agents, and such Member shall not be responsible for any misconduct or negligence on the part of any such agent appointed by the Member (so long as such agent was selected in good faith and with due care). Any duties (including fiduciary duties) of, and liabilities relating thereto imposed by law upon, any Member shall, to the extent permitted by law, be modified by the terms of this Agreement. No Person who is a Member and/or officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Member and/or officer of the Company. The Members shall have no liability under this Agreement except as otherwise provided in the following sentence or in the Delaware Act. A Member's liability for Company liabilities and losses shall be limited to the Company's assets; provided that a Member shall be required to return to the Company any Distribution made to it in error.

## ARTICLE XIV
## DISSOLUTION AND LIQUIDATION

**14.1 Dissolution**. The Company shall not be dissolved by the admission of Additional Members or Substituted Members. The Company shall dissolve, and its affairs shall be wound up, upon: (a) the agreement of all of the Members to dissolve the Company, (b) the expiration of the term set forth in Section 2.5; or (c) any other event which would cause the dissolution of the Company under the Delaware Act. Each Member hereby waives any right, to the extent permitted by law, to any action for dissolution other than pursuant to rights set forth in this Agreement.

**14.2 Selection of Liquidator.** Upon dissolution of the Company, the Members shall select a Member to be the Liquidator. The Liquidator shall agree not to resign at any time without 30 days' prior written notice. The Liquidator may be removed at any time, with or without cause, by notice of removal and appointment of a successor Liquidator approved by Members which own at least a majority of the Percentage Interests. Within 30 days following the occurrence of any Event of Withdrawal with respect to the Liquidator, a successor Liquidator may be elected by Members which own at least a majority of the Percentage Interests. The successor Liquidator shall succeed to all rights, powers and duties of the former Liquidator. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor

or substitute Liquidator appointed in the manner herein provided. Except as expressly provided in this Article XIV, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the Members under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Company as provided for herein.

**14.3 Liquidation.** The Liquidator shall liquidate the assets of the Company, and apply and distribute the proceeds of such liquidation, in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

(a) first, to the payment of the Company's debts and obligations to its creditors, including sales commissions and other expenses incident to any sale of the assets of the Company;

(b) second, to the establishment of and additions to such reserves as the Liquidator may deem necessary or appropriate; and

(c) third, to the Members, in accordance with their relative Capital Accounts.

The reserves established pursuant to subparagraph (b) shall be paid over by the Liquidator to a bank or other financial institution, to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations and, at the expiration of such period as the Liquidator deems advisable, such reserves shall be distributed to the Members in the priorities set forth in this Section 14.3. The allocations and distributions provided for in this Agreement are intended to result in the Capital Account of each Member immediately prior to the distribution of the Company's assets pursuant to this Section 14.3 being equal to the amount distributable to such Member pursuant to this Section 14.3. The Company shall make appropriate adjustments in the allocation of Net Profits and Net Losses as necessary to cause the amount of each Member's Capital Account immediately prior to the distribution of the Company's assets pursuant to this Section 14.3 to equal the amount distributable to such Member pursuant to this Section 14.3.

**14.4 Distribution in Kind.** The provisions of Section 14.3 which require the liquidation of the assets of the Company notwithstanding, but subject to the order of priorities set forth therein, if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or would cause undue loss to the Members, the Liquidator may, in its sole discretion, defer for a reasonable time the liquidation of any assets except those necessary to satisfy Company liabilities (other than loans to the Company by

Members) and reserves, and may, in its absolute discretion, distribute to the Members, in Lieu of cash, as tenants in common and in accordance with the provisions of Section 14.3, undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. The Liquidator shall determine the Fair Market Value of any property distributed in accordance with the valuation procedures set forth in Article XIV.

**14.5 Cancellation of Certificate of Formation.** Upon the completion of the distribution of Company property as provided in this Article, the Company shall be terminated, and the Liquidator (or the Members, if necessary) shall cause the cancellation of the Certificate of Formation and all qualifications of the Company as a foreign limited liability company in jurisdictions other than the State of Delaware and shall take such other actions as may be necessary to terminate the Company.

**14.6 Reasonable Time for Winding Up.** A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets in order to minimize any. losses otherwise attendant upon such winding up. Distributions upon liquidation of the Company (or any Member's interest in the Company) and related adjustments shall be made by the end of the Taxable Year of the liquidation (or, if later, within 90 days after the date of such liquidation) or as otherwise permitted by Treasury Regulation Section 1.704-1(b)(2)(ii)(b), including requirements (2) and (3) thereof.

**14.7 Return of Capital.** The Liquidator shall not be personally liable for the return of Capital Contributions or any portion thereof, it being understood that any such return shall be made solely from Company assets.

## ARTICLE XV
## GENERAL PROVISIONS

**15.1 Addresses and Notices.** Any notice, demand, request or report required or permitted to be given or made to any Person under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by first class mail, overnight courier, confirmed facsimile, electronic mail, or by other commercially reasonable means of written communication to the Person at his address as shown on the Company's books and records. An affidavit or certificate of mailing executed on behalf of the Company shall be conclusive (but not exclusive) evidence of the date and fact of mailing of any such notice, demand, request or report. Any notice to the Company shall be deemed given if received by the Company at its principal office designated pursuant to Section 2.4.

**15.2 Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives and permitted assigns.

**15.3 Waiver.** No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any tight or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

**15.4 Counterparts.** This Agreement may be executed in separate counterparts, each of which will be an original and all of which together shall constitute one and the same agreement binding on all the parties hereto.

**15.5 Applicable Law.** The limited liability company law of the State of Delaware will govern all issues concerning the relative rights of the Company and its Members. All other questions concerning the construction, validity and interpretation of this Agreement will be governed by the internal law, and not the law of conflicts, of the State of Delaware.

**15.6 Invalidity of Provisions.** If any provision of this Agreement is or becomes invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected thereby.

**15.7 Interpretation.** This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware. If any provision of this Agreement shall be held to be invalid, the remainder of this Agreement shall not be affected. The titles of the Articles and Sections in this Agreement are for convenience only and shall not be considered in construing this Agreement. Pronouns shall be construed to refer to the feminine, neuter, singular and plural as the identity of the individual or entity referred to may require. In interpreting the meaning of this Agreement: (a) "includes" and "including" are not limiting, (b) "or" is not exclusive, (c) each reference to any gender shall include reference to all other genders, as appropriate, and (d) "all" includes "any" and "any" includes "all."

**15.8 Further Action.** The parties shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

**15.9 Integration.** This Agreement and the other agreements executed as of the date hereof constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersede all prior agreements and understandings pertaining thereto.

**15.10 Taxation as a Partnership.** It is the intent of the Company and its Members that the Company be treated as a partnership for income tax purposes, and the terms of this Agreement shall be construed so as to accomplish that goal and the Members will use their best efforts to cause the Company to be so treated.

## ARTICLE XVI
## REPRESENTATIONS OF MEMBERS

Each Member represents and warrants to the Company as follows:

**16.1 Investment.** The Membership Interest issued to the Member is being acquired for investment for the Member's own account, not as a nominee or agent, and not with a view to or for sale in connection with the distribution thereof. The Member has not been contacted concerning the acquisition of Membership Interest by means of any advertisement.

**16.2 Sophistication.** The Member has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the Member's investment in the Membership Interest; the Member has the ability-to bear the economic risks of such investment; the Member has the capacity to protect its own interests in connection with the transactions contemplated by this Agreement; and the Member has had an opportunity to ask questions and to obtain such financial and other information regarding the Company as the Member deems necessary or appropriate in connection with evaluating the merits of the investment in the Membership Interest. Member acknowledges that the Membership Interests have not been and will not be registered under the Securities Act of 1933 or under any state securities act and may not be transferred except in compliance with the Securities Act of 1933 and all applicable state laws.

**16.3 Accredited Investor.** The Member qualifies as an Accredited Investor within the meaning of Regulation D promulgated under the Securities Act of 1933.

**IN WITNESS WHEREOF,** the undersigned have executed or caused to be executed on its behalf this Limited Liability Company Agreement as of the date first above written.

**BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC**

BY: **BABCOCK & BROWN INC.**,
a California corporation

ITS: Member

By: Jan Blaustein Scholes
Its: Vice President

## SCHEDULE I

## BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC

LIMITED LIABILITY COMPANY AGREEMENT

MEMBERS

*As of December 31, 1999*

| Members | Initial Contribution | Percentage Interest |
|---|---|---|
| Babcock & Brown Inc.<br>2 Harrison Street, 6th Floor<br>San Francisco, CA 94105 | N/A | 100% |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

**AFFIDAVIT OF WALTER A. HORST**

The undersigned, Walter A. Horst, being duly sworn, deposes and says:

1. I am the Manager of Babcock & Brown Holdings LLC (formerly Babcock & Brown Holdings, Inc.) and former Chief Financial Officer of Babcock & Brown International Pty. Ltd. (Currently in a Members Voluntary Liquidation) and former subsidiaries (collectively, "B&B").

1. In making this affidavit, I have reviewed and relied on the available records of B&B regarding the employment and resignation of Jan Blaustein Scholes ("Ms. Scholes") and regarding anything that took place before 2008, when I first joined B&B.

2. On October 1, 2007, Babcock & Brown LP, acting as the sole member of Babcock and Brown Administrative Services, LLC ("BBAS"), adopted a resolution by written consent (the "Written Consent") which recognized the resignation of Ms. Scholes as President and Vice President of BBAS effective as of October 1, 2007 and which appointed another individual to serve as President of BBAS. A copy of the Written Consent is attached hereto as **Exhibit A**.

3. Ms. Scholes also provided a resignation letter to B&B which confirmed her resignation as Vice President of multiple B&B entities as of October 1, 2007. A copy of the Resignation Letter is attached hereto as **Exhibit B**.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated: 5 / 27 , 2025

[signature]
Walter A. Horst

STATE OF ____________________

County of _____________, ss.

On this ____ day of ___________, 2025, before me, the undersigned notary public, Walter A. Horst, personally appeared, proved to me through satisfactory evidence of identification, which was _______________________, to be the person who signed the preceding or attached document in my presence and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

______________________________________
Notary Public:__________________________
My Commission Expires:________________

*[Seal]*

See Attached
Notarial Certificate

# CERTIFICATE OF ACKNOWLEDGMENT
## California All-Purpose Acknowledgment

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Contra Costa

On 5-27-25 (Date) before me, Kimberly C Maus (Name of Officer), Notary Public,

personally appeared WALTER ANDREAS HORST (Name of Signer(s)),

**who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.**

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.**

**WITNESS my hand and official seal.**

KIMBERLY C. MAUS
Notary Public - California
Contra Costa County
Commission # 2476505
My Comm. Expires Dec 15, 2027

Kimberly C. Maus
Signature of Notary Public

Place Notary Seal Above

**Description of Attached Document**

Title or Type of Document: AFFIDAVIT

Document Date: 5-27-25 Number of Pages: 2

Signers(s) other than named above: ______

# EXHIBIT A

**BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC**

**ACTION BY WRITTEN CONSENT OF MEMBER**

**October 1, 2007**

The undersigned, being the sole member of Babcock & Brown Administrative Services LLC, a Delaware limited liability company (the "Company"), hereby adopts the following resolution on behalf of the Company in accordance with the Delaware Limited Liability Company Act and the Company's Limited Liability Company Agreement dated as of December 31, 1999:

**WHEREAS**, the Member is aware of the resignation of Jan Blaustein Scholes as President and Vice President of the Company effective October 1, 2007, and it is

**RESOLVED,** that Karen R. Fagerstrom be and she hereby is appointed to serve as President of the Company until her resignation.

**IN WITNESS WHEREOF,** the undersigned have caused this Written Consent to be duly executed on the date first set forth above.

**BABCOCK & BROWN LP**

By: Babcock & Brown GP LLC
Its: General Partner

Dyann Blaine
By: Dyann Blaine
Its: Vice President

sf_legal 16870v1

# EXHIBIT B

**JAN BLAUSTEIN SCHOLES**
34 Stern Lane
Atherton, CA 94027

October 1, 2007

To Whom It May Concern
2 Harrison Street, 6th Floor
San Francisco, CA 94105

Dear Sirs:

I hereby resign as a Vice President of each of the companies listed on Schedule I attached hereto with immediate effect.

Sincerely,

Jan Blaustein Scholes

sf_legal 24038v1

**SCHEDULE I**

Alliance PP2 FX1 GP, L.L.C.
Alliance PP2 FX1, L.L.C.
Alliance PP2 FX2 GP, L.L.C.
Alliance PP2 FX2, L.L.C.
Alliance PP2 FX3 GP, L.L.C.
Alliance PP2 FX3, L.L.C.
Alliance PP2 FX4 GP, L.L.C.
Alliance PP2 FX4, L.L.C.
Alliance PP2 FX5 GP, L.L.C.
Alliance PP2 FX5, L.L.C.
Alliance PP2 Holdings, L.L.C.
Babcock & Brown Blue Canyon 1 LLC
Babcock & Brown Combine Hills 1 LLC
Babcock & Brown Commercial Realty Development LLC
Babcock & Brown GP LLC
Babcock & Brown Holdings Inc.
Babcock & Brown Ireland Holdings LLC
Babcock & Brown Kumeyaay LLC
Babcock & Brown PFI L.L.C.
Babcock & Brown Power Operating Partners LLC
Babcock & Brown Sweetwater 1 LLC
Babcock & Brown Sweetwater 2 LLC
Babcock & Brown Sweetwater 3 LLC
Babcock & Brown Wind Park Jersey LLC
BBPOP Wind Equity LLC
Caprock Wind Investments LLC
Harrison Partners LLC
J&J Wharf Co. LLC
Marelda Bel Air Mall LLC
Marelda Glynn Place Mall LLC
Marelda Greenville Mall LLC
Marelda Myrtle Beach Mall LLC
Marelda Retail Development LLC
Marelda Retail Holdings LLC
Marelda TRS LLC
Marelda University Village Mall LLC
Marelda Valdosta Mall LLC
Trans Bay Holdings LLC

sf_legal 24038v1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) | |
| | ) | |
| Debtor. | ) | |

**AFFIDAVIT OF LOLONYON Y. AKOUETE**

I, **Lolonyon Akouete**, (the "Akouete"), depose and say that:

1. I am a creditor in the above-captioned case and a party to the contested matters involving my claim and related issues. I make this declaration based on my personal knowledge, my review of the documents attached as exhibits, and records maintained in my possession, custody, or control.

2. **Exhibit Handling.** Unless otherwise stated, each exhibit attached hereto is a **true and correct copy** of the described document. Where I added Bates labels, page numbers or Exhibit numbers for ease of reference, I note that explicitly; otherwise the documents are unaltered.

3. Exhibit 1 — **Certified Delaware Records for Westborough SPE LLC (File No. 2811561).** On **April 8, 2025**, in response to my subpoena, I received from the Delaware Secretary of State certified copies for Westborough SPE LLC consisting of: (1) the Certificate of Formation filed Oct. 22, 1997 (9:00 a.m.); (2) a Certificate to Restore to Good Standing filed July 13, 1999 (signed F. Jan Blaustein Scholes); (3) a Certificate of Revival filed Nov. 22, 2022 (executed Denise Edwards); and (4) a current status certificate noting the company ceased good standing on June 1, 2024 for non-payment of annual tax, while remaining a Delaware domestic LLC. The Secretary's cover certificates are signed by Charuni Patibanda-Sanchez with authentication nos. 203387906, 203387905, 203387904, and 203387767. These are true and correct certified copies as received

4. Exhibit 2 — Unanimous Consent of Directors of Babcock & Brown Administrative Services, Inc. (October 1997). Attached as Exhibit 2 **is a** true and correct copy of the Unanimous Consent of Directors of Babcock & Brown Administrative Services, Inc. ("BBAS Inc."), which I obtained from Babcock & Brown in response to my subpoena. The document (footer GS2-136623-1, timestamp 10/28/97 7:47 PM, Bates BB001086) states that BBAS Inc. is the sole manager of Westborough SPE LLC and authorizes the LLC to: (i) assume Interstate Theatres Corporation's Contract of Sale for the Westborough property; (ii) close on that acquisition; and (iii) obtain financing from The Northwestern Mutual Life Insurance Company. It further authorizes F. Jan Blaustein ("Authorized Officer") to execute any and all documents, in her sole discretion, including the Participation Agreement, Lease Agreement, Mortgage, Lease Assignment, and Assignment of Lease Guaranty. I keep this document in my files as produced.

5. Exhibit 3 — **Massachusetts Foreign Corporation Filings for Babcock & Brown Administrative Services, Inc. (with Delaware Certificate; Access & Foundation).** Attached as Exhibit 3 are true and correct copies of the Massachusetts foreign corporation filings for Babcock & Brown Administrative Services, Inc. that I obtained from the Massachusetts Secretary of the Commonwealth, Corporations Division website; the packet consists of the Foreign Corporation Certificate filed in October 1997 for Babcock & Brown Administrative Services, Inc. (FEIN 94-3285178), listing the principal office at 2 Harrison Street, 6th Floor, San Francisco, CA 94105, the initial Massachusetts resident agent Shelly G. Widoff, 4 Faneuil Hall Marketplace, 4th Floor, Boston, MA 02109, and officers/directors including F. Jan Blaustein (President), Monique Belkin (Secretary), James D. Jaworski (Director), and David G. Crane (Director); an Amended Foreign Corporation Certificate (2003) identifying Corporation Service Company, 84 State Street, Boston, MA 02109, as resident agent; and an attached Delaware Secretary of State certificate dated October 24, 1997 (signed by Edward J. Freel) confirming BBAS Inc. was duly incorporated and in good standing as of that date; as of September 7, 2025, this filing remains publicly available online at https://corp.sec.state.ma.us/corpweb/corpsearch/CorpSearch.aspx , where it can be located by searching the Identification Number 943285178 and opening the "Foreign Corporation Certificate" filed 10/27/1997 (Filing No. 020502975689; PDF "020502975689_1.pdf," 5 pages); these are true and correct copies as downloaded.

6. Exhibit 4 — **Delaware Secretary of State Certified Records for Babcock & Brown Administrative Services (Inc./LLC)** (File No. 2811627). Attached as Exhibit 4 are true and correct certified copies I received on April 8, 2025 from the Delaware Secretary of State in response to my subpoena, arranged chronologically as follows: the Certificate of Incorporation of Babcock & Brown Administrative Services, Inc. filed October 23, 1997 at 9:00 a.m. (Auth. 203387797), the Certificate of Amendment filed November 21, 1997 at 9:00 a.m. (Auth. 203387796), the Certificate of Conversion converting the corporation to Babcock & Brown Administrative Services LLC filed January 3, 2000 at 9:00 a.m. (Auth. 203387794) and signed by F. Jan Blaustein Scholes, the Certificate of Formation creating BBAS LLC filed January 3, 2000 at 9:00 a.m. (Auth. 203387795) and signed by F. Jan Blaustein Scholes as the executing/authorized person, and the Certificate of Merger merging BBAS LLC into Babcock & Brown Parallel Member LLC filed August 29, 2011 at 2:33 p.m. (Auth. 203387793), together with a Secretary's certification listing these as the only certificates of record for BBAS LLC (Auth. 203387818, SR# 20251460210) and signed by Charuni Patibanda-Sanchez, Secretary of State; these certified records demonstrate that Ms. Scholes executed both the conversion and formation instruments, evidencing continuity of her corporate authority across the transition from BBAS Inc. to BBAS LLC.

7. Exhibit 5 — **Limited Liability Company Agreement of Babcock & Brown Administrative Services LLC (Dec. 31, 1999) (Foundation).** Attached as Exhibit 5 is a true and correct copy of the Limited Liability Company Agreement of Babcock & Brown Administrative Services LLC, dated December 31, 1999, which I obtained from Babcock & Brown in response to my subpoena; the agreement organizes the company under the Delaware Limited Liability Company Act (Art. II §2.1), identifies Babcock & Brown Inc. as the sole Member (100%) (Schedule I), sets the principal office at 2 Harrison Street, San Francisco, CA 94105 and the registered agent/office at CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, DE 19901 (§2.4), states the company's purpose in connection with the Westborough property transaction (Art. II §2.3), and, critically, lists the initial officers (§5.1.2), including F. Jan Blaustein Scholes as President (and also as a Vice President), James D. Jaworski as Chief Financial Officer, and Monique Belkin as Secretary; the

agreement further authorizes the officers—each of them—to execute and deliver instruments on behalf of the Company (§5.1.3), and the execution page reflects Babcock & Brown Inc., Member**, by** Jan Blaustein Scholes, Vice President

8. Exhibit 6 **— Resignation Letter of Jan Blaustein Scholes (Oct. 1, 2007) (Foundation).** Attached is a true and correct copy of a resignation letter dated October 1, 2007, which I obtained from Babcock & Brown in response to my subpoena in this contested matter; the letter, sent "To Whom It May Concern" at 2 Harrison Street, 6th Floor, San Francisco, CA 94105, states: "I hereby resign as a Vice President of each of the companies listed on Schedule I attached hereto with immediate effect," and the attached Schedule I lists multiple entities but does not include Babcock & Brown Administrative Services, Inc. or Babcock & Brown Administrative Services LLC; the document therefore reflects a resignation limited to the Vice President role and only as to the entities specifically listed on Schedule I; the letter bears Ms. Scholes's name and Atherton, California address (34 Stern Lane, Atherton, CA 9402**7**)

9. Exhibit 7**— Notice of Resignation (Apr. 30, 2011) (Foundation).** Attached is a true and correct copy of a Notice of Resignation I obtained from Babcock & Brown in discovery in this contested matter; the letter appears on Babcock & Brown LP letterhead (One Letterman Drive, Bldg. D, San Francisco, CA) and is dated April 30, 2011, addressed to Westborough SPE LLC, c/o Equity Trust, 31/F The Center, 99 Queen's Road Central, Hong Kong, Attn: Serena Kwok, General Manager, Trade Support**,** re: Westborough SPE LLC; it states, **"**Pursuant to Section 1(e) of the LLC Agreement and Section 18-602 of the Delaware Limited Liability Company Act, this letter serves as notice to the Member of the Manager's intent to resign as Manager of the Company effective as of May 30, 2011," and is executed on behalf of Babcock & Brown Administrative Services LLC by its Treasurer.

10. Exhibit 8 **— Mignonette Investments Limited (BVI) Corporate Records (Obtained via Dato Capital, Mar. 9, 2023) (Foundation).** Attached are true and correct copies of British Virgin Islands corporate records for Mignonette Investments Limited (BVI Co. No. 243736) that I obtained on March 9, 2023 through Dato Capital, a commercial service that retrieves and provides official filings and registry extracts from government registries (including the BVI FSC/VIRRGIN system); the packet includes the 1997 Certificate of Good Standing, name-reservation and Memorandum & Articles of Association from incorporation in August 1997, registry profile/transaction history pages reflecting a 2011 restoration, annual fee submissions, a 2017 registered-agent intent to resign and Register of Directors filing, and the status change to "Struck off – Non Payment of Annual Fee" in May 2017, and it shows that while the registered agent name changed over time (Integro → Equity Trust/TMF), the registered office consistently remained P.O**.** Box 438, Road Town, Tortola, BVI; these are true and correct copies as provided.

11. Exhibit 9 **— Affidavit of David Abromowitz, Esq. (Apr. 4, 2025) (Foundation).** Attached is a true and correct copy of the Affidavit of David Abromowitz, Esq. of Goulston & Storrs PC, executed April 4, 2025, which I received in this case and maintain in my files; in it, Mr. Abromowitz—Massachusetts attorney, Of Counsel at Goulston & Storrs, and counsel on the 1997–1998 formation/lease matter for Westborough SPE LLC—identifies the client representatives with whom the firm communicated, including F. Jan Blaustein and Monique Belkin at Babcock & Brown Administrative Services, 2 Harrison Street, 6th Floor, San Francisco, CA 94105 (Tel. 415-512-1515; Fax 415-267-1500), and Derek Andrews (Mignonette) at Integro Trust (BVI) Limited, P.O. Box 438, Tropic Isle Building, Wickhams Cay, Road Town, Tortola, British Virgin Islands (Fax 1-809-494-2704**)**; the

affidavit is signed under the pains and penalties of perjury, and is offered to authenticate the firm's contemporaneous contact records and to corroborate Mignonette's BVI registered office/agent details used during the 1997–1998 transaction period

12. Exhibit 10 — Attached hereto as **Exhibit 10** is a true and accurate copy of the "**Participation Agreement**" dated October 30, 1997, among Interstate Theatres Corporation, certain Hoyts entities, Westborough SPE LLC, Mignonette Investments Limited, and The Northwestern Mutual Life Insurance Company, which I obtained by subpoena to Babcock & Brown and which Babcock & Brown produced in connection with this Contested Matter; Section 10.5 of that Agreement states that Mignonette Investments Limited irrevocably appointed Corporation Service Company, 84 State Street, Fifth Floor, Boston, Massachusetts 02109, as its agent for service of process in the Commonwealth of Massachusetts.

13. Exhibit 11 — Attached hereto as **Exhibit 11** is a true and correct copy of IRS Letter 147C, dated December 23, 2022, issued from the IRS Ogden, Utah office, confirming EIN 94-3286768 for Westborough SPE LLC and addressed "c/o F. Jan Blaustein," 1241 Deer Park Ave., Ste. 1 No. 1051, North Babylon, NY 11703; I together with Denise Edward, obtained this letter by calling the IRS, providing a power of attorney, and requesting EIN verification and an address update, after which the IRS mailed the letter. This document reflects that, as of that date, the IRS listed Westborough SPE LLC's account under the care-of name F. Jan Blaustein in connection with this Contested Matter.

14. Exhibit 12— Attached as **Exhibit 12** is a true and correct copy of docket materials I downloaded from the Massachusetts Land Court in Town of Westborough v. Westborough SPE, LLC, No. 19 TL 000768, showing that in September 2021—during the Town's tax-foreclosure proceeding—service of process was directed to and/or attempted upon "F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E., Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Administrative Services, Inc." at 34 Stern Lane, Atherton, CA 94027, including the Land Court Citation, certified-mail labels/envelope marked "Return to Sender—Attempted—Not Known," a Sheriff's Return of Service, and a process server affidavit reflecting substitute service; I obtained these documents directly from the Land Court docket for use in this Contested Matter.

15. Exhibit 13— Attached hereto as **Exhibit 13** is a true and correct copy of the relevant portions of the deposition transcript of Denise Edwards, taken on March 31, 2025, in this case (In re Westborough SPE LLC, No. 23-40709-CJP). I obtained the transcript directly from the Chapter 7 Trustee's attorney, Christine Devine, Esq., of Nicholson Devine LLC. For ease of reference, I have excerpted only the pertinent pages and omitted the remaining pages to reduce length; the text on the included pages has not been altered. The full certified transcript is 204 pages and is available from counsel or the court reporter.

16. Exhibit 14— **August 13–14, 2024 Emails Between Lenard B. Zide and Trustee Jonathan Goldsmith (Foundation).** Attached hereto as Exhibit 14 is a true and correct copy of an email chain I obtained from the Chapter 7 Trustee's counsel in response to my subpoena in this Contested Matter. The chain consists of (i) an August 13, 2024, 8:09 a.m. email from Jonathan Goldsmith (jgoldsmith@gkalawfirm.com), subject "AI," stating, among other things, that he had "called in some reinforcements," that there was "a good possibility" I would "get nothing," and that he "already [has] a legal fee escrow … in the tune of 1.2 million dollars remitted to me from the State of California"; and (ii) Mr. Zide's August 14, 2024, 7:35 a.m. reply "Re: AI," relaying a ChatGPT statement about a trustee's ability to distribute uncontested funds subject to court approval. The exhibit preserves the

sender/recipient addresses, dates/times, and subject lines as produced; I have not altered the wording and removed only non-substantive footer material for brevity.

*09/9/25* [signature]

Date LOLONYON Y AKOUETE

STATE OF NEW YORK

County of Ulster

On this *9TH* day of *September*, 20*25*, the undersigned notary public, personally appeared Frances Lolonyon Y. Akouete, proved to me through satisfactory evidence of identification, which was *Driver's License*, to be the person whose name is signed on the preceding document, and acknowledged to the undersigned that he signed it voluntarily for its stated purpose.

Official Signature of Notary: [signature]

Notary's Printed or Typed Name: *JOEL VOZZO*

My Commission Expires: *11/09/2025*

JOEL VOZZO
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01VO6213484
Qualified in Ulster County
Commission Expires *11/09/2025*

# EXHIBIT 1

Certified Delaware Records – Westborough SPE LLC (File No. 2811561)

# Delaware

The First State

Page 1

I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "WESTBOROUGH SPE LLC", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF OCTOBER, A.D. 1997, AT 9 O`CLOCK A.M.

C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

2811561 8100
SR# 20251460210

You may verify this certificate onli...

Authentication: 203387906
Date: 04-08-25

# CERTIFICATE OF FORMATION

# OF

# WESTBOROUGH SPE LLC

This Certificate of Formation of Westborough SPE LLC (the "LLC") is being duly executed and filed by Eleanor M. Coleman, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.Code Ann. §18-101, et seq.)

FIRST. The name of the limited liability company formed hereby is:

Westborough SPE LLC

SECOND. The address of the registered office of the LLC in the State of Delaware is c/o Corporation Service Company, 1013 Centre Road, Wilmington, Delaware 19805.

THIRD. The name and address of the registered agent for service of process on the LLC in the State of Delaware is Corporation Service Company, 1013 Centre Road, Wilmington, Delaware 19805.

IN WITNESS WHEREOF, the undersigned, an authorized person of the LLC, has caused this Certificate of Formation to be duly executed as of the 22nd day of October, 1997.

Eleanor M. Coleman

Name: Eleanor M. Coleman
Authorized Person

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 10/22/1997
971357275 - 2811561

# Delaware

The First State

Page 1

*I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF RESTORATION OF "WESTBOROUGH SPE LLC", FILED IN THIS OFFICE ON THE THIRTEENTH DAY OF JULY, A.D. 1999, AT 9 O`CLOCK A.M.*

C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

2811561 8100
SR# 20251460210

Authentication: 203387905
Date: 04-08-25

You may verify this certificate onlin… …ml

001078 SOSRL2

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 07/13/1999
991290319 - 2811561

FILE NO.: 2811561

# STATE OF DELAWARE
# CERTIFICATE TO RESTORE TO GOOD STANDING
# A DELAWARE LIMITED LIABILITY COMPANY

1. Name of Limited Liability Company:

   WESTBOROUGH SPE LLC.

2. Date the limited liability company was formed: OCTOBER 22, 1997.

3. The limited liability company is paying all sums due under Section 18-1107.

4. This filing will permit the limited liability company to be restored to good standing.

IN WITNESS WHEREOF, the undersigned have executed Certificate on the 6th day of July, 1999.

By: [signature]
Authorized Person(s)

Name: JAN BLAUSTEIN SCHOLES
Type or Print

# Delaware

The First State



*I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF REVIVAL OF "WESTBOROUGH SPE LLC", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2022, AT 5 O`CLOCK P.M.*

C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

2811561 8100
SR# 20251460210
You may verify this certificate onli... ...ml

Authentication: 203387904
Date: 04-08-25

# STATE OF DELAWARE
# CERTIFICATE OF REVIVAL OF A DELAWARE LIMITED LIABILITY COMPANY PURSUANT TO TITLE 6, SEC. 18-1109

1. Name of the Limited Liability Company WESTBOROUGH SPE LLC

2. Date of the original filing with the Delaware Secretary of State:
   10/22/1997

3. The name and address of the Registered Agent is
   THE INCORPORATORS LTD.
   300 CREEK VIEW ROAD, SUITE 209
   NEWARK, DE 19711

4. (Insert any other matters the members determine to include herein).

5. This Certificate of Revival is being filed by one or more persons authorized to Execute and file the Certificate of Revival.

In witness whereof, the above name Limited Liability Company does hereby certify that the Limited Liability Company is paying all annual Taxes, penalties and interest due to the State of Delaware.

BY: Denise Edwards
Authorized Person

Name: Denise Edwards
Print or Type

State of Delaware
Secretary of State
Division of Corporations
Delivered 05:00 PM 11/22/2022
FILED 05:00 PM 11/22/2022
SR 20224086804 - File Number 2811561

# Delaware

The First State



I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THAT THE CERTIFICATE OF FORMATION OF "WESTBOROUGH SPE LLC", WAS RECEIVED AND FILED IN THIS OFFICE THE TWENTY-SECOND DAY OF OCTOBER, A.D. 1997.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID LIMITED LIABILITY COMPANY CEASED TO BE IN GOOD STANDING ON FIRST DAY OF JUNE, A.D. 2024, BY REASON OF NEGLECT, REFUSAL, OR FAILURE TO PAY AN ANNUAL TAX, BUT REMAINS A DOMESTIC LIMITED LIABILITY COMPANY FORMED UNDER CHAPTER 18 OF TITLE 6.

C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

2811561 8300X

SR# 20251460210

You may verify this certificate o... ...r.shtml

Authentication: 203387767

Date: 04-08-25

# EXHIBIT 2

Unanimous Consent of Directors – Babcock & Brown Administrative Services, Inc. (Oct. 1997)

October __, 1997

**UNANIMOUS CONSENT OF DIRECTORS**

**BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.**

The undersigned, being all of the Directors of Babcock & Brown Administrative Services, Inc., a Delaware corporation (the "Corporation"), in lieu of holding a formal meeting on the above date, hereby consent to the adoption of, and adopt, in accordance with the By-Laws of the Corporation, the following resolutions:

WHEREAS, the Corporation is the sole manager of Westborough SPE LLC, a Delaware limited liability company (the "LLC"); and

WHEREAS, Interstate Theatres Corporation, a Massachusetts corporation ("Interstate"), has entered into a certain Contract of Sale dated __________, 1997 (the "Contract of Sale") with Northside Realty Trust, established under declaration of trust dated January 14, 1994, and recorded with the Worcester County Registry of Deeds in Book 15975, Page 213 ("Northside"), for the acquisition of the land, buildings and other improvements thereon located in Westborough, Worcester County, Massachusetts as more specifically described in the Contract of Sale (the "Property"); and

LLC WHEREAS, Interstate desires to assign its rights under the Contract of Sale to the ~~Corporation~~ in consideration for the assumption of Interstate's obligations under the Contract of Sale by the ~~Corporation~~ LLC; and

WHEREAS, the LLC will enter into a Lease of the Property with Interstate upon the acquisition of the Property (the "Lease"); and

WHEREAS, the Corporation, as manager of the LLC, desires to cause the LLC to (i) assume the obligations of Interstate as Buyer under the Contract of Sale, (ii) close on the acquisition of the Property pursuant to the Contract of Sale, and (iii) borrow funds from Northwestern Mutual Life Insurance Company (the "Lender") for the acquisition of the Property (the "Loan") and execute any and all documents necessary in the sole discretion of F. Jan Blaustein ("Authorized Officer") to evidence, govern and secure the Loan.

NOW, THEREFORE, it is:

RESOLVED: That the Corporation, in its capacity as manager of LLC, be and hereby is authorized to cause the LLC to assume Interstate's obligations as Buyer under the Contract of Sale by executing such an assignment agreements and such other documents in connection therewith as Authorized Officer

deems appropriate, in each case in such form as the Authorized Officer may approve in her sole discretion, the execution thereof by the Authorized Officer to constitute conclusive evidence of such approval

RESOLVED: That the Corporation, in its capacity as manager of the LLC, be and hereby is authorized to cause the LLC to purchase the Property from Northside in accordance with the terms of the Contract of Sale;

RESOLVED: That the Corporation, in its capacity as manager of the LLC, be and hereby is authorized to undertake the borrowing represented by the Loan and to execute the documents evidencing, governing and securing the Loan including, without limitation, the Participation Agreement, the Lease Agreement, the Mortgage, the Lease Assignment, the Assignment of Lease Guaranty, and such other documents as the Authorized Officer may deem appropriate, in each case in such form as the Authorized Officer may approve in her sole discretion, the execution thereof by the Authorized Officer to constitute conclusive evidence of such approval;

RESOLVED: That the Corporation, in its capacity as Manager of the LLC, cause the LLC to enter into the Lease Agreement with Interstate;

RESOLVED: That the Corporation in its own capacity, and as ~~general partner~~ Manager of the LLC, execute such document and take such other actions as may be required in furtherance of any of the transaction described in the foregoing resolutions as approved by the Authorized Officer, the execution of any such document or the taking of any such action to constitute conclusive evidence of such approval;

RESOLVED: That the Authorized Officer is hereby authorized to execute on behalf of the Corporation in its own capacity, or as ~~general partner~~ Manager of the LLC, any document contemplated in any of the foregoing resolutions;

RESOLVED: That the Corporation hereby ratifies, confirms and adopts all other actions heretofore taken as of the date hereof by or on behalf of the Corporation, in its own capacity, or as ~~general partner~~ Manager of the LLC, as the case may be, in connection with the transactions authorized by the foregoing resolutions;

RESOLVED: That these resolutions be filed with the records of the Corporation.



GS2- 136623-1
10/28/97 7:47 PM

00 0 3

760

This Consent of Directors may be executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.

F. Jan Blaustein

David G. Crane

James D. Jaworski



GS2- 136623-1
10/28/97 7:47 PM

This Consent of Directors may be executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.

F. Jan Blaustein

David G. Crane

James D. Jaworski

This Consent of Directors may be executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.

______________________________
F. Jan Blaustein

______________________________
David G. Crane

______________________________
James D. Jaworski



GS2- 136623-1
10/28/97 7:47 PM

# EXHIBIT 3

Massachusetts Foreign Corporation Filings – Babcock & Brown Administrative Services, Inc. (incl. Delaware Certificate)

FEDERAL IDENTIFICATION NO. 94-3285178

Examiner

# The Commonwealth of Massachusetts

William Francis Galvin
Secretary of the Commonwealth

ONE ASHBURTON PLACE, BOSTON, MASSACHUSETTS 02108

## FOREIGN CORPORATION CERTIFICATE

We, F. Jan Blaustein, President/~~Vice President~~
and Monique Belkin, Clerk/~~Assistant Clerk~~ or
Secretary/~~Assistant Secretary~~ of Babcock & Brown Administrative Services, Inc., in compliance with the provisions of General Laws, Chapter 181, Section 4, certify that:

Name Approved

1. The exact name of the corporation, including any words or abbreviations indicating incorporation or limited liability is: Babcock & Brown Administrative Services, Inc.

2. The corporation is organized under the laws of: Delaware

3. The date of its organization is: October (Month) 23 (Day) 1997 (Year)

4. The location of its principal office is: 2 Harrison Street, 6th Floor
San Francisco, CA 94105

5. A brief description of the activities of the corporation within the Commonwealth of Massachusetts is as follows: administrative service provider

97300056

C. ☐
M. ☐
R.A. ☑

6. The location of its local office in the Commonwealth of Massachusetts, if any, is:
N/A

7. The name and address of its resident agent in the Commonwealth of Massachusetts, if any, is:
Shelly G. Widoff, 4 Faneuil Hall Marketplace
Fourth Floor, Boston, MA 02109

8. The date on which the corporation's fiscal year ends is: March (Month) 31 (Day)

5
P.C.

9. If the corporation's existence is other than perpetual, state the duration of existence: ______

10. The NAME and RESIDENTIAL ADDRESSES of the following officers and directors are as follows:

| | NAME | RESIDENTIAL ADDRESSES |
|---|---|---|
| President: | F. Jan Blaustein | 2334 Corona Court, Berkeley, CA 94708 |
| * Vice President: | | |
| Treasurer: | Geri Stukel | 4706 Edgewood Ave., Oakland, CA 94602 |
| CXXXXX Secretary: | Monique Belkin | 200 10th Ave. #5, San Francisco, CA 94118 |
| * Assistant Clerk or Assistant Secretary: | | |
| Board of Directors: | F. Jan Blaustein | Same as above. |
| | James D. Jaworski | 1715 Easton Drive, Burlingame, CA 94010 |
| | David G. Crane | 2485 Broadway, San Francisco, CA 94115 |

* Please provide the name and residence of the Vice President and Assistant Clerk/Assistant Secretary if they are executing this certificate.

PAGE 1

State of Delaware

# Office of the Secretary of State

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-FOURTH DAY OF OCTOBER, A.D. 1997.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC." WAS INCORPORATED ON THE TWENTY-THIRD DAY OF OCTOBER, A.D. 1997.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE NOT BEEN ASSESSED TO DATE.

Edward J. Freel, Secretary of State

2811627 8300

971360676

AUTHENTICATION: 8721838

DATE: 10-24-97

11. Please indicate the fees for which a Massachusetts corporation would be required to pay to register to do business in your State of incorporation:

**$100**

12. Attached to this certificate shall be a certificate of Legal Existence of such foreign corporation issued by an officer or agency properly authorized in the state or country in which such foreign corporation was organized or other evidence of legal existence acceptable to the Secretary. If such certificate or other evidence of such legal existence is in language other than English, a translation thereof, under oath of the translator, shall also be attached.

The corporation hereby appoints the Secretary of the Commonwealth of Massachusetts and his successor in office to be its attorney in and for Massachusetts, upon whom all lawful process in any judicial or administrative proceeding in Massachusetts may be served as long as any liability incurred in the Commonwealth of Massachusetts while it was doing business in said Commonwealth shall remain outstanding.

**IN WITNESS WHEREOF AND UNDER THE PENALTIES OF PERJURY,** we hereto sign our names this 23rd day of October, 19 97.

[signature]
President, ~~Vice President~~

[signature]
~~Clerk/Assistant Clerk~~
~~or~~
Secretary/~~Assistant Secretary~~

OCT-23-97 THU 15:23 CORPAMERICA INC-ADVTRS FAX NO. 3027365620 P. 03

532856

THE COMMONWEALTH OF MASSACHUSETTS

FOREIGN CORPORATION CERTIFICATE
(General Laws, Chapter 181, Section 4)

97 OCT 27 PM 3:26
THE COMMONWEALTH
CORP DIVISION

I hereby approve the within Certificate and, the filing fee in the amount of $ 300 - having been paid, said Certificate is deemed to have been filed with me this 27th day of October, 1997

William Francis Galvin

William Francis Galvin
Secretary of the Commonwealth

TO BE FILLED IN BY CORPORATION
Photo Copy of Certificate to be Sent

To: CorpAmerica, Inc.
Rose L. Redman
30 Old Rudnick Lane
Dover, DE 19901

Telephone: 302-736-5510

FEDERAL IDENTIFICATION
NO. 943285178

Fee: $100.00

Examiner

# The Commonwealth of Massachusetts

William Francis Galvin
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

Name Approved

## AMENDED FOREIGN CORPORATION CERTIFICATE
(General Laws, Chapter 181, Section 4)

We, Jan Blaustein Scholes, *President / *~~Vice President~~,

and Monique Belkin, *~~Clerk~~ / *~~Assistant Clerk or~~ Secretary / *~~Asst. Secretary~~,

of BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.,
*(Exact name of corporation)*

in compliance with the provisions of General Laws, Chapter 181, Section 4, certify that:

1. The name of the corporation has been changed to:

2. The location of its principal office has been changed to:

3. The location of its local office in the Commonwealth of Massachusetts has been changed to:

4. The activities of the corporation within the Commonwealth of Massachusetts have been changed to:

5. The date of the corporation's fiscal year end has been changed to:

6. The name and street address of the resident agent of the corporation in the Commonwealth of Massachusetts is: Corporation Service Company 84 State Street Boston, MA 02109

7. The jurisdicrion under the laws of which the corporation is organized or governed has been changed to:

8. Other:

C ☐
M ☐
R.A. ☑

SIGNED UNDER THE PENALTIES OF PERJURY, this 22nd day of October, 20 03,

[signature], *President / *~~Vice President~~,

_______________, *~~Clerk~~ / *~~Assistant Clerk~~ or *Secretary/*~~Asst. Secretary~~.

**Delete the inapplicable words.*
*Note: If this amendment involves a change of name or jurisdiction, a certificate of such change issued by an officer or agency properly authorized in the state or country in which such foreign corporation is organized must be attached to this amended certificate. If such certificate is in a language other than English, a translation thereof under the oath of the translator must be attached.*

P.C.

180afcc 4/5/00

090 65581

THE COMMONWEALTH OF MASSACHUSETTS

# AMENDED FOREIGN CORPORATION CERTIFICATE

(General Laws, Chapter 181, Section 4)

I hereby approve the within Amended Foreign Corporation Certificate and, the filing fee in the amount of $ 100 having been paid, said certificate is deemed to have been filed with me this 3rd day of March 2004.

SECRETARY OF STATE
RECEIVED
04 MAR -3 PM 3:15
CORPORATIONS DIVISION

William Francis Galvin

WILLIAM FRANCIS GALVIN
*Secretary of the Commonwealth*

8747773

TO BE FILLED IN BY CORPORATION
Photocopy of document to be sent to:

CSC
Corporation Service Company
84 State Street, 5th Floor
Boston, MA 02109

Telephone: ______

# EXHIBIT 4

Delaware Certified Records – Babcock & Brown Administrative Services (Inc./LLC) (File No. 2811627)

# Delaware

The First State



*I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THAT THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF CONVERSION OF A DELAWARE CORPORATION UNDER THE NAME OF "BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC." TO A DELAWARE LIMITED LIABILITY COMPANY, CHANGING ITS NAME FROM "BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC." TO "BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC", FILED IN THIS OFFICE ON THE THIRD DAY OF JANUARY, A.D. 2000, AT 9 O`CLOCK A.M.*




C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

2811627 8100V
SR# 20251460210
You may verify this certificate o[illegible]html

Authentication: 203387794
Date: 04-08-25

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 01/03/2000
001001228 – 2811627

**STATE OF DELAWARE**

**CERTIFICATE OF CONVERSION**

**FROM A CORPORATION TO A LIMITED LIABILITY COMPANY**

**PURSUANT TO SECTION 266 OF THE**

**DELAWARE GENERAL CORPORATION LAW**

(1) The name of the corporation immediately prior to filing this Certificate is **Babcock & Brown Administrative Services, Inc.**

(2) The date the Certificate of Incorporation was filed on is October 23, 1997.

(3) The original name of the corporation as set forth in the Certificate of Incorporation is Babcock & Brown Administrative Services, Inc.

(4) The name of the limited liability company as set forth in the formation is **Babcock & Brown Administrative Services LLC.**

(5) The conversion has been approved in accordance with the provisions of Section 266.

[signature]

By: Jan Blaustein Scholes, Authorized Officer

Dated: December 31, 1999

# Delaware

The First State

Page 1

I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC", FILED IN THIS OFFICE ON THE THIRD DAY OF JANUARY, A.D. 2000, AT 9 O`CLOCK A.M.




C. P. Sanchez
Charuni Patibanda-Sanchez, Secretary of State

2811627 8100
SR# 20251460210
You may verify this certificate onli[...]ml

Authentication: 203387795
Date: 04-08-25

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 01/03/2000
001001228 – 2811627

**CERTIFICATE OF FORMATION**

**OF**

**BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC**

This Certificate of Formation of Babcock & Brown Administrative Services LLC, a Delaware limited liability company (the "Company"), dated as of December 31, 1999, is being duly executed and filed by Babcock & Brown Inc., a California corporation, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, et seq.) (the "Delaware Act").

FIRST: The name of the limited liability company formed hereby is **Babcock & Brown Administrative Services LLC.**

SECOND: The address of the registered office of the Company in the State of Delaware is c/o CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901.

THIRD: The name and address of the registered agent for service of process on the Company in the State of Delaware is CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901.

IN WITNESS WHEREOF, the undersigned, an authorized person as described in the Delaware Act, has executed this Certificate of Formation as of the date first above written.

Authorized Person:

Babcock & Brown Inc.,
a California corporation

[signature]

By: Jan Blaustein Scholes
Its: Vice President

# Delaware

The First State



I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC", FILED IN THIS OFFICE ON THE TWENTY-THIRD DAY OF OCTOBER, A.D. 1997, AT 9 O`CLOCK A.M.




C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

2811627 8100
SR# 20251460210

You may verify this certificate online a... ...ml

Authentication: 203387797
Date: 04-08-25

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 10/23/1997
971358220 – 2811627

# CERTIFICATE OF INCORPORATION

# OF

# BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

FIRST. The name of the Corporation is Babcock & Brown Administrative Services, Inc.

SECOND. Its registered office in the State of Delaware is to be located at 30 Old Rudnick Lane, in the City of Dover, County of Kent. The Registered Agent in charge thereof is CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901.

THIRD. The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

FOURTH. The total number of shares of stock which this corporation is authorized to issue is Five Thousand (5,000) shares at One Dollar ($1.00) per share, for a total authorized capital of Five Thousand Dollars ($5,000.00).

FIFTH. The name and mailing address of the incorporator is as follows:

CorpAmerica, Inc.
30 Old Rudnick Lane
Dover, DE 19901

SIXTH. The Board of Directors shall have the power to adopt, amend or repeal the by-laws.

SEVENTH. No director shall be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty by such director as a director. Notwithstanding the foregoing sentence, a director shall be liable to the extent provided by applicable law, (i) for breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith of law, (iii) pursuant to Section 174 of the Delaware General Corporation Law or (iv) for any transaction from which the director derived an improper personal benefit. No amendment to or repeal of this Article Seventh shall apply to or have any effect on the liability or alleged liability of any director of the Corporation for or with respect to any acts or missions of such director occurring prior to such amendment.

I, THE UNDERSIGNED, for the purpose of forming a corporation under the laws of the State of Delaware, do make, file and record this Certificate, and do certify that the facts herein stated are true, and I have accordingly hereunto set my hand this 23rd day of October, 1997.

CorpAmerica, Inc., Incorporator

By: Rose L. Redman
Rose L. Redman, Assistant Secretary

# Delaware

The First State



I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF AMENDMENT OF "BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC", FILED IN THIS OFFICE ON THE TWENTY-FIRST DAY OF NOVEMBER, A.D. 1997, AT 9 O`CLOCK A.M.




C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

2811627 8100
SR# 20251460210
You may verify this certificate onlin... ...tml

Authentication: 203387796
Date: 04-08-25

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 11/21/1997
971400696 - 2811627

# CERTIFICATE OF AMENDMENT
# OF
# CERTIFICATE OF INCORPORATION
# OF
# BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

Babcock & Brown Administrative Services, Inc., a corporation duly organized and existing under and by virtue of the General Corporation Law of the State of Delaware, DOES HEREBY CERTIFY:

FIRST: The following amendment was adopted by the directors and sole stockholder in the manner prescribed by the Delaware General Corporation Law:

Article FOURTH of the Certificate of Incorporation is hereby amended to read in its entirety as follows:

"THIRD. The Corporation is formed for the sole purpose of, and the nature of the sole business to be conducted by the Corporation is, to own interest in and be a member and/or manager, partner, general or limited, venturer, stockholder or other holder of any interest in any entity holding direct or indirect interests in the real property generally described in Exhibit A attached hereto, and any other real property and any personal property, tangible or intangible, appurtenant to any thereof or hereafter acquired as necessary or convenient in connection with such real property, and in connection with all of the above, the Corporation may engage in any lawful act or activity for which corporations may be formed under the laws of the State of Delaware and in any and all activities necessary, advisable, convenient or incidental thereto. Additionally, the Corporation may engage in similar activities with respect to any entity or entities holding direct or indirect interests in real property to be later identified, which property shall be purchased in a transaction involving The Northwestern Mutual Life Insurance Company, as Lender, Hoyts Cinemas Corporation, and/or its affiliates, the Corporation, and any others. The purposes of the Corporation may not be broadened if such would violate or cause a default under any agreement to which the Corporation is a party or by which it is bound."

IN WITNESS WHEREOF, Babcock & Brown Administrative Services, Inc. has caused this Certificate of Amendment of the Certificate of Incorporation to be duly executed by its Secretary this 21st day of November, 1997.

[signature]
Monique Belkin, Secretary

# EXHIBIT A

## METES AND BOUNDS DESCRIPTION

Lot 1
Westborough, Massachusetts
W-45.30

A certain parcel of land in the Commonwealth of Massachusetts, County of Worcester, Town of Westborough situated on the northerly side of Boston Worcester Turnpike, Route 9, and shown as Lot 1 on a plan entitled "Plan of Land in Westborough, Worcester County,...", dated April 11, 1997, prepared by Beals and Thomas, Inc. More particularly bounded and described as follows:

Beginning at a point in the east bank of the Assabet River at Boston Worcester Turnpike, thence running:

| | |
|---|---|
| N 30 58 22 W | 1123.34 feet to a point, said course being by land now or formerly of Brown Realty Trust, thence turning and running: |
| N 86 07 42 E | 1022.91 feet to a point, thence turning and running; |
| N 03 52 18 W | 501.72 feet to a point, thence turning and running; |
| N 86 07 42 E | 627.83 feet to a point, thence turning and running; |
| N 58 30 39 E | 523.55 feet to a point, said four courses being by land now or formerly of P.V. Davis Construction Company, Inc., thence turning and running; |
| S 18 32 25 E | 9.51 feet to a Worcester County Highway bound, thence turning and running; |
| S 17 00 25 E | 69.96 feet to a point, thence turning and running; |
| S 15 35 25 E | 79.20 feet to a Worcester County Highway bound, thence turning and running; |
| S 11 50 25 E | 63.36 feet to a point, thence turning and running; |
| S 09 15 25 E | 67.32 feet to a Worcester County Highway bound point, thence turning and running; |
| S 06 35 25 E | 66.00 feet to a point, thence turning and running; |
| S 06 25 25 E | 74.57 feet to a Worcester County Highway bound, thence turning and running; |
| S 05 48 30 E | 73.06 feet to a Worcester County Highway bound, thence turning and running; |
| S 04 09 29 E | 190.38 feet to a point, thence turning and running; |

Metes and Bounds Description
Lot 1
Westborough, Massachusetts
W-45.30
Page 2 of 2

| | |
|---|---|
| Southerly | by a curve to the right having a radius of 1000.00 feet and a length of 215.67 feet to a point, said last 10 courses being by the westerly line of Milk Street, thence turning and running; |
| S 52 34 33 W | 376.10 feet to a point, thence turning and running; |
| S 86 07 42 W | 209.07 feet to a point, thence turning and running. |
| N 49 56 56 W | 33.00 feet to a point, thence turning and running; |
| Northwesterly | by a curve to the left having a radius of 335.00 feet and a length of 76.89 feet to a point, thence turning and running; |
| S 86 07 42 W | 213.61 feet to a point, thence turning and running; |
| N 03 47 36 W | 319.22 feet to a point, thence turning and running; |
| S 86 07 42 W | 337.66 feet to a point, thence turning and running; |
| S 03 52 18 E | 112.44 feet to a point, thence turning and running; |
| S 86 07 42 W | 437.86 feet to a point, said last nine courses being by Lot 2, thence turning and running; |
| S 03 52 18 E | 925.00 feet to a point, said course being in part by Lot 2 and in part by land now or formerly of Lillian E. Brown Life Estate, thence turning and running; |
| S 86 07 42 W | 148.31 feet to the point of beginning said course being by the northerly line of Boston Worcester Turnpike. |

Containing 1,277,351 square feet more or less, or 29.324 acres, more or less.

Subject to any and all existing rights and easements of record.

The plan referenced herein is recorded herewith as Plan Book 714 Plan 77.

# Delaware

The First State

Page 1

I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC", A DELAWARE LIMITED LIABILITY COMPANY,

WITH AND INTO "BABCOCK & BROWN PARALLEL MEMBER LLC" UNDER THE NAME OF "BABCOCK & BROWN PARALLEL MEMBER LLC", A LIMITED LIABILITY COMPANY ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, AS RECEIVED AND FILED IN THIS OFFICE ON THE TWENTY-NINTH DAY OF AUGUST, A.D. 2011, AT 2:33 O`CLOCK P.M.




C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

2811627 8100M
SR# 20251460210
You may verify this certificate on[...]l

Authentication: 203387793
Date: 04-08-25

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:33 PM 08/29/2011
FILED 02:33 PM 08/29/2011
SRV 110960806 - 4370415 FILE

# DELAWARE
# CERTIFICATE OF MERGER
# OF
# BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC
# WITH AND INTO
# BABCOCK & BROWN PARALLEL MEMBER LLC

August 28, 2011

Pursuant to Section 18-209 of the Delaware Limited Liability Company Act (the "DLLCA"), Babcock & Brown Parallel Member LLC, a Delaware limited liability company (the "Company"), in connection with the merger (the "Merger") of Babcock & Brown Administrative Services LLC, a Delaware limited liability company ("Target"), with and into the Company, hereby certifies as follows:

FIRST: The respective names and states of formation or incorporation of the constituent companies to the Merger are as follows:

| Name | State of Formation or Incorporation |
| --- | --- |
| Babcock & Brown Parallel Member LLC | Delaware |
| Babcock & Brown Administrative Services LLC | Delaware |

SECOND: An Agreement and Plan of Merger, dated as of August 29, 2011, between the Company and Target (the "Merger Agreement"), setting forth the terms and conditions of the Merger, has been approved, adopted, certified, executed and acknowledged by each of the Company and Target.

THIRD: The Company shall be the surviving limited liability company (the "Surviving Company") of the Merger. The name of the Surviving Company is "Babcock & Brown Parallel Member LLC".

FOURTH: The Merger shall become effective upon the filing of this Certificate of Merger with the Secretary of State of the State of Delaware.

FIFTH: An executed copy of the Merger Agreement is on file at the office of the Surviving Company located at 50 California Street, Suite 3610, San Francisco, California 94111. A copy of the Merger Agreement will be furnished by the Surviving Company, on request and without cost, to any member of the Surviving Company or any member of Target.

[Signature page follows.]

The undersigned is signing this Certificate of Merger as of the date first written above.

BABCOCK & BROWN PARALLEL MEMBER LLC

By: ______________________
Name: Chaye Besherse
Title: Secretary

*Signature page to Delaware Certificate of Merger*

# Delaware

The First State



*I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THAT "BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC" HAS FILED THE FOLLOWING DOCUMENTS:*

*CERTIFICATE OF INCORPORATION, FILED THE TWENTY-THIRD DAY OF OCTOBER, A.D. 1997, AT 9 O`CLOCK A.M.*

*CERTIFICATE OF AMENDMENT, FILED THE TWENTY-FIRST DAY OF NOVEMBER, A.D. 1997, AT 9 O`CLOCK A.M.*

*CERTIFICATE OF CONVERSION, CHANGING ITS NAME FROM "BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC." TO "BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC", FILED THE THIRD DAY OF JANUARY, A.D. 2000, AT 9 O`CLOCK A.M.*

*CERTIFICATE OF FORMATION, FILED THE THIRD DAY OF JANUARY, A.D. 2000, AT 9 O`CLOCK A.M.*

*CERTIFICATE OF MERGER, FILED THE TWENTY-NINTH DAY OF AUGUST, A.D. 2011, AT 2:33 O`CLOCK P.M.*

*AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIMITED LIABILITY COMPANY, "BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC".*

Charuni Patibanda-Sanchez, Secretary of State

Authentication: 203387818

Date: 04-08-25

2811627 8340

SR# 20251460210

You may verify this certificate o… .shtml

# EXHIBIT 5

LLC Agreement – Babcock & Brown Administrative Services LLC
(Dec. 31, 1999)

## BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC

### LIMITED LIABILITY COMPANY AGREEMENT

This LIMITED LIABILITY COMPANY AGREEMENT, dated as of December 31, 1999 is entered into by and among **Babcock & Brown Inc.**, a California corporation ("BBI"), and any and all Persons who hereafter become "Members." Each Member, in consideration of the agreements of the other Members contained in this Agreement, agrees as follows:

### ARTICLE I
### DEFINITIONS

The following terms shall have the following meanings, unless otherwise clearly indicated to the contrary.

***"Additional Member"*** means a Person admitted to the Company as a Member pursuant to Section 11.2.

***"Affiliate"*** with respect to any Person means any Person that directly or indirectly Controls, is Controlled by, or is under common Control with the Person in question.

***"Agreement"*** means this Limited Liability Company Agreement, as it may be amended, supplemented or restated from time to time.

***"Assignee"*** has the meaning specified in Section 10.3.

***"Capital Account"*** means an account to be maintained for each Member, the balance of which shall equal the amount of Capital Contributions made by such Member plus allocations to such Member of Net Profit pursuant to Article 4 and other additions made in accordance with generally accepted accounting principles, decreased by the amount of cash and the fair market value of property distributed to such Member by the Company, allocations to such Member of Net Loss pursuant to Article 4 and other deletions made in accordance with generally accepted accounting principles; provided, however, that in the event of a redemption or other purchase by the Company of less than all of the Percentage Interest of any Member, the Capital Account of such Member shall be reduced in proportion to the portion of its Percentage Interest redeemed or purchased.

***"Capital Contributions"*** shall mean, with respect to any Member, the amount of money and the net fair market value of property contributed by such Member to the Company pursuant to this Agreement.

***"Certificate of Formation"*** means the Certificate of Formation of the Company, as filed on December 31, 1999 with the Secretary of State of Delaware, as such Certificate of Formation may be amended, supplemented or restated from time to time.

***"Code"*** means the United States Internal Revenue Code of 1986, as amended.

***"Company"*** means the limited liability company organized pursuant to the Certificate of Formation.

***"Control"*** means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

***"Delaware Act"*** means the Delaware Limited Liability Company Act, 6 Del. Code Ann. tit. 6, §§18-101, et seq., as it may be amended from time to time, and any successor thereto.

***"Distribution"*** means each distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution, redemption, repurchase or otherwise.

***"Event of Withdrawal"*** means, with respect to any Person, the occurrence of any event described in subsection (4) of Section 18-801 of the Delaware Act.

***"Fair Market Value"*** means, with respect to any asset as of any date, the price a willing buyer would pay a willing seller in an arm's-length transaction, determined using any reasonable valuation method.

***"Fiscal Period"*** means any interim accounting period within a Taxable Year which is permitted or required by Code Section 706.

***"Fiscal Year"*** means the Company's annual accounting period established pursuant to Section 7.2.

***"Indemnified Person"*** has the meaning specified in Section 13.1.1.

***"Limited Liability Company Interest"*** has the meaning specified for such term in the Delaware Act.

***"Liquidator"*** has the meaning specified in Section 14.3.

***"Member"*** means each of the members named on Schedule I attached hereto and any Person admitted to the Company as a Substituted Member or Additional Member; but only so long as such Person is shown as a Member on the Company's books and records.

***"Membership Interest"*** means a Member's rights in the Company, collectively, including the Member's Percentage Interest, Limited Liability Company Interest, any right to vote or participate in management, and any right under the Delaware Law to information concerning the business and affairs of the Company.

***"Net Profit"*** and ***"Net Loss"*** shall mean, for each Fiscal Year or other period, an amount equal to the Company's income or loss for such year or period (including any gain or loss realized on the sale or other disposition of assets), determined in accordance with generally accepted accounting principles.

***"Percentage Interest,"*** with respect to any Member, means the percentage interest of that Member set forth in the column "Member's Percentage Interest" in Schedule I hereto, as such percentage interest may be adjusted from time to time pursuant to the terms of this Agreement.

***"Person"*** means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trusts companies, land trusts, business trusts and other organizations, whether or not legal entities, and governments and agencies and political subdivisions thereof.

***"Securities Act"*** means the United States Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

***"Substituted Member"*** means a Person that is admitted as a Member of the Company pursuant to Section 11.1.

***"Taxable Year"*** means the Company's accounting period for federal income tax purposes determined pursuant to Section 8. 1.

***"Tax Matters Member"*** has the same meaning as "Tax Matters Partner" set forth in Code Section 6231.

***"Transfer"*** means a transaction by which a Member assigns all or any portion of its Membership Interest to another Person, and includes a sale, conveyance, assignment, transfer, gift, pledge, encumbrance, hypothecation, mortgage, exchange or any other disposition, whether voluntary or involuntary.

***"Treasury Regulations"*** means the income tax regulations promulgated under the Code and effective as of the date hereof, including any future amendments to such regulations and any corresponding provisions of succeeding regulations which (a) are mandatory or (b) call for an election by

the Company as to the application of the amendment or succeeding regulation to the Company if the Members so elect; provided that any such amendments and succeeding regulations do not adversely affect the economic interests of the Members hereunder.

## ARTICLE II
## ORGANIZATIONAL MATTERS

**2.1 Organization of Company.** The Company was organized as a limited liability company pursuant to the provisions of the Delaware Act on December 31, 1999. Except as expressly provided herein to the contrary, the rights and obligations of the Members, and the administration and termination of the Company, shall be governed by the Delaware Act.

**2.2 Name.** The name of the Company shall be **Babcock & Brown Administrative Services LLC**. The Members may change the name of the Company at any time and from time to time. Notification of any such change shall be promptly given to all Members. The Company's business may be conducted under such name or names as the Members deem advisable.

**2.3 Purpose.** The Corporation is formed for the sole purpose of, and the nature of the sole business to be conducted by the Corporation is, to own interest in and be a member and/or manager, partner, general or limited, venturer, stockholder or other holder of any interest in any entity holding direct or indirect interests in the real property generally described in Exhibit A attached hereto, and any other real property and any personal property, tangible or intangible, appurtenant to any thereof or hereafter acquired as necessary or convenient in connection with such real property, and in connection with all of the above, the Corporation may engage in any lawful act or activity for which corporations may be formed under the laws of the State of Delaware and in any and all activities necessary, advisable, convenient or incidental thereto. Additionally, the Corporation may engage in similar activities with respect to any entity or entities holding direct or indirect interests in real property to be later identified, which property shall be purchased in a transaction involving The Northwestern Mutual Life Insurance Company, as Lender, Hoyts Cinemas Corporation, and/or its affiliates, the Corporation, and any others. The purposes of the Corporation may not be broadened if such would violate or cause a default under any agreement to which the Corporation is a party or by which it is bound.

**2.4 Principal Office; Registered Office.** The principal office of the Company shall be at 2 Harrison Street, San Francisco, CA 94105, or at any other place designated by the Members from time to time. The records of the Company shall be maintained at the principal executive office of the Company or at such other location determined by the Members. The address of the registered office of the Company in the State of Delaware shall be c/o CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901 and the registered agent for service of process on the Company in the State of Delaware at such registered office shall be CorpAmerica, Inc. The

Company may maintain offices at such other place or places as the Members may determine.

**2.5 Term.** The Company shall continue in existence until 11:59 p.m. Delaware time, on March 31, 2050 or until the earlier termination of the Company in accordance with the provisions of Article XIV.

## ARTICLE III
## CAPITAL CONTRIBUTIONS

**3.1 Members.** Each Member named on Schedule I attached hereto has made the Capital Contribution set forth opposite that Member's name on Schedule I in exchange for that Member's Percentage Interest listed on Schedule I. No Member shall be required to make any additional Capital Contributions to the Company (other than in connection with a voluntary purchase of additional Membership Interests of the Company).

**3.2 Capital Accounts.** The Company shall maintain a separate Capital Account for each Member.

**3.3 Interest.** The Company shall not pay interest on Capital Contributions or on balances in Capital Accounts.

**3.4 No Withdrawal.** No Member shall be entitled to withdraw any part of his Capital Contribution or Capital Account or to receive any Distribution from the Company, except as expressly provided herein.

**3.5 Loans from Members.** Loans by Members to the Company shall not be considered Capital Contributions or result in any increase in the amount of the Capital Account of that Member. The amount of any such loan shall be a debt of the Company to such Member, payable or collectible in accordance with the terms and conditions upon which such loan is made; provided that the terms of any such loan shall not be less favorable to the Company than would be available to the Company from unrelated lenders.

**3.6 Issuance of Memberships.** If Company capital and revenues are insufficient to meet the Company's cash requirements and the Company is unable to obtain loans on terms the Members deem acceptable, the Company may issue additional Membership Interests in exchange for additional contributions to the capital of the Company, on such terms as are determined by the Members, which may include priority over existing Membership Interests as to Limited Liability Company Interests, voting rights and/or participation in management. Membership Interests shall be offered first to all existing Members in proportion to their Percentage Interests and, in the event that any Member fails to purchase any or all of his, her or its respective share, the Company may offer the remaining unsold Membership Interests to other Persons, including other Members, and any Person

who purchases any such Membership Interest shall be admitted as a Member. Notwithstanding any provision in this Agreement to the contrary, this Agreement shall be amended to reflect the sale of the additional Membership Interests, and the addition of additional Members and any other changes in allocations of Percentage Interests, voting rights and participation in management.

## ARTICLE IV
## DISTRIBUTIONS AND ALLOCATIONS

### 4.1 Distributions of Cash.

**4.1.1 Tax Distributions.** The Company shall distribute to the Members prior to June 15 of each Fiscal Year an amount equal to the lesser of (a) the amount of cash held by the Company that the Company can then distribute to its Members without violating any restrictions imposed by law or by any contractual covenants of the Company, or (b) the amount by which the sum of the Members' Cumulative Estimated Tax Liabilities exceeds the aggregate amount of Distributions previously made to the Members pursuant to this Section 6.1. For purposes of this paragraph, a Member's "Cumulative Estimated Tax Liability" means the product of (i) the aggregate amount of taxable income and gain (net of or offset by items of deduction, loss, and credit) of the Company that has been recognized for income tax purposes and allocated to such Member for all Fiscal Years of the Company through the end of the preceding Fiscal Year times (ii) the highest marginal combined federal and state income tax rate applicable to any of the Members (determined after giving effect to the deduction, if allowable, of state income taxes for federal income tax purposes), as reasonably determined by the Tax Matters Member. All cash required to be distributed pursuant to this Section 4.1.1 shall be allocated among the Members in proportion to the respective amounts by which each Member's Cumulative Estimated Tax Liability exceeds the aggregate amount of distributions previously made to such Member pursuant to this Section 4.1.1.

**4.1.2 Current Distributions.** All cash of the Company derived from operations and not required to be distributed pursuant to Section 4.1.1 may be distributed at such times and in such amounts as the Members shall determine. All Distributions of cash pursuant to this Section 4.1.2 shall be allocated to the Members in accordance with their respective Percentage Interests.

**4.1.3 Liquidating Distributions.** After the payment of the debts and liabilities of the Company and the establishment of reserves, as provided in Article 14, any property or assets of the Company, including proceeds from the liquidation thereof, remaining upon the dissolution and liquidation of the Company shall be distributed among the Members in proportion to such Members' Capital Accounts. Such Distributions shall be made after allocating all items of Net Profit or Net Loss to the Members as provided in this Agreement.

**4.2 Allocations of Net Profit and Net Loss.**

**4.2.1 Allocation of Net Profit.** Net Profit for each Fiscal Year (or portion thereof) shall be allocated first to Members who have been previously allocated Net Loss in proportion to such allocations of Net Loss, and thereafter to Members in accordance with their Percentage Interests.

**4.2.2 Allocation of Net Loss.** Except as provided in Section 4.2.3, Net Loss for each Fiscal Year (or portion thereof) shall be allocated to Members in accordance with their Percentage Interests.

**4.2.3 Loss Limitation.** Notwithstanding Section 4.2.2, Net Loss shall not be allocated to any Member to the extent such allocation would case such Member to have a deficit balance in its Capital Account that exceeds the amount the Member is obligated to restore to the Company pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), less the amount of any item described in paragraph (d)(4), (d)(5) or (d)(6) of Treasury Regulations Sections 1.704-1(b)(2)(ii), and any Net Loss that cannot be allocated to a Member by virtue of this Section 4.2.3 shall be allocated to other Members in accordance with Section 4.2.2.

**4.3 Tax Allocations.** Items of income, deduction, gain, loss, or credit that are recognized for income tax purposes shall be allocated among the Members in such manner as to reflect equitably the amounts credited to or debited against each member's Capital Account (or which will be so credited and debited), whether in such year, in prior years, or in subsequent years. The Company shall establish and maintain records that indicate the extent to which the Capital Account of each Member, as of the last day of each Fiscal Year, includes amounts that have and have not been reflected in the taxable income of such Member. Taxable income and gain in each Fiscal Year shall be allocated among the Members whose Capital Accounts have been allocated the related credits, and items of deduction, loss, and credit in each fiscal Year shall be allocated among the Members whose Capital Accounts have been allocated the related debits.

**4.3.1 Allocation Rules**. In performing the allocations under Section 4.3, the following rules shall apply unless manifestly unreasonable:

(a) Items of income and gain of the Company shall be allocated to the Members in a manner that complies with the gain chargeback requirements of Treasury Regulations Section 1.704-2(f) and 1.704-2(i)(4).

(b) If any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), 1.704-l(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)

(d)(6), items of Company gross income and gain shall be specially allocated to such Member for tax purposes in an amount and manner sufficient to eliminate as quickly as possible any deficit balance created by such adjustments, allocations, or distributions in the Member's capital account maintained for tax purposes. Any special allocation under this Section 4.3.1(b) shall be taken into account in computing subsequent allocations of income, deduction, gain, loss, and credit so that the net amount of allocations of income, deduction, gain, loss, and credit shall, to the extent possible, be equal to the net amount that would have been allocated if the unexpected adjustment, allocation, or distribution had not occurred.

(c) The Company shall take into account the allocations in Sections 4.3.1(a) and 4.3.1(b) (the "Regulatory Allocations") in computing subsequent allocations pursuant to Section 4.3 so that the net amount of any items so allocated and all other items allocated to each Member pursuant to this Section 4.3.1(c) shall, to the extent possible, be equal to the amount that would have been allocated to each Member had the Regulatory Allocations not been in this Agreement.

**4.3.2. Daily Determination.** For purposes of determining the tax items allocable to any period, such items shall be determined on a daily basis, using any permissible method under Code Section 706 and the Regulations thereunder.

**4.3.3. Contributed Property.** In accordance with Code Section 704(b) and Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company or revealed by the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its value as reflected on the books of the Company. Any elections or other decisions relating to such allocations shall be made in any mariner that reasonably reflects the intent of this Agreement.

## ARTICLE V
## MANAGEMENT

### 5.1 In General.

**5.1.1 Management by Members.** The Members may exercise all powers of the Company and do all lawful acts and things as they may determine to be necessary or appropriate in the ordinary course of the trade or business of the Company. Unless the Act or this Agreement requires a greater vote or consent, all matters requiring the vote, consent, approval, authorization or determination by the

Members shall require the vote or consent of Members holding a majority of Percentage Interests outstanding. The members shall have the power and authority to appoint officers and to delegate to such officers such authority and duties as the Members may determine.

**5.1.2 Officers.** The officers of the Company shall include a chairman, president, secretary, and chief financial officer and may include one or more vice presidents, assistant secretaries and assistant financial officers. The officers shall serve at the pleasure of the Members. Any individual may hold any number of offices. If any Member is not an individual, such Member's directors, officers, partners, members and employees may serve as officers of Company. The officers shall exercise such powers and perform such duties as specified in this Agreement and as shall be determined from time to time by the Members. Subject to the rights, if any, of an officer under a contract of employment, any officer may be removed, either with or without cause, by the Members at any time. Any officer may resign at any time by giving written notice to the Members, which resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. A vacancy in any office because of death, resignation, removal disqualification or any other cause shall be ruled by the Members. The salaries of officers and agents of the company shall be fixed by the Members. The initial officers of the Company shall be as follows:

| | |
|---|---|
| **President:** | **Jan Blaustein Scholes** |
| **Chief Financial Officer:** | **James D. Jaworski** |
| **Secretary:** | **Monique Belkin** |
| **Vice Presidents:** | **Jan Blaustein Scholes**<br>**David G. Crane**<br>**Jay David Gayner**<br>**Robert S. Tomczak** |

**5.1.3 Execution of Documents.** With respect to all of its obligations, powers and responsibilities under this Agreement, the officers of the Company, and each of them, is authorized to execute and deliver, for and on behalf of the Company, such promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, contracts, agreements, assignments, documents, deeds, leases, loan agreements, mortgages, security agreements, guaranties, certificates, registrations, applications, notices and other documents, instruments and agreements ("Agreements") on such terms and conditions as the Members deem proper. Notwithstanding the foregoing, any officer, acting alone, is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the company's accounts. All checks, drafts, and other instruments obligating the Company to pay money in an

amount equal to or less than $10,000 may be signed by any one officer acting alone. All checks, drafts, and other instruments obligating the Company to pay money in an amount greater than $10,000 shall be signed on behalf of the Company by any two officers acting together.

**5.2 Company Qualifications and Filings.** The officers shall cause to be filed such Agreements as may be necessary or appropriate for the continuation, qualification and operation of a limited liability company in the State of Delaware and any other jurisdiction in which the Company may elect to do business, including California. Subject to applicable law, any and all filings in and reports to any state, and all amendments thereto may omit the names and addresses of the Members, information relating to the Members' Capital Contributions and shares of Net Profits and Net Losses and information relating to compensation of the Members, or may state such information in the aggregate rather than with respect to each individual Member. The Company shall not be required to deliver or mail a copy of the Certificate of Formation or any amendment thereto to any Member.

**5.3 Compensation and Reimbursement of Members.**

**5.3.1 Compensation.** Except as provided in this Section 5.3 or elsewhere in this Agreement, no Member shall be compensated for its services to the Company.

**5.3.2 Reimbursement.** Each Member shall be reimbursed on a monthly basis for all reasonable actual out-of-pocket expenses, disbursements and advances it pays or incurs in connection with the formation and business of the Company, including all expenses, disbursements and advances for legal, accounting, printing and banking matters, consultants and other third parties, reasonable travel expenses, and filing fees.

**5.4 Outside and Competing Activities.** Subject to the application of general common law principles of Delaware corporate law, (a) each Member, their respective Affiliates and their respective stockholders, directors, partners, managers, members, officers, controlling persons, partners and employees may engage or invest in, independently or with others, any business activity of any type or description, including those that might be the same as or similar to, or in direct or indirect competition with, the Company's business. Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom; (b) no Member shall be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company; and (c) each Member shall have the right to hold any investment opportunity or prospective economic advantage for its own account or to recommend such opportunity to Persons other than the Company. The Members acknowledge that the Members and their Affiliates may own and/or manage other businesses, including businesses that may compete with the Company's business and may compete for the Member's time; each Member hereby waives any and all rights

and claims which it may otherwise have against any Member and its officers, directors, shareholders, partners, members, managers, agents, employees, and Affiliates as a result of any such ownership or management. The Members shall devote to the management of the Company only such time as may reasonably be required to cause the affairs of the Company to be conducted in an efficient and businesslike manner.

**5.5 Conflicts of Interest.**

**5.5.1 In General.** Notwithstanding that a conflict of interest may exist, any Member or any Affiliates of any Member may engage in any transaction (including the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as (a) such transaction is not expressly prohibited by this Agreement, and (b) the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from Persons capable of similarly performing them and in similar transactions between parties operating at arm's length.

**5.5.2 Determination of Reasonableness.** Any such transaction shall be conclusively determined to be fair and reasonable to the Company and at least as favorable to the Company as similar transactions between parties operating at arm's length if the Members holding a majority of the Percentage Interests (excluding the Percentage Interest of any Member having an interest (other than solely as a Member) in such transaction) affirmatively vote or consent in writing to approve the transaction. Unless otherwise expressly provided herein, whenever this Agreement provides that any Person shall act in a manner which is, or provide terms which are, fair and reasonable to the Company or any Member, any determination of fairness and reasonableness shall consider the relative interests of each party to such agreement, transaction or situation and the benefits and burdens relating to such interests, any customary or accepted industry practices, and any applicable United States generally accepted accounting practices or principles.

**5.5.3 Acts in Good Faith.** So long as a Member acts in good faith, the resolution, action or terms so made, taken or provided by the Member shall not constitute a breach of this Agreement. Whenever in this Agreement any Person is permitted or required to take any action or to make a decision in its "good faith" or under another express standard, that Person shall act under such express standard and shall not be subject to any other or different standards imposed by this Agreement or any other agreement contemplated herein. Whenever in this Agreement any Person is permitted or required to take any action or to make a decision in its "sole discretion" or "discretion," with "complete discretion" or under a grant of similar authority or latitude, that Person shall be entitled to consider only such interests and factors as it wishes, provided that, except as provided in Section 11.1, that Person shall act in good faith.

**5.6 Purchase of Memberships.** The Members may cause the Company to purchase or otherwise acquire Membership Interests or may purchase or otherwise acquire Membership Interests on behalf of the Company. As long as such Membership Interests are owned by or on behalf of the Company, such Membership Interests shall not be considered outstanding for any purpose.

**5.7 Reliance on Advisors.** The Members may consult with counsel, accountants or other independent consultants in respect of Company affairs and be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel, accountants or other independent consultants, provided that they shall have been selected with reasonable care.

**5.8 Member Authority.** Unless expressly and duly authorized in writing to do so by the Members, no Member shall have any power or authority to bind or act on behalf of the Company in any way to pledge its credit or to render it liable for any purpose.

## ARTICLE VI
## NO RIGHT OF PARTITION

No Member shall have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular or individual assets of the Company.

## ARTICLE VII
## BOOKS, RECORDS, ACCOUNTING AND REPORTS

**7.1 Records and Accounting.** The officers shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists and copies of documents required to be provided pursuant to Section 7.3 or pursuant to applicable laws.

**7.2 Fiscal Year.** The Fiscal Year of the Company shall be the 12-month period ending on December 31 of each year or such other annual accounting period as may be established by the Members.

**7.3 Reports.**

**7.3.1 Annual Reports.** Within 120 days after the end of each Fiscal Year, the Company shall deliver to each Member an annual report containing a Company balance sheet as of the end of such Fiscal Year, and Company statements of income, changes in cash flows and changes in Members' equity for such Fiscal

Year, each of which shall be prepared according to United States generally accepted accounting principles.

**7.3.2 Tax Reports.** The Company shall use reasonable efforts to deliver or cause to be delivered, as early as possible each year, to each Person who was a Member at any time during the previous Taxable Year all information necessary for the preparation of such Person's United States federal income tax returns and any state, local and foreign income tax returns which such Person is required to file as a result of the Company being engaged in a trade or business within such state, local or foreign jurisdiction, including a statement showing such Person's share of income, gains, losses, deductions and credits for such year for United States federal income tax purposes (and, if applicable, state, local or foreign income tax purposes) and the amount of any Distributions made to or for the account of such Person pursuant to this Agreement. Upon the written request of any such Person made not later than 30 days after the end of each Fiscal Year and at the sole expense of such Person, the Company shall use reasonable efforts to deliver or cause to be delivered any additional information necessary for the preparation of any state, local and foreign income tax returns which must be filed by such Person.

## ARTICLE VIII
## TAX MATTERS

**8.1 Tax Elections.** The Taxable Year shall be the Fiscal Year set forth in Section 7.2, unless the Members shall determine otherwise in compliance with applicable laws. The Members shall determine whether to make or revoke any available election pursuant to the Code. Each Member will upon request supply the information necessary to give proper effect to such election.

**8.2 Tax Controversies.** BBI is designated the Tax Matters Member, and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees to cooperate with BBI and to do or refrain from doing any or all things reasonably requested by BBI with respect to the conduct of such proceedings. The Tax Matters Member shall have sole discretion to determine whether the Company (either in its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any taxing authority. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes) shall be paid by such Member, and if paid by the Company, shall be recoverable from such Member.

## ARTICLE IX
## VOTING; AMENDMENTS

**9.1 Action Without Meeting.** Any action that may be taken at a Members' meeting may be taken without a meeting if written consents to the action are solicited, and if within 90 days after delivery of the request for written consents, such consents are received from Members owning not less than the minimum Percentage Interests that would be necessary to authorize or take such action at a meeting. A written consent to the taking of any action shall have no force and effect if it is received more than 90 days after the date of the delivery of the written request soliciting consents to such action. The Company shall promptly provide notice of any action taken pursuant to this Section 9.1 to all the Members.

**9.2 Amendments.** This Agreement may be amended upon the affirmative vote of the Members holding not less than a majority of the Percentage Interests; provided, that without the consent of each Member directly affected thereby, no amendment shall modify the limited liability of a Member, increase the liabilities or responsibilities of (including requiring additional future capital contributions of Members or otherwise obligating any Member as to any matter not otherwise covered by this Agreement), or diminish the rights or protections of, a Member under this Agreement, or modify the method provided in this Agreement for determining allocations and Distributions and the definitions relating thereto. This Section 9.2 may be amended only with the approval by written consent or affirmative vote of all Members. As promptly as practicable following the execution and delivery of any amendment to this Agreement, the Company shall provide all of the Members with written notice and a copy of such amendment.

## ARTICLE X
## TRANSFER AND CONVERSION OF
## LIMITED LIABILITY COMPANY INTERESTS

**10.1 Transfer in General.** A Membership Interest, or any part thereof, may not be Transferred to any Person other than a Member. Any Transfer or purported Transfer which is not permitted under this Section 10.1 shall be void and shall not bind or be recognized by the Company and the Company shall recognize the purported Transferor as continuing to be the owner of the Membership Interest purported to be Transferred.

**10.2 Opinion of Counsel.** Except as may otherwise be agreed by the Members, no Transfer shall be made if, in the opinion of counsel for the Company, (a) such Transfer would violate the Act or any applicable state securities or "blue sky" laws, or any other applicable provision of law in any respect, (b) such Transfer would require registration of the Membership Interest (or any part thereof) Transferred under the Act, (c) such Transfer would result in the Company having to register as an investment company under the Investment Company Act of 1940, as

amended, or in the assets of the Company being considered plan assets within the meaning of the Employee Retirement Income Security Act of 1974, as amended, (d) such Transfer would cause the Company to be treated as an association taxable as a corporation for purposes of the federal income tax laws, (e) such Transfer would cause a default under the terms of any material agreement to which the Company is a party or (f) such Transfer would cause a termination of the Company under Section 708 of the Code.

**10.3 Assignee's Rights.** A Transfer permitted under this Agreement shall be effective as of the date determined by the Members. Net Profits, Net Losses and other Company items shall be allocated between the Transferor and the assignee (the "Assignee") according to Code Section 706. Distributions made before the effective date of such Transfer shall be paid to the Transferor, and Distributions made after such date shall be paid to the Assignee. Unless and until an Assignee becomes a Member pursuant to Article XI, the Assignee shall not be entitled to any of the rights granted to a Member hereunder or under applicable law, other than the rights (a) to receive allocations of Net Profits and Net Losses and Distributions as if such Assignee were a Member, (b) to Transfer the Assignee's Limited Liability Company Interest (subject to the conditions of this Article X), and (c) to receive reports and information as specified in Section 7.3. Further, such Assignee shall be bound by any limitations and obligations contained herein with respect to Members.

## ARTICLE XI
## ADMISSION OF MEMBERS

**11.1 Substituted Members.** An Assignee may request admission as a Substituted Member on the form prescribed by the Members. No Assignee shall become a Substituted Member without the prior written consent of Members, other than the assigning Member, holding at least a majority of the Percentage Interests, which consents may be withheld in the sole discretion of any Member for any reason or for no reason.

**11.2 Death, Incompetency or Bankruptcy of a Member.** If any Member who is a natural person dies or if a court of competent jurisdiction adjudges such a Member to be competent, that Member's executor, administrator, guardian, conservator or other legal representative will have the rights conferred under Section 18-705 of the Act. Upon the bankruptcy of any Person who is a Member, that Person will cease to be a Member as provided in Section 18-304 of the Act.

**11.3 Additional Members.** A Person may be admitted to the Company as an Additional Member only upon furnishing to the Company (a) a letter of acceptance, in form satisfactory to the Members, of all the terms and conditions of this Agreement, and (b) such other documents or instruments as may be reasonably necessary or appropriate to effect his admission as a Member. Such admission shall become effective on the date on which Members holding at least a majority of the

Percentage Interests consent (in their sole discretion) thereto and the conditions set forth above have been satisfied.

**11.4 Representations of New Members.** Each Person admitted to the Company as a Substituted or Additional Member shall become a party to, and agree, to be bound by, this Agreement.

## ARTICLE XII
## WITHDRAWAL OF MEMBERS

No Member shall have any right to withdraw from the Company without the prior written consent of the Members.

## ARTICLE XIII
## INDEMNIFICATION; LIABILITY

**13.1 Indemnification.**

**13.1.1 In General.** The Company shall, to the full extent permitted by law, indemnify, defend and hold harmless each Member, each officer of the Company and each of their respective Affiliates, officers, directors, controlling persons, partners, members, employees and shareholders, together with their respective successors and assigns, heirs, executors and administrators (each, an "Indemnified Person") from and against any and all losses, claims, costs, damages, liabilities, expenses (including legal fees and expenses), judgments, fines, settlements and other amounts arising from or incurred or imposed upon such Indemnified Person in connection with any and all claims, demands, actions, suits or other proceedings, whether civil, criminal, administrative or investigative, which relate to the status or activities as a Member, or officer or to the Company's property, business or affairs ("Claims"). An Indemnified person's expenses paid or incurred in investigating, preparing or defending itself against any Claim shall be reimbursed as paid or incurred. This Section 13.1 shall not apply with respect to any Indemnified Person for that portion of any Claim determined by the final decision (from which an appeal cannot be taken or is not timely taken) of a court of competent jurisdiction to have been caused by his gross negligence, will or wanton misconduct or knowing violation of law. Any payments made to or on behalf of a Person who is later determined not to be entitled to such payments shall be refunded to the Company promptly following such determination.

**13.1.2 Non-Exclusive.** The right to indemnification and the advancement of expenses conferred in this Section 13.1 shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute, agreement, vote of the Members or otherwise.

**13.1.3 Insurance.** The Company may maintain insurance, at its expense, to protect any Person against any expense, liability or loss, to the extent that the Company would have the power to indemnify such Person against such expense, liability or loss under the Delaware Act.

**13.2 Limitation on Liability.** Each Member may exercise any of the powers granted to it by this Agreement either directly or by or through its agents, and such Member shall not be responsible for any misconduct or negligence on the part of any such agent appointed by the Member (so long as such agent was selected in good faith and with due care). Any duties (including fiduciary duties) of, and liabilities relating thereto imposed by law upon, any Member shall, to the extent permitted by law, be modified by the terms of this Agreement. No Person who is a Member and/or officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Member and/or officer of the Company. The Members shall have no liability under this Agreement except as otherwise provided in the following sentence or in the Delaware Act. A Member's liability for Company liabilities and losses shall be limited to the Company's assets; provided that a Member shall be required to return to the Company any Distribution made to it in error.

## ARTICLE XIV
## DISSOLUTION AND LIQUIDATION

**14.1 Dissolution**. The Company shall not be dissolved by the admission of Additional Members or Substituted Members. The Company shall dissolve, and its affairs shall be wound up, upon: (a) the agreement of all of the Members to dissolve the Company, (b) the expiration of the term set forth in Section 2.5; or (c) any other event which would cause the dissolution of the Company under the Delaware Act. Each Member hereby waives any right, to the extent permitted by law, to any action for dissolution other than pursuant to rights set forth in this Agreement.

**14.2 Selection of Liquidator.** Upon dissolution of the Company, the Members shall select a Member to be the Liquidator. The Liquidator shall agree not to resign at any time without 30 days' prior written notice. The Liquidator may be removed at any time, with or without cause, by notice of removal and appointment of a successor Liquidator approved by Members which own at least a majority of the Percentage Interests. Within 30 days following the occurrence of any Event of Withdrawal with respect to the Liquidator, a successor Liquidator may be elected by Members which own at least a majority of the Percentage Interests. The successor Liquidator shall succeed to all rights, powers and duties of the former Liquidator. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor

or substitute Liquidator appointed in the manner herein provided. Except as expressly provided in this Article XIV, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the Members under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Company as provided for herein.

**14.3 Liquidation.** The Liquidator shall liquidate the assets of the Company, and apply and distribute the proceeds of such liquidation, in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

(a) first, to the payment of the Company's debts and obligations to its creditors, including sales commissions and other expenses incident to any sale of the assets of the Company;

(b) second, to the establishment of and additions to such reserves as the Liquidator may deem necessary or appropriate; and

(c) third, to the Members, in accordance with their relative Capital Accounts.

The reserves established pursuant to subparagraph (b) shall be paid over by the Liquidator to a bank or other financial institution, to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations and, at the expiration of such period as the Liquidator deems advisable, such reserves shall be distributed to the Members in the priorities set forth in this Section 14.3. The allocations and distributions provided for in this Agreement are intended to result in the Capital Account of each Member immediately prior to the distribution of the Company's assets pursuant to this Section 14.3 being equal to the amount distributable to such Member pursuant to this Section 14.3. The Company shall make appropriate adjustments in the allocation of Net Profits and Net Losses as necessary to cause the amount of each Member's Capital Account immediately prior to the distribution of the Company's assets pursuant to this Section 14.3 to equal the amount distributable to such Member pursuant to this Section 14.3.

**14.4 Distribution in Kind.** The provisions of Section 14.3 which require the liquidation of the assets of the Company notwithstanding, but subject to the order of priorities set forth therein, if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or would cause undue loss to the Members, the Liquidator may, in its sole discretion, defer for a reasonable time the liquidation of any assets except those necessary to satisfy Company liabilities (other than loans to the Company by

Members) and reserves, and may, in its absolute discretion, distribute to the Members, in Lieu of cash, as tenants in common and in accordance with the provisions of Section 14.3, undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. The Liquidator shall determine the Fair Market Value of any property distributed in accordance with the valuation procedures set forth in Article XIV.

**14.5 Cancellation of Certificate of Formation.** Upon the completion of the distribution of Company property as provided in this Article, the Company shall be terminated, and the Liquidator (or the Members, if necessary) shall cause the cancellation of the Certificate of Formation and all qualifications of the Company as a foreign limited liability company in jurisdictions other than the State of Delaware and shall take such other actions as may be necessary to terminate the Company.

**14.6 Reasonable Time for Winding Up.** A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets in order to minimize any. losses otherwise attendant upon such winding up. Distributions upon liquidation of the Company (or any Member's interest in the Company) and related adjustments shall be made by the end of the Taxable Year of the liquidation (or, if later, within 90 days after the date of such liquidation) or as otherwise permitted by Treasury Regulation Section 1.704-1(b)(2)(ii)(b), including requirements (2) and (3) thereof.

**14.7 Return of Capital.** The Liquidator shall not be personally liable for the return of Capital Contributions or any portion thereof, it being understood that any such return shall be made solely from Company assets.

## ARTICLE XV
## GENERAL PROVISIONS

**15.1 Addresses and Notices.** Any notice, demand, request or report required or permitted to be given or made to any Person under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by first class mail, overnight courier, confirmed facsimile, electronic mail, or by other commercially reasonable means of written communication to the Person at his address as shown on the Company's books and records. An affidavit or certificate of mailing executed on behalf of the Company shall be conclusive (but not exclusive) evidence of the date and fact of mailing of any such notice, demand, request or report. Any notice to the Company shall be deemed given if received by the Company at its principal office designated pursuant to Section 2.4.

**15.2 Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives and permitted assigns.

**15.3 Waiver.** No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any tight or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

**15.4 Counterparts.** This Agreement may be executed in separate counterparts, each of which will be an original and all of which together shall constitute one and the same agreement binding on all the parties hereto.

**15.5 Applicable Law.** The limited liability company law of the State of Delaware will govern all issues concerning the relative rights of the Company and its Members. All other questions concerning the construction, validity and interpretation of this Agreement will be governed by the internal law, and not the law of conflicts, of the State of Delaware.

**15.6 Invalidity of Provisions.** If any provision of this Agreement is or becomes invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected thereby.

**15.7 Interpretation.** This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware. If any provision of this Agreement shall be held to be invalid, the remainder of this Agreement shall not be affected. The titles of the Articles and Sections in this Agreement are for convenience only and shall not be considered in construing this Agreement. Pronouns shall be construed to refer to the feminine, neuter, singular and plural as the identity of the individual or entity referred to may require. In interpreting the meaning of this Agreement: (a) "includes" and "including" are not limiting, (b) "or" is not exclusive, (c) each reference to any gender shall include reference to all other genders, as appropriate, and (d) "all" includes "any" and "any" includes "all."

**15.8 Further Action.** The parties shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

**15.9 Integration.** This Agreement and the other agreements executed as of the date hereof constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersede all prior agreements and understandings pertaining thereto.

**15.10 Taxation as a Partnership.** It is the intent of the Company and its Members that the Company be treated as a partnership for income tax purposes, and the terms of this Agreement shall be construed so as to accomplish that goal and the Members will use their best efforts to cause the Company to be so treated.

## ARTICLE XVI
## REPRESENTATIONS OF MEMBERS

Each Member represents and warrants to the Company as follows:

**16.1 Investment.** The Membership Interest issued to the Member is being acquired for investment for the Member's own account, not as a nominee or agent, and not with a view to or for sale in connection with the distribution thereof. The Member has not been contacted concerning the acquisition of Membership Interest by means of any advertisement.

**16.2 Sophistication.** The Member has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the Member's investment in the Membership Interest; the Member has the ability-to bear the economic risks of such investment; the Member has the capacity to protect its own interests in connection with the transactions contemplated by this Agreement; and the Member has had an opportunity to ask questions and to obtain such financial and other information regarding the Company as the Member deems necessary or appropriate in connection with evaluating the merits of the investment in the Membership Interest. Member acknowledges that the Membership Interests have not been and will not be registered under the Securities Act of 1933 or under any state securities act and may not be transferred except in compliance with the Securities Act of 1933 and all applicable state laws.

**16.3 Accredited Investor.** The Member qualifies as an Accredited Investor within the meaning of Regulation D promulgated under the Securities Act of 1933.

**IN WITNESS WHEREOF,** the undersigned have executed or caused to be executed on its behalf this Limited Liability Company Agreement as of the date first above written.

**BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC**

BY: **BABCOCK & BROWN INC.**, a California corporation

ITS: Member

By: Jan Blaustein Scholes
Its: Vice President

**SCHEDULE I**

**BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC**

LIMITED LIABILITY COMPANY AGREEMENT

MEMBERS

*As of December 31, 1999*

| Members | Initial Contribution | Percentage Interest |
|---|---|---|
| Babcock & Brown Inc.<br>2 Harrison Street, 6th Floor<br>San Francisco, CA 94105 | N/A | 100% |

# EXHIBIT 6

Resignation Letter – Jan Blaustein Scholes (Oct. 1, 2007)

**JAN BLAUSTEIN SCHOLES**
34 Stern Lane
Atherton, CA 94027

October 1, 2007

To Whom It May Concern
2 Harrison Street, 6th Floor
San Francisco, CA 94105

Dear Sirs:

I hereby resign as a Vice President of each of the companies listed on Schedule I attached hereto with immediate effect.

Sincerely,

Jan Blaustein Scholes

sf_legal 24038v1

## SCHEDULE I

Alliance PP2 FX1 GP, L.L.C.
Alliance PP2 FX1, L.L.C.
Alliance PP2 FX2 GP, L.L.C.
Alliance PP2 FX2, L.L.C.
Alliance PP2 FX3 GP, L.L.C.
Alliance PP2 FX3, L.L.C.
Alliance PP2 FX4 GP, L.L.C.
Alliance PP2 FX4, L.L.C.
Alliance PP2 FX5 GP, L.L.C.
Alliance PP2 FX5, L.L.C.
Alliance PP2 Holdings, L.L.C.
Babcock & Brown Blue Canyon 1 LLC
Babcock & Brown Combine Hills 1 LLC
Babcock & Brown Commercial Realty Development LLC
Babcock & Brown GP LLC
Babcock & Brown Holdings Inc.
Babcock & Brown Ireland Holdings LLC
Babcock & Brown Kumeyaay LLC
Babcock & Brown PFI L.L.C.
Babcock & Brown Power Operating Partners LLC
Babcock & Brown Sweetwater 1 LLC
Babcock & Brown Sweetwater 2 LLC
Babcock & Brown Sweetwater 3 LLC
Babcock & Brown Wind Park Jersey LLC
BBPOP Wind Equity LLC
Caprock Wind Investments LLC
Harrison Partners LLC
J&J Wharf Co. LLC
Marelda Bel Air Mall LLC
Marelda Glynn Place Mall LLC
Marelda Greenville Mall LLC
Marelda Myrtle Beach Mall LLC
Marelda Retail Development LLC
Marelda Retail Holdings LLC
Marelda TRS LLC
Marelda University Village Mall LLC
Marelda Valdosta Mall LLC
Trans Bay Holdings LLC

# EXHIBIT 7

Notice of Resignation – Babcock & Brown Administrative Services LLC (Apr. 30, 2011)

BABCOCK & BROWN

Babcock & Brown LP
One Letterman Drive · Bldg D · San Francisco CA 94129 USA
T +1 415 512 1515 · F +1 415 267 1500 · www.babcockbrown.com

## NOTICE OF RESIGNATION

April 30, 2011

Westborough SPE LLC
c/o Equity Trust
31/F, The Center
99 Queen's Road Central, Hong Kong

Attention: Serena Kwok, General Manager, Trade Support

RE: Westborough SPE LLC (the "Company")

Dear Ms. Kwok:

We refer to the Company's Limited Liability Company Agreement dated as of October 22, 1997 (the "LLC Agreement") between Mignonette Investments Limited (the "Member") and Babcock & Brown Administrative Services LLC, as successor to Babcock & Brown Administrative Services, Inc. (the "Manager").

Pursuant to Section 1(e) of the LLC Agreement and Section 18-602 of the Delaware Limited Liability Company Act, this letter serves as notice to the Member of the Manager's intent to resign as Manager of the Company effective as of May 30, 2011.

Sincerely,

Babcock & Brown Administrative Services LLC

By: Walter Horst
Title: Treasurer

# EXHIBIT 8

BVI Corporate Records – Mignonette Investments Limited (Dato Capital, Mar. 9, 2023)

Integro
Societé de Finance

23 October 1997

RECEIVED
OCT 23 1997
REGISTRY
British Virgin Islands
52604

The Registrar of Companies
Registrar's Office
Road Town, Tortola
British Virgin Islands

Dear Madam,

**MIGONETTE INVESTMENTS LIMITED - IBC NO:243736**
**NOVA OVERSEAS HOLDINGS LIMITED - IBC NO: 252452**
**Everlight (BVI) Co., Ltd. - IBC NO: 162608**

The above companies have been incorporated under the International Business Companies Act, Cap. 291

We shall be grateful if you will forward to ourselves certificates of good standing, containing the particulars required by section 114 of the Act.

A cheque in the sum of $75.00 in payment of our fees is enclosed.

Yours faithfully,

Claudette Francis
Authorised Signatory

Enc.

**INTEGRO TRUST (BVI) LIMITED**
(formerly P.M.M. Services (B.V.I.) Limited)

P.O. BOX 438, TROPIC ISLE BUILDING, WICKHAMS CAY, ROAD TOWN, TORTOLA, BRITISH VIRGIN ISLANDS
TELEPHONE (809) 494-2616 • TELEFAX (809) 494-2704

## TERRITORY OF THE BRITISH VIRGIN ISLANDS

## THE INTERNATIONAL BUSINESS COMPANIES ACT
## (CAP. 291)

### CERTIFICATE OF GOOD STANDING (Section 114)

**No. 243736 MIGNONETTE INVESTMENTS LIMITED**

**The Registrar of Companies of the British Virgin Islands
DO HEREBY CERTIFY:**

1. *The above company was duly incorporated under the provisions of the International Business Companies Act, (Cap.291) on the 11th day of August, 1997 as Company No. 243736 of the register of International Business Companies.*
2. *The name of the Company is still on the register of International Business Companies and the company has paid all fees, licence fees, and penalties due and payable under the provisions of sections 104 and 105 of the said Act.*
3. *The company has not submitted to me articles of merger or consolidation that have not yet become effective.*
4. *The company has not submitted to me articles of arrangement that have not yet become effective.*
5. *The company is not in the process of being wound up and dissolved.*
6. *No proceedings have been instituted to strike the name of the company off the said register.*
7. *In so far as is evidenced by the documents filed with me the company is in good legal standing.*

*Given under my hand and seal
at Road Town, Tortola in the
Territory of the British Virgin Islands
this 23rd day of October,1997*

[signature]

REGISTRAR OF COMPANIES

*CRTI0043*

**VIRRGIN**



## POST-INCORPORATION TRANSACTIONS

## GENERAL FILING

| | | |
|---|---|---|
| BVI Company No. | : | 243736 |
| Company Name | : | MIGNONETTE INVESTMENTS LIMITED |
| Processing on behalf of: | : | Integro Trust (BVI) Limited |
| Foreign Character Name | : | |
| Transaction Description | : | IBC Request for Certificate of Goodstanding/Certified Certificates |
| Date of Change | : | |
| Change Description | : | |
| Remark | : | |
| Attachment (in English) | : | 20180419143902ifmw3ovs1fnvzwxngqhbp5lrdi.pdf |
| Attachment (Foreign Language) | : | |
| Translator's Certificate | : | |
| Agent | : | |

We, Financial Services Commission, processing on behalf of Integro Trust (BVI) Limited, hereby confirm that information provided is true and correct to our knowledge.

| | | |
|---|---|---|
| Authorised Signatory Name | : | Financial Services Commission on behalf of Integro Trust (BVI) Limited |

## POST-INCORPORATION TRANSACTIONS

| | | | |
|---|---|---|---|
| Name : | SuperUser 7, FSC | BVI Company No. : | 243736 |
| User No. : | 23 | Date of Filing : | 23/10/1997 0:00:00 |
| User Name : | Integro Trust (BVI) Limited | Transaction No. : | T970007040 |
| User Address : | | Receipt No. : | |
| User Voice No. : | | | |
| User Email : | | | |

**VIRRGIN**



## POST-INCORPORATION TRANSACTIONS

## ANNUAL FEE SUBMISSION

| | | |
|---|---|---|
| Company Name | : | MIGNONETTE INVESTMENTS LIMITED |
| BVI Co. No. | : | 243736 |
| Previous Bearer Fee | : | 0.00 |
| Current Bearer Fee | : | 0.00 |
| Previous Renewal Fees | : | 0.00 |
| Current Renewal Fee | : | 350.00 |
| Restoration Charges | : | 0.00 |
| Total Amount | : | 350.00 |

**List of fees paid by year**

| Year | Licence Fee | Penalty Fee | Bearer Fee |
|---|---|---|---|
| 2014 | 350.00 | 0.00 | 0.00 |

I / We, Francis, Claudette, hereby confirm that information provided is true and correct to our knowledge.

Authorised Signatory Name: Francis, Claudette

| | | | | | |
|---|---|---|---|---|---|
| Name | : | Francis, Claudette | BVI Company No. | : | 243736 |
| Agent No. | : | 23 | Date of Filing | : | 10/11/2014 18:37:07 |
| Agent Name | : | TMF Corporate Services (BVI) Limited | Transaction No. | : | T140760598 |
| Agent Address | : | Palm Grove House | Receipt No. | : | RCS00000001806818 |
| | | P.O. Box 438 | | | |
| | | Road Town | | | |
| | | Tortola | | | |
| | | VG1110 | | | |
| | | VIRGIN ISLANDS, BRITISH | | | |
| Agent Voice No. | : | 284-494-2616 | | | |
| Agent Email | : | infovg@equitytrust.com | | | |

VIRRGIN



## POST-INCORPORATION TRANSACTIONS

## ANNUAL FEE SUBMISSION

| | | |
|---|---|---|
| Company Name | : | MIGNONETTE INVESTMENTS LIMITED |
| BVI Co. No. | : | 243736 |
| Previous Bearer Fee | : | 0.00 |
| Current Bearer Fee | : | 0.00 |
| Previous Renewal Fees | : | 0.00 |
| Current Renewal Fee | : | 350.00 |
| Restoration Charges | : | 0.00 |
| Total Amount | : | 350.00 |

**List of fees paid by year**

| Year | Licence Fee | Penalty Fee | Bearer Fee |
|---|---|---|---|
| 2015 | 350.00 | 0.00 | 0.00 |

I / We, Francis, Claudette, hereby confirm that information provided is true and correct to our knowledge.

Authorised Signatory Name: Francis, Claudette

| | | | | | |
|---|---|---|---|---|---|
| Name | : | Francis, Claudette | BVI Company No. | : | 243736 |
| Agent No. | : | 23 | Date of Filing | : | 10/11/2015 11:54:24 |
| Agent Name | : | TMF Corporate Services (BVI) Limited | Transaction No. | : | T150768924 |
| Agent Address | : | Palm Grove House | Receipt No. | : | RCS00000002052141 |
| | | P.O. Box 438 | | | |
| | | Road Town | | | |
| | | Tortola | | | |
| | | VG1110 | | | |
| | | VIRGIN ISLANDS, BRITISH | | | |
| Agent Voice No. | : | 284-494-2616 | | | |
| Agent Email | : | infovg@equitytrust.com | | | |

VIRRGIN



## POST-INCORPORATION TRANSACTIONS

### Registered Agent Intent to Resign

| | | |
|---|---|---|
| BVI Company No.: | : | 243736 |
| Company Name: | : | MIGNONETTE INVESTMENTS LIMITED |

(Please note the 90 days period starts from date specified in notice)

| | | |
|---|---|---|
| Date specified in notice: | : | 29/03/2017 |
| Email Address of a director of the company: | : | serena.kwok@tmf-group.com |

**Attachment:(attach the following)**

| | | |
|---|---|---|
| Notice of Intention to resign given to the company under section93(2)(In English) | : | 20170329224632rpmxdck4gu5opgeijrqfg.pdf |
| Notice of Intention to resign given to the company under section93(2)(Foreign Language) | : | |
| Translator's Certificate | : | |
| Agent: | : | TMF Corporate Services (BVI) Limited<br>Palm Grove House<br>P.O. Box 438<br>Road Town<br>Tortola<br>VG1110<br>VIRGIN ISLANDS, BRITISH |

**Remarks:**

Please note that these comments will have no legal implications, nor form any part of the Company's Profile

I / We, TMF Corporate Services (BVI) Limited, hereby confirm that information provided is true and correct to our knowledge.

| | | |
|---|---|---|
| Authorised Signatory Name | : | Frett, Tamisha |

BVI Financial Services Commission, Registry of Corporate Affairs
## Register of Companies Search Report

Print

**Date of Search :** 09/03/2023
This search is accurate as at the Search Date above.

**Company Name :** MIGNONETTE INVESTMENTS LIMITED

**Company Number :** 243736

**Company Type :** BC Re-registration **Date of Incorporation / Registration :** 11/08/1997

**Current Status :**

| | |
|---|---|
| Status Description: | Struck off - Non Pmt A/Fee |
| Status Date: | 02/05/2017 |
| Re-registration Type: | Automatic |
| Re-registration date: | 01/01/2007 |
| Current Registered Agent: | TMF (B.V.I.) LTD. |
| Current Registered Agent Address: | Palm Grove House<br>P.O. Box 438<br>Road Town<br>Tortola<br>VIRGIN ISLANDS, BRITISH |
| Current Registered Agent Phone Number: | 284-494-4997 |
| Current Registered Agent Fax Number: | 284-494-4999 |
| Current Registered Office : | Palm Grove House<br>P.O. Box 438<br>Road Town<br>Tortola<br>VG1110<br>VIRGIN ISLANDS, BRITISH |
| Telephone: | |
| Agent Fax: | |
| Register of Directors Filed : | Yes |
| First Registered Agent: | TMF Corporate Services (BVI) Limited |
| First Registered Office: | Palm Grove House<br>P.O. Box 438<br>Road Town<br>Tortola<br>VG1110<br>VIRGIN ISLANDS, BRITISH |

**Share/Capital Information:**

| | |
|---|---|
| Authorized Capital: | 50,000.00 United States of America, Dollars |
| Ability to Issue Bearer Shares: | No |

**Previous Names History**

| S.No | Previous Name | Foreign Character Name | Date Range or Cease Date From | To |
|---|---|---|---|---|
| 1 | MIGNONETTE INVESTMENTS LIMITED | | 11/08/1997 | |

**Transaction History**

| S.No | Date | Transaction Number | Description | Status | Eforms/Attachments |
|---|---|---|---|---|---|
| 1 | 11/08/1997 | T970007039 | Application for Incorporation (IBC) | Approved | General Filing |

| | | | | |
|---|---|---|---|---|
| | | | | General Filing - General Filing |
| 2 | 23/10/1997 T970007040 | IBC Request for Certificate of Goodstanding/Certified Certificates | Approved | General Filing<br>General Filing - General Filing |
| 3 | 17/03/2008 T080144830 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 4 | 17/11/2008 T080766540 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 5 | 27/06/2011 T110479651 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 6 | 21/11/2012 T120824356 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 7 | 11/11/2013 T130747395 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 8 | 10/11/2014 T140760598 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 9 | 10/11/2015 T150768924 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 10 | 29/03/2017 T170521455 | Registered Agent intent to Resign | Approved | Registered Agent Intent To Resign<br>Notice of intention to resign given to the company under section 93(2) |
| 11 | 31/03/2017 T170568523 | Register of Members or Directors | Approved | Register of Directors |

### Certificate History

| S.No | Transaction No. | Type of Certificate | Date of Filing |
|---|---|---|---|
| 1 | T110479651 | Certificate of Restoration | 27/06/2011 |

**DISCLAIMER:**

Although care has been taken to ensure the accuracy, completeness and reliability of the information provided through the use of this service ("the Information"), neither the Registrar of Corporate Affairs ("the Registrar") nor the Financial Services Commission ("the Commission") assumes any responsibility for the accuracy, completeness and reliability of the Information. This report does not reflect any transactions that may be submitted and not yet registered, or other changes for which the Registrar has not received notice. The user of the Information agrees that the Information is subject to change without notice, and neither the Registrar nor the Commission is responsible for any discrepancies that may result if a transaction is approved for filing after the issuance of this report. Neither the Registrar nor the Commission assumes any responsibility for the consequences of use of the Information, nor for any infringement of third party intellectual property rights which may result from its use. In no event shall the Commission or the Registrar be liable for any direct, indirect, special or incidental damage resulting from, arising out of or in connection with the use of the Information.

## POST-INCORPORATION TRANSACTIONS

### Registered Agent Intent to Resign

| | | | | | |
|---|---|---|---|---|---|
| Name | : | Frett, Tamisha | BVI Company No. | : | 243736 |
| Agent No. | : | 23 | Date of Filing | : | 29/03/2017 22:46:51 |
| Agent Name | : | TMF Corporate Services (BVI) Limited | Transaction No. | : | T170521455 |
| Agent Address | : | Palm Grove House | Receipt No. | : | |
| | | P.O. Box 438 | | | |
| | | Road Town | | | |
| | | Tortola | | | |
| | | VG1110 | | | |
| | | VIRGIN ISLANDS, BRITISH | | | |
| Agent Voice No. | : | 284-494-2616 | | | |
| Agent Email | : | infovg@equitytrust.com | | | |

11-08-97
8.47.42
23

IN0015
A#23
Page 1

Commercial Registry

Company Name Reservation Confirmation

Agent: Integro Trust (BVI) Limited

| Date Reserved | | Name Reserved | Res Days | Exp. Date | Ref # |
|---|---|---|---|---|---|
| 7-08-97 | I | MIGNONETTE INVESTMENTS LIMITED | 10 | 17-08-97 | 357976 |

Name reserved by Riggall, Murray

Please submit a copy of this receipt with incorporation documents

IBC No. 2435736

territory of the british virgin islands

the international business companies act, cap. 291

MEMORANDUM AND ARTICLES OF ASSOCIATION OF

**MIGNONETTE INVESTMENTS LIMITED**

INCORPORATED THE **11th** DAY OF **August, 1997**

integro

INTERNATIONAL BUSINESS COMPANIES REGISTRAR

TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT, CAP. 291

# MEMORANDUM OF ASSOCIATION

# OF

# MIGNONETTE INVESTMENTS LIMITED

1. The Name of the Company is **MIGNONETTE INVESTMENTS LIMITED.**

2. The Registered Office of the Company will be situate at Tropic Isle Building, P O Box 438, Road Town, Tortola, British Virgin Islands or at such other place within the British Virgin Islands as the directors may from time to time determine

3. The Registered Agent of the Company will be Integro Trust (BVI) Limited, Tropic Isle Building, P O. Box 438, Road Town, Tortola, British Virgin Islands or such other person or company being a person or company entitled to act as a registered agent as the directors may from time to time determine

4. The Objects for which the Company is established are.

    (1) To buy, sell, underwrite, invest in, exchange or otherwise acquire, and to hold, manage, develop, deal with and turn to account any bonds, debentures, shares (whether fully paid or not), stocks, options, commodities, futures, forward contracts, notes or securities of governments, states, municipalities, public authorities or public or private limited or unlimited companies in any part of the world, precious metals, gems, works of art and other articles of value, and whether on a cash or margin basis and including short sales, and to lend money either unsecured or against the security of any of the aforementioned property

    (2) To buy, own, hold, subdivide, lease, sell, rent, prepare building sites, construct, reconstruct, alter, improve, decorate, furnish, operate, maintain, reclaim or otherwise deal with and/or develop land and buildings and otherwise deal in real estate in all its branches, to make advances upon the security of land or houses or other property or any interest therein, and whether erected or in course of erection and whether on first mortgage or charge or subject to a prior mortgage or mortgages or charge or charges, and to develop land and buildings as may seem expedient but without prejudice to the generality of the foregoing

    (3) To borrow or raise money by the issue of debentures, debenture stock (perpetual or terminable), bonds, mortgages, or any other securities founded or based upon all or any of the assets or property of the Company or without any security and upon such terms as to priority or otherwise as the Company shall think fit

    (4) To guarantee loans and to lend money with or without guarantee or security to any

INTERNATIONAL BUSINESS COMPANIES * REGISTRAR OF

persons, firms or corporations

(5) To engage in any other business or businesses whatsoever, or in any acts or activities, which are not prohibited under any law for the time being in force in the British Virgin Islands

(6) To do all such other things as are incidental to or the Company may think conducive to the attainment of all or any of the above objects

And it is hereby declared that the intention is that each of the objects specified in each paragraph of this clause shall, except where otherwise expressed in such paragraph, be an independent main object and be in nowise limited or restricted by reference to or inference from the terms of any other paragraph or the name of the Company

5 (1) The Company has no power to

(a) carry on business with persons resident in the British Virgin Islands,

(b) own an interest in real property situate in the British Virgin Islands, other than a lease referred to in paragraph (e) of subsection (2),

(c) carry on banking or trust business, unless it is licensed under the Banks and Trust Companies Act, 1990,

(d) carry on business as an insurance or reinsurance company, insurance agent or insurance broker, unless it is licensed under an enactment authorizing it to carry on that business,

(e) carry on the business of company management unless it is licensed under the Company Management Act, 1990, or

(f) carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands

(2) For purposes of paragraph (a) of subsection (1), the company shall not be treated as carrying on business with persons resident in the British Virgin Islands by reason only that

(a) it makes or maintains deposits with a person carrying on banking business within the British Virgin Islands,

(b) it makes or maintains professional contact with solicitors, barristers, accountants, bookkeepers, trust companies, administration companies, investment advisers or other similar persons carrying on business within the British Virgin Islands,

(c) it prepares or maintains books and records within the British Virgin Islands,

(d) it holds, within the British Virgin Islands, meetings of its directors or members,

(e) it holds a lease of property for use as an office from which to communicate with members or where books and records of the company are prepared or maintained,

(f) it holds shares, debt obligations or other securities in a company incorporated under the International Business Companies Act or under the Companies Act, or



(g) shares, debt obligations or other securities in the company are owned by any person resident in the British Virgin Islands or by any company incorporated under the International Business Companies Act or under the Companies Act

6. The shares in the Company shall be issued in the currency of the United States of America

7. The authorised capital of the Company is US$50,000 divided into 50,000 shares with a par value of US$1.00 each. The directors shall have the authority to determine by resolution at their discretion whether shares are to be issued as registered shares or to bearer

8. The shares shall be divided into such number of classes and series as the directors shall by resolution from time to time determine and until so divided shall comprise one class and series.

9 The directors shall by resolution have the power to issue any class or series of shares that the Company is authorised to issue in its capital, original or increased, with or subject to any designations, powers, preferences, rights, qualifications, limitations and restrictions

10. Shares issued as registered shares may be exchanged for shares issued to bearer, and shares issued to bearer may be exchanged for registered shares

11. Where shares are issued to bearer, the bearer, identified for this purpose by the number of the share certificate, shall be requested to give to the Company the name and address of an agent or attorney for service of any notice, information or written statement required to be given to members, and service upon such agent or attorney shall constitute service upon the bearer of such shares. In the absence of such name and address being given it shall be sufficient for purpose of service for the Company to publish the notice, information or written statement in one or more newspapers published or circulated in the British Virgin Islands and in a newspaper in the place where the Company has its principal office.

12 The Company shall by resolution of the directors have the power to amend or modify any of the conditions contained in this Memorandum of Association and to increase or reduce the authorised capital of the Company in any way which may be permitted by law



WE, the undersigned Registered Agent, subscribe our name to this Memorandum of Association

---

**NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER**

---

**Integro Trust (BVI) Limited**
Tropic Isle Building
P O. Box 438
Road Town, Tortola
British Virgin Islands

Registered Agent

[signature]
**Authorised Signatory**

---

**DATED** this 11th day of August, 1997

**WITNESS** to the above signature:

[signature]
N. Hull
Road Town
Tortola
British Virgin Islands

Secretary

INTERNATIONAL BUSINESS

# EXHIBIT 9

Affidavit of David Abromowitz, Esq. (Apr. 4, 2025)

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>WESTBOROUGH SPE LLC,<br><br>Debtor. | Chapter 7<br>Case No. 23-40709-CJP |

**AFFIDAVIT OF DAVID ABROMOWITZ, ESQ.**
**OF GOULSTON & STORRS PC**

I, David Abromowitz, being duly deposed and sworn, aver as follows:

1. I am an attorney in good standing licensed to practice law in the Commonwealth of Massachusetts and have been for over forty years.

2. Since September 1983, I have worked as a lawyer at Goulston & Storrs PC in Boston (the "Firm"), first as an Associate, then as a Director and Shareholder, and currently as Of Counsel.

3. In 1997 and 1998, I worked on a matter pertaining to the formation of Westborough SPE LLC (the "LLC") and the negotiation of a lease to which the LLC was a party (the "Matter).

4. Based upon my best memory and my review of the Firm's readily available records concerning the Matter, the following table identifies (a) the client representatives with whom the Firm communicated in connection with the Matter, and (b) the contact information evident from the Firm's records for each person:

| Name | Contact Information |
|---|---|
| James B. McCaffrey | Telephone: 212-935-7800; Fax: 212-935-8949 |
| F. Jan Blaustein | Telephone: 415-512-1515; Fax: 415-267-1500<br><br>Babcock & Brown Administrative Services<br>2 Harrison Street<br>San Francisco, CA 94105 |
| Phillip Green | Telephone: 011.612.9233.4033;<br>Fax: 011.612.9231.5619<br><br>Level 37, The Chifley Tower<br>2 Chifley Square<br>Sydney, Australia NSW 2000 |
| Monique Belkin | Telephone: 415-512-1515; Fax: 415-267-1500<br><br>Babcock & Brown Administrative Services<br>2 Harrison Street<br>San Francisco, CA 94105 |
| Derek Andrews (Mignonette) | Fax: 1-809-494-2704<br><br>Integro Trust (BVI) Limited<br>P.O. Box 438<br>Tropic Isle Building<br>Wickhams Cay, Road Town,<br>Tortola, British Virgin Islands |

Signed under the pains and penalties of perjury this 4th day of April 2025.

/s/ David Abromowitz
David Abromowitz, Esq.

# EXHIBIT 10

Participation Agreement (Oct. 30, 1997)

CONFORMED COPY

---

PARTICIPATION AGREEMENT

Dated as of October 30, 1997

RE:
Leveraged Lease of Theater Premises

Among

INTERSTATE THEATRES CORPORATION

Tenant

HOYTS CINEMAS CORPORATION

Lease Guarantor

HOYTS CINEMAS LIMITED

Lease Guarantor

HOYTS CINEMAS AMERICA LIMITED

Lease Guarantor

WESTBOROUGH SPE LLC

Company

MIGNONETTE INVESTMENTS LIMITED

Equity Investor

and

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY

Note Purchaser

---

# TABLE OF CONTENTS


| SECTION | HEADING | PAGE |
|---|---|---|
| Parties | | 1 |
| Recitals | | 1 |
| SECTION 1. | COMMITMENTS OF THE PARTICIPANTS | 2 |
| Section 1.1. | Issue and Sale of Notes | 2 |
| Section 1.2. | Investments and Payments by the Equity Investor | 3 |
| Section 1.3. | The Closing Date | 3 |
| Section 1.4. | Expiration of Commitments | 3 |
| Section 1.5. | Several Commitments | 3 |
| SECTION 2. | TRANSACTIONAL EXPENSES | 3 |
| Section 2.1. | Transactional Expenses to Be Borne by the Company on Behalf of the Equity Investor | 3 |
| Section 2.2. | Transactional Expenses to Be Borne by the Tenant | 4 |
| Section 2.3. | Transactional Expenses to Be Borne by the Company | 4 |
| SECTION 3. | WARRANTIES AND REPRESENTATIONS | 4 |
| Section 3.1. | Warranties and Representations of the Company | 4 |
| Section 3.2. | Warranties and Representations of the Tenant | 7 |
| Section 3.3. | Warranties and Representations of the Guarantors | 10 |
| Section 3.4. | Private Offering | 14 |
| Section 3.5. | Representations and Covenants of the Participants; Transfer of Beneficial Interest and Notes | 15 |
| SECTION 4. | CONDITIONS | 19 |
| Section 4.1. | Conditions Precedent to Investment by Each Participant | 19 |
| Section 4.2. | Additional Conditions Precedent to Note Purchase | 23 |
| SECTION 5. | SPECIAL RIGHTS OF NOTE PURCHASER | 24 |
| SECTION 6. | COMPANY COVENANTS | 25 |
| Section 6.1. | Office for Notices | 25 |
| Section 6.2. | Maintenance of Existence, Rights | 25 |
| Section 6.3. | Maintenance of Property | 25 |
| Section 6.4. | Insurance | 25 |
| Section 6.5. | Payment of Taxes and Other Charges; Compliance with Laws | 26 |
| Section 6.6. | Negative Covenants | 26 |

Section 6.7. Mergers and Consolidations ........ 27
Section 6.8. Financial Information and Reports ........ 27
Section 6.9. Repurchase of Notes ........ 28
Section 6.10. Transactions with Affiliates ........ 28
Section 6.11. Post Closing Undertaking of the Company ........ 28

SECTION 7. COVENANTS OF THE GUARANTORS ........ 28

Section 7.1. Corporate Existence, Etc ........ 28
Section 7.2. Insurance ........ 28
Section 7.3. Taxes, Claims for Labor and Materials; Compliance with Laws ........ 29
Section 7.4. Maintenance, Etc ........ 29
Section 7.5. Nature of Business ........ 29
Section 7.6. Limitations on Consolidated Total Debt ........ 29
Section 7.7. Fixed Charges Coverage Ratio ........ 30
Section 7.8. Sale of Assets ........ 30
Section 7.9. Mergers and Consolidations ........ 31
Section 7.10. Limitations on Restrictive Agreements ........ 32
Section 7.11. HCL's Shareholders' Equity ........ 32
Section 7.12. Reports and Rights of Inspection ........ 32
Section 7.13. Consummation of Second Transaction ........ 35
Section 7.14. Post Closing Undertaking ........ 36

SECTION 8. TENANT'S INDEMNITIES ........ 36

SECTION 9. INDEMNITIES OF THE COMPANY AND THE EQUITY INVESTOR ........ 36

SECTION 10. MISCELLANEOUS ........ 37

Section 10.1. Amendments ........ 37
Section 10.2. Notices ........ 37
Section 10.3. Survival ........ 37
Section 10.4. Successors and Assigns ........ 37
Section 10.5. Governing Law ........ 38
Section 10.6. Counterparts ........ 38
Section 10.7. Headings and Table of Contents ........ 38
Section 10.8. Conditions to Purchase of Beneficial Interest by Tenant ........ 38
Section 10.9. Rent Payment Instructions ........ 39
Section 10.10. Certain Rights of Tenant and Guarantor Reserved ........ 39
Section 10.11. Note Purchaser Consent ........ 40

| | | |
|---|---|---|
| SCHEDULE I | — | Financial Statements |
| EXHIBIT A | — | Lease Agreement |
| EXHIBIT B | — | First Mortgage, Security Agreement and Fixture Filing |
| EXHIBIT C | — | Lease Guaranty |
| EXHIBIT D | — | Assignment of Lease |
| EXHIBIT E | — | Assignment of Guaranty |
| EXHIBIT F | — | Officer's Certificate of the Company Manager |
| SCHEDULE 7.10 | — | List of Restrictive Agreements |
| ANNEX I | — | Definitions |
| ANNEX II | — | Schedule of Amortization |
| ANNEX III | — | Form of 10.25% Senior Secured Note due November 21, 2017 |
| ANNEX IV | — | Forms of Opinions of Counsel |

## PARTICIPATION AGREEMENT

THIS PARTICIPATION AGREEMENT dated as of October 30, 1997 is among INTERSTATE THEATRES CORPORATION, a Massachusetts corporation (the *"Tenant"*), HOYTS CINEMAS CORPORATION, a Delaware corporation (*"HCC"*), HOYTS CINEMAS LIMITED, an Australian corporation (*"HCL"*), HOYTS CINEMAS AMERICA LIMITED, a Barbados company (*"HCA"*, HCA, together with HCC and HCL being hereinafter sometimes individually referred to as a *"Guarantor"* and collectively as the *"Guarantors"*), WESTBOROUGH SPE LLC, a Delaware limited liability company (the *"Company"*), MIGNONETTE INVESTMENTS LIMITED, a British Virgin Islands limited liability company (the *"Equity Investor"*) and THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY (the *"Note Purchaser"*). The Equity Investor and the Note Purchaser are herein sometimes referred to collectively as the *"Participants"* and individually as a *"Participant"*.

## RECITALS

A. The capitalized terms used in this Participation Agreement shall have the respective meanings specified in Annex I attached hereto, unless otherwise herein defined.

B. It is intended by the parties hereto that, on the Closing Date, title to the Premises shall pass to the Company pursuant to a Quitclaim Deed between Northside Realty Trust, as seller (the *"Developer"*), and the Company, as purchaser, providing for the sale by the Developer of the Premises to the Company for the consideration specified therein.

C. The Company has entered into or proposes to enter into:

(1) a Lease Agreement (the *"Lease"*) substantially in the form attached hereto as Exhibit A between the Company, as lessor, and the Tenant, as lessee, providing for the lease of the Premises; and

(2) a First Mortgage, Security Agreement and Fixture Filing (the *"Mortgage"*) substantially in the form attached hereto as Exhibit B between the Company and the Note Purchaser, as beneficiary and secured party.

D. Concurrently with the execution and delivery of this Agreement, the Guarantors will enter into a Lease Guaranty (the *"Lease Guaranty"*) substantially in the form attached hereto as Exhibit C under which the Guarantors will absolutely and unconditionally guarantee the payment of all Basic Rent, Additional Rent and all other amounts due and to become due under the Lease and the performance of all obligations of the Tenant under the Lease.

SECTION 1. COMMITMENTS OF THE PARTICIPANTS.

*Section 1.1. Issue and Sale of Notes.*

(a) *The Notes.* In order to finance 90% of the Acquisition Cost of the Premises, the Company proposes to issue and sell its 10.25% Senior Secured Notes due November 20, 2017 (the *"Notes"*) in an aggregate principal amount of $9,406,742.40. The Notes are to be issued hereunder and secured by the Mortgage, to be dated the date of issue, to bear interest at the rate of 10.25% per annum prior to maturity and to bear interest on overdue principal and premium, if any, and (to the extent legally enforceable) on any overdue installment of interest at the rate of 12.25% per annum until paid, to be expressed to be payable as follows:

(i) seventy-nine (79) consecutive quarterly installments of interest and principal payable in accordance with the amortization schedule set forth in Annex II hereto, payable on February 21, 1998 and on the twenty-first day of each May, August, November and February thereafter to and including August 21, 2017; followed by

(ii) a final installment on November 21, 2017 in an amount equal to the entire principal and interest remaining unpaid as of said date;

and to be otherwise substantially in the form attached hereto as Annex III. Interest shall be computed on the basis of a 360-day year of twelve consecutive 30-day months.

(b) *Commitment of Note Purchaser.* Subject to the terms and conditions hereof and on the basis of the representations and warranties hereinafter set forth, the Company agrees to issue and sell to the Note Purchaser, and the Note Purchaser agrees to purchase from the Company, on the Closing Date hereinafter provided for, Notes of the Company at a price of 100% of the principal amount thereof and in an aggregate principal amount equal to $9,406,742.40, which shall equal 90% of the Acquisition Cost. The Notes delivered to the Note Purchaser on the Closing Date will be in the form of a single Note, in a principal amount equal to 100% of the aggregate principal amount of the Note and registered in the name of the Note Purchaser or its nominee.

(c) *Failure to Deliver.* If on the Closing Date the Company fails to tender to the Note Purchaser the Notes to be purchased by the Note Purchaser or if the conditions to the obligation of the Note Purchaser specified in **Section 4** have not been fulfilled, the Note Purchaser may thereupon elect to be relieved of all further obligations under this Agreement.

(d) *Security for the Notes.* The Notes will be entitled to the benefits of and will be secured by (1) the Mortgage, (2) an Assignment of Lease (the *"Lease Assignment"*) substantially in the form attached hereto as Exhibit D, among the Company, the Tenant and the Note Purchaser, pursuant to which the Company will grant a valid and perfected first Lien on the Premises and create a valid and perfected first Lien on the right, title and interest of the Company in and to the Lease, including, without limitation, a present

assignment and right to receive payment of all Basic Rent, Additional Rent and other amounts payable thereunder, and (3) an Assignment of Guaranty (the *"Guaranty Assignment"*) substantially in the form attached hereto as Exhibit E, among the Company, the Guarantors and the Note Purchaser, pursuant to which the Company shall assign to the Note Purchaser all of its right, title and interest in and to the Lease Guaranty.

(e) *Prepayment.* Except to the extent otherwise provided for in the Mortgage, the Notes shall not be subject to prepayment or redemption in whole or in part prior to the expressed maturity date thereof.

*Section 1.2. Investments and Payments by the Equity Investor.* (a) Subject to the terms and conditions hereof and on the basis of the representations and warranties hereinafter set forth, on the Closing Date the Equity Investor will advance to the Company an amount equal to 10% of Acquisition Cost.

(b) If on the Closing Date the conditions to the obligations of the Equity Investor specified in **Section 4.1** have not been fulfilled, the Equity Investor may thereupon elect to be relieved of its obligation to make the investment provided for in paragraph (a) of this **Section 1.2**.

*Section 1.3. The Closing Date.* The equity investment by the Equity Investor pursuant to **Section 1.2(a)** will be made, and the Notes will be delivered to the Note Purchaser hereunder, on such date (the *"Closing Date"*), not later than the expiration of the commitments of the Participants as set forth in **Section 1.4**, as the Tenant shall designate to each Participant by not less than one Business Day's prior written notice. The payment by the Equity Investor pursuant to **Section 1.2(a)** and payment for the Notes shall be made available for the account of the Company, at 10:00 A.M., Boston time on the Closing Date in Federal Reserve or otherwise immediately available funds current in Boston, Massachusetts, at such account as shall be specified in writing by the Company (or the Tenant, as the case may be), at least one Business Day prior to the Closing Date.

*Section 1.4. Expiration of Commitments.* The commitment of the Equity Investor under **Section 1.2(a)** and the commitment of the Note Purchaser hereunder shall expire at the close of business on November 21, 1997.

*Section 1.5. Several Commitments.* The obligations hereunder of the Participants shall be several and not joint and no Participant shall be liable or responsible for the acts or defaults of any other Participant.

## SECTION 2. TRANSACTIONAL EXPENSES.

*Section 2.1. Transactional Expenses to Be Borne by the Company on Behalf of the Equity Investor.* If the Company shall have purchased the Premises from the Developer in accordance with the provisions of **Section 4,** the Company will pay all reasonable out-of-pocket expenses relating to the transactions contemplated by this Agreement, including but not limited to: (a) the cost of producing the Operative Documents; (b) the reasonable fees

and expenses of counsel for the Company; (c) the reasonable fees and expenses of Chapman and Cutler, special counsel for the Note Purchaser; (d) all recording and filing fees, stamp taxes and other recording or filing taxes in connection with the recordation or filing of any of the Operative Documents and in connection with any financing statements or other documents filed to perfect, maintain and protect the rights of the parties under the Operative Documents; (e) the premium for the title insurance, the cost of the survey and the cost for the appraisal required by **Section 4.1**; (f) the cost of delivering to the main office of the Note Purchaser, insured to the satisfaction of the Note Purchaser, the Notes purchased by the Note Purchaser on the Closing Date; and (g) the reasonable fees and expenses of each of the counsel for the Tenant and the Guarantors named in **Section 4.1(i)** but excluding any other expenses incurred by the Tenant or the Guarantors; *provided, however,* that the aggregate amount of all fees and expenses described in clause (g) of this **Section 2.1** to be paid by the Company and included in the Acquisition Cost of the Premises may not exceed $100,000.

*Section 2.2. Transactional Expenses to Be Borne by the Tenant.* The Tenant will pay the amount of all fees and expenses described in **Section 2.1** in the event the Company does not purchase the Premises from the Developer in accordance with **Section 4**. Without limiting the foregoing, the Tenant will pay as Additional Rent pursuant to the Lease: (a) the cost of delivering to or from the home office of any holder of a Note from or to the Company, insured to the satisfaction of such holder, any Notes surrendered pursuant to the Mortgage and any Note issued in substitution or replacement for the surrendered Notes; and (b) the reasonable out-of-pocket expenses of the Equity Investor, the Company and the holders of the Notes, including reasonable fees and expenses of their counsel, in connection with any amendments, waivers, consents or modifications requested with respect to any of the Operative Documents by any party other than the Company or the Equity Investor and all recording and filing fees, stamp taxes and other recording or filing taxes in connection with the recordation or filing of any such amendments, waivers, consents or modifications and in connection with any continuation statements or other documents filed to maintain and protect the rights of the parties under the Operative Documents.

*Section 2.3. Transactional Expenses to Be Borne by the Company.* The Company will pay the reasonable out-of-pocket expenses of the holders of the Notes, the Tenant and the Guarantors, including reasonable fees of their counsel, in connection with any amendments, waivers, consents or modifications requested by the Company or the Equity Investor with respect to any of the Operative Documents and all recording and filing fees, stamp taxes and other recording or filing taxes in connection with the recordation or filing of any such amendments, waivers, consents or modifications and in connection with any continuation statements or other documents filed to maintain and protect the rights of the parties under the Operative Documents.

SECTION 3. WARRANTIES AND REPRESENTATIONS.

*Section 3.1. Warranties and Representations of the Company.* The Company represents and warrants on and as of the Closing Date that:

(a) The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has the power and authority and all necessary entity qualifications to enter into and perform its obligations under the Operative Documents to which it is a party. The Company is duly licensed, qualified and is in good standing as a foreign corporation in each jurisdiction wherein such licensing or qualification is necessary in order to perform its obligations under the Operative Documents to which it is a party. The Company has no Subsidiaries.

(b) The Company has no Indebtedness other than the Notes.

(c) The Operative Documents to which the Company is a party have been duly authorized, executed and delivered by the Company and constitute legal, valid and binding obligations of the Company enforceable against the Company in accordance with the respective terms thereof, except as such terms may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and except as equitable remedies such as specific performance may be in the discretion of the courts.

(d) The execution and delivery by the Company of the Operative Documents to which the Company is a party and the sale of the Notes and compliance by the Company with all of the provisions thereof do not and will not contravene any law or any order of any court or governmental authority or agency applicable to or binding on the Company or contravene the provisions of, or constitute a default under, or result in the creation of any Lien (other than Permitted Encumbrances) upon the Property of the Company under, its charter or by-laws or any indenture, mortgage, contract or other agreement or instrument to which the Company is a party or by which it or any of its Property may be bound or affected.

(e) There are no proceedings pending or threatened, nor is there any existing basis for any such proceedings, against or affecting the Company in any court or before any governmental authority or arbitration board or tribunal which, if adversely determined, could materially and adversely affect the Properties, business, profits or condition (financial or otherwise) of the Company or impair the ability of the Company to perform its obligations under the Operative Documents to which the Company is a party. The Company is not in default with respect to any order of any court or governmental authority or arbitration board or tribunal.

(f) The Company is not in violation of any law, including, without limitation any Environmental Law, ordinance, franchise, governmental rule or regulation to which it is subject; and the Company has not failed to obtain, any license, permit, franchise or other governmental authorization necessary to the ownership of the Premises, which violation or failure to obtain would materially adversely affect the Properties, business, profits or condition (financial or otherwise) of the Company, or impair the ability of the Company to perform the obligations contained in the Operative Documents to which the Company is a party.

(g) The Premises are free and clear of any Liens or encumbrances which result from claims against the Company not arising out of or directly related to the transactions contemplated by the Operative Documents. The Company has not conveyed any interest in the Premises to any Person or subjected the Premises to any Lien not arising out of or relating to the transactions contemplated by the Operative Documents. The Company has full right, power and authority to grant, warrant, pledge, assign, demise, convey, transfer and mortgage the Premises pursuant to the Mortgage. Other than the Premises, the Company owns no Property.

(h) No Mortgage Default or Mortgage Event of Default has occurred and is continuing. The Company is not in violation of any Operative Document to which it is a party.

(i) No approval, consent or withholding of objection on the part of any regulatory body, state, Federal or local, is necessary in connection with the execution, delivery and performance by the Company of the Operative Documents to which it is a party or compliance by the Company with any of the provisions of such Operative Documents, which has not been obtained and furnished to the Note Purchaser, the Tenant and the Guarantors.

(j) The proceeds from the sale of the Notes and the Beneficial Interest will be applied to the Acquisition Cost of the Premises, and to pay certain costs and expenses incurred in connection with the transactions contemplated by the Operative Documents. None of the transactions contemplated in the Operative Documents (including without limitation thereof, the use of proceeds from the issuance of the Notes) will violate or result in a violation of Section 7 of the Securities Exchange Act of 1934, as amended, or any regulation issued pursuant thereto, including, without limitation, Regulations G, T and X of the Board of Governors of the Federal Reserve System, 12 C.F.R., Chapter II. The Company does not own or intend to carry or purchase any *"margin security"* within the meaning of said Regulation G. None of the proceeds from the sale of the Notes will be used to purchase or carry (or refinance any borrowing, the proceeds of which were used to purchase or carry), any *"security"* within the meaning of the Securities Exchange Act of 1934, as amended.

(k) The consummation of the transactions provided for in this Agreement and in the Operative Documents to which the Company is a party and compliance by the Company with the provisions of the Operative Documents to which the Company is a party, including the Notes issued thereunder, will not involve any prohibited transaction within the meaning of ERISA or Section 4975 of the Code. The Company does not maintain or contribute to an *"employee pension benefit plans"*, as defined in ERISA. The Company does not maintain, contribute to or have any direct or indirect liability or contingent liability with respect to any "employee pension benefit plan" under Title IV of ERISA.

(l) The Company is not an *"investment company"*, or a company *"controlled"* by an *"investment company"*, as such terms are defined in the Investment Company Act of 1940, as amended.

*Section 3.2.* *Warranties and Representations of the Tenant.* The Tenant warrants and represents on and as of the Closing Date that:

(a) The Tenant is a wholly-owned Subsidiary of HCC.

(b) The Tenant is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts and has the corporate power and authority and all necessary licenses and permits (1) to carry on its present business and operations, (2) to own or lease its Properties, and (3) to enter into and perform its obligations under the Operative Documents to which it is a party, except where the failure to have any such license or permit for the items described in the preceding clauses (1) and (2) would not have a Tenant Material Adverse Effect. The Tenant is duly licensed or qualified and is in good standing as a foreign corporation in each jurisdiction wherein the nature of the business transacted by it or the nature of the Property owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed or qualified would not have a Tenant Material Adverse Effect.

(c) The Operative Documents to which the Tenant is a party have been duly authorized, executed and delivered by the Tenant and constitute legal, valid and binding obligations of the Tenant enforceable against the Tenant in accordance with the respective terms thereof, except as such terms may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and except as equitable remedies such as specific performance may be in the discretion of the courts.

(d) The execution and delivery by the Tenant of the Operative Documents to which the Tenant is a party and compliance by the Tenant with all of the provisions thereof do not contravene any existing law or any existing order of any court or governmental authority or agency applicable to or binding on the Tenant or contravene the provisions of, or constitute a default under, or result in the creation of any Lien upon the Property of the Tenant under, its charter or by-laws or any indenture, mortgage, contract or other agreement or instrument to which the Tenant is a party or by which it or any of its Property may be bound or affected.

(e) There are no proceedings pending or (to the Tenant's knowledge, after due inquiry) threatened, nor (to the Tenant's knowledge, after due inquiry) is there any existing basis for any such proceedings, against or affecting the Tenant in any court or before any governmental authority or arbitration board or tribunal which, if adversely determined, would have a Tenant Material Adverse Effect. The Tenant is not (to the Tenant's knowledge, after due inquiry) in default with respect to any order of any court or governmental authority or arbitration board or tribunal which default would have a Tenant Material Adverse Effect.

(f) The Tenant is not in violation of any term of any charter instrument, by-law or other agreement or instrument to which it is a party or by which it may be bound, except in the case of any such agreement or instrument, a violation of which would not have a Tenant Material Adverse Effect. The Tenant is in compliance with all laws, ordinances,

governmental rules and regulations to which it is subject, failure to comply with which would have a Tenant Material Adverse Effect, and has obtained all licenses, permits, franchises and other governmental authorizations material to the conduct of its business, including, without limitation, the leasing and operation of the Premises, except where failure to obtain any such license, permit, franchise or other governmental authorization pertaining to the leasing and operation of the Premises would not have a Tenant Material Adverse Effect.

(g) The written statements furnished to any Participant by the Tenant, the Guarantors and any Person authorized or employed by the Tenant or the Guarantors as agent, broker, dealer or otherwise in connection with the negotiation of the transactions contemplated by this Agreement, do not, when taken as a whole, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading. There is no fact known to the Tenant or any Guarantor which the Tenant or the Guarantors have not disclosed to each Participant in writing which would have a Tenant Material Adverse Effect.

(h) The Company has good and marketable title in fee simple to the Premises free and clear of all Liens, other than Permitted Encumbrances and Liens which are the responsibility of the Company or the Equity Investor pursuant to **Section 9**. Without limiting the foregoing, there are no taxes (including, without limitation, stamp taxes), fees or assessments due, assessed or levied against the Premises as contemplated by this Agreement by any Australian, Barbados or United States Federal, state or local governmental or public authority or agency (including any taxing authority) which are unpaid on and as of the Closing Date.

(i) (1) Assuming the accuracy of the Company's representations and warranties contained in **Section 3.1**, the Lease is in full force and effect and has not been modified or amended. No offset exists with respect to any Rent or other sums payable or to become payable to the Company, as landlord under the Lease. The Company holds no deposit or other security for performance by the Tenant under the Lease and no Rent payable to the Company as landlord under the Lease has been paid in advance.

(2) To the Tenant's knowledge, after due inquiry, the Company, as landlord under the Lease, has no unsatisfied obligations to the Tenant arising out of or incurred in connection with the lease of the Premises to the Tenant pursuant to the Lease.

(3) To the Tenant's knowledge, after due inquiry, no Lease Event of Default or Lease Default has occurred and is continuing.

(j) The amount of each installment of Basic Rent payable under the Lease on each Payment Date on which such payments are due during the Primary Term equals or exceeds the sum of the interest payments and the payments or prepayments of principal due on each such date on the Notes. The amount of the Termination Value Purchase Price under the Lease payable on any date equals or exceeds the sum of the principal amount of the Notes

which will remain unpaid on such date plus accrued interest thereon, assuming all scheduled payments of principal and interest have been previously made.

(k) The Premises is covered by the insurance required by Section 12 of the Lease and all premiums due in respect of such insurance have been paid.

(l) No approval, consent or withholding of objection on the part of any regulatory body, state, Federal or local, which has not been obtained is necessary in connection with the execution, delivery and performance by the Tenant of the Operative Documents to which it is a party or compliance by the Tenant with any of the provisions of such Operative Documents.

(m) To the Tenant's knowledge, after due inquiry, all tax returns and reports required by law to be filed by Tenant have been duly filed, and no taxes, assessments, contributions, fees or other governmental charges upon it or any of its assets or income which are due and payable thereon are delinquent, except to the extent that (1) such taxes, assessments, contributions, fees or charges are being contested in good faith and by proper proceedings and against which appropriate reserves are being maintained or (2) the failure to file any such returns or pay any such tax, assessment, contribution, fee or charge would not have a Tenant Material Adverse Effect.

(n) Assuming the accuracy of the representations and warranties of the other parties hereto contained in **Sections 3.4** and **3.5**, none of the transactions contemplated by the Operative Documents (including, without limitation, the use of the proceeds from the sale of the Notes) will result in a violation of Section 7 of the Securities Exchange Act of 1934, as amended, or any regulations issued pursuant thereto, including, without limitation, Regulations G, T and X of the Board of Governors of the Federal Reserve System, 12 C.F.R., Chapter II.

(o) To the Tenant's knowledge, after due inquiry, the consummation of the transactions provided for in this Agreement and in the other Operative Documents to which the Tenant is a party and compliance by the Tenant therewith will not involve any prohibited transaction within the meaning of ERISA or Section 4975 of the Code. The representation by the Tenant in the preceding sentence is made in reliance upon and subject to the accuracy of the representations of the Participants in **Section 3.5(c)** and disclosures pursuant thereto as to the source of the funds used by the Participants to make their respective investments pursuant to this Agreement. Neither the Tenant nor any ERISA Affiliate thereof has incurred or could be reasonably expected to incur in connection with the withdrawal from any Multiemployer Plan, the termination of a Plan or any other Reportable Event, any liability which would have a Tenant Material Adverse Effect.

(p) The Premises has not suffered damage or destruction which renders it inoperable and, under applicable zoning, use, Environmental Laws and other laws, ordinances, rules and regulations, such Property may be used as a movie theater. Without limiting the foregoing, no portion of the real property constituting a portion of the Premises is located in an *"area of special flood hazard,"* as that term is defined in the regulations of

the Federal Insurance Administration, Department of Housing and Urban Development, under the National Flood Insurance Act of 1968, as amended (24 C.F.R. §1909.1).

(q) To the Tenant's knowledge, after due inquiry, (1) the Premises has been constructed in a good and workmanlike manner in conformity with good construction and engineering practice, and the Premises conforms in all material respects to the description thereof contained in the Lease, and (2) such construction has been in accordance with all laws, ordinances, rules, regulations or orders applicable thereto, including, without limitation, any thereof relating to matters of health, safety or environmental protection, other than immaterial violations that would not, in any case or in the aggregate, prevent or interfere with the continued satisfactory operation of the Premises, result in the imposition of material penalties on any Participant, or involve material costs of correction.

(r) To the Tenant's knowledge, after due inquiry, and except as reflected in the environmental report referred to in Section 4.1(g), the operations of Tenant at the Premises comply in all material respects with all Environmental Laws to which Tenant is subject, none of the operations of Tenant are subject to any judicial or administrative proceedings alleging the violation of any Environmental Laws, none of the operations of Tenant are the subject of any federal, state or local investigation evaluating whether any remedial action is needed to respond to a release of any Hazardous Substance into the environment, which remedial action may materially and adversely affect the Premises, the Tenant has not filed any notice under any federal, state or local law indicating past or present treatment, storage or disposal of a Hazardous Substance at the Premises or reporting a spill or release of a Hazardous Substance at the Premises into the environment, and the Tenant does not have any contingent liability in connection with any release of any Hazardous Substance at the Premises into the environment, which contingent liability if liquidated would not be adequately covered by insurance or other indemnification rights.

*Section 3.3. Warranties and Representations of the Guarantors.* Each Guarantor represents and warrants, as applicable, in respect of itself only, on and as of the Closing Date that:

(a) (1) HCC is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the corporate power and authority and all necessary licenses and permits (i) to carry on its present business and operations, (ii) to own or lease its Properties, and (iii) to enter into and perform its obligations under the Operative Documents to which HCC is a party except, in the case of any such license or permit, the nonpossession of which would not have a Guarantor Material Adverse Effect. HCC is duly licensed or qualified and is in good standing as a foreign corporation in each jurisdiction wherein such licensing or qualification is necessary in order to perform its obligations under the Operative Documents to which it is a party, except where the failure to be so licensed or qualified would not have a Guarantor Material Adverse Effect.

(2) HCL is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the corporate power and

authority and all necessary licenses and permits (i) to carry on its present business and operations, (ii) to own or lease its Properties, and (iii) to enter into and perform its obligations under the Operative Documents to which HCL is a party except, in the case of any such license or permit, the nonpossession of which would not have a Guarantor Material Adverse Effect. HCL is duly licensed or qualified and is in good standing as a foreign corporation in each jurisdiction wherein such licensing or qualification is necessary in order to perform its obligations under the Operative Documents to which it is a party, except where the failure to be so licensed or qualified would not have a Guarantor Material Adverse Effect.

(3) HCA is a company duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the corporate power and authority and all necessary licenses and permits (i) to carry on its present business and operations, (ii) to own or lease its Properties, and (iii) to enter into and perform its obligations under the Operative Documents to which HCA is a party except, in the case of any such license or permit, the nonpossession of which would not have a Guarantor Material Adverse Effect. HCA is duly licensed or qualified and is in good standing as a foreign corporation in each jurisdiction wherein such licensing or qualification is necessary in order to perform its obligations under the Operative Documents to which it is a party, except where the failure to be so licensed or qualified would not have a Guarantor Material Adverse Effect.

(4) The Guarantors are members of an affiliated group of entities.

(5) All of the outstanding shares of capital stock or similar equity interests of each Subsidiary which are owned by a Guarantor or its Subsidiaries have been validly issued, are fully paid and are nonassessable (except in the case of any Subsidiary of any Guarantor other than the Tenant, where the failure of any such shares to be so validly issued, fully paid and non-assessable would not have Guarantor Material Adverse Effect) and all such shares are owned by such Guarantor or Subsidiary, as the case may be, free and clear of any Lien, except that some or all of such shares of capital stock or similar equity interests may be subject to the Lien of a pledge thereof to one or more Institutional Investors or other financial institutions.

(b) (1) The Guarantors have delivered to the Note Purchaser copies of the financial statements of the Guarantors and their Subsidiaries listed on Schedule II. All of said financial statements (including in the each case the related schedules and notes) fairly present in all material respects the consolidated or combined, as the case may be, financial position of each Guarantor and its respective Subsidiaries as of the respective dates specified in such financial statements and the consolidated or combined, as the case may be, results of their operations and cash flows for the respective periods so specified and have been prepared in accordance with GAAP consistently applied throughout the periods involved except as set forth in the notes thereto (subject, in the case of any interim financial statements, to normal year-end adjustments).

(2) Since January 2, 1997, there has been no change in the condition, financial or otherwise, of HCL and HCA and their consolidated Subsidiaries, on a combined basis, as

shown on the combined balance sheets thereof as of such date except changes, none of which individually or in the aggregate would have a Guarantor Material Adverse Effect.

(3) No Guarantor, and no Subsidiary of any Guarantor, is in default and no waiver of default is currently in effect, in the payment of any principal or interest on any Indebtedness of the Guarantors or any of their respective Subsidiaries and no event or condition exists with respect to any Indebtedness of the Guarantors or any of their respective Subsidiaries that would permit (or that with notice or the lapse of time, or both, would permit) one or more Persons to cause such Indebtedness to become due and payable before its stated maturity or before its regularly scheduled dates of payment, except for such defaults, events and conditions which would not individually or in the aggregate have a Guarantor Material Adverse Effect.

(c) The Operative Documents to which the Guarantors are parties have been duly authorized, executed and delivered by each Guarantor and constitute valid and binding obligations of each Guarantor enforceable against each Guarantor in accordance with the respective terms thereof, except as such terms may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and except as equitable remedies such as specific performance may be in the discretion of the courts.

(d) The execution and delivery by the Guarantors of the Operative Documents to which the Guarantors are parties and compliance by the Guarantors with all of the provisions thereof do not and will not contravene any law or any order of any court or governmental authority or agency applicable to or binding on the Guarantors or contravene the provisions of, or constitute a default under, or result in the creation of any Lien upon the Property of any Guarantor under, its respective charter or by-laws or any indenture, mortgage, contract or other agreement or instrument to which any Guarantor is a party or by which it or any of such Guarantor's Property may be bound or affected.

(e) There are no proceedings pending or (to the Guarantor's knowledge, after due inquiry) threatened, nor (to the Guarantor's knowledge, after due inquiry) is there any existing basis for any such proceedings, against or affecting any Guarantor in any court or before any governmental authority or arbitration board or tribunal which, if adversely determined, would have a Guarantor Material Adverse Effect. No Guarantor is (to the knowledge of such Guarantor, after due inquiry) in default with respect to any order of any court or governmental authority or arbitration board or tribunal, which default would have a Guarantor Material Adverse Effect.

(f) No Guarantor is in violation of any term of any charter instrument, by-law or other material agreement or instrument to which it is a party or by which it may be bound, which violation would have a Guarantor Material Adverse Effect. Each Guarantor is in compliance with all laws, ordinances, governmental rules and regulations to which it is subject, failure to comply with which would have a Guarantor Material Adverse Effect, and has obtained all licenses, permits, franchises and other governmental authorizations necessary to the conduct of its business, except where the failure to have any such license, permit, franchise or authorization would not have a Guarantor Material Adverse Effect.

(g) The written statements furnished to any Participant by the Guarantors, the Tenant or any Person authorized or employed by the Guarantors or the Tenant as agent, broker, dealer or otherwise in connection with the negotiation of the transactions contemplated by this Agreement, do not, when taken as a whole, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading. There is no fact known to the Tenant or any Guarantor which the Guarantors or the Tenant have not disclosed to each Participant in writing which would have a Guarantor Material Adverse Effect.

(h) The Lease Guaranty is in full force and effect according to its terms and is not in default.

(i) No approval, consent or withholding of objection on the part of any Australian, Barbados or United States regulatory body, state, Federal or local, which has not been obtained is necessary in connection with the execution, delivery and performance by the Guarantors of the Operative Documents to which the Guarantors are parties or compliance by the Guarantors with any of the provisions of such Operative Documents.

(j) To the Guarantors' knowledge, after due inquiry, all tax returns and reports required by law to be filed by each Guarantor have been duly filed, and no taxes, assessments, contributions, fees or other governmental charges upon it or any of its assets or income which are due and payable thereon are delinquent, except to the extent that (1) such taxes, assessments, contributions, fees or charges are being contested in good faith and by proper proceedings and against which appropriate reserves are being maintained or (2) the failure to file any such return or pay any such tax, assessment, contribution, fee or charge would not have a Guarantor Material Adverse Effect.

(k) To the Guarantors' knowledge, after due inquiry, (1) the consummation of the transactions provided for in this Agreement and in the other Operative Documents to which the Guarantors are parties and compliance by the Guarantors with the provisions of the Lease Guaranty and with the provisions of the other Operative Documents to which the Guarantors are parties, will not involve any prohibited transaction within the meaning of ERISA or Section 4975 of the Code. The representation by the Guarantors in the preceding sentence is made in reliance upon and subject to the accuracy of the representations of the Participants in **Section 3.5(c)** and disclosures pursuant thereto as to the source of the funds used by the Participants to make their respective investments pursuant to this Agreement. None of the Guarantors nor any ERISA Affiliate thereof has incurred or could reasonably be expected to incur in connection with the withdrawal from any Multiemployer Plan, the termination of a Plan or any other Reportable Event, any liability which would have a Guarantor Material Adverse Effect.

(2) Each Non-U.S. Pension Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities; none of the Guarantors nor any of their respective Subsidiaries have incurred any obligation in connection with the termination of or withdrawal from any Non-

U.S. Pension Plan; and all contributions required to be made with respect to each Non-U.S. Pension Plan have been timely made, except where any such obligation or the nonpayment of any such contribution would not have a Guarantor Material Adverse Effect.

*Section 3.4. Private Offering.* (a) The Company warrants and represents to the Tenant, the Guarantors and the Participants that neither the Company nor any Person authorized or employed by the Company as agent, broker, dealer or otherwise in connection with the placement of the Notes, the Beneficial Interest or any similar Security has offered any of the Notes, the Beneficial Interest or any similar Security for sale to, or solicited offers to buy any thereof from, or otherwise approached or negotiated with respect thereto with, any prospective purchaser.

(b) The Tenant warrants and represents to the Company and the Participants that neither the Tenant nor, except as provided in **Section 3.4(c)**, any Person authorized or employed by the Tenant as agent, broker, dealer or otherwise in connection with the placement of the Notes, the Beneficial Interest or any similar Security has offered any of the Notes, the Beneficial Interest or any similar Security for sale to, or solicited offers to buy any thereof from, or otherwise approached or negotiated with respect thereto with, any prospective purchaser, except as expressly contemplated by **Section 3.4(c)**.

(c) The Guarantors warrant and represent to the Participants that:

(1) neither the Guarantors nor any Affiliate of any thereof or Babcock & Brown (the only Person authorized or employed by the Guarantors as agent, broker or otherwise in connection with the offering or sale of the Beneficial Interest or any similar Security) has offered any of the Beneficial Interest or any similar Security for sale to, or solicited offers to buy any thereof from, or otherwise approached or negotiated with respect thereto with, any prospective purchaser, other than the Equity Investor and not more than ten other Institutional Investors, each of which was offered the Beneficial Interest at private sale for investment and which the Guarantors or such agent had reasonable grounds to believe, and did believe, and, as to the Equity Investor, after reasonable inquiry does believe, has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Beneficial Interest; and

(2) neither the Guarantors nor any Affiliate of any thereof or Babcock & Brown (the only Person authorized or employed by the Guarantors as agent, broker, dealer or otherwise in connection with the offering or sale of the Notes or any similar Security) has offered any of the Notes or any similar Security for sale to, or solicited offers to buy any thereof from, or otherwise approached or negotiated with respect thereto with, any prospective purchaser, other than the Note Purchaser and ten other institutional investors, each of which was offered a portion of the Notes at private sale for investment and each of which the Guarantors or such agent had reasonable grounds to believe, and did believe, and, as to the Note Purchaser, after reasonable inquiry does believe, has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Notes.

(d) The Equity Investor warrants and represents to the Tenant and the Note Purchaser that neither the Equity Investor or any Person affiliated therewith nor any Person authorized or employed by the Equity Investor as agent, broker, dealer or otherwise in connection with the placement of the Beneficial Interest, the Notes or any similar Security has offered any of the Beneficial Interest, the Notes or any similar Security for sale to, or solicited offers to buy any thereof from, or otherwise approached or negotiated with respect thereto with, any prospective purchaser.

(e) The Company, the Equity Investor, the Tenant and the Guarantors each for itself agree that neither it nor anyone acting on its behalf will offer:

(1) the Beneficial Interest or any part thereof or any similar Security for issue or sale to, or solicit any offer to acquire any of the Beneficial Interest from, anyone so as to bring the issuance and sale of the Beneficial Interest within the provisions of Section 5 of the Securities Act of 1933, as amended, or

(2) the Notes or any part thereof or any similar Security for issue or sale to, or solicit any offer to acquire any of the Notes from, anyone so as to bring the issuance and sale of the Notes within the provisions of Section 5 of the Securities Act of 1933, as amended.

*Section 3.5. Representations and Covenants of the Participants; Transfer of Beneficial Interest and Notes.*

(a) *Representations and Covenants of the Equity Investor.* The Equity Investor warrants and represents to the Note Purchaser, the Company, the Tenant and the Guarantors that:

(1) The Equity Investor is a limited liability company duly organized, validly existing and in good standing under the laws of the British Virgin Islands and has the power and authority to carry on its present business and operations, to own or lease its Properties and to enter into and perform its obligations under the Operative Documents to which it is a party.

(2) The Operative Documents to which the Equity Investor is a party have been duly authorized, executed and delivered by the Equity Investor and constitute legal, valid and binding obligations of the Equity Investor enforceable against the Equity Investor in accordance with their respective terms, except as such terms may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and except as equitable remedies such as specific performance may be in the discretion of the courts.

(3) The execution and delivery by the Equity Investor of the Operative Documents to which it is a party and compliance by the Equity Investor with all of the provisions thereof do not and will not contravene any law or any order of any court or governmental authority or agency applicable to or binding on the Equity Investor

or contravene the provisions of, or constitute a default under, its charter or by-laws or any indenture, mortgage, contract or any agreement or instrument to which the Equity Investor is a party or by which it or any of its Property may be bound or affected.

(4) No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery or performance by the Equity Investor of the Operative Documents to which the Equity Investor is a party.

(5) The Premises are free of Liens and encumbrances of other Persons resulting from claims against the Equity Investor not related to the transactions contemplated by the Operative Documents. Without limiting the foregoing, there are no taxes (including, without limitation, any stamp tax), fees or assessments due, assessed or levied against the Equity Investor by any Australian or United States Federal, state or local governmental or public authority or agency (including any taxing authority) arising out of the acquisition of the Premises as contemplated by this Agreement which are unpaid on and as of the Closing Date.

(6) The Equity Investor is not a party in interest with respect to any employee benefit plan whose name has been disclosed to the Note Purchaser pursuant to **Section 3.5(c)** and the Securities of the Equity Investor are not employer securities with respect to any such plan.

(7) The Equity Investor has not assigned or transferred any of its right, title or interest in or to the Beneficial Interest.

(b) *Purchase for Investment.* Each Participant represents to each other Participant, the Company, the Tenant and the Guarantors that such Participant is purchasing the Interest (as hereinafter defined) to be acquired by it for the account of such Participant for investment and with no present intention of distributing or reselling such Interest or any part thereof, but without prejudice, however, to the right of such Participant at all times to sell or otherwise dispose of all or any part of such Interest under a registration under the Securities Act of 1933, as amended, or under an exemption from such registration available under such Act and otherwise in compliance with all applicable laws (including, without limitation, ERISA); *provided* that the disposition of such Interest shall at all times be within its control, subject, in the case of the Beneficial Interest, to compliance with the provisions of **Section 3.5(e)** and, in the case of the Notes, **Section 3.5(f)**.

The Beneficial Interest and the Notes are sometimes referred to in this **Section 3.5** collectively as the *"Interests"* and individually as an *"Interest"*.

(c) *Source of Funds.* Each Participant represents that at least one of the following statements is an accurate representation as to the source of funds (a *"Source"*) to be used by such Participant to make its investment pursuant to Section 1:

(1) if such Participant is an insurance company, the Source is an "insurance company general account" as defined in Department of Labor Prohibited Transaction Exemption (*"PTE"*) 95-60 (issued July 12, 1995) and there is no employee benefit plan established or maintained by the Tenant or the Equity Investor, treating as a single plan all plans maintained by the same employer or employee organization, with respect to which the amount of the reserves and liabilities of all general account contracts held by or on behalf of such plan(s) exceed ten percent (10%) of the total reserves and liabilities of such general account (exclusive of separate account liabilities) *plus* surplus, as set forth in the NAIC Annual Statement filed with the Note Purchaser's state of domicile; or

(2) if such Participant is an insurance company, the Source is either (i) an insurance company pooled separate account, within the meaning of PTE 90-1 (issued January 29, 1990), or (ii) a bank collective investment fund, within the meaning of the PTE 91-38 (issued July 12, 1991) and, except as such Participant has disclosed to the Tenant and the Equity Investor in writing pursuant to this paragraph (2), no employee benefit plan or group of plans maintained by the same employer or employee organization beneficially owns more than 10% of all assets allocated to such pooled separate account or collective investment fund; or

(3) if such Participant is an insurance company, the Source constitutes assets of an "investment fund" (within the meaning of Part V of the QPAM Exemption) managed by a "qualified professional asset manager" or "QPAM" (within the meaning of Part V of the QPAM Exemption), no employee benefit plan's assets that are included in such investment fund, when combined with the assets of all other employee benefit plans established or maintained by the same employer or by an affiliate (within the meaning of Section V(c)(1) of the QPAM Exemption) of such employer or by the same employee organization and managed by such QPAM, exceed 20% of the total client assets managed by such QPAM, the conditions of Part I(c) and (g) of the QPAM Exemption are satisfied, neither the QPAM nor a Person controlling or controlled by the QPAM (applying the definition of "control" in Section V(e) of the QPAM Exemption) owns a 5% or more interest in the Tenant or the Equity Investor and (A) the identity of such QPAM and (B) the names of all employee benefit plans whose assets are included in such investment fund have been disclosed to the Tenant and the Equity Investor in writing pursuant to this paragraph (3); or

(4) the Source is a "governmental plan" (as defined in Section 3(32) of ERISA); or

(5) the Source is one or more employee benefit plans, or a separate account or trust fund comprised of one or more employee benefit plans, each of which has been identified to the Tenant and the Equity Investor in writing pursuant to this paragraph (5); or

(6) the Source does not include assets of any employee benefit plan, other than a plan exempt from the coverage of ERISA.

If the Note Purchaser or any subsequent transferee of the Notes indicates that it or such transferee is relying on any representation contained in paragraph (2), (3) or (5) above, the Tenant shall deliver to the Note Purchaser on the date of Closing and on the date of any applicable transfer of the Notes a certificate, which shall either state that (A) it is neither a party in interest nor a "disqualified person" (as defined in Section 4975(e)(2) of the Code), with respect to any plan identified pursuant to paragraphs (2) or (5) above, or (B) with respect to any plan, identified pursuant to paragraph (3) above, neither it nor any "affiliate" (as defined in Section V(c) of the QPAM Exemption) has at such time, and during the immediately preceding one year, exercised the authority to appoint or terminate said QPAM as manager of any plan identified in writing pursuant to paragraph (3) above or to negotiate the terms of said QPAM's management agreement on behalf of any such identified plan. As used in this **Section 3.5**, the terms "employee benefit plan", "governmental plan", "party in interest" and "separate account" shall have the respective meanings assigned to such terms in Section 3 of ERISA.

(d) *Reaffirmation on the Closing Date.* The advance of funds by the Equity Investor on the Closing Date shall constitute a reaffirmation by the Equity Investor of its representations and warranties set forth in this **Section 3.5** as of the Closing Date, and the purchase of the Notes by the Note Purchaser on the Closing Date shall constitute reaffirmation by the Note Purchaser of its representations and warranties set forth in this **Section 3.5** as of the Closing Date.

(e) *Restrictions on Transfer of Equity Investor's Interests.* The Equity Investor agrees that it will not at any time transfer or assign any of the Beneficial Interest unless (1) the transferee or assignee is organized under the laws of any state of the United States, (2) the transferee or assignee is an "affiliated company" or is acceptable to the Note Purchaser, the Tenant and the Guarantors as evidenced by their respective written consents delivered to the Equity Investor, such consents not to be unreasonably withheld or delayed, (3) the transferee or assignee shall execute and deliver an agreement in form and substance satisfactory to the Note Purchaser, the Tenant and the Guarantors whereby the transferee or assignee agrees to be bound by all of the terms of and to undertake all of the obligations of the Equity Investor under each of the Operative Documents to which it is a party and makes representations of the scope provided for as to the Equity Investor in each of the Operative Documents, and (4) all Australian, Barbados and United States Federal, state and local taxes (including, without limitation, stamp taxes), fees and assessments due or to become due in connection with such transfer or assignment of the Beneficial Interest shall have been paid in full and evidence thereof shall have been delivered to the Note Purchaser, the Tenant and the Guarantors. The term *"affiliated company"* shall mean any company (the *"Parent"*) owning not less than 80% of the Equity Interests of the Equity Investor, any company (the *"Holding Company"*) owning, directly or indirectly, not less than 80% of the Equity Interests of the Parent, and any company not less than 80% of the Equity Interests of which is owned, directly or indirectly, by the Holding Company, the Parent or the Equity Investor. Prior to transferring its Beneficial Interest, the Equity Investor shall give written notice to the Note Purchaser, the Tenant and the Guarantors specifying the name and address of the transferee and such additional information as may be required to demonstrate compliance with the preceding provisions of this **Section 3.5(e)**, accompanied by the opinion of independent

counsel for the transferring Equity Investor (at the expense of the transferring Equity Investor or the new Equity Investor) that a registration of the Beneficial Interest under the Securities Act of 1933, as amended, has been performed or, if applicable, no such registration is necessary in connection with such transfer or assignment (the cost of such opinion, together with any out-of-pocket expenses of the Note Purchaser, the Tenant and the Guarantors directly incurred in connection with any such transfer, to be paid by the transferring Equity Investor). Upon any such transfer or assignment of the Beneficial Interest as above provided, the transferee or assignee shall be deemed the "Equity Investor" for all purposes of the Operative Documents and shall be deemed to have made all payments previously made by the transferring or assigning Equity Investor; each reference in the Operative Documents to the Equity Investor shall thereafter be deemed to mean such transferee or assignee; and the transferring or assigning Equity Investor shall be relieved of all obligations and liabilities of the Equity Investor arising subsequent to the date of such transfer or assignment (other than any obligation or liability under any guaranty referred to in clause (iii) above); *provided* that in no event shall any such transfer or assignment waive or release the transferor or assignor from any liability on account of any breach of any representations or warranties, covenants or obligations set forth in this Agreement or for any fraudulent or willful misconduct. Any transfer or assignment of the Beneficial Interest in violation of this **Section 3.5(e)** shall be void and of no effect.

(f) *Restrictions on Transfer of Notes*. Anything contained in this Agreement or any of the other Operative Documents to the contrary notwithstanding, the Note Purchaser may transfer all or any part of the Notes and its rights under and pursuant to the Operative Documents, in whole or in part, to any Person; *provided* that (i) such Person is an Institutional Investor and (ii) such Person is not a Competitor; and *provided, further*, that if the Note Purchaser wishes to transfer to any Person other than an Institutional Investor, it may do so, *provided* that it shall first have obtained the prior written consent of any of the Guarantors, which consent shall not be unreasonably withheld or delayed.

SECTION 4. CONDITIONS.

*Section 4.1. Conditions Precedent to Investment by Each Participant*. The obligations of each Participant to make its investment pursuant hereto on the Closing Date shall be subject to the following conditions:

(a) *Execution of Operative Documents*. On or before the Closing Date, the Operative Documents shall have been duly executed and delivered by the parties thereto and shall be in full force and effect, and no default shall exist in the performance by any party thereto of any of its obligations thereunder.

(b) *Recording*. Either (1) the Quitclaim Deed and the Lease (or notices or memoranda thereof) and such other documents as are deemed necessary or appropriate by such Participant shall on the Closing Date have each been recorded or filed for record in such public offices as may be necessary or appropriate in order to protect the rights of the Company thereunder and if such Participant is the Note Purchaser to perfect the right, title and interest of the Note Purchaser in and to the,

the Premises, the Lease and the Lease Guaranty, or (2) the transactions contemplated hereunder are to be closed by a so-called "New York-style" closing with the Title Company providing policies of title insurance to the parties dated the Closing Date and in the form required by **Section 4.1(g)**, and all of the foregoing documents shall have been delivered to the Title Company on the day of or prior to the Closing Date.

(c) *Closing Certificate of Tenant.* On the Closing Date, such Participant shall have received an Officer's Certificate of the Tenant dated the Closing Date, the truth and accuracy of which shall be a condition to the obligation of such Participant to make the investment by such Participant contemplated by **Section 1** on the Closing Date, to the effect that the warranties and representations of the Tenant set forth in **Section 3.2** and **3.4(b)** hereof are true on the Closing Date with the same effect as though made on and as of that date and that no Lease Default or Lease Event of Default has occurred and is continuing.

(d) *Closing Certificate of Guarantors.* On the Closing Date, such Participant shall have received an Officer's Certificate of each Guarantor dated the Closing Date, the truth and accuracy of such shall be a condition to the obligation of such Participant to make the investment of such Participant contemplated by **Section 1** on the Closing Date, to the effect that the warranties and representations of the Guarantors set forth in **Section 3.3** and **3.4(c)** hereof are true on the Closing Date with the same effect as though made on and as of that date and that no Lease Default or Lease Event of Default under the Lease has occurred and is continuing.

(e) *Survey.* At least two Business Days prior to the Closing Date, the Company shall have caused a physical survey of the parcel of real estate constituting the Premises, showing the location of the improvements on such parcel of real estate, to be made by a registered civil engineer or surveyor licensed in the Commonwealth of Massachusetts in accordance with the standard detail requirements for land title surveys adopted by the American Land Title Association (*"ALTA"*) (including the items 3, 4, 6, 7 (in its entirety), 8, 9, 10, 11 and 14 (number of stories, and finish floor elevations if the building is in a flood zone) checked on Table A — Optional Survey Responsibilities and Specifications) and the American Congress on Surveying & Mapping, as revised and in effect as of the date hereof, and shall have furnished to such Participant and its special counsel a plat of survey duly certified by such engineer or surveyor which shall show no material encroachments upon such real estate parcel by adjoining buildings or structures and no encroachments on adjoining premises by the buildings or improvements erected thereon.

(f) *Evidence of Title.* At least two Business Days prior to the Closing Date, the Company shall have obtained the commitment of First American Title Insurance Company (the *"Title Company"*), to issue policies of mortgage title insurance on a standard ALTA Form Mortgage Title Insurance Policy (Loan Policy-1970 Form, if available, or if the 1970 is unavailable, the 1992 Form) with a Comprehensive Endorsement, Access Endorsement, Endorsement requiring the Title Company to first obtain the Note Purchaser's consent before the Title Company exercises its options

under paragraph 6(b)(i) of the Conditions and Stipulations sections of the ALTA Policy (if the 1992 form is used), Zoning Endorsement, and Endorsement deleting Item 7 from the Exclusions from Coverage (if the 1992 form is used) and otherwise in form and substance satisfactory to you and your special counsel (*"ALTA Policy"*) in the aggregate amount which will provide for mortgage title insurance in an amount not less than the aggregate principal amount of Notes then and thereafter issued, covering the Premises, and showing good and marketable record title to the Premises to be vested in the Company subject only to:

(1) the Liens and encumbrances, if any, permitted by the Mortgage;

(2) such exceptions as are standard under an ALTA Policy (but such policy shall not be subject to a standard survey or mechanic's lien exception); and

(3) such other exceptions as shall be satisfactory to such Participant and its special counsel; and

agreeing to insure the Note Purchaser, upon the proper execution and recording of the Mortgage, against loss or damage sustained by reason of such Mortgage not being a first and paramount lien upon the title to the Premises, subject only to the exceptions referred to in the foregoing clauses (1) through (3).

(g) *Environmental Report.* At least five Business Days prior to the Closing Date, such Participant and its special counsel shall have received a copy of an environmental assessment of the Premises prepared by Beals & Thomas, Inc., which shall be in form and substance reasonably satisfactory to such Participant and its special counsel.

(h) *Appraisal Report.* At least one Business Day prior to the Closing Date each Participant shall have received from Lynch Murphy Walsh & Partners Incorporated an MAI-approved report dated such date with respect to the fair market value of the Premises which shall be in form and substance reasonably satisfactory to such Participant and its special counsel.

(i) *Opinions of Counsel.* On the Closing Date, such Participant shall have received the favorable written opinions of Riemer & Braunstein, independent Massachusetts counsel for the Tenant and the Guarantors, Arnold Bloch Leibler, independent Australian counsel for HCL, R.H. Maraj, independent Barbados counsel for HCA, and Skadden, Arps, Slate, Meagher & Flom LLP, independent Delaware counsel for the Tenant and the Guarantors substantially in the respective forms set forth in Annex IV hereto.

(j) *Engineers' or Architects' Certificate.* Not less than one Business Day prior to the Closing Date, such Participant and its special counsel shall have received executed copies of a certificate of an engineer or architect employed by the Tenant and

licensed to do business in the Commonwealth of Massachusetts, to the effect that the signer has reviewed the Plans of the Premises, and based on such review, (1) the Premises has been completed in accordance with the Plans and (2) no other facilities are or will be necessary to permit the operation and maintenance of the Premises in accordance with good engineering and operational practices.

(k) *Cost Certificate.* Not less than one Business Day prior to the Closing Date, such Participant and its special counsel shall have received an Officer's Certificate of the Tenant dated the Closing Date stating in reasonable detail the actual construction cost of the Premises, exclusive of the cost of any Tenant's Trade Property.

(l) *Insurance Certificate.* On or before the Closing Date, such Participant and its special counsel shall have received an Officer's Certificate of the Tenant dated the Closing Date accompanied by certificates or other satisfactory evidence of the maintenance of the insurance required pursuant to Section 12 of the Lease.

(m) *Corporate Existence and Authority of Tenant.* On the Closing Date, the Participants and their special counsel shall have received, in form and substance reasonably satisfactory to the Participants and their special counsel, such documents and evidence with respect to the Tenant as any Participant may reasonably request in order to establish the existence and good standing of the Tenant, the authorization of the transactions contemplated by the Operative Documents, the taking of all corporate proceedings in connection therewith and compliance with the conditions set forth in this **Section 4.1**.

(n) *Corporate Existence and Authority of Guarantors.* On the Closing Date, the Participants and their special counsel shall have received, in form and substance reasonably satisfactory to the Participants and their special counsel, such documents and evidence with respect to each Guarantor as any Participant may reasonably request in order to establish the existence and good standing of the Guarantors, the authorization of the transactions contemplated by the Operative Documents, the taking of all corporate proceedings in connection therewith and compliance with the conditions set forth in this **Section 4.1**.

(o) *Related Transactions.* The other Participant shall make the investment contemplated for such other Participant by **Section 1**.

(p) *Real Property Foreign Investment.* On the Closing Date, the Developer shall deliver to the Company, the Equity Investor and the Note Purchaser an affidavit in form reasonably satisfactory to the Participants certifying that the Developer is not a "foreign person" for purposes of Section 1445 of the Code.

(q) *Proceedings Satisfactory.* All proceedings taken in connection with the transactions contemplated hereby and all documents and papers relating thereto shall be reasonably satisfactory to such Participant and its special counsel, and such

Participant and such special counsel shall have received copies of such documents and papers as such Participant or such special counsel may reasonably request in connection therewith or as a basis for such special counsel's closing opinion, all in form and substance reasonably satisfactory to such Participant and such special counsel.

*Section 4.2. Additional Conditions Precedent to Note Purchase.* The obligation of the Note Purchaser to purchase and pay for Notes pursuant hereto on the Closing Date shall be subject to the conditions specified in **Section 4.1** and the following additional conditions:

(a) *Recording of Mortgage.* Either (1) the Mortgage and the Lease Assignment shall on the Closing Date have been recorded or filed in all public offices as may be necessary or appropriate in order to perfect the Lien and security interest granted by the Mortgage and the Lease Assignment as against creditors of and purchasers from the Company and the Equity Investor or (2) the transactions contemplated hereunder are to be closed by a so-called "New York-style" closing, and the Mortgage and the Lease Assignment shall have been delivered to the Title Company on the day of or prior to the Closing Date.

(b) *Legal Investment.* The Notes shall on the Closing Date qualify as a legal investment for the Note Purchaser under any laws regulating investments to which it may be subject.

(c) *Closing Certificate of Company and Company Manager.* (1) On the Closing Date, the Note Purchaser shall have received an Officer's Certificate of the Company dated the Closing Date, the truth and accuracy of which shall be a condition to the obligation of the Note Purchaser to make the investment by the Note Purchaser contemplated by **Section 1** hereof on the Closing Date, to the effect that the representations and warranties of the Company set forth in **Sections 3.1** and **Section 3.4(a)** hereof are true on the Closing Date with the same effect as though made on and as of that date, and that to the knowledge of the Company, no Mortgage Default or Mortgage Event of Default has occurred and is continuing.

(2) On the Closing Date, the Note Purchaser shall have received an Officer's Certificate of the Company Manager dated the Closing Date, the truth and accuracy of which shall be a condition to the obligation of the Note Purchaser to make the investment of the Note Purchaser contemplated by **Section 1** on the Closing Date, in the form attached hereto as Exhibit F.

(d) *Compliance Certificate.* On the Closing Date, the Note Purchaser and its special counsel shall have received an Officer's Certificate from each of the Guarantors dated the Closing Date, the truth and accuracy of which shall be a condition to the obligation of the Note Purchaser to make the investment of the Note Purchaser contemplated by **Section 1** on the Closing Date, to the effect that after giving effect to the issuance of the Notes, and the transactions contemplated hereby (including, without limitation, the delivery of the Lease Guaranty), the ratio of

Consolidated Total Indebtedness to Consolidated EBITDA for the immediately preceding four fiscal quarter period does not exceed 5.50 to 1.00.

(e) *Corporate Existence and Authority of Company, Company Manager, Equity Investor and Equity Investor Manager.* On the Closing Date, the Note Purchaser and its special counsel shall have received, in form and substance reasonably satisfactory to the Note Purchaser and its special counsel, such documents and evidence with respect to the Company, the Company Manager, the Equity Investor and the Equity Investor Manager as the Note Purchaser may reasonably request in order to establish the existence and good standing of the Company, the Company Manager, the Equity Investor and the Equity Investor Manager, the authorization of the transactions contemplated by the Operative Documents, the taking of all corporate proceedings in connection therewith and compliance with the conditions set forth in **Section 4.1**.

(f) *Opinions of Counsel.* On the Closing Date, the Note Purchaser shall have received the favorable written opinions of Chapman and Cutler, special counsel for the Note Purchaser, and of Goulston & Storrs, independent counsel for the Company, substantially in the respective forms set forth in Annex IV hereto.

(g) *Reconciliation to U.S. GAAP.* Not less than one Business Day prior to the Closing Date, the Note Purchaser shall have received, in form and substance satisfactory to the Note Purchaser a reconciliation between Australian GAAP and U.S. GAAP with regard to the profit and loss account of the Guarantors for the fiscal year ended July 3, 1997.

(h) *Funding Instructions.* Not less than one Business Day prior to the Closing Date, the Note Purchaser shall have received written instructions executed by an authorized financial representative of the Company directing the manner of payment of funds and setting forth (1) the name and address of the transferee bank, (2) the transferee bank's ABA number, (3) the account name and number into which the purchase price for the Notes is to be deposited, and (4) the name and telephone number of the account representative responsible for verifying receipt of such funds.

(i) *Payment of Special Counsel Fees.* On the Closing Date, reasonable fees and expenses of Chapman and Cutler, special counsel to the Note Purchaser in connection with the transactions contemplated hereby, as set forth in an invoice delivered to the Company and the Tenant, shall be paid.

## SECTION 5. SPECIAL RIGHTS OF NOTE PURCHASER.

Notwithstanding any provision to the contrary in this Agreement, the Mortgage or the Notes relating to the manner and place of payment, but, subject always to the Lease Assignment pursuant to which the Tenant agrees on the terms and conditions therein set forth to pay Basic Rent, the Casualty Value Purchase Price, the Make-Whole Amount, if any, and any Additional Rent due and owing to Note Purchaser directly to the Note Purchaser, all amounts payable to the Note Purchaser with respect to any Notes held by the Note Purchaser

or a nominee for the Note Purchaser shall be paid by the Company to the Note Purchaser (without any presentment thereof and without any notation of such payment being made thereon) by check, duly mailed, by first class mail, postage prepaid, or delivered to the Note Purchaser at the address for payments for the Note Purchaser appearing beneath its signature at the foot of this Agreement or, if wire transfer to a bank account is designated by the Note Purchaser beneath its signature at the foot of this Agreement or in a written notice from the Note Purchaser to the Company, by wire transfer of immediately available Federal Reserve funds to the bank so designated for credit to the account and marked for attention as so designated, *provided* that such bank has facilities for the receipt of a wire transfer, or in such other manner or to such other address in the United States as may be designated by the Note Purchaser in a written notice from the Note Purchaser to the Company. In the case of any wire transfer, the Company will make such transfer from the office of the Company on each date any payment or prepayment of principal or interest on the Notes is due not later than 10:00 a.m., Chicago, Illinois time, *provided* that funds therefor have been received by the Company in cash or in solvent credits acceptable to it or if not so received promptly upon receipt.

SECTION 6. COMPANY COVENANTS.

From and after the Closing Date and continuing so long as any amount remains unpaid on any Note, the Company covenants with the Note Purchaser, the Tenant and the Guarantors and their successors and assigns as follows:

*Section 6.1. Office for Notices.* The Company will keep an office while any of the Notes issued hereunder are outstanding at the notice address set forth herein, where notices, presentations and/or demands to or upon the Company in respect of said Notes or any other Operative Document may be given or made, until such time as the Company shall so notify the holders of the Notes of any change of location of such office.

*Section 6.2. Maintenance of Existence, Rights.* The Company will at all times preserve its existence and will obtain and maintain, or will cause to be obtained and maintained, in full force and effect all franchises, privileges, rights, licenses and permits and all other consents, approvals and authorizations of any governmental authority necessary for the ownership and efficient operation and maintenance of its business and Property.

*Section 6.3. Maintenance of Property.* The Company will at all times maintain, preserve and keep, or will cause to be maintained, preserved and kept, its Property and assets (whether owned in fee or a leasehold interest) in good repair and working order and from time to time will make, or will cause to be made, all necessary repairs, replacements, renewals and additions so that at all times the efficiency thereof shall be maintained.

*Section 6.4. Insurance.* The Company will maintain, or will cause to be maintained, insurance coverage by financially sound and reputable insurers in such forms and amounts and against such risks as are required of it by the terms of Section 2.6 of the Mortgage.

*Section 6.5. Payment of Taxes and Other Charges; Compliance with Laws.* (a) The Company will promptly pay and discharge or will cause to be paid promptly or discharged all lawful taxes, assessments and governmental charges or levies imposed upon the Company or upon or in respect of all or any part of the Property, assets and business of the Company, all trade accounts payable in accordance with usual and customary business terms, and all claims for work, labor or materials which if unpaid might become a Lien or charge upon any property or assets of the Company, other than Permitted Encumbrances which are not by the terms of the Operative Documents the responsibility of the Company.

(b) The Company will promptly comply with all laws, ordinances or governmental rules and regulations to which it is subject, including without limitation, the Occupational Safety and Health Act of 1970, as amended, ERISA, the Americans with Disabilities Act of 1990, and all Environmental Laws.

*Section 6.6. Negative Covenants.* The Company will not, directly or indirectly:

(a) engage in any business other than the ownership and operation of the Premises, the leasing of the Premises to the Tenant under the Lease and the financing thereof through the issuance of the Notes as provided in this Agreement and the Mortgage;

(b) incur, assume, guarantee or otherwise create or be or become liable in respect of any Indebtedness other than the Notes;

(c) make, or permit to remain outstanding, any investment, loan or advance to, or own or acquire any stock or Securities of, any Person;

(d) pay or declare any dividend, or make any other distribution if, after giving effect thereto, a Mortgage Default or Mortgage Event of Default would exist or if the making of such dividend or other distribution would adversely affect the ability of the Company to perform its obligations under this Agreement or any other Operative Document to which it is a party;

(e) create by its acts or suffer to be created or exist any mortgage, security interest, lien, charge or encumbrance of any kind whatsoever upon any part of the Premises or any part or portion thereof or upon any rents, income, revenues, issues and profits thereof, other than the Mortgage and Liens, claims and encumbrances expressly permitted by the terms thereof;

(f) enter into any lease of the Premises, whether as lessor or as lessee, other than the Lease;

(g) sell, transfer, exchange or otherwise dispose of any part of the Premises or any part or portion thereof, other than as expressly permitted by the Mortgage;

(h) create, organize or establish any Person, including, without limitation any Subsidiary or partnership; or

(i) hire any employee.

*Section 6.7. Mergers and Consolidations.* The Company will not consolidate with or be a party to a merger with any other Person.

*Section 6.8. Financial Information and Reports.* The Company will keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to the business and affairs of the Company, in accordance with GAAP consistently maintained and will furnish to each holder of outstanding Notes in duplicate:

(a) As soon as available and in any event within 90 days after the close of each fiscal year of the Company, copies of:

(1) a balance sheet of the Company as of the close of such fiscal year, and

(2) statements of income, retained earnings and cash flows of the Company for such fiscal year,

in each case setting forth in comparative form the figures for the preceding fiscal year, all in reasonable detail and certified by the chief financial officer of the Company to the effect that such financial statements have been prepared in accordance with GAAP, are complete and correct and present fairly, in all material respects, the financial condition of the Company;

(b) Within the period provided in paragraph (a) above, the written statement of the Company, signed by the chief financial officer, stating whether there existed as of the date of such financial statements and whether, to the best of his knowledge, there exists on the date of the certificate any Mortgage Default, Mortgage Event of Default, Lease Default or Lease Event of Default and specifying the nature and period of existence thereof and the action the Company is taking and proposes to take with respect thereto;

(c) Within five Business Days after becoming aware of the same, the Company shall notify the holders of the Notes in writing of any condemnation proceedings or casualty occurrence to which the Premises has become subject; and

(d) Such additional information as such holder may reasonably request concerning the Company.

The Company will permit each holder of outstanding Notes (or such Persons as any such holder may designate) to examine all of its books of account, records, reports and other

papers, to make copies and extracts therefrom and to discuss its affairs, finances and accounts with its officers, all at such reasonable times and as often as any such holder may reasonably request. Any visitation shall be at the sole expense of the holder of the Notes, unless a Mortgage Default or Mortgage Event of Default shall have occurred and be continuing, in which case, any such visitation shall be at the sole expense of the Company.

*Section 6.9. Repurchase of Notes.* Neither the Company nor any Affiliate of the Company, directly or indirectly, may repurchase or make any offer to repurchase any Notes.

*Section 6.10. Transactions with Affiliates.* The Company will not enter into or be a party to, any transaction or arrangement with any Affiliate (including without limitation, the purchase from, sale to or exchange of property or assets with, or the rendering of any service by or for, any Affiliate), except in the ordinary course of and pursuant to the reasonable requirements of the Company's business and upon fair and reasonable terms no less favorable to the Company than would obtain in a comparable arm's-length transaction with a Person other than an Affiliate.

*Section 6.11. Post Closing Undertaking of the Company.* The Company will, not more than ten days following the Closing Date, cause such amendments and modifications to the organizational documents and instruments of the Company Manager as shall in the opinion of the Note Purchaser be necessary to cause the Company Manager to be a corporation the purpose of which shall be solely to act as the managing member of the Company and another special purpose limited liability company which will own the Property which will be the subject of the financing contemplated by **Section 7.13**.

SECTION 7. COVENANTS OF THE GUARANTORS.

From and after the Closing Date and continuing so long as any amount remains unpaid on any Note, each Guarantor covenants and agrees severally in the case of **Sections 7.1** through **7.5** and jointly and severally in the case of **Sections 7.6** through **7.14**, in each such case with the Note Purchaser and its successors and assigns as follows:

*Section 7.1. Corporate Existence, Etc.* (a) Such Guarantor will preserve and keep in full force and effect, and will cause each of its Subsidiaries to preserve and keep in full force and effect, its corporate existence and all licenses and permits necessary to the proper conduct of its business, except in the case of any such license or permit or the existence of any such Subsidiary the failure of which to maintain in force and effect would not have a Guarantor Material Adverse Effect and except that the foregoing shall not prevent any transaction permitted by **Section 7.8** or **7.9**.

(b) The Tenant or its successors will at all times be and remain a Subsidiary of a Guarantor.

*Section 7.2. Insurance.* Such Guarantor will maintain, and will cause each of its Subsidiaries to maintain, insurance coverage by financially sound and reputable insurers and

in such forms and amounts and against such risks as are customary for corporations of established reputation engaged in the same or a similar business and owning and operating similar properties.

*Section 7.3. Taxes, Claims for Labor and Materials; Compliance with Laws.* (a) Such Guarantor will promptly pay and discharge, and will cause each of its Subsidiaries promptly to pay and discharge, all lawful taxes, assessments and governmental charges or levies imposed upon such Guarantor or any such Subsidiary, respectively, or upon or in respect of all or any part of the property or business of such Guarantor or any such Subsidiary, all trade accounts payable in accordance with usual and customary business terms, and all claims for work, labor or materials, which if unpaid might become a Lien upon any property of such Guarantor or any of its Subsidiaries; *provided* such Guarantor or such Subsidiaries shall not be required to pay any such tax, assessment, charge, levy, account payable or claim if either (1) (i) the validity, applicability or amount thereof is being contested in good faith by appropriate actions or proceedings which will prevent the forfeiture or sale of any property of such Guarantor or such Subsidiary or any material interference with the use thereof by such Guarantor or such Subsidiary, and (ii) such Guarantor or such Subsidiary shall set aside on its respective books, reserves deemed by it to be adequate with respect thereto or (2) the failure to pay any such tax, assessment, charge, levy, account or claim would not have a Guarantor Material Adverse Effect.

(b) Such Guarantor will promptly comply and will cause each of its Subsidiaries to promptly comply with all laws, ordinances or governmental rules and regulations to which it is subject, including, without limitation, the Occupational Safety and Health Act of 1970, as amended, ERISA, the Americans with Disabilities Act of 1990, and all Environmental Laws, the violation of which would have a Guarantor Material Adverse Effect.

*Section 7.4. Maintenance, Etc.* Such Guarantor will maintain, preserve and keep, and will cause each of its Subsidiaries to maintain, preserve and keep, its Properties which are used or useful in the conduct of its business (whether owned in fee or a leasehold interest) in good repair and working order and from time to time will make all necessary repairs, replacements, renewals and additions so that at all times the efficiency thereof shall be maintained, except where the failure to so maintain, preserve and keep such Properties or make such repairs, replacements, renewals and additions would not have a Guarantor Material Adverse Effect.

*Section 7.5. Nature of Business.* No Guarantor and no Subsidiary of such Guarantor will engage in any business if, as a result, the general nature of the business, taken on a consolidated basis, which would then be engaged in by such Guarantor and its Subsidiaries would be substantially changed from the general nature of the business engaged in by such Guarantor and its Subsidiaries on the date of this Agreement.

*Section 7.6. Limitations on Consolidated Total Debt.* The Guarantors will not as at the end of each fiscal quarter permit the ratio of Consolidated Total Indebtedness to Consolidated EBITDA for the immediately preceding four fiscal quarter period ending at such date to exceed 5.50 to 1.00.

*Section 7.7. Fixed Charges Coverage Ratio.* The Guarantors will not as at the end of each fiscal quarter permit the ratio of Consolidated EBITDA Available for Fixed Charges for the four consecutive fiscal quarter period ending at such date to Consolidated Fixed Charges for such four consecutive fiscal quarter period to be less than 1.0 to 1.0.

*Section 7.8. Sale of Assets.* (a) Subject always to clause (b) of this **Section 7.8**, the Guarantors will not, and will not permit any Subsidiary, to sell, lease, transfer, abandon or otherwise dispose of assets (except assets (including, without limitation, obsolete assets) sold in the ordinary course of business for fair market value as determined by a Guarantor or the affected Subsidiary); *provided* that the foregoing restrictions do not apply to:

(1) the sale, lease, transfer or other disposition of assets of a Guarantor or a Subsidiary to a Guarantor or a Wholly-owned Subsidiary; or

(2) the sale or other disposition on an arms-length basis of assets which are obsolete or uneconomic to use; or

(3) leases, subleases and similar transfers of all or any portion of an asset; *provided* that after giving effect to such transfer such asset remains an asset owned by the applicable Guarantor or Subsidiary in accordance with GAAP; or

(4) the sale or other disposition of assets for cash or other Property to a Person or Persons other than an Affiliate of any Guarantor if:

(i) such assets (valued at net book value) do not, together with all other assets of the Guarantors and their Subsidiaries previously disposed of during the same fiscal year pursuant to this clause (4), exceed 15% of Consolidated Total Net Assets determined as of the end of the immediately preceding fiscal year; and

(ii) immediately after the consummation of the transaction and after giving effect thereto, no Lease Default or Lease Event of Default would exist; *provided, however,* that for purposes of any calculation pursuant to this clause (4), there shall not be included any assets the proceeds of which (net of out-of-pocket expenses and taxes payable in connection with such sale and any Indebtedness which is or will be repaid with such proceeds) were or are applied within twelve months of the sale of such assets to the acquisition of fixed or capital assets or other assets similar to the assets which have been sold or otherwise disposed of and intended to be used in the operation of the business of any Guarantor or any of its Subsidiaries; or

(5) a transaction expressly permitted by the terms of Section 30.6 of the Lease or **Section 7.9**.

Notwithstanding the foregoing, in the event any Guarantor or Subsidiary proposes to sell, lease, transfer, abandon or otherwise dispose of assets and such assets may not be disposed of

within the limitations of clause (a)(1), (a)(2), (a)(3) or (a)(4) of this **Section 7.8** and the Note Purchaser shall withhold its consent to such disposition not otherwise permitted, then and in such event, the Guarantors shall at their option have the right to either (y) purchase (or have another Person purchase) all of the then outstanding Notes and pay interest accrued thereon to the date of purchase, but without premium, or (z) direct the Tenant to purchase the Premises and terminate the Lease pursuant to Section 15 of the Lease and in connection therewith the Company shall concurrently prepay the Notes in full pursuant to Section 5.5 of the Mortgage.

(b) Anything contained in clause (a) of this **Section 7.8** to the contrary notwithstanding, HCC shall not permit any of the issued and outstanding capital stock of each of its Wholly-owned Subsidiaries as of the Closing Date to be owned by HCL, HCA or any Subsidiary of HCL or HCA other than HCC or any Subsidiary of HCC; *provided* that HCC may request the consent of the Note Purchaser to the disposition of all or any part of the capital stock of any such Wholly-owned Subsidiary within the limitations of **Section 7.8(a)** and such consent by the Note Purchaser shall not be unreasonably withheld or delayed.

*Section 7.9. Mergers and Consolidations.* No Guarantor will consolidate with or be a party to a merger with any other Person unless and to the extent (a) after giving effect to such consolidation or merger, the surviving Person shall have a net worth determined in accordance with GAAP equal to or greater than the net worth determined in accordance with GAAP of such Guarantor immediately prior to such consolidation or merger, (b) in the case of a consolidation or merger involving HCC, the surviving corporation shall be organized under the laws of any state of the United States or the District of Columbia, and in the case of a consolidation or merger involving HCL, the surviving corporation shall be organized under the laws of Australia, (c) the due and punctual performance and observance of all of the covenants of such Guarantor in this Agreement and the other Operative Documents to which it is a party are expressly assumed in writing by the surviving corporation, (d) the surviving corporation shall furnish to the Participants an opinion of counsel to the effect that the instrument of assumption has been duly authorized, executed and delivered and constitutes the legal, valid and binding contract and agreement of the surviving corporation enforceable in accordance with its terms, except as enforcement of such terms may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors' rights generally and by general equitable principles, (e) each of the Guarantors which is not a party to such consolidation or merger shall have acknowledged in writing that the due and punctual performance and observance of all of the covenants of such Guarantor in this Agreement and the other Operative Documents to which it is a party remain legal, valid and binding obligations of such Guarantor and such Guarantor shall furnish to the Participants an opinion of counsel to the effect that such merger or consolidation does not adversely affect the legal, valid and binding nature of such obligations, and (f) (1) immediately prior to such consolidation or merger, no Lease Default or Lease Event of Default exists and (2) immediately after giving effect to such consolidation or merger, (i) no Lease Default or Lease Event of Default would exist and (ii) the ratio on a *pro forma* basis of Consolidated Total Indebtedness (which will include the surviving corporation) to Consolidated EBITDA (which will include the surviving

corporation) for the immediately preceding four fiscal quarter period shall not exceed 5.50 to 1.00.

*Section 7.10. Limitations on Restrictive Agreements.* The Guarantors will not, and will not permit any of their respective Subsidiaries to, enter into, or suffer to exist, any agreement with any Person which, directly or indirectly, limits the ability of any Subsidiary to (a) pay dividends or make other equity distributions to any Guarantor, (b) prepay any Indebtedness owed to any Guarantor, or (c) transfer any of its Property to any Guarantor, except for any such limitations contained in any agreement in existence on the Closing Date relating to any Indebtedness of any Guarantor or any of their respective Subsidiaries and listed on **Schedule 7.10** attached hereto and renewals or replacements of any such agreements, *provided* that any such renewal or replacement agreement shall not be materially more onerous in respect of the payment of dividends or the making of other equity distributions, the prepayment of any such Indebtedness or the transfer of any such Property than the agreement replaced or renewed; and *provided further* that this **Section 7.10** shall not in any event be deemed or construed to prohibit any anti-assignment clause contained in any lease or other contract.

*Section 7.11. HCL's Shareholders' Equity.* HCL will at all times keep and maintain its total shareholders' equity determined in accordance with Australian GAAP at an amount not less than Aust. $100,000,000.

*Section 7.12. Reports and Rights of Inspection.* The Guarantors will keep, and will cause each Subsidiary to keep, proper books of record and account in which full and correct entries will be made of all dealings or transactions of, or in relation to, the business and affairs of HCL and its Subsidiaries, and of HCA and its Subsidiaries, in accordance with GAAP consistently applied (except for changes disclosed in the financial statements furnished to the Note Purchaser pursuant to this **Section 7.12** and concurred in by the independent public accountants referred to in **Section 7.12**), and will furnish to the Note Purchaser (in duplicate if so specified below or otherwise requested):

(a) *Quarterly Statements.* As soon as available and in any event within 75 days after the end of each quarterly fiscal period (except the last) of each fiscal year, copies of:

(1) a consolidated balance sheet of HUSH Holdings U.S. Inc. and its Subsidiaries as of the close of such quarterly fiscal period setting forth in comparative form the consolidated figures for the fiscal period then most recently ended,

(2) a consolidated statement of income of HUSH Holdings U.S. Inc. and its Subsidiaries for such quarterly fiscal period and for the portion of the fiscal year ending with such quarterly fiscal period, in each case setting forth in comparative form the consolidated figures for the corresponding period of the preceding fiscal year, and

(3) a consolidated statement of cash flows of HUSH Holdings U.S. Inc. and its Subsidiaries for the portion of the fiscal year ending with such quarterly fiscal period setting forth in comparative form the consolidated figures for the corresponding period of the preceding fiscal year,

all in reasonable detail and certified as complete and correct by an authorized financial officer of HUSH Holdings U.S. Inc.;

(b) *Semiannual Statements.* As soon as available and in any event within 90 days after the end of the sixth fiscal month of each fiscal year, copies of:

(1) a combined balance sheet of HCL, HCA and their Subsidiaries as of the close of such semiannual fiscal period, setting forth in comparative form the combined figures for the fiscal period then most recently ended,

(2) a combined profit and loss account of HCL, HCA and their Subsidiaries for such semiannual fiscal period and for the portion of the fiscal year ending with such semiannual fiscal period, in each case setting forth in comparative form the combined figures for the corresponding periods of the preceding fiscal year, and

(3) a combined statement of cash flows of HCL, HCA and their Subsidiaries for the portion of the fiscal year ending with such semiannual fiscal period, setting forth in comparative form the combined figures for the corresponding periods of the preceding fiscal year,

all in reasonable detail and certified as having been prepared in accordance with GAAP by an authorized financial officer of HCL;

(c) *Annual Statements.* As soon as available and in any event within 120 days after the close of each fiscal year of HCL and HCA, copies of:

(1) combined balance sheets of each of HCL and HCA and their respective Subsidiaries as of the close of such fiscal year, and

(2) combined profit and loss accounts and cash flows of each of HCL and HCA and their respective Subsidiaries for such fiscal year,

in each case setting forth in comparative form the combined figures for the preceding fiscal year, all in reasonable detail and accompanied by a report thereon of a firm of independent public accountants of recognized national standing selected by HCL and HCA to the effect that the combined financial statements present fairly, in all material respects, the combined financial position of each of HCL and HCA and their respective Subsidiaries as of the end of the fiscal year being reported on and the combined results of the operations and cash flows for said year in conformity with GAAP and that the examination of such accountants in connection with such financial statements has been

conducted in accordance with generally accepted auditing standards and included such tests of the accounting records and such other auditing procedures as said accountants deemed necessary in the circumstances;

(d) *Shareholder and Other Reports.* Promptly upon their becoming available, one copy of each financial statement, report, notice or proxy statement sent by either HCL, HCA or HUSH Holdings U.S. Inc. to its creditors or shareholders generally and of each regular or periodic report, and any registration statement or prospectus filed by either HCL or HCA or any Subsidiary with any Australian or Barbados securities exchange or the United States Securities and Exchange Commission or any successor agency of any thereof, and copies of any orders in any proceedings to which HCL or HCA or any of their respective Subsidiaries is a party, issued by any governmental agency, Australian, Barbados or United States Federal or state or otherwise, having jurisdiction over HCL or HCA or any of their respective Subsidiaries, if such order would have a Guarantor Material Adverse Effect;

(e) *Officer's Certificates.* Within the periods provided in paragraphs (b) and (c) above, a certificate of the chief financial officer of HCL stating that such officer has reviewed (or caused to be reviewed) the provisions of this Agreement and setting forth: (1) the information and computations (in sufficient detail) required in order to establish whether HCL and HCA were in compliance with the requirements of **Sections 7.6** through **7.8** and **Section 7.11** at the end of the period covered by the financial statements then being furnished, and (2) whether there existed as of the date of such financial statements and whether, to such officer's knowledge, after due inquiry from the Tenant (except with regard to **Sections 7.6** through **Section 7.8** and **Section 7.11**) there exists on the date of the certificate or existed at any time during the period covered by such financial statements any Lease Default or Lease Event of Default and, if any such condition or event exists on the date of the certificate, specifying the nature and period of existence thereof and the action HCL and HCA are taking and propose to take with respect thereto;

(f) *Australian GAAP Reconciliation.* Within the periods provided in paragraphs (b) and (c) above, a certificate of the Chief Financial Officer of HCL reconciling any change in Australian GAAP adopted by HCL with U.S. GAAP which may have occurred during such period; and

(g) *Requested Information.* With reasonable promptness, such other data and information in respect of any Guarantor or its Subsidiaries as the Note Purchaser may reasonably request.

Without limiting the foregoing, HCL and HCA will permit the Note Purchaser, so long as the Note Purchaser is the holder of any Note, (or such Persons as the Note Purchaser may designate), to visit and inspect for purposes of monitoring the credit, under their guidance, any of the Properties of HCL, HCA or any Subsidiary thereof, to examine all of their books of account, records, reports and other papers, to make copies and extracts therefrom and to so discuss their respective affairs, finances and accounts with their respective officers,

employees, and, in the presence of officers of HCL and HCA, independent public accountants (and by this provision HCL and HCA authorize said accountants to so discuss with the Note Purchaser the finances and affairs of HCL and HCA and their Subsidiaries), all at such reasonable times and as often as may be reasonably requested. Any visitation or inspection shall be at the sole expense of the Note Purchaser, unless a Lease Default or Lease Event of Default shall have occurred and be continuing with respect to a default asserted in writing, in which case, any such visitation or inspection shall be at the sole expense of HCL and HCA. HCL and HCA also agree that if either thereof furnishes financial information of the scope and character contemplated by clause (b) of this **Section 7.12** to (1) any of its creditors or (2) shareholders generally more frequently than on a six fiscal month basis, then and in such event HCL or HCA, as the case may be, shall furnish the same such financial information to the Note Purchaser on such more frequent basis to such other creditor or shareholder.

The Note Purchaser agrees with the Tenant and the Guarantors that it will keep confidential in accordance with its internal policies and procedures in effect from time to time any written information with respect to any Guarantor or its Subsidiaries which is furnished pursuant to this Agreement and which is designated by a Guarantor or its Subsidiaries to the Note Purchaser in writing as confidential, *provided* that the Note Purchaser may disclose any such information (1) as has become generally available to the public (other than as a consequence of its actions) or to the Note Purchaser on a non-confidential basis from a source other than any Guarantor or its Subsidiaries or as was shown to the Note Purchaser on a non-confidential basis prior to its disclosure by a Guarantor or its Subsidiaries, (2) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over the Note Purchaser or to the National Association of Insurance Commissioners or similar organizations or their successors, (3) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation, (4) to the extent that the Note Purchaser reasonably believes it appropriate in order to protect its investment in the Notes or in order to comply with any law, order, regulation or ruling applicable to the Note Purchaser, (5) in accordance with the Note Purchaser's usual and customary procedures relating to confidentiality, to its officers, trustees, employees, auditors or counsel or to rating agencies or another holder of the Notes, (6) to Persons who are parties to similar confidentiality agreements in favor of the Guarantors, or (7) to the prospective transferee in connection with any contemplated transfer of any of the Notes by the Note Purchaser *provided* that such prospective transferee agrees in a customary and usual manner in connection with such transfers for the benefit of the Guarantors to be bound by this paragraph. By its acceptance of a Note, any transferee shall be bound by the terms of this paragraph.

*Section 7.13. Consummation of Second Transaction.* The Note Purchaser and the Guarantors agree that they shall use all reasonable commercial efforts to consummate the closing of a second lease financing (the *"Second Financing Transaction"*) of a movie theater property to be acquired by a Subsidiary of a Guarantor for an acquisition price of approximately $5,500,000, pursuant to which a Subsidiary of a Guarantor will be the lessee of such property and The Northwestern Mutual Life Insurance Company (*"NML"*) will be

the sole debt participant, with the operative documents relating to such financing to be in substantially the same form as the Operative Documents and with the Securities to be purchased by NML to finance 90% of such acquisition price to bear interest at the rate of 9.875% per annum (computed on the basis of a 360-day year of twelve 30-day months) and with such Securities to mature in twenty years from the date of issuance and to have a weighted average life to maturity (calculated in accordance with standard financial practice) of approximately 13 years. Notwithstanding the foregoing, the Note Purchaser shall have no obligation to participate in the second financing transaction if the closing does not occur on or prior to April 1, 1998.

*Section 7.14. Post Closing Undertaking.* The Guarantors will not more than 15 days following the Closing Date deliver to the Note Purchaser a complete and correct list of each of the Guarantors' Subsidiaries, showing as to each Subsidiary, the correct name thereof, the jurisdiction of its incorporation and the percentage of shares of each class of its Capital Stock or similar equity interests outstanding owned by each Guarantor and each other Subsidiary.

## SECTION 8. TENANT'S INDEMNITIES.

The Tenant hereby agrees, whether or not any of the transactions contemplated hereby shall be consummated, to perform and observe, for the benefit of the Participants and their respective successors and assigns, all of the terms and provisions of Sections 6(a) and 8 of the Lease to the full extent and in the same manner and upon the same conditions as if set forth in full herein. The indemnities contained in Sections 6(a) and 8 of the Lease, and the agreements of the Tenant in this **Section 8**, shall survive the termination of this Agreement and the other Operative Documents and shall survive the transfer of any Note or the Beneficial Interest and payment of any or all Notes and extinguishment of the Beneficial Interest.

## SECTION 9. INDEMNITIES OF THE COMPANY AND THE EQUITY INVESTOR.

Each of the Company and the Equity Investor (referred to in this Section as the "*Indemnitors*") hereby jointly and severally agrees for the benefit of the other Indemnitor, the Tenant, the Guarantors and the Note Purchaser (referred to in this Section as the "*Indemnitees*") that at all times the Premises shall be free of any Lien arising as a result of claims against any Indemnitor not related to the transactions contemplated by the Operative Documents and to any Indemnitor's interest in the Premises (other than Permitted Encumbrances) and arising as a result of any act or omission on the part of an Indemnitor and that each Indemnitor will at its own cost and expense promptly take such action as may be necessary duly to discharge any such Lien, *provided* that no such Lien need be discharged so long as it is being contested by means of a Permitted Contest. Each Indemnitor further agrees to indemnify and hold harmless the Indemnitees from and against any costs or expenses (including legal fees and expenses) incurred, in each case, as a result of the imposition or enforcement of any such Lien.

SECTION 10. MISCELLANEOUS.

*Section 10.1. Amendments.* (a) This Agreement may, from time to time and at any time, be amended, supplemented or modified, by an instrument or instruments in writing executed by the Tenant, the Guarantors and the Required Holders (and without the consent of the Company or the Equity Investor), except in the case of any amendment, supplement or modification to **Sections 1**, **2**, **3.1** through **3.4**, **3.5(a)** through **(e)**, **4**, **6** and **9**, in which case such amendment, supplement or modification to **Sections 1, 2, 3.1** through **3.4**, **3.5(a)** through **(e)**, **4**, **6** or **9**, as the case may be, shall require the consent of all of the parties hereto. Without limiting the foregoing, the parties hereto acknowledge and agree that the Required Holders in their sole discretion shall have the right to waive any Lease Default or Lease Event of Default pursuant to Section 19(a)(4) of the Lease and to make any decision with respect to the declaration or nondeclaration of a Lease Default or Lease Event of Default pursuant to said Section 19(a)(4) (or waiver thereof) and/or the waiver in any fashion whatsoever of compliance by the Tenant with one or more of the provisions contained in Section 30 of the Lease, in any such case, without the consent or concurrence of the Company or the Equity Investor.

(b) The Note Purchaser understands and agrees with the Guarantors as long as no Lease Default or Lease Event of Default has occurred and is continuing, it will not enter into any written amendment to the Mortgage without the prior written concurrence of at least one of HCL or HCC, which concurrence shall not be unreasonably withheld or delayed.

*Section 10.2. Notices.* All communications under this Agreement shall be in writing and shall be personally delivered or sent by first class mail, postage prepaid, or by prepaid courier or express service guaranteeing overnight delivery or by telecopier (with original being promptly sent as otherwise provided above), and shall be deemed to have been given (unless otherwise required by the specific provisions hereof in respect of any matter) when delivered in person or otherwise actually received.

*Section 10.3. Survival.* All warranties, representations and covenants made by any party herein or in any certificate or other instrument delivered by any party to any other party under this Agreement shall be considered to have been relied upon by such other party (excepting only that the covenants of the Guarantors shall have been deemed and have been exclusively relied upon by the Note Purchaser and not the Company or the Equity Investor) and shall survive the consummation of the transactions contemplated hereby on the Closing Date regardless of any investigation made by such other party or on behalf of such other party.

*Section 10.4. Successors and Assigns.* This Agreement shall be binding upon and shall inure to the benefit of, and shall be enforceable by, the parties hereto and their respective successors and permitted assigns including each permitted successive holder of the Beneficial Interest and each permitted successive holder of any Note issued and delivered pursuant to this Agreement or the Indenture whether or not an express assignment to any such holder of rights under this Agreement has been made.

*Section 10.5. Governing Law.* The Note Purchaser, the Equity Investor, the Company, the Tenant, HCC, HCL, and HCA have agreed that the local law of a single state should govern their respective rights and duties under this Agreement and the other Operative Documents, regardless of whether a proceeding to enforce those rights is brought in the courts of another state. The parties hereby agree that their respective rights and duties under this Agreement shall be governed by the internal laws of the Commonwealth of Massachusetts.

Any legal action or proceeding with respect to this Agreement or any document relating thereto shall be brought in the courts of the Commonwealth of Massachusetts or of the United States of America for the Eastern District of Massachusetts and in no other courts, and, by execution and delivery of this Agreement, each party hereto hereby accepts for itself and in respect of its property generally and unconditionally, the jurisdiction of the aforesaid courts. Each party hereto hereby irrevocably and unconditionally waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of *forum non conveniens* which it may now or hereafter have to the bringing of any action or proceeding in such respective jurisdiction and waives personal service of any and all process upon it. Each party hereto consents that all such service of process may be made by delivery to it at the address of such party set forth below or, in the case of HCA, HCL, the Company and the Equity Investor, to their agent referred to below at such agent's address set forth below. HCA and HCL hereby irrevocably appoint Hoyts Cinemas Corporation, with an office on the date hereof at One Exeter Plaza, Boston, Massachusetts 02116-2836, as its agent for the purpose of accepting service of any process within the Commonwealth of Massachusetts. The Company and the Equity Investor hereby irrevocably appoint Corporation Service Company with an office on the date hereof at 84 State Street, Fifth Floor, Boston, Massachusetts 02109, as their agent for the purpose of accepting service of any process within the Commonwealth of Massachusetts. Nothing contained in this **Section 10.5** shall affect the right of any party to this Participation Agreement to serve legal process in any other manner permitted by law or to bring any action or proceeding in the courts of any jurisdiction against any party or to enforce a judgment obtained in the courts of any other jurisdiction.

*Section 10.6. Counterparts.* This Agreement may be executed in any number of counterparts, each executed counterpart constituting an original but all together only one Agreement.

*Section 10.7. Headings and Table of Contents.* The headings of the sections of this Agreement and the Table of Contents are inserted for purposes of convenience only and shall not be construed to affect the meaning or construction of any of the provisions hereof.

*Section 10.8. Conditions to Purchase of Beneficial Interest by Tenant.* Anything to the contrary herein or in the other Operative Documents notwithstanding, the Tenant shall not purchase or otherwise acquire the Beneficial Interest or any part thereof unless, as a condition thereto and simultaneously therewith, the Tenant shall, by agreement or agreements in writing containing covenants substantially equal to the covenants of the Tenant set forth in the Operative Documents (a) expressly assume the Indebtedness evidenced by the

Notes as the full, recourse obligations of the Tenant, (b) grant to the Note Purchaser a first Lien on and security interest in the Premises and (c) cause the Guarantors to enter into a guaranty of the Notes and the performance by the Tenant of its obligations under such agreement or agreements, all in form and substance reasonably satisfactory to the holders of the Notes and their special counsel in their sole and absolute judgment and at the expense of the Tenant and the Guarantors.

*Section 10.9. Rent Payment Instructions.* The parties hereto understand and agree that for administrative convenience and without the effect or result of amending, altering or modifying the terms of the other Operative Documents, including, without limitation, the terms and provisions on which the Lease and the Lease Guaranty have been assigned to the Note Purchaser pursuant to the Lease Assignment and the Guaranty Assignment, it is desirable that the Tenant shall, and the Note Purchaser hereby instructs the Tenant pursuant to the Lease Assignment to, make all payments of Rent as follows: (a) prior to the occurrence of a Lease Default or Lease Event of Default, pay the entirety of the Basic Rent, the Termination Value Purchase Price, Make-Whole Amount, if any, and all other sums due and owing under the Lease (other than the Percentage Rent, if any) directly to the holders of the Notes and to pay the Percentage Rent, if any, directly to the Company and (b) following the occurrence of a Lease Default or Lease of Event of Default, all Basic Rent and all Additional Rent (including, without limitation, Percentage Rent, if any) shall be paid directly to the holders of the Notes for application in accordance with the terms of the Mortgage. In furtherance of the foregoing, the Tenant understands and agrees that prior to delivery of the Note Purchaser Notice hereinafter referred to, the Tenant shall in any and all events pay the entirety of each installment of Basic Rent and any Termination Value Purchase Price payment and any Additional Rent consisting of the Make Whole Amount, if any, as and when due under the Lease directly to the Note Purchaser in the manner and at the address provided for the Note Purchaser set forth below its signature to this Agreement and prior to the receipt of a notice from the Note Purchaser (the *"Note Purchaser Notice"*) to the effect that a Lease Default or Lease Event of Default has occurred and is continuing, shall pay any Additional Rent consisting of Percentage Rent, if any, to the Company at its address set forth below its signature to this Agreement and that from and after the date of such Note Purchaser Notice, the Tenant shall pay all Rent, including without limitation, Percentage Rent, if any, to the Note Purchaser as herein above provided and by its execution of this Agreement, the Company ratifies, confirms and agrees with the Note Purchaser and the Tenant that the Tenant shall be protected and held harmless from any liability whatsoever to the Company in making as herein provided payments to the Note Purchaser after the date of such Note Purchaser Notice and agrees that the Tenant will not be liable to the Company for making such payments as herein provided without any inquiry whatsoever or for any acts or omissions or any error of judgment or mistake of fact or law of the Tenant in connection therewith.

*Section 10.10. Certain Rights of Tenant and Guarantor Reserved.* The Company understands and agrees with the Tenant and the Guarantors that the Tenant and the Guarantors have, provided always that the Tenant is in all material respects in full compliance with the terms and provisions of the Lease and the Guarantors are in full compliance with the terms and provisions of the Lease Guaranty, reserved any rights which

they may have against the Company arising as a result of any material misrepresentation by the Company contained in **Section 3.1** of this Agreement or the breach by the Company of any of its covenants, agreements or other obligations under the Operative Documents to the extent of any actual damages suffered as a result thereof by the Tenant or the Guarantors, in each case notwithstanding the terms and provisions of the Lease, but subject always, to full compliance in all material respects by the Tenant with the terms of the Lease and full compliance by the Guarantors with the terms and provisions of the Lease Guaranty. Without limiting the foregoing, the Company agrees that it will satisfy the terms and conditions of Section 3 of the Mortgage upon the terms and conditions therein set forth upon written direction from the Tenant to do so, provided only that no Lease Default or Lease Event of Default shall the have occurred and be continuing.

*Section 10.11. Note Purchaser Consent.* It is understood and agreed by the parties hereto that if the consent of the Note Purchaser to any consent, amendment, waiver or other modification to the terms and provisions of this Agreement or any of the other Operative Documents is given by the Required Holders, then such consent of the Required Holders to such consent, amendment, waiver or other modification, as the case may be, shall be deemed and construed to constitute the consent of the Note Purchaser.

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be executed and delivered, all as of the date first above written.

TENANT

INTERSTATE THEATRES CORPORATION

By: /s/ Terence P. Moriarty
Its: Treasurer & Secretary

c/o Hoyts Cinemas Corporation
One Exeter Plaza
Boston, Massachusetts 02116-2836
Attention: Chief Financial Officer
Facsimile: (617) 421-1819

GUARANTOR

HOYTS CINEMAS CORPORATION

By: /s/ Terence P. Moriarty
Its: Treasurer & Secretary

One Exeter Plaza
Boston, Massachusetts 02116-2836
Attention: Chief Financial Officer
Facsimile: (617) 421-1819

GUARANTOR:

HOYTS CINEMAS LIMITED

By: /s/ Kevin Healy
Its: Attorney-In-Fact

Level 6
505-523 George Street
Sidney, NSW 2001, GPO Box 110
Australia
Attention: Chief Financial Officer
Facsimile: 011-61-9-273-7322

GUARANTOR:

HOYTS CINEMAS AMERICA LIMITED

By: /s/ Terence P. Moriarty
Its: Attorney-In-Fact

c/o Hoyts Cinemas Corporation
One Exeter Plaza
Boston, Massachusetts 02116-2836
Attention: Chief Financial Officer
Facsimile: (617) 421-1819

with a copy to:

Hoyts Cinemas Limited
Level 6
505-523 George Street
Sidney, NSW 2001, GPO Box 110
Australia
Attention: Chief Financial Officer
Facsimile: 011-61-9-273-7322

COMPANY

WESTBOROUGH SPE LLC

By: BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

By: /s/ F. Jan Blaustein
Its: President

2 Harrison Street, 6th Floor
San Francisco, California 94105
Attention: Chief Financial Officer
Facsimile: (415) 267-1500

EQUITY INVESTOR:

MIGNONETTE INVESTMENTS LIMITED

For F.M.C. LIMITED CORPORATE DIRECTORS

By: /s/ Derek Andrew
Its: Director
Attention: Derek Andrew
Facsimile: 1-809-494-2704

NOTE PURCHASER

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY

By /s/ Richard A. Strait
Its Vice President

720 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention: Securities Department
Facsimile: (414) 299-7124

Payments

All payments on or in respect of the Notes to be by bank wire transfer of Federal or other immediately available funds (identifying each payment as "Westborough SPE LLC, 10.25% Senior Secured Notes due November 21, 2017, PPN 95715# AA 0, principal, premium or interest") to:

Bankers Trust Company (ABA #0210-01033)
16 Wall Street
Insurance Unit, 4th Floor
New York, New York 10005

for credit to: The Northwestern Mutual Life Insurance Company
Account Number 00-000-027

Notices

All notices and communications to be addressed as first provided above, except notices with respect to payments and written confirmation of each such payment to be addressed, Attention: Securities Operations.

Name of Nominee in which Notes are to be issued: None

Taxpayer I.D. Number: 39-0509570

# EXHIBIT 11

IRS Letter 147C — EIN Confirmation for Westborough SPE LLC (Dec. 23, 2022)

IRS Department of the Treasury
Internal Revenue Service

OGDEN UT 84201-0038

000424.285966.81865.21656 1 AB 0.491 693

WESTBOROUGH SPE LLC
A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON NY 11703

000424

CUT OUT AND RETURN THE VOUCHER BELOW IF YOU HAVE AN INQUIRY OR A RESPONSE.
DO NOT USE IF YOU ARE MAKING A PAYMENT.

The IRS address must appear in the window.
0457217447
BODCD-

Use for inquiries only
Letter Number: LTR0147C
Letter Date : 2022-12-
Tax Period : 000000

*943286768*

WESTBOROUGH SPE LLC
A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON NY 11703

INTERNAL REVENUE SERVICE

OGDEN UT 84201-0038

943286768 RW WEST 00 2 000000 670 00000000000

Department of the Treasury
Internal Revenue Service

OGDEN UT 84201-0038

In reply refer to: 0457217447
Dec. 23, 2022 LTR 147C 0
94-3286768 000000 00
00005433
BODC: SB

WESTBOROUGH SPE LLC
A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON NY 11703

000424

Employer identification number: 94-3286768

Dear Taxpayer:

Thank you for your inquiry dated Dec. 14, 2022.

Your employer identification number (EIN) is 94-3286768. Please keep this letter in your permanent records. Enter your name and EIN on all federal business tax returns and on related correspondence.

You can get any of the forms or publications mentioned in this letter by visiting our website at www.irs.gov/forms-pubs or by calling 800-TAX-FORM (800-829-3676).

If you have questions, you can call us at 800-829-0115.

If you prefer, you can write to us at the address at the top of the first page of this letter.

When you write, include a copy of this letter, and provide your telephone number and the hours we can reach you in the spaces below.

Telephone number (   )____________________ Hours ____________________

Keep a copy of this letter for your records.

Thank you for your cooperation.

0457217447
Dec. 23, 2022 LTR 147C 0
94-3286768 000000 00
00005434

WESTBOROUGH SPE LLC
A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON NY 11703

Sincerely yours,

Dwayne Wilson
Department Manager, Accounts Mgmt.

Enclosures:
Copy of this letter

IRS Department of the Treasury
Internal Revenue Service

OGDEN UT 84201-0038

In reply refer to: 0457217447
Dec. 23, 2022 LTR 147C 0
94-3286768 000000 00
00005433
BODC: SB

WESTBOROUGH SPE LLC
A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON NY 11703

000424

Employer identification number: 94-3286768

Dear Taxpayer:

Thank you for your inquiry dated Dec. 14, 2022.

Your employer identification number (EIN) is 94-3286768. Please keep this letter in your permanent records. Enter your name and EIN on all federal business tax returns and on related correspondence.

You can get any of the forms or publications mentioned in this letter by visiting our website at www.irs.gov/forms-pubs or by calling 800-TAX-FORM (800-829-3676).

If you have questions, you can call us at 800-829-0115.

If you prefer, you can write to us at the address at the top of the first page of this letter.

When you write, include a copy of this letter, and provide your telephone number and the hours we can reach you in the spaces below.

Telephone number ( )____________________ Hours ____________________

Keep a copy of this letter for your records.

Thank you for your cooperation.

0457217447
Dec. 23, 2022 LTR 147C 0
94-3286768 000000 00
00005434

WESTBOROUGH SPE LLC
A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON NY 11703

Sincerely yours,

Dwayne Wilson
Department Manager, Accounts Mgmt.

Enclosures:
Copy of this letter

# EXHIBIT 12

Massachusetts Land Court Docket Materials — Town of Westborough v. Westborough SPE, LLC (No. 19 TL 000768)

CERTIFIED MAIL

LAND COURT
3 PEMBERTON SQUARE, 5TH FLOOR
BOSTON MA 02108-1700

LAND COURT
FILED

2020 OCT -2 PM 2:03

U.S. POSTAGE PITNEY BOWES
ZIP 02108 $ 006.90⁰
02 4W
0000365600 SEP 23 2020

6

7190 1706 1970 0095 9843

F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E.
Signatory & Agent for Westborough SPE LLC and Pres.
of Babcock & Brown Adminstrative Services, Inc.
151 E. 31st
Apt. 28B
New York, NY 10016

M/D

NIXIE 100 DE 1 0009/30/20

RETURN TO SENDER
ATTEMPTED - NOT KNOWN
UNABLE TO FORWARD

BC: 02108170099 *0121-04359-24-03

ANK

02108>1700
1001689509 C04

PATENT NO. 5, 901 903

FORM CML-5.2 Certified Mail Done Fast, Inc.

TEAR FROM BOTTOM UP

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by *(Printed Name)*

C. Date of Delivery

1. Article Addressed to:

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

19 TL 000768
F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E.
Signatory & Agent for Westborough SPE LLC and Pres.
of Babcock & Brown Adminstrative Services, Inc.
151 E. 31st
Apt. 28B
New York, NY ...

9290 9901 7061 9701 9117 66

2. Article Number *(Transfer from service label)*

7190 1706 1970 0095 9843

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, (facsimile) July 2015

Domestic Return Receipt

CERTIFIED MAIL

LAND COURT
3 PEMBERTON SQUARE, 5TH FLOOR
BOSTON MA 02108-1700

LAND COURT
FILED

21 SEP 24 PM 1:24

BOSTON MA 021

11 JUN 2021 PM 6 L

US POSTAGE PITNEY BOWES
ZIP 02108 $ 006.96⁰
02 4W
0000365600 JUN 11 2021

7190 1706 1970 0098 0878

F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E.
Signatory & Agent for Westborough SPE LLC and Pres.
of Babcock & Brown Adminstrative Services, Inc.
34 Stern Lane
Atherton, CA 94027

NIXIE 950 DE 1 0009/21/21

RETURN TO SENDER
NO SUCH NUMBER
UNABLE TO FORWARD

NSN

BC: 02108170099 *1821-03136-11-36

94027-542
02108>1700

PATENT NO. 5, 901 903

FORM CML-5.2 Certified Mail Done Fast, Inc.

TEAR FROM BOTTOM UP

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by *(Printed Name)*

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

19 TL 000768
F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E.
Signatory & Agent for Westborough SPE LLC and Pres.
of Babcock & Brown Adminstrative Services, Inc.
34 Stern Lane
Atherton, CA 94027

9290 9901 7061 9701 9339 04

2. Article Number *(Transfer from service label)*

7190 1706 1970 0098 0878

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, (facsimile) July, 2015

Domestic Return Receipt

FOLD BACK TO REMOVE CARD

LAW OFFICE OF
IRIS A. LEAHY

4 OPEN SQUARE WAY, SUITE 217, HOLYOKE, MA 01040
Phone: (413)322-8318 Fax: (413) 322-8661

Iris A. Leahy
attyleahy@outlook.com

Dawn E. Bloom, Of Counsel
attybloom@outlook.com

Audrey Jones, Legal Assistant
audreyj@gmail.com

COPY

September 20, 2021

Deborah J. Patterson, Recorder
Land Court, 5th Floor
Suffolk County Courthouse
Three Pemberton Square
Boston, MA 02108

**Re: Return of Service by Sheriff**
**Town of Westborough v. Westborough SPE, LLC, et al.**
**19 TL 000768**

Dear Recorder Patterson:

Please find enclosed, a Sheriff's Return of Service in the above-referenced case upon F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Administrative Services, Inc.

If you have any questions per this matter, please do not hesitate to contact this office.

Sincerely,

Iris A. Leahy, Esq.

Enclosure

[SEAL]

| CITATION BY DEPUTY SHERIFF | DOCKET NUMBER 19 TL 000768 | Commonwealth of Massachusetts Land Court Department of The Trial Court |
|---|---|---|

## RETURN OF SERVICE

(for use by person making service on behalf of Plaintiff)

I certify that on September 7, 2021 at 11:02am I served a copy of the within Citation, together with a copy of the Complaint in this case, upon the named Defendant in the following manner (see Mass. R. Civ. P. 4 (d)(1)-(5)):

by leaving at the last and usual place of abode of F. Jan Bluestein a/k/a Jan Blaustein, 34 Stern Lane, Atherton, California, 94027 with a "Limited Assistance Representation (LAR) Document.

Document placed at Front gate with knowledge of male who answered electronic intercom

DATED: September 8, 2021

SIGNATURE: x Jeffrey Pinny
San Mateo County Registered process server # 180 -

DATED: 08/17/2021 RECORDER: Deborah J. Patterson

[SEAL]

| CITATION BY DEPUTY SHERIFF | DOCKET NUMBER<br>19 TL 000768 | Commonwealth of Massachusetts<br>Land Court<br>Department of The Trial Court |
|---|---|---|

CASE NAME:

Town of Westborough, Plaintiff(s)

v.

Westborough SPE, LLC , et al., Defendant(s)

**TO THE DEFENDANT:**

F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Adminstrative Services, Inc.
34 Stern Lane
Atherton, CA 94027

COURT ADDRESS & PHONE NUMBER

Land Court
Three Pemberton Square
Room 507
Boston, MA 02108

(617)788-7470

The Plaintiff has filed a lawsuit against you in the Land Court. A copy of the Plaintiff's Complaint filed against you is attached to this Citation. **To protect your interests, you must respond to this lawsuit in writing by the DEADLINE TO ANSWER: 10/11/2021.**

If you wish to object or defend against this Complaint, you or your attorney must file a written appearance and an answer. The answer must state clearly and specifically your objection or defense to each part of the Complaint. You must sign the answer "under oath", which means that you swear or affirm the answer is true. This appearance and answer must be filed in the Land Court Recorder's Office at the Court Address shown above, or in the office of the Assistant Recorder at the Registry of Deeds where the land is located on or before the deadline. You must also serve your answer upon the Plaintiff at the service address below on or before the deadline. If you do not respond, you may lose the chance to tell your side, and the Court may decide the case against you by default and award the Plaintiff everything asked for in the Complaint.

**To the Plaintiff:**

The Court **ORDERS** the Plaintiff to serve a copy of this Citation along with a copy of the Complaint upon the above-named Defendant by deputy sheriff at least fourteen (14) days prior to the deadline to answer. Plaintiff shall give this Citation and copy of the Complaint to the appropriate deputy sheriff where the Defendant is to be served, and is responsible for paying the sheriff's fee, except in Registration/Confirmation cases. The deputy sheriff's return of service must be completed on this Citation and then the Citation shall be submitted to the Land Court.

**SO ORDERED.** **Attest:**

**By the Court:**

| WITNESS | DATE ISSUED: | RECORDER: Deborah J. Patterson |
|---|---|---|
| Hon. Gordon H. Piper, Chief Justice | 08/17/2021 | Deborah J. Patterson |

PLAINTIFF'S SERVICE ADDRESS

Iris Ann Leahy, Esq.
Law Office of Iris A. Leahy
4 Open Square Way
Suite 217
Holyoke MA 01040
(413)322-8318

## AFFIDAVIT OF SERVICE

**State of Maryland** | **County of** | **Commonwealth Of Massachusetts Court**

Case Number: 19 TL 000768

Plaintiff:
**Town Of Westborough**

vs.

Defendant:
**F. Jan Bluestein**

For:
Iris Ann Leahy, Esq.
Law Office Of Iris A. Leahy
4 Open Square Way
Suite 217
Holyoke, MA 01040

Received by Are You Being Served?, Inc. on the 26th day of August, 2021 at 12:00 pm to be served on **F. Jan Bluestein a/k/a Jan Blaustein, 34 Stern Lane, Atherton, CA 94027**.

I, Jeffrey Pink, being duly sworn, depose and say that on the **7th day of September, 2021 at 11:02 am, I:**

**SUBSTITUTE** served by delivering a true copy of the **Citation By Deputy Sheriff; Limited Assistance Representation (LAR) Document.** with the date and hour of service endorsed thereon by me, to: **"John Doe"** as **Tenant** at the address of: **34 Stern Lane, Atherton, CA 94027**, the within named person's usual place of **Abode**, who resides therein, who is fifteen (15) years of age or older and informed said person of the contents therein, in compliance with state statutes.

I Certify, Under The Laws Of The State Of California, That The Above Information Is True And Correct Under Penalty Of Perjury.

9-7-2021

**Jeffrey Pink**
180

**Are You Being Served?, Inc.**
**1325 Howard Avenue**
**PMB 507**
**Burlingame, CA 94010**
**(650) 348-7378**

Our Job Serial Number: AYB-2021001686
Ref: TOWN OF WESTBOROUGH
Service Fee: $90.00

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2d

# EXHIBIT 13

Deposition Excerpts — Denise Edwards (Mar. 31, 2025)

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

---

IN RE: WESTBOROUGH SPE LLC,

Debtor.

LOLONYON AKOUETE, CLAIMANT,

Plaintiff,

v. Case No.

JONATHAN GOLDSMITH, CHAPTER 7 23-40709-CJP

TRUSTEE OF WESTBOROUGH SPE LLC,

Defendant.

---

DEPOSITION OF

DENISE EDWARDS

DATE: Monday, March 31, 2025

TIME: 1:01 p.m.

LOCATION: Remote Proceeding

Wyandanch, NY 11798

REPORTED BY: Robert Lombardi

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF LOLONYON AKOUETE, CLAIMANT:

LOLONYON AKOUETE, PRO SE (by videoconference)

ON BEHALF OF DEFENDANT JONATHAN GOLDSMITH, CHAPTER 7 TRUSTEE OF WESTBOROUGH SPE LLC:

CHRISTINE DEVINE, ESQUIRE (by videoconference)
Nicholson Devine LLC
21 Bishop Allen Drive
Cambridge, MA 02139
christine@nicholsondevine.com
(857) 600-0508

ALSO PRESENT:

Jonathan Goldsmith, Defendant (by videoconference)

I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Ms. Devine | 9 |
| By Mr. Akouete | 128 |
| By Ms. Devine | 157 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena of Denise Edwards | 13 |
| Exhibit 2 | Document Provided by Denise Edwards Dated 3/23/2025, 4 Pages | 30 |
| Exhibit 3 | Claim for Abandoned Property Submitted to California State Controller's Office | 57 |
| Exhibit 4 | Email Thread "Jan's Conservator" 12/21/2022, 6 pages | 67 |
| Exhibit 5 | Hawaii Conservatorship Docket, 4 Pages | 76 |
| Exhibit 6 | Bill of Sale 11/21/2022, 2 Pages | 76 |
| Exhibit 7 | Email Thread "Westborough SPE LLC - New Agreement" 12/21/2022, 2 Pages | 85 |

E X H I B I T S (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | Email Thread "Resignation From Westborough SPE LLC" 3/31/2023, 1 Page | 96 |
| Exhibit 9 | Email Thread "Signed Document from Jan Blaustein Scholes" 6/29/2023, 1 Page | 98 |
| Exhibit 10 | Durable Power of Attorney | 102 |
| Exhibit 11 | Delaware Secretary of State Certificate of Cancellation | 102 |
| Exhibit 12 | Delaware Secretary of State Certificate of Correction | 104 |
| Exhibit 13 | Babcock & Brown Administrative Services Agreement Termination Notice 6/8/2009 | 107 |
| Exhibit 14 | Babcock & Brown Notice of Resignation 4/30/2011 | 109 |
| Exhibit 15 | Affidavit of Peter L. Blaustein 5/3/2023 | 113 |
| Exhibit 16 | Proof of Claim Filed by Denise Edwards 12/19/2023 | 118 |

E X H I B I T S (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 17 | Email Thread Between Matthew Morris, Lolonyon Akouete and Denise Edwards 12/20/2022, 2 Pages | 133 |
| Exhibit 18 | Text Message from Peter Blaustein, 1 Page, and Email Thread "Westborough SPE, LLC - Introductions," 2 Pages | 138 |
| Exhibit 19 | Attorney Notes from Matthew Morris, Bates SL000488 through SL000495 | 139 |
| Exhibit 20 | Email Thread Between Iris Leahy and Peter Blaustein with Affidavit Draft 3/30/2023 | 144 |
| Exhibit 21 | Email Thread between Iris Leahy and Peter Blaustein Ending 2/21/2023, 4 Pages | 153 |

D. EDWARDS

appointed conservatorship, and it shouldn't be a public" -- I'm dyslexic, so sorry for my reading -- "it shouldn't be a public record. I looked in California but could not find anything. We are waiting for Peter to confirm."

So if you knew that Jan was under conservatorship, why are you -- why are we looking for conservatorship documents on -- in California and in Arizona where she lives?

A Right, we should --

Q No, let me rephrase that. That's not a question.

A Right -- able to answer that. But yeah, right. We -- we were looking because we weren't sure that -- you know, we didn't see anything. You said it right there, it should be a public record that there's a conservatorship for her in California, in Hawaii, in -- in Hawaii, and in Arizona.

Q Okay. So is it the first time you're hearing of this conservatorship was

D. EDWARDS

in that meeting with Matthew Morris; is that correct?

A Right. I believe so. Yeah.

Q Okay. All right. So and then we've searched conservatorship in California where Jan's home state and then in Arizona where she resides at a nursing home. Did we find anything?

A Nothing. We didn't find anything.

Q Okay. Did Julia Royce find one in Hawaii where she lives?

A I saw the one. It was attached.

Q Okay. Thank you.

A Yes, it was attached.

MR. AKOUETE: And I think we're done with this exhibit. Let's move on to the next exhibit.

THE REPORTER: Would you like to mark this, Mr. Akouete?

MR. AKOUETE: Sure. Yes, please.

THE REPORTER: Okay.

MR. AKOUETE: How are you marking it? This will be the Defendant or Respondent

D. EDWARDS

Exhibit 1.

THE REPORTER: Okay. You don't want to continue the numbers that we were going?

MR. AKOUETE: Oh, yeah. I guess, yeah, we can do the same thing if that's okay with Ms. Devine.

MS. DEVINE: That's fine.

MR. AKOUETE: Okay.

THE REPORTER: Okay. So this document is Exhibit 17.

(Exhibit 17 was marked for identification.)

MR. AKOUETE: 17. Okay, thank you. So the next one -- okay.

BY MR. AKOUETE:

Q Ms. Edwards, do you remember this text message, who is it from, who is it going to, and what's the conversation?

A Yeah, that's a conversation between me and Peter. Well, a little -- almost conversation. Mostly my conversation, but that's just me reaching out to him.

D. EDWARDS

Q Yeah, why are you reaching out to him?

A I wanted to check and see if he had any additional questions and that if he was ready if he was going to allow his mother to proceed. I always ask permission because that's just something that we was taught, so, getting permission from people.

Q I notice he sent you an email address there. Did you send him the documents you sent over to you want him to give permission for Jan to sign?

A No, he didn't want -- he just provided it, his email for me.

Q So you didn't send him a copy of any of the document you sent over to Jan?

A No, he didn't want a copy of that. He just said -- told me to send it to the lady.

Q Okay.

A To the notary.

Q How do you understand his permission? Was his permission just for

D. EDWARDS

this specific document? Was just his permission just to let you work directly with Jan in recovering the funds?

A I understood it as just let me work with Jan to recover the funds since he didn't need the documents, he didn't read the documents. He said just send them directly over to the notary and to his mom, and she would review all of them and then, yeah, sign them.

Q Did he told you in any of those conversations that he was a court-appointed conservator and that he needed to sign anything that Jan signed?

A No.

MR. AKOUETE: Thank you.

Can you scroll down, Ms. Devine, please? And maybe next, one more, I think the next page. Okay, thank you.

BY MR. AKOUETE:

Q Denise, what is this email about? Can you look and identify who are the sender, receivers, who are part of it, and what is it saying?

D. EDWARDS

A This is a email from Peter to Matt, cc Julia. And --

Q Yeah. And what is it about?

A They want to see if we can have a meeting with -- with Peter.

Q And what is Peter offering?

A Okay. So "I have meaningfully advanced the case by connecting with Dyann Blaine and the former -- the former leader of Babcock & Brown and have engaged with them to proceed.

"However, we are disappointed with your actions to how my mom signed illegal contract while knowing she had a guardian and conservator. Most thought I should proceed with you -- without you -- you all. Your -- your ownership of the LLC is less than tenuous, and this degraded my trust in your operation.

"Given time and my agreement to pay you 10 percent of the cash findings, I'd like to come to an agreement for your continued participation but at a substantial lower percentage that you

D. EDWARDS

proposed to me and my mom. I propose 10 percent of cash and -- of cash, and I agree to 5 percent of RE received in a fair payment.

"If you're willing to engage, let us -- let me know."

Okay. So he wanted to make a deal. So all of the -- all this follows with whatever was happening in regards to his mother goes out the window, and he just sort of, you know, I guess he would get paid.

Q So is he reducing your compensation to 10 percent of their 1.2 million and then 5 percent for the whatever sale of the property?

A Yes.

MR. AKOUETE: Okay. Thank you.

We can move on to the next exhibit.

THE REPORTER: Hold on. Before we move on, so the document before this with all the text messages, is that going to be a separate exhibit, and then this one will be the next one, and then now the next

one?

MR. AKOUETE: I think I put them all in one PDF, so we can consider just one exhibit.

THE REPORTER: Got you. So all your documents will be Exhibit 17? Okay. Noted.

MR. AKOUETE: Oh, no. For the first one was 17, so this must be 18; right?

THE REPORTER: You just told me that you have them all in one thing and you wanted to mark them all the same, though. Do you want to mark them differently?

MR. AKOUETE: No. The first one was an email.

THE REPORTER: Yes.

MR. AKOUETE: Is an email from me and Julia, and then that's Exhibit 17. And this one is the text message and then another email from Peter; that's Exhibit 18.

(Exhibit 18 was marked for identification.)

THE REPORTER: Okay. So the text and

D. EDWARDS

the one we just saw are going to be 18?

MR. AKOUETE: Correct.

THE REPORTER: Okay. Just please be a little more clear about that, Mr. Akouete.

MR. AKOUETE: Thank you.

So this will be the Exhibit 19.

(Exhibit 19 was marked for identification.)

This is attorney's notes from Attorney Matthew Morris, the attorney that we hired to represent the entity.

BY MR. AKOUETE:

Q Denise, do you remember during the conversation with Matt he will talk with Peter and Dyann alone without us present?

A Yes.

Q Okay. So these are the notes, his notes that he was taking, and Ms. Devine subpoenaed those notes from Sherin and Lodgen, and this is the --

MR. AKOUETE: And then if you scroll down, Ms. Devine, if you will scroll down,

D. EDWARDS

you will see the Bates number on the right-hand corner of these pages.

MS. DEVINE: I just want to put my objection to the form of the question on the record.

MR. AKOUETE: Thank you. Objection noted. Can you scroll down to page 7, please?

Okay, thank you. That's page 7.

BY MR. AKOUETE:

Q So this is a -- what's the title of this page here? What's this note about?

A I guess it's -- there may be holdings.

Q No, what's the title of the notes? It has a title and a date.

A Oh. "Call with" -- that's not how you spell her last name, but okay -- Dyann.

Q Who is Dyann Blaine?

A She was -- she was the person I withdrew the company. I believe she was an attorney.

Page 141

D. EDWARDS

Q Okay.

A And she withdrew Westborough --

Q So can you please read the -- from the last two -- let me see here -- where it says -- I'm not finding what I'm looking for.

MR. AKOUETE: Can you please -- Ms. Devine, can you please scroll down a little bit more? Maybe -- okay. Maybe it's there.

BY MR. AKOUETE:

Q Yeah, from where it says "Peter is saying," can you please read those three groups of sentences?

A Where -- "Peter is saying it seems worth it to give them a small" -- what's that -- "nominal -- a small fee to get rid of them and not have to sue them, E-T, in a small timeline -- in this small timeline.

"Peter is going to connect the CUPD with Dyann Blaine, I guess, since they said she will need -- he said" -- I think -- I don't know what that was

D. EDWARDS

supposed to be -- "they will need her, and here's Dyann so that this is really the person you need to talk with for WSPE.

"Peter and Dyann to talk to Lolo to try to negotiate a fee."

Q Okay. So this sentence is saying that Peter is saying that it's worth it to just give them a small nuisance fee to get rid of them and not having to sue them, et cetera.

And then that's when Peter called us and make the offer for 10 and 5 percent; right?

MS. DEVINE: Objection to form.

THE WITNESS: You're answering the question for me.

BY MR. AKOUETE:

Q Sorry. I'm not an attorney.

A Right.

Q How does that make you feel to be treated as a nuisance to be given 10 to 5 percent to get rid of you?

A Well, I just want to say that it didn't make me feel any kind of way

D. EDWARDS

because he didn't -- I know that he didn't have any control over anything. This is a big, long process that we was going through.

You know, and if he wanted to come in and, you know, help pay for stuff, then we could have negotiated whatever had to be negotiated. You understand? But I'm not no nuisance. We -- if we wasn't here, then what -- what would have happened with this company and the money and everything?

No one would have known anything, and the town would have gotten what they wanted, and that's it. The money would be still sitting over there in the state, so.

Q So if you haven't revived the company -- are you saying that if you haven't revived the company, all of the money will be lost?

A Right. Right.

Q Okay.

A Because it had been sitting for

D. EDWARDS

years. It said that Babcock & Brown abandoned the company. When they went to go pay for the taxes or whatever, the company that had rented the -- the movie theater, Babcock & Brown had took off.

So that was it. That meant that they wasn't going to, even though Jan formed the company through them.

Q Does that ever happen to you before when you do all the paperwork, you find the claimant, and they trying to go under you and cut you out of the deal?

A It happens all the time, yeah. People do that. That happens, but not all the time, you know, not all the time.

MR. AKOUETE: Okay. Thank you.

Let's move on to the next exhibit, which will be 20, I believe.

(Exhibit 20 was marked for identification.)

Okay. So this is the exhibit we obtained a while ago when we subpoenaed the Town of Westborough. You were not part of this email, but it was an email

D. EDWARDS

from Attorney Leahy, the town attorney, to Peter asking him to draft an affidavit for him.

Ms. Devine, would you mind scrolling down to the affidavit? Yes, thank you.

BY MR. AKOUETE:

Q So let's take a look at point 6 of the affidavit. Can you please read that for us, Ms. Edwards?

A "I consented to the assistance and gave permission for Jan to sign Claim for Abandoned Property."

Q Okay. So from your understanding, when Peter consented for you to proceed in getting Jan to sign some document, did he made it clear, or do you understand that that permission was only limited to the signing of the Abandoned Property form and nothing else?

A No, I thought it was okay because he -- again, he didn't give me any follow-up like he had to sign with her or anything like that, any intention like that. He said just send her the documents

Page 146

D. EDWARDS

and whatever.

And because we had -- we was moving on -- on also recovering the property, there was no time to keep going back and forth, you know. So I just assumed, okay, since he's not reading things, not asking us -- saying he needs to sign anything, that meant that Jan could read everything that she was presented, understand it, right? And then sign off on it.

And she also had a licensed notary there who would also not let her be signing things, you know, without some understanding 'cause if she had questions, the notary would have to contact me or whatever, so. Yeah.

Q Okay. So is it correct to say that your understanding was that the goal is what he's giving permission to, the goal is to retrieve the funds --

A Yesh.

Q -- not the manner of the retrieval?

D. EDWARDS

A Right. The goal was to retrieve the funds, and if you listen -- if you look up about -- if you see about his behaviors afterwards, when he did have a little concern about it, then afterwards, you know, even with this affidavit he had a concern about it.

But then trying to tell us, oh, no, don't worry about that, we'll go ahead and settle for this, this, or this, and y'all can get whatever. You know, so, yeah --

Q Okay. So do you understand his permission to apply to this second agreement, the bill of sale, which is the --

A Everything. Every document that she signed that didn't -- that only involved us and not the attorney 'cause the attorney had us going back and forth with her for some stuff, I think the affidavit or something.

You know, so besides that, we did everything else that I had her sign

D. EDWARDS

was, like, yeah, let's get this process done so that -- and she wanted to go back to Hawaii anyway.

Q Okay. Let's -- can you please read point number 8?

A Yeah. "Lolo and Denise were aware Jan lacked capacity and that I was her legal guardian, and they did not involve me in Bill of Sale contract process or seek my consent for her to sign it."

Q Is that statement accurate, that you were aware that she was incapacitated?

A Like I said, if incapacitated just -- just means that you can't walk, then I was aware that she couldn't walk without help. As far as her speech and, you know, talking to me, and memory, and stuff like that, she had no problem with it.

So I was under -- since he gave permission for her to sign the documents to recover the funds, and the property is abandoned property, tax, mortgage, or

D. EDWARDS

unclaimed property, bankruptcy, all those things are unclaimed property, so I understood that we needed to move forward to, you know, do what we can.

You know, our mission -- our job is not to Jan or anybody like that, or even to ourselves. Our job is to the person -- or to the person, or company, or person who has lost a loved one to help them recover those funds.

And in the process, we get a service fee for helping them do that, you know.

Q Thank you. Can you please read point number 9?

A "I do not believe the bill of sale contract terms are reasonable." But I don't either, so.

Q Yeah. What are the terms of the bill of sale?

A I don't know. I have to be looking at it.

Q I think Ms. Devine and yourself went over that earlier. It was to pay

D. EDWARDS

$600,000 each end, which is purportedly represented 50 percent of the 1.2 million; is that correct?

A Yeah, half of that. The -- yeah.

Q Okay. So Jan will get $600,000, which is half, 50 percent; correct?

A She would have if that bill of sale was legitimate.

Q Okay. So can you -- so the point number 9 is saying the term of the bill of sale is -- what is this? Can you please read it again?

A "I do not believe the bill of sale contract terms are reasonable."

Q Okay.

A "I do not believe Jan is or even was the legal or rightful owner of -- of the LLC."

Q So Peter doesn't believe that $600,000 to Jan is reasonable? Is -- does he mean that is too much? Or does he mean that is too little?

MS. DEVINE: I'm going to object to

D. EDWARDS

the form of the question.

THE WITNESS: Yeah. There's no way I could know what he meant.

BY MR. AKOUETE:

Q From his email trying to reduce the amount of money you're getting, because that bill of sale is saying we shall get 50 percent, and from his email trying to reduce it to 10 to 5 percent, what does he mean by it's not reasonable from your understanding?

A The only thing is because in this bill of sale, it really only covers the state funds. And what he's talking about covers state funds and the tax overage, as well. So he's talking about two things, and this is talking about one thing.

Q So is your understanding that his statement on this only applied to the 1.2 million?

A Yeah, for the bill of sale, yeah. Because I think that was --

Q So what -- sorry.

D. EDWARDS

A -- what he was talking about.

Q Will that same principle apply to the sale of the property, too?

A To the sale? No, no, wait. Hold on. I'm mixed up. It's -- this is a little confusing because in this bill -- in this bill of sale, it feels like we were also -- we were talking about all of the money.

Like -- like the property, so you -- that would have to be cleared by Lolo to make it clear as to is this the price that she was going to get or whatever, if we was only going to split, is that the money for just for the state, or does that include once the property sells for -- once the property sells, as well, because that is a lot of money.

Q Okay. Let's move on. How much is your claim in the bankruptcy court? How much your claim is for?

A I put up 300 and something thousand, 333, something like that. I don't have it --

D. EDWARDS

Q Okay. So if you were assuming that $600,000 was what Jan is going to get and Peter said that it's not reasonable, how is that compared to your claim in the reasonability of it?

A I don't understand that question.

Q That's okay. I don't understand it, either. Let's move on to the next one.

MR. AKOUETE: Next exhibit is -- that will be 21, I believe.

(Exhibit 21 was marked for identification.)

And then that will be the last, so it won't take long.

Okay. This is the -- an email from the town attorney again to Peter, I believe -- yeah, Peter Blaustein, we obtained through discovery a while ago.

Can you please, Ms. Devine, can you please scroll down? Okay, that's good.

BY MR. AKOUETE:

Q There are, I believe, six things

D. EDWARDS

that the town is prepared to share. Can you just boil down what they're trying -- what the town attorney is saying? I know it's a lot of reading, but can you just summarize basically what they're claiming? What the town is claiming?

A I mean, I could read it. You want me to read it, or what? Where do you want me to start from?

Q Sure. Maybe just read it for yourself and just summarize the claim, what they're claiming, because it will be a lot of reading.

MR. AKOUETE: Ms. Devine, you can pull it up so she can see the entire six claims. Yeah.

THE WITNESS: What, you talking about on the six questions here?

BY MR. AKOUETE:

Q Yeah, the points. There are six points that the town attorney, Attorney Leahy, is claiming here. And he wanted to make sure that Peter is okay with him sharing that with the court. If it's easy

# EXHIBIT 14

Email Correspondence — Lenard B. Zide & Jonathan Goldsmith (Aug. 13–14, 2024)

**From:** Lenard B. Zide <zide@buttersbrazilian.com>
**Sent:** Wednesday, August 14, 2024 7:35 AM
**To:** Jonathan Goldsmith
**Subject:** Re: AI

In light of Mr. Akoute's election to go MEDIEVAL on all of us, I checked ChatGPT about your (TEE's) ability to distribute uncontested funds. Although I am CERTAIN you knew the answer anyhow, this was the response I received:

"Yes, a trustee can generally make distributions to creditors from uncontested funds while a dispute over contested funds is still being resolved, but this is subject to the approval of the bankruptcy court and the specifics of the case."

I hope this is helpful.

LZ

On Aug 13, 2024, at 8:09 AM, Jonathan Goldsmith <jgoldsmith@gkalawfirm.com> wrote:

Good morning Len:
I have now come to the realization (which I should have come to much earlier) that this guy has no interest in resolving the matter unless he gets a seven-figure settlement- which he will not get!! I offered him a settlement (subject to approval by the Bankruptcy Court) that would have provided him with many shekels, but that still wasn't enough for him. As such, I have called in some reinforcements, and we will fight the battle and win the war. There is a good possibility that he will get nothing at the end, but clearly will not get the amount that I offered as a settlement. I already have a legal fee escrow so to speak, in the tune of 1.2 million dollars remitted to me from the State of California.
By the way, I believe it is my first generative A1 Bankruptcy proceeding.
We will miss you on the 20th.
All the best,
Jon

---

**rom** Lenard B. Zide <zide@buttersbrazilian.com>
**ent** Tuesday, August 13, 2024 7:24 AM
**o** Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>
**u ect** AI

Jon: it became clear to me when I awoke this AM to Lolo's latest missive that this must be your first generative AI Bankruptcy proceeding. Should I file a Joint Assented To Motion To Establish a Legal Fee Escrow? Although I will be on vacation on the 20th, I wouldn't miss this upcoming hearing. Hope you are well. Len

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

| | |
|---|---|
| In re:<br><br>WESTBOROUGH SPE LLC,<br><br>Debtor. | Chapter 7<br>Case No. 23-40709-CJP |

**MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM FOR POST-PETITION COSTAR SUBSCRIPTION PURSUANT TO 11 U.S.C. §§ 503(b)(1)(A), 503(b) AND THE COURT'S EQUITABLE POWERS**

Plaintiff / Movant Lolonyon Akouete ("Movant"), in his capacity as a creditor and asset-recovery professional whose efforts preserved and maximized the value of the Debtor's primary asset, respectfully moves this Court for entry of an order:

(i) allowing an administrative expense claim in the amount of **$5,028.30** (or such other amount as the Court finds proved) for post-petition CoStar subscription charges incurred by Movant to obtain market data and comparables for the 231 Turnpike Road property; and

(ii) directing the Chapter 7 Trustee to pay that amount forthwith from estate funds (including, if appropriate, the funds held from the California State Controller), with priority under 11 U.S.C. § 507(a)(2).

In support, Movant states as follows:

## I. JURISDICTION AND STATUTORY BASIS

1. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (O).
2. The statutory basis for the relief requested includes 11 U.S.C. §§ 503(b)(1)(A), 503(b), 507(a)(2) and 105(a), as well as the Court's inherent equitable powers to prevent unjust enrichment and to recognize extraordinary creditor contributions that preserve the estate.

## II. NARROW SCOPE OF THIS MOTION

3. This motion **does not** seek administrative-expense treatment for (a) Movant's pre-petition retainer paid to Sherin & Lodgen LLP, or (b) any other pre-petition expense.
4. Instead, Movant seeks allowance of a **single, discrete post-petition cost**—his CoStar real-estate data subscription—for the limited period from October 3, 2024 through February 5, 2025, totaling **approximately $5,028.30** (five monthly invoices including tax), as evidenced by the attached invoices (collectively, "CoStar Charges").
5. The Trustee does not dispute that Movant paid these invoices personally, nor that Movant used the CoStar data to challenge the originally proposed undervalued settlement and to generate comparable-sale and valuation evidence for the property at 231 Turnpike Road.

The only question is legal characterization: whether these post-petition costs qualify as administrative expenses.

## III. FACTUAL BACKGROUND RELEVANT TO THIS MOTION

6. Movant incorporates by reference the detailed factual background previously set out at paragraphs 64–154 of his pleadings in Adversary Proceeding No. 25-04033-CJP, including:

a. The 1997 sale-leaseback structure, formation of Westborough SPE LLC, and the role of Babcock & Brown Administrative Services, Inc. as Manager;

b. The Town's deliberate choice to pursue **tax-title foreclosure** instead of eminent domain despite a 2018 appraisal valuing the property at approximately **$5,500,000 - $6,000,000** and a $6 million appropriation to pay just compensation;

c. The Town's use of false "unknown owner" affidavits, defective service, and statutory non-compliance with Massachusetts service provisions for withdrawn foreign entities, resulting in a judgment transferring a multi-million-dollar asset for **zero consideration**;

d. Movant's and Denise Edwards' later discovery and revival of Westborough SPE LLC and their identification of approximately **$1.293 million** in escheated funds traceable to Mignonette/Westborough in the custody of the California State Controller;

e. The coordinated interference by Peter Blaustein, Dyann Blaine, Town counsel, and others to displace Movant, undermine his management authority, and divert recovery efforts;

f. The involuntary Chapter 7 filing on August 31, 2023, the Trustee's initial pursuit of a **$2.5 million** sale and Rule 9019 settlement heavily favoring the Town and preferred bidders, and the later emergence of higher valuations and offers, including Ferris's **$3,502,702** "compromise" offer and a subsequent **$5,000,000** offer from Connect United.

7. Against this backdrop, Movant subscribed to CoStar post-petition to obtain **objective market comparables** and industry data necessary to demonstrate that:

a. The Town–LAX/Ferris settlement was grossly undervaluing the property;

b. The estate's only significant hard asset could command a far higher price in an open, properly marketed sale than $2.5 million; and

c. The Trustee's position that no current appraisal or market testing was needed was untenable in light of readily available market data.

8. Movant's CoStar subscription generated concrete outputs—comparable sales, market rents, and capitalization benchmarks—that he integrated into emails, objections, and settlement analyses presented to the Trustee, Town counsel, and the Court. Those data points:

a. Informed Movant's September 5, 2024 email to the Trustee and Town, setting out a reasoned valuation framework and proposing a **$3,502,702** fair price based on after-repair value (ARV), loan-to-value standards, and repair costs;

b. Directly elicited David Ferris's September 6, 2024 email offering to increase his purchase price to **$3,502,702** "in the spirit of compromise" if Movant would cease challenges—an admission that higher value was in fact available;

c. Contributed to the Trustee's subsequent decision to obtain a formal appraisal, which returned a value of **$4,790,000**, undermining the proposed $2.5 million "settlement" and leading to its withdrawal; and

d. Helped validate and support a later **$5,000,000** offer from Connect United, confirming that open-market testing supported a price far exceeding the Town's preferred deal.

9. But for Movant's CoStar-supported efforts, the estate would likely have proceeded under a settlement that treated the property as worth roughly **half** of its appraised and market-tested value. Movant's work thereby preserved millions of dollars in equity that would otherwise have been irretrievably lost.
10. The CoStar Charges are not vague "preparation" costs or generalized litigation fees. They are line-item, post-petition, out-of-pocket expenses paid by Movant to secure professional-grade market data necessary to expose an undervalued sale and force adherence to the Trustee's statutory duty to maximize value.

## IV. LEGAL STANDARD

### A. Section 503(b)(1)(A): Actual, Necessary Costs of Preserving the Estate

11. Section 503(b)(1)(A) requires allowance of "the actual, necessary costs and expenses of preserving the estate" as administrative expenses.
12. Courts routinely hold that an expense is "actual" and "necessary" if:

(a) it arises from a post-petition transaction; and
(b) it confers a direct and demonstrable benefit upon the estate as a whole (not merely upon the claimant).

13. Even where a creditor is not formally retained by the estate, courts have allowed administrative expenses when the creditor's post-petition efforts preserve estate value or prevent waste, especially when the estate acquires the benefit without paying for it.

### B. Section 503(b) and Substantial Contribution in Chapter 7 – Minority View

14. Section 503(b) provides that, after notice and a hearing, "there shall be allowed administrative expenses, including" the enumerated categories that follow. Congress's use of "including" has been interpreted to make the list of nine categories non-exclusive.
15. While § 503(b)(3)(D) expressly refers to "substantial contribution" expenses in cases under **chapter 9 or 11**, a minority of courts have held that, in **extraordinary Chapter 7 circumstances**, similar contributions can be treated as administrative expenses under the general authority of § 503(b) and § 503(b)(1)(A). That line of authority is exemplified by:

a. **In re Connolly North America, LLC, 802 F.3d 810 (6th Cir. 2015)** – where unsecured creditors in a Chapter 7 were allowed administrative-expense reimbursement for successfully litigating the removal of a misfeasant Chapter 7 trustee. The Sixth Circuit held that the "including" language of § 503(b) permits recognition of administrative expenses not expressly listed where creditors provide an extraordinary benefit to the estate.

b. **In re Javed, 592 B.R. 615 (Bankr. D. Md. 2018)** – recognizing that in "rare" Chapter 7 cases, creditor actions that significantly benefit the estate can justify administrative priority, even though § 503(b)(3)(D) is textually limited to Chapters 9 and 11.

c. **In re Maqsoudi, 566 B.R. 40 (Bankr. C.D. Cal. 2017)**; **In re Maust Transp., Inc., 589 B.R. 887 (Bankr. W.D. Wash. 2018)**; and **In re Thacker, 2020 WL 4000864 (Bankr. N.D. Fla. May 28, 2020)** – each recognizing that Connolly's reasoning allows Chapter 7 courts, in exceptional circumstances, to grant administrative-expense status where the creditor's efforts substitute for or supplement the trustee's duties and confer a clear estate-wide benefit.

16. Although other courts, including **In re Concepts America, Inc., 625 B.R. 881 (Bankr. N.D. Ill. 2021)**, disagree and would limit substantial-contribution claims strictly to Chapters 9 and 11, Movant respectfully submits that this Court should follow the Connolly line where, as here, the facts are extreme and the estate has accepted a substantial benefit from a creditor's work.
17. Moreover, even courts skeptical of substantial-contribution claims in Chapter 7 recognize that § 503(b)(1)(A) remains a flexible tool: if a creditor's post-petition expenditures directly preserve or enhance estate value in situations where the trustee did not act, those "actual, necessary costs of preserving the estate" may be compensated notwithstanding the Chapter 9/11 limitation in § 503(b)(3)(D).

**C. Benefit Must Be Direct and Demonstrable – Movant Exceeds Any Standard**

18. Courts distinguish between efforts that "incidentally" benefit the estate and those that provide a **direct, demonstrable benefit**. Under both the stricter Third/Tenth Circuit approach (Lebron, Lister) and the more objective Fifth/Eleventh Circuit approach (DP Partners, Celotex), the focus is on whether the estate actually gained value, not the creditor's motives.
19. Here, Movant's CoStar-supported work did far more than incidentally benefit the estate:

a. It revealed that the proposed $2.5 million settlement grossly undervalued the property;

b. It directly produced a higher purchase offer from Ferris ($3,502,702);

c. It prompted the Trustee to obtain an appraisal confirming a value in the $4.7–$4.9 million range; and

d. It helped clear the way for a $5,000,000 offer, demonstrating that legitimate market testing supported a much higher price.

20. Whatever standard the Court applies—Connolly's flexible one or the more restrictive "transcend self-interest" test—Movant's actions qualify. He did the market-testing work the Trustee refused to do, and the entire creditor body stands to benefit from the multi-million-dollar delta between the original settlement and current value.

## V. APPLICATION OF LAW TO THE COSTAR CHARGES

21. The CoStar Charges satisfy § 503(b)(1)(A):

a. **Post-petition:** All invoices submitted (October 3, 2024; November 5, 2024; December 4, 2024; January 6, 2025; February 5, 2025) are post-petition and are incurred by Movant personally.

b. **Actual, necessary costs:** CoStar is a professional market-data platform widely used by institutional investors, lenders, and asset managers. In this case, it was the only practical way for Movant, as a pro se creditor, to obtain reliable comparable-sale and valuation data to challenge the Trustee's undervalued settlement.

c. **Preservation and maximization of estate value:** The data directly led to higher offers and an appraisal aligning with Movant's analysis, preserving millions in equity that would otherwise have been lost under a $2.5 million deal.

22. This is not a case of a "stalking horse" bidder seeking compensation for a pre-petition deposit (as in Upstate/Kidron-type situations) or of a creditor incurring general litigation fees. Movant's CoStar Charges are:

a. Limited in amount (approximately $5,028.30);
b. Narrow in scope (five months of subscription, now concluded); and
c. Directly traceable to specific, quantifiable benefits for the estate (higher offers, new appraisal, withdrawal of undervalued settlement).

23. Under Connolly and its progeny, this is precisely the type of "atypical" Chapter 7 case where creditors had to step into the breach left by a Trustee who initially refused to obtain an appraisal or conduct adequate market testing. Movant's CoStar work served as a substitute for the Trustee's own duty to maximize value.
24. Separately, even if the Court declines to label this as "substantial contribution" in the technical § 503(b)(3)(D) sense, the CoStar Charges still qualify as "actual, necessary costs and expenses of preserving the estate" under § 503(b)(1)(A). The Bankruptcy Code does not require that the person who incurs such costs be formally retained by the estate before reimbursement is allowed, particularly where the estate knowingly accepts the benefit.
25. Equity and the policy underlying administrative expenses support allowance. It would be fundamentally unfair, and contrary to the purposes of § 503(b), for the estate to enjoy the benefit of Movant's work in forcing a multi-million-dollar upward correction of value while refusing to reimburse the relatively minor data costs required to achieve that result.

## VI. RELIEF REQUESTED

26. Movant respectfully requests that the Court enter an order:

a. Allowing an administrative expense claim in favor of Movant in the amount of **$5,028.30**, representing the CoStar Charges incurred post-petition;

b. Directing the Chapter 7 Trustee to pay that amount promptly from estate funds, including, if necessary, from the funds currently held that were received from the California State Controller, subject to reservation of all parties' rights regarding the ultimate ownership of those funds; and

c. Granting such other and further relief as the Court deems just and proper.

DATED: December 11, 2025, Respectfully submitted:

By creditor,

Lolonyon Akouete
800 Red Mills Rd
Wallkill NY 12589
info@smartinvestorsllc.com
(443) 447-3276

Case 1:26-cv-10037-WGY Document 13-4 Filed 02/11/26 Page 800 of 840

**From:** Jonathan Goldsmith
**Sent:** riday, August 2, 2024 12:3 M
**To:** sgordon@gordon irm.com
**Subject:** Westborough

Good morning Steve:
I just wanted to get your uick thoughts on an issue regarding this case. As you are aware, Lolo files pleadings and emails me on an almost a daily basis. His emails today focus on my failure to have obtained an appraisal for the real estate. I do believe the grounds proffered in the Motion support the settlement without a need for a current appraisal. I'm wondering, however, if you think it is necessary for me to obtain one to help bolster the settlement.

Jonathan R. Goldsmith, Es .
GOLDSMITH, ATZ ARGENIO, P.C.
13 0 Main Street, Suite 1 0
Springfield, MA 01103
Tel. (413) 4 -0 00
Fa (413) 81-3 80

PLEASE NOTE: This transmission and any attachments contain confidential or privileged information from Goldsmith, atz Argenio, P.C. This information is intended to be for the use of the addressed individual(s) or entity. If you are not the intended recipient, be aware that any disclosure, printing, copying, distribution or use of the contents of this information is prohibited. If you have received this transmission in error, please notify us by telephone or by return email immediately.

Case 23-40709 Doc 1063-4 Filed 02/11/26 13:28:48 Page 80 of 840
Document Page 81 of 240

**From:** te hen Gordon <sgordon@gordon irm.com>
**Sent:** riday, August 2, 2024 2:13 M
**To:** Jonathan Goldsmith
**Subject:** R : Westborough

Jon-
Lolo emailed me yesterday to see if N&G received an appraisal (from the Town) in discovery. I have them checking. Appraisal is an issue. This is not a straight up sale. You're settling with the Town and Ferris and (a lesser issue) MobileStreet. You're not just selling a piece of property. Nonetheless, if the property is worth 5 Million or more, maybe you should think about fighting with everyone rather than settling. But if the appraisal were even 3.5 million, best to settle as the additional benefit of settling is clearly worth a million dollars. What is the assessed value? Let me see if N&G has an appraisal. Ferris fought to buy for 2.8 million, so clearly he thought there was value over and above that. But would you be chasing your (the estate's) tail. If Ferris had a valid pre-petition contract to buy for 2.8 Million, and you sell for 5 million, his executory contract rejection damages will be the difference between 2.8 million and the amount above that that you sell the property for. So, Ferris' rejection claim, in a 100 case, consumes all of your sale proceeds above 2.8 million (hence the chasing of the tail). Still, the settlement will fly through if an appraisal comes in anywhere under 3 million. Let's see if N&G has an appraisal. Worth asking Roger if he has one?

Stephen F. Gordon
The Gordon Law Firm LLP
River Place
57 River Street
Wellesley, MA 02481
Main: 617-261-0100
Direct: 617-456-1270
Sgordon@gordonfirm.com
www.GordonFirm.com

---

**From:** Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>
**Sent:** Friday, August 2, 2024 12:38 PM
**To:** sgordon@gordonfirm.com
**Subject:** Westborough

Good morning Steve:
I just wanted to get your quick thoughts on an issue regarding this case. As you are aware, Lolo files pleadings and emails me on an almost a daily basis. His emails today focus on my failure to have obtained an appraisal for the real estate. I do believe the grounds proffered in the Motion support the settlement without a need for a current appraisal. I'm wondering, however, if you think it is necessary for me to obtain one to help bolster the settlement.
Jonathan R. Goldsmith, Esq.
GOLDSMITH, KATZ & ARGENIO, P.C.

1350 Main Street, Suite 1505
Springfield, MA 01103
Tel. (413) 747-0700
Fax (413) 781-3780

PLEASE NOTE: This transmission and any attachments contain confidential or privileged information from Goldsmith, Katz & Argenio, P.C. This information is intended to be for the use of the addressed individual(s) or entity. If you are not the intended recipient, be aware that any disclosure, printing, copying, distribution or use of the contents of this information is prohibited. If you have received this transmission in error, please notify us by telephone or by return email immediately.

Gmail **Lolonyon Akouete <info@smartinvestorsllc.com>**

---

## WSPE - Compromise

1 message

---

**David Ferris** <david@ferrisdevelopment.com> Fri, Sep 6, 2024 at 1:48 PM
To: Lolonyon Akouete <info@smartinvestorsllc.com>, Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>, "Roger L. Smerage" <rsmerage@k-plaw.com>
Cc: "USTPRegion01.WO.ECF@usdoj.gov" <USTPRegion01.WO.ECF@usdoj.gov>, Brian Riley <briley@k-plaw.com>, "Carey, Paul W." <pcarey@mirickoconnell.com>, Stephen Gordon <sgordon@gordonfirm.com>, "Jeffrey T. Blake" <jblake@k-plaw.com>, "Lenard B. Zide" <zide@buttersbrazilian.com>, "Matthew A. Morris" <mmorris@sherin.com>, "Brian R. Charville" <bcharville@ferrisdevelopment.com>

Lolo, Trustee Goldsmith & Mr. Smerage,

In the spirit of compromise, I would be willing to meet your request Lolo and increase my offer to $3,502,702 provided you discontinue all these challenges and unnecessary motions. The property has been tied up long enough and needs a certain outcome. If the remaining parties can come to agreement I can formalize a new offer to the Trustee and agree to close in 30 days.

I would like this matter to get closure for all involved.

Thank you,

David M. Ferris

---

**From:** Lolonyon Akouete <info@smartinvestorsllc.com>
**Sent:** Thursday, September 5, 2024 7:47 AM
**To:** Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>; Roger L. Smerage <rsmerage@k-plaw.com>
**Cc:** USTPRegion01.WO.ECF@usdoj.gov; Brian Riley <briley@k-plaw.com>; Carey, Paul W. <pcarey@mirickoconnell.com>; Stephen Gordon <sgordon@gordonfirm.com>; Jeffrey T. Blake <jblake@k-plaw.com>; Denise Edwards <deniseedwards818@yahoo.com>; Scott A. Schlager <sas@natgolaw.com>; Mary Wolohan <trusteedocs1@gkalawfirm.com>; Alvin Nathanson <asn@natgolaw.com>; Jose Centeio <jcc@natgolaw.com>; Lenard B. Zide <zide@buttersbrazilian.com>; Matthew A. Morris <mmorris@sherin.com>; Darin Clagg <Dclagg@gmail.com>; Dyann Blaine <dyann.blaine@gmail.com>; David Ferris <david@ferrisdevelopment.com>; Abromowitz, David M. <dabromowitz@goulstonstorrs.com>; Durga Nagalla <durganagalla@gmail.com>; Allen Hight <reomanagement11@gmail.com>; Peter Blaustein <pblaustein@gmail.com>; Julia C. Royce <JCRoyce@sherin.com>; janscholes2@gmail.com; Brian R. Charville <bcharville@ferrisdevelopment.com>; venkatesh mohanraj <venki.mohanraj@gmail.com>; mark.lichtenstein@akerman.com; samual.miller@akerman.com; Walter Horst <walter.horst@babcockbrown.com>; sharlene.harrison-carera@akerman.com; Ronan, Gary M. <GRonan@goulstonstorrs.com>; EEnglander@ec-attorneys.com; Christine Devine <christine@nicholsondevine.com>

Case 23-40709 Doc 623-4 Filed 02/11/26 Page 801 of 840

**Subject:** Request for Agreement on Property Valuation to Expedite Settlement Hearing

Dear Trustee Goldsmith and Town of Westborough,

I hope this email finds you well.

As we approach the scheduled evidentiary hearing on September 17, 2024, regarding the settlement for the property at 231 Turnpike Road, Westborough, I would like to propose an agreement on the property's valuation to streamline the proceedings and save time. I believe resolving this issue in advance will help focus the court's attention on the substantive aspects of the settlement proposal.

During the discovery process, several critical facts came to light that further support the need for a fair valuation:

1. **Jonathan Steinberg, Chief Assessor of the Town of Westborough**, recommended not setting a base price in the RFP, allowing the market to define itself through offers. The offers received from the RFP process ranged from $2,500,000 to $7,942,000.
2. **Lax Media's Proposal and Tax Impact**: The tax assessor estimated that Lax Media's proposal would bring the property's assessed value to $9,329,750, which is similar to the assessed value of $9,264,800 in 2016. Lax Media's estimated repair costs are $3,490,110.
3. **Massachusetts Department of Revenue Assessment Ratio**: According to the Massachusetts Department of Revenue (LA19 Report - Fiscal Year 2024), the assessment ratio for commercial property in the Town of Westborough is 0.91, meaning that the assessed value is approximately 9% below market value. Given this fact, it's clear that the assessed value does not reflect the true market value of the property.
4. **Fair Market Value and Offer Calculation**: Since the town selected Lax Media for other advantageous purposes rather than establishing a fair market value through an appraisal, it would be appropriate to renegotiate the selling price. Based on industry standards, most lenders will not refinance a loan at more than 75% of a property's after-repair value (ARV). Using this formula:

   **$9,329,750 (ARV) x 0.75 (75% of market value) - $3,490,110 (Repairs) = $3,502,702 (Fair Offer)**

   Lax Media's offer, if calculated according to standard market practice, should reflect a fairer price closer to $3,502,702. It is evident that the current offer is significantly undervaluing the property.

Given these facts, I believe it would be appropriate for the town and the trustee to either renegotiate the purchase price with Lax Media or consider returning the property to the debtor for a proper sale. This would ensure a more accurate reflection of the property's market value and protect the rights of creditors.

I would like to propose that we reach an agreement on the valuation before the hearing to expedite the resolution. If both parties can agree, we can file a joint stipulation with the court, focusing the hearing on the settlement terms rather than disputing the property's value.

I appreciate your consideration of this request and look forward to your response.

Best regards,

Lolonyon Akouete
800 Red Milles Rd
Wallkill, NY 12589
info@smartinvestorsllc.com
(443) 447-3276

**Invoice** **Page 1 of 2**

CoStar™ 501 S 5th Street
Richmond, VA 23219

| | |
|---|---|
| Invoice Number | 121316317 |
| Account #/Location ID | 283095531 |
| Invoice Date | 10/03/2024 |
| CoStar Federal Tax ID | 52-2134617 |
| Payment Terms | Net 30 |
| Due Date | 11/02/2024 |
| Service Period | 09/30/2024 to 10/31/2024 |
| | |
| **Invoice Amount** | **USD 1,032.30** |

LOLONYON AKOUETE
SMART INVESTORS LLC
800 RED MILLS RD
WALLKILL, NY 12589

Pay by credit card or checking account online by registering at **CoStar.BillTrust.com**

Use your personalized **Enrollment Token** below.

## CURRENT INVOICE See the following page(s) for detail

| | |
|---|---|
| CoStar Suite | USD 955.83 |
| Sub-Total | USD 955.83 |
| Tax | USD 76.47 |
| **Current Invoice Total** | **USD 1,032.30** |

For questions about your bill, please call us at 800-894-4720.
Email: Billing@costar.com
Please ensure that your account is kept current to avoid an interruption of service.
Office Hours: Monday - Friday 9:00 AM - 8:00 PM EST

TEAR HERE **REMITTANCE DOCUMENT - Please Include With Your Payment** TEAR HERE

Account #/Location ID: 283095531

CoStar™
LOLONYON AKOUETE
SMART INVESTORS LLC
800 RED MILLS RD
WALLKILL, NY 12589

| | |
|---|---|
| Invoice Number: | 121316317 |
| Invoice Date: | 10/03/2024 |
| Payment Due Date: | 11/02/2024 |
| Current Invoice Amount: | USD 1,032.30 |
| Total Balance: | USD 1,032.30 |

| | |
|---|---|
| **Amount Enclosed:** | |

**REMITTANCE INSTRUCTIONS**

**Make EFT and Credit Card payments online:**

Log on to costar.billtrust.com
Use enrollment token SFW HQF DFB

**Make Checks Payable and Send To:**

COSTAR REALTY INFORMATION, INC.
2563 Collection Center Dr
Chicago, IL 60693

00000012131631700000103230

| Account #/Location ID | Invoice Date | Invoice Number | Federal Tax ID | Page |
|---|---|---|---|---|
| 283095531 | 10/03/2024 | 121316317 | 52-2134617 | 2 of 2 |

**COSTAR SUITE**

| SITE ADDRESS | SUBMARKET | CONTRACT # | BILLING PERIOD | SUBTOTAL | TAX | AMOUNT |
|---|---|---|---|---|---|---|
| 800 Red Mills Rd, Wallkill, NY, 12589 | | 1192600 | 09/30/2024 to 09/30/2024 | 30.83 | 2.47 | 33.30 |
| 800 Red Mills Rd, Wallkill, NY, 12589 | | 1192600 | 10/01/2024 to 10/31/2024 | 925.00 | 74.00 | 999.00 |
| | | **CoStar Suite** | | **955.83** | **76.47** | **1,032.30** |

| | | | |
|---|---|---|---|
| **Current Invoice Total (USD):** | **955.83** | **76.47** | **1,032.30** |

000000121316317000000103230

**Invoice** **Page 1 of 2**

CoStar™
501 S 5th Street
Richmond, VA 23219

| | |
|---|---|
| Invoice Number | 121449292 |
| Account #/Location ID | 283095531 |
| Invoice Date | 11/05/2024 |
| CoStar Federal Tax ID | 52-2134617 |
| Payment Terms | Net 30 |
| Due Date | 12/05/2024 |
| Service Period | 11/01/2024 to 11/30/2024 |
| | |
| **Invoice Amount** | **USD 999.00** |

LOLONYON AKOUETE
SMART INVESTORS LLC
800 RED MILLS RD
WALLKILL, NY 12589

Pay by credit card or checking account online by registering at **CoStar.BillTrust.com**

Use your personalized **Enrollment Token** below.

## CURRENT INVOICE
See the following page(s) for detail

| | |
|---|---|
| CoStar Suite | USD 925.00 |
| Sub-Total | USD 925.00 |
| Tax | USD 74.00 |
| **Current Invoice Total** | **USD 999.00** |

For questions about your bill, please call us at 800-894-4720.
Email: Billing@costar.com
Please ensure that your account is kept current to avoid an interruption of service.
Office Hours: Monday - Friday 9:00 AM - 8:00 PM EST

TEAR HERE **REMITTANCE DOCUMENT - Please Include With Your Payment** TEAR HERE

Account #/Location ID: 283095531

CoStar™
LOLONYON AKOUETE
SMART INVESTORS LLC
800 RED MILLS RD
WALLKILL, NY 12589

| | |
|---|---|
| Invoice Number: | 121449292 |
| Invoice Date: | 11/05/2024 |
| Payment Due Date: | 12/05/2024 |
| Current Invoice Amount: | USD 999.00 |
| Total Balance: | USD 999.00 |
| **Amount Enclosed:** | |

### REMITTANCE INSTRUCTIONS

**Make EFT and Credit Card payments online:**

Log on to costar.billtrust.com
Use enrollment token SFW HQF DFB

**Make Checks Payable and Send To:**

COSTAR REALTY INFORMATION, INC.
2563 Collection Center Dr
Chicago, IL 60693

| Account #/Location ID | Invoice Date | Invoice Number | Federal Tax ID | Page |
|---|---|---|---|---|
| 283095531 | 11/05/2024 | 121449292 | 52-2134617 | 2 of 2 |

**COSTAR SUITE**

| SITE ADDRESS | SUBMARKET | CONTRACT # | BILLING PERIOD | SUBTOTAL | TAX | AMOUNT |
|---|---|---|---|---|---|---|
| 800 Red Mills Rd, Wallkill, NY, 12589 | | 1192600 | 11/01/2024 to 11/30/2024 | 925.00 | 74.00 | 999.00 |
| | | **CoStar Suite** | | **925.00** | **74.00** | **999.00** |

| | | | |
|---|---|---|---|
| **Current Invoice Total (USD):** | **925.00** | **74.00** | **999.00** |

000000121449292000000099900

CoStar™
501 S 5th Street
Richmond, VA 23219

**Invoice** **Page 1 of 2**

| | |
|---|---|
| Invoice Number | 121557277 |
| Account #/Location ID | 283095531 |
| Invoice Date | 12/04/2024 |
| CoStar Federal Tax ID | 52-2134617 |
| Payment Terms | Net 30 |
| Due Date | 01/03/2025 |
| Service Period | 12/01/2024 to 12/31/2024 |
| | |
| **Invoice Amount** | **USD 999.00** |

LOLONYON AKOUETE
SMART INVESTORS LLC
800 RED MILLS RD
WALLKILL, NY 12589

Pay by credit card or checking account online by registering at **CoStar.BillTrust.com**

Use your personalized **Enrollment Token** below.

## CURRENT INVOICE See the following page(s) for detail

| | |
|---|---|
| CoStar Suite | USD 925.00 |
| Sub-Total | USD 925.00 |
| Tax | USD 74.00 |
| **Current Invoice Total** | **USD 999.00** |

For questions about your bill, please call us at 800-894-4720.
Email: Billing@costar.com
Please ensure that your account is kept current to avoid an interruption of service.
Office Hours: Monday - Friday 9:00 AM - 8:00 PM EST

TEAR HERE **REMITTANCE DOCUMENT - Please Include With Your Payment** TEAR HERE

Account #/Location ID: 283095531

CoStar™
LOLONYON AKOUETE
SMART INVESTORS LLC
800 RED MILLS RD
WALLKILL, NY 12589

| | |
|---|---|
| Invoice Number: | 121557277 |
| Invoice Date: | 12/04/2024 |
| Payment Due Date: | 01/03/2025 |
| Current Invoice Amount: | USD 999.00 |
| Total Balance: | USD 999.00 |
| **Amount Enclosed:** | |

**REMITTANCE INSTRUCTIONS**

**Make EFT and Credit Card payments online:**

Log on to costar.billtrust.com
Use enrollment token SFW HQF DFB

**Make Checks Payable and Send To:**

COSTAR REALTY INFORMATION, INC.
2563 Collection Center Dr
Chicago, IL 60693

0000001215572770000009900

| Account #/Location ID | Invoice Date | Invoice Number | Federal Tax ID | Page |
|---|---|---|---|---|
| 283095531 | 12/04/2024 | 121557277 | 52-2134617 | 2 of 2 |

**COSTAR SUITE**

| SITE ADDRESS | SUBMARKET | CONTRACT # | BILLING PERIOD | SUBTOTAL | TAX | AMOUNT |
|---|---|---|---|---|---|---|
| 800 Red Mills Rd, Wallkill, NY, 12589 | | 1192600 | 12/01/2024 to 12/31/2024 | 925.00 | 74.00 | 999.00 |
| | | **CoStar Suite** | | **925.00** | **74.00** | **999.00** |

| | | | |
|---|---|---|---|
| **Current Invoice Total (USD):** | **925.00** | **74.00** | **999.00** |

0000001215572770000099900

**Invoice** **Page 1 of 2**

CoStar™
501 S 5th Street
Richmond, VA 23219

| | |
|---|---|
| Invoice Number | 121664546 |
| Account #/Location ID | 283095531 |
| Invoice Date | 01/06/2025 |
| CoStar Federal Tax ID | 52-2134617 |
| Payment Terms | Net 30 |
| Due Date | 02/05/2025 |
| Service Period | 01/01/2025 to 01/31/2025 |
| | |
| **Invoice Amount** | **USD 999.00** |

LOLONYON AKOUETE
SMART INVESTORS LLC
800 RED MILLS RD
WALLKILL, NY 12589

Pay by credit card or checking account online by registering at **CoStar.BillTrust.com**

Use your personalized **Enrollment Token** below.

## CURRENT INVOICE See the following page(s) for detail

| | |
|---|---|
| CoStar Suite | USD 925.00 |
| Sub-Total | USD 925.00 |
| Tax | USD 74.00 |
| **Current Invoice Total** | **USD 999.00** |

For questions about your bill, please call us at 800-894-4720.
Email: Billing@costar.com
Please ensure that your account is kept current to avoid an interruption of service.
Office Hours: Monday - Friday 9:00 AM - 8:00 PM EST

TEAR HERE **REMITTANCE DOCUMENT - Please Include With Your Payment** TEAR HERE

Account #/Location ID: 283095531

CoStar™
LOLONYON AKOUETE
SMART INVESTORS LLC
800 RED MILLS RD
WALLKILL, NY 12589

| | |
|---|---|
| Invoice Number: | 121664546 |
| Invoice Date: | 01/06/2025 |
| Payment Due Date: | 02/05/2025 |
| Current Invoice Amount: | USD 999.00 |
| Total Balance: | USD 999.00 |

| | |
|---|---|
| **Amount Enclosed:** | |

**REMITTANCE INSTRUCTIONS**

**Make EFT and Credit Card payments online:**

Log on to costar.billtrust.com
Use enrollment token SFW HQF DFB

**Make Checks Payable and Send To:**

COSTAR REALTY INFORMATION, INC.
2563 Collection Center Dr
Chicago, IL 60693

000000121664546000000099900

| Account #/Location ID | Invoice Date | Invoice Number | Federal Tax ID | Page |
|---|---|---|---|---|
| 283095531 | 01/06/2025 | 121664546 | 52-2134617 | 2 of 2 |

**COSTAR SUITE**

| SITE ADDRESS | SUBMARKET | CONTRACT # | BILLING PERIOD | SUBTOTAL | TAX | AMOUNT |
|---|---|---|---|---|---|---|
| 800 Red Mills Rd, Wallkill, NY, 12589 | | 1192600 | 01/01/2025 to 01/31/2025 | 925.00 | 74.00 | 999.00 |
| | | **CoStar Suite** | | **925.00** | **74.00** | **999.00** |

| | | | |
|---|---|---|---|
| **Current Invoice Total (USD):** | **925.00** | **74.00** | **999.00** |

0000001216645460000099900

Invoice



501 S 5th Street
Richmond, VA 23219

| | |
|---|---|
| Invoice Number | 121765598 |
| Account #/Location ID | 283095531 |
| Invoice Date | 02/05/2025 |
| CoStar Federal Tax ID | 52-2134617 |
| Payment Terms | Net 30 |
| Due Date | 03/07/2025 |
| Service Period | 02/01/2025 to 02/28/2025 |
| | |
| **Invoice Amount** | **USD 999.00** |

LOLONYON AKOUETE
SMART INVESTORS LLC
800 RED MILLS RD
WALLKILL, NY 12589

Pay by credit card or checking account online by registering at **CoStar.BillTrust.com**

Use your personalized **Enrollment Token** below.

## CURRENT INVOICE See the following page(s) for detail

| | |
|---|---|
| CoStar Suite | USD 925.00 |
| Sub-Total | USD 925.00 |
| Tax | USD 74.00 |
| **Current Invoice Total** | **USD 999.00** |

For questions about your bill, please call us at 800-894-4720.
Email: Billing@costar.com
Please ensure that your account is kept current to avoid an interruption of service.
Office Hours: Monday - Friday 9:00 AM - 8:00 PM EST

TEAR HERE **REMITTANCE DOCUMENT - Please Include With Your Payment** TEAR HERE

Account #/Location ID: 283095531

LOLONYON AKOUETE
SMART INVESTORS LLC
800 RED MILLS RD
WALLKILL, NY 12589

| | |
|---|---|
| Invoice Number: | 121765598 |
| Invoice Date: | 02/05/2025 |
| Payment Due Date: | 03/07/2025 |
| Current Invoice Amount: | USD 999.00 |
| Total Balance: | USD 999.00 |
| **Amount Enclosed:** | |

**REMITTANCE INSTRUCTIONS**

**Make EFT and Credit Card payments online:**

Log on to costar.billtrust.com
Use enrollment token SFW HQF DFB

**Make Checks Payable and Send To:**

COSTAR REALTY INFORMATION, INC.
2563 Collection Center Dr
Chicago, IL 60693

00000012176559800000099900

| Account #/Location ID | Invoice Date | Invoice Number | Federal Tax ID | Page |
|---|---|---|---|---|
| 283095531 | 02/05/2025 | 121765598 | 52-2134617 | 2 of 2 |

**COSTAR SUITE**

| SITE ADDRESS | SUBMARKET | CONTRACT # | BILLING PERIOD | SUBTOTAL | TAX | AMOUNT |
|---|---|---|---|---|---|---|
| 800 Red Mills Rd, Wallkill, NY, 12589 | | 1192600 | 02/01/2025 to 02/28/2025 | 925.00 | 74.00 | 999.00 |
| | | **CoStar Suite** | | **925.00** | **74.00** | **999.00** |

| | | | |
|---|---|---|---|
| **Current Invoice Total (USD):** | **925.00** | **74.00** | **999.00** |

0000001217655980000099900

CERTIFICATE OF SERVICE

I, Lolonyon Akouete, hereby certify that the above document is served by email and mailing a copy of the same, first-class mail, to the following:

Stephen F. Gordon, Attorney of the Petitioners
(Email: sgordon@gordonfirm.com)
The Gordon Law Firm LLP
River Place 57 River Street Wellesley, MA 02481

Scott A. Schlager on behalf of,
Nathanson & Goldberg, P.C., a creditor.
(Email: sas@natgolaw.com)
183 State Street, 5th Floor Boston, MA 02109

Assistant U.S. Trustee
Richard King
Office of US. Trustee
446 Main Street 14th Floor
Worcester, MA 01608
USTPRegion01.WO.ECF@USDOJ.GOV

Jonathan R. Goldsmith
Chapter 7 Trustee
trusteedocs1@gkalawfirm.com
Goldsmith, Katz & Argenio P.C.
1350 Main Street, 15th Floor.
Springfield, MA 01103

Dyann Blaine
20 Queensbrook Place
Orinda, CA 94563
dyann.blaine@gmail.com

Jan Blaustein Scholes
7501 E Thompson Peak Pkwy
Scottsdale, AZ 85255
jan.scholes2@gmail.com

Mark S. Lichtenstein
AKERMAN LLP
1251 Avenue of the Americas, 37th Flr.
New York, New York 10020
mark.lichtenstein@akerman.com

Paul W. Carey, Attorney of Creditor
FERRIS DEVELOPMENT GROUP, LLC
(Email: pcarey@mirickoconnell.com)
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street, Worcester, MA 01608

Brian W. Riley, Attorney of Creditor
Jeffrey T. Blake, Attorney of Creditor
Roger L. Smerage, Attorney of Creditor
TOWN OF WESTBOROUGH
(Email: briley@k-plaw.com)
(Email: jblake@k-plaw.com)
(Email: rsmerage@k-plaw.com)
KP Law, P.C. 101 Arch Street,
12th Floor Boston, MA 02110

Gary M Ronan
David M Abromowitz
Goulston&storrs
GRonan@goulstonstorrs.com
DAbromowitz@goulstonstorrs.com
400 Atlantic Avenue
Boston, MA 02110

Peter Blaustein
950 Vista Road
Hillsborough, CA 94010
pblaustein@gmail.com

Walter Horst
Babcock & Brown
1264 Rimer Drive
Moraga, CA 94556
walter.horst@babcockbrown.com

Samual A. Miller, Esq.
AKERMAN LLP
420 South Orange Avenue
Suite 1200
Orlando, FL 32801
samual.miller@akerman.com
sharlene.harrison-carera@akerman.com

Lolonyon Y Akouete

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

**TRUSTEE'S OBJECTION TO AKOUETE'S MOTIONS**
**SEEKING RELIEF UNDER FED. R. CIV. P. 56(d)**
**(Responding to Dkt. Nos. 1074 and 1083)**

Jonathan R. Goldsmith (the "Trustee"), Chapter 7 Trustee of the bankruptcy estate (the "Estate") of Westborough SPE LLC (the "Debtor"), hereby objects (the "Objection") to *Creditor Lolonyon Akouete's Rule 56(d) Motion for Entry of a Narrow Order Directing the Internal Revenue Service to Release Forms SS-4 and 8822-B* [Dkt. No. 1074] (the "First Rule 56(d) Motion") and *Creditor Lolonyon Akouete's Emergency Motion for Relief Under Fed. R. Civ. P. 56(d)* [Dkt. No. 1083] (the "Second Rule 56(d) Motion"; together with the First Rule 56(d) Motion, the "Rule 56(d) Motions") filed by Lolonyon Akouete ("Akouete").

As set forth below, the Trustee objects to the Rule 56(d) Motions because (i) the information purportedly sought "is unlikely to garner useful evidence" related to the Contested Matter (as defined below), (ii) Akouete clearly seeks to engage in the quintessential "fishing expedition" and, as such, relief should be denied, (iii) Akouete's request is too "late in the process," discovery having closed more than nine (9) months ago regarding the Contested Matter (as defined below), and (iv) as to the First Rule 56(d) Motion, "a direct order to a federal agency to release discrete administrative records" is not the type of "other appropriate order" contemplated by Rule 56(d).

In support of this Opposition, the Trustee states as follows:

## FACTUAL BACKGROUND

1. Akouete currently has pending before this Court certain claims in which he alleges that he was appointed the manager of the Debtor prior to the Petition Date pursuant to the Disputed Appointment Documents[1] and, further, Akouete alleges that by virtue of that "appointment", he is entitled to a claim totaling approximately $3.1 million. *See* Claim No. 4.1, 4.2 and 4.3 (collectively, the "Akouete Claim").

2. The Trustee objected to the Akouete Claim (*see* Dkt. Nos. 462 and 544), disputes the validity, relevance, and effectiveness of the Disputed Appointment Documents, and disputes that the Akouete Claim is allowable.

3. The allowability of the of Akouete Claim is currently the subject of a contested matter before this Court (the "Contested Matter").

4. This Court has issued numerous procedural orders regarding the Contested Matter [*See* Dkt. Nos. 540, 595, 646]. Ultimately, the procedural orders established a deadline of April 7, 2025 for the completion of discovery and a deadline of May 31, 2025 for filing motions for summary judgment. To be clear, discovery closed regarding the Contested Matter more than nine (9) months ago.

5. More than seven (7) months ago, the Trustee timely requested disallowance of the Akouete Claim at summary judgment as set forth in detail in the Trustee's Motion for Summary Judgment inclusive of all documents submitted therewith. *See* Dkt. Nos. 736, 737, 739, 740, 741, 742, 743, 744, and 791 (collectively, the "Trustee's Summary Judgment Materials"). Again,

[1] The term "Disputed Appointment Documents" as used herein has the meaning ascribed in the Memorandum of Law in Support of Trustee's Motion for Summary Judgment [Dkt. No. 737, at footnote 5]. In addition, all other capitalized terms not otherwise defined herein hall have the meanings as ascribed in the Memorandum of Law in Support of Trustee's Motion for Summary Judgment [Dkt. No. 737].

Case 1:26-cv-10037-WGY Document 13-4 Filed 02/11/26 Page 818 of 840

Akouete has been aware of the basis of the Trustee's request for summary judgment for more than (7) months.

6. Allowance of Akouete's Claim requires that the Disputed Appointment Documents be valid, authorized, and enforceable. The Disputed Appointment Documents are the basis for Akouete's assertion that he "is the manager of the Debtor" and Akouete further asserts that, as manager, he is entitled to direct the Debtor to pay his Claim in the amount that he desires. Akouete further asserts that each of the Disputed Appointment Documents was executed by Ms. Scholes in the following specific purported capacities, on the dates noted:

**Basis of Akouete Claim / Disputed Appointment Documents**

| | |
|---|---|
| Bill of Sale | Ms. Scholes purportedly executed for the Debtor as its President **in November of 2022** |
| Power of Attorney | Ms. Scholes purportedly executed for BB Parallel as its Manager **in June of 2023** |
| Manager Consent | Ms. Scholes purportedly executed for BB Parallel as its Manager **in June of 2023** |

**Basis of Trustee's Summary Judgment Motion**

7. The Trustee's Summary Judgment Materials establish multiple facts which Akouete is unable to rebut and which the Trustee contends must result in the denial of Akouete's Claim at summary judgment. Without limitation, the Trustee has submitted evidence which Akouete cannot rebut as to the following:

a. Ms. Scholes herself (i.e., individually) never had any authority as manager of the Debtor because (the entity ultimately known as) BBAS LLC was the manager of the Debtor (not Ms. Scholes individually). Dkt. No. 739, SOF ¶¶ 45-48.

b. As set forth in the Affidavit of Walter Horst dated February 11, 2025 ("Horst Aff. I"), "Ms. Scholes resigned from all of her officer

positions with B&B[2] as of October 1, 2007 and, since that date, she has had no actual authority to act for or represent B&B, its affiliates, or any customer of B&B." Dkt. No. 742, Horst Aff. I, ¶ 6.

c. Akouete acknowledged in a pleading filed with the Land Court that Ms. Scholes suffered a stroke in 2004, that she deteriorated physically and mentally, and that she retired from BBAS in 2007. Dkt. No. 739, SOF ¶ 70.

d. In October of 2007, BBAS adopted a resolution which recognized the resignation of Ms. Scholes as President and Vice President effective as of October 1, 2007. Dkt. No. 743, Horst Aff II, ¶ 2.

e. Ms. Scholes never served as a manager of BB Parallel nor did she ever serve as an officer, director, or employee of BB Parallel. Dkt. 742, Horst Aff. I, ¶¶ 11-12.

f. BBAS resigned as manager of the Debtor as of August 2011 and no party in interest has disputed that resignation at any time since. Dkt. No. 739, SOF ¶¶ 53-56 and 72-75.

g. Ms. Scholes was adjudicated incompetent in 2019, and her son was appointed as her guardian and conservator. Dkt. No. 739, SOF ¶¶ 65-68.

h. Ms. Scholes's conservator/guardian did not authorize the execution of the Disputed Appointment Documents. Dkt. No. 739, SOF ¶¶ 87-88.

8. In sum, the Trustee has demonstrated that the Disputed Appointment Documents provided Akouete with no authority to act for the Debtor in any capacity. Further, and quite shockingly, (i) *Akouete knew* that Ms. Scholes had suffered a stroke in 2004, that she deteriorated physically and mentally, and that she retired from BBAS in 2007 [Dkt. No. 739, SOF ¶ 70] and (ii) *Akouete knew* that Ms. Scholes was adjudicated incompetent in 2019, and that her son was appointed as her guardian and conservator [Dkt. No. 739].

9. At this late stage of the summary judgment process (i.e., more than nine (9) months after the close of discovery and more than seven (7) months after the Trustee filed the

[2] In the Horst Aff. I, the term "B&B" is defined as "Babcock & Brown Holdings, Inc. and Babcock & Brown International Pty. Ltd. and their current and former subsidiaries."

Trustee's Summary Judgment Materials), Akouete now seeks relief though the Rule 56(d) Motions as follows:

a. First Rule 56(d) Motion: Regarding both Mignonette Investment Limited (the Debtor's sole member) and regarding the Debtor, Akouete requests that this Court direct the Internal Revenue Service (the "IRS") to produce (i) Form SS-4s (application for employer identification number), Forms 8822-B (change of address or responsible party forms), and (iii) "any IRS material transcript reflecting responsible party designation and effective dates, to the extent customarily maintained)."

b. Second Rule 56(d) Motion: Akouete requests that this Court reopen discovery to allow Akouete to seek from the Massachusetts Department of Revenue ("MDOR") and from the Trustee and his professionals (i) Form 355 signature pages and signer identifying portions for the relevant tax years and (ii) Form M-2848 Power of Attorney filings/records.

**ARGUMENT**

**A. Standard for Obtaining Relief Under Rule 56(d).**

10. The First Circuit has made clear that relief under Rule 56(d) "is not to be granted as a matter of course." *Hicks v. Johnson*, 755 F.3d 738, 743 (1st Cir. 2014), *citing Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 91 (1st Cir. 1996). Further, this Circuit has ruled that use of Rule 56(d) (formerly Rule 56(f)) "requires due diligence *both* in pursuing discovery *before* the summary judgment initiative surfaces *and* in pursuing an extension of time thereafter. In other words, Rule 56[d] is designed to minister to the vigilant, not to those who slumber upon perceptible rights." *Ayala-Gerena*, 95 F.3d at 92, *citing Resolution Trust Corp. v. North Bridge Assoc.*, 22 F.3d 1198, 1203 (1st Cir. 1991). In addition, the First Circuit instructs that,

> [t]o benefit from the protections of Rule 56[d], a litigant ordinarily must furnish the *nisi prius* court with a timely statement -- if not by affidavit, then in some other authoritative manner -- that (i) explains his or her current inability to adduce the facts essential to filing an opposition, (ii) provides a plausible basis for believing that the sought-after facts can be assembled within a reasonable time, and (iii) indicates how those facts would influence the outcome of the pending summary judgment motion.

> *Hicks v. Johnson*, 755 F. 3d 738, 743 (1st Cir. 2014) (internal citations omitted).

The First Circuit further advises that a court "is entitled to refuse a Rule 56(d) motion if [the court] concludes that the party opposing summary judgment is unlikely to garner useful evidence from supplemental discovery." *Id.*

11. As discussed below, Akouete's Rule 56(d) Motions should be denied for multiple reasons.

**B. Information Sought Not Likely to "Garner Useful Evidence".**

12. First, Mignonette has no relevance to the Disputed Appointment Documents. Mignonette is not mentioned in the Disputed Appointment Documents, no one executed the Disputed Appointment Documents on behalf of Mignonette, and any documents signed by Mignonette (for taxing authorities or otherwise) are not relevant to the Disputed Appointment Documents. Mignonette's tax documents are not relevant to Ms. Scholes' resignation from all of the B&B Entities, or to the resignation of BBAS as manager of the Debtor, or to Ms. Scholes' lack of capacity due to the guardianship/conservatorship established in 2019. As such, information in the possession of the IRS regarding Mignonette is not likely to "garner useful evidence" and discovery should not be reopened in the Contested Matter for that purpose.

13. Second, the Disputed Appointment Documents are dated November of 2022 *or later*. Akouete now seeks dated and historical information regarding initial submissions made by the Debtor to the IRS (i.e. Form SS-4) as well as Forms 8822-B (change of address or responsible party forms), and "any IRS material transcript reflecting responsible party designation and effective dates, to the extent customarily maintained)". Whether Ms. Scholes signed any SS-4 in 1997 is certainly not relevant to whether Ms. Scholes had authority to act for BB Parallel in 2023 (as the Disputed Appointment Documents purport to do). Whether the

Debtor subsequently changed its address or otherwise updated the information provided on the original Form SS-4 is not relevant to the Disputed Authority Documents or to the other arguments made by the Trustee in the Summary Judgment Materials. The date of the Debtor's Form SS-4 necessarily pre-dates Ms. Scholes' resignation from all of the B&B Entities (in 2007), pre-dates the resignation of BBAS as manager of the Debtor (in 2011), and pre-dates the guardianship/conservatorship established over Ms. Scholes (in 2019). As such, information in the possession of the IRS regarding Mignonette is not likely to "garner useful evidence" and discovery should not be reopened in the Contested Matter for that purpose. Further, Forms 8822-B (change of address or responsible party forms), and "any IRS material transcript reflecting responsible party designation and effective dates, to the extent customarily maintained)" are similarly not relevant to the arguments made by the Trustee at summary judgment.

14. Third, Akouete's purported basis for seeking documents from the MDOR is based on records attached to the Second Rule 56(d) Motion all of which are dated between 1999 and 2004. Again, those records pre-date Ms. Scholes' resignation from all of the B&B Entities. Those records pre-date the resignation of BBAS as manager of the Debtor. Further, those records will not "garner useful evidence" as to Ms. Scholes' purported execution of the Disputed Appointment Documents *on behalf of BB Parallel.*

15. Fourth, the declarations submitted by Akouete are insufficient because (without limitation) they fail to indicate "how those facts would influence the outcome of the pending summary judgment motion." *See Hicks v. Johnson*, 755 F. 3d at 743. Although Akouete attached declarations to the Rule 56(d) Motions, the declarations fail to demonstrate the relevance of the information sought. The information sought would have no relevance to BB Parallel, the entity which purportedly delegated authority to Akouete to manage the Debtor. Nothing in the

declarations has any tie to BB Parallel. Further, upon Ms. Scholes' resignation from all B&B Entities, the Debtor may have been required to file a Form 8822-B, but in the event that the Debtor failed to do so, the Debtor's failure would not result in continuing authority for Ms. Scholes to act for the Debtor (or for any other entity from which she resigned).

16. In sum, the information which Akouete seeks to compel from the IRS and subpoena from the MDOR is not likely to garner useful evidence relevant to the arguments made by the Trustee in the Trustee's Summary Judgment Materials. Despite his repeated assertions to the contrary, Akouete seeks to embark on the oft-referenced "fishing expedition" and "Rule 56(d) does not condone a fishing expedition where a plaintiff merely hopes to uncover some possible evidence of unlawful conduct." *See Est. of Usaamah Abdullah Rahim v. Doe*, 51 F.4th 402, 411 (1st Cir. 2022), at footnote 5 (internal citations omitted).

**C. Akouete's Rule 56(d) Motions Should be Denied as Too "Late in the Process".**

17. The Trustee filed the Summary Judgment Materials more than seven (7) months ago. In that time period, Akouete has filed dozens and dozens of pleadings. In that seven (7) month period, Akouete has also requested that this Court shorten deadlines regarding summary judgment (*See* Dkt. No. 664) and Akouete has sought to reopen discovery multiple times (*See* Dkt. No. 764, 820, 827, and 852). Akouete also already previously sought essentially the same relief requested in the First Rule 56(d) Motion (*See* Dkt. No. 827). This Court denied Akouete's motion to reopen discovery and stated in the order denying Akouete's request to reopen discovery "as to the requested subpoena to the IRS, movant does not set out any reason why the discovery could not have been timely served within the discovery period" (*See* Dkt. No. 839).

18. Essentially, Akouete made choices during the discovery process (including spending time trying to shorten deadlines) and he neglected to issue the subpoenas to the IRS and

MDOR. Akouete's regret regarding the discovery he chose to do versus chose not to do is not a satisfactory reason to reopen discovery at this very late juncture. To be clear, however, the Trustee primarily believes that the Rule 56(d) Motions fail in substance as the information sought is not likely to garner useful evidence relevant to the arguments made by the Trustee in the Trustee's Summary Judgment Materials.

**D. Regarding the First Rule 56(d) Motion, Relief Requested is Not Contemplated or Appropriate Under Rule 56(d)**

19. The Trustee believes that the First Rule 56(d) Moton seeks a remedy which is not available to Akouete. Specifically, even if the Court were to grant relief under Rule 56(d), the issuance of an order directing the IRS to produce documents outside of normal discovery rules and procedures (i.e., allowing for objections, opportunities to seek protective orders, etc.), is not appropriate under Fed. R. Civ. P. 56 and the Trustee objects on that basis.

**E. Information Relative to Administration of Estate, Although Unrelated to Contested Matter**

20. As reported by the Trustee at the recent sale hearing, the Trustee has authorized his accountants to interact with the IRS and attached hereto as **Exhibit A** is an Affidavit of Matthew Whitehouse, an accountant with Verdolino & Lowey PC, regarding the status of those efforts.

21. To be clear and for the avoidance of doubt, the Trustee maintains that the information set forth in **Exhibit A** is not relevant to (i) the Contested Matter, (ii) the Disputed Appointment documents, or (iii) any other fact or issue upon which the Trustee's request for summary judgment is based.

22. More specifically, it is simply not relevant whether Ms. Scholes may have submitted the initial SS-4 form to the IRS when the Debtor was formed and it is further

irrelevant whether or not any subsequent party has been named by the Debor to replace Ms. Scholes. It is without question in this case that the Debtor ceased functioning at some point, lost possession of a bank account holding substantial funds, and allowed its valuable real property to be "taken" by the Town of Westborough through a tax title process. That the Debtor also may have failed to update contact information with the IRS would simply not be surprising and, importantly, would provide no useful information regarding the Disputed Appointment Documents or any argument made by the Trustee at summary judgment.

23. Notwithstanding Mr. Whitehouse's affidavit relaying his communications with the IRS, during the discovery process the Trustee received from Mr. Akouete a copy of a letter dated December 9, 2022, from "Denise S Edwards, Owner" to the IRS (the "Edwards Letter"). The Edwards Letter refers to "Denise S. Edwards, Owner; Business Name: Westborough SPE LLC" and appears to be an attempt by Edwards to change the Debtor's address with the IRS and establish herself as the "new responsible party" in the Debtor's records at the IRS. Further, attached to the Edwards Letter was a form 8822-B signed by Denise S. Edwards (now redacted). The Edwards Letter with attachment is attached hereto as **Exhibit B**.

24. It is the Trustee's position that Edwards had no authority to send the Edwards Letter. The Trustee does not know why the IRS representative, when speaking to Mr. Whitehouse, was unaware of the form 8822-B from Edwards. The foregoing, however, is **not relevant** to the Contested Matter or to the Trustee' request for Summary Judgment.

**F. Reservation of Rights**

25. Notwithstanding the Trustee's belief and assertion that the information that Akouete seeks thought the Rule 56(d) Motions is not relevant to the Contested Matter, the

Trustee reserves the right to pursue any and all information from the IRS and the MDOR at any point to the extent that the Trustee believes may be relevant to the administration the Estate.

WHEREFORE, for the foregoing reasons, the Trustee respectfully requests that this Court enter an Order (i) denying the Rule 56(d) Motions and (ii) granting such other and further relief as is just.

Respectfully submitted,

**Jonathan R. Goldsmith,**
**Chapter 7 Trustee**

by his counsel,

/s/ Christine E. Devine
Christine E. Devine, BBO #566990
Angelina M. Savoia, BBO #715690
Nicholson Devine LLC
P.O. Box 7
Medway, MA 02053
Phone: 508-533-7240
Email: christine@nicholsondevine.com

Dated: January 22, 2026

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

**CERTIFICATE OF SERVICE**

The undersigned, Christine E. Devine, hereby certifies that on this day I caused a copy of the following document to be served on all parties listed on the attached Service List in the manner noted thereon:

- **TRUSTEE'S OBJECTION TO AKOUETE'S MOTIONS SEEKING RELIEF UNDER FED. R. CIV. P. 56(d) (Responding to Dkt. Nos. 1074 and 1083).**

Dated: January 22, 2026

/s/ Christine E. Devine
Christine E. Devine, BBO #566990
Nicholson Devine LLC
P.O. Box 7
Medway, MA 02053
Phone: 508-533-7240
Email: christine@nicholsondevine.com

Electronic Mail Notice List

The following list of parties and attorneys have received electronic notice via the Court's CM/ECF noticing process:

- **Jeffrey T Blake** jblake@k-plaw.com
- **Paul W. Carey** pcarey@miricklaw.com, bankrupt@mirickoconnell.com
- **Luis R. Casas** luis.casasmeyer@akerman.com
- **Jose C. Centeio** jc@jcfirm.com
- **Brian Charville** bcharville@ferrisdevelopment.com
- **Christine E. Devine** christine@nicholsondevine.com, devine.christiner109603@notify.bestcase.com;angelina@nicholsondevine.com;christine_492@ecf.courtdrive.com
- **Jonathan R. Goldsmith** bankrdocs1@gkalawfirm.com, bankrdocs@gkalawfirm.com;intern@gkalawfirm.com;Esq..JonathanR.G.B145355@notify.bestcase.com
- **Jonathan R. Goldsmith** trusteedocs1@gkalawfirm.com, mwolohan@gkalawfirm.com;mew@efclaw.com;trusteedocs@gkalawfirm.com;intern@gkalawfirm.com;MA43@ecfcbis.com
- **Stephen F. Gordon** sgordon@gordonfirm.com, vhaggerty@gordonfirm.com;notices@gordonfirm.com;stephenfgordon@gmail.com
- **Richard King** USTPRegion01.WO.ECF@USDOJ.GOV
- **Brian Lee** blee@nutter.com
- **Samual A. Miller** samual.miller@akerman.com
- **Brian W. Riley** briley@k-plaw.com
- **Douglas B. Rosner** drosner@goulstonstorrs.com
- **Angelina M. Savoia** angelina@nicholsondevine.com, angelina@ecf.courtdrive.com
- **Roger L. Smerage** rsmerage@k-plaw.com

Email List

The following list of parties and attorneys have been served via as noted:

Lolonyon Akouete Via Email
800 Red Mills Rd
Wallkill, NY 12589
info@smartinvestorsllc.com

Denise Edwards Via Email
137 North 25th Street
Wyandanch, NY 11798
deniseedwards818@yahoo.com

Case 4:26-cv-10037-MRG Document 13-4 Filed 02/21/26 Page 83 of 840
Document Page 15 of 25

Mark S. Lichtenstein Via Email
Akerman LLP
1251 Avenue of the Americas
37th Floor
New York, NY 10020
mark.lichtenstein@akerman.com

Lenard Benson Zide, Esq.
Butters Brazilian LLP Via Email
420 Boylston Street, 4th Floor
Boston, MA 02116
zide@buttersbrazilian.com

Jonathan La Liberte Via Email
Sherin and Lodgen LLP
101 Federal Street, 30th Floor
Boston, MA 02110
jclaliberte@sherin.com

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:**<br><br>**WESTBOROUGH SPE LLC,**<br><br>**Debtor.** | **Chapter 7**<br>**Case No. 23-40709-CJP** |

**AFFIDAVIT OF MATTHEW WHITEHOUSE, MSA, EA**

I, Matthew Whitehouse (the "Mr. Whitehouse"), hereby depose and state upon my own personal knowledge:

1. I am an accountant with the firm Verdolino & Lowey PC ("VLPC"). I have worked as an accountant with VLPC for approximately seventeen years. I have a degree in accounting from the University of Rhode Island – College of Business and Administration.

2. VLPC has been engaged by the Trustee as its accountant in the above-captioned bankruptcy case.

3. The Trustee provided VLPC with a power of attorney which authorized me, among others, to engage in discussions with the Internal Revenue Service ("IRS") on behalf of the Trustee regarding the Debtor.

4. I have engaged in discussions with the IRS regarding the Debtor and a representative of the IRS informed me that:

   a. There is no record of tax returns having been filed by the Debtor.

   b. There is no record of Form 941 filings on behalf of the Debtor.

   c. No change of address form has been filed regarding the Debtor.

d. There is no record of the Debtor having filed with the IRS a Form 8832 or a Form 2553.

e. The IRS received 1099-INT Forms regarding the Debtor through 2022. The IRS provided me with masked copies of those 1099-INT Forms for the period of 2015 through 2022 and I provided those to the Trustee.

f. The address of the Debtor noted the 1099-INT Forms is marked as "undeliverable."

g. The IRS received a 2024 Form 1120 extension form, however, the IRS will not accept that form due to incorrect filing status.

5. I also contacted the IRS Business & Specialty Tax Line and a representative informed me that that division of the IRS does not retain copies of filed Forms SS-4 or 8822-B.

6. The representative of the IRS Business & Specialty Tax Line informed me that copies of Forms SS-4 and Forms 8822-B might be housed at the "IRS Entity Department", but the representative was unable to put me in contact with that department as it has no direct phone number.

7. The representative of the IRS business & Specialty Tax Line provided me with an EIN verification letter, a copy of which is attached hereto as **Schedule 1**.

*[Signature Page Follows]*

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated: January 21, 2026

Matthew Whitehouse
Matthew Whitehouse

# Schedule 1

**Department of the Treasury**
**Internal Revenue Service**
**2385 CHAMBLEE TUCKER ROAD**
**CHAMBLEE, GA, 30341**

In reply refer to: 0245118589
12/10/2025 LTR 147C

WESTBOROUGH SPE LLC A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 # 1051
NORTH BABYLON, NY 11703-3114-018

Employer Identification Number: [redacted]6768

Dear Taxpayer:

Thank you for your inquiry of 12/10/2025.

Your Employer Identification Number (EIN) is [redacted]6768.
Please keep this letter in your permanent records. Enter your name and your EIN on all business federal tax forms and on related correspondence.

If you have any questions regarding this letter, you can call 1-800-829-0115. If you prefer, you may write to us at the address shown at the top of the first page of this letter. When you write, please include a telephone number where you may be reached and the best time to call.

Sincerely,

MS. FLETCHER
1005642911
CSR

# Exhibit B

INTERNAL REVENUE SERVICES

12/09/2022

TAXPAYER ASSISTANCE CENTER

333 WEST PERSHING RD

MAILSTOP 6055 S -2

KANSAS CITY, MO 64108

DENISE S EDWARDS, OWNER

BUSINESS NAME: WESTBOROUGH SPE LLC

EIN: [redacted]6768

NEW BUSINESS ADDRESS: 1241 DEER PARK AVE, SUITE 1 # 1051, NORTH BABYLON, NEW YORK 11703.

OLD ADDRESS WAS: 2 HARRISON STREET, 6TH FLOOR, SAN FRANCISCO, CA 94105

HELLO, STAFF

I WOULD LIKE TO REQUEST THAT WESTBOROUGH SPE LLC ENTITY TYPE BE CHANGED TO A SINGLE MEMBER LLC.

I WOULD ALSO LIKE TO REQUEST 147C -WHICH IS ATTACHED WITH THIS LETTER BE REGISTRATED OR RECORDED.

THANK YOU SO MUCH FOR YOUR TIME AND ENERGY WITH THIS MATTER.

SINCERELY

Denise S Edwards

DENISE S EDWARDS

Form **8822-B** (Rev. December 2019) Department of the Treasury Internal Revenue Service

# Change of Address or Responsible Party — Business

▶ Please type or print.
▶ See instructions on back. ▶ Do not attach this form to your return.
▶ Go to *www.irs.gov/Form8822B* for the latest information.

OMB No. 1545-1163

**Before you begin:** If you are also changing your home address, use Form 8822 to report that change.

If you are a tax-exempt organization (see instructions), check here ☐

Check all boxes this change affects.

1 ☐ Employment, excise, income, and other business returns (Forms 720, 940, 941, 990, 1041, 1065, 1120, etc.)

2 ☐ Employee plan returns (Forms 5500, 5500-EZ, etc.)

3 ☐ Business location

**4a Business name**
WESTBOROUGH SPE LLC

**4b Employer identification number**
[redacted]6768

**5 Old mailing address** (no., street, room or suite no., city or town, state, and ZIP code). If a P.O. box, see instructions. If foreign address, also complete spaces below, see instructions.
2 Harrison Street, 6TH Floor, SAN FRANCISCO, CA 94105

Foreign country name | Foreign province/county | Foreign postal code

**6 New mailing address** (no., street, room or suite no., city or town, state, and ZIP code). If a P.O. box, see instructions. If foreign address, also complete spaces below, see instructions.
1241 Deer PARK AVE, SUITE 1 #1051, NORTH Babylon, NY 11703

Foreign country name | Foreign province/county | Foreign postal code

**7 New business location** (no., street, room or suite no., city or town, state, and ZIP code). If a foreign address, also complete spaces below, see instructions.

Foreign country name | Foreign province/county | Foreign postal code

**8 New responsible party's name**
Denise Edwards

**9 New responsible party's SSN, ITIN, or EIN. (CAUTION: YOU MUST REFER TO THE INSTRUCTIONS FOR FORM SS-4 TO SEE WHO MAY USE AN EIN.)**
[redacted]

**10 Signature.** Under penalties of perjury, I declare that I have examined this application, and to the best of my knowledge and belief, it is true, correct, and complete.

Daytime telephone number of person to contact (optional) ▶

**Sign Here**
▶ Denise S Edwards — Signature of owner, officer, or representative — Date 12/09/2022
▶ Owner — Title

## Where To File

Send this form to the address shown here that applies to you.

| IF your old business address was in . . . | THEN use this address . . . |
|---|---|
| Connecticut, Delaware, District of Columbia, Georgia, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, Virginia, West Virginia, Wisconsin | Internal Revenue Service Kansas City, MO 64999 |
| Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Hawaii, Idaho, Iowa, Kansas, Louisiana, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, Wyoming, any place outside the United States | Internal Revenue Service Ogden, UT 84201-0023 |

**For Privacy Act and Paperwork Reduction Act Notice, see back of form.** Cat. No. 57465H Form **8822-B** (Rev. 12-2019)

UNITED STATES POSTAL SERVICE.

WHEATLEY HEIGHTS
6 COLONIAL SPRINGS RD
WYANDANCH, NY 11798-1075
(800)275-8777

12/09/2022 04:15 PM

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| PM Express 1-Day Flat Rate Env | 1 | | $27.90 |
| Kansas City, MO 64108<br>Flat Rate<br>Signature Requested<br>Scheduled Delivery Date<br>Sat 12/10/2022 06:00 PM<br>Money Back Guarantee<br>Tracking #:<br>EI101976188US | | | |
| Insurance<br>Up to $100.00 included | | | $0.00 |
| Return Receipt<br>Tracking #:<br>9590 9402 6578 1028 2892 82 | | | $3.25 |
| Total | | | $31.15 |

Grand Total: $31.15

Cash $40.00
Change -$8.85

Save this receipt as evidence of insurance. For information on filing an